# EXHIBIT B
## Class Action Complaint

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| VANESSA C. GRANGER, BEVERLY KRISTINA MILLER, and LILYA J. MCATEE, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> GREAT PLAINS LENDING, LLC, KENNETH E. REES, VICTORY PARK CAPITAL ADVISORS, LLC, VICTORY PARK MANAGEMENT, LLC, GPL SERVICING, LTD., GPL SERVICING AGENT, LLC, GPL SERVICING TRUST, GPL SERVICING TRUST II, HAYNES INVESTMENTS, LLC, SEQUOIA CAPITAL OPERATIONS, LLC, SEQUOIA CAPITAL FRANCHISE PARTNERS, L.P., SEQUOIA CAPITAL IC, L.P., SEQUOIA CAPITAL ENTREPRENEURS ANNEX FUND, L.P., SEQUOIA CAPITAL GROWTH FUND III, L.P., SEQUOIA CAPITAL GROWTH III PRINCIPALS FUND, LLC, SEQUOIA CAPITAL FRANCHISE FUND, L.P., SEQUOIA CAPITAL GROWTH PARTNERS III, L.P., TECHNOLOGY CROSSOVER VENTURES, TCV V L.P., TCV MEMBER FUND L.P., TECHNOLOGY CROSSOVER MANAGEMENT V LLC, and JOHN DOES 1-50, <br><br> Defendants. | _____ Civ. _____ (___) |

## CLASS ACTION COMPLAINT

1

Plaintiffs Vanessa C. Granger, Beverly Kristina Miller, and Lilya J. McAtee (collectively, "Plaintiffs"), by and through their attorneys, on behalf of themselves and the Class defined below, allege the following based on the research of counsel, publicly available articles, reports, and other sources, a reasonable inquiry under the circumstances, and upon information and belief, except for those allegations that pertain to Plaintiffs, which are based on their personal knowledge:

## I.    INTRODUCTION

1.    This action is brought on behalf of individuals who have been victimized by an unlawful, predatory online lending scheme involving an entity called Great Plains Lending ("Great Plains"), defined herein.  Great Plains was created in a brazen attempt by Defendant Kenneth E. Rees ("Rees") and Think Finance, Inc. (along with various corporate alter-egos and affiliates, "Think Finance") to circumvent state and federal laws that protect American consumers from extortionate interest rates.

2.    Additional Defendants (defined below) are entities who conspired with Defendant Rees and Think Finance to enable and facilitate the unlawful Great Plains online lending scheme and/or managed or controlled the affairs of the unlawful lending enterprise, referred to herein as the "Great Plains Enterprise" (defined below).  Details of Defendants' extensive involvement in the Great Plains Enterprise have recently been revealed in documents filed in connection with: (a) litigation brought by the Pennsylvania Attorney General against Victory Park Capital Advisors, LLC, Think Finance, Rees, and others, *Commonwealth of Pa. v. Think Finance, Inc., et al.*, No. 2:14-cv-07139-JCJ (E.D. Pa.) ("the Pennsylvania AG Action"); (b) litigation filed in the U.S. District Court for the

Southern District of New York against Think Finance by a financial advisory firm, *Marlin & Associates Holding LLC v. Think Finance, Inc.*, No. 1:17-cv-04977- RWS (S.D.N.Y.) (the "Marlin Action"); and (c) Chapter 11 bankruptcy proceedings involving Think Finance and related entities in the Northern District of Texas, *In re: Think Finance, LLC, et al.*, No. 17-33964-hdh11 (Bankr. N.D. Tex.) (the "Think Finance Bankruptcy").

3.     The unlawful online payday lending scheme that ensnared Plaintiffs and members of the Class is a prime example of what is known as a "rent-a-tribe" lending operation.  In "rent-a-tribe" schemes, payday lenders attempt to circumvent state and federal law by issuing high interest loans in the name of a Native American tribal business entity that purports to be shielded by the principle of tribal sovereign immunity.  As alleged herein, however, the tribal lending entity is nothing but a front for the illegal lending scheme; all substantive aspects of the payday lending operation (*e.g.*, financial backing, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections) are performed by individuals and entities that are unaffiliated with the Native American tribe.  In exchange for "renting" its sovereign immunity to the individuals and entities running the payday lending scheme, the cooperating Native American tribe receives a small percentage of the revenues generated.

4.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct.  On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted two individuals responsible for running a network of tribal lending operations, Scott Tucker and Timothy Muir, on all fourteen felony counts brought against them.  In

3

that case, *United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y) (the "Tucker Criminal Matter"), Tucker and Muir were convicted of, among other things, multiple counts involving participation in a $3.5 billion Racketeer Influenced and Corruptions Act ("RICO") enterprise through the collection of unlawful debts.[1]  While the particular individuals and Native American entities at the heart of the Tucker Criminal Matter are different from the Defendants and other interested parties here, the underlying scheme in the Tucker Criminal Matter is substantially identical to what Plaintiffs allege herein: payday lenders taking advantage of people by charging unlawfully high, triple digit interest rates through sham entities that purport to be operated by Native American tribes but, in reality, are controlled by non-tribal individuals and entities that control and manage all substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation.

5.    The unlawful "rent-a-tribe" online payday lending model, including the enterprise alleged herein, exploits the financial vulnerability of people who find themselves with an urgent need for cash, generating enormous profits for payday lenders and their financial backers, which include hedge funds, private equity funds, and venture capital investors.

---

[1] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017) (available at https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial-35-billion-unlawful-internet-payday).

4

## II.   PARTIES

### A.   PLAINTIFFS

6.     Vanessa C. Granger is a citizen of North Carolina and resides within this judicial district. Ms. Granger took out two loans in the name of Great Plains. On December 2, 2015, Ms. Granger took out a loan in the amount of $900 with an annual interest rate of 347.43%. On January 13, 2017, Ms. Granger took out a loan in the amount of $1,200 with an annual interest rate of 288.21%.

7.     Beverly Kristina Miller is a citizen of Texas. Ms. Miller has taken out four loans in the name of Great Plains. On July 26, 2013, Ms. Miller took out a loan in the amount of $100 with an annual interest rate of 448.73%. On November 18, 2013, Ms. Miller took out a loan in the amount of $800 with an annual interest rate of 398.91%. On December 11, 2015, Ms. Miller took out a loan in the amount of $900 with an annual interest rate of 348.09%. On March 3, 2017, Ms. Miller took out a loan in the amount of $500 with an annual interest rate of 328.09%.

8.     Lilya J. McAtee is a citizen of Florida. Ms. McAtee took out two loans in the name of Great Plains. On July 6, 2016, she took out a loan in the amount of $1,200 with an annual interest rate of 274.08%. On March 8, 2017, Ms. McAtee took out a loan in the amount of $1,500 with an annual interest rate of 227.88%.

### B.   DEFENDANTS

9.     Defendant Great Plains Lending, LLC ("Great Plains") purports to be an entity formed under the laws of the Otoe-Missouria Tribe of Indians ("Otoe" or the "Tribe") with a principal place of business located in Red Rock, Oklahoma, which is the

location where the Tribe is headquartered. According to its website (www.greatplainslending.com), Great Plains maintains a mailing address at 1050 East 2nd Street, Box 500, Edmond, Oklahoma 73034. As alleged at ¶¶ 112-119 herein, Great Plains does not operate as an "arm" of the Tribe.

10. Defendant Kenneth E. Rees is the former President, Chief Executive Officer, and Chairman of the Board of Think Finance. He is currently the Chief Executive Officer of Elevate Credit, Inc., an entity spun off from Think Finance in approximately May 2014. At all times relevant to the conduct alleged herein, Rees maintained a controlling interest and operational role in Think Finance. He has personally designed and directed the business activity described in this Complaint. He is a citizen of Texas.

11. Defendant Victory Park Capital Advisors, LLC ("Victory Park") is registered as a limited liability company in Delaware and Massachusetts and maintains a principal place of business located at 227 West Monroe Street, Suite 3900, Chicago, Illinois.

12. Defendant Victory Park Management, LLC ("VP Management") is a Delaware limited liability company with a principal place of business located at 227 West Monroe Street, Suite 3900, Chicago Illinois.

13. Defendant GPL Servicing, Ltd. ("GPLS") is a Cayman Islands exempted company incorporated with limited liability that maintains a principal place of business located at 227 West Monroe Street, Suite 3900, Chicago, Illinois. According to a sworn declaration and a verified adversary proceeding complaint filed in the Think Finance Bankruptcy, Defendant Victory Park established GPLS in 2011 as a vehicle for funding and controlling the loans issued in the name of North American tribal lenders, including

6

Great Plains.  As also described in those sworn documents from the Think Finance Bankruptcy, GPLS is a special purpose entity that has no employees and is completely controlled by Victory Park (directly and/or through certain Victory Park-controlled entities).  During a September 10, 2017 deposition taken in the Think Finance Bankruptcy, Thomas Welch of Victory Park testified that GPLS has no employees and that Scott Zemnick is the sole officer of GPLS.  Mr. Welch further testified that Victory Park had access to GPLS's bank accounts and the ability to transfer funds from those accounts.  As also described in the verified adversary proceeding complaint filed in the Think Finance Bankruptcy, the General Counsel of Victory Park, Scott R. Zemnick, has signed documents as the authorized signatory of the Collateral Agent (defined below).

14.    Defendant GPL Servicing Agent, LLC (the "Collateral Agent") is a Delaware limited liability company that uses the mailing address of 525 West Monroe Street, Chicago Illinois, which is the Chicago address of the law firm Katten Muchin Rosenman LLP ("Katten Muchin"), counsel to Defendants Victory Park and GPLS.  According to a sworn declaration and a verified adversary proceeding complaint filed in the Think Finance Bankruptcy, the Collateral Agent is an affiliate of Victory Park, acts at the direction of Victory Park, and serves as the sole director of GPLS.

15.    Defendant GPL Servicing Trust is a Delaware statutory trust.  According to allegations in a complaint filed by the Pennsylvania Attorney General, GPL Servicing Trust was established by Defendant Victory Park, with an effective date of February 11, 2011, for the purpose of holding ownership interests in loans issued through the unlawful tribal lending scheme described herein.  Defendant GPLS is the sole beneficiary of the trust.

7

16.    Defendant GPL Servicing Trust II is a Delaware statutory trust.  According to allegations in a complaint filed by the Pennsylvania Attorney General, GPL Servicing Trust II was established by Defendant Victory Park with an effective date of May 20, 2011 for the purpose of holding ownership interests in loans issued through the unlawful tribal lending scheme described herein.  Defendant GPLS is the sole beneficiary of the trust.

17.    Defendant Haynes Investments, LLC is a Texas limited liability company that maintains a principal place of business at 7515 Lemmon Ave, Hangar R, Dallas, Texas 75209.   On its website, Defendant Haynes touts that "[o]ur Native American investments have successfully monetized the tribal advantages of sovereignty to enhance yield while substantially reducing risk."  Haynes Investments, LLC is a successor in interest to a now defunct entity called Haynes Investments, Inc.  In a July 1, 2016 Engagement Agreement between Think Finance, Marlin & Associates Holding LLC, and Marlin & Associates Securities LLC, "Haynes Investments or any of its affiliates" is listed as an existing servicer of the unlawful tribal lending scheme described herein, along with Defendant Victory Park.

