Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75209
Telephone: (214) 979-3000

Tyler P. Brown (admitted pro hac vice)
Jason W. Harbour (admitted pro hac vice)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower 951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

*Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Think Finance, LLC, *et al.*;[1] | § | Case No. 17-33964 (HDH) |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |
| | § | |

## MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION TO
## EXCLUDE TESTIMONY OF MOVANTS' EXPERT WITNESSES
## DESIGNATED FOR THE INITIAL HEARING ON THE 7023 MOTIONS

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by

their undersigned counsel, hereby submit this motion (the "Motion") seeking to exclude the

testimony of Eric Schachter ("Schachter") and Shannon R. Wheatman ("Wheatman"),

individuals designated by VT/NC Counsel[2] and VA/FL/CA Counsel, respectfully, to provide

purported expert testimony at the initial hearing on the 7023 Motions scheduled to begin on

August 7, 2018.  In support of the Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Think Finance, LLC (6762), Think Finance SPV, LLC (4522), Financial U, LLC (1850), TC Loan Service, LLC (3103), Tailwind Marketing, LLC (1602), TC Administrative Services, LLC (4558), and TC Decision Sciences, LLC (8949).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Omnibus Objection of the Debtors and Debtors-in-Possession to the 7023 Motions Regarding the Initial Hearing* (the "Objection") [Doc. No. 693] filed contemporaneously herewith.

HOU:3901010.2

## I.      Preliminary Statement

1.      Even though there is no jury, this Court has an obligation to serve a gatekeeping role and exclude purported expert testimony that is not relevant or not reliable. *See Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147-148 (1999).   The proposed testimony from the Movants' two designated experts, Schachter and Wheatman, is neither relevant nor reliable.

2.      VT/NC Counsel proposes to call Schachter to give an opinion that the notice procedures found in the Bar Date Order (the "Notice Procedures") and the notices themselves (the "Notices") do not meet the standard set forth in Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure and were designed to deter participation in the bankruptcy process.  VA/FL/CA Counsel proposes to call Wheatman to give an opinion that "whether or not the Debtors' notice program would comply with Bankruptcy procedure, it would not serve as a reasonable, effective or comparable alternative to a class action claims notice process."  Neither of these opinions are relevant to the matters at issue in the Initial 7023 Hearing.  Nor are the opinions based on any reliable methodology that could be admissible under applicable law.

3.      The question for the Court is whether to exercise its discretion to apply Bankruptcy Rule 7023 to the putative class claims.  The Fifth Circuit has identified three factors germane to this issue: "(1) whether the class was certified pre-petition, (2) whether the members of the putative class received notice of the bar date, and (3) whether class certification will adversely affect the administration of the case, especially if the proposed litigation would cause undue delay."  *In re TWL Corp.*, 712 F.3d 886, 893 (5th Cir. 2013).  Neither designated expert addresses any of these factors in their reports.  Their opinions concern whether the Notice and Notice Procedures would satisfy, or serve as an effective alternative to, a rule that does not apply to bankruptcy bar date notices and that the Court need not address at the Initial 7023 Hearing.

For these reasons, the proposed expert testimony should be excluded because it does not satisfy the requirement of relevance under applicable law.

4.      Further, the opinions are inadmissible under *Daubert* and its progeny for lacking reliability.  Opinions based on nothing more than *ipse dixit* conclusions, without any supporting data or analysis, are rightfully excluded.  By Schachter's own admission, he has no experience in bankruptcy bar date noticing.  Thus, he does not even have a basis to give an opinion about the effectiveness or design of the Notice and Notice Procedures, and he has not pointed to any data or analysis to support his opinions.  As for Wheatman, the report fails to employ *any* methodology, much less one that could meet the *Daubert* factors for reliability, to support the conclusions about comparative claims submission rates[3] and confusion among consumer borrowers.  Without employing a reliable methodology, and in Schachter's case without having any experience in the subject matter, the testimony cannot be accepted as expert testimony.

5.      Apart from lacking relevance or reliability, the efforts of Schachter and Wheatman to challenge the design and content of the Debtors' proof of claim forms, the proof of claim instructions, the FAQ, and the selection of newspapers for publication, are a belated, collateral attack on the Court's prior ruling that the Notices and Notice Procedures satisfied due process requirements.  The Movants should not get a second bite at the apple.  This purported "expert" testimony is contrary to the prior findings of this Court and supportive only of arguments that the Movants have waived and are collaterally estopped from pursuing.  For this additional reason, the Court should exclude the proposed testimony of Schachter and Wheatman.

---

[3] As an initial matter, the claims submission rate is irrelevant with respect to whether the Notice Procedures satisfied due process or whether putative class members received the Notices.

HOU:3901010.2

## II.    Jurisdiction and Venue

6.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## III.    Background

7.    In support of this Motion, the Debtors incorporate by reference the recitation of facts set forth in the background section of their Objection as if fully set forth herein.  In further support of the Motion, the Debtors set forth the following facts.

8.    In accordance with the deadline for exchanging expert reports in the Agreed Scheduling Order Regarding Class Claims (the "Original Scheduling Order") [Doc. No. 356], on March 30, 2018, VT/NC Counsel produced the Expert Report of Eric Schachter ("Schachter Report") in support of the VT/NC 7023 Motions, a copy of which is attached hereto as Exhibit A.[4]  The Schachter Report purports to address whether the bar date noticing process approved by this Court in the Bar Date Order was the "best notice practicable under the circumstances," a legal standard for notices provided to class members for any class certified under Rule 23(b)(3) of the Federal Rules of Civil Procedure.  Schachter Report ¶ 6.  Neither Mr. Schachter nor his firm, A.B. Data, have any experience with a bankruptcy bar date noticing process or have ever been retained in a bankruptcy case.  *See* Schachter Dep. Tr. 14:3–15:24 (July 24, 2018).  A copy of the cited portions of the Schachter deposition transcript is attached hereto as Exhibit B.

9.    VA/FL/CA Counsel did not produce any expert report by the deadline provided by the Original Scheduling Order that purports to address whether the Court should exercise its

---

[4] Although the Debtors attach the Schachter Report to this Motion as Exhibit A, portions of the Schachter deposition transcript as Exhibit B, the Wheatman Report as Exhibit C, and portions of the Wheatman deposition transcript as Exhibit D, to confirm the accuracy of certain statements herein, the Debtors reserve all rights to object to the admissibility of such Reports and transcripts in connection with the Initial 7023 Hearing.

discretion to apply Bankruptcy Rule 7023 to the Movants' putative class claims.    At the scheduling hearing on July 3, 2018, held in order to resolve disputes among the parties regarding entry of an amended scheduling order concerning the Initial Hearing, VA/FL/CA Counsel requested permission to produce two new expert reports.

> They are going to have a rebuttal expert anyways, and it's similar issues, but our experts will be adding a little bit – something a little bit different from the consumer perspective.  Our proposed expert is Dr. – I can tell the Court right now is Dr. Shannon Wheatman.  She is a PhD, and she regularly testifies in large class actions and is familiar with consumer borrowers and the language that is necessary for consumer borrowers to understand their rights and to understand the process.    Additionally, we have an expert from the National Consumer Law Center to testify about these type of consumer borrowers and the notice and how – whether or not it may be effective.

Hr'g Tr. 8:13-25 (Jul. 2, 2018).

10.    Based on this representation, the Court permitted VA/FL/CA Counsel to designate two new experts and produce two new expert reports on the same day.

11.    That same day, VA/FL/CA Counsel produced a single expert report, the Expert Report of Shannon R. Wheatman, Ph.D. ("Wheatman Report," and together with the Schachter Report, the "Reports").  A copy of the Wheatman Report is attached hereto as Exhibit C.  Like the Schachter Report, the Wheatman Report purports to address whether the bar date noticing process approved by this Court in the Bar Date Order was the "best notice practicable under the circumstances" and gives the opinion that "[w]hether or not the Debtors' notice program would comply with Bankruptcy procedure, it would not serve as a reasonable, effective, or comparable alternative to a class action claims program notice process."    Wheatman Report ¶¶ 13, 14. Wheatman admits that her engagement was limited to "form[ing] an opinion as to whether [the Notice and Noticing Procedures] would fulfill Rule 23 notice requirements."    Wheatman Dep. Tr. 9:14-17 (July 23, 2018).  A copy of the cited portions of the Wheatman deposition transcript is attached hereto as Exhibit D.

### III.    Argument

**A.    The Legal Standard for Admitting Expert Testimony**

12.    Rule 702 of the Federal Rules of Evidence ("FRE") provides that an expert witness may provide opinion testimony if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to **understand the evidence** or to **determine a fact in issue**." Fed. R. Evid. 702(a) (emphasis added).  Trial judges have a "gatekeeping" obligation to exclude purported expert testimony that is not reliable or that is not relevant. *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147-148 (1999).  Only expert testimony that is both relevant and reliable may be admitted. *Id.* at 141.  The party offering the expert testimony has the burden of establishing that the testimony is admissible under the standard provided by FRE 702 and controlling judicial precedent. *See id.* at 147.

13.    The relevant question for the Court at the Initial 7023 Hearing is whether to apply Bankruptcy Rule 7023 to the putative class claims, a discretionary determination that the Fifth Circuit has indicated includes the following factors: "(1) whether the class was certified pre-petition, (2) whether the members of the putative class received notice of the bar date, and (3) whether class certification will adversely affect the administration of the case, especially if the proposed litigation would cause undue delay." *In re TWL Corp.*, 712 F.3d 886, 893 (5th Cir. 2013).

14.    As for factor two (2) concerning whether putative class members received notice of the General Bar Date, the Court has already approved the Notice Procedures and the Notices, including finding that the "procedures set forth in the [Bar Date Motion] are fair and reasonable and will provide good, sufficient and proper notice to all potential creditors of their rights and obligations in connection with the claims that they may have against the Debtors or their property in these Bankruptcy Cases." Bar Date Order at 2.  As this was a prior contested matter

-6-

involving the same parties, the Movants are collaterally estopped from attacking the Notice

Procedures and the Notices, and the Court's prior findings are the law of the case. *See In re*

*Radnor Holdings Corp.,* 564 B.R. 467, 484 (D. Del. 2017); *In re W.R. Grace & Co.*, 398 B.R.

368, 373-74 (D. Del. 2008). Thus, the only relevant remaining factual questions for the Court

are whether the Debtors followed the Notice Procedures, whether the Notices were successfully

delivered and whether the putative class members are within the group that received the Notices.

If there is *admissible* expert testimony concerning factor two (2), it must assist the Court in

answering these questions or assist the Court in understanding the evidence concerning these

questions.

**B.     The Reports and Testimony Are Inadmissible as Not Relevant**

15.     FRE 401 defines relevant evidence as that which has "any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence." *Nixon v. Krause, Inc.*, No. 3:00-CV-0915-

L, 2003 WL 26098644, at *4 (N.D. Tex. Aug. 29, 2003) (*quoting* Fed. R. Evid. 401). "The

relevancy requirement ensures that the expert testimony will actually 'assist the trier of fact to

understand the evidence or to determine a fact in issue.'" *Id.* (citing *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

**a.     The Reports do not address any of the factors specified by the Fifth Circuit**
**as applicable to the 7023 Motions**

16.     Neither Wheatman nor Schachter attempt to address any of the factors identified

by the Fifth Court as germane to the 7023 Motions, including whether a class was certified pre-

petition or whether class certification would adversely affect administration of the bankruptcy

cases, which are factors one (1) and three (3).

HOU:3901010.2

17.    Save for one exception, neither Report expresses any opinion about factor two (2) either, which is whether putative class members received notice of the General Bar Date.  For example, there is no analysis concerning how many putative class members received the Bar Date Postcard.  Nor is there any analysis about how many putative class members received electronic notice of the General Bar Date.[5]  The one exception in each of the Reports is the opinion that publication notice did not effectively reach putative class members due to the choice of publications.  *See* Wheatman Report, at ¶ 20; Schachter Report, at ¶ 15.  However, these opinions are similarly unhelpful to the Court because the Bar Date Order already approved publication of the General Bar Date in national editions of *The Wall Street Journal* and *USA Today*.  *See* Bar Date Order ¶ 24.  If the Movants believed that other publications were more appropriate, they should have brought that to the attention of the Court at the hearing on the Bar Date Motion.

18.    Rather than attempt to assist the Court in determining whether putative class members received notice of the General Bar Date under the court-approved Notice Procedures— a potentially relevant inquiry—the Reports collaterally attack the content and design of the Notices and the sufficiency of the Noticing Procedures.  Schachter concludes that the Notice Procedures were "inadequate."  Schachter Report ¶ 23.  But the Court already approved the Notice Procedures, finding that they were "fair and reasonable" and that the Notices "will provide good, sufficient and proper notice to all potential creditors."  Bar Date Order, at 2.  Thus, opinions about the content and design of the Notices, and other aspects of the Noticing Process,

---

[5]  The Schachter Report makes reference to a potentially relevant factually inquiry concerning the number of emails that "bounced back" from incorrect or inactive email accounts of consumer borrowers.  *See* Schachter Report ¶ 17.  Such facts are potentially relevant to the Court's determination of whether consumer borrowers received notice of the General Bar Date.  However, the Schachter Report does not give any opinion about this fact and the Report has not been supplemented, despite the Debtors providing this information to VT/NC Counsel on May 31, 2018.  *See* Schachter Dep. Tr. 58:15–59:10.

are irrelevant and particularly unhelpful more than seven months after such materials were mailed.  The appropriate time to offer such opinions would have been at the hearing on the Bar Date Motion.  At this juncture, such opinions are simply irrelevant and should be excluded.

**b.    The Reports address factors purportedly applicable to class action notices, not bar date notices**

19.    Both Reports should be excluded for the additional reason that they purport to address factors that are not relevant to a bankruptcy bar date noticing process.  As explained in the Objection, the noticing requirements for a class action certified under Civil Rule 23(b)(3) have no application to the requirements for approval of a bar date notice, the latter of which is governed by due process.  *See* Objection ¶¶ 66–74.  Yet, both Reports improperly attempt to import these irrelevant requirements into the Court's analysis of whether putative class members received notice of the General Bar Date.  For example, the Wheatman Report discloses that Wheatman was asked to give an opinion on "whether this bankruptcy notice and process could serve as an effective or comparable alternative to a notice process for a claims process under Fed. R. Civ. P. 23."  Wheatman Report ¶ 13.  Said differently, Wheatman was asked whether the noticing process approved by the Court's Bar Date Order satisfied the legal standard for notices provided under Civil Rule 23(b)(3).[6]  That is irrelevant.

20.    Similarly, Schachter purports to give an opinion about whether the Notice and Notice Procedures were "the best notice practicable under the circumstances."  That is the legal standard set forth in Civil Rule 23.  The Debtors have found no case law that imports that

---

[6] Curiously, despite the clear disclosure in paragraphs 13 and 14 of the Wheatman Report that Wheatman was asked by VA/FL/CA Counsel to give an opinion about whether the noticing materials provided to consumer borrowers provided "the best notice practicable under the circumstances"—which is the standard applicable to notices for class actions certified under Civil Rule 23(b)(3)—the final paragraphs of the Wheatman Report opine that the noticing procedures failed to comply with due process standards.  *See* Wheatman Report ¶ 29.  These are two different standards.  Moreover, in contradiction of this later opinion, Wheatman appears to concede, without giving an opinion on the issue, the possibility that "the Debtors' notice program would comply with Bankruptcy procedure," and therefore due process standards, in paragraph 14 of the Wheatman Report.

HOU:3901010.2

requirement into a bankruptcy bar date noticing process, and in fact, case law indicates that the requirements of Civil Rule 23 should not be imported into a bankruptcy bar date noticing process. *See, e.g., In re Chemtura Corp.*, 09-11233 (JLG), 2016 Bankr. LEXIS 4056, *50 (Bankr. S.D.N.Y. Nov. 23, 2016) ("it is inappropriate to apply the subjective notice standards under class action law in evaluating the adequacy of a bar date notice in a bankruptcy case."). Even if the Movants could point to such a case, however, this Court already approved the Notice and Notice Procedures. Moreover, that opinion is simply not relevant to the issue of whether putative class members received notice of the General Bar Date. For all of these reasons, the proposed testimony of the two experts regarding the sufficiency of the Notice and Notice Procedures fails to satisfy the relevancy requirement.

## C.    The Proposed Testimony About the Claims Submission Rate and Consumer Borrower Confusion Fails the Reliability Requirement

21.    Reliability of expert opinions turns on whether they are based on sufficient facts or data and are the product of valid, objective methodologies properly applied to the facts of the case. *See* Fed. R. Evid. 702; *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004) (citing the *Daubert* factors). An opinion is inadmissible when it lacks a reliable factual foundation or is based on an unreliable methodology. *McCarty v. City of Southside Place*, 4:15-CV-01214, 2016 WL 4995048, at *2 (S.D. Tex. July 15, 2016). When "an expert's opinion is based on insufficient information, the analysis is unreliable" and must be stricken. *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). Courts should not admit expert testimony where the "conclusions are nothing more than *ipse dixit*" and based only on the alleged personal experience of the purported expert. *See, e.g., De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd.*, No. 3:12-cv-01462-L, 2015 WL 12698060, at *1 (N.D. Tex. Jan. 21, 2015).

HOU:3901010.2

22.    Both Reports advance the theory that the Notice Procedures were defective because of the claims submission rate.  The Schachter Report claims that in "certain cases" A.B. Data has "implemented direct notice and claims administration programs" with claims submission rates that have exceeded 20%.  *See* Schachter Report ¶ 24.  As an initial matter, the claims submission rate is irrelevant to the determination of whether consumer borrowers received notice, and such testimony should be excluded for the reasons discussed above.  Even if the Court were to consider the claims submission rate as evidence of whether putative class members received notice, which it should not, the Schachter Report fails to disclose any of these "certain cases" or to provide any descriptions about the nature of the cases from which the Court could determine the relevance or reliability of the cited claims submission rate.

23.    In fact, after stating the "20%" claims submission figure, the Schachter Report later discloses that consumer class action cases "can face challenges that tend to reduce claims submission rates."  Schachter Report ¶ 24.  Schachter then discloses that "the average claim rate in [consumer cases] is typically between 5% and 20%."  Again, there is no disclosure of what cases Schachter is referring to or what methodology Schachter used to calculate his "average."  More importantly, however, these cited figures are entirely anecdotal and, by Schachter's own admission, not based on any objective methodology at all.  *See* Schachter Dep. Tr. 56:1–57:3.  Case law suggests that in consumer class actions, the percentage of class members who file claims is "often quite low."  *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014) (noting that the claims submitted were 30,245 out of 12 million, or about 0.25%, which is slightly more than half of the claims submission rate here).  But Schachter admittedly never analyzed the response rates in any bankruptcy cases and the statements in the Schachter Report are not even based on experience in bankruptcy cases.  *See* Schachter Dep. Tr. 52:14–17; 54:25–55:25.

HOU:3901010.2

Schachter also admits he used no methodology whatsoever for the Court to compare claim submission rates to other, similar bankruptcy cases or even to consumer class actions, which would be much less relevant. *Id.* 56:1–57:3. As a result, the claims submission rates cited by Schachter fall well short of what would be required to admit the testimony as expert testimony and the Court lacks the information it would require to even make such a determination. Thus, this testimony should be excluded.

24.     The Wheatman Report suffers the same fatal flaw in not employing any methodology in summarily asserting that the claims submission rate was likely the result of deficiencies in the noticing process. *See* Wheatman Report ¶ 26. Wheatman alleges that "claims rates are typically much higher (between 5% and 15%) in cases where a mailing list of potential claimants can be compiled." *Id.* Like Schachter, none of the cases Wheatman considered in citing these figures were bankruptcy cases. *See* Wheatman Dep. Tr. 65:3–13. Like the Schachter Report, the Wheatman Report fails to disclose what cases Wheatman is referring to or what methodology Wheatman used to calculate the range of claim submission rates cited. The Court cannot determine, for example, whether the targets of the notices were consumers, or whether those cases bear any resemblance to the Debtors' bankruptcy cases at all. Without any cited methodology for calculating the figures cited, the Court cannot even apply the *Daubert* factors to determine whether it would be appropriate to consider the data and this testimony must be excluded.

25.     Wheatman's conclusion that there was "much confusion" among consumer borrowers in the claim submission process also lacks any objective, supporting methodology. *See* Wheatman Report ¶ 25. Wheatman cherry picks ten questions that ALCS received from consumer borrowers without any reference to any sort of methodology used in selecting the

questions, determining that they reflect confusion, or extrapolating the ten data points to a population of more than a million consumer borrowers.  *See* Wheatman Dep. Tr. 51:18–52:4; 53:19–54:6.  Wheatman's comment about confusion, at best, leaves "too great an analytical gap" between the data and the opinion, but appears to be entirely subjective, and lacks any factual foundation and any reliable methodology to support it.  *Lee-Bolton v. Koppers, Inc.*, 319 F.R.D. 346, 371 (N.D. Fla. 2017).  Such testimony is inappropriate in an expert report and should be excluded.  *See, e.g., Imperial Trading Co. v. Travelers Prop. Casualty Co.*, No. 06-4262, 2009 U.S. Dist. LEXIS 132828 (E.D. La. July 28, 2009) ("The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.").

## IV.    Relief Requested

For the foregoing reasons, the Debtors respectfully request that the Court (i) exclude the testimony of Wheatman and Schachter and the Reports; and (iii) and grant such further relief, in law and equity, to which the Debtors may be justly entitled.

Dated: July 26, 2018

Respectfully submitted,

HUNTON ANDREWS KURTH LLP

/s/ Gregory G. Hesse
Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue Suite 3700
Dallas, Texas 75209
Telephone: (214) 979-3000
Email: ghesse@HuntonAK.com

 -and

Tyler P. Brown (admitted pro hac vice)
Jason W. Harbour (admitted pro hac vice)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower 951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

HOU:3901010.2

Email: tpbrown@HuntonAK.com
jharbour@HuntonAK.com

*Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

HOU:3901010.2

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| THINK FINANCE, LLC, *et al*., | ) | Chapter 11 |
| | ) | |
| Debtors | ) | |
| | ) | |
| | ) | Case No. 17-33964 (HDH) |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |

## EXPERT REPORT OF ERIC SCHACHTER

**March 30, 2018**

## I.    INTRODUCTION

1.    My name is Eric Schachter.  I am a Vice President with A.B. Data, Ltd.'s Class

Action Administration Company ("A.B. Data").  I have been asked by counsel for Jessica

Gingras, Angela Given, Vanessa Granger, Beverly Kristina Miller, and Lilya J. McAtee

(collectively, the "Vermont and North Carolina Plaintiffs") to provide an expert opinion (this

"Expert Report") in support of the Vermont and North Carolina Plaintiffs' motions for entry of

orders (i) applying Bankruptcy Rule 7023 to the Plain Green and Great Plains borrower class

claims, and (ii) certifying the classes of Plain Green and Great Plains borrower classes for the

purposes of Plain Green and Great Plains borrower class claims (collectively, the "7023

Motions").

2.    This Expert Report and the opinions contained herein are based upon my personal

knowledge, professional experience, industry-specific knowledge, and expertise in the area of

claims administration and class notice programs, as well as upon information provided to me by

my associates and staff at A.B. Data.

3.    A.B. Data has been appointed as Notice, Claims, and/or Settlement Administrator

in thousands of class actions, administering some of the largest and most complex notice and

settlement programs of all time, involving all aspects of media, direct, and third-party notice

programs, data management, claims administration, and settlement fund distribution.  A profile

of A.B. Data's background and capabilities, including representative case and client lists, is

attached as Exhibit A to this Expert Report.

4.    I have over 10 years of experience in the claims administration industry that

includes implementing and maintaining notice plans and claims administration programs in

hundreds of class action cases and related proceedings, including complex consumer, antitrust,

and securities class actions; Securities and Exchange Commission settlements and related

distributions; and civil rights, employment, and insurance class actions.  My specific case experience includes, but is not limited to: *In re Lithium Ion Batteries Antitrust Litigation*, Case No. 13-MD-2420 (N.D. Cal.); *Roberts v. C.R. England, Inc., et al.,* Case No. 12-cv-00302 (D. Utah); *In re BP plc Securities Litigation*, Case No. 4:10-md-02185 (S.D. Tex.); *The Department of the Treasury of the State of New Jersey and its Division of Investment v. Cliffs Natural Resources Inc., et al*., Case No. 1:14-cv-1031 (N.D. Ohio.); *In re NII Holdings, Inc., Securities Litigation*, Case No. 1:14-cv-00227 (E.D.Va.); *Forsta AP-Fonden, et al. v. St. Jude Medical, Inc., et al*., Case No. 12-cv-3070 (D. Minn.); *In re Facebook, Inc. IPO Securities Litigation (NASDAQ)*, Case No. 12-md-2389 (S.D.N.Y.); *David E. Kaplan, et al. against S.A.C. Capital Advisors, L.P., et al*., Case No. 12-cv-9350 (S.D.N.Y.); *In re: Capacitors Antitrust Litigation*, Case No. 3:14-cv-03264 (N.D. Cal.); and *Shannon Mahoney v. Endo Health Solutions, Inc., et al*., Case No. 15-cv-09841 (S.D.N.Y.).  In my career, I have provided testimony to courts in support of class action notice programs in numerous cases, including the twenty-two cases from the preceding four years listed in <u>Exhibit B</u> to this Expert Report.

5.      A.B. Data is being compensated at a rate of $275.00 per hour for my work on this matter, and my compensation is not contingent on my findings or on the outcome of this matter.

## II.    SUMMARY OF OPINIONS

6.      Based on my review of the Debtors' notice program and related materials, including the Postcard Notice, the Consumer Borrower Proof of Claim form ("Proof of Claim"), the website referenced on the Postcard Notice, www.americanlegal.com/TFConsumerBorrower, the other materials included in <u>Exhibit C</u> to this Expert Report, and my professional experience and judgment, I have reached the following conclusions:

A.  The Debtors' notice program, including the form of Postcard Notice sent to Consumer Borrowers and the manner of publication notice, was not the best notice practicable under the circumstances.

B.  The Consumer Borrower Proof of Claim form and the procedures for submitting a Proof of Claim were designed in a manner to deter participation in the bankruptcy claims process.

C.  The abysmal Consumer Borrower claim submission rate evidences the ineffectiveness of the notice and claims program.

7.  To the extent that additional documents, deposition testimony, or other information is disclosed in discovery concerning Debtors' notice and proof of claim program, I reserve my right to supplement or modify my opinions and this Expert Report as may be necessary.

