Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000

Thomas M. Hefferon (admitted *pro hac vice*)
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, D.C. 20001
Telephone: (202) 346-4000
Email:  THefferon@goodwinlaw.com

Tyler P. Brown (admitted *pro hac vice*)
Jason W. Harbour (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

*Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **THINK FINANCE, LLC,** *et al.*, | Case No. 17-33964 (HDH) |
| **Debtors.**[1] | **(Jointly Administered)** |

## DEBTORS' CONSOLIDATED BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON CERTAIN VIRGINIA AND TEXAS CLAIMS AND OBJECTION TO PLAINTIFF STEPHANIE EDWARDS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Think Finance, LLC (6762), Think Finance SPV, LLC (4522), Financial U, LLC (1850), TC Loan Service, LLC (3103), Tailwind Marketing, LLC (1602), TC Administrative Services, LLC (4558), and TC Decision Sciences, LLC (8949).

## **TABLE OF CONTENTS**

SUMMARY ........................................................................................................ 1

BACKGROUND ON THE TRIBES AND  ECONOMIC DEVELOPMENT EFFORTS ............ 4

UNDISPUTED FACTS BASED ON THE EVIDENTIARY RECORD ....................................... 7

I.   The Tribes' Engagement of Think Finance and Establishment of Their Tribal Lending
     Enterprises.................................................................................................... 7

II.  The Tribes' Contract Renegotiations in 2015 ................................................. 11

III. Responsibilities of the Tribal Lenders from 2015 Onward as to the Specific Loans at
     Issue in this Cross-Motion ............................................................................ 12

IV.  The Virginia and Texas Claims ..................................................................... 16

     A.  Stephanie Edwards................................................................................ 16

     B.  Beverly Miller....................................................................................... 17

     C.  Darlene Gibbs ....................................................................................... 18

THE PENDING MOTIONS .......................................................................................... 19

II.  The Edwards Motion for Partial Summary Judgment ..................................... 19

III. The Instant Cross-Motion ............................................................................. 21

STANDARD OF LAW .................................................................................................. 21

ARGUMENT .............................................................................................................. 22

I.   Texas Choice-of-Law Rules Establish that the Choice-of-Law Clauses are Valid and
     Enforceable. ................................................................................................. 22

     A.  Texas's Choice-of-Law Rules Supply the Governing Legal Standard...................... 22

     B.  Texas Choice-of-Law Rules Require Application of Tribal Law.............................. 24

         1.  The undisputed factual record establishes the Tribes' "substantial
             relationship" to the loans. ..................................................................... 24

         2.  Neither Texas nor Virginia recognizes a policy against the loans so
             fundamental it overrides the parties' selected choice of law. ............................ 28

i

3.  Ms. Edwards' claim that "Virginia has a materially greater interest than the Otoe-Missouria Tribe in the application of its laws" also finds no support in the law or the undisputed record. ........................................................................ 31

C.  "True Lender" Arguments are Irrelevant to the Choice-of-Law Analysis and, In Any Event, Think Finance Is Not CashCall and Is Not the "True Lender." ............... 34

1.  Substantive "liability" questions do not inform the choice-of-law analysis. ........ 35

2.  Ms. Edwards' "true lender" theory also fails on the merits. ............................... 37

D.  There Is No Basis for Ms. Edwards' "Prospective Waiver" Argument. .................... 43

II.  Even Without a Choice-of-Law Clause, Tribal Law Would Apply Because the Tribes Have the Most Significant Relationship to the Loan Agreements. .................................... 46

III.  Applicable Tribal Law Precludes Ms. Edwards's Motion for Summary Judgment and Mandates Summary Judgment in Debtors' Favor on All Usury-Based Claims. .............. 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A/S Kreditt-Finans v. Cia Venetico De Navegacion S.A. of Panama*,
   560 F. Supp. 705 (E.D. Pa. 1983) ............................................................................35

*Admiral Ins. Co. v. Brinkcraft Dev., Ltd.*,
   921 F.2d 591 (5th Cir. 1991) ...................................................................................30

*Am. Exp. Co. v. Italian Colors Restaurant*,
   570 U.S. 228 (2013)..................................................................................................44

*Beechum v. Navient Solutions, Inc.*,
   No. 15-8239, 2016 WL 5340454 (C.D. Cal. Sept. 20, 2016) ..................................40

*Bradt v. West Publ'g Co.*,
   No. A14-89-00694-CV, 1991 WL 230182 (Tex. App. Oct. 31, 1991) .......... *passim*

*California v. Cabazon Band of Mission Indians*,
   480 U.S. 202 (1987)....................................................................................3, 32, 36

*Cardoni v. Prosperity Bank*,
   805 F.3d 573 (5th Cir. 2015) ............................................................................24, 47

*CashCall, Inc. v. Morrisey*,
   No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014)..........................35, 40, 41

*CFPB v. CashCall, Inc.*,
   No. 15-7522, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) ......................... *passim*

*In re Chanel Fin., Inc.*,
   102 B.R. 549 (N.D. Tex. 1988)................................................................................23

*Cherokee Pump & Equip. Inc. v. Aurora Pump*,
   38 F.3d 246 (5th Cir. 1994) ...............................................................................29, 31

*Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*,
   94 S.W.3d 163 (Tex. App. 2002).......................................................31, 33, 46, 47

*CNL Hotels & Resorts, Inc. v. Houston Cas. Co.*,
   505 F. Supp. 2d 1317 (M.D. Fla. 2007)...................................................................35

*Cook v. Frazier*,
   765 S.W.2d 546 (Tex. App. 1989)....................................................................23, 25

*Cottage Sav. Ass'n v. C.I.R.*,
　499 U.S. 554 (1991) ........................................................................39

*Crowley v. Chait*,
　No. 85-2441, 2004 WL 5434953 (D.N.J. Aug. 25, 2004) ......................35

*Davenport v. Edward D. Jones & Co., L.P.*,
　891 F.3d 162 (5th Cir. 2018) ............................................................21

*Delhomme Indus., Inc. v. Houston Beechcraft, Inc.*,
　669 F.2d 1049 (5th Cir. 1982) ..........................................................22

*DeSantis v. Wackenhut Corp.*,
　793 S.W.2d 670 (Tex. 1990) .........................................................24, 26

*Dillon v. BMO Harris Bank, N.A.*,
　856 F.3d 330 (4th Cir. 2017) ........................................................44, 46

*EEOC v. Karuk Tribe Housing Authority*,
　260 F.3d 1071 (9th Cir. 2001) ..........................................................46

*Exxon Mobil Corp. v. Drennen*,
　452 S.W.3d 319 (Tex. 2014) .........................................................29, 31

*FDIC v. Lattimore Land Corp.*,
　656 F.2d 139 (5th Cir. 1981) ............................................................38

*First Commerce Realty Investors v. K-F Land Co.*,
　617 S.W.2d 806 (Tex. App. 1981) ......................................................23

*Ga. Cash Am., Inc. v. Greene*,
　734 S.E.2d 67 (Ga. Ct. App. 2012) ....................................................40

*Gator Apple, LLC v. Apple Tex. Rests., Inc.*,
　442 S.W.3d 521 (Tex. App. 2014) ......................................................26

*Grant Thornton LLP v. Suntrust Bank*,
　133 S.W.3d 342 (Tex. App. 2004) ......................................................36

*Hayes v. Delbert Servs. Corp.*,
　811 F.3d 666 (4th Cir. 2016) ............................................................44

*Howard v. Plain Green, LLC*,
　No. 17-cv-0302, 2017 WL 3669565 (E.D. Va. Aug. 7, 2017) ............25, 41

*Hudson v. ACE Cash Express, Inc.*,
　No. IP 01-1336-C, 2002 WL 1205060 (S.D. Ind. May 30, 2002) .....38, 39, 40

iv

*Huntsman v. Longwell*,
   4 F.2d 105 (5th Cir. 1925) ..................................................................38

*Inetianbor v. CashCall, Inc.*,
   No. 13-cv-60066, 2015 WL 11438192 (S.D. Fla. Dec. 8, 2015)......................................41, 42

*Jones v. Countrywide Homeloan*,
   No. 11-cv-0405, 2011 WL 2462845 (E.D. Cal. June 16, 2011) ..............................................39

*Kennedy v. Chase Manhattan Bank USA, NA*,
   369 F.3d 833 (5th Cir. 2004) ..................................................................47

*Krispin v. May Dep't Stores Co.*,
   218 F.3d 919 (8th Cir. 2000) ..................................................................39, 40

*Lehnerd v. E-Loan, Inc.*,
   No. 14-cv-1811, 2015 WL 13333686 (D. Ariz. July 31, 2015)............................................39

*In re Lyon Fin. Servs., Inc.*,
   257 S.W.3d 228 (Tex. 2008)..................................................................30

*MacDonald v. CashCall, Inc.*,
   No. 16-2781, 2017 WL 1536427 (D.N.J. Apr. 28, 2017)......................................41

*Mary Kay Inc. v. Woolf*,
   146 S.W.3d 813 (Tex. App. 2004)..................................................................23

*Maxus Exploration Co. v. Moran Bros., Inc.*,
   817 S.W.2d 50 (Tex. 1991)..................................................................47

*McFarland v. JP Morgan Chase Bank*,
   No. 13-1838, 2014 WL 4119399 (C.D. Cal. Aug. 21, 2014) ..............................................39

*McIntosh v. Bank of Am., N.A.*,
   No. 12-4336, 2013 WL 3866619 (N.D. Tex. July 26, 2013)..............................................39

*In re Meritt Dredging Co.*,
   839 F.2d 203 (4th Cir. 1988) ..................................................................23

*Michigan v. Bay Mills Indian Cmty.*,
   134 S. Ct. 2024 (2014)..................................................................46

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*,
   473 U.S. 614 (1985)..................................................................44

*Mitsui & Co. (USA), Inc. v. Mira M/V*,
   111 F.3d 33 (5th Cir. 1997) ..................................................................22

*Monahan v. Great Plains Lending, LLC*,
  No. 15-449, 2016 WL 6127568 (Fla. Cir. Ct. Sept. 30, 2016) ...................................20, 25, 41

*New Mexico v. Mescalero Apache Tribe*,
  462 U.S. 324 (1983)...................................................................................................................32

*Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative, & ERISA Litig.)*,
  391 F. Supp. 2d 541 (S.D. Tex. 2005) ......................................................................................25

*Orcasitas v. Wells Fargo Home Mortg.*,
  2013 U.S. Dist. LEXIS 93760 (N.D. Tex. Apr. 10, 2013).........................................................29

*Penn v. Cumberland*,
  883 F. Supp. 2d 581 (E.D. Va. 2012) .......................................................................................29

*Projects Mgmt. Co. v. Dyncorp Int'l, LLC*,
  No. 13-cv-331, 2014 WL 1248075 (E.D. Va. Mar. 26, 2014).............................................26, 41

*Salazar v. Coastal Corp.*,
  928 S.W.2d 162 (Tex. App. 1996)..............................................................................................23

*Saturn Capital Corp. v. Dorsey*,
  No. 01-04-00626-CV, 2006 WL 1767602 (Tex. App. June 29, 2006)..............................23, 30

*Sawyer v. Bill Me Later, Inc.*,
  23 F. Supp. 3d 1359 (D. Utah 2014) .........................................................................................39

*Settlement Funding, LLC v. Von Neumann-Lillie*,
  645 S.E.2d 436 (Va. 2007)...................................................................................................30, 32

*Shetty v. Nationstar Mortg., LLC*,
  No. B272283, 2018 WL 346129 (Cal. Ct. App. Jan. 10, 2018)..............................................39

*Sidorenko v. Nat'l City Mortg. Co.*,
  No. 12-5180, 2012 WL 3877749 (W.D. Wash. Sept. 6, 2012)................................................39

*People ex rel. Spitzer v. County Bank of Rehoboth Beach*,
  846 N.Y.S.2d 436 (N.Y. App. Div. 2007) .................................................................................40

*Stillwater Liquidating LLC v. Net Five at Palm Pointe, LLC*,
  559 B.R. 563 (Bankr. S.D.N.Y. 2016).......................................................................................39

*In re Thelen LLP*,
  736 F.3d 213 (2d Cir. 2013).......................................................................................................23

*Estate of Thorne by Thorne v. South Park Motor Lines, Inc.*,
  No. 06-0033, 2006 WL 8435583 (D. Wyo. Nov. 2, 2006)......................................................35

*Walsh v. Household Fin. Corp. III*,
No. 15-4112, 2016 U.S. Dist. LEXIS 160264 (D.N.J. Nov. 17, 2016) ...................................39

*Wiley v. State Farm Fire & Cas. Co.*,
585 F.3d 206 (5th Cir. 2009) ...........................................................................................22

*Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.*,
642 F.2d 744 (5th Cir. 1981) .........................................................................23, 29, 30, 45

*Zivanic v. Wash. Mut. Bank, F.A.*,
No. 10-0737, 2010 WL 2354199 (N.D. Cal. June 9, 2010)..................................................39

## Statutes, Rules, and Regulations

25 U.S.C. § 4301(a) ..........................................................................................5, 32, 38

Chippewa Cree Tribe, Consumer Finance Services Regulatory Ordinance ...........................8, 49

Otoe-Missouria Tribe, Tribal Consumer Regulatory Code ....................................................8, 49

83 Fed. Reg. 34,863 (July 23, 2018)........................................................................................4

## Other Authorities

David E. Wilkins, *American Indian Politics and
the American Political System* (2002).........................................................................................4

Otoe-Missouria Tribe, *Enterprises*,
http://www.omtribe.org/who-we-are-enterprises.......................................................................6

Otoe-Missouria Tribe, *Otoe & Missouria: Five Hundred Years of History*,
http://www.omtribe.org/who-we-are-history..............................................................................6

Restatement (Second) of Conflict of Laws § 187............................................................24, 26, 27

Restatement (Second) of Conflict of Laws § 188........................................................................47

Restatement (Second) of Conflict of Laws § 195........................................................................48

## SUMMARY

This brief is filed in opposition to Plaintiff Stephanie Edwards' Motion for Partial Summary Judgment and in support of Debtors' Motion for Summary Judgment on Certain Virginia and Texas Claims. Pursuant to Local Bankruptcy Rule 7056-1(c)(1), Debtors move for summary judgment on the ground that the choice-of-law provisions in the loan agreements underlying certain proofs of claim filed by Stephanie Edwards (Nos. 41325, 41330), Darlene Gibbs (No. 41319), and Beverly Miller (Nos. 43997, 43998), require the application of the laws of the Otoe-Missouria and Chippewa Cree Tribes, and that, under those laws, the loan agreements are lawful. *See* Debtors' First Omnibus Objection to Certain Claims, ECF No. 359, at 5 ¶¶ 10(d), 12(b), 14(a)-(b). Debtors are entitled to summary judgment on Ms. Edwards', Ms. Gibbs', and Ms. Miller's Claims.