18.    Defendant Sequoia Capital Operations, LLC ("Sequoia Capital") is a Delaware limited liability company with its principal place of business at 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

19.    Defendant Sequoia Capital Franchise Partners, L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

20.    Defendant Sequoia Capital IC, L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

21.    Defendant Sequoia Capital Entrepreneurs Annex Fund, L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

22.    Defendant Sequoia Capital Growth Fund III, L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

23.    Defendant Sequoia Capital Growth III Principals Fund, LLC is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

24.    Defendant Sequoia Capital Franchise Fund, L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

25.    Defendant Sequoia Capital Growth Partners III L.P. is a member fund of Sequoia Capital whose mailing address is c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

26.    Defendant SCFF Management, LLC is the general partner of Sequoia Capital Franchise Partners, L.P. and Sequoia Capital Franchise Fund, L.P.  The managing members of SCFF Management are Douglas M. Leone, Michael J. Moritz and Mark Stevens of

9

Sequoia Capital.  The mailing address for SCFF Management, LLC is c/o Sequoia Capital

2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

27.    Defendant SC IX.I Management, LLC is the General Partner of Sequoia

Capital IX, L.P. and Sequoia Capital Entrepreneurs Annex Fund, L.P.  The managing

members of SC IX.I Management, LLC are Douglas M. Leone, Michael J. Moritz and

Mark Stevens of Sequoia Capital.  The mailing address for SC IX.I Management, LLC is

c/o Sequoia Capital 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

28.    Defendant SCGF III Management, LLC is the general partner of Sequoia

Capital Growth Partners III, L.P. and Sequoia Capital Growth Fund III, L.P. and is the

managing member of Sequoia Capital Growth III Principals Fund, LLC.  The managing

members of SCGF III Management, LLC are Roelof Botha, James J. Goetz, Douglas M.

Leone and Michael J. Moritz of Sequoia Capital.

29.    Defendants Sequoia Capital Franchise Partners, L.P., Sequoia Capital IC,

L.P., Sequoia Capital Entrepreneurs Annex Fund, L.P., Sequoia Capital Growth Fund III,

L.P., Sequoia Capital Growth III Principals Fund, LLC, Sequoia Capital Franchise Fund,

L.P., and Sequoia Capital Growth Partners III L.P. are collectively referred to herein as the

Sequoia Member Funds.  SCFF Management, LLC, SC IX.I Management, LLC, and SCGF

III Management, LLC are collectively referred to as the Sequoia General Partners. The

Sequoia Member Funds, Sequoia Capital, Sequoia Operations, and the Sequoia General

Partners are collectively referred to herein as the Sequoia Defendants.

30.    Defendant Technology Crossover Ventures ("TCV") is a Delaware corporation with its principal place of business located at 528 Ramona Street, Palo Alto, California, 94301.

31.    Defendant TCV V L.P. is a member fund of TCV whose address is c/o Technology Crossover Ventures, 528 Ramona Street, Palo Alto, California 94301.

32.    Defendant TCV Member Fund, L.P. is a member fund of TCV whose address is c/o Technology Crossover Ventures, 528 Ramona Street, Palo Alto, California 94301.

33.    Defendant Technology Crossover Management V LLC ("TCM V") is the general partner of TCV V L.P. and TCV Member Fund.  TCM V's address is c/o Technology Crossover Ventures, 528 Ramona Street, Palo Alto, California 94301.

34.    Defendants TCV V L.P. and TCV Member Fund, L.P. are collectively referred to herein as the TCV Member Funds.  Defendants TCV, TCV V L.P., TCV Member Fund, L.P., and TCM V are collectively referred to herein as the TCV Defendants.

35.    Defendant John Doe 1 is an entity referred to in UCC filings as Princeton Capital Funding and whose address is 55 Water Street, New York, NY 10041.  According to a July 1, 2016 Engagement Agreement between Think Finance and Marlin & Associates Holding LLC and Marlin & Associates Securities LLC, "Princeton Capital Funding and its affiliates" are described as existing servicers of the unlawful tribal lending scheme alleged herein, along with Defendants Victory Park Capital and Haynes.

36.    Defendant John Doe 2 is an entity that has publicly been referred to as Cortex.  Defendant Think Finance's website describes Cortex as an "online lending platform fueled by our proprietary fintech decision engine."  According to an August 15,

11

2017 Complaint filed in the Marlin Action against Think Finance, as of August 2017, Think Finance was planning on transferring its unlawful tribal lending portfolio to Cortex, and Think Finance's executives had already begun using Cortex email addresses.  Further, according to the Marlin Action, Marlin advised Think Finance on a potential restructuring and a potential future separation of Cortex from Think Finance.

37.    Defendant John Doe 3 is the entity or entities that refinanced the unlawful lending scheme alleged herein after March 31, 2017 when, according to the sworn declaration of Barney Briggs of Think Finance that was submitted in the Think Finance Bankruptcy, Defendant Victory Park ceased funding the scheme through GPLS. According to the Marlin Action and a July 1, 2016 Engagement Agreement between Think Finance and Marlin & Associates Holding LLC and Marlin & Associates Securities LLC, Think Finance engaged Marlin to help find new financing for the unlawful lending scheme alleged herein in anticipation of Defendant Victory Park ceasing its funding of the scheme on March 31, 2017.

38.    Defendant John Doe 4 is an entity formed under the laws of the Cayman Islands that has been publicly referred to as VPC/TF Trust I.  According allegations in a complaint in the Pennsylvania AG Action, VPC/TF Trust I was established by Defendant Victory Park for the purpose of holding ownership interests in some loans issued through the unlawful tribal lending scheme described herein.

39.    Defendant John Doe 5 is the bank or banks that processed ACH transactions in furtherance of the unlawful lending scheme alleged herein.

40.     Defendants John Does 6-50 are individuals and entities whose identities and addresses are presently unknown to Plaintiffs.  In addition to Defendants and the non-defendant interested parties identified herein, the John Doe Defendants provide financial or operational support for the illegal lending scheme described herein.

## C.     NON-DEFENDANT INTERESTED PARTIES

41.     The Tribe is a federally recognized Native American tribe headquartered in Red Rock, Oklahoma.  The Tribe has approximately 3,000 enrolled members, the majority of which live off-reservation, in the state of Oklahoma.

42.     John R. Shotton ("Shotton") is the Chairman of the Otoe Missouria Council of the Tribe and has held that position since 2007.  As the principal leader of the Tribe, Shotton was involved in the Tribe's cooperation with Rees and Think Finance and the steps taken by the Tribe to enable and facilitate the online payday lending scheme through the creation of tribal laws and business entities.  Shotton nominally holds a position in the leadership of Great Plains, having held the title "Secretary/Treasurer" of Great Plains since approximately May 2011.  Shotton's status in the leadership of Great Plains is further demonstrated by his role as a party (or the individual acting on behalf of the Tribe or its entities) in various litigation and enforcement actions concerning the Tribe's involvement in Great Plains.  Recently, in June 2017, the Connecticut Department of Banking imposed a civil penalty of $700,000 against Shotton in connection with unlawful lending by Great Plains and another payday lending entity affiliated with the Tribe in the state of Connecticut.  Shotton is a resident of Oklahoma.

43.    Ted Grant ("Grant") is the Vice-Chairman of the Otoe Missouria Council of the Tribe.  Grant nominally holds a position in the leadership of Great Plains, having held the titles Chief Executive Officer and President of the Board of Directors of Great Plains.

## D.    CHAPTER 11 DEBTORS

44.    Think Finance, LLC is a Delaware limited liability company with a principal place of business located at 5080 Spectrum Drive, Suite 700 West, Addison, Texas 75001. It is the successor to a Delaware corporation called Think Finance, Inc., which was headquartered at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. (Collectively, Think Finance LLC and Think Finance, Inc. are referred to herein as "Think Finance").  Think Finance formerly had the name ThinkCash, Inc.  Its principal place of business is outside the State of North Carolina.  On October 23, 2017, Think Finance LLC filed for Chapter 11 bankruptcy.  Think Finance would have been named as a defendant in this action but for the pendency of the Think Finance Bankruptcy and the dictates of Section 362 of the United States Bankruptcy Code.

45.    TC Loan Service, LLC ("TC Loan") is a Delaware limited company located at 5080 Spectrum Drive, Suite 700 West, Addison, Texas 75001.  It previously maintained a business address at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109.  Its principal place of business is outside the State of North Carolina.  On October 23, 2017, TC Loan filed for Chapter 11 bankruptcy.  TC Loan would have been named as a defendant in this action but for the pendency of the Think Finance Bankruptcy and the dictates of Section 362 of the United States Bankruptcy Code.

46.    TC Decision Sciences, LLC ("TC Decision Sciences") is a Delaware limited liability company located at 5080 Spectrum Drive, Suite 700 West, Addison, Texas 75001. It previously maintained a business address at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109.  Its principal place of business is outside the State of North Carolina. On October 23, 2017, TC Decision Sciences filed for Chapter 11 bankruptcy.  TC Decision would have been named as a defendant in this action but for the pendency of the Think Finance Bankruptcy and the dictates of Section 362 of the United States Bankruptcy Code.

47.    Tailwind Marketing, LLC ("Tailwind Marketing") is a Delaware limited liability company located at 5080 Spectrum Drive, Suite 700 West, Addison, Texas 75001. It previously maintained a business address at 4150 International Plaza, Suite 400, Fort Worth, Texas 76109. On October 23, 2017, Tailwind Marketing filed for Chapter 11 bankruptcy.  Tailwind Marketing would have been named as a defendant in this action but for the pendency of the Think Finance Bankruptcy and the dictates of Section 362 of the United States Bankruptcy Code.

### III.    JURISDICTION AND VENUE

48.    This Court has jurisdiction over this dispute pursuant to 18 U.S.C. § 1965. This Court also has federal question jurisdiction under 28 U.S.C. § 1331, and jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

49.    This Court has personal jurisdiction over Defendants because their activities directed toward the State of North Carolina, conducted both directly and through their alter egos, as alleged herein, give rise to the claims in this action.  This Court also has personal jurisdiction over Defendants under 18 U.S.C. § 1965(b)

50.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965.  Venue is also

proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiff Granger is a resident of

this District and this Division and a substantial part of Plaintiffs' claims occurred in North

Carolina.

## IV.    FACTUAL ALLEGATIONS

### A.    Usury Laws Generally

51.     Prohibitions on usury and other limitations on excessive interest rates can be

traced back to the origins of human civilization, before the concept of money was invented.

According to University of Utah law professor and senior adviser to the Consumer

Financial Protection Bureau ("CFPB"), Christopher Peterson, the ancient Babylonians set

a cap on the amount of grain that could be charged as interest, recognizing the considerable

danger to families from becoming trapped in debt that cannot be repaid.  Professor Peterson

also observed, in a 2012 article published in the Washington & Lee Law Review, that

"[e]arly American leaders held usurious lenders in contempt," and "[a]ll of the thirteen

original American colonies aggressively regulated consumer loans with annual interest rate

caps of between eight and five percent, with six percent being most typical."