## III.    THE INEFFECTIVE NOTICE PROGRAM

8.  Based upon my review of the materials described in <u>Exhibit C</u>, my understanding is that a Postcard Notice was mailed via the United States Postal Service ("USPS") to approximately 1,134,125 or 1,300,000 Consumer Borrowers.[1]  According to the form of the Postcard Notice approved by the Court and attached to the Debtors' "Bar Date Motion" (Doc. 69 at 48), the Postcard Notice provided information concerning bankruptcy proceedings concerning "Think Finance, et al." pending in the United States Bankruptcy Court for the Northern District of Texas.  The Postcard Notice also alludes to an informational website, which I understand was

---

[1] Debtors have provided inconsistent information about how many postcard notices were mailed to Consumer Borrowers.  For example, counsel for Debtors stated at a November 20, 2017 hearing that there were "about probably 1.3 million consumer borrowers who will get a postcard at a distinct address." However, in the Motion of the Debtors and Debtors-in-Possession for Entry of an Order Approving Procedures For Claims Objections (Doc. No. 372), Debtors state that notice was provided to a smaller number of "approximately 1,134,125" Consumer Borrowers.

set up at the internet address www.americanlegal.com/TFConsumerBorrower, where "more information" and a "proof of claim form" can be obtained.  The instructions accompanying the Proof of Claim form provided that in order to make a claim for payment in a bankruptcy case, the Proof of Claim form needed to be downloaded, printed, completed and mailed to "Think Finance, LLC et al., c/o ALCS" at a post office box in Jacksonville, Florida.  According to Debtors' Motion for Entry of an Order Approving Procedures for Claims Objections (Doc. No. 372), as of March 29, 2018, approximately 4,932 Proof of Claim forms have been submitted by Consumer Borrowers, representing a claim submission rate of less than one half of one percent, between 0.38% and 0.43%, depending on the number of notices mailed.

9.    My understanding is that the Consumer Borrowers, including people who are members of putative classes in the class actions brought by the Vermont and North Carolina Plaintiffs, took out online "payday" loans through online lending websites called Great Plains Lending, Plain Green, and MobiLoans.  In my experience with other consumer-oriented class actions, and based on guidance widely accepted in the claims administration industry provided by the Federal Judicial Center in the FJC's Judge's Class Action Notice and Claims Process Checklist and Plain Language Guide (the "FJC Notice Guide"), the best notice practicable under the circumstances would need to, among other things, be tailored to meet the particular demographics of the targeted class of notice recipients, be appropriately targeted to reach the intended recipients, be designed to come to the attention of the class, be written in clear, concise, and easily understood language, and contain sufficient information for a class member to make an informed decision.  Moreover, the FJC Notice Guide provides for, among other things that: i) "notices stand out as important, relevant, and reader-friendly"; ii) a "prominent headline" be

featured; and iii) the overall layout of the notice will dictate whether busy class members will take their time to read the notice and learn of their rights."

10.      Based on my experience with class action notice programs, I have identified several deficiencies with the Debtors' Postcard Notice and other aspects of the Debtors' Consumer Borrower notice program as presented in the materials I have reviewed to date compared to industry best practices and guidance from the FJC Notice Guide.

11.      The Debtors' Postcard Notice was not designed to come to the attention of Consumer Borrowers and does not provide Consumer Borrowers with sufficient information about the bankruptcy proceedings and the relevance of those proceedings to those people.  The people who received the Postcard Notice took out loans from online lenders named Great Plains Lending, Plain Green, and MobiLoans.  Those entities' names, which likely were known by or familiar to the Consumer Borrowers, do not appear *anywhere* on the postcard, much less appearing prominently as part of a design intended to catch the attention of the Consumer Borrowers, making it substantially less likely for Consumer Borrowers to seek additional information about the bankruptcy and the claims process.  Further, the one reference near the bottom of the Postcard Notice to "sovereign Native American Tribal lender" conveys little, if any, useful information to recipients of the Postcard Notice, particularly anyone who may not have associated Great Plains Lending, Plain Green, or MobiLoans with any Native American tribe.  Since Consumer Borrowers did not knowingly transact with Think Finance, LLC, a recipient who read just the first few sections of the Postcard Notice would have no idea how these bankruptcy proceedings affected them and likely would not take the time to read through the information and submit a claim.

12.      The Postcard Notice in this case also does not use a layout that would capture the

attention of Consumer Borrowers.  There is no headline, clear call-to-action, or clear command for the recipient.  Based upon my experience working with notice programs and consistent with industry best practices and the FJC Notice Guide, my recommendation would have been to put a large font headline on the front and back of the postcard that said:  "IF YOU TOOK OUT AN ONLINE LOAN FROM GREAT PLAINS LENDING, PLAIN GREEN, OR MOBILOANS, YOU MAY BE ELIGIBLE TO RECOVER MONEY."

13.     The Postcard Notice is not written in a clear and concise manner and with plain language.  The FJC Notice Guide, an industry standard guideline for preparing class action notices, provides the following notable checklist items:

- Will the notices come to the attention of the class?

- Are the notices informative and easy to understand?

14.     The Postcard Notice was not drafted using plain and easy to understand language. The language used by Debtors is highly technical, includes bankruptcy jargon (*e.g.*, "filing proofs of claim against the Debtors by non-governmental units," and the reference to claims "arising or deemed to have arisen prior to the Petition Date") and is otherwise not relatable to an ordinary individual consumer.  There is also no clear explanation as to how these bankruptcy proceedings affect the consumer and why a Consumer Borrower should submit a claim.  I believe that there are likely many Consumer Borrowers who, after reading this notice, may have thought that they were either being sued, being threatened with bankruptcy, or received the notice in error.

15.     I understand that, as part of their notice program, the Debtors published notice of the Bar Date in national editions of the *Wall Street Journal* and *USA Today*.  The audiences of the *Wall Street Journal* and *USA Today*, which are in large part business professionals in

managerial positions, do not align with the apparent demographic of the Consumer Borrowers.

Instead, if a notice program were to use media to provide notice to potential Consumer

Borrowers, based on my experience with designing similar programs, my colleagues at A.B.

Data and I would have recommended serving targeted online banner ads across digital platforms

(such as the Google and Yahoo! networks) and social media including Facebook and Twitter.

Those banner ads and social media marketing would have been microtargeted to Consumer

Borrowers using behavioral and contextual targeting, and geotargeted to Consumer Borrowers

using their known mailing addresses.  These digital media ads would include a link to the

informational website allowing Consumer Borrowers to directly connect to the Proof of Claim

form which has historically resulted in an increased number of claims submitted.  In addition to

these benefits, this type of digital media notice is typically more cost effective than traditional

print media.

16.    I also understand from the Bar Date Order in this case that, as part of their notice

program, the Debtors were to provide "electronic notice" to certain Consumer Borrowers by

email that contained "substantially the same information as provided in the Bar Date Postcard,"

with a link to an informational website.  To the extent that the email notice was, in fact,

"substantially the same" as the Postcard Notice, I would have the same opinions regarding the

insufficiency of the content, language (and possibly the layout) of the email notice as I have

regarding the Postcard Notice.  The email notice program may have had further deficiencies,

including for example, based on the sender's name and email address, the subject line, web

address or URL of any links in the email message, and other information that may give the

appearance that the message was unwanted, irrelevant "spam" email or, worse, a "phishing"

scam or something potentially malicious that would cause the recipient to ignore or delete the

email message. To the extent that information regarding the email notice program is provided through the discovery process, I may seek to supplement or amend my Expert Report and opinions to address such information.

17.    Further, based on my experience with email notice programs involving class actions, I would also want to know information regarding, among other things, the numbers of emails sent, the numbers of emails "bounced back" from incorrect or inactive email accounts, and any other information regarding Debtors' tracking of email delivery, receipt, and action by the recipient to further understand the potential effectiveness of the email component of the Debtors' notice program. To the extent that such information is provided through the discovery process, I may seek to supplement or amend my Expert Report and opinions to address such information.

18.    The Postcard Notice provided a toll-free telephone number for Consumer Borrowers to call if they wanted more information or wanted to obtain a Proof of Claim form. I understand that, after reaching a recorded message, Consumer Borrowers were able to leave a voicemail message for a call-back. Further, I understand from Consumer Borrower Plaintiffs' counsel that recordings of those voicemails may have been deleted and are no longer available. In my experience, it is a best practice to maintain and archive original class member communications, whether by hard copy, email, or voicemail messages, in the event those original communications are needed in future proceedings. I find it odd that these voicemails might have been deleted and that there would be no existing records on the specific details surrounding the call. In addition to records related to inquiries from Consumer Borrowers to the toll-free telephone number, I would also want to know what "scripts" or other guidance were provided to call center or other personnel who spoke with Consumer Borrowers about the notice and claims

process to determine the effectiveness of the notice program.  To the extent that such information

is provided through the discovery process, I may seek to supplement or amend my Expert Report

and opinions to address such information.

### IV.      THE INEFFECTIVE CLAIMS PROCESS

19.      The Postcard Notice required any Consumer Borrower who wished to submit a

Proof of Claim to access the internet, go to the informational website, find the link to the Proof

of Claim form, download the Proof of Claim form, print the Proof of Claim form, complete the

Proof of Claim form, gather, copy and/or print any supporting documentation, obtain an

envelope, apply postage, and insert the completed Proof of Claim in an envelope to be placed in

to the mail stream.  This process is overly burdensome on Consumer Borrowers and, in my

experience, the use of mail-in-only claims has deterred the claim submission rate in similar

contexts.

20.      My recommendation would have been, consistent with increasingly standard

industry practice and guidance of the FJC Notice Guide, to provide an option for Consumer

Borrowers to submit the Proof of Claim form online through the informational website, which

would have alleviated many of these burdensome steps.  As the FJC Notice Guide indicates, use

of "an online submission option" increases claims based on convenience and the increasingly

widespread public expectation of "the convenience of one-click submission of claims."

21.      As a further alternative to increase claim submissions, I would have recommended

attaching the Proof of Claim form to the mailed Postcard Notice as a detachable postcard, which

would eliminate the need for the consumer to go retrieve and print the Proof of Claim from the

website.  Notably, the USPS allows for detachable postcards to be sent at the same postcard

postage rate as a single postcard such that the postage costs for sending a detachable Proof of

Claim form would have not have increased and print costs would only have slightly increased. Any increase in print costs would have likely been more than offset by the benefit of generating increased claim submissions.

22.      The Proof of Claim form also suffers from many of the same deficiencies present with the Postcard Notice.  In my experience, claim submission rates depend in large part on how voluminous, complex, and accessible to the consumer the information requested on the Proof of Claim form is.  Generally speaking, forms that require just a name, signature and basic contact information are far more likely to be completed and returned as compared to forms that require many data points, transactional information and/or documentation.  Here, the Proof of Claim Form required eight sections of information, and certain of those data points would not be readily accessible or determinable by a Consumer Borrower, including the Date Loan Received, the Loan Number, and the Amount & Basis of Claim.  In my experience designing claims processes for class actions, the Debtor would have been able to search their records and obtain substantially all of the relevant information (loan date and amount, interest charged, borrower name, etc.) to facilitate the consumer's claim.  The burden on the consumer could have been alleviated by either pre-populating the form and sending it to the consumer as described above,[2] or requiring just a name and some more limited contact information such as an address or telephone number.

## V.      THE CLAIMS SUBMISSION RATE EVIDENCES THE INADEQUACY OF THE NOTICE AND CLAIMS PROGRAM

23.      For the reasons stated herein, it is my opinion that the Debtors' notice program for

---

[2] The Postcard Notice similarly could have been tailored to be more meaningful to Consumer Borrowers using data available to the Debtors that would, for example, more clearly identify the relevant tribal lending entity (Great Plains Lending, Plain Green, or MobiLoans) on the face of the postcard sent to a particular Consumer Borrower.  Without further information regarding the manner in which Debtors mailed the Postcard Notices, however, I cannot determine whether such customization would have been cost-effective under the circumstances.  Should such information become available, I may supplement or revise my Expert Report to address that information.

purposes of providing notice to the class of Consumer Borrowers was inadequate and not the best practicable under the circumstances.  The inadequacy of the notice and claims submission program is further evidenced by the stunningly low claim submission rate of less than 0.5% (between 0.38% and 0.43%, depending on the number of notices that were actually mailed).

24.    Based on my experience in claims administration, a claim rate of less than 0.5% through a direct mail and email notice program would never be deemed by a court to evidence effective notice to a class.  By comparison, in certain cases in which A.B. Data has implemented direct notice and claims administration programs, the claim rate has exceeded 20%.    In consumer class action cases, which can face challenges that tend to reduce claim submission rates (and that have claim rates below other types of class actions with higher participation rates, such as securities class actions), our experience indicates that the average claim rate in those cases is typically between 5% and 20%, and that a rate of less than 1% would suggest that the notice and claims program was ineffective.

## <u>LIMITING FACTORS AND OTHER ASSUMPTIONS</u>

25.    This Expert Report is furnished solely for the purpose of class certification proceedings in the above-captioned matter and may not be used for any other purpose.  The analysis and opinions contained in this Expert Report are based on information available as of the date of this Report.  I reserve the right to supplement or amend this report, including in the event additional information becomes available.


Dated: March 30, 2018

_____

Eric Schachter

# EXHIBIT A

## A.B. DATA, LTD.
## PROFILE OF CAPABILITIES



Headquarters
600 A.B. Data Drive
Milwaukee, WI 53217
p: 866-217-4470
f: 414-961-3099

New York
One Battery Park Plaza
32nd Floor
New York, NY 10004
p: 646-290-9137

Washington, D.C.
1808 Swann Street, NW
Washington, D.C. 20009
p: 202-618-2908
f: 202-462-2085

Florida
3507 Kyoto Gardens Drive
Palm Beach Gardens, FL 33410
p: 561-336-1801
f: 561-336-1808

Israel
19 Weissburg Street
Tel Aviv 69358
Israel
p: +972 (3) 720-8782



info@abdataclassaction.com
Rev. 8/1/17

## ABOUT A.B. DATA

Founded in 1981, A.B. Data has earned an international reputation for expertly managing the complexities of class action administration in securities class actions, Securities and Exchange Commission (SEC) enforcement actions, and ERISA, consumer, antitrust, employment, civil rights, insurance, environmental, wage and hour, and other class action cases. A.B. Data's work in all aspects of class action administration has been perfected by decades of experience. Dedicated professionals deliver A.B. Data's all-inclusive services, working in partnership with its clients to administer their class action cases effectively, efficiently, and affordably, regardless of size or scope.

A.B. Data has administered hundreds of class action cases involving billions of dollars in total settlements. A.B. Data was among the 5,000 fastest-growing companies on the 2010 *Inc.* and 2013 *Inc.* 500|5000, an exclusive ranking of the nation's entrepreneurial businesses. We were the only class action administration company to achieve this elite standing in 2010.

Whether notifying millions of class members in the United States or throughout the world, processing millions of claims, or printing and distributing millions of checks, A.B. Data matches its talent and technology to the specific needs of its clients, delivering unparalleled service on time and on budget without ever compromising quality.

A.B. Data offers unmatched resources and capacity, and is capable of expertly administering any class action notice, settlement, and/or fund administration. We offer the highest level of security and have the in-house capacity to mail four million personalized pieces every 24 hours. The company's 170,000-square-foot mail distribution center, with its own on-site United States Postal Service (USPS) substation, is one of the nation's largest and most advanced facilities. In addition, A.B. Data has been entrusted to Magnetic Ink Character Recognition- (MICR-)print and mail more than 20 million checks in one year alone and has the capacity to print and mail 1 million checks per day.

A.B. Data has administered some of the largest and most complex class action cases in history. Our success is driven by passion for class action administration and our focus on client relationships. An intensely case-specific approach and a philosophy of respect and professionalism toward our clients and claimants guide every aspect of our work, from the presettlement phase through notice administration, claims processing, and fund distribution.

A.B. Data administers class action cases on schedule and on budget with accuracy and efficiency. Trust the extraordinary, experienced professional talent at A.B. Data, and retain our services.

info@abdataclassaction.com

| Headquarters | New York | Washington, D.C. | Florida | Israel |
|---|---|---|---|---|
| 600 A.B. Data Drive | One Battery Park Plaza | 1808 Swann Street, NW | 3507 Kyoto Gardens Drive | 19 Weissburg Street |
| Milwaukee, WI 53217 | 32nd Floor | Washington, D.C. 20009 | Palm Beach Gardens, FL 33410 | Tel Aviv 69358 |
| p: 866-217-4470 | New York, NY 10004 | p: 202-618-2908 | p: 561-336-1801 | Israel |
| f: 414-961-3099 | p: 646-290-9137 | f: 202-462-2085 | f: 561-336-1808 | p: +972 (3) 720-8782 |



A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

info@abdataclassaction.com
Rev. 8/1/17

# TABLE OF CONTENTS

FACTORS THAT DIFFERENTIATE A.B. DATA

CLASS ACTION ADMINISTRATION SERVICES

    Presettlement Consultation

    Notice Administration

    Publication Notice, Print Media, Social Media, and Digital Media

    Reach and Frequency Analysis

    Claims Processing

    Development of Distribution Plans

    Fund Distribution

    Call Center

    Website Services

    Secure Environment

    Data Security

    Fraud Prevention and Detection

    Accountability and Reporting

    Community and Diversity

    Environmentally Friendly Business

A.B. DATA'S LEADERSHIP

NOTABLE NON-CLASS-ACTION ENGAGEMENTS

NOTABLE CLASS ACTION ENGAGEMENTS



# FACTORS THAT DIFFERENTIATE A.B. DATA

- A.B. Data's competitive and transparent pricing structure contains no hidden fees or unpredictable expenses. No out-of-scope or additional services or costs are incurred without clients' prior approval.

- Our experienced class action administration team includes attorneys and CPAs who handle every aspect of the administration and deliver an impeccable work product with exemplary service. Our executive and management professionals have, on average, 14 years or more of industry experience, and our client services/project employees average ten years.

- We rapidly respond to our clients' needs and strive to exceed their expectations in every detail.

- A.B. Data's notice programs are known worldwide for their innovation, efficiency, and compliance with due process requirements.

- Our customized approach results in simplified claims processing, quick distributions, and considerable cost savings.

- A.B. Data's proprietary fraud detection database prevents payment of fraudulent claims.

- Our call center operates 24/7 and contains state-of-the-art telecommunications systems designed to meet the requirements of all administration projects.

- Our cutting-edge information and systems technologies enable us to provide superior quality control and quality assurance.

- Our proprietary online claims-submission system allows class members to submit claims in a fast, flexible, and cost-effective manner.

- A.B. Data offers the highest level of security and has the in-house capacity to mail 4 million personalized pieces every 24 hours. A.B. Data's 170,000-square-foot mail distribution center, with its own on-site USPS substation, is one of the nation's largest and most advanced facilities.

- We maintain a neutral focus when working with multiple clients, including class counsel, defense counsel, defendant companies, government entities, special masters, and claims-filing services.

- A.B. Data's in-house printing, mailing, and operational facilities streamline communication and maintain the highest level of security.

- Documents are designed to withstand legal scrutiny through accurate, efficient, and timely preparation.

- Clients receive updates with the latest developments in class action and industry news.

# CLASS ACTION ADMINISTRATION SERVICES

## PRESETTLEMENT CONSULTATION

**A.B. Data helps its clients to prepare a stronger case.** During investigation and discovery, our electronic records management and proven procedures enable our team to quickly provide a fully interactive media package for court presentations and settlement negotiations.

By retaining A.B. Data, clients gain confidence that their case management is rock-solid from the start with
- Document analysis, organization, and conversion into an interactive media package
- Consultation on proposed plans of allocation and damages analyses by our experienced administration team and certified public accountants
- Assistance with "reach and frequency" analysis
- Consultation for designing and implementing preliminary notice programs that will withstand objections and challenges, as well as meet legal statutes and CAFA requirements
- Consultation to determine probable claim rates and settlement structures in an effort to avoid unexpected delays and additional costs that can arise when providing notice and distributing a settlement fund

## NOTICE ADMINISTRATION

**A.B. Data is an industry leader in full-service class action notice administration.** Our class action notice programs are known worldwide for their efficiency, effectiveness, affordability, and compliance with Federal Rule of Civil Procedure 23 and due process requirements. Our services include class member location; third-party outreach; and media, internet, email, and direct-mail notice.

A.B. Data has designed and implemented some of the largest and most complicated national and international antitrust and class action notifications in the world. Globally, A.B. Data has successfully notified millions of class members throughout 137 countries in more than 80 languages. Domestically, as part of our multifaceted approach to class member location, A.B. Data is a licensee of various postal products, including NCOALink, which tracks millions of moves across the United States.

As a leading class action notice administrator, A.B. Data produces high volumes of notice documents with accuracy, speed, and quality. We print customized notice packages in a cost-efficient format that substantially improves the efficacy of the notice program.

A.B. Data's team of attorneys, proofreaders, design specialists, and experienced Project Managers ensures that all notice packages are clear, accurate, and easy to understand. We
- Identify and locate potential class members via proprietary methods and research tools
- Design and implement synergistic media notice campaigns (online, print, radio, and television)
- Develop and implement case-specific third-party outreach campaigns
- Coordinate legal translation of notice documents
- Draft CAFA notices, identify appropriate government agencies, and disseminate CAFA notices
- Utilize a proprietary list of over 5,000 domestic and international banks, brokers, and other nominees (for securities class action cases and SEC enforcement actions)

## PUBLICATION NOTICE, PRINT MEDIA, SOCIAL MEDIA, AND DIGITAL MEDIA

**A.B. Data's Media Notice Division** is led by Linda V. Young, a media veteran with decades of class action media notice expertise in some of the most prominent cases in the industry. As Vice President of Media, Young develops media notice plans along with Thomas R. Glenn, President; members of the Development Management Team; Mary Getz, Vice President, Digital Media; and Kelly Gardner, Vice President, List Services.

The Media Notice Division will also provide expertise on Rule 23, MRI-generated audience analysis, reach and frequency analysis, and direct-marketing tactics to reach unidentified class members. Under Young's leadership, the A.B. Data Media Division continues to expand the array of targeted media solutions for class action notice programs.

## CLAIMS PROCESSING

A.B. Data's customized approach combines accuracy, accountability, and speed with our human touch. Each claim is reviewed in detail and processed precisely in accordance with the court-approved plan of allocation or settlement stipulation. A.B. Data's claims-processing services include paper and electronic claims processing, with optical character recognition technology to convert claims and correspondence into electronically searchable databases.

A.B. Data's proprietary Claims Engine, created by expert software engineers in collaboration with the Claimant Services Department, offers an extremely flexible workflow engine that allows high-speed claims imaging and processing without compromising quality. The database's high level of automation allows maximum control and provides a comprehensive and accurate claims solution. The A.B. Data Claims Engine contains the following special features:

- Eligibility criteria formula, which allows automatic flagging of claimants that do not meet the established criteria
- High-speed, bar-coded claims-processing system
- Complete tracking of all claims administration-related activities
- Case-specific algorithms and formulas for the calculation of individual payments and pro rata distributions.

When processing is complete and recommendations must be made to the court for settlement distribution, A.B. Data prepares timely affidavits that are accurate, concise, supported by the required documentation, and designed to withstand legal scrutiny. A.B. Data has the in-house capacity to process millions of pages, but every process is transparent, and every claim is handled as if it were the only one.

Whether processing a claim form requires only a signature or detailed data with supporting documentation, A.B. Data's claims administration team

- Prepares affidavits and recommendations drafted by experienced class action litigators and accounting professionals
- Assures that the lead plaintiff's claim is filed timely and correctly
- Verifies claims substantiations, as well as flags deficiencies and resolutions
- Detects and rejects fraudulent, duplicate, or excluded-party claims
- Processes exclusion requests and objections within two hours of receipt
- Calculates recognized losses and individual payments
- Manages claim-related correspondence
- Audits claims processing, including quality control and quality assurance
- Provides comprehensive on-demand reporting

## DEVELOPMENT OF DISTRIBUTION PLANS

A.B. Data's team of fund administration professionals includes attorneys, certified public accountants, and certified financial analysts and auditors. They bring years of dedicated experience assisting investors with SEC enforcement actions and private securities litigations.

We have developed hundreds of distribution plans, all in accordance with applicable orders, laws, regulations, policies, and procedures. Our customized approach to every case results in timely distributions, user-friendly claims processes, and greater cost savings. Depending upon the circumstances of each action, A.B. Data works in concert with its clients to conduct relevant economic and financial analyses, develop related methodologies for loss calculation, create appropriate plans of allocation, and if applicable, generate targeted notice programs and claims processes.

## FUND DISTRIBUTION

A.B. Data provides a full-service solution to settlement fund distribution. Our team of certified public accountants and financial advisers expertly manages fund distribution while meeting legal, financial, and governmental requirements. We offer complete escrow services; establish qualified settlement funds; print and mail checks, vouchers, and/or coupons; electronically distribute cash or stock; and provide tax services. We also

- Establish and maintain accounts (escrow, FDIC-insured controlled distribution, or managed distribution), with daily account reconciliations and records of all distributions
- Create fund investment strategies
- Electronically transfer cash and/or common stock
- Utilize positive pay
- Securely print and mail checks (up to 1 million per day)
- Monitor outstanding and cleared checks
- Investigate and attempt to resolve issues with undelivered checks
- Provide detailed reporting, including completion of the standardized fund accounting report (SFAR)
- Offer all-inclusive tax and accounting services, including 1099 and W-2 tax reporting

## CALL CENTER

A.B. Data's multilingual call center utilizes state-of-the-art telecommunications systems designed to meet the specific requirements of any administration project, as well as to maximize the financial and service goals of our clients.

Our call center is managed by full-time staff well versed in the specific details of every case. Our skilled multilingual customer service representatives are trained using case-specific materials and resources and use telephone scripts written by our attorneys and approved by our clients.

Quality assurance and quality control procedures ensure the transmission of clear and accurate information to class members in a courteous and professional manner. The call center is able to handle large call volumes for notice mailing and emailing, claims administration, deficiency and rejection letter mailings, and distribution check mailings.

In addition to providing class members with superior-quality service, our customer service representatives can respond to online and email inquiries; document notice, claim form, and call-back requests; and return calls on a next-business-day basis regarding the status of an administration.

Clients may also utilize A.B. Data's advanced interactive voice response (IVR) system, which is a cost-effective way for class members to receive informational announcements, request notices and claim forms, and obtain case-specific details. Our IVR system provides toll-free telephone numbers, multilingual customer service representatives, and Teletype (TTY) for deaf and hearing-impaired individuals.