## INTRODUCTION

This case calls upon the Court to decide whether sovereign Native American tribes have the right to make consumer loans governed by their own laws. Great Plains Lending, LLC and Plain Green, LLC (the "Tribal Lenders") are arms of two federally recognized sovereign Native American tribes—the Otoe-Missouria Tribe and the Chippewa Cree Tribe, respectively ("Tribes"). Since 2011, they have provided small-dollar installment loans to consumers who face unexpected expenses or have other short-term liquidity needs. Initially, the Tribal Lenders retained Debtor Think Finance, LLC and certain of its subsidiaries (including Debtors Tailwind Marketing, LLC and TC Decision Sciences, LLC) to help launch their operations. As the Tribal Lenders gained experience in the industry, they relied less on third-party assistance. By 2015, when the first loan at issue here was made, the Tribal Lenders were nearing the point of not needing Think Finance's services at all and had renegotiated their contracts with Think Finance

accordingly. By mid-2017, the Tribal Lenders stopped working with Think Finance altogether, but *kept originating loans*.

The Tribal Lenders have always had ultimate responsibility and oversight for every material aspect of these loans—underwriting, origination, servicing, marketing, and collection. The Tribal Lenders and the Tribe members employed by them reviewed and approved the underwriting criteria used to make decisions about the loans, controlled the funding of approved loans, serviced customer accounts, fielded customer-service inquiries from on-reservation call centers, collected loan payments, and assumed financial risk as to every loan they originated. Tribal entities have also always been the legal owners of 100% of all loans issued to every customer. As sovereign-owned enterprises, the Tribal Lenders understandably included a clear and conspicuous choice-of-law provision in their loan agreements that stated the agreement would be governed by the laws of the Tribal sovereign. For Great Plains, that meant the law of the Otoe-Missouria; for Plain Green, the law of the Chippewa Cree.

Several borrowers now seek to evade the obligations of their loan agreements by claiming their agreements are usurious under the laws of their respective home states notwithstanding the choice-of-law provisions in their loan agreements—among them are Stephanie Edwards of Virginia and Beverly Miller of Texas, who took out loans with Great Plains, and Darlene Gibbs of Virginia, who borrowed money from Plain Green (together "Claimants"). Ms. Edwards' motion for partial summary judgment asks the Court to set aside the choice-of-law provision. But the fully disclosed choice-of-law provisions in Claimants' loan agreements make Tribal law applicable, and under those laws, their loans were lawful. Ms. Edwards admits that her claims rise and fall on this issue and that if the clause is enforced, then

her claims "must be dismissed because the Otoe-Missouria Tribe's laws do not have an interest-rate cap." ECF No. 641 ("Edwards Br.") at 2.

Indeed, as a matter of law and undisputed fact, it is *Debtors* who are entitled to summary judgment on Ms. Edwards' claims, as well as the claims brought by Ms. Gibbs and Ms. Miller.

The parties agree Texas choice-of-law rules apply. Each of the relevant factors under those rules supports enforcement of the Tribal choice-of-law provisions as to all three Claimants. First, those rules require only that the parties or the transaction have a "substantial relationship" to the selected law in order for the choice-of-law provision to be valid. The Tribal Lenders' undisputed role in originating, servicing, and retaining an interest in each loan is sufficient to establish this relationship as a matter of law. Second, to overcome this valid choice, Claimants would have to show that Texas or Virginia has a "fundamental" public policy against enforcing the parties' choice of law. Yet the case law of both jurisdictions expressly disclaims any such policy. Finally, even if either state had such a "fundamental" policy, Texas choice-of-law rules would *still* respect the parties' choice of Tribal law because the Tribes' own public policies and their federally protected interests in promoting economic development on their reservations is materially greater than the interests of any other jurisdiction. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 220 (1987).

Because every relevant factor under Texas's choice-of-law rules supports enforcement of the Tribal choice-of-law provision and, as Ms. Edwards concedes, Claimants' loans are valid under the selected Tribal laws, Debtors are entitled to summary judgment on the claims brought by Ms. Edwards, Ms. Gibbs, and Ms. Miller.

For the same reasons, Ms. Edwards' summary-judgment motion must be denied—it is based on immaterial facts predating her transaction that she attempts to apply to the wrong legal

standard. At the outset, her motion focuses on events that have nothing to do with her agreement chronologically—Tribal involvement looked quite different in 2011, at the very start of the Tribal Lenders' operations, than in 2015, when the Tribal Lenders' operations were in full swing. Moreover, Ms. Edwards hinges her argument on assertions that Think Finance and its subsidiaries, not the Tribal Lenders, should be regarded as the "true" lenders. But Texas's choice-of-law rules do not recognize a "true lender" test, a "predominant economic interest" test, or any other similar analysis. The few cases Ms. Edwards cites in support of her "true lender" arguments represent a minority view that never seriously considers how such an analysis fits into a choice-of-law test. (It doesn't.) What Texas's rules unambiguously require is a "substantial relationship" between the parties or transaction and the selected law. And here, the undisputed facts show a very "substantial relationship" between the Tribal Lenders' loans and the laws of their sovereigns. Because Ms. Edwards' motion relies on the wrong legal standard and does not controvert any of the material facts favoring enforcement of the choice-of-law provision under the *correct* standard, her motion should be denied.

### BACKGROUND ON THE TRIBES AND ECONOMIC DEVELOPMENT EFFORTS[2]

The Otoe-Missouria and Chippewa Cree (together "Tribes") are two of the 537 federally recognized, sovereign Indian tribes in the United States. 83 Fed. Reg. 34,863 (July 23, 2018). Recognizing that Native American tribes have been impoverished due to historically adverse federal and state actions, the United States has a firm and long-held policy of encouraging tribal economic development, including through tribally-owned corporations. *See* David E. Wilkins,

---

[2] None of the facts recited in this Section is necessary or relied on for the Court's determination of this Cross-Motion for Summary Judgment or Ms. Edwards's Motion for Partial Summary Judgment. They are provided to assist the Court in understanding the background of the Tribes' consumer-lending businesses.

*American Indian Politics and the American Political System* 105 (2002) (the Indian Reorganization Act of 1934 encouraged the creation of federally chartered tribal corporations as vehicles for supporting tribal government economic development). Congress has more specifically recognized the importance of tribes partnering with non-tribal entities on economic development: "[T]he United States has an obligation to assist Indian tribes with the creation of appropriate economic and political conditions with respect to Indian lands to (A) encourage investment from *outside sources* that do not originate with the tribes; and (B) facilitate economic ventures with *outside entities* that are not tribal entities." 25 U.S.C. § 4301(a)(9) (emphasis added).

Tribally owned corporations and entrepreneurialism are necessary because tribes face unique hurdles in achieving economic independence and self-sufficiency. TF App. 359 (NAFSA Amicus Brief). Unlike state and local governments, tribes cannot simply resort to taxes to raise revenue. *Id*. Tribes are legally prevented from using reservation trust lands as leverage for capital, and federal Indian laws severely limit their use of other revenue-raising methods. *Id*. Further, tribes suffer from other significant economic disadvantages, including often being remotely located, away from major population and commerce centers, and having relatively under-educated and under-employed populations. TF App. 360; *see also* 25 U.S.C. § 4301(a)(11) (noting "the lack of employment and entrepreneurial opportunities"). To overcome these obstacles, tribes have turned to the new economic frontier of Internet e-commerce, which overcomes geographic hurdles and permits consumer access to tribal goods and services, including lending products. TF App. 360-62.

Consistent with these federally-encouraged policies, both Tribes here have a history of promoting economic development through tribally owned commercial enterprises, including

5

consumer-lending businesses, long before they contracted with Think Finance in 2011. The Otoe-Missouria Tribe, with nearly 3,000 members, is located in Red Rock, a remote area of northern Oklahoma. *See* The Otoe-Missouria Tribe, *Otoe & Missouria:  Five Hundred Years of History*, http://www.omtribe.org/who-we-are-history.   The Otoe-Missouria have operated a diverse group of businesses, including four casinos, two convenience stores, a biofuel company, a propane company, and a ranching company. *See* The Otoe-Missouria Tribe, *Enterprises*, http://www.omtribe.org/who-we-are-enterprises. Before ever meeting Think Finance, the Otoe-Missouria had identified consumer lending as a desired business venture and operated a short-term lending business, American Web Loans (AWL), which the Tribe launched with a consultant, the MacFarlane Group. TF App. 16-17 (Harvison Dep. 136:18-138:1). AWL remains in operation and has never had any relationship with any Think Finance entity. *See* American Web Loan, https://www.americanwebloan.com; TF App. 370 (Smith Dec. ¶ 8).

The Chippewa Cree tribal grounds are even more remote. Located in northeastern Montana near the Canadian border, the Chippewa Cree Tribe has over 7,000 members. TF App. 184 (Whitford Dec. ¶ 3). Over the years, the Tribe has developed a number of other tribally owned ventures, including an oil and gas corporation and the Northern Winz Hotel & Casino. TF App. 114, 116 (Haynes Dep. 57:5-12; 59:12-15; 65:1-6). Like the Otoe-Missouria tribe, the Chippewa Cree had engaged third-party consultants—Encore Services, LLC—and retained attorneys to launch a preexisting online lending business (First American Capital Resources). TF App. 117 (Haynes Dep. 95:1-18). Before meeting Think Finance, the Tribe already had developed "an established platform, established site, and a portfolio" with Encore's assistance, but the business plan fell apart due to a last-minute lapse in funding. TF App. 14, 117 (Harvison Dep. 122:25-123:16; Haynes Dep. 95:1-18).

Thus, both Tribes independently decided to enter the consumer-lending field and actively sought business partners with relevant expertise to overcome the significant barriers to entry. The Think Finance entities were a natural fit. For over a decade, Think Finance has been a market leader in helping its clients, including two federally chartered banks, overcome these barriers by providing technological infrastructure and support services to help tackle issues such as "technology, marketing, risk management, compliance support, and access to capital funding." Edwards App. 36; TF App. 369-70 (Smith Dec. ¶¶ 5-6).

## UNDISPUTED FACTS BASED ON THE EVIDENTIARY RECORD

I.    **The Tribes' Engagement of Think Finance and Establishment of Their Tribal Lending Enterprises**

By 2011, both Tribes had already established tribal corporations for the purpose of providing loans via the Internet, had engaged third-party vendors to facilitate components of the business operations, and were eager to expand their businesses. TF App. 14, 16-17, 107, 117. At the same time, Think Finance had identified tribal lending as a developing business model and was evaluating prospective tribal lenders to whom it could offer its support services. TF App. 19, 81 (Harvison Dep. 145:24-148:19; Rees Dep. 193:9-196:15).

Think Finance was introduced to the Otoe-Missouria Tribe by a consulting company engaged by the Tribe. TF App. 16-17 (Harvison Dep. 136:13-137:6). After numerous meetings, the Otoe-Missouria engaged certain Think Finance entities as service providers in 2011 because the Tribe wanted to "expand[] from a single payment to an installment loan" model. TF App. 19 (Harvison Dep. 146:10-16). The Otoe-Missouria's past involvement in consumer lending (well pre-dating its relationship with Think Finance) and other commercial ventures made them an obvious fit for Think Finance. TF App. 46, 81 (Nguyen Dep. 297:2-5; Rees Dep. 193:12-18).

7

Think Finance was introduced to the Chippewa Cree Tribe by Stephen Haynes, an independent businessman who had previously participated in gaming and real-estate deals with the Chippewa Cree and could vouch for their ability to handle complex commercial enterprises. TF App. 19, 111-12 (Harvison Dep. 146:17-22; Haynes Dep. 28:11-29:19). Like the Otoe-Missouria, the Chippewa Cree engaged Think Finance to provide support services after in-person meetings regarding the Tribe's prospective consumer-lending business. Although the Chippewa Cree's previous consumer-lending enterprise had not successfully launched, the Tribe's commitment to the project nevertheless "made them an attractive business partner" to Think Finance. TF App. 81 (Rees Dep. 193:13-15).

After engaging Think Finance, each Tribe formed lending companies incorporated under Tribal law, and wholly owned by the respective Tribes: Great Plains Lending, LLC ("Great Plains"), an arm of the Otoe-Missouria, and Plain Green, LLC ("Plain Green"), an arm of the Chippewa Cree. TF App. 122 (Shotton Dec. ¶¶ 8-11), 185 (Whitford Dec. ¶¶ 4-5). Each Tribe also adopted detailed financial codes into tribal law. The Otoe-Missouria Tribal Council enacted a Consumer Finance Services Regulatory Ordinance, which implemented "necessary regulation and oversight to ensure legal and lawful business operations." TF App. 123 (Shotton Dec. ¶ 12); *see also* TF App. 127 (Ordinance). The Chippewa Cree Tribal Council enacted its own Tribal Consumer Regulatory Code providing for supervision and oversight of activities conducted by Plain Green and other tribal lending businesses. TF App. 185 (Whitford Dec. ¶ 7); *see* TF App. 240 (Code); *see also* TF App. 84, 94, 96 (Rosette Sr. Dep. 53:19-54:4; Raining Bird Dep. 21:4-22; 27:7-11). While both Tribes' consumer finance laws are comprehensive, they do not cap interest rates—a policy they share with many states. *See generally* TF App. 127 (Otoe-Missouria Ordinance); TF App. 240 (Chippewa Cree Code).   The Tribes also established consumer

regulatory commissions expressly to oversee the Tribal Lenders and their loan products. TF App.