52.     While public policy shifts in the twentieth century led to a relaxation of many

state interest rate caps, most states still have strict laws against usury and regulate or

prohibit high interest, short term consumer loans.  In addition, other federal and state laws

protect consumers from excessive interest rates and other predatory lending practices.  The

rationale underpinning these contemporary consumer protection laws parallels the ancient

Babylonians' concern with excessive interest rates: people facing an urgent need for cash

should be protected from lenders who would unfairly take advantage of a person's difficult financial situation and potentially trap that person in crushing debt.

**B.    Usury Law Avoidance Schemes**

53.    Predatory lenders, including "payday" lenders and other unscrupulous individuals and entities, have long sought ways around state interest rate caps and other laws intended to protect Americans from high-interest, short-term loans.[2]  Those efforts took off starting in the 1980s and 1990s, after a handful of states eliminated their interest rate caps.

**1.    The Rent-a-Bank Scheme**

54.    Payday lenders devised a scheme to exploit those few states' permissive laws and make high-interest loans to borrowers throughout the United States at rates far greater than allowed in the borrowers' home states.  That scheme, known in the money lending industry as the "rent-a-bank" model, typically involved a partnership between a payday lender and a federally chartered bank located in a state with no interest rate cap.  While the payday lender or other "non-depository institution" is subject to the laws of the state in which the borrower resides (including that state's interest rate cap), federal preemption allows a federally regulated bank to charge whatever interest rates are permitted in *the bank's* home state.

---

[2] The terms "payday loan" and "payday lender" do not have set definitions.  *See*, *e.g.*, CFPB, *What is a payday loan*, available at https://www.consumerfinance.gov/ask-cfpb/what-is-a-payday-loan-en-1567/.  As used herein, the terms "payday loan" and "payday lender" are used in connection with relatively small, short-term loans made to individuals at interest rates that exceed other types of high cost consumer borrowing (for example, credit cards, which charge interest rates ranging from 12% to 30%).

55.     The "rent-a-bank" scheme was predicated on a pretense that the bank would be acting as the "lender" when, in reality, the payday lender performed substantially all of the lending functions, including the marketing, funding, servicing, and collection of the loans.  The bank's role was to do nothing more than serve as the nominal lender, effectively "renting" its federal charter to the payday lender.  Significantly, the bank in the "rent-a-bank" scheme had no financial interest in the loan transactions other than the fees it received from the payday lender.  Since the payday lender funded the loans and bore the economic risk of loan defaults, it was the *de facto* lender.

56.     By the mid- to late-2000s, federal and state regulators were cracking down on "rent-a-bank" operations as improper attempts at an end-run around state interest rate caps and other restrictions on payday lending.  One of those unlawful operations involved an online lending entity called ThinkCash, Inc., which sought to exploit the lack of an interest rate cap under Delaware law and charge borrowers across the country triple-digit interest rates for short-term loans.  First Bank of Delaware (FBD) developed a relationship with ThinkCash that enabled ThinkCash to offer high interest rate loans and represent itself as "ThinkCash by First Bank of Delaware."

57.     ThinkCash and FBD continued this relationship despite enforcement and regulatory efforts to stop the activity.  The FDIC instituted an enforcement action in 2008 that culminated in a consent order.  That consent order required FBD to end its relationship with a number of entities that had used FBD in the rent-a-bank scheme, including ThinkCash.

58.    According to a document produced in the Pennsylvania AG Action, entitled "VPC Funding Deal," which was authored by Defendant Rees in April 2012, Defendant Victory Park provided a $100 million commitment, in July 2010, to participate in an investment vehicle called the "Universal Fund."  The Universal Fund purchased payday loans that were originated under the Think Cash/FBD scheme.

59.    In an attempt to avoid liability and obscure its participation in the illegal lending scheme, Defendants Victory Park and VP Management executed a series of agreements.  On July 9, 2010, VP Management executed a Declaration of Trust of VPC/TF Trust I (the "VPC Trust.")  The purpose of the VPC Trust was to "acquire and hold Universal Participation Interests" and "to enter into, execute and perform its obligations under the VP Participation Agreement and the VP Administrative Agency Agreement (Universal Fund)."  On July 28, 2009, VP Management entered into an Administrative Agency Agreement with TC Administrative Services, LLC ("TC Administrative").  Think Finance is the sole member of TC Administrative.

60.    FBD is no longer in business.  In 2012, its shareholders voted to dissolve the bank.  Soon thereafter, the United States Department of Justice announced a $15 million civil penalty to be paid by FBD in connection with FBD's participation in rent-a-bank lending.

## 2.    The Rent-a-Tribe Scheme

61.    After their "rent-a-bank" scheme ended, ThinkCash and Defendants Rees, Victory Park and VP Management developed plans for another law avoidance scheme called "rent-a-tribe."

19

62.    The concept behind the "rent-a-tribe" scheme is to exploit tribal immunity in the same way that ThinkCash exploited federal bank preemption.  Under the scheme, the loans are made in the name of an entity affiliated with a Native American tribe, but Defendant Rees, ThinkCash, Think Finance (and entities controlled by or affiliated with it), along with Defendants Victory Park and VP Management, combined their resources and expertise to tightly manage and control the funding, marketing, issuance, and collection of the loans.

63.    Indeed, in a June 4, 2012 article in Bloomberg, Defendant Rees stated that Think Finance "has shifted away from doing direct lending itself because 'byzantine state laws' made it complicated."  According to Rees, "Native American tribes . . . don't have to look to each state's lending laws."

64.    Defendant Victory Park, along with Defendant Rees, ThinkCash, and Think Finance, sought to exploit their knowledge of online payday lending and their existing customer base to generate income from future loans using a "rent-a-tribe" scheme.  One of the "rent-a-tribe" schemes that Defendant Rees, ThinkCash, Think Finance, and Defendant Victory Park started was Great Plains, which ultimately became affiliated with the Otoe Tribe.

65.    According to allegations in a complaint filed in the Pennsylvania AG Action, by December 2010—when ThinkCash loan originations had been terminated—Defendant Rees and Think Finance had already devised a rent-a-tribe lending model, even before entering into any agreement with a Native American Tribe.  They called it "Great Plains Lending."  They developed text and graphics for the upcoming Great Plains Lending

Website; they purchased the domain name www.greatplainslending.com; and they partnered with Defendant Victory Park to develop and manage the online payday lending product.

66.     Defendant Victory Park helped design and direct the transition from the "rent-a-bank" scheme to the "rent-a-tribe" scheme in conjunction with Defendant Rees and Think Finance. On January 6, 2011, Defendant Victory Park changed the name of VPC/TF Fund I Ltd. to reflect the transition to "tribal" lending by calling its special purpose entity "GPL Servicing" (Defendant GPLS) – after Defendant Great Plains – for the purpose of holding participation interests in "tribal" loans. GPLS was designed as a pass-through, special purpose vehicle through which Defendant Victory Park and Think Finance would collect revenue from the rent-a-tribe scheme. Specifically, after payment of all operating expenses, GPLS would pay a fixed rate of return to investors (Victory Park was to receive a fixed rate of 20%) and the remaining revenue would be distributed to Think Finance. Defendant Victory Park is the sole manager of GPLS. GPLS would purchase a 99% participation interest in the loans nominally issued by the tribal entities. The tribes would keep a 1% interest in the loans plus a "service fee."

67.     This rent-a-tribe scheme was memorialized in a Think Finance presentation, produced in the Pennsylvania AG Action. entitled "Great Plains Lending Meeting," dated January 12, 2011, months before Great Plains was created as a tribal entity, on May 4, 2011. Defendant Victory Park is referred to as "VPC" in the following schematic:



68.    Indeed, a slide in the Great Plains Lending Meeting presentation entitled "Next Steps" described the necessary steps that Defendants Victory Park and Rees (along with Think Finance) needed to launch Great Plains as a tribal entity, including setting up a tribal bank account, and devising loan agreements and other consumer legal documents.

22

69.     The Great Plains Lending Meeting also featured a screenshot of the Great
Plains Lending website, again, months before Great Plains was created as a tribal entity.
As shown on this screenshot, the purported "features" of a loan from Great Plains that
would be pitched to potential borrowers would include an "easy" application process, an
answer "in seconds," and the ability to receive "cash in our account as soon as tomorrow!"
Moreover, Defendants (along with Rees and Think Finance) claimed that Great Plains
loans were "better than a payday loan," with "lower" interest rates, and the ability to pay
the loan over time.



70.    The Great Plains Lending Meeting specifically contemplated Defendant Victory Park's involvement in the Great Plains scheme, noting that collection of illegal loans issued through Great Plains would be performed via inbound electronic banking (ACH) transactions by Victory Park through GPLS.

24



**ACH and Settlement**

Outbound ACH (credits/funding and any related returns or rescinds) will be from Great Plains Lending, LLC (Tribal Entity)

- Initially using FBD as processor

Inbound ACH (debits/collections and related returns) will be to GPL Servicing, LLC (Purchasing Entity)

Settlement for loan purchases by GPL Servicing will occur on a 2-day lag

CONFIDENTIAL – DO NOT COPY                                    10

71.    The Great Plains Lending Meeting also contemplated Sequoia Capital's and TCV's involvement in the Great Plains rent-a-tribe scheme, noting that both Sequoia Capital and TCV are "Key investors" in Think Finance's consumer finance products, which includes "ThinkCash/Great Plains Lending: Installment Loans."

25



**Think Finance Provides Next-Generation Consumer Finance Products**

**Founded in 2001 – Rapid Growth to Industry Leadership**

- Approx. 250 employees - headquarters in Fort Worth, TX
- Over $2 billion in loans underwritten to over one million customers
- $215MM in 2010 revenue
- Key investors include Sequoia Capital and Technology Crossover Ventures

**Product Diversification Minimizes Regulatory Risk**

- Elastic:  Line of credit linked to prepaid debit cards
- ThinkCash/Great Plains Lending: Installment loans
- PayDay One: State-licensed payday lender
- Partner with First Bank of Delaware and Urban Trust Bank

**Industry Innovator in Technology and Underwriting**

- Low price leader & product innovator – 93% customer satisfaction
- First fully automated short-term loan transaction in industry
- Proprietary risk scores and technology platform

CONFIDENTIAL – DO NOT COPY                                                    3

72.    According to a document authored by Think Finance's CFO that was filed as

an exhibit in the Pennsylvania AG Action, in February 2011, Defendant Victory Park, in

conjunction with Rees and Think Finance designed a specific flow of funds for the rent-a-

tribe scheme:

- Through GPLS, Defendant Victory Park would deposit $1 million in a bank account at a John Doe Defendant bank called the Funding Account that would be owned by the tribal entity.  This amount would cover a few days of loan originations and the anticipated 1% ownership stake that the tribe would retain.

- The tribe would then begin originating loans on a daily basis that were funded from the Funding Account, via nightly ACH processing provided by a John Doe Defendant bank.

26

- Two days after a loan was approved, the tribal entity would sell the 99% participation in those loans at book value to GPLS. Through GPLS, Defendant Victory Park would then deposit in the Funding Account an amount equal to the loan participations that GPLS had purchased. The proceeds from selling the participation interests would then be used by the tribal entity to originate additional loans.

- Each day, the same bank would process customer payments via ACH through a John Doe Defendant bank and would deposit those funds in a Collection Account.