## WEBSITE SERVICES

In cases where a website is required, A.B. Data in each instance designs, hosts, and maintains a case-specific website via which class members have access to relevant case information and updates, key documents, and downloadable notice and claim documents. Depending upon the circumstances of the specific case, the website could include the following:

- Case status
- Responses to frequently asked questions
- Online claim forms and instructions
- Real-time claim status updates
- Case contact information

For all Web-based features, A.B. Data's system has complete functionality using the three most recent versions of industry-standard browsers. Samples of case-specific websites developed by A.B. Data can be obtained by referencing cases on our website at abdataclassaction.com/cases/.



## SECURE ENVIRONMENT

A.B. Data's facilities provide the highest level of security and customization of security procedures, including

- A Secure Sockets Layer server
- Video monitoring
- Limited physical access to production facilities
- Lockdown mode when checks are printed
- Background checks of key employees completed prior to hire
- Frequency of police patrol – every two hours, with response time of five or fewer minutes
- Disaster recovery plan available upon request

## DATA SECURITY

A.B. Data is committed to protecting the confidentiality, integrity, and availability of information we collect from our clients, investors, and class members. We transmit, save, and process an immense quantity of electronic information on a daily basis. A.B. Data's Information Security Policy includes procedures intended to address all information-security issues for A.B. Data's divisions, departments, employees, vendors, and clients.

A.B. Data has a number of high-profile clients, including the Securities and Exchange Commission (SEC), the United States government, and the Government of Israel, direct-banking and payment-service companies for popular brands, and some of the largest credit-card issuers in the world.

A.B. Data is frequently subject to physical, logical, data, and information system security reviews and audits. We are compliant with our clients' security standards as well as with ISO/IEC 27001/2 and Payment Card Industry (PCI) data-security standards, the Gramm-Leach-Bliley Act of 1999, the National Association of Insurance Commissioners' regulations, the Health Insurance Portability and Accountability Act (HIPAA) of 1996, and the Health Information Technology for Economic and Clinical Health Act (HITECH).

The Government of Israel has determined that A.B. Data is compliant with its rigorous security standards in connection with its work on Project HEART (Holocaust Era Asset Restitution Taskforce).

A.B. Data's fund distribution team has been audited by EisnerAmper LLP and was found compliant with class action industry standards and within 99% accuracy. EisnerAmper LLP is a full-service advisory and accounting firm and is ranked the 15th-largest accounting firm in the United States.

In addition, as part of PCI compliance requirements, A.B. Data has multiple network scans and audits from third-party companies, such as SecurityMetrics and 403 Labs, and is determined to be compliant with each of them.

## FRAUD PREVENTION AND DETECTION

A.B. Data is at the forefront of class action fraud prevention.

A.B. Data maintains and utilizes comprehensive proprietary databases and procedures to detect fraud and prevent payment of allegedly fraudulent claims. We are in constant communication and collaboration with federal, state, and local law enforcement agencies in an effort to identify and prevent fraudulent claims from being paid.

We review and analyze various filing patterns across all existing cases and claims. Potential fraudulent filers are reported to our clients as well as to the appropriate governmental agencies.

## ACCOUNTABILITY AND REPORTING

A.B. Data has the expertise necessary to provide project-management services to ensure that all work is completed timely, accurately, and precisely to our clients' specifications. Upon request, we provide affidavits detailing the methodologies employed in notice administration, claims processing, and fund administration, as well as expert testimony and audit trail reporting.

A.B. Data tracks and audits every aspect of daily production with
- Receipt of files (noting any issues with transmission)
- Status reports regarding claims or check status
- Audited and confirmed record counts
- Confirmation of mailings
- Inventory counts
- Daily production counts reported on a weekly basis

Once funds are fully distributed, we provide a detailed accounting of fund sources and usage with a listing of individual disbursements. We maintain records of all disbursements to answer class member inquiries, investigate and resolve undelivered material, monitor outstanding and cleared checks, and maintain mailing and financial databases for an agreed-upon period.

## COMMUNITY AND DIVERSITY

A.B. Data maintains employment policies that highlight and support diversity within the company and utilizes employment programs that benefit minorities in the community. At the company's mail processing center, located in a HUBZone (Historically Underutilized Business Zone), more than half of the employees are minorities. A.B. Data continues to partner with community organizations to increase minority employment opportunities and benefits.

By participating in employment service programs, such as the Transitional Jobs Demonstration Project, A.B. Data helps to create jobs and build partnerships that improve people's lives with valued job opportunities. Operated by Policy Studies, Inc. (PSI), this important project helps to connect Milwaukee-area employers with qualified job seekers.

As part of the 30th Street Industrial Corridor, a nonprofit organization that advocates on behalf of the corridor-area community, A.B. Data works diligently to restore the economic vitality of the area, providing industry, jobs, and safety to its members, residents, and visitors.

In addition, A.B. Data's mail-processing center is located in Milwaukee's Renewal Community, a targeted area that was designated for renewal from 2002 to 2009. A.B. Data partnered with other businesses to guide and promote development that created jobs, generated wealth, and strengthened the urban environment.

A.B. Data maintains its assistance to workers in need of additional services through State of Wisconsin employment programs, such as Welfare-to-Work (WtW), so that eligible employees receive FoodShare and medical benefits as well as day-care services. Through participation in these and other available employment programs, A.B. Data continues in its commitment to enhancing people's lives by providing quality employment opportunities.

## ENVIRONMENTALLY FRIENDLY BUSINESS

A.B. Data conserves its resources and operates as a green business. Paper claim forms are imaged and stored on A.B. Data's secure SQL server, and all claims processing is done electronically. We emphasize the need for recycling and encourage the use of recycled products. Our policies compel employees to turn off their computers when not in use, and email communications are encouraged to the extent possible.

A.B. Data's headquarters in Milwaukee was designed with the environment in mind. Upon purchasing the 16-acre campus in September 2007, A.B. Data renovated the 30-year-old building, utilizing natural elements such as cork, bamboo, and concrete, and upgraded its mechanical and electrical systems to optimize efficiency. For its efforts, A.B. Data won the *Milwaukee Business Journal*'s Real Estate Award for Best Environmentally Friendly Project.

# A.B. DATA'S LEADERSHIP

A.B. Data's administration team is composed of the following key executives, who collectively have decades of experience settling and administering class actions:

**Bruce A. Arbit, Co-Managing Director**, one of the founders of the A.B. Data Group, serves as Chairman of the Board. Additionally, Mr. Arbit is the Chairman of the United Israel Appeal and has served as President and General Campaign Chair of the Milwaukee Jewish Federation. Mr. Arbit currently serves as the Treasurer of the Jewish Telegraphic Agency and on the Boards of the Milwaukee Jewish Community Foundation and the American Joint Jewish Distribution Committee. Mr. Arbit has been a member of the Jewish Agency for Israel Board of Governors since June 2002, is a member of Jewish Agency Executives, and chairs the Committee on Israel Government Relations. Mr. Arbit has also served on the Boards of community banks for more than 25 years.

**Thomas R. Glenn, President.** Mr. Glenn's management of A.B. Data's Class Action Administration Company includes designing and implementing notice plans and settlement administration programs for antitrust, securities, and Securities and Exchange Commission settlements and SEC disgorgement fund distributions, as well as consumer, employment, insurance, and civil rights class actions. Mr. Glenn previously served as Executive Vice President at Rust Consulting and has more than 25 years of industry executive management experience.

**Eric Miller, Senior Vice President**, as a key member of A.B. Data's Class Action Administration Leadership Team, oversees the Case Management Department and supervises the operations and procedures of all of A.B. Data's class action administration cases. Mr. Miller is recognized in the class action administration industry as an expert on securities, SEC, consumer, product recall, product liability, general antitrust, pharmaceutical antitrust, and futures contract settlements, to name a few settlement types. Prior to joining A.B. Data, Mr. Miller served as the Client Service Director for Rust Consulting, responsible there for its securities practice area. He has more than 15 years of operations, project management, quality assurance, and training experience in the class action administration industry. In addition, Mr. Miller manages A.B. Data's office in Palm Beach Gardens, Florida.

**Ravin Raj, Vice President-Operations**, has more than 12 years of experience in class action claims management, document management, and insurance claims remediation. Mr. Raj's responsibilities for A.B. Data's Class Action Administration Company include heading the shared operations center, which includes mailroom, call center, claims processing, quality control, and information systems operations. His areas of expertise include business process development, strategic/tactical operations planning and implementation, risk analysis, budgeting, business expansion, growth planning and implementation, cost reduction, and profit, change, and project management. In his previous position, as Assistant Vice President-Operations at RR Donnelley India Pvt. Ltd., in Chennai, India, he led a team of more than 400 employees with the capacity to process more than 4 million claims a year, servicing several leading claims administrators. Mr. Raj managed six of the top ten securities class action settlements, by settlement value, including several multibillion-dollar settlements. His background also includes work as a Project Lead for iMarque Solutions Pvt. Ltd., Chennai, India.

**Linda V. Young, Vice President, Media**, oversees the Media Department and is responsible for the direction, development, and implementation of media notice plans for A.B. Data's class action clients. Prior to joining A.B. Data, Ms. Young served as the Principal of Mile Marker Zero, LLC, a full-service marketing and advertising consulting firm. She has more than 20 years of marketing, advertising, and media planning experience, managing advertising for brands such as Georgia-Pacific, American Express, Denny's, and Coca-Cola. In addition, Ms. Young has developed and implemented national and international print- and earned-media notice programs for some of the industry's leading pharmaceutical, insurance, and securities class action cases, including cases involving Premarin, Unity Life Insurance Co., and Morgan Stanley.

**Eric Schachter, Vice President**, is a member of A.B. Data's Class Action Administration Leadership Team. He has over 15 years of experience in the legal settlement administration services industry. Mr. Schachter's responsibilities include ensuring successful implementation of claims administration services for A.B. Data's clients in accordance with settlement agreements, court orders, and service agreements. He also works closely with Project Managers to develop plans of administration to provide the highest level of effective and efficient delivery of work product. Mr. Schachter has a bachelor's degree in sociology from Syracuse University, earned his law degree at Hofstra University School of Law, and was previously an associate at Labaton Sucharow LLP in New York City.

**Paul Sauberer, Director of Quality Assurance**, is responsible for overseeing quality assurance and process management, working diligently to mitigate risk, ensure exceptional quality control, and develop seamless calculation programming. Mr. Sauberer brings more than 15 years of experience as a quality assurance specialist with a leading claims-processing company where he developed extensive knowledge in securities class action administration. He is recognized as the class action administration industry's leading expert on claims and settlement administrations of futures contracts class actions.

**Al Wichtoski, CPA, Vice President and Chief Financial Officer**, began as a Controller with A.B. Data over 20 years ago. Mr. Wichtoski rose to a number of corporate administrative and financial management positions before realizing his current role with the company. Mr. Wichtoski attained his financial management expertise through a broad range of roles, including bank liaison, Internal Revenue Service conduit, and final compliance officer for all financial accounts associated with A.B. Data. Mr. Wichtoski's responsibilities include risk management, budgeting, tax filing, statement preparation, and financial analysis.

**Kathy Versteegh, Senior Vice President, Data Services Division**, has been with A.B. Data since 1993. In her current position, Ms. Versteegh oversees operations, client relationships, business development, contracts, budget, security, postal affairs, and other key functions, leveraging her expertise in planning, leading, and controlling resources within the organization to ensure the continued growth of the division. As Vice President of Client Services and Marketing, she was responsible for business-critical communications, client service operations, and marketing, in addition to serving as a Security Team and Corporate Management Team member. Ms. Versteegh earned U.S. Postal Service and Postal Customer Council (PCC) professional certificates in Management and Leadership, Intelligent Mail, Enhancing Mail Value, Mail Center Operations, and PCC Leadership. In May 2010, she was elected the United States Postal Customer Council Co-Chair. Currently, Ms. Versteegh is serving her second term as Co-Chair. She offers an outstanding track record in business/organizational development, client satisfaction, and marketing strategies that include print, internet, mail, trade show, and other sales and marketing communications.

**Lizabeth Ludowissi, MQCCS, Vice President, Production**, is responsible for overseeing the production of all A.B. Data Group mailings and special projects. Ms. Ludowissi has experience in virtually every role in the company, which provides her with invaluable insight into the needs of our clients. During her tenure, Ms. Ludowissi has worked to streamline our Production Department, implementing strict quality controls and overseeing all scheduling and coordination, including print purchasing as well as data-processing, personalization, and mail-shop services. As a Mailpiece Quality Control Certified Specialist (MQCCS), Ms. Ludowissi acts as the company's Postal Liaison regarding all USPS-related matters. Ms. Ludowissi is a member of the Wisconsin Direct Marketing Association and the Milwaukee Postal Customer Council.

**Adam Walter, PMP, Senior Project Manager**, has more than nine years of experience managing a range of securities class action settlements and SEC disgorgements totaling more than $3.5 billon. This includes developing case administration strategies, overseeing daily operations of case administrations, ensuring execution of client deliverables, providing case-related legal and administration support to case counsel, overseeing notice dissemination programs, implementing complex claims-processing and allocation methodologies, establishing quality assurance and quality control procedures, and managing distribution of settlement funds. Mr. Walter frequently consults with clients in planning, reporting, and management of

each unique case to ensure that all requirements and objectives are met. Mr. Walter's background as Project Manager for a leading claims administrator brings his expertise on the development of case administration strategies and service methodologies to A.B. Data's Class Action Administration Company.

**Steve Straub, Senior Project Manager**, joined A.B. Data in February 2012. As a Senior Project Manager, his responsibilities include developing case administration strategies, overseeing daily operations of case administrations, ensuring execution of client deliverables, providing case-related legal and administration support to case counsel, overseeing notice dissemination programs, implementing complex claims processing and allocation methodologies, establishing quality assurance and quality control procedures, and managing distribution of settlement funds. Mr. Straub's experience in administering class action settlements includes securities, consumer, and antitrust settlements, with a primary focus on antitrust cases. He holds a Juris Doctor degree from Seton Hall University School of Law, Newark, New Jersey.

**Linda Opichka, CPA, Quality Assurance Analyst**, has over a decade of experience as a broker-dealer auditor, trainer, and manager and, in 2008, passed the examination for Certified Anti-Money Laundering Specialists. Ms. Opichka is responsible for managing and performing financial analysis, reviewing plans of allocation, working with independent distribution consultants, and performing account reconciliations for fund distributions. Prior to joining A.B. Data, Ms. Opichka conducted audits for Northwestern Mutual, where she was a subject-matter expert for anti-money laundering and broker-dealer audits. Ms. Opichka was also in charge of performing financial and compliance audits for broker-dealers and futures-commission merchants at the Chicago Board of Trade.

**Eric Schultz, MCSE, Information Technology Manager and Security Team Chairperson**, has been with A.B. Data for more than ten years, and is currently responsible for overseeing all information technology areas for all A.B. Data divisions across the United States and abroad. As a Microsoft Certified Systems Engineer (MCSE) with more than 20 years of experience in information technology systems and solutions, Mr. Schultz has developed specializations in network security, infrastructure, design/architecture, telephony, and high-availability network systems.

**Dan Deschamps, Project Manager**, since joining A.B. Data in November 2011, has handled a number of positions developing substantial knowledge regarding the administration of consumer, ERISA, and high-volume securities litigations. In his current role as Project Manager, he leads the planning and implementation of projects to meet internal and external deadlines; manages the day-to-day operational aspects of each of his assigned projects; continuously monitors and reports on the progress of his projects; and resolves any issues and solves problems with projects throughout the project life cycle. He also works closely with A.B. Data's Senior Project Managers, clients, and others on each of his assigned projects and coaches, mentors, and trains project team members. Mr. Deschamps' specialties include ERISA and complex consumer cases, but his practice areas also include SEC enforcement actions; Fair Debt Collection Practices Act (FDCPA), Telephone Consumer Protection Act (TCPA), and personal injury protection (PIP) class actions; Class Action Fairness Act (CAFA) mailings; and securities class actions. Mr. Deschamps received his paralegal certificate from Harper College, Palatine, Illinois, where he was a member of Lambda Epsilon Chi, the national honor society founded by the American Association for Paralegal Education.

**Bridgett Ryland, Project Manager**, joined A.B. Data in January 2014. She has handled a number of positions developing substantial knowledge regarding the administration of class action settlements. She works closely with A.B. Data's Senior Project Managers, the Information Systems team, and clients on all types of cases, including nonsecurities, FDCPA, ERISA, TCPA, and other types of class action settlements. Ms. Ryland manages the day-to-day administration of case settlements, interacting with multiple colleagues and consulting on many projects. She received both her bachelor's degree in communications and her master's degree in education and professional development from Cardinal Stritch University, Milwaukee, Wisconsin.

**Anike Keller, Business Development Director**, provides expertise in legal marketing strategies and brings extensive experience in client relations to A.B. Data's business development team. Previously, Ms. Keller served the legal industry as part of the marketing group at a major class action law firm specializing in securities and antitrust litigation. Ms. Keller's knowledge and understanding of the class action industry, as well as her client relationship skills, expand A.B. Data's capacity to achieve its business development and marketing goals effectively.

# NOTABLE NON-CLASS-ACTION ENGAGEMENTS

## Holocaust Era Asset Restitution Taskforce (Project HEART)

An initiative of the Government of Israel and the Jewish Agency for Israel (JAFI), Project HEART – Holocaust Era Asset Restitution Taskforce – sought to provide the tools, strategy, and information to bring about a small measure of justice to eligible heirs of Jewish victims, the victims themselves, and the Jewish people as a whole.

During its initial phase, Project HEART focused on identifying individuals in 137 countries with potential claims regarding the following types of private property for which no restitution was received after the Holocaust era: (1) private property that was located in countries that were controlled by the Nazi forces or Axis powers at any time during the Holocaust era; (2) private property that belonged to Jewish persons, as defined by Nazi/Axis racial laws; and (3) private property that was confiscated, looted, or forcibly sold by the Nazi forces or Axis powers during the Holocaust era.

## Obama for America — 2008 and 2012

Retained by Obama for America in 2007, A.B. Data was responsible for designing, analyzing, and directing its grassroots fundraising efforts for the presidential campaign of 2008. From February 2007 to Election Day 2008, A.B. Data's direct-marketing efforts helped to elect President Barack Obama, raising a record amount of money – almost $108 million – via the mail from more than 700,000 donors. As a result, A.B. Data was reappointed to lead President Obama's 2012 direct-marketing campaign in his attempt to gain reelection. As the sole administrator of the direct-marketing campaign for Obama for America 2012, A.B. Data designed, printed, and mailed each direct-marketing piece to raise money and awareness about President Obama's candidacy and efforts for reelection in 2012. A.B. Data's effort shattered all previous records, raising more than $147 million through the mail from almost 875,000 individual donors.

## Doctors Without Borders/Médecins Sans Frontières

In 2009, A.B. Data was chosen to manage all facets of the direct-mail program for Doctors Without Borders/Médecins Sans Frontières (MSF). MSF is one of the most respected organizations in the world, having won the 1999 Nobel Peace Prize for its emergency medical humanitarian response to people around the world caught in armed conflict or suffering from epidemics, malnutrition, and natural disasters without access to health care. MSF is known for its fierce independence and its refusal to "look the other way" when a crisis is caused by the failure of a government, either through passive or aggressive actions. MSF raises $84 million a year through its direct-marketing program, and it mails 17 million prospect pieces annually. MSF's house file consists of 465,000 12-month donors and about 800,000 lapsed donors – and it has 38,000 monthly donors. MSF's total house-file volume is 11 million a year.

## Holocaust Victim Assets Litigation (Swiss Banks) — $1.25-billion settlement

As a court-appointed notice administrator for this litigation, A.B. Data played a key role in a worldwide Phase I notice effort that resulted in the processing of more than 500,000 initial questionnaires. In Phase III of the administration, A.B. Data delivered notice to more than 10,000 Jewish communities in 109 countries and administered international help and call centers in Phases I and III that directly assisted more than 100,000 potential claimants.

A.B. Data created a class-appropriate notice targeting Romanies (Gypsies) in 48 countries and directed hundreds of staff members to communicate orally and directly with Romani communities and individuals. A.B. Data notified more than 2 million people and, as designated by the International Organization for Migration (IOM), directly assisted more than 22,000 Romanies in 17 countries of central and eastern Europe with claim completion.

## German Forced Labour Compensation Programme (GFLCP)

As designated by the IOM, A.B. Data located more than 43,000 Romani survivors in 17 countries of central and eastern Europe who were potentially eligible for humanitarian aid. A.B. Data created a comprehensive database for the GFLCP and the Holocaust Victim Assets Litigation and directly assisted more than 11,000 Romanies in eight central and eastern European countries with claim completion.

## The Wilderness Society

In 2012, A.B. Data was chosen to oversee and implement all facets of the direct mail and online fundraising programs for The Wilderness Society.

The Wilderness Society – with 500,000 members and supporters – is the leading American conservation organization working to protect our nation's beautiful wildlands. Since 1945, it has been at the forefront of nearly every major public lands battle, and its collaborative style and focus on practical solutions have saved some of our most beloved natural treasures from destruction.

# NOTABLE CLASS ACTION ENGAGEMENTS

A.B. Data and/or its team members have successfully administered hundreds of class actions, including many major cases. Listed below are some of the most notable of these engagements.

## Securities Cases

- *In re Fannie Mae 2008 Securities Litigation*
- *In re Anadarko Petroleum Corporation Class Action Litigation*
- *Ge Dandong, et al., v. Pinnacle Performance Limited, et al.*
- *In Re: Rough Rice Commodity Litigation*
- *Xuechen Yang v. Focus Media Holding Limited et al.*
- *In re Massey Energy Co. Securities Litigation*
- *In re Swisher Hygiene, Inc.*
- *The City of Providence vs. Aeropostale, Inc., et al.*
- *In re Metrologic Instruments, Inc. Shareholders Litigation*
- *Public Pension Fund Group v. KV Pharmaceutical Company et al.*
- *Pension Trust Fund for Operating Engineers, et al. v. Assisted Living Concepts, Inc., et al.*
- *In re Lehman Brothers Equity/Debt Securities Litigation*
- *In re: Platinum and Palladium Commodities Litigation (Platinum/Palladium Physical Action)*
- *In re: Platinum and Palladium Commodities Litigation (Platinum/Palladium Futures Action)*
- *In re General Electric Co. Securities Litigation*
- *In re CNX Gas Corporation Shareholders Litigation*
- *Oscar S. Wyatt, Jr. et al. v. El Paso Corporation, et al.*
- *In re Par Pharmaceutical Securities Litigation*
- *In re Par Pharmaceutical Companies, Inc. Shareholders Litigation*
- *In re Delphi Financial Group Shareholders Litigation*
- *In re SLM Corporation Securities Litigation*
- *In re Del Monte Foods Company Shareholder Litigation*
- *Leslie Niederklein v. PCS Edventures!.com, Inc. and Anthony A. Maher*
- *In re Beckman Coulter, Inc. Securities Litigation*
- *Michael Rubin v. MF Global, Ltd., et al.*
- *Allen Zametkin v. Fidelity Management & Research Company, et al.*
- *In re BP Prudhoe Bay Royalty Trust Securities Litigation*
- *Police and Fire Retirement System of the City of Detroit et al. v. SafeNet, Inc., et al.*



**A.B. DATA, LTD.**
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

- *In re Limelight Networks, Inc. Securities Litigation*
- *In re Gilead Sciences Securities Litigation*
- *In re ACS Shareholder Litigation, Consolidated C.A. No. 4940-VCP*
- *Lance Provo v. China Organic Agriculture, Inc., et al.*
- *In re LDK Solar Securities Litigation*

## General and Pharmaceutical Antitrust Cases

- *In re Ready-Mixed Concrete Antitrust Litigation*
- *In re: Marine Hose Antitrust Litigation*
- *Iowa Ready Mixed Concrete Antitrust Litigation*
- *In re Potash Antitrust Litigation (II)*
- *In re Evanston Northwestern Healthcare Corp. Antitrust Litigation*
- *In re Polyurethane Foam Antitrust Litigation*
- *In re LIBOR-Based Financial Instruments Antitrust Litigation*
- *In re Lorazepam and Clorazepate Antitrust Litigation*
- *In re Cardizem CD Antitrust Litigation*
- *Vista Healthplan, Inc., and Ramona Sakiestewa v. Bristol-Myers Squibb Co., and American BioScience, Inc.*
- *In re Lupron Marketing and Sales Practices Litigation*
- *In re Terazosin Hydrochloride Antitrust Litigation*
- *In re Warfarin Sodium Antitrust Litigation*
- *Rosemarie Ryan House, et al. v. GlaxoSmithKline PLC and SmithKline Beecham Corporation*
- *Carpenters and Joiners Welfare Fund, et al. v. SmithKline Beecham*
- *New Mexico United Food and Commercial Workers Union's and Employers' Health and Welfare Trust Fund, et al. v. Purdue Pharma L.P.*
- *In Re Pharmaceutical Industry Average Wholesale Price Litigation*
- *Alma Simonet, et al. v. SmithKline Beecham Corporation, d/b/a GlaxoSmithKline*
- *In re Relafen Antitrust Litigation*
- *In Re Remeron Direct Purchaser Antitrust Litigation*
- *In re TriCor Indirect Purchasers Antitrust Litigation*
- *Nichols, et al., v. SmithKline Beecham Corporation*
- *In re: DDAVP Indirect Purchaser Antitrust Litigation*

## Telephone Consumer Protection Act (TCPA) Cases

- *Diana Mey vs. Frontier Communications Corporation*
- *Matthew Donaca v. Dish Network, L.L.C.*
- *Matthew Benzion and Theodore Glaser v. Vivint, Inc.*
- *John Lofton v. Verizon Wireless (VAW) LLC, et al.*
- *Lori Shamblin v. Obama for America et al.*
- *Ellman v. Security Networks*

## Consumer Products Case

- *In the Matter of Maxfield and Oberton Holdings, LLC and Craig Zucker, et al.* ("Buckyballs Case")

## Representative Case and Client Lists

Representative general lists of A.B. Data's cases and clients are appended.

# A.B. DATA, LTD.: REPRESENTATIVE CASE LIST

Ace Marine Rigging & Supply, Inc. v. Virginia Harbor Services, Inc.