123 (Shotton Dec. ¶ 12) (Otoe-Missouria Consumer Financial Services Regulatory

Commission); TF App. 250 (Tribal Consumer Protection Bureau).

To facilitate the Tribal Lenders' access to capital, Think Finance introduced the Tribes to

an investor, Victory Park Capital ("VPC"). The Tribes each hired their own lawyers from

different prominent law firms and engaged in thorough negotiations with Think Finance and

VPC to settle on final terms acceptable to the Tribes. TF App. 86, 94, 119 (Rosette Sr. Dep.

81:10-21; Raining Bird Dep. 18:10-21; Haynes Dep. 302:18-303:21). The Tribes heavily relied

on the advice of their counsel in structuring their lending programs and their contractual

agreements. TF App. 89, 99, 104 (Rosette Sr. Dep. 114:24-115:20; Raining Bird Dep. 66:7-25,

47:25-48:12).

Under the final, agreed-upon structure, VPC formed GPL Servicing, Ltd. ("GPLS") to

purchase a negotiated portion of participation interests in the loans the Tribal Lenders would

make. *See infra* note 4. VPC's network of investors primarily funded GPLS, a separate entity.

Think Finance held only a varying minority interest in the non-voting participation shares of

GPLS through its subsidiary, Think SPV, which never exceeded 33% until other parties' shares

were redeemed in mid-2017, well after the loans presently at issue were made. The voting, non-

participation management shares of GPLS have always been owned by a VPC entity. Neither

Think SPV nor any of the other Debtors ever held participation interests in any loans. TF App.

758 (Wong Dec. ¶ 8).

The Tribal Lenders made and owned the loans, and held 100% of the participation

interests for several business days prior to selling participation interests ranging from 90-99% to

GPLS (more earlier in the lending programs and less later).[3] *See* TF App. 53 (Rogenski Dep. 202:2-7) ("They're their loans. They manage them, they collect money on them, regardless of the fact that they sold participations off in them."). At all times, the Tribal Lenders retained title to the loans,[4] retained servicing rights and provided customer service,[5] kept an interest in each loan, and received their share of revenues and losses.[6]

Think Finance, through its affiliates Tailwind Marketing and TC Decision Sciences, was responsible for providing marketing and risk-management services to the Tribes. TF App. 370-72 (Smith Dec. ¶¶ 10-13). One of Think Finance's market advantages was the sophisticated technology and software it had developed, which the Tribes licensed. TF App. 371-72 (Smith Dec. ¶ 13). The Tribal Lenders also outsourced certain other services, such as some collection activity, to third parties unaffiliated with Think Finance, while keeping others in-house. TF App. 374 (Smith Dec. ¶ 22).

From the beginning, the Tribal Lenders and the Tribes had a substantial economic interest in the lending programs and derived substantial revenue for their continued servicing of the loans despite the sale of participation interests to GPLS. Under the 2011 contracts, Plain Green received 4.5% of GPLS's revenue each month, while Great Plains received between 6% to 10%

---

[3] A participation interest only enables the interest holder to share in the revenues and losses of a loan; ownership remains with the lender at all times.

[4] TF App. 533-34 (2011 Great Plains Participation Agreement); TF App. 597 (2015 Great Plains Participation Agreement); TF App. 565 (2011 Plain Green Participation Agreement); TF App. 639 (2015 Plain Green Participation Agreement).

[5] TF App. 520, 533-34 (2011 Great Plains Participation Agreement); TF App. 583 (2015 Great Plains Participation Agreement); TF App. 663, 672 (2015 Great Plains Servicing Agreement); TF App. 552 (2011 Plain Green Participation Agreement); TF App. 623 (2015 Plain Green Participation Agreement); TF App. 673 (2015 Plain Green Servicing Agreement).

[6] TF App. 520 (2011 Great Plains Participation Agreement); TF App. 583 (2015 Great Plains Participation Agreement).

of the net cash revenue from each month, based on volume. TF App. 549 (2011 Plain Green Participation Agreement); TF App. 517, 543 (2011 Great Plains Participation Agreement). GPLS also reimbursed both Tribal Lenders for certain expenses. TF App. 523 (2011 Great Plains Participation Agreement); TF App. 554 (2011 Plain Green Participation Agreement).

## II.    **The Tribes' Contract Renegotiations in 2015**

Eventually, the Tribal Lenders re-negotiated their contracts with Think Finance and GPLS to have the Tribes take on even more operational responsibilities and a greater share of risk and profits. Plain Green completed renegotiation of its Participation Agreement with GPLS in June 2015. TF App. 614 (2015 Plain Green Participation Agreement). Under the renegotiated agreement, Plain Green retained a minimum 10% participation interest in all loans it made, and received from GPLS a monthly service fee equal to 6.25% of revenues received by GPLS plus $256 per loan for any new borrower and $105 for every other loan. TF App. 619, 624. In total, Plain Green has received over $60 million from its lending operations. TF App. 375 (Smith Dec. ¶ 26).

Great Plains also renegotiated its Participation Agreement with GPLS by December 2015. TF App. 574. Under that agreement, Great Plains retained a minimum 3.25% participation interest in all loans it made, and received the profit amounts due from its retained participation interest, plus 10% to 14% of the net cash revenue from each month, plus $305 per loan for any new borrower, and an additional $120 per loan for all other loans. TF App. 577, 584, 608. In total, Great Plains has received over $45 million in revenue from its lending operations. TF App. 375 (Smith Dec. ¶¶ 27).

Importantly, from the very beginning, the two Tribes envisioned using the expertise of their outside service providers to help get their operations off the ground, but they (and Think Finance) always anticipated that responsibilities would transition to tribal personnel over time.

TF App. 62-63, 96-97 (Smith Dep. 244:19-245:10; Raining Bird Dep. 28:20-25, 30:3-18). For

example, Billi Ann Raining Bird, Plain Green's former CEO and COO, acknowledged that from

day one, Plain Green intended to learn day-to-day operations from Think Finance so that it

eventually could manage all aspects of servicing the loans it made. TF App. 97 (Raining Bird

Dep. 30:3-18). This was exactly what happened and exactly what permitted the Tribes to take on

additional responsibilities from launch through 2015, to renegotiate their service agreements with

Think Finance in 2015, and eventually to terminate their relationships altogether in 2016 and

2017. *See* TF App. 29-30, 64 (Nguyen Dep. 114:23-115:20, 117:15-20; Smith Dep. 249:7-10);

TF App. 375 (Smith Dec. ¶ 25); *see also* TF App. 344 (Mar. 1, 2016 Letter from Plain Green to

TC Decision).

### III.     Responsibilities of the Tribal Lenders from 2015 Onward as to the Specific Loans at Issue in this Cross-Motion

Because Ms. Edwards, Ms. Miller, and Ms. Gibbs took their loans in 2015 and after, it is

the Tribal Lenders' operations during those years that is relevant here. By 2015, the Tribal

Lenders had grown increasingly independent from Think Finance from an operational

perspective. *See* TF App. 22, 29 (Harvison Dep. 239:11-25; Nguyen Dep. 115:12-116:2). The

Tribal Lenders managed their own marketing relationships to draw in new loan applicants. TF

App. 31 (Nguyen Dep. 127:4-14). They continued to serve as the final decisionmakers for their

respective underwriting parameters. TF App. 371-72 (Smith Dec. ¶ 13). They also verified

applications from their call centers on Tribal lands as part of the loan underwriting process. TF

App. 40-41 (Nguyen Dep. 206:9-18, 209:4-8). And, as noted above, they re-negotiated contracts

in 2015 to shift even more operational responsibilities (as well as risk and potential benefits) to

the Tribes. *See generally* TF App. 574 (2015 Great Plains Participation Agreement); TF App.

663 (2015 Great Plains Servicing Agreement); TF App. 614 (2015 Plain Green Participation

Agreement); TF App. 673 (2015 Plain Green Servicing Agreement). To perform all of these functions, both Tribal Lenders employed a significant number of people; at least 77 by Plain Green and at least 39 by Great Plains. TF App. 374 (Smith Dec. ¶ 24).

Contrary to the picture Ms. Edwards attempts to paint, at all times up to the point they terminated Think Finance's services, the Tribal Lenders were "a hundred percent responsible" for key aspects of the origination process (TF App. 72 (Lutes Dep. 166:6-8)) and were also actively overseen by their respective Tribal Councils. TF App. 37-38 (Nguyen Dep. 168:19-169:1). The Tribal Lenders (and indeed, the Tribal Councils) kept in constant contact with Think Finance. *See, e.g.*, TF App. 44 (Nguyen Dep. 290:14-23) (describing contact as "not only daily," but "almost . . . hourly, several times an hour"); TF App. 45 (Nguyen Dep. 294:21-295:22) (noting that Think Finance met with members of both Tribal Councils at least quarterly on Tribal land). While it is true that Think Finance provided the Tribal Lenders with substantial support services, the Tribal Lenders took the lead in "defining the product, . . . the brand, the marketing, look, [] the feel, and any enhancements they wanted to the product offering," and frequently rejected or required changes to marketing creatives. TF App. 27 (Nguyen Dep. 105:13-19); *see also* TF App. 15, 98 (Harvison Dep. 127:12-25; Raining Bird Dep. 44:24, 45:14-18).

Every time a marketing, operations, or other significant change was proposed by either Think Finance or one of the Tribes, it had to be submitted to the Tribal Lender for approval before Think Finance would implement it. TF App. 374 (Smith Dec. ¶ 23). This included requiring Tribal approval for changes to the language in marketing materials, the language in applications and contracts, underwriting changes, and the design of the websites supported by Think Finance. *Id*. Plain Green reviewed and approved over 200 non-underwriting changes between 2015 and 2016, while Great Plains reviewed and approved over 300 such changes

between 2015 and 2017. *Id*. In addition to these changes, both Plain Green and Great Plains also reviewed and approved dozens of additional underwriting changes between 2015 and 2017. *Id*.

Every loan started with a loan application on a form approved by the Tribal Lenders. TF App. 40 (Nguyen Dep. 205:14-25). The Tribal Lenders participated in developing the criteria for approving and issuing loans and had exclusive final authority to approve or reject all such criteria. TF App. 377 (2011 Great Plains Marketing Agreement); TF App. 393 (2011 Plain Green Marketing Agreement); TF App. 410 (2015 Great Plains Marketing Agreement); TF App. 426 (2015 Plain Green Marketing Agreement). Both Tribes also retained the exclusive discretion to approve or deny each application on an individual basis. TF App. 32, 58, 61 (Smith Dep. 105:5-107:4, 150:15-151:16; Nguyen Dep. 130:8-14). The Tribal Lenders had online access to information on all pending and approved loan applications and the right to decline any application before funding. *See* TF App. 40 (Nguyen Dep. 206:8-208:8); TF App. 373 (Smith Decl. ¶ 18).

The underwriting criteria—objective factors such as income and credit score—were set by the Tribal Lenders based on their "appetite for losses" and were established and changed with the Tribal Lenders' feedback and approval after "lengthy discussions of the impact to the portfolio." TF App. 32, 41, 372 (Nguyen Dep. 130:8-14, 210:2-7; Smith Dec. ¶¶ 13-14). Great Plains and Plain Green offered significantly different lending programs, with Plain Green favoring relatively larger, safer, and lower-priced loans, and Great Plains favoring relatively smaller, riskier, and higher-priced loans. TF App. 372 (Smith Dec. ¶ 14). As they gained experience, they explored changes to price points or credit criteria, TF App. 33 (Nguyen Dep. 134:6-135:11), and took over the process of verifying information supplied by applicants

14

requiring further diligence, which they handled on Tribal lands through call centers that employed Tribe members. TF App. 40-41 (Nguyen Dep. 206:9-18, 209:4-8).

After a loan application was approved under the Tribal Lenders' selected underwriting criteria, a signed loan agreement from the proposed borrower was received, and a final review period expired, an ACH transfer was made from the Tribal Lenders' reserve accounts to the borrower's account. TF App. 4 (Callnin Dep. 47:6-48:2); *see also* TF App. 376 (Smith Dec. ¶ 33). These accounts were the Tribal Lenders' accounts, not Think Finance's; they were funded by GPLS's purchase of participation interests, not by Think Finance; and Tribal Lender approval, not Think Finance's, was required for any ACH transfer or check disbursement. TF App. 7, 52, 97-98, 101 (Rogenski Dep. 126:23-128:16, 129:1-6; Callnin Dep. 90:2-92:6; Raining Bird Dep. 30:19-24, 45:1-4, 55:7-8).

Although Think Finance assisted the Tribal Lenders in developing servicing policies based on the Tribal Lenders' instructions and preferences and provided some servicing support until 2015, Think Finance never owned the servicing rights to any loan, and the Tribal Lenders were always the ultimate loan servicers. TF App. 59 (Smith Dep. 127:16-128:20); TF App. 373 (Smith Dec. ¶ 20). Further, as the lending operations grew, the Tribal Lenders developed their own new servicing and compliance policies so that they "could self-regulate." TF App. 101 (Raining Bird Dep. 56:11-13). By 2015, when the first of the loans at issue here was originated, the Tribal Lenders alone were responsible for responding to customer-service requests, either through their own call centers employing dozens of members of their respective Tribes or through third-party companies that had no connections to Think Finance. TF App. 10, 43, 44, 66, 101 (Callnin Dep. 153:3-13, Nguyen Dep. 291:19-20, 221:17-20, Smith Dep. 266:14-19, Raining Bird Dep. 57:6-16). The Tribal Lenders also handled collections on delinquent loans; Think

Finance "did not handle collections in any way." TF App. 10, 72, 107 (Callnin Dep. 153:3-13;

Lutes Dep. 167:9-15; Raining Bird Dep. 81:16-19); *see also* TF App. 374 (Smith Dec. ¶ 22).