- TC Decision Sciences, as the exclusive "technology and services provider" to the tribal entity, would distribute the payments in the Collection Account attributable to the participation interest of GPLS to GPLS.

- Each month, through GPLS, Defendant Victory Park would reconcile the revenue received from the loans and distribute an agreed-upon amount of revenue sharing to the tribal entity.

- Also each month, Tailwind Marketing and TC Decision Sciences would invoice the tribal entity for fees. These invoices would be provided to Victory Park, through GPLS, for reimbursement so that the tribal entity would not have to make any out-of-pocket payments.

73.    Notably, an integral aspect of the "rent-a-tribe" scheme was that the tribes would not actually pay the contracted service fees to the Think Finance entities. Instead, these fees would be reimbursed by Defendant Victory Park, through GPLS.

a.    Victory Park's Further Participation in the Unlawful Debt Scheme

74.    Victory Park provided the necessary funding for use as lending capital for the payday lending scheme and also provided substantial oversight, management, and control over the scheme.

75.    Defendant Victory Park (and/or entities controlled by it) received and continues to receive weekly reports concerning the payday loans generated in the name of

27

Great Plains.  Great Plains does not generate these reports; Think Finance generates the reports.

76.    On May 25, 2011, GPLS entered into a Participation Agreement with Great Plains.  Scott Zemnick, General Counsel of Defendant Victory Park Capital, signed the Participation Agreement for GPLS.  John Shotton signed on behalf of Great Plains.  Notice to GPLS under the Participation Agreement is to be sent to Scott Zemnick at Defendant Victory Park's principal address in Chicago.

77.    Under the Participation Agreement, GPLS had the "right, but not the obligation," to purchase undivided ninety-nine percent participation interests in payday loans offered through Great Plains.  The Participation Agreement further describes one manner in which Defendant Victory Park actively participated in the unlawful online payday lending scheme, stating: "GPLS IS PURCHASING PARTICIPATION INTERESTS BASED UPON GPLS' INDEPENDENT EXMINATION, STUDY, INSPECTION, AND KNOWLEDGE OF THE PARTICIPATION INTERESTS AND THE LOANS AND THAT GPLS IS RELYING UPON ITS OWN DETERMINATION OF THE QUALITY, VALUE, AND CONDITION OF THE PARTICIPATION INTERESTS AND THE LOANS AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY GP LENDING."

78.    The Participation Agreement mandates that Great Plains establish and maintain a "Reserve Account" from which it takes money to fund illegal loans.  The Reserve Account only contains enough money to fund a limited number of days of payday

loans. Defendant Victory Park controls whether additional funds are placed in the "Reserve Account."

79. The Participation Agreement also mandates that Great Plains "obtain the express written permission of GPLS prior to selling any loans or participation interests other than to GPLS." Further, the Participation Agreement requires that, in general, Great Plains "shall not [] reduce the interest rate on a Loan or the principal balance due on a Loan."

80. The Participation Agreement provided that Victory Park, through GPLS, would pay Great Plains a "Service Fee" from the net revenue earned by GPLS and reimburse Great Plains for any expenses, including expenses owed to Think Finance. This "Service Fee" was paid in exchange for simply originating the illegal loans in the name of Great Plains, in accordance with various Program Guidelines that were established by Think Finance.

81. In late 2011, Victory Park increased its funding from GPLS from $100 million to $150 million. Beginning in 2012, Victory Park created separate tranches to allow investors to invest in GPLS alongside Victory Park, and Victory Park increased funding of GPLS from $150 million to $250-$300 million. In addition, Think Finance was a principal investor in GPLS, having purchased 25% of outstanding shares.

82. Victory Park used its control over the Great Plains Enterprise to halt loan originations in August 2013 and the purchase of certain participation interests because banks were becoming less willing to process ACH payments on payday loans.

83.    In a separate incident, in October 2013, Victory Park temporarily suspended the purchase of certain participation interests after the United States District Court for the Southern District of New York, in *Otoe Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353 (S.D.N.Y. 2013), denied a motion for a preliminary injunction against the New York Department of Financial Services, which had sent cease and desist letters regarding Victory Park's  and Rees's and Think Finance's illegal loans issued through Great Plains.  On October 1, 2014, the United States Court of Appeals for the Second Circuit affirmed the decision, noting that "a tribe has no legitimate interest in selling an opportunity to evade state law."  *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 114 (2d Cir. 2014).

84.    When Victory Park stopped purchasing participation interests, Think Finance and Rees would, in turn, instruct Great Plains to shut down origination of payday loans.  Indeed, an email, dated October 4, 2013, from Chris Lutes at Think Finance to individuals at Haynes, Lutes notes that if Victory Park stops purchasing participation interest, "the tribes typically shut down loan originations."

85.    Victory Park also controlled the volume of loans by controlling the amount of marketing that Think Finance and Rees did for Great Plains.  Employees of Think Finance consulted with employees of Victory Park about the amount of marketing for the illegal loans.

86.    Victory Park was aware of the illegality of the loans that were being made. Thomas M. Welch, a partner at Victory Park, received email communications in March and April of 2013 that listed certain states where, at that time, Defendants would not issue

30

illegal loans in the name of Great Plains because Defendants believed the regulatory risk was too great.  The identification of states where the loans presented such risk was prepared by unnamed attorneys for Think Finance from the law firm Patton Boggs and Claudia Callaway, attorney for Victory Park from the law firm Katten Muchin Rosenman LLP.

87.    Other email correspondence from Think Finance's Chief Financial Officer (and sent to Thomas Welch, a partner at Defendant Victory Park) shows that the decision about whether to make illegal loans in a particular state was based on how aggressively states enforced their laws.  Victory Park did not have concern for the legality of their loans, and instead was more concerned about avoiding responsibility for the actions that they knew were illegal.

88.    Victory Park also transferred money from GPLS's bank accounts to its own bank account.  For example, during a September 10, 2017 deposition in the Think Finance Bankruptcy, Thomas Welch of Victory Park testified that, on August 2, 2017 and August 21, 2017, Victory Park transferred millions of dollars from a GPLS bank account where illegal lending proceeds from Great Plains were deposited by Think Finance to a Victory Park checking account.

89.    Other documents filed in the Think Finance Bankruptcy show that Victory Park made similar transfers to a Victory Park checking account from a GPLS bank account that received illegal lending proceeds from Great Plains.  For example, a GPLS checking account statement shows that, on October 20, 2017, $201,417.87 was received from Great Plains, and, that same day, Victory Park transferred $5 million to a Victory Park checking account.

31

b.      Additional Agreements Between Think Finance and Great Plains

90.     In addition to the Participation Agreement with GPLS, Great Plains entered

into a series of agreements with Rees and Think Finance in furtherance of the illegal

lending scheme.   On May 25, 2011, Tailwind Marketing entered into a Marketing

Agreement, signed by Rees, with Great Plains, pursuant to which the Otoe tribe agreed to

retain Tailwind to market loans and identify potential customers, as well as manage all cash

accounts, for a fee of $100 per loan.

91.     That same day, Great Plains entered into a License and Support Agreement

with TC Decision Sciences, signed by Rees, under which TC Decision Sciences would

provide and maintain the entire technology platform, including the website and the loan

decisioning software, for a license fee of $50 per loan.

92.     Also on May 25, 2011, Great Plains entered into a Servicing Agreement with

TC Decision Sciences, signed by Rees, under which TC Decision Sciences managed the

outsourcing of customer service functions for a fee of $5 per month per active account.

c.      Agreements Between Think Finance, Victory Park, and VP
        Management

93.     Victory Park entered into various formal agreements with Think Finance,

including the Third Amended and Restated Administrative Agency Agreement ("Agency

Agreement") and the Second Amendment to Amended and Restated Guaranty and Security

Agreement ("Guaranty Agreement"), dated October 4, 2011.

94.     Under the Agency Agreement, Defendants GPL Servicing Trust, GPL

Servicing Trust II, and GPLS agreed with TC Administrative that TC Administrative would

perform daily loan settlement for GPLS, GPL Servicing Trust, and GPL Servicing Trust II.

95.     TC Administrative also had the obligation to purchase the interests in payday loans held by GPLS that were past due by 60 days.

96.     TC Administrative paid a monthly fee to Defendant VP Management.

97.     TC Administrative had the right to request additional equity investment into Defendant GPLS.  That additional equity investment would then be used to fund additional payday loans.

98.     Under the Guaranty Agreement, Think Finance and Think Finance SPV, LLC, a wholly owned subsidiary of Think Finance, agreed with Defendant Victory Park to guarantee obligations related to TC Administrative's duties under the Agency Agreement.

99.     Rees signed the Guaranty Agreement on behalf of the Think Finance entities. Scott Zemnick of Victory Park signed the Guaranty Agreement on behalf of Victory Park.

100.    On July 31, 2012, Victory Park and Think Finance entered into a Second Amended and Restated Guaranty and Security Agreement with substantially the same terms as the Guaranty Agreement.  Rees signed the Second Amended and Restated Guaranty Agreement on behalf of the Think Finance entities.  Scott Zemnick of Victory Park signed the Second Amended and Restated Guaranty Agreement on behalf of Victory Park.

101.    On December 13, 2012, Victory Park and Think Finance entered into a Third Amended and Restated Guaranty and Security Agreement with substantially the same terms as the Guaranty Agreement.  Rees signed the Third Amended and Restated Guaranty

33

Agreement on behalf of the Think Finance entities.  Scott Zemnick of Victory Park signed the Third Amended and Restated Guaranty Agreement on behalf of Victory Park.

102.   On April 2, 2013, Victory Park and Think Finance entered into a Fourth Amended and Restated Guaranty and Security Agreement with substantially the same terms as the Guaranty Agreement.   Rees signed the Fourth Amended and Restated Guaranty Agreement on behalf of the Think Finance entities.  Scott Zemnick of Victory Park signed the Fourth Amended and Restated Guaranty Agreement on behalf of Victory Park.

103.   On May 1, 2014, Victory Park and Think Finance entered into a First Amendment to the Fourth Amended and Restated Guaranty and Security Agreement. Martin Wong of Think Finance signed the First Amendment on behalf of the Think Finance entities.  Scott Zemnick of Victory Park signed the First Amendment on behalf of Victory Park.

104.   On February 27, 2015, Victory Park and Think Finance entered into a Second Amendment to the Fourth Amended and Restated Guaranty and Security Agreement. Martin Wong of Think Finance signed the Second Amendment on behalf of the Think Finance entities.  Scott Zemnick of Victory Park signed the Second Amendment on behalf of Victory Park.

105.   On July 25, 2016, Victory Park and Think Finance entered into a Third Amendment to the Fourth Amended and Restated Guaranty and Security Agreement. Martin Wong of Think Finance signed the Third Amendment on behalf of the Think

34

Finance entities.  Scott Zemnick of Victory Park signed the Third Amendment on behalf of Victory Park.

   d. <u>Sequoia and TCV's Participation in the Illegal Lending Scheme</u>

  106. In addition to the aforementioned Great Plains Lending Meeting where Sequoia and TCV were noted as "Key Investors" in the unlawful lending scheme, both Sequoia Capital and TCV have owned substantial percentages of Think Finance, along with board seats, since the inception of the unlawful lending scheme.  TCV has a 22.3 % equity ownership in Think Finance.  TCV held that ownership through the TCV Member Funds and managed its ownership through TCM V.  TCV has a representative on the Board of Directors of Think Finance.  John C. Rosenberg, a General Partner of TCV, was a member of the Board of Directors of Think Finance from approximately 2009 to 2016. John Drew, a General Partner of TCV, is currently a member of the Board of Directors of Think Finance.  As directors, Rosenberg and Drew were and/or continue to be fully aware of the Great Plains Enterprise, including its formation and operation, and, through their leadership of Think Finance, perpetuated the scheme to collect unlawful debts and directed the strategy that Think Finance followed, including its domination and control of Great Plains.