Acevedo v. Lawyers Title Insurance Corporation

Aceves, et al. v. Knights Inspection Services, LLC, and Knight

In re ACS Shareholders Litigation

In re Adolor Corporation Shareholders Litigation

In re Advanta Corp. ERISA Litigation

In re Affiliated Computer Services ERISA Litigation

In re AIG ERISA Litigation

In re AirGate PCS, Inc. Securities Litigation

Akins v. Worley Catastrophe Response, LLC

Alakayak v. All Alaskan Seafoods, Inc.

Allen v. HealthPort Technologies, LLC

Alper v. Warnock Ford, Inc.

Altier v. Worley Catastrophe Response, LLC

In re American Italian Pasta Company Securities Litigation (AIPC Settlement)

In re American Italian Pasta Company Securities Litigation (Ernst Settlement)

Anderson v. Third Federal Savings and Loan Association of Cleveland

In re Andrx Corporation, Inc.

Annoreno and Perez, individually, and on behalf of all others similarly situated v. Claire's Stores, Inc. and Claire's Boutiques, Inc.

Arias v. Award Homes, Inc.

Arteaga v. MODA Furniture, Inc.

In re Assicurazioni Generali S.p.A. Holocaust Insurance Litigation

In re Atlas Energy, Inc. Shareholders Litigation

Austrian Banks Holocaust Litigation

Baptista v. Mutual of Omaha Insurance Company

Bauman v. Superior Financial Corp.

Beach, et al. v. Citigroup Alternative Investments LLC, et al.

In re Bear Stearns Companies, Inc. ERISA Litigation

In re Beazer Homes USA, Inc. ERISA Litigation

In re Beckman Coulter, Inc. Securities Litigation

Benzion v. Vivint, Inc.

Bergman et al. v. DAP Products Inc., et al. (XHose Litigation)

Berry v. Third Federal Savings and Loan Association of Cleveland, et al.

Best v. Bluegreen

In re BigBand Networks, Inc. Securities Litigation

In re BioScrip, Inc. Securities Litigation

In re BISYS Securities Litigation

Black v. Metso Paper USA, Inc.

Blaine v. Pressler & Pressler, LLP

Blanco v. KeyBank USA, N.A.

Board of Commissioners of the Port of New Orleans v. Virginia Harbor Services Inc.

Bosland v. Warnock Dodge, Inc.

Bowe v. Public Storage

In re BP plc Securities Litigation

In re BP Prudhoe Bay Royalty Trust Securities Litigation

Bragg v. Bill Heard Chevrolet, Inc.-Plant City

Branham and Smith, et al. v. Crawford & Company

Brattain v. Richmond State Hospital

Brennan v. Community Bank

Brey Corp. v. Life Time Improvements, Inc.

Brieger v. Tellabs, Inc.

Broad St. Partners Fund v. Dods

Brown v. Hayt, Hayt & Landau, LLC

Brown v. Rita's

Brumfield v. Countrywide Home Loans, Inc.

Burns v. First American Bank

Bushansky v. Simplicity Bancorp, Inc. et al.

In re Calpine Corporation ERISA Litigation

Canning v. Concord EFS, Inc.

Capovilla v. Lone Star Technologies, Inc.

In re Cardinal Health, Inc. ERISA Litigation

Carlson v. C.H. Robinson Worldwide, Inc.

Carlson v. State of Alaska, Commercial Fisheries Entry Commission

In the Matter of Determining whether there has been a violation of the Consumer Loan Act of Washington by CashCall, Inc. et al.

In re Cbeyond, Inc. Securities Litigation

Cement Masons & Plasterers Joint Pension Trust v. TNS, Inc.

Cerda v. Associates First Capital Corporation

Cervantes v. RCS Recovery

Chamberlin v. Mullooly

Chao v. Slutsky

Charlessaint v. Persian Acceptance Corp. et al.

Clayton v. Velociti, Inc.

Clearview Imaging, L.L.C. v. Dairyland Insurance Company

Clearview Imaging, L.L.C. v. Mercury Insurance Company of Florida

Clearview Imaging, L.L.C. v. Nationwide Mutual Insurance Company



**A.B. DATA, LTD.**
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Clearview Imaging, L.L.C. v. Progressive Consumers Insurance Company

Clemons v. Thompson

In re CNX Gas Corporation Shareholders Litigation

Cohen v. JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.

Coleman v. Lincoln Wood Products, Inc.

In re Colgate-Palmolive Co. ERISA Litigation

Collins v. American Consumer Shows, Inc.

Commonwealth of Massachusetts v. H&R Block, Inc.

Conlon v. The City of Fernandina Beach

In re Connetics Securities Litigation

In re: The Consumers Trust

Coppess v. Healthways, Inc.

Corsello v. Verizon New York, Inc.

Cotton v. Ferman Management Services Corporation

Cottrell v. Gardner

In re CP Ships Ltd. Securities Litigation

In re Crestwood Midstream Partners Unitholder Litigation

Croxall v. Tampa Hund L.P.

In re Crude Oil Commodity Futures Litigation

Cruz v. Condor Capital Corporation

Curtis v. Northern Life Insurance Company

Davis v. First Financial Federal Credit Union

In re: DDAVP Indirect Purchaser Antitrust Litigation

DeCario v. Lerner New York, Inc.

In re Del Monte Foods Company Shareholder Litigation

In re Delphi Financial Group Shareholders Litigation

Deprospo v. The Provident Bank

Desai v. ADT Security Services, Inc.

Di Popolo v. Ramsey Nissan, Inc.

In re Diebold ERISA Litigation

Dishkin v. Tire Kingdom, Inc.

In re Dole Food Co., Inc. Stockholder Litigation

Donepudi v. OfficeMax Inc.

Drury v. Countrywide Home Loans, Inc.

Duchene v. Westlake

In re Dura Pharmaceuticals, Inc. Securities Litigation

Eisenberger v. Boston Service Company, Inc.

In re Electronic Data Systems Corp. ERISA Litigation

In re Emergent Group, Inc. Shareholder Litigation

In re: Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation

Epstein v. Sears, Roebuck and Co.

Estakhrian v. Obenstine et al.

Estates of Hampton v. Beverly Enterprises-Arkansas, Inc.

Estep v. Smythe Volvo, Inc.

Evans v. Stewart Title Guaranty Company

In re Facebook, Inc. IPO Securities and Derivative Litigation - NASDAQ

Family Open MRI, Incorporated v. Direct General Insurance Company

In re Fannie Mae ERISA Litigation

In re Fannie Mae 2008 Securities Litigation

Fernando v. Neopost USA, Inc.

Fernando v. Priority Mailing Systems

Ferro v. Florida Windstorm Underwriting Association

Finney v. Stewart Title Guaranty Company

In re First Financial Holdings Inc. Shareholders Litigation

In re FLAG Telecom Holdings, Ltd. Securities Litigation

Flood v. Dominguez

Office of the Attorney General, Department of Legal Affairs, State of Florida v. KB Home et al.

Kellman v. Forever 21 Retail, Inc.

Forsta AP-Fonden, et al. v. St. Jude Medical, Inc., et al.

Francis v. A&E Stores, Inc.

Franco v. Ace Parking Management Inc.

Fray-Witzer v. Metropolitan Antiques, LLC

Fray-Witzer v. Olde Stone Land Survey Company, Inc.

Fremont General Corporation Litigation

Friedman v. Rayovac Corporation

Froumy v. Stark & Stark

FW Transportation, Inc. v. Associates Commercial Corporation

In re General Electric Company Securities Litigation

German Forced Labor Compensation Program (GFLCP)

Gevaerts et al. v. TD Bank, N.A.

In re Gilead Sciences Securities Litigation

Gilley v. Ernie Haire Ford, Inc.

In re Goodrich Shareholders Litigation

Graham v. Town & Country Disposal of Western Missouri, Inc.

Greenstein v. Nations Title Agency of Florida, Inc.

Griffin v. Flagstar Bancorp, Inc.

Groen v. PolyMedica Corporation

Gulf Coast Injury Center, LLC v. Nationwide Mutual Fire Insurance Company

Haas v. Burlington County

Hall v. The Children's Place Retail Stores, Inc.

Hamilton v. ATX Services Inc.

Hargrave v. TXU Corp.

Harlacher and Woodring v. Members 1st Federal Credit Union



**A.B. DATA, LTD.**
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

*Harris v. First Regional Bancorp*

*Harris v. Koenig*

*In re Hartford Financial Services Group Inc. ERISA Litigation*

*Haynes v. Baptist Health*

*In re: Hearst-Argyle Shareholder Litigation*

*Hellmers v. Countrywide Home Loans, Inc.*

*Hess v. Oriole Homes Corp.*

*Hill v. American Medical Security Life Insurance Company*

*Hill v. Countrywide Home Loans, Inc.*

*Hockenberry v. People First Federal Credit Union*

*Holley v. Kitty Hawk, Inc.*

*In re Holocaust Victim Assets Litigation* (Swiss Banks) (HVAP)

*Hudson United Bank v. Chase*

*Hughley v. Maryland Casualty Company*

*Hunt v. PacifiCare Life and Health Insurance Company*

*Hutt v. Martha Stewart Living Omnimedia, Inc.*

*Hutson v. Baptist Health*

*In re ICG Communications, Inc. Securities Litigation*

*Ikuseghan v. MultiCare Health System*

*The State of Illinois v. Au Optronics Corporation et al.*

*In re: InfoSonics Securities Litigation*

*In re ING Groep, N.V. ERISA Litigation*

*In re International Business Machines Corp. Securities Litigation*

*International Commission on Holocaust Era Insurance Claims (ICHEIC)*

*In re Iowa Ready-Mixed Concrete Antitrust Litigation*

*In re J. Crew Group, Inc. Shareholders Litigation*

*In re JDS Uniphase Corporation ERISA Litigation*

*Johnson v. Navient Solutions Inc.*

*Kalow & Springut, LLP v. Commence Corporation*

*Katz et al. v. Live Nation Worldwide, Inc.*

*Katz and Davidson v. Live Nation Worldwide, Inc.*

*Kay v. Wells Fargo & Company*

*Kemp v. DataBank IMX, LLC*

*In re Kinder Morgan Energy Partnership, L.P. Capex Litigation*

*In re: King Pharmaceuticals, Inc. Securities Litigation*

*Kolluri v. Belco Community Credit Union*

*Krakauer v. Dish Network L.L.C.*

*Kreher v. City of Atlanta, Georgia*

*Kubota v. Walker*

*The Lafayette Life Insurance Company v. City of Menasha*

*Laffan v. Santander Bank, N.A., et al.*

*Lara, et al., v. G & E Florida Contractors, LLC*

*In re LDK Solar Securities Litigation*

*In re Lear Corp. ERISA Litigation*

*Lehmann v. Ivivi Technologies, Inc.*

*In re Lehman Brothers Equity/Debt Securities Litigation*

*In re Lernout & Hauspie Securities Litigation* (Directors and FLV Settlements)

*In re Lernout & Hauspie Securities Litigation* (KPMG Settlement)

*Leslie Niederklein v. PCS Edventures!.com, Inc.*

*Li v. Bowers et al.* (Square 1 Financial Case)

*Lilly v. Oneida Ltd. Employee Benefits Admin. Comm.*

*In re Limelight Networks, Inc. Securities Litigation*

*Long v. Eschelon Telecom, Inc.*

*The Louisiana Municipal Police Employees Retirement System v. Deloitte & Touche LLP*

*Lyons, et al. v. Litton Loan Servicing, LP, et al.*

*Mann & Company, PC v. C-Tech Industries, Inc.*

*Mann v. Lawyers Title Insurance Corporation*

*Mantzouris v. Scarritt Motor Group, Inc.*

*In re Marine Hose Antitrust Litigation* (Bridgestone Settlement)

*In re Marine Hose Antitrust Litigation* (Dunlop Settlement)

*In re Marine Hose Antitrust Litigation* (Parker Settlement)

*In re Marine Hose Antitrust Litigation* (Trelleborg Settlement)

*In re Marine Hose Antitrust Litigation* (Yokohama Settlement)

*In re Marsh ERISA Litigation*

*In re Martek Biosciences Corp. Securities Litigation*

*Martin v. aaiPharma, Inc.*

*Martin v. Dun & Bradstreet, Inc.*

*Martin v. Foster Wheeler Energy Corporation*

*In Re Massey Energy Co. Securities Litigation*

*In the Matter of Maxfield and Oberton Holdings, LLC*

*Mayer v. Administrative Committee of the Smurfit-Stone Container Corporation Retirement Plans*

*Mayes v. The Geo Group, Inc.*

*Mayotte v. Associated Bank, N.A.*

*In re MBNA Corp. Securities Litigation*

*Meadows v. Clearwater Bay Marketing, LLC*

*Means v. River Valley Financial Bank*

*In re Merck & Co. Inc. Vytorin ERISA Litigation*

*Medoff v. CVS Caremark Corporation et al.*

*Merrimon v. UNUM Life Insurance Company of America*

*In re Metavante Technologies, Inc. Shareholder Litigation*

*In re Metrologic Instruments, Inc. Shareholders Litigation*

*Mey v. Herbalife International, Inc.*

*Mey v. Interstate National Dealer Services, Inc., et al.*

*In re Micromuse, Inc. Securities Litigation*

*Milford & Ford Associates, Inc. v. Cell-Tek, LLC*



**A.B. DATA, LTD.**
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

*Miller v. Weltman, Weinberg & Reis Co., L.P.A.*

*In re: MK Resources Company Shareholders Litigation*

*Montalvo v. Tripos, Inc.*

*Moore v. The Hertz Corporation*

*In re Morgan Asset Management, Inc.*
*(Kelsoe and Weller Settlements)*

*Morrison v. MoneyGram International, Inc.*

Mortgage Settlement Consumer Restitution Program
(Foreclosure Restitution Program and Bank of America Victims
Program)

*In re Motive, Inc. Securities Litigation*

*Mozenter v. Nalco Holding Company*

*Mukoma v. Fleet Lease Network Inc.*

*Mulhern v. MacLeod d/b/a ABC Mortgage Company*

*Munday v. Navy Federal*

*In re: National City Corporation Securities, Derivative & ERISA Litigation*

*In re Neustar, Inc. Securities Litigation*

*The Department of the Treasury of the State of New Jersey
and its Division of Investment v. Cliffs Natural Resources Inc.,
et al.*

*The People of the State of New York v. SKS Associates, LLC*

*In re NII Holdings, Inc., Securities Litigation*

*Norflet v. John Hancock Life Insurance Company*

*Norris and Tatem v. Eichenbaum & Stylianou, LLC, et al.*

*In re Novamed, Inc. Shareholders Litigation*

*NSL Capital Management v. Gorman*

*Nthenge v. Pressler and Pressler, LLP*

*In re: NX Networks Securities Litigation*

*Obermeyer v. Marinemax East, Inc.*

*Olivo v. Homecomings Financial LLC*

*Open MRI of Pinellas, Inc. v. Atlanta Casualty Insurance Company*

*Ori v. Fifth Third Bank and Fiserv, Inc.*

*In re: Ortiz v. Aurora Health Care, Inc.*

*Osborn v. EMC Corporation*

*In re OSI Pharmaceuticals, Inc. Securities Litigation*

*Otte v. Life Insurance Company of North America*

*Overby v. Tyco International Ltd.*

*Ownby v. Citrus County, Florida*

*In re: Pacific Gateway Exchange, Inc. Securities Litigation*

*Paliotto v. Johnny Rockets Group, Inc.*

*In re Par Pharmaceutical Companies, Inc. Shareholders Litigation*

*In re Par Pharmaceutical Securities Litigation*

*Parker v. American Medical Security Group, Inc.*

*Parthiban v. GMAC Mortgage Corporation*

*Paskowitz v. Ernst & Young, LLP (Motive, Inc.)*

*Patel v. Baluchi's Indian Restaurant*

*Payson v. Capital One Home Loans, LLC (FLSA Settlement)*

*Payson v. Capital One Home Loans, LLC (KWPA Settlement)*

*Pension Trust Fund for Operating Engineers v.
Assisted Living Concepts, Inc.*

*Pereira v. Foot Locker, Inc.*

*Perez v. Rent-A-Center, Inc.*

*Pettway v. Harmon Law Offices, P.C.*

*Pfeiffer and McElroy derivatively on behalf of Occidental
Petroleum Corporation v. Abraham et al. and Occidental
Petroleum Corporation*

*In re: PFF Bancorp, Inc. ERISA Litigation*

*Pickett v. Triad Financial Corporation*

*In Re: Platinum And Palladium Commodities Litigation*

*Police and Fire Retirement System of the City of Detroit,
Plymouth County Retirement System v. SafeNet, Inc.*

*Politi v. Pressler & Pressler, LLP*

*Pollard, et al. v. ETS PC, Inc. (f/k/a Eberl's Temporary Services,
Inc.) et al.*

*Pollitt v. DRS Towing, LLC*

*In re Potash Antitrust Litigation (II)*

*Premier Open MRI, LLC v. Progressive American Ins. Co.*

Project HEART—Holocaust Era Asset Restitution Taskforce

*In re Prospect Medical Holdings, Inc. Shareholders Litigation*

*Provo v. China Organic Agriculture, Inc.*

*Public Pension Group v. KV Pharmaceutical Co.*

*Puritan Budget Plan, Inc. v. Amstar Insurance Company*

*Quaak v. Dexia, S.A.*

*Ragsdale v. SanSai USA, Inc.*

*Ramirez v. GreenPoint Mortgage Funding, Inc.*

*Rational Strategies Fund v. Demere, Jr.*

*Rational Strategies Fund v. Hill*

*Raul v. Western Liberty Bancorp*

*In re RBC Dain Rauscher Overtime Litigation*

*In re RCN Corporation ERISA Litigation*

*In re Ready-Mixed Concrete Antitrust Litigation*

*Reeves, et al. v. Zealandia Holding Company, Inc., f/k/a Festiva
Hospitality Group, Inc., et al.*

*In re Reliant Securities Litigation*

*In re RenaissanceRe Holdings Ltd. Securities Litigation*

*In re R.H. Donnelley Corp. ERISA Litigation*

*Roberti v. OSI Systems, Inc.*

*Rodriguez v. Fulton Bank, N.A.*

*Rolark v. Lawyers Title Insurance Corporation*



**A.B. DATA, LTD.**
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Rubin v. MF Global, Ltd.

Rufo v. Alpha Recovery Corp.

Rupp v. Thompson

S. Parker Hardware Mfg. Corp. v. AT&T Corp.

Saint Pete MRI v. Hartford

Saint Pete MRI v. Auto Club South Insurance Company

Saint Pete MRI v. First Acceptance Insurance Company

Saint Pete MRI v. First Floridian Auto and Home Insurance Company

Saldana v. C & C Unisex

Sam v. White

Santos v. Silver

Scher v. Oxford Health Plans, Inc.

In re Schering-Plough Corp. Enhance ERISA Litigation

In re Schering-Plough Corp. ERISA Litigation

Schmitz v. Liberty Mutual Insurance Company

In re Scottish Re Group Securities Litigation

In re Sears, Roebuck & Co. ERISA Litigation

SEC v. Anderson

SEC v. Gen-See Capital Corporation and Richard S. Piccoli

SEC v. RenaissanceRe Holdings Ltd.

In re SEC v. Rockford Funding Group

In re SEC v. Take-Two Interactive Software, Inc.

SEC v. Tecumseh Holdings Corporation

SEC v. The BISYS Group, Inc.

SEC v. Value Line, Inc.

SEC v. WexTrust Capital, LLC

SEC v. Zomax, Inc.

Serino v. Kenneth Lipper v. PricewaterhouseCoopers, LLP

In re Sexy Hair Concepts, LLC

In re SFBC International Securities & Derivative Litigation

Shane v. Edge

Sheikh v. Maxon Hyundai, Inc.

Silke v. Irwin Mortgage Corporation

Sivsubramanian v. DNC Health Corp.

In re SLM Corporation Securities Litigation

Smith v. Mill-Tel, Inc.

Smolkin v. Leviton Manufacturing Co., Inc.

Soden v. East Brunswick Buick-Pontiac-GMC, Inc.

Sokoloski v. Stewart Title Guaranty Company Settlement

Sonoda v. Amerisave

Southeast Texas Medical Associates, LLP v. VeriSign, Inc.

Special Situations Fund III, L.P. v. Quovadx, Inc.

Steele v. GE Money Bank

Stein v. Pactiv Corporation

In re: Sterling Financial Corporation Securities Class Action

Stoffels v. SBC Communications, Inc.

In re Stone & Webster, Inc. Securities Litigation

In re: Supervalu, Inc. Securities Litigation

In re Suprema Specialties, Inc. Securities Litigation

In re Susser Holdings Corp. Stockholder Litigation

Sutterfield v. Carney

In Re Swisher Hygiene, Inc. Securities and Derivative Litigation

In re Symbol Technologies, Inc. Securities Litigation

In re Take-Two Interactive Securities Litigation and SEC v. Brant

Tannlund v. Real Time Resolutions, Inc.

Taylor v. McKelvey (Monster Worldwide, Inc.)

Taztia XT Securities Litigation

In re TD Banknorth Shareholders Litigation

In re Terex Corp. ERISA Litigation

In re Ticketmaster Entertainment Shareholder Litigation

In re Tower Group International, Ltd. Securities Litigation

In re Tower Group International, Ltd. Shareholder Litigation

In re: Tyson Foods, Inc. Securities Litigation

In the Matter of UBS Financial Services Inc. of Puerto Rico

Ultra Open MRI Corporation v. Hartford Casualty Insurance Company

Ultra Open MRI Corporation v. Nationwide Assurance Company

United Consumer Financial Services Company v. William Carbo v. A&M Merchandising, Inc.

Valley National Bank v. Cahn

Valuepoint Partners, Inc. v. ICN Pharmaceuticals, Inc.

In re Vaso Active Pharmaceuticals Derivatives Litigation

In re Vaso Active Pharmaceuticals Securities Litigation

Veal v. Crown Auto Dealerships, Inc.

In re Viisage Technology, Inc. Securities Litigation

In re VisionAmerica, Inc. Securities Litigation

Von Friewalde v. Boeing Aerospace Operations, Inc.

In re Vonage Initial Public Offering (IPO) Securities Litigation

Walker v. Hill Wallack LLP

Walter v. Level 3 Communications, Inc.

In re Warner Chilcott Limited Securities Litigation

Warren v. Orkin Exterminating Company, Inc.

State of Washington v. Au Optronics Corp., et al.

Wells v. DTD Enterprises, Inc.

Brown v. Wells Fargo & Company

Wenger v. Cardo Windows, Inc.

Wenger v. Freehold Subaru, LLC



A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

*White v. E-Loan, Inc.*

*White v. Wells Fargo, N.A.*

*Will v. American Equity Mortgage, Inc.*

*Williams v. CBE Group*

*Wisniak v. Mirant Americas Generation, LLC*

*Wood v. New Century Financial Services, Inc.*

*Wyatt v. El Paso Corporation*

*Herrera v. Wyeth ERISA Litigation*

*Yang v. Focus Media Holding Limited*

*Yariv v. AT&T Corp.*

*Yingling v. eBay, Inc.*

*Yost v. First Horizon*

*Young v. Heimbuch*

*In re: YRC Worldwide, Inc. ERISA Litigation*

*Zametkin v. Fidelity Management & Research Company*

*Zelnik v. Citation Homes, Inc.*

*Zilhaver v. UnitedHealth Group Incorporated*

*In re Zomax, Inc. Securities Litigation*



**A.B. DATA, LTD.**
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

# A.B. DATA, LTD.: REPRESENTATIVE CLIENT LIST

Abbey Spanier, LLP

Abraham, Fruchter & Twersky, LLP

Abrams & Bayliss LLP

Ademi & O'Reilly, LLP

Ajamie LLP

Akerman LLP

Akin Gump Strauss Hauer & Feld LLP

Aldrich Law Firm, Ltd.

Alston & Bird LLP

Anderson Kill P.C.

Anderson + Wanca

Andrews & Springer LLC

Ankcorn Law Firm, PC

Arent Fox LLP

Atkinson & Brownell, P.A.

Office of the Attorney General, State of Arizona

Office of the Attorney General, Department of Legal Affairs, State of Florida

Office of the Illinois Attorney General

Office of the Attorney General, State of Indiana

Office of the Attorney General, Commonwealth of Massachusetts

Office of the Attorney General, State of New York

Washington State Office of the Attorney General

Bailey & Glasser LLP

Baker & Hostetler LLP

Ballard Spahr LLP

Banker Lopez Gassler P.A.

Bared & Associates PA

Barnes Law Group

Barnow and Associates, P.C.

Barrack, Rodos & Bacine

S. Barrett, P.C.

Barrett Johnston Martin & Garrison, LLC

Law Offices of James V. Bashian, P.C.

Baskin Law Firm

Bell & Brigham

Benesch Friedlander Coplan & Aronoff LLP

Bennett Bigelow & Leedom, P.S.

Berens Law LLC

Berger & Montague, P.C.

Berke, Berke & Berke

Berman DeValerio

Bernstein Liebhard LLP

Bernstein Litowitz Berger & Grossmann LLP

Bernstein & Miller, P.A.

Betts, Patterson & Mines, P.S.

Biggs & Battaglia

The Bilek Law Firm, L.L.P.

Block & Leviton LLP

Bock & Hatch, LLC

Bohrer Law Firm, L.L.C.

Bond, Schoeneck & King PLLC

Bonnett, Fairbourn, Friedman & Balint, P.C.

Borsellino, PC

Bottini & Bottini, Inc.

Brady & Associates

Bressler, Amery & Ross, P.C.

The Briscoe Law Firm, PLLC

Broderick Law, P.C.

Bromberg Law Office, P.C.

Law Office of Brown & Associates

The Brualdi Law Firm, P.C.

Buchalter, Hoffman & Dorchak Law Firm

Buchanan Ingersoll & Rooney PC

Burke Law Offices, LLC

Burns Charest LLP

Bush Law Firm, PC

Butler Weihmuller Katz Craig LLP

Cafferty Clobes Meriwether & Sprengel LLP

Law Office of Michael T. Callahan

Carlton Fields Jorden Burt P.A.

Carney Bates & Pulliam, PLLC

Law Offices of Jeffrey G. Casurella

Catlett Law Firm, PLC

Chaffin & Burnsed, PLLC

Champion Law LLC

Chavez & Gertler LLP

Chimicles & Tikellis LLP

Chitwood Harley Harnes LLP

Law Office of Glen H. Chulsky

Choate Hall & Stewart LLP

Law Offices of J. Mitchell Clark

Clark • Martino, P.A.