Importantly, the increasing sophistication and growth of the Tribes' lending operations

led to what everyone anticipated from the beginning: no longer needing Think Finance to support

loan originations at all. Plain Green terminated its relationship with Think Finance on June 1,

2016, while Great Plains ceased originating loans using Think Finance's services in early May

2017. TF App. 375 (Smith Dec. ¶ 25).

## IV.    The Virginia and Texas Claims

This Motion concerns proofs of claim brought by Stephanie Edwards and Darlene Gibbs

of Virginia and Beverly Miller of Texas concerning loans they received (the "Loan

Agreements"). These loans were all short-term installment loans with 15 to 60 payments; they

were not "balloon" payment loans requiring large payments at the end, nor were they "payday"

loans requiring full repayment with interest at the end of the next pay cycle. *See, e.g.*, Edwards

App. 300, 308.

### A.  Stephanie Edwards

Stephanie Edwards is a Virginia resident. On July 17, 2015, Ms. Edwards logged on to

www.greatplainslending.com—a website owned by Great Plains—and submitted an online loan

application to Great Plains for a short-term loan of $1,300, to be repaid with interest over 30

payments. *See* Edwards App. 297, 300.[7] The lender on Ms. Edwards' loan agreement was "Great

Plains Lending, LLC." Edwards App. 297. Ms. Edwards elected to make payments via ACH

transfer (Edwards App. 301) and those payments went to an account held by Great Plains. TF

---

[7] This loan agreement is associated with Proof of Claim No. 41330, for which she seeks a recovery of $4,382.27.

App. 375 (Smith Dec. ¶¶ 28). Ms. Edwards *again* applied to Great Plains online on November 14, 2016, this time for a loan in the amount of $3,000 to be repaid over 60 payments.[8] Those payments also went to a Great Plains bank account. TF App. 375 (Smith Dec. ¶¶ 29).

Both agreements contain choice-of-law provisions that adopt the law of the Otoe-Missouria Tribe:

> **GOVERNING LAW; NON-APPLICABILITY OF STATE LAW; INTERSTATE COMMERCE:** This Agreement and the Agreement to Arbitrate are governed by Tribal Law and such federal law as is applicable under the Indian Commerce Clause of the Constitution of the United States of America. We do not have a presence in Oklahoma or any other state of the United States of America. Neither this Agreement nor the Lender is subject to the laws of any state of the United States. The Lender may choose to voluntarily use certain federal laws as guidelines for the provision of services. Such voluntary use does not represent acquiescence of the Otoe-Missouria Tribe to any federal law unless found expressly applicable to the operations of the Otoe-Missouria Tribe.
>
> \*      \*      \*
>
> By checking here and signing below, you understand, acknowledge and agree that Great Plains Lending, LLC is a tribal lending entity wholly owned by the Otoe-Missouria Tribe of Indians, a federally recognized tribe. You further understand, acknowledge and agree that this Loan is governed by the laws of the Otoe-Missouria Tribe and is not subject to the provisions or protections of the laws of your home state or any other state. If you wish to have your resident state law apply to any loan that you take out, you should consider taking a loan from a licensed lender in your state.

Edwards App. 303-04, 306, 311-12.

### B.  Beverly Miller

Beverly Miller is a Texas resident. On December 11, 2015, Ms. Miller submitted an online loan application to Great Plains for a short-term loan of $900, to be repaid with interest

---

[8] This loan agreement is associated with Proof of Claim No. 41325, which seeks a recovery of $1,767.40.

over 30 payments. *See* TF App. 375 (Smith Dec. ¶¶ 30).[9] Ms. Miller made payments via ACH to

an account held by Great Plains. *Id.* On March 3, 2017, Ms. Miller applied online to Great Plains

for another short-term loan, this time for $500 to be repaid over 16 payments.[10] TF App. 375-76

(Smith Dec. ¶¶ 31). ACH payments for this loan also went to an account held by Great Plains. *Id.*

The method of application, identified lender, and payment requirements for Ms. Miller's

two loans were the same as Ms. Edwards'. Both contain the same choice-of-law provisions that

adopt the law of the Otoe-Missouria Tribe. TF App. 696, 704-05 (Smith Dec. Exs. O, P).

### C. Darlene Gibbs

Darlene Gibbs is another Virginia resident. On January 6, 2016, Ms. Gibbs logged on to

www.plaingreenloans.com—a website owned by Plain Green—and submitted an online loan

application for a short-term loan of $1,200, to be repaid with interest over 15 payments. *See* TF

App. 376 (Smith Dec. ¶¶ 32).[11] Ms. Gibbs made electronic payments to an account held by Plain

Green. *Id.*

Ms. Gibbs's loan agreement identifies "Plain Green LLC" as the lender and contains the

following choice-of-law provision that adopts the law of the Chippewa Cree Tribe:

> **GOVERNING LAW; NON-APPLICABILITY OF STATE LAW;
> INTERSTATE COMMERCE:** This Agreement and the Agreement to Arbitrate
> are governed by Tribal Law. The Agreement to Arbitrate also comprehends the
> application of the Federal Arbitration Act, as provided below. Plain Green does
> not have a presence in Montana or any other state of the United States of
> America. Neither this Agreement nor Plain Green is subject to the laws of any
> state of the United States. Plain Green may choose to voluntarily use certain

---

[9] This loan agreement is associated with Proof of Claim No. 43997, which seeks an unspecified amount of recovery.

[10] This loan agreement is associated with Proof of Claim No. 43998, which seeks an unspecified amount of recovery.

[11] This loan agreement is associated with Proof of Claim No. 41319, which seeks a recovery of $566.82.

federal laws as guidelines for the provision of services. Such voluntary use does not represent acquiescence of the Chippewa Cree Tribe to any federal law unless found expressly applicable to the operations of the Chippewa Cree Tribe.

*     *     *

By checking here and signing below, you understand, acknowledge and agree that Plain Green, LLC is a tribal lending entity wholly owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana, a federally recognized tribe. You further understand, acknowledge and agree that this Loan is governed by the laws of the Chippewa Cree Tribe and is not subject to the provisions or protections of the laws of your home state or any other state. If you wish to have your resident state's law apply to any loan that you obtain, you should consider obtaining a loan from a licensed lender in your state.

TF App. 717, 719 (Gibbs Proof of Claim, No. 41319)

## THE PENDING MOTIONS

## II.     The Edwards Motion for Partial Summary Judgment

On July 3, 2018, Ms. Edwards filed a motion for partial summary judgment seeking a determination that Great Plains' choice-of-law clause is unenforceable. Specifically, in her brief ("Edwards Br.," ECF No. 641), Ms. Edwards argues that the choice-of-law clause impermissibly applies the law of the Otoe-Missouria Tribe "to the exclusion" of the law of other jurisdictions (which is tautologically true of *any* choice-of-law clause). Edwards Br. 22. Ms. Edwards then argues that the Tribe's law should not apply because the Otoe-Missouria Tribe "does not have a substantial relationship" to the loans it gave her, based on her assertions that Think Finance provided "marketing" services and supposedly "had the predominant economic interest in the loans." *Id*. at 27. The first assertion (regarding marketing services) is true, but immaterial. The second assertion is wrong, but *also* immaterial, because, under Texas choice-of-law principles, "*a* substantial" relationship, not necessarily "*the* predominant" one, is all that is required to uphold a choice-of-law clause's validity. Indeed, Ms. Edwards concedes this. Edwards Br. 26.

Many of the facts cited in the Edwards summary judgment motion are incorrect, immaterial, or both. The facts relevant to the choice-of-law analysis are the Tribal Lenders' and the loans' connections to Tribal law when the agreements were made in 2015, 2016, and 2017. Meanwhile, the facts on which Ms. Edwards relies do not inform the choice-of-law analysis:

- Think Finance's purported relationship with the First Bank of Delaware, concededly terminated before 2011, has nothing to do with loans issued by the Tribal Lenders nearly a decade later. Edwards Br. 5-6 ¶¶ 1-8.

- Ms. Edwards does not accurately portray the relationship Think Finance had with Great Plains. A single 2011 PowerPoint presentation does not and could not summarize the full extent of Tribal involvement even then, much less four years later. Moreover, the PowerPoint outlines *the substantive responsibilities that a Tribe has in connection with a loan*, making it self-defeating for Ms. Edwards' purposes (as it establishes a substantial connection). Edwards App. 46.

- Ms. Edwards' incorrect description of Great Plains' formation in 2011 says nothing about what actually matters in the choice-of-law analysis: the Tribal Lender's role in originating, servicing, and collecting on loans in 2015 onward. Edwards Br. 9 ¶¶ 22-25, 27-30. Facts concerning Great Plains' responsibilities during the life cycle of the loans at issue are undisputed.

- Ms. Edwards did not have a loan with the Chippewa Cree Tribe; thus, for purposes of her motion, Think Finance's relationship with the Chippewa Cree is irrelevant. The activities of the Chippewa Cree and Plain Green have nothing to do with whether Ms. Edwards' loans with *Great Plains* have a sufficient nexus with the *Otoe-Missouria*. Edwards Br. 9-10 ¶¶ 31-36.

- The choice-of-law inquiry focuses on the relationship between the Tribal Lenders, the Loan Agreements, and Tribal Law. GPLS's relationship with various Think Finance entities is therefore not germane to the choice-of-law analysis and is thus immaterial to Ms. Edwards' motion for summary judgment. Edwards Br. 12-13 ¶¶ 47-51. The same is true of alleged facts concerning VPC. Edwards Br. 14-15 ¶¶ 66-76.

- The Edwards brief also mischaracterizes key aspects of the loan-funding arrangements involving GPLS. *See* Edwards Br. 10-12 ¶¶ 37-46. For instance, she concedes that VPC, an entity entirely unrelated to Think Finance, "owned a significant amount of GPLS's shares," but also states that Think Finance "purchase[d] a portion of the equity in GPLS." Edwards Br. 11 ¶ 41. What she does not state, however, is that Think SPV had only a small minority interest (typically 25%, but no more than 33%) in GPLS. That stake did not give Think SPV any management rights—those belonged only to VPC. Think's minority stake hardly substantiates her specious theory that Think Finance, *through*

20

*GPLS*, somehow "control[led] . . . operations." Edwards Br. 11 ¶ 42; *see also* TF App. 758 (Wong Decl. ¶ 8).

## III.    The Instant Cross-Motion

This motion seeks resolution of the same issues as the Edwards Motion—the enforceability of the choice-of-law provisions and the application of substantive Tribal law to her loan agreements. Insofar as Ms. Edwards' claims are concerned, this motion is a cross-motion for summary judgment.[12] But Ms. Edwards' Claims implicate only one of the two Tribal Lenders whose loans form the basis of the borrowers' proofs of claim in this matter; for that reason, Debtors also move for summary judgment on a claim brought by another Virginia borrower, the Gibbs Claim, which implicates the other Tribal Lender, Plain Green.

The bellwether trial in October in this matter involves claims by five Virginia claimants (including Ms. Edwards and Ms. Gibbs) and one Texas claimant, Ms. Miller. Thus, this motion also seeks summary judgment on the choice-of-law issue as to Ms. Miller's claims, so this Court can decide the issue as to all states implicated in the upcoming trial.

## STANDARD OF LAW

"Summary judgment is appropriate . . . if, viewing the evidence in the light most favorable to the nonmovant, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 167 (5th Cir. 2018). "A fact is material only if its resolution would affect the outcome of the action, and an issue is genuine only 'if the evidence is sufficient

---

[12] Ms. Edwards' Motion seeks partial summary judgment as to her 2015 and 2016 loans, while conceding that any resulting ruling will be dispositive of all of her "usury related claims." Motion at 2. Accordingly, for simplicity of the factual record, this Motion also seeks summary judgment on Edwards' 2015 and 2016 loans, as well as similarly dated loans for Mses. Gibbs and Miller, since the parties agree a choice-of-law ruling on these loans favorable to Think Finance will dispose of all of Claimants' usury related claims.

for a reasonable jury to return a verdict for the nonmoving party.'" *Wiley v. State Farm Fire &
Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) (citation omitted).

Choice-of-law provisions are presumptively valid. *Mitsui & Co. (USA), Inc. v. Mira M/V*,
111 F.3d 33, 35 (5th Cir. 1997). As a result, the burden falls on the party seeking to invalidate a
choice-of-law provision to prove its invalidity. *Delhomme Indus., Inc. v. Houston Beechcraft,
Inc.,* 669 F.2d 1049, 1058 (5th Cir. 1982).

## ARGUMENT

**I.**   **Texas Choice-of-Law Rules Establish that the Choice-of-Law Clauses are Valid and
Enforceable.**

Think Finance is entitled to summary judgment for the same reasons Ms. Edwards'
motion for partial summary judgment must be denied. Specifically, under Texas's choice-of-law
rules (which both sides agree apply, *see* Edwards Br. at 25), Tribal law must be enforced as the
governing law of the Loan Agreements. The parties expressly selected Tribal law to govern the
Loan Agreements, and that selection is presumptively valid. Based on the undisputed facts, there
is no question that the Loan Agreements have a substantial relationship to Tribal law, which is
all Texas law requires for enforcing a choice-of-law provision. There is no fundamental public
policy in Texas or Virginia that would override a bargained-for choice-of-law provision selecting
Tribal law. And because arms of the Tribal sovereigns have a direct financial interest in the Loan
Agreements, and because that interest reflects a broader federal and Tribal policy of promoting
tribal independence and economic development, the Tribes have the materially greatest interest
in ensuring that their laws are enforced. Thus, *all* factors considered under Texas's choice-of-law
rules favor enforcement of the choice-of-law provisions in the Loan Agreements.