  107. Sequoia Capital has a 27.4% equity ownership in Think Finance.  Sequoia Capital holds that ownership interest through the Sequoia Funds and managed it through Sequoia Capital and the Sequoia General Partners.  Sequoia Capital had a representative on the Board of Directors of Think Finance.  Until approximately 2016, Michael L. Goguen, a General Partner at Sequoia Capital, served as a director for Think Finance.  As

a director, Goguen was fully aware of the Great Plains Enterprise, and through his leadership of Think Finance, he perpetuated the scheme to collect unlawful debts and directed the strategy that Think Finance followed, including its domination and control of Great Plains.

108.    Upon information and belief, the unlawful debt scheme, and Think Finance's strategies for executing and directing that scheme, were discussed during Think Finance board meetings.  For example, in an April 2013 email, Chris Lutes, Think Finance's CFO, told Tom Welch of Victory Park that he would share Think Finance's revised 2013 revenue forecast—due to having then stopped lending through Great Plains and other tribal entities in various states as a result of increased regulatory activity—after Think Finance's board of directors call, which included Sequoia Capital and TCV representatives.   Upon information and belief, Think Finance's board of directors, including Sequoia Capital and TCV representatives, discussed and voted on revised revenue forecasts for 2013 due to regulatory pressure from certain states where the illegal loans presented significant risk.

e.    Processing of ACH Transactions

109.    At the behest of Victory Park, in conjunction with Rees and Think Finance, Great Plains entered into payday lending relationships with John Doe Defendant banks to process ACH transactions.  Those bank relationships enabled Great Plains to process ACH transactions for Plaintiffs and the Class.   The ACH transactions involved interstate commerce because they flowed through Great Plains in Oklahoma, Plaintiffs in North Carolina, Texas, and Florida, and Class members throughout the United States.

110.    Haynes was in charge of due diligence to find alternative ACH processors after the New York Department of Financial Services in October 2013 defeated the attempt to obtain a preliminary injunction against the enforcement of New York laws against usury.

f.    <u>Great Plains' Further Participation in the Unlawful Debt Scheme</u>

111.    In addition to the various agreements noted above that Great Plains entered into with Think Finance and Victory Park, Great Plains operates a website at https://www.greatplainslending.com.    The website furthers the illegal financial transactions.  The website allows individuals to enter information to execute ACH wire transfers to the individual and to debit the person's account in the purported repayment of the illegal debt.  The website involves transactions in interstate commerce.

**C.    Great Plains is not an "Arm of the Tribe"**

112.    Great Plains purports to be a "tribal lending entity wholly owned by the Otoe-Missouria Tribe of Indians . . . operating within the boundaries of the Otoe-Missouria Reservation."  The Tribe has taken the position that since Great Plains is a tribally created, wholly owned business entity of the Tribe, the principle of tribal sovereign immunity applies to shield Great Plains from the application of state and federal law.  As alleged herein, Great Plains was devised by Defendant Victory Park, along with Rees and Think Finance, to perpetrate an illegal lending scheme and is substantially operated and controlled by them.  Therefore, Great Plains is *not* a legitimate arm of the Tribe and tribal sovereign immunity does *not* shield Great Plains or any other Defendant from liability in connection with the illegal lending scheme.

37

113.    At least one state has examined the question of whether Great Plains operates as a legitimate arm of the Tribe and has concluded that it is not.  In 2014, the Connecticut Department of Banking issued a Cease and Desist Order and a Notice of Intent to Impose Civil Penalty to Great Plains and John Shotton for violation of Connecticut's usury laws, seeking a $700,000 penalty and declaration that Great Plains cease and desist from offering loans to Connecticut residents (the "Connecticut Enforcement Action").  In response, Great Plains maintained that it was an arm of the Tribe and therefore immune from any suit or enforcement action.

114.    After nearly three years of administrative and judicial adjudication, the principal financial services regulator in the State of Connecticut determined that Great Plains is not an arm of the Tribe.  On June 14, 2017, the Banking Commissioner issued a Restated Order and Ruling on Motion to Dismiss in the Connecticut Enforcement Action (the "Connecticut Ruling").  The Connecticut Ruling found that Great Plains is not an arm of the Tribe.  In doing so, the Connecticut Ruling noted the following facts that weighed heavily against a finding that Great Plains is an arm of the Tribe:

- "The [Tribe's] LLC Act explicitly states that '[n]othing contained in [the] Act shall be construed as creating any liability . . . of the Tribe in any manner; provided that the assets of the LLC in which the Tribe holds an interest may be subject to liabilities and claims unless otherwise provided herein' (AR 66)."

- "Under Part 6, Section 601 of the LLC Act, all property originally transferred to or acquired by a limited liability company is property of the company and not property of the Tribe's members individually (AR 80)."

- "Under Part 9, Subpart 1, Section 913 of the LLC Act, any recovery against the LLC is limited to the assets of the LLC and the Tribe is not liable for the payment or performance of any of the obligations of the LLC (AR 88)."

38

- "The LLC Act explicitly provides that 'no recourse shall be had against any assets or revenues of the Tribe in order to satisfy the obligations of the LLC; including assets of the Tribe leased, loaned, or assigned to the LLC for its use, without transfer of title' (AR 88)."

- "According to Great Plains' Operating Agreement . . . The Tribe has no liability to creditors of Great Plains."

- "According to Great Plains' Operating Agreement . . . 'It is intended that the Company will operate separately from the Tribe and will not require continuing financial support from the Tribe' (AR 122)."

- "According to Great Plains' Operating Agreement . . . 'As an entity separate from the Tribe, the Company shall either contract with independent professionals for accounting, legal and other services which the Company may require; or may contract with the Tribe to obtain such services from the Tribe's internal operating departments on such terms as shall be agreed between the Directors on behalf of the Company and the Tribal Council on behalf of the Tribe' (AR 124)."

115.    Based on these facts, the Connecticut ruling found that Great Plains is not an arm of the tribe—and therefore not entitled to immunity from suit—for the following reasons, among others:

- "[B]oth the LLC Act and Great Plains' Operating Agreement clearly protect the Tribe and its treasury from liability" and therefore "the financial relationship between Great Plains and the Tribe weighs heavily against arm of the tribe status for Great Plains."

- "[A] tribe has no legitimate interest in selling an opportunity to evade state law," and "it is impossible to know whether the apparent relationship between Great Plains and the Tribe truly serves tribal interests or instead is merely a pretense in order to claim tribal sovereign immunity and evade state law."

- "Great Plains did not show that the Tribe exercises control over the business. In fact, the record reflects a lack of significant control. . . . The documentation provided by Respondents shows that the Tribe does not have

control over the administration or accounting activities of the business. . . .
Accordingly, the Tribe's lack of significant control over the governance of
Great Plains weighs against arm of the tribe status."

116.    Moreover, in an earlier ruling in the Connecticut Enforcement Action, dated

May 6, 2016, the Banking Commissioner noted that the illegal loans issued in the name of

Great Plains *violated the Tribe's own criminal usury laws*:

- "Section 150 of the Tribe's Criminal Offenses makes it unlawful for 'any
  individual to intentionally provide financing or make loans without the
  expressed written consent from the Otoe Missouria Tribal Counsel at a rate
  of interest higher than the following: (1) If the amount to which the interest
  applies is less than one hundred dollars ($100), or the period of the loan or
  financing is less than one (1) year, or both, the rate of interest shall not exceed
  twenty-four percent (24%) per annum simple interest rate.  (2) If the amount
  to which the interest applies is greater than one hundred dollars ($100), or
  the period of loan or financing is greater than one (1) year, or both, the rate
  of interest shall not exceed eighteen percent (18%) per annum simple interest
  rate.'"

- "Section 150 of the Tribe's Criminal Offenses further provides that 'criminal
  usury shall be punishable by a fine not exceeding two hundred fifty dollars
  ($250.00), or by imprisonment in the Tribal jail for a term not exceeding
  three (3) months, or both,' and that the 'victim shall be entitled to restitution
  for double the actual amount of interest which was actually paid and
  cancellation of all interest owing for the term of the financing.'"

The Commissioner found that this weighed against a finding that Great Plains was an arm

of the tribe "[b]ecause the predominant purpose of Great Plains is not clear and the

company does not appears to be operating in accordance with Tribal law," and, as a result,

"the Commissioner is hard-pressed to find that the organization and purpose of the business

predominantly serves the tribal government."

117.    Notably, Connecticut's two federally recognized Native American tribes, the

Mohegan and Mashantucket Pequot tribes, support the Connecticut Enforcement

Action.  The tribes' chairmen appeared alongside the Governor of Connecticut and a key state legislator at an April 13, 2015 press conference to condemn predatory rent-a-tribe online payday lending.  During the press conference, the tribes' chairmen publicly stated that they had rejected similar offers by outside payday lenders who wanted to exploit the tribes' sovereignty to issue illegal, high-interest loans.  Kevin Brown, chairman of the Mohegan tribe, was blunt in his assessment that tribal sovereignty provides no justification for the exploitation of consumers: "[d]enying this business pursuit in the state of Connecticut is not about tribal sovereignty or welfare or business, it is about protecting consumers in the state of Connecticut."

118.    Moreover, the United States District Court for the Eastern District of Texas addressed an analogous situation where, in September 2017, pharmaceutical giant Allergan, Inc. announced that it had transferred its patents on a blockbuster eye drug to the Saint Regis Mohawk Tribe in upstate New York in order to defeat pending patent challenges by exploiting Native American sovereign immunity.  The court stated:

> The Court has serious concerns about the legitimacy of the tactic that Allergan and the Tribe have employed. The essence of the matter is this: Allergan purports to have sold the patents to the Tribe, but in reality it has paid the Tribe to allow Allergan to purchase—or perhaps more precisely, to rent—the Tribe's sovereign immunity in order to defeat the pending IPR proceedings in the PTO. This is not a situation in which the patentee was entitled to sovereign immunity in the first instance. Rather, Allergan, which does not enjoy sovereign immunity, has invoked the benefits of the patent system and has obtained valuable patent protection for its product, Restasis. But when faced with the possibility that the PTO would determine that those patents should not have been issued, Allergan has sought to prevent the PTO from reconsidering its original issuance decision. What Allergan seeks is the right to continue to enjoy the considerable benefits of the U.S. patent system without accepting the limits that Congress has placed on those benefits through the administrative mechanism for canceling invalid patents.