Cleary Gottlieb Steen & Hamilton LLP

Clifford Chance

Climaco, Wilcox, Peca, Tarantino & Garofoli Co., L.P.A.

Coblentz Patch Duffy & Bass LLP

Cohen & Malad, LLP

Cohen Milstein Sellers & Toll PLLC

Cohen, Placitella & Roth, P.C.

Cohn Lifland Pearlman Herrmann & Knopf LLP

Cole Schotz P.C.


A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Page 1 of 5
A.B. Data, Ltd.: Representative Client List
Updated: February 26, 2016

Complex Litigation Group LLC

Connolly Gallagher LLP

Conroy, Simberg, Ganon, Krevans, Abel, Lurvey, Morrow, Schefer, Gutterman, Kraft, Klein

Consumer Advocacy Center, P.C.

Consumer Lawyers Group

Cooch and Taylor

Cooley LLP

Cravath, Swaine & Moore LLP

Criden & Love, P.A.

Day Pitney LLP

de La Parte & Gilbert, P.A.

Dechert LLP

Dickie, McCamey & Chilcote, P.C.

Law Office of Dimitrios Kolovos, LLC

DiTommaso • Lubin

The Divale Law Group, P.A.

DLA Piper LLP (US)

Loren Domke, P.C.

Donelon, P.C.

Dorsey & Whitney LLP

Duane Morris LLP

The Law Office of Pelayo Duran

Robert J. Dyer III Law Office

Edelman, Combs, Latturner & Goodwin, LLC

Edelson PC

Eisenstadt Law Group, P.A.

Law Office of David W. Engstrom

Entwistle & Cappucci LLP

Faruqi & Faruqi, LLP

Fay Law Group PLLC

Federman & Sherwood

Feinstein Doyle Payne & Kravec, LLC

Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP

Fields Howell LLP

Fieschko & Associates, Inc.

Figari & Davenport

Finazzo Cossolini O'Leary Meola & Hager, LLC

Fineman Krekstein & Harris P.C.

Finkelstein & Krinsk LLP

Finkelstein Thompson LLP

Finn Law Group

Flaster/Greenberg

Flitter Milz, P.C.

Foley Bryant Holloway & Raluy PLLC

Foote, Mielke, Chavez & O'Neil, LLC

Freshfields Bruckhaus Deringer US LLP

Friday, Eldredge & Clark, LLP

Friedlander & Gorris, P.A.

Gainey McKenna & Egleston

Law Office of Dalinda B. Garcia, P.C.

Gardy & Notis, LLP

Garwin Gerstein & Fisher LLP

Gibson, Dunn & Crutcher LLP

Gilman Law LLP

Girard Gibbs LLP

Giskan Solotaroff & Anderson LLP

Godfrey & Kahn S.C.

Gottesdiener Law Firm, PLLC

Gottlieb & Associates

Grant & Eisenhofer P.A.

Gravely & Pearson, L.L.P.

Green & Noblin, P.C.

Greenberg Traurig, LLP

Greene & Schultz

Greenwald Davidson Radbil PLLC

Grissom Law Office

Grossman Roth Yaffa Cohen

Hagens Berman Sobol Shapiro LLP

Roderick V. Hannah, Esq., P.A.

Harwood Feffer LLP

Hicks Thomas LLP

Hill Wallack LLP

Hill Ward Henderson

Hinshaw & Culbertson LLP

Hoffman Libenson Saunders & Barba

Hogan Lovells

Holland & Knight LLP

Hollis Wright Clay & Vail P.C.

Hughes Brown, PLLC

Hughes Hubbard & Reed LLP

Ice Miller LLP

Irvine Law Group, LLP

Government of Israel

Izard Nobel LLP

The Jackson Law Group, PLLC

Jackson Lewis P.C.

Jacobs Scholz & Associates, LLC

James P.A.

Jeeves Law Group

Jenner & Block

Johnson & Benjamin LLP

Johnson & Weaver, LLP

Jolley Urga Woodbury & Little

Jones Day

Law Office of Justian Jusuf APC

K&L Gates LLP

Kahn Swick & Foti LLC



A.B. DATA, LTD.
abdataclassaction.com
New York  |  Washington, D.C.  |  Chicago  |  West Palm Beach  |  Milwaukee

Page 2 of 5
A.B. Data, Ltd.: Representative Client List
Updated: February 2016

Kantrowitz, Goldhamer & Graifman, P.C.

Kaplan Fox & Kilsheimer LLP

Katten Muchin Rosenman LLP

Katz & Korin PC

E. Clinch Kavanaugh P.A.

Keker & Van Nest LLP

Keller Rohrback L.L.P.

Kendall Law Group, LLP

Keogh Law, Ltd.

Kershaw, Cutter & Ratinoff LLP

Kessler Topaz Meltzer & Check, LLP

Kilpatrick Townsend & Stockton LLP

The Kim Law Firm, LLC

King & Spalding

Kirby McInerney LLP

Kirby Noonan Lance & Hoge LLP

Kirkland & Ellis LLP

Klafter Olsen & Lesser LLP

Klein Kavanagh Costello, LLP

Kobre & Kim LLP

Kohn Swift & Graf, P.C.

Korein Tillery

Korth Law Office

The Koval Firm, LLC

Kramer Levin Naftalis & Frankel LLP

Kwall, Showers, Barack & Chilson, PA

LG Law LLC

Labaton Sucharow LLP

The Lambert Firm

Latham & Watkins LLP

Leavengood, Dauval, Boyle & Meyer, P.A.

The Lee Firm

Lemberg Law LLC

León Cosgrove LLC

Levi & Korsinsky LLP

Lieff Cabraser Heimann & Bernstein, LLP

Lifshitz & Miller

John Linkosky & Associates

Litchfield Cavo LLP

Lite DePalma Greenberg, LLC

Locke Lord LLP

Locks Law Firm

Loevy & Loevy

Loren Domke, P.C.

Lovell Stewart Halebian Jacobson LLP

Lowenstein Sandler LLP

Lowey Dannenberg Cohen & Hart, P.C.

Ludwig Law Firm PLC

Lueddeke Law Firm

Law Offices of Sahag Majarian II

Malesovas Law Firm

Margolis Edelstein

Marovitch Law Firm, LLC

Marshall Dennehey Warner Coleman & Goggin, P.C.

Mase Lara, P.A.

Mayer Brown

The McCleery Law Firm

Law Office of Matthew McCue

McDermott Will & Emery

McDonald Carano Wilson LLP

McDonald Hopkins LLC

The Law Office of Christopher J. McGinn

McGuire Law, P.C.

McGuireWoods LLP

McTigue Law LLP

Mehri & Skalet, PLLC

Merlin Law Group, P.A.

Milbank, Tweed, Hadley & McCloy LLP

Milberg LLP

Miles & Stockbridge P.C.

Miller, Canfield, Paddock and Stone, P.L.C.

Miller Law LLC

Mirick, O'Connell, DeMallie & Lougee, LLP

Mitchell, Blackstock, Ivers, Sneddon & Marshall, PLLC

Molleur Law Office

Montes & Associates Law Firm

Montgomery McCracken Walker & Rhoads LLP

Moore & Van Allen PLLC

Morgan, Lewis & Bockius LLP

Morris, Nichols, Arsht & Tunnell LLP

Morrison & Foerster LLP

Motley Rice LLC

Munley Law

Murray Murphy Moul + Basil LLP

National Consumer Law Center, Inc.

Neal, Gerber & Eisenberg LLP

Law Offices of Bohdan Neswiacheny

New York State Department of Labor

Nix, Patterson & Roach, LLP

Law Offices of Stephen J. Nolan, Chartered

Nolan Caddell Reynolds

Norris Law Firm PLLC

Norton Rose Fulbright US LLP

O'Melveny & Myers LLP

O'Quinn Stumphauzer & Sloman, P.L.

Page Perry (Perry Law Firm, LLC)

The Pappas Group

Law Office of Edgar Pauk



A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Paul Hastings LLP

Paul, Weiss, Rifkind, Wharton & Garrison LLP

Pepper Hamilton LLP

Perkins Coie LLP

Podvey, Meanor, Catenacci, Hildner, Cocoziello & Chattman

Pomerantz LLP

Carl D. Poplar, P.A.

Potter Anderson & Corroon LLP

Potter Minton

The Powell Law Firm

Poyner Spruill LLP

Pressler and Pressler, LLP

Preti, Flaherty, Beliveau & Pachios, Chartered, LLP

Prickett, Jones & Elliott, P.A.

Proctor Heyman Enerio LLP

Proskauer Rose LLP

Provost Umphrey Law Firm L.L.P.

Quarles & Brady LLP

Quinn Emanuel Urquhart & Sullivan, LLP

Reed Smith LLP

Reilly Like & Tenety

William Riback LLC

Richards, Layton & Finger, P.A.

Rigrodsky & Long, P.A.

Law Offices of Stephen H. Ring, P.C.

Robbins Arroyo LLP

Robbins Geller Rudman & Dowd LLP

The Roberts Law Firm

Ronald Frederick & Associates Co., L.P.A.

Rose, Klein & Marias, LLP

Rosenthal, Monhait & Goddess, P.A.

Rosman & Germain LLP

Ross Aronstam & Moritz LLP

Craig E. Rothburd, P.A.

Paul S. Rothstein & Associates

Rozwood & Company, APC

Ruckelshaus Kautzman Blackwell Bemis & Hasbrook

Ryan & Maniskas, LLP

SL Chapman LLC

Sacher, Zelman, Hartman, P.A.

Sacks & Sacks, PC

Sandberg Phoenix & von Gontard P.C.

Sanford Heisler Kimpel, LLP

Sarraf Gentile LLP

Saxena White P.A.

Law Office of David Schafer, PLLC

Schiller & Pittenger, P.C.

Schoengold & Sporn, P.C.

Schrader, Byrd & Companion, PLLC

Schwartz Semerdjian Cauley & Moot LLP

Shapiro Haber & Urmy LLP

Shavitz Law Group, P.A.

Shipman & Wright, L.L.P.

Shook, Hardy & Bacon L.L.P.

Shutts & Bowen LLP

Sidley Austin LLP

Sills Cummis & Gross P.C.

Simpson Thacher & Bartlett LLP

Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates

Sly James Law Firm

Smith Mackinnon Et Al

Smyser Kaplan & Veselka, L.L.P.

Spector Roseman Kodroff & Willis, P.C.

Speights & Worrich

Sprenger + Lang, PLLC

Squire Patton Boggs

Squitieri & Fearon, LLP

Starzyk & Associates, P.C.

Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.

Steptoe & Johnson LLP

Philip D. Stern & Associates, LLC

Stinson Leonard Street LLP

Stone Bonner & Rocco LLP

Stradley Ronon Stevens & Young, LLP

Stull, Stull & Brody

Sullivan & Cromwell LLP

Sulloway & Hollis, P.L.L.C.

Susman Godfrey L.L.P.

Gary J. Takacs, P.A.

Tanner Bishop Attorneys

Thierman Buck Law Firm, LLP

Thompson Hine

Tousley Brain Stephens PLLC

Travis Law Group

Trenam Law

Trief & Olk

Troutman Sanders LLP

United States Consumer Product Safety Commission

United States Securities and Exchange Commission

Vianale & Vianale LLP

Vinson & Elkins LLP

Wachtell, Lipton, Rosen & Katz

Walfish & Noonan, LLC

Wardell & Quezon, PLLC

State of Washington, Department of Financial Institutions, Division of Consumer Services

Watton Law Group

Brian L. Weakland Law Office



A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Page 4 of 5
A.B. Data, Ltd.: Representative Client List
Updated: February 26, 2016

Weil, Gotshal & Manges LLP

Weinstein Law Firm

The Weiser Law Firm P.C.

WeissLaw LLP

Weltman, Weinberg & Reis Co., LPA

Westrup Klick, LLP

WhatleyKallas, LLP

White & Case LLP

White & MacDonald, LLP

Theresa I. Wigginton, P.A.

Wilentz, Goldman & Spitzer P.A.

The Law Offices of David M. Wise, P.A.

Williams & Connolly LLP

Williams Cuker Berezofsky

Willkie Farr & Gallagher LLP

Wilmer Cutler Pickering Hale and Dorr LLP

Wilson Elser Moskowitz Edelman & Dicker LLP

Wimmer Stiehl & McCarthy

Winstead PC

Winston & Strawn LLP

Wites & Kapetan P.A.

The Law Offices of Steven L. Wittels, P.C. (Wittels Law)

Wolf Haldenstein Adler Freeman & Herz LLP

The Wolf Law Firm, LLC

Wolf Popper LLP

Wong Fleming

Young Conaway Stargatt & Taylor, LLP

Zamansky LLC

Zimmerman Reed, LLP

Zwerling, Schachter & Zwerling, LLP



A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

# EXHIBIT B

## CASES WITH TESTIMONY IN SUPPORT OF
## CLASS ACTION NOTICE PROGRAMS
## WITHIN THE PRECEDING FOUR YEARS

1. *In re Lithium Ion Batteries Antitrust Litigation*, Case No. 13-MD-2420 (N.D. Cal.)

2. *Roberts v. C.R. England, Inc., et al.*, Case No. 12-cv-00302 (D. Utah)

3. *In re BP plc Securities Litigation*, Case No. 4:10-md-02185 (S.D. Tex.)

4. *The Department of the Treasury of the State of New Jersey and its Division of Investment v. Cliffs Natural Resources Inc., et al*., Case No. 1:14-cv-1031 (N.D. Ohio.)

5. *In re NII Holdings, Inc., Securities Litigation*, Case No. 1:14-cv-00227 (E.D.Va.)

6. *Forsta AP-Fonden, et al. v. St. Jude Medical, Inc., et al*., Case No. 12-cv-3070 (D. Minn.)

7. *In re Facebook, Inc. IPO Securities Litigation* (NASDAQ), Case No. 12-md-2389 (S.D.N.Y.)

8. *David E. Kaplan, et al. against S.A.C. Capital Advisors, L.P., et al.*, Case No. 12-cv-9350 (S.D.N.Y.)

9. *In re: Capacitors Antitrust Litigation*, Case No. 3:14-cv-03264 (N.D. Cal.)

10. *Ge Dandong et al. v. Pinnacle Performance Limited et al*., Case No. 10-cv-8086 (S.D.N.Y)

11. *In re BioScrip, Inc. Securities Litigation*, Case No. 13-cv-6922 (S.D.N.Y)

12. *Kasper v. AAC Holdings, Inc., et al*., Case No. 3:15cv--00923 (M.D. Tenn)

13. *Abante Rooter and Plumbing Inc. v. Birch Communications, Inc*. Case No. 1:15-cv-03562-AT (D. Ga.)

14. *Roxanne Best and Dean Snapp v. Bluegreen, et al*., 14-cv-80929 (S.D. Fla.)

15. *Beach, et al., v. Citigroup Alternative Investments, LLC*., et al., Case No.: 12-cv-7717 (S.D.N.Y)

16. *Gevaerts, et al., v. TD Bank, N.A., et al*., Case No.: 11:14-cv-20744- (S.D. Fla.)

17. *GFI Group, Inc. Securities Litigation*, Case No. 1:04-cv-09438 (S.D.N.Y.)

18. *Rainbow Business Solutions, et al. v. MBF Leasing LLC, et al*., Case No 10-cv-01993 (N.D. Cal.)

19. *In re: Ocwen Financial Corporation Securities Litigation*, Case No. 14-cv-81057 (S.D. Fla.)

20. *Kyndl Buzas et al. v. Phillips 66 Company*, Case No. 4:17-cv-00163 (N.D. Cal.)

21. *Bowe, et al., v. Public Storage*, Case No.: 1:14-cv-21559 (S.D. Fla.)

22. *Smith v. Questar Capital Corporation*, Case No. 12-cv-02669 (D.Minn)

# EXHIBIT C

# MATERIALS CONSIDERED

Debtors' Motion for an Order (I) Establishing Bar Dates For Filing Proofs of Claim, (II) Approving Proofs of Claim Forms, (III) Approving the Form and Manner of Notice Thereof, and (IV) Providing Certain Supplemental Relief, Case No. 17-33964 (HDH) (Bankr. Ct., ND Tex.), Docket #69.

Postcard Notice, Case No. 17-33964 (HDH) (Bankr. Ct., ND Tex.), Docket #69, Page 48 of 48.

Objection to Debtors' Motion For an Order (I) Establishing Bar Dates For Filing Proofs of Claim, (II) Approving Proofs of Claim Forms, (III) Approving the Form and Manner of Notice Thereof, and (IV) Providing Certain Supplemental Relief Service of Notice and Pleadings, Motion of the Debtors and Debtors-In-Possession For Entry of an Order Approving Procedures for Claims Objections, Case No. 17-33964 (HDH) (Bankr. Ct., ND Tex.), Docket #106.

Transcript of Proceedings Before the Honorable Harlin DeWayne Hale, November 20, 2017, Application to Employ, Motion to Maintain Bank Accounts, Motion to Use Cash Collateral, Motion to Reject, Motion for Order Establishing Bar Dates, Motion for Temporary Restraining Order.

Order (I) Establishing Bar Dates for Filing Proofs of Claim, (II) Approving Proof of Claim Forms, (III) Approving the Form and Manner of Notice Thereof, and (IV) Providing Certain Supplemental Relief, Motion of the Debtors and Debtors-In-Possession For Entry of an Order Approving Procedures for Claims Objections, Case No. 17-33964 (HDH) (Bankr. Ct., ND Tex.), Docket #137.

Notice of Motion of Consumer Borrower Plaintiffs for Entry of an Order (I) Applying Bankruptcy Rule 7023 to the Class Claim, and (II) Certifying the Class for Purposes of the Class Claim, Motion of the Debtors and Debtors-In-Possession For Entry of an Order Approving Procedures for Claims Objections, Case No. 17-33964 (HDH) (Bankr. Ct., ND Tex.), Docket #286.

Notice of Motion of Consumer Borrower Plaintiffs for Entry of an Order (I) Applying Bankruptcy Rule 7023 to the Great Plains Borrower Class Claim, and (II) Certifying the Great Plains Borrower Class for Purposes of the Great Plains Borrower Class Claim, Motion of the Debtors and Debtors-In-Possession for Entry of an Order Approving Procedures for Claims Objections, Case No. 17-33964 (HDH) (Bankr. Ct., ND Tex.), Docket #349.

Motion of the Debtors and Debtors-In-Possession For Entry of an Order Approving
Procedures for Claims Objections, Case No. 17-33964 (HDH) (Bankr. Ct., ND Tex.),
Docket #372.

Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and
Plain Language Guide (Jan. 1, 2010).

Websites:    www.americanlegal.com/tfconsumerborrower.com
             www.americanlegal.com/tf

**EXHIBIT B**

HOU:3901010.2

**In the Matter Of:**

RE THINK FINANCE, LLC, ET. AL.

17-33964 (HDH)

---

# ERIC SCHACHTER

*July 24, 2018*

---



800.211.DEPO (3376)
EsquireSolutions.com

1                   UNITED STATES BANKRUPTCY COURT
                      NORTHERN DISTRICT OF TEXAS
2
                            -   -   -
3

4     IN RE:
      THINK FINANCE, LLC, ET. AL.:   NO. 17-33964 (HDH)
5

6

7

8

9

10

11

12                          -   -   -

13                     ***DEPOSITION***

14    DEPONENT:    Eric Schachter

15    DATE:        Tuesday, July 24, 2018

16    TIME:        11:03 a.m.

17    PLACE:       Dilworth Paxson, LLP
                   1500 Market Street, Suite 3500E
18                 Philadelphia, Pennsylvania 19102

19    REPORTER:    Valerie D. Lawrence, Notary Public

20

21

22

23

24

25



```
 1   APPEARANCES:

 2   HUNTON ANDREWS KURTH, LLP
     BY:  JASON W. HARBOUR, ESQUIRE
 3   Riverfront Plaza, East Tower
     951 East Byrd Street
 4   Richmond, Virginia 23219
     (804) 788-7233
 5        Representing Think Finance, LLC

 6
     TYCKO & ZAVAREEI, LLP
 7   BY:  ANDREW J. SILVER, ESQUIRE
     1828 L Street, NW, Suite 1000
 8   Washington, District of Columbia 20036
     (202) 417-3658
 9        Representing Consumer Borrower Claimants from
          the states of Florida, Virginia, and
10        California
     Via Telephone
11
12   BERMAN TABACCO
     BY:  STEVEN J. BUTTACAVOLI, ESQUIRE
13   One Liberty Square
     Boston, Massachusetts 02109
14   (617) 542-8300
          Representing Eric Schachter
15

16

17

18

19

20

21

22

23

24

25
```



ERIC SCHACHTER
RE THINK FINANCE, LLC, ET. AL.

July 24, 2018
14

1

2

3      Q.      While at A.B. Data, have you ever worked

4  on an engagement as a claims and noticing agent in a

5  bankruptcy case?

6      A.      No.

7      Q.      Does your report indicate that you've

8  ever worked as a claims and noticing agent in a

9  bankruptcy case?

10     A.      My report doesn't -- my report does not

11 indicate that I've done noticing in a bankruptcy

12 case.

13     Q.      My initial question was had you done it

14 at A.B. Data, so I'm not just repeating myself.

15             Have you ever worked as a claims and

16 noticing agent in a bankruptcy case?

17     A.      No.

18     Q.      Paragraph 4 of the report identifies a

19 number of cases you've worked on; is that correct?

20     A.      Yes.

21     Q.      None of those cases are bankruptcy

22 cases, correct?

23     A.      Correct.

24     Q.      Exhibit B of the report identifies cases

25 in which you've provided testimony, correct?



ERIC SCHACHTER                                    July 24, 2018
RE THINK FINANCE, LLC, ET. AL.                          15

```
 1        A.      Correct.
 2        Q.      In the last four years -- sorry --
 3   correct?
 4        A.      That's correct.
 5        Q.      And none of those cases are bankruptcy
 6   cases?
 7        A.      That's correct.
 8        Q.      Have you ever worked in any capacity on
 9   a bankruptcy case?
10        A.      Years ago I was involved in some
11   business development ventures while at my previous
12   employer that concerned bankruptcy, but
13   substantively, no.
14        Q.      Never in a claims administration
15   capacity --
16        A.      Correct.
17        Q.      -- or otherwise related to claims?
18        A.      Correct.
19        Q.      Does A.B. Data do any claims
20   administration work in bankruptcy cases?
21        A.      I don't believe we have.
22        Q.      To your knowledge, A.B. Data hasn't done
23   any work in bankruptcy cases?
24        A.      That's correct.
25
```



ERIC SCHACHTER
RE THINK FINANCE, LLC, ET. AL.

July 24, 2018
52



14      Q.      And you have not analyzed claim

15   submission rates for bankruptcy bar date notices,

16   correct?

17      A.      Correct.



ERIC SCHACHTER                                         July 24, 2018
RE THINK FINANCE, LLC, ET. AL.                              54



25        Q.       In reaching the conclusion in paragraph



ERIC SCHACHTER                                                July 24, 2018
RE THINK FINANCE, LLC, ET. AL.                                          55

1   23 that the response rate was stunningly low, you

2   didn't compare the response rate to the response

3   rate for any bankruptcy bar date notices, correct?

4        A.      Correct.

5        Q.      In paragraph 24, you state that based on

6   your experience in claims administration, the claim

7   rate of less than 0.5 percent through a direct mail

8   and e-mail notice program would never be deemed by a

9   court evidence effective -- deemed by a court to

10  evidence effective notice to a class, correct?

11       A.      Correct.

12       Q.      When you refer to your experience in

13  claims administration, you're referring to your

14  experience in administering class action claims

15  following class action settlements or other claims

16  after other settlements, correct?

17       A.      Correct.

18       Q.      You are not referring to experience in

19  administering claims filed in bankruptcy cases,

20  correct?

21       A.      Correct.

22       Q.      And you're not referring to experience

23  in administering bankruptcy bar date notice

24  processes, correct?

25       A.      Correct.



ERIC SCHACHTER                                                  July 24, 2018
RE THINK FINANCE, LLC, ET. AL.                                          56

1      Q.      The statements in paragraph 24 are based
2   on your experience, correct?
3      A.      Correct.
4      Q.      Did you review any documents or other
5   analyses to come up with the percentages in
6   paragraph 24?
7      A.      No.
8      Q.      Did you perform any math calculations to
9   come up with the percentages in paragraph 24?
10     A.      No.
11     Q.      Then how did you come up with the
12  percentages?
13     A.      Based on my experience.
14     Q.      But you didn't use a denominator and a
15  numerator to come up with those percentages and
16  divide your whole experience with the subset of
17  experience with the number of the response rates in
18  the various -- various cases, right?
19                MR. BUTTACAVOLI:  Objection.
20                THE WITNESS:  That's correct.
21  BY MR. HARBOUR:
22     Q.      So I'm just trying to understand what
23  you did.  So instead you would look at some of the
24  cases you worked on and look at the response rates
25  in those cases, correct?



ERIC SCHACHTER                                          July 24, 2018
RE THINK FINANCE, LLC, ET. AL.                                    57

1      A.      I didn't even have to look at those

2   cases.  I know -- I mean, this is what I do every

3   day, so I'm -- I'm just aware.



ERIC SCHACHTER                                          July 24, 2018
RE THINK FINANCE, LLC, ET. AL.                                    58



15       Q.       Have you supplemented or amended your

16   report?

17       A.       I have not.

18       Q.       Have you supplemented or amended your

19   opinions?

20       A.       I have not.

21       Q.       Does this report contain all of your

22   opinions?

23       A.       It does.

24       Q.       Does this report contain the basis for

25   all of your opinions?



ERIC SCHACHTER                                                    July 24, 2018
RE THINK FINANCE, LLC, ET. AL.                                              59

1          A.       I believe it does.

2          Q.       Are you engaging in any work concerning

3     modifying any of your opinions?

4          A.       I am not.

5          Q.       Are you engaging in any work concerning

6     modifying the basis of any of your opinions?

7          A.       I am not.

8          Q.       Are you engaging in any work concerning

9     any new opinions?