### A.   **Texas Choice-of-Law Rules Supply the Governing Legal Standard.**

When a federal court sits in bankruptcy and considers claims based largely on state law,

the court applies the choice-of-law rules of the forum state, rather than choice-of-law principles arising from federal common law. *See, e.g.*, *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013); *In re Meritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir. 1988); *In re Chanel Fin., Inc.*, 102 B.R. 549, 550 (N.D. Tex. 1988) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).[13]

Despite Claimants' attempt to import an artificial "predominant economic interest" standard into these proceedings, under Texas rules, a choice-of-law provision should be honored "so long as the contract bears *a substantial relationship* to the chosen state." *Mary Kay Inc. v. Woolf*, 146 S.W.3d 813, 816 (Tex. App. 2004) (emphasis added). A substantial relationship exists when "the contacts between the transaction and the chosen state" are "reasonably related," and the "contacts themselves are not contrived in order to substantiate the choice of law." *Cook v. Frazier*, 765 S.W.2d 546, 549 (Tex. App. 1989).

If there is a relationship between the transaction or the parties to that transaction and the selected law, the provision must be honored unless another state has (i) a materially greater interest and a more significant relationship to the transaction, *and* (ii) that state has a *fundamental* public policy that would cause its courts not to honor the choice-of-law provision. *Saturn Capital Corp. v. Dorsey*, No. 01-04-00626-CV, 2006 WL 1767602, at *8 (Tex. App. June 29, 2006). "Fundamental" requires more than the mere enactment of a state law on the subject;

---

[13] Here, the distinction between federal and forum-state choice-of-law rules is not relevant in any event, as the Fifth Circuit has recognized that the inquiry is identical. *Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748-49 (5th Cir. 1981). *Woods-Tucker* was a case involving the Uniform Commercial Code's treatment of choice-of-law provisions, and Texas law treats the U.C.C. inquiry and the inquiry under section 187 of the Second Restatement as one and the same. *Salazar v. Coastal Corp.*, 928 S.W.2d 162, 166 (Tex. App. 1996); *First Commerce Realty Investors v. K-F Land Co.*, 617 S.W.2d 806, 809 (Tex. App. 1981) (the Restatement rule "has been codified in Texas: '(W)hen a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state of such other state or nation shall govern their rights and duties'").

there must be clear expression by the state's courts that they "will refuse to enforce an agreement contrary to that law, despite the parties' original intentions." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 680 (Tex. 1990).

**B.     Texas Choice-of-Law Rules Require Application of Tribal Law.**

1.     The undisputed factual record establishes the Tribes' "substantial relationship" to the loans.

Texas law does not require much to establish a "substantial relationship"—as the comments to the Second Restatement make clear, *any* substantial contact will be enough. Restatement (Second) of Conflict of Laws § 187 cmt. f (substantial relationship will exist except in "unusual situation where [selected law] is wholly fortuitous and bears no real relation either to the contract or to the parties"). "Substantial relationship" does not mean the *most* significant relationship—any reasonable relationship will do. *Bradt v. West Publ'g Co.*, No. A14-89-00694-CV, 1991 WL 230182, at *4 (Tex. App. Oct. 31, 1991) ("The determinative issue here is not which state has the 'most significant' contacts, but whether there is 'a reasonable relationship' between [the selected law] and the transaction." (citation omitted)).

Cases applying the "substantial relationship" test demonstrate that Texas does not treat the test as an onerous one. The fact that one of the contracting parties lives in the jurisdiction of the selected law and conducts business there is enough to establish the requisite relationship. *See, e.g., Cardoni v. Prosperity Bank*, 805 F.3d 573, 581 (5th Cir. 2015) ("The parties had a reasonable basis for agreeing that Texas law would apply given that Prosperity is headquartered in the state."); *DeSantis*, 793 S.W.2d at 678 ("Florida has a substantial relationship to the parties and the transaction because [the defendant's] corporate offices are there, and some of the

negotiations" took place there).[14] Meanwhile, the cases in which courts have found the requisite

substantial relationship *lacking* are extreme situations such as where a jurisdiction's only

connection to the transaction is the choice-of-law clause itself. *See*, *e.g.*, *Newby v. Enron Corp.*

*(In re Enron Corp. Sec., Derivative, & ERISA Litig.)*, 391 F. Supp. 2d 541, 585 (S.D. Tex. 2005)

("New York has no significant relationship to the parties or the policy other than the choice of

law provision. . . .").[15]

Here, it is undisputed that the Tribal Lenders are not only incorporated under tribal laws

and have their principal places of business on tribal lands—but they are also, legally, arms of the

tribes. TF App. 574 (2015 Great Plains Participation Agreement); TF App. 614 (2015 Plain

Green Participation Agreement); *see also Howard v. Plain Green, LLC*, No. 17-cv-0302, 2017

WL 3669565, at *1, *3-*6 (E.D. Va. Aug. 7, 2017); *Monahan v. Great Plains Lending, LLC*, No.

15-449, 2016 WL 6127568, at *4-5 (Fla. Cir. Ct. Sept. 30, 2016). Thus, they easily meet the test.

Nor is it surprising that a sovereign will want to use its own laws to govern its generation of

public revenue and its commercial transactions to ensure that its interests are best protected;[16]

sovereigns engaging in such commercial activity will naturally have a "substantial relationship"

---

[14] *See also*, *e.g.*, *Bradt*, 1991 WL 230182, at *4 (provision honored where selected law was home state of party and where documents were sent to and from).

[15] *See also*, *e.g.*, *Cook v. Frazier*, 765 S.W.2d 546, 549 (Tex. App. 1989) ("We are not persuaded by [the] contention that the choice of Utah law is itself a significant contact with Utah.").

[16] Indeed, many state-run commercial enterprises include choice-of-law provisions in their loan agreements that select the law of the sovereign state operating the enterprise. See, e.g., State Council of Higher Educ. for Va., *Application for Participation in the Virginia Optometry Program*, http://www.schev.edu/docs/default-source/tuition-aid-section/undergrad-grad-financial-aid/virginia-optometry-grant-loan-application.pdf ("Virginia law shall govern this note."); N.C. Hous. Fin. Agency, *N.C. Home Advantage Mortgage Program, Promissory Note*, https://www.nchfa.com/sites/default/files/page_attachments/406DAPPromissoryNote.pdf ("This Note is to be governed and construed in accordance with the laws of the State of North Carolina.").

with their own laws. *See Projects Mgmt. Co. v. Dyncorp Int'l, LLC*, No. 13-cv-331, 2014 WL

1248075, at *5 (E.D. Va. Mar. 26, 2014) (contract "to which the United States is a party" has a

"substantial relationship" with "the federal common law of government contracts"), *aff'd*, 584 F.

App'x 121 (4th Cir. 2014). Sovereignty aside, the principal place of business by itself also is

sufficient to constitute a substantial relationship. *See* Restatement (Second) of Conflict of Laws

§ 187, cmt. f; *Gator Apple, LLC v. Apple Tex. Rests., Inc.*, 442 S.W.3d 521, 533 (Tex. App.

2014) ("substantial relationship" to Kansas because party was headquartered in Kansas).  Here,

the Tribal Lenders are located on Tribal reservations.

The Restatement also allows for more than just the location of the parties to provide the

basis for the "substantial relationship"—the transaction itself can provide the requisite link. *See*

Restatement (Second) of Conflict of Laws § 187(2)(a) ("substantial relationship to the parties *or*

the transaction"). Many aspects of Claimants' loans tie them to Tribal land. The Loan

Agreements were negotiated at least in part on tribal land because tribe members employed by

the Tribal Lenders set the terms for their loans in business decisions made on tribal land. *See* TF

App. 20-21 (Harvison Dep. 127:12-24); *see also DeSantis*, 793 S.W.2d at 678. The underwriting

criteria which were used to approve the underlying loan transactions were reviewed, modified,

and approved by members of the Tribe on Tribal land. TF App. 20-21, 32 (Harvison Dep. 128:1-

6; Nguyen Dep. 130:6-14). And part of the Loan Agreements was performed on tribal lands—the

act of finally approving the Loan Agreements and the act of approving the transfer of funds to

borrowers took place on-reservation. *See* TF App. 4. Once the funds were issued from bank

accounts owned by the Tribes, call centers located on Tribal land employing Tribal residents

provided customer service for Claimants' loans. TF App. 10, 43, 44, 66, 101. (Callnin Dep.

153:3-13; Nguyen Dep. 291:19-20, 221:17-20; Smith Dep. 266:14-19; Raining Bird Dep. 57:6-

26

16). Based on a traditional application of Texas's choice-of-law principles, there is an easily discernible (and substantial) relationship between Tribal law and the Loan Agreements.  And, of course, the Tribes earned revenue from the loans, which contributed to their respective $45 million (Plain Green) and $60 million in earnings from their lending enterprises—hardly an insubstantial interest.

Tellingly, in attempting to deny the "substantial relationship," Ms. Edwards does not cite a single Texas case, either state or federal. Instead, Ms. Edwards relies on isolated decisions purporting to conduct a choice-of-law analysis for the lender known as CashCall, whose operations had virtually nothing in common with the Tribal Lenders', most prominently because CashCall did *not* involve a sovereign tribal lender, but rather an individual Native American tribe member. As explained in greater detail below, *see infra* at 35-36, the analysis in those decisions is wholly inconsistent with choice-of-law principles, which hold that parties should be able to select a jurisdiction's law so long as there is *some* connection between the parties (or the transaction) and the selected law.

Ms. Edwards' theory that the "predominant economic interest" in every transaction determines the "true lender" would mean that for every transaction only one jurisdiction could ever have the "predominant economic interest." *CFPB v. CashCall, Inc.*, No. 15-7522, 2016 WL 4820635, at *6-*7 (C.D. Cal. Aug. 31, 2016) (holding that CashCall had the predominant economic interest and thus the relevant contacts were in California, not Tribal land). But this concept is completely at odds with the Restatement's view that any number of states could have such a relationship. *See* Restatement (Second) of Conflict of Laws § 187, cmt. f. A "substantial relationship" does not mean "most significant." *See Bradt*, 1991 WL 230182, at *4 (citation omitted).

27

For that reason, the Court's analysis should end with the multiple and undisputed contacts between the Tribal Lenders, the Loan Agreements, and Tribal Law—those contacts are more than enough to establish a "substantial relationship." The "true lender" assertions on which Ms. Edwards relies are not dispositive of whether a substantial relationship exists and therefore are wholly immaterial (and incompatible with) the choice-of-law rules.  As Texas's choice-of-law rules make amply clear, "[t]he determinative issue here is not which state has the 'most significant' contacts, but whether there is 'a reasonable relationship' between [the selected law] and the transaction." *Bradt*, 1991 WL 230182, at \*4. Here, there is.

2.   <u>Neither Texas nor Virginia recognizes a policy against the loans so
fundamental it overrides the parties' selected choice of law.</u>

Ms. Edwards argues that the Tribal choice-of-law provisions should not be honored because they contravene "Virginia's fundamental policy against usury." Edwards Br. 34-36. Her argument fails because Ms. Edwards cannot meet her burden of proving that Virginia's policy against usury is *fundamental*—meaning, the policy is so important to the state that the state's courts would be willing to override a choice-of-law provision because of it. Whatever Virginia thinks of usury, it is certainly not that. The same is true of Texas—Texas imposes caps on interest rates, but also allows parties to negotiate for the application of the law of a jurisdiction that has no such caps. For that reason, Ms. Edwards, Ms. Gibbs, and Ms. Miller lack any argument that public policy should prevent enforcement of the choice-of-law provisions in their respective Loan Agreements.

Under Texas choice-of-law rules, a party may avoid application of a choice-of-law provision on public-policy grounds by demonstrating that a state with a more significant relationship *and* a materially greater interest in the contract has a fundamental policy that will be contravened by applying the chosen law. A "fundamental" policy is more than just a statutory

prohibition that would lead to a different result in the other state; it is a policy that would view a choice-of-law provision to be so abhorrent as to override the presumption of uniformity that arises from a choice-of-law provision. *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 330-31 (Tex. 2014); *see also Cherokee Pump & Equip. Inc. v. Aurora Pump*, 38 F.3d 246, 252 (5th Cir. 1994) ("The law of a state and its public policy are not necessarily synonymous. Not every law enacted by the legislature embodies the 'public policy' of the state."). To prove that a fundamental policy exists, a party seeking to avoid a choice-of-law provision must point to substantive and specific grounds demonstrating that such a strong fundamental policy exists that would invalidate a choice-of-law provision. *See Cherokee Pump*, 38 F.3d at 252-53 (noting that party seeking invalidation of choice-of-law provision failed to meet its burden of proof because it could not point to a statute or caselaw reflecting strong public policy).

Neither Texas nor Virginia has a policy against usury that is so fundamental that it would preclude application of a choice-of-law provision that selects the law of Delaware, South Dakota, Native American tribes, or any other jurisdiction with no cap on interest rates, so long as the requisite relationship to that jurisdiction exists. Indeed, loans are routinely made in Texas, Virginia, and elsewhere that import interest rates based on the law of the lenders' primary place of business. *See Penn v. Cumberland*, 883 F. Supp. 2d 581, 591 (E.D. Va. 2012); *Orcasitas v. Wells Fargo Home Mortg.*, 2013 U.S. Dist. LEXIS 93760, at *14 (N.D. Tex. Apr. 10, 2013).