*Allergan, Inc. v. Teva Pharm. USA, Inc.*, No. 2:15-CV-1455-WCB, 2017 WL 4619790, at

*2 (E.D. Tex. Oct. 16, 2017).  Likewise, as alleged herein, Victory Park, Sequoia, TCV,

Rees, and Think Finance, purport to be merely servicing, investing in, and financing a tribal

lending operation, but in reality have paid the Tribe to allow them to rent the Tribe's

sovereign immunity in order to defeat regulatory and private challenges to the illegal

lending operation.  Also, as alleged herein, Victory Park, Sequoia, TCV, Rees, and Think

Finance seek the right to enjoy the benefits of a lucrative nationwide online lending

business without accepting the limits that state and federal law have placed on interest

rates.

119.    The *Allergan* court further stated:

> [S]overeign immunity should not be treated as a monetizable commodity that
> can be purchased by private entities as part of a scheme to evade their legal
> responsibilities. It is not an inexhaustible asset that can be sold to any party
> that might find it convenient to purchase immunity from suit. Because that is
> in essence what the agreement between Allergan and the Tribe does, the
> Court has serious reservations about whether the contract between Allergan
> and the Tribe should be recognized as valid, rather than being held void as
> being contrary to public policy.

> ***

> [T]he Court has serious doubts that the transaction in which Allergan has
> sought to obtain immunity from inter parties review by the PTO in
> exchange for payments to the Tribe is the kind of transaction to which the
> Tribe's sovereign immunity was meant to extend.

*Id.* at *3.  Similarly, the creation of Great Plains as a tribal entity through which Victory

Park, Sequoia, TCV, Rees, and Think Finance issue illegal loans is not "the kind of

transaction to which the Tribe's sovereign immunity was meant to extend."

42

E.      **PLAINTIFF GRANGER'S LOANS FROM GREAT PLAINS**

120.    On or about December 2, 2015, Ms. Granger went to the Great Plains website

and took out a $900 loan in the name of Great Plains with an annual interest rate of

347.43%.

121.    During the online loan application process, Ms. Granger was asked to

provide, and did provide, bank account information to enable a prompt transfer of the loan

funds via direct deposit/ACH transfer.  The $900 that Ms. Granger borrowed was deposited

into her credit union account on December 2, 2015, the same day she completed the online

loan application.

122.    On or about December 18, 2015, a first loan payment of $124.30 was

automatically withdrawn from Ms. Granger's credit union account via ACH transfer.

Thereafter, approximately twenty-eight additional payments of $124.30 were

automatically debited from Ms. Granger's credit union account every two weeks.  She paid

a total of $3,728.30 on a $900 loan.

123.    On January 13, 2017, Ms. Granger went to the Great Plains website and took

out a $1,200 loan in the name of Great Plains with an annual interest rate of 288.21%.

124.    During the online loan application process, Ms. Granger was asked to

provide, and did provide, bank account information to enable a prompt transfer of the loan

funds via direct deposit/ACH transfer.   The $1,200 that Ms. Granger borrowed was

deposited into her bank account on January 13, 2017, the same day she completed the

online loan application.

125.    On or about January 27, 2017, a first loan payment of $133.86 was automatically withdrawn from Ms. Granger's bank account via ACH transfer.  Thereafter, approximately ten additional payments of $133.86 were automatically debited from Ms. Granger's bank account every two weeks.

126.    In the summer of 2017, Ms. Granger believed that she was overpaying on her January 13, 2017 loan and thereafter discovered that (1) the 288.21% interest rate was far greater than the applicable maximum allowable interest rate under North Carolina law, and (2) Great Plains was not licensed in the State of North Carolina.  As a result, she notified Great Plains that she was refusing to make any further payments on the loan because she had already paid an amount in excess of the principal plus the maximum allowable interest rate under North Carolina law.  In response, Great Plains did not seek further payment on the January 13, 2017 loan, but nonetheless reported that Ms. Granger had defaulted on the loan, thereby negatively impacting her credit report.

127.    Absent certain exceptions, no one may issue a loan of $25,000 or less to a resident of the State of North Carolina at an annual percentage rate greater than 16%.

128.    At the time Ms. Granger took out her loan from Great Plains, neither Great Plains nor any other Defendant had obtained a license from the State of North Carolina; no Defendant has ever attempted to obtain such a license in connection with loans made in the name of Great Plains.

129.    Under North Carolina law, if a lender is not exempt from the 16% interest rate cap and has not obtained a license, and nonetheless contracts to make a consumer loan and charges, contracts for, or receives interest or other compensation in excess of 16% per

44

year, then the loan is deemed to be null and void and the lender is not able to collect, obtain, or receive any principal, interest, or charges on the loan.

130.   Ms. Granger's December 2, 2015 loan was unlawful and void under North Carolina law, and the 347.43% interest rate charged was more than 21 times greater than the maximum allowable interest rate.   Ms. Granger's January 13, 2017 loan was also unlawful and void under North Carolina law, and the 288.21% interest rate charged was more than 18 times greater than the maximum allowable interest rate.

## F.   PLAINTIFF MILLER'S LOANS FROM GREAT PLAINS

131.   On or about July 26, 2013, Ms. Miller went to the Great Plains website and took out a $100 loan in the name of Great Plains with an annual interest rate of 448.73%.

132.   During the online loan application process, Ms. Miller was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer.   The $100 that Ms. Miller borrowed was deposited into her bank account on July 26, 2017, the same day she submitted the loan application.

133.   On or about August 9, 2013, an initial loan payment of $23.21 was automatically withdrawn from Ms. Miller's bank account via ACH transfer.   Thereafter, seven additional payments of $23.21 were automatically debited from Ms. Miller's bank account every two weeks.

134.   On or about November 18, 2013, Ms. Miller visited the Great Plains website and took out an $800 loan in the name of Great Plains with an annual interest rate of 398.91%.

135.    During the online loan application process, Ms. Miller was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer.  The $800 that Ms. Miller borrowed was deposited into her bank account on November 18, 2013, the same day she submitted the loan application.

136.    On November 23, 2013, Ms. Miller made a single interest payment $835.07 (the $800 principal plus a $35.07 interest payment) to pay off the loan early.

137.    On or about December 11, 2015, Ms. Miller visited the Great Plains website and submitted an application for a $900 loan in the name of Great Plains with an annual interest rate of 348.09%.

138.    During the online loan application process, Ms. Miller was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer.  The $900 that Ms. Miller borrowed was deposited into her bank account on December 12, 2015, the day after she submitted the loan application.

139.    On December 25, 2015, an initial loan payment of $119.18 was automatically withdrawn from Ms. Miller's bank account via ACH transfer.  Thereafter, twenty-nine additional payments of $119.18 were automatically debited from Ms. Miller's bank account every two weeks, plus a final payment of $4.98.  Ms. Miller paid $3,580.38 on a $900 loan.

140.    On or about March 3, 2017, Ms. Miller visited the Great Plains website and submitted an application for a $500 loan in the name of Great Plains with an annual interest rate of 328.09%.

141.    During the online loan application process, Ms. Miller was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer.  The $500 that Ms. Miller borrowed was deposited into her bank account on March 3, 2017, the same day that she submitted the loan application.

142.    On March 17, 2017, an initial loan payment of $71.80 was automatically withdrawn from Ms. Miller's bank account via ACH transfer.  Thereafter, nine additional payments of $71.80 were automatically debited from Ms. Miller's bank account every two weeks.  On July 28, 2017, she paid off the loan early with a payment of $308.36.

143.    Absent certain exceptions, no one may make a loan to a resident of Texas at an annual percentage rate greater than 18%.  Under Texas law, usury laws apply to loans with interest rates that exceed the 18% maximum interest rate.

144.    At the time Ms. Miller took out her loans from Great Plains, neither Great Plains nor any other Defendant had obtained a license from the state of Texas; no Defendant has ever attempted to obtain such a license in connection with loans made in the name of Great Plains.

145.    Under Texas law, if a lender issues a consumer loan with an annual interest rate in excess of 36%, then the loan is deemed to be null and void and the lender is not able to collect, obtain, or receive any principal, interest, or charges on the loan.

146.    Ms. Miller's loans were unlawful and void under Texas law.  The July 26, 2013 loan with a 448.73% interest rate charged was nearly 25 times greater than the maximum allowable interest rate.  The November 18, 2013 loan with a 398.91% interest rate charged was more than 22 times the maximum allowable interest rate.  The December

47

11, 2015 loan with a 348.09% interest rate charted was more than 19 times the maximum allowable interest rate.  And the March 3, 2017 loan with a 328.09% interest rate charged was more than 18 times the maximum allowable interest rate.

### G.    PLAINTIFF MCATEE'S LOANS FROM GREAT PLAINS

147.    On or about July 6, 2016, Ms. McAtee went to the Great Plains website and took out a $1,200 loan in the name of Great Plains with an annual interest rate of 274.08%.

148.    During the online loan application process, Ms. McAtee was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer.   The $1,200 that Ms. McAtee borrowed was deposited into her bank account on July 6, 2016, the same day she submitted the loan application.

149.    On or about July 29, 2016, an initial loan payment of $141.10 was automatically withdrawn from Ms. McAtee's bank account via ACH transfer.  Thereafter, twelve additional payments of $141.10 were automatically debited from Ms. McAtee's bank account every two weeks.   After making these payments for approximately six months under the loan's predetermined payment plan, her principal had only been reduced by $143.62.  Consequently, on January 10, 2017, Ms. McAtee paid the remaining balance of $1,056.38.  She paid $2,890.68 on a $1,200 loan.

150.    On or about March 8, 2017, Ms. McAtee went to the Great Plains website and took out a $1,500 loan in the name of Great Plains with an annual interest rate of 227.88%.

48

151.    During the online loan application process, Ms. McAtee was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer.    The $1,500 that Ms. McAtee borrowed was deposited into her bank account on March 8, 2017, the same day she submitted the loan application.

152.    On or about March 25, 2017, an initial loan payment of $137.90 was automatically withdrawn from Ms. McAtee's bank account via ACH transfer.    Thereafter, nineteen additional payments of $137.90 were automatically debited from Ms. McAtee's bank account every two weeks.    After making these payments for nearly nine months under the loan's predetermined payment plan, her principal had only been reduced by $221.35.    Consequently, on December 21, 2017, Ms. McAtee paid the remaining balance of $1,318.76.    She paid $4,076.76 on a $1,500 loan.

153.    Absent certain exceptions, no one may make a loan to a resident of Florida at an annual percentage rate greater than 18%.    Under Florida law, usury laws apply to loans with interest rates that exceed the 18% maximum interest rate.

154.    At the time that Ms. McAtee took out her loan from Great Plains, neither Great Plains nor any other Defendant was licensed to make loans in the State Florida; no Defendant has ever attempted to obtain such a license in connection with loans made in the name of Great Plains.

155.    Under Florida law, if a lender issues a consumer loan with an annual interest rate in excess of 25%, then the loan is deemed to be null and void and the lender is not able to collect, obtain, or receive any principal, interest, or charges on the loan.

156.   Ms. McAtee's loans were unlawful and void under Florida law.  The July 6, 2016 loan with a 274.08% interest rate charged was more than 15 times greater than the maximum allowable interest rate. The March 8, 2017 with a 227.88% interest rate charged was nearly 13 times greater than the maximum allowable interest rate.