10         A.       No.





ERIC SCHACHTER                                                July 24, 2018
RE THINK FINANCE, LLC, ET. AL.                                        66

```
1            C E R T I F I C A T E

2

3            I, Valerie D. Lawrence, Court Reporter and

4    Notary Public, Pennsylvania, do hereby certify that

5    ERIC SCHACHTER was by me first duly sworn to testify

6    to the whole truth and that the above deposition was

7    recorded stenographically by me and was transcribed

8    by means of computer-aided transcription under my

9    personal direction and that the said deposition

10   constitutes a true record of the testimony given by

11   said witness.

12            I further certify that I am not a relative

13   or employee of any of the parties, a relative or

14   employee of any attorney involved in this action, or

15   financially interested directly or indirectly in

16   this action.

17

18

19

20

21   VALERIE D. LAWRENCE, Notary Public

22   Pennsylvania
     My Commission Expires February 17, 2022

23

24

25
```



**EXHIBIT C**

HOU:3901010.2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| THINK FINANCE, LLC, *et al.*, | : | Chapter 11 |
| | : | |
| | : | Case No. 17-33964 (HDH) |
| Debtors. | : | |
| | : | (Jointly Administered) |
| _____ | : | |

### EXPERT REPORT OF SHANNON R. WHEATMAN, PH.D.

**July 3, 2018**

## INTRODUCTION

1.      I am president of Kinsella Media, LLC ("KM"), a nationally recognized advertising and legal notification firm in Washington, D.C. specializing in the design and implementation of notification programs to reach unidentified putative class members, primarily in consumer and antitrust class actions, and claimants in bankruptcy and mass tort litigation.  My business address is 2101 L Street, NW Suite 800, Washington, DC 20037.  My telephone number is (202) 686-4111.

2.      This Expert Report and the opinions contained herein are based on my personal knowledge, professional experience, industry-specific knowledge, and expertise in the area of class action and bankruptcy notice programs.

3.      KM is being compensated at a rate of $500 per hour for my work on this matter, and my compensation is not contingent on any findings or the outcome of this matter.

## RELEVANT EXPERIENCE

4.      I have served as a qualified class action and plain language notice expert in many major class actions and large bankruptcy cases.  State and federal courts have accepted my analyses and expert testimony on whether information is effectively communicated to people, including whether or not a notice program to reach potential class members/claimants is the best notice practicable under the circumstances.  My curriculum vitae is attached as **Exhibit 1**.

5.      I worked on the following bankruptcy cases where I assisted with designing notice plans and drafting notices:  *In re W.R. Grace & Co.*, No. 01-01139 (Bankr. D. Del.); *In re: Energy Future Holdings Corp., et al.*, No.  14-10979 (Bankr. D. Del.); *In re Garlock Sealing Technologies LLC*, No. 10-31607 (Bankr. W.D.N.C.); and *In re: SCBA Liquidation, Inc., f/k/a Second Chance Body Armor, Inc.,* No. 04-12515 (Bankr. W.D. Mich.) which was a class action settled within a bankruptcy.

6.      I have testified in court as an expert in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litig.*, MDL No. 2672 (N.D. Cal.); *State v. Farmers Group Inc.*, No. D-1-GV-02-002501 (D. Ct. Tex., Travis County); *Scharfstein v. BP West Coast Products,*

2

*LLC*, No. 1112-17046 (Cir. Ct. Ore.); *Spillman v. RPM Pizza, Inc.*, No. 10-349 (M.D. La.); *PRC Holdings, LLC v. East Resources, Inc.*, No. 06-C-81 (Cir. Ct. W. Va.); *Guidry v. American Public Life Ins. Co*., No. 2008-3465 (14th Jud. Dist. Ct., Calcasieu Parish); *Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark); and *Beasley v. The Reliable Life Insurance Co.*, No. CV-2005-58-1 (Cir. Ct. Ark).  I have been deposed as an expert in *Hale v. CNX Gas Company, LLC*, No. 10-CV-59 (W.D. Va.) and *Thomas v. A. Wilbert Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish).

7.     I have been involved in some of the largest and most complex national notification programs in the country, including: *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litig.*, MDL No. 2672 (N.D. Cal.); *Precision Associates, Inc. v. Panalpina World Transport*, No. 08-CV-00042 (E.D.N.Y.); *In re Transpacific Passenger Air Transportation Antitrust Litig.,* MDL No. 1913 (N.D. Cal.) (involving millions of international airline passengers); *In re Dynamic Random Memory Antitrust Litig.,* MDL No. 1486 (N.D. Cal.) (involving tens of millions of consumers); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (N.D. Cal.) (involving millions of indirect purchasers); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010,* MDL No. 2179 (E.D. La.); *In re Target Corp. Customer Data Security Breach Litig.*, MDL No. 14-2522 (D. Minn.) (data breach); *In re Sony Gaming Networks & Customer Data Security Breach Litig.*, No. 11-MD-2258 (S.D. Cal.) (data breach); *Fogel v. Farmers Group, Inc.*, No. BC300142 (Cal. Super. Ct., LA County) ($455 million settlement involving tens of millions of insureds); *In re Katrina Canal Breaches Consolidated Litig.*, No. 05-4182 (E.D. La.) (settlement obtained for Hurricane Katrina and Rita survivors); and many others.

8.     Courts have admitted my expert testimony on quantitative and qualitative evaluations of the effectiveness of notice programs, and several courts have commented favorably, on the record, regarding the effectiveness of notice plans I have done.  Selected judicial comments are included in the attached curriculum vitae.

9.     My qualifications include expertise in the form and content of notice.  For example,

while serving with the Federal Judicial Center ("FJC"), I played an integral part in the development of the illustrative, "model" forms of notice designed to satisfy the plain language requirements of Federal Rule of Civil Procedure 23(c)(2). This research formed the basis for my doctoral dissertation, *The Effects of Plain Language Drafting on Layperson's Comprehension of Class Action Notices* (2001) (Ph.D. dissertation, University of Georgia). To assist judges and attorneys, both in state and federal courts, the FJC posted the notices at www.fjc.gov.

10.  I have authored and co-authored articles on class action notice and due process. I believe notice and due process depend upon clear communication with the people affected, and have stated this position in my publications *See, e.g.,* Shannon R. Wheatman & Katherine M. Kinsella, *International Class Action Notice,* in WORLD CLASS ACTION: A GUIDE TO GROUP AND REPRESENTATIVE CLASS ACTIONS AROUND THE GLOBE 673-686 (Paul Karlsgodt ed., 2012); Katherine Kinsella & Shannon Wheatman, *Class Notice and Claims Administration,* in PRIVATE ENFORCEMENT OF ANTITRUST LAW IN THE UNITED STATES: A HANDBOOK 338-348 (Albert A. Foer & Randy M. Stutz eds., 2012); Shannon R. Wheatman & Terri R. LeClercq, *Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements*, 30 REV. LITIG. 53 (2011); Katherine Kinsella & Shannon R. Wheatman, *Class Notice and Claims Administration*, in THE INTERNATIONAL PRIVATE ENFORCEMENT OF COMPETITION LAW 264–274 (Albert A. Foer & Jonathan W. Cuneo eds., 2010); Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language: A desire to actually inform*, 18 GEO. J. LEGAL ETHICS 1359 (2005); and Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 TULANE LAW REV. 1771 (2006).

## OVERVIEW

11.  I have been asked by attorneys for Darlene Gibbs, Stephanie Edwards, Lula Williams, Patrick Inscho, Lawrence Mwethuku, Kimetra Brice, Jill Novorot, Earl Browne, India

4

Banks, Joanne Griffths, Jeri Brennan, and Alicia Patterson to study the communication effectiveness of the Bar Date Notices ("Postcard Notice", "Email Notice" and "Publication Notice") and Proof of Claim form and the manner of publication.

12.    I have also studied the questions the Claims, Noticing, and Balloting Agent, American Legal Claims Services, LLC ("ALCS"), received from potential claimants.

13.    I was presented with the question of whether this bankruptcy notice and notice process could serve as an effective or comparable alternative to a notice process for a claims process under Fed. R. Civ. P. 23.

14.    In my opinion, the Debtors' notice program did not provide the best notice practicable under the circumstances and did not afford potential claimants enough details to make an informed decision.  Whether or not the Debtors' notice program would comply with Bankruptcy procedure, it would not serve as a reasonable, effective, or comparable alternative to a class action claims program notice process.

15.    To the extent that additional information is disclosed in discovery concerning Debtors' notice program, I reserve the right to amend my opinions and this Expert Report.

## THE NOTICES[1]

16.    **The Notices do not follow accepted standards for effectively written communication, including:**

> a.    A prominent headline that makes the notice "stand out as important, relevant, and reader-friendly"[2];

> b.    Being designed to come to the attention of recipients;

> c.    Being written in clear, concise, and easily understood language;

> d.    Containing sufficient information for recipients to make an informed

---

[1] The actual Email Notice was not available for review but ALCS reported it was the same as the Postcard Notice. Therefore, all of my opinions on the Postcard Notice would apply to the Email Notice.

[2] Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, available at www.fjc.gov/content/judges-class-action-notice-and-claims-process-checklist-and-plainlanguage-guide-0 (last visited July 3, 2018).

decision; and

e.    A clear call-to-action.

17.    **The Postcard Notice was not designed to capture the attention of potential claimants.**  Advertising research has found that the eyes and consciousness of most readers never make it past the headline.[3]  The Postcard Notice has an uninformative headline, "Important Legal Notice authorized by the United States Bankruptcy Court for the Northern District of Texas" that will fail to attract the reader's attention.  A carefully crafted headline should be subject matter-specific and quickly persuade readers that they have a stake in the matter and that they will be able to understand it.  A headline that merely talks about a legal notice and the court name will not garner readership and may cause recipients to fear they are being sued.  An appropriate headline for this case would have mentioned the names of the online lenders from which Consumer Borrowers obtained their loans.

18.    **The Postcard Notice is not written in plain language and will be misunderstood by many recipients.**  Plain language, particularly in legal notice documents is necessary because the average U.S. adult reads at an eighth-grade reading level.[4]

a.    The Postcard Notice does not explain concepts that are foreign to the average person.  It uses complicated, legalistic words and phrases that laypersons are not likely to understand, instead of clear, simple terms and references.  Numerous terms will hold little meaning for the layperson, such as, "Debtors", "chapter 11", "United States Bankruptcy Code", "barred", "estopped", "enjoined", etc.

b.    From a communications perspective, in my opinion, the language used to inform potential claimants about the bankruptcy falls short of providing the information that people need to properly exercise their due process rights.

19.    **The content is deficient because important information is missing.**

---

[3] Chris Cilizza, *Americans Read Headlines and Not Much Else*, THE WASHINGTON POST (Mar. 19, 2014).
[4] *See* William H. DuBay, *The Principles of Readability 1* (Aug. 25, 2004), *at* http://www.impact-information.com/impactinfo/readability02.pdf (last visited  July 3, 2018).

a.    *The Postcard Notice does not convey enough information for potential claimants to make an informed decision about whether to file a claim.*    It is my understanding that many Consumer Borrowers received a payday loan through Great Plains Lending, Plain Green, and Mobi-Loans.    The Postcard Notice does not list any entity the consumer would recognize other than First Bank of Delaware.    Consumer Borrowers who had loans from the unnamed entities were likely unaware that these entities were affiliated with Native American Tribal lenders.    As a result, many Consumer Borrowers may not have realized that this bankruptcy proceeding involved their loan at all.    Consumer Borrowers would have needed to call or access the case website to learn about the other entities.    However, there were only 55,101 unique page views of the home page of the Consumer Borrowers website and 25,759 calls to the pre-recorded message at the toll-free number through March 1, 2018.    Assuming these numbers are unique,[5] this means that 92.9% of Consumer Borrowers did not take any action to learn more about the bankruptcy proceeding and many of these individuals would have no idea that other banks were involved.

b.    *The Postcard Notice does not explain how a Consumer Borrower could even have a claim.*    Bankruptcy proceedings are foreign and confusing to laypersons.    The Postcard Notice did not take into consideration how these Consumer Borrowers differ from the average creditor who is likely to be a business entity that is acquainted with bankruptcy proceedings.    Without any background, the Consumer Borrowers would have no basis to understand why the Debtors would owe them money and therefore the reason for and amount of their claim would be unknown to them.    The FAQs and other information available at the website do not provide any assistance in understanding the bankruptcy proceeding or the potential claims that Consumer Borrowers may have in the case.

c.    *The Postcard Notice fails to meet all of the standards of due process*

---

[5] There is no identifying information available to determine if these are unique individuals or if there is any duplication.

*because the consequences of participation are not adequately disclosed.*  The Notice is unclear about what potential claimants will give up if they do not file a claim.  Recipients of the postcard are told they will be "barred, estopped, and enjoined from asserting a Prepetition Claim."  However, these legalistic terms are never defined.

20.    **The publication portion of the notice program would not have effectively reached Consumer Borrowers**.  The Notice was published in *The Wall Street Journal* and *USA Today*.  These publications are not an effective way to reach Consumer Borrowers because only 1.09% of Adults 18+ read *The Wall Street Journal* and 1.26% of Adults 18+ read *USA Today*.[6] The percent of Consumer Borrowers reading these publications is likely much lower.  The table below compares the demographics of payday loan borrowers and the demographics of readers[7] of *The Wall Street Journal* and *USA Today*:

|  | **Payday Loan Borrowers**[8] | *Wall Street Journal* | *USA Today* |
|---|---|---|---|
| **Age** | 25-49 | 45+ | 45+ |
| **Income** | < $40k | $100k+ | $75k+ |
| **Education** | High School | College Educated | College Educated |

21.    **The Publication Notice is neither clear or concise nor written in plain language.** The language in the Publication Notice (see **Exhibit 2** for actual copies of how the Notice looked when published) would not be accessible to a person with a high school education since it is full of legalistic terms (*e.g.*, "notwithstanding that such claims may not have matured or become fixed or liquidated prior to such date.  Under section 101(5) of the Bankruptcy Code as used herein, the word "claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,

---

[6] GfK MRI, 2017 Doublebase.  This is a third-party media survey data provider that measures audiences for print publications.
[7] Finder, *A Look at the Telling Statistics of Payday Loans*, *at* https://www.finder.com/payday-loans-statistics (last visited July 3, 2018).  Group noted in table represents the highest payday lending use.
[8] *supra* note 4.

Case 17-33964-swe11    Doc 694    Filed 07/26/18    Entered 07/26/18 23:16:21    Desc
Main Document    Page 83 of 117

equitable, secured, or unsecured, or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."). The Publication Notice uses the case caption in lieu of an attention-getting headline, is written in small print that appears to be six-point font, and is not concise at over 1,175 words. The small print is very obvious when comparing the size of the font used in the Notice versus that used in the articles in the newspaper.

22. **There was no other available source from which Consumers could obtain necessary information**. I have reviewed correspondence between consumers requesting information by mail or e-mail that was not otherwise in the Notice or on the website. I have also reviewed the standard responses that were sent to these communications. Correspondence sent by mail or email requesting the identity of a consumer's lender or details about their loan were answered with only a standard and substance-less response containing pre-written FAQs. There was not any effective supplement or alternative to the defective notice process.

## CONSUMER BORROWER PROOF OF CLAIM

23. **The Consumer Borrower Proof of Claim is confusing, burdensome, and the process is overly complicated.**

    a.      The Proof of Claim asks for information that many Consumer Borrowers may not currently have (*e.g.,* loan number) or cannot determine on their own (*e.g.,* amount of claim, basis for claim).

    b.      The Proof of Claim is burdensome since it asks for information that should be in the possession of the Debtors.

    c.      The Proof of Claim uses language that will only serve to scare potential claimants from filing a genuine claim ("fraudulent claim could be fined up to $500,000, imprisoned up to 5 years, or both").

24. **The Instructions for the Consumer Borrower Proof of Claim does little to clear**

**up any confusion.**  Here, they advise people to consider getting the advice of an attorney.  Given the demographics of payday loan borrowers, it is unlikely that people that make less than $40,000 a year would have the means to consult with an attorney.  The class action mechanism would go a long way to provide Consumer Borrowers the representation they need to truly understand the claims they may have against the Debtors and the amount of those claims.

## CONSUMER BORROWER RESPONSE

25.  **Consumer Borrower responses showed much confusion.**  Numerous Consumer Borrowers reached out to the administrator by email or phone.  I reviewed the consumer correspondences and listened to the consumer voice messages that appeared at TF-BK-VT_NC 000711-001440.  Some of the questions posed by potential claimants showed a high level of confusion:

> a.  "I'm just confused on what this means?  Are they trying to sue me?  The FAQ didn't answer my questions.", "Not sure if I had a loan and I never filed Bankruptcy?"

> b.  "Can you explain to me what a claim is?", "Hi can you please tell me what the claim is for? What is a claim?", "What is filing a claim?  Can you please explain this to me?", "Does Think Finance have to reimburse people to whom loans were distributed?", "What should be placed in the basis for claim?"

> c.  "I do not remember amounts or anything they should have that on record who would get what."

> d.  One Consumer Borrower emailed a question in Spanish and ALCS was directed to respond in English.

26.  **Claims rate for Consumer Borrowers is low.**  In my experience, claims rates are typically much higher (between 5% and 15%) in cases where a mailing list of potential claimants can be compiled.  In this case, the claims rate for Consumer Borrowers is only .43% (4,931 proof of claims filed for 1,134,125 Consumer Borrowers).  This lower than expected claims rate is likely

the result of the deficient Notices and burdensome claims process.

27.    **Simple ways to increase the claims rate.**  In my experience, including the Proof of Claim in the mailing to Consumer Borrowers or as a tear off to the Postcard Notice would have increased the claims rate.   Also, allowing claims to be filed online also would have been helpful.[9]

## CONCLUSION

28.    In the course of planning notification efforts, the U.S. Supreme Court's guidance in *Mullane*, which deals with communications' principles underlying due process, needs to be followed: "But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected . . . ."[10]   The Debtors' notice program in this case falls short of this admonition.

29.    From a communications perspective, it is my opinion that the Postcard Notice, Email Notice, Publication Notice, and the Borrower Proof of Claim does not satisfy all of the standards of due process.

## LIMITING FACTORS AND OTHER ASSUMPTIONS

30.    This Expert Report is being provided solely addressing issues raised for the Rule 7023 hearing pending in the above-captioned matter and may not and is not intended to be used for other purposes.   The analysis and opinions contained in this Expert Report are based on information available to me as of the date of this Report.  (See **Exhibit 3** for list of documents.)  I reserve the right to amend this report in the event additional information becomes available.

Dated: July 3, 2018

Shannon R. Wheatman

---

[9] *supra* note 1, FJC guidelines state that using "an online submission option" will increase claims because of "the convenience of one-click submission of claims."
[10] Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 315 (1950).

# EXHIBIT 1



# Shannon R. Wheatman, Ph.D.

President

Kinsella Media, LLC

2101 L Street NW, Suite 800

Washington, DC 20037

2010 – Present

Dr. Wheatman specializes in designing, developing, analyzing, and implementing large-scale legal notification plans. She is a court-recognized expert who provides testimony on the best notice practicable. Dr. Wheatman began her class action career in 2000 at the Federal Judicial Center where she was instrumental in the development of model notices to satisfy the plain language amendment to Rule 23. Her plain language expertise was advanced by her education, including her doctoral dissertation on plain language drafting of class action notice and her master's thesis on comprehension of jury instructions. Dr. Wheatman has been involved in over 500 class actions.  Her selected case experience includes:

### Antitrust

*Allen v. Dairy Farmers of America, Inc*., No. 5:09-CV-00230-CR (D. Vt.).

*Blessing v. Sirius XM Radio, Inc.*, No. 09-CV-10035 HB (S.D.N.Y.).

*Brookshire Bros. v. Chiquita*, No. 05-CIV-21962 (S.D. Fla.).

*Cipro Cases I and II*, No. 4154 and No. 4220 (Super. Ct. Cal.).

*In re Automotive Parts Antitrust Litigation,* MDL No. 2311 (E.D. Mich.).

*In re Dynamic Random Memory (DRAM) Antitrust Litig.,* MDL No. 1486 (N.D. Cal.).

*In re Flonase Antitrust Litig*., No. 08-CV-3301 (E.D. Pa.).

*In re LIBOR-Based Financial Instruments Antitrust Litig. (Barclays Bank plc Settlement)*, No. 11-cv-5450 (S.D.N.Y.).

*In re Metoprolol Succinate End-Payor Antitrust Litig.*, No. 06-CV-71 (D. De.).

*In re NYC Bus Tour Antitrust Litig.,* No. 13-CV-0711 (S.D. N.Y.).

*In re Online DVD Rental Antitrust Litig.*, MDL No. 2029 (N.D. Cal.).

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (N.D. Cal.).

*In re Transpacific Passenger Air Trans. Antitrust Litig.*, MDL No. 1913 (N.D. Cal.).

*Precision Associates, Inc. v. Panalpina World Transport*, No. 08-cv-00042 (E.D. N.Y.).

*Roos v. Honeywell Int'l, Inc.*, No. CGC 04-0436205 (Super. Ct. Cal.).

*Sweetwater Valley Farm, Inc. v. Dean Foods*, No. 2:07-CV-208 (E.D. Tenn.).

*The Shane Grp., Inc., v. Blue Cross Blue Shield of Michigan*, No. 2:10-CV-14360 (D. Minn.).

### *Consumer and Personal Injury/Product Liability*

*Abbott v. Lennox Industries, Inc.,* No.16-2011-CA-010656 (4th Jud. Cir. Ct., Dade Cty. Fla).

*Beringer v. Certegy Check Servs., Inc.*, No. 8:07-CV-1434-T-23TGW (M.D. Fla.) (data breach).

*Chaudhri v. Osram Sylvania, Inc.,* No. 2:11-CV-05504 (D.N.J.) (false advertising).

*CSS, Inc. v. FiberNet, L.L.C.*, No. 07-C-401 (Cir. Ct. W. Va.) (telecommunications).

*Donovan v. Philip Morris USA, Inc.,* No. 06-12234 NG (D. Mass.) (medical monitoring).

*FIA Card Servs., N.A. v. Camastro*, No. 09-C-233 (Cir. Ct. W.Va.) (credit card arbitration).

*George v. Uponor Corp.*, No. 12-249 (D. Minn.) (defective product).

*Glazer v. Whirlpool Corp.*, No. 1:08-WP-65001 (N.D. Ohio)(defective product).

*Grays Harbor v. Carrier Corp.*, No. 05-CIV-21962 (W.D. Wash.) (defective product).

*In re Building Materials Corp. of America Asphalt Roofing Shingle Prods. Liab. Litig.,* No. 8:11- 02000 (D.S.C.) (roofing shingles).

*In re Checking Account Overdraft Litig.*, MDL No. 2036 (S.D. Fla.) (JP Morgan, U.S. Bank, BOA settlements; overdraft fees).

*In re Enfamil LIPIL Mktg. & Sales Practs. Litig.*, No. 11-MD-02222 (S.D. Fla.) (false advertising).

*In re M3Power Razor System Mktg. & Sales Practs. Litig.*, MDL No. 1704 (D. Mass.) (false advertising).

*In re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323 (E.D. Pa.)

*In re Netflix Privacy Litig.*, No. 5:11-CV-00379 (N.D. Cal.) (privacy).

*In re Pharm. Industry Average Wholesale Price Litig.*, MDL No. 1456 (D. Mass.) (pharmaceutical).

*In re SCBA Liquidation, Inc., f/k/a Second Chance Body Armor, Inc.,* No. 04-12515 (Bankr. W.D. Mich.) (defective product).

*In re Sony Gaming Networks & Customer Data Security Breach Litig.*, No. 11-MD-2258 (S.D. Cal.) (data breach).

*In re Target Corp. Customer Data Security Breach Litig.*, MDL No. 14-2522 (D. Minn.) (data breach).



*In re Toyota Motor Corp. Unintended Acceleration Mktg, Sales Practs, & Prods. Litig.,* No. 8:10ML2151 (C.D. Cal.) (unintended acceleration).

*In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 3:15-md-2672 (N.D. Cal.)

*In re Vioxx Products Liab. Litig.*, No. 05-MD-01657 (E.D. La) (pharmaceutical).

*In re Wachovia Corp. "Pick-a-Payment" Mortgage Mktg & Sales Practs. Litig.*, No. M:09-CV-2015 (N.D. Cal.) (negative amortization).

*In re Wirsbo Non-F1807 Yellow Brass Fittings*, No. 2:08-CV-1223 (D. Nev.) (defective product).

*Jabbari v. Wells Fargo*, No. 3:15-cv-02159 (N.D. Cal.) (unauthorized accounts).

*Keilholtz v. Lennox Hearth Prods.*, No. 08-CV-00836 (N.D. Cal.) (defective product).

*Kramer v. B2Mobile, LLC*, No. 10-CV-02722 (N.D. Cal.) (TCPA).

*Lee v. Carter Reed Co., L.L.C.*, No. UNN-L-39690-04 (N.J. Super. Ct.) (false advertising).

*Mirakay v. Dakota Growers Pasta Co., Inc.*, No. 13-CV-4229 (D.N.J.) (false advertising).

*Palace v. DaimlerChrysler*, No. 01-CH-13168 (Cir. Ct. Ill.) (defective product).

*Pauley v. Hertz Global Holdings, Inc.*, No. 13-C-236 (Cir. Ct. W.Va.) (administrative/handling fees).

*Rowe v. UniCare Life & Health Ins. Co.*, No. 09-CV-02286 (N.D. Ill.) (data breach).

*Spillman v. Domino's Pizza*, No. 10-349 (M.D. La.) (robo-call).

*Trammell v. Barbara's Bakery, Inc.*, No. 3:12-CV-02664 (N.D. Cal.) (false advertising).

*United Desert Charities v. Sloan Valve Company*, No. CV12-06878 (C.D. Cal.)(defective product).

*Wolph v. Acer America Corp.*, No. 09-CV-01314 (N.D. Cal.) (false advertising).

**Environmental/Property**

*Allen v. Monsanto Co.*, No. 041465 and *Carter v. Monsanto Co.*, No. 00-C-300 (Cir. Ct. W. Va.) (dioxin release).

*Andrews et al. v. Plains All American Pipeline, L.P.*, No. 2:15-cv-04113 (C.D. Cal.) (Santa Barbara Oil Spill).

*Angel v. U.S. Tire Recovery*, No. 06-C-855 (Cir. Ct. W.Va.) (tire fire).

*Cather v. Seneca-Upshur Petroleum Inc.*, No. 1:09-CV-00139 (N.D. W.Va.) (oil & gas rights).

*Ed Broome, Inc. v. XTO Energy, Inc.,* No. 1:09-CV-147 (N.D. W.Va.) (oil & gas rights).



*Good v. West Virginia American Water Co.*, No. 2:14-cv-1374 (S.D.W. Va.) (water contamination).

*In re Katrina Canal Breaches Litig.*, No. 05-4182 (E.D. La.) (Hurricanes Katrina and Rita).