With respect to Texas law, the Fifth Circuit has held that Texas courts will not bar enforcement of a choice-of-law provision on the grounds of public policy despite "the underlying policy of each state's usury laws to protect necessitous borrowers within its borders." *Woods-Tucker Leasing*, 642 F.2d at 753 n.13. The Fifth Circuit has explained that there is nothing inherently wrong with a party selecting a particular jurisdiction's law for the sake of avoiding

usury laws: "That the intent of their choice of law provision was to avoid the usury laws of some interested jurisdiction is immaterial as they are perfectly free to do just that." *Id.* at 751. The Court "found no Texas cases that have invalidated a party choice of law on grounds that the application of a foreign usury statute would violate public policy." *Id.* at 753 n.13; *accord Admiral Ins. Co. v. Brinkcraft Dev., Ltd.*, 921 F.2d 591, 594 (5th Cir. 1991).

Texas courts have since reaffirmed this principle, repeatedly. "In Texas," they hold, "there is nothing inherently violative of public policy in contracting for another state's usury laws to apply." *Saturn Capital Corp.*, 2006 WL 1767602, at *8; *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 234 (Tex. 2008) (the fact that selected forum "does not allow a corporation to maintain a cause of action for usury" does not mean the forum-selection clause is invalid—the "inability to assert [a] usury claim . . . does not create a public policy reason to deny enforcement of the forum-selection clause"); *Bradt*, 1991 WL 230182, at *4 ("Texas public policy does not forbid the choice of law of another state to control as to usury questions if there exists a reasonable connection between the contract and such other state.").

Virginia similarly lacks a policy against usury that is so fundamental so as to disrupt the parties' selected choice of law. The Virginia Supreme Court decided this point a decade ago. *Settlement Funding, LLC v. Von Neumann-Lillie*, 645 S.E.2d 436 (Va. 2007), *enforces* a choice-of-law provision despite the fact that the selected law had no caps on interest rates and the interest rates in that case exceeded Virginia's usury cap. Rejecting a challenge to a Utah choice-of-law clause in a consumer loan contract (a state which lacked a cap on interest rates), the Virginia Supreme Court held that "[i]f a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied." *Id.* at 438. The court did so *despite* the borrower's contentions that enforcing the

choice-of-law provision would run afoul of Virginia's public policy. *See* Appellee's Br., *Settlement Funding, LLC v. Neumann-Lillie*, No. 061373, 2006 WL 4701777, at *3 (Va. filed Jan. 5, 2007).

Because Ms. Edwards fails to establish that the Virginia Supreme Court would decline to enforce a choice-of-law provision on grounds that it would violate the Commonwealth's fundamental public policy against usury, she has failed to meet her burden. *See Cherokee Pump*, 38 F.3d at 252-53. The same conclusion naturally applies to the Gibbs loan agreement. And Texas law demonstrates resoundingly that Texas courts would honor a choice-of-law provision even if the jurisdiction selected has no interest rate caps. So this Court must reach the same conclusion as to Ms. Miller's claims, too.

3.   Ms. Edwards' claim that "Virginia has a materially greater interest than the Otoe-Missouria Tribe in the application of its laws" also finds no support in the law or the undisputed record.

A party looking to evade his or her agreed-upon choice of law must not only demonstrate the existence of a fundamental public policy against enforcing the agreement, but *also* that the alternative jurisdiction has a "materially greater" interest in the parties and the transaction. *Exxon Mobil*, 452 S.W.3d at 326. The Edwards, Gibbs, and Miller claims fail on this independent ground because sovereigns generally have a "strong interest in enforcing [their] residents' contracts, even those concerning work done out of state"—particularly when the interest concerns an industry vital "to [the] state, its economy, and its people." *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 179-80 (Tex. App. 2002).

To support her argument that Virginia's interest in the Loan Agreements is materially greater than the Otoe-Missouria tribe, Ms. Edwards invokes the public policies of several states on the issue of interest rates. Edwards Br. 37-38 & n.15. Oddly, she omits the one state whose

interest she is ostensibly seeking to vindicate: Virginia. And Virginia, as explained above, does *not* have an interest in enforcing its usury laws that is so great as to invalidate a choice-of-law provision. *See Settlement Funding*, 645 S.E.2d at 438.

The Tribes, on the other hand, have a federally recognized interest in pursuing economic independence as sovereign nations. As the Supreme Court has explained repeatedly, "[s]elf-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 219 (1987). Part of the "broad federal commitment" to Tribal sovereignty includes the Tribes' ability to "undertake and regulate economic activity." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 335 (1983). The ability to invigorate economic development through creative means is particularly important for the Tribes, who often do not have the traditional means of taxation to which larger sovereigns, such as States, may resort.  TF App. 358-61 (NAFSA Amicus Brief).  The Tribes' economic interest here is substantial (with their combined $105 million in earnings), and their interest in "build[ing] . . . vigorous economies" by "enter[ing] into contracts" and "trad[ing] freely" is recognized in federal law. 25 U.S.C. § 4301(a)(4), (7).

The Tribes have pursued their sovereign interest in economic independence by allowing short-term loans with rules intended to promote the free flow of capital. The Otoe-Missouria's lending enterprise "accounts for close to half of the Tribe's nonfederal tribal budget, and has provided critical funding for new tribal housing and renovations." TF App. 272 (Shotton *CFPB* Declaration). Great Plains' revenues have been "used towards additional classrooms, books, and teachers," as well as "child care services, employment training, health care and wellness

coverage, child protection, and family violence protection." *Id.*; *see also* TF App. 358-61 (NAFSA Amicus Brief).

Plain Green's revenues have similarly benefited the Chippewa Cree. The Chippewa Cree Tribal government has used the funds received from Plain Green to "promot[e] the general welfare of the Tribe and its members, including development of a Tribal health clinic; funding Tribal community events, such as ceremonies and pow-wows; funding school supplies and medical equipment for Tribal members; and funding subsistence distributions to Tribal members." TF App. 280 (Whitford *Gibbs* Declaration); *see also* TF App. 106 (Raining Bird Dep. 75:20-76:21) ("[W]e're doing things that were not just a benefit to ourselves but to the entire community.")

Moreover, as a matter of sovereign policymaking, the decision *not* to penalize higher interest rates and the free movement of capital can be just as "materially great" an interest as another state's interest in limiting interest rates, as one of Ms. Edwards' own authorities recognizes:

> Of course, the lack of a usury law or licensing law does not necessarily mean that the [tribe] has a less substantial concern than the Subject States in interest rates and licensing. Indeed, the lack of such laws may instead merely "reflect a choice to favor individual contract decisions and the free flow of capital."

*CFPB*, 2016 WL 4820635, at *8 (citation omitted).

Here, there is much more to the Tribes' interest than just "the widely recognized interest of enforcing a choice-of-law provision." Edwards Br. 39. The Tribes have a sovereign interest to ensure that their own laws are used to protect their proprietary interests. That interest is "materially greater" than any other sovereign's interest because it concerns a vital industry of "importance . . . to [the Tribes], [their] econom[ies], and [their] people." *See Chesapeake Operating, Inc.*, 94 S.W.3d at 180. The Tribes' interest in securing economic independence and

providing for their members vastly outweighs Virginia's lukewarm interest in enforcing its usury laws against fellow sovereigns, especially given its supreme court's willingness to enforce choice-of-law provisions requiring payment of interest rates clearly above the usury limit.

With no contrary public policy and no interest materially greater than the Tribes', the Loan Agreements' choice of Tribal law must be enforced under Texas's choice-of-law rules. This mandates the denial of Ms. Edwards' motion for summary judgment seeking the enforcement of Virginia law, and the entry of judgment in Think Finance's favor on all claims dependent on state laws that do not, and cannot, apply here.

### C. "True Lender" Arguments are Irrelevant to the Choice-of-Law Analysis and, In Any Event, Think Finance Is Not CashCall and Is Not the "True Lender."

In her brief, Ms. Edwards raises, as a supposed "gatekeeping" issue, the question of "the identity of the 'true lender' of these loans." Edwards Br. 2. She contends that this issue "is relevant to Plaintiff's claim under Va. Code § 6.2-1541, which limits liability to the lender." *Id*. at 4 n.4. But this claim is not brought against the Tribal Lenders (nor could it be)—it is brought against six Think Finance–affiliated entities. *See* ECF No. 211. Thus, the only way Claimants can prevail on this claim is if they can find some way to call the six Think Finance–affiliated entities "the lender," and simultaneously establish that the Tribal Lenders are *not* "the lender"— hence Ms. Edwards' implied characterization of the Think Finance entities as the "true" lender.

This argument is defective on multiple fronts. First, as Ms. Edwards concedes, it is relevant only to a substantive "liability" analysis (Edwards Br. 4 n.4.)—it is not relevant to the *choice-of-law* analysis that must *precede* the liability analysis. Second, it fails on the merits— longstanding Fifth Circuit precedent, along with the overwhelming weight of authority from every court to consider the issue *until* CashCall, preclude Ms. Edwards from calling the Think Finance entities the "lender" merely on account of a (false) contention that they acquired a

"predominant economic interest in the loans." *Id.* at 27. (That contention isn't true and isn't even supported by the record evidence Ms. Edwards cites, but it would be legally immaterial even if it *were* true.)

<ul>
<li style="list-style:none">1.    <u>Substantive "liability" questions do not inform the choice-of-law analysis.</u></li>
</ul>

Invoking *substantive law* to determine which jurisdiction's substantive law applies is impermissibly circular. Yet Ms. Edwards concedes that her characterization of the Debtors as having "the predominant economic interest in the loans" goes to the "liability" analysis for her "claim under Va. Code § 6.2-1541"—not the choice-of-law analysis. Edwards Br. 4 n.4. And the minority of courts that have performed this "predominant economic interest" inquiry have likewise made clear that it goes to "*the merits*" of the claim. *CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300, at *14 & n.19 (W. Va. May 30, 2014). But substantive law going to the "merits" (*id.*) or to a "liability" analysis "under Va. Code § 6.2-1541" (Edwards Br., *supra*) has no place in a *choice-of-law* analysis.[17] The whole *point* of a choice-of-law determination is to decide which substantive law applies in the first place. Ms. Edwards cannot establish that Virginia law should apply by arguing that Virginia law (much less the law of some other unspecified jurisdiction) would deem the Think Finance entities the "true lender."

---

[17] *See Estate of Thorne by Thorne v. South Park Motor Lines, Inc.*, No. 06-0033, 2006 WL 8435583, at *2 (D. Wyo. Nov. 2, 2006) (noting that an argument that Colorado substantive law should apply in resolving choice-of-law question is "a circular process of legal analysis" that "clearly misapprehends application of choice of law rules"); *CNL Hotels & Resorts, Inc. v. Houston Cas. Co.*, 505 F. Supp. 2d 1317, 1319 (M.D. Fla. 2007) ("a choice of law issue . . . must be resolved before the substantive points may be addressed"); *Crowley v. Chait*, No. 85-2441, 2004 WL 5434953, at *5 n.4 (D.N.J. Aug. 25, 2004) ("[A] full discussion of choice of law in general is appropriate before addressing the substantive merits . . . ."); *A/S Kreditt-Finans v. Cia Venetico De Navegacion S.A. of Panama*, 560 F. Supp. 705, 710 (E.D. Pa. 1983) ("Before one can address that substantive question, it is necessary to determine a choice-of-law question. . . .").

Accepting Ms. Edwards' invitation to perform a substantive analysis of the "true lender" at the choice-of-law stage would turn choice-of-law analysis on its head: the Court would have to use substantive law to decide which substantive law to apply. This is unsustainable, because choice-of-law rules are intended to *avoid* such inquiries—indeed, those rules must be construed in a way that protects the parties' "justified expectations," along with "certainty, predictability and uniformity of result" in a manner that is "simple and easy to apply." *Grant Thornton LLP v. Suntrust Bank*, 133 S.W.3d 342, 360-61 (Tex. App. 2004). Skipping ahead to the "liability" analysis in order to make the choice-of-law determination promotes none of these principles.

As set forth above, the law applicable to the choice-of-law determination is not the law of whichever unspecified jurisdiction may (or may not) impose a true-lender analysis, but Texas's choice-of-law rules. And as we have already seen, the relevant question for Texas's choice-of-law rules is not which party is the "true lender," but whether the chosen jurisdictions—the Tribes—have a "substantial relationship" to the transactions or the parties. Even if Ms. Edwards were *right* that a true-lender analysis were relevant to the merits *and* that the Tribal Lenders would not be found the true lenders under that analysis, those arguments do nothing to change the fact that the Tribes—in their capacity as lenders or any other type of beneficiary of the loan transactions—have a "substantial relationship" to the loans based on their revenue from the loans, their role in servicing the loans, the Tribe members employed in those functions, the Tribal Lenders' incorporation under tribal law, and their interest in using their commercial enterprises to raise funds for their governments. *See supra* at 5-6 (discussing the Tribes' heavy reliance on lending revenues to fund "essential tribal services" such as education, childcare, and healthcare); *Cabazon Band of Mission Indians*, 480 U.S. at 220 (recognizing Native American

tribes' "strong incentive" to "generate[] funds for essential tribal services and provide[] employment for tribal members").

All of these facts establishing the Tribes' substantial relationship to the loans are undisputed here. The only question is how much weight they carry. Texas choice-of-law rules assign them dispositive weight and require that Tribal law, not Virginia (or any other) substantive law, be applied here. (Needless to say, this also negates Ms. Edwards' theory that she is entitled to summary judgment on her claim challenging the "receiving" of payments even without regard to who is the "true lender" (Edwards Br. 4), as she concedes that this claim only exists "under Virginia law," which does not apply).