## H.   PURPORTED ARBITRATION CLAUSES IN PLAINTIFFS' LOAN AGREEMENTS ARE VOID AND UNENFORCEABLE

157.   Because Great Plains is not licensed to make loans in any state in which Plaintiffs and members of the Class reside and/or because the loans were made through an illegal scheme, the loan agreements that purport to govern any online payday loans made in the name of Great Plains were void *ab initio*.

158.   Plaintiffs' purported loan agreements with Great Plains not only violate the usury laws or applicable interest rate caps in the borrowers' home states, they include unconscionable choice of law and arbitration provisions that unlawfully seek to disclaim the application of federal and state law and impose the law of the Tribe as the sole governing law.

159.   The language in the purported form Great Plains loan agreement states the following regarding the applicable governing law (Emphasis added below):

**YOU AGREE THAT THIS LOAN IS . . . GOVERNED BY TRIBAL LAW AND NOT THE LAW OF YOUR RESIDENT STATE.**

\*\*\*

Our inclusion of [Truth In Lending] disclosures ***does not mean that we or any subsequent holder of this Agreement consent to application of state or federal law to us, to the loan, or this Agreement***.

\*\*\*

50

You agree that we may assign or transfer this Agreement, or any of our rights hereunder, to any other person or entity without prior notice or consent from you.  Regardless of any transfer, *this Agreement shall remain exclusively subject to Tribal Law* and courts of the Otoe-Missouria Tribe.

*** 

This Agreement and the Agreement to Arbitrate are governed by Tribal law and such federal law as is applicable under the Indian Commerce Clause of the Constitution of the United States of America.  We do not have a presence in Oklahoma or any other state of the United States of America.  *Neither this Agreement nor the Lender is subject to the laws of any state of the United States.  The Lender may choose to voluntarily use certain federal laws as guideline for the provision of services.  Such voluntary use does not represent acquiescence of the Otoe-Missouria Tribe to any federal law* unless found expressly applicable to the operations of the Otoe-Missouria Tribe.

160.    The purported Great Plains loan agreement also includes a purported arbitration provision under the heading "WAIVER OF JURY TRIAL AND ARBITRATION AGREEMENT" (the "Purported Arbitration Clause").  The Purported Arbitration Clause also expressly disclaims the application of state and federal law.  In the subsection concerning the location of arbitration and the description of the borrower's option to have the arbitration conducted within thirty miles of his or her residence, the Purported Arbitration Clause states (emphasis added): "this accommodation for you *shall not be construed in any way* (a) as a relinquishment or waiver of the sovereign status or immunity of the Tribe, or (b) *to allow for the application of any law other than Tribal Law*, or (c) to constitute a transaction of business in any place other than the Indian country of the Tribe."

51

161.    The Purported Arbitration Clause also includes a subsection describing the exclusive application of Tribal law and exclusive judicial review by a Tribal court (emphasis added below):

> **APPLICABLE LAW AND JUDICIAL REVIEW OF ARBITRATOR'S AWARD: THIS AGREEMENT SHALL BE GOVERNED BY TRIBAL LAW.**  *The arbitrator shall apply Tribal Law and the terms of this Agreement*, including this Agreement to Arbitrate and the waivers included herein.  The arbitrator may decide, with or without a hearing, any motion that is substantially similar to a motion to dismiss for failure to state a claim or a motion for summary judgment.  The arbitrator shall make written findings and the arbitrator's award may be filed with a Tribal court.  The arbitration award shall be supported by substantial evidence and *must be consistent with this Agreement and Tribal Law, and if it is not, it may be set aside by a Tribal court upon judicial review*.  During the arbitration, the amount of any settlement offer made by us or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled.  *The parties will have the right to judicial review in a Tribal court* of (a) whether the findings of fact rendered by the arbitrator are supported by substantial evidence and (b) whether the *conclusions of law are erroneous under Tribal Law*.  Judgment confirming an award in such a proceeding may be entered *only if a Tribal court determines that the award is supported by substantial evidence and is not based on legal error under Tribal Law*.

162.    Additional language in the "EFT Authorization Agreement" that is included within the purported Great Plains loan agreement further states that "this Loan is governed by the laws of the Otoe-Missouria Tribe and is not subject to the provisions or protections of the laws of your home state or any other state."

163.    The Purported Arbitration Clause includes a section with the heading, "RIGHT TO OPT OUT," which describes specific procedures that a borrower would be required to follow if he or she were to seek to opt out of the Purported Arbitration Clause. The purported opt-out "right" also is illusory and unconscionable because the *sole* alternative available to the borrower is to have his or her claim heard by a Tribal judge, in a Tribal court, on Tribal land located in rural Oklahoma.  The purported opt-out language

states: "IN THE EVENT YOU OPT OUT OF THE AGREEMENT TO ARBITRATE, ANY DISPUTES SHALL NONETHELESS BE GOVERNED UNDER TRIBAL LAW AND MUST BE BROUGHT WITHIN THE COURT SYSTEM OF THE OTOE-MISSOURIA TRIBE."

164.   The Purported Arbitration Clause is unconscionable and unenforceable for the same reasons articulated by the U.S. Court of Appeals for the Fourth Circuit in *Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016), and *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017).  Indeed, in *Dillon*, the Court of Appeals invalidated the exact same Purported Arbitration Clause described above in a Great Plains loan agreement. *See* 856 F.3d at 336.

165.   Specifically, the Purported Arbitration Clause is invalid because it "purports to renounce wholesale the application of any federal law to plaintiffs' federal claims." *Hayes*, 811 F.3d at 673.  Further, arbitration agreements like the Purported Arbitration Agreement are invalid when they provide that an "arbitrator shall not allow for the application of any law other than tribal law" and amount to "an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*."  *Dillon*, 856 F.3d at 336-37 (emphasis in original).

166.   Like the arbitration provisions invalidated in *Hayes* and *Dillon*, the Purported Arbitration Clause here was created and/or utilized by Victory Park, Sequoia, TCV, Rees, and Think Finance in a deliberate attempt to avoid the application of federal and state law through the use of unconscionable choice of law and arbitration provisions. The use of arbitration as a means of circumventing the application of federal and state law,

particularly in a law avoidance scheme like the one engaged in by Defendants here, is not

permitted under controlling law in this Circuit.

167.    Moreover, under controlling authority in this Circuit, no part of the unlawful

Purported Arbitration Clause may be severed to preserve the remainder of Defendants'

integrated scheme to contravene public policy.  *See Dillon*, 856 F.3d at 336; *Hayes*, 811

F.3d at 675-76.

168.    Plaintiffs are therefore entitled to a declaratory judgment that the governing

law, forum selection, and Purported Arbitration Clause provisions of the Great Plains

agreements are unenforceable in their entirety.

## V.    CLASS ALLEGATIONS

169.    Plaintiffs bring this action on behalf of themselves and all others similarly

situated pursuant to Federal Rules of Civil Procedure ("Rule") 23(a) and 23(b)(2) and

(b)(3), as representatives of the following Class:

> All persons who took out loans issued in the name of Great Plains.  The Class
> Period begins on May 25, 2011 and continues through the present.  Excluded
> from the Class are any persons who are residents of the Commonwealth of
> Pennsylvania and would be beneficiaries of claims brought by the
> Pennsylvania Attorney General in the action, *Commonwealth of Pa. v. Think
> Finance Inc, et al.*, No. 2:14-cv-07139-JCJ (E.D. Pa.).  Also excluded from
> the Class are any persons who may become members of a certified class in
> the following putative class actions that have been filed on behalf of certain
> Great Plains borrowers, limited to any claims against the defendants named
> in those actions as of February 16, 2018: (i) actions brought on behalf of
> residents of Virginia captioned as *Gibbs et al. v. Haynes Investments, LLC,
> et al.*, 18-cv-0048 (E.D. Va.), *Gibbs et al. v. Rees et al.*, 17-cv-0386 (E.D.
> Va.), and *Gibbs et al. v. Plain Green, LLC et al.*, 17-cv-0495 (E.D. Va.); and
> (ii) the action on behalf of residents of Florida captioned as *Banks v. Rees et
> al.*, 17-cv-2201 (M.D. Fla.).

Plaintiffs reserve the right to redefine the Class prior to certification.

170.    This action is brought, and may properly be maintained, as a class action pursuant to Rule 23.    This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.  The members of the Class are readily ascertainable from records maintained by Defendants.

171.    <u>Numerosity</u>.  Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, based on information and belief and information obtained from publicly available sources, Plaintiffs believe that there are likely hundreds of thousands of individuals who are members of the Class.  The exact number of Class members and their identities are known by Defendants or are readily ascertainable in Defendants' records.

172.    <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs' claims are based on the same facts and legal theories as each of the members of the Class.  Plaintiffs and all Class members were charged interest rates on online loans in the name of Great Plains that exceeded the lawful interest rate caps in their states of residence.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants in connection with the operation of the Great Plains online payday lending scheme.

173.    <u>Adequacy</u>.  Plaintiffs will fairly and adequately protect the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the Class.  Plaintiffs have retained counsel that are competent and experienced in the prosecution of complex class action litigation and have experience with

class action litigation involving tribal lending schemes.  Plaintiffs' counsel will undertake to vigorously protect the interests of the Class.

174.  <u>Commonality</u>.  Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual Class members.  The claims of all Class members originate from the same misconduct and violations of law perpetrated by Defendants.  The common questions include, but are not limited to:

    a.  Whether the Great Plains Enterprise (defined below) is an enterprise under 18 U.S.C. § 1961(4);

    b.  Whether Victory Park and VP Management, along with Rees, Think Finance, TC Loan, TC Decision Sciences, Tailwind Marketing, Sequoia Capital, TCV, and TCV V  engaged and/or are engaging in the collection of unlawful debt in violation of18 U.S.C. § 1962(c);

    c.  Whether Victory Park and VP Management, along with Rees, Think Finance, TC Loan, TC Decision Sciences, Tailwind Marketing, Sequoia, TCV, TCV V, and Haynes conspired to engage in the collection of unlawful debt in violation of 18 U.S.C. § 1962(d);

    d.  Whether Great Plains is an arm of the tribe of the Otoe-Missouria Tribe of Indians;

    e.  Whether the purported arbitration agreement in Plaintiffs' and the Class' loan agreements is void and/or unenforceable.

f.   Whether Defendants unlawfully required Plaintiffs and members of the
Class to consent to the use of ACH transactions in connection with their
loans;

g.   Whether Defendants are liable to Plaintiffs and members of the Class for
disgorgement or other remedies and, if so, in what amount; and

h.   Whether Defendants are liable to Plaintiffs and the Class for reasonable
attorneys' fees and expenses.

175.   <u>Superiority</u>.  Under Rule 23(b)(3), class action treatment is a superior method
for the fair and efficient adjudication of the controversy.  Such treatment will permit a large
number of similarly situated persons to prosecute their common claims in a single forum
simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or
expense that numerous individual actions would entail.  The benefits of proceeding through
the class mechanism, including providing injured persons with a method for obtaining
redress on claims that could not practicably be pursued individually, substantially
outweighs potential difficulties in management of this class action.

176.   This action is also maintainable as a class action under Rule 23(b)(2) because
Defendants have acted on grounds generally applicable to the Class, thereby making
appropriate final injunctive, declaratory, or other appropriate equitable relief with respect
to the Class as a whole.

177.   Plaintiffs know of no special difficulty to be encountered in the maintenance
of this action that would preclude its maintenance as a class action.