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010,* MDL No. 2179 (E.D. La.) (BP, Halliburton and Transocean settlements).

*Jones v. Dominion Transmission Inc.*, No. 2.06-CV-00671 (S.D. W.Va.) (oil & gas rights).

*Thomas v. A. Wilbert & Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish) (vinyl chloride water contamination).

### Government

*Cobell v. Salazar*, No. 1:96-CV-01285 (D. D.C.), Depts. of Interior and Treasury.

Countrywide Mortgage Settlement, Department of Justice.

Iovate Settlement, Federal Trade Commission.

National Mortgage Settlement, Attorneys General.

Walgreens Settlement, Federal Trade Commission.

### Insurance

*Beasley v. Hartford Ins. Co. of the Midwest*, No. CV-2005-58-1 (Cir. Ct. Ark.) (homeowners insurance).

*Bond v. Am. Family Ins. Co.*, No. CV-06-01249 (D. Ariz) (property insurance).

*Burgess v. Farmers Ins. Co.*, No. 2001-292 (Dist. Ct. Okla.) (homeowners insurance).

*Cole's Wexford Hotel, Inc. v. UPMC,* No. 2:10-CV-01609 (W.D. Pa.)(health insurance).

*Campbell v. First Am. Title Ins. Co.*, No. 2:08-CV-311-GZS (D. Me.) (title insurance).

*DesPortes v. ERJ Ins. Co.,* No. SU2004-CV-3564 (Ga. Super. Ct.) (credit premium insurance).

*Fogel v. Farmers Grp., Inc.*, No. BC300142 (Super. Ct. Cal.)(management exchange fees).

*Guidry v. Am. Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct.) (cancer insurance).

*Gunderson v. F.A. Richard & Assocs., Inc.*, No. 2004-2417-D. (14th Jud. D. Ct. La.) (PPO).

*Johnson v. Progressive Casualty Ins., Co.*, No. CV-2003-513 (Cir. Ct. Ark.) (automobile insurance).

*McFadden v. Progressive Preferred*, No. 09-CV-002886 (Ct. C.P. Ohio) (UM/UIM).

*Orrill v. Louisiana Citizens Fair Plan*, No. 05-11720 (Civ. Dist. Ct., Orleans Parish) (Hurricane Katrina property insurance).



*Press v. Louisiana Citizens Fair Plan Prop. Ins. Co.*, No. 06-5530 (Civ. Dist. Ct., Orleans Parish) (Hurricane Katrina property insurance).

*Purdy v. MGA Ins. Co.*, No. D412-CV-2012-298 (4th Jud. Ct. N. Mex.) (UM/UIM).

*Shaffer v. Continental Casualty Co.*, No. 06-2235 (C.D. Cal.) (long term care insurance).

*Sherrill v. Progressive Northwestern Ins. Co.*, No. DV-03-220 (18th D. Ct. Mont.) (automotive premiums).

*Soto v. Progressive Mountain Ins. Co.*, No. 2002-CV-47 (Dist. Ct. Mont.) (personal injury insurance).

*Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark) (bodily injury claims).

### Securities

*In re Municipal Derivatives Antitrust Litig.*, MDL No. 1950 (S.D.N.Y.).

*In re Mutual Funds Inv. Litig.,* MDL No. 1586 (D. Md.) (Allianz Sub-Track).

### Canada

*Bechard v. Province of Ontario*, No. CV-10-417343 (Ont. S.C.J.) (personal injury).

*Clarke v. Province of Ontario*, No. CV-10-411911 (Ont. S.C.J.) (personal injury).

*Dolmage v. Province of Ontario*, No. CV-09-376927CP00 (Ont. S.C.J.) (personal injury).

*Donnelly v. United Technologies Corp.,* No. 06-CV-320045 CP (Ont. S.C.J.) (defective product).

*Hall v. Gillette Canada Co.*, No. 47521CP (Ont. S.C.J.) (false advertising).

*Wener v. United Technologies Corp.*, 2008 QCCS 6605 (Québec) (defective product).

## Articles and Presentations

Shannon Wheatman, Speaker, *How to Get Your Notice Actually Noticed: Claims Stimulation 3.0*, Women Antitrust Plaintiffs' Attorneys, Napa, CA (June 2018).

Shannon Wheatman & Katherine Kinsella, *The Plain Language Toolkit for Class Action Notice*, in A PRACTITIONER'S GUIDE TO CLASS ACTIONS, 2ND ED. 701 - 710 (Marcy Greer ed., 2017).

Katherine Kinsella & Shannnon Wheatman, *Quantifying Notice Results in Class Actions,* in A PRACTITIONER'S GUIDE TO CLASS ACTIONS, 2ND ED. 693 - 700 (Marcy Greer ed., 2017).

Maureen Gorman & Shannon Wheatman, *Reality Check: The State of Media and Its Usage in Class*



*Notice*, in A PRACTITIONER'S GUIDE TO CLASS ACTIONS, 2ND ED. 711-722 (Marcy Greer ed., 2017).

Joshua P. Davis, Shannon Wheatman, & Cristen Stephansky, *Writing Better Jury Instructions: Antitrust As An Example*, 119 W. VA. L. REV. 235 (Fall 2016).

Shannon Wheatman, Webinar Speaker, *Balancing Due Process and Claims: A Conversation on Strategies to Safeguard Your Settlement*, American Association for Justice (Sept. 2016).

Shannon Wheatman & Alicia Gehring, *Mixed Media: A Smarter Approach To Class Action Notice*, Law360.com (June 11, 2015).

Shannon Wheatman, Speaker, *Balancing Due Process and Claims: A Conversation on Strategies to Safeguard Your Settlement*, Plaintiffs' Forum, Rancho Palos Verdes, CA (Apr. 2015).

Joshua Davis, Shannon Wheatman & Cristen Stephansky, *Writing Better Jury Instructions: Antitrust as an Example*, Paper presented at 15th Annual Loyola Antitrust Colloquium, Chicago, IL (Apr. 2015).

Shannon R. Wheatman, Speaker, *Can Competition Concepts be Made Comprehensible to Juries (and Judges)*, American Antitrust Institute's Business Behavior & Competition Policy in the Courtroom: Current Challenges for Judges, Stanford, CA (Aug. 2014).

Shannon R. Wheatman, Webinar Speaker, *Crafting Class Settlement Notice Programs: Due Process, Reach, Claims Rates, and More*, Strafford Publications (Feb. 2014).

Shannon R. Wheatman, *Cutting Through the Clutter: Eight Tips for Creatively Engaging Class Members and Increasing Response*, CLASS ACTION LITIGATION REPORT, 15 CLASS 88 (Jan. 24, 2014).

Shannon Wheatman & Michelle Ghiselli, *Privacy Policies: How To Communicate Effectively with Consumers*, International Association of Privacy Professionals (2014).

Shannon R. Wheatman, Speaker, *Report on Model Jury Instructions in Civil Antitrust Cases, Presentation*, American Antitrust Institute's 7th Annual Private Antitrust Enforcement Conference, Washington, DC (Dec. 2013).

Shannon R. Wheatman, Speaker, Class Action Notice, Reach & Administration, CLE International's 9th Annual Class Action Conference, Washington, DC (Oct. 2013).



Shannon R. Wheatman, *Ensuring Procedural Fairness Through Effective Notice,* in NATIONAL
CONFERENCE ON CLASS ACTIONS:  RECENT DEVELOPMENTS IN QUÉBEC, IN CANADA AND IN THE
UNITED STATES 83-99 (Yvon Blais ed., 2013).

Shannon R. Wheatman, Speaker, *Class Action Developments and Settlements*, 18th Annual Consumer
Financial Services Institute, New York, New York (Apr. 2013).

Shannon R. Wheatman, Speaker, *Recent Trends in Class Actions in the United States*, National
Conference on Class Actions:  Recent Developments in Québec, in Canada and in the United States,
Montreal, Canada (Mar. 2013).

Shannon R. Wheatman, Speaker, *Report on Model Jury Instructions in Civil Antitrust Cases, Presentation*,
American Antitrust Institute's 6th Annual Private Antitrust Enforcement Conference, Washington,
DC (Dec. 2012).

Shannon R. Wheatman & Katherine M. Kinsella, *International Class Action Notice*, in WORLD CLASS
ACTION: A GUIDE TO GROUP AND REPRESENTATIVE ACTIONS AROUND THE GLOBE 673-686 (Paul
Karlsgodt ed., 2012).

Katherine Kinsella & Shannon Wheatman, *Class Notice and Claims Administration*, in PRIVATE
ENFORCEMENT OF ANTITRUST LAW IN THE UNITED STATES: A HANDBOOK 338–348 (Albert A. Foer
& Randy M. Stutz eds., 2012).

Shannon R. Wheatman, Webinar Speaker, *Class Action Notice Requirements:  Challenges for Plaintiffs
and Defendants*, Strafford Publications (July 2012).

Shannon R. Wheatman, Webinar Speaker, *How to Craft Plain Language Privacy Notices*, Int'l Assoc. of
Privacy Professionals (Oct. 2011).

Shannon R. Wheatman, Speaker, *Improving Take-Up Rates in Class Actions*, The Canadian Institute's
12th Annual National Forum on Class Actions, Ontario, Canada (Sept. 2011).

Shannon R. Wheatman & Terri R. LeClercq, *Majority of Publication Class Action Notices Fail to Satisfy
Rule 23 Requirements*, 30 REV. LITIG. 53 (2011).

Shannon R. Wheatman & Terri R. LeClercq, *Majority of Publication Class Action Notices Fail to Satisfy
Rule 23 Requirements*, CLASS ACTION LITIGATION REPORT, 12 CLASS 560, (June 24, 2011).



Katherine Kinsella & Shannon Wheatman, *Class Notice and Claims Administration*, in THE INTERNATIONAL PRIVATE ENFORCEMENT OF COMPETITION LAW 264–274 (Albert A. Foer & Jonathan W. Cuneo eds., 2010).

Shannon R. Wheatman, Speaker, *Majority of Publication Class Action Notices Fail to Satisfy Plain Language Requirements*, Clarity International Conference, Lisbon, Portugal (Oct. 2010).

Shannon R. Wheatman, Webinar Speaker, *Class Action Notification with Electronic Media: Emerging Legal Issues*, Stratford Publications (Sept. 2010).

Shannon R. Wheatman & Thomas E. Willging, *Does Attorney Choice of Forum in Class Action Litigation Really Make a Difference?* 17 CLASS ACTIONS & DERIVATIVES SUITS 1 (2007).

Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 TULANE L. REV. 1771 (2006).

Thomas E. Willging & Shannon R. Wheatman, *Attorney Choice of Forum in Class Action Litigation: What Difference Does it Make?* NOTRE DAME L. REV., 81 (2), 101, 161 (2006).

Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language: A desire to actually inform*. GEO. J. LEGAL ETHICS, 18 (4), 1359-1382 (2005).

Thomas E. Willging & Shannon R. Wheatman, *An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation*. FEDERAL JUDICIAL CENTER (2005).

Elizabeth C. Wiggins & Shannon R. Wheatman, *So what's a concerned psychologist to do? Translating the research on interrogations, confessions, and entrapment into policy*, in INTERROGATIONS, CONFESSIONS AND ENTRAPMENT 265–280 (G. Daniel Lassiter ed., 2004).

Thomas E. Willging & Shannon R. Wheatman, *Attorneys' Experiences and Perceptions of Class Action Litigation in Federal and State Courts. A Report to the Advisory Committee on Civil Rules Regarding a Case Based Survey*. FEDERAL JUDICIAL CENTER (2003).

Shannon R. Wheatman, *Survey of Bankruptcy Judges on Effectiveness of Case-Weights*. FEDERAL JUDICIAL



CENTER (2003).

Elizabeth C. Wiggins & Shannon R. Wheatman, *Judicial Evaluation of Bankruptcy Judges*.  FEDERAL
JUDICIAL CENTER (2003).

Robert Niemic, Thomas Willging, & Shannon Wheatman, *Effects of Amchem/Ortiz on Filing of Federal
Class Actions: Report to the Advisory Committee on Civil Rules*. FEDERAL JUDICIAL CENTER (2002).

Shannon Wheatman, Robert Niemic & Thomas Willging, *Report to the Advisory Committee on Civil
Rules: Class Action Notices*.  FEDERAL JUDICIAL CENTER (2002).

Elizabeth C. Wiggins & Shannon R. Wheatman, *Implementation of Selected Amendments to Federal Rule
of Civil Procedure 26 by United States Bankruptcy Courts*.  FEDERAL JUDICIAL CENTER (2001).

Shannon R. Wheatman & David R. Shaffer, *On finding for defendants who plead insanity: The crucial
impact of dispositional instructions and opportunity to deliberate*. LAW & HUM. BEH., 25(2), 165, 181
(2001).

Shannon R. Wheatman, *Distance Learning in the Courts*. FEDERAL JUDICIAL CENTER (2000).

David R. Shaffer & Shannon R. Wheatman, *Does personality influence the effectiveness of judicial
instructions?*  PSYCHOL. PUB. POL'Y & L., 6, 655, 676 (2000).

## Court Testimony

*In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 3:15-
md-2672 (N.D. Cal.)

*State v. Farmer Group Inc.*, No. D-1-GV-02-002501(D. Ct. Tex., Travis County)

*Scharfstein v. BP West Coast Products, LLC*, No. 1112-17046 (Cir. Ct. Ore.)

*Spillman v. Domino's Pizza*, No. 10-349 (M.D. La.)

*PRC Holdings LLC v. East Resources, Inc.*, No. 06-C-81 (Cir. Ct. W. Va.)

*Guidry v. Am. Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct., Calcasieu Parish)

*Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark)

*Beasley v. The Reliable Life Ins. Co.*, No. CV-2005-58-1 (Cir. Ct. Ark)



## Depositions

*Hale v. CNX Gas Co., LLC*, No. 10-CV-59 (W.D. Va.).

*Thomas v. A. Wilbert Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish).

## Judicial Comments

*Jabbari v. Wells Fargo*, No. 3:15-cv-02159 (N.D. Cal.)
"In addition to that robust direct mail and email notice program, the Settlement provided an extensive media and advertising component. *See* Wheatman Decl. (ECF 183). That included printing a color publication notice in national news outlets and Spanish-language outlets. Id. ¶¶ 17-19.  "Banner ads" were also placed on websites, using targeted ad campaigns. Id. ¶ 23. Supplementing all of these efforts was a media outreach program designed to drive awareness of the Settlement and point Settlement Class Members to the Settlement Website, www.WFSettlement.com, which provided notice, frequently asked questions, and key court documents. Id. ¶¶ 28-33 . . . In short, the parties and their Court-appointed experts used every reasonable tool to create and implement and [sic] wide-ranging program to provide the best notice practicable to potential Settlement Class Members . . . Because the Court finds that the Notice complied with due process and the requirements of Rule 23, it overrules objections to the Notice."
- Hon. Vince Chhabria (2018)

*Good v. West Virginia American Water Co.*, No. 2:14-cv-1374 (S.D.W. Va.)
"The Notice transmitted to the Settlement Class met the requirements of Fed. R. Civ. P. 23(c), constituted the best notice practicable under the circumstances, and satisfied the Constitutional due process requirements of notice with respect to all Settlement Class Members, . . . The Notice Program was executed by qualified and experienced Notice Administrators . . ." - Hon. John T. Copenhaver, Jr. (2018)

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010,* MDL No. 2179 (E.D. La.) (Haliburton and Transocean settlements)
"The Class Notices were 'noticeable, clear, concise, substantive, and informative.' Wheatman Decl. ¶ 4(b).14 The notice distribution method satisfied Rule 23(c)(2), as it was the 'best notice that is practicable under the circumstances.' Fed. R. Civ. P. 23(c)(2); *see* Wheatman Decl. ¶ 5. The notice contents satisfied Rule 23(c)(2)(B)(i)–(vii) . . . " - Hon. Carl J. Barbier (2017)

*In re Automotive Parts Antitrust Litigation,* MDL No. 2311 (E.D. Mich.).
"EPPs, through EPPs' class action notice expert consultant, Kinsella Media, LLC ("Kinsella"),



implemented a class-notice program utilizing paid and earned media. See, e.g., Declaration of Shannon R. Wheatman, Ph.D. . . . Notice was published in *Field & Stream*, *ESPN The Magazine*, *People*, *Reader's Digest*, *Southern Living*, *Woman's Day*, *The Wall Street Journal*, *Auto Rental News*, *Automotive Fleet*, *Reuters*, *NBC Money*, *Consumer Reports*, and *Automotive Weekly*, and online media efforts through banner advertisements on outlets like Facebook and Yahoo!. The banner advertisements . . . have been seen a total estimated 354,593,140 times. The earned media component of this notice program included a multimedia news release distributed on PR Newswire's US1 National Circuit on November 29, 2016. Id. [T]he release was republished across 171 news websites and received over 11,415 views. Id. A total of 248 journalists engaged with the multimedia news release, and major national outlets that covered the Settlements, include: *Reuters*, *Associated Press*, *Boston Globe*, *Chicago Tribune*, *The Today Show*, *NBC Money*, *Consumer Reports*, and *Automotive Weekly*. Other earned media efforts . . . included statewide press releases in the EPP States as well as outreach to 275 national and local reporters for print and television." - Hon. Marianne O. Battani (2017)

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 3:15-md-2672 (N.D. Cal.)
"The Notice Program included 811,944 mailings, 453,797 emails, 125 newspaper insertions and targeted online advertising.  The Court is satisfied that the extensive Notice Program was reasonably calculated to notify Class Members of the proposed Settlement.  The Notice 'apprise[d] interested parties of the pendency of the action and afford them an opportunity to present their objections.' *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  Indeed, the Notice Administrator reports the Notice Program reached more than 90% of potential Class Members." - Hon. Charles R. Breyer (2016)

*In re Transpacific Passenger Air Trans. Antitrust Litig.*, MDL No. 1913 (N.D. Cal.)
In overruling an objection that direct notice should have been done, the Court found "[T]he notice program, which the Court already approved, reached 80.3% of the potential class members in the United States an average of 2.6 times and "at least 70%" of members of the Settlement Classes living in Japan. See Mot. for Final Approval at 4; Wheatman Decl. ¶¶ 8, 18. The notice also included paid media in 13 other countries. Id.; ¶ 25. There were 700,961 unique visits to the website, toll-free numbers in 15 countries received over 2,693 calls, and 1,015 packages were mailed to potential class members. Id. ¶¶ 6, 9, 10. It was therefore adequate." - Hon. Charles R. Breyer (2015)

*In re Target Corp. Customer Data Security Breach Litig.*, MDL No. 14-2522 (D. Minn)
"The parties accomplished notice here through direct notice, paid and earned media, and an informational website . . . [T]he notice program reached 83% of potential class members. The notice here comports with Rule 23(e) . . . Class notice reached more than 80 million people, with direct notice sent to 61 million consumers . . . [The] infinitesimally small amount of opposition weighs in favor of



approving the settlement." - Hon. Paul A. Magnuson (2015)

*The Shane Grp., Inc., v. Blue Cross Blue Shield of Michigan*, No. 2:10-CV-14360 (D. Minn.)
"The notice to Settlement Class Members consisted of postcard notices to millions of potential class members, as well as advertisements in newspapers and newspaper supplements, in *People* magazine, and on the Internet . . . The Court finds that this notice . . . was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to be provided with notice; and . . . fully complied with due process principles and Federal Rule of Civil Procedure 23." - Hon. Denise Page Hood (2015)

*Mirakay v. Dakota Growers Pasta Co., Inc.*, No. 13-CV-4229 (D. N.J.)
"Having heard the objections made, the Court is unimpressed with the Objectors argument that there was somehow insufficient notice . . . This notice program has fully informed members of their rights and benefits under the settlement, and all required information has been fully and clearly presented to class members. Accordingly, this widespread and comprehensive campaign provides sufficient notice under the circumstances, satisfying both due process and Rule 23 and the settlement is therefore approved by this Court." - Hon. Joel A. Pisano (2014)

*Spillman v. Dominos Pizza, LLC.*, No. 10-349 (M.D. La.)
"At the fairness hearing notice expert Wheatman gave extensive testimony about the design and drafting of the notice plan and its implementation, the primary goal of which was to satisfy due process under the applicable legal standards . . . Wheatman, who has extensive experience developing plain-language jury instructions, class action notices and rules of procedure, testified that the notice was composed at a ninth grade reading level because many adults read below a high school level." - Hon. Stephen C. Riedlinger (2013)

*Kramer v. B2Mobile, LLC*, No. 10-CV-02722 (N.D. Cal.)
"The Court approved Notice Plan to the Settlement Classes . . . was the best notice practicable under the circumstances, including comprehensive nationwide newspaper and magazine publication, website publication, and extensive online advertising. The Notice Plan has been successfully implemented and satisfies the requirements of Federal Rule of Civil Procedure 23 and Due Process." - Hon. Claudia A. Wilken (2012)

*Cather v. Seneca-Upshur Petroleum, Inc.*, No. 1:09-CV-00139 (N.D. W. Va.)
"The Court finds that Class Members have been accorded the best notice as is practical under the circumstances, and have had the opportunity to receive and/or access information relating to this Settlement by reading the comprehensive written notice mailed to them . . . or by reading the published Notice in the local newspapers . . . The Court further finds that the Notice provided to the members of the Settlement Class had been effective and has afforded such class members a reasonable opportunity to



be heard at the Final Fairness Hearing and to opt-out of the subject settlement should anyone so desire."
- Hon. Irene M. Keeley (2012)

*In re Checking Account Overdraft Fee Litig.*, No. 1:09-MD-2036 (S.D. Fla.) (JP Morgan Settlement)
"The Court finds that the Settlement Class Members were provided with the best practicable notice; the notice was "reasonably calculated, under [the] circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Shutts*, 472 U.S. at 812 (quoting *Mullane*, 339 U.S. at 314-15). This Settlement with Chase was widely publicized, and any Settlement Class Member who wished to express comments or objections had ample opportunity and means to do so." - Hon. James Lawrence King (2012)

*Purdy v. MGA Ins. Co.,* No. D412-CV-2012-298 (N.M. 4th Jud. Dist. Ct.)
"Notice of the Settlement Class was constitutionally adequate, both in terms of it substance and the manner in which it was disseminated.  The Notice contained the essential elements necessary to satisfy due process . . . [T]he Notice also contained a clear and concise Claim Form, and a described a clear deadline and procedure for filing of Claims.  Notice was directly mailed to all Class Members whose current whereabouts could be identified by reasonable effort.  Notice reached a large majority of the Class Members.  The Court finds that such notice constitutes the best notice practicable." - Hon. Eugenio Mathis (2012)

*Soto v. Progressive Mountain Ins. Co.*, No. 2002-CV-47 (Dist. Ct. Colo.)
"Notice of the Settlement Class was constitutionally adequate, both in terms of its substance and the manner in which it was disseminated. The Notice contained the essential elements necessary to satisfy due process . . . Finally, the Notice also contained a clear and concise Claim Form, and described a clear deadline and procedure for filing of claims . . . Notice reached a large majority of the Class Members. The Court finds that such notice constitutes the best notice practicable." - Hon. J. Steven Patrick (2010)

*In re Katrina Canal Breaches*, No. 05-4182 (E.D. La.)
"The notice here was crafted by Shannon Wheatman, Ph.D., whose affidavit was received as evidence . . . The entire notice was drafted in plain, comprehensible language . . . The Court finds this notice adequately reached the potential class." - Hon. Stanwood R. DuVal, Jr. (2009)

*Jones v. Dominion Transmission Inc.*, No. 2.06-CV-00671 (S.D. W. Va.)
"The Parties' notice expert Shannon R. Wheatman, Ph.D. . . . testified that in this case . . . that the mailed notices reached approximately 95.4 percent of the potential class . . . I HOLD that personal jurisdiction exists over the Class Members because notice was reasonable and afforded the Settlement Class an opportunity to be heard and to opt out." - Hon. Joseph R. Goodwin (2009)



*Guidry v. Am. Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct.)

"The facts show that the notice plan . . . as adequate to design and implementation . . . Dr. Shannon R. Wheatman, a notice expert, also testified at the fairness hearing as to the sufficiency of the notice plan. Dr. Wheatman testified that the notice form, content, and dissemination was adequate and reasonable, and was the best notice practicable." - Hon. G. Michael Canaday (2008)

*Webb v. Liberty Mutual Ins. Co.*, (March 3, 2008) No. CV-2007-418-3 (Cir. Ct. Ark)

"Ms. Wheatman's presentation today was very concise and straight to the point . . . that's the way the notices were . . . So, I appreciate that . . . Having admitted and reviewed the Affidavit of Shannon Wheatman and her testimony concerning the success of the notice campaign, including the fact that written notice reached 92.5% of the potential Class members, the Court finds that it is unnecessary to afford a new opportunity to request exclusion to individual Class members who had an earlier opportunity to request exclusion but failed to do so . . . The Court finds that there was minimal opposition to the settlement. After undertaking an extensive notice campaign to Class members of approximately 10,707 persons, mailed notice reached 92.5% of potential Class members." - Hon. Kirk D. Johnson (2008)

*Sherrill v. Progressive Northwestern Ins. Co.*, No. DV-03-220 (18th D. Ct. Mont.)

"Dr. Wheatman's affidavit was very informative, and very educational, and very complete and thorough about the process that was undertaken here . . . So I have reviewed all of these documents and the affidavit of Dr. Wheatman and based upon the information that is provided . . . and the significant number of persons who are contacted here, 90 percent, the Court will issue the order." - Hon. Mike Salvagni (2008)

*Beasley v. The Reliable Life Ins. Co.*, No. CV-2005-58-1 (Cir. Ct. Ark)

"[T]he Court has, pursuant to the testimony regarding the notification requirements, that were specified and adopted by this Court, has been satisfied and that they meet the requirements of due process. They are fair, reasonable, and adequate. I think the method of notification certainly meets the requirements of due process . . . So the Court finds that the notification that was used for making the potential class members aware of this litigation and the method of filing their claims, if they chose to do so, all those are clear and concise and meet the plain language requirements and those are completely satisfied as far as this Court is concerned in this matter." - Hon. Joe Griffin (2007)

## Education and Experience

*Education*

Ph.D., Social Psychology, 2001; The University of Georgia, Athens, GA
Dissertation Title: *The effects of plain language drafting on layperson's comprehension of class action notices.*



M.S., Social Psychology, 1999; The University of Georgia, Athens, GA
Thesis Title: *Effects of verdict choice, dispositional instructions, opportunity to deliberate, and locus of control on juror decisions in an insanity case.*

M.L.S., Legal Studies, 1996; The University of Nebraska-Lincoln, Lincoln, NE

B.A., Psychology, 1993; Millersville University of Pennsylvania, Millersville, PA
Honor's Thesis Title: *The effects of inadmissible evidence and judicial admonishment in individual versus group decisions in a mock jury simulation.*

### Related Experience

Hilsoft Notifications
Souderton, PA
2004-2009

Dr. Wheatman was the Vice President (2006-2009) and Notice Director (2004-2009) at Hilsoft Notifications, a legal notification firm.