2.      Ms. Edwards' "true lender" theory also fails on the merits.

Ms. Edwards relies on the *CashCall* cases in urging this Court to find the Think Finance entities the "true lender" of the Tribal Lenders' loans. This framing of the issue is telling. Ms. Edwards appears to presume these cases apt simply because they also involved lending agreements that sought to invoke tribal law, and thus she would consign this case and the *CashCall* cases to the same "tribal lending" bucket on that superficial basis. The problem with this theory is that the Tribal Lenders' enterprises here have virtually nothing in common with the enterprise challenged in *CashCall*, but *everything* in common with the industry-standard way lending operations have been structured for *decades* well before Native American tribes entered the scene. *See* ECF No. 407, Ex. 5, at 10 (expert report of Ronald Mann) ("[I]t has for many years been customary in many sectors of finance for entities that make loans promptly to sell all or a portion of their loans to a third party"). For example, the practice of originating loans and selling interests to outside investors is standard in the home-mortgage market and student-loan markets, with investors like Fannie Mae, Freddie Mac, and Sallie Mae routinely purchasing the

entire beneficial interest in loans originated by others. Thus, an abundance of precedent, including Fifth Circuit precedent, holds that outside investments in loans (even "predominant" interests) do not make investors the "true lender" or deprive the originating lender of its legal status as lender. Seen in that light, the relevant law here is not the tiny bucket of three *CashCall* cases, but the much larger bucket of cases upholding lenders' interests in their loans against challenges to their investors or assignees.

For example, in *FDIC v. Lattimore Land Corp.*, 656 F.2d 139 (5th Cir. 1981), the Georgia-based Lattimore Land Corp. took a loan from a lender which assigned 91.48% of its interest in the loan to an affiliated Tennessee bank. *See id*. at 140-41. "There was no contention . . . that the interest was usurious under Georgia law," but Lattimore urged the court to apply a 10% interest-rate cap under Tennessee law based on the Tennessee entity's 91.48% assigned interest in the loan. *Id*. at 146. The Fifth Circuit refused. "Applying normal choice of law rules to the present case, we think the Georgia usury laws should guide this Court and the note, initially non-usurious, remains so. The non-usurious character of a note should not change when the note changes hands." *Id*. at 148-49 (citing *Huntsman v. Longwell*, 4 F.2d 105, 106 (5th Cir. 1925)). So too here. Loans made by the Tribal Lenders under tribal law cannot become "invalidated by a subsequent transaction" and somehow become governed by the law of another jurisdiction simply because the Tribal Lenders sell participation interests. *Huntsman*, *supra*. That is *especially* so where "encourag[ing] investment from outside sources that do not originate with the tribes" and "facilitat[ing] economic ventures with outside entities that are not tribal entities" are *express* federal policies. 25 U.S.C. § 4301(a)(9).

Numerous other courts have applied the same principle when borrowers argue that lenders that sell participation interests or assign loans outright to outside investors are not the

"true lenders." *E.g.*, *McIntosh v. Bank of Am., N.A.*, No. 12-4336, 2013 WL 3866619, at *6 (N.D.

Tex. July 26, 2013) (rejecting theory that because "Fannie Mae acquired the[] loan seven days

after they closed on it," "BANA was not the true lender"); *Krispin v. May Dep't Stores Co.*, 218

F.3d 919 (8th Cir. 2000) (for purposes of usury claims, "it makes sense to look to the originating

entity . . . , and not the ongoing assignee").[18] The district court in *Hudson*, *supra* n.18, for

---

[18] *See also*, *e.g.*, *Cottage Sav. Ass'n v. C.I.R.*, 499 U.S. 554, 557 n.3 (1991) ("each party retained
its relationship with the individual obligors" notwithstanding sale of 90% participation interests);
*Hudson v. ACE Cash Express, Inc.*, No. IP 01-1336-C, 2002 WL 1205060, at *3-*4 (S.D. Ind.
May 30, 2002) (dismissing usury claim based on theory that originating lender was not "the
actual lender" because outside investor "was required to purchase an undivided 95%
participation interest in these loans"); *Lehnerd v. E-Loan, Inc.*, No. 14-cv-1811, 2015 WL
13333686, at *3-*4 (D. Ariz. July 31, 2015) (rejecting theory that "because the lender securitized
his mortgage, the investors are the true beneficial owners and real parties in interest," and finding
"erroneous" plaintiff's belief that "once his loan was securitized, the lender no longer had any
interest in his Note"); *Walsh v. Household Fin. Corp. III*, No. 15-4112, 2016 U.S. Dist. LEXIS
160264, at *13 (D.N.J. Nov. 17, 2016) (finding that if a lender "rather than drawing on its own
funds, caused the funding to issue from some third party, that would not vitiate its status as the
party that contracted with Plaintiffs"); *Jones v. Countrywide Homeloan*, No. 11-cv-0405, 2011
WL 2462845, at *5 (E.D. Cal. June 16, 2011) ("It does not follow that any of the [] entitlements
of the lender . . . are transferred or lost because of the transfer or sale of the cash flow due from
the mortgage."); *Zivanic v. Wash. Mut. Bank, F.A.*, No. 10-0737, 2010 WL 2354199, at *6 (N.D.
Cal. June 9, 2010) (finding no "legal basis" for allegation that "the true lenders and owners of the
loan are the individual investors of the securitized loan"); *McFarland v. JP Morgan Chase Bank*,
No. 13-1838, 2014 WL 4119399, at *6 (C.D. Cal. Aug. 21, 2014) ("no legal support" for claim
that originating lender "is only a nominal lender because there was no loan, only an investment
security"); *Shetty v. Nationstar Mortg., LLC*, No. B272283, 2018 WL 346129, at *3, *8 (Cal. Ct.
App. Jan. 10, 2018) (citing federal court's rejection of argument that originating lender "was not
the true lender" due to its "subsequent transfers of rights and interests in the[] mortgage loan,"
and finding it "unclear" why its "status as the lender . . . or its legal interest in the [] loan would
be affected by whether it funded [the] loan using money obtained from an outside source");
*Sidorenko v. Nat'l City Mortg. Co.*, No. 12-5180, 2012 WL 3877749, at *2 (W.D. Wash. Sept. 6,
2012) ("'true lender' arguments" based on loan securitization "fail as a matter of law"); *Sawyer
v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1368-70 (D. Utah 2014) ("Plaintiff's argument that
the banks . . . are not the true lender or the real party in interest are unavailing" where the bank
"holds the credit receivables for two days, continues to own the accounts, and shares in the
financial upside of the program based on the amount of interest collected"); *Stillwater
Liquidating LLC v. Net Five at Palm Pointe, LLC*, 559 B.R. 563, 599-600 (Bankr. S.D.N.Y.
2016) (noting "the prevalence of participation interests in modern finance" and finding no
transfer of a loan where the lender "did not purport to transfer [] a direct ownership interest . . .

example, characterized *Krispin* as holding that "the real party in interest" is the originating lender even if an assignee's "daily purchase" of the loans "significantly reduced the [originating lender]'s financial stake and risk of loss." 2002 WL 1205060, at *5. That holding reflects the weight of authority on this issue.

The *CashCall* cases stand alone in departing from this body of law to hold that CashCall as an investor, and not the originating lender owned by a Sioux tribe member, is the "true lender." The court that accepted that theory even *admitted* that "there was no case law that clearly established" that a true-lender analysis could be used to hold the challenged transactions unlawful "until" that court's own ruling. *CFPB*, 2018 WL 485963, at *13, *15. And that ruling is of dubious provenance: The first *CashCall* case to articulate the "predominant economic interest" test (which, it must be noted, was a decision "on the merits," not a choice-of-law case), relied on *People ex rel. Spitzer v. County Bank of Rehoboth Beach*, 846 N.Y.S.2d 436 (N.Y. App. Div. 2007), for the test. *See CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300, at *14 (W. Va. May 30, 2014). *Spitzer*, however, invented the test out of whole cloth, citing not a single decision for the proposition that "an examination of the totality of the circumstances . . . must be used to determine who is the 'true lender,' with the key factor being 'who had the predominant economic interest' in the transactions." 846 N.Y.S.2d at 439.[19]

---

in the underlying loans themselves" but only "the right to receive portions of Payments, but only to the extent that [the lender] actually received such Payments"); *see also generally Beechum v. Navient Solutions, Inc.*, No. 15-8239, 2016 WL 5340454, at *7 (C.D. Cal. Sept. 20, 2016) (collecting cases holding that courts "look only to the face of [the] transaction" in adjudicating exemptions from usury laws and other statutory requirements).

[19] Other courts that have assessed who holds the "predominant economic interest" in the transactions have done so only on the basis of specific, codified statutes in the jurisdiction that supplies the governing law. *E.g.*, *Ga. Cash Am., Inc. v. Greene*, 734 S.E.2d 67, 72 (Ga. Ct. App. 2012) (citing O.C.G.A. § 16-17-2 (Georgia statute providing that an agent "shall be considered a de facto lender if the entire circumstances of the transaction show that the purported agent holds,

Even considering the merits of Ms. Edwards' "true lender" argument, there is no basis for Ms. Edwards' presumption that a "true lender" analysis here would lead to the same result as in *CashCall*. The distinctions referenced above are just the tip of the iceberg. The Tribes' and Tribal Lenders' roles in the loans they made here is different in every material respect from the CashCall loans, which were originated merely by a company owned by a single member of a tribe, and Think Finance's role here is different in every material respect from CashCall's role:

- The named lender in *CashCall*, Western Sky Financial, LLC, was "a South Dakota, LLC, not a member of the Tribe." *Inetianbor v. CashCall, Inc.*, No. 13-cv-60066, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *accord MacDonald v. CashCall, Inc.*, No. 16-2781, 2017 WL 1536427, at *14 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018). The Tribal Lenders here *are* arms of sovereign Tribes, and as sovereigns, it is reasonable for them to apply their own laws to protect their sovereign interests. *See Howard*, 2017 WL 3669565, at *1, *6 (Plain Green is an "arm" of the Chippewa Cree Tribe, "a federally recognized Indian tribe with a reservation in Montana"); *Monahan v. Great Plains Lending, LLC*, No. 15-449, 2016 WL 6127568, at *1, *4-5 (Fla. Cir. Ct. Sept. 30, 2016) (finding that Great Plains is an arm of the "federally recognized Otoe-Missouria Tribe of Indians"); *cf. Projects Mgmt. Co.*, 2014 WL 1248075, at *4 (agreement has "substantial relationship" with federal law because the federal government is a party).

- In the CashCall arrangement, "little work relevant to the loan" took place on the reservation. *Inetianbor*, 2015 WL 11438192, at *3. CashCall not only marketed but also dictated the underwriting criteria and funded, purchased, and serviced the loans, which the CashCall courts found dispositive. *See Inetianbor*, 2015 WL 1143192, at *3 ("CashCall took Inetianbor's phone calls. . . . CashCall ran Inetianbor's credit report. CashCall reviewed the application and called to request additional information. . . . [T]he loan [] would be serviced by CashCall. All of Inetianbor's payments were to CashCall."); *Morrisey*, 2014 WL 2404300, at *7 (loan funded "only if CashCall's underwriting guidelines were followed"). Here, by contrast, the Tribal Lenders and members of the Tribes working on tribal lands:

  - Played a principal role designing their loan offerings and approving the marketing campaigns that attracted prospective borrowers—as evidenced by the fact that Plain Green and Great Plains had substantially different underwriting requirements, based on their own respective commercial strategies and risk appetites. TF App. 20-21, 32 (Harvison Dep. 128:1-6; Nguyen Dep. 130:6-14).

---

acquires, or maintains a predominant economic interest in the revenues generated by the loan")). But there is no basis to hold this analysis appropriate *absent* such a statute.

- o  Set the underwriting parameters for the loans. TF App. 20-21.

- o  Retained the exclusive right to decline loan applications. TF App. 32, 58, 61 (Nguyen Dep. 130:8-14; Smith Dep. 105:5-107:4, 150:15-151:16).

- o  Responded to current and prospective customer inquiries. TF App. 10, 43, 44, 66, 101 (Callnin Dep. 153:3-13; Nguyen Dep. 291:19-20, 221:17-20; Smith Dep. 266:14-19; Raining Bird Dep. 57:6-16). Indeed, in contrast to CashCall's taking all borrower "phone calls" (*Inetianbor*, *supra*), there is no evidence here that any of the Think Finance entities *ever* communicated with Mses. Edwards, Gibbs, or Miller.

- o  Conducted verifications and "request[ed] additional information" needed to complete or process loan applications. TF App. 40-41 (Nguyen Dep. 206:9-18, 209:4-8).

- o  Serviced the loans and collected loan payments. TF App. 10, 40-41, 72, 107 (Callnin Dep. 153:3-13; Nguyen Dep. 206:9-18, 209:4-8; Lutes Dep. 167:9-15; Raining Bird Dep. 81:16-19).

- • CashCall owned all the loans made by Western Sky. *See CFPB*, 2016 WL 4820635, at *6. Here, the Tribal Lenders owned (and continued to own following the sale of participation interests) each of the loans that they made. TF App. 53.

- • Western Sky was guaranteed a riskless "minimum payment of $100,000 per month" and bore no risk of loss on account of an indemnification agreement. *CFPB*, 2016 WL 4820635, at *6. Here, the Tribal Lenders bore their fair share of economic risk, were not indemnified by Think Finance or anybody else, and earned revenue based on their participation interests in the loans. For the time period relevant to this choice-of-law analysis, Plain Green maintained, at a minimum, 10% participation interest in its loans, and Great Plains maintained, at a minimum, 3.25% participation interest in its loans. TF App. 619 (2015 Plain Green Participation Agreement); TF App. 577 (2015 Great Plains Participation Agreement).

Meanwhile, the facts in common with the CashCall structure are immaterial and superficial. CashCall created marketing materials and provided technological "support services on the website where [borrowers] applied for the loan[s]." *Inetianbor*, 2015 WL 11438192, at *3. But marketing and technological support are among *the* most commonly outsourced functions, and nobody has ever dared to suggest that, say, an outside advertising agency is the "true lender" on a loan when it provides services to a bank instead of a tribe. Equally immaterial is the Tribal Lenders' sale of participation interests to outside investors—this is industry-standard practice

and an inherent feature of a modern economy, as discussed above. Regardless, the interests the Tribal Lenders retained in the loans (up to 10%) are more than sufficient to tie their economic interests to the success of the loans as a financial matter, as their $105 million in combined earnings demonstrate. These substantial participation interests are in marked contrast to the *zero percent* interest retained by Western Sky in CashCall, and CashCall's *one hundred percent* ownership of the Western Sky loans is in marked contrast to GPLS, not Think Finance, being the primary investor in the participation interests in the loans.[20]

*    *    *

Ms. Edwards' reliance on the *CashCall* cases is thus completely without merit. But the more important, fundamental point is that *CashCall*'s "true lender" analysis has no place in a *choice-of-law* analysis, even apart from the merits. This may explain why, despite Ms. Edwards' eagerness to identify the "true lender" question as a "'gatekeeping' issue[] that must be resolved," Ms. Edwards never expressly connects this issue to the choice-of-law issue, and never actually articulates *why* the Tribal Lenders are not the "true lenders" except in the most superficial, conclusory manner.