## VI.    CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c), COLLECTION OF UNLAWFUL DEBT
### (AGAINST GREAT PLAINS, VICTORY PARK, VP MANAGEMENT, TCV, AND SEQUOIA CAPITAL)

178.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

179.    At all relevant times, Great Plains, Victory Park, VP Management, TCV, and Sequoia Capital (the "RICO Defendants") were members and associates of an internet payday lending enterprise (the "Great Plains Enterprise"), whose members and associates engaged in the collection of unlawful debt.

180.    The Great Plains Enterprise, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and entities associated in fact.   In addition to the RICO Defendants, the Great Plains Enterprise has included Rees, Think Finance, LLC, TC Loan, TC Decision Sciences, Tailwind Marketing, GPLS, the Collateral Agent, GPL Servicing Trust, GPL Servicing Trust II, the Sequoia Funds, the Sequoia General Partners, the TCV Funds, TCM V, Haynes, and John Does 1-10, as well as Non-Defendant Interested Parties the Tribe, Shotton, and Grant.

181.    The enterprise is engaged in, and its activities affect, interstate commerce. The Great Plains Enterprise has leadership based in Chicago, Illinois, Addison and Fort Worth, Texas, and Palo Alto and Menlo Park, California, and operates throughout the United States, including the Middle District of North Carolina.

58

182.    The Great Plains Enterprise constitutes an ongoing organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

183.    The Great Plains Enterprise is led, controlled, and managed by the RICO Defendants.

184.    The purpose of the enterprise was and continues to be the enrichment of the RICO Defendants, and other members and associates of the Great Plains Enterprise through the collection of unlawful debt.

185.    RICO defines an "unlawful debt" as debt incurred in connection with "the business of lending money or a thing of value at a usurious rate under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).  The RICO Defendants have violated RICO through the "collection of unlawful debt" as that term is defined in RICO, 18 U.S.C. § 1962(c).

186.    The means and methods by which the RICO Defendants and other members and associates conducted and participated in the conduct of the affairs of the Great Plains Enterprise was and continues to be the operation, direction, and control of the payday loan companies in the business of lending money at usurious rates under the laws of numerous states, including without limitation North Carolina, Florida, and Texas, where the usurious rates charged were at least twice the enforceable rate.

187.    In operating and conducting the affairs of the Great Plains Enterprise, the RICO Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the Great Plains Enterprise.

188.   The RICO Defendants' leadership, management, and participation in the Great Plains Enterprise began at some point as early as May 2011, following the formation of Defendant Great Plains and continues to date to the detriment of individual consumers throughout the United States.

189.   The predicate acts of collection of unlawful debt are described herein and in particular in ¶¶ 122, 125, 133, 136, 139, 142, 149, and 152 herein.  The debts incurred by Plaintiffs and all other members of the Class are unlawful and unenforceable.

190.   As a result of the unlawful collection of illegal debt, Plaintiffs and members of the Class have been injured in their property in that they paid extortionate and illegal interest rates.

191.   As a direct and proximate cause of the RICO Defendants' violations of RICO, the RICO Defendants are jointly and severally liable to Plaintiffs and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT TWO
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(d), RICO CONSPIRACY (AGAINST DEFENDANTS GREAT PLAINS, VICTORY PARK, VP MANAGEMENT, TCV, SEQUOIA CAPITAL, AND HAYNES)

192.   Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

193.   Beginning as early as February 2011, the RICO Defendants, as defined in Count One, along with Rees and Think Finance, being persons employed by and associated with the Great Plains Enterprise, willfully and knowingly combined, conspired,

confederated, and agreed together and with each other to violate 18 U.S.C. § 1962(c)—that

is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the

Great Plains Enterprise through the collection of unlawful debt.  In addition, Defendants

Haynes and John Does 1-10 knowingly entered into agreements with the RICO Defendants

to facilitate the RICO Defendants' participation and management of the affairs of the Great

Plains Enterprise and engaged in overt acts in furtherance thereof.

194.    Specifically, the RICO Defendants, along with other participants not yet

known to Plaintiffs, violated § 1962(d) of RICO by entering into a series of agreements to

violate § 1962(c).  These agreements, include, *inter alia*: (a) agreements between and

among Great Plains, Victory Park, VP Management, TCV, Sequoia Capital, Think Finance,

Rees, Shotton, and Grant to create the necessary legal frameworks and entities to conduct

the affairs of the Great Plains Lending Enterprise; (b) agreements between and among

Victory Park, VP Management, TCV, Sequoia Capital, Great Plains, Shotton, Rees, and

Think Finance to provide the necessary funds to conduct and expand the affairs of the Great

Plains Enterprise; (c) agreements between and among Victory Park, Rees, Think Finance,

and Haynes to investigate and solicit John Doe banks to perform ACH transactions in

furtherance of the affairs of the Great Plains Enterprise; (d) agreements between Great

Plains, Victory Park, Rees, Think Finance, and John Doe 5 perform ACH transactions in

furtherance of the affairs of the Great Plains Enterprise; (e) agreements between Great

Plains, Rees, Think Finance, and John Doe 3 to refinance and further conduct the affairs of

the Great Plains Enterprise.

195.    Each of the agreements identified in the above paragraph contemplated that a conspirator would commit at least one collection of unlawful debt in the conduct of the affairs of the enterprise.

196.    As a result of the RICO Defendants' participation in the Great Plains Enterprise and the violations of RICO, the RICO Defendants and their co-conspirators are jointly and severally liable to Plaintiffs and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT THREE
**VIOLATIONS OF THE ELECTRONIC FUNDS TRANSFER ACT**
**(AGAINST ALL DEFENDANTS)**

197.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

198.    Defendants are "persons" as that term is defined in Section 1005 of Regulation E, 12 C.F.R. § 1005.2(j).

199.    Section 913(1) of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693k(1), provides that no person may condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers.

200.    Section 1005.10(e)(1) of Regulation E, 12 C.F.R. § 1005.10(e)(1), provides that "[n]o financial institution or other person may condition the extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers, except for credit extended under an overdraft credit plan or extended to maintain a specified minimum balance in the consumer's account."

201.    The Official Interpretation of Regulation E, Section 1005.10(e)(1), 12 C.F.R.

§ 1005.10(e)(1)-1, Supp. I, provides that creditors may not require repayment of loans by

electronic means on a preauthorized recurring basis.

202.    Under § 918(c) of the EFTA, 15 U.S.C. § 1693o(c), every violation of the

EFTA and Regulation E constitutes a violation of the Federal Trade Commission ("FTC")

Act.

203.    In connection with offering online payday loans to consumers, Defendants

have conditioned the extension of credit on recurring preauthorized electronic fund

transfers, thereby violating § 913(1) of the EFTA, 15 U.S.C. § 1693k(1), and §

1005.10(e)(1) of Regulation E, 12 C.F.R. § 1005.10(e)(1).

204.    Defendants' violations of the EFTA are ongoing.

205.    Defendants conditioned the online payday loans on the acceptance of

"automated clearing house" ("ACH") electronic fund transfers as the transaction method.

Specifically, Defendants exploited borrowers' economic situation to compel their

acceptance of ACH transfers.

206.    Loans issued in the name of Great Plains are marketed on Great Plains'

website homepage to consumers as "emergency loans [that] can get you back on track as

soon as tomorrow," and "cash in your account as soon as tomorrow."  The only way for a

borrower to obtain funds that quickly would be to enroll in electronic funds transfer via

ACH.

207.    While Great Plains purports to offer borrowers the option of receiving their

loan via paper check, the borrower must wait for delivery of the check via U.S. Mail, which

typically takes 7-10 days.  The Great Plains loan documents indicate that interest begins accruing on the Effective Date of the loan, which is generally four days after the borrower signs the loan agreement.  A borrower with payments due every two weeks could have their first payment due as little as one day after receiving the check, with the first payment due date coming before the loan check can be deposited and cleared by the receiving bank.

208.    Any choices with respect to opting for ACH or other methods were false choices, compelling the borrower to accept transfers by ACH, which is prohibited by the EFTA.

209.    By engaging in the violations of the EFTA and Regulation E set forth herein, Defendants have violated the FTC Act.

210.    As a result of Defendants' violations of the EFTA, Plaintiffs were damaged.

## COUNT FOUR:
## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

211.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

212.    Defendants have been unjustly enriched by their continued possession of funds illegally taken from Plaintiffs and members of the Class who were experiencing financial difficulties and taken advantage of through the Great Plains illegal lending scheme.

213.    In equity and good conscience, those funds should be returned to the people victimized by Defendants' unlawful scheme.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully seek the following relief:

A.     Certification of this action as a class action and appointing Plaintiffs and their counsel (listed below) to represent the Class;

B.     A declaration that loans made in the name of Great Plains are unlawful, unenforceable, and void.

C.     A declaration that the governing law, forum selection clause, and Purported Arbitration Clause provisions of the Great Plains agreements are unenforceable in their entirety.

D.     A finding that the Defendants have violated § 1962(c) of RICO through the collection of unlawful debt;

E.     A finding that Defendants have violated § 1962(d) of RICO through their conspiracy to engage in the collection of unlawful debt under § 1962(c) of RICO;

F.     Awarding Plaintiffs and the Class equitable relief to the extent permitted by the above claims, including but not limited to: an accounting; a return of all unlawful interest and finance charges paid in connection with the loan; disgorgement of profits; a constructive trust; restitution; and/or any other remedy the Court deems proper;

G.     Treble damages under 18 U.S.C. § 1964.

H.     An injunction against further violations of law;

I.     An order awarding attorneys' fees and costs; and

J.     An award of any such other and further relief that the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury of all issues so triable.


Dated:  February 16, 2018                    Respectfully submitted,


                                             /s/Edward B. Davis
                                             **BELL DAVIS & PITT, P.A.**
                                             Edward B. Davis, N.C. State Bar No. 27546
                                             Kevin G. Williams, N.C. State Bar No. 25760
                                             100 North Cherry Street, Suite 600
                                             P. O. Box 21029
                                             Winston-Salem, NC  27120-1029
                                             Telephone:  (336) 722-3700
                                             Facsimile: (336) 748-5890
                                             Email: ward.davis@belldavispitt.com
                                                    kwilliams@belldavispitt.com

                                             **BERMAN TABACCO**
                                             Kathleen M. Donovan-Maher (*pro hac vice* forthcoming)
                                             Steven J. Buttacavoli (*pro hac vice* forthcoming)
                                             Steven L. Groopman (*pro hac vice* forthcoming)
                                             One Liberty Square
                                             Boston, MA  02109
                                             Telephone: (617) 542-8300
                                             Fax: (617) 542-1194
                                             Email: kdonovanmaher@bermantabacco.com
                                                    sbuttacavoli@bermantabacco.com
                                                    sgroopman@bermantabacco.com

                                             **GRAVEL & SHEA PC**
                                             Matthew B. Byrne (*pro hac vice* forthcoming)
                                             76 St. Paul Street, 7th Floor
                                             P.O. Box 369
                                             Burlington, VT  05402-0369
                                             Telephone: (802) 658-0220
                                             Fax: (802) 658-1456
                                             Email: mbyrne@gravelshea.com

                                             *Counsel for the Plaintiffs and the Class*