Federal Judicial Center
Washington, DC
2000-2004

Dr. Wheatman was a Research Associate at the Federal Judicial Center. The Federal Judicial Center is the education and research agency for the Federal Courts. The Research Division performs empirical and explanatory research on federal judicial processes and court management. Dr. Wheatman worked with the Civil Rules Advisory Committee on a number of class action studies and with the Bankruptcy Administration Committee on judicial evaluations.

### Supplementary Background

Dr. Wheatman has a strong statistical background, having completed nine graduate level courses as well as teaching undergraduate statistics at the University of Georgia.



# EXHIBIT 2

P2JW346000-0-B00400-1--------XA

Case 17-33964-swe11 Doc 694 Entered 07/26/18 Entered 07/26/18 23:16:21 Desc
Main Document Page 103 of 117

Case 17-33964-hdh11 Doc 199 Filed 12/14/17 Entered 12/14/17 16:42:51 Page 2 of 2

B4 | Tuesday, December 12, 2017

THE WALL STREET JOURNAL.

## TECHNOLOGY

# Bitcoin Trading Overwhelms Exchanges

Disruptions follow a jump in the value of the currency and the launch of futures trading

By Gregor Stuart Hunter

Some of the world's biggest cryptocurrency exchanges have experienced disruptions in recent days as interest in bitcoin surged in the weeks leading up to Sunday's launch of bitcoin futures.

Bitcoin exchanges and brokerages including **bitFlyer**, **Bitfinex** and **Coinbase** have all reported service outages in the past week. The digital currency has increased in value by more than 16 times since the start of the year and lured more customers into the market.

The latest problems at bitcoin exchanges followed similar outages when the digital currency crossed above $10,000 last month. The impetus for disruptions in re-

### A Bit of a Crunch
Aggregated size of bitcoin transactions waiting to be confirmed

[chart: 120 megabytes]

Source: Blockchain.info
THE WALL STREET JOURNAL.

cent days has been the rally around the start of futures trading on **Cboe Global Markets** over the weekend. The availability of futures lets investors take leveraged or short bets on the currency, and marks its entry into the mainstream financial system. The Chicago-based exchange re-

ported outages to its website Sunday due to heavy traffic.

bitFlyer, Japan's biggest cryptocurrency exchange, said Sunday that some of its users were unable to log on as a result of "erroneous deposits made to a portion of users' accounts," an issue which it has now resolved. The company

didn't respond to requests for comment.

Coinbase, the cryptocurrency brokerage which shot to the second-most-downloaded app in Apple's App Store for the U.S. on Thursday, said it was experiencing "significant backlog" in processing some bitcoin withdrawals.

"Despite the sizable and ongoing increases in our technical infrastructure and engineering staff, we wanted to remind customers that access to Coinbase services may become degraded or unavailable during times of significant volatility or volume," the co-founder and chief executive Brian Armstrong wrote in a blog post on Friday.

Bitfinex said twice this month it came under so-called distributed denial-of-service attacks, in which attackers try to overwhelm a website with traffic. The issue has since been resolved. The company didn't respond to requests for comment.

SEC Chairman Warns on Rush to Cryptocurrencies

WASHINGTON—Wall Street's top regulator on Monday raised alarms about the money flooding into bitcoin trading and other cryptocurrency markets, warning the red-hot corner of less-regulated finance is burning with risk for retail investors.

Securities and Exchange Commission Chairman Jay Clayton issued a statement spelling out his concerns about bitcoin, which the agency doesn't regulate, and other deals that piggyback off excitement about the cryptocurrency. The SEC has come down particularly hard on initial coin offerings, in which startups raise money—sometimes by soliciting bitcoin—from investors in exchange for giving them a

new digital coin that may be traded or grow in value.

"The world's social media platforms and financial markets are abuzz about cryptocurrencies and initial coin offerings," Mr. Clayton said. "There are tales of fortunes made and dreamed to be made. We are hearing the familiar refrain, 'this time is different.'"

Mr. Clayton's alert came on the same day the SEC intervened to halt a $15 million initial coin offering that it said should have been conducted under the regulator's long-standing rules for securities sales.

A person familiar with Mr. Clayton's thinking said he voiced his views now because the run-up in bitcoin's price has captivated retail investors and because the commission's prior statements on bitcoin and ICOs have generated substantial interest.

—Dave Michaels

## BITCOIN

*Continued from page B1*

on the first day of trading to draw firm conclusions about how the new futures market will play out, traders said.

On their first day of trading, 3,969 of Cboe's contracts had changed hands, worth about $68 million, according to calculations by the WSJ Market Data Group—still a tiny market compared with the billions of dollars worth of daily trading volume in bitcoin itself.

"People are cautiously trading in a very small and limited capacity, not really taking huge bets," said Garrett Ser, chief executive of BV Chain, a proprietary trading firm focused on cryptocurrencies.

The digital currency has

posted an extraordinary price surge, running up more than 1,500% since the start of the year. That surge of late has been fueled by how difficult it has been to short bitcoin, traders have said.

Shorting bitcoin futures can be potentially ruinous for a trader because it can lead to unlimited losses if bitcoin keeps rocketing higher.

That was the reasoning of a

major online brokerage, Interactive Brokers Group Inc., when it announced last week that it would provide its customers with access to Cboe's bitcoin futures—but only if they were going long.

That decision might have contributed to the early price run-up in bitcoin futures, some market participants said.

Interactive Brokers disputed that its decision led to the

price surge. Big trading firms have the opportunity to go short if bitcoin futures surge too high, said Steven Sanders, an executive vice president at the firm. "If it was really out of whack, they'd take advantage and dive in until it fell in line," Mr. Sanders said.

Many large futures-clearing firms, including JPMorgan Chase & Co. and Bank of America Merrill Lynch, told their

customers they would sit out Sunday's launch of bitcoin futures, The Wall Street Journal reported last week.

The absence of large clearing firms likely damped volumes on the first day of trading, traders said. Such firms can suffer losses if their customers' bets go bad. That made them hesitant about clearing bitcoin futures, given the volatility of bitcoin.

---

ADVERTISEMENT

## Legal Notices

To advertise: 800-366-3975 or WSJ.com/classifieds

BANKRUPTCIES

[dense legal notice small print omitted]

## BUSINESS WATCH



**APPLE**

### iPhone Maker Acquires Shazam

**Apple** Inc. said it has acquired **Shazam Entertainment** Ltd., giving it ownership of one of the popular song-recognition apps at a time the iPhone maker is looking to boost its music-subscription service. Financial terms of the deal weren't disclosed.

Apple said Monday it has "exciting plans" for Shazam but declined to disclose more. Shazam said Apple would enable it to "continue innovating."

The acquisition gives Apple ownership of an app that helps users identify unfamiliar songs. Users are often directed to listen to those songs at Apple Music or Spotify, helping those services possibly reach new subscribers. Such referrals could help Apple boost the number of subscribers to its streaming-music service from its current 30 million. **Spotify** AB says its service has 60 million paid subscribers.

Shazam, which made its debut as an app in 2008, also gives Apple access to extensive data and insight on people's musical interests.

"If you have the direct integration of Shazam as part of Apple, and people find out what a song is [by] using Apple, then they go buy it using Apple. It creates a full ecosystem," said Brian Zisk, the executive producer of the SF MusicTech Summit, an annual conference.

—Tripp Mickle

**Apple's purchase of Shazam gives it access to wide data and insight on users' musical interests.**

**BOEING**

### Dividend Rises 20% To $1.71 a Share

**Boeing** Co. boosted its quarterly dividend to $1.71 a share, a 20% increase and above the Wall Street consensus for a raise.

Boeing, which in October gave a bullish outlook citing demand for its single-aisle jets, also replaced its share-repurchase program with an $18 billion authorization, targeting buybacks over the next 24 to 30 months.

Boeing said $8.57 billion in cash as of Sept. 30, the most

recent figures released.
Shares rose 1.4% to $286.98 in extended trading Monday.

—Maria Armental

**ATOS**

### French IT Company Bids for Gemalto

French information-technology services firm **Atos** SA is making an unsolicited bid to buy smart-card maker **Gemalto** NV for €4.3 billion ($5.1 billion), part of a broader wave of deals in the payment space as rivals join forces to cut costs.

Atos, which offers services such as infrastructure and cloud

applications for businesses, said Monday that it had made a friendly all-cash offer for Gemalto two weeks ago. The offer was for €46 a share, representing a premium of 36% over Gemalto shares at Monday's close and 42% over the company's one-month weighted average price, Atos said.

Thierry Breton, Atos's chief executive, said in a conference call Monday that he hadn't received a response from Gemalto on the bid. He said he went public with the offer because of recent gyrations in Gemalto's shares. An Atos spokesman declined to answer to dictate to whether there have been any negotiations since the offer was made. A Gemalto spokeswoman didn't respond to requests for comment.

Atos's bid comes comes as firms in the payments space join forces to cut costs, develop new products and add customers as greater regulatory scrutiny and rising competition from technology start-ups squeeze fees.

—Sam Schechner

**FARM EQUIPMENT**

### Sales Increase At Cooler Pace

Retail sales of large farm tractors and harvesting combines rose at a more moderate pace in November after months of big gains against depressed year-earlier sales volumes.

Sales of high-horsepower, two-wheel-drive tractors in the US and Canada increased 5% from a year earlier, the Association of Equipment Manufacturers, U.S. sales alone were up 3%.

November is typically the slowest month of the year for sales of big tractors, says JPMorgan, which expects retail sales to be up about 10% in 2018. Year-to-date, sales of high-horsepower, two-wheel-drive tractors are down 6%. Combine sales increased 14% in November against a weak comparison last year.

—Bob Tita

### Corning to Buy 3M Optical Fiber, Copper Cable Unit

**Corning** Inc. said Monday it agreed to buy almost all of 3M Co.'s optical fiber and copper cable business for $900 million.

3M's communications markets division, based in Austin, Texas, generates about $400 million a year in sales, the company said. About 500 3M employees will join Corning as part of the deal, which is expected to

be completed in 2018.

"After completing a thorough strategic review, we believe that this business will be well positioned with Corning," said Ashish Khandpur, 3M's executive vice president for its electronics and energy business group.

The deal will add to Corning's 2019 per-share earnings by between 7 cents and 9 cents, it

said. 3M said it expects to realize a gain of 40 cents a share from the divestiture.

Corning said it plans to spend between $1 billion and $3 billion on acquisitions as part of its multiyear capital-allocation plan.

Shares in Corning rose 0.7% Monday, while shares of 3M rose 0.5%.

—Allison Prang

## BRIEFS

### Trump signs $700 billion budget for military spending into law

President Trump signed a defense policy bill that authorizes a $700 billion budget for the military, including additional money for missile defense programs to respond to the growing nuclear threat from North Korea.

There's a catch. The budget won't become reality until lawmakers agree to roll back a 2011 law that set strict limits on federal spending. The law caps 2018 defense spending at $549 billion.

### Arkansas panel clears way for new Ten Commandments marker

An Arkansas commission cleared the way to install another Ten Commandments monument outside the state Capitol, months after the previous marker was destroyed by an activist who crashed his car into it.

The Arkansas Capitol Arts and Grounds Commission signed off on the final design Tuesday. The monument will include four concrete posts for protection.

### Governor to name Sen. Franken's replacement Wednesday

Minnesota Gov. Mark Dayton was set to appoint a replacement Wednesday for Sen. Al Franken amid pressure to choose someone who could keep the seat in Democratic hands in a special election next November.

Dayton has deflected questions about the appointment since Franken announced last week he would step down after allegations of sexual misconduct.

### Watchdog to probe EPA chief's purchase of privacy booth

A government watchdog will examine whether the head of the Environmental Protection Agency misused taxpayer money by purchasing a soundproof booth for making private phone calls from his office.

The EPA's Office of the Inspector General confirmed the latest investigation Tuesday after a request by congressional Democrats. It will be at least the third inquiry launched into EPA Administrator Scott Pruitt's actions since his appointment.

Pruitt spent nearly $25,000 on the custom-made privacy booth.

### Drone strike kills 'imminent threat' to Somalians, U.S. says

A U.S. military drone strike on a vehicle carrying explosives in Somalia removed "an imminent threat to the people of 'Mogadishu" by the al-Shabab extremist group, the U.S. Africa Command said Tuesday. The airstrike was carried out Tuesday about 40 miles southwest of Somalia's capital, the U.S. statement said.

*From staff and wire reports*

# British want police to do more to stop stalkers

### Crime is misunderstood, government report says

**Jane Onyanga-Omara**
USA TODAY

LONDON – The Rev. Graham Sawyer has been a victim of stalking, so he can speak from personal experience when he complains that authorities in England and Wales aren't doing enough to stop the growing problem.

"It's horrendous because people do not understand the crime of stalking," Sawyer says. "It's covered in mystery, and it's also a bit embarrassing. ... The victim doesn't realize they are being stalked until it's advanced."

Stalking has been a crime in England and Wales since 2012. Many victims complain they are not being taken seriously by authorities.

Victims reported nearly 250,000 cases of stalking or harassment in the 12 months through June, a 36% increase from the same period in 2016, according to the most recent data from the Office for National Statistics.

Sawyer, who preaches at a church in Burnley in northern England, says he was stalked by a churchgoer, starting in early 2014 after he provided the woman pastoral support following the death of



Singer Lily Allen says she was stalked for years and let down by the police response. MONICA SCHIPPER/GETTY IMAGES

her husband. He says he reported hundreds of emails and calls to the police, but they failed to act for more than a year.

His ordeal ended after the woman was given a warning from the Lancashire police in December 2015, and she stopped stalking him.

Others are speaking out for police to take greater steps to stop the crime. Last year, anti-stalking charities attributed a sharp increase in the number of victims coming forward to singer Lily Allen, who

spoke about her own seven-year stalking ordeal.

A government report on the problem this past summer says stalking is often misunderstood by police and prosecutors, who charge suspects with other offenses, especially harassment.

"Stalking is a terrible form of abuse that can have a devastating effect on its victims, which is why this government is working to protect victims and stop perpetrators at the earliest opportunity," Britain's Home Office said in a statement on Thursday.

It said the maximum sentences for stalking and harassment were raised from five to 10 years this year.

In the USA, California introduced the world's first anti-stalking law in 1990 after five women, including actress Rebecca Schaeffer, were killed by stalkers. Anti-stalking laws are in place in all U.S. states.

Victoria Charleston of Suzy Lamplugh Trust, a British charity that helps victims of stalking, says the group's national anti-stalking help line aided 4,500 people in 2017. "We hear from them (the callers) that often stalking isn't taken seriously by the police and their concerns around the impact of emails and social media aren't taken into account," she says.

# 'Monster' penguin marched long ago

### Fossils of human-sized bird in New Zealand reveal unknown species

**Doyle Rice**
USA TODAY

Talk about your big bird.

Scientists on Tuesday announced the discovery of a new species of an ancient giant penguin, one that was nearly 6 feet tall and weighed about 220 pounds, roughly the same height and size as an average man.

Fossilized remains of the extinct penguin were discovered in the Otago region on New Zealand's South Island. The new species is named *Kumimanu biceae*: In the Maori language of New Zealand, *Kumi* means "monster," and *manu* is the word for "bird."

The penguin lived about 55 million years ago, scientists say, so the fossils help provide clues to the early evolution of penguins.

"We examined the wing and leg bones of this penguin and quickly realized that we were looking at a previously unknown species," said Gerald Mayr, a paleontologist at the Senckenberg Re-



An artistic reconstruction compares an ancient penguin (Kumimanu biceae) and a human diver. RECONSTRUCTION BY G. MAYR/SENCKENBERG RESEARCH INSTITUTE

search Institute in Frankfurt and lead author of the study.

It is also one of the oldest known penguin species; only two other species are known from as far back as 62 million to 58 million years ago.

"The fossil species is not directly ancestral to any of the modern species," he

said, adding that the giant penguins became extinct without leaving any direct descendants.

When the species lived, there were very few potential predators in the seas around New Zealand. Large marine mammals — such as toothed whales and seals — had not evolved, so the only predators probably were sharks, Mayr said.

Other large marine predators soon appeared, so the penguins faced new competition and predation — which may have led to their extinction. Therefore, penguins did not get smaller as they evolved. The smaller species lived together with the large penguins, but only the descendants of the smaller penguins survive today.

The scientists assume the penguins' gigantism was a result of the seabirds' flightlessness. Like penguins today, they were not able to fly: "It was certainly perfectly able to swim and walk on land but probably spent most time in the water," Mayr said.

As for its diet, this new penguin species was probably a fish eater and sported long, spear-like beaks.

The study was published in *Nature Communications*, a peer-reviewed British journal.

# Arctic is warming at its fastest pace in 1,500 years

**Doyle Rice**
USA TODAY

The Arctic is running a fever.

The magnitude and pace of the Arctic's sea-ice decline and ocean warming is "unprecedented" in at least the past 1,500 years and probably much longer, according to a federal report released Tuesday by the National Oceanic and Atmospheric Administration.

The polar region shows no sign of returning to its reliably frozen state of recent decades, and its permafrost is thawing faster than ever before, the report warned.

"The Arctic is going through its most unprecedented transition in human history, and we need better observations to understand and predict how these changes will affect everyone, not just the people of the north," said Jeremy Mathis, head of NOAA's Arctic Research Program. "The Arctic has traditionally been the refrigerator to the planet, but the door of the refrigerator has been left open."

Research shows that changes in Arctic sea ice and temperature can alter the jet stream, a major factor in U.S. weather and climate patterns.

"There are some connections between the warming in the Arctic and the extreme weather events down here," Mathis said.

The shift probably is partially responsible for the unusual weather in the U.S. in recent years, including the destructive wildfires in California and the sharp cold snap in the South and East, said NOAA scientist James Overland.

Retired Navy rear admiral Timothy Gallaudet, acting NOAA administrator, said Tuesday that "the rapid and dramatic changes we continue to see in the Arctic present major challenges and opportunities."

*Contributing: The Associated Press*

## MARKETPLACE TODAY

For advertising information: 1.800.397.0070 www.russelljohns.com/usat

### NOTICES

#### LEGAL NOTICES

# EXHIBIT 3

## APPENDIX

Documents provided to Expert, Dr. Shannon Wheatman

1. Declaration of Jeffrey Pirrung Regarding Notice of Change of Physical Address of American Legal Claim Services (Dkt. 474)
2. Correspondence Regarding Proof of Claim Matter filed by Credit Bruce Kevin Green (Dkt. 388)
3. Pew Trusts Report 4 in the Payday Lending in America series: *Fraud and Abuse Online: Harmful Practices in Internet Payday Lending*
4. Think Finance Bankruptcy Case Heading
5. NonPrime101.com Report: *Profiling Internet Small-Dollar Lending, Basic Demographics and Loan Characteristics*
6. Clarity Services Report: *Changing Patterns and Behaviors of Unsecured Short Term Loan Consumers*
7. Clarity Services Report: *Preliminary 2012 Study Findings*
8. Think Finance Consumer Borrower Notice
9. American Legal Claim Website: Think Finance, LLC-Consumer Borrower Site, Consumer Borrower Postcard Mailing Frequent Asked Questions
10. Plaintiffs' Brief in Support of Motion for Class Certification (Dkt. 47)
11. An Opinion from the United States District Court, Eastern District of Pennsylvania regarding Attorney General Josh Shapiro v Think Finance, Inc.
12. TF-BK-VT_NC 000711-001440
13. Motion of the Debtors and Debtors-in-Possession for Entry of an Order Approving Procedures for Claims Objections (Dkt. 372)
14. USA Today's Affidavit of Publication  (Dkt. 200)
15. The Wall Street Journal's Affidavit of Publication (Dkt. 199)
16. Declaration of Jeffrey Pirrung, Managing Director of American Legal Claim Services, LLC, in Support of the Debtors' Bar Date Motion (Dkt. 102)
17. Order Authorizing the Appointment of American Legal Claims Services, LLC, as Claims, Noticing and Balloting Agent (Dkt. 147)
18. Think Finance, et al. c/o ALCS Bankruptcy Notice
19. Order Granting Application to Employ American Legal Claims Services, LLC (Dkt, 140)
20. Order (I) Approving the Form and Manner of Notice of Commencement of These Chapter 11 Cases and (II) Authorizing the Debtors to File a Consolidated List of Debtor's Thirty (30) Largest Unsecured Creditors (Dkt. 040)
21. Stipulated Protective Order regarding related document(s) and Motion for Leave filed by Creditor Patrick Inscho (Dkt. 455)
22. Vermont and North Carolina Plaintiffs' Designations of (1) Expert Witness and (2) Potential Witnesses for the May 1, 2018 Hearing on Rule 7023 Motions
23. Expert Report of Eric Schachter, dated March 30, 2018

## **EXHIBIT D**

HOU:3901010.2
10131.000001 EMF_US 70282132v7

**In the Matter Of:**

THINK FINANCE, LLC

17-33964 (HDH)

---

**SHANNON WHEATMAN**

*July 23, 2018*

---



800.211.DEPO (3376)
EsquireSolutions.com

SHANNON WHEATMAN
THINK FINANCE, LLC

July 23, 2018

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - -

IN RE:                    : Chapter 11
                          :
THINK FINANCE, LLC, et    : Case No. 17-33964 (HDH)
al,                       :
          Debtors.        : (Jointly Administered)

- - -

JULY 23, 2018

- - -

          Oral deposition of SHANNON WHEATMAN, taken
pursuant to notice, was held at the law offices of
FRANCIS & MAILMAN, P.C., 100 South Broad Street, Suite
1902, Philadelphia, Pennsylvania 19110, commencing at
10:02 a.m., on the above date, before Maryelise Griffis,
a Professional Court Reporter and Notary Public in the
Commonwealth of Pennsylvania.

- - -

ESQUIRE DEPOSITION SOLUTIONS
1835 Market Street, Suite 2600
Philadelphia, Pennsylvania 19103
(215) 988-9191



800.211.DEPO (3376)
EsquireSolutions.com

```
1    APPEARANCES:

2

3              HUNTON, ANDREWS, KURTH, LLP
               BY:   TYLER P. BROWN, ESQUIRE
4              Riverfront Plaza, East Tower
               951 East Byrd Street
5              Richmond, Virginia   23219
               (804)788-8674
6              Tpbrown@huntonAK.com
               Representing Think Finance, LLC, et al.
7
               CONSUMER LITIGATION ASSOCIATES, P.C.
8              BY:   ELIZABETH W. HANES, ESQUIRE
               763 J. Clyde Morris Boulevard
9              Suite 1-A
               Newport News, Virginia   23601
10             (757)930-3660
               Elizabeth@clalegal.com
11
               BERMAN TABACCO
12             BY:   STEVEN J. BUTTACAVOLI, ESQUIRE
               One Liberty Square
13             Boston, Massachusetts   02109
               (617)542-8300
14             Sbuttacavoli@bermantabacco.com
               Representing Nationwide Plain Green and
15             Great Plains Lending

16             KELLY & CRANDALL, PLC
               BY: KRISTI KELLY, ESQUIRE
17             3925 Chain Bridge Road
               Suite 202
18             Fairfax, Virginia   22030
               (703)424-7570
19             (Via teleconference)

20

21                          -  -  -

22

23

24
```



SHANNON WHEATMAN                                    July 23, 2018
THINK FINANCE, LLC                                            9

1

2

3

4

5

6

7

8

9

10

11

12

13

14   Q.      What were you engaged to do?

15   A.      I was engaged to review the debtors notice

16   program and to form an opinion as to whether that would

17   fulfill Rule 23 notice requirements.

18

19

20

21

22

23

24



Q.      How many people did you identify in your report

as being confused?

A.      I didn't count.

Q.      You listed four examples, right?

A.      Four?

        No, it was more than four.

Q.      How many more?



SHANNON WHEATMAN                                          July 23, 2018
THINK FINANCE, LLC                                                    52

1 | A.      Well, because there is a couple in each of them.

2 | I just pulled out some examples.

3 | Q.      How many more did you identify?

4 | A.      I pulled out ten examples.





SHANNON WHEATMAN                                          July 23, 2018
THINK FINANCE, LLC                                                    53

19  Q.      Okay.  When we broke we were talking about your

20  statement in Paragraph 19A that, "Many consumer

21  borrowers may not have realized this bank proceeding

22  involved their loan at all."  Do you see that?

23  A.      Yes.

24  Q.      When we talked about that previously you said



1  | you identified maybe ten comments?

2  |         MS. HANES:   Objection.   Misstates her testimony.

3  |         MR. BROWN:   I am asking the question.

4  | BY MR. BROWN:

5  | Q.      Did you identify anymore than about ten?

6  | A.      I pulled out ten examples.





3   Q.      You mentioned a typical claims rate of between

4   five and 15 percent in cases where a mailing list of

5   potential claimants can be compiled.  Do you see that in

6   Paragraph 26?

7   A.      Yes.

8   Q.      How many of those notices that you are talking

9   about involved general bankruptcy bar date notices?

10  A.      None of them.

11  Q.      How many of those involved class action notices

12  or asbestos type notices?

13  A.      All of them were class action.



SHANNON WHEATMAN                                              July 23, 2018
THINK FINANCE, LLC                                                        77

1                           CERTIFICATION

2          I, MARYELISE GRIFFIS, Court Reporter, certify that

3    the foregoing is a true and accurate transcript of the

4    foregoing deposition.

5          I further certify that I am neither attorney nor

6    counsel for, not related to nor employed by any of the

7    parties to the action in which this deposition was

8    taken; further, that I am not a relative or employee of

9    any attorney or counsel employed in this case, nor am I

10   financially interested in this action.

11

12   _Maryelise Griffis_

13

14   Maryelise Griffis, a
     Professional Court Reporter and
     Notary Public

15   Dated:  July 23, 2018

16

17

18

19

20

21          (The foregoing certification of this

22   transcript does not apply to any reproduction of the

23   same by any means, unless under the direct control

24   and/or supervision of the certifying reporter.)