### D.    There Is No Basis for Ms. Edwards' "Prospective Waiver" Argument.

Perhaps recognizing that Texas's choice-of-law rules are of no help to her position, Ms. Edwards' primary argument relies on alleged *federal* interests and a claim that the choice-of-law clause supposedly operates as a "prospective waiver" of federal rights. Ms. Edwards relies on a

---

[20] Perhaps the plainest sign that Think Finance is not CashCall comes from the fact that Think Finance *rejected* an opportunity to do business with CashCall's affiliate, Western Sky, an entity with a simple business license from the Cheyenne River Sioux Tribe with no sovereign affiliation. Western Sky's proprietor, Butch Webb, who was simply a member of the Tribe, approached Think Finance for a partnership. Think Finance was particularly concerned about the lack of Tribal involvement—that "there didn't seem to be an arm of the tribe in any way involved." TF App. 76, 78 (Rees Dep.).

statement the Supreme Court made in passing that "important federal statutory rights" may not be prospectively waived in a contract, *Am. Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228, 241 (2013), and dicta opining that this extends to "choice-of-forum clauses," which she equates (without explanation) to choice-of-*law* clauses. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 637 n. 19 (1985); *see* Edwards Br. 21.[21]

The Fifth Circuit has never embraced (or addressed) the prospective waiver doctrine. So Ms. Edwards relies on out-of-circuit decisions to argue that the choice-of-law provisions in the Loan Agreements constitute an "unambiguous and categorical waiver of federal statutory rights." Edwards Br. 21 (citing *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 335 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016)). But even assuming the prospective-waiver doctrine applies as Ms. Edwards says it does—*i.e.*, that *federal rights* may not be prospectively waived through a choice-of-law provision—Ms. Edwards' claim of prospective waiver fails for the basic reason that she does not actually identify any waiver of federal rights in her contracts. (Indeed, she is pursuing federal claims in this proceeding.)

Instead, as purported evidence of waiver, she cites the provision stating:

YOU AGREE THAT THIS LOAN IS MADE WITHIN THE TRIBE'S JURISDICTION AND IS SUBJECT TO AND GOVERNED BY TRIBAL LAW AND NOT THE LAW OF YOUR RESIDENT STATE. . . . You further understand, acknowledge and agree that this Loan is governed by the laws of the

---

[21] It is worth noting that the cases on which Ms. Edwards principally relies are cases in which a party seeks enforcement of a choice-of-law provision *in conjunction* with the enforcement of an arbitration provision. *Am. Exp.*, 133 S. Ct. at 2307 ("contractual waiver of class arbitration"); *Mitsubishi Motors*, 473 U.S. at 616 ("a valid arbitration clause in an agreement embodying an international commercial transaction"); *Dillon*, 856 F.3d at 331-32 ("we consider the enforceability of an arbitration agreement"); *Hayes*, 811 F.3d at 668 (appeal arose from motion to compel arbitration). It is *both* an arbitration provision and a choice-of-law provision, *acting in concert*, that can convert "a choice of law clause into a choice of no law clause." *Hayes*, 811 F.3d at 675. Here, no arbitration is being pursued.

> Otoe-Missouria Tribe and is not subject to the provisions or protections of the laws of your home state or any other state.

Edwards App. 298, 306. By their express terms, these provisions can only be read as a waiver of claims brought under *state* law, which parties may permissibly do under choice-of-law provisions. *See Woods-Tucker*, 642 F.2d at 748-49. No federal rights have been waived—or even mentioned.

Next, she points to this language:

> **GOVERNING LAW; NON-APPLICABILITY OF STATE LAW; INTERSTATE COMMERCE:** This Agreement and the Agreement to Arbitrate are governed by Tribal Law and such federal law as is applicable under the Indian Commerce Clause of the Constitution of the United States of America. We do not have a presence in Oklahoma or any other state of the United States of America. Neither this Agreement nor the Lender is subject to the laws of any state of the United States. The Lender may choose to voluntarily use certain federal laws as guidelines for the provision of services. Such voluntary use does not represent acquiescence of the Otoe-Missouria Tribe to any federal law unless found expressly applicable to the operations of the Otoe-Missouria Tribe.

Edwards App. 303-04. The first sentence of this provision does not waive any federal rights; to the contrary, it recognizes that certain federal laws may be applicable. The next two sentences only reiterate what the agreement previously stated: Tribal law will apply, not state law. Ms. Edwards asserts that the sentences regarding "voluntary use" of federal laws constitute a waiver of federal rights. Yet Ms. Edwards does not actually *name* any federal rights waived, because there aren't any. The plain language of the provision acknowledges "federal law" may be found "expressly applicable" and simply preserves the Tribes' sovereign immunity outside that sphere.[22] The Tribal Lenders, like other arms of the Tribal sovereign, are entitled to sovereign

---

[22] *See* Edwards App. 298 ("Both the lender and the Tribe are immune from suit in any court unless the Tribe . . . expressly waives that immunity . . . ."); Edwards App. 305 (accommodation of arbitration location "shall not be construed . . . as a relinquishment or waiver of the sovereign status or immunity of the Tribe").

immunity, *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2031 (2014), and the provisions

concerning federal law merely preserve that immunity insofar as Congress has not abrogated it;

they also reflect the axiom that not *all* federal laws apply to tribes in the first place. *See EEOC v.*

*Karuk Tribe Housing Authority*, 260 F.3d 1071 (9th Cir. 2001) (holding that Age Discrimination

in Employment Act does not apply to tribal housing authority).

The lack of an "unambiguous and categorical waiver of federal statutory rights" is

particularly clear when the Loan Agreements are compared to the agreements at issue in cases

like *Dillon*. Ms. Edwards' assertion that the Loan Agreements "include[] the same language" as

the language found to be impermissible in *Dillon* is demonstrably false. Edwards Br. 22. The

*Dillon* agreement specifically stated "that no . . . federal law or regulation shall apply to this

Agreement, its enforcement or interpretation." 856 F.3d at 336. That language is absent here. In

light of the Loan Agreements' admission that federal law may be found "expressly applicable to

the operations of the Otoe-Missouria Tribe," there is no reasonable way to construe the contracts

as containing an "*unambiguous* and *categorical* waiver" of federal rights—especially where Ms.

Edwards cannot even identify the federal right or rights supposedly waived. *Dillon*, 856 F.3d at

335 (emphasis added).

## II.    Even Without a Choice-of-Law Clause, Tribal Law Would Apply Because the Tribes Have the Most Significant Relationship to the Loan Agreements.

If an agreement lacks a choice-of-law provision or the provision is held ineffective, Texas

choice-of-law rules require a court to apply the substantive law of the state "which, *with respect*

*to [the] issue* [that is the subject of the litigation], has the most significant relationship to the

transaction." *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 169

(Tex. App. 2002) (emphasis added). Because the Virginia- and Texas-law claims turn on the

interest rates set by the Tribal Lenders, this question would turn on which state has "the most significant relationship" to *that* aspect of the Loan Agreements, not the contract generally. *Id.*

The Second Restatement (incorporated in Texas's choice-of-law rules) sets forth five factors "to be taken in account . . . to determine the law applicable to an issue" absent an effective choice-of-law clause: "(a) the place of contracting, the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188(2). Each of these factors either supports a finding that Tribal law is the appropriate law to apply or at least weighs equally in favor of Tribal law or State law:

- **The "last act" necessary for contract formation occurred on Tribal lands (place of contracting).** The place of contracting is defined as "the place where occurred the last act necessary . . . to give the contract binding effect." Restatement (Second) of Conflict of Laws § 188, cmt. e. It is true that the "last act" typically occurs at the place of acceptance, *Cardoni*, 805 F.3d at 583, but the "last act" here requires more than the parties' signatures. The Loan Agreements were not complete and binding until the Tribal Lenders were satisfied that the consumer met previously established standards of creditworthiness. *See Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 840-41 (5th Cir. 2004); Edwards App. 306 ("You further acknowledge that we may withhold funding of your Loan until (i) we confirm that you have made all payments on any previous loans with Lender, (ii) *we verify that all information you gave us on your application is true* and (iii) *we decide whether you meet our requirements to receive the Loan*.") (emphasis added). Under the Second Restatement's "last act" rule, the last act necessary was the funding of the loan, and it is undisputed that this took place on Tribal lands. *See* TF App. 4.

- **The Loan Agreements' terms were negotiated on Tribal land (place of negotiation).** The place of negotiation is the place where the terms of the contract are set and agreed upon. *See Maxus Exploration Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 51 (Tex. 1991). The place of negotiation is "of less importance when there is no single place of negotiation." Restatement (Second) of Conflict of Laws § 188, cmt. e; *see also Maxus*, 817 S.W.2d at 51 (applying Kansas law despite Texas being the place of negotiation). But to the extent that this factor favors any party, it favors the Tribal Lenders, as it is undisputed that the underwriting criteria by which applications were selected for denial or initial approval were approved on Tribal land and form the terms of the Loan Agreements that were approved on Tribal land, and there is no

47

asserted evidence of any further negotiation of the terms by the borrowers. TF App. 20-21, 32 (Harvison Dep. 128:1-6; Nguyen Dep. 130:6-14).

- **The place of performance is Tribal lands, not the States.** For money loans, the place of performance is the place "where the contract requires that repayment be made." Restatement (Second) of Conflict of Laws § 195. That is true even if the borrower asserts the contract is invalid on grounds of usury. *Id.* § 195, cmt. a. Here, the place of repayment (and thus, performance) is clearly Tribal land. *See* Edwards App. 308 ("for forwarding to and receipt and processing on the Otoe-Missouria Indian reservation"); *see* TF App. 715 (Gibbs Loan Agreement) (same for Chippewa Cree). Ms. Edwards argues that section 195 does not support the application of Tribal law because paper check payments are sent to a Pennsylvania address. Edwards Br. 34 n.13. But even if her argument were true, that factor does not support the application of *Virginia* law, and Pennsylvania lacks any other ties to the Loan Agreements. Moreover, Mses. Edwards, Gibbs, and Miller elected to make their payments by ACH withdrawal; their withdrawn funds were electronically delivered to the Great Plains bank account, or the Plain Green bank account. TF App. 375-76 (Smith Dec. ¶¶ 28-32).

- **The remaining factors favor state or Tribal law equally.** Ms. Miller is a resident of Texas, and Mses. Gibbs and Edwards are residents of Virginia. Plain Green is domiciled on the Tribal lands of the Chippewa Cree, and Great Plains is domiciled on the Tribal lands of the Otoe-Missouria. So the "residence . . . of the parties" does not cut in either direction. "[T]he location of the subject matter of the contract" does not cut in either direction, either, because the "subject matter of the contract"—the loaned funds—went from one party to the other and thus was "located" variously in both jurisdictions.

Thus, even if this Court were to strike the choice of law provisions entirely, it still would not change the outcome here because the relevant factors overwhelming favor the application of the law of the Tribes.

## III.    Applicable Tribal Law Precludes Ms. Edwards' Motion for Summary Judgment and Mandates Summary Judgment in Debtors' Favor on All Usury-Based Claims.

Ms. Edwards' brief concedes the dispositive point: "If the Court enforces the choice-of-law clause and applies the substantive laws of [the Tribes] to the claims, then [] usury related claims must be dismissed because the . . . [Tribes'] laws do not have an interest-rate cap."

Edwards Br. 2.[23] The Otoe-Missouria and Chippewa Cree have sophisticated financial codes governing consumer finance products, but those codes, just like the laws of some states, "reflect a choice to favor individual contract decisions and the free flow of capital" (*CFPB*, 2016 WL 4820635, at *8) and do not impose a cap on interest rates that may be charged for short-term loans. TF App. 127 (Otoe-Missouria); TF App. 240 (Chippewa Cree).

The Loan Agreements are therefore enforceable, Ms. Edwards' motion for summary judgment must be denied, and Debtors are entitled to summary judgment in their favor on (i) Counts I-II (federal RICO claims predicated on alleged "violat[ions]" of Virginia law) and Counts III-IV (claims expressly under Virginia law) of the Gibbs and Edwards complaint, and (ii) on Counts I, II, and IV of the Miller complaint.[24]   As a result, Debtors are entitled to summary judgment on the First Omnibus Claim Objection concerning these portions of Proof of Claim Nos. 41319, 41325, 41330, 43997, and 43998.

---

[23] Ms. Edwards also concedes that summary judgment in her favor is only appropriate if the Court "determine[s] that Virginia law applies the loan agreements." Edwards Br. 39.

[24] Count III of the Miller complaint (alleging violations of the Electronic Funds Transfer Act) does not appear to apply to Debtors.  The Miller proof of claim does not assert that it does.

Respectfully submitted this 27th day of July, 2018,

*/s/ Gregory G. Hesse*
Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
Email: ghesse@HuntonAK.com

-and-

Tyler P. Brown (admitted *pro hac vice*)
Jason W. Harbour (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Email: tpbrown@HuntonAK.com
         jharbour@HuntonAK.com

-and-

Thomas M. Hefferon (admitted *pro hac vice*)
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, D.C. 20001
Telephone: (202) 346-4000
Email:  THefferon@goodwinlaw.com

*Counsel to the Debtors and Debtors in Possession*