# EXHIBIT A

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

Linda Callnin

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
by Attorney General JOSH       *
SHAPIRO,                       *
    Plaintiff,             *
               *
VS.                * Civil Action
         * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
    Defendants.           *

*****************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
LINDA CALLNIN
MARCH 8, 2018
*****************************************************

      DEPOSITION of LINDA CALLNIN, produced
as a witness at the instance of the Plaintiff, and
duly sworn, was taken in the above-styled and
numbered cause on the 8th day of March, 2018, from
9:08 a.m. to 3:15 p.m., before Christy R. Sievert,
CSR, RPR, in and for the State of Texas, reported by
machine shorthand, at the offices of Hunton &
Williams, LLP, 1445 Ross Avenue, Suite 3700, Dallas,
Texas 75202, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

## Page 2

1
2          A P P E A R A N C E S
3  COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4    MR. IRV ACKELSBERG
     MR. JOHN J. GROGAN
5    Langer, Grogan & Diver, PC
     1717 Arch Street, Suite 4130
6    Philadelphia, Pennsylvania 19103
     Phone:  215-320-5701
7    E-mail:  iackelsberg@langergrogan.com
              jgrogan@langergrogan.com
8
9  COUNSEL FOR THINK FINANCE, INC.:
10   MR. MATTHEW S. SHELDON
     Goodwin Procter, LLP
11   901 New York Avenue, NW
     Washington, D.C.  20001
12   Phone:   202-346-4000
     E-mail:  msheldon@goodwinprocter.com
13
14 COUNSEL FOR VICTORY PARK CAPITAL:
15   MR. DANIEL P. SHAPIRO
     Katten Muchin Rosenman, LLP
16   525 W. Monroe Street
     Chicago, Illinois  60661
17   Phone:   312-902-5622
     E-mail:  daniel.shapiro@kattenlaw.com
18
19 COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
20   MS. FRANCES B. MORRIS
     Van Ness Feldman, LLP
21   1050 Thomas Jefferson Street, NW
     Seventh Floor
22   Washington, D.C.
     Phone:   202-298-1874
23   E-mail:  ftb@vnf.com
24
25

## Page 3

1          A P P E A R A N C E S
           (continued)
2
   COUNSEL FOR KENNETH REES:
3
     MR. RICHARD L. SCHEFF
4    Montgomery, McCracken, Walker & Rhoads, LLP
     123 South Broad Street
5    Philadelphia, Pennsylvania 19109
     Phone:   215-772-7502
6    E-mail:  rscheff@mmwr.com
7  ALSO PRESENT:
8    GUS PHILLIPS, Videographer
     KEVIN BYERS
9    TOM GRABER
     SAVERIO "SAM" MIRARCHI, (Appearing Telephonically)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1          I N D E X
                    PAGE
2
   Appearances................................ 2-3
3
   Exhibits................................... 5-7
4
   Proceedings................................ 8
5
   LINDA CALLNIN:
6
     Examination by Mr. Ackelsberg............... 9
7
   Changes and Signature.................. 250-251
8
   Reporter's Certification............... 252-253
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Linda Callnin

Page 5

E X H I B I T S

| | NUMBER | DESCRIPTION | PAGE |
|---|---|---|---|
| Exhibit 23 | Companies a part of Think Finance, Inc. TF-PA-228224 | | 25 |
| Exhibit 24 | Finance Org Structure TF-PA409810, TF-PA178525 | | 35 |
| Exhibit 25 | Daily Cash Instructions TF-PA318531 - 318539 | | 44 |
| Exhibit 26 | E-mail correspondence, 11-19-12 Re: Cash Movement TF-PA540675 - 540678 | | 49 |
| Exhibit 27 | E-mail correspondence, 9-10-12 Re: Great Plains Lending Daily Settlement Reports for 09-07-2012 TF-PA325814 - 325816 | | 74 |
| Exhibit 28 | E-mail correspondence, 9-19-12 Re: Approvals TF-PA527512 - 527513 | | 85 |
| Exhibit 29 | TC Loan Service, Account Clarification, 9-30-12 GPLP00313236 - 00313246 | | 92 |
| Exhibit 30 | Spreadsheet GPLP00435570 - 00435590 | | 98 |
| Exhibit 31 | E-mail correspondence, 11-15-12 Re: Docs Highlighting Control of Tribal Accounts GPLP00048680 - 00048681 | | 122 |
| Exhibit 32 | Wells Fargo, Commercial Electronic Office (CEO) Portal | | 128 |
| Exhibit 33 | E-mail correspondence, 10-18-13 Re: Wire Approval TF-PA288913 - 288915 | | 130 |
| Exhibit 34 | E-mail correspondence, 10-4-13 Re: Cash TF-PA684666, TF-PA429839 - 429840 | | 131 |

Page 7

E X H I B I T S (continued)

| | NUMBER | DESCRIPTION | PAGE |
|---|---|---|---|
| Exhibit 43 | E-mail correspondence, 9-23-14 Re: Portfolio Access TF-PA051916 - 051919 | | 209 |
| Exhibit 44 | E-mail correspondence, 9-22-14 Re: Portfolio Access TF-PA052208 - 052209 | | 212 |
| Exhibits 45-48 | (Not identified or marked.) | | |
| Exhibit 49 | Finance Team - Structure-Draft TF-PA178509 - 178510 | | 221 |
| Exhibit 50 | (Not identified or marked.) | | |
| Exhibit 51 | Think Finance Defendants' Response To Plaintiff's First Set of Interrogatories | | 237 |
| Exhibit 52A | E-mail correspondence, 1-5-15 Re: Fw: Clayton Wire - Today TF-PA 393463 - 393465 | | 245 |
| Exhibit 52B | E-mail correspondence, 12-23-14 Re: New Investor for PA loans TF-PA038003 - 038004 | | |

Page 6

E X H I B I T S (continued)

| | NUMBER | DESCRIPTION | PAGE |
|---|---|---|---|
| Exhibit 35 | Third Amended and Restated Administrative Agency Agreement TF-PA-000241 - 000275 | | 137 |
| Exhibit 36 | E-mail correspondence, 7-6-15 Re: Tribe Financials TF-PA070356 - 470358 | | 142 |
| Exhibit 37 | Plain Green, LLC Standard Operating Procedure #300-40 Daily Wire Transfers TF-PA378980 - 378981 | | 164 |
| Exhibit 38A | E-mail correspondence, 1-30-15 Re: Daily Wire Transfer SOP TF-PA096707 - 096709 | | 176 |
| Exhibit 38B | Standard Operating Procedure TF-PA178669 - 178670 | | 176 |
| Exhibit 39A | E-mail correspondence, 3-21-13 Re: Call Centers TF-PA013829 - 013831 | | 187 |
| Exhibit 39B | Map TF-PA014425 - 014426 | | 187 |
| Exhibit 40 | Information obtained through inquiry of Linda Callnin and Janice Weikert, 8-11-15 TF-PA300153 - 300154 | | 194 |
| Exhibit 41A | E-mail correspondence, 9-27-1 Re: Incident #IR-0101078 is closed TF-PA291639 - 291640 | | 199 |
| Exhibit 41B | E-mail correspondence, 9-4-14 Re: Fw: Wire Approvals TF-PA291806 | | 199 |
| Exhibit 42 | E-mail correspondence, 9-4-14 Re: Wire Approvals TF-PA440122 - 440125 | | 207 |

Page 8

P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record for the videotaped deposition of Linda Callnin. The time is 9:08 a.m., March 8, 2018, in the matter of Commonwealth of Pennsylvania, et al., vs. Think Finance. Civil Action No. 14-7139-JC- -- excuse me -- JCJ, being held in the United States District Court for the Eastern District of Pennsylvania.

The court reporter is Linda Callnin, and the videog- -- excuse me. The court reporter is Christy Sievert, and the videographer is Gus Phillips. Both are representatives of Kaplan, Leaman & Wolfe Court Reporters.

Will the court reporter please administer the oath.

(Oath administered.)

THE VIDEOGRAPHER: Will counsel please state their appearances for the record.

MR. ACKELSBERG: Irv Ackelsberg for the plaintiff, Commonwealth of Pennsylvania.

MR. GROGAN: John Grogan, also for the Commonwealth.

MS. MORRIS: Francis Morris for National Credit Adjusters.

2 (Pages 5 to 8)

Linda Callnin

Page 9

1          MR. SHAPIRO:  Dan Shapiro for the
2   Victory Park defendants.
3          MR. SCHEFF:  Richard Scheff for Ken
4   Rees.
5          MR. SHELDON:  Matt Sheldon for Think
6   Finance, joined with -- by Tom Graber with Think
7   Finance.
8             LINDA CALLNIN
9          having been first duly sworn,
10            testified as follows:
11            EXAMINATION
12   BY MR. ACKELSBERG:
13     Q.  Ms. Callnin, good morning.
14     A.  Good morning.
15     Q.  I am Irv Ackelsberg, and I represent the
16   Pennsylvania Attorney General in -- in a civil
17   action against Think Finance, Mr. Rees, and Victory
18   Park Capital concerning certain loan programs.  You
19   understand that, correct?
20     A.  Yes.
21     Q.  Okay.  And you're going to have to speak
22   up.  The -- the court reporter has to hear your
23   answer, and -- and also, the videographer has to --
24   has to hear it.  Okay?
25     A.  Okay.

Page 10

1     Q.  And let -- let's just start with who you're
2   employed by.
3     A.  Think Finance.
4     Q.  And what's your position there?
5     A.  Accounting operations controller.
6     Q.  And as operations controller, you're
7   responsible for, among other things, accounting for
8   the ACH transfers going in and out every day?
9     A.  Yes.  Responsible for making sure that cash
10   balances the system that goes in and out every day.
11     Q.  And that includes the ACH -- the ACH
12   activity as well as the activity of the various bank
13   accounts that you're -- you're managing, correct?
14          MR. SHELDON:  Object to form.
15          At various times today, Ms. Callnin, I may
16   object.  And unless I instruct you not to answer --
17          THE WITNESS:  Okay.
18          MR. SHELDON:  -- please do answer, and
19   you -- you can ignore my objections.
20          MR. ACKELSBERG:  I appreciate it.
21   Thank you.
22     A.  Yeah, for -- for accounts that are within
23   the program, yes.
24   BY MR. ACKELSBERG:
25     Q.  Okay.  And -- and you're also responsible

Page 11

1   for figuring out who's owed what and from which
2   account, things like that?
3          MR. SHELDON:  Object to form.
4     A.  Not for the entire program.  Only -- only
5   for certain pieces of the program.
6   BY MR. ACKELSBERG:
7     Q.  Okay.  And we'll -- we'll get into that.
8          But for certain pieces of the program,
9   you're responsible for figuring out who's owed what
10   and from which account?
11     A.  Correct.
12     Q.  And -- and are you responsible for making
13   sure that -- either past or present, because we're
14   talking about a period of time going back a ways,
15   but have you also been responsible for making sure
16   that GPLS was paid what Think was obligated to pay
17   them?
18          MR. SHELDON:  Object to form.
19     A.  That was not in my area.
20   BY MR. ACKELSBERG:
21     Q.  Okay.  That was in someone -- someone else
22   within finance?
23     A.  Yes.
24     Q.  Okay.  And what about invoicing and paying
25   fees owed by the tribal entities?

Page 12

1     A.  The invoicing was not in my area.
2     Q.  Now -- but it's something that you
3   understand how the -- how the process works, though?
4     A.  I have -- I have limited knowledge of the
5   process, yes.
6     Q.  Okay.  And -- and is that also true of --
7   of the -- of the payments to GPLS, that you have
8   knowledge, some knowledge, limited knowledge, but
9   you're not immediately responsible for that?
10          MR. SHELDON:  Object to form.
11     A.  I have limited knowledge of that process.
12   BY MR. ACKELSBERG:
13     Q.  And that's -- but that goes on within the
14   Think finance department?
15     A.  Yes, it does.
16     Q.  And what about the invoicing and paying the
17   revenue share payments to the tribal entities?
18     A.  I have limited knowledge of that, yes.
19     Q.  Okay.  But that also goes on within --
20     A.  Yes, it does.
21     Q.  -- the finance department?  Okay.
22          MR. SHELDON:  Linda, just make sure
23   you wait for Mr. Ackelsberg to finish asking his
24   question.  In some cases, you're going to know the
25   answer, and you already have known several answers,

3  (Pages 9 to 12)

TF App. 0003

Linda Callnin

Page 45

1    A.  I have not.
2    Q.  You haven't seen it?
3    A.  I have not seen this one before.
4    Q.  Okay.  Well, you see that I got this from
5    Think Finance, right?
6    A.  Uh-huh (affirmative response).
7    Q.  And -- and it's -- it's titled "Daily Cash
8    Instructions, May 21st, 2012."  Do you see that?
9    A.  Yes, sir.
10   Q.  Okay.  Let me just look at the -- let's
11   just look at the first paragraph.  And -- and I'll
12   just read the first paragraph out loud.
13        MR. SHELDON:  Irv, earlier you asked
14   her to review the document.  Do you want her not to
15   review it and just --
16        MR. ACKELSBERG:  Well, she said she's
17   never seen it before, so -- I don't want to take a
18   lot of time here.
19   BY MR. ACKELSBERG:
20   Q.  Let me just -- let me just ask -- the first
21   paragraph, "On a daily basis, Finance monitors
22   operating, collections, funding, and payroll cash
23   accounts."  Is that correct?
24   A.  That's what it says, yes.
25   Q.  I'm not saying what it says.  Is it a

Page 46

1    correct statement of the finance department that you
2    know?
3        MR. SHELDON:  Object to form.
4    A.  To the best of my knowledge, checking
5    accounts were monitored.
6    BY MR. ACKELSBERG:
7    Q.  And -- and who did the checking account
8    monitoring?
9    A.  That would have been the treasury.
10   Q.  Okay.  What about the monitoring of
11   collections and funding?
12   A.  It would be my group that would go -- that
13   would have view access to some of the accounts to
14   make sure that the collections files from the system
15   and the funding files from the system.
16   Q.  And let me make sure I understand how
17   that -- how that works.  So -- and I'm not sure I
18   will completely understand how that works.  I'm --
19   but you -- over the course of your work at Think,
20   you've dealt with ACH providers, correct?
21   A.  Yes.
22   Q.  Okay.  And when someone goes -- a customer
23   goes online and applies for a loan and is approved
24   for a loan, the money that hits their account
25   actually comes from a service provider, an ACH

Page 47

1    provider, correct?
2        MR. SHELDON:  Object to form.
3    A.  The money that hits their account is
4    pre-funded to an ACH provider.
5    BY MR. ACKELSBERG:
6    Q.  When you say "pre-funded," pre-funded by
7    Think Finance?
8    A.  No.
9    Q.  By who?
10   A.  It would be who the owner of the product
11   is.
12   Q.  Okay.  So -- so let's say we're talking
13   about Plain Green.
14   A.  Uh-huh (affirmative response).
15   Q.  You're saying Plain Green would fund all
16   that money?
17   A.  Uh-huh (affirmative response).
18   Q.  How would Plain Green do that?
19   A.  They -- they have a funding account in
20   their name, and they would send the funds to the ACH
21   provider.
22   Q.  And how would they do that?
23   A.  They would wire it.
24   Q.  And how would they wire it?
25   A.  The wire amount would be set up -- as a

Page 48

1    service provider, we have authority to set up the
2    wire.  They would approve the wire.
3    Q.  Okay.  I didn't -- I'm not -- this isn't a
4    trick question.  I'm not asking who -- who had the
5    ultimate authority and who -- what approvals were
6    necessary.  I just want to clarify that the -- the
7    wiring of money that you just described was actually
8    something that your team did pursuant to some
9    authority that it had.  Right?
10        MR. SHELDON:  Object to form;
11   mischaracterizing her testimony.
12   BY MR. ACKELSBERG:
13   Q.  Am I right?
14   A.  No.  It's not something our team did.  It's
15   something our team set up.  And I wouldn't even say
16   our team.  Treasury set up.
17   Q.  Okay.  And you then -- and you're involved
18   with the reconciling of all this, though, aren't
19   you?
20   A.  Yes.  We have view access to the accounts.
21   Q.  And you -- but -- and then -- but then you
22   reconcile, right?  What does reconciling mean?
23   A.  That the amount of funds that the ACH
24   processer processed equaled the amount of new loans
25   on the loan management system.

12  (Pages 45 to 48)

TF App. 0004

Linda Callnin

Page 49

1    Q.  Okay.  And this was the responsibility of
2  your team?
3    A.  Yes.
4    Q.  Okay.  Well, I'll tell you what, if you --
5  if you're not familiar with this document, we'll
6  just -- we'll -- we'll ask someone -- who would
7  know?  Do you know?  Do you know who likely would
8  know about this?
9    A.  Given -- given the year, it was treasury,
10  David Gentry, which may have fallen under L2.
11    Q.  Okay.  We'll ask L2.
12      MR. ACKELSBERG:  I'm going to show you
13  another document, 27.
14      MR. SHAPIRO:  27?
15      MR. ACKELSBERG:  26.  I'm sorry.
16      MR. SHELDON:  For the record, this
17  document is also marked "Confidential."
18      (Exhibit No. 26 marked.)
19  BY MR. ACKELSBERG:
20    Q.  Now, this is -- this is -- I realize this
21  is a document that has Linda -- Linda 2 on it, not
22  Linda 1.  And I'm going to ask you questions about
23  it, but I guess the first question would be, is this
24  something you had ever seen before?
25    A.  Not -- not this --

Page 50

1    Q.  Well, the e-mail -- it looks like you're
2  not on the e-mail.  But what about the attachment to
3  the e-mail?
4      MR. ACKELSBERG:  And by the way, Matt,
5  you can see how I -- you can -- let me show you how
6  I -- how I did prepare the exhibit.  So -- this goes
7  to your question at the beginning.  So attached to
8  this e-mail was a file, the file -- the -- that page
9  in nonnative shows the "Confidential" stamp.  Do you
10  see?  And then the next thing I did was, I down- --
11  I then downloaded the native Excel, and I made a
12  screenshot so you can see the tabs on it.  And then
13  I just copied the tabs.  And that's -- that's how I
14  created this exhibit.
15      MR. SHELDON:  Thank you for that.  And
16  for the record, the entire Exhibit P-26 was produced
17  as confidential and is marked as "Confidential" in
18  the way Irv described, wherein the page Bates
19  numbered TF-PA-540678 indicates confidentiality of
20  the subsequent pages.
21  BY MR. ACKELSBERG:
22    Q.  So let me -- let me just start with -- you
23  can see this is an e-mail that -- there's an e-mail
24  trail here that starts from the second page, and
25  it -- you can see it -- it's from Linda Rogenski to

Page 51

1  Billi Anne Morsette and -- and Bobbi Favel.  Do you
2  see that?
3    A.  Yes, sir.
4    Q.  Okay.  Are these people that you have --
5  you've had any contact with in the past, Billi Anne
6  Morsette or Bobbi Favel?
7    A.  No.
8    Q.  No -- no -- no --
9    A.  I have --
10    Q.  -- direct contact --
11    A.  Not to my --
12    Q.  -- at all?
13    A.  No.  No.
14    Q.  Okay.
15      MR. SHELDON:  And, Linda, don't
16  forget, you need to let Irv finish asking his
17  questions.
18      Irv, don't forget, Linda needs to be able
19  to finish --
20      MR. ACKELSBERG:  Sure.
21      MR. SHELDON:  -- answering her
22  question.
23  BY MR. ACKELSBERG:
24    Q.  Let me ask you this:  Did the -- did you
25  have contact with anyone at Plain Green, you have

Page 52

1  direct contact?
2    A.  In their accounting area.
3    Q.  Okay.  And would that be true also of Great
4  Plains Lending and Mobiloans?
5    A.  Yes, sir.
6    Q.  Okay.  So and who is -- there's a Michelle
7  Nguyen, N-g-u-y-e-n.
8    A.  Uh-huh (affirmative response).
9    Q.  Is Michelle Nguyen -- who is she?
10    A.  At that time, she worked for Think Finance,
11  and she was a product manager.
12    Q.  She's not at Think Finance now?
13    A.  No.
14    Q.  Where is she?
15    A.  I am not sure.
16    Q.  Okay.  So you see that Linda is sending --
17  well, let me ask you this:  Are these names you've
18  heard of?  Did you ever hear the name Billi Anne
19  Morsette or Bobbi Jo Favel?
20    A.  Bobbi Jo, I had never heard of.  Billi
21  Anne, I had heard the name.
22    Q.  You knew of the name?
23    A.  I knew of the name.
24    Q.  Okay.  So you see the context here, that
25  Linda is sending two people at Plain Green what

13  (Pages 49 to 52)

TF App. 0005

Linda Callnin

Page 85

1     A. Yes, sir.
2     Q. And was that done for all tribes -- all of
3 the tribal entities?
4     A. Yes, sir.
5        MR. ACKELSBERG: All right. Let's
6 look at the next exhibit, 28.
7        (Exhibit No. 28 marked.)
8        MR. ACKELSBERG: And just to save some
9 time, it's marked "Confidential." I mean, I don't
10 know that we really need to do this on the record
11 for every single document. But it's marked
12 "Confidential."
13        MR. SHELDON: I don't think that took
14 too long.
15 BY MR. ACKELSBERG:
16     Q. Now, we're looking at the -- we're looking
17 at some wire approvals that occurred on
18 September 19th, correct, of 2012?
19     A. Correct.
20     Q. And -- and if you look at the Great Plains
21 portion of the wires, we're looking at the Citibank
22 wires. When we're talking about Citibank, we're
23 talking about the GPLS accounts, correct?
24     A. Correct.
25     Q. And if you look at the GP wire, you see

Page 86

1 it's $1,187,285?
2     A. Yes.
3     Q. Okay. And if you need to calculate it,
4 that's fine, or if -- if you know, is that
5 $1,187,285 the sum of the three invoices for
6 Tailwind and TCDS that we were just looking at?
7        MR. SHELDON: Object to form.
8     A. Do you have a calculator that. . .
9 BY MR. ACKELSBERG:
10     Q. Sure.
11        MR. SHELDON: Do you have a piece of
12 paper she can do the calculations on?
13        MR. ACKELSBERG: It's probably easier
14 to do it on -- on my iPhone. So. . .
15        MR. SHELDON: For the record, the
16 witness is looking back at Document P-27 and is
17 performing calculations of invoices discussed
18 regarding that exhibit.
19     A. That is correct.
20 BY MR. ACKELSBERG:
21     Q. So -- you can hold that exhibit. I'll just
22 take my phone back. Okay. Thanks.
23        So -- so we're basically looking at the
24 wires that were prepared. Now, were these wires
25 coming out of the Citibank account to the -- to the

Page 87

1 tribal accounts -- to the -- to the G -- to the
2 Great Plains Lending account?
3        MR. SHELDON: Object to form.
4 BY MR. ACKELSBERG:
5     Q. Is that what we're looking at?
6     A. I would have to see the wire transaction
7 itself to see which way it was going.
8     Q. Okay. But it's one of those two
9 directions, right?
10     A. Yes, sir.
11     Q. Okay. Now, the procedure was that -- now,
12 David Gentry, he worked for Badr Qureshi?
13     A. In that time frame, I'm not sure if Badr. . .
14     Q. Well, it looks like David Gentry is -- has
15 prepared these wires, correct?
16     A. Yeah. And he copied Badr on it, yes.
17     Q. Yes. Okay.
18     A. Okay.
19     Q. And -- and he's -- and he's asking you,
20 Linda 1, for approval, right?
21     A. Yes.
22     Q. Okay. And that means that -- that someone
23 else wasn't around?
24     A. That's correct.
25     Q. And -- and we're talking about with regard

Page 88

1 to the -- to the Great Plains Lending invoice that
2 we -- that we saw, that this could be a wire out
3 of -- I mean, you wouldn't need to -- would you need
4 to get approval for a wire into -- into the Citibank
5 account?
6        MR. SHELDON: Object to form.
7     A. No. No. Incoming wires to --
8 BY MR. ACKELSBERG:
9     Q. Right.
10     A. -- only -- only. . .
11     Q. Right. So we're basically looking at the
12 transfer of money that went from the Citibank GPLS
13 account to Great Plains Lending for those three fees
14 that we were -- that we were looking at in the
15 previous exhibit, correct?
16        MR. SHELDON: Object to form.
17     A. To the best of my knowledge, yes, without
18 looking at the debits and credits and the wire
19 transfer.
20 BY MR. ACKELSBERG:
21     Q. Okay. When you -- when the finance
22 department would -- I mean, what we're looking at
23 was a common occurrence, right? This happened every
24 month, something like this?
25     A. This was part of the monthly invoicing in

22 (Pages 85 to 88)

TF App. 0006

Linda Callnin

Page 89

1   accordance with the agreements.
2     Q. Okay. And by the way, was it common to --
3   in the wiring, to combine all three of the tribal
4   entities at once like you see here? You can see
5   there's -- there's Mobiloans, there's Great Plains,
6   and -- and Plain Green all in the same -- the same
7   approval. Do you see that?
8     A. It's on the same e-mail approval.
9   Independent transactions as far as wires.
10     Q. Okay. But they would -- they would be
11   processed all together?
12     A. Monthly, and they were done at the same
13   time.
14     Q. Okay. And so in this case, David Gentry is
15   asking for your approval to take money out of the
16   GPLS account and wire it to Great Plains Lending?
17     A. We were authorized by GPLS or have
18   authority out of -- I don't remember which specific
19   account, but to do these transactions.
20     Q. And you didn't need to get an approval from
21   GPLS every time you did that?
22     A. They were copied on some e-mails.
23     Q. They're not copied on this e-mail, right?
24     A. I don't know which ones, but they were sent
25   e-mails on the transactions that we were going to

Page 90

1   have.
2     Q. Okay. Okay. Now, were there similar wires
3   that had to be prepared for the -- for the flow of
4   money in the opposite direction, from the tribal
5   accounts to GPLS?
6     A. Yes.
7     Q. Or from the tribal -- I'm sorry. From the
8   tribal accounts to Tailwind or to TC Decision?
9     A. Not that I'm aware of. I don't -- I
10   don't -- if -- if the tribe authorized us to set up
11   the wire, if that was the case, then we would set it
12   up. But the tribe would have to approve it.
13     Q. Would the tribe have to approve every
14   single wire?
15     A. Out of their accounts, yes.
16     Q. Okay. And how would that approval happen?
17     A. We would send them an e-mail: Here are the
18   wires to be approved and here's the calculations.
19     Q. And -- and they would always do it?
20     A. Unless they --
21       MR. SHELDON: Object to form.
22   BY MR. ACKELSBERG:
23     Q. Would they always do it?
24     A. Unless they had a disagreement with the
25   calculation.

Page 91

1     Q. Okay. And was that -- was it true of the
2   whole period of time of the tribal products, that --
3   that they would always approve every single wire?
4       MR. SHELDON: Object to form.
5     A. Well, you're saying that in a form that's
6   like, every single -- every wire that was -- every
7   wire that was part of the program that had the
8   calculations and was sent to them for approval as
9   part of the program, yes, they would -- they would
10   approve them.
11   BY MR. ACKELSBERG:
12     Q. And were there situations where they forgot
13   to approve, and the wire went through, or they would
14   approve after the wire? I mean, was it -- was -- in
15   this -- was the system set up in such a way that if
16   you didn't get a reply from the tribe, you couldn't
17   make the transfer?
18     A. That is correct.
19     Q. All right. And was that true in 2012 and
20   2013?
21       MR. SHELDON: Object to form.
22   BY MR. ACKELSBERG:
23     Q. Or 2011?
24     A. If -- as far as I can remember, possibly,
25   yes. Yeah, I believe so.

Page 92

1       MR. SHELDON: Sorry, which one of his
2   questions are you answering to?
3     A. Well, yeah, I know, I'm getting. . .
4     They had to approve the wires, and we --
5   we had occasions where they didn't, and money wasn't
6   sent.
7       MR. ACKELSBERG: Okay. All right.
8   Next exhibit, 29.
9       (Exhibit No. 29 marked.)
10       MR. SHELDON: For the record, this
11   document is marked "Confidential, Attorneys' Eyes
12   Only."
13   BY MR. ACKELSBERG:
14     Q. Now, you'll notice that, Ms. Callnin, on
15   the lower right-hand corner, that the marking is a
16   little bit different. It says "GPLP." That means
17   this document came from GPLS, from Victory Park, not
18   from -- not from -- from Think Finance, okay, just
19   so you understand what -- what these numbers mean.
20     A. Uh-huh (affirmative response).
21     Q. You got that?
22     A. Yes. Yes, sir.
23     Q. Okay. Now, what I think I'm showing you,
24   and ask me -- and tell me whether I'm right, is that
25   this is a bank account reconciliation of the GPLS

23 (Pages 89 to 92)

TF App. 0007

Linda Callnin

Page 93

1 account that was done September -- that was done
2 September 30th.
3 A. Yes, sir.
4 Q. For -- and this shows the -- the activity
5 in the accounts that occurred during the month of
6 September.
7 A. Yes, sir.
8 Q. And who would have prepared the document
9 that we're looking at? Which -- which team?
10 A. That would have been someone under my -- my
11 team, and it was Jill Carter.
12 Q. And Jill Carter was someone that you
13 supervised?
14 A. Yes, sir.
15 Q. Okay. And it's reviewed by somebody.
16 A. That would have been me.
17 Q. So that's your -- that's your -- those are
18 your initials there?
19 A. Uh-huh (affirmative response).
20 Q. Okay. So this is a document that -- that
21 Jill Carter prepared under your supervision, that
22 you reviewed and signed off on the following month,
23 correct?
24 MR. SHELDON: Object to form.
25 A. She prepared it 10/8, and I signed it

Page 94

1 10/29.
2 BY MR. ACKELSBERG:
3 Q. Right. Okay. Now, if you go to, I believe
4 the third page. Is what we're looking at here daily
5 transaction entries from the GPLS ledger?
6 A. We're looking at this?
7 Q. Yes.
8 A. It's from our general ledger.
9 Q. Your general ledger. Your general ledger
10 for GPLS?
11 A. Correct.
12 Q. Okay. And you see that -- the part of the
13 ledger that I marked at the bottom?
14 A. Correct.
15 Q. Okay. That's my marking. And if we look
16 at -- "PG" means Plain Green, correct?
17 A. Correct.
18 Q. And -- and "GP" is Great Plains Lending?
19 A. Correct.
20 Q. And "ML" is Mobiloans?
21 A. Correct.
22 Q. Okay. And what we're doing -- what you're
23 doing here on the ledger is -- is showing the kind
24 of activity that we were looking at in the invoices
25 that we were looking in the previous exhibits,

Page 95

1 right?
2 A. Correct.
3 Q. And in fact, for -- for Great Plains
4 Lending, those are the very -- the very invoices
5 that we were looking at in the -- in the previous
6 exhibit, correct?
7 A. That's correct.
8 Q. And so what this reflects is the work that
9 your team did in ledgering -- I don't know if that's
10 a -- in the accounting world, is that a proper --
11 A. Ledgering, booking.
12 Q. "Ledgering" is okay? You can --
13 A. Yeah.
14 Q. You can verb it. Okay.
15 A. Yeah.
16 Q. So this -- this reflects under the GP the
17 three -- the three back-and-forths that you -- we
18 were previously looking at, right?
19 A. Correct.
20 Q. Okay. And that was true of Plain Green and
21 for Mobiloans?
22 A. Correct.
23 Q. Okay. And you mentioned that generally, at
24 the same time of the month, you would -- or that --
25 that Ms. Rogenski's people, but finance department

Page 96

1 would prepare the invoices and then do the wires,
2 and -- and they would do it for all three of the
3 tribes at the same time, right?
4 A. Yes, sir.
5 Q. And then similarly, your people in -- on
6 the settlement side would then make sure that all
7 those transactions were ledgered into the general
8 ledger that Think Finance maintained for GPLS?
9 A. Correct.
10 Q. And when it says in the right, "BA funds,"
11 are we talking about bank account?
12 A. That is -- that --
13 Q. What's "BA"?
14 A. That download is the description from the
15 bank. That's the bank side.
16 Q. Okay. So the -- so the far right column is
17 a download from the bank?
18 A. Uh-huh (affirmative response).
19 Q. Okay. And whereas, the column under
20 "Reference" would be from the general ledger?
21 A. Correct.
22 Q. And this is done automatically? Is this
23 generated automatically, or. . .
24 A. No. My -- my team would down -- download
25 the activity for the month from the bank, and

24 (Pages 93 to 96)

TF App. 0008

Linda Callnin

Page 149

1 swallow their 1 percent portion of that?
2    A. Uh-huh (affirmative response).
3    Q. Okay. So if, for example -- so if a
4 decision was made -- I mean, let's give you an
5 example. Customer says, "I don't owe this because
6 it's illegal." And the decision is made to forgive
7 the balance. The way that would be handled on the
8 accounting -- on the accounting side would be,
9 99 percent of that lost principal would go to GPLS,
10 and 1 percent would go to the tribal entity?
11    A. Correct.
12        MR. SHELDON: Object to form.
13    A. Yes.
14 BY MR. ACKELSBERG:
15    Q. All right. And then it says "Operating
16 Expenses." That's another reduction. What kind of
17 operating expenses would be -- would be on this part
18 of the ledger?
19    A. I'm not sure. I would have to go into the
20 --
21    Q. Okay.
22    A. -- the roll-up behind it.
23    Q. Well, it's a small amount, so --
24    A. Yeah.
25    Q. -- it's probably not worth talking about.

Page 150

1 But the -- so the net program revenue for Mobiloans
2 was -- in June of 2015 was $306,653, right?
3    A. Correct.
4    Q. Okay. Now we deal with the reimbursable
5 program expenses. And -- and this relates to the
6 kind of invoicing that we were looking at before,
7 right?
8    A. (Nods head affirmatively.)
9    Q. You've got to say "yes" or "no."
10    A. Yes. Yes.
11    Q. Okay. And so there's the Tailwind charge
12 of $100 a loan, right?
13    A. Yes, sir.
14    Q. The TC Decision Sciences charge of $25 a
15 loan. And then there's a different -- there's
16 another fee, "Loan to TC Admin." Do you know what
17 that is? Due annually. Do you have any idea what
18 that is?
19    A. Not -- not off the top of my head.
20    Q. Okay. All right. But there are these --
21 there are -- there's a variety of -- and then -- and
22 there's "Internal Tribal Expenses." What's that?
23    A. In the program, I'm -- the tribe had
24 expenses that they would let us know that they paid.
25    Q. Okay. And then -- then "Other Reimbursable

Page 151

1 Expenses." This -- this would be sort of the
2 same -- well, this is what's -- I see. This is
3 what's asterisk down at the bottom.
4    A. Yes.
5    Q. Right? And this is among the expenses that
6 you had to verify, right?
7    A. Correct.
8    Q. Okay. But before we get to that -- or --
9 well, why don't we go right there. That's fine.
10        So Clarity Services, what's that?
11    A. They provided some sort of -- and it's a
12 data verification.
13    Q. So this is -- this is third-party billing
14 that's connected to the loan decisioning process,
15 correct?
16    A. Yes.
17    Q. So some data is pulled from Clarity
18 expenses to decide whether to make a loan, and
19 that's a charge, it's an expense?
20    A. That is correct.
21    Q. Okay. And then there's something called
22 Iovation. Is that similar?
23    A. Yeah, I know very little about what each
24 one exactly did, but they were all in verifying
25 customer data in order --

Page 152

1    Q. Okay. All of --
2    A. -- to approve the loan.
3    Q. In order to approve the loan. Or deny the
4 loan, right?
5    A. Yes.
6    Q. Okay. And then there are other costs of
7 sale. There's the ACH processing. So these would
8 be the fees charged by the ACH processor, right?
9    A. Correct.
10    Q. And similarly, for credit card processing,
11 there would be fees?
12    A. Yes, sir.
13    Q. So some customers are paying by credit card
14 rather than ACH, right?
15    A. Yes. Debit card.
16    Q. Or debit card. Okay.
17        So you couldn't pay by credit card, you'd
18 have to pay by debit card?
19    A. (Nods head affirmatively.)
20    Q. I was wondering. You -- okay?
21        MR. SHELDON: Don't forget to -- to be
22 verbal in your --
23    A. Yes. Yes. Yes.
24 BY MR. ACKELSBERG:
25    Q. And then there are charges to MetaSource

38 (Pages 149 to 152)

TF App. 0009

Linda Callnin

Page 153

1  and Yessio. Am I right that these are collection
2  companies?
3      A. Customer service and collections.
4      Q. Customer service and collections. So these
5  would be like if a -- if a Mobiloans customer called
6  or was called, there would be a -- they'd be talking
7  with a customer service representative who worked
8  for MetaSource or Yessio.
9          MR. SHELDON: Object to form.
10 BY MR. ACKELSBERG:
11     Q. Correct?
12     A. They -- they were contracted by the -- by
13 the tribes, yes, and worked for them, yes.
14     Q. And -- and -- and all of these costs during
15 June were added up, it came up to 302,240, right?
16     A. Correct.
17     Q. And that got -- then got inserted into
18 line 12, "Other Reimbursable Expenses"?
19     A. Yes, sir.
20     Q. Now, let me make sure I understand how this
21 works. So all -- 8, 9, 10, 11, 12 are all the
22 expenses that were charged to the tribal entity for
23 that -- during that month period, right?
24     A. Correct.
25     Q. And those then are all zeroed out by a

Page 154

1  reimbursement, line 13, from GPLS for the exact same
2  amount of money, right?
3      A. Correct.
4      Q. This is the way all of the tribal programs
5  worked; am I right, that whatever operating expenses
6  existed were charged as an accounting matter to the
7  tribe, but then zeroed out by a reimbursement from
8  GPLS in the exact same amount?
9          MR. SHELDON: Object to form.
10     A. I don't know exactly how it was done.
11 Okay. Because, you know, if you're -- if you're --
12 are you stating that the tribe received
13 1-million-490?
14 BY MR. ACKELSBERG:
15     Q. No. What I'm -- what I'm asking you --
16 remember about an hour or so ago, we were looking at
17 those invoices for the --
18     A. Right.
19     Q. -- Tailwind, and -- and what you showed us
20 was that -- that Think Finance would create invoices
21 going in and out.
22     A. Correct.
23     Q. And -- and so that effectively, in the end,
24 the tribe wasn't actually paying anything; it was
25 GPLS that was paying it. Am I right?

Page 155

1      A. Yes.
2      Q. Okay. And that's what this is showing
3  here.
4      A. Yes.
5      Q. Right?
6      A. Yes.
7      Q. Yes. And that's the way it worked with
8  Mobiloans, Plain Green, and Great Plains Lending?
9          MR. SHELDON: Object to form.
10     A. Well, I won't guarantee it worked exactly
11 the same for each one, but the Mobil- --
12 BY MR. ACKELSBERG:
13     Q. The concept -- the concept was the same?
14     A. If that's what the agreement said. I don't
15 remember off the top of my head.
16     Q. I'm not asking you to remember the
17 agreements. I'm just asking you to remember the
18 accounting.
19     A. If that's -- yeah, if it's the same
20 represents -- representation on their financials,
21 yes.
22     Q. And so the net program profit -- and we're
23 here -- we're now -- we're not talking about the
24 profit that Think Finance made, right?
25     A. As far as I know, yes, that's correct, this

Page 156

1  would be --
2      Q. And we're not talking about -- let me make
3  sure I -- I'm not sure I got the negatives or the
4  positives there. So -- so we're looking here at
5  what the tribe -- the tribal entity made during the
6  month of June 2015?
7      A. That is correct.
8      Q. We're not looking at the amount that Think
9  Finance or Victory Park made during June 2015 from
10 the interest and fees paid by Mobiloans customers?
11     A. That is correct.
12     Q. Okay. That's what you meant by "tribal
13 look"?
14     A. Yes.
15     Q. And they don't ever see what Think Finance
16 or Victory Park made, right --
17         MR. SHELDON: Object to form.
18 BY MR. ACKELSBERG:
19     Q. -- in the reporting, as far as you know?
20     A. Not that I know of.
21     Q. Okay.
22         THE VIDEOGRAPHER: Counsel, I
23 apologize.
24         Ms. Callnin, you have the cable in your
25 hands. It's -- if you -- there you go. Thank you.

39 (Pages 153 to 156)

TF App. 0010

Linda Callnin

Page 252

1                    SIGNATURE

2

3         I, LINDA CALLNIN, have read the

4   foregoing deposition, or have had it read to me, and

5   hereby affix my signature that same is true and

6   correct, except as noted above.

7

8                    _Linda Callnin_____

9                    LINDA CALLNIN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TF App. 0011

# EXHIBIT B

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO,                          *
    Plaintiff,          *
                 *
VS.                     * Civil Action
            * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
    Defendants.        *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
JASON HARVISON
APRIL 17, 2018

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION of JASON HARVISON, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 17th day of April, 2018, from 8:53 a.m. to 4:22 p.m., before Christy R. Sievert, CSR, RPR, in and for the State of Texas, reported by machine shorthand, at the Fort Worth Club, 306 West 7th Street, Fort Worth, Texas 76102, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

```
 1              A P P E A R A N C E S
 2
 3   COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
 4     MR. IRV ACKELSBERG
       MR. JOHN J. GROGAN
 5     Langer, Grogan & Diver, PC
       1717 Arch Street, Suite 4130
 6     Philadelphia, Pennsylvania 19103
       Phone:  215-320-5701
 7     E-mail:  iackelsberg@langergrogan.com
                jgrogan@langergrogan.com
 8
       MR. SAVERIO "SAM" MIRARCHI
 9     Senior Deputy Attorney General
       Bureau of Consumer Protection
10     1600 Arch Street, Suite 300
       Philadelphia, Pennsylvania 19103
11     Phone:  215-560-2445
       E-mail:  smirarchi@attorneygeneral.gov
12
13   COUNSEL FOR JASON HARVISON:
14     MR. RICHARD L. SCHEFF
       Montgomery, McCracken, Walker & Rhoads, LLP
15     123 South Broad Street
       Philadelphia, Pennsylvania 19109
16     Phone:  215-772-7502
       E-mail:  rscheff@mmwr.com
17
18   COUNSEL FOR KENNETH REES:
19     MR. DAVID HERMAN
       Montgomery, McCracken, Walker & Rhoads, LLP
20     123 South Broad Street
       Philadelphia, Pennsylvania 19109
21     Phone:  215-772-7502
       E-mail:  jboughrum@mmwr.com
22
23
24
25
```

## Page 3

```
 1              A P P E A R A N C E S
                    (continued)
 2
 3   COUNSEL FOR THINK FINANCE, INC.:
 4     MR. MATT GATEWOOD
       Eversheds Sutherland (US), LLP
 5     700 Sixth Street, NW, Suite 700
       Washington, D.C.  20001
 6     Phone:  202-383-0100
       E-mail:  mattgatewood@eversheds-sutherland.com
 7
 8   COUNSEL FOR VICTORY PARK CAPITAL:
 9     MR. DANIEL P. SHAPIRO
       MR. MATTHEW W. HAWS
10     Katten Muchin Rosenman, LLP
       525 W. Monroe Street
11     Chicago, Illinois  60661
       Phone:  312-902-5622
12     E-mail:  daniel.shapiro@kattenlaw.com
                matthew.haws@kattenlaw.com
13
14   COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
15     MR. PATRICK DAUGHERTY
       Van Ness Feldman, LLP
16     1050 Thomas Jefferson Street, NW
       Seventh Floor
17     Washington, D.C.
       Phone:  202-298-1874
18     E-mail:  pod@vnf.com
19   ALSO PRESENT:
20     GUS PHILLIPS, Videographer
       KEVIN BYERS
21
22
23
24
25
```

## Page 4

```
 1              I N D E X
                           PAGE
 2
     Appearances................................ 2-3
 3
     Exhibits.................................... 5-9
 4
     Proceedings................................. 10
 5
 6   JASON HARVISON:
 7     Examination by Mr. Ackelsberg.............. 11
 8   Changes and Signature.................. 268-269
 9   Reporter's Certification............... 270-271
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

TF App. 0012

Jason Harvison

Page 9

E X H I B I T S
(continued)

NUMBER          DESCRIPTION          PAGE

Exhibit 146 Product and Operations      229
         Overview
         11-7-12
         TF-PA 325436 - 325475
Exhibits 147 - 148 (Not marked or identified.)
Exhibit 149 Strengthening the Tribal    234
         Model and Program Update
         December 20, 2012
         TF-PA 369516 - 369534

Exhibit 150 Proposal for Compliance     245
         Risk Assessment Review
         and Audit, Plain Green
         Loans, LLC, The Chippewa
         Cree Tribe
         August 22, 2012
         TF-PA 572588
         TF-PA 572589 - 572595
Exhibit 151 CFPB Readiness Exams, Tribal  246
         January 7, 2013, Preliminary
         Draft
         TF-PA 572596 - 572623

Exhibit 152 (Not marked or identified.)

Exhibit 153 Map and Legend             256
         TF-PA 014425 - 014426
Exhibit 154 E-mail correspondence, 9-26-13  258
         Re: Ho Chunk
         TF-PA 257992 - 258004

Page 10

1    THE VIDEOGRAPHER: We are now on the
2  record for the videotaped deposition of Jason
3  Harvison. The time is 8:53 a.m., April 17, 2018, in
4  the matter of Commonwealth of Pennsylvania, et al.,
5  vs. Think Finance, et al., Case No. 14-7139-JCJ,
6  being held in the United States Eastern District of
7  Pennsylvania.
8    The court reporter is Christy Sievert, and
9  the videographer is Gus Phillips. Both are
10  representatives of Kaplan Leaman & Wolfe Court
11  Reporters.
12    Will counsel please state their
13  appearances for the record.
14    MR. ACKELSBERG: Irv Ackelsberg for
15  the Commonwealth of Pennsylvania.
16    MR. GROGAN: John Grogan, also for the
17  Commonwealth.
18    MR. MIRARCHI: Saverio Mirarchi for
19  the Commonwealth of Pennsylvania.
20    MR. DAUGHERTY: Andrew Daugherty on
21  behalf of National Credit Adjusters.
22    MR. HAWS: Matthew Haws on behalf of
23  the Victory Park defendants.
24    MR. SHAPIRO: Daniel Shapiro for the
25  Victory Park defendants.

Page 11

1    MR. GATEWOOD: Matthew Gatewood for
2  the Think Finance defendants.
3    MR. HERMAN: David Herman on behalf of
4  Kenneth E. Rees.
5    MR. SCHEFF: Richard Scheff for Jason
6  Harvison.
7    THE VIDEOGRAPHER: Counsel on the
8  phone?
9    MR. SCHEFF: There's no -- one of the
10  Victory Park guys, one of the clients.
11    THE VIDEOGRAPHER: Will the court
12  reporter please administer the oath.
13    JASON HARVISON
14    having been first duly sworn,
15    testified as follows:
16    EXAMINATION
17  BY MR. ACKELSBERG:
18    Q. Good morning, Mr. Harvison.
19    MR. SCHEFF: Hold on, we --
20    MR. ACKELSBERG: Yeah, we're going to
21  put on the record first.
22    MR. GATEWOOD: The parties have
23  conferred, and to facilitate the deposition process
24  and to avoid multiple disruptions per question, any
25  defendant that raises an objection; form, preserves

Page 12

1  the objection with respect to all other defendants
2  as well, and the parties have agreed on that.
3    MR. ACKELSBERG: And I think we'll do
4  that -- you want to do that in -- going forward in
5  the other depositions so we won't even have to make
6  this statement going forward, right?
7    MR. GATEWOOD: That's right, it
8  will -- it will apply to all depositions.
9    MR. ACKELSBERG: Okay. Anything else
10  anyone wants to put on the record before we begin?
11  BY MR. ACKELSBERG:
12    Q. Good morning, Mr. Harvison.
13    A. Good morning.
14    Q. Welcome. I want to -- I'm Irv Ackelsberg,
15  as you know, representing the Commonwealth of
16  Pennsylvania.
17    Before we get into the substance of the
18  matters here, I want to -- I want to ask you a few
19  preliminary questions. The first is whether you
20  have been deposed before?
21    A. Yes, I have.
22    Q. Okay. And how many times?
23    A. Three separate times.
24    Q. Okay. And could you identify the three
25  times? And if you could, roughly, when it happened,

Jason Harvison

Page 121

1    A.  Early on that was the expectations.
2    Q.  Okay.  And we're just talking about early
3  on.  I know there were changes made, and I -- and
4  we'll -- promise you, we're going to -- we're going
5  to work our way through them.  But I'm just really
6  dealing with the -- the initial -- establishing the
7  relationships the way things were in the beginning.
8  Okay?
9    A.  Okay.
10   Q.  With regard to application processing,
11 well, this -- this relates to the decision engine
12 that we talked about before; am I right?
13   A.  So, actually, I would say the decision
14 engine piece would be one below.  Application
15 processing is --
16   Q.  Okay.  That's the website?
17   A.  Yes.
18   Q.  And Think Finance was telling the tribe:
19 We can -- we'll put together the website for you,
20 right?
21   A.  So, actually, let me back up just real
22 quick.  So, yes, so the application processing piece
23 would be -- you're right.  I was getting confused
24 here.  It would be on the -- what the tribes wanted
25 for the look and feel of the site, what kind of

Page 122

1  creative, what kind of verbiage they wanted out
2  there, and also any kind of communications with the
3  customer before the application process was
4  completed.
5    Q.  And then under "Underwriting Criteria,"
6  then that's -- that's the decision engine, right?
7    A.  So here what would be requested -- required
8  of the tribes would be that they would have to
9  approve up front any kind of underwriting criteria,
10 whether that's knockout rules, score cuts that --
11 that they would set.  And then on a go-forward basis
12 any kind of modifications that needed to be made had
13 to be approved and -- reviewed and approved by the
14 tribe, and then there would also be ongoing
15 reporting on how the portfolio performed that they
16 would be expected to -- to review to make sure they
17 understand the portfolio is performing.
18   Q.  Now, I mean, when you went to the Chippewa
19 Cree, I mean, they didn't have any -- they didn't
20 have any experience running a loan operation like
21 you were -- like you were -- like you were offering
22 to set up for them, had they?
23        MR. GATEWOOD:  Objection; form.
24        MR. SCHEFF:  Object to the form.
25   A.  Sure.  I mean, actually, one of the

Page 123

1  interesting things about the Chippewa Cree tribe
2  that we felt that they were a good partner for was
3  they actually had an established lending operation
4  already set up through another third-party servicer.
5  BY MR. ACKELSBERG:
6    Q.  Meaning Encore?
7    A.  I believe that was the partner that they
8  had.
9    Q.  Well, had they ever made a loan with
10 Encore?
11   A.  Have I ever made?
12   Q.  No.  Had the tribe ever made a loan with
13 Encore?
14   A.  It was my understanding that they had an
15 established platform, established site, and a
16 portfolio that was there.
17   Q.  That wasn't my question.  My question was
18 whether they were actually making loans on that
19 platform?
20        MR. SCHEFF:  Object to the form; asked
21 and answered.
22        You can answer again.
23   A.  That was my complete understanding.
24 BY MR. ACKELSBERG:
25   Q.  That you thought they were making loans?

Page 124

1    A.  (Nods head affirmatively.)
2    Q.  Okay.  And so in terms of the -- the role
3  of the tribe with regard to underwriting, the tribe
4  had to -- the tribe had to approve any -- the
5  development of the -- the decision engine required
6  certain parameters that the tribe would have to --
7  would have to agree to, right?  They would have to
8  approve certain -- whatever the particular
9  underwriting criteria were of the platform that was
10 set up, right?
11   A.  The tribe would have to approve anything
12 that into the -- the underwriting.
13   Q.  Right.  So Think Finance would have to
14 develop something in order to -- there would have to
15 then be someone saying:  Yes, I approve that.
16 Right?  That's -- that's what the tribal role would
17 be, to approve what Think Finance put in front of
18 them, right?
19        MR. GATEWOOD:  Objection; form.
20   A.  My understanding was, and the way it
21 actually took place, was not that they just approve
22 anything that was sent over to them.  They -- they
23 would have to review any kind of changes that were
24 being proposed, understand the impacts that it would
25 have to the portfolio.  And since they did own a

31 (Pages 121 to 124)

TF App. 0014

Jason Harvison

Page 125

1　piece of the portfolio, that they -- you know, they
2　wanted to make sure that it was a prudent decision.
3　So they -- they were the ones that had to review and
4　approve and make any suggested modifications back to
5　us --
6　BY MR. ACKELSBERG:
7　　Q.　And your --
8　　A.　-- on anything.
9　　Q.　And your sense was that the tribe really
10　understood all that and they understood -- when you
11　sent loan criteria, they understood that?  I mean,
12　were you involved in that?
13　　　　MR. GATEWOOD:  Objection; form.
14　　A.　So most of the -- from a -- an underwriting
15　standpoint, a lot of that conversation came from our
16　risk department with -- with the partners.  But I
17　reviewed some of the documentation that was sent --
18　you know, not every documentation but -- but how
19　that structure was put together, and I thought they
20　were very thorough on what the -- the changes were
21　being proposed for, what the impact would be so that
22　the tribe could really understand what was going on
23　and ask the questions they needed to ask to get
24　comfortable.
25　BY MR. ACKELSBERG:

Page 126

1　　Q.　What about under "Funding and Payment
2　Processing," that was, basically, all done by Think
3　Finance, wasn't it?
4　　　　MR. GATEWOOD:  Objection; form.
5　　　　MR. SCHEFF:  Object to the form.
6　　A.　So under "Funding and Payment Processing,"
7　as -- as part of the system, the system would cue up
8　what -- what loans needed to be funded that night,
9　what loans needed to take payments out of.
10　BY MR. ACKELSBERG:
11　　Q.　Whose system?
12　　A.　The loan management system that was
13　licensed by the tribe.  So based on loans that they
14　had originated, the system would cue up any kind of
15　outgoing credits or incoming debits, but those
16　were -- would all be going into a tribal account
17　that they owned.
18　　Q.　That would all be managed by Think Finance,
19　right?
20　　A.　That was the tribe's product that they
21　were -- I don't understand what you're saying.
22　　Q.　Well, I'm just trying to understand who's
23　doing what here.  So let's go to the top -- from the
24　top.  The tribe -- the marketing is done by Think,
25　but the tribe has to approve it before it goes out,

Page 127

1　right?
2　　　　MR. SCHEFF:  Objection; asked and
3　answered.
4　　　　You can answer it again.
5　BY MR. ACKELSBERG:
6　　Q.　That's -- right?
7　　A.　So I would say you see many lenders out
8　there partner with ad agencies, creative agencies to
9　do marketing for them on behalf of their products.
10　And so this is --
11　　Q.　Understood.
12　　A.　And so, just -- just as you see as in many
13　other industries, the tribe contracted with
14　telemarketing to do that -- that marketing, but they
15　had to be involved with every piece of communication
16　and creative to make sure it met their criteria.
17　　Q.　I understand.  And they contract with Think
18　Finance to -- to operate the website and decision
19　engine?
20　　A.　So, I mean, once again, on the website
21　creative, there was -- there was work done with the
22　tribes on how to propose what that look and feel,
23　what that language would be that the tribes had
24　input on.  Any kind of verbiage that was out there,
25　it had to be approved upon.  And then the same thing

Page 128

1　with the underwriting criteria, as I mentioned
2　earlier, that was something that it was their
3　underwriting criteria, they -- they set that
4　criterion up front when the program was established.
5　Any changes that were proposed, they approved or
6　made modifications to.
7　　　　And the other thing they had -- they had
8　access to was at the end of the day, the -- the
9　decision engine that underwrote the loans based on
10　their criteria, it would say these are the loans
11　that met your criteria and these are the loans that
12　did not meet your criteria and so it had to be
13　declined, and they had the ability to go in and
14　review any and all of those to audit and sample and
15　make sure it met their criteria.
16　　Q.　Well, they had the ability, but they
17　didn't -- they didn't really have to do it in order
18　for the loans to be either approved or denied,
19　right?
20　　　　MR. SCHEFF:  Object to the form.
21　　　　MR. GATEWOOD:  Objection; form.
22　　A.　So to me, that's -- that's what I would
23　call a belts and suspenders approach.  They have
24　already set up the criteria up front.  They had
25　already made approvals on any changes that were made

32 (Pages 125 to 128)

TF App. 0015

Jason Harvison

Page 133

1  with that -- that were -- were a part of the deal
2  structure.
3  BY MR. ACKELSBERG:
4    Q. Now, generally, in the sales presentations,
5  would -- would Think mention Victory Park by name or
6  just mention that we have an investor?
7      MR. GATEWOOD: Objection; form.
8      MR. SCHEFF: Object to the form.
9    A. Going off memory, which is a long time ago,
10  my -- my memory was that there was an investor there
11  to purchase receivables but not talk about them
12  specifically.
13  BY MR. ACKELSBERG:
14    Q. Let's look at another dec -- I'm sorry --
15  another report, a Rees report to the board
16  January 21, 2011.
17      (Exhibit No. 123 marked.)
18      MR. SHAPIRO: Is this 123?
19      MR. ACKELSBERG: Yes.
20  BY MR. ACKELSBERG:
21    Q. So if you turn to the discussion in this --
22  in this board report, the report concerning "Think
23  Cash/Great Plains Lending." Do you see that?
24    A. Yes.
25    Q. So, again, the date of this is

Page 134

1  January 21st, 2011. And from the second paragraph,
2  it's -- it's clear that at this point in time, it
3  was still assumed that the company was going to
4  be -- that the -- that ThinkCash migration was
5  going to be the Otoe-Missouria tribe, correct?
6      MR. SCHEFF: Object to the form.
7    A. So at this point, we were looking for
8  Otoe-Missouria to still be the first tribe we
9  launched with.
10  BY MR. ACKELSBERG:
11    Q. Right. And they -- and the expectation was
12  the first tribe would be the ones that would get the
13  returning customers from ThinkCash, right?
14      MR. SCHEFF: Object to the form.
15    A. So the first tribe had the ability to
16  market to the ThinkCash customers.
17  BY MR. ACKELSBERG:
18    Q. Yeah. Okay. Now, in the -- in the last
19  paragraph, it says, "Because of the concerns about
20  the potential impact on valuation due to the tribal
21  deal," and then it says that the Great Plains
22  lending concept was discussed with some investment
23  bankers. Do you see that?
24    A. I do.
25    Q. Okay. So what's going on here? Was this

Page 135

1  about -- was this about an IPO?
2      MR. GATEWOOD: Objection; form.
3    A. So my recollection on this was, from time
4  to time, investment bankers would come in and talk
5  to us about the potential for an IPO, and Ken had --
6  had talked to one of those investors about some of
7  the products we were looking to take to market.
8  BY MR. ACKELSBERG:
9    Q. And so when Ken says they were surprisingly
10  nonplussed about the model, do you know why --
11  what's the reason for the surprise?
12    A. No, I don't.
13    Q. Okay. The last -- on page 4, I'm sorry,
14  it's the -- the last item going forward, TF-PA
15  411042, the last bullet item is, "Complete the
16  automation of the debt sales process." That's what
17  we were talking about before, right, the
18  arrangements with -- with Bret Horrocks?
19      MR. SCHEFF: Object to the form.
20      You can answer the question if you can.
21    A. Yeah, so what I would say that's more
22  around we would talk with the third-party debt
23  buyers. I mean, Brett Horrocks was a consultant.
24  So that was completing the automations from the
25  lender and the debt buyer.

Page 136

1  BY MR. ACKELSBERG:
2    Q. Now, I've noticed in -- in some of the
3  documents that with regard to the Otoe-Missouria,
4  there's reference to a group called The MacFarlane
5  Group. Do you remember them and someone named Mark
6  Curry?
7    A. I do.
8    Q. Okay. So what was the connection between
9  MacFarlane and Curry and the discussions about
10  whether or not to proceed with the Great Plains
11  Lending project with Otoe-Missouria?
12      MR. SCHEFF: Object to the form.
13    A. So my recollection on that was Mark Curry
14  is an individual that had been in the space. We had
15  met him at conferences and things like that before.
16  Not -- not just tribal lending but other lending
17  ventures.
18      He had -- or one of his entities has
19  worked as a service provider to the Otoe-Missouria
20  tribe to launch American Web Loan. They had a
21  single pay product out there.
22      THE REPORTER: I'm sorry, American
23  what?
24      THE WITNESS: American Web Loan.
25    A. And that when we started to research the

34 (Pages 133 to 136)

TF App. 0016

Jason Harvison

Page 137

1    tribal lending model, I believe -- I believe it was
2    Ken that reached out to him to talk about a
3    potential partnership. And the Otoe-Missouria tribe
4    was looking to expand out past just the payday -- or
5    single pay product and wanted to go into installment
6    lending. So that's where the conversations began.
7    BY MR. ACKELSBERG:
8        Q. You mentioned a few times this idea of a
9    single pay product. So when you -- when you use
10   that term, you're referring to traditional payday
11   lending, right?
12           MR. SCHEFF: Object to the form.
13       You can answer the question.
14       A. Sometimes referred to as "payday." We
15   refer to as "single pay."
16   BY MR. ACKELSBERG:
17       Q. Okay. Meaning that the borrower takes a
18   loan out for, let's say, two weeks and then after
19   two weeks, everything is due, the borrower can
20   either pay that or roll over for some additional
21   period of time, right? That's the single pay model,
22   right?
23           MR. SCHEFF: Object to the form.
24       You can answer the question.
25       A. A single pay model typically works under

Page 138

1    that construct or some variation of it.
2    BY MR. ACKELSBERG:
3        Q. Yeah. Okay. And the idea with an
4    installment loan product is that the consumer is
5    taking -- is taking a loan out for a -- for a longer
6    period of time than two weeks, right?
7            MR. SCHEFF: Object to the form.
8        A. So, typically, with an installment product,
9    what we had seen in our research, it had higher
10   satisfaction scores. And, like I said, from a
11   contract standpoint, there was a longer term product
12   with fixed payments that amortized over -- over that
13   term and gave -- just gave more consumer flexibility
14   than a single pay product.
15   BY MR. ACKELSBERG:
16       Q. And so as I understand it, the -- the
17   Otoe-Missouria was already doing a single pay
18   product through Mark Curry, and they were interested
19   in considering an installment loan product through
20   Think Finance? That's what -- that's what was
21   happening at that time?
22           MR. GATEWOOD: Objection; form.
23       A. So the way I would say it is that, yes,
24   Otoe-Missouria had a service provider relationship
25   already set up. They were the lender, had a program

Page 139

1    set up and were looking to expand their product
2    offerings, and we were somebody they were talking to
3    about that.
4            MR. ACKELSBERG: Now, let me show you
5    one more document. This is P-124.
6           (Exhibit No. 124 marked.)
7        A. (Reviews document.)
8    BY MR. ACKELSBERG:
9        Q. All right. So first off, do you -- do you
10   remember this -- this e-mail that Ken sent around
11   in -- on February 24th, 2011, saying that, "We
12   finally got the signed agreement for the tribe.
13   Gentlemen, start your engines"? Do you remember
14   that?
15       A. Yes.
16       Q. Okay. And what did -- how did you take
17   that start -- what was your understanding of "let's
18   start your engines" meant?
19           MR. SCHEFF: Object to the form.
20       A. Sure. I mean, I go back to -- you know, we
21   had gone through over the last, call it, five months
22   of the -- the termination of our bank partner
23   relationships, exploring new different partnerships
24   and channels to go into, a lot of work had gone into
25   the last 90 to 120 days to -- to explore some

Page 140

1    different options. The first tribal partnership had
2    been signed. And so just because the deal was
3    signed, it didn't mean the work was done yet. There
4    was a lot of work to be done to get that ready to
5    launch. And so it was -- it's kind of a celebration
6    of we signed our first deal, let's -- let's be
7    excited about that and get going.
8    BY MR. ACKELSBERG:
9        Q. Well, and then attached is that -- is that
10   signed agreement that he was saying he had gotten
11   back, right? Do you see the -- and the agreement is
12   the trademark and URL assignment agreement, correct?
13       A. Correct.
14       Q. And am I correct that the URL for Great
15   Plains Lending was already owned by -- by TailWind
16   at the time?
17       A. So I'll go back to what I said earlier this
18   morning was, that when we decided to explore the
19   path of a different lending model, we made an
20   investment on some work that we didn't know if it
21   would come to fruition or not. And so by doing some
22   of the IT work while we were doing the legal
23   research and procuring a name and a domain, a
24   website domain was part of that process. We didn't
25   know if it was going to be able to be used or not.

35 (Pages 137 to 140)

TF App. 0017

Jason Harvison

Page 141

1 But we found the name Great Plains Lending, we
2 secured it, and we were able to transfer that other
3 to the first partner.
4    Q. And, basically, what this agreement meant
5 was that the Otoe-Missouria tribe was agreeing to be
6 the tribal lender behind that product, Great Plains
7 Lending, that you had designed, right?
8        MR. GATEWOOD: Objection; form.
9        MR. SCHEFF: Object to the form; the
10 document speaks for itself.
11       You can answer the question if you can.
12    A. That's the way I read it, yes.
13 BY MR. ACKELSBERG:
14    Q. Okay. And the agreement -- this agreement
15 in February was between TailWind Marketing and Great
16 Plains Lending, Incorporated, right?
17    A. That's correct.
18    Q. I found in -- let me just give you this
19 document and see if you can illuminate us on what it
20 is.
21       MR. ACKELSBERG: This is 125.
22       (Exhibit No. 125 marked.)
23 BY MR. ACKELSBERG:
24    Q. I think some of the copies are front and
25 back. So you see this is part of the Think Finance

Page 142

1 production, you see from the lower right-hand
2 corner.
3    A. Uh-huh (affirmative response).
4    Q. And this appears to be a resolution
5 establishing where the tribe -- the Otoe-Missouria
6 tribe established an entity called Great Plains
7 Lending, LLC, several months later. Do you see
8 that?
9    A. I do.
10    Q. Okay. Do you remember -- so let's take
11 this -- let's take this in steps. So the last
12 document, February -- in late February 2011, Ken
13 Rees gets back the signed trademark and URL
14 assignment agreement, and it's -- and it's with an
15 entity called Great Plains Lending, Incorporated,
16 right?
17    A. That's correct.
18    Q. All right. Now, ultimately, the agreements
19 that -- that were signed that set up the Great
20 Plains Lending operation, the actual -- the actual
21 product operation, those agreements were all with an
22 entity, I'll represent to you was Plain Green
23 Lending, LLC, as opposed to Plain Green Lending,
24 Incorporated. Do you remember anything in the delay
25 being connected to confusion about what the -- what

Page 143

1 the contracting entity on the tribal side would be?
2        MR. SCHEFF: Object to the form.
3        MR. GATEWOOD: Objection; form.
4    A. I don't.
5 BY MR. ACKELSBERG:
6    Q. No. Okay.
7        MR. ACKELSBERG: I think we'll do one
8 more exhibit, and then this will be a good time for
9 a break.
10       MR. SCHEFF: They're bringing in lunch
11 at 12:30.
12       MR. ACKELSBERG: Oh, okay.
13       MR. SCHEFF: So, again, break whenever
14 you want to break, but lunch will be here around
15 12:30.
16       (Exhibit No. 126 marked.)
17 BY MR. ACKELSBERG:
18    Q. Now, I am right that in the sales
19 discussions with the tribes, the first step would
20 have -- would have generally been a nondisclosure
21 agreement?
22       MR. SCHEFF: Object to the form.
23    A. That's correct.
24 BY MR. ACKELSBERG:
25    Q. Okay. And so what we see here is a

Page 144

1 nondisclosure agreement dated February 28th, 2011,
2 right? And this is with the Chippewa Cree?
3    A. That's correct.
4    Q. Okay. So this would then roughly situate
5 the beginnings of the substantive discussions with
6 the -- situate in time the substantive discussions
7 with the Chippewa Cree; am I right?
8        MR. SCHEFF: Object to the form.
9    A. I believe so, yes.
10 BY MR. ACKELSBERG:
11    Q. Okay. What do you recall -- and I -- let
12 me refer you back to the -- to that timeline, the
13 tribal timeline we looked at where -- where the
14 slide described a shift to a different tribe.
15       So you have February 24th, 2011, Ken Rees
16 is saying: We've got back the first agreement,
17 start your engines, gentlemen, and four days later
18 there's a -- there's a nondisclosure agreement with
19 the Chippewa Cree. Now, what can you tell us about
20 the shift from the focus on the Otoe-Missouria to
21 the shift -- to the shift to the Chippewa Cree?
22       MR. GATEWOOD: Objection; form.
23       MR. SCHEFF: Object to the form.
24    A. So it was always the intent once we decided
25 to go down to partner with different tribes to have,

36 (Pages 141 to 144)

TF App. 0018

Page 145

1 you know, multiple programs out to market, similar
2 like we did -- similar -- similar to we did with
3 bank partners. And so even though we had already
4 been talking with the Otoe-Missouria tribe, we were
5 out trying to find other potential partners that we
6 could engage with, and this was the next one we were
7 introduced to.
8 BY MR. ACKELSBERG:
9 Q. Okay. So just the mere fact that there is
10 a nondisclosure agreement doesn't -- doesn't
11 indicate to you there was anything -- anything awry
12 with the -- with the Otoe-Missouria, it's just this
13 was just another tribe that you had -- that you were
14 exploring possibilities with?
15 MR. SCHEFF: Object to the form.
16 A. I believe so.
17 BY MR. ACKELSBERG:
18 Q. Okay. But you do recall that something
19 happened with Great Plains, and the -- and the
20 ThinkCash customer base ended up with Plain Green
21 rather than Great Plains, right? You remember that
22 happening, right?
23 MR. SCHEFF: Object to the form.
24 A. So I do remember there was -- there was a
25 delay in getting the Otoe-Missouria partnership

Page 146

1 live. And right now I can't remember exactly what
2 the -- the big piece of that, what caused that
3 delay. And so -- but once it started to slow down
4 and we had already identified -- the Chippewa Cree,
5 as I mentioned earlier, already had a lending
6 product to market, and they were -- they were
7 interested in moving forward pretty quickly, we
8 decided to move forward with Plain Green first.
9 BY MR. ACKELSBERG:
10 Q. Now, with regard to Great Plains Lending,
11 what you told us is that you had this -- this
12 contact in the industry, someone you knew, Mark
13 Curry, who made the connection with the tribe, that
14 they might be interested in expanding from a single
15 payment to an installment loan, right?
16 A. That's correct.
17 Q. Okay. What was your contact with the
18 Chippewa Cree? How did you -- how did you make that
19 connection?
20 A. Yeah, we were introduced -- we were
21 introduced to the Chippewa Cree through a gentleman
22 named Steve Haynes.
23 Q. And how -- how did you or the company know
24 Steve Haynes? What's -- what was your connection to
25 Steve Haynes?

Page 147

1 MR. SCHEFF: Object to the form.
2 A. So I believe the introduction was made as
3 we were working with an attorney who had a partner
4 that was working -- had a partner within his firm
5 that was working with Steve Haynes and knew that we
6 were exploring potential tribal relationships. And
7 they knew that Steve had previously done work in
8 Indian country on the gaming side and knew many of
9 the tribes very well and could help make some
10 introductions for us.
11 BY MR. ACKELSBERG:
12 Q. And so after learning that from that
13 attorney, what happened next?
14 A. There was an introduction made to Steve
15 Haynes. We gave him an overview of what we were
16 looking --
17 Q. Well, slow down. Who's the "we"?
18 A. I believe it would have been -- the first
19 conversation would have been probably myself and
20 Steve Schafer with -- with Steve Haynes.
21 Q. Okay.
22 A. And so we gave Steve an overview of what we
23 were looking to do by partnering with tribes, and he
24 felt like he had potential partners that could be
25 interesting for us to speak with. And so we

Page 148

1 negotiated a consulting agreement with him for him
2 to help introduce us to tribes.
3 Q. And so what happened next?
4 A. Steve made an introduction to the Chippewa
5 Cree. He felt like they would be a good partnership
6 because of what I mentioned earlier, they -- they
7 were already in the lending business. They were
8 looking to expand that operation. He felt like
9 because of their -- their -- their exposure already
10 into service provided lending and in the lending
11 space, that they would -- they would be of interest,
12 and he made the introduction for us.
13 Q. Now, when you say that the Chippewa Cree
14 was already in the lending business, would that have
15 been based on what Steve Haynes told you?
16 A. So, initially, it was what Steve Haynes
17 told us, but then also in conversations with members
18 up on the reservation, they also talked to us about
19 the programs they already had in market.
20 Q. And did Steve Haynes, in the -- before you
21 went to the tribe, did Steve Haynes mention anything
22 about -- about a company named Encore Services?
23 A. No, he didn't.
24 Q. Okay. So before you went out to the
25 Chippewa Cree, did you have any idea of -- of the

37 (Pages 145 to 148)

TF App. 0019

Jason Harvison

Page 169

1    A.  I remember calling it just our loan
2  management system, but at some point it became our
3  Legacy system because it became somewhat dated
4  versus the newer systems we put in place.
5    Q.  Okay.  So if we use the term -- if the term
6  "Legacy" comes up, "Legacy platform," that probably
7  refers to the installment loan platform as opposed
8  to the line of credit platform?
9         MR. SCHEFF:  Object to the form.
10    A.  Okay.
11  BY MR. ACKELSBERG:
12    Q.  Is that -- is that okay?  Is that true?
13    A.  Yes.
14    Q.  Okay.  And how did the company refer to the
15  platform that operated the line of credit product
16  called Mobiloans?
17    A.  We refer to that underlying platform as the
18  CoreCard platform.
19    Q.  Okay.  I've also seen reference to
20  something called Roadrunner.  Do you know what that
21  is?
22    A.  I don't remember that name.
23    Q.  Okay.  So just so that I have it straight,
24  CoreCard is the loan platform for Mobiloans.  The
25  Legacy platform, or the LMS, would be the

Page 170

1  installment loan platform?
2    A.  Correct.
3    Q.  Okay.
4         MR. ACKELSBERG:  I show you another
5  memo by Ken Rees to the board.  This one is from
6  August of 2011, August 14, 2011, that I am going to
7  identify as Plaintiff's Exhibit 139.
8         (Exhibit No. 139 marked.)
9  BY MR. ACKELSBERG:
10    Q.  All right.  Turning on this report -- this
11  memo to the board, turning to the discussion on the
12  second page of what's referred to as "Think
13  Cash/Great Plains Lending/Plain Green Loans," in the
14  second sentence, referencing Great Plains Lending,
15  Mr. Rees says that, "This product," meaning Great
16  Plains Lending, "has a bit higher APR, and we will
17  be targeting affiliate and lead gen traffic as its
18  primary marketing channels."  Do you see that?
19    A.  I do.
20    Q.  Okay.  Now, could you explain what he's
21  referring to?  Now, you are, at this point in time,
22  overseeing the marketing teams, right?  That was
23  part of what you were doing as the -- the chief
24  product officer, right?
25    A.  In 2011, I didn't have the marketing team

Page 171

1  underneath me just yet.
2    Q.  What -- you had -- as I understand it, you
3  were vice president for products, right?
4    A.  Correct.
5    Q.  And so what was -- what did that entail?
6    A.  As I mentioned earlier, it was mainly
7  around product design, user experience, customer
8  communications, the customer service and the
9  operations role side of things, and then working
10  with the IT teams to get those products developed
11  and working with the external partners to make sure
12  we can meet the needs that they had as well.
13    Q.  Okay.  But as the product vice president
14  and as a member of the board, you understand what
15  Ken Rees is saying here when he says that Plain
16  Green has a bit higher APR -- I'm sorry -- Great
17  Plains Lending has a -- has a bit higher APR than
18  the Plain Green product and that Think will be
19  targeting affiliate and lead gen traffic as Great
20  Plains Lending's primary marketing channel; you know
21  what he's -- what he's saying there, don't you?  You
22  understand that --
23         MR. SCHEFF:  Object to the form.
24         MR. GATEWOOD:  Objection; form.
25  BY MR. ACKELSBERG:

Page 172

1    Q.  Do you understand that?
2         MR. SCHEFF:  Object to the form.
3    A.  So I can't speak to exactly what his
4  thought process was.  I can speak to what -- how I
5  understood it to read.
6  BY MR. ACKELSBERG:
7    Q.  Sure.  Why don't you do that?
8    A.  What I remember is the way we set up the
9  Great Plains program for the Otoe-Missouria tribe is
10  they put a product structure together that had a
11  slightly higher price point from an APR perspective
12  as compared to the Plain Green product.  And so what
13  that allowed them to do is actually to be able to go
14  out and market or -- or partner with us to meet
15  the product through other channels that might have
16  traffic that defaulted at a slightly higher rate.
17  And because it was priced a little bit higher,
18  there's a little bit more appetite for risk that
19  they could take from a default perspective.
20    Q.  When -- when Mr. Rees says here that, "We
21  will be targeting affiliate and lead gen traffic,"
22  he's referring to Think Finance there, is he not?
23         MR. GATEWOOD:  Objection; form.
24         MR. SCHEFF:  Object to the form.
25    A.  As I mentioned, the way I read that is

43 (Pages 169 to 172)

TF App. 0020

Jason Harvison

Page 173

1 because the program was set up with Great Plains to
2 have that structure, they were -- they had a
3 different threshold for risk tolerance to go out and
4 allow us to go market into channels that a company
5 like Plain Green might not be comfortable marketing
6 in.
7 BY MR. ACKELSBERG:
8 Q. And so is it your testimony that -- I mean,
9 did Plain Green -- is it your testimony that Great
10 Plains Lending understood that it was receiving
11 lower quality customer traffic than Great -- than
12 Plain Green was?
13 MR. GATEWOOD: Objection; form.
14 MR. SCHEFF: Object to the form.
15 A. As -- as I talked about earlier in the day,
16 when we set up the programs for Great Plains, one,
17 they design what the product structure would look
18 like and set the pricing targets, and we can go back
19 and compare on the pricing for Great Plains is set
20 higher than what Plain Green's was set at.
21 The Otoe-Missouria tribe had already been
22 using channels like affiliate and lead gen for their
23 current existing products and were comfortable with
24 going into that traffic or those channels for that
25 traffic. And so when the product was designed, that

Page 174

1 was the intent, to go into some of these channels
2 that in this past either Think Finance directly or
3 Think Finance with some of the other partners hadn't
4 marketed into before.
5 BY MR. ACKELSBERG:
6 Q. Yeah, but that wasn't my question. My
7 question was whether Think Finance told Great Plains
8 that the higher quality traffic was going to be
9 routed to Plain Green?
10 MR. GATEWOOD: Objection; form.
11 A. So I wouldn't say that the higher quality
12 traffic was being routed to -- to Plain Green. As I
13 mentioned, Otoe-Missouria, with their existing
14 product, had already been in a variety of channels.
15 These were two channels they had already been in in
16 addition to search and direct mail, as -- as other
17 channels. And so when they set this product up from
18 the beginning, the full intent was to use a broader
19 suite of channels to market into with the
20 understanding that you could have some channels that
21 performed differently from other channels.
22 BY MR. ACKELSBERG:
23 Q. And you're saying this was -- well, strike
24 that. I'll -- let's move on to the next -- the next
25 question.

Page 175

1 Yeah, I'm -- I'm still trying to get an
2 answer to the question I asked, which was, did Think
3 Finance inform Great Plains Lending that it was
4 getting lower quality marketing traffic than the
5 Plain Green product?
6 MR. GATEWOOD: Objection; form.
7 BY MR. ACKELSBERG:
8 Q. Did they or didn't they?
9 MR. SCHEFF: Object to the form; asked
10 and answered.
11 You can answer it again.
12 A. So as I said, going into the product, the
13 Great Plains Lending arrangement was so that they
14 could have a broader array -- array of channels to
15 go into. So they -- as I mentioned, they've already
16 been in these channels. They were comfortable in
17 those channels. And as the product was designed,
18 they were -- had full intent to go into those
19 channels. So they -- they were marketed there
20 because of their comfort with those -- those areas
21 to go into.
22 BY MR. ACKELSBERG:
23 Q. What's your understanding of Mr. Rees's --
24 the phrase that, "The increased interest rate will
25 help us keep our fund rates at target levels"? Do

Page 176

1 you see that?
2 MR. GATEWOOD: Objection; form.
3 BY MR. ACKELSBERG:
4 Q. What's your understanding of that?
5 A. I do see that. So the way I read that is
6 because of a product having a higher APR, it has a
7 higher yield sitting there, and so the lender is
8 able to keep a fund rated at a certain level and buy
9 into other channels that might have a little bit
10 higher loss rate. So their -- their fund rate stays
11 the same, but because it has a little bit higher
12 price point, they can take on higher losses if they
13 need to to make that channel work for them.
14 Q. Okay. The last paragraph states, "In
15 addition, we are trying to accelerate the creation
16 and lobbying efforts of the Native American Lending
17 Association. Getting all of the tribes on the same
18 page about the mission membership and activities of
19 the association has been a challenge, but I am
20 optimistic that it will be operational this quarter.
21 We anticipate using it to publicize the virtues of
22 tribal lending to develop and maintain best
23 practices and to lobby against any potential
24 legislation that might impact the products."
25 What -- my question is, what do you

44 (Pages 173 to 176)

TF App. 0021

Jason Harvison

Page 237

1      A.  So --
2    BY MR. ACKELSBERG:
3      Q.  Am I right?  Please answer that --
4         MR. SCHEFF:  Object to the form.
5    BY MR. ACKELSBERG:
6      Q.  Please answer that question first.
7         MR. SCHEFF:  You can answer -- answer
8    it as you choose.
9      A.  Sure.  So one of the things we want to do
10   is look at the program from all aspects and make
11   sure that -- make sure that it was as solid as
12   poss- -- as possible.  Once again, as I said, as
13   programs grow to the size, you want to make sure
14   that from time to time you take a step back and make
15   sure that they've been set up and are running in the
16   most efficient manners.
17   BY MR. ACKELSBERG:
18     Q.  Well, why don't you turn to page 5 of this
19   presentation that -- that you prepared.  And now --
20   and on the slide entitled, "Simple Changes to
21   Mitigate True Lender Claims," the first thing you
22   came up with was is an experienced CEO, right?  And
23   you're referring -- you're not referring to
24   Mr. Rees there, you're referring to at the tribe
25   level, right?

Page 238

1         MR. GATEWOOD:  Objection; form.
2      A.  So as I mentioned, this -- this was a
3    brainstorming exercise of things that could be done
4    to help make improvement, and it wasn't -- it wasn't
5    specific to any one tribe but just the thought
6    process of how we could make things --
7    BY MR. ACKELSBERG:
8      Q.  Right.
9      A.  -- improved.
10     Q.  Including have the tribes actually hire an
11   experienced CEO.  That was the first -- that was the
12   first thing that came out of the brainstorm, right?
13        MR. SCHEFF:  Object to the form.
14        MR. GATEWOOD:  Objection; form.
15     A.  I won't say that these were listed in any
16   particular order of --
17   BY MR. ACKELSBERG:
18     Q.  I'm sorry.  The first one you listed,
19   though, in --
20        MR. SCHEFF:  Don't interrupt his
21   answer, please.
22   BY MR. ACKELSBERG:
23     Q.  -- in this slide.
24     A.  So the first one mentioned within the
25   presentation.  But, like I said, they weren't in any

Page 239

1    kind of order of importance.
2      Q.  Well, that's because the -- there were --
3    as of this point in time, the tribes did not have an
4    experienced CEO, correct?
5         MR. GATEWOOD:  Objection; form.
6         MR. SCHEFF:  Object to the form.
7      A.  I think each tribe is at a different level
8    of what kind of experience they have within the
9    lending programs to manage their business.
10   BY MR. ACKELSBERG:
11     Q.  And how would you rank them, the three --
12   the three tribes in terms of their level of
13   sophistication with regard to the programs?
14        MR. SCHEFF:  As of December 20, 2012?
15        MR. ACKELSBERG:  Yes.
16        MR. SCHEFF:  Object to the form.
17     A.  Sure.  I think all three had made
18   significant progress in building out their -- their
19   internal business and operations.  You know, I mean,
20   to rank them, I don't -- I don't know that -- I
21   don't know what kind of system you want to use to
22   rank them on, but I think they all -- like I said, I
23   think they all had grown from an experience level,
24   grown from an understanding of the portfolios on --
25   on building out their teams.

Page 240

1         But you look at the size of these
2    business -- it's kind of, like, when you look at a
3    start-up, a start-up that has -- when we were PayDay
4    One and had five or ten people starting it up, that
5    program evolves and matures and you bring in
6    leadership as you get a more complex and more
7    sizable organization.  And as we looked and took a
8    step back and said where are these programs going,
9    you know, let's make sure they have -- let's make
10   sure we can talk to them about what could help them
11   to be as successful -- as successful as possible.
12   BY MR. ACKELSBERG:
13     Q.  I understand.  But at this point in time
14   you were preparing this, you weren't talking
15   about -- about one of the three tribes, you were
16   talking about the tribes collectively with regard to
17   this slide -- were you not?
18        MR. GATEWOOD:  Objection; form.
19        MR. SCHEFF:  Object to the form.
20     A.  Yes.
21   BY MR. ACKELSBERG:
22     Q.  Okay.  And so, collectively, you thought it
23   would be a good idea to strengthen the tribal model
24   by having the tribes hire an experienced CEO, an
25   accountant controller that was a CPA, an experienced

60  (Pages 237 to 240)

TF App. 0022

## Page 241

1  compliance vendor management executive, and an
2  experienced risk management executive, correct?
3         MR. GATEWOOD: Objection; form.
4         MR. SCHEFF: Object to the form.
5  BY MR. ACKELSBERG:
6     Q. That was your suggestion in this -- in
7  this -- in this presentation, right?
8         MR. SCHEFF: Object to the form.
9     A. So as I mentioned, as you -- as you look
10 and evaluate programs that mature to their level,
11 you're going to want to build out and have
12 specific -- one person might be able to do many
13 trades at one size, and then you've got to
14 specialize as it continues to grow. And so all of
15 three of these programs have become fairly sizable,
16 and our recommendation was that they go ahead and
17 build out this expertise or broaden it from what
18 they had before.
19 BY MR. ACKELSBERG:
20    Q. And another recommendation you had was to
21 actually establish a tribal credit committee and
22 documentation for the tribal credit committee,
23 right?
24        MR. GATEWOOD: Objection; form.
25        MR. SCHEFF: Object to the form.

## Page 242

1     A. So, yes, that was one of the
2  recommendations.
3  BY MR. ACKELSBERG:
4     Q. Now, under -- under "Improve Optics," why
5  was optics important?
6     A. So from -- the way this was presented --
7  and this also came out of some of the conversations
8  even meeting with tribal council, is when you talk
9  about a rev share, that is off -- that is off the
10 top line. That has no expenses, whether that's
11 losses, marketing expense, operational expenses.
12 It's right off the top, which -- which is a number
13 that doesn't have to be watered down.
14        But a small number of revenue versus a
15 bigger number of profit can actually be the same
16 thing. It's just there's more -- there's more items
17 that as you go through a P&L statement that are
18 taken out before you get to the net profit.
19        And so one thing we were looking at is --
20 because some of the partners would -- would get
21 confused on we want a piece of the profits, not of
22 the revenue. And so we -- we discussed can we
23 create a revenue stream that could either be a
24 revenue share from the top of the funnel or a piece
25 of the profit so that we can -- we can help

## Page 243

1  eliminate any kind of confusion that was out there.
2     Q. Are you -- are you saying that the idea to
3  shift from 4 percent revenue share to a percent
4  profit share was the tribe's idea?
5         MR. SCHEFF: Object to the form.
6     A. So that's not what I was saying, but I --
7  BY MR. ACKELSBERG:
8     Q. Oh, okay.
9     A. But what I was saying is --
10    Q. I thought that's what you said.
11        MR. SCHEFF: Object to the form. Let
12 him finish his answer.
13    A. What I did say is that there was confusion
14 from the tribes when I was meeting with some of the
15 council members, not the entire tribes or the actual
16 lenders, but when I would meet with the council
17 members of trying to understand the difference
18 between a revenue share versus a profit share. And
19 so we wanted to create a vehicle to where they could
20 look at either one of those numbers and feel
21 comfortable with it.
22 BY MR. ACKELSBERG:
23    Q. And another idea you had for improving the
24 optics would be to have no automatic end-of-day
25 funding, to actually require daily tribal review

## Page 244

1  prior to funding of loans, correct? That was
2  another one of your ideas?
3         MR. SCHEFF: Object to the form.
4         MR. GATEWOOD: Objection; form.
5     A. So as I mentioned before, and also multiple
6  times earlier in the conversation, the lenders all
7  had the -- the preapproved underwriting criteria
8  established in any changes taking place. They still
9  had the right to go in and -- and review anything at
10 the end of the day. This was one suggestion of do
11 we make that a -- does this system make that
12 mandatory that they have to go in and do that
13 review, or do we keep leaving -- leaving that as
14 what I mentioned earlier, as more of a belts and
15 suspenders approach to where they know that it's
16 already there, met their criteria, they know they
17 can audit. It's just the third step in the process
18 where you can that make manually -- or make that
19 mandatory.
20 BY MR. ACKELSBERG:
21    Q. Now, at the same time that Think was
22 looking for ways -- or that you, as the chief
23 product officer, was looking at ways to mitigate the
24 true lender risk, Think's true lender risk, am I
25 right that Think also hired the accounting firm of

# EXHIBIT C

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

Michelle Nyugen

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO, *
    Plaintiff, *
     *
VS.     * Civil Action
    * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
    Defendants. *

********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
MICHELLE NYUGEN
APRIL 19, 2018

********************************************************

    DEPOSITION of MICHELLE NYUGEN,
produced as a witness at the instance of the
Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on the 19th day of
April, 2018, from 9:04 a.m. to 5:20 p.m., before
Christy R. Sievert, CSR, RPR, in and for the State
of Texas, reported by machine shorthand, at the
offices of Hunton & Williams, LLP, 1445 Ross Avenue,
Suite 3700, Dallas, Texas 75202, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

## Page 2

1
2        A P P E A R A N C E S
3  COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4    MR. JOHN J. GROGAN
    MR. IRV ACKELSBERG
5    Langer, Grogan & Diver, PC
    1717 Arch Street, Suite 4130
6    Philadelphia, Pennsylvania 19103
    Phone: 215-320-5701
7    E-mail: iackelsberg@langergrogan.com
    jgrogan@langergrogan.com
8
9    MR. SAVERIO "SAM" MIRARCHI
    Senior Deputy Attorney General
    Bureau of Consumer Protection
10    1600 Arch Street, Suite 300
    Philadelphia, Pennsylvania 19103
11    Phone: 215-560-2445
    E-mail: smirarchi@attorneygeneral.gov
12
13  COUNSEL FOR MICHELLE NYUGEN:
14    MR. RICHARD L. SCHEFF
    Montgomery, McCracken, Walker & Rhoads, LLP
15    123 South Broad Street
    Philadelphia, Pennsylvania 19109
16    Phone: 215-772-7502
    E-mail: rscheff@mmwr.com
17
18  COUNSEL FOR KENNETH REES:
19    MR. DAVID F. HERMAN
    Montgomery, McCracken, Walker & Rhoads, LLP
20    123 South Broad Street
    Philadelphia, Pennsylvania 19109
21    Phone: 215-772-7502
    E-mail: dherman@mmwr.com
22
23
24
25

## Page 3

1       A P P E A R A N C E S
        (continued)
2
  COUNSEL FOR THINK FINANCE, INC.:
3
    MR. MATT GATEWOOD
4    Eversheds Sutherland (US), LLP
    700 Sixth Street, NW, Suite 700
5    Washington, D.C. 20001
    Phone: 202-383-0100
6    E-mail: mattgatewood@eversheds-sutherland.com
7
  COUNSEL FOR VICTORY PARK CAPITAL:
8
    MR. DANIEL P. SHAPIRO
9    MR. MATTHEW W. HAWS
    Katten Muchin Rosenman, LLP
10    525 W. Monroe Street
    Chicago, Illinois 60661
11    Phone: 312-902-5622
    E-mail: daniel.shapiro@kattenlaw.com
12    matthew.haws@kattenlaw.com
13
  COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
14
    MR. PATRICK DAUGHERTY
15    Van Ness Feldman, LLP
    1050 Thomas Jefferson Street, NW
16    Seventh Floor
    Washington, D.C. 20007
17    Phone: 202-298-1874
    E-mail: pod@vnf.com
18
19  ALSO PRESENT:
20    GUS PHILLIPS, Videographer
    KEVIN BYERS
21    SCOTT ZEMINCK (Appearing telephonically)
22
23
24
25

## Page 4

1        I N D E X
2          PAGE
Appearances................................ 2-3

Exhibits.................................... 5-6

Proceedings................................. 7

MICHELLE NYUGEN:

  Examination by Mr. Grogan.................. 8
  Examination by Mr. Gatewood............... 287
Changes and Signature.................... 307-308
Reporter's Certification................ 309-310

Michelle Nyugen

## Page 5

EXHIBITS

| | PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|---|
| | Exhibit 178 | Key Initiatives, Growth & Profitability | 84 |
| | | TF-PA 671684 - 671695 | |
| | Exhibit 179 | E-mail correspondence 7-31-13, Re: Updated | 119 |
| | | TF-PA 521098 - 521113 | |
| | Exhibit 180 | E-mail correspondence 5-20-14, Re: MBL Council Visit 5-27-14 (2).pptx | 167 |
| | | TF-PA 300666 - 300706 | |
| | Exhibit 181 | E-mail correspondence 11-21-14, Re: Plain Green Control of Loan Underwriting Criteria and Process | 184 |
| | | TF-PA 673863 - 673864 | |
| | Exhibit 182 | E-mail correspondence 5-8-15, Re: Plain Green Agreement | 186 |
| | | TF-PA 667815 - 667817 | |
| | Exhibit 183 | E-mail correspondence 3-18-14, Re: Summer Job | 197 |
| | | TF-PA 120366 - 120369 | |
| | Exhibit 184 | E-mail correspondence 4-17-14, Re: Updated Online Consumer Lending 2014.pptx | 201 |
| | | TF-PA 276040 - 276067 | |
| | Exhibit 185 | E-mail correspondence 4-11-14, Re: Decks from qbr | 215 |
| | | TF-PA 611729 - 611756 | |
| | Exhibit 186 | E-mail correspondence 5-2-13, Re: Exec agenda | 232 |
| | | TF-PA 515479 - 515544 | |
| | Exhibit 187 | E-mail correspondence 5-7-15, Re: Board Tutorial 5-7-14.pptx | 241 |
| | | TF-PA 708090 - 708151 | |

## Page 6

EXHIBITS
(continued)

| | PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|---|
| | Exhibit 188 | E-mail correspondence 3-30-12, Re: VPC Covenant - Max Lines on PGL | 246 |
| | | TF-PA 309917 - 309919 | |
| | Exhibit 189 | E-mail correspondence 10-4-13, Re: AGAIN! Decision: Tribal customer acquisition | 250 |
| | | TF-PA 244554 - 244557 | |
| | Exhibit 190 | E-mail correspondence 5-3-13, Re: Latest Consumer Loan Agreements | 261 |
| | | GPLP00006040 - 00006043 | |
| | Exhibit 191 | E-mail correspondence 1-18-13, Re: PG credit agreement | 266 |
| | | TF-PA 041391 - 041392 | |

| | DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|---|
| | Exhibit 1 | E-mail correspondence 11-21-14, Re: Privileged and Confidential: Re: Plain Green Control of Loan Underwriting Criteria and Process | 288 |
| | | TF-PA 673861 - 673862 | |

## Page 7

PROCEEDINGS

THE VIDEOGRAPHER: We are now on the record for the videotaped deposition of Michelle Nguyen. The time is 9:04 a.m., April 19, 2018. In the matter of the Commonwealth of Pennsylvania, et al, vs. Think Finance, Incorporated, et al., Civil Action No. 14-7139-JCJ, being held in the United States Court for the Eastern District of Pennsylvania.

The court reporter is Christy Sievert, and the videographer is Gus Phillips. Both are representatives of Kaplan, Leaman & Wolfe Court Reporters.

Will counsel please state their appearances for the record.

MR. GROGAN: John Grogan for the Commonwealth of Pennsylvania.

MR. ACKELSBERG: Irv Ackelsberg, same.

MR. MIRARCHI: Saverio Mirarchi for the Commonwealth of Pennsylvania.

MR. DAUGHERTY: Patrick Daugherty on behalf of National Credit Adjusters.

MR. HAWS: Matthew Haws on behalf of the Victory Park defendants.

MR. SHAPIRO: Dan Shapiro for the

## Page 8

Victory Park defendants. And Scott Zeminck is on the phone with us, general counsel of Victory Park.

MR. GATEWOOD: Matthew Gatewood for the Think Finance defendants.

MR. HERMAN: David Herman on behalf of Kenneth E. Rees.

MR. SCHEFF: Richard Scheff for Michelle Nguyen.

MR. GROGAN: Could we also identify a second person on the phone, please? Is there --

MR. HERMAN: No, that's the --

MR. SCHEFF: He already did.

MR. ACKELSBERG: That was just this phone. All right.

MR. GROGAN: Swear in the witness, please.

MICHELLE NYUGEN
having been first duly sworn,
testified as follows:
EXAMINATION
BY MR. GROGAN:

Q. Good morning, Ms. Nguyen.

A. Good morning.

Q. Am I pronouncing your last name correctly?

A. Yes.

2 (Pages 5 to 8)

TF App. 0025

Michelle Nyugen

Page 101

1      Q.  -- Plain Green, not Great Plains?
2      A.  With Plain Green.
3      Q.  And do you -- do you know why?
4      A.  Why. . .
5      Q.  Why Plain Green, but not Great Plains?
6      A.  At that time, Great Plains was not live.
7      Q.  So Plain Green was ready to -- to go live
8   earlier than Plain Green -- than Great Plains?
9      A.  From the timeline I recall, Plain Green was
10  live in the spring.  Great Plains was live in the
11  summer.
12     Q.  So you testified before that at least as of
13  November 2010, there had been no conversation with
14  the tribes.
15     A.  Not with me.
16     Q.  Okay.  Do you know if anybody else at Think
17  Finance had been talking to tribes?
18     A.  Talking to tribes?
19     Q.  Yeah.
20     A.  I don't -- I don't know.
21     Q.  Okay.  And Plain Green was up and lending
22  when?
23     A.  I believe the date was in April.
24     Q.  Of 2011?
25     A.  Correct.

Page 102

1      Q.  And they were the first of the -- of the
2   tribal products?
3      A.  That's correct.
4      Q.  Okay.  And who followed Plain Green in
5   terms of coming on live?
6      A.  Who followed?
7      Q.  Which tribe followed?
8      A.  Oh, after?
9      Q.  Yeah.
10     A.  The second tribe was Otoe-Missouria, and
11  the offering was called Great Plains.
12     Q.  Okay.  And both of the Great -- both the
13  Great Plains product and the Plain Green product
14  were installment loan products; is that correct?
15     A.  Both Plain Green and Great Plains were
16  installment loan offerings.
17     Q.  Okay.  And then there came a time when you
18  developed a relationship with the -- the Tunica
19  tribe in Louisiana; is that correct?
20     A.  That's correct.
21     Q.  Okay.  Did you travel there?
22     A.  I did later.
23     Q.  Okay.  But not for the initial discussions
24  of the potential relationship?
25     A.  No.

Page 103

1      Q.  Okay.  And that eventually became
2   Mobiloans?
3      A.  That's correct.
4      Q.  Okay.  And Mobiloans was a line of credit
5   product?
6      A.  That's correct.
7      Q.  And were you involved in the decision as
8   to -- or why was Mobiloans line of credit instead of
9   installment?
10         MR. SCHEFF:  Object to the form.
11         You can answer the question.
12     A.  I wasn't part of that decision, because I
13  wasn't part of the initial ideation of that tribe.
14  BY MR. GROGAN:
15     Q.  Who was?
16     A.  Jason Harvison.
17     Q.  Okay.  Would Jason have decided that they
18  should be a line of credit product?
19         MR. GATEWOOD:  Objection; form.
20         MR. SCHEFF:  Object to the form.
21     A.  When we have ideation with a -- with a
22  tribe as a service provider, we talk about the
23  different options.  And so I would -- I would not
24  say that it was his decision.
25  BY MR. GROGAN:

Page 104

1      Q.  Okay.
2      A.  It was a decision made by all parties.
3      Q.  Okay.  And what's the difference between an
4   installment product and a line of credit product?
5      A.  The installment product is a closed loan
6   product, where a consumer can pay the loan off over
7   several payments.  And just depends on the term and
8   the length of the loan.
9          A line of credit product is an open --
10  open-ended product, meaning that they have a credit
11  upon which they can draw and pay down and draw
12  again.
13     Q.  Okay.  And had Think Finance ever been
14  involved with the line of credit product before
15  Mobiloans?
16     A.  Yes.
17     Q.  To the point where it got live?
18     A.  Yes.
19     Q.  And what product was that?
20     A.  Elastic.
21     Q.  Elastic.  The state-based Elastic?
22     A.  This is Elastic that is in partnership with
23  a bank.
24     Q.  Irving Trust Bank?
25     A.  That's correct.

26  (Pages 101 to 104)

TF App. 0026

Michelle Nyugen

## Page 105

1    Q.  How long did that product last?
2    A.  I can't recall.  I wasn't in charge of that
3    offering, so I don't --
4    Q.  Who was in charge of that?
5    A.  Jason Harvison, ultimately.  But an
6    individual named Kerry Baker at the time.
7    Q.  Okay.  So at this time now, with the three
8    tribal products coming online, what were your
9    responsibilities at Think?
10   A.  In 2011?
11   Q.  Yeah.
12   A.  My responsibilities were similar in regards
13   to my relationship with First Bank of Delaware.  I'm
14   a service provider, and assisted them in terms of
15   defining the product, making sure it was live, to
16   their specifications.  The brand, the marketing,
17   look and the feel, and any enhancements they wanted
18   to the product offering, as well as just being their
19   general point of contact.
20   Q.  And you had responsibility for those
21   functions with regard to each of the tribal
22   products: Great Plains, Plain Green, and Mobiloans?
23   A.  Plain Green and Great Plains in 2011, and
24   then eventually Mobiloans.
25   Q.  Who was handling Mobiloans in 2011?

## Page 106

1    A.  It was Jason Harvison, along with that
2    Kerry Baker.
3    Q.  And what was the -- why was -- do you
4    understand why Mobiloans was not within your purview
5    at that point, in 2011?
6    A.  It was -- my understanding, was just
7    bandwidth.  As you're assisting an organization with
8    a startup, there's a lot of -- lot to do as a
9    startup organization.  And so I just didn't have
10   enough bandwidth.
11   Q.  Now, as you started out in 2011, were the
12   Great Plains and Plain Green products on the -- the
13   loan management system at Think Finance?
14   A.  They were using the loan management system.
15   Q.  Okay.
16   A.  Our platform.
17   Q.  The same one that ThinkCash and PayDay One
18   had been on?
19   A.  As the service provider, they were using
20   the same platform.  Again, it was segregated, as a
21   service provider will do.
22   Q.  But the same platform?
23   A.  Correct.
24   Q.  And was Mobiloans also on that platform?
25   A.  No.

## Page 107

1    Q.  Okay.  That was on a separate platform?
2    A.  That's correct.
3    Q.  Did they have different names?
4    A.  The -- the platforms?
5    Q.  Yeah.
6    A.  I mean, the -- what I recall from the --
7    the platform for Mobiloans, the loan -- the core
8    loan management system was called CoreCard.  So that
9    was actually the first time we utilized an outside
10   loan management system.  And then it was part of the
11   overall platform.
12   Q.  And which of the tribal products resided on
13   CoreCard?
14   A.  Just the line of credit, the Mobiloans
15   offering.
16   Q.  Okay.  And the others remained.  And do you
17   know why that was?
18   A.  Why?
19   Q.  Why the line of credit product would be on
20   a separate loan management platform than the
21   installment loan products.
22   A.  Speed to market.
23   Q.  How -- how so?
24   A.  As I mentioned before, our -- our platform
25   was designed to support payday and installment

## Page 108

1    loans.  It would take longer to make modifications
2    for a line of credit.  And so the decision was made
3    technically to utilize another loan management
4    system to -- to embed into the overall platform.
5    Q.  You testified earlier that Plain Green came
6    online in April of 2011.
7    A.  Yes.
8    Q.  When did Great Plains go live, if you
9    recall?
10   A.  I recall the summer of -- of that year.
11   Q.  And how about Mobiloans?
12   A.  I -- I recall the fall of that year.
13   Q.  All right.  Let's try Document A.
14        How are you doing?
15   A.  I need to go to the restroom.
16        MR. SCHEFF:  We've been going a little
17   less than an hour.  Do you want to go to the
18   restroom?
19        THE WITNESS:  Yeah.
20        THE VIDEOGRAPHER:  We are off the
21   record.  The time is 11:14 a.m.
22        (Break taken, 11:14 a.m. to 11:25 a.m.)
23        THE VIDEOGRAPHER:  We are back on the
24   record.  The time is 11:25 a.m.
25   BY MR. GROGAN:

27  (Pages 105 to 108)

Michelle Nyugen

Page 109

1    Q.  Ms. Nguyen, before we move on to the next
2  document, I wanted to ask you some follow-up
3  questions about the meetings, the initial meetings
4  with certain of the tribes.
5    You testified that the first one you
6  attended was in South Dakota with Mr. Webb; is that
7  correct?
8    A.  Right.
9    Q.  Who else was at that meeting?
10    A.  From Think Finance?
11    Q.  Who entirely.
12    A.  At least with Think Finance, it was myself,
13  Sarah Cutrona, Chris Lutes, Ken Rees.
14    Q.  Okay.  Do you recall anybody else from the
15  tribal side?
16    A.  It was only one meeting.  I -- I don't
17  recall who else.  It was really just Butch Webb and
18  whoever his associates were.
19    Q.  I see.  And over the course of your career
20  at Think Finance, how many initial meetings with
21  tribal entities did you attend?
22    A.  And you define "initial meetings" as the
23  first meeting?  The introductory meeting?
24    Q.  Yeah.
25    A.  Six or seven.

Page 110

1    Q.  Okay.  And generally, what would occur at
2  such a meeting?  Did they follow a pattern?
3    A.  Generally, the introductory meetings, we
4  would meet with individuals of the tribe, so whether
5  that be individuals as part of their economic
6  development organization, as an example, or even if
7  the tribe was smaller, possibly with the chairman or
8  the vice chairman or chairperson.
9    We would talk a bit about Think Finance
10  and the capabilities that we had as service
11  provider.  We would talk about, you know, the
12  platform, the marketing services, the underwriting
13  services.  We would discuss, you know, the -- if
14  they were so inclined, even go to a deeper
15  discussion of, you know, what they were initially
16  thinking from a product perspective.
17    And then we would also get to know that
18  tribe and really understand them as a tribe.  I
19  said, you know, earlier, their -- their essence,
20  meaning, you know, what's important to them for the
21  tribe, how that's important in terms of their brand,
22  and building that brand to make sure it aligned with
23  the tribe's values.  And -- and part of that was
24  actually meeting with other members of the tribe and
25  walking around, you know, the -- the tribe's

Page 111

1  grounds, if you will.
2    Q.  So what if the tribes that you were
3  speaking with had no money to lend?
4       MR. GATEWOOD:  Objection; form.
5       MR. SCHEFF:  Object to the form.
6    A.  In our earlier discussions, we didn't go
7  into that level of detail.  It was --
8  BY MR. GROGAN:
9    Q.  In the first --
10    A.  -- introductory, about who we were and who
11  they are and if there was a --
12    Q.  Well, I just imagine that if I were a
13  tribe, particularly an impoverished tribe, the first
14  thing I would say is, "Well, how -- I don't have any
15  money to lend.  How can I be a lender?"  Did that
16  ever come up?
17       MR. GATEWOOD:  Objection; form.
18       MR. SCHEFF:  Object to the form.
19    A.  I think I recall a meeting or so where a
20  tribe would indicate that it would want to
21  understand the next steps if they wanted to become a
22  lender and to have partnerships with us.
23  BY MR. GROGAN:
24    Q.  And how did you respond to that?
25    A.  My response would be -- what I recall

Page 112

1  saying was, you know, we needed to understand a
2  little bit more, sign an NDA, and we can start
3  having an ideation session with them.
4    Q.  But a tribe not having any money to lend
5  wasn't a deal breaker for Think Finance, right?
6       MR. GATEWOOD:  Objection; form.
7       MR. SCHEFF:  Object to the form.
8    A.  Yeah, I can't recall the specifics.  Each
9  tribe is different in terms of why we would partner
10  with them or not, or if the tribe decided to partner
11  with us.  It goes both ways.
12  BY MR. GROGAN:
13    Q.  Well, the three tribes that you did partner
14  with, at least in 2011 --
15    A.  Okay.
16    Q.  -- did they have lending capital available?
17    A.  You know, I wasn't privy to their
18  financials and how they utilized it.  So. . .
19    Q.  You didn't participate, you said, in the
20  negotiation of the terms with regard to the three
21  tribes in 2011.  Is that -- was that your testimony?
22    A.  That's correct.
23    Q.  Did you later come to participate in
24  negotiations with other tribes?
25    A.  I participated in the negotiations of the

28  (Pages 109 to 112)

TF App. 0028

Michelle Nyugen

Page 113

1  existing tribes at a later date.
2  Q. When was that?
3  A. I believe it was either -- it was probably
4  2014 or 2013.
5  Q. Renegotiation of the deals with. . .
6  A. With -- renegotiating of the contracts with
7  the Chippewa, Otoe, and Tunica.
8  Q. Okay. How long -- how many times were
9  those deals renegotiated? Do you recall?
10  A. Each tribe was different.
11  Q. How about Plain Green?
12  A. I recall specifically three times.
13  Q. Three times?
14  A. Uh-huh (affirmative response).
15  Q. How about Mobiloans?
16  A. What I recall is -- when I left, they were
17  still negotiating, so I guess you can call it one
18  and a half.
19  Q. Okay. And how about Plain Green -- or
20  Great Plains. Sorry.
21  A. For the Otoe, I think it's similar in terms
22  of it wasn't complete. So you could say one and a
23  half.
24  Q. And in those subsequent negotiations; that
25  is, not the first negotiation, were you involved in

Page 114

1  those?
2  A. For the -- the Chippewa?
3  Q. Yes, let's start there.
4  A. Yeah. I was involved in the second, but
5  not the -- the third. I think I -- I had already
6  left by the time it was completed.
7  Q. And who else from Think was involved in
8  that renegotiation discussion?
9  A. You know, this was in 2014, so it was
10  Martin Wong.
11  Q. Okay. Anybody else?
12  A. Counsel probably, just to write it up, and
13  the CFO at the time.
14  Q. How about the second go-round with
15  Mobiloans?
16  A. Mobiloans was around the same time period,
17  and so that would involve Martin Wong as well.
18  Q. What precipitated the renegotiation? Was
19  there a term to the first agreement that expired, or
20  just new issues arose, or. . .
21  MR. SCHEFF: Object to the form.
22  You can answer the question.
23  A. Each tribe was different. So for the
24  Chippewa Cree, they had indicated that they wanted
25  to renegotiate the terms because they were -- had

Page 115

1  hired new individuals in terms of the organization.
2  And they specifically had indicated to me that
3  they're looking for a short-term renegotiation of
4  six months because they're eventually going to not
5  need the services of Think Finance as a platform
6  provider. They had already evolved, and this is
7  already, call it, four or five years of the
8  evolution of their offering, so they were. . .
9  BY MR. GROGAN:
10  Q. And so we're talking about 2014?
11  A. Correct.
12  Q. By 2014, they -- they felt they were pretty
13  close to being able to go on their own?
14  MR. SCHEFF: Object to the form.
15  You can answer the question.
16  A. In 2014, I specifically had conversations
17  with their COO, who indicated that they only wanted
18  to do a six-month deal in order to -- because they
19  were going to separate and not need Think Finance as
20  a platform provider or a service provider anymore.
21  BY MR. GROGAN:
22  Q. And at that time, did you think they were
23  ready to go on their own?
24  A. I was surprised, because they didn't share
25  internal strategies. Which, that's their decision.

Page 116

1  That's their business strategy. So, yes, I was
2  surprised.
3  Q. You were surprised?
4  A. Uh-huh (affirmative response).
5  Q. How about with Mobiloans, do you recall
6  what occasioned their desire to -- to renegotiate?
7  MR. SHELDON: Object to the form.
8  You can answer.
9  A. So the -- the Tunica tribe, they were
10  always looking to take on more ownership. And so I
11  think that's what -- that was the -- the reason.
12  BY MR. GROGAN:
13  Q. And how about with regard to Great Plains?
14  MR. SCHEFF: Same objection.
15  You can answer.
16  A. I can't recall Otoe specifically, just
17  because, like I said, that was a longer process, and
18  it wasn't complete. So I can't recall the -- the
19  start, why.
20  BY MR. GROGAN:
21  Q. And do you recall in your tenure at Think
22  Finance, did Think ever come to an agreement with
23  another tribe other than the Chippewa, the Otoe, and
24  the Tunica?
25  A. Not when I was there. When I had left, we

29 (Pages 113 to 116)

TF App. 0029

Michelle Nyugen

| Page 117 | Page 119 |
|---|---|

**Page 117**

1  were still in negotiations with another tribe.
2  Q.  Do you happen to know whether they've come
3  to an agreement with another tribe since you've
4  left?
5  A.  I'm aware that they have.
6  Q.  And which tribe is that?
7  A.  I believe they're called Rosebud South
8  Dakota.
9  Q.  Okay.  And is there a lending product
10  associated with the Rosebud tribe?
11  A.  Yes.
12  Q.  Now, as I understand it, Mobiloans is still
13  in business.  Is that correct?
14  A.  That's my understanding.
15  Q.  Do you know if Plain Green is still in
16  business?
17  A.  That's my understanding.  They're doing it
18  themselves.
19  Q.  Okay.
20  A.  They have their own platform.
21  Q.  Do you know if anybody from Think Finance
22  is working with Plain Green?
23  A.  I understand that there's some individuals
24  that are working, yeah.
25  Q.  Do you know who they are?

**Page 118**

1  A.  Yes.
2  Q.  Who are they?
3  A.  Linda Callnin.
4  Q.  Linda Callnin is working for Plain Green?
5  A.  That's my understanding.
6  Q.  Anybody else?
7  A.  An individual in marketing.
8  Q.  Do you recall the name?
9  A.  His name is Guy Dilger.
10  Q.  Anybody else?
11  A.  I think another person in accounting.
12  Q.  Anybody else?
13  A.  From Think Finance?
14  Q.  Yeah.  Or -- or somebody who might have
15  gone to Elevate.
16  A.  Those are the three that I recall.
17  Q.  Okay.  Are you in contact with those folks?
18  A.  I am via LinkedIn.
19  Q.  How about Great Plains?  Now, I understand
20  it, Great Plains went out of business at some point.
21  A.  Okay.
22  Q.  I mean, do you know that?
23  A.  I haven't kept up with their offering.
24  Q.  Do you know if they're back in the market?
25  A.  I -- what I understand is, Otoe still has

**Page 119**

1  the American Web Loan offering that they had prior.
2  I don't -- I don't know what happened with Great
3  Plains or if it's on or off or what have you.
4  Q.  When you left, Great Plains was still live
5  with Think Finance?
6          MR. GATEWOOD:  Objection; form.
7  A.  When I left, Think Finance was still
8  supporting the Great Plains platform.
9  BY MR. GROGAN:
10  Q.  Okay.  Let's -- let's change directions a
11  little -- well, not really, but let's get a new
12  document, anyway.  We're marking this as P-179.  And
13  I would ask you to take a look at that.  The --
14  there is a cover e-mail, but my main interest is
15  with the attachments and e-mail which. . .
16          (Exhibit No. P-179 marked.)
17  BY MR. GROGAN:
18  Q.  Again, my question is, you're familiar with
19  this?
20  A.  Let me look through it.
21      (Reviews document.)
22  BY MR. GROGAN:
23  Q.  All set?
24  A.  Yes.
25  Q.  Do you recognize this document?

**Page 120**

1  A.  I'm familiar with it now.
2  Q.  Were you the author of this document?
3  A.  I think so.
4  Q.  All right.  Our metadata indicates that as
5  well.  Okay.  Great.
6      This is -- we've jumped ahead quite a bit.
7  We're in April of 2013.
8  A.  Is it April or July?
9  Q.  You're right.  July.  July.  Okay.
10     What is an executive offsite, by the way?
11  A.  That's where the executive team and key
12  leaders go to an all-day session to do strategy
13  planning.
14  Q.  Did you do that regularly in the course of
15  your business?
16  A.  Quarterly.
17  Q.  Quarterly.  Okay.  And who would attend?
18  A.  The executives and key leaders.
19  Q.  So Mr. Rees?
20  A.  Sorry.  Yes.  Ken, Chris Lutes, Jason
21  Harvison, Sarah Cutrona, Kevin Dahlstrom.
22  Q.  I don't mean to -- to flatter you, but my
23  understanding is that you're in that executive
24  group.  Or is that not an accurate reading of your
25  hierarchy?

30  (Pages 117 to 120)

TF App. 0030

Michelle Nyugen

Page 125

1    hires, you mean a hire within the tribal lending
2    organization, the Plain Green, Great Plains, and
3    Mobiloans?
4        A.  That's correct.
5        Q.  Not additional staff at Think Finance?
6        A.  No.
7        Q.  Okay.  And all three have -- had tribal
8    call centers at that point; that's correct?
9        A.  Yes.
10       Q.  Okay.  So if there's nothing filled in the
11   box underneath each of the tribal products, that
12   means that that benchmark of tribalization had not
13   yet been established?
14           MR. GATEWOOD:  Objection; form.
15       A.  From what I recall, if there wasn't an
16   indication here, then the tribe was still utilizing
17   Think Finance to provide those services and wasn't
18   able to take that in-house yet.
19   BY MR. GROGAN:
20       Q.  Okay.  Good.
21           You talk about the -- one of the items is
22   "tribal regulatory commission."  Do you recall what
23   that was referring to?
24       A.  From what I recall, I mean, that was
25   guidance based off of internal counsel.

Page 126

1            MR. GROGAN:  This is your moment.
2            MR. GATEWOOD:  You have to ask another
3    question.
4            MR. GROGAN:  Oh, okay.
5    BY MR. GROGAN:
6        Q.  Counsel recommended that you have tribal
7    regulatory -- that they have tribal regulatory
8    commissions?
9            MR. GATEWOOD:  I would instruct the
10   witness not to answer to the extent that the answer
11   is derived from discussions with in-house counsel.
12   BY MR. GROGAN:
13       Q.  Okay.  To the extent -- and I really don't
14   want you to tell me what your counsel told you.  But
15   do you have any understanding that didn't come from
16   counsel as to why tribal regulatory commissions were
17   important?
18           MR. SCHEFF:  Object to the form.
19           You can answer the question.
20       A.  The information I understand from tribal
21   regulatory, that piece came from counsel.
22   BY MR. GROGAN:
23       Q.  I understand.  Okay.
24           "All third-party contracts in the tribe's
25   name."  And there's nothing filled in, in the boxes.

Page 127

1    What third-party contracts are you referring to?
2        A.  This is 2013?
3        Q.  July 2013.
4        A.  From what I recall, these would be
5    contracts such as an agreement with a marketing
6    organization to print their direct mail pieces.  In
7    the beginning, because it's a startup, oftentimes
8    us, as the marketing agency, would have the -- the
9    direct contracts.  And the thought is, now that it's
10   over time, and the tribe had always indicated that
11   they wanted to evolve and do things on their own,
12   this is one of those indications of "You can have
13   the direct contract with the print house," as an
14   example.
15       Q.  I see.  This is 2013, though, and they
16   started in 2011.  So we're two years into the tribal
17   lending programs?
18       A.  Depends -- right.  Because each tribe went
19   live different times.  And so, you know, as -- that
20   would be one and a half, two years, you know, which
21   is pretty young in a startup organization.
22       Q.  Okay.  Well, with regard to Plain Green, it
23   was -- they started in April of '11.  And this is
24   July 13th, right?
25       A.  Sure.

Page 128

1        Q.  So that's two years.
2        A.  Okay.
3        Q.  And with regard to Great Plains, you said
4    it was the summer of 2011?
5        A.  Sure.
6        Q.  So that's two years.
7        A.  And then Mobiloans is not --
8        Q.  A little bit less?
9        A.  Right.
10       Q.  Okay.  What about the risk credit
11   committee, what was that function -- what's the
12   function of a risk credit committee?
13       A.  The function of a risk credit committee
14   would be within a -- a lending organization to -- to
15   formally have a credit committee that would have
16   individuals that are working in the organization
17   with the rest -- with an underwriting or risk
18   background.
19       Q.  Doing underwriting and risk analysis?
20           MR. GATEWOOD:  Objection; form.
21           MR. SCHEFF:  Object to the form.
22       A.  Each organization, as a lender, can have --
23   their credit committees can vary.  Some of them --
24   BY MR. GROGAN:
25       Q.  And so what they do --

32  (Pages 125 to 128)

TF App. 0031

Michelle Nyugen

Page 129

1    A.   Some of them can be specifically the
2  underwriting, or some of them can be review and
3  audit.
4    Q.   And why did you think it important that the
5  tribes have risk credit committees?
6         MR. SCHEFF:  Object to the form.
7    A.   As I mentioned before, you know, as the
8  evolution of the tribes, you know, this is another
9  step for them to take on ownership and evolve as a
10 lender and to, you know, have -- to begin doing
11 their own underwriting.  They, you know, still are
12 looking to us as experts.
13 BY MR. GROGAN:
14   Q.   What couldn't they do without a risk credit
15 committee that you thought they should be doing?
16        MR. GATEWOOD:  Objection; form.
17   A.   I don't -- I wouldn't say it that way, in
18 terms of what they couldn't -- or could not do.
19 BY MR. GROGAN:
20   Q.   How would you say it?
21   A.   You know, as they've evolved, to, you know,
22 create more controls and audits in place.  And this
23 is an example of a -- one of those.  Just like a
24 large organization, you'll have a SOC.  But small
25 organizations that are startups, you don't have SOC;

Page 130

1  one, because it's not necessary.
2    Q.   I see.  And what functions of a risk credit
3  committee -- were those functions simply not being
4  done, or was Think Finance doing it?
5         MR. GATEWOOD:  Objection; form.
6    A.   I think, as I mentioned, it all depends on
7  the -- the definitions each lender would have for a
8  credit committee.  But they -- each of the tribes
9  worked with Think Finance to perform underwriting
10 capabilities and provide recommendations, and every
11 single time there is any changes or recommendations
12 to changes, the tribes would review that, and we
13 would have lengthy discussions of the impact to the
14 portfolio.
15 BY MR. GROGAN:
16   Q.   What would the tribe do to work with Think
17 to develop the underwriting principles?  What did
18 they do?
19   A.   I think it depends on the stage of their
20 evolution.  So are you -- are you asking in 2011,
21 when they started, or in 2014?
22   Q.   Let's ask right now in 20 -- July 2013.
23 Because you wrote this down as an important -- I
24 assume an important item.  And I'm not clear about
25 what you meant with regard to those functions, what

Page 131

1  a risk credit committee would be doing and why it
2  was important for the tribes to be doing that.
3         MR. SCHEFF:  Do you have a question
4  there?  Why don't you ask --
5         MR. GROGAN:  Yeah.
6         MR. SCHEFF:  -- the question?
7         MR. GROGAN:  Well, that's the
8  question.
9         MR. SCHEFF:  Well, it didn't sound
10 like a question.  So why don't you rephrase it to
11 sound like a question?
12        MR. GROGAN:  Can you read back what I
13 wrote?
14        COURT REPORTER:  "Let's ask right in
15 July 2013.  Because you wrote this down as an
16 important -- I assume an important item.  And I'm
17 not clear about what you meant with regard to those
18 functions, what a risk credit committee would be
19 doing and why it was important for the tribes to be
20 doing that."
21        MR. SCHEFF:  Is that your question?
22 BY MR. GROGAN:
23   Q.   What did the risk credit -- what would a
24 risk credit committee do, and why was it important
25 for the tribes to be doing it?

Page 132

1         MR. GATEWOOD:  Objection; form.
2         MR. SCHEFF:  Object to the form.
3         You can answer the question if you can.
4    A.   Each tribe is different.  So an example is
5  Mobiloans.  They are always reviewing and are -- any
6  of the underwriting, or they can also audit.  So
7  that it would be a formalization of that process.
8  That could be minutes.  That could look like in the
9  form of a weekly internal evaluation of the
10 portfolio.  And it's just formalized.
11 BY MR. GROGAN:
12   Q.   So they were doing something already, but
13 it just wasn't formalized?
14        MR. SCHEFF:  Object to the form.
15        You can answer the question if you can.
16   A.   Like, from what I recall, again, it's a lot
17 of the -- as a startup, a lot of things weren't
18 formalized.  And so these were recommendations, just
19 like those other items, to formalize as you grow an
20 organization.
21 BY MR. GROGAN:
22   Q.   Do you recall any instance in which one of
23 the tribal lending partners suggested a change to
24 the underwriting?
25   A.   Yes.

33  (Pages 129 to 132)

TF App. 0032

Page 133

1          MR. GATEWOOD:  Objection; form.
2     A.  Sorry.
3   BY MR. GROGAN:
4     Q.  When?
5     A.  I don't remember the time, but I do
6   remember different tribes and different discussions
7   of the changes to --
8     Q.  What changes were they concerning?
9     A.  You know, one example for Mobiloans is,
10  they wanted to change the underwriting for returning
11  customers and provide -- identify those good
12  customers and provide a rewards program.  And so it
13  was two part, one for credit and one for the
14  reduction in the -- in the price point.
15    Q.  They wanted to create a rewards program?
16    A.  That's correct.
17    Q.  And that's relating to underwriting?
18    A.  It is, because you have to identify the
19  customers that are likely candidates to be rewarded.
20  You're not going to reward someone that's
21  delinquent.
22    Q.  I understand.  So they wanted to create a
23  rewards program?
24    A.  Right.  And so that would be part of the --
25  the risk decision, identifying those customers, when

Page 134

1   are they going to be offered it, how does the
2   rewards program look.  And so there was a lengthy
3   discussion that was -- I really recall that, for
4   sure.
5     Q.  Do you recall any others?
6     A.  Plain Green, you know, there was different
7   times in terms of whether it be former customers and
8   what that price point would look like, new
9   customers, the loan amounts to offer.
10    Q.  When did these discussions occur with Plain
11  Green?
12    A.  In terms of these specific discussions, I
13  can't recall.  We had discussions -- I talked to
14  the -- each of these tribes every day about
15  different topics.  We met weekly with the tribes to
16  review, you know, risks and underwriting changes, as
17  well as platform changes and marketing changes.
18    Q.  I understand that.  But my question was
19  about changes initiated by the tribes.
20    A.  So I would -- I would have to go back and
21  look at any documents to give you the specific dates
22  of each of these items that they --
23    Q.  You talked about the rewards program with
24  regard to Mobiloans.
25    A.  Uh-huh (affirmative response).

Page 135

1     Q.  And with regard to former customers in
2   Plain Green.
3     A.  Okay.
4     Q.  Do you recall any other instances?
5     A.  Great Plains.
6     Q.  Okay.
7     A.  Great Plains was -- you know, a lot of that
8   discussion was about the acquisition of new
9   customers and is there an opportunity to loosen the
10  credit criteria in order to obtain new customers,
11  even though it would be at a higher default.
12    Q.  And when did those occur?
13    A.  I would have to go back and look at those
14  notes.  But those are the examples that I recall in
15  terms of risk credit decisions and discussions.
16    Q.  And do you recall any other examples?
17    A.  Yes.
18    Q.  Okay.  Go ahead.
19    A.  Okay.  Again, for, you know, Plain Green,
20  another discussion item was around, you know, can we
21  champion and challenge the different mail pieces,
22  and does that mean that the -- you should change the
23  underwriting underneath that?
24    Q.  What were their problems with the mail
25  pieces?

Page 136

1     A.  I think it was more --
2          MR. GATEWOOD:  Objection; form.
3     A.  Sorry.  It was more of an opportun- -- it
4   wasn't a -- an objection to it.  It was really
5   discussion of an opportunity to improve and to
6   optimize.  And so we had a lengthy discussion about
7   that, because you don't want to change too many
8   variables for a test.
9   BY MR. GROGAN:
10    Q.  Okay.  Anything else?
11    A.  You know, for Mobiloans, we had a lengthy
12  discussion about what made up the risk criteria,
13  what's in some of the proprietary scores that we had
14  built for them.  And so we kind of -- we talked
15  through that quite at length.  I do recall that.
16    Q.  Did you make changes because of that?
17    A.  No.  The -- that discussion was really
18  involved in really understanding all of the pieces
19  that went into the risk core, because they wanted to
20  make sure, in test, that it wasn't -- the score
21  wasn't build for a disparate impact, which was a
22  very good point that they brought out.  And we had
23  to demonstrate that over and over -- time and time again.
24  And that became actually a quarterly kind of
25  exercise that we had to do for -- for that tribe.

34  (Pages 133 to 136)

Michelle Nyugen

Page 137

1    Q.  Okay.  Good.
2        With regard to Great Plains, was
3    MacFarlane still playing a role?
4    A.  Correct.
5    Q.  What was the role that they were playing
6    with Great Plains Lending?
7    A.  As I mentioned, MacFarlane was already
8    working with Otoe.  They had the other offering, the
9    American Web Loan product, but they also supported
10   the -- that tribe for back-end services, such as
11   hiring of the call center folks, HR, payroll,
12   their -- their books, if you will, the financials,
13   reconciling their P&L.
14   Q.  Did Mobiloans or Plain Green have a similar
15   organization working with them?
16       MR. GATEWOOD:  Objection; form.
17       MR. SCHEFF:  Object to the form.
18   A.  Plain Green did not have a back-end
19   consulting organization, that I was aware of.  And
20   Mobiloans did not have one.  Mobiloans would utilize
21   different vendors to assist because they were a
22   startup and they can't do everything in-house.
23   BY MR. GROGAN:
24   Q.  Good.
25       Take a look at page 7, if you would.

Page 138

1    These are benchmarks of what you think an industry
2    leader looked like?  Is that a fair statement of
3    what this is trying to capture?
4    A.  That's -- that's a fair statement.
5    Q.  Okay.  And, again, the same -- same drill:
6    If there's not a checkmark, that means it's missing
7    from that particular tribal product?
8        MR. SCHEFF:  Object to the form.
9    A.  If it was not a checkmark, then this is my
10   opinion --
11   BY MR. GROGAN:
12   Q.  Okay.
13   A.  -- of what was lacking and what needed to
14   be improved.
15   Q.  Okay.  And with regard to "stable and
16   scalable product with minimal compliance defects,"
17   that's -- Plain Green and GPL are okay, in your --
18   in your opinion, at that point?
19   A.  That's correct.
20   Q.  But Mobiloans was still challenged in that
21   area?
22   A.  That's correct.  I think -- you recall that
23   I said that we had utilized a different loan
24   management system, the CoreCard.  Because it wasn't
25   built in-house, we didn't know all the ins and outs,

Page 139

1    and so it caused some unacceptable defects that we
2    had to work through.
3    Q.  Okay.  But those defects would have been
4    caused by Think Finance difficulties, or -- or
5    deficits at Mobiloans?
6        MR. SCHEFF:  Object to the form.
7    A.  This line specifically was the platform
8    defects, and so it was the platform itself.  You
9    know, it could be within the CoreCard build itself,
10   which is not something that was proprietary to Think
11   Finance.  Or it could have been around the platform
12   itself that touched CoreCard.  So it's both pieces.
13   BY MR. GROGAN:
14   Q.  Right.  But Mobiloans didn't have CoreCard
15   within their purview, right?  That was something
16   that Think Finance had?
17       MR. GATEWOOD:  Objection; form.
18   A.  CoreCard is part of the platform that was
19   licensed to --
20   BY MR. GROGAN:
21   Q.  Who licensed it?
22   A.  Who licensed. . .
23   Q.  CoreCard.
24   A.  Oh, I don't -- I don't recall.  I don't
25   know.  I'd have to look at the contracts.  I was --

Page 140

1    Q.  But was it Think Finance or Mobiloans?
2        MR. GATEWOOD:  Objection; form.
3    BY MR. GROGAN:
4    Q.  Or a Think Finance-related entity?
5        MR. GATEWOOD:  Same objection.
6    A.  I -- I don't know.  That's a technical -- I
7    was not part of that.
8    BY MR. GROGAN:
9    Q.  That's fine.
10       What was the metric that you were using in
11   determining whether there were minimal compliance
12   defects?  Do you recall?
13       MR. GATEWOOD:  Objection; form.
14   A.  I don't -- there was not another piece of
15   paper that had 12 items.  This is based on my
16   opinion from a product perspective and if there were
17   defects.  Any defect as a platform provider is not
18   acceptable.
19   BY MR. GROGAN:
20   Q.  And I just want to be clear.  When you say
21   a "stable platform" in that -- that item, you're
22   talking about the technical loan platform, you're
23   not talking about, for instance, tribal leadership
24   or marketing --
25   A.  I'm talking about the technical platform.

35  (Pages 137 to 140)

TF App. 0034

Michelle Nyugen

## Page 145

1  referenced here, this says half of it, RISE has
2  access to. They get the first pass. What did that
3  mean?
4            MR. SCHEFF: Object to the form.
5      A. You know, from what I recall, it's -- you
6  know RISE, as I said before, the -- we identify the
7  universe of consumers that are responsive and would
8  have a decent default, and then we would overlap
9  them with the RISE states, and then anything --
10  remainder, we would -- as this says, we would split
11  amongst the tribes.
12  BY MR. GROGAN:
13     Q. Who's "we"?
14     A. The -- as a marketing agency --
15     Q. That's what you'd do? You'd allocate them
16  first to RISE, and then if there were a remainder,
17  to tribal products; is that right?
18            MR. GATEWOOD: Objection; form.
19     A. We -- as -- you know, as I stated, we would
20  identify those for RISE, and then any of the
21  remainders, we would recommend splitting them up
22  between the other three tribes --
23  BY MR. GROGAN:
24     Q. And how would you --
25     A. -- or direct mail.

## Page 146

1      Q. -- split them up -- how would you split
2  them up between the tribes?
3      A. You know, it really depended on different
4  factors.
5      Q. Like what factors?
6      A. What the goals were for each of the tribes
7  in terms of the revenue growth, what each tribe
8  looked like in terms of their offering. You know,
9  Great Plains had a higher APR, and so they were --
10  that product was inclined to take a riskier customer
11  base, as well as the other channels that the tribes
12  were interested in. And so all of those came into
13  play when we talked about the direct mail pieces and
14  where they went.
15     Q. Okay. And who would get direct mail and
16  who wouldn't?
17     A. Again, like, it's all of those factors that
18  I indicated.
19     Q. Okay. And you said one of the factors was
20  what the goals for the revenue growth of the
21  individual tribal products was. Whose goals were
22  they?
23            MR. GATEWOOD: Objection; form.
24     A. In the beginning of each year, we would
25  meet with each of the tribes, because they're doing

## Page 147

1  their budget. Or, actually, I would say the end of
2  the prior year for budget planning purposes. And we
3  would talk to them about their revenue goals, and we
4  would back into: Well, if you want X, then you need
5  Y type of customers at XZ assumption in terms of
6  revenue.
7            And so we would create a budget like any
8  organization. We would work with them as a
9  marketing organization, and we'd say: Okay, this is
10  your budget for X amount of customers. We would try
11  to meet that with these different channels, whether
12  it be direct mail, or -- you know, for Great Plains,
13  it also included lead generation, paid search,
14  affiliate traffic.
15  BY MR. GROGAN:
16     Q. Now, direct mail, by its nature, is an
17  invitation to a customer to respond to a particular
18  product offering; is that right?
19     A. In general.
20     Q. So there would be direct mail that would
21  say, "Please call RISE if you want a loan," right?
22  And there would be some direct mail that said,
23  "Please call Plain Green if you want a loan," right?
24            MR. GATEWOOD: Objection; form.
25     A. There's different versions of direct mail.

## Page 148

1  There could be a pre-approval. There could be an
2  invitation to apply. There could be another -- a
3  repeat customer direct mail piece to remind them of
4  the brand.
5  BY MR. GROGAN:
6      Q. Right. But they would all be
7  brand-specific, wouldn't they?
8      A. That's correct.
9      Q. Okay. Okay. So you're -- okay. That's
10  fine.
11            It says, "No current differentiation
12  between other channels today. Should other channels
13  follow DM volume split?"
14            And my first question is, what are the
15  other channels?
16     A. I -- you know, the -- I -- I can't really
17  remember this -- this bullet point. I mean. . .
18     Q. Did you mean other marketing channels?
19     A. Yes. But I don't -- I can't remember why I
20  put this here. Sorry. I just really can't
21  remember.
22     Q. Okay. Well, what are -- what are the other
23  marketing channels?
24     A. Paid search, lead generation. Lead
25  generation was really only for Great Plains.

37 (Pages 145 to 148)

TF App. 0035

Michelle Nyugen

Page 149

1    Affiliate traffic for all three.  And then there's
2    repeat -- repeat customers are also considered a
3    channel.
4        Q.  This document was created for the executive
5    offsite, right?
6        A.  That's correct.
7        Q.  Were tribal members or -- or
8    representatives of Plain Green, Mobiloans, or Great
9    Plains at that -- at those meetings?
10       A.  No.
11       Q.  Okay.  Now, "Items to consider," and you
12   have some characteristics of the three different
13   tribal lending organizations.  For instance,
14   Mobiloans is -- has "Strong political influence,"
15   "Lowest profit share," "Currently most profitable,
16   but will change as we lower pricing."
17           Now, what are these items to consider
18   relevant to?
19       A.  They were -- from what I'm thinking, from
20   what I recall, these items were relevant for
21   identifying the best channels for each of the
22   different portfolios.
23       Q.  I see.
24       A.  So an example would be that, you know, as
25   Mobiloans is currently the most profitable, but will

Page 150

1    change over lower pricing, I indicated that the
2    tribe really wanted a rewards program, thus would
3    lower the pricing.  To that end, a lead generation
4    as a channel would not fit in terms of that
5    Mobiloans offering, because typically lead
6    generation has a higher default -- has a higher
7    default with a lower price at the spread or the --
8    and won't be profitable for that tribe.
9        Q.  And when you're saying Mobiloans is
10   currently the most profitable, profitable to whom?
11       A.  I believe when I was writing this, it was
12   just in general, in terms of revenue minus the
13   losses.  So the interest revenue minus the losses.
14       Q.  But most profitable to Think Finance?
15           MR. GATEWOOD:  Objection; form.
16           MR. SCHEFF:  Object to the form.
17       A.  I -- I didn't say that.  I said profitable
18   as it pertains to -- I always looked at revenue
19   minus losses.  Keep it simple in terms of that.
20   BY MR. GROGAN:
21       Q.  Right.  But a profitable product -- a
22   profitable Mobiloans product is profitable for Think
23   Finance and Mobiloans, right?
24       A.  A profitable product is definitely
25   profitable for the Tunica tribe, absolutely.

Page 151

1        Q.  And for Think Finance?
2        A.  No, we -- it all depended on, you know,
3    each of the -- each of the contracts with each
4    tribes were different.  But. . .
5        Q.  I'm sorry, are you suggesting that a
6    profitable Mobiloans product is not profitable to
7    Think Finance?
8        A.  No, I --
9            MR. GATEWOOD:  Objection; form.
10           MR. SCHEFF:  Misstates the testimony.
11           MR. GROGAN:  Okay.  I'm just asking
12   for the clarity.
13           MR. SCHEFF:  Let's not play games
14   here.
15           MR. GROGAN:  Richard.
16           MR. SCHEFF:  You're just playing
17   games.  She -- you know she didn't say that.  Just
18   ask your question.
19           MR. GROGAN:  I'm just asking her to
20   clarify that.
21       A.  I -- I didn't say that.  I said --
22   BY MR. GROGAN:
23       Q.  Okay.  What did you say?
24       A.  -- profitable -- I said profitable equals
25   revenue minus the losses, and that would be

Page 152

1    profitable for the tribe.  And as a service
2    provider, we wanted to make sure that each of our
3    tribes were profitable and meeting their budgets.
4        Q.  Because it was profitable to Think Finance,
5    right?
6            MR. SCHEFF:  Object to the form;
7    misstates the testimony.
8    BY MR. GROGAN:
9        Q.  Okay.  With regard to Mobiloans, it says
10   "lowest profit share."  What does that refer to?
11       A.  I believe that refers to the -- their
12   profit share of the agreements.
13       Q.  So they -- they're receiving the lowest
14   profit share of -- relative to the other two tribal
15   products?
16       A.  That -- this is relative to the other two
17   tribal products.
18       Q.  And are we talking about the revenue share?
19       A.  This is profit share.
20       Q.  Okay.
21       A.  But it's probably misstated.
22       Q.  Okay.  It says profit share, but do you
23   think it referred to revenue share?
24           MR. SCHEFF:  Object to the form.
25       You can answer the question.

38 (Pages 149 to 152)

TF App. 0036

Page 165

1          MR. GATEWOOD: Objection; form.
2      A.  From what I recall, this was purposes of --
3  for discussion items, and, you know, is there an
4  opportunity to reposition the brands.
5  BY MR. GROGAN:
6      Q.  But repositioning them at different
7  segments of the -- of the market?
8          MR. GATEWOOD: Same objection.
9      A.  Again, it's repositioning it, and then
10 discussing these items with the tribes and get their
11 feedback as a marketing agent.
12 BY MR. GROGAN:
13     Q.  But repositioning them with regard to
14 different segments of the consumer markets?
15         MR. GATEWOOD: Objection; form.
16         MR. SCHEFF: Object to the form.
17     A.  Again, it says "customer and product
18 discussion item." And so this is -- these were --
19 it's an ideation session. So it's repositioning it
20 from a brand perspective, and different customers,
21 if that makes sense to them, if it resonates to
22 them. . .
23 BY MR. GROGAN:
24     Q.  Okay. I understand these are just
25 examples. Is -- is there any reason why Plain Green

Page 166

1  is not characterized in some way here?
2      A.  I can't recall. I think these were just
3  examples for discussion.
4      Q.  Okay. Thank you. If we could turn to
5  Document D, please.
6          MR. SCHEFF: John, we've been going
7  about an hour and ten minutes.
8          MR. GROGAN: What time is it?
9          MR. SCHEFF: 12:35.
10         MR. GROGAN: Are we having lunch
11 provided, or. . .
12         MR. SCHEFF: I guess. I don't know.
13 Did you make any arrangements? Because I didn't.
14         MR. GROGAN: No. This is an okay
15 time. If people need lunch now, that's fine.
16         MR. SCHEFF: Okay.
17         THE VIDEOGRAPHER: Go off the record?
18         MR. GROGAN: Yes.
19         THE VIDEOGRAPHER: We are off the
20 record at 12:34 p.m.
21         (Break taken, 12:34 p.m. to 1:20 p.m.)
22         THE VIDEOGRAPHER: We're back on the
23 record. The time is 1:20 p.m.
24 BY MR. GROGAN:
25     Q.  Welcome back, Ms. Nguyen. Thank you,

Page 167

1  again, for your patience.
2      I want to introduce a new document for our
3  discussion, and this is going to be Plaintiff's
4  Exhibit 180. It's a very large exhibit. You may
5  look at as much of it as you need to, but I will
6  preface my remarks by saying that I have a question
7  about what's on page 27, I think, is the only --
8  only part of this document that I'm concerned with.
9          (Exhibit No. P-180 marked.)
10         MR. SCHEFF: I'm sorry, you said 27?
11         MR. GROGAN: Page 27.
12         MR. SCHEFF: What's the Bates on that?
13 Because these don't appear to be numbered.
14         MR. GROGAN: Hold on.
15         MR. SCHEFF: Michelle, look at as much
16 of this as you need to.
17     Oh, I'm sorry.
18         MR. GROGAN: Yeah, it's pretty clear.
19         MR. SCHEFF: It is -- they have --
20 they have numbers. Never mind. Got it.
21     A.  (Reviews document.)
22     27? Is that right?
23 BY MR. GROGAN:
24     Q.  Page 27, yes. The PowerPoint 27.
25     Have you studied under Dean Smith,

Page 168

1  Ms. Nguyen? Never mind. Strike that. I'm sorry.
2  I couldn't resist.
3      Take a look at the first page. I'm sorry,
4  I told you 27, but if you look at the cover of the
5  document --
6      A.  This --
7      Q.  Not the e-mail transmittal, but the cover
8  of the PowerPoint.
9      A.  Okay.
10     Q.  Do you recall this document?
11     A.  I recall the document.
12     Q.  All right. Are you the author of this
13 document?
14     A.  I am author of the majority of this
15 document.
16     Q.  Okay. Fine.
17     And what was this document used for? Do
18 you recall?
19     A.  I believe this was a meeting that we met
20 with the council. I think we had indicated before
21 that I speak to different tribal members every
22 single day. We also had an opportunity to go out
23 there, and we made it a point of at least meeting
24 with each of the councils once a quarter. And so
25 this is an example of meeting with the council as a

42 (Pages 165 to 168)

TF App. 0037

Michelle Nyugen

Page 169

1 quarter --
2 Q. Do you recall or can you tell what the
3 purpose of the meeting would have been?
4 A. So this is with Mobiloans. It was probably
5 twofold. Kind of giving them update on the -- on
6 the product and its evolution. And the second part
7 is, I -- I believe at this time, there was a new
8 chairman of the Tunica tribe.
9 Q. So generally informational? This wasn't
10 part of renegotiation of a contract or. . .
11 A. That's my understanding. I think it was --
12 it was just informational and -- as we did every
13 quarter.
14 Q. Okay. Take a look at page 27, ma'am. This
15 slide -- first of all, do you recall being the
16 person who wrote this slide?
17 A. You know, I don't recall if I did this or
18 if this was in conjunction with Chris Lutes.
19 Q. Okay. It says, "How do Think and VPC make
20 money? Think makes money two ways." You can look
21 at that. My first question: Is that accurate?
22 A. I -- I mean, I think it's -- it's missing
23 more detail.
24 Q. What -- what detail is missing?
25 A. There's the -- so this is 125 for every

Page 170

1 funded loan. That was from a marketing perspective.
2 And then there's also the -- the platform piece, and
3 that wasn't captured on here. So there's just --
4 there's more fees from a service provider
5 perspective, I believe.
6 Q. Anything else?
7 A. No. I think this is. . .
8 Q. That's accurate? I'm sorry. Accurate?
9 A. Yes.
10 Q. Okay.
11 A. Other than the clause I had indicated
12 earlier.
13 Q. Yeah, what does "credit guarantee provided
14 to GPLS" mean, if you know?
15 A. As the service provider, we also acted as
16 administrative agent, and I believe as part of that,
17 it's where the credit guarantee came into place.
18 Q. Do you know why it's referred to as the
19 credit guarantee rather than the administrative
20 agency fee?
21 A. Oh, I think I'm getting confused, then.
22 Q. Take your time.
23 A. So I -- I did misstate. So we indicated
24 before, the first bullet is probably missing some
25 fees, including the -- the admin fee that I spoke

Page 171

1 of. And I think from what I recall for -- for this
2 piece was, Think was the guarantee on -- credit
3 guarantee to GPLS for their fixed return, and
4 anything beyond that was the revenue for Think.
5 Q. Okay. And that's what you believe that
6 "credit guarantee provided to GPLS" is -- is
7 referring to?
8 A. That's what I recall.
9 Q. Okay. Take a look -- well, I lied again.
10 Page 28, if you'd just look at that for a second.
11 And I understand that this isn't your area, but,
12 again, my question is, is that generally accurate?
13 A. I -- I don't know. Because I see a lot of
14 pages in here that are draft, and so I'm not sure if
15 that's the final numbers. You know, like, the next
16 page is empty, and the other pages before were
17 empty, so I wasn't sure -- I don't know if this is a
18 draft format. So I don't -- I don't know if those
19 numbers are correct.
20 Q. Right. But looking at the substantive of
21 the numbers themselves, rather than -- I understand
22 your point that this may be a draft. But looking at
23 the numbers, do they appear to be accurate to you?
24 A. I -- I couldn't recall. You know, just to
25 your point, I'm not -- I wasn't the CFO, so I don't

Page 172

1 have them memorized and I don't know if this is the
2 final version.
3 Q. Right. And I -- I should have been
4 clearer. I'm not really concerned with the pinpoint
5 accuracy as to the number itself, but with the
6 general proportion among the three entities
7 represented there, MBL, Think, and VPC.
8     MR. SHAPIRO: What's the question?
9     MR. GROGAN: Is the general proportion
10 of the profitability -- I mean, I understand she
11 doesn't know whether it's 7.4 or 7.9. But is the
12 general proportion accurate?
13     MR. SHAPIRO: For 2013 --
14     MR. GROGAN: Yeah.
15     MR. SHAPIRO: -- for Mobiloans?
16     MR. GROGAN: As related -- in
17 relationship to Think and VPC.
18     MR. SHAPIRO: Okay. I'll object to
19 the form of the question. I think the witness has
20 already testified she doesn't have the foundation
21 for this.
22     But go ahead.
23 A. Yeah, I -- I would say that I don't -- you
24 know, again, this might be in draft form. I believe
25 that those are the correct parties, Mobiloans,

43 (Pages 169 to 172)

TF App. 0038

Michelle Nyugen

Page 201

1 a Think -- a Mobiloans staff and a -- and a Great
2 Plains staff; is that correct?
3 A. At this time, that's correct.
4 Q. Did it ever come a time when that was true?
5 A. What I recall, early 2011, 2012, we had
6 enough individuals in one organization where they
7 were segregated.
8 Q. But by 2014, that had changed?
9 A. That's correct.
10 Q. Okay. Why had that changed?
11 A. The company split occurred.
12 Q. Not in March of 2014.
13 A. No. But by then, as you see, I said my
14 staff is quite small. So. . .
15 Q. Okay. I see. Okay. Thanks.
16 MR. GROGAN: Can we turn to Document
17 H, please. Document H is P -- will be P-184.
18 (Exhibit No. P-184 marked.)
19 A. (Reviews document.)
20 Okay.
21 BY MR. GROGAN:
22 Q. Okay. Do you recognize this document?
23 A. Yes.
24 Q. What is it?
25 A. I think it's a draft version for an initial

Page 202

1 meeting with a new tribe.
2 Q. Okay. Do you recall which tribe it was?
3 A. I think it's the Ranchero tribe. I believe
4 they're in California.
5 Q. Okay. And were you the author of this
6 document?
7 A. Yes.
8 Q. This is in April of 2014. And you were
9 still involved at this point in -- in reaching out
10 to new -- potentially new tribal partners?
11 A. Correct.
12 Q. Okay. How many of these would you do a
13 year, these outreaches?
14 A. These outreaches for new tribes?
15 Q. Uh-huh (affirmative response).
16 A. In 2014, I -- I think there were three.
17 Q. Okay.
18 A. Three different tribes.
19 Q. And did any of them come to fruition?
20 A. I think I mentioned before, Rosebud. But
21 they had signed after I had left.
22 Q. I see. Okay. And if you take a look at
23 page 17 of the -- the presentation page 17.
24 A. Okay.
25 Q. And it says, "We have developed a unique

Page 203

1 turnkey platform for tribal corporations."
2 And what did you mean by the word
3 "turnkey"?
4 A. I think what we were trying to convey is
5 that we are able to offer multiple solutions for a
6 tribe. So that includes the build of the -- the
7 product offering, to marketing services, to
8 underwriting services.
9 Q. Anything else?
10 A. I think here, it also said "Access to
11 third-party capital." We can help facilitate
12 introductions as well as compliance experience.
13 Q. So just looking at this slide on page 17,
14 what you seem to be offering is a proven technology
15 platform, correct?
16 A. Yes.
17 Q. A marketing machine?
18 A. Marketing services, yes.
19 Q. Okay. The underwriting?
20 A. Yes.
21 Q. Access to third-party capital for funding
22 of the loans; is that correct?
23 MR. GATEWOOD: Objection; form.
24 BY MR. GROGAN:
25 Q. What would the third-party capital be for?

Page 204

1 A. It would be access to the third-party
2 capital, how they would need to -- to utilize it if
3 they needed to utilize --
4 Q. Okay.
5 A. -- capital.
6 Q. Did you -- did you ever talk to a tribe
7 that didn't need access to third-party capital?
8 MR. GATEWOOD: Objection; form.
9 A. Yes.
10 BY MR. GROGAN:
11 Q. Which one?
12 A. Rosebud.
13 Q. Okay. Look on page 16 -- I mean -- I'm
14 sorry, 18. "Who does what." And I want you to
15 study this and tell me if you think this is
16 accurate.
17 A. Okay.
18 (Reviews document.)
19 Okay.
20 Q. And we see a list of things that Think
21 Finance will do and some things that the tribal
22 entity will do, the center column being sort of the
23 topics of the various things that have to be done.
24 Is that a fair summary?
25 A. Yes.

51 (Pages 201 to 204)

TF App. 0039

Michelle Nyugen

Page 205

1      Q.   Okay.  And for the tribal entity, they
2  would have to do ongoing market reviews -- marketing
3  reviews?
4      A.   That's what this says.
5      Q.   What would that encompass?
6      A.   Examples would be the collaboration of
7  material, whether it's website material, e-mail
8  material, direct mail, what content they wanted to --
9  to utilize.  We would, as a marketing agent, provide
10 recommendations for them to agree, to strike, to
11 change.
12     Q.   And how about "periodic application reviews
13 and daily prefunding approval"?
14     A.   So this is in regards to the platform, as I
15 indicated, isn't able to take applications.  And so,
16 you know, at the ideation, we would sit down with
17 the -- the lender and say:  Here are all the
18 proposed fields that you need for your application.
19 Do you agree?  And we'll build it.  And the consumer
20 can then apply online, and you will have access to
21 the data if you want to review it.  If you think
22 that we should not be asking certain fields, then we
23 can strike it.  So you always have access to that,
24 as well as tying to the next point of the
25 underwriting criteria.  So it's for auditing

Page 206

1  purposes as well, did we do what we say we were
2  going to do, per your requirements.
3      Q.   That's the kind of review that they would
4  engage in, to check to make sure the application was
5  the way they wanted it?
6      A.   Right.  And if they made changes, did we do
7  what we say we did, and demonstrate that.
8      Q.   And how about "daily prefunding approval"?
9      A.   This was also tied to -- somewhat with the
10 underwriting.  You know, in the beginning, we would
11 say, you know, at a high level, because we're
12 experts at -- from a risk management perspective,
13 certain customers that meet this kind of criteria,
14 you probably do minimal verifications, and the
15 system can automatically then approve a customer
16 based on that.  And then you can also audit those
17 applications at any time to make sure it's aligned
18 to what we had discussed.
19     Q.   And is that how the approvals worked?  Were
20 they done automatically?
21     A.   Not necessarily.
22     Q.   In what circumstances were they not done
23 automatically?
24     A.   It's all dependent upon the -- the
25 underwriting criteria with that tribe.  So some of

Page 207

1  them would go to a pending status where it would
2  have to be verified based on the documentation.
3      Q.   I understand.  But that's as to the
4  completeness or incompleteness of the application,
5  right?  I'm talking about applications that the
6  underwriting system approves.
7      A.   You had asked if -- was it always auto
8  approved, and I -- I said no.
9      Q.   My problem.  I don't mean that every
10 application was automatically approved.
11     A.   Okay.
12     Q.   I mean those applications that met the
13 criterion.
14     A.   Okay.
15     Q.   And were adequately verified.
16     A.   Okay.
17     Q.   They were automatically approved.
18          MR. GATEWOOD:  Objection; form.
19 BY MR. GROGAN:
20     Q.   Is that true?
21     A.   It all depended on which tribe and what
22 criteria.  They could say that maybe 5 percent would
23 be auto approved, or it could be:  No, I want -- I
24 want every single application to be approved, to be
25 verified.

Page 208

1      Q.   What does it mean to verify an application
2  for approval?
3      A.   It depends on the creditworthiness.
4  Sometimes the criteria would be just to -- for a
5  consumer to submit their identification, such as
6  FACTA, if someone had a fraud alert and you had to
7  submit in your driver's license.  Other instances we
8  need to verify income.
9      Q.   How did this work at Plain Green, for
10 instance?  What did they choose to do with automatic
11 approvals?
12     A.   It's hard to recall, because it's evolved
13 over the years since when they started in 2011 to
14 when I left.
15     Q.   Can you recall anything with regard to
16 Mobiloans?
17     A.   Again, it's -- each of them evolved over
18 time as -- as the universe would change, as maybe
19 there's a fraud ring.  And so the criteria is an
20 evolution, so I can't --
21     Q.   Was there a time in --
22     A.   -- recall --
23     Q.   -- any of the evolution of any of the
24 tribal products where someone at the -- on the
25 tribal lending side, at Plain Green or Mobiloans or

52 (Pages 205 to 208)

Michelle Nyugen

1 Great Plains, was reviewing the verifications of
2 applications for each application that was funded?
3      MR. GATEWOOD: Objection; form.
4     A. So you specify verifications. The tribes
5 had call centers, and as part of those call centers,
6 they performed verifications, and those tribal
7 member -- those were employees of that entity. And
8 so yes, they would verify.
9 BY MR. GROGAN:
10     Q. Was there ever a time when anybody on the
11 tribal lending side was approving each loan
12 individually?
13      MR. GATEWOOD: Objection; form.
14     A. So the purpose of partnering with a service
15 provider is to outline your criteria, and -- so the
16 system can do what you dictate. So that way,
17 there's not necessarily a reason for you to look at
18 every single loan and approve it. They have
19 purposes of auditing it to make sure that they
20 performed to their satisfaction.
21 BY MR. GROGAN:
22     Q. Fair enough.
23     And with regard to underwriting, they --
24 they would approve the -- their function was to
25 review and approve the criteria and the loan

1 amounts? That's what they needed to do?
2     A. You know, I think I stated earlier, as we
3 would start the program and it's ongoing, we would
4 provide recommendations in terms of underwriting
5 criteria based on their -- their appetite for
6 losses, and we would change it, and we would
7 discuss.
8     Q. Okay. And with regard to "Funding and
9 payment processing," it didn't look like that the
10 tribe has to do anything there; is that correct? It
11 says, "Automated funding process. Fund loans sold
12 to third party after two days."
13      MR. GATEWOOD: What's the question?
14 BY MR. GROGAN:
15     Q. Is the tribe doing anything with regard to
16 that stage of the process?
17      MR. GATEWOOD: Objection; form.
18     A. I don't think that this is probably very
19 clear. The intent for this was that the platform
20 can produce an ACH file, as we talked about before,
21 the mechanics, and then send it off to an ODFI, as
22 well as payments.
23 BY MR. GROGAN:
24     Q. Verifications were done -- some of the
25 verifications were, in fact, done on the tribal end

1 in the call centers, right?
2     A. That's correct.
3     Q. Okay. And with regard to "Collections," it
4 says, "Not applicable." Why is that?
5     A. I don't know. Maybe this is a draft. I
6 don't know why it's not applicable. Loans go past
7 due. So. . .
8      COURT REPORTER: I'm sorry?
9     A. Loans go past due, so I don't know why --
10 this must have been a draft form.
11 BY MR. GROGAN:
12     Q. Someone would have to collect, right?
13     A. Correct.
14     Q. Okay. Let's turn to page 19. And, again,
15 this -- my question is really, generally, as you
16 look at this, is this generally accurate?
17     A. Generally, this is accurate.
18     Q. Okay. There would be no marketing cost to
19 the tribes?
20      MR. GATEWOOD: Objection; form.
21     A. I think those were incorrect words because,
22 as we know from the way we structured it, there was
23 marketing costs from a cost per loan. And so I
24 think we were trying to convey that there's no large
25 cost up front from a -- you have to -- a large down

1 payment, as an example.
2 BY MR. GROGAN:
3     Q. Who ended up paying those per-loan
4 marketing costs in the TailWind costs? Who ended up
5 paying that?
6      MR. GATEWOOD: Objection; form.
7     A. For which tribe?
8 BY MR. GROGAN:
9     Q. All three.
10      MR. GATEWOOD: Same objection.
11     A. I have to go back and -- and look at all of
12 the -- the mechanics.
13 BY MR. GROGAN:
14     Q. Do you recall that GPLS reimbursed those
15 costs?
16      MR. GATEWOOD: Objection; form.
17     A. I'll have to go back and look at some
18 documents to refresh.
19 BY MR. GROGAN:
20     Q. You don't recall right now?
21     A. I don't recall right now. All the fees get
22 confusing after a long time.
23     Q. I understand.
24     "Minimal credit exposure." What was the
25 risk of the loss that the tribes faced in this --

53 (Pages 209 to 212)

TF App. 0041

Michelle Nyugen

Page 217

1     A. I would surmise -- this is Jason, so he --
2 these are what his -- his notes are to each slide.
3 BY MR. GROGAN:
4     Q. I see.
5     He says on page -- well, the third page
6 out -- I'll use the Bates numbers here because the
7 presentation pages are obscured. Just go to 733.
8 "The main purpose is to discuss the changes that can
9 help protect a very large and successful business."
10     Protected from what, if you know?
11     MR. GATEWOOD: Objection; form.
12     MR. SCHEFF: Object to the form.
13     A. I -- I don't -- I don't know. I didn't
14 write this.
15 BY MR. GROGAN:
16     Q. Did you participate at all in the creation
17 of this document?
18     A. No. I was off -- I was on vacation.
19     Q. Okay. Look at page 15. And I think you
20 can see the PowerPoint pages.
21     MR. GATEWOOD: Can you give us the
22 Bates number, please?
23     MR. GROGAN: Sure. I think I can.
24 BY MR. GROGAN:
25     Q. I'm sorry, let's go to page 19, Bates No.

Page 218

1 748.
2     The slide says, "Risk to the tribal
3 program. Why do we need to restructure the model?
4 To protect a growing $700 million business.
5     "What is the risk to the business? States
6 may argue that the tribe is not the 'true lender'
7 due to TF's involvement."
8     Are you familiar with that phrase, the
9 "true lender"?
10     A. I am familiar with that.
11     Q. What do you understand that to mean?
12     MR. SCHEFF: Objection.
13     To the extent that you can answer that
14 question without reference to discussions with
15 counsel, please do. If not, then I assume
16 Mr. Gatewood will have a direction for you.
17     A. I understand the "true lender" definition
18 from counsel.
19 BY MR. GROGAN:
20     Q. Okay. Was there discussion within Think
21 Finance about something called the "true lender
22 problem"?
23     MR. SCHEFF: Just answer the question
24 "yes" or "no."
25     Unless, Matt, you have a different

Page 219

1 direction.
2     MR. GATEWOOD: No, I -- I will
3 instruct the witness not to answer to the extent
4 that the answer requires her to divulge
5 conversations with counsel.
6 BY MR. GROGAN:
7     Q. Can you answer that without revealing the
8 conversations with counsel?
9     A. No. The conversations included counsel.
10     Q. All conversations that you had regarding
11 the true lender problem included counsel?
12     MR. SCHEFF: Object to the form.
13     A. The conversations we had regarding true
14 lender included counsel.
15 BY MR. GROGAN:
16     Q. Apparently, Mr. Harvison has written a
17 note, "Risk is similar to what we saw with the bank
18 model partnerships." Do you have an understanding
19 of what he means there?
20     MR. GATEWOOD: Objection; form.
21     A. I don't. I can guess. I don't know what
22 risk --
23     MR. SCHEFF: Don't guess.
24     A. I don't know what risk. . .
25     MR. SCHEFF: No, I don't want her to

Page 220

1 guess. She's not here to guess, she's here to tell
2 the truth. Guessing is not telling the truth.
3 She's not going to guess.
4 BY MR. GROGAN:
5     Q. All right. Okay. Let's take a look at
6 page 20. "How is 'true lender' risk mitigated
7 today?" And it lines out some activities. And my
8 question to you is, looking at the -- looking at the
9 activities, not so much the large categorizations,
10 but the smaller bullet points, are these things
11 that, as you understand it, the tribes are doing?
12     A. Let me just make sure -- 2013. At this
13 time, I believe that those were the activities the
14 tribes were doing.
15     Q. Okay. And the activities that they were
16 doing on the reservation were program management,
17 application verifications, and limited customer
18 service work, and EOB review of loan underwriting?
19     A. Correct.
20     Q. What is EOB review?
21     A. End of business. End of business day.
22     Q. I see. They were reviewing the
23 underwriting at the end of the business day?
24     A. It -- it goes back to our discussion of
25 they had the opportunity to audit.

55 (Pages 217 to 220)

TF App. 0042

Michelle Nyugen

Page 221

1    Q. On a daily basis?
2    A. Correct.
3    Q. Were they actually doing that?
4    A. I believe they were. I didn't speak about
5 it every day with them.
6    Q. Okay.
7    A. But I know that they're -- they identified
8 some issues that went bump in the night, and they
9 brought it to our attention.
10    Q. And they were also engaging in approvals
11 over the underwriting policies and changes,
12 marketing materials, and the product and website
13 changes?
14    A. That's correct.
15    Q. And we talked about that?
16    A. That's correct.
17    Q. Okay. And they own certain key contracts.
18 Contracts with the third-party call centers and with
19 data providers?
20    A. Correct.
21    Q. Okay. Were the tribes doing anything else
22 that's not reflected here?
23    A. In 2013? This time period?
24    Q. April 2013.
25    A. Not that I can recall right now.

Page 222

1    Q. Okay. Turn the page to -- I don't know
2 what. 22 or 21. "Opportunities to improve."
3    A. Okay.
4    Q. "Increased oversight by the tribes: Tribal
5 management team CEO, CRO, and CCO." Did each of the
6 tribal entities at this time have a CEO, CRO, and
7 CCO?
8    A. 2013. Each tribe was different. Plain
9 Green, for example, I believe had the CEO, as well
10 as Mobiloans. I can't recall if the -- the CCO was
11 already on board -- maybe not yet -- for Mobiloans.
12    Q. What's "CCO" stand for?
13    A. "Chief compliance officer." And then "CRO"
14 is "chief risk officer."
15    Q. Okay. And, I'm sorry, I missed your
16 testimony. Did -- you said Plain Green had the CEO,
17 but not the CRO and CCO?
18    A. I believe so at this April of 2013.
19    Q. Okay. And how about Mobiloans?
20    A. I believe Mobiloans had the CEO, which was
21 Marshall Pierite at the time. And I can't recall if
22 the CCO was already in place.
23    Q. And how about the CRO?
24    A. No, not the CRO.
25    Q. What about Great Plains?

Page 223

1    A. Not Great Plains. They were utilizing the
2 MacFarlane Group to that extent. That was -- that
3 was their wish.
4    Q. Okay. And "Established compliance programs
5 with testing." Is it the import of this slide that
6 the tribes did not yet have that in place; that was
7 an area where they could improve?
8    A. 2013. We -- the Think Finance affiliates,
9 if you will, were performing the compliance --
10 compliance program activities on their behalf and
11 providing them the results, and we were encouraging
12 them to either hire, as we said, a compliance
13 officer, or you can engage another firm.
14    Q. Okay. And how about the comprehensive
15 financial reporting, that was something Think was
16 doing as well at this stage?
17    A. I believe so.
18    Q. Then there's some contractual changes that
19 are contemplated, "Shift from a revenue share to a
20 profit share, 51 percent to the tribe." Was that
21 ever implemented?
22    A. Not while I was there.
23    Q. Okay. Do you know if it -- do you know if
24 it was done afterward?
25    A. I don't know.

Page 224

1    Q. Okay. "Increase tribe ownership from
2 1 percent to 5 percent." Was that ever done?
3    A. I believe it was done, but I don't --
4 again, I wasn't there by the time -- I left. It was
5 in -- it was in the works.
6    Q. "Transfer marketing agreements to the
7 tribe." What does that mean?
8    A. Oh, this is in relation to any marketing
9 agreements, similar to the third-party data
10 providers in the previous slide, to get those
11 contracts into the tribal entities' names.
12    Q. Because currently, they're in Think
13 Finance's name?
14    A. Or TailWind is an entity.
15    Q. Is the same for the server and
16 maintenance agreements?
17    A. Correct.
18    Q. Okay. I confess to being confused about
19 "Operational improvement: Eliminate TF from
20 operation activities (fraud and complaint
21 management)."
22       What do you understand that to mean?
23    A. There were certain activities that Think
24 Finance was performing on behalf of the tribe, so
25 that includes fraud detection, as well as assisting

56 (Pages 221 to 224)

TF App. 0043

Michelle Nyugen

Page 289

1  Defendant's Exhibit 1 from Kristen Hensley, refresh
2  your recollection as to how the company responded to
3  that e-mail?
4      A.  Yes, that's correct.
5      Q.  For the record, can you just read the text
6  of the mail from Kristen Hensley?
7      A.  Yes.  "Greg, while I understand that you
8  have only been with Plain Green, LLC, for two
9  months, it is important that you realize that there
10  is a long history and series of decisions of which
11  you probably have very little insight.  As you are
12  aware, Think Finance and Plain Green do work
13  together on the credit underwriting policies and
14  strategies.  At our recent meetings earlier this
15  week, we all agreed to collaborate further on these
16  issues, as evidenced by the two-hour meeting
17  scheduled for today, to specifically discuss
18  underwriting.  Many assertions made in the below
19  e-mail are inaccurate, possibly due to your
20  relatively short time period at Plain Green.  We are
21  happy to discuss this further with you during the
22  call today and again in ongoing calls."
23      Q.  Thank you.  And did you work with
24  Ms. Hensley on issues like this?
25      A.  Yes.

Page 290

1      Q.  And did you often communicate with Plain
2  Green on issues related to this or other issues?
3      A.  Yes.
4      Q.  Can you -- earlier today, you testified
5  that you had, I think you said, frequent contact
6  with Plain Green.  So I want to ask specifically
7  about Plain Green, and then we'll ask a series of
8  the same questions with respect to the other tribes.
9      A.  Okay.
10      Q.  So with Plain Green, how often was your
11  contact?
12      A.  In the very beginning, or just in general?
13      Q.  Start at the very beginning.
14      A.  In -- in the very beginning, as with a
15  startup, there's a lot of touching, if you will.
16  And so what that means is, it was not only daily, it
17  was almost, you know, hourly, several times an hour,
18  talking about different aspects of starting a
19  lending program as a service provider, whether it be
20  "Here's an update on where we're at" from the
21  website that we discussed about earlier, or you had
22  questions on how underwriting would happen, and
23  it's -- it was a lot of that in the very beginning.
24      Q.  And would those conversations occur via
25  phone or e-mail or both?

Page 291

1      A.  Phone, e-mail, as well as in the very
2  beginning, we made a point to go up there at least
3  once a month at the start of the program, and after
4  the program, myself specifically.  We wanted to make
5  sure that everything was okay and that the -- the
6  tribe was happy.  That included meetings with the
7  members of Plain Green as well as the tribal
8  council.
9      Q.  I'll ask you about the tribal council in a
10  second, but in terms of the calls with Plain Green,
11  these are calls that you or other members of your
12  team were having with employees of Plain Green?
13      A.  Absolutely.
14      Q.  So even from day one, Plain Green had its
15  own employees?
16      A.  That's correct.
17      Q.  And then over time, would you say the
18  number of employees increased or decreased?
19      A.  Over time, the number of employees
20  increased.
21      Q.  Did it consistently increase from year to
22  year?  So if we looked at, for example, 2011 versus
23  2012, we would see an increase from '11 to '12?
24      A.  Yes.
25      Q.  Most likely an increase from '12 to '13 and

Page 292

1  so on?
2      A.  That's correct.
3      Q.  Okay.  Was that the same way with the other
4  two tribes?
5      A.  Yes.
6      Q.  In terms of number of employees?
7      A.  Absolutely.
8      Q.  And that the number of employees for both
9  Mobiloans and for Great Plains Lending also
10  increased over time?
11      A.  That's correct.
12      Q.  Okay.  So back to Plain Green.  You also
13  mentioned earlier today that you would have weekly
14  meetings with them.
15      A.  Yes.
16      Q.  Those would occur over the phone?
17      A.  Yes.
18      Q.  And who would participate in those?
19      A.  It would be myself, sometimes Jason
20  Harvison would attend the call, an individual to
21  represent marketing specifically, an individual to
22  represent the risk department specifically.  We had
23  a set agenda.  The agenda would comprise of always
24  giving an update on the product and enhancements,
25  how we're tracking against their earlier budget from

73  (Pages 289 to 292)

TF App. 0044

Michelle Nyugen

Page 293

1 a marketing perspective, as well as any updates on
2 risks in the portfolio itself, and if there was any
3 questions.
4 Q. Do you remember, especially in the first
5 year, when Plain Green --
6 MR. SCHEFF: Were you finished with
7 your answer?
8 THE WITNESS: Yes.
9 MR. SCHEFF: Okay.
10 BY MR. GATEWOOD:
11 Q. When the Plain Green operation was just
12 starting up, do you remember who from Plain Green
13 would participate in those weekly discussions?
14 A. In the very beginning, it would have been
15 Neal, as well as Billi Anne.
16 Q. That's Neal Rosette?
17 A. That's correct, Neal Rosette. And Billi
18 Anne Morsette.
19 Q. Any others?
20 A. On occasion, there might have been a
21 question regarding accounting, and so -- I can't
22 recall the accounting individual that would
23 participate as well.
24 Q. As the Plain Green program progressed,
25 would there be additional individuals from -- from

Page 294

1 Plain Green that would participate on the weekly
2 calls?
3 A. Yes.
4 Q. Take a -- you know, 2013 or 2014, and give
5 me an example of who might be on the calls at that
6 point in time.
7 MR. GROGAN: Objection to form.
8 A. You know, let's take 2014. You know, let's
9 take this November time period. The calls would now
10 include Greg Hillyard, who's over compliance. You
11 know, Bo Mitchell, who was acting as the chief
12 operating officer, which was a brand new role. Joel
13 was the CEO and acting in that capacity. Dan would
14 often sit in -- Dan Bellcore would often sit in on
15 the calls from an attorney perspective, as well
16 as -- you know, we would -- so those would be those
17 examples of individuals and how they have changed in
18 their roles and what they were looking for in those
19 calls.
20 BY MR. GATEWOOD:
21 Q. You also mentioned that you would meet with
22 tribal councils. Can you explain, with respect to
23 the Chippewa Cree, how often would these meetings
24 occur?
25 A. In the beginning, we actually met more

Page 295

1 often. I want to just say probably -- the call was
2 every other month, and then we ended up scheduling
3 it once a quarter. The objective of meeting with
4 the council would be to give the council an update
5 on the Plain Green program, how the program was
6 tracking against the budget, any other questions.
7 We wanted to make sure we had it open
8 for -- for the council. It was important that the
9 council understand Think Finance and its role as a
10 service provider. And that was clearly always the
11 case when -- even from the beginning, that Neal and
12 Billi Anne, as well as even Joel, they wanted to
13 always make sure that the service provider got in
14 front of the -- the tribal council so they can
15 provide that insight and -- also building that
16 relationship and rapport with the tribal council.
17 Q. And where would those meetings with the
18 tribal council take place?
19 A. It was at Box Elder actually in the council
20 headquarters.
21 Q. On the reservation?
22 A. On the reservations, correct.
23 Q. Did it seem to you that as time went by,
24 the Plain Green employees learned more about the
25 lending operation?

Page 296

1 MR. GROGAN: Objection; form.
2 A. Over time, the -- the employees of Plain
3 Green certainly learned more and took on more
4 responsibilities. In the beginning, that tribe and
5 all other tribes likened the relationship
6 somewhere to their casinos that they had and casino
7 management, where in the beginning, they would
8 ask -- they would lean heavily on the -- on the
9 service provider, and eventually learn more and take
10 it over. And so that was communicated to us early
11 days.
12 BY MR. GATEWOOD:
13 Q. And in Plain Green's case, Plain Green
14 ultimately took over the full, not only lending, but
15 also servicing of the program?
16 A. Yeah, servicing as well as even the
17 platform itself, which is tremendous for them.
18 Q. Okay. Let's turn to Great Plains.
19 A. Okay.
20 Q. From day one, what type of contact did you
21 have with Great Plains?
22 A. So Great Plains was a little bit different
23 because they had MacFarlane, which was beneficial at
24 least for the chairman, because he indicated that
25 the tribe was quite small and there was a lot that

74 (Pages 293 to 296)

TF App. 0045

Michelle Nyugen

Page 297

1  they had to deal with, and they were leaning heavily
2  on MacFarlane. They already had, like we said
3  before, American Web Loan, which was a lending
4  operation that I think was already live for one or
5  two years. And so they were familiar with that.
6      Our interactions with the -- tribe,
7  you know, in the beginning, they -- they did hire
8  someone that's, you know, on site to -- to run the
9  call center and to be the point person and that
10 reported into both MacFarlane as well as a tribal
11 member.
12     Q. So even though MacFarlane performed some
13 task for Great Plains, they also had their own Great
14 Plains employees?
15     A. That's correct.
16         MR. GROGAN: Objection to the form.
17 BY MR. GATEWOOD:
18     Q. Did Great Plains have Great Plains
19 employees the day that it started making loans?
20     A. From what I recall, they -- they did,
21 because I -- I recall going up there and training
22 certain, you know, individuals. So. . .
23     Q. And same question that I asked for Plain
24 Green. Was it your understanding as the product
25 manager that the Great Plains employees became more

Page 298

1  knowledgeable as time went by?
2      A. Yes. That's correct. And they also ended
3  up hiring and utilizing more tribal members in terms
4  of taking roles and eventually becoming the vice
5  president of their consumer lending products.
6      Q. Did you have any weekly calls with the
7  Great Plains group?
8      A. We did. It was very similar format to the
9  Plain Green.
10     Q. Who would participate on those?
11     A. In that format, it would be the -- the
12 Great Plains individual and the MacFarlane
13 individuals, since that's who does -- that's who
14 they designated.
15     Q. Would any counsel -- legal counsel for the
16 tribe participate?
17     A. Yes.
18     Q. Who was that?
19     A. It changed. In the beginning, it was John
20 Kenny Hurts, and then later, it ended up being
21 Eric -- I don't recall his last name.
22     Q. Eric Low?
23     A. Thank you. Eric Low eventually. Oh, I'm
24 sorry, and also their in-house counsel -- sorry, I
25 forgot -- Rebecca Bartlett, you know, she was always

Page 299

1  available on those calls. And so we always had
2  frequent -- she was a direct member -- or she worked
3  directly for the tribe, and we always went through
4  her if we had questions or needed guidance or
5  approvals.
6      Q. And would Think Finance employees meet with
7  the Otoe-Missouria tribal council as well?
8      A. Yes.
9      Q. How often were those meetings?
10     A. That tribe was a bit busier, and so it
11 wasn't as frequent as the Chippewa, but we did
12 strive at least quarterly to provide updates.
13     Q. And where did those meetings occur?
14     A. In Ponca City on tribal land.
15     Q. On the reservation?
16     A. That's correct.
17     Q. With respect to the Tunica-Biloxi and
18 Mobiloans, what type of contact did you have with
19 them?
20     A. For Tunica, I think, as I stated earlier, I
21 came on board to support that, call it, you know,
22 maybe six or eight months later, after it had
23 launched. And the purpose of that was to make
24 everything uniform in terms of how we're handling
25 our relationships. And so then we ended up visiting

Page 300

1  them once a quarter. Again, similar format. We
2  would meet with the -- internal people. With
3  Mobiloans, it would be Marshall Pierite as the
4  acting CEO or president. Kim Palermo was, I
5  believe, hired at the time, and she was a compliance
6  officer. And then we would meet with the tribal
7  council, the full tribal council.
8      Q. From the time period where you had direct
9  oversight of Think's relationship with Mobiloans,
10 what was your personal contact with them?
11     A. Can you clarify?
12     Q. Sure. You said that you took oversight of
13 the Mobiloans relationship, I guess, in early 2012?
14     A. I think so.
15         MR. GROGAN: Objection to the form.
16 BY MR. GATEWOOD:
17     Q. Did you have weekly meetings with Mobiloans
18 like you did with Plain Green and Great Plains?
19         MR. GROGAN: Objection to the form.
20     A. My communication with Mobiloans was weekly,
21 but as well as daily. And -- and that's really
22 because I was new to the relationship and wanted to
23 make sure that they knew who I was and I was
24 available and able to support them.
25 BY MR. GATEWOOD:

75 (Pages 297 to 300)

TF App. 0046

# EXHIBIT D

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

Linda Rogenski

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO, *
  Plaintiff, *
     *
VS.     * Civil Action
     * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
  Defendants. *

************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
LINDA ROGENSKI
APRIL 19, 2018

************************************************

   DEPOSITION of LINDA ROGENSKI, produced
as a witness at the instance of the Plaintiff, and
duly sworn, was taken in the above-styled and
numbered cause on the 19th day of April, 2018, from
9:06 a.m. to 4:49 p.m., before Christy R. Sievert,
CSR, RPR, in and for the State of Texas, reported by
machine shorthand, at the Fort Worth Club, 306 West
7th Street, Fort Worth, Texas 76102, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

## Page 2

1
2    A P P E A R A N C E S
3 COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4  MR. IRV ACKELSBERG
   MR. JOHN J. GROGAN
5  Langer, Grogan & Diver, PC
   1717 Arch Street, Suite 4130
6  Philadelphia, Pennsylvania 19103
   Phone: 215-320-5701
7  E-mail: iackelsberg@langergrogan.com
      jgrogan@langergrogan.com
8
9  MR. SAVERIO "SAM" MIRARCHI
   Senior Deputy Attorney General
   Bureau of Consumer Protection
10  1600 Arch Street, Suite 300
   Philadelphia, Pennsylvania 19103
11  Phone: 215-560-2445
   E-mail: smirarchi@attorneygeneral.gov
12
13 COUNSEL FOR LINDA ROGENSKI:
14  MR. RICHARD L. SCHEFF
   Montgomery, McCracken, Walker & Rhoads, LLP
15  123 South Broad Street
   Philadelphia, Pennsylvania 19109
16  Phone: 215-772-7502
   E-mail: rscheff@mmwr.com
17
18 COUNSEL FOR KENNETH REES:
19  MR. JONATHAN BOUGHRUM
   Montgomery, McCracken, Walker & Rhoads, LLP
20  123 South Broad Street
   Philadelphia, Pennsylvania 19109
21  Phone: 215-772-7502
   E-mail: jboughrum@mmwr.com
22
23
24
25

## Page 3

1    A P P E A R A N C E S
     (continued)
2
  COUNSEL FOR THINK FINANCE, INC.:
3
  MR. MATTHEW S. SHELDON
4  Goodwin Procter, LLP
   901 New York Avenue, NW
5  Washington, D.C. 20001
   Phone: 202-346-4000
6  E-mail: msheldon@goodwinprocter.com
7
  COUNSEL FOR VICTORY PARK CAPITAL:
8
  MR. DANIEL P. SHAPIRO
9  MR. MATTHEW W. HAWS
   Katten Muchin Rosenman, LLP
10  525 W. Monroe Street
   Chicago, Illinois 60661
11  Phone: 312-902-5622
   E-mail: daniel.shapiro@kattenlaw.com
12      matthew.haws@kattenlaw.com
13
  COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
14
  MR. PATRICK DAUGHERTY
15  Van Ness Feldman, LLP
   1050 Thomas Jefferson Street, NW
16  Seventh Floor
   Washington, D.C.
17  Phone: 202-298-1874
   E-mail: pod@vnf.com
18
19 ALSO PRESENT:
20  GUS PHILLIPS, Videographer
   KEVIN BYERS
21  SCOTT ZEMINCK (Appearing telephonically)
22
23
24
25

## Page 4

1    I N D E X
      PAGE
2
 Appearances.................................. 2-3
3
 Exhibits...................................... 5-7
4
 Proceedings................................... 8
5
 LINDA ROGENSKI:
6
  Examination by Mr. Ackelsberg............... 9
7
8 Changes and Signature.................. 273-274
9 Reporter's Certification............... 275-276
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

TF App. 0047

## Page 5

E X H I B I T S

NUMBER    DESCRIPTION    PAGE

Exhibit 155    Universal Fund II    31
    Financial Result
    August 2010
    TF-PA 504628

Exhibit 156    Draft, Funds Flow    57
    Structure for GPL
    TF-PA098465 - 098467

Exhibit 157    E-mail correspondence    108
    10-21-14, Re: Paths and other
    info you requested
    TF-PA 454508 - 454014

Exhibit 158    Wells Fargo, WellsOne    125
    Account
    TF-PA 454501 - 454507

Exhibits 159-161  (Not marked or identified.)

Exhibit 162    E-mail correspondence    134
    7-18-14, Re: Debt Sale wire
    requests
    TF-PA 359539 - 359551

Exhibit 163A    E-mail correspondence    220
    9-24-12, Re: Plain Green
    Audit Questions
    TF-PA 351208 - 351217

Exhibit 163B    Think Finance - SOX    224
    Process Documentation, 5.3.0
    Daily Settlement
    TF-PA 351218 - 351231

Exhibit 164    E-mail correspondence    134
    7-26-12, Re: Weekly Package
    GPLP00209657 - 00209727

Exhibit 165A    VPC Monthly Package    153
    Checklist Produced in
    Native Format
    TF-PA 389604

## Page 6

E X H I B I T S
(continued)

NUMBER    DESCRIPTION    PAGE

Exhibit 165B    E-mail correspondence    154
    6-21-13, Re: GPLS Monthly
    Package, May 2013
    GPLP00007224

Exhibit 166A    E-mail correspondence    187
    6-6-13, Re: (Near Final)
    Tribe Financials
    TF-PA 368104

Exhibit 166B    Plain Green Lending    187
    Financial Results, May 2013
    Produced in Native Format
    TF-PA 368105

Exhibit 166C    Mobiloans Lending    187
    Financial Results, May 31, 2013
    Produced in Native Format
    TF-PA 3668106

Exhibit 166D    Great Plains Lending, LLC    187
    Financial Results, May 2013
    Produced in Native Format
    TF-PA 368107

Exhibit 166E    E-mail correspondence    207
    6-12-13, Re: May Financials
    TF-PA 434714 - 434715

Exhibits 167-172  (Not marked or identified.)

Exhibit 173    E-mail correspondence    233
    9-13-12, Re: Plain Green
    Audit Questions
    TF-PA 323902 - 323910

Exhibits 174-175  (Not marked or identified.)

Exhibit 176    E-mail correspondence    238
    4-10-13, Re: PGL Financial
    support for December 2012
    TF-PA 535853 - 535854

## Page 7

E X H I B I T S
(continued)

NUMBER    DESCRIPTION    PAGE

Exhibit 177    E-mail correspondence    248
    4-17-13, Re: Other PG items
    TF-PA 104005

## Page 8

PROCEEDINGS

1  THE VIDEOGRAPHER:  We are now on the

2  record for the videotaped deposition of Linda

3  Rogenski.  The time is 9:06 a.m., April 18, 2018.

4  In the matter of the Commonwealth of Pennsylvania,

5  et al, vs. Think Finance, Civil Action

6  No. 14-7139-JCJ.  Being held in the United States

7  District Court for the Eastern District of

8  Pennsylvania.

9  The court reporter is Christy Sievert, and

10  the videographer is Gus Phillips.  Both are

11  representatives of Kaplan Leaman and Wolfe Court

12  Reporters.

13  Will counsel please state their

14  appearances for the record.

15  MR. ACKELSBERG:  Irv Ackelsberg,

16  special counsel for the Commonwealth of

17  Pennsylvania.

18  MR. MIRARCHI:  Saverio Mirarchi, for

19  the Commonwealth of Pennsylvania.

20  MR. GROGAN:  John Grogan, also for the

21  Commonwealth.

22  MR. DAUGHERTY:  Andrew Daughtery, on

23  behalf of National Credit Adjusters.

24  MR. HAWS:  Matthew Haws, on behalf of

Linda Rogenski

Page 9

1 the Victory Park defendants.
2          MR. SHAPIRO: Dan Shapiro, for the
3 Victory Park defendants. And Scott Zeminck, the
4 general counsel of Victory Park, on the telephone
5 with us as well.
6          MR. SHELDON: Matt Sheldon, for the
7 Think Finance defendants.
8          MR. BOUGHRUM: Jonathan Boughrum, for
9 Ken Rees.
10          MR. SCHEFF: Richard Scheff, for Linda
11 Rogenski.
12          LINDA ROGENSKI
13          having been first duly sworn,
14          testified as follows:
15          EXAMINATION
16 BY MR. ACKELSBERG:
17     Q. Good morning, Ms. Rogenski. And is it
18 Rogenski or Rogenski?
19     A. It's Rogenski.
20     Q. Rogenski. Okay.
21        I introduced myself to you before. I'm
22 Irv Ackelsberg, and I'm with -- representing the
23 Commonwealth of Pennsylvania, and you understand
24 this is litigation against your former employer,
25 Think Finance?

Page 10

1     A. Yes.
2     Q. Okay. And various other -- other
3 defendants.
4        Ms. Rogenski, have you ever been deposed
5 before?
6     A. One time.
7     Q. Okay. And was that in a personal matter or
8 related to your job?
9     A. Personal matter.
10     Q. Okay. And what kind of a case was that?
11     A. A car accident.
12     Q. Okay. So you might have some -- how long
13 ago was that?
14     A. It was in my early 20s.
15     Q. Okay.
16     A. So a long time ago.
17     Q. So -- okay. So -- so I'm sure your lawyer
18 has gone over, like, how this all works, and you've
19 got a -- a feel already for how this is going to
20 happen, but just to clarify that you do understand
21 what's going on here, I need to just run through a
22 few preliminaries.
23        And the first is -- is just to confirm
24 with you that the way this -- the way this
25 proceeding works is that it's a series of questions

Page 11

1 and answers. And, you know, I'll be asking
2 questions. You -- you then answer. And then
3 your -- my questions, your answers are going to be
4 in a transcript that the court reporter here is
5 going to be preparing at the end, a written
6 transcript. Do you understand that?
7     A. Yes.
8     Q. And that it's possible that that transcript
9 could be used by any of the parties in this case
10 over the course of the -- the proceedings in this --
11 in this lawsuit. Okay?
12     A. Yes.
13     Q. Now, it's not just -- as you see, there's
14 lots of lawyers in the room. And so from time to
15 time, there may be an objection. Your lawyer may
16 object, but also some of these -- the other lawyers
17 representing the other parties may insert an
18 objection. They're objecting to my question. What
19 you need to understand is that unless your lawyer
20 directs you not to answer that specific question,
21 you still have to answer the question, even though
22 lawyers have objected. Okay?
23     A. Okay.
24     Q. All right. So the court reporter is going
25 to be typing -- well, not just my questions, not

Page 12

1 just your answers, but all the objections.
2 Everything that happens here on the record is going
3 to be recorded, and that's the official -- the
4 official transcript. Okay?
5     A. Okay.
6     Q. And because the written transcript, rather
7 than the videotape that -- that is being prepared,
8 is going to be the official record, we really need
9 you to -- to give us verbal responses to all the
10 questions. So nods or shakes or shrugs, those
11 things don't get -- make -- that's hard for the
12 court reporter to -- to record. So there may be a
13 moment when I say, "Is that a yes?" And, you know,
14 it -- please forgive me. It's not intended to be
15 disrespectful. It's just that we need -- we need
16 verbal responses to everything. Okay?
17     A. Okay.
18     Q. Alrighty. Another sort of ground rule is
19 that if you don't understand my question, it's
20 perfectly fine to say, "I don't understand the
21 question," and then I'll try to rephrase it. If you
22 don't know the answer to the question, you can --
23 that's perfectly fine too. You can just tell me, "I
24 don't know the answer to that."
25        Now, the -- whole thing here is just --

3 (Pages 9 to 12)

TF App. 0049

Linda Rogenski

Page 121

1  period passes, you're not sharing anything with
2  anyone.
3          MR. ACKELSBERG:  Exactly.
4          MR. SCHEFF:  Thank you.
5          MR. ACKELSBERG:  Dan, can we move on,
6  or is there anything else you need to clarify on the
7  record?
8          I would say to -- to counsel that given
9  that -- that there are these -- that there's this
10 other -- this other proceeding that's going on, and
11 if -- you should talk to me if -- if you're
12 concerned about -- I mean, I -- you know, I want to
13 make sure that I'm getting the right information
14 from creditors' committee counsel.  If there's -- if
15 there's some disputes there, I certainly don't want
16 to do anything inconsistent with my obligations
17 under -- under the confidential --
18         MR. SCHEFF:  We understand that.
19         MR. ACKELSBERG:  Yeah.
20         MR. SHAPIRO:  For the moment -- and we
21 will be in touch with you on this.  For the moment,
22 please don't share this outside of this case.  And
23 we'll be in touch with you on this document to let
24 you know whether that -- our position has changed on
25 that or -- or not.

Page 122

1          MR. ACKELSBERG:  But with regard to
2  other documents, I can tell you that just -- there
3  was a representation made to me by -- by counsel for
4  the creditors' committee that there is an
5  understanding between him and Hunton Williams
6  that -- that documents marked confidential in our
7  case could be shared.
8          Now, I have not -- I have not shared
9  anything at this point, but I -- I'm trying to
10 remember what -- what was said.  There certainly was
11 nothing explained in terms of any difference between
12 "confidential" or "confidential, attorneys' eyes
13 only."  And so since nothing has been exchanged, I
14 would just ask you to clarify what --
15         MR. SHAPIRO:  That's fair.
16         MR. ACKELSBERG:  Yeah.
17         MR. SHAPIRO:  So until we've had a
18 chance to do that, though, you won't share any of
19 these documents?
20         MR. ACKELSBERG:  Yes, I -- I promise
21 that.
22         MR. SHAPIRO:  Okay.
23         MR. SHELDON:  And let me just state
24 for the record that I -- I think at least in some
25 instances, there's been some confusion between

Page 123

1  counsel for the creditors' committee as to what the
2  agreements with Hunton have been as to the sharing
3  of documents.  And so before you share any
4  documents, I would just ask you to confer with
5  myself or confer with Hunton Williams to make sure
6  that everyone is on the same page.
7          MR. ACKELSBERG:  I think I've already
8  said that I -- that I would do that.
9          MR. SHAPIRO:  That's fine.  Thank you.
10 BY MR. ACKELSBERG:
11 Q.  So -- sorry, Ms. Rogenski, for the -- for
12 the lawyer distractions, but let's go -- you know,
13 now it's back to you.
14         So this started as an inquiry from Victory
15 Park to Chris Lutes, right?  Or --
16 A.  That's what it appears to be.
17 Q.  Okay.  And then it -- it's an inquiry
18 where -- where an investor is -- is asking for the
19 mechanics:  How is it that Think Finance has actual
20 control over the -- the tribal bank accounts, right?
21 That's what. . .
22 A.  That's what it appears to be asking.
23 Q.  Okay.  And so then Chris refers that to you
24 for you to help them understand how that actually
25 works?

Page 124

1  A.  Yes.
2  Q.  Okay.  And as I understand, your answer is
3  that the control that -- that Think Finance finance
4  department has over the accounts titled in the name
5  of the tribal entities is not through the account
6  contract -- the account agreements themselves, but
7  rather, through some administrative -- separate
8  administrative agreement that Think has with Wells
9  Fargo at this point in time?
10 A.  Access to the administrative portal.
11 Q.  And what does that mean, "administrative
12 portal"?
13 A.  That when you do online banking with Wells
14 Fargo, you are required to use a product they call
15 CEO, which is their client electronic something.
16 And that's where all of your accounts are housed and
17 that's where you set any kind of limits, where you
18 put positive pay or you say who's authorized to --
19 to set up a wire or release a wire, all that -- all
20 that type of information, and to look at account
21 balances in detail.
22 Q.  And so the -- the criteria with regard to
23 access in -- in the various accounts that were
24 administered through the CEO portal, that was
25 determined by agreement between Think Finance and

31  (Pages 121 to 124)

TF App. 0050

Page 125

1  Wells Fargo?
2       MR. SHELDON:  Object to form.
3       A.  Yes, I would say that was an agreement with
4  Think Finance -- it was Think Finance's CEO portal,
5  yes.
6  BY MR. ACKELSBERG:
7       Q.  So we previously -- well, strike that.
8       I'm going to show you one another
9  document, and then I think it will be a good time to
10  break for lunch.
11      A.  Are we finished with this one, sir?
12      Q.  Yes.  For the time being, yes.
13          (Exhibit No. 158 marked.)
14      MR. SCHEFF:  What number is this?
15      MR. ACKELSBERG:  158.
16  BY MR. ACKELSBERG:
17      Q.  We're looking at a bank statement from
18  Wells Fargo with regard to the Plain Green
19  collection account; am I right?
20      A.  Correct.
21      Q.  And this is from January of 2014?
22      A.  Yes.
23      Q.  And the address that appears to be the
24  mailing address for the account is the office of
25  Think Finance.  Am I right?

Page 126

1       A.  That's the address on the -- on the report.
2       Q.  And is -- was that the procedure for
3  monthly bank statements, that Wells would send --
4  we're talking about Plain Green at the moment --
5  would send the bank statements to Think Finance?
6       A.  I don't know if they mailed these or if we
7  went online and printed them out.
8       Q.  Okay.  But they were -- what we're looking
9  at here, TF-PA-454501, is an example of a bank
10  statement that -- during the period of time that
11  Wells was the bank handling the Plain Green
12  accounts, this is the way it was reported out by
13  Wells Fargo:  Plain Green, LLC, collection account,
14  in care of -- well, with an address of the Think
15  Finance office?
16      A.  That's correct.
17      Q.  And we're looking at the collection
18  account.  Am I right that the funding account would
19  have been done the same way?
20      A.  Without seeing it, but I would say yes,
21  because they were all under the Think Finance CEO
22  umbrella.
23      Q.  And the tribes did not have access to
24  the -- to the CEO portal at -- at Wells Fargo, did
25  they?

Page 127

1       A.  Yes, they did.
2       Q.  And did they have -- so -- and was that
3  true for all three of the tribes?
4       A.  No.  Only Plain Green had accounts at Wells
5  Fargo.
6       Q.  Okay.  And with regard to Plain Green, they
7  had access.  Did -- did the tribes themselves, as
8  far as you know, have the ability -- I'm sorry,
9  we're just talking about Plain Green.  Did Plain
10  Green have the ability, itself, to go into the
11  portal and wire money without Think Finance's
12  involvement?
13      A.  Without looking back at the specifics on
14  the -- the setup, I don't know the answer.  It does
15  take two people, one to set up, one to release.
16      Q.  Okay.  But -- so --
17      A.  Typically, we would set them up, and they
18  would go in and release.
19      Q.  And when they release, would they be doing
20  that through the portal?
21      A.  Yes.
22      Q.  Okay.  So it -- so in a typical wire
23  transfer, it would have required a setup on the
24  Think Finance side, and then an actual release from
25  the Plain Green side?

Page 128

1       A.  That would be correct.
2       Q.  Okay.  All done through the Wells portal?
3       A.  That would be correct.
4       Q.  Okay.  And how did the movement of money
5  work with regard to Great Plains Lending?
6       A.  It changed over time.  For the most part,
7  they handled most of the their wires on their own.
8  We would do the setup, and -- or they would do the
9  setup, and then they would release.  Meaning, Great
10  Plains sometimes set up their own wires and released
11  them, and sometimes we set them up, and they release
12  them.
13      Q.  So there were times when Great Plains would
14  release wires that Think Finance was not -- not
15  playing a role?
16      A.  Yes.
17      Q.  And did that include transfers to Great --
18  to GPLS?
19      A.  I wouldn't know without looking at some of
20  the transactions, but I would say no.
21      Q.  Okay.  So what kinds of transactions could
22  Great Plains Lending do out of their -- their
23  accounts -- and we're talking about the funding and
24  collection accounts, right?
25      A.  Yes.

32  (Pages 125 to 128)

TF App. 0051

Linda Rogenski

Page 129

1    Q.  Okay.  So what was the extent of Great
2  Plains Lending's ability to move money in and out of
3  the funding or collections account by themselves
4  without Think Finance?
5    A.  They were their accounts.  They could move
6  anything they wanted to move.
7    Q.  Your previous answer said, though, that
8  they wouldn't have -- they wouldn't have done
9  anything on their own with regard to transfers to
10  GPLS.
11    A.  Not to my knowledge, because we always
12  coordinated that with them.  Gave them the amounts,
13  and they would confirm them and then do the wires.
14    Q.  Okay.  So you were involved in some fashion
15  at least with regard -- "you," I mean the Think
16  Finance finance people -- were involved in any -- in
17  any wire transfer that involved GPLS?
18    A.  Yes.
19    Q.  What about with Mobiloans?
20    A.  Mobiloans, at different points in time, it
21  was different.  The ultimate, I think, ending
22  position was that we would set up the wires, notify
23  them, and they would release them.
24    Q.  Okay.  And you mentioned that the other two
25  tribal entities other than Plain Green did not --

Page 130

1  their accounts were not in -- in Wells Fargo, right?
2    A.  Correct.
3    Q.  Did -- well, did the banks that the other
4  tribes use have an administrative portal similar to
5  Wells' CEO function?
6    A.  I am -- I do not know.
7    Q.  Okay.  Because that was more on the
8  treasury side?
9    A.  No.  Just because we had the -- we had the
10  CEO portal -- being Think Finance owned the CEO
11  portal relationship with Wells Fargo, and we brought
12  the Plain Green tribes in under our umbrella for
13  ease of administration.  And the other two tribes
14  had their own banks, and I don't know how they had
15  their stuff set up.  They added us to have access to
16  view and access to set up wires.
17    Q.  Okay.
18    A.  "Us" meaning various people on the Think
19  Finance team.
20    Q.  What would -- were there ever a
21  circumstance where -- that you know, where Think
22  Finance set up a wire, and -- and the tribal entity
23  did not release?
24    A.  I can't remember a specific time.  That's
25  not to say it never happened.

Page 131

1    Q.  Were there situations where the Think
2  Finance finance people were waiting to get the
3  attention of the tribe to release, and it took a
4  while for that to happen?
5    A.  Yes.
6    Q.  Okay.  How often did that happen?
7    A.  I can't even give you a percentage.  It was
8  just occasionally.
9    Q.  Were there -- as between the three tribes,
10  were -- were there -- was there a tribe that was --
11  I'm not sure what word to use -- delinquent or -- or
12  difficult for the -- for the Think Finance people in
13  terms of getting -- getting the proper release?
14    A.  I would say Plain Green, because they
15  had -- you know, they were in a remote location and
16  had weather issues and things at times.
17    Q.  So what would happen if -- let's say --
18  now, did you -- did you need -- let's say you want
19  to make -- it's Plain Green, and there's money
20  sitting in the collections account, and you want to
21  transfer the 99 cents to GPLS.  Right?  And that's
22  at Citibank, right?
23    A.  Yes.
24    Q.  So were there -- so I want to be clear in
25  what -- what kind of a situation we're talking

Page 132

1  about.  Would that include situations where you and
2  Think Finance, in its capacity as the administrative
3  agent for VPC, is trying to get Plain Green to
4  release a wire that you've set up for the transfer
5  to GPLS for its 99 percent share?  Would that be the
6  kind of context that -- that you're talking about
7  where there would be some -- some delay in getting a
8  response back from Plain Green?
9        MR. SHAPIRO:  Object to form.
10    A.  That could happen.
11  BY MR. ACKELSBERG:
12    Q.  Okay.  And so what was the procedure for --
13  you know, in the situation where -- was there a way
14  that the wire could be released without the tribe
15  giving the okay?
16    A.  I'm sure there were occasions where the
17  wire was released prior to receiving okay from the
18  tribe when the wire cutoff time was approaching or
19  going to pass.  Generally, if they couldn't release
20  their wires, they would, in e-mail, tell us -- or in
21  phone call, tell us, "It's okay.  Go ahead and
22  release that for us.  We can't get into the office."
23    Q.  Okay.  And -- and were there times you
24  couldn't even get the e-mail back, and that you just
25  had to get -- had to get the wire to GPLS on your

33  (Pages 129 to 132)

TF App. 0052

Linda Rogenski

Page 201

1 inception to date, the money that's been transferred
2 to the tribe.
3 Q. I see. That's inception to date. Okay.
4 So in -- over the first two years of the program,
5 that's the total amount of cash that was paid over
6 to Plain Green?
7 A. Correct.
8 Q. Okay. And then what's the "loan
9 receivable" line mean?
10 A. This loan receivable would be the -- the
11 1 -- their 1 percent balance of the whole program.
12 The loans -- the -- they own all loans, but they're
13 only showing 1 percent on their balance sheet.
14 Q. Okay. What -- I'm just curious, what --
15 what does that mean that they -- they own all the
16 loans, but only 1 percent?
17 A. They -- we show the 1 percent because
18 they've sold off participations in 99 percent of the
19 loans. So we could break this into two lines and
20 show here's 100 percent, here's the 99 percent that
21 they sold participations in. Would get you down to
22 the same number. We just show the 1 percent.
23 Q. Well, I'm just curious about the way you
24 said that. You said, "They own all the loans, but
25 we only reflect 1 percent." What do you mean "they

Page 202

1 owned all the loans"?
2 A. They -- say they own the loans because
3 they -- they're the ones that created the loans.
4 They're their loans. They manage them, they collect
5 all the money on them, regardless of the fact that
6 they sold participations in them. They manage
7 those loans. They're their loans.
8 Q. They manage them through you, right?
9 Through Think Finance?
10 MR. SCHEFF: Object to the form.
11 A. I don't know -- I mean, they're involved in
12 the management of them. They're authorizing, saying
13 that the loans are made or not made.
14 BY MR. ACKELSBERG:
15 Q. Okay. I'm just curious what you meant.
16 "Accountants receivable," what is that?
17 A. Well, that says, "Reimbursement of expenses
18 from GPLS and their service fee."
19 Q. Is that a cumulative number, or is that
20 just for a one month. . .
21 A. That's a point in time. The balance sheet
22 is a point in time.
23 Q. Okay. Same thing with "accounts
24 receivable"?
25 A. Yes. And that's -- you see that's two-day

Page 203

1 wire and payment clearing. So that's just cash
2 that's clearing through the banks.
3 Q. Okay. And then you have -- in the -- under
4 "Liabilities," the -- the "accounts payable and
5 accrued expenses," which it says, "Payables to
6 TailWind and TCDS," is -- is that -- that's just a
7 point in time, the -- the payables that -- that
8 exist in that point in time?
9 A. That should be the sum of the numbers over
10 here.
11 Q. Over where?
12 A. On May -- on the -- on the "Income
13 Statement" tab for May.
14 Q. Okay.
15 A. Without a calculator, I don't know, but
16 it's -- it should be close to that number.
17 Q. Okay. And then the "legal reserve," what's
18 that? That's pursuant to the contract, right?
19 A. That was pursuant to the contract. Just a
20 reserve they were required to have.
21 Q. And that's money sitting in an account
22 somewhere pursuant to the contract?
23 A. Yes. It would be in this cash up here
24 somewhere.
25 Q. Now, what about "notes payable to Haynes,"

Page 204

1 what's that about?
2 A. That is for Plain Green. I think we talked
3 about earlier that the Haynes -- Haynes -- there was
4 an agreement between Haynes and -- and Plain Green
5 tribe that they would lend them money. This was the
6 balance at a point in time.
7 Q. Now, we looked at an earlier point in time
8 where the money that Haynes was lending to Plain
9 Green to fund the loans was coming from Think
10 Finance, and that -- right?
11 A. That's a separate -- that's a separate --
12 MR. SCHEFF: Object to the form.
13 A. That's a separate contract between Think
14 Finance and Haynes.
15 BY MR. ACKELSBERG:
16 Q. Well, so it wouldn't even show up on -- it
17 wouldn't show up on this report?
18 A. The -- the part between Think and Haynes?
19 Q. Yes.
20 A. No, because these are Plain Green's
21 financials.
22 Q. Okay. Do you know if at this point in
23 time, the money that Haynes was lending to the tribe
24 was still coming from Think Finance?
25 A. I believe it --

51 (Pages 201 to 204)

TF App. 0053

Linda Rogenski

Page 205

1          MR. SCHEFF:  Object to the form.
2      Go ahead.
3      A.  I believe it was.
4  BY MR. ACKELSBERG:
5      Q.  Okay.  And then it says, "Notes payable to
6  the tribe," a million dollars.  What's that?
7      A.  There was -- there was a -- a point in time
8  somewhere in this window, in '13, that the actual
9  Chippewa Cree wanted to put some excess cash they
10  had into their Plain Green structure to lend on
11  loans and to earn some extra interest on.  That was
12  theirs.
13      Q.  Okay.
14      A.  So another capital -- another financing
15  source.
16      Q.  And then Line 11, "Other payables," there's
17  a notes that says, "Intercept debt sale
18  payments/reserves."  So explain to us that line.
19      A.  Okay.  So that would -- that would be --
20  and so that would be any other -- it's what it says,
21  it's Intercept debt sale payments or reserves.  I'm
22  not sure how to explain it any -- any better than
23  that.  Yeah, I mean, I'm just not sure how to
24  explain that.  Intercept is the ACH processor.
25      Q.  Now ordinarily, when I've looked at balance

Page 206

1  sheets for lenders, I see, like, a provision for
2  loan loss.  I don't see that here.  Do you know why?
3      A.  That was part of the agreements, that
4  the -- the tribe would -- the tribe didn't have to
5  absorb -- actually, I have to look at the agreement
6  to get the specifics.  I don't remember the
7  specifics.  But --
8      Q.  But they weren't going to incur -- because
9  Think Finance was essentially incurring the risk of
10  loss on -- on bad loans; am I right?
11          MR. SHELDON:  Object to form.
12  BY MR. ACKELSBERG:
13      Q.  You're familiar with the contracts, right?
14      A.  Yes.
15      Q.  Yeah.  And that was your understanding of
16  the contracts, correct?
17          MR. SHELDON:  Object to form.
18      A.  Yes.
19  BY MR. ACKELSBERG:
20      Q.  Now, what is -- I know you told us that
21  with regard to the income statements, the -- the
22  accounting was done in accordance with GAAP,
23  G-A-A-P.  Would that be true of the balance sheet as
24  well?
25      A.  These are the program financials.  We do

Page 207

1  them in conformity with GAAP to the best we can.
2  They're not -- the program financials themselves are
3  not audited.  So I can't state that they were
4  independently audited and noted that they were under
5  GAAP.  These would go in -- these would go --
6  provided to the tribes, and they would combine them
7  with their operations, and then theirs should be
8  prepared in GAAP.
9      Q.  Okay.  And -- and without -- without
10  spending a lot of time on the Mobiloans and the
11  Plain Greens, can -- can we agree that -- that they
12  were done in accordance with the same protocol that
13  you've described with regard to Plain Green?
14      A.  Yes.
15          MR. SHELDON:  Counsel --
16          MR. ACKELSBERG:  Yeah.  Yes.  We're
17  near a break time.
18  BY MR. ACKELSBERG:
19      Q.  I want to -- we'll end with a document that
20  I've identified as 166-E.  We'll end -- I mean,
21  until the break.  There's -- there's a little bit
22  more.
23          (Exhibit No. 166-E marked.)
24          MR. SHELDON:  I think the witness
25  previously said she was hoping to take a break after

Page 208

1  the last exhibit.  How long are you going to --
2          MR. ACKELSBERG:  Yes.  Well, we
3  already heard from the -- we only have five minutes
4  left on the -- on the tape, so I -- I'm sorry you
5  missed that.  So I said we're going to -- he says
6  break in five, so I'm just going to --
7          MR. SHELDON:  No, I know, you're going
8  to be no more than five minutes.
9          MR. ACKELSBERG:  Yes.  Yes, before a
10  break.  Yes.
11      A.  (Reviews document.)
12  BY MR. ACKELSBERG:
13      Q.  So let me just ask a -- just a few -- a few
14  brief questions.  So you saw that in the previous
15  e-mail, we -- Bob Peterson was sending to Chris
16  Lutes all of the -- the tribal financials together.
17  You see that, right?
18      A.  Yes.
19      Q.  And then six days later, Chris Lutes is
20  sending to various people on the e-mail the Great
21  Plains Lending financials that had been sent to --
22  previously to Chris Lutes, right?
23      A.  That appears so.
24      Q.  Okay.  So I'm just -- my question is just
25  to kind get a sense of the -- of the protocol and

52  (Pages 205 to 208)

TF App. 0054

# EXHIBIT E

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -
COMMONWEALTH OF        :
PENNSYLVANIA           :
    Plaintiff          :
                       :
VS.        :  CIVIL ACTION NUMBER
           :  2:14-CV-07139
THINK FINANCE, INC., :
ET AL.,                :
    Defendants         :
                       - - -
                    APRIL 26, 2018
                       - - -

         Videotaped deposition of STEPHEN
SMITH, was taken pursuant to notice at 901 New
York Avenue, NW, Washington, D.C., beginning
at or about 9:00 a.m. before Jeannine
Cancelliere, Court Reporter and Notary Public
and David Levin, Videotape Operator, there
being present.

         KAPLAN, LEAMAN AND WOLFE
         Registered Professional Reporters
         230 S. Broad Street, Suite 1303
         Philadelphia, Pennsylvania 19102

---

Page 2

1
2   APPEARANCES:
3   LANGER, GROGAN & DIVER, P.C.
    BY: IRV ACKELSBERG, ESQUIRE
4   BY: JOHN J. GROGAN, ESQUIRE
    1717 Arch Street, Suite 4130
5   Philadelphia, Pennsylvania 19103
    Phone: (215) 320-5701
6   Representing the Plaintiff
    iackelsberg@langergrogan.com
7
8   ATTORNEY GENERAL'S OFFICE
9   BY: SAVERIO MIRARCHI, ESQUIRE
    1600 Arch Street, 3rd Floor
10  Philadelphia, Pennsylvania 19103
    Phone: (215) 560-2445
11  Representing the Defendant
    smirarchi@attorneygeneral.gov
12
13
    MONTGOMERY McCRACKEN
14  BY: RICHARD SCHEFF, ESQUIRE
    123 South Broad Street
15  Philadelphia, Pennsylvania 19109
    Phone: (215) 772-7228
16  Representing Ken Rees
    rscheff@mmwr.com
17
18
    KATTEN, MUCHIN, ROSENMAN LLP
19  BY: J. MATTHEW HAWS, ESQUIRE
    BY: DANIEL SHAPIRO, ESQUIRE
20  525 W. Monroe Street
    Chicago, Illinois 60661-3693
21  Phone: (312) 902-5319
    Representing Victory Park
22  matthew.haws@kattenlaw.com
    daniel.shapiro@kattenlaw.com
23  Also Present: Scott Zemnick
        (Via Phone)
24

---

Page 3

1   APPEARANCES (continued)
2
3   GOODWIN PROCTER
    BY: MATTHEW S. SHELDON, ESQUIRE
    BY: THOMAS GRABER, ESQUIRE
4   BY: STEPHEN SHAW, ESQUIRE
    901 New York Avenue, NW
5   Washington, D.C. 20001
    Phone: (202) 346-4000
6   Representing Think Finance
    msheldon@goodwinprocter.com
7
8
9   VAN NESS FELDMAN
    BY: PATRICK DAUGHERTY, ESQUIRE
10  1050 Thomas Jefferson Street, NW
    Washington, D.C. 20007-3877
11  Phone: (202) 298-1800
    Representing National Credit
12  Adjusters LLC
    pod@vnf.com
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 4

1              - - -
2           I N D E X
3              - - -
4   STEPHEN SMITH              PAGE
5   BY MR. ACKELSBERG           8
6              - - -
7         E X H I B I T S
8              - - -
9   EXHIBIT NO.   DESCRIPTION        PAGE
10  P-216      Metadata Document       37
11  P-217    E-Mail with Attachments   55
12  P-218        E-Mail Chain          61
13  P-219    E-Mail with Attachments   65
14  P-220   Response to Interrogatories 86
15  P-221    E-Mail with Attachments   91
16  P-222-A      E-Mail Chain         109
17  P-222-B      E-Mail Chain         110
18  P-223      SOP for Plain Green    129
19  P-224        E-Mail Chain         133
20  P-225        E-Mail Chain         158
21  P-226    E-Mail with Attachments  187
22  P-227-A      E-Mail Chain         207
23  P-227-B      E-Mail Chain         208
24  P-228       Draft Report          212

1 (Pages 1 to 4)

Stephen Smith

Page 5

```
 1              ---
 2          E X H I B I T S
 3              ---
 4   EXHIBIT NO.    DESCRIPTION         PAGE
 5   P-229      Remediation Plan       221
 6   P-230      E-Mail Chain           223
 7              P-231 was not marked
 8   P-232      E-Mail Chain           226
 9   P-233      E-Mail Chain           231
10   P-234      E-Mail Chain           236
11   P-235      Document               239
12   P-236      Document               239
13   P-237      Weekly Call Document   242
14   P-238      Production Document    245
15   P-239      Complaint Document     258
16   P-240      E-Mail Chain           268
17   P-241      Complaint Template     272
18   P-242      E-Mail                 272
19           P-59 and P-60 Referenced on Page 140
20
21
22
23
24
```

Page 6

```
 1          VIDEOTAPE OPERATOR:  We're now
 2   on the record.  My name is David Levin.  I'm
 3   the videographer employed by On the Record.
 4   This is a video deposition in the United
 5   States District Court for the Eastern District
 6   of Pennsylvania, Civil Action Number
 7   14-7139-JCJ.  Today's date is Thursday, April
 8   26th, 2018 and the video time is 9:00 a.m.
 9   This deposition is being held at 901 New York
10   Avenue, Northwest, Ninth Floor, Washington,
11   D.C., in the matter of the Commonwealth of
12   Pennsylvania by Attorney Josh Shapiro versus
13   Think Finance Incorporated, Et Al.
14          The deponent is Stephen E.
15   Smith.
16          Will counsel please identify
17   themselves for the record and whom they
18   represent?
19          MR. ACKELSBERG:  Irv Ackelsberg
20   for Attorney General Shapiro.
21          MR. GROGAN:  John Grogan, also
22   for the Commonwealth.
23          MR. MIRARCHI:  Sam Mirarchi for
24   the Commonwealth of Pennsylvania.
```

Page 7

```
 1          MR. SHELDON:  Matthew Sheldon
 2   representing the Think Finance defendants,
 3   joined today by Thomas Graber, general counsel
 4   of Think Finance.
 5          MR. SCHEFF:  Richard Scheff for
 6   Kenneth E. Rees.
 7          MR. SHAPIRO:  Dan Shapiro for
 8   the Victory Park defendants.
 9          MR. HAWS:  Matthew Haws for the
10   Victory Park defendants.
11          MR. SHAW:  Stephen Shaw for the
12   Think Finance defendants.
13          VIDEOTAPE OPERATOR:  The court
14   reporter is Jeannine Cancelliere.  Can she now
15   swear in the witness.
16              - - -
17          STEPHEN SMITH, after having been
18   first duly sworn, was examined and testified
19   as follows:
20              - - -
21          VIDEOTAPE OPERATOR:  Please
22   proceed, counsel.
23              - - -
24          EXAMINATION
```

Page 8

```
 1              - - -
 2   BY MR. ACKELSBERG:
 3   Q.   Good morning, Mr. Smith.
 4   A.   Good morning.
 5   Q.   Have you ever been deposed before?
 6   A.   Yes.
 7   Q.   Okay.  When -- can you tell me when or
 8   what the circumstances were of that
 9   deposition?
10   A.   It was approximately 15 years ago, by
11   the SEC.
12   Q.   Were you working for Think Finance then?
13   A.   No.
14   Q.   Was it a prior employment?
15   A.   Yes.
16   Q.   Okay.  That prior employer was who?
17   A.   At the time, I guess it was Citigroup.
18   Q.   Was it -- I don't understand what's -- I
19   don't understand the answer.  Was it -- did it
20   have a different name?
21   A.   Well, there were several acquisitions
22   along the way of the company that I worked for
23   that ultimately ended with Citigroup.
24   Q.   Well, the company that was acquired by
```

2 (Pages 5 to 8)

TF App. 0056

Stephen Smith

Page 101

1   you a question about that. Just that first
2   paragraph, the overview paragraph.
3   A.   Oh, I'm sorry. Yes. Okay.
4   Q.   So the next-to-last sentence in it, it
5   says: PGL -- PGL means Plain Green, right?
6   A.   Plain Green Loans.
7   Q.   Okay. So Plain Green management will
8   review and approve the Plain Green
9   underwriting guidelines prior to deployment.
10          Do you see that?
11  A.   It says that, yes.
12  Q.   So is there any document containing
13  what's referred to there to as underwriting
14  guidelines? Other than the document we're
15  looking at.
16  A.   I don't know.
17  Q.   Okay. And then it says: Plain Green
18  management ensures that all credit risks are
19  properly identified, monitored, and
20  controlled.
21          How does -- at this point in
22  time, in 2012, how would Plain Green
23  management -- how would they have been
24  ensuring that all credit risks were properly

Page 102

1   identified, monitored, and controlled?
2   A.   I don't know exactly everything that
3   they did to ensure those items.
4   Q.   Okay.
5   A.   I don't know what they did.
6   Q.   Okay. Then if we go into the policy,
7   the policy section, there is something that's
8   under the title "Underwriting Philosophy."
9   You see?
10  A.   Yes.
11  Q.   And it basically describes that the
12  policy is to -- is to use data obtained from
13  the applicant, him or herself, and from
14  third-party data providers, right? That's
15  basically what it says.
16  A.   Yes.
17  Q.   And then number 3 -- and then it states
18  that the outcome of the underwriting process
19  is one of three results, either approved;
20  declined; or approved, pending -- pending
21  verification. Right?
22  A.   Yes.
23  Q.   Okay. So the data goes in and a
24  decision along one of those -- and a decision

Page 103

1   comes out in one of those three categories.
2   That's basically what this is saying, right?
3   A.   That's correct.
4   Q.   And that's how it works, right?
5   A.   For the most part, that's the Reader's
6   Digest version, but yes.
7   Q.   Okay. And what we're basically talking
8   about is the decision engine that Think
9   Finance has licensed to the Plain Green tribe;
10  am I right?
11          MR. SHELDON: Object to form.
12          THE WITNESS: Yes.
13  BY MR. ACKELSBERG:
14  Q.   Now, the next page, it refers to law and
15  regulations applicable to the underwriting
16  process. Do you see that?
17  A.   Yes.
18  Q.   And you see it refers to the principles
19  of the Equal Credit Opportunity Act and the
20  principles of the Fair Credit Reporting Act.
21  Do you see that?
22  A.   Yes.
23  Q.   Do you -- is there a difference between
24  the principles of the act and following the

Page 104

1   act? I mean, I'm trying to understand whether
2   there was any intent here to say something
3   less than compliance with the laws that are
4   mentioned?
5          MR. SHELDON: Object to form.
6   BY MR. ACKELSBERG:
7   Q.   Do you know what's intended by that?
8   A.   I don't know what Plain Green intended
9   by using the term "principles," no.
10  Q.   When you say Plain Green intended,
11  you're not suggesting that someone at the
12  tribe actually drafted this, are you?
13          MR. SHELDON: Object to form.
14          THE WITNESS: Well, I don't
15  know who may have participated in the drafting
16  of the document, but I do know that it
17  indicates that Plain Green approved the
18  document.
19  BY MR. ACKELSBERG:
20  Q.   And I don't -- I'm certainly not
21  suggesting that Think Finance does these
22  things without tribal approval. I'm not
23  suggesting that at all. I'm basically trying
24  to understand the process and really the role

26 (Pages 101 to 104)

TF App. 0057

Stephen Smith

Page 105

1  played by Think Finance as service provider in
2  developing standard operating procedures,
3  policies like we're looking at now, right?
4         So that's part of what
5  compliance did; am I right?  You work with the
6  tribal partners in developing policies; am I
7  right?
8  A.    At times, yes, we assisted them with
9  policy reviews or standard operating
10 procedures, particularly those that were
11 outlining system functionality.  Since we
12 designed the system, we were most
13 knowledgeable about system functionality.
14        So they relied on us to
15 assist them with procedures related to how
16 things progressed through the system.
17 Q.    Like for example, the decision engine,
18 no one at the -- there was no expectations at
19 Think Finance that anyone at the tribe would
20 understand the mechanics of the decision
21 engine, was there?
22        MR. SHELDON:  Object to form.
23        THE WITNESS:  I don't think
24 there was an expectation of -- that they would

Page 106

1  have the technical knowledge.  However, they
2  were made aware of the general -- how it
3  functioned, what the inputs were.  They had
4  insight and discretion to that information to
5  be able to provide feedback to our decision
6  sciences folks if they, for example, saw
7  something that maybe they didn't like.
8  Q.    Well, the previous page explained
9  what -- I mean, there is data from the
10 application, data from third parties, and then
11 you get a decision, right?
12 A.    Yes.  That's a very high-level
13 description of what goes on.
14 Q.    So that's what you meant, that they
15 would have to approve -- they would have to
16 have a sense of generally how it functioned
17 and would have to approve that.  That's what
18 you meant, right?
19        MR. SHELDON:  Object to form.
20        THE WITNESS:  That and in
21 addition to specifics within -- for example,
22 they would know, for example, the types of
23 third-party data that was being used.  So for
24 example, if there was a piece of data that

Page 107

1  they weren't comfortable with, they would have
2  reviewed that and been able to provide
3  feedback.  So it goes a little bit beyond just
4  encapsulating it as data.
5  BY MR. ACKELSBERG:
6  Q.    Okay.  I understand.  But there's no
7  separate document which memorializes any
8  specific input that the Plain Green folks
9  would have provided to the technology folks
10 who were responsible for the decision engine,
11 in terms of the design here, right?
12        MR. SHELDON:  Object to form.
13        THE WITNESS:  I don't know.
14 If there was a document like that, it would
15 likely have been communicated with our risk
16 and our decision sciences folks.
17 BY MR. ACKELSBERG:
18 Q.    So if there was such a document, the
19 risk people would know -- would be the ones to
20 talk to about that?
21        MR. SHELDON:  Object to form.
22        THE WITNESS:  I would assume
23 that would be the correct route to have
24 knowledge about that, yes.

Page 108

1  BY MR. ACKELSBERG:
2  Q.    Okay.  But let's go back to the drafting
3  of these documents.  And I fully understand
4  that whenever there is a written policy for a
5  particular tribal product, the tribal
6  entities -- there has got to be some approval
7  some way, and I understand that.
8         I'm really trying to
9  understand the process that precedes the
10 approval by the tribe.  I'm -- isn't it
11 correct that there were people within the
12 compliance team that worked on policies --
13 worked on the actual written policies?
14        MR. SCHEFF:  Object to the
15 form.
16        MR. SHELDON:  Object to form.
17        THE WITNESS:  I don't recall
18 that we had anyone specific, you know, their
19 job function was to that do that specific
20 role, right?  I think as -- my recollection as
21 just the general services as part of the
22 lending platform, we assisted with, at times,
23 drafting, you know, maybe policies or
24 procedures and then provided those to, in this

27  (Pages 105 to 108)

TF App. 0058

Stephen Smith

Page 125

```
 1              Now, the document referenced
 2   in this e-mail is not this document.
 3   Q.   And how do you know that?
 4   A.   They are two separate documents.
 5   Q.   And how do you know that?
 6   A.   Well, this is a policy and the e-mail
 7   refers to procedures.
 8   Q.   Okay.  All right.  I got it.  So we're
 9   talking about a different document.  I do have
10   that.  Okay.
11              And then in the third
12   paragraph, you say:  I'd like to have the SOPs
13   finalized this week.  Would why -- would you
14   be telling her that?
15   A.   I don't recall exactly.
16   Q.   And then you're telling her that you
17   anticipate policies being approved at the next
18   Plain Green board meeting.  Do you see that?
19   A.   Yes.
20   Q.   Why would you get involved in that?
21         MR. SCHEFF:  Object to the
22   form.
23         MR. SHELDON:  Object to form.
24         THE WITNESS:  I don't recall
```

Page 127

```
 1   part.
 2              I'd like to have the SOPs
 3   finalized this week, if possible, because I
 4   anticipate that the policies will get approved
 5   at your board meeting tomorrow, and then we'll
 6   be finished with policies and procedures and
 7   can move on to complaints.  Yay.
 8         MR. ACKELSBERG:  Thank you.
 9   BY MR. ACKELSBERG:
10   Q.   Can you -- can you tell us -- first of
11   all, does it refresh your recollection at all?
12   Do you remember this exchange with Billi Anne
13   and Bobbi?
14   A.   No.  I don't recall this particular
15   exchange.  I'm sorry.
16   Q.   Was there a period early on in the Plain
17   Green product where you were you were trying
18   to put together a whole package, work with the
19   tribe to put together a whole package of
20   policies and procedures?  Wouldn't that
21   generally be the way it would work with a new
22   customer?
23   A.   We would certainly assist them with
24   policies and procedures.  We may have
```

Page 126

```
 1   at that particular time how I was involved.
 2   BY MR. ACKELSBERG:
 3   Q.   But does it -- did there come a time
 4   when -- that Think Finance decided that it
 5   wanted approvals that were actually done
 6   higher up than the staff of Plain Green, that
 7   it wanted approvals at a tribal level?  Do you
 8   remember that?
 9         MR. SHELDON:  Object to form.
10         THE WITNESS:  No.  I don't
11   recall anything specific to that.
12   BY MR. ACKELSBERG:
13   Q.   And you can't -- and then it says, if
14   you continue reading after you mentioned that
15   you're hoping to get these policies approved
16   at the next Plain Green board meeting, you
17   say:  And then we'll be finished with policies
18   and procedures and can move on to complaints.
19   Yay.
20         MR. SHELDON:  Object to form.
21   Just for the sake of the record, so that it
22   will be clear, let me just read this one
23   sentence since it's been split up now in three
24   different parts and read mistakenly in one
```

Page 128

```
 1   discussed with them activities such as their
 2   board reviewing and approving such things.  I
 3   may have been referring back to that in this
 4   e-mail.
 5              But it was a very iterative
 6   process.  We would assist them.  In some
 7   cases, we might draft an initial version to
 8   send to them and let them review that, make
 9   any changes, ask any questions, send us back
10   maybe a revised version or, you know, say,
11   hey, this, you know, looks good to us.  And we
12   did that kind of in our role as a service
13   provider from time to time, just to assist
14   with documentation.
15              It was ultimately their -- it
16   was ultimately their approval of the
17   documents.  So, you know, we were always
18   asking for something back with their approval
19   on it so we could memorialize that for our
20   records.
21         MR. ACKELSBERG:  Okay.  I'm
22   going to show you a document I'm going to
23   mark -- we're marking as Plaintiff's Exhibit
24   223.
```

32  (Pages 125 to 128)

TF App. 0059

Stephen Smith

## Page 129

1          - - -
2          (Whereupon Exhibit P-223 was
3     marked for identification.)
4          - - -
5     BY MR. ACKELSBERG:
6     Q.   Mr. Smith, am I correct that Exhibit 223
7     is an example of an SOP for Plain Green?
8     A.   Yes.
9     Q.   And is this one that would have come
10    past your desk or the desk of someone in
11    compliance?
12    A.   It's likely that someone in my
13    compliance group would have viewed this
14    document, yes.
15    Q.   For what purpose?
16    A.   Primarily for accuracy.
17    Q.   Okay.  And again, to make sure that it's
18    accurately describing the system, the
19    operational system as it functions in reality?
20    A.   Yes.
21    Q.   And you'll see the dates at the end of
22    it.  It says version 1.0.  Was -- well, it
23    says it had an effective date of March 21st
24    and was revised on March 28th.  Do you see

## Page 130

1     that?  Of 2001.
2     A.   The effective date --
3     Q.   Of 2011.
4     A.   -- is March 31st, not 21st.
5     Q.   Yes.  March 31st, yeah.  And it says
6     that it was approved by the CEO and that it
7     was authored by Billi Anne Morsette.  Do you
8     see that?
9     A.   Yes.
10    Q.   Do you think that Billi Anne Morsette
11    actually drafted this document?  Based on your
12    experience with the way these SOPs were
13    developed.
14    A.   She probably did not draft the entire
15    document.  She may have participated in making
16    changes to it, but it's likely that she didn't
17    draft the entire document from start to
18    finish.
19    Q.   So how -- explain the process of how
20    SOPs, the SOPs that originated from Think
21    Finance as opposed to an outside consultant,
22    someone else.  But to the extent Think Finance
23    was working on a SOP, how would the process
24    work from start to finish?

## Page 131

1          MR. SHELDON:  Object to form.
2          THE WITNESS:  Well, we had
3     a -- there was a group within the company that
4     assisted with standard operating procedures
5     and making changes, proposed changes, when
6     maybe systems changed.  And so the document
7     would normally get started, in many cases, by
8     someone at Think Finance and then sent over to
9     the client for them to review and then go
10    through and ask questions.
11    BY MR. ACKELSBERG:
12    Q.   Okay.  I got it.  Now, this group that
13    would actually work on the initial drafting,
14    was that part of compliance?
15    A.   No.  I believe it was part of our loan
16    operations group.
17    Q.   Who ran that?
18    A.   At what time?
19    Q.   Well, would that be under the chief
20    operating officer or -- I mean, I'm just
21    curious in the organizational structure where
22    that would fall.
23    A.   It's changed over time.  So what
24    specific time are you interested in?

## Page 132

1     Q.   Well, we're looking at early days of
2     tribal in 2011 and 2012.
3     A.   This -- the loan operations group at
4     that time reported up to Jason Harvison.
5     Q.   Okay.  Now, is this a -- can you tell us
6     what the function of this specific -- in other
7     words, I understand you've talked generically
8     about the function of standard operating
9     procedures.  But what was the function of this
10    particular SOP?
11    A.   Well, according to the purpose
12    statement, it was to outline the process for
13    the lender's daily review and approval process
14    for funding of applications.
15    Q.   Is this process one that compliance ever
16    touched, from what you recall?
17    A.   Can you clarify?  Touched, meaning --
18    Q.   Well, was there ever an occasion where
19    the compliance group, from what you remember,
20    had to test to see whether the operation was
21    going consistent with this SOP?
22    A.   I don't recall if we specifically tested
23    the functionality around this SOP or not.
24    Q.   Okay.

33 (Pages 129 to 132)

TF App. 0060

Stephen Smith

---

Page 149

1    Q.   Okay.  So it gave the user at the tribe
2  the opportunity to say, even though the system
3  has approved this person for a loan, we don't
4  want that loan funded?
5    A.   The intent was to give them that
6  functionality, yes.
7    Q.   Okay.  And my question is, in the set-up
8  of the system, what information would the
9  tribe have available to it -- why would the
10  tribe want to reject the loan?
11        MR. SCHEFF:  Object to the
12  form.
13  BY MR. ACKELSBERG:
14    Q.   What information came?  It's just a
15  name, right?
16        MR. SCHEFF:  Object to the
17  form.
18        MR. SHELDON:  Object to form.
19  BY MR. ACKELSBERG:
20    Q.   Anything more than a name?
21        MR. SCHEFF:  Object to the
22  form.
23        THE WITNESS:  Well, they can
24  take the name, and then go into the front-end

---

Page 150

1  system and review the application.  They could
2  review any notes that might have been
3  attached.  They could review documents if the
4  customer actually had to send in documents.
5  So there were pieces of the process that they
6  could review just based on the name.  I don't
7  recall.  It may have been where they could
8  have clicked on that name and it took them to
9  that screen.
10  BY MR. ACKELSBERG:
11    Q.   But you don't know whether, in fact,
12  that --
13    A.   Yeah.  I don't recall.  I didn't work
14  with that particular system very much.
15    Q.   Okay.  Now, am I right that if, let's
16  say, at the end of the day, Mobiloans did
17  nothing, they didn't review the loans, the
18  loans would get funded anyway, right?
19    A.   They would get funded based on their
20  approved credit underwriting criteria.  So at
21  the point that that screen was building
22  throughout the day, the loans had already
23  passed their approved underwriting criteria.
24    Q.   And so just to be clear, those -- and

---

Page 151

1  those loans would be funded, the approved
2  loans would be funded, absent some affirmative
3  rollback that was communicated from the tribe
4  to Think Finance on that functionality that
5  you're talking about, right?
6        MR. SCHEFF:  Object to the
7  form.
8        MR. SHELDON:  Object to form.
9        THE WITNESS:  Right.  They
10  had ultimate authority through that screen if
11  they wanted to remove one or all of those
12  approvals through the functionality.  Again,
13  that was intent of the functionality, even
14  though, like I said, they wouldn't have been
15  put on that screen had they not already passed
16  the lender's criteria.
17  BY MR. ACKELSBERG:
18    Q.   Okay.  It sounds like from the e-mail
19  that Kim Palermo was actually taking that
20  responsibility seriously, that she was at the
21  end of the day, taking responsibility for
22  going over that screen and pushing that
23  approval button, right?
24        MR. SCHEFF:  Object to the

---

Page 152

1  form.
2  BY MR. ACKELSBERG:
3    Q.   That's kind of what it looks like.
4    A.   I don't know if she was personally --
5    Q.   Someone was there was doing that?
6    A.   -- responsible to review them or if she
7  had someone to do it.  But clearly she was
8  reviewing the SOP against their internal
9  procedures and raising the concern that they
10  weren't following their SOP.  And I don't know
11  who she had doing that review process.
12    Q.   Am I right, that's she's also -- it
13  sounds like she's also complaining about
14  another aspect of it, which is that when she
15  or someone working with her would go to the
16  screen at five o'clock in the afternoon, she
17  would -- she felt like she was having some
18  involvement in the underwriting process but
19  loans were effectively getting -- but loans
20  were still being approved and funded in the
21  evenings, over the weekends, during periods
22  where there was no one in the office at
23  Mobiloans, right?  That's parts of what her
24  concern is, right?

---

38  (Pages 149 to 152)

TF App. 0061

Stephen Smith

Page 241

1  Q.  Okay.  And you were involved in Plain
2  Green from the beginning, right?  From 2011,
3  as a member of the team, right?
4  A.  In a compliance capacity, yes.
5  Q.  Okay.  And looking at the second meeting
6  minutes, the one from 2013, that one's not
7  familiar to you either?
8  A.  No.
9  Q.  The handwriting on -- the handwriting
10  that you see at the top where it says, see
11  page 5.  Do you see that?
12  A.  I see that, yes.
13  Q.  And then you see on page 5, there's --
14  someone outlined the reference to the credit
15  agreement.  Do you see that?
16  A.  Yes.
17  Q.  Is that your writing?
18  A.  I'm not sure if that's my handwriting or
19  not.  It may be, but I --
20  Q.  Well, look at the item in the word
21  minutes that are actually being highlighted on
22  page 5.  It's a reference to an arrangement
23  between Think Finance, Plain Green, and
24  someone named Haynes or Haynes Investment.  Do

Page 242

1  you see that?
2  A.  Okay, yeah.  I see the section, yes.
3  Q.  Do you know -- do you remember anything
4  about Haynes Investments and its relationship
5  to Plain Green?
6  A.  No.  I wasn't involved in that part of
7  the business.  My role was more in compliance.
8  It didn't touch the agreements.  It didn't
9  touch the financing.  That was not anything
10  that I ever dealt with.
11  Q.  Understood.  And the question is whether
12  you knew anything about Haynes Investments and
13  its connection to Plain Green?
14  A.  I never really never knew anything
15  specific to Haynes's involvement with the
16  tribe.
17      MR. ACKELSBERG:  I'll
18  identify this exhibit as 237.
19      THE WITNESS:  Okay.
20                 - - -
21  (Whereupon Exhibit P-237 was marked for
22            identification.)
23                 - - -
24  BY MR. ACKELSBERG:

Page 243

1  Q.  Okay.  My first question is whether you
2  remember, in this time period, mid-2013, a
3  Think Finance project that had the name Tribal
4  Restructure?
5  A.  I remember the word "restructure" being
6  used.  I don't -- there's not enough in here
7  to jog my memory about a specific project.  It
8  appears there was a weekly project.  I'm just
9  not recalling the specifics around what that
10  was.
11  Q.  Do you remember -- let me try another
12  term rather than tribal restructure.  Do you
13  remember the term "tribalization"?
14  A.  I may have heard that term once or
15  twice.  I don't even -- honestly don't know
16  what it means.
17  Q.  Okay.
18  A.  It wasn't anything I ever used
19  regularly.
20  Q.  Okay.  And in looking at this document,
21  at least can you surmise what this weekly call
22  was covering, what it was about?  At least
23  this particular call, among the weekly calls.
24  A.  I'm struggling to remember what this

Page 244

1  was.
2  Q.  Well, let me just ask you generally.  I
3  mean, we looked at the CRA.  And actually,
4  this was -- this is right at the point where
5  CRA was doing the remediation plan that we
6  were looking at before, right?  This is July
7  of 2013, which is the same time the
8  remediation plan was being put out, right?
9  A.  Right.
10  Q.  So do you agree that at this point in
11  time, there was a little bit of mobilization
12  going on at the Think Finance side about
13  trying to get the tribes more engaged in the
14  product?
15      MR. SCHEFF:  Object to the
16  form.
17      MR. SHELDON:  Object to the
18  form.
19      THE WITNESS:  I know from the
20  compliance perspective that we were trying
21  to -- the tribes' operations were evolving
22  over time, and they were becoming more mature
23  as the product grew.  And as such, they were
24  taking over duties that maybe they had

61 (Pages 241 to 244)

TF App. 0062

Stephen Smith

Page 245

1 outsourced prior to that. And we assisted
2 with much of that.
3 And this is talking about
4 dates of hiring and I, I mean, I recall that
5 there had been an identification of certain
6 roles within the organization at Plain Green
7 that were hires that as a company that was
8 maturing and growing, they needed to have.
9 And my recollection is that this may be
10 referring to that.
11 BY MR. ACKELSBERG:
12 Q. Let me show you another document I will
13 identify as 238.
14 - - -
15 (Whereupon Exhibit P-238 was marked for
16 identification.)
17 - - -
18 BY MR. ACKELSBERG:
19 Q. Now, just so you see what we're dealing
20 with, some of the -- some of the production
21 that -- some of the documents that we got
22 actually contain spreadsheets, Excel sheets.
23 So what you're seeing here is a transmittal
24 e-mail, right? And then you see the next

Page 246

1 page -- so this is 409. You see? Just so you
2 see what we're doing here.
3 A. I see 409.
4 Q. Okay. And then the next page, it says
5 410. And it says produced in native format.
6 You see? And then what I have done there,
7 I'll just represent to you is I've just
8 printed out the Excel sheet that is, in fact,
9 the attachment there.
10 A. Okay.
11 Q. Do you see?
12 A. Yes.
13 Q. So this is now a year later, a year and
14 two months since the last one we were looking
15 at. The tribal restructure weekly meeting.
16 And this is now September 2014 and Michelle
17 Nguyen is sending to you this document, which
18 apparently has a title "Tribal Improved
19 Management." Do you see that?
20 A. I see that.
21 Q. Okay. And is this a document that you
22 remember, or do you remember seeing documents
23 like this?
24 A. Yeah, I do recall this particular

Page 247

1 spreadsheet.
2 Q. Why don't you tell me what this is?
3 A. Well, again, as the tribes' programs
4 were growing, the tribes' operations were
5 maturing. And as part of that maturation
6 process, we worked together with the tribe to
7 identify areas that maybe they were
8 outsourcing and they wanted to start bringing
9 some of that work in-house. We worked with
10 them collaboratively to come up with a list of
11 things that we felt was a way to assist them
12 in maturing their operations.
13 And so collectively, you
14 know, this list was put together. We had
15 independent meetings with each of the three
16 tribal lending enterprises and kind of came to
17 a -- I think something that everybody felt
18 comfortable with. We started talking to them
19 about the timelines, when, you know, when
20 could they complete these. And we started to
21 try to formalize somewhat of a project to
22 assist the tribes in their -- in the expansion
23 of their operations.
24 Q. So before, we were looking at sort of an

Page 248

1 improve -- we looked at an improvement grid
2 that was prepared by CRA as part of their
3 work, right?
4 A. Right.
5 Q. In an earlier period of time. And I
6 take it from your answer that this grid is
7 really the work of -- this is the product of
8 Think Finance and the tribes kind of doing a
9 self-assessment of where things stand?
10 MR. SHELDON: Object to form.
11 BY MR. ACKELSBERG:
12 Q. Is that -- or is it something -- you
13 tell me. Put it in your words.
14 A. The way I recall that we approached this
15 was that -- my recollection is, is that this
16 all started soon after Martin came on as CEO.
17 And the tribes, at that point, had been
18 lending -- using Think as a service provider
19 for three years. Some a little more, some a
20 little -- one a little less, I think.
21 And there were pieces of the
22 operation that -- they had started to grow
23 their infrastructure. They had more
24 employees. They had a call center. They were

62 (Pages 245 to 248)

TF App. 0063

Stephen Smith

Page 249

1  managing bigger pieces of the operations than
2  they did day one. And so this was a way to
3  try to formalize the types of things that
4  could still be transitioned and for the tribes
5  to take ownership of certain activities that
6  maybe they outsourced.
7          But it was because of the
8  growth and maturation of the tribe and the
9  product that they wanted to have a little bit
10  more of the operations to themselves.
11  Q.   And who prepared -- was this something
12  you prepared or Michelle prepared, or who did
13  this, do you remember?
14  A.   I think this was a collective -- this
15  particular document incorporated lists of
16  activities that both Think and the tribes
17  participated in -- in identifying. And then
18  I think someone at Think actually scribed most
19  of this.
20  Q.   Okay. And so what is the -- so some
21  items have a check; some items have an
22  asterisk. Do you know how this worked?
23  A.   Yeah. I don't know why there's an X or
24  an asterisk. I think in each case, the X or

Page 250

1  the asterisk indicated that that function or
2  that particular item was already completed for
3  that particular tribal lending enterprise.
4  Q.   And you're not sure if there is a
5  distinction between the X and the asterisk or
6  whether it's like a degree of engagement or
7  sophistication or anything like that?
8  A.   No, I don't recall us ever having any
9  degrees. It was either done or not done.
10  Q.   But where it's blank, that means it's
11  still a work in progress, right?
12  A.   That's what that would suggest. It
13  shouldn't --
14  Q.   So under understanding credit policy,
15  where basically none of the tribes are up to
16  speed on that --
17          MR. SCHEFF: Object to the
18  form.
19          MR. SHELDON: Object to form.
20  BY MR. ACKELSBERG:
21  Q.   Isn't that what that says?
22  A.   I think this particular item was a deep
23  dive into the credit underwriting, the
24  decision engine. The tribes were aware of the

Page 251

1  underwriting process. They had a credit
2  policy. But, you know, over time, we wanted,
3  I think, a little bit more. If they were
4  going to hire a chief risk officer, for
5  example, or if they needed to assess whether
6  they needed a chief risk officer, some of that
7  information is very detailed that those risk
8  analysts and statisticians do.
9          And so I believe, if I
10  recall, this was a deep dive into that risk,
11  kind of peeling back the onion a little bit
12  and letting them look a little bit deeper into
13  the credit scoring models. And that's a very
14  difficult piece to get through. It takes
15  awhile.
16  Q.   When you say they all had a credit
17  policy, are we talking about the document we
18  looked at before, the underwriting policy?
19  A.   I was referring to, like, the loan
20  underwriting policy.
21  Q.   So like the one we looked at earlier
22  from back in 2011, 2012?
23          MR. SCHEFF: Object to the
24  form.

Page 252

1          MR. SHELDON: Same objection.
2          THE WITNESS: Yes.
3  BY MR. ACKELSBERG:
4  Q.   Okay. And that's the policy that
5  they're -- that according to this, they're
6  still lacking some understanding of --
7          MR. SCHEFF: Object to the
8  form.
9          THE WITNESS: No. My
10  recollection of this particular item was a --
11  and it's probably just poorly worded. It was
12  a deep dive into the components, the workings
13  of the decision engine.
14  BY MR. ACKELSBERG:
15  Q.   Okay. And the next item, collections
16  strategy practices. Now, up until this time
17  -- and as of this time from the beginning, the
18  inception of the tribal products to this point
19  in time, September 2014, the collections were
20  all handled by some -- by an outsource, some
21  agency outside of the tribe, right?
22  A.   That's correct.
23  Q.   Whether people paying, it's done -- the
24  payments that were done by ACH, that's handled

63 (Pages 249 to 252)

TF App. 0064

Stephen Smith

Page 261

1   Q.   Okay.  And then there is a letter, it
2   looks like it's dated the same day, where
3   Pepper Hamilton by Rich Zack is responding and
4   basically referencing the tribal affiliation
5   of Plain Green and suggesting that's a reason
6   why Plain Green is entitled to make this
7   loan to this -- actually, it looks like this
8   is two different complaints; am I right?
9         One is regarding a lady by
10  the name of Jenkins and the other is regarding
11  a lady by the name of Raneri.  Do you see
12  that?
13        So let's go through it, just
14  so you see it.  The first letter that you were
15  sending to -- this is all in a package that
16  you're sending to Martin Wong, right?
17  A.   Yes.
18  Q.   And to Steve Costas, who at the time was
19  the general counsel?
20  A.   Yes.
21  Q.   Okay.  So the first letter is a letter
22  from New York State regarding a Ms. Jenkins,
23  who got a Plain Green loan, and they're
24  basically saying this loan, whatever you call

Page 262

1   it, is illegal in New York, right?
2         MR. SCHEFF:  Object to the
3   form.
4         MR. SHELDON:  Object to form.
5         THE WITNESS:  Yes.
6   BY MR. ACKELSBERG:
7   Q.   And then on the same date, you have --
8   you apparently have a copy of a letter sent on
9   the same date to the same examiner regarding a
10  different New York citizen by the name of
11  Teresa Lynn Raneri.  Do you see that?
12  A.   Yes.
13  Q.   And would Rich Zack -- did he refer this
14  to you or did you get this from Plain Green?
15  How did you get Mr. Zack's letter?
16  A.   I don't recall Mr. Zack.  I don't
17  believe I ever communicated with him.  I don't
18  recall how I got a copy of this.
19  Q.   It looks like -- at least with regards
20  to Ms. Jenkins, that particular New York
21  citizen, that the following month in October,
22  Plain Green sent a refund check of nearly
23  $4,000, right?
24  A.   Yes.

Page 263

1   Q.   Now, the loans from Plain Green in New
2   York were never more than $2,500; am I right?
3   A.   I don't recall the specific loan amounts
4   by state.
5   Q.   But by looking at the amount here, it
6   looks like Plain Green is refunding not just
7   money lent, but basically it's a full refund
8   of all monies paid, right?
9         MR. SHELDON:  Object to the
10  form.
11  BY MR. ACKELSBERG:
12  Q.   That looks like what they are doing
13  here.  That's what they mean by a refund
14  check, right?
15  A.   Well, in my e-mail, I said that they
16  were refunding the amount of interest that was
17  paid.
18  Q.   Okay.  Am I right that Plain Green only
19  got a 1 percent share of interest, the
20  interest earned?
21  A.   I don't know about at this time what
22  their -- what participation they sold.  I'm
23  not familiar with it.
24  Q.   It wasn't 100 percent though, right?

Page 264

1   A.   I don't recall it being 100 percent.
2         MR. SHELDON:  We've been
3   going for over an hour.  I think we need a
4   break soon.
5         MR. ACKELSBERG:  Well, I'm
6   going to try and end soon.  If it's all
7   right -- if you can give me ten minutes, I'm
8   going to shut this down so, I mean, if you
9   want -- if you need a break, we'll take a
10  break.  I'm trying my best to get us all out
11  of here.
12        MR. SHELDON:  If you can do
13  ten minutes, you've got ten minutes.
14  BY MR. ACKELSBERG:
15  Q.   So it looks like Plain Green is
16  refunding out of its own pocket the interest
17  earned by the participating investor as well
18  as the percentage that they had?
19        MR. SHELDON:  Object to form.
20  Witness already testified he didn't know.
21  BY MR. ACKELSBERG:
22  Q.   Is that what it looks like here?
23  A.   I see a check from Plain Green.  As far
24  as the accounting, I'm not familiar with that.

66 (Pages 261 to 264)

TF App. 0065

Stephen Smith

Page 265

```
1    Q.    Next document.  What was your
2    expectation in sending that to Martin?  I
3    mean, what did you -- you know, why did you
4    send it to Martin?
5    A.    I think it was just to keep him in the
6    loop of -- it wasn't customary to see the
7    tribal lenders responding like this.  And I
8    think I was just trying to keep him informed
9    of something that I had seen starting to crop
10   up a couple of times now, as I referenced a
11   couple of times with Great Plains on these
12   letters.
13   Q.    Would I be correct in saying that what's
14   remarkable here wasn't the complaint from the
15   State of New York; what was remarkable was
16   that Plain Green was actually making a full
17   refund?
18         MR. SCHEFF:  Object to the
19   form.
20   BY MR. ACKELSBERG:
21   Q.    Isn't that what you wanted Martin to be
22   aware of?
23         MR. SCHEFF:  Object to the
24   form.
```

Page 266

```
1          MR. SHELDON:  Object to form.
2          THE WITNESS:  I don't know if
3    it was either/or or maybe both.  He was
4    interested in knowing what types of complaints
5    the tribes received.
6    BY MR. ACKELSBERG:
7    Q.    And what about the response letter
8    that -- I mean, do you know if -- generally,
9    when these kinds of complaints were received
10   by Plain Green, am I right that the procedure
11   was Plain Green would forward it to Think
12   Finance and Think Finance would draft a
13   suggested response?
14   A.    My recollection is that that's how it
15   worked early on.  At some point, we fully
16   transitioned where we weren't a part of the
17   complaint process for those type of
18   complaints.  They handled them from start to
19   finish.
20   Q.    Like, for example, the Rosette firm
21   would take it -- would actually draft the
22   response in the later period?
23   A.    Yeah.  I'm not -- I don't recall who
24   they were using or if they did it themselves.
```

Page 267

```
1    But yeah, they handled it themselves.
2    Q.    But you do remember that early on, that
3    Think Finance was drafting the suggested
4    responses for the tribes?
5    A.    There were different types of responses.
6    So for example, if there was a -- just a
7    customer complaint in the ordinary course of,
8    you know, customer e-mails in or maybe they'd
9    say something over the phone that constitutes
10   a complaint, the tribal lenders had all
11   reviewed template-type responses, because many
12   of these complaints fell into a very similar
13   bucket.  So we would -- if it was an approved
14   template, we would use something like that.
15         For a complaint, like, from
16   the attorney general or from another
17   state-type agency, I recall getting out -- the
18   tribes' outside counsel had put together
19   some -- some --
20         MR. SHELDON:  Let me just
21   stop this testimony for a second and say, if
22   anything you're about to reveal concerns
23   information that you received from Think
24   Finance's in-house counsel or Think Finance's
```

Page 268

```
1    outside counsel or outside counsel of the
2    tribe that was potentially shared with Think
3    Finance pursuant to a common interest, there
4    may be a privilege there.  And we'll have to
5    go out in the hall and discuss it first before
6    you continue with your testimony talking about
7    what you've been told by attorneys.
8          So with that restated, why
9    don't you ask you a new question if you want
10   to continue going on.
11         MR. ACKELSBERG:  I'll just go
12   on to a new document.
13         MR. SHELDON:  Okay.
14         MR. ACKELSBERG:  240.
15                - - -
16   (Whereupon Exhibit P-240 was marked for
17        identification.)
18                - - -
19   BY MR. ACKELSBERG:
20   Q.    What can you tell us about this
21   document?
22   A.    So it starts with an e-mail from a lady
23   at NCA, and that was the firm that acquired
24   charged-off debt from at least one of the
```

67 (Pages 265 to 268)

TF App. 0066

Stephen Smith

Page 288

1          I have read the foregoing deposition

2    and the answers given by me are true and

3    correct, to the best of my knowledge and

4    belief.

5

6

7    . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

8                    STEPHEN SMITH

9

10

11

12

13   Witness to signature

14

15

16

17   Address

18

19

20

21

22              My Commission expires

23              . . . . . . . . . . . . .

24

TF App. 0067

# EXHIBIT F

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

Christopher Lutes

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO, *
    Plaintiff, *
     *
VS.      * Civil Action
     * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
    Defendants. *

*****************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
CHRISTOPHER LUTES
MAY 3, 2018
*****************************************************

    DEPOSITION of CHRISTOPHER LUTES,
produced as a witness at the instance of the
Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on the 3rd day of
May, 2018, from 9:03 a.m. to 5:13 p.m., before
Christy R. Sievert, CSR, RPR, in and for the State
of Texas, reported by machine shorthand, at the Fort
Worth Club, 306 West 7th Street, Fort Worth, Texas
76102, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

Page 3

1      A P P E A R A N C E S
         (continued)
2
  COUNSEL FOR THINK FINANCE, INC.:
3
    MR. MATTHEW S. SHELDON
4     Goodwin Procter, LLP
    901 New York Avenue, NW
5     Washington, D.C. 20001
    Phone: 202-346-4000
6     E-mail: msheldon@goodwinprocter.com
7
  COUNSEL FOR VICTORY PARK CAPITAL:
8
    MR. DANIEL P. SHAPIRO
9     MR. MATTHEW W. HAWS
    Katten Muchin Rosenman, LLP
10     525 W. Monroe Street
    Chicago, Illinois 60661
11     Phone: 312-902-5622
    E-mail: daniel.shapiro@kattenlaw.com
12           matthew.haws@kattenlaw.com
13
  COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
14
    MR. PATRICK DAUGHERTY
15     Van Ness Feldman, LLP
    1050 Thomas Jefferson Street, NW
16     Seventh Floor
    Washington, D.C.
17     Phone: 202-298-1874
    E-mail: pod@vnf.com
18
19   ALSO PRESENT:
20     WILL RAINE, Videographer
    KEVIN BYERS
21
22
23
24
25

Page 2

1      A P P E A R A N C E S
2
3   COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4     MR. IRV ACKELSBERG
    Langer, Grogan & Diver, PC
5     1717 Arch Street, Suite 4130
    Philadelphia, Pennsylvania 19103
6     Phone: 215-320-5701
    E-mail: iackelsberg@langergrogan.com
7
    MR. SAVERIO "SAM" MIRARCHI
8     Senior Deputy Attorney General
    Bureau of Consumer Protection
9     1600 Arch Street, Suite 300
    Philadelphia, Pennsylvania 19103
10     Phone: 215-560-2445
    E-mail: smirarchi@attorneygeneral.gov
11
12   COUNSEL FOR CHRISTOPHER LUTES:
13     MR. RICHARD L. SCHEFF
    Montgomery, McCracken, Walker & Rhoads, LLP
14     123 South Broad Street
    Philadelphia, Pennsylvania 19109
15     Phone: 215-772-7502
    E-mail: rscheff@mmwr.com
16
17   COUNSEL FOR KENNETH E. REES:
18     MR. DAVID F. HERMAN
    Montgomery, McCracken, Walker & Rhoads, LLP
19     123 South Broad Street
    Philadelphia, Pennsylvania 19109
20     Phone: 215-772-7502
    E-mail: dherman@mmwr.com
21
22
23
24
25

Page 4

1      I N D E X
            PAGE
2
  Appearances................................ 2-3
3
  Exhibits.................................... 5-7
4
  Proceedings................................. 8
5
  CHRISTOPHER LUTES:
6
    Examination by Mr. Ackelsberg.............. 9
7
8   Changes and Signature.................. 304-305
9   Reporter's Certification............... 306-307
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

## Page 5

E X H I B I T S

NUMBER        DESCRIPTION        PAGE

Exhibit 243    Great Plains Lending    109
              Flow of Funds for Ongoing
              Loan Originations and Sales
              TF-PA 013418

Exhibit 244    Credit Agreement, Plain    169
              Green, LLC, and Haynes
              Investments, Inc.
              TF-PA 000491 - 000503

Exhibit 245    Credit Agreement, Haynes    171
              Investments, Inc., and
              Think Finance, Inc.
              TF-PA 001231 - 001242

Exhibit 246    E-mail correspondence    182
              6-7-12, Re: Revised Structure
              GPLP 00151908 - 00151909

Exhibit 247    E-mail correspondence    186
              6-19-12, Re: Haynes Amendment
              TF-PA 583777 - 583778

Exhibit 248    E-mail correspondence    188
              11-15-12, Re: Fw: Revised
              Put Agreement for your
              review
              TF-PA 608431 - 608433

Exhibit 249    E-mail correspondence    191
              9-11-12, Re: Haynes Loan to PGL
              TF-PA 582865

Exhibit 250    E-mail correspondence    198
              1-18-13, Re: PG credit
              agreement
              TF-PA 041391 - 041392

Exhibit 251    Credit and Security    200
              Agreement
              TF-PA 000504 - 000529

Exhibit 252    Put Agreement    200
              TF-PA 269583 - 228385

## Page 7

E X H I B I T S
(continued)

NUMBER        DESCRIPTION        PAGE

Exhibit 263A    E-mail correspondence    243
              10-29-13, Re: Revised Model
              TF-PA 575005 - 575001

Exhibit 263B    VPC, Summary of Terms    243
              October 29, 2013
              TF-PA 575012 - 575015

Exhibit 264    E-mail correspondence    250
              12-14-13, Re: Monthly
              Reporting Package
              GPLP 00014578 - 00014581

Exhibit 265    E-mail correspondence    254
              12-24-13, Re: Fw: Rise
              Structural Overview Chart
              TF-PA 674500 - 674502

Exhibit 266    E-mail correspondence    255
              1-16-14, Re: Rise
              GPLP 00016130

Exhibit 267    E-mail correspondence    257
              3-13-14, Re: Insurance Overview
              TF-PA 210850

Exhibit 268    E-mail correspondence    263
              3-19-14, Re: GPLS/Split
              Discussion
              TF-PA 108729 - 108732

Exhibit 269-270  (Not marked or identified.)

Exhibit 271    E-mail correspondence    284
              6-20-14, Re: Monthly
              Reporting Package
              GPLP 00383459 - 00383563

## Page 6

E X H I B I T S
(continued)

NUMBER        DESCRIPTION        PAGE

Exhibit 253    Enterprise Risk Assessment    202
              Produced in Native Format
              TF-PA 290895

Exhibit 254    E-mail correspondence    203
              4-18-13, Re: Final No State
              lists for PG, GPL, Mobi
              TF-PA 267158 - 267160

Exhibit 255    E-mail correspondence    209
              11-20-13, Re: States serviced
              by tribes
              TF-PA 228363 - 228365

Exhibit 256    7-25-13 letter from C.    216
              Lutes
              TF-PA 041394 - 041397

Exhibit 257    E-mail correspondence    219
              8-8-13, Re: Fw: WSJ Article
              GPLP 00008844 - 00008845

Exhibit 258    E-mail correspondence    221
              8-14-13, Re: VPC
              TF-PA 678633 - 678635

Exhibit 259    E-mail correspondence    227
              8-19-13, Re: Forecasts
              TF-PA 367418 - 367420

Exhibit 260    E-mail correspondence    231
              8-21-13, Re: GPLS Letter
              TF-PA 677073

Exhibit 261    E-mail correspondence    238
              10-10-13, Re: Fw: Mobi
              TF-PA 309723 - 309725

Exhibit 262    E-mail correspondence    239
              10-7-13, Re: GPLS
              GPLP 00518002

## Page 8

P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record for the video deposition of Chris Lutes. The time is 9:03 a.m. on May 3, 2018.

This is the matter of the Commonwealth of Pennsylvania, et al., vs. Think Finance, Incorporated, et al., Civil Action No. 14-7139-JCJ. This is being held in the United States District Court for the Eastern District of Pennsylvania.

The court reporter is Christy Sievert. The videographer is Will Raine. Both are representatives of Kaplan, Leaman & Wolfe Court Reporter.

And now would counsel please state your appearances for the record.

MR. ACKELSBERG: For the Commonwealth of Pennsylvania, Irv Ackelsberg. Also with me, temporarily out in the hall, is Saverio Mirarchi with the attorney general's office.

MR. SCHEFF: Irv, could you identify -- could you --

MR. ACKELSBERG: Yes. This is Kevin Byers, our consultant.

MR. SCHEFF: Thank you.

Richard Scheff for Christopher Lutes.

2 (Pages 5 to 8)

Christopher Lutes

Page 9

1       MR. HERMAN: David Herman for Kenneth
2   E. Rees.
3       MR. SHELDON: Matt Sheldon for the
4   Think Finance defendants.
5       MR. SHAPIRO: Dan Shapiro for the
6   Victory Park defendants. And Matt Haws, who's in
7   the hall right now, will be joining us shortly.
8       MR. DAUGHERTY: Patrick Daugherty on
9   behalf of National Credit Adjusters.
10          CHRISTOPHER LUTES
11  having been first duly sworn,
12      testified as follows:
13          EXAMINATION
14  BY MR. ACKELSBERG:
15      Q. Good morning, Mr. Lutes. It's very nice to
16  meet you, finally.
17      A. Thank you. Likewise.
18      Q. So we have to go through, as you know, a
19  few preliminaries just to make sure that, first of
20  all, you understand the procedure and what's
21  happening here. Have you been deposed before?
22      A. No, I have not.
23      Q. Okay. So I'm sure your lawyer has gone
24  through this, but I need to do it myself.
25  Basically, the way we're going to proceed, it's a

Page 11

1       Q. Yeah, the nods aren't going to be picked
2   up. And if I -- and if I say, "Did you mean yes,"
3   it's not -- I'm not trying -- it's not an act of
4   disrespect. We just have to get it onto the --
5       A. Understood.
6       Q. -- onto the record.
7          Right. So nods or shrugs don't work. We
8   need verbal.
9          If you don't know the answer, just --
10  that's fine, "I don't know." If you don't
11  understand the question, please tell me, and I'll do
12  my best. I might ask you, well, what about the
13  question don't you understand, but we can -- we can
14  work together to clarify the question so we can
15  get -- we can get an answer from you to a question
16  that you understand.
17      A. Uh-huh (affirmative response).
18      Q. Let's see. What else haven't I covered?
19  We're going to take breaks. This will be a long day
20  for all of us. We'll take many breaks. If you need
21  a break, just tell us.
22      A. Okay.
23      Q. And I would just ask you to finish your
24  answer to the pending question, and then we can go
25  off the record and. . .

Page 10

1   series -- it's questions and answers. I ask a
2   question, you answer as best as you can. There may
3   be objections by your lawyer. And I can assure you
4   there will be objections from your lawyer and maybe
5   from other lawyers. But the way this -- the way
6   this works in a deposition as opposed to a trial is
7   that after the objections, you still have to answer
8   the question unless the -- your lawyer specifically
9   directs you not to answer the question. And, you
10  know, I'm guessing we're not going to be doing a
11  whole lot of that today, but it's -- but there will
12  be plenty of objections.
13         And so it's important that we not talk
14  over one another. The court reporter has to get
15  everything down. My question, the lawyer's
16  objection, your answer, the whole thing. But -- do
17  you understand that?
18      A. Yeah, I do.
19      Q. Okay. And we are being videotaped today,
20  but the official -- the record of this deposition is
21  the written transcript that the court reporter is
22  preparing, and the reason I stress that is that
23  nonverbal responses aren't picked up. So, you know,
24  if I say, "Is that a yes or a no," I mean --
25      A. I shouldn't nod my head.

Page 12

1       A. Got it.
2       Q. And, finally, is there any reason, such as
3   illness, hearing disorder, medication, lack of
4   sleep, things like that, that would get in the way
5   of you giving this deposition your full attention
6   today?
7       A. No.
8       Q. Okay. So we are going to go just a little
9   bit into your background, and I'm --
10      A. Sure.
11      Q. -- going to try to breeze through this. My
12  understanding is that you're a CPA. Is that right?
13      A. Yes, I am, in the state of Arizona.
14      Q. Okay. And is that -- and your
15  certification is current?
16      A. Yes, it is.
17      Q. Okay. And am I right that at some point,
18  you were the CEO -- the CFO, the chief financial
19  officer, for Silicon Valley Bank?
20      A. Yes, I was.
21      Q. And where is that located?
22      A. That's located in Santa Clara, California.
23      Q. And during what period of time were you
24  with the bank?
25      A. I was with the bank from 1994 through 2001,

3 (Pages 9 to 12)

TF App. 0070

Christopher Lutes

Page 161

1   also -- I shouldn't say "we." The lawyers had
2   introduced the concept of you've got to wait two or
3   three days -- I think it might be two, maybe
4   three -- from the point --
5           MR. SHELDON: Let me just put in an
6   objection here and just say to the extent that your
7   answer requires revealing any information that was
8   communicated to you by Think's lawyers or Think's
9   outside counsel, please don't give -- provide that
10  answer. If you have any questions about it, we can
11  step out in the hall. To the extent your answer is
12  just conveying what ended up in a document, you
13  know, please talk about what ended up in a document,
14  not what -- what was communicated to you by Think's
15  in-house or outside counsel. Okay?
16      A.  Okay. Let me just finish the thought. I
17  know this was a little long-winded, but I think it
18  was an important point and that's why I'm taking my
19  time here.
20          Is that with each of the tribes, for tax
21  purposes, they held on to a hundred percent of the
22  originations of the loans for two to three business
23  days before they sold the participation to the GPLS
24  entity.
25          As you can appreciate, thousands of

Page 162

1   customer loans could be originated on a daily basis
2   by each of those tribes. They were concerned that
3   they would originate two to three days' worth of
4   loan and GPLS would say: We're not going to buy it.
5   And, suddenly, they're on the hook for a hundred --
6   holding a hundred percent of those loans and being
7   capital constrained on a pretty immediate time
8   space.
9           So what the lawyer -- what the concept
10  was, was to introduce that GPLS would advance two to
11  three days in the form of a reserve that in the
12  event that it said, no, we're not going to buy any
13  more, there was already a reserve to cover the two
14  to three days' worth of loans originated.
15  BY MR. ACKELSBERG:
16      Q.  Okay. That's what I was --
17      A.  So I'm sorry it was so longwinded, but
18  that's -- I wanted to get that out there. It was
19  really for the -- from my perspective, the tax and
20  the delay in being able to sell same day.
21      Q.  So I just -- I think I understand your
22  answer.
23          So I was asking how the loans were funded
24  in the first place, and it sounds like with
25  Mobiloans, the answer was there was a reserve

Page 163

1   account that GPLS set up to serve that function. Am
2   I right?
3           MR. SCHEFF: Object to the form;
4   misstates the testimony.
5           Answer the question if you can.
6       A.  I wouldn't phrase it that way. There was a
7   reserve that if the tribe wanted to use it for
8   originating loans or for other purposes, it had,
9   because it was meant -- capital meant to kind of
10  cover them in the situation that if GPLS stopped
11  buying, that covered the two to three days' worth of
12  loans that -- that they would have originated. Each
13  of the tribes could have had alternative sources for
14  funding the loans. I don't have privy to that
15  information.
16  BY MR. ACKELSBERG:
17      Q.  Well, they could have, but you're -- you're
18  not aware of them ever having -- having supplied any
19  outside funding capital to the funding of Mobiloans
20  loans --
21          MR. SCHEFF: Object to the form.
22          You can answer the question.
23  BY MR. ACKELSBERG:
24      Q.  -- loans, do you?
25      A.  I'm not aware of -- I just don't -- I don't

Page 164

1   have enough knowledge to answer that question. I
2   don't know.
3       Q.  You sat in, it sounds like, on two -- two
4   sales -- sales visits, one at the Chippewa Cree and
5   one at Mobiloans. You went with Jason and Michelle
6   or people from the product side, right? So this
7   happened twice, right?
8           MR. SCHEFF: Object to the form.
9           You can answer the question.
10      A.  From my perspective, I wouldn't call those
11  sales pitches. The Chippewa Cree was not a sales
12  pitch, as I think we discussed earlier. We might
13  have already signed the term sheet or we might have
14  been in the process. It was more of just an onsite
15  visit to meet our business partners.
16  BY MR. ACKELSBERG:
17      Q.  Do you remember -- do you remember the
18  term -- do you remember the -- you were at the
19  initial Mobiloans trip, though. And I'm wondering,
20  during that trip, do you remember someone on the
21  Think side explaining that the Tunica would not have
22  to lay out any money?
23      A.  I -- I don't -- I was at that presentation.
24  I don't specifically recall, but it's -- yeah, I
25  don't -- I don't recall specifically. I'm sure what

41 (Pages 161 to 164)

TF App. 0071

Christopher Lutes

Page 165

1    we would have -- would have explained to them is
2    with the reserve concept, that they shouldn't be
3    concerned from a capital perspective that they would
4    be originating loans that they would not be able to
5    sell at least 90 percent participation interest to
6    GPLS.
7       Q.  Okay.  Thank you.
8       Do you remember the term "turnkey"?
9       A.  I would not have used it from a finance
10   perspective.  So I --
11      Q.  I'm not suggesting it's a financial term.
12   I'm asking whether --
13         MR. SCHEFF:  Let him finish his
14   answer.
15   BY MR. ACKELSBERG:
16      Q.  -- you remember the term being used by
17   other members of the team:  Michelle or Jason, for
18   example?
19         MR. SCHEFF:  Object to the form.
20       You can answer the question if you can.
21      A.  No, I don't specifically recall.
22   BY MR. ACKELSBERG:
23      Q.  You have seen it -- you have seen marketing
24   material where Think's services as a service
25   provider are described as a turnkey, haven't you?

Page 166

1        MR. SCHEFF:  Object to the form.
2       You can answer the question.
3      A.  I would say that from the services we
4    provide, the marketing services, the licensing of
5    the technology, in essence, yes, what we do is
6    turnkey.  But there were certainly obligations that
7    the tribes as the originating lender would still be
8    a hundred percent responsible for that we were not
9    involved in at all.  So --
10   BY MR. ACKELSBERG:
11      Q.  Like what?
12        MR. SHELDON:  Hold on.  Can we stop
13   for a second, please?  Irv, I realize that you're
14   frustrated with some of the witness's answers and
15   you don't like some of the answers because of your
16   tone and you don't like the length of answers.
17   But at probably a dozen different points through
18   this deposition already, which is only halfway
19   through, you've cut the witness off.  And I'd just
20   ask you to please let the witness finish and wait
21   until the end.  The witness is allowed to give the
22   full answer that he believes is necessary for any of
23   your questions.  Okay?
24   BY MR. ACKELSBERG:
25      Q.  My question was, like what?

Page 167

1      A.  From my perspective, things that the tribe
2    would be responsible for besides just originating
3    the loan and, you know, reviewing, you know, the --
4    the credit decisioning suggestions or scores that we
5    gave them for their approval and understanding, and,
6    you know, the ACH things out of their accounts and
7    all of that stuff, they would be responsible for
8    the -- the customer support and the collections.
9       We did not handle the collections in any
10   way.  We helped provide monitoring services to help
11   them monitor the outsourced customer support and
12   collections, but that ultimately was responsible for
13   the tribes.  I'm sure I'm probably forgetting some
14   other operational things, but by no means did we
15   ever provide everything.
16        MR. ACKELSBERG:  I'm going to break
17   very soon.  I know we're all hungry.  I'm just
18   trying to get to a good cutoff point.
19   BY MR. ACKELSBERG:
20      Q.  So with Mobiloans, the funding of the loans
21   up front was done through a -- the reserve account,
22   right, that you described?
23        MR. SHAPIRO:  Object to form.
24        MR. SCHEFF:  Object to the form.
25      A.  That's not how I would phrase my answer.

Page 168

1    There was a reserve account established, like I said
2    previously, to cover the two to three days' worth of
3    originations that they provided.  Whether they chose
4    to use some of those funds to help them originate
5    loans or whether they used other third-party
6    capital, I'm not aware of.
7    BY MR. ACKELSBERG:
8      Q.  Okay.  And the same was true of Great
9    Plains Lending?
10      A.  Yes, I believe so.
11      Q.  And what about Plain Green?
12      A.  Plain Green, that was the -- as you're
13   aware, the first transaction that we entered into.
14   I don't think the reserve concept was introduced
15   with them.  Like I said, I know that they had an
16   existing lending relationship with Encore or
17   whoever.  They had other capital means.  So, no,
18   there was no reserve -- initial -- initial reserve
19   concept, as I recall.  Whether we amended that
20   later, I know that there was suggestions, but I
21   can't recall whether that actually happened.
22        MR. ACKELSBERG:  Okay.  This is a good
23   time to break.
24        THE VIDEOGRAPHER:  We are off the
25   record at 12:41 p.m.

42  (Pages 165 to 168)

TF App. 0072

Christopher Lutes

Page 169

1    (Break taken, 12:41 p.m. to 1:22 p.m.)
2    THE VIDEOGRAPHER:  We are back on the
3 record at 1:22 p.m.
4 BY MR. ACKELSBERG:
5    Q.  Before we broke, Mr. Lutes, we were talking
6 about the -- how the loans got funded in the first
7 instance, specifically with regard to Plain Green,
8 and I want to show you a few agreements and ask
9 for -- for your comments.
10    A.  Sure.
11    MR. ACKELSBERG:  So the first one, I
12 am going to -- I am going to identify it as Exhibit
13 P-244.
14    (Exhibit No. 244 marked.)
15    A.  (Reviews document.)
16    Okay.
17 BY MR. ACKELSBERG:
18    Q.  Okay.  Does this -- does this refresh your
19 recollection at all about how the loans got funded
20 in the first instance in the beginning of the Plain
21 Green relationship?
22    MR. SCHEFF:  Object to the form.
23    A.  As I've discussed before, I'm not sure
24 whether there were any other capital arrangements
25 for Plain Green to help fund loans, but I am

Page 170

1 familiar with the Haynes Investment to Plain Green,
2 LLC.
3 BY MR. ACKELSBERG:
4    Q.  And so at the inception of the product,
5 Mr. Haynes, through this entity Haynes Investment,
6 provided $2 million in lending capital to the tribe;
7 am I right, to -- to Plain Green, LLC?
8    MR. SCHEFF:  Object to the form.
9    A.  I'm not sure I would use the term "lending
10 capital."  Working capital for the -- for the
11 program, yeah.
12 BY MR. ACKELSBERG:
13    Q.  Okay.  Well, in fact, it had to be used to
14 fund loans.  It couldn't be used for any other
15 purpose; isn't that what the -- wasn't that your
16 understanding of what the purpose of this was?  I'm
17 not asking for your legal opinion.
18    A.  No, no, I'm just -- I wasn't a hundred
19 percent certain whether it was required just for
20 funding the loans or whether it could be used for
21 other working capital related to the -- the loan
22 program.
23    Q.  Okay.  I see.
24    You'll see that under the Recital B, "The
25 credit facility will be used to assist the borrower

Page 171

1 with the funding of certain installment loan
2 programs."  Do you see that?
3    A.  Yes.
4    Q.  Okay.  So you -- you do remember there
5 being a credit facility that Plain Green, LLC, had
6 with Haynes Investments in the beginning?
7    A.  Yes.
8    Q.  Okay.  Do you remember anything about how
9 it came to be?
10    A.  No.  I -- I don't recall those initial
11 conversations regarding Plain Green, Haynes or even
12 us and how we were involved with Haynes.
13    Q.  Okay.  And let me show you another
14 agreement.
15    MR. ACKELSBERG:  This one is 245.
16    (Exhibit No. 245 marked.)
17    A.  (Reviews document.)
18    Okay.
19 BY MR. ACKELSBERG:
20    Q.  Do you remember this agreement?
21    A.  Yes, I do.
22    Q.  And why don't you explain to me what the
23 purpose of this agreement was?
24    A.  The purpose of this agreement was for us to
25 lend money to Haynes Investment.

Page 172

1    Q.  So that Haynes Investment could lend it to
2 Plain Green, right?
3    A.  Correct.
4    Q.  Okay.  And, in fact, I recall it was either
5 the deposition of -- it was one of the Lindas where
6 she kind of described there actually was a bank
7 account that was a -- was a Haynes bank account and
8 a Plain Green bank account where -- and a -- and a
9 Think -- I forgot which entity it was which --
10    MR. SCHEFF:  Let him finish his
11 question.
12 BY MR. ACKELSBERG:
13    Q.  I forgot what the name of the Think entity
14 was, but there actually were -- there was actually a
15 tran- -- on occasion, a transfer of money
16 facilitated by the finance department staff from the
17 Think Finance account to the Haynes account to the
18 Plain Green funding account.  Right?  And so you're
19 familiar that that was -- that there was actually a
20 Think Finance operation that corresponded to these
21 agreements?
22    A.  Yes.
23    Q.  Okay.  What was the purpose of Think
24 Finance giving money to Haynes to give to the tribe?
25    MR. SCHEFF:  Object to the form.

43  (Pages 169 to 172)

TF App. 0073

# EXHIBIT G

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

Kenneth Rees

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO, *
    Plaintiff, *
             *
VS.       * Civil Action
      * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
    Defendants. *

*******************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
KENNETH REES
MAY 8, 2018
*******************************************************

      DEPOSITION of KENNETH REES, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 8th day of May, 2018, from 9:08 a.m. to 5:46 p.m., before Christy R. Sievert, CSR, RPR, in and for the State of Texas, reported by machine shorthand, at the Fort Worth Club, 306 West 7th Street, Fort Worth, Texas 76102, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

1
2       A P P E A R A N C E S
3 COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4   MR. IRV ACKELSBERG
    Langer, Grogan & Diver, PC
5     1717 Arch Street, Suite 4130
    Philadelphia, Pennsylvania 19103
6     Phone: 215-320-5701
    E-mail: iackelsberg@langergrogan.com
7
  MR. SAVERIO "SAM" MIRARCHI
8     Senior Deputy Attorney General
    Bureau of Consumer Protection
9     1600 Arch Street, Suite 300
    Philadelphia, Pennsylvania 19103
10     Phone: 215-560-2445
    E-mail: smirarchi@attorneygeneral.gov
11
12 COUNSEL FOR KENNETH E. REES:
13   MR. RICHARD L. SCHEFF
    Montgomery, McCracken, Walker & Rhoads, LLP
14     123 South Broad Street
    Philadelphia, Pennsylvania 19109
15     Phone: 215-772-7502
    E-mail: rscheff@mmwr.com
16
17 COUNSEL FOR THINK FINANCE, INC.:
18   MR. MATTHEW S. SHELDON
    Goodwin Procter, LLP
19     901 New York Avenue, NW
    Washington, D.C. 20001
20     Phone: 202-346-4000
    E-mail: msheldon@goodwinprocter.com
21
22
23
24
25

## Page 3

1     A P P E A R A N C E S
       (continued)
2
  COUNSEL FOR VICTORY PARK CAPITAL:
3
    MR. DANIEL P. SHAPIRO
4     MR. MATTHEW W. HAWS
    Katten Muchin Rosenman, LLP
5     525 W. Monroe Street
    Chicago, Illinois 60661
6     Phone: 312-902-5622
    E-mail: daniel.shapiro@kattenlaw.com
7        matthew.haws@kattenlaw.com
8
  COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
9
    MR. PATRICK DAUGHERTY
10     Van Ness Feldman, LLP
    1050 Thomas Jefferson Street, NW
11     Seventh Floor
    Washington, D.C.
12     Phone: 202-298-1874
    E-mail: pod@vnf.com
13
14 ALSO PRESENT:
15   GUS PHILLIPS, Videographer
16
17
18
19
20
21
22
23
24
25

## Page 4

1     I N D E X
            PAGE
2
Appearances................................. 2-3
3
Exhibits..................................... 5-6
4
Proceedings.................................. 7
5
KENNETH REES:
6
  Examination by Mr. Ackelsberg............... 8
7
8
Changes and Signature.................. 345-346
9
Reporter's Certification............... 347-348
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 272 | How to Become a Bus Driver, Not a Bulldozer | 34 |
| Exhibit 273 | LendIt Fintech, Ken Rees | 43 |
| Exhibit 274 | Think Finance Business Plan, April 2013 TF-PA 683403 - 683418 | 46 |
| Exhibit 275 | E-mail correspondence 4-6-15, Re: GP article TF-PA 308918 - 308920 | 64 |
| Exhibit 276 | E-mail correspondence 11-30-12, Re: Presentation For Abu Dhabi Investors TF-PA 677353 - 677371 | 135 |
| Exhibit 277 | IPO Roadshow Presentation Breakout #1 TF-PA 670288 - 670295 | 141 |
| Exhibit 278 | E-mail correspondence 8-26-13, Re: Encore Video TF-PA 677068 | 200 |
| Exhibit 279 | Term Sheet for Think Finance - Chippewa Cree Transaction | 208 |
| Exhibit 280 | E-mail correspondence 10-24-13, Re: BMO TF-PA 606626 - 606627 | 226 |
| Exhibit 281 | E-mail correspondence 12-13-13, Re: Selected Expense Report TF-PA 674488 - 674489 | 229 |
| Exhibit 282 | Memorandum, 2-17-11 TF-PA 710233 - 710236 | 280 |
| Exhibit 283 | Memorandum, 4-13-11 TF-PA 710229 - 710232 | 283 |

## Page 6

E X H I B I T S
(continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 284 | Memorandum, 5-18-11 TF-PA 710237 - 710240 | 292 |
| Exhibit 285 | Memorandum, 10-19-11 TF-PA 474695 - 474698 | 298 |
| Exhibit 286 | Memorandum, 12-14-11 TF-PA 705357 - 705361 | 303 |
| Exhibit 287 | E-mail correspondence 8-9-13, Re: GPL Volume TF-PA 680605 - 680606 | 305 |
| Exhibit 288 | E-mail correspondence 9-26-13, Re: Call to Bob from Tunica-Biloxi Tribal Chairman Marshall Pierite TF-PA 258168 | 315 |
| Exhibit 289 | E-mail correspondence 4-28-13, Re: Tribal training TF-PA 191141 | 318 |
| Exhibit 290 | LinkedIn, Think Finance | 325 |
| Exhibit 291 | E-mail correspondence 7-8-13, Re: FWST mention TF-PA 310765 - 310768 | 325 |
| Exhibit 292 | Think Finance Tribal Holdings Statement TF-pA 301317 - 301320 | 330 |

## Page 7

1  THE VIDEOGRAPHER: We are now on the
2  record for the videotaped deposition of Kenneth
3  Rees. The time is 9:08 a.m., May 8, 2018, in the
4  matter of the Commonwealth of Pennsylvania vs. Think
5  Finance Incorporated, et al., Case No. 14-7139-JCJ,
6  being held in the United States District Court for
7  the Eastern District of Pennsylvania.
8  The court reporter is Christy Sievert.
9  The videographer is Gus Phillips. Both are
10 representatives of Kaplan, Leaman & Wolfe Court
11 Reporting.
12 Will counsel please state their
13 appearances for the record.
14 MR. ACKELSBERG: Irv Ackelsberg for
15 the Commonwealth of Pennsylvania.
16 MR. GROGAN: John Grogan, also for the
17 Commonwealth.
18 MR. MIRARCHI: Saverio Mirarchi for
19 the Commonwealth of Pennsylvania.
20 MR. DAUGHERTY: Patrick Daugherty on
21 behalf of National Credit Adjusters.
22 MR. HAWS: Matthew Haws on behalf of
23 the Victory Park defendants.
24 MR. SHAPIRO: Dan Shapiro for the
25 Victory Park defendants.

## Page 8

1  MR. SHELDON: Matt Sheldon for the
2  Think Finance defendants.
3  MR. SCHEFF: Richard Scheff for Ken
4  Rees.
5  KENNETH REES
6  having been first duly sworn,
7  testified as follows:
8  EXAMINATION
9  BY MR. ACKELSBERG:
10 Q. Mr. Rees, you have been deposed before?
11 A. I have.
12 Q. Okay. So I'm sure you understand how this
13 works, but just to confirm that you do know the
14 ground rules, I want to just go over a few things
15 that I'm sure are familiar to you.
16 You see that there's a videographer.
17 There's also a court reporter. The official record
18 of what happens today is the -- is going to be the
19 written transcript. The reason I tell you that is
20 just to caution you that gestures -- verbal
21 responses -- don't register on the -- on the written
22 record, so we need -- we need verbal responses from
23 you.
24 And I'll do my best -- and the other thing
25 about the written record is that it's very hard for

Page 157

1    A.  So I'll walk through the history as I
2  remember it.  We were notified by FBD that they were
3  going to be terminating the program.  The program
4  was representing a very significant part of the
5  revenue and net income of the business.
6        We assembled the executive team together
7  that weekend to look at a wide variety of things to
8  do.  Continued to grow the -- existing nonbank
9  product, adding new ones.  We looked at
10 opportunities in the UK.  We looked at new product
11 opportunities even outside of credit.  And sort of
12 moved down a path of -- and including a tribal lend,
13 which is something we hadn't really evaluated in the
14 past.  So we took all of those potential business
15 opportunities, began looking into them.
16       We actually ended up doing all of those
17 things.  You know, we bought a company in the UK.
18 We launched a prepaid debit card.  We launched a
19 rent-to-own product.  We enhanced the direct
20 consumer product to grow that more aggressively.
21 And then -- but as we were evaluating all the
22 alternatives -- I'm sorry if I'm doing too much
23 here --
24    Q.  That's okay.
25    A.  -- but I'm hoping this provides some of

Page 158

1  what you're looking for.
2        We looked at -- at sort of other tribal
3  lending businesses.  There was a couple of court
4  cases at the time that had just been decided in
5  favor of the tribes, one in California and one in
6  Colorado -- I don't know the -- you know, what names
7  those were -- that seemed to specify what it would
8  take for a tribal lending entity to have sovereign
9  immunity and to not be, you know, subject to state
10 law as per the tribal sovereignty would be.
11       We looked at other programs that were out
12 there.  And then based on that, then based on --
13 really, you know, based on sort of the evaluation of
14 that by all the parties, including the board, we
15 decided that it made sense to move forward with
16 seeing if we could come up with a suitable tribal
17 relationship where we would provide technology and
18 services to them, very similar to the way we had
19 provided technology and services to the bank.
20    Q.  And at that point in time, were other of
21 your peer organizations -- well, let's say within --
22 within the OLA, other than Mark Curry, were there
23 other peer members of OLA that were doing business
24 under the tribal model?
25       MR. SCHEFF:  Object to the form.

Page 159

1    A.  I think there were.  I don't know that I
2  could name any of them, but I'm pretty sure there
3  were other entities within the Online Lenders
4  Alliance that were licensing technology to tribal
5  lenders as well.
6  BY MR. ACKELSBERG:
7    Q.  Now, the first -- my understanding is the
8  first potential partner that the company talked to
9  was Butch Webb in South Dakota.  Right?
10   A.  Yes.
11   Q.  And how did that meeting come to be?
12   A.  Actually, our -- the founder of the
13 company, Mike Stinson, had known another gentleman
14 named John Templer, who had known Butch Webb.  And
15 when -- I -- I know that was the connection.  I
16 don't know exactly how it was sort of connected up
17 that Butch Webb was involved in a tribal lending
18 organization.  I don't remember that.
19       But one thing led to another, and we -- we
20 traveled up to North Dakota -- North or South
21 Dakota.  I think it was North Dakota -- to meet with
22 him.  We ultimately couldn't get comfortable with
23 his -- his business model.  It seemed to run
24 contrary to what -- you know, what we and outside
25 counsel thought was the legally justifiable lending

Page 160

1  structures and --
2        MR. SCHEFF:  Stay away from whatever
3  counsel told you.
4        THE WITNESS:  Sorry.
5    A.  But in -- in any event, we -- I mean, did
6  not like the fact that there didn't seem to be an
7  arm of the tribe in any way involved with the --
8  with the lending operation.  So it was -- he was not
9  very happy about it, but -- but we told him we
10 weren't going to do business with him.
11 BY MR. ACKELSBERG:
12   Q.  Now, did Claudia Callaway play a role in
13 that connection?
14       MR. SCHEFF:  Just answer the question
15 "yes" or "no."
16   A.  I just don't know.
17 BY MR. ACKELSBERG:
18   Q.  Do you -- do you remember if she was
19 representing Butch Webb back at that time?
20   A.  Don't know.
21   Q.  Or CashCall or. . .
22   A.  I don't know.
23   Q.  The -- did Butch Webb have a
24 relationship -- now his company was called Western
25 Sky, right?

40  (Pages 157 to 160)

Kenneth Rees

Page 161

1    A. Yes.
2    Q. And did Western Sky have -- have a
3  relationship with CashCall at that time, or did that
4  happen when you turned him down?
5    A. I don't know. He had an operation. My
6  recollection, Western Sky was the name. I don't
7  know if at that time he already had a relationship
8  with -- with CashCall or not.
9    Q. I mean,, you do know eventually --
10    A. Yes.
11    Q. -- he did develop a relationship with
12  CashCall, right?
13    A. Yes.
14    Q. And that was one of your competitors,
15  right?
16    A. They were an online lender. I don't know
17  how much we directly competed with them. They were
18  an online lender, though.
19    Q. Okay. And then the next -- as I understand
20  it, the next tribe that you made contact with was
21  the Otoe-Missouria. Right? And that was through
22  Mark Curry.
23    A. I believe that's correct.
24    Q. And I can show this to you if you want to
25  see it, but we've seen an e-mail from you to the

Page 162

1  executives, I think it's February 28th, 2011, where
2  you say something to the effect of, "Start your
3  engines," where -- where you thought it looked like
4  the Otoe-Missouria were ready to -- ready to go. Do
5  you remember that?
6    MR. SCHEFF: Object to the form.
7  BY MR. ACKELSBERG:
8    Q. I can show -- I can show you the e-mail.
9    MR. SCHEFF: Lack of foundation.
10    You can answer the question if you can.
11    A. I've seen the e-mail and --
12  BY MR. ACKELSBERG:
13    Q. Okay.
14    A. And I -- I think we believed that the
15  business relationship was going to happen.
16    Q. And, in fact, the e-mail was connected to a
17  signed agreement whereby the tribe agreed to acquire
18  the website, Plain Green, that -- that Think Finance
19  had already -- already owned in terms of the URL,
20  right? I mean,, that was the context of that,
21  correct?
22    MR. SCHEFF: Object to the form.
23    You can answer the question.
24    A. Yeah, you know, as we talked about when the
25  bank relationship was terminated, we were looking at

Page 163

1  a lot of business opportunities and were -- one of
2  the biggest challenges for launching a product, we
3  launched a number of products over the years, is
4  getting an URL and getting a trademark that -- that
5  you could actually use.
6    So we had already gone and looked at a
7  whole bunch of different potential names and done
8  the trademark searches and found the URLs and bought
9  a few. So we had a handful of things that we were
10  sort of sitting on. So in order to, you know, help
11  them get live, we lice- -- well, not -- we actually
12  sold them, I think, the URL so that they could have
13  that as the basis for the product.
14  BY MR. ACKELSBERG:
15    Q. So, in other words, that -- before you
16  approached the Otoe-Missouria, you already had a
17  website called greatplainslending.com, right?
18    A. Yes.
19    Q. And --
20    A. Actually, I don't know if that's true. I
21  know that we began looking for product names and
22  URLs. Whether that was completed before we met
23  with the Otoe-Missouria, I don't know the exact
24  timing of that.
25    Q. All right. But the start your engines

Page 164

1  e-mail was at the point where they -- whatever the
2  timing of your original meeting with them was, it
3  was -- it was at the point where they were saying,
4  okay, we'll -- we'll agree to this agreement to
5  assume the responsibility and ownership of that --
6  of that website, that URL, right?
7    MR. SCHEFF: Object to the form; the
8  document speaks for itself. An unmarked document
9  speaks for itself.
10    A. I'm sorry, if you can rephrase the
11  question.
12  BY MR. ACKELSBERG:
13    Q. See, that's the problem. That's the
14  problem.
15    MR. SCHEFF: Why don't you mark the
16  document. Just mark the exhibit as opposed to --
17    MR. ACKELSBERG: I'll be happy to.
18    MR. SCHEFF: -- talking about it in
19  the air.
20    MR. ACKELSBERG: That's fine, Richard.
21  I don't want to have any misunderstandings.
22    MR. SCHEFF: Good.
23  BY MR. ACKELSBERG:
24    Q. This document has already been marked
25  Exhibit 124.

41 (Pages 161 to 164)

TF App. 0077

Page 181

1  day, at some point, Victory Park told you that they
2  were interested, right?
3      A. That's correct.
4      Q. Okay. And so whoever kind of came up with
5  the name, either it was Victory Park or Think
6  Finance, or together, the concept came up of GPLS to
7  be a -- essentially, a replacement investment fund
8  for whatever the preexisting one was with regard to
9  First Bank of Delaware?
10         MR. SHAPIRO: Object.
11         MR. SCHEFF: Object to the form.
12         MR. SHAPIRO: Object to the form. And
13  inconsistent with prior testimony, mischaracterizing
14  the testimony.
15      A. And, again, the way I remember it, and I
16  remember it fairly discreet, there was the Universal
17  Fund that Victory Park Capital was an investor in.
18  At some point in time, the GPLS fund was established
19  and Victory Park was an investor in that fund. I
20  don't remember with any specificity how things
21  evolved and if they did evolve. I'm sure Chris
22  could do a better job than I could about that.
23  BY MR. ACKELSBERG:
24      Q. Okay. Now, the Great Plains Lending
25  labelled product didn't -- didn't happen as you

Page 182

1  thought it was going to happen when you said start
2  the engines on February 28, 2011?
3         MR. SCHEFF: Object to the form.
4      You can answer the question.
5      A. Yes.
6  BY MR. ACKELSBERG:
7      Q. Okay. Instead, there was a -- there was a
8  switch to a different tribe, the Chippewa Cree in
9  Montana, correct?
10      A. Yes.
11      Q. Okay. So what do you remember -- well,
12  first of all, what went wrong with the
13  Otoe-Missouria and Mark Curry, or whoever you were
14  talking with back then, or whoever --
15      A. Yeah.
16      Q. -- the company was talking with?
17      A. You know, the difference between the
18  preliminary sort of deal terms that seemed to make
19  sense and the final paperwork, we just weren't
20  really happy with what we were seeing. At a high
21  level, we thought that the -- we believed that the
22  way that we worked with the bank, which we felt was
23  very stable and a well-functioning structure, was
24  such that we had really -- you know, we were the
25  service provider for the bank, and there weren't

Page 183

1  intermediaries in between. As we saw the final
2  proposed documents coming from -- from the tribe,
3  they had the sort of management company that the
4  tribe was using --
5      Q. MacFarlane Group?
6      A. I don't know which entity it was. It
7  was -- it was one that Mark Curry was associated
8  with. I don't know if it was The MacFarlane Group
9  or anyone else. But -- but there was a business
10  entity that we were to be contracting with as
11  opposed to directly with the tribal lending entity,
12  and we didn't think that was a smart way to do
13  business. And the --
14      Q. Why not --
15         MR. SCHEFF: Let him finish the
16  answer, please.
17      A. You know, we -- we felt we had a business
18  model that, you know, A, it worked well. It had had
19  FDIC -- in our minds at least, an FDIC sort of stamp
20  of approval on it because it had gone through FDIC
21  examination. We wanted to replicate that as much as
22  possible. And having another entity where also we
23  didn't feel like we'd be working directly with
24  that -- that, you know, tribal lending entity, it
25  just didn't feel like the right relation- -- I mean,

Page 184

1  we already walked away from the Butch Webb operation
2  because we didn't think that was an appropriate
3  way -- you know, we didn't think there was -- they
4  had any sovereign rights to lend at all.
5      And this, we just thought, was not the
6  kind of business relationship that would be a
7  stable, longstanding one that we wanted to be part
8  of. So we had been continuing to talk to other
9  tribes.
10      And as you mentioned, I think it was
11  Haynes that bound the -- the -- what became the
12  Plain Green tribe, the Chippewa Cree tribe, and we
13  were sort of in parallel talking with those two --
14  two tribes. And, ultimately, we were more
15  comfortable with the structure and the relationship
16  with the Chippewa Cree than we were with the
17  Otoe-Missouria at that time.
18  BY MR. ACKELSBERG:
19      Q. Where did you get the impression that the
20  FDIC had approved of the structure that you had in
21  place with First Bank of Delaware?
22      A. Well, it had gone through multiple FDIC
23  exams.
24      Q. How do you know?
25         MR. SHELDON: I would just caution

46 (Pages 181 to 184)

TF App. 0078

Kenneth Rees

Page 185

1  again if anything you're going to say would be as a
2  result of being told something by counsel, you know,
3  you can state that for the record, but if it's
4  independent of that, please do testify.
5      A.  It was independent.  It was from bank --
6  bank management.
7  BY MR. ACKELSBERG:
8      Q.  Like Alonzo?
9      A.  Alonzo and Harry Madonna, the chairmen.
10  And they -- I'm sorry, I just lost my train of
11  thought.  Excuse me.
12      Yeah, so back to the -- sort of FDIC
13  oversight.  So you've probably seen that at one
14  point in time the FDIC stopped the bank from some of
15  its programs and thought that they exhibited
16  rent-a-bin characteristics.  Ours was excluded from
17  that.  And we did modify the structure of the
18  relationship with the bank, sort of looking at -- at
19  what the FDIC didn't like about the other
20  transactions.  That was actually largely what the
21  bank asked us to do.  And then -- and that's when we
22  established the Universal Fund -- for instance.
23  Yeah, Universal Fund --.  And the FDIC did -- I
24  think it was two more exams, at least one more exam
25  since that time.

Page 186

1      So from our perspective, you know, the
2  bank had been told this is how we think you ought to
3  be working with service providers for credit
4  programs.  We made changes specifically based on
5  bank guidance.  And then the FDIC looked at it and
6  continued that -- that business until the bank
7  ultimately exited it.
8      So, again, from our perspective, the FDIC
9  had looked at it and thought there was an
10  appropriate relationship for a lender and a service
11  provider to have.  So that was -- that was our
12  perspective and why we wanted to heed as close to
13  that structure as possible when working with tribes.
14      Q.  Based on your conversations with Alonzo
15  Primus and Harry Madonna, did you have the
16  impression that the FDIC had been informed by them
17  that the invest- -- that the investors in the
18  Universal Fund who was buying the participations
19  were family and friends of the bank leadership?
20      A.  The FDIC, my understanding -- and this is
21  really coming from representations from Alonzo and
22  others at -- at the bank, was pretty thorough in its
23  evaluation of these programs, both the program with
24  us and previous programs that the -- that the bank
25  had had.

Page 187

1      So I guess I'd be surprised if the FDIC
2  was unaware of it because they used that same
3  structure and the same -- some of the same
4  investors, at least for the previous program as well
5  as for ours, but I don't know for a fact whether the
6  FDIC didn't know that.
7      Q.  Okay.  You do know that the government
8  ultimately shutdown First Bank of Delaware, you do
9  know that, right?
10          MR. SCHEFF:  Object to the form; lack
11  of foundation.
12      A.  I will go ahead an answer the question.
13  They did shut it down, but, again, my
14  understanding is --
15  BY MR. ACKELSBERG:
16      Q.  They did or didn't?
17      A.  Oh, actually, did they shut it down?  I
18  thought the -- the bank actually sold all the
19  assets.
20      Q.  After they were sued by the justice
21  department?
22      A.  I don't know that that means they shut them
23  down.
24          MR. SCHEFF:  Object to the form; lack
25  of foundation.

Page 188

1      A.  Maybe -- maybe they -- I assumed that they
2  were selling assets, there was some value to those
3  assets as an -- as an entity.
4  BY MR. ACKELSBERG:
5      Q.  By the way, the -- the loan assets with
6  regard to the ThinkCash program, at the time the
7  bank was selling off its assets, Think Finance
8  already owned all those loan assets; am I right?
9          MR. SCHEFF:  Object to the form; lack
10  of foundation.
11      A.  So when the -- at the end of the -- when
12  the bank notified us that they wanted us -- they
13  wanted to no longer continue the program, they told
14  us they would stop originating by the end of the
15  year, and they asked us to -- to buy those assets
16  off of their books.  And I don't know if --
17  actually, I --
18  BY MR. ACKELSBERG:
19      Q.  Well, there weren't any --
20      A.  I just don't know.  There -- there was a --
21  they -- you know, their -- and I'm not sure how much
22  the bank retained.  It was maybe 2 or 3 percent that
23  they had on their books after they participated out
24  the majority to the Universal Fund --.  But at some
25  point in time, as sort of the end of the program,

Kenneth Rees

Page 189

1 they wanted to get all of those assets off their
2 books. And I don't know exactly where those ended
3 up. I don't think that Think bought those assets.
4 Maybe they did. But I thought they were ultimately
5 contributed to -- to another fund.
6 Q. The investment fund, right. But that
7 investment fund, due to those quirky accounting
8 rules back in the Universal -- Universal Fund
9 period, those loan assets were on the books of Think
10 Finance anyway, right?
11 A. I thought you asked --
12 MR. SCHEFF: Object to the form; lack
13 of foundation.
14 You can answer the question.
15 A. I thought you asked who bought the -- the
16 assets.
17 BY MR. ACKELSBERG:
18 Q. So it might --
19 A. I believe the assets were bought by the
20 investment fund, not by us.
21 Q. And then by virtue of those pesky
22 accounting rules, those -- they were actually shown
23 on the financial statements of Think Finance as
24 assets of the company?
25 MR. SCHEFF: Object to the form.

Page 190

1 A. I certainly wouldn't -- you know, I
2 wouldn't characterize accounting rules as pesky. I
3 just don't think they're an accurate way to judge
4 the contractual relationships that the -- that Think
5 had with the entities that it did business with.
6 BY MR. ACKELSBERG:
7 Q. Okay. Now, did -- did Think Finance when
8 it began talking with the Chippewa Cree, did it do
9 any due diligence on Steven Haynes, the go-between?
10 MR. SCHEFF: Object to the form; lack
11 of foundation.
12 A. You know, I don't know the answer to that.
13 Oftentimes we would do background checks on people
14 we work with. That was sort of a common practice.
15 I don't know if in that case we did. I know there
16 was some -- I mean,, I expect there was some vetting
17 of him by the people that worked with him and in how
18 we came into contact, I think you said Rick Eckman,
19 sort of was the person who was kind of the person
20 that put us together.
21 And I -- I just don't know exactly what --
22 you know, how much background or due diligence was
23 done on Haynes. I mean,, because it came from an
24 attorney, there might have been a sense that he had
25 already been vetted to a certain extent. But I

Page 191

1 don't know. Oftentimes we would do that.
2 BY MR. ACKELSBERG:
3 Q. And he was someone that you would -- you
4 trusted and had -- you know, he was involved in the
5 First Bank of Delaware product, right?
6 MR. SCHEFF: Object to the form.
7 A. I mean,, he was -- he was an attorney
8 with -- with a reputable law firm and seemed to have
9 a lot of experience in, you know, supporting credit
10 programs.
11 BY MR. ACKELSBERG:
12 Q. Well, but he's someone you knew and trusted
13 already, right?
14 MR. SCHEFF: Object to the form.
15 BY MR. ACKELSBERG:
16 Q. As -- as --
17 A. I mean,, so you're saying "trusted." I'm
18 sorry, there's a lot of attorneys in the room here.
19 He is an attorney. He is someone we worked with in
20 the past. I'm not sure "trusted" is the word I
21 would use for him, but he was a person who had
22 experience with us and we knew him and had worked
23 with him.
24 Q. Specifically, with regard to the
25 ThinkCash/First Bank of Delaware product, right?

Page 192

1 A. Yes.
2 Q. Okay. And with regard to the Chippewa
3 Cree, it's -- you know, the tribe itself, was there
4 any due diligence done by Think with regard to the
5 tribe?
6 A. I'm sorry, which tribe are we talking
7 about?
8 Q. Chippewa Cree.
9 A. The Chippewa Cree tribe.
10 Q. The tribe that Haynes -- Eckman and Haynes
11 connected you with.
12 A. Yes, it's -- it's not easy to get a lot of
13 detailed due diligence on -- on tribal
14 organizations. You don't have all the sort of
15 filings and stuff that you have with, you know, a
16 nontribal company. But we did what we could.
17 A lot of it actually came from Haynes.
18 Haynes had worked with the Chippewa Cree before.
19 And as far as various other tribal organizations he
20 had worked with, he seemed to think they were a
21 pretty sound business partner. There was certainly
22 a real need on the reservation for business
23 development, and we felt they'd be a good partner.
24 But I think we probably -- it was hard for
25 us to do a whole lot of additional due diligence on

TF App. 0080

Page 193

1 the Chippewa Cree as a business partner outside of
2 what Haynes represented to us.
3     Q. And Haynes' business relationship with the
4 tribe was in a casino business, right?
5     A. I believe he was in a casino business with
6 them. I don't know any more details than that. But
7 he had worked with them and thought they were good
8 business partners.
9     Q. Did the company -- did Think Finance do any
10 due diligence with regard to the Chippewa Cree's
11 prior experience in the lending business?
12     A. Well, I knew that they had a lending
13 business in the past. It was one of the things that
14 made them an attractive business partner because
15 they had already had some experience with lending.
16 I don't know anything other than the fact that they
17 had a product that they -- that they told us that
18 they were unhappy with.
19     Q. Did you look at the product or look at its
20 track record or. . .
21     A. I didn't personally.
22     Q. Did anybody at Think Finance do that?
23     A. I can't speak to that.
24     Q. So that's not something that you, as CEO,
25 required? That wasn't information that you needed

Page 194

1 in order to make a decision whether this was a good
2 partner?
3     MR. SCHEFF: Object to the form.
4     You can answer the question.
5     A. I can say I didn't do that. And I can't
6 remember now exactly what due diligence was done on
7 that tribe. I can speak to the fact that as a team
8 we got comfortable that they would be a good
9 business partner, but I just can't speak to exactly
10 what was done and how much detail was accomplished.
11 BY MR. ACKELSBERG:
12     Q. To the extent the Chippewa Cree had any
13 prior experience in a lending operation, that would
14 have been with the service provider being a company
15 called Encore, Encore Services, right?
16     A. I believe that's true; although, I don't
17 know exactly what role Encore played in the previous
18 lending business that the tribe had. I remember
19 that name in association with the business but not
20 what the role was.
21     Q. Well, did the -- did Think Finance do any
22 due diligence with regard to --
23     A. To Encore?
24     Q. -- to Encore?
25     A. Not that I'm aware of. That -- that was

Page 195

1 a -- as far as we knew, that was a former business
2 relationship. I think it had already ended by the
3 time that we had begun discussions with the tribe.
4 I'm not certain about that, but that was my
5 recollection.
6     Q. Hang on just for a second.
7     Now, at some point you learned that --
8 sorry. At some point Think Finance learned that
9 Encore was, in fact, getting a percentage of the
10 take from the Plain Green product, right?
11     A. Yes.
12     Q. Okay.
13     A. It's very frustrating.
14     Q. Explain. Why was it so frustrating?
15     A. We didn't think they had done any value in
16 terms of helping the tribe establish a relationship
17 with us, yet they were taking what we felt was, you
18 know, economic benefits from the tribe and putting
19 them into their own pocket for no value add.
20     Q. Well -- so make sure I understand this. So
21 when you were talking -- let's switch tribes. When
22 you were talking to the Otoe-Missouria, you knew
23 that there was a nontribal, call it intermediary
24 service provider, that -- that you were talking with
25 about the possible relationship. You were talking

Page 196

1 with Mark Curry about whether or not you could
2 connect with the Otoe-Missouria, right?
3     MR. SCHEFF: Object to the form;
4 compound question.
5     You can answer whatever question you
6 choose.
7     A. So, you know, the -- I didn't know all the
8 details of how Curry worked with the Otoe, but Curry
9 was the intermediary -- intermediary that sort of
10 found us as a potential partner for the tribe. So
11 they had added some value add there. And, also, we
12 knew that they were providing some level of
13 consulting to the tribal lending about how to think
14 about their economic development on the reservation.
15 Neither of those things is true of Encore.
16 BY MR. ACKELSBERG:
17     Q. Well -- okay. So --
18     A. So we just saw no value in what they were
19 doing. Whereas -- whereas, Mark Curry -- and we can
20 argue about, you know, exactly how much they got.
21 I'm not sure exactly I know what it was. But there
22 was real value add they provided to the tribe, and
23 they should have been compensated in some fashion
24 for that.
25     Q. But did you care whether or not the

49 (Pages 193 to 196)

# EXHIBIT H

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

Page 1

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF PENNSYLVANIA


COMMONWEALTH OF PENNSYLVANIA,   )
By Attorney General             )
JOSH SHAPIRO,                   )
                                )
            Plaintiff,          )   CIVIL ACTION
                                )   NO.14-cv-07139-JCJ
     v.                         )
                                )
THINK FINANCE, INC., et al.,    )
                                )
            Defendants.         )
_____  )


Videotaped Deposition of NEAL ROSETTE, SENIOR

Great Falls, Montana

Monday, June 18, 2018 - 3:01 p.m.


Reported by:

Bambi A. Goodman

Job no: 21968

TF App. 0082

Page 14

1 THE VIDEOGRAPHER: The time is 3:01 p.m.
2 We are on the record. This is the videotaped deposition
3 of Neal Rosette taken in the matter of Commonwealth of
4 Pennsylvania versus Think Finance, Inc., et al. This is
5 Civil Action Number 14-cv-07139-JCJ.
6 This deposition is being taken on Monday, the
7 18th day of June, 2018 at Mansfield Center for the
8 Performing Arts, 2 Park Drive South, in Great Falls,
9 Montana.
10 The videographer is John Nordhagen and the
11 court reporter is Bambi Goodman.
12 Counsel will now introduce themselves, after
13 which the court reporter will swear in the witness.
14 MR. SCHEFF: Richard Scheff for Kenneth
15 Rees.
16 MR. HERMAN: David Herman for Kenneth Rees.
17 MR. SMITH: Patrick Smith for Victory Park
18 and GPLS and the related Defendants. I'll give you all
19 their names.
20 MR. DAUGHERTY: Patrick Daugherty on behalf
21 of National Credit Adjusters.
22 MR. GATEWOOD: Matthew Gatewood on behalf
23 of the Think Finance, Defendants.
24 MR. GROGAN: John Grogan on behalf of the
25 Commonwealth of Pennsylvania.

Page 15

1 NEAL ROSETTE, SENIOR,
2 having been first duly sworn to testify to the truth, the
3 whole truth and nothing but the truth, testified upon his
4 oath as follows:
5 THE REPORTER: Would you identify who is on
6 the phone?
7 MR. SMITH: Matthew Haws from Katten Muchin
8 Rosenman, also representing Victory Park and GPLS.
9 EXAMINATION
10 BY MR. SCHEFF:
11 Q Mr. Rosette, good afternoon.
12 A Good afternoon.
13 Q My name is Richard Scheff, and I represent Ken
14 Rees. Have you ever met Mr. Rees?
15 A I believe so.
16 Q How many times?
17 A Once, I believe.
18 Q When was that, approximately?
19 A It was in 2011. I don't know the exact date,
20 but it had to be after April 1st.
21 Q Why did it have to be after April 1st?
22 A Because that was the day that Plain Green
23 launched.
24 Q Okay; so this was post-launch?
25 A Yes.

Page 16

1 Q And where did you meet Mr. Rees?
2 A Fort Worth, Texas, I believe.
3 Q So did you travel down to the offices of Think
4 Finance to meet with Mr. Rees and others?
5 A Yes.
6 Q Okay. And how long did you spend with
7 Mr. Rees?
8 A I'm not sure.
9 Q What went on at that meeting?
10 A A meet-and-greet, talked a little bit of
11 business. I can't even remember exactly what the
12 business we talked about, but I know Mr. Rees was there
13 for a short period of time.
14 Q Who else was present?
15 A Sarah Cutrona, Quite a few -- Billi Ann Raining
16 Bird Morsette, Marquieta Jilot, which were some of my
17 staff. I think -- I don't know if Jason was in that
18 meeting, Jason Harvison, and then Michelle Nguyen. Those
19 are the only names I can remember.
20 Q So this one meeting that you had where Mr. Rees
21 attended for a short time was the only time you've met
22 Mr. Rees?
23 A Correct.
24 Q Okay.
25 So Mr. Rosette, you've been placed under oath

Page 17

1 as you know. The court reporter swore you in. And this
2 is a deposition, so it's a question and answer. Are you
3 aware of that?
4 A Yes.
5 Q Have you been deposed before?
6 A Yes.
7 Q How many times?
8 A Twice, I believe.
9 Q Okay. And when were you deposed? And if you
10 know, what matters were you deposed in?
11 A I think it's a matter of the record. So if you
12 wanted to find that out, I think you could go to the
13 public record.
14 Q Okay.
15 A I was deposed once in Havre, Montana, and it
16 had to do with -- had to do with Think Finance, I
17 believe. Can't remember or Plain Green, one of the two.
18 Q Okay. And when was the second time you were
19 deposed?
20 A Again you'll have to go to the public record.
21 I can't remember.
22 Q Okay. So -- but you're familiar with the
23 process of being deposed. That is lawyers ask you
24 questions, you provide answers and just go back and
25 forth. You look at documents and eventually the

5 (Pages 14 to 17)

TF App. 0083

Page 50

1      A  Yes.
2      Q  And the next bullet says "The tribe will have
3  the sole proprietary interest (it will be the primary
4  beneficiary) in, and will be solely responsible for the
5  conduct of the consumer lending activity of First
6  American Capital Resources."  Have I read that correctly?
7      A  Yes.
8      Q  And that was part of the sovereign model as
9  well.
10     A  I guess.
11     Q  And the next line says "The management company
12  will be under the direct supervision of First American
13  Capital."  Have I read that correctly?
14     A  Yes.
15         MR. GROGAN:  Objection to the form.
16     Q  (By Mr. Scheff)  That was part of the sovereign
17  model as well.
18     A  Say that again.  You only said the first
19  sentence of the whole bullet.
20     Q  Oh, I'm sorry; I thought it was the whole
21  bullet.  I apologize.  "The management company will be
22  under the direct supervision of First American Capital
23  Resources board of directors.  The management company
24  personnel will not be salaried employees of First
25  American Capital Resources, rather the management company

Page 51

1  will receive 40 percent of the First American Capital
2  Resources net profits as its sole compensation for
3  services provided."  Have I read that correctly?
4      A  Yes.
5      Q  And so this management company that is referred
6  to on this page is not a tribally owned entity; right?
7      A  No.
8         MR. GROGAN:  Objection to form.
9      Q  (By Mr. Scheff)  It's an entity that's an expert
10  in online lending that will enter into a business
11  relationship with the tribe so it can do online lending;
12  correct?
13     A  Correct.
14     Q  And going to the last bullet, it says "The
15  management agreement will expire in approximately seven
16  years, at year-end 2017.  It should be expected that
17  First American Capital Resources will then be
18  sufficiently experienced and have the necessary financial
19  resources to continue business operations without
20  contracted managerial assistance."  I've read that
21  accurately, haven't I?
22     A  Yes.
23     Q  And that was the goal of the sovereign model
24  was that you would team up with an outside expert in
25  online lending, and over time the tribe itself, and the

Page 52

1  tribal entity, would learn how to do the online lending
2  business to the point that it would then not need the
3  managerial assistance of the third party.  Isn't that
4  what the sovereign model was?
5      A  That's what was written down on paper.
6      Q  Well, is that your understanding of what the
7  sovereign model was?
8      A  The perfect world, yes.
9      Q  And that would not have been a rent-a-tribe;
10  correct?
11     A  If it had been put together just like this?
12     Q  Right.
13     A  Then no.
14     Q  It wouldn't have been a rent-a-tribe.
15     A  No.
16     Q  Correct.  Now, this never got off the ground;
17  right?
18     A  Nope.  Because -- you want to know why?
19     Q  I was about to ask you a question about that.
20  And it didn't get off the ground because the tribe
21  couldn't get -- or ARM couldn't get the ten million
22  dollars in funding; is that right?
23     A  No, it was bigger than that.
24     Q  Okay; tell me what happened.
25     A  It was because ARM -- number one, yeah, you're

Page 53

1  right, that was part of it, the money part.
2      Q  Okay.
3      A  The other part is is that ARM wanted to
4  maintain control over everything.
5      Q  Okay.
6      A  And there was no this taking over management
7  after seven years.  That's why it didn't get off the
8  ground.
9      Q  In other words, ARM was saying You're not going
10  to take over management after seven years.
11         MR. GROGAN:  Objection to the form.
12         THE WITNESS:  Yeah, pretty much everybody
13  does.
14     Q  (By Mr. Scheff)  Now, so after this
15  didn't -- let me go one more page; okay?  "Current
16  Corporate Needs (Owners)."  It's the second-to-the-last
17  page.  Got that?
18     A  Yep.
19     Q  Look at the second bullet.  "Adoption of a
20  tribal regulatory code - Chippewa Cree tribal credit
21  transaction code."
22     A  (Nods head.)
23     Q  You're nodding your head.  Does that mean yes?
24     A  Yes.
25     Q  And in fact, the tribe adopted a tribal code in

14 (Pages 50 to 53)

TF App. 0084

Page 54

1  2010, didn't it?
2      A  No, they didn't.
3      Q  They didn't?  When was it adopted?
4      A  I believe it was in 2011.
5          MR. SCHEFF:  And -- but the tribe
6  had -- strike that.
7          (Deposition Exhibit No. 3 marked for
8  identification.)
9      Q  (By Mr. Scheff)  So Mr. Rosette --
10     A  Uh-huh.
11     Q  -- I'm going to represent to you that this
12  cover email that I'm going to describe --
13         MR. GROGAN:  A second, Richard.  Is that
14  one of the emails that --
15         MR. SCHEFF:  It is.
16         MR. GROGAN:  Okay.
17         MR. SCHEFF:  It is.
18         MR. GROGAN:  I'm going to put an objection
19  on the record with regard to any -- use of any of these
20  emails because they have not been shown to the
21  Commonwealth at this point.
22         MR. SCHEFF:  Okay.
23     Q  (By Mr. Scheff)  Mr. Rosette --
24     A  Uh-huh.
25     Q  -- I'm going to represent to you, you see that

Page 55

1  there's a cover email which is the first page?
2      A  Yes.
3      Q  And then there's a blue piece of paper?
4      A  Yes.
5      Q  And then after that there's a document that
6  says "Title 10 Chippewa Cree Tribal Codes?"
7      A  Yes.
8      Q  "Chippewa Cree Tribal Transaction Code."  I'm
9  going to represent to you that this document, the
10  Chippewa Cree Tribal Transaction Code, was attached to
11  the cover email; okay?
12     A  Okay.
13     Q  So let's take a look at the cover email, just
14  to identify it for the record as Exhibit 3.  In the
15  middle of the page, okay, you see an email from you, Neal
16  Rosette, to an individual named Ray Brown, copy to Robin
17  Kovash and Billi Ann Morsette, dated March 1, 2011.  Have
18  I identified that correctly?
19     A  Yes.
20     Q  All right. And the reference line says "Tribal
21  law." Have I read that correctly?
22     A  Yes.
23     Q  And then it appears, if you go right above
24  that, that --
25     A  Excuse me.

Page 56

1      Q  Uh-huh?
2      A  Wasn't that a forwarded message?
3      Q  Yes.  That's what it says.  This is what we
4  pulled out.  So -- Mr. Rosette, looking at the
5  attachment, the Chippewa Cree Tribal Credit Transaction
6  Code --
7      A  Yes.
8      Q  -- is that a true and correct copy of the
9  Chippewa Cree Tribal Credit Transaction Code as of March
10  1, 2011?
11     A  I have no idea.
12     Q  Can you take a look at it and see?
13     A  You're asking me if this is the code for the
14  Chippewa Cree Tribe?  I have no idea.
15     Q  As of March 1, 2011.
16     A  I have no idea.
17     Q  Did you play any role in preparing this
18  document?
19     A  I can't recall.
20     Q  Did Mr. Kovash?
21     A  I can't speak for Mr. Kovash.
22     Q  Do you have any recollection of Mr. Kovash
23  being tasked with the -- with preparing a Chippewa Cree
24  tribal credit transaction code?
25     A  I don't recall.

Page 57

1      Q  You don't recall one way or the other.
2      A  One way or the other.
3      Q  All right.  Well, you would agree that you are
4  providing a copy of a document called the Chippewa Cree
5  Tribal Credit Transaction Code to Mr. Ray Brown on or
6  about March 1st, 2011; correct?
7      A  I think it looks like I forwarded it to them
8  from someplace else.  Looks like Mr. Steven Haynes from
9  Haynes Investments.
10     Q  Well, it looks like Mr. Brown forwards it to
11  Mr. Haynes or, actually, to Sarah Cutrona to Tim
12  Anderson, Steve Shaper, Jason Harvison with a copy to
13  Steven Haynes.  Where did you get the Chippewa Cree
14  Tribal Credit Transaction Code to send to
15  Mr. Kovash -- or to Mr. Brown, excuse me?
16     A  I can't recall.
17     Q  Who is Mr. Brown?
18     A  Ray Brown is an associate of Steven Haynes.
19     Q  Okay.
20     A  Ray Brown was the individual that called me in
21  early February of 2011, or sometime in February, I don't
22  know in it was early or late -- it was February of
23  2011 -- and talked to me or asked me if our tribe would
24  be interested in entering into a business relationship
25  with Think Finance for online lending.

15  (Pages 54 to 57)

Page 78

1  Plain Green from March of 2011 until January of 2012;
2  correct?
3      A  Correct.
4      Q  And you were the chief executive officer; is
5  that right?
6      A  Correct.
7      Q  And Billi Ann Morsette was the chief operating
8  officer; right?
9      A  Correct.
10     Q  And when you left in January of 2012, Billi Ann
11  Morsette became the chief executive officer; correct?
12     A  I'm not positive.
13     Q  Not positive.
14     A  I'm assuming that's what happened.
15     Q  And is it correct, Mr. Rosette, that once you
16  left Plain Green in January of 2012, from that point
17  forward until today, you've had no involvement with Plain
18  Green; is that correct?
19     A  Correct.
20     Q  All right.  So you haven't been employed by
21  Plain Green?
22     A  No.  Oh wait, wait, that is incorrect.
23     Q  Okay; what's incorrect about it?
24     A  Because I was receiving a payment from Plain
25  Green based on a severance agreement that I had with the

Page 79

1  Plain Green corporation.
2      Q  Okay.
3      A  So I had -- I was receiving payments all the
4  way up until 2013.
5      Q  Right; okay.  So you were receiving payments as
6  a result of a severance agreement, which we may mark
7  later and go through.  But you had no operational
8  responsibility for Plain Green --
9      A  No.
10     Q  -- after late January of 2012; is that correct?
11     A  Correct.
12     Q  Okay; good.
13         Now, what was your role in creating Plain
14  Green?
15     A  Well, first of all, I was the one that was
16  contacted by Ray Brown, Steven Haynes, I guess, through
17  Steven Haynes, to present this idea to the tribal
18  government, to bring it before the tribal council, to
19  bring the -- what the hell's it called, the
20  proposed -- you know, the proposed plan to the tribal
21  government, and to sit with them and discuss whether it
22  would be -- whether it would be appropriate for the tribe
23  to look into it.
24     Q  And did you make a recommendation that they do
25  that?

Page 80

1      A  Yes, I did.
2      Q  And were you the one, among others, who was
3  responsible to look into it?
4      A  Yes.
5      Q  And then to report back to the tribal council?
6      A  Yes.
7      Q  And you did that with the assistance of
8  Mr. Kovash; is that right?
9      A  Correct.
10     Q  And you did that with the assistance of anybody
11  else or no?
12     A  Encore Services.
13     Q  And Encore Services helped you as well?
14     A  Supposedly.  They didn't really help us.
15     Q  Well, you tell me what they did.
16     A  They didn't do anything, really.
17     Q  Okay.  So they didn't help you.
18     A  They helped themselves.
19     Q  My question was did they help you --
20     A  No.
21     Q  -- investigate the opportunity with Think
22  Finance?
23     A  They investigated the opportunity.  They
24  provided some input about the opportunity to the tribal
25  government.

Page 81

1      Q  And what was the input that they provided?
2      A  I can't recall.
3      Q  Were you present when they did it?
4      A  Yes.
5      Q  Who from Encore made the presentation?
6      A  I believe it was Marty Mazzara.
7      Q  Anyone else?
8      A  Maybe Mr. Lee Broome, from what I recall.  I'm
9  not positive
10     Q  Was Mr. Kovash present at the time?
11     A  He may have been present or he may have been on
12  a conference line.
13     Q  Okay.
14     A  I'm sure he was involved with it.
15     Q  Did Mr. Kovash recommend to the tribe that it
16  go forward with Think Finance and enter into a business
17  deal?
18     A  I can't recall.
19     Q  Wasn't he the person who, in fact, worked on
20  the negotiations with you with Think Finance?
21     A  Yes.
22     Q  Now, take a look, please, and this is that
23  deposition testimony again, that Exhibit 4, page 31.
24  Hold on here.  Take a look at page 31, line 18 where it
25  starts at line 18.  You have that?

21 (Pages 78 to 81)

TF App. 0086

Page 82

1  A  Uh-huh.
2  Q  "How many hours a week did you spend as CEO of
3  FACR?
4     "A   Sixty to 70, I would say.
5     "Q  What did you do?
6     "A  Once we got started, officially with our
7  Plain Green business, which was in March, we created the
8  whole company in one month."  And then it goes on to say
9  that "because Think Finance was basically out of the
10 online business in the state of Texas and they needed an
11 Indian outlet to begin operations and migrate their
12 portfolio over to Rocky Boy.  So they were very anxious
13 to start that online lending on our reservation."  Have I
14 read that correctly?
15 A  Correct.
16 Q  All right.  And is it correct that you worked
17 60 to 70 hours a week to create the Plain Green business
18 in one month?
19 A  Yes.
20 Q  Okay; good.  And if you would look now on page
21 54 of this deposition, beginning at line 23 at the bottom
22 of the page, you see it says "So when Plain Green was
23 formed you became CEO?  Do you have it?
24    "A  Yes."
25 A  Yep.

Page 83

1  Q  "What were your duties as CEO of Plain Green?
2  All the functions and operational duties to get this
3  business up and running for the tribe."  Have I read that
4  correctly?
5  A  Yes.
6  Q  Was that accurate?
7  A  It depends on how you define "functions and
8  operational duties," I guess.
9  Q  What did you mean in your testimony in January
10 of 2014 when testified under oath that your duties as CEO
11 of Plain Green were all the functions and operational
12 duties to get this business up and running for the tribe?
13 A  It meant that I did everything that Think
14 Finance told me to do and that was necessary for them so
15 that they could get -- so it was -- that
16 was -- everything they told me that needed to be
17 done to get the business up and running.  That's what it
18 was.
19 Q  But you didn't say that when you testified
20 under oath in January of 2014, did you?
21    MR. GROGAN:  Objection to the form.
22    THE WITNESS:  How can I say what I was
23 thinking at the time?  I said "functions and operational
24 duties" when, in fact, those were the functions and
25 operational duties.  If you want to define them, that's

Page 84

1  what they were.
2  Q  But you didn't say in your testimony in January
3  of 2014 that basically all you did was what Think Finance
4  told you to do.
5     MR. GROGAN:  Objection to form.
6  Q  (By Mr. Scheff)  Is that right?
7  A  I said "functions and operational duties" is
8  all I said it looks like, so....
9     MR. SCHEFF:  Okay; let's take a look at
10 what we'll mark as Exhibit 6.
11    (Deposition Exhibit No. 6 marked for
12 identification.)
13    MR. GROGAN:  This is another one of the
14 documents not produced?
15    MR. SCHEFF:  Uh-huh.
16    MR. GROGAN:  Okay; my objection to the use
17 of this document is as stated before, and I'll reiterate
18 it now.
19    MR. SCHEFF:  Okay.
20 Q  (By Mr. Scheff)  Looking at Exhibit 6, the first
21 email goes to, Neal Rosette.  It's from Michelle
22 Nguyen, dated March 21, 2011, and it says "Please Review
23 Privacy Notice" as the subject line.  Have I read that
24 correctly?
25 A  Yep.

Page 85

1  Q  And then underneath, it says "Please find the
2  privacy policy.  Below you will find Pepper Law's review
3  and approval.  I've also included an updated content
4  review list, including a column to help your
5  prioritization."  Do you remember receiving this
6  document?
7  A  No, I don't.
8  Q  Take a look at the attachment which is
9  the -- beginning the fourth page.  Do you see that?
10 A  What does it say on the top?
11 Q  It says "Facts.  What does Plain Green, LLC do
12 with your personal information?"
13 A  Yes, I see that.
14 Q  Have that?
15 A  Yep.
16 Q  Did you approve this document?
17 A  Not that I recall.
18    MR. SCHEFF:  Let's mark --
19    THE WITNESS:  No, I was told to approve it.
20 I don't remember if I did or not though.
21    MR. SCHEFF:  Let's mark Exhibit 7.
22    (Deposition Exhibit No. 7 marked for
23 identification.)
24    MR. GROGAN:  Same objection as previously
25 stated.

22 (Pages 82 to 85)

TF App. 0087

Page 110

1    A  Oh, I can't recall.
2    Q  You can't recall whether you did or you didn't.
3    A  Can't recall.
4    Q  Okay.  Mr. Belcourt responds to you "Neal that
5  makes good sense to me.  Just let me know if I can help."
6  So even though you were on leave at the end of 2011, you
7  were still functioning in the capacity as CEO of Plain
8  Green; correct?
9    A  Off and on.
10   Q  Off and on; okay.
11   A  You know, I take that back.  I wasn't on leave
12 in December.  I was on leave in January.
13   Q  Okay.
14   A  But it's been eight years ago, so I misspoke.
15      MR. SCHEFF:  That's fine.  Anytime you feel
16 you need to correct one of your answers, please do.
17      Hold on one moment.
18      Take a look at what I'll mark as Exhibit 15.
19      (Deposition Exhibit No. 15 marked for
20 identification.)
21   Q  (By Mr. Scheff)  If you would, please, turn to
22 the second page.  The bottom there's an email from you to
23 a number of people including Ms. Cutrona and Mr. Kovash,
24 copied to Billi Ann Morsette and others, Dan Belcourt.
25 And to Mr. Eckman as well.  Do you see that?

Page 111

1    A  Yes.
2    Q  All right.  So first I want to go back to some
3  of your testimony from earlier today where you said that
4  Mr. Kovash stopped working for Plain Green, you thought,
5  in May or June of 2010.  Looking at this --
6    A  No, I said May or June of 2011, didn't I?
7    Q  I'm sorry; 2011.  You did say that.  Thank you
8  for correcting me.
9      Well, this email dated September 19th, 2011
10 that's going to Mr. Kovash, does that refresh your
11 recollection that as of September 2011 Mr. Kovash was
12 still representing Plain Green?
13   A  I know it was sometime in 2011.  And again,
14 it's been eight years ago.
15   Q  I understand.
16   A  I don't know the exact month.  I thought it was
17 June or something like that, but maybe it was longer.
18   Q  You could be mistaken based on -- right?
19   A  Yeah.
20   Q  Okay; that's fine.
21      And you're commenting on an FTC lawsuit?
22   A  Looks like it, yes.
23   Q  Do you remember doing that?
24   A  No.
25   Q  You do not.

Page 112

1    A  No.
2    Q  All right.  And you basically say that you
3  don't think you're qualified to review the lawsuit and
4  provide any type of input or opinion; correct?
5    A  That's what it says, yes.
6    Q  But by looking at the email, it does
7  demonstrate that you read the lawsuit, correct, because
8  you're providing specific comment about it.
9    A  Let me read it first.
10   Q  Sure; take as much time as you need.
11   A  One and 2?  The two bullets 1 and 2?
12   Q  Yes.
13   A  That wasn't written by me.
14   Q  Who was it written by?
15   A  I think that might have came out of the letter
16 or whatever I was reading, looks like to me.  Because I
17 would have never wrote -- those two -- those two bullet
18 points 1 and 2.  And especially where it says "I'm of the
19 opinion," because right above it I just said "I'm not
20 qualified to render an opinion."
21   Q  Okay.
22   A  And then all of a sudden that second sentence
23 there, number 2, it says "I'm of the opinion."  I don't
24 think those two were -- I must have -- if I wrote that
25 email, which apparently it looks like I did, then those

Page 113

1  two pieces came from somewhere else.  It didn't come from
2  me.
3    Q  Well, it looks like what you're doing, if you
4  ask me is --
5    A  Cutting and pasting.
6    Q  -- you're cutting and pasting.  You're taking
7  something out of the lawsuit and you're making a comment
8  on it.  So if you look at number 2, at the end of what
9  you've cut and past and put in quotes, you say "I'm of
10 the opinion that this is relevant to how Plain Green
11 operates."  So you're commenting on what's in the
12 lawsuit; correct?
13   A  It appears so.
14   Q  Okay.  Go to the next paragraph, please.
15   A  Okay.
16   Q  And it says -- I'm going to skip the first
17 sentence.  I'm sorry; I won't skip the first sentence.
18 "I hope this request does not appear to be unreasonable
19 but given the fact that we all have a huge responsibility
20 to our employers, I would be able to sleep a lot better
21 at night knowing that you (the attorneys)have thoroughly
22 reviewed and rendered an opinion based on our (Plain
23 Green's) standard operating procedures.  I have been
24 fielding multiple questions from my board of directors on
25 this matter and at this point in time have been informing

29 (Pages 110 to 113)

Page 114

1 them that the entire situation is under legal review.
2 They are anxious to receive some sort of assurance that
3 our lending and collection practices conform to all
4 federal regulatory requirements. Please let me know as
5 soon as possible when I can expect an answer/comments.
6 Thank you for your time." Have I read that accurately?
7    A Yes.
8    Q All right. And does reading this refresh your
9 recollection about this FTC lawsuit and the dialogue that
10 you were having with the board of directors of Plain
11 Green at this time?
12    A You know, it doesn't.
13    Q Okay. So let's then turn back to page two.
14 And above the email that you send, Mr. Eckman responds
15 "Neal, I will send you a memo that outlines the
16 allegations in the complaint and whether we have any
17 issues; my initial read is that we do not. But we will
18 confirm this week." Have I read that correctly?
19    A Yes.
20    Q And then you responded to him "Thank you so
21 much. I will be patiently awaiting your response to this
22 request. Thanks again"; correct?
23    A That's what it says, yes.
24    Q And so you relied on Mr. Eckman to provide you
25 advice that Plain Green was operating lawfully; is that

Page 115

1 right?
2        MR. GROGAN: Objection to form.
3        THE WITNESS: I relied on Mr. Eckman to
4 tell me what to do.
5    Q (By Mr. Scheff) Well, and if you look at the
6 top email on Exhibit 15, you write to Sarah Cutrona, "I
7 think I can speak for Billi Ann and the tribal council
8 when I say we are extremely motivated to learn and are
9 very excited to being one of the "good" lenders operating
10 properly. Thanks again"; correct?
11    A That's what it says.
12    Q And Mr. Eckman was Plain Green's lawyer; right?
13    A I believe so at the time, yes.
14    Q As was Mr. Kovash; correct?
15    A I believe so.
16    Q And so you relied on your counsel, Mr. Kovash
17 and Mr. Eckman, to make sure that Plain Green was
18 operating in accordance with federal law; correct?
19        MR. GROGAN: Objection to form.
20        THE WITNESS: Yes, correct.
21        MR. SCHEFF: Take a look at what we'll mark
22 as 16 -- 16A, excuse me.
23    (Deposition Exhibit Nos. 16A and B marked for
24 identification.)
25    Q (By Mr. Scheff) Mr. Rosette, let's just look at

Page 116

1 16A first. This goes from Steven Smith to you and Billi
2 Ann Morsette, May 9th, 2011, "Banners for CJ network for
3 review and approval." And then there are, it looks like,
4 one, two, three, four, five, six, seven, eight, nine
5 things attached. And if you look, there are a variety of
6 things that are attached for your review and approval.
7 Do you see that?
8    A Yes.
9    Q Who is Steven Smith?
10    A I have no idea.
11    Q No idea. It says "Director of compliance" at
12 Think Finance. Do you remember dealing with Mr. Smith?
13    A No. Billi Ann probably did.
14    Q Okay. And why do you say that?
15    A Because she handled -- she dealt with -- she
16 corresponded with the Think Finance folks on a daily
17 basis. I didn't.
18    Q Oh. So Billi Ann was in touch with Think
19 Finance on a daily base?
20    A She handled, yeah, all this type of stuff.
21    Q All the day-to-day operational issues that
22 Plain Green needed to handle.
23    A Chief operating officer, yes.
24    Q Billi Ann was responsible for doing that on a
25 day-to-day basis.

Page 117

1    A Yep.
2    Q Okay; good. Now, if you take a look at 16B,
3 top email, you respond to Mr. Smith "Thank you for the
4 information. As far as I'm concerned they are approved.
5 Thanks." So you approved the documents that Mr. Smith
6 gave you; correct?
7    A I approved everything that Think Finance gave
8 me.
9    Q Okay.
10    A Everything.
11        MR. SCHEFF: All right.
12    Let's go to the next one.
13        THE WITNESS: Vaguely recall going through
14 them and looking at them.
15    Q (By Mr. Scheff) All right.
16    A I'd be very surprised if you found any email
17 that said This is disapproved.
18        MR. SCHEFF: Let's mark 17A and B.
19    (Deposition Exhibit Nos. 17A and B marked for
20 identification.)
21    Q (By Mr. Scheff) Take a look at 17A,
22 Mr. Rosette. This is to you from Mr. Smith again, May
23 9th, 2011, Review/Approval of CJ Network. And it says
24 "Please review attached the change control form and short
25 PowerPoint presentation for the CJ Network. We would

30 (Pages 114 to 117)

TF App. 0089

# EXHIBIT I

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF PENNSYLVANIA


COMMONWEALTH OF PENNSYLVANIA,    )
By Attorney General              )
JOSH SHAPIRO,                    )
                                 )
            Plaintiff,           )   CIVIL ACTION
                                 )   NO.14-cv-07139-JCJ
    v.                           )
                                 )
THINK FINANCE, INC., et al.,     )
                                 )
            Defendants.          )
_____  )



Videotaped Deposition of BILLI ANN RAINING BIRD

Great Falls, Montana

Tuesday, June 19, 2018 - 10:13 a.m.





Reported by:

Bambi A. Goodman

Job no: 21969

TF App. 0090

**Page 2**

1     On Tuesday, June 19, 2018, beginning at
2  10:13 a.m., the videotape deposition of BILLI ANN RAINING
3  BIRD, appearing at the insistence of Defendant Kenneth
4  Rees, was taken at The Mansfield Center for the
5  Performing Arts, 2 Park Drive South, Great Falls,
6  Montana, pursuant to the Federal Rules of Civil
7  Procedure, before Bambi A. Goodman, Registered
8  Professional Reporter, Certified Realtime Reporter,
9  Notary Public and John Nordhagen, videographer.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1              A P P E A R A N C E S
2
3   John J. Grogan, Esq.
4     LANGER GROGAN & DIVER, PC
5     1717 Arch Street, Suite 4020
6     Philadelphia, PA 19103
7     jgrogan@langergrogan.com
8     personally appeared on behalf of Plaintiff.
9
10  Matthew O. Gatewood, Esq.
11    EVERSHEDS SUTHERLAND, LLP
12    700 Sixth Street, NW, Suite 700
13    Washington, DC 20001
14    matthewgatewood@eversheds-sutherland.com
15    personally appeared on behalf of Defendant
16    Think Finance.
17
18  Richard L. Scheff, Esq. and David F. Herman, Esq.
19    MONTGOMERY MCCRACKEN
20    1735 Market Street, 21st Floor
21    Philadelphia, PA 19103
22    rscheff@mmwr.com
23    personally appeared on behalf of Defendant
24    Kenneth Rees.
25

**Page 4**

1   Patrick Daugherty, Of Counsel
2     VAN NESS FELDMAN, LLP
3     1050 Thomas Jefferson Street, NW, 7th Floor
4     Washington, DC 20007
5     pod@vnf.com
6     personally appeared on behalf of Defendant
7     National Credit Adjusters.
8
9   Patrick M. Smith, Esq.
10    KATTEN MUCHIN ROSENMAN, LLP
11    525 West Monroe Street
12    Chicago, IL 60661
13    patrick.smith@kattenlaw.com
14    personally appeared on behalf of Defendants GPLS
15    and Victory Park.
16  Also Present:  Alexandra McNicholas, Esq.
17              (telephonically)
18
19
20
21
22
23
24
25

**Page 5**

1
2              I N D E X
3   WITNESS:                    PAGE:
4   BILLI ANN RAINING BIRD,
5   Examination by Mr. Scheff            7
6   Examination by Mr. Daugherty        80
7
8   EXHIBITS:
9    Deposition Exhibit No. 38
10     Bates TF-PA-092490-2498; 4/12/2011
11   and 3/4-6/2013 Email Chain
12     marked for identification        67
13
14   Deposition Exhibit No. 39
15     Bates NCA_PA013657-3662; 7/11/2013
16   Email With Attachment
17     marked for identification        83
18   Deposition Exhibit No. 40
19     Bates TF-PA-042631; Email Chain With
20   Attachment
21     marked for identification        83
22
23
24
25

2 (Pages 2 to 5)

TF App. 0091

Page 6

1
2       THE VIDEOGRAPHER: The time is 10:13 a.m.
3   We are on the record. This is tape one of the videotaped
4   deposition of Billi Ann Raining Bird in the matter of
5   Commonwealth of Pennsylvania versus Think Finance, Inc.,
6   et al. This is Civil Action number 14-cv-07139-JCJ in
7   the United States District Court for the Eastern District
8   of Pennsylvania.
9       This deposition is being taken on Tuesday, the
10  19th day of June, 2018, at Mansfield Center for the
11  Performing Arts, 2 Park Drive, in Great Falls, Montana.
12      The videographer is John Nordhagen of Nordhagen
13  Court Reporting. The court reporter is Bambi Goodman of
14  Goodman Reporting.
15      Counsel will now introduce themselves, after
16  which the court reporter will swear in the witness.
17      MR. SCHEFF: Richard Scheff for Kenneth
18  Rees.
19      MR. HERMAN: David Herman, also on behalf
20  of Kenneth Rees.
21      MR. SMITH: Patrick Smith on behalf of
22  GPLS, and Victory Park, Defendants.
23      MR. DAUGHERTY: Patrick Daugherty on behalf
24  or National Credit Adjusters.
25      MR. GATEWOOD: Matthew Gatewood on behalf

Page 7

1   of Think Finance.
2       MR. GROGAN: John Grogan for the
3   Commonwealth of Pennsylvania.
4       MR. SMITH: And to be clear, we also have
5   Alexandra McNicholas on the phone on behalf of GPLS and
6   Victory Park.
7       THE WITNESS: Billi Ann Raining Bird,
8   former employee of Plain Green.
9       BILLI ANN RAINING BIRD,
10  having been first duly sworn to testify to the truth, the
11  whole truth and nothing but the truth, testified upon her
12  oath as follows:
13              EXAMINATION
14  BY MR. SCHEFF:
15      Q Ms. Raining Bird, my name is Richard Scheff,
16  and I represent Kenneth Rees. And I will be the person
17  who is primarily asking you questions today, although
18  others -- others may ask you questions as well.
19      A Okay.
20      Q You've been placed under oath, so your
21  testimony is subject to the penalties of perjury and so
22  you're required to tell the truth. Do you understand
23  that?
24      A Yes.
25      Q Okay.

Page 8

1       You and I had a very, very brief conversation
2   before we went on the record where I gave you some --
3   just some instructions with respect to this deposition.
4   I'm going to ask you questions. The court reporter's
5   taking everything down. The videographer's recording it.
6   Your responses should be verbal. So a nodding of the
7   head or the shaking of the head, although the
8   videographer will see it, the record should reflect an
9   answer. And if you do that I will probably say Well, do
10  you mean yes? Do you mean no? Something like that.
11      A Okay.
12      Q If you don't understand a question that I ask,
13  just tell me you don't understand it and I'll try and
14  explain myself a little bit better. If you don't know
15  the answer to a question, that's okay. If you don't
16  remember something, that's okay. Just tell the truth.
17  That's the only requirement. If at any time you'd like
18  to take a break for whatever reason, just let us know and
19  we'll take a break. Do you have any questions?
20      A No.
21      Q Okay; good. And you'd like to be referred to
22  as Ms. Raining Bird; is that right?
23      A Yes.
24      Q Okay. Ms. Raining Bird, where do you reside?
25      A In Box Elder. Physical address is 146 Russian

Page 9

1   Olive Street.
2       Q In Box Elder?
3       A Yes.
4       Q And how long have you lived in Box Elder?
5       A Well I meant in the home that I'm living in
6   now, I've only been there for about two months now. And
7   prior to that, I lived in Rock -- on the -- farther into
8   the reservation. Rocky Boy is kind of a little bit of a
9   distinction between Rocky Boy and Box Elder. But I mean,
10  it's all the same area but yeah.
11      Q And you're a member of the Chippewa Cree Tribe?
12      A Yes.
13      Q So can you please describe for us your
14  educational background.
15      A Let's see. I -- I've -- I guess I went to Box
16  Elder School almost all my life. I graduated high
17  school, went to college as soon as I got out of high
18  school. Started college in Billings and then ended up
19  back home and got an associate degree at Stone Child
20  College, which is the local community college, and then I
21  moved to get my bachelor's degree here in Great Falls at
22  the University of Great Falls. That's what it was at the
23  time. It's changed names now. But I have a bachelor's
24  degree in human services administration.
25      And since graduating, I'm not necessarily

3 (Pages 6 to 9)

TF App. 0092

Page 14

1    Resources?
2        A   Yes.
3        Q   And that was also known as FACR?
4        A   Yes.
5        Q   Okay.  And before you were employed by FACR,
6    and again, I'm going to try and give you some dates on
7    that.  And I'm not sure they're correct, but try -- you
8    know, please correct me if I'm wrong.
9            Would it be accurate that you became the chief
10   operating officer of FACR in approximately May of 2010
11   and that that entity -- and no longer were in that
12   position as of the time that you became the chief
13   operating officer of Plain Green?
14       A   No.  Actually, originally FACR was the original
15   project that we had been hired to start.  And -- so the
16   way that we kind of dealt with it at the time was that
17   they kind of just went together.  Like they were separate
18   businesses but we did them -- I mean, we served in both
19   roles in both entities.
20       Q   So for how long did you remain the chief
21   operating officer of FACR?
22       A   The same amount of time -- I meant all the way
23   up until June of 2013 when I left.  I mean, it was still
24   an existing business when I left.
25       Q   We have a document....  So was -- so when did

Page 15

1    you become the chief operating officer of FACR?
2        A   Let's see.  Well, and you just mentioned the
3    change of the name.  Originally that it was not FACR.  I
4    mean, it started out as a different project name in June
5    2010.  And so I meant -- I guess I would say from when I
6    started working for the project, we -- the titles were
7    given to us at that time.  I mean, we were the only two
8    employees there.
9        Q   You and Mr. Rosette.
10       A   Yes.
11       Q   And that was approximately June of 2010?
12       A   Uh-huh.
13       Q   Before that, were you employed by the tribe?
14       A   Yes.
15       Q   In what position?
16       A   I was in the planning department.  I was
17   compliance officer, and I did -- assisted the
18   planning -- I meant we worked right below the tribal
19   council.  We provided like, I guess I don't know how you
20   want to say, like guidance, technical assistance to the
21   council specifically, you know, the chairman.  Did a lot
22   of the grant writing and reviewing programs and all kinds
23   of things.
24       Q   And before that, were you employed by the tribe
25   as well, or was that your first position with the tribe?

Page 16

1        A   That was probably my first position.  We had to
2    have contracts prior to that, but other than that.
3        Q   How did it come about, and if you would, what
4    was the name of the project that you referred to before
5    it was called FACR?
6        A   How did it come about?
7        Q   No, what was the name of it?
8        A   The first name?
9        Q   The first name.
10       A   Oh, it was -- I believe it was called ARM or
11   something.
12       Q   Was it PDL?
13       A   No, that was a different project.
14       Q   Different project; okay.
15       A   That was the first project the tribe -- or the
16   first loan program the tribe had.
17       Q   PDL was?
18       A   Yes, it was.  That was before FACR.
19       Q   Were you involved with PDL?
20       A   No.
21       Q   Okay.  How did you become involved with any
22   online project for the tribe, online lending project for
23   the tribe, and what was its name?
24       A   How did I become involved?
25       Q   Yes.

Page 17

1        A   Basically, Curtis Pope apparently, based on the
2    previous project they were working on, the PDL project,
3    had other -- you know, people, I guess in the industry
4    began to hear about, you know, working with tribes to
5    expand their businesses or to have their businesses be a
6    little bit more protected or whatever.  But -- so he
7    introduced -- some of his partners were introduced to the
8    council, and some of his partners were starting new
9    businesses, from what I understand.  And so those people,
10   you know, approached the tribe.  The tribe, they kind of
11   you know, said -- they provide this proposal to do a new
12   project.  And they told the tribal council that we need,
13   you know, two of your best employees.  And that's how I
14   became involved is I was asked specifically to come and
15   work for the project.
16       Q   And what were your duties and responsibilities?
17       A   I meant we're starting a new project from the
18   ground up.  To review the original contract or whatever
19   it was called.  But I meant just to get -- start a new
20   business, to get the business going, to negotiate with
21   some of the terms.  And I meant just whatever it took to
22   get the business going.
23       Q   So did you participate in those negotiations?
24       A   Yeah.
25       Q   And did Mr. Rosette participate in those

5 (Pages 14 to 17)

Page 18

1 negotiations?
2 A Yes.
3 Q Who else for the tribe participated?
4 A Probably there's Chance Houle, originally Jake
5 Parker or Raymond Parker. Let's see, who else? I know
6 those two for sure. Kelly Eagle Man, Bruce Sun Child.
7 Q What about Dan Belcourt?
8 A Yeah, Dan, Dan Belcourt. I meant the existing
9 council pretty much, I guess.
10 Q Did you have outside counsel at the time who
11 also participated in negotiating the contracts?
12 A At the original?
13 Q Yes.
14 A In the beginning we did not, but I don't
15 remember, it was maybe in the fall that we hired Robin
16 Kovash.
17 Q Robin Kovash from a firm in Denver?
18 A Yes.
19 Q Okay. And Mr. Kovash assisted in negotiations
20 as well?
21 A Yes.
22 Q What else did you need to do, and what did you
23 do, to get this business off the ground? Just list the
24 types of things that you had to do.
25 MR. GROGAN: Objection to form.

Page 19

1 Could you just clarify "this business".
2 Q (By Mr. Scheff) The first business.
3 A Okay; well, the first -- I meant obviously the
4 first steps are making sure the tribe has the appropriate
5 laws in place to I, guess, within the tribal government
6 so that we were capable of performing or ensuring that
7 we're running the program under our terms, I guess, under
8 our laws.
9 Q Under Chippewa Cree law.
10 A So it protects the business and protects us.
11 But so the legal part of it was probably, you know, I
12 meant basically you're writing a new law because we had
13 no existing credit laws or anything like that.
14 Q So did you participate in writing the Chippewa
15 Cree credit law, lending law?
16 A Not necessarily. I meant, a lot of it was
17 already done and it kind of -- you know, we review it and
18 make sure that -- but other than -- not I didn't
19 specifically write any of the law.
20 Q Do you know who did?
21 A I meant, I can't say for sure, but I'm almost
22 positive it came from the group that we were working with
23 that already had what they wanted to see in the law in
24 place. And so that's -- that's where it came from and
25 then, you know, so it basically was already written and

Page 20

1 we just adopted it.
2 Q These are some documents, some exhibits that
3 were marked yesterday.
4 A Yeah.
5 Q So if you would please, I want to show you
6 what's been previously marked as Exhibit 3.
7 A Okay.
8 Q And what I'm going to do is just describe this
9 document so -- for the record, and I'm going to ask if
10 you agree with this description.
11 A Okay.
12 Q And what I'm going to do is I'm going to look
13 at the top of the first page to describe it. And that is
14 an email from Steven Haynes to Sarah Cutrona. And it's
15 dated March 1st, 2011. And the body of it says "Chippewa
16 tribal lending law/ordinance." Have I identified that
17 correctly?
18 A Yes.
19 Q Okay. And underneath that in the middle of the
20 page, the original email is from Neal Rosette to a person
21 named Ray Brown, copy to Robin Kovash and to yourself, I
22 believe; is that correct?
23 A Yes.
24 Q And that one's dated March 1st, 2011 as well;
25 okay?

Page 21

1 A Yes.
2 Q I've identified that correctly?
3 A Yes.
4 Q All right. Would you turn to the page after
5 the blue -- March 1, 2011. So would you thumb through
6 the document that is titled Title 10 - Chippewa Cree
7 Tribal Codes, Chippewa Cree Tribal Credit Transaction
8 Code and tell us whether you've ever seen this before?
9 A Yeah, I mean, I've seen it before.
10 Q And is this the tribal code, the lending code
11 that you just referred to in your testimony?
12 A Yes. I'm not reading all of it at the moment,
13 but yeah, as far as I....
14 Q And this was prepared and drafted sometime
15 before March 1 of 2011?
16 A It, yeah, had to be.
17 Q Had to be.
18 A Yeah.
19 Q And so is this part of the work that was done
20 that you participated in with others to get the first
21 business off the ground?
22 A Yes.
23 Q Okay; good.
24 Now, let me show you what has previously been
25 marked as Exhibit 5. And again, I'm just going to

6 (Pages 18 to 21)

Page 22

1  describe the top of it. And I'll ask you to follow along
2  and tell me whether or not I'm describing it accurately;
3  okay?
4      A  Okay.
5      Q  This is titled Rocky Boy Tribal Newsletter, and
6  it's dated October of 2011. Have I described that
7  accurately?
8      A  Yes.
9      Q  Okay. Are you familiar with this type of a
10 document?
11     A  Yes.
12     Q  How frequently does it come out?
13     A  It came out monthly, maybe.
14     Q  Okay. So if you look in the lower right-hand
15 corner of the first page, there's an article that
16 says -- is titled Online Lending A Hit With The Chippewa
17 Cree Tribe. And it says "Plain Green generating
18 substantial revenue for the tribe." Did I read that
19 accurately?
20     A  Yes.
21     Q  And do you remember this article?
22     A  Yes.
23     Q  Okay. Would you turn, please, to the second
24 page. In the third column at the bottom, okay, the last
25 paragraph on that column starts "Ms. Morsette added," and

Page 23

1  you were the Ms. Morsette who was speaking there; is that
2  correct?
3      A  Yes.
4      Q  And in fact, was that your picture that is in
5  the column over on the fourth column?
6      A  Yes.
7      Q  Okay. And it says "Ms. Morsette added," quote,
8  "from June 2010 to March 2011, we did nothing but
9  exclusively work with Encore to prepare the operational
10 policies, procedures, website, website content, loan
11 documents, agreements/contracts with third-party service
12 providers and other related activities necessary to get
13 this business off the ground." Have I read that
14 correctly?
15     A  Yes.
16     Q  Is that a true statement?
17     A  Yes.
18     Q  And so when you were testifying a few minutes
19 ago about all the work that you did in that prior
20 business venture trying to get it off the ground, the
21 sentence that appears in Exhibit 5 that I just read is
22 what you were talking about; is that right?
23     A  Yes.
24     Q  And that's all that work that was done over
25 that time period of time; is that right?

Page 24

1      A  Yes.
2      Q  And that business never got off the ground, did
3  it?
4      A  No.
5      Q  Okay. So let's just go back to who were the
6  people, other than you and Mr. Rosette, who participated
7  in the effort to do all this work that's described in
8  Exhibit 5 that I just read?
9      A  Who were the people?
10     Q  Yeah. Just if you could identify whoever you
11 can remember who participated in that.
12     A  I meant, most of the council, the council at
13 the time, I guess, and then they switched councils
14 somewhere in between that time. And then Dan Belcourt.
15 I guess a lot of the work was on Dan and Robin Kovash.
16     Q  Okay. Anyone else that you can remember on
17 behalf of the tribe. I'm not talking on behalf of
18 everybody else.
19     A  I meant I'm not really positive I said as far
20 as -- no, I mean, I don't really even recall aside from
21 the council, I guess.
22     Q  It's a long time ago; I understand that.
23     A  And attorneys.
24     Q  Let me show you another document that was
25 marked yesterday as Exhibit 2; okay?

Page 25

1      A  Okay.
2      Q  Take a look at that. And again, I'm going to
3  identify this document just for the record and ask for
4  you to agree or not agree with what I said.
5      A  Uh-huh.
6      Q  This an email, it was the first page. It's
7  from Neal Rosette to Robin Kovash and yourself, copy to
8  Grady Reynolds, Gordon Jones, Dan Belcourt, Leann Montes,
9  Subject, slide presentation. And it's dated June 2nd,
10 2010. Have I identified that correctly?
11     A  Yes.
12     Q  All right. And if you go to the email below
13 that, there's an email from Mr. Kovash to Mr. Rosette and
14 yourself with a series of comments to the slide
15 presentation; is that correct?
16     A  Yes.
17     Q  All right. Would you then turn to the third
18 page on the exhibit? That one right there. This is the
19 slide deck; right?
20     A  Yes.
21     Q  And it's for First American Capital Resources,
22 LLC and that's FACR; is that right?
23     A  Yes.
24     Q  Okay. Are you familiar with this slide deck?
25     A  Yes.

7 (Pages 22 to 25)

Page 26

```
1      Q   Spend as much time as you need just thumbing
2  through it.
3      A   Yes.
4      Q   You're familiar with it?
5      A   Yes.  I made it, I think.
6      Q   You made this?
7      A   Yeah.
8      Q   Who prepared it with you?  Who participated in
9  the preparation?
10     A   It was probably Grady and Gordon, not positive.
11 But I meant the information came from somewhere, not
12 necessarily all things that I made up myself.
13     Q   And what about Mr. Rosette?  Did he participate
14 in the preparation of this as well?
15     A   Yeah.
16     Q   And what about Mr. Belcourt?
17     A   I'm sure they reviewed it.  But I'm pretty
18 positive I did most of it, put it together.
19     Q   In terms of actually putting it together.
20     A   Yeah.
21     Q   What about the substantive content of it?
22     A   Yeah.  Like I said it came -- the content came
23 from information that was given to me from the different
24 sources, whether it was Grady or Gordon or whoever I
25 meant.
```

Page 27

```
1      Q   And Robin Kovash as well?
2      A   Yes.
3      Q   And so would it be accurate, Ms. Raining Bird,
4  that the plan for First American Capital Resources to
5  form a business is reflected in this slide deck?
6      A   Yes.
7      Q   And that part of the work that was done to get
8  that business off the ground was to prepare the tribal
9  lending code, which was marked yesterday and you saw, as
10 Exhibit 3 just a few minutes ago?
11     A   Yes.
12     Q   Is that right?  Okay; good.
13     MR. GROGAN:  Richard, we're starting to use
14 documents that --
15     MR. SCHEFF:  Yeah, please.
16     MR. GROGAN:  Let me put on the record that
17 it's been disclosed to the Commonwealth that there are a
18 substantial number of documents, some of which were used
19 yesterday as exhibits and others of which will probably
20 be used today, that have not been previously produced to
21 the Commonwealth.  And the Commonwealth wishes to have a
22 standing objection to the use of any of those documents
23 in this deposition.
24     MR. SCHEFF:  Fine; thanks, John.
25     Q   (By Mr. Scheff)  Okay; what was the reason that
```

Page 28

```
1  FACR never got off the ground?
2      A   The lack of funding.
3      Q   So as I understand it, and again, I want you to
4  correct if I have a misunderstanding.  There was an
5  effort to find money that would capitalize this business
6  so loans could actually be made; is that right?
7      A   Yes.
8      Q   And that money was going to come from a third
9  party.  It wasn't going to come directly from the tribe;
10 right?
11     A   Nope, yes.
12     Q   And the tribe, over time, would pay that money
13 back; right?
14     A   Yes.
15     Q   And at least at inception, the way that it was
16 contemplated or intended, was that FACR would operate not
17 only with tribal members involved but also a third-party
18 expert or consultant who would assist; is that right?
19     A   Yes.
20     Q   And over time, as the business progressed, the
21 reliance on that third party to assist in the business
22 would change over time, would get less and less to the
23 point where the tribe then fully operated all aspects of
24 the business; is that right?
25     A   Yes, yes.
```

Page 29

```
1      Q   And that was contemplated to take place over a
2  roughly a seven-year time period?
3      A   Yeah, yes.
4      Q   And was -- in fact, isn't that what's happened
5  with Plain Green with FACR?
6      MR. GROGAN:  Objection to form.
7      THE WITNESS:  I wouldn't know what happened
8  with Plain Green.  That was the intention when I was
9  there, but I don't know what's going on now.
10     Q   (By Mr. Scheff)  So let me just clarify your
11 answer to make sure I understand it.  You left Plain
12 Green in June of 2013.
13     A   Uh-huh.
14     Q   "Uh-huh," meaning yes?
15     A   Yes.
16     Q   And you haven't been employed at Plain Green
17 since June 2013.
18     A   No.
19     Q   So you don't have firsthand knowledge of what's
20 happened at Plain Green since June of 2013; is that
21 right?
22     A   Nothing at all.
23     Q   Okay.  So -- and when you say "nothing at all,"
24 you're agreeing with me that you don't know what is going
25 on at --
```

Page 30

1　　　A　Yes, I don't know anything that's going on
2　there.
3　　　Q　So when you said that was the intention with
4　Plain Green when you responded to my question a few
5　minutes ago, are you saying that when Plain Green was
6　launched in 2011, and for the time period that you worked
7　with Plain Green until June 2013, the intention was that
8　over time, the third party, Think Finance, would be less
9　and less involved, the tribe more and more involved to
10　the point where the tribe then fully controlled the
11　operation at some point in the future?
12　　　　　MR. GROGAN: Objection to form.
13　　　Q　(By Mr. Scheff) Is that what you were saying
14　the intention was at that time?
15　　　A　Yes.
16　　　Q　Okay. And that's consistent with what the plan
17　was for FACR; correct?
18　　　A　Yes.
19　　　Q　Okay. And -- okay. And with respect to Plain
20　Green, the source of outside funding was Victory Park and
21　the GPLS group; is that right?
22　　　A　Yes.
23　　　Q　Okay. It wasn't Think Finance.
24　　　A　No.
25　　　　　MR. GROGAN: Objection to form.

Page 31

1　　　Q　(By Mr. Scheff) Think Finance simply provided
2　a -- you know, a software platform and some expertise in
3　lending and underwriting that it made recommendations to
4　the tribe; is that right?
5　　　　　MR. GROGAN: Objection to form.
6　　　Q　(By Mr. Scheff) You can answer. John's making
7　objections for the record, which are perfectly
8　appropriate, but they don't impact you needing to respond
9　to the question; okay?
10　　　A　Okay. Can you repeat what you said?
11　　　Q　I'll do my best. I'll do a better job this
12　time. We'll get back to that in a minute; all right?
13　　　A　Okay.
14　　　Q　Okay. But I'm correct in understanding that at
15　least as far as you understand, for the time period that
16　you were at Plain Green, that roughly two-year time
17　period, the plan for the future was at some point in the
18　future the tribe will be running the operation entirely
19　and won't need Think Finance.
20　　　A　Yes.
21　　　　　MR. GROGAN: Objection to form.
22　　　Q　(By Mr. Scheff) But you don't know whether
23　that's ever happened.
24　　　A　Yes.
25　　　Q　All right; very good.

Page 32

1　　　　　Let's sort of change gears just a little bit
2　and then I'll come back to this. Before today's
3　deposition, at any time before today's deposition, have
4　you met Mr. Grogan?
5　　　A　Yes.
6　　　Q　And how many times have you met Mr. Grogan?
7　　　A　Just once.
8　　　Q　And when was that, approximately?
9　　　A　Oh, maybe November, I can't remember the exact.
10　　　Q　So November of 2017?
11　　　A　Yes. I think in November or December. I can't
12　even really remember.
13　　　Q　Just your best memory --
14　　　A　Pretty close to that.
15　　　Q　You remember it was cold outside.
16　　　A　Yeah.
17　　　Q　And where did that meeting take place?
18　　　A　In Havre.
19　　　Q　And who else attended that meeting?
20　　　A　I can't even tell you the names of the other
21　people. I meant, I can't remember their names. But
22　there was like two other people. I believe there was two
23　other people there.
24　　　Q　All right; two other people?
25　　　A　Yes.

Page 33

1　　　Q　So Mr. Grogan, yourself and two others.
2　　　A　I believe it was two or maybe three.
3　　　Q　Two or three others?
4　　　A　Yeah. I can't remember really.
5　　　Q　And were all of those people -- you understood
6　that John at the time, Mr. Grogan at the time,
7　represented the Commonwealth of Pennsylvania; is that
8　right?
9　　　A　Yes.
10　　　Q　Were there other people there who also said
11　that they represented the Commonwealth of Pennsylvania?
12　　　A　Yes, I believe, yes.
13　　　Q　And do you remember that person's name or those
14　persons' names?
15　　　A　I don't remember. But I know that there was at
16　least one other person there that -- that was
17　representing Pennsylvania, yes.
18　　　Q　Okay. And was there somebody there from the
19　consumer -- from the CFPB?
20　　　A　Yes.
21　　　Q　And that was a woman?
22　　　A　Yes.
23　　　Q　Do you remember her name?
24　　　A　I don't remember her name.
25　　　Q　Was it Vanessa Buchko?

9 (Pages 30 to 33)

Page 42

1    Q   Okay.  And since that meeting, have you had
2   further telephone conversations with Mr. Grogan?
3    A   No.
4    Q   If you know, who else did Mr. Grogan and others
5   meet with in November or December of 2017 in Havre?
6    A   All I know is Bobbi, Bobbi Jo.
7    Q   Bobbi Jo Favel?
8    A   Yeah.  We're cousins so --
9    Q   Oh, you're cousins.
10    A   Yeah, so we talk.  Other than that, I don't
11   know.
12    Q   Okay; good.  Other than Mr. Grogan and the
13   people who you met with in November or December of 2017,
14   have you talked with anyone else about the case that
15   brings us all here today --
16    A   No.
17    Q   -- the Commonwealth versus Think Finance and
18   others.
19    A   No.
20    Q   Okay.  So this is -- and -- that's fine; okay.
21    The computer that you have at home, I assume
22   that's your personal computer?
23    A   Yes.
24    Q   Do you have any files on your personal computer
25   that relate to your work at Plain Green?

Page 43

1    A   At home?
2    Q   Yeah.
3    A   Possibly, but -- everything that I had I always
4   kept an external hard drive.  So I meant it's -- I never
5   saved things on a computer, whether it was at work or at
6   home.  I never saved things to that specific computer
7   just for personal security, personal -- again, part of
8   the OCD stuff.
9    Q   That's okay.
10    A   I meant, so, yeah, I always had an external
11   hard drive or USB or something.
12    Q   And that's the hard drive that you know longer
13   have.
14    A   Yep -- yes.
15    Q   So you -- you somehow got misplaced when you
16   were away?
17    A   Yes.
18    Q   Okay.  Okay; well, thank you.  After the
19   deposition, I want to talk to you about getting copies of
20   your notes --
21    A   Okay.
22    Q   -- and whatever documents you have.  And we'll
23   figure that out; okay?
24    A   Yes.
25    Q   All right; good.

Page 44

1    So let's -- excuse me, I'm sorry -- talk about
2   your duties and responsibilities as the chief operating
3   officer at Plain Green.
4    A   Okay.
5    Q   Tell us what they were.
6    A   Just day-to-day management.  I meant, pretty
7   much I did everything and anything that needed to be done
8   as far as, you know, any type of presentations, reports,
9   I meant, whatever it was.  I meant, ensuring contracts
10   were getting signatures, board meeting.  You know, I did
11   pretty much everything.
12    Q   Okay; let's -- I'd like you, if can, using your
13   best memory, to be as specific as possible.  Even just
14   give me a list of all the different things that you did
15   as the chief operating officer of Plain Green.
16    A   I guess, let's see.  You know, I was like the
17   main point of contact between the council and the
18   investors that we were working with or the -- not
19   investors, but the -- I don't know how -- the company
20   that provided the technical assistance, whatever, to us,
21   you know.  And just, I meant, I ensured that if something
22   needed a signature, it got signed, whether it was by
23   myself or by Neal or by the councilmen or whoever.
24   Reviewed contracts.  We reviewed websites.  We set up
25   bank accounts.  We -- let's see.

Page 45

1    Q   Authorized wire transfers?
2    A   Yes.
3    Q   Made wire transfers yourself?
4    A   Yes.
5    Q   Handled personnel matters?
6    A   Yes.
7    Q   Hired people?
8    A   Yes.
9    Q   Fired people?
10    A   Yes.
11    Q   Reviewed emails that were supposed to go to
12   consumers?
13    A   Yes.
14    Q   Did you review like direct-mail campaigns?
15    A   Yes.
16    Q   And the content of what was going to be said to
17   consumers?
18    A   Yes.
19    Q   And who, other than you, would do all of the
20   things that you've just described?
21    A   Neal would help with some of it, too.  And then
22   also Dan Belcourt or Robin Kovash, whoever was -- I know
23   Robin didn't stay under contract with us too long as far
24   as into the business.  So he was -- there was a point, I
25   think it was -- I don't remember the exact date, where

12 (Pages 42 to 45)

TF App. 0098

Page 46

1    Robin was no longer needed.  So Dan Belcourt and that's
2    probably about it that assisted with a lot of the --
3        Q   What about Leann Montes?  Did she also review
4    materials for you?
5        A   Yes.
6        Q   And provide you with advice?
7        A   Yeah, yes.
8        Q   And Mr. Belcourt and Mr. Kovash would do that
9    as well?
10       A   Yes.
11       Q   And would they sometimes provide edits or
12   changes to the materials that had been sent to you for
13   review?
14       A   Sometimes.  But it was very rare that they made
15   any edits.  I mean, depending on what it was.  Like a
16   direct-mail campaign, you know, they're not necessarily
17   going to change anything.
18       Q   Pretty straightforward.
19       A   Yeah.  And so I meant, it's depending on what
20   type of document it was, yeah.
21       Q   Okay.  They'd provide assistance with contracts
22   and things of that nature?
23       A   Yes.
24       Q   And they would review them and tell you whether
25   they were fine or not fine?

Page 47

1        A   Yes.
2        Q   And would they provide, sometimes, edits or
3    changes to those contracts?
4        A   Yes.
5        Q   Did you do that as well?
6        A   Yes.
7        Q   Okay.  So when you got material from Think
8    Finance -- and by the way, the company that you referred
9    to just a couple minutes ago that was providing the
10   technical assistance and support, that was Think Finance;
11   right?
12       A   Yes.
13       Q   So when Think Finance would send materials and
14   documents and things for the business that needed to be
15   reviewed, you would review them; correct?
16       A   Yes.
17       Q   Sometimes Mr. Rosette would review them?
18       A   Sometimes both of them.
19       Q   Sometimes both of you?
20       A   Sometimes all of them.
21       Q   You'd either make changes or not; correct?
22       A   Yes.
23       Q   You'd approve or not; correct?
24       A   Yes.
25       Q   You'd get advice of the lawyers around you as

Page 48

1    well, Mr. Kovash for a period of time; correct?
2        A   Yes.
3            MR. GROGAN:  Objection to form.
4        Q   (By Mr. Scheff)  Mr. Belcourt?
5        A   Yes.
6        Q   And on occasion Ms. Montes?
7        A   Yes.
8        Q   What types of things -- types of items or
9    issues needed to be addressed by tribal council in
10   connection with the business?
11       A   It -- depending on -- I meant, usually it was a
12   contract that needed approval.  And again, we did have a
13   board, not necessarily directly to the council.  There
14   was a separate board which included tribal council
15   members and a few other community members.  So a lot of
16   the things happened at the board level and not at the
17   tribal council level.  And so just any major issues or
18   any major contracts which we could say -- I meant, when I
19   say "major," it's like probably anything that may be over
20   a certain -- maybe $5,000 or more or something like that.
21   But the board did -- you know, we did -- we did try to
22   get their approval on just about everything and anything
23   that was, you know, a decision -- a major decision, even
24   employment, as far as approving the people that we
25   hired --

Page 49

1        Q   Okay.
2        A   -- things like that.
3        Q   So let me understand this.  I want to make sure
4    that the record's clear on this.  There were the people
5    that ran the business on a day-to-day basis, you being
6    one of them; is that correct?
7        A   Yes.
8        Q   Neal Rosette was one of them, at least up until
9    January of 2012; is that right?
10       A   Yes.
11       Q   And there were others.  And we can -- I'm going
12   to ask you to identify different employees, you know, in
13   a minute.
14       A   Okay.
15       Q   There was a separate board of directors for
16   Plain Green?
17       A   Yes.
18       Q   Were you on that board?
19       A   No.  Well, originally I was.  But as I became
20   an employee --
21       Q   You were not.
22       A   Of course, I meant that, again, it started out,
23   you know, we were working on FACR, so --
24       Q   Right.
25       A   -- at the time I was on -- I was a board member

13  (Pages 46 to 49)

TF App. 0099

Page 50

1  for that.  And then when we became employed, I was no
2  longer.  So I've never actually been on the Plain Green
3  board.
4      Q  Okay.  Did you attend Plain Green board
5  meetings?
6      A  Yes.
7      Q  And I assume, but I want you to tell me if I'm
8  right or wrong, you attended those between March of 2011
9  and June of 2013?
10     A  Yes.
11     Q  And were they held on a regular basis?
12     A  Yes.
13     Q  How frequently were board meetings held?
14     A  At least -- we tried to have them monthly.  I
15  mean, there may have been a couple of months where we did
16  not have a meeting.  But I meant, we would not go two
17  months without having a meeting.  So I mean, it's a
18  monthly.
19     Q  Were those -- were those board meetings held on
20  the reservation?
21     A  Yes.
22     Q  Was the work that you did for Plain Green, did
23  that occur on the reservation?
24     A  The work I did, yes.
25     Q  And the work that the other employees who

Page 51

1  reported to you either as chief operating officer or
2  chief executive officer, did their work largely take
3  place on the reservation as well?
4      A  Yes.
5      Q  Okay.  Would you make presentations to the
6  board of directors?
7      A  Yes.
8      Q  About different issues that involved the
9  business of Plain Green?
10     A  Yes.
11     Q  And I assume that that would occur on a regular
12  basis; is that right?
13     A  Yes.
14     Q  Almost at every board meeting?
15     A  Yes.
16     Q  All right.  And did Mr. Rosette also make
17  presentations to the board, at least while he was the
18  chief executive officer?
19     A  Yes.
20     Q  Did others?
21     A  Yes.  I meant, yeah.  Yeah, there was always
22  other presentations as well too.
23     Q  Okay.  And did the board -- strike that.
24        Did the board review the financial performance
25  of the business?

Page 52

1      A  Yes.
2      Q  And were they given reports on monthly
3  performance?
4      A  Yes.
5      Q  Did you review those reports before they went
6  to the board?
7      A  I can't recall if I reviewed them before they
8  went to the board, but I know there were times that they
9  were reviewed before they went to the board.  I meant, we
10  all -- I received monthly reports or sometimes -- I could
11  receive a daily report if I wanted as well, but yes.
12     Q  Were there -- there were minutes kept of the
13  board meetings; is that right?
14     A  Yes.
15     Q  Okay.  And who was responsible for keeping
16  those?
17     A  Me.
18     Q  Okay.  And do you -- so -- and those minutes
19  became part of the books and records of Plain Green?
20     A  Yes.
21     Q  Did you -- when you left the employment of
22  Plain Green, was there a file with all the board minutes?
23     A  Yes.
24     Q  Or on the computer they were stored there?
25     A  Yes.

Page 53

1      Q  Did you ever make reports -- strike that.
2        Did you ever meet with the tribal council about
3  the business of Plain Green?
4      A  Yes.
5      Q  And how frequently would you do that?
6      A  We reported -- every department is required to
7  give a report at every council meeting, so it's monthly.
8      Q  Monthly.  And council meetings occur monthly?
9      A  Yes.
10     Q  And I assume, like the Plain Green board
11  minutes -- board meetings, they might skip a month every
12  now and then, but you'd never go more than two months
13  without a tribal council.
14     A  Normally they don't cancel a tribal council
15  meeting.  But I meant there may have been one or two.
16     Q  What's the function of the tribal council?
17  What's their authority, if you know?
18     A  They're responsible for the operation of the
19  entire tribe and the community.  It's their leadership.
20     Q  So -- and that -- it's its own sovereign
21  government; correct?
22     A  Yes.
23     Q  When you said a few minutes ago that each
24  department would, at every council meeting, make a report
25  or presentation to the full tribal council, what

14 (Pages 50 to 53)

TF App. 0100

Page 54

1  department were you reporting for? What was the name of
2  that department?
3      A  I meant, at the time it was a combined like
4  Plain Green/FACR. I mean, it wasn't -- people didn't
5  necessarily know that it was two businesses or whatever.
6  I mean, it's just....
7      Q  Okay. So if you could, please, can you just
8  identify, tell us, who other employees of Plain Green
9  were and what their functions were.
10     A  Other employees?
11     Q  Yeah. You've got yourself and you've got Neal
12  Rosette, Senior, at least up until of January '12; right?
13     A  Yeah.
14     Q  Who else?
15     A  At the time, I guess when we started, I think
16  we added Marquieta Right -- or Right -- Marquieta Jilot.
17  We added her. I think she might have been one of the
18  first people that we employed.
19     Q  What was her -- what were her duties and
20  responsibilities?
21     A  She was more for, you know, financial
22  assistance.
23     Q  Financial assistance?
24     A  As far as like bookkeeping-type things and
25  stuff like that.

Page 55

1      Q  She was a bookkeeper?
2      A  Yeah, or just -- I don't even know what her
3  title was, yeah.
4      Q  Well her -- if you remember her title, that's
5  fine. But it would also be helpful to understand what
6  she did.
7      A  Yeah, yeah. I meant, she made checks and would
8  do all the check requests and more for --
9      Q  Would she keep the financial records of Plain
10  Green?
11     A  Yes.
12     Q  Okay. And who else was an employee of Plain
13  Green?
14     A  Let's see. We had -- after her, I believe -- I
15  think her mom came to work for us soon after, Christine
16  Jilot.
17     Q  Okay.
18     A  Neal Rosette, Junior.
19     Q  And what did Mr. Rosette, Junior do? What was
20  his function?
21     A  He still at the time -- he originally was
22  originally with the PDL stuff. So he -- because of that
23  experience, we moved him under to do -- basically, he
24  originally started out approving the loans every day.
25     Q  Okay.

Page 56

1      A  So -- and he helped with compliance-type stuff,
2  compliance.
3      Q  Okay; who else was an employee of the Plain
4  Green while you were there?
5      A  Bobbi, Bobbi Jo Favel, my sister Jennifer
6  Raining Bird.
7      Q  Lets's go back to Bobbi Jo Favel. What was her
8  role and function?
9      A  Well, she had just -- she had been going to law
10  school. And so part of her function was to assist. And
11  I had wanted to develop our own internal compliance
12  department within the company so that we could
13  self-regulate in some manner. Instead of having somebody
14  from the outside come in and tell us that we're doing
15  something wrong, that we do it ourselves. And then part
16  of her -- and then she also -- again, she worked with
17  the -- as far as answering complaints from BBB, Better
18  Business Bureau, from states from -- you know, from
19  customers. So she helped answer a lot of the customer
20  complaints and take care of a lot of that type of stuff.
21  And again, trying to develop a compliance -- an internal
22  compliance component. But yeah, so that was....
23     Q  Did she develop an internal compliance program?
24     A  When I left, and as far as I knew, there
25  was -- we kind of had a first draft or so. I don't know

Page 57

1  where it went from there. But yeah, she was working on
2  it, so....
3      Q  Who else were employees of Plain Green?
4      A  I believe Tony Woods.
5      Q  What did Mr. Woods do?
6      A  IT. He worked all the -- I meant, because we
7  added the call center and we had to -- there was a lot of
8  IT work that needed to be done in the building. So I
9  don't know how -- I meant, when I left we had like 30
10  employees or whatever, so I don't necessarily....
11     Q  And were those 30 employees -- they included
12  customer service representatives?
13     A  Yes.
14     Q  And the 30 employees that you're referring to,
15  they were located on the reservation working there?
16     A  Yes.
17     Q  Okay. And let's -- at some point during your
18  employment with Plain Green, the tribe or Plain Green
19  built a call center; correct?
20     A  Yes.
21     Q  And that was done with a loan that Think
22  Finance provided?
23     A  Yes.
24     Q  Okay. And was the loan paid back?
25     A  Not that I remember.

Page 58

1    Q  Didn't happen before you left?
2    A  No.
3    Q  Okay.  Before the call center was built, were
4  there customer service representatives on the reservation
5  handling customer calls?
6    A  No.
7    Q  Okay.  So the call center was the first time
8  that happened.
9    A  Yes.
10    Q  And that was part of the progression of the
11  business, to make the tribe or Plain Green more able to
12  run the business on its own; correct?
13    A  Yes.
14        MR. GROGAN:  Objection to form.
15        MR. SCHEFF:  Why don't we take a break,
16  because I understand we're sort of at the end of a tape.
17  We'll just take a break for about five-or-so minutes;
18  okay?
19        THE VIDEOGRAPHER:  This concludes tape one
20  of the videotape deposition of Billi Ann Raining Bird.
21  The time is 11:10 a.m.  We're off the record.
22        (Deposition in recess from 11:10 a.m. to
23  11:18 a.m.)
24        THE VIDEOGRAPHER:  We're on the record.
25  This is tape two of the videotape deposition of Billi Ann

Page 59

1  Raining Bird.
2    Q  (By Mr. Scheff)  Ms. Raining Bird, before we
3  broke, we were talking about the building of the call
4  center and customer service representatives?
5    A  Yes.
6    Q  And I think you testified that before the call
7  center was built, the tribe didn't have any customer
8  service representatives on the reservation.
9    A  No.
10    Q  They did not?
11    A  No, we did not.
12    Q  What about -- weren't there some customer
13  service representatives before the call center was
14  bought -- built who were located on the second floor of
15  the casino?
16        MR. GROGAN:  Objection to form.
17        THE WITNESS:  Not that I remember.  And if
18  they were, it didn't have anything to do with this
19  business.
20    Q  (By Mr. Scheff)  Okay; all right.
21      Now, there was a lot of work that needed to be
22  done in March of 2011 to get the Plain Green business off
23  the ground; correct?
24    A  Yes.
25    Q  All of the same type of work that you had done

Page 60

1  for FACR that you testified about earlier this morning
2  needed to be done for Plain Green as well.
3    A  Yes.
4        MR. GROGAN:  Objection; form.
5    Q  (By Mr. Scheff)  And so you participated in that
6  process to review those documents.  They were reviewed by
7  counsel, and ultimately the business got off the ground;
8  is that right?
9    A  Yes.
10    Q  Now, once the business got off the
11  ground -- and that would have been in or about April of
12  2011; is that right?
13    A  Yes.
14    Q  Okay.  Who were your main -- strike that.
15      Who were the people at Think Finance, if
16  anyone, who you had contact with?
17    A  Michelle Nguyen, Jason Harvison, Sarah Cutrona.
18  Let's see, some guy in finance.  I can't remember his
19  name.
20    Q  Is that Chris Loots*?
21    A  Oh, Chris Loots, yes.  Ken Rees, but Ken wasn't
22  necessarily -- we didn't have a lot of contact with him
23  but he was still a part.  David Gentry.
24    A  Uh-huh.
25    A  There was a couple of ladies that had the same

Page 61

1  name.
2    Q  Linda Calvin --
3    A  Linda, yeah.
4    Q  -- and Linda Rigensky*?
5    A  Yeah, Linda and Linda.
6    Q  Called them Linda One and Linda Two or L One
7  and L Two?
8    A  Yeah.  Let's see.
9    Q  How about Steven Smith?
10    A  Yeah, but not -- I guess I didn't -- I didn't
11  talk to him a whole lot, but yes.
12    Q  Okay.  So of all the people that you've just
13  listed -- and there may be others who you had contact
14  with at Think Finance; is that right?
15    A  Yes.
16    Q  So this is not the complete list.
17    A  No.
18    Q  You can't remember all the different people.
19    A  No, I meant -- some of them I had more or less
20  contact with, so yeah.
21    Q  Would it be accurate that the person who you
22  had most contact with was Michelle Nguyen?
23    A  Yes.
24    Q  And tell us the type of things -- strike that.
25      And you would speak to Michelle by telephone?

16 (Pages 58 to 61)

TF App. 0102

Page 62

1     A  Yes.
2     Q  Did you exchange emails with Michelle?
3     A  Yes.
4     Q  And on occasion you would meet with Michelle;
5  is that right?
6     A  Yes.
7     Q  And Michelle would come out to the tribe on a
8  periodic basis?
9     A  Yes.
10    Q  She'd come up to -- up to the reservation?
11    A  Yes.
12    Q  And were there times that you also traveled to
13  Fort Worth?
14    A  I've only been there once.
15    Q  You've been there once; okay.  And that was
16  sort of shortly after the launch?
17    A  Yes.
18    Q  All right.  So tell me about the different
19  types of issues or reasons why you would be speaking with
20  Michelle.
21    A  The contracts that needed to be updated or
22  signed, payments that need to be processed, bank
23  transfers, board approval, things that we needed board
24  approval on.  Just any concerns they may have had with
25  the operations or anything that possibly was not being

Page 63

1  processed in a timely manner, whatever.  But just, I
2  meant, just day-to-day everything, I guess.
3     Q  And similarly, if you had issues with Think
4  Finance, would you talk to Michelle Nguyen about that?
5     A  Yes.
6     Q  And would Michelle generally address those
7  problems or direct you to the right person to address
8  those problems?
9     A  Yes.  I meant, if it was even possible or
10  whatever, yes.
11    Q  Okay.  Would it be fair to say that you had
12  contact with Michelle Nguyen on a daily basis?
13    A  Yes.
14    Q  Did you have weekly telephone calls with
15  Michelle?
16    A  Yes.  I meant, again, we probably some weeks we
17  talked every day.  So it's -- yeah, I meant it was just
18  whatever.  But we tried to at least schedule a call that
19  was a consistent, I guess, that's something that we make
20  sure was done every week, so yes.
21    Q  Did you -- and when you spoke with Michelle
22  Nguyen and others, they were about issues relating to the
23  operation of the business; correct?
24    A  Yes.
25    Q  It wasn't just small talk, just people to see

Page 64

1  how you were doing.
2     A  Yes.
3     Q  These were business conversations.
4     A  Yes.
5     Q  And they were issues that needed to be
6  addressed either by Plain Green or by Think Finance that
7  people were working through together; is that right?
8     A  Yes.
9     Q  Okay.  When, for example,
10  underwriting -- underwriting criteria were being
11  recommended to be modified, would that be discussed with
12  you?
13    A  Yes.
14    Q  And would it be Michelle who would discuss that
15  with you?
16    A  Could have been Michelle.  Sometimes
17  it -- depending on -- because underwriting requires
18  different financial information and calculations,
19  whatever, it may have been, you know, some of the people
20  involved in doing that in that department, I guess.
21    Q  For Plain Green, you mean.
22    A  For Think Finance and Plain Green.
23    Q  Oh, for Think Finance.  So it might have been
24  other people than Michelle.
25    A  Yes.

Page 65

1     Q  I understand what you're saying.
2        And what role, if any -- strike that.
3        Did -- you had an understanding that Plain
4  Green had contracts with third parties relating to
5  collections; is that right?
6     A  Yes.
7     Q  And do you remember any of the names of those
8  companies with whom Plain Green had contracts?  I know
9  it's been a number of years.
10    A  Specifically for collections?
11    Q  Yeah, for collections.
12    A  For collections?  No, I don't remember the
13  exact names.
14    Q  Okay.  And did -- did Plain Green also sell
15  charged-off debt to any third parties?
16    A  Yes, yes.
17    Q  And did you, when you became the CEO, have to
18  sign those contracts --
19    A  Yes.
20    Q  -- and review them?
21    A  Yes.
22    Q  And did your counsel also review those
23  contracts?
24    A  Yes.
25    Q  And before you became the CEO, did Mr. Rosette

17 (Pages 62 to 65)

TF App. 0103

Page 66

1  perform that function?
2      A  Yes.
3      Q  Do you remember any of the third parties with
4  whom Plain Green had relationships to help operate the
5  business?
6          MR. GROGAN:  Objection to form.
7          THE WITNESS:  Well, I meant, there's the
8  servicing agreement, marketing agreement.  I mean, there
9  was like five different agreements or contracts that we
10  had as far as operational-wise.  And then there's, you
11  know, buying leads from different vendors or from -- I
12  guess that was another contract that we had.  And then,
13  geez, it's hard to remember everything but --
14      Q  (By Mr. Scheff)  I understand.
15      A  -- but yeah, I meant, just -- again, we had
16  contracts with other -- other call centers.
17      Q  Right.
18      A  Two other that I can remember, three possibly.
19      Q  And did you or Mr. Rosette have to review those
20  contracts and sign them with other third parties who were
21  performing services for Plain Green?
22      A  Yes.
23      Q  And did you get advice of counsel before you
24  signed those contracts?
25      A  Yes.

Page 67

1      Q  Who would review those contracts --
2      A  Yes.
3      Q  -- and make changes, if need be?
4      A  Yes.
5          MR. SCHEFF:  Okay.
6      Can you mark this as Exhibit 38, please.
7          (Deposition Exhibit No. 38 marked for
8  identification.)
9      Q  (By Mr. Scheff)  Ms. Raining Bird --
10      A  Yes.
11      Q  -- I've showed you -- or the court reporter has
12  handed you what's been marked as Exhibit 38.  And
13  like -- actually, with this one I'm going to do it a
14  little bit different.  In the lower right-hand corner you
15  see a number?
16      A  Uh-huh.
17      Q  And that says -- I'm just going to read.  I
18  want you to just tell me whether I've read it correctly.
19  TF-PA-092490; is that correct?
20      A  Yes.
21      Q  And the last page, if you'd turn to the last
22  page of the document.
23      A  Okay.
24      Q  All the way at the end.
25      A  Oh.

Page 68

1      Q  The number of the last page is TF-PA-092498.
2  Have I read that correctly?
3      A  Yes.
4      Q  All right; let's go back to the first page,
5  please.  And this is an email from Bobbi Favel to Steven
6  Smith, yourself, and Michelle Nguyen.  And there are
7  other people who are cc'd; correct?
8      A  Yes.
9      Q  And the subject line is Weekly Plain Green
10  Call.  Have I -- and it's dated March 6th, 2013.  Have I
11  identified that correctly?
12      A  Yes.
13      Q  And on March 6, 2013, you were the chief
14  executive officer of Plain Green; is that right?
15      A  Yes.
16      Q  All right.  Before we talk about the email
17  itself, the people who are listed in the cc line,
18  Traci@plaingreenllc.com, who is Traci?
19      A  Traci Henderson.  She was another employee
20  under he compliance.
21      Q  And she worked on the reservation?
22      A  Yes.
23      Q  Did she report to Bobbi Favel?
24      A  Yes.
25      Q  Okay.  And there's Neal Rosette, Junior?

Page 69

1      A  Uh-huh.
2      Q  "Uh-huh" meaning yes?
3      A  Yes.
4      Q  And you've already identified what his role
5  was.
6      A  Yes.
7      Q  And then Kelly, and I don't -- I'm not going
8  to --
9      A  Ahenakew.
10      Q  Ahenakew.  And what did Ms. Ahenakew do?
11      A  Kelly did -- she helped in the finance
12  department, so I'm not sure why she's included, but I'm
13  sure there's a reason.  But she did personnel and
14  finance.
15      Q  Okay.  And by the way, all of these people,
16  Traci -- Traci Henderson, Neal Rosette, Junior and Kelly
17  Ahenakew, they all reported to you?
18      A  Well, yes, I guess.  Like I said, Traci
19  reported to Bobbi.
20      Q  To Bobbi; okay.
21      A  But yes, they did.
22      Q  I mean, ultimately they reported to you.
23      A  Yes.
24      Q  You were the senior person at Plain Green.
25      A  Yes.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

TF App. 0104

Page 70

1    Q How many direct reports did you have?
2    A How many direct reports did you have?
3    Q Bobbi was a direct report to you; is that
4  right?
5    A Yes. I meant, probably everybody, except for
6  the people in the call center.
7    Q Who did the people in the call center report
8  to?
9    A To the call center supervisor.
10    Q Who was that?
11    A At the time, I think there was Clyde Brown,
12  maybe.
13    Q Okay.
14    A And there was one other supervisor. I can't
15  even remember who it was.
16    Q Okay.
17      So let's turn to the very last page of the
18  document; all right? And actually, it's the
19  second-to-the-last page; I'm sorry.
20    A Okay.
21    Q Where it's from Michelle -- I'm sorry. There
22  is -- hold on one second. Just give me a moment. Let's
23  turn to the page in the lower right-hand corner, the
24  document that says TF-PA-092496. Do you have that?
25    A Yes.

Page 71

1    Q Okay. And this is Michelle Nguyen to Steven
2  Smith, Billi Ann, yourself, that is Bobbi Jo Favel, Dan
3  Belcourt, copies to Jason Harvison, April Sealy and
4  Michelle Peek. Again, Weekly Plain Green Call. Do you
5  see the list of issues to be discussed?
6    A Uh-huh -- yes.
7    Q Yes. Was that typical of the types of issues
8  that you talked to Think Finance about?
9    A Yes.
10      MR. GROGAN: Objection; form.
11    Q (By Mr. Scheff) Okay. And so it may not have
12  been all of these issues every single week, but these
13  were among the usual types of issues that were discussed
14  and resolved?
15    A Yes. But I know that, I guess, again, this one
16  was focused on compliance because of some of the issues
17  we were having. So I know there's a lot more compliance
18  issues in this meeting, I guess, than normal.
19    Q What were the issues that you were dealing with
20  on the compliance range?
21    A As far as tracking, tracking the complaints
22  that were being answered and responded or that may have
23  needed follow-up and things like that. So I know that
24  the tracking of receiving those complaints and then, on
25  our end, sending the complaints out and things like that.

Page 72

1  So -- because a lot -- the complaints didn't directly
2  come to our office a lot of the times, or a majority of
3  the time. Almost all the time they went to the Think
4  Finance office. So we didn't necessarily receive those
5  complaints directly, so it was hard to understand, you
6  know, what has come in and what needed to be responded
7  to, so....
8    Q Okay. If you look at the -- if you look above
9  the -- sort of the list of issues --
10    A Yes.
11    Q -- the people who that email is addressed to,
12  one of those persons is Tim McInerney?
13    A Yes.
14    Q Who was Tim McInerney?
15    A He was a board member.
16    Q Board member of Plain Green?
17    A Yes.
18    Q Was he a member of the tribe?
19    A No.
20    Q And when did he start to work with Plain Green?
21  Or strike that.
22      When did he become a member of the board?
23    A It had to be the early part of 2013.
24    Q And how did -- if you know, how did it come
25  about that Mr. McInerney joined the board of Plain Green?

Page 73

1    A He has a banking background, so -- I mean, he
2  was a former banker that the tribe worked with at First
3  Interstate.
4    Q And do you know who contacted Mr. McInerney to
5  ask him to join the board?
6    A It had to be Tony Belcourt, Chance Houle. I
7  can't say for sure who actually originally contacted him,
8  but he had....
9    Q And did you work closely with Mr. McInerney
10  during the time period that he was on the board and you
11  were the chief executive officer?
12    A Yeah, I meant not really close, but yeah, yes.
13  We had -- I mean, he worked in the same building, so
14  yeah, I had contact with him.
15    Q When you say he worked in the same building, he
16  worked in the same building on the reservation?
17    A Yeah -- yes.
18    Q Was evolved in the day-to-day operations of
19  Plain Green or not?
20    A No.
21    Q Was he performing other functions for the
22  tribe?
23    A Yes.
24    Q And what other functions, if you know, was he
25  performing?

19 (Pages 70 to 73)

Page 74

1    A  He worked at the construction -- with the
2  construction -- Belcourt Construction Corporation.  He
3  worked with Tony Belcourt specifically.
4    Q  Okay.  All right; good.
5    I want to go back to Exhibit 5, which is the
6  newsletter article.
7    A  Okay.
8    Q  And again, if you could turn to the second
9  page, please, to the one, two, three, four, fifth column.
10  And you'll see -- and I'm just going to point it to you
11  so it's easy for you to find it.  Ms. Raining Bird?
12    A  Oh.
13    Q  Right there; okay?  So I'm looking at the
14  paragraph that starts "Ms. Morsette added"; okay?  Do you
15  see that?
16    A  Uh-huh.
17    Q  All right.  So "Uh-huh," meaning yes?
18    A  Oh, yes.
19    Q  That's okay.  So I'm going to read this, and I
20  just want to ask you a couple questions about this; okay?
21  It says "Ms. Morsette added," quote, "We are proud to
22  report in our first six months of operation Plain Green
23  has exceeded our most optimistic revenue projections and
24  has generated $2,195,227 in gross revenue to the
25  business.  With this revenue, we have distributed

Page 75

1  $896,656 (about 40 percent of total revenues received) to
2  our tribal government which is unrestricted money that
3  was used by the tribe to offset some of the budget
4  shortfalls they endured as a result of the 2010 and 2011
5  floods.  Also, we have established a business investment
6  account that is intended to be invested in businesses
7  that the tribe could own outright, so we can establish
8  our own income stream to support our elders, our youth,
9  and future generations of the Chippewa Cree tribe."  Have
10  I read that correctly?
11    A  Yes.
12    Q  Is that true?
13    A  Yes.
14    Q  And so if you would, please, during the time
15  that you were the chief operating officer and then the
16  chief executive officer of Plain Green, can you describe
17  or tell us about the economic benefit, if any, that was
18  provided to the tribe as a result of the Plain Green
19  business?
20    A  Okay.  So I guess, if you don't know too much
21  about the reservation and where we live, we're very
22  isolated.  There's not a whole lot of opportunity, as far
23  as employment, for any business development.  So for us
24  to actually acquire a business that does provide any
25  revenue back to the tribe was very -- was rare.  I don't

Page 76

1  recall it ever even happening, aside from this business
2  but -- so just, I guess, the way that Neal and I were is
3  like we were always looking for something that could help
4  benefit the tribe and mostly to provide employment for
5  tribal members.  So that was a lot of the work that we
6  did, you know, not just for the tribe but prior to coming
7  to the tribe.  So I meant, any business that can provide
8  funding and invest back to the community or give to the
9  community help cover shortfalls from -- in different
10  departments, you know, we were always open to trying to
11  do what we could to make sure that, you know, we're doing
12  things that we're not just a benefit to ourselves but to
13  the entire community.  So just to have that additional
14  revenue, I know it's something that the tribe's never
15  had.  So that's, I mean, that was a majority of the funds
16  went back into the community, and so it was -- I mean, we
17  saw it as positive in that sense.  Not necessarily
18  understanding, you know, actually how much money was
19  involved in the entire business but, you know,
20  any -- any -- with the way we seen it, any money that we
21  can give back and to support the community was good.
22    MR. SCHEFF:  Okay; good.  Why don't we take
23  about a three-minute break?
24    THE VIDEOGRAPHER:  The time is 11:41 a.m.
25  I'm off the record.

Page 77

1    (Deposition in recess from 11:41 a.m. to
2  11:44 a.m.)
3    THE VIDEOGRAPHER:  The time is 11:44.
4  We're on the record.
5    Q  (By Mr. Scheff)  Ms. Raining Bird?
6    A  Yes.
7    Q  Could you go back to this Exhibit 5 that's in
8  front of you, please?
9    A  Okay.
10    Q  And go to the last column on the second page
11  that you have.  And again, I'm just going to point this
12  out to you to see.  I'm right there (indicating).  It
13  said "Mr. Rosette and Ms. Morsette added," quote, "We
14  would like the tribal membership to know that this
15  for-profit business now employs 20 full-time, part-time
16  and contract positions that are bringing home a regular
17  paycheck each and every week.  In addition, we are on
18  pace to add another five full-time customer verification
19  representatives to our call center by mid November so if
20  you are interested in applying, please stop by the Plain
21  Green office and get the application completed."  Was
22  that an accurate statement about the employment that was
23  being provided by Plain Green at or about that time,
24  October of 2011?
25    A  Yes.

20  (Pages 74 to 77)

TF App. 0106

Page 78

1    Q Okay. Could you go a little bit further down
2 to the last paragraph on that page, the lower right-hand
3 corner? It says "While Plain Green has been a huge
4 success in a very short period of time, the tribe has
5 also secured deals with at least four other," quote,
6 "third-party industry businesses," close quote, "and now
7 has launched or are preparing to launch these online
8 businesses under the same model. Ms. Morsette promised
9 to provide a feature story about each of these
10 enterprises in the next edition of the" November -- "of
11 the newsletter so please stay tuned." What were those
12 four businesses?
13    A Let's see. There was -- I can't even remember
14 their names. I can't even remember their names right
15 now. It's -- yeah, I can't.
16    Q Can't remember the names.
17    A I can't.
18    Q Okay; so let me ask you a separate question, if
19 you can't remember the names. That's fine.
20    A Okay.
21    Q There were four businesses that you were
22 working on launching as a result of the Plain Green
23 success that is reported in the article; is that right?
24    A Not necessarily as a result of the Plain Green
25 success, but just other companies that were looking to

Page 79

1 work with a tribal government.
2    Q As far as you know, did any of those
3 relationships ever get formed?
4    A Yes.
5    Q They did.
6    A Yes.
7    Q And do you remember any of them?
8    A Starts with an O.
9    Q Okay.
10    A I can't remember what it was called.
11    Q What type of business was it?
12    A I meant, there's lending, same thing, online
13 lending.
14    Q Okay.
15    Have you ever spoken to anyone from Victory
16 Park Capital?
17    A Not that I remember, no.
18    Q Have you ever spoken to anyone from GPLS?
19    A Nope, no.
20    MR. SCHEFF: Okay.
21    Ms. Raining Bird, at this time I have no
22 further questions. Thank you very much; I appreciate it.
23    Other questions?
24    Patrick?
25    MR. DAUGHERTY: I have a few, yeah.

Page 80

1    MR. SCHEFF: Please.
2    EXAMINATION
3 BY MR. DAUGHERTY:
4    Q Ms. Raining Bird, is it correct that Plain
5 Green started making loans on April 1st of 2011?
6    A I'm not sure if it was April 1st, but it was
7 like the first -- it was like a Monday, and so I'm not
8 sure -- I don't think it was the 1st but it was like the
9 7th or something. It was very soon.
10    Q Early in April of 2011.
11    A Yes, yes.
12    Q Okay. So at that point the contracts and
13 everything that you needed to work out with Think Finance
14 were done?
15    A Yes.
16    Q The business was up and running?
17    A Yes.
18    Q Have you ever heard of a company called
19 National Credit Adjusters?
20    A Yeah, I believe I have.
21    Q What, if anything, do you remember about that
22 company?
23    A I don't even really remember at all, but I
24 meant the name sounds familiar. I don't necessarily
25 remember.

Page 81

1    Q Generally, what would happen when a consumer
2 took out a loan from Plain Green and wasn't able to pay
3 that loan back?
4    A It would go into collections. Well, they would
5 get, you know, a certain amount of time, I guess, as far
6 as being able to -- for us or for the business to figure
7 out, you know, what was going on or why they were
8 delinquent. But you know, I think they got like three
9 notices or something and then it went in to the
10 collections department.
11    Q Okay. And when you say "collections," that
12 means you're engaging people to try and reach out to the
13 consumer on behalf of Plain Green.
14    A Yes.
15    Q Okay.
16    A And I believe the way the process worked was
17 internally we would go to an internal collections
18 department at first, and then later on the debt was sold
19 to an outside collections company.
20    Q Okay. I'd like to have you take a look at a
21 document we've used in this case before. It's
22 Plaintiff's Exhibit 81.
23    MR. SCHEFF: 81.
24    MR. DAUGHERTY: 81.
25    Take however much time you want to read this.

21 (Pages 78 to 81)

TF App. 0107

Page 82

1  I really just want to ask you about the very first
2  paragraph and then the signature page.
3        THE WITNESS: Okay. I mean, go ahead, ask.
4    Q (By Mr. Daugherty) So does this refresh your
5  memory at all about who it was that Plain Green sold
6  charged-off accounts to?
7    A I meant, yeah, I mean it does. But again, I
8  guess I just want to add like a lot of -- a lot of these
9  documents, yes, I can say that I reviewed it and
10  whatever, you know. I can't necessarily say that I
11  always understood everything that was involved because I
12  was not specific -- I was not trained -- I meant, I was
13  in training as we went along as well. And so was
14  everybody else that was involved internally. So meant
15  yeah, I can say that I've seen this document, I signed
16  the document, whatever, but I can't -- I mean, I can
17  honestly tell you I probably never read the whole thing.
18    Q Did you have any attorneys helping you out in
19  the review of this?
20    A Yes, yes. I also feel as though the attorneys
21  that we did have were also not as -- I meant, I don't
22  know. I didn't necessarily a hundred percent trust their
23  review of anything, you know. I mean it's just --
24    Q Can I have you take a look at page 18, please.
25    A Yes.

Page 83

1    Q Is the signature that appears above your
2  printed name there your signature?
3    A Yes.
4        MR. DAUGHERTY: And just one other one.
5  No, that's all I need to ask you about that.
6  I'll hand you what we'll mark as Defendant's
7  Exhibit 39. And I'll tell you I don't need to ask you
8  about the cover email. I just want to ask you a question
9  or two about the loan agreement that makes up the last
10  five pages of the document.
11        (Deposition Exhibit No. 39 marked for
12  identification.)
13    Q (By Mr. Daugherty) Is the loan agreement that
14  we see here in Exhibit 39 typical of the loan agreement
15  that Plain Green was using with its customers in 2013?
16    A Yes.
17    Q And those loan agreements typically had your
18  name and signature at the end of them.
19    A Yes.
20        MR. DAUGHERTY: We'll move on to another
21  document. We'll mark this as Defendant's Exhibit 40.
22        (Deposition Exhibit No. 40 marked for
23  identification.)
24    Q (By Mr. Daugherty) Now, I think you already
25  told Mr. Scheff that you didn't recall the name of any of

Page 84

1  the companies that Plain Green used to provide collection
2  services. But if I could direct your attention to the
3  second page of this email. And I know the type is pretty
4  small, but if you look at the -- about two-thirds of the
5  way down the page, there's an entry for CMS with the word
6  "collections" in parentheses.
7    A Okay; yes.
8    Q Does that refresh your memory at all about
9  using a company called CMS that was run by a man named
10  Larry Costa?
11    A Yeah. I meant, again, this was -- we worked
12  with -- we had a lot of different vendors and so that
13  yes, I guess. I don't necessarily specifically remember
14  CMS or Larry Costa, but I mean if it's on the list, then
15  we worked with him.
16    Q And just a few more lines down there's an entry
17  for National Recovery Services. They're described as a
18  debt sale agency.
19    A Uh-huh.
20    Q Does that mean you also sold debt to National
21  Recovery Services?
22    A Yes.
23    Q And did you know the owner of that business, a
24  man by the name of Brad Dekraai?
25    A Nope, no.

Page 85

1    Q Did you ever talk to anyone at National Credit
2  Adjusters?
3    A Not that I can remember. If I did, it may have
4  been one time or so, but not that I can specifically
5  remember.
6        MR. DAUGHERTY: I have no further
7  questions.
8        MR. GROGAN: None for me.
9        THE REPORTER: Do you want to explain the
10  read and sign?
11        THE VIDEOGRAPHER: Do you want to go off
12  the record?
13        MR. SCHEFF: Yeah.
14        THE VIDEOGRAPHER: This concludes the
15  videotaped deposition of Billi Ann Raining Bird. The
16  time is 11:56 a.m. It is June 19th, 2018. We're off the
17  record.
18        MR. SCHEFF: Ms. Raining Bird, you have the
19  option. Bambi's going to prepare a transcript. You have
20  the option of reviewing the transcript and then making
21  corrections if you see that she's made some mistakes in
22  the transcription or if you see that, you know, for
23  whatever reason a word is incorrect or something's not
24  correct. Do you want to do that?
25        THE WITNESS: I mean, is it right now?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

TF App. 0108

# EXHIBIT J

## TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

COMMONWEALTH OF　　:
PENNSYLVANIA　　　:
　Plaintiff　　　:
　　　　　　　:
VS.　　　:　CIVIL ACTION NUMBER
　　　:　2:14-CV-07139
THINK FINANCE, INC., :
ET AL.,　　　:
　Defendants　:
- - -
JUNE 26, 2018
- - -

　　Videotaped deposition of STEVEN
HAYNES, was taken pursuant to notice at 1735
Market Street, Philadelphia, Pennsylvania,
beginning at or about 8:30 a.m. before
Jeannine Cancelliere, Court Reporter and
Notary Public and David Levin, Videotape
Operator, there being present.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 S. Broad Street, Suite 1303
Philadelphia, Pennsylvania 19102

## Page 2

1　APPEARANCES:
2
3　　LANGER, GROGAN & DIVER, P.C.
　　BY: IRV ACKELSBERG, ESQUIRE
4　　BY: JOHN J. GROGAN, ESQUIRE
　　1717 Arch Street, Suite 4130
5　　Philadelphia, Pennsylvania 19103
　　Phone: (215) 320-5701
6　　Representing the Plaintiff
　　jgrogan@langergrogan.com
7
8
9　　ATTORNEY GENERAL'S OFFICE
　　BY: SAVERIO MIRARCHI, ESQUIRE
10　　1600 Arch Street, 3rd Floor
　　Philadelphia, Pennsylvania 19103
11　　Phone: (215) 560-2445
　　Representing the Defendant
12　　smirarchi@attorneygeneral.gov
13
14　　MONTGOMERY McCRACKEN
　　BY: RICHARD SCHEFF, ESQUIRE
15　　BY: DAVID HERMAN, ESQUIRE
　　123 South Broad Street
16　　Philadelphia, Pennsylvania 19109
　　Phone: (215) 772-7228
17　　Representing Ken Rees
　　rscheff@mmwr.com
18
19
20　　KATTEN, MUCHIN, ROSENMAN LLP
　　BY: DANIEL SHAPIRO, ESQUIRE
　　BY: J. MATTHEW HAWS, ESQUIRE
21　　525 W. Monroe Street
　　Chicago, Illinois 60661-3693
22　　Phone: (312) 902-5319
　　Representing Victory Park
23　　matthew.haws@kattenlaw.com
24

## Page 3

1　APPEARANCES (continued)
2
3　　GOODWIN PROCTER
　　BY: MATTHEW SHELDON, ESQUIRE
4　　901 New York Avenue, NW
　　Washington, D.C. 20001
5　　Phone: (202) 346-4000
　　Representing Think Finance
6　　msheldon@goodwinlaw.com
7
8　　VAN NESS FELDMAN
　　BY: PATRICK DAUGHERTY, ESQUIRE
9　　1050 Thomas Jefferson Street, NW
　　Washington, D.C. 20007-3877
10　　Phone: (202) 298-1800
　　Representing National Credit
11　　Adjusters LLC
　　pod@vnf.com
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1　　　I N D E X
2　　　- - -
3　STEVEN HAYNES　　PAGE
4　BY MR. ACKELSBERG　　8
5　BY MR. SHELDON　　302
6　BY MR. DAUGHERTY　　308
7　　　- - -
8　　　E X H I B I T S
9　　　- - -
10　EXHIBIT NO.　PAGE
11　　Haynes-1　12
12　　P-337　20
13　　P-338　80
14　　P-339　85
15　　P-340　123
16　　P-341　130
17　　P-342　134
18　　P-343　135
19　　P-344　141
20　　P-345　142
21　　P-346　147
22　　P-347　149
23　　P-348　154
24　　P-349　164

1 (Pages 1 to 4)

| Page 5 | |
|---|---|
| | |

EXHIBITS (continued)

| EXHIBIT NO. | PAGE |
|---|---|
| P-350 | 168 |
| P-351 | 173 |
| P-352 | 187 |
| P-353 | 211 |
| P-354 | 217 |
| P-355 | 219 |
| P-356 | 220 |
| P-357 | 223 |
| P-358 | 233 |
| P-359 | 238 |
| P-360 | 241 |
| P-361 | 243 |
| P-362 | 253 |
| P-363 | 256 |
| P-364 | 259 |
| P-365 | 260 |
| P-366 | 261 |
| P-367 | 266 |
| P-368 | 274 |
| P-369 | 277 |
| P-370 | 281 |
| P-371 | 282 |

**Page 6**

1     VIDEOTAPE OPERATOR: We're now
2 on the record my name is David Levin. I am
3 the videographer employed by On the Record.
4 This is a video deposition in the United
5 States District Court for the Eastern District
6 of Pennsylvania, Civil Action No.
7 2:14-CV-07139.
8     Today's date is Tuesday, June
9 26th, 2018, and the video time is 8:38 a.m.
10 This deposition is being held at 1735 Market
11 Street, 21st Floor, Philadelphia,
12 Pennsylvania, in the matter of Commonwealth of
13 Pennsylvania versus Think Finance,
14 Incorporated, et al.
15     The deponent is Steven Haynes.
16 All counsel will be noted on the stenographic
17 record. The court reporter is Jeannine
18 Cancelliere. She'll now swear in the witness.
19     - - -
20     STEVEN HAYNES, after having been
21 first duly sworn, was examined and testified
22 as follows:
23     VIDEOTAPE OPERATOR: Please
24 proceed, counsel.

**Page 7**

1     - - -
2     EXAMINATION
3     - - -
4 BY MR. ACKELSBERG:
5 Q. Good morning, Mr. Haynes.
6 A. Good morning.
7 Q. We just met. My name, again, is Irv
8 Ackelsberg, and I am one of the lawyers
9 representing the Commonwealth of Pennsylvania
10 in this matter.
11     Can you state the -- what's
12 your home address?
13 A. 4215 San Carlos Street, Dallas, Texas.
14 Q. Do you have a different business
15 address?
16 A. I do.
17 Q. What's that?
18 A. 7515 Lemmon Avenue, Hangar R, Dallas,
19 Texas.
20 Q. Hangar R, is that in an airport?
21 A. It is.
22 Q. Why do you have an office in an airport?
23 A. Very cheap space.
24 Q. Have you been deposed before?

**Page 8**

1 A. I have.
2 Q. How many times?
3 A. Once for sure, maybe twice.
4 Q. The one for sure, what case was that?
5 A. It was a divorce case of a business
6 partner of mine.
7 Q. I don't care about that divorce case.
8 What about the other case?
9 A. It was an accident case.
10 Q. Okay. So nothing pertaining to your
11 business activities?
12 A. No.
13 Q. I assume your lawyer has explained to
14 you the procedures and -- but I need to go
15 over them just to make sure that we're on the
16 same page.
17     So what's going to happen is
18 as we proceed today, I am going to be asking
19 you questions. You're going to be answering
20 those questions to the best of your ability.
21 There may be some comment from the lawyers in
22 the room. Everything that is spoken is going
23 to be taken down by the court reporter, who's
24 sitting at your left.

2 (Pages 5 to 8)

TF App. 0110

Page 25

1    THE WITNESS: Yes, sir.
2  BY MR. ACKELSBERG:
3  Q. Which came first, Think or Zest?
4  A. Think Finance.
5  Q. So both of those lending operations were
6  financed by Victory Park, right?
7    MR. SCHEFF: Object to form.
8    THE WITNESS: I don't know.
9  BY MR. ACKELSBERG:
10  Q. Well, you know that Think was, right?
11    MR. SCHEFF: Same objection.
12    THE WITNESS: Yes, sir.
13  BY MR. ACKELSBERG:
14  Q. Okay. But you don't know if Zest was?
15  A. No.
16  Q. Okay. Now, turn the page, and we're
17  now -- the number at the right-hand side would
18  be 914.
19  A. Yes, sir.
20  Q. Okay. And this appears to be -- so this
21  is Terence Dunleavy's original e-mail, and it
22  appears to be him forwarding an e-mail from
23  you; am I right?
24    MR. SCHEFF: Object to the

Page 26

1  form.
2    THE WITNESS: I don't know.
3  BY MR. ACKELSBERG:
4  Q. Well, let's look at this. "Terry, two
5  years ago, I expanded by my dealings with
6  Native American tribes from gaming and energy
7  to installment and payday lenders." Do you
8  see that?
9  A. Yes, I do.
10  Q. That's you speaking, right? Or writing.
11    MR. SCHEFF: Object to the
12  form.
13    THE WITNESS: I don't know.
14  I've not seen this before.
15  BY MR. ACKELSBERG:
16  Q. I'm not asking whether you've seen this
17  before. I'm asking you, are those your words
18  to Terry?
19    MR. SCHEFF: Object to form;
20  asked and answered. You can answer it again.
21    THE WITNESS: I don't know.
22  BY MR. ACKELSBERG:
23  Q. Okay. Well, this is in 2013, July of
24  2013. It's correct, isn't it, that in 2011,

Page 27

1  two years earlier, you had expanded your
2  dealings with Native American tribes from
3  gaming and energy to installment and payday
4  lenders. That is true, right?
5  A. That is correct.
6  Q. Okay. And then the next sentence says:
7  I was responsible for setting up Think Finance
8  with the Rocky Boy reservation and was a party
9  to their agreements with Victory Park. That's
10  all true, right?
11  A. That's correct.
12  Q. And the "I" there is Steven Haynes,
13  isn't it?
14    MR. SCHEFF: Object to the
15  form. You can answer the question.
16    THE WITNESS: I don't
17  remember. I can see where you can get that
18  conclusion. I just don't remember.
19  BY MR. ACKELSBERG:
20  Q. You don't remember writing this. And I
21  appreciate that. I understand that, but over
22  the course of reading this, you may -- it --
23  your recollection might get refreshed so this
24  sounds like something you probably wrote to

Page 28

1  Terry Dunleavy.
2    MR. SCHEFF: Object to the
3  form; it misstates testimony. You can answer
4  the question.
5  BY MR. ACKELSBERG:
6  Q. Have we gotten to the point yet where
7  your recollection is refreshed?
8  A. I don't remember writing this. Clearly
9  the first paragraph is something that I have
10  done, yes.
11  Q. Let's continue reading. "Since that
12  initial deal, I've set up 12 other lenders
13  with tribes." That's true, right? Was that
14  true at the time, in July of 2013?
15  A. Very close, yes.
16  Q. It might have been an exaggeration a
17  little bit, but --
18  A. Or it didn't take after they were put
19  together. But yes, I had made introductions
20  of lenders to tribes.
21  Q. One of those was ZestCash?
22  A. Yes, sir.
23  Q. Did that one get off the ground?
24  A. I believe it did.

7 (Pages 25 to 28)

TF App. 0111

Steven Haynes

Page 29

1    Q.   Okay.  And what tribe was that?
2    A.   That was the Turtle Mountain Band of
3    Chippewa Indians.
4    Q.   And where are they located?
5    A.   In North Dakota.
6    Q.   Was that a payday product -- payday loan
7    product?
8    A.   I don't know what kind of product they
9    offered.
10   Q.   But it was an online lending product of
11   some sort?
12   A.   It was an online lending product, yes.
13   Q.   What was the -- do you know what the
14   website was called?  What would someone need
15   to type in to get to that website?
16   A.   I don't know.  I made an introduction
17   and once they were put together, I was
18   dismissed.  So I don't know what the terms of
19   what they were doing was.
20   Q.   What were the terms of your compensation
21   for putting that together?
22   A.   I got paid $100,00 for making the
23   introduction.
24   Q.   And nothing further?

Page 30

1    A.   Nothing further.
2    Q.   Who paid that?  Was that the tribe?  Was
3    that Victory Park?  I mean --
4    A.   It was -- it's always -- in my business,
5    it is always the commercial corporation that I
6    bring to the tribe that pays the fees.  It
7    would have been ZestCash.
8    Q.   And ZestCash is the name -- that's sort
9    of the equivalent of ThinkCash, if we look at
10   the Rocky Boy deal?
11        MR. SCHEFF:  Objection.
12        MR. SHAPIRO:  Object to the
13   form.
14        MR. SCHEFF:  You can answer
15   the question.
16        THE WITNESS:  I don't know
17   what their product was.  ZestCash was the
18   corporation that was looking for a tribe to do
19   online lending with.
20   BY MR. ACKELSBERG:
21   Q.   Okay.  And what year was that?
22   A.   I would have to guess.  I don't know for
23   sure.
24        MR. SCHEFF:  Don't guess.  If

Page 31

1    you know, you know.  If you don't, you don't.
2    BY MR. ACKELSBERG:
3    Q.   You know it was sometime after 2011,
4    right?  And it was sometime before July '13
5    when Mr. Dunleavy --
6    A.   Yes.
7    Q.   So somewhere in that range?
8    A.   Yes, sir.
9    Q.   Do you know if that -- do you know
10   during what period of time that loan product
11   was online?
12   A.   I believe it is still online.
13   Q.   How did you know that -- or did you know
14   that Victory Park was involved in the ZestCash
15   deal like it was in the Think Finance deal?
16        MR. SHELDON:  Objection to
17   form.
18        THE WITNESS:  I did not.
19   BY MR. ACKELSBERG:
20   Q.   Okay.  You say other tribes -- I'm
21   sorry.  You say with other lenders including
22   ZestCash, and then you say CompuCredit.  Is
23   that a deal that came to fruition?
24        MR. SCHEFF:  Object to the

Page 32

1    form for the characterization of the question.
2    Mr. Haynes has said he doesn't remember
3    writing this, and you're characterizing your
4    question as if he did.  You can answer the
5    question.
6        THE WITNESS:  I don't
7    remember the CompuCredit.  I just --
8    unfortunately, I don't.
9    BY MR. ACKELSBERG:
10   Q.   Okay.  What about Microbilt?
11   A.   Yes, I remember Microbilt.
12   Q.   Did you do a deal with Microbilt?
13   A.   Microbilt was a service provider and
14   they were in a couple of the deals that we
15   did.
16   Q.   With different tribes?
17   A.   Yes, sir.
18   Q.   What were those tribes?
19   A.   The Rosebud Sioux Tribe did a deal with
20   Microbilt.  I believe that the Ketowah tribe
21   may have been --
22   Q.   Spell Ketowah?
23   A.   K-E-T-O-W-A-H.
24   Q.   Where's the Ketowah tribe located?

8  (Pages 29 to 32)

TF App. 0112

Steven Haynes

Page 53

1  Q.  When's the last time -- is Mr. Dunleavy
2  still representing you?
3  A.  He does.
4  Q.  Was the initial deal that you did
5  involving Think and the Rocky Boy Chippewa
6  Cree the biggest tribal lending deal you've
7  been involved in?
8           MR. SCHEFF:  Object to the
9  form.  You can answer the question.
10          THE WITNESS:  Yes.
11  BY MR. ACKELSBERG:
12  Q.  Is it the biggest in terms of the volume
13  of loans generated by the business?
14  A.  I don't know how many loans they've
15  generated.
16  Q.  Well, in terms of -- but it's the
17  biggest in terms of the most cash generated
18  for you though, correct?
19  A.  That's correct.
20  Q.  Why was that deal so lucrative?  What
21  were the aspects of that deal that made it
22  especially lucrative for you?
23  A.  Think Finance had decided that instead
24  of paying me a flat fee for making the

Page 54

1  connection, they were going to pay me a
2  percent of collected revenues.
3  Q.  Good deal, huh?
4           MR. SCHEFF:  Object to the
5  form.  You can answer the question.
6           THE WITNESS:  It was a very
7  good deal for me.
8  BY MR. ACKELSBERG:
9  Q.  Why would they want to give you -- do
10  you have any sense of why they'd want to give
11  you 1 percent of their revenues?
12          MR. SHELDON:  Object to the
13  form.
14          THE WITNESS:  I believe at
15  the time in our discussions, it was not that
16  they wanted to give me 1 percent of the
17  revenues.  They just did not want to give me a
18  large flat fee for finding them a tribe.
19  BY MR. ACKELSBERG:
20  Q.  Let's move to the beginning of this
21  relationship with Think Finance and the Rocky
22  Boy Chippewa Cree.
23          How did you get connected
24  to -- did you have a -- you had a relationship

Page 55

1  with the tribe before you had a relationship
2  with Think Finance, correct?
3  A.  That's correct.
4  Q.  That's why Think Finance was interested
5  in developing a relationship with you,
6  correct?
7           MR. SCHEFF:  Object to the
8  form.  You can answer the question.
9           MR. SHELDON:  Objection --
10  BY MR. ACKELSBERG:
11  Q.  As best as you understand.
12          MR. SHELDON:  Object to form.
13          MR. ACKELSBERG:  I'll
14  withdraw.  I'll restate the question.
15  BY MR. ACKELSBERG:
16  Q.  You spent time on the Rocky Boy
17  reservation in Box Elder, Montana?
18  A.  Yes, I have.
19  Q.  Okay.  How many times have you been
20  there?
21  A.  Half a dozen.
22  Q.  When was the first time?
23  A.  I'm not sure.
24  Q.  Approximately?

Page 56

1  A.  Approximately 2006.
2  Q.  Okay.  And when's the most recent time?
3  A.  Probably around 2011.
4  Q.  When the deal was first set up with
5  Think Finance?
6           MR. SCHEFF:  Object to the
7  form.  You can answer the question.
8           THE WITNESS:  Correct.
9  BY MR. ACKELSBERG:
10  Q.  How would you describe -- describe the
11  reservation in Box Elder for me?
12  A.  It is poor.  It is disheveled.  It's
13  beautiful.
14  Q.  Would it be correct to say it is also
15  very remote?
16  A.  It is extremely remote.
17  Q.  Would I be correct to say that the
18  biggest population center is probably Great
19  Falls, which is roughly two hours away?
20  A.  Yeah, that's pretty safe to say.
21  Q.  Okay.  On the Canadian -- it's near the
22  Canadian border, correct?
23  A.  Correct.
24  Q.  But there's no population centers -- big

14  (Pages 53 to 56)

TF App. 0113

Page 57

1 population centers in Canada near Box Elder
2 either; am I right?
3 A. I don't remember. I think you're
4 correct.
5 Q. What economic activity, if any, exists
6 at Box Elder?
7 MR. SCHEFF: Object to the
8 form. You can answer the question if you can.
9 BY MR. ACKELSBERG:
10 Q. That you recall.
11 A. They had an oil and gas industry on the
12 reservation. They had a casino.
13 Q. That's about it?
14 A. That's about it.
15 Q. Those half a dozen times that you were
16 in Box Elder, how did you get there?
17 A. I would fly to Great Falls or someplace
18 close and rent a car and drive for a very long
19 time.
20 Q. Now, the company that financed the
21 casino that you mentioned, that's a company
22 called BEH Gaming, correct?
23 A. That's correct.
24 Q. Okay. Now, do you have any connection

Page 58

1 to that company or to the principals of that
2 company?
3 MR. SCHEFF: Object to the
4 form. You can answer the question.
5 THE WITNESS: I have no
6 connection to the company. I know the
7 principals.
8 BY MR. ACKELSBERG:
9 Q. Okay. And who are they, the principals?
10 MR. SCHEFF: Irv, if this has
11 something to do with the eventual relationship
12 with Think Finance, then I don't have a
13 problem with this question. But it if
14 doesn't, then we're just not going to his
15 other business relationships. It's just none
16 of your business.
17 BY MR. ACKELSBERG:
18 Q. You can answer the question.
19 MR. SCHEFF: You can't answer
20 the question. Does it have a relationship?
21 MR. ACKELSBERG: Yes.
22 MR. SCHEFF: Okay. What's
23 the relationship?
24 MR. ACKELSBERG: I'm not here

Page 59

1 to take your deposition.
2 MR. SCHEFF: Let's go off.
3 VIDEOTAPE OPERATOR: 9:36,
4 off the record.
5 - - -
6 (Whereupon a short break was taken at this
7 time.)
8 - - -
9 VIDEOTAPE OPERATOR: 9:42,
10 we're back on the record.
11 BY MR. ACKELSBERG:
12 Q. So the casino that's on the Rocky Boy
13 reservation, it's called the Northern Winds
14 Casino?
15 A. I believe that's correct.
16 Q. So your role with regard to the casino
17 was supplying the slot machines?
18 MR. SCHEFF: Object to the
19 form. You can answer if you can.
20 THE WITNESS: I supplied them
21 slot machines later in the life of the casino.
22 I was not involved in the building or the
23 opening of the casino.
24 BY MR. ACKELSBERG:

Page 60

1 Q. Okay. So the developer of the casino
2 was BEH, right?
3 A. I believe that to be correct, yes.
4 Q. Okay. And at some point after it was
5 opened, you developed a contract -- you had an
6 agreement with the tribe to lease slot
7 machines, like you were talking about before?
8 MR. SCHEFF: Object to the
9 form. You can answer the question.
10 THE WITNESS: I was --
11 entered into a revenue agreement to lease
12 machines to the tribe, to the casino, correct.
13 BY MR. ACKELSBERG:
14 Q. Okay. And through what business name
15 was your slot machine contract with the
16 Chippewa Cree?
17 A. I believe it was AGame NV. It may have
18 been Tribal Gaming Solutions. I'm not sure
19 which one. It may have been both.
20 Q. AGame NV was a business -- who is your
21 partner in that business?
22 A. Ray Brown.
23 Q. And is Ray Brown connected to BEH
24 Gaming?

15 (Pages 57 to 60)

Page 61

1    MR. SCHEFF: Object to the
2 form.
3    THE WITNESS: I'm not sure.
4 BY MR. ACKELSBERG:
5 Q. How did you meet Ray Brown?
6 A. I met Ray Brown in Dallas years before.
7 He and a partner he had then came to my office
8 looking for capital at the time for Indian
9 gaming machine leasing.
10 Q. Was Mr. Brown the one who connected you
11 to the Chippewa Cree that led to the slot
12 machine deal at the Northern Winds Casino?
13    MR. SCHEFF: Object to the
14 form. You can answer the question.
15    THE WITNESS: Yes, Mr. Brown
16 introduced me to the Chippewa Cree.
17 BY MR. ACKELSBERG:
18 Q. As a result of that, you and Mr. Brown
19 created this LLC called AGame NV?
20    MR. SCHEFF: Object to the
21 form. You can answer the question.
22    THE WITNESS: I don't
23 remember it being specifically for or starting
24 with Chippewa Cree.

Page 62

1 BY MR. ACKELSBERG:
2 Q. But when you first met Mr. Brown, I
3 mean, you weren't talking specifically about
4 the Chippewa Cree, you were talking more
5 generally about providing machines to tribal
6 casinos, correct?
7    MR. SCHEFF: Object to the
8 form.
9    THE WITNESS: When Mr. Brown
10 came to our offices, he was looking for
11 financing for a whole host of gaming-related
12 opportunities in and off reservations.
13 BY MR. ACKELSBERG:
14 Q. And then at some time you and Mr. Brown
15 decided to create a business together?
16 A. That's correct.
17 Q. Okay. And what was the purpose of that
18 business?
19 A. The purpose of AGame was to develop
20 and -- develop tribal casinos, commercial
21 casinos, and to lease slot machines to those
22 casinos.
23 Q. And at some point, Mr. Brown brought to
24 your attention the possibility of AGame NV

Page 63

1 getting a piece of the action at the Northern
2 Winds Casino?
3    MR. SCHEFF: Object to the
4 form. You can answer the question if you can.
5    THE WITNESS: Mr. Brown, you
6 know, yes, brought it to our attention -- my
7 attention, the opportunity to lease slot
8 machines to the Northern Winds Casino.
9 BY MR. ACKELSBERG:
10 Q. And then how does this work? Do you and
11 Mr. Brown raise money to do this? Do you have
12 investors? Did you have investors in
13 AGame NV?
14    MR. SCHEFF: Why is this --
15 how is this relevant to this case, Mr.
16 Ackelsberg? I mean, honestly, how is this
17 relevant?
18    MR. ACKELSBERG: We'll get
19 back to AGame NV later. That's why.
20    MR. SCHEFF: Okay.
21 BY MR. ACKELSBERG:
22 Q. Now, the deal that you signed with the
23 Chippewa Cree for the slot machines, was there
24 any paperwork connected to that deal?

Page 64

1    MR. SCHEFF: Object to the
2 form. You can answer the question.
3    THE WITNESS: There were
4 always signed contracts with our agreements.
5 BY MR. ACKELSBERG:
6 Q. Did you provide those signed contracts
7 either to your lawyers at Dinsmore or to your
8 lawyers here at Montgomery McCracken?
9 A. I provided access to all of my files,
10 both on my computer and online and my file
11 cabinets.
12 Q. And that would include the contract for
13 the slot machines with the Chippewa Cree?
14 A. If they still exist, yes.
15 Q. Now, at the time that -- now, is the
16 first time that you went to the Rocky Boy
17 reservation to investigate the possibility of
18 the deal for the slot machine?
19    MR. SCHEFF: Object to the
20 form.
21    THE WITNESS: No, sir.
22 BY MR. ACKELSBERG:
23 Q. What was the occasion for your first
24 trip to the Rocky Boy reservation?

16 (Pages 61 to 64)

TF App. 0115

Page 65

1　A.　I believe my first trip, the casino was
2　under construction and they were looking for
3　help with their oil and gas leases.
4　Q.　And who was looking for help, the tribe?
5　A.　The tribal oil and gas corporation that
6　they owned.
7　Q.　I see.　And Mr. Brown made that
8　connection for you with the tribe?
9　A.　Yes, sir.
10　Q.　So this was after the meeting in Dallas
11　with Mr. Brown?　He connected you to the tribe
12　with regard to an oil and gas lease?
13　A.　Yes, sir.
14　Q.　Okay.　And did you have a contract with
15　the Chippewa Cree on an oil and gas deal?
16　A.　No, sir.　After investigating the
17　opportunity, there was no business to be done.
18　Q.　Okay.　And would the next time you went
19　up there, that would -- the next time you went
20　up there would have been with regard to the
21　slot machines?
22　A.　I'm not sure.　There was another
23　opportunity to build hotels and multifamily
24　housing up there.　And then after that -- or

Page 66

1　previous with the slot machines, there was
2　business opportunities growing out of
3　Mr. Brown's relationship with the tribe.
4　Q.　But none of them came to fruition?
5　A.　No, sir.
6　Q.　Now, with regard to the casino, given
7　how remote that reservation is, what was the
8　business plan for getting people to come to
9　the casino?
10　　　　MR. SCHEFF:　Object to the
11　form.　You can answer the question if you can.
12　Again, I don't know how this is on point,
13　Mr. Ackelsberg, to this case.　You can answer
14　the question if you can.
15　　　　THE WITNESS:　That's a very
16　good question.　I wasn't invested in the
17　casino.　I don't know what their business plan
18　was.
19　BY MR. ACKELSBERG:
20　Q.　Now, was Mr. Brown also the one who
21　connected you?　Did Mr. -- well, you already
22　had a relationship -- before the Think Finance
23　deal happened, you already had this
24　pre-existing relationship with the tribe,

Page 67

1　correct?
2　A.　That's correct.
3　Q.　Now, with the slot machines, for
4　example, who at the tribe were you dealing
5　with?
6　A.　I don't remember specifically.
7　Traditionally, we deal with the general
8　manager of the casino.
9　Q.　You weren't dealing with anyone in the
10　tribal council, that you remember?
11　A.　I had met members of the tribal council.
12　But the way the businesses always work is you
13　go to the general manager because they had the
14　knowledge of what they need on the
15　reservation.
16　Q.　And you don't remember who that general
17　manager was?
18　A.　I don't remember his name, no.
19　Q.　Okay.　So how did the first connection
20　with Think Finance happen?
21　　　　MR. SCHEFF:　Object to the
22　form.　You can answer the question.
23　　　　THE WITNESS:　My attorney,
24　Tim Anderson.

Page 68

1　BY MR. ACKELSBERG:
2　Q.　At Pepper?
3　A.　At Pepper Hamilton.　Introduced me to
4　Rick Eckman, who is also an attorney there who
5　was working with Think Finance to help them
6　find a tribe to partner with.
7　Q.　So tell us what happened.
8　A.　I met with Tim, talked to Rick Eckman on
9　the phone.　He set up a conference call
10　with -- or a call between myself and Jason
11　Harvison, and Jason came over after that phone
12　call and showed me a presentation of what it
13　is they were trying to accomplish.　And I
14　thought it was interesting; I thought I could
15　help them.
16　Q.　The meeting with Tim Anderson, was that
17　at Pepper's office in Philly.
18　A.　No, it was not.
19　Q.　Where was it?
20　A.　It was either -- I'm not sure where it
21　was.　I don't know.
22　Q.　Okay.　And so you met with Mr. Anderson.
23　He got Eckman on the phone, and this was
24　basically Eckman presenting a potential

17　(Pages 65 to 68)

TF App. 0116

Steven Haynes

Page 93

1    statements, all support documents."
2        So he's referring to the
3    Great Plains Lending website that they had
4    ready to go, right?
5        MR. SCHEFF: Object to the
6    form. Calls for speculation. You can answer
7    the question if you can.
8    BY MR. ACKELSBERG:
9    Q.   That you saw referenced in the
10   PowerPoint?
11   A.   I don't --
12       MR. SCHEFF: Same objection.
13   You can answer the question.
14       THE WITNESS: I don't know
15   what he was referring to in this.
16   BY MR. ACKELSBERG:
17   Q.   And then he says: I got pretty excited
18   yesterday around noon when you said that the
19   Montana tribe had everything ready to go and
20   then lost their funding.
21       Now, when you say that the
22   Montana -- well, first of all, the Montana
23   tribe, you're referring to Rocky Boy here,
24   right?

Page 94

1    A.   Rocky Boy was the only Montana tribe
2    that I had -- yes.
3    Q.   Yeah. Okay. So it would have been that
4    at the time that you were talking with
5    Mr. Shaper and Mr. Harvison prior to the NDA
6    being signed, that you and Mr. Brown had
7    already concluded your analysis where you
8    figured that Rocky Boy might be the one,
9    right?
10       MR. SCHEFF: Object to the
11   form. You can answer the question.
12       THE WITNESS: At this point,
13   we had found a tribe that hit all of our
14   criteria --
15   BY MR. ACKELSBERG:
16   Q.   Right.
17   A.   -- and Ray was chatting and talking to
18   them, yes.
19   Q.   Oh, so Ray was already talking about the
20   possibility of the deal before the NDA was
21   signed?
22   A.   Ray was the contact for the tribe. I
23   was the contact with Think Finance as he knew
24   the tribe well.

Page 95

1    Q.   Okay, okay. When it says here that the
2    tribe had everything ready to go and then lost
3    their funding, that was with regard to the
4    pre-existing online lending product that they
5    were trying to launch; am I right?
6        MR. SCHEFF: Object to the
7    form. You can answer the question if you can.
8        THE WITNESS: It was that
9    they had an online lending business in place,
10   correct.
11   BY MR. ACKELSBERG:
12   Q.   But they didn't have the funding to
13   launch it?
14       MR. SCHEFF: Object to the
15   form. You can answer the question if you can.
16       THE WITNESS: I don't
17   remember whether it was to launch it or to
18   grow it.
19   BY MR. ACKELSBERG:
20   Q.   Okay. Let's go to your reply. And then
21   you reply the same day, actually it looks like
22   15 minutes later. Do you see that?
23   A.   At the bottom of the first page?
24   Q.   Yes.

Page 96

1    A.   Yes.
2    Q.   Actually, you're all in Dallas at this
3    point, right? I mean -- or Dallas/Fort Worth.
4    Think Finance is in Fort Worth; and you're in
5    Dallas, right?
6    A.   That's correct.
7    Q.   Okay. So you reply to Steve and -- with
8    the following: "Steve, thanks for the e-mail.
9    We're moving quickly. I would greatly
10   appreciate a letter outlining my
11   compensation."
12       Because at that point, it
13   wasn't clear how you were going to get paid,
14   correct?
15   A.   That's correct.
16   Q.   Okay. So you wanted to know before you
17   get going with this, what's -- what are the
18   dollars for AGame NV, right?
19   A.   At this point, I had no idea how
20   valuable or invaluable or not valuable an
21   installment lending business was. So yes, I
22   wanted to know how I was going to get paid for
23   doing this work.
24   Q.   Okay. And then it says: I've extended

24 (Pages 93 to 96)

TF App. 0117

Page 97

1 the offer, meaning that Ray has talked --
2 that's -- when you say: I have extended the
3 offer, you're referring to Ray talking to the
4 tribe, right?
5 A. I'm not sure what I -- who I was
6 referring to when I say "I've extended an
7 offer."
8 Q. And it says that they are to meet
9 this -- meet, they're checking and working on
10 due diligence. They have to pool info and
11 call a meeting of their council and the
12 council members. I mean, you're talking about
13 the tribe here, right?
14 A. I don't remember if I was talking about
15 Ray talking to a tribal member, the business
16 office or their attorney, Robin Kovash. But
17 it was some representative of the tribe.
18 Q. Okay. So then you got a reply from
19 Steve Shaper. So your e-mail was at 2 p.m.
20 and then at quarter to four, Steve Shaper
21 replies to you, correct?
22 A. Correct.
23 Q. And I want to make sure I have this
24 correct, what it says. "Steve, if you, your

Page 98

1 Montana partner, or any other and Think
2 Finance are able to move fast enough to put
3 together an agreement whereby one of your
4 tribes is Think Finance's first tribal
5 partner, Think Finance will pay the tribal
6 corporation 4 1/2 percent of gross interest
7 collected from all loans made by that tribal
8 corporation through Think Finance." Right?
9 A. That's what it says, correct.
10 Q. Okay. And you or any entity you name,
11 1 percent of the gross interest collected. So
12 that was the offer, right?
13 A. That was the offer.
14 Q. So it was a total of 5 1/2 percent of
15 the revenue, 4 1/2 going to the tribe and 1
16 going to you or any entity that you name,
17 correct?
18 MR. SCHEFF: Object to form.
19 THE WITNESS: Yes, that's
20 what this says.
21 BY MR. ACKELSBERG:
22 Q. Well, that was the offer, right?
23 A. That was the offer.
24 Q. "Implicit" -- I'm continuing to read in

Page 99

1 Mr. Shaper's e-mail -- "Implicit is the fact
2 that Steven Haynes or another of his entities
3 will finance all loans made by the tribal
4 corporation for two days before they are sold
5 to Think Finance's outside loan financing
6 organization." Do you see that?
7 A. Yes, I see that.
8 Q. Okay. Now, was this the first time that
9 you heard anything about you being asked to
10 finance the loans being made by the tribe?
11 A. I don't remember if that is the first
12 time that this e-mail or it was in a prior
13 conversation.
14 Q. Well, when Jason Harvison first came to
15 you and you met at your residence, wasn't --
16 were any of these terms discussed?
17 MR. SCHEFF: "These terms"
18 meaning the compensation terms?
19 MR. ACKELSBERG: Yes, the
20 compensation terms.
21 MR. SCHEFF: Thank you. You
22 can answer that question.
23 THE WITNESS: Yes --
24 BY MR. ACKELSBERG:

Page 100

1 Q. In other words --
2 A. -- yes. We discussed fair compensation
3 for the roles played and -- yes.
4 Q. Were the numbers as high as they are in
5 the e-mail when you were talking with Jason?
6 A. I remember having a discussion with
7 Jason about how to lay out a plan that was
8 acceptable to a tribe because they had been
9 burned very many times in the past on
10 transactions. And it was best that they were
11 compensated off the top with no expenses taken
12 out, so they could calculate their income
13 every day and not worry about salaries paid to
14 other people or expenses or travel costs or
15 anything else.
16 So when this -- this fits the
17 general description of the tribe needs to have
18 a gross compensation plan. And I just don't
19 remember if in my discussion with Jason we
20 talked about me raising money for them or if
21 it first was brought up in this letter.
22 Q. Okay. And then Shaper says: This
23 applies only to Think Finance's first tribal
24 partner and signed agreements must be in place

25 (Pages 97 to 100)

Page 301

1  Q.   Okay.  Are you still involved with Plain
2  Green at all?
3  A.   I'm not involved with Plain Green in any
4  way.
5  Q.   Do you have any further relationships
6  with Think or Cortex?  Have you ever heard of
7  a company called Cortex?
8         MR. SCHEFF:  Object to the
9  form.
10        THE WITNESS:  I have heard of
11  Cortex.
12  BY MR. ACKELSBERG:
13  Q.   Have you had any business with Cortex?
14  A.   I don't do any business with Cortex, no.
15  Q.   Or with Think?
16  A.   I don't think I do any business directly
17  with Think, no.
18        MR. SCHEFF:  We're at 3:30.
19        MR. ACKELSBERG:  Thank you.
20        MR. SCHEFF:  Steven, can I
21  just talk to you for a second outside.
22        VIDEOTAPE OPERATOR:  3:31,
23  off the record.
24        3:32, we are back on the

Page 302

1  record.
2              - - -
3         EXAMINATION
4              - - -
5  BY MR. SHELDON:
6  Q.   Mr. Haynes, my name is Matt Sheldon.
7  I'm counsel for the Think Finance defendants.
8  And I will try to keep this brief because I
9  know you got to be somewhere.
10        I would like to revisit Mr.
11  Ackelsberg's series of questions regarding the
12  negotiations in 2011 between the Chippewa Cree
13  Tribe, yourself and Think Finance regarding
14  the establishment of the tribal lending
15  program.  Do you understand what time period
16  I'm talking about?
17  A.   Yes, sir.
18  Q.   Do you remember an attorney named Robin
19  Kovash with the firm Jones and Keller?
20  A.   Yes, sir.
21  Q.   Did that attorney represent the Chippewa
22  Cree tribe in the negotiations?
23  A.   Yes, he did.
24  Q.   How would you characterize Mr. Kovash's

Page 303

1  advocacy for the tribe in those negotiations?
2  A.   Vigorous.
3  Q.   Did Mr. Kovash push for contractual
4  terms more favorable to the tribe, than those
5  originally on the table?
6  A.   I believe he did.  I know that
7  everything was red lined and marked up
8  significantly.
9  Q.   Was it your recollection that Mr. Kovash
10  was successful in negotiating a more favorable
11  agreement for the tribe, than the terms
12  initially under consideration?
13  A.   I believe he did.
14  Q.   Did you introduce Mr. Kovash to the
15  tribe?
16  A.   No, sir.
17  Q.   Is it your understanding that Mr. Kovash
18  was already representing the Chippewa Cree
19  Tribe, before the tribe had any dealings with
20  Think Finance?
21  A.   Yes, he was.
22  Q.   In your line of work, you've helped
23  broker various contractual arrangements
24  between Native American tribes and non-tribe

Page 304

1  counter parties, right?
2  A.   Yes, sir.
3  Q.   Is it accurate that you brokered dozens
4  of such contractual arrangements?
5         MR. ACKELSBERG:  At this
6  point I object to the form of the question.
7         MR. SHELDON:  Let me finish
8  my questions, then you can -- you're objecting
9  to form.  You said, object to form.  We've got
10  a tight timeframe, let's go.
11        MR. ACKELSBERG:  What I'm
12  asking is, can I avoid doing that for every
13  question where you're leading?  Can we just
14  accept that I've objected --
15        MR. SHELDON:  Continued
16  objection granted.
17        MR. ACKELSBERG:  Thank you.
18  BY MR. SHELDON:
19  Q.   Is it accurate that in establishing
20  those contractual arrangements, the tribes
21  generally had to employ attorneys to negotiate
22  the terms acceptable to the tribe?
23  A.   In every case.
24  Q.   These attorneys charge for their time,

76 (Pages 301 to 304)

TF App. 0119

Page 305

1  correct?
2  A.  Yes, sir.
3  Q.  In your experience, brokering those
4  dozens of contractual arrangements, what was
5  the standard industry practice for the payment
6  of the tribe's attorney's fees?
7  A.  In almost all instances, the commercial
8  enterprise trying to do business with the
9  tribe would pay the tribe's legal expenses.
10 Q.  Does this include arrangements involving
11 the gaming industry?
12 A.  Yes, sir.
13 Q.  Oil and gas?
14 A.  Yes.
15 Q.  Real estate development?
16 A.  Yes.
17 Q.  Financial services arrangements?
18 A.  Yes.
19 Q.  Do you know why that was the case?
20 A.  Early on, the tribes -- from '99 forward
21 the tribes had either little or no money.  And
22 the lawyers representing them wouldn't do it
23 pro bono, so they expected the commercial
24 company to pay.  Over time, as the casinos

Page 306

1  grew, more and more tribes became wealthy.
2  Those tribes no longer practice that.  But the
3  tribes that don't have large sums of money
4  still require that the legal fees be paid by
5  the corporation trying to do business with the
6  tribe.
7  Q.  Thank you.  Is it correct that you
8  testified earlier today that Plain Green
9  negotiated to receive a payment of 4 1/2
10 percent of the gross revenue from its lending
11 operation supported by Think Finance?
12 A.  Yes.
13 Q.  Do you have any understanding as to what
14 45 percent of gross revenue generally
15 correlates to, in terms of a percentage of
16 profits?
17        MR. SCHEFF:  45 percent --
18 BY MR. SHELDON:
19 Q.  4.5 percent.  Do you have any
20 understanding as to what 4.5 percent of gross
21 revenue generally correlates to, in terms of a
22 percentage of profit?
23 A.  There's a general rule of thumb that
24 it's a 6X, 5 to 7X.  So if you're getting 5

Page 307

1  percent of 4.5 percent, you can multiply that
2  by five.  If the business is not particularly
3  successful, up to 7 if it's really successful.
4        And that would correlate to a
5  gross profit or an after expense, an EBITDA
6  number.  So 4.5 percent would look roughly
7  somewhere between 25 and 35 percent of the
8  gross profits.
9  Q.  By Plain Green negotiating 4 1/2 percent
10 of the gross revenue, it's your understanding
11 that that would roughly correlate to their
12 negotiating a share of the profits in the --
13 did you say 25 to 35 percent range?
14 A.  Approximately, that's correct.
15 Q.  Do you consider 4 1/2 percent of gross
16 revenue to be an industry standard
17 compensation term when it comes to contractual
18 arrangements involving Native American tribes?
19 A.  It is extremely close.  In the early
20 part of the gaming business, the NIGC, which
21 is the National Indian Gaming Congress, would
22 create a 30 percent barrier, which is the most
23 -- or the least that a tribe could get.
24        So they set the standard of

Page 308

1  where you needed to be able to pay a tribe to
2  do business with them.
3  Q.  Thank you.  Do you consider the
4  contractual arrangements involving Plain Green
5  and Think Finance to be industry standard in
6  terms of contractual arrangements involving
7  Native American tribe?
8  A.  Yes, I do.
9        MR. SHELDON:  No further
10 questions.
11        MR. SCHEFF:  Patrick?
12        - - -
13        EXAMINATION
14        - - -
15 BY MR. DAUGHERTY:
16 Q.  Mr. Haynes, have you ever heard of a
17 company called National Credit Adjusters?
18 A.  No, sir.
19        MR. DAUGHERTY:  No further
20 questions.
21        MR. SCHEFF:  Dan?  Dave?
22        MR. HERMAN:  No questions.
23        VIDEOTAPE OPERATOR:  That
24 concludes this deposition.  The time is 3:38,

77  (Pages 305 to 308)

TF App. 0120

# EXHIBIT K

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| COMMONWEALTH OF<br>PENNSYLVANIA, by<br>Attorney General KATHLEEN G. KANE, | :<br>:<br>: | CIVIL ACTION |
| | : | |
| *Plaintiff,* | :<br>: | NO.  14-cv-07139-JCJ |
| v. | :<br>: | |
| THINK FINANCE, INC., et al. | :<br>: | |
| *Defendants.* | : | |

---

**DECLARATION OF JOHN SHOTTON**

1.       My name is John Shotton.  I am over eighteen (18) years old and am competent to make this declaration.  Everything stated herein is based on my personal knowledge.  I would be competent to testify as to these facts if called upon to do so in a court of law or administrative proceeding.

2.       I serve as the elected Chairman of the Otoe-Missouria Tribe of Indians (the "Tribe"), a federally recognized Indian tribe, and have served in this capacity since 2007.  The Tribe is a Red Rock, Oklahoma-based Native American Tribe with nearly 3,000 members.

3.       I also serve as the Secretary/Treasurer of Great Plains Lending, LLC ("Great Plains"), a business wholly owned and operated by the Tribe.

4.       On February 4, 1984, the Tribe adopted the Constitution of the Otoe-Missouria Tribe of Indians as the supreme law governing all affairs of the Tribe.

5.    Under Article IV, Section 1 of the Tribe's Constitution, the Tribal Council, of which I am Chairman, serves as the Tribe's governing body.

6.    The Tribal Council, as the Tribe's governing body, has the power to make all laws and ordinances for the benefit of the Tribe.

7.    The Tribal Council exercised its constitutional power and adopted the Otoe-Missouria Tribe of Indians Limited Liability Company Act (the "LLC Act") on May 4, 2011, which governs the formation of businesses within the Tribe's jurisdiction, including wholly owned and operated Tribal businesses.  (Exhibit A, LLC Act.)

8.    The LLC Act established that wholly owned corporate entities created under the Act would be instrumentalities and arms of the Tribe and that the officers of such instrumentalities and arms would be deemed officers of the Tribe.

9.    The LLC Act established that wholly owned corporate entities created under its authority would be established for the purpose of carrying out the authorities and responsibilities of the Tribe for economic development of the Tribe and advancement of its citizens.

10.    Under the LLC Act, the Tribal Council passed Resolution OMTC #54293, creating Great Plains Lending, LLC on May 4, 2011.  (Exhibit B, A Resolution Creating Great Plains Lending, LLC.)

11.    Pursuant to Tribal law, Great Plains was created to advance the Tribe's economic development and to aid in addressing issues of public health, safety, and welfare.

12.     The Tribal Council also exercised its sovereignty by developing, approving, and enacting the Otoe-Missouria Consumer Finance Services Regulatory Ordinance (the "Ordinance"), which governs all consumer finance business activity occurring within the Tribe's jurisdiction and implements the necessary regulation and oversight to ensure legal and lawful business operations. This Ordinance also established, pursuant to sovereign law-making and constitutional powers of the Tribal Council, the Otoe-Missouria Consumer Financial Services Regulatory Commission (the "Commission").  (Exhibit C, Otoe-Missouria Consumer Finance Services Regulatory Ordinance.)

13.     The Commission is a regulatory agency formed pursuant to tribal law and functions as a governmental arm and instrumentality of the Tribe, with its principal place of governmental business located in Red Rock, Oklahoma. The Commission is tasked with regulating all consumer finance business occurring within the Tribe's jurisdiction, including the activities of Great Plains.

14.     Great Plains is licensed and regulated by the Commission pursuant to the requirements of the Ordinance.  Its license is in good standing.  Pursuant to the Ordinance, Great Plains must be compliant with Tribal law to maintain its license.  Great Plains also voluntarily complies with all applicable federal consumer protection laws.

15.     The Commission has been active in assuring that Great Plains has complied with tribal law and voluntarily with federal laws.  (Exhibit D, Operating Agreement of Great Plains Lending, LLC.)

16.     Regulated tribal lending has been an invaluable vehicle for economic growth, tribal services, and tribal development. The impact of tribal lending on tribal growth and opportunity has been immeasurable, and its effects have proven critical for tribal advancement and financial assistance.

17.     The Tribe's online lending business accounts for a significant portion of the Tribe's nonfederal governmental budget and has created dozens of jobs on tribal land, including financial support staff, Head Start educators, and tribal housing personnel.

18.     Revenues from tribal lending have been used towards additional classrooms, books, and teachers for Head Start programs, as well as new after-school and summer programs for tribal youth. Revenues have also been used to support several tribal government programs that benefit the general membership, including child care services, employment training, health care and wellness coverage, child protection, and family violence protection.

19.     Outside of gaming, tribal lending has been the most significant economic development opportunity that has been available to the Tribe, in terms of both revenue and job creation.

20.     The Tribe's lending initiatives do not just support basic, fundamental needs for tribal operations and services. They extend the opportunity for the Tribe to move beyond the bottom line of economic footing.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of August 2015.

_____
John Shotton

28172330.1

TF App. 0125

# EXHIBIT A



# OTOE · MISSOURIA
## TRIBE OF INDIANS

8151 HIGHWAY 177
RED ROCK, OK 74651-0348

### RESOLUTION

"A Resolution to Adopt Limited Liability Company (llc) Codes for the Otoe-Missouria Tribe of Indians"

OMTC # __54292__ FY- 2011

NOW, THEREFORE, BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE OTOE-MISSOURIA TRIBE OF INDIANS, and

WHEREAS, the Otoe-Missouria Tribal Council, the Governing Body of the Otoe-Missouria Tribe of Oklahoma, in accordance with the Tribal Constitution, Article VIII-Powers, Section I. Tribal Council, duly convened to discuss, review and approve Tribal business, and

WHEREAS, the Otoe-Missouria Tribal Council has been vested with authority to enact Tribal law and adopt regulations to administer governmental functions of the Tribe, and

WHEREAS, the Otoe-Missouria Tribal Council has reviewed the Otoe-Missouria Limited Liability Code

THEREFORE, BE IT RESOLVED, the Otoe-Missouria Tribal Council hereby adopt and approve the attached Otoe-Missouria Limited Liability Code for the betterment of the Tribe.

### CERTIFICATION

We, the undersigned Chairman and Secretary of the Otoe-Missouria Tribal Council, do hereby certify, by signature, that the above and foregoing Resolution was approved and adopted on this 4th day of May, 2011, with a quorum present, and a vote of __6__ for, __0__ against, __0__ absent, and __1__ abstaining.

John R. Shotton
Chairman

(SEAL)

ATTEST: Barbara Childs-Walton
Barbara Childs-Walton
Secretary

## An Act

To provide regulations for organizing limited liability companies within the Otoe-Missouria Tribe of Indians.

*Be it enacted by the Tribal Council of the Otoe-Missouria Tribe of Indians:*

## Table of Contents

**PART 1. GENERAL PROVISIONS**    **4**

    *SECTION 101. SHORT TITLE*    *4*
    *SECTION 102. AUTHORITY AND PURPOSES*    *4*
    *SECTION 103. SCOPE*    *4*
    *SECTION 104. APPLICABLE LAW*    *5*
    *SECTION 105. DEFINITIONS*    *5*
    *SECTION 106. NAME*    *6*
    *SECTION 107. REGISTERED OFFICE AND REGISTERED AGENT*    *6*
    *SECTION 108. TRIBE AS MEMBER*    *7*
    *SECTION 109. NATURE OF BUSINESS*    *7*
    *SECTION 110. EXECUTION OF DOCUMENTS*    *9*
    *SECTION 111. FILING*    *9*
    *SECTION 112. CERTIFICATE OF STATUS*    *10*
    *SECTION 113. EXECUTION BY JUDICIAL ACT*    *10*
    *SECTION 114. INTERSTATE APPLICATION*    *10*

**PART 2. ARTICLES OF ORGANIZATION AND DEALING WITH LLC**    **10**

    *SECTION 201. ARTICLES OF ORGANIZATION*    *10*
    *SECTION 202. AGENCY POWER OF MEMBERS AND MANAGERS*    *11*
    *SECTION 203. ADMISSIONS OF MEMBERS AND MANAGERS*    *12*
    *SECTION 204. KNOWLEDGE OF OR NOTICE TO MEMBER OR MANAGER*    *12*
    *SECTION 205. LIABILITY OF MEMBERS TO THIRD PARTIES*    *12*
    *SECTION 206. PARTIES TO ACTION*    *13*
    *SECTION 207. AUTHORITY TO SUE*    *13*

**PART 3. MEMBERS AND MANAGERS**    **13**

    *SECTION 301. MANAGEMENT*    *13*
    *SECTION 302. DUTIES*    *14*
    *SECTION 303. LIMITATION OF LIABILITY AND INDEMNIFICATION*    *14*
    *SECTION 304. VOTING*    *15*
    *SECTION 305. RECORDS AND INFORMATION*    *16*
    *SECTION 306. ADMISSION OF MEMBERS*    *17*
    *SECTION 307. DISSOCIATION*    *17*

**PART 4. FINANCE**    **18**

TF App. 0128

*SECTION 401. CONTRIBUTIONS*     *18*

*SECTION 402. LIABILITY FOR CONTRIBUTION*     *18*

*SECTION 403. ALLOCATION OF PROFITS AND LOSSES*     *19*

**PART 5. NON-LIQUIDATING DISTRIBUTIONS**     **19**

*SECTION 501. INTERIM DISTRIBUTIONS*     *19*

*SECTION 502. ALLOCATION OF DISTRIBUTIONS*     *19*

*SECTION 503. DISTRIBUTION UPON PARTIAL REDEMPTION*     *19*

*SECTION 504. DISTRIBUTION UPON DISSOCIATION*     *19*

*SECTION 505. DISTRIBUTION IN KIND*     *19*

*SECTION 506. RIGHT TO DISTRIBUTION*     *20*

*SECTION 507. LIMITATIONS OF DISTRIBUTIONS*     *20*

*SECTION 508. LIABILITY FOR WRONGFUL DISTRIBUTION*     *20*

**PART 6. OWNERSHIP AND TRANSFER OF PROPERTY**     **21**

*SECTION 601. OWNERSHIP OF LLC PROPERTY*     *21*

*SECTION 602. TRANSFER OF PROPERTY*     *21*

*SECTION 603. NATURE OF INTEREST*     *21*

*SECTION 604. ASSIGNMENT OF LLC INTEREST*     *21*

*SECTION 605. RIGHTS OF JUDGMENT CREDITOR*     *22*

*SECTION 606. RIGHT OF ASSIGNEE TO BECOME A MEMBER*     *22*

*SECTION 607. POWERS OF LEGAL REPRESENTATIVE*     *22*

**PART 7. DISSOLUTION**     **23**

*SECTION 701. DISSOLUTION*     *23*

*SECTION 702. JUDICIAL DISSOLUTION*     *23*

*SECTION 703. WINDING UP*     *23*

*SECTION 704. DISTRIBUTION OF ASSETS*     *24*

*SECTION 705. ARTICLES OF DISSOLUTION*     *25*

*SECTION 706. KNOWN CLAIMS AGAINST DISSOLVED LLC*     *25*

*SECTION 707. UNKNOWN OR CONTINGENT CLAIMS*     *25*

**PART 8. MERGER**     **26**

*SECTION 801. MERGER*     *26*

*SECTION 802. APPROVAL OF MERGER*     *26*

*SECTION 803. PLAN OF MERGER*     *26*

*SECTION 804. ARTICLES OF MERGER*     *26*

*SECTION 805. EFFECTS OF MERGER*     *27*

*SECTION 806. RIGHT TO OBJECT*     *28*

**PART 9. LIMITED LIABILITY COMPANIES WHOLLY OWNED BY THE TRIBE**     **28**

SUBPART 1. GENERAL PROVISIONS FOR TRIBALLY-OWNED LLCS     28

*SECTION 911. LLCS DIRECTLY OWNED BY THE TRIBE*     *28*

*SECTION 912. TRIBAL SUBSIDIARY COMPANIES*     *28*

*SECTION 913. PRIVILEGES AND IMMUNITIES*     *28*

TF App. 0129

*SECTION 914. OWNERSHIP*                                                                 *29*
*SECTION 915. PROJECT COMPANIES WITH NON-TRIBAL OWNERS*                   *29*
*SECTION 916. PURPOSE OF LLC'S DIRECTLY AND INDIRECTLY OWNED BY TRIBE*   *30*

SUBPART 2. SPECIAL FORMATION REQUIREMENTS FOR LLC'S WHOLLY OWNED BY
THE TRIBE                                                                                30
*SECTION 921. FORMATION*                                                             *30*
*SECTION 922. ADDITIONAL REQUIREMENTS FOR ARTICLES OF ORGANIZATION*        *30*

SUBPART 3. MANAGEMENT OF TRIBALLY-OWNED LLCS                               31
*SECTION 931. BOARD OF DIRECTORS AS MANAGER*                                    *31*

SUBPART 4. DISTRIBUTIONS TO TRIBE AS MEMBER                                   31
*SECTION 941. DISTRIBUTIONS OF INCOME TO TRIBE AS MEMBER*                     *31*

SUBPART 5. ADDITIONAL REPORTS AND AUDITS                                       31
*SECTION 951. AUDIT*                                                                 *31*
*SECTION 952. FINANCIAL, BUSINESS, AND BUDGET INFORMATION FOR THE TRIBE*   *31*

SUBPART 6. ACTIONS AGAINST LLCS WHOLLY OWNED BY THE TRIBE                   32
*SECTION 961. COURT ACTIONS AUTHORIZED*                                          *32*
*SECTION 962. APPROVAL OF TRIBE REQUIRED*                                        *33*
*SECTION 963. RELIEF AVAILABLE*                                                     *33*

**PART 10. REGISTRATION OF FOREIGN LIABILITY COMPANIES**                     **33**

**PART 11. SEVERABILITY CLAUSE**                                                 **33**

TF App. 0130

# LIMITED LIABILITY COMPANIES

# PART 1. GENERAL PROVISIONS

## SECTION 101. SHORT TITLE

This act shall be known as the Otoe-Missouria Tribe of Indians Limited Liability Company Act (the "Act").

## SECTION 102. AUTHORITY AND PURPOSES

1. This Act is enacted pursuant to the Otoe-Missouria Tribe of Indians inherent sovereign powers and as specifically authorized by the Constitution of the Otoe-Missouria Tribe of Indians.

2. The Otoe-Missouria Tribe of Indians Tribal Council finds that the regulation of persons engaged in trade and business is necessary to safeguard and promote the peace, safety, morals, and general welfare of the Otoe-Missouria Tribe of Indians.

3. The purposes of this Act are to provide for economic development for the Otoe-Missouria Tribe of Indians and its citizens by providing the legal framework for organizing business entities under Otoe-Missouria Tribe of Indians law in order to expand the private business sector, and to provide for the organization of arms of the tribe into entities to promote economic development and the general welfare of the Otoe-Missouria Tribe of Indians.

4. This Act is enacted pursuant to the inherent sovereign tribal powers expressly outlined in the Constitution that recognizes the jurisdiction of the Otoe-Missouria Tribe of Indians to extend over all persons, subjects, property, and over all activities that occur within the territory of the Otoe-Missouria Tribe of Indians and over all Otoe-Missouria citizens, subjects, property, and activities outside such territory affecting the rights and laws of the Otoe-Missouria Tribe of Indians.

5. By the adoption of this Act, except as provided herein, the Otoe-Missouria Tribe of Indians does not waive its sovereign immunity or consent to suit in any court, federal tribal or state, and neither the adoption of this Act, nor the incorporation of any limited liability company hereunder, shall be construed to be a waiver of the sovereign immunity of the Otoe-Missouria Tribe of Indians or a consent to suit against the Otoe-Missouria Tribe of Indians in any court.

## SECTION 103. SCOPE

TF App. 0131

This Act shall apply to all limited liability companies organized under Otoe-Missouria Tribe of Indians law or which elect to accept the provisions of this Act, including all LLCs wholly owned by the Otoe-Missouria Tribe of Indians, whether directly or as a wholly-owned subsidiary of another LLC or an Entity wholly owned by the Otoe-Missouria Tribe of Indians.

## SECTION 104. APPLICABLE LAW

The companies organized and created under this Act shall be subject to this Act and all other laws of the Otoe-Missouria Tribe of Indians.

## SECTION 105. DEFINITIONS

Terms used in this Act have the following meaning:

1. "Articles of Organization" means the articles of organization filed under Section 201 (and Section 922, if applicable) and those articles as amended or restated from time to time.

2. "Corporation" means any corporation for profit organized under the laws of the Tribe or a foreign corporation formed under the laws of any other jurisdiction.

3. "Court" means the Tribal Court as established by the Constitution of the Otoe-Missouria Tribe of Indians.

4. "Distribution" means a direct or indirect transfer by an LLC of money or other property to or for the benefit of its Members in respect of their interests.

5. "Domestic Limited Liability Company" means an LLC formed under this Act.

6. "Entity" means any general partnership, limited partnership, LLC, trust, estate, association, Corporation, the Tribe, or any other legal or commercial entity.

7. "Foreign" refers to any Entity organized under the laws of a jurisdiction other than the Tribe.

8. "LLC" means a limited liability company.

9. "LLC Interest" means a Member's rights in the LLC, including rights to distributions, profits and losses, and to participate in management of the LLC, as specified in this Act and the Operating Agreement (if any).

10. "Majority in Interest" means Member(s) that have contributed more than fifty percent (50%) of the value of all total capital contributions to the LLC, excluding any interest which is not to be counted as voting on a matter as described elsewhere in this Act.

11. "Manager" or "Managers" means the Person(s) designated to manage the LLC pursuant to the Articles of Organization or Operating Agreement.

12. "Member" means a Person who has been admitted to membership in an LLC and who has not dissociated from the LLC.

13. "Organizer(s)" means the Person(s) that signs and delivers the Articles of Organization for filing to the Secretary.

14. "Operating Agreement" means an agreement in writing among all of the Members as to the conduct of the business of an LLC and the relationships among its Members.

15. "Person" means any individual or Entity.

16. "Secretary" means the individual duly appointed or elected to serve in the administrative capacity with all the rights, duties, obligations, and authority as authorized by the Tribe.

17. "State" includes a state, territory, or possession of the United States and the District of Columbia.

18. "Tribal Council" means the legislative branch of the government of the Tribe as established under Constitution of the Tribe.

19. "Tribe" means the Otoe-Missouria Tribe of Indians, a federally recognized Indian tribe.


## SECTION 106. NAME

1. The name of an LLC as set forth in its Articles of Organization must contain the words "limited liability company" or end with the abbreviation "L.L.C." or "LLC". The words "limited" and "company" may be abbreviated as "ltd." and "co.", respectively. The name may not contain language stating or implying that the LLC is organized for any purpose other than that permitted under Section 109, below.

2. The name of a Domestic LLC shall be distinguishable from any other Domestic LLC or Tribal Corporation.


## SECTION 107. REGISTERED OFFICE AND REGISTERED AGENT

1. An LLC's registered agent is the LLC's agent for receiving service of process, notice, or demand required or permitted by law to be served on the LLC under the laws of the Tribe.

2. Each LLC shall continuously maintain a registered office and a registered agent. The registered office may, but need not, be the same as any of its places of business. The registered agent may be a designated office of the Tribe rather than a specified individual,

TF App. 0133

provided that the Tribe is a Member of the LLC in which the Tribal officer is the registered agent.

3. An LLC may change its registered office or registered agent, or both, by filing a written notice of change containing the name of its registered agent and the street address of its registered office, as changed, with the Secretary and paying the requisite filing fee.

4. The registered agent of an LLC may resign as registered agent by delivering to the Secretary, with a copy to each Member of the LLC, for filing a written statement of resignation and the appointment by the LLC of another registered agent.

## SECTION 108. TRIBE AS MEMBER

1. The Tribe shall form or become a Member of an LLC formed under this Act only upon approval of such action by resolution of the Tribal Council.

2. If the Tribe is a Member of any LLC formed under this Act, any action which the Tribe is required or permitted to take with respect to any vote, approval, consent, appointment, direction, or other matter shall be taken as specified in Section 931 of this Act or, as to actions related to the managers of a manager-managed LLC, as stated in the LLC's Articles of Organization approved by the Tribal Council and the Chairman.

3. In no event shall any manager not a Member of an LLC in which the Tribe is a Member, bind the Tribe in any manner; provided that the Tribe's interest as a Member may be bound by Manager or Member actions as stated in this Act or the Operating Agreement of the LLC.

4. Nothing contained in this Act shall be construed as creating any liability or waiving of sovereign immunity of the Tribe in any manner; provided that the assets of the LLC in which the Tribe holds an interest may be subject to liabilities and claims unless otherwise provided herein. In no event shall any action taken by the Tribe as Member concerning the exercise of any right or privilege or discharge of any duty with respect to an interest in an LLC be construed as a waiver of immunity or creation of a liability on the part of the Tribe separate and apart from its interest as a Member of the LLC.

5. If the Tribe is the sole Member of an LLC formed under this Act, such LLC shall possess the Tribe's sovereign immunity from suit except to the extent otherwise provided in its Articles of Organization or Operating Agreement,or as expressly waived pursuant to Section 913.

6. If the Tribe is the sole Member of an LLC formed under this Act, the additional provisions of Part 9 of this Act shall apply.

## SECTION 109. NATURE OF BUSINESS

An LLC may be organized under this Act for any lawful purpose. Unless otherwise provided in its Operating Agreement, an LLC organized and existing under this Act has the same powers as an

TF App. 0134

individual to do all things necessary and convenient to carry out its business, including, but not limited to, the following:

1. Sue and be sued, complain, and defend in its name; provided that if an LLC is wholly owned by the Tribe, or wholly owned by a Domestic LLC or Tribal Corporation, or other Entity which itself is wholly owned by the Tribe, it shall be entitled to and shall enjoy the Tribe's sovereign immunity from suit unless the Articles of Organization otherwise provide.

2. Purchase, take, receive, lease, or otherwise acquire and own, hold, improve, use, and otherwise deal in or with real or personal property, or any legal or equitable interest in real or personal property, wherever situated.

3. Sell, convey, mortgage, pledge, create a security interest in, lease, exchange, or otherwise dispose of all or any part of its property.

4. Lend money, property, and services to, and otherwise assist, its Members and Managers, if any.

5. Purchase, take, receive, subscribe for, or otherwise acquire and own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of and deal in and with shares or other interests in, or obligations of, any other enterprise or Entity.

6. Make contracts and guarantees; incur liabilities; borrow money; issue notes, bonds, and other obligations; and secure any of its obligations by mortgage or pledge of all or part of its property, franchises, and income.

7. Lend money, invest and reinvest its funds, and receive and hold real or personal property as security for repayment.

8. Conduct its business, locate offices, and exercise the powers granted by this Act.

9. Be a promoter, incorporator, partner, member, associate, or manager of any enterprise or Entity.

10. Elect or appoint Managers, agents, and employees, define their duties, and set their compensation.

11. Pay pensions and establish pension plans, pension trusts, profit-sharing plans, and benefit or incentive plans for any or all of its current or former Members, Managers, employees, and agents.

12. Make donations to and otherwise devote its resources for the public welfare or for charitable, scientific, educational, humanitarian, philanthropic, or religious purposes.

13. Indemnify a Member, Manager, employee, officer or agent, or any other Person.

TF App. 0135

14. Provide benefits or payments to Members, Managers, employees, and agents of the LLC, and to their estates, families, dependants, or beneficiaries in recognition of the past services of the Members, Managers, employees, and agents of the LLC.

15. Make payments or donations, or do any other act not prohibited by law, that furthers the business of the LLC.

16. Transact any lawful business that the Members or the Managers find to be appropriate to promote and further the business and affairs of the LLC.

## SECTION 110. EXECUTION OF DOCUMENTS

1. Except as otherwise provided in this Act, any document required or permitted by this Act to be delivered for filing to the Secretary shall be executed by any of the following:

   a. Any Manager, if management of the LLC is vested in a Manager or Managers, or by a Member, if management of the LLC is reserved to theM.

   b. All Organizer(s) of the LLC if the LLC has not been organized. The name and address of each Organizer shall be provided.

   c. The name of the drafter of the document.

2. The Person executing the document shall sign it and state beneath or opposite the signature the Person's name and capacity in which the Person signs.

3. The Person executing the document may do so as an attorney-in-fact. Except as provided in Section 305.1.b, powers of attorney relating to the executing of the document need not be shown to nor filed with the Secretary.

## SECTION 111. FILING

1. The office of the Secretary shall receive all filings required under this Act and maintain the records of such filings pursuant to this Act, including, but not limited to, Articles of Organization, amended or restated Articles of Organization, annual reports, names and addresses of registered offices and registered agents, and all other reports as required by this Act.

2. Upon receipt of a document for filing under this Act, the Secretary shall ensure it meets the requirements herein and then shall stamp or otherwise endorse the date and time of receipt of the original, the duplicate copy, and, upon request, any additional copy received.

3. If the Secretary refuses to file any requested document, the Secretary shall return it to the Person tendering such document for filing within five (5) business days after the date on

TF App. 0136

which such document is received by the Secretary for filing, together with a brief written explanation of the reason for refusal.

4. Any document accepted by the Secretary shall be effective at the time of receipt unless a delayed effective date and/or time not more than ninety (90) days after receipt by the Secretary is specified in the document.

5. The Secretary shall impose a reasonable filing fee for each document filed, initially not to exceed the sum of $100.00, and an annual renewal fee initially not to exceed the sum of $25.00. The Secretary shall post a schedule of all fees or otherwise promptly communicate the amount of any fee upon request.

## SECTION 112. CERTIFICATE OF STATUS

Any individual may obtain from the Secretary, upon request, a certificate of status for either a Domestic LLC or a Foreign LLC.

## SECTION 113. EXECUTION BY JUDICIAL ACT

Any Person who is adversely affected by the failure or refusal of any Person to execute and file the Articles of Organization or any other document to be filed under this Act may petition the Court to direct the execution and filing of the Articles of Organization or such other document.

## SECTION 114. INTERSTATE APPLICATION

An LLC may conduct its business, carry on its operations, and have and exercise the powers granted by this Act, in any sovereign Native American nation, any State or in any Foreign jurisdiction.

# PART 2. ARTICLES OF ORGANIZATION AND DEALING WITH LLC

## SECTION 201. ARTICLES OF ORGANIZATION

1. One or more Persons may organize an LLC by signing and delivering Articles of Organization to the Secretary for filing. The Organizer(s) need not be Members of the LLC at the time of organization or at any time thereafter.

2. An LLC shall have one or more Members.

3. The Articles of Organization shall contain all of, and only, the following information:

   a. A statement that the LLC is organized under this Act.

   b. A name for the LLC that satisfies the provisions of this Act.

TF App. 0137

    c. The street address of the registered office and the name of the registered agent at such registered office. In the case of an LLC wholly owned by the Tribe, such registered office and agent shall be located within the boundaries of the Otoe-Missouria Tribe of Indians Indian Country.

    d. If management of the LLC is vested in one or more Managers or a Board of Directors, a statement to that effect.

    e. Whether the LLC is wholly owned by the Tribe.

    f. If wholly owned by the Tribe, whether the LLC is to enjoy the Tribe's sovereign immunity and the scope of any waiver of that immunity.

4. The Secretary shall assign to each LCC formed by filing Articles of Organization a unique identification number.

5. An LLC may amend or restate its Articles of Organization at any time by delivering an amendment or restatement, as applicable, with the requisite filing fee, for filing to the Secretary.

6. Effect of Delivery or Filing.

    a. An LLC is formed when the Articles of Organization become effective under Section 111.4.

    b. The Secretary filing of the Articles of Organization is conclusive proof that the LLC is organized and formed under this Act.

## SECTION 202. AGENCY POWER OF MEMBERS AND MANAGERS

1. Except as provided in subsection 2, below:

    a. Each Member is an agent of the LLC, but not of the other Members or any of them, for the purpose of the business of the LLC.

    b. The act of any Member, including the execution in the name of the LLC of any instrument for apparently carrying on in the ordinary course of business the business of the LLC, binds the LLC in the particular matter, unless the Person with whom such Member is dealing has knowledge that such Member has no authority to act for such matter.

    c. If the Tribe is a Member, the Tribe's authority therefor shall be exercised pursuant to Section 931.

2. If management of the LLC is vested in one or more Managers:

TF App. 0138

a. Each Manager is an agent of the LLC, but not of the other Members, for the purpose of its business. The act of any Manager, including the execution in the name of the LLC of any instrument for apparently carrying on the ordinary course of business of the LLC, binds the LLC, unless the manager has, in fact, no authority to act for the LLC in the particular matter, and the Person with whom such Manager is dealing has knowledge that such Manager has no authority to act for such matter.

## SECTION 203. ADMISSIONS OF MEMBERS AND MANAGERS

1. Except as provided in Section 203.2, an admission or representation made by any Member concerning the business of an LLC within the scope of the Member's actual authority may be used as evidence against the LLC in any legal proceeding.

2. If management of the LLC is vested in one or more Managers:

    a. An admission or representation made by a Manager concerning the business of an LLC within the scope of the Manager's authority may be used as evidence against the LLC in any legal proceeding.

    b. The admission or representation of any Member, acting solely in the Member's capacity as a Member, is not evidence against the LLC in any legal proceeding.

## SECTION 204. KNOWLEDGE OF OR NOTICE TO MEMBER OR MANAGER

1. Except as provided in Section 204.2), notice to any Member of any matter relating to the business of an LLC, and the knowledge of a Member acting in the particular matter, acquired while a Member or known by the Person at the time of becoming a Member, and the knowledge of any Member who reasonably could and should have communicated it to the acting Member, operates as notice to or knowledge of the LLC.

2. If management of the LLC is vested in one or more managers:

    a. Notice to any Manager of any matter relating to the business of the LLC, and the knowledge of the Manager acting in the particular matter acquired while a Manager or known by the Person at the time of becoming a Manager and the knowledge of any other Manager who reasonably could and should have communicated it to the acting Manager, operates as notice to or knowledge of the LLC.

    b. Notice to or knowledge of any Member while the Member is acting solely in the capacity of a Member is not notice to or knowledge of the LLC.

## SECTION 205. LIABILITY OF MEMBERS TO THIRD PARTIES

TF App. 0139

The debts, obligations, and liabilities of an LLC, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the LLC. Except as otherwise specifically provided for in this Act, a Member or Manager of an LLC is not personally liable for any debt, obligation, or liability of an LLC. Nothing in this Section 205 is intended to waive the LLC's sovereign immunity as provided in Sections 108.4 and 108.5.

## SECTION 206. PARTIES TO ACTION

A Member of an LLC is not a proper party to a proceeding by or against an LLC solely by reason of being a Member of such LLC, except if any of the following exist:

1. The object of the proceeding is to enforce a Member's right against or liability to the LLC.

2. The action is brought by a Member under Section 207.

## SECTION 207. AUTHORITY TO SUE

Unless otherwise provided in the Operating Agreement, an action on behalf of an LLC may be brought in the name of the LLC by:

1. One or more Members of the LLC, if authorized by a Majority in Interest, excluding the vote of any Member who has an interest in the outcome of the action that is adverse to the interest of the LLC.

2. One or more Managers of an LLC if the management of the LLC is vested in one or more Managers, or if the Managers are authorized to sue by a Majority in Interest.

# PART 3. MEMBERS AND MANAGERS

## SECTION 301. MANAGEMENT

1. Unless the Articles of Organization vest management in one or more Managers, management of the LLC shall be vested in the Members subject to any provision in the Operating Agreement or this Act restricting or enlarging the management rights and duties of any Member or group of Members.

2. If the Articles of Organization vest management in one or more Managers, management of the business or affairs of the LLC shall be invested in the Manager or Managers subject to any provisions in the Operating Agreement or this Act restricting or enlarging the management rights and duties of any Manager or group of Managers. Unless otherwise provided in Operating Agreement, the Manager or Managers:

TF App. 0140

a. Shall be designated, appointed, elected, removed, or replaced by a vote of a Majority in Interest.

b. Need not be Members of the LLC nor individuals.

c. Unless earlier removed or earlier resigned, shall hold office until a successor is elected and qualified.

## SECTION 302. DUTIES

Unless otherwise provided in the Operating Agreement:

1. No Member or Manager shall act or fail to act in a manner that constitutes any of the following:

   a. A willful failure to deal fairly with the LLC or its Members in connection with a matter in which the such Member or Manager has a material conflict of interest.

   b. A violation of criminal law, unless the Member or Manager had reasonable cause to believe that the conduct was lawful or no reasonable cause to believe that the conduct was unlawful.

   c. A transaction from which the Member or Manager derived an improper personal profit.

   d. Willful misconduct.

2. Every Member and Manager shall account to the LLC and hold as trustee for it any improper personal profit derived by such Member or Manager without the consent of a majority of the disinterested Members or Managers, or other Persons participating in the management of the LLC, from any of the following:

   a. A transaction connected with the organization, conduct, or winding up of the LLC.

   b. A use by a Member or Manager of the property of an LLC, including confidential or proprietary information or other matters entrusted to the person as a result of the such Person's status as Member or Manager.

   c. The Operating Agreement may impose duties on its Members and Managers that are in addition to, but not in abrogation of, those provided in subsection (1) above.

## SECTION 303. LIMITATION OF LIABILITY AND INDEMNIFICATION

1. In this Section, "expenses" means expenses of defending a lawsuit, including attorneys' fees, and any civil judgment or penalty, or settlement payment in lieu thereof, paid in connection with a lawsuit against a Member or Manager in such capacity.

TF App. 0141

2. An LLC shall indemnify or allow expenses to each Member and Manager for all reasonable expenses incurred with respect to any proceeding if such Member or Manager was a party to the proceeding in the capacity of a Member or Manager.

3. The Operating Agreement may alter or provide additional rights to indemnification or allowance of expenses to Members and Managers.

4. Notwithstanding subsections (2) and (3) above, an LLC may not indemnify a Member or Manager unless it is determined that such Member or Manager did not breach or fail to perform a duty to the LLC as provided in Section 302.

5. Unless otherwise provided in Operating Agreement:

   a. A Member or Manager shall be conclusively presumed not to have breached or failed to perform a duty to the LLC to the extent that the Member or Manager has been successful on the merits or otherwise in the defense of the proceeding.

   b. In situations not described in paragraph (a) above, the determination of whether a Member or Manager has breached or failed to perform a duty to the LLC shall be made by the vote of a Majority in Interest, excluding any Member who is a party to the same or related proceeding, unless all Members or Managers, as applicable, are parties.

## SECTION 304. VOTING

1. Unless otherwise provided in the Operating Agreement or this Section 304, and subject to subsection (2) below, an affirmative vote, approval, or consent as follows shall be required to decide any matter connected with the business of an LLC:

   a. If management of an LLC is reserved to the Members, an affirmative vote, approval, or consent by a Majority in Interest.

   b. If the management of an LLC is vested in one or more Managers or a Board of Directors, the affirmative vote, consent, or approval of more than fifty percent (50%) of the Managers.

2. Unless otherwise provided in the Operating Agreement or this Act, the affirmative vote, approval, or consent of all Members shall be required to do any of the following:

   a. Amend the Articles of Organization.

   b. Issue an interest in an LLC to any Person.

   c. Adopt, amend, or revoke the Operating Agreement.

   d. Allow an LLC to accept any additional contribution from a Member.

TF App. 0142

e.  Allow a partial redemption of an interest in an LLC under Section 503.

f.  Value contributions of Members under Section 401.2.

g.  Authorize a Manager, Member, or any other Person to do any act on behalf of the LLC that contravenes the Operating Agreement.

3.  Unless otherwise provided in the Operating Agreement if any Member is precluded from voting with respect to a given matter, the value of the contribution represented by the interest in the LLC with respect to which the Member would otherwise have been entitled to vote shall be excluded from the total contributions made to the LLC for purposes of determining the fifty percent (50%) threshold under Section 105.10 for that matter.

4.  Unless otherwise provided in the Operating Agreement or this Section, if all or part of an interest in the LLC is assigned under Section 604, the assigning Member shall be considered the owner of the assigned interest for purposes of determining the 50% threshold under Section 105.11 until the assignee of the interest in the LLC becomes a Member pursuant to Section 606.

## SECTION 305. RECORDS AND INFORMATION

1.  An LLC shall keep at its principal place of business all of the following:

a.  A list of each past and present Member and, if applicable, Manager.

b.  A copy of the Articles of Organization and all amendments to the articles, together with executed copies of any powers of attorney under which any Articles of Organization or Operating Agreement were executed.

c.  A record of all matters referred to in this Act as maintained in such records which are not otherwise specified in the Operating Agreement.

2.  Upon request, a Member may, at such Member's own expense, inspect and copy during ordinary business hours any LLC record, unless otherwise provided in the Operating Agreement.

3.  Members or, if the management of the LLC is vested in one or more Managers, Managers, shall provide true and full information of all things affecting the Members to any Member or to the legal representative of any Member upon reasonable request of any Member or his, her or its legal representative.

4.  Failure of an LLC to keep or maintain any of the records of information required under this Section shall not be grounds for imposing liability on any person for the debts and obligations of the LLC.

## SECTION 306. ADMISSION OF MEMBERS

1. In connection with the formation of an LLC, a Person acquiring an LLC Interest is admitted as a Member upon formation unless the Operating Agreement otherwise provides.

2. After the formation of an LLC, a Person acquiring an LLC Interest is admitted as a Member of the LLC as specified in the Operating Agreement or, if not so specified, by consent of all the other Members, or, if the Person is an assignee of another Member's LLC Interest, only pursuant to Section 606.

## SECTION 307. DISSOCIATION

1. A person ceases to be a Member of an LLC upon the simultaneous occurrence of and at the same time of any of the following events:

   a. The Member withdraws by voluntary act pursuant to subsection (3).

   b. The Member is removed as a Member in accordance with the Operating Agreement or this Act.

   c. Unless otherwise provided in the Articles of Organization or by the written consent of all Members at the time of the event, the Member does any of the following:

      i. Makes an assignment for the benefit of the creditors.

      ii. Files a petition in bankruptcy.

      iii. Becomes the subject of an order for relief under the federal bankruptcy laws or State or Tribal insolvency laws.

      iv. Fails to gain dismissal of any federal bankruptcy or State or Tribal insolvency proceeding within 120 days of commencement of an involuntary proceeding.

   d. Unless provided in the Operating Agreement or by the written consent of all Members, if the Member is an individual, either of the following occur:

      i. The Member's death.

      ii. The entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's person or estate.

   e. Unless otherwise provided in the Operating Agreement or by written agreement or by the written consent of all Members at the time, if the Member is a Entity, upon the liquidation, dissolution, or termination of such Entity.

TF App. 0144

2. The Members may provide in the Operating Agreement for other events the occurrence of which would result in a Person ceasing to be a Member of the LLC.

3. Unless the Operating Agreement provides that a Member does not have the power to withdraw by voluntary act from an LLC, the Member may do so at any time by giving written notice to the other Members or as provided in the Operating Agreement. If the Member has the power to withdraw, but the withdrawal is a breach of the Operating Agreement, the LLC may offset the damages against the amount otherwise distributable to the Member, in addition to pursuing any remedies provided for in the Operating Agreement or otherwise available under applicable law.

# PART 4. FINANCE

## SECTION 401. CONTRIBUTIONS

1. A Member's contributions to an LLC may consist of cash, property, or services rendered, or promissory notes or other written obligations to provide cash or property or to perform services.

2. The value of a Member's contribution shall be determined in the manner provided in the Operating Agreement. If the Operating Agreement does not fix a value to a contribution, or if the Members have not adopted an Operating Agreement, the value of a contribution shall be approved by a Majority in Interest, shall be properly reflected in the records and information kept by the LLC pursuant to Section 305.1. The value of contributions so determined shall be binding and conclusive on the LLC and its Members.

## SECTION 402. LIABILITY FOR CONTRIBUTION

1. An obligation of a Member to provide cash or property or to perform services as a contribution to an LLC is not enforceable unless specified in a writing and signed by the Member.

2. Unless otherwise provided in the Operating Agreement, a Member is obligated to an LLC to perform any enforceable promise to provide cash or property or to perform services, even if the Member is unable to perform because death, disability, or any other reason. If a Member does not provide cash, property, or services as promised, such Member is obligated, at the option of the LLC, to provide cash equal to that portion of the value of the stated contribution that has not been fulfilled.

3. Unless otherwise provided in the Operating Agreement, a Member's obligation to provide cash or property or perform services as a contribution to the LLC may be compromised only by the written consent of all of the Members.

TF App. 0145

## SECTION 403. ALLOCATION OF PROFITS AND LOSSES

The profits and losses of an LLC shall be allocated among the Members in the manner provided in the Operating Agreement. If the Members do not enter into or the do not provide otherwise, profits and losses shall be allocated on the basis of value of the contributions made by each Member.

# PART 5. NON-LIQUIDATING DISTRIBUTIONS

## SECTION 501. INTERIM DISTRIBUTIONS

Except as provided in this Part, a Member is entitled to receive distributions from an LLC before the Member's dissociation from the LLC and before its dissolution and winding up to the extent to the extent and at the times or upon the events specified in its Articles of Organization, or to the extent and at the times determined by the Members or Managers.

## SECTION 502. ALLOCATION OF DISTRIBUTIONS

Distributions of cash or other assets of an LLC shall be allocated among the Members as provided in the Operating Agreement, or if the Operating Agreement does not so provide, on the basis of the value of the contributions made by each Member.

## SECTION 503. DISTRIBUTION UPON PARTIAL REDEMPTION

Except as provided in this Part, upon the Distribution in partial liquidation of a Member's interest, the redeeming Member is entitled to receive the amount to which the Member is entitled under and, if not otherwise provided in, the fair value of the redeemed interest based on the Member's right to share in distributions from the LLC.

## SECTION 504. DISTRIBUTION UPON DISSOCIATION

Except as otherwise provided in this Part, upon an event of dissociation under Section 307 that does not cause dissolution of the LLC, a dissociating Member is entitled to receive any Distribution to which the Member is entitled under and, if not otherwise provided in, the fair market value of the Member's interest in the LLC based on the Member's rights to share in distributions from the LLC.

## SECTION 505. DISTRIBUTION IN KIND

Unless otherwise provided in the Operating Agreement:

1. A Member may not demand and receive any Distribution from an LLC in any form other than cash.

2. A Member may not be compelled to accept a Distribution of any asset in kind except for a liquidating Distribution made proportionately to all of the Members.

## SECTION 506. RIGHT TO DISTRIBUTION

At the time that a Member becomes entitled to receive a Distribution from an LLC, the Member has the status of and is entitled to all remedies available to a creditor of the LLC with respect to the Distribution.

## SECTION 507. LIMITATIONS OF DISTRIBUTIONS

1. An LLC may not declare or make a Distribution to any of its Members, if after giving effect to the Distribution, any of the following would occur:

   a. The LLC would be unable to pay its debts as they become due in the usual course of business.

   b. The fair market value of the LLC's total assets would be less than the sum of its total liabilities plus, unless the Operating Agreement provides otherwise, the amount that would be needed for the preferential rights upon dissolution of Members, if any.

2. An LLC may base a determination that a Distribution is not prohibited by subsection (1), above, on any of the following:

   a. Financial statements and other financial data prepared on the basis of accounting practices and principles that are reasonable under the circumstances.

   b. A fair market valuation or other method that is reasonable under the circumstances.

3. An LLC's indebtedness to a Member incurred by reason of a Distribution made in accordance with this Section is at parity with the LLC's indebtedness to its general unsecured creditors, except to the extent subordinated by written agreement. This Section does not affect the validity or priority of a security interest in an LLC's property that is created to secure the indebtedness to the Member.

## SECTION 508. LIABILITY FOR WRONGFUL DISTRIBUTION

1. Except as provided in subsection (2) below, a Member (other than the Tribe) or manager who votes or assents to a distribution in violation of Section 507 or is personally liable to the LLC for the amount of the excess distribution, subject to contribution from all other Managers or Members participating in such action.

TF App. 0147

2. An action to recover under this Section may be brought in the Courts of the Tribe; however a proceeding under this Section is barred unless it is brought within two (2) years after the date of the distribution.

# PART 6. OWNERSHIP AND TRANSFER OF PROPERTY

## SECTION 601. OWNERSHIP OF LLC PROPERTY

1. All property originally transferred to or acquired by an LLC is property of the LLC and not the Members individually.

2. Property acquired with LLC funds is presumed to be LLC property.

3. Property may be acquired, held, and conveyed in the name of the LLC.

## SECTION 602. TRANSFER OF PROPERTY

The property of an LLC may be transferred by an instrument of transfer executed by any Member in the name of the LLC, unless management is vested in Managers, in which case the document of transfer shall be executed by a manager, subject to any limitation that may be imposed by the Articles of Organization or Operating Agreement.

## SECTION 603. NATURE OF INTEREST

An LLC Interest is a general intangible, a type of personal property.

## SECTION 604. ASSIGNMENT OF LLC INTEREST

1. Unless otherwise provided:

   a. An LLC Interest is assignable in whole or in part.

   b. An assignment of an LLC Interest entitles the assignee to receive only the Distributions and to share in the allocations of profits and losses to which the assignee would be entitled with respect to the assigned interest.

   c. An assignment of an LLC Interest does not dissolve the LLC.

   d. Unless and until the assignee becomes a Member of the LLC under Section 606, the assignment of an LLC Interest does not entitle the assignee to participate in the management or exercise rights of a Member.

TF App. 0148

e. Unless and until the assignee of an LLC Interest becomes a Member of the LLC under Section 606, the assignor continues to be a Member.

f. The assignor of an LLC Interest is not released from any personal liability arising under this Act as a Member of the LLC solely as a result of the assignment.

2. Unless otherwise provided in the Operating Agreement, the granting of a security interest, lien, or other encumbrance in or against any or all of a Member's LLC Interest is not assignable and shall not cause the Member to cease to have the power to exercise any rights or powers of a Member.

## SECTION 605. RIGHTS OF JUDGMENT CREDITOR

Upon application to a court of competent jurisdiction, including a court other than the Tribal Court having valid jurisdiction over the Member, by any judgment creditor of a Member, the court may charge the LLC Interest of any Member (other than the Tribe) with payment of the unsatisfied amount of the judgment. To the extent so charged, the judgment creditor has only the rights of an assignee of the Member's LLC Interest in Distributions made by the LLC to Members and other assigned interest holders in the usual course of business. This Section does not deprive any Member of the benefit of any exemption laws applicable to the LLC Interest. In no event shall the Tribe's interest be attachable in abrogation of its sovereign immunity.

## SECTION 606. RIGHT OF ASSIGNEE TO BECOME A MEMBER

1. Unless otherwise provided in the Operating Agreement, an assignee of an LLC Interest may become a Member only if all of the other Members unanimously consent.

2. An assignee of an LLC Interest who becomes a Member has, to the extent assigned, the rights and powers and is subject to the restrictions and liabilities of the assignor under and this Act.

3. Unless otherwise provided in the Operating Agreement, an assignor of an LLC Interest is not released from any liability to the LLC without the written consent of all the Members, whether or not the assignee becomes a Member.

## SECTION 607. POWERS OF LEGAL REPRESENTATIVE

If a Member who is an individual dies or a court of competent jurisdiction adjudges the Member to be incompetent to manage his or her person or property, the Member's personal representative, administrator, guardian, conservator, trustee, or other legal representative shall have all the rights of an assignee of the Member's interest. If a Member is an Entity and is dissolved or terminated, the powers of such Member may be exercised by its legal representative or successor.

TF App. 0149

# PART 7. DISSOLUTION

## SECTION 701. DISSOLUTION

An LLC is dissolved and its affairs shall be wound up upon the happening of the first of the following:

1.  The occurrence of events specified in the Operating Agreement.

2.  The written consent of all Members.

3.  An event of dissociation of a Member, unless otherwise provided in the Operating Agreement, or continuation is consented to by all remaining Members.

4.  Entry of a decree of judicial dissolution under Section 702.

## SECTION 702. JUDICIAL DISSOLUTION

In a proceeding by or for a Member, the Court may order dissolution of an LLC if any of the following is established:

1.  That it is not reasonably practicable to carry on the business of the LLC.

2.  That the LLC is in a material way not acting in substantial conformity with its Operating Agreement.

3.  That one or more Managers are consistently acting or will act in a manner that is illegal, oppressive, or fraudulent.

4.  That one or more Members in control of the LLC are consistently acting or will consistently act in a manner that is illegal, unduly oppressive, or fraudulent.

5.  That a substantial portion of the LLC assets are being misapplied or wasted.

## SECTION 703. WINDING UP

1.  A dissolved LLC continues its legal existence but may not carry on any business except that which is appropriate to wind up and liquidate its business.

2.  Unless otherwise provided for in the Operating Agreement:

    a.  The business of the LLC may be wound up by any of the following:

TF App. 0150

      i.  The Members or Managers who have authority to manage the LLC before dissolution.

     ii.  In a judicial dissolution, the Person(s) designated by the Court.

  b.  The Persons winding up the business of the LLC may do all of the following in the name of and on behalf of the LLC:

      i.  Collect its assets.

     ii.  Prosecute and defend suits.

    iii.  Take any action necessary to settle and close the business of the LLC.

    iv.  Dispose of and transfer the property of the LLC.

     v.  Discharge or make provision for discharging the liabilities of the LLC.

    vi.  Distribute to the Members any remaining assets of the LLC.

3.  Dissolution of an LLC does not do any of the following:

  a.  Transfer title to any property of the LLC's.

  b.  Prevent transfer of all or part of a Member's interest.

  c.  Prevent commencement of a civil, criminal, administrative, or investigatory proceeding by or against the LLC.

  d.  Abate or suspend a civil, criminal, administrative, or investigatory proceeding pending by or against the LLC at the time of dissolution.

  e.  Terminate the authority of the registered agent of the LLC.

  f.  Alter the limited liability of any Member.

## SECTION 704. DISTRIBUTION OF ASSETS

Upon the winding up of an LLC, the assets shall be distributed in the following order:

1.  To creditors, including to the extent permitted by law, Members, and former Members in satisfaction of liabilities of the LLC.

2.  Unless otherwise provided in the Operating Agreement, to Members and former Members in satisfaction of liabilities for Distributions under Sections 501, 503 and 504.

3. Unless otherwise provided in the Operating Agreement, to Members and former Members first for the return of their contributions in proportion to their respective values and, thereafter, in proportion to their respective rights to share in Distributions from the LLC before dissolution.

## SECTION 705. ARTICLES OF DISSOLUTION

After the dissolution of an LLC under Section 701, the LLC may file articles of dissolution with the Secretary, that include the following:

1. The name of the LLC.

2. The date of filing of its Articles of Organization, and the dates of any amendments thereafter.

3. The statutory grounds under Section 701 for dissolution.

4. The delayed effective date of the articles of dissolution under Section 111.4, if applicable.

## SECTION 706. KNOWN CLAIMS AGAINST DISSOLVED LLC

1. A dissolved LLC may notify its known claimants in writing of the dissolution and specify a procedure for making claims.

2. A claim against the LLC is barred if:

   a. A claimant who was given written notice under subsection (1) above, does not deliver the claim, in writing, to the LLC by the deadline specified in the notice; or

   b. A claimant whose claim is rejected by the LLC does not commence a proceeding to enforce the claim within ninety (90) days after receipt of the rejection notice.

## SECTION 707. UNKNOWN OR CONTINGENT CLAIMS

A claim not barred under Section 706 may be enforced:

1. Against the dissolved LLC, to the extent of its undistributed assets.

2. If the dissolved LLC's assets have been distributed in liquidation, against a Member of the LLC, other than the Tribe, to the extent of the Member's proportionate share of the claim or of the assets of the LLC distributed to the Member in liquidation, whichever is less, but a Member's total liability for all claims under this Section may not exceed the total value of assets at the time distributed to the Member.

TF App. 0152

# PART 8. MERGER

## SECTION 801. MERGER

1. Unless the context required otherwise, in this Part, LLC includes a Domestic LLC and a Foreign LLC.

2. Unless otherwise provided in the Operating Agreement, one or more LLCs may merge with or into one or more LLCs or one or more other Foreign LLCs as provided in the plan of merger.

3. Interests in an LLC that are a party to a merger may be exchanged for or converted into cash, property, obligations, or interest in the surviving LLC.

## SECTION 802. APPROVAL OF MERGER

1. Unless otherwise provided in the Operating Agreement, an LLC that is a party to a proposed merger shall approve the plan of merger by an affirmative vote by all of the Members.

2. Unless otherwise provided in the Operating Agreement, the Manager or Managers of an LLC may not approve a merger without also obtaining the approval of the LLC's Members under subsection (1), above.

3. Each foreign LLC that is a party to a proposed merger shall approve the merger in the manner and by the vote required by the laws applicable to the Foreign LLC.

4. Each LLC that is a party to the merger shall have any rights to abandon the merger that is provided for in the plan of merger or in the laws applicable to the LLC.

5. Upon approval of a merger, the LLC shall notify each Member of the approval and of the effective date of the merger.

## SECTION 803. PLAN OF MERGER

Each LLC that is a party to a proposed merger shall enter into a written plan of merger to be provided under Section 804 and approved under Section 802.

## SECTION 804. ARTICLES OF MERGER

1. The surviving LLC shall deliver to the Secretary articles of merger, executed by each party to the plan of merger, that include all of the following:

   a. The name and state or jurisdiction of organization for each LLC that is to merge.

TF App. 0153

    b.  The plan of merger.

    c.  The name of the surviving or resulting LLC.

    d.  A statement as to whether the management of the surviving LLC will be reserved to its Members or vested in one or more Managers.

    e.  The delayed effective date of the merger under Section 111.4, if applicable.

    f.  A statement as to whether the Tribe is the sole Member.

    g.  If the Tribe is sole Member, a statement as to whether the LLC enjoys the Tribe's sovereign immunity.

    h.  A statement that the plan of merger was approved under Section 802.

2.  A merger takes effect upon filing with and acceptance by the Secretary, or if applicable, the effective date of the articles of merger.


## SECTION 805. EFFECTS OF MERGER

A merger has the following effects:

1.  The LLCs that are parties to the plan of merger must become a single entity, which shall be the entity designated in the plan of merger as the surviving LLC.

2.  Each party to the plan of merger, except the surviving LLC, ceases to exist.

3.  The surviving LLC possesses all of the rights, privileges, immunities, and powers of each merged LLC (including any rights of sovereign immunity) and is subject to all of the restrictions, disabilities, and duties of each merged LLC.

4.  All property and all debts, including contributions, and each interest belonging to or owed to each of the parties to the merger are vested in the surviving LLC without further act.

5.  Title to all real estate and any interest in real estate, vested in any party to the merger, does not revert and is not in any way impaired because of the merger.

6.  The surviving LLC has all the liabilities and obligations of each of the parties to the plan of merger and any claim existing or action or proceedings pending by or against any merged LLC may be prosecuted as if the merger had not taken place, or the surviving LLC may be substituted in the action.

7.  The rights of creditors and any liens on the property of any party to the plan of merger survive the merger.

TF App. 0154

8. The interests in an LLC that are to be converted or exchanged into interest, cash, obligations, or other property under the terms of the plan of merger are converted and the former interest holders are entitled only to the rights provided in the plan of merger of the rights otherwise provided by law.

9. The Articles of Organization of the surviving LLC are amended to the extent provided in the articles of merger.

## SECTION 806. RIGHT TO OBJECT

Unless otherwise provided in the Operating Agreement, upon receipt of the notice required by Section 802.5, a Member who did not vote in favor of the merger may, within twenty (20) days after the date of the notice, voluntarily dissociate from the LLC under Section 307.3 and receive fair value for the Member's LLC Interest under Section 504.

# PART 9. LIMITED LIABILITY COMPANIES WHOLLY OWNED BY THE TRIBE

## SUBPART 1. GENERAL PROVISIONS FOR TRIBALLY-OWNED LLCS

### SECTION 911. LLCS DIRECTLY OWNED BY THE TRIBE

It is hereby authorized to be created, by a duly adopted resolution of the Tribal Council, LLCs wholly owned by the Tribe. The organizer shall file with the Secretary Articles of Organization and a certified copy of the resolution authorizing the formation of each such LLC.

### SECTION 912. TRIBAL SUBSIDIARY COMPANIES

It is hereby authorized to be created by resolution of the Board of Directors of an LLC wholly owned by the Tribe, or of a wholly-owned subsidiary of such LLC, subsidiary LLCs to be wholly owned by the parent LLC, which shall be instrumentalities and arms of the Tribe. The organizer of such a Tribal subsidiary LLC shall file with the Secretary the Articles of Organization of the Tribal subsidiary LLC and a certified copy of a resolutions of the Board of Directors of the parent LLC authorizing the formation of the subsidiary LLC.

### SECTION 913. PRIVILEGES AND IMMUNITIES

The LLCs established under Sections 911 and 912 shall be considered to be instrumentalities and arms of the Tribe, and their officers and employees considered officers and employees of the Tribe, created for the purpose of carrying out authorities and responsibilities of the Tribe for economic development of the Tribe and the advancement of its citizens. Such LLCs, their directors, officers, and

TF App. 0155

employees shall, therefore, be entitled to all of the privileges and immunities enjoyed by the Tribe, including, but not limited to, immunities from suit in Federal, State and Tribal courts and from Federal, State, and local taxation or regulation, except that:

1.  The LLC may specifically grant limited waivers of its immunity from suit and consent to be sued in Tribal Court or another court of competent jurisdiction; provided, however, that:

    a.  any such waiver or consent to suit granted pursuant to the LLC's shall in no way extend to any action against the Tribe, nor shall it in any way be deemed a waiver of any of the rights, privileges and immunities of the Tribe;

    b.  any recovery against the LLC shall be limited to the assets of the LLC (or such portion of the LLC's assets as further limited by the waiver or consent), and the Tribe shall not be liable for the payment or performance of any of the obligations of the LLC, and no recourse shall be had against any assets or revenues of the Tribe in order to satisfy the obligations of the LLC; including assets of the Tribe leased, loaned, or assigned to the LLC for its use, without transfer of title, and

    c.  any waiver of the LLC's immunities granted pursuant to the LLC's Operating Agreement shall be further limited or conditioned by the terms of such waiver.

2.  The sovereign immunity of the LLC shall not extend to actions against the LLC by the Tribe acting as its sole Member, or, in the case of a subsidiary LLC created pursuant to this Part, by the parent LLC acting as its Member, pursuant to Section 912.

3.  The special privileges and immunities described in this Section shall only apply to an LLC wholly owned, directly or indirectly, by the Tribe.

## SECTION 914. OWNERSHIP

1.  No LLC Interest in any LLC in which the Tribe is the sole Member may be alienated unless approved by a duly adopted resolution of the Tribal Council. Further, no LLC Interest in any Tribally-owned subsidiary LLC may be alienated unless approved by a duly adopted resolution of the Board of Directors of the parent LLC.

2.  All LLC Interests in any LLC wholly owned by the Tribe shall be held by and for the Tribe, or in the case of a Tribal subsidiary LLC, by an LLC wholly owned by the Tribe. No individual citizen of the Tribe shall have any personal ownership interest in any LLC organized under this Act and Part, whether by virtue of such person's status as a citizen of the Tribe, as an officer of the government of the Tribe, or otherwise.

## SECTION 915. PROJECT COMPANIES WITH NON-TRIBAL OWNERS

Any LLC created pursuant to this Act and Part, including any subsidiary LLCs, may form or own interests or shares in any Entity with other governmental or non-governmental Persons under the laws of

TF App. 0156

the Tribe or any other jurisdiction ("Project Companies"); provided, however, that the partial ownership interest in such Project Companies shall not diminish or affect the privileges and immunities of the Tribally-owned LLC or subsidiary LLC created pursuant to this Act.

## SECTION 916. PURPOSE OF LLC'S DIRECTLY AND INDIRECTLY OWNED BY TRIBE

The Operating Agreement for an LLC wholly owned, directly or indirectly, by the Tribe shall state the purpose of the LLC that relates to the overall needs, priorities, goals, and objectives of the Tribe and the Tribe's government, including how the LLC will contribute to tribal economic policy and further the Tribe's goals of self-determination and economic self-sufficiency.

## SUBPART 2. SPECIAL FORMATION REQUIREMENTS FOR LLC'S WHOLLY OWNED BY THE TRIBE

## SECTION 921. FORMATION

1. The Chairman of the Tribal Council shall be the Organizer of any LLC in which the Tribe will be the sole Member.

2. Unless a delayed effective date is specified:

   a. the existence of an LLC directly owned by the Tribe begins when the Articles of Organization have been approved by a resolution enacted by the Tribal Council or approved by the Chairman, and the articles have been filed with the Secretary.

   b. the existence of a Tribal subsidiary LLC owned by a parent LLC that is wholly owned by the Tribe begins when the Articles of Organization have been approved by a resolution of the Board of Directors of the parent LLC, and the Articles of Organization have been filed with the Secretary.

## SECTION 922. ADDITIONAL REQUIREMENTS FOR ARTICLES OF ORGANIZATION

As set forth in Section 913, LLCs established under Sections 911 and 912 may grant a limited waiver of sovereign immunity in order to promote economic development through commercial transactions for which such a waiver is necessary and beneficial to the Tribe. The method for granting a limited waiver of sovereign immunity through the above mentioned entities is as follows:

1. The sovereign immunity of a Tribal entity may be waived only by:

   c. A resolution adopted by the Board of Directors of the Tribal LLC for the specific purpose of granting a waiver; and

   d. the language of the waiver must be explicit; and

TF App. 0157

e. the waiver must be contained in a written contract or commercial document to which the LLC is a party.

2. Waivers of sovereign immunity by resolution may be granted only when necessary to secure a substantial advantage or benefit to the tribal entity of the Tribe. Waivers of sovereign immunity by resolution may not be general but must be specific and limited as to duration, grantee, transaction, property or funds of the Tribal LLC subject to the waiver, the court having jurisdiction, and any applicable law.

## SUBPART 3. MANAGEMENT OF TRIBALLY-OWNED LLCS

### SECTION 931. BOARD OF DIRECTORS AS MANAGER

1. Any LLC in which a wholly-owned Tribal LLC is the sole Member shall be managed by a Board of Directors.

2. The number, terms, and method for selecting and removing Directors of any LLC in which a Tribally-owned LLC is the sole Member shall be specified in the subsidiary LLC's Articles of Organization.

## SUBPART 4. DISTRIBUTIONS TO TRIBE AS MEMBER

### SECTION 941. DISTRIBUTIONS OF INCOME TO TRIBE AS MEMBER

An LLC in which the Tribe is a Member shall distribute the net income of the LLC as set forth in a dividend plan adopted in accordance with the Articles or Organization and Operating Agreement (if any) and duly approved by the Tribe except that an LLC may retain reserves necessary to carry on the LLC's business in a reasonably prudent manner and as recommended by its Board of Directors, if applicable, subject to further limitations set forth in Section 507 and in its Articles of Organization.

## SUBPART 5. ADDITIONAL REPORTS AND AUDITS

### SECTION 951. AUDIT

In addition to any Member inspection rights provided in the Operating Agreement of an LLC wholly owned by the Tribe, the Tribe may at any time, by process in the manner provided in Section 941, require that any LLC wholly owned by the Tribe or an LLC in which the Tribe owns an LLC Interest be audited by an independent auditor hired by the Tribe who shall have the absolute right to require access to all of the LLC's records and documents necessary for such an audit.

### SECTION 952. FINANCIAL, BUSINESS, AND BUDGET INFORMATION FOR THE TRIBE

In addition to any reports to the Member required by the Operating Agreement, the management of each LLC in which the Tribe or a Tribally-owned LLC is the sole Member shall submit the following information to the Chairman of the Tribal Council and the Tribal Council or their designees (which the Tribal Council may deem confidential and proprietary upon request of the LLC's Board of Directors):

1. Copies of any periodic financial statements (including monthly or quarterly balance sheets, profit and loss statements, and cash flow statements) as may be prepared in the ordinary course of business, promptly after such statements are furnished to the LLC's management;

2. A full report of the business activities of the corporation within 120 days after the close of each fiscal year; and

3. A proposed annual budget for the following Tribal fiscal year, including any proposed funding from the Tribe or anticipated distributions to the Tribe, by May 15 of each year, and the final annual budget adopted by each Board by October 1 of each tribal fiscal year.

## SUBPART 6. ACTIONS AGAINST LLCS WHOLLY OWNED BY THE TRIBE

## SECTION 961. COURT ACTIONS AUTHORIZED

1. The Tribe, as the sole Member of any LLC organized pursuant to this Act, may bring a civil action against the LLC, its Managers or its officers in the Tribal Court only pursuant to this Part to:

   a. enjoin temporarily or permanently any action of the LLC that is an ultra vires act outside the authority of the LLC and that is either:

      i. unlawful; or

      ii. has or could cause material harm to the assets of the LLC or the Tribe if no immediate action is taken.

   b. require the distribution of the LLC's surplus net income, to the extent permitted by Section 507.

2. In accordance with Section 913.2, the sovereign immunity of the LLC shall not extend to actions against the LLC by the Tribe acting in its capacity as a Member of such LLC, or, in the case of a subsidiary LLC created pursuant to this Part, by the parent LLC acting as a Member of such subsidiary LLC.

3. Nothing contained herein shall be construed authorizing actions of any kind whatsoever against the Tribe.

TF App. 0159

## SECTION 962. APPROVAL OF TRIBE REQUIRED

The filing of any court action against the LLC pursuant to this Part must be authorized by the Tribe as a Member in the same manner as required for voting on any item properly coming before the Tribe as a Member. The request for consideration of the proposed court action may be made by the Chairman of the Indian Council.

## SECTION 963. RELIEF AVAILABLE

In any action brought under this Part, the Tribal Court may, based upon a preponderance of the evidence set forth in its findings of fact and conclusions of law:

1. Issue a temporary restraining order, preliminary injunction, and permanent injunctive relief pursuant to the procedures and standards in the Tribe's Rules of Civil Procedure, except that no bond need be posted for any preliminary injunctive relief; or

2. Order that funds of the LLC be distributed to the Tribe to the extent permitted by the Articles of Organization and Section 507.


# PART 10. REGISTRATION OF FOREIGN LIABILITY COMPANIES
[RESERVED.]


# PART 11. SEVERABILITY CLAUSE

If any provision of this Act or the application of such provision to any Person or circumstance is found to be unenforceable by a court of competent jurisdiction, such provision shall be of no force or effect; but the remainder of the Act shall continue in full force and effect.


[Enacting language and any approval signature to follow]

TF App. 0160

# EXHIBIT B

TF App. 0161



# OTOE·MISSOURIA
## TRIBE OF INDIANS

8151 HIGHWAY 177
RED ROCK, OK 74651-0348

OMTC# _54293_ FY2011

RESOLUTION

## A RESOLUTION CREATING GREAT PLAINS LENDING, LLC

NOW, THEREFORE, BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE OTOE-MISSOURIA TRIBE OF INDIANS, AND
WHEREAS, the Otoe-Missouria Tribal Council, the governing body of the Otoe-Missouria Tribe of Indians, in accordance with the Tribal Constitution, Article VIII-Powers, Section I, duly convened to discuss, review, and approve tribal business; and

WHEREAS, the Constitution and By-Laws of the Otoe-Missouria Tribe of Indians provides that the Otoe-Missouria Tribal Council shall have the power to act on behalf of the Tribe in all matters on which the Tribe is empowered to act; and

WHEREAS, the Otoe-Missouria Tribal Council is the supreme governing body of the Otoe-Missouria Tribe of Oklahoma with the authority to enact laws and ordinances; and

WHEREAS, the Otoe-Missouria Tribal Council has determined that it is in the best interests of the Otoe-Missouria people to organize an arm of the Tribe pursuant to the Otoe-Missouria Tribe of Indians Limited Liability Company Act to advance tribal economic development to aid addressing issues of public safety, health and welfare, and therefore, desires to create the tribal lending entity, Great Plains Lending, LLC; and

WHEREAS, the Otoe-Missouria Tribal Council has determined that the best interest of the Otoe-Missouria Tribe of Indians is best served by the creation of Great Plains Lending, LLC.

THEREFORE, BE IT RESOLVED, that the Otoe-Missouria Tribal Council does hereby form Great Plains Lending, LLC as a limited liability company wholly-owned by the Tribal government pursuant to Part 9 of Otoe-Missouria Limited Liability Company Act with all the powers and attributes associated therewith including, but not limited to, sovereign immunity. The Articles of Formation for Great Plains, LLC are attached to this resolution and are hereby adopted and accepted.

BE IT FURTHER RESOLVED, that the Board of Directors of Great Plains Lending, LLC shall consist of five (5) members including the President of the Development Authority and the Tribal Vice-Chairman. The remaining Board members shall be appointed by the Tribal Council and shall serve three (3) year terms. All Board members of Great Plains Lending, LLC or any Great Plains Lending, LLC subsidiary must be at least eighteen (18) years old. No Board member of Great Plains Lending, LLC or any Great Plains Lending, LLC subsidiary may have ever been: (i) convicted of any misdemeanor involving fraud or violation of law governing the consumer finance business or any business of a similar nature or any felony, or (ii) permanently or temporarily enjoined by a court of competent jurisdiction from engaging in or continuing any conduct or practice involving any aspect of a consumer finance service or any business of a similar nature.

**TF App. 0162**

BE IT FURTHER RESOLVED, that pursuant to Part 9 of the Otoe-Missouria Limited Liability Company Act, the Board of Directors of Great Plains Lending, LLC shall have the authority to create subsidiary LLCs which are wholly owned by the Tribe.

BE IT FURTHER RESOLVED, that, the Otoe-Missouria Tribal Council grants to Great Plains Lending, LLC formed under Part 9 of the Otoe-Missouria Tribe of Indians Limited Liability Company, as a wholly-owned entity of the Tribe, a consumer lending license required under Section 104 of the Otoe-Missouria Tribe of Indians Consumer Finance Regulatory Commission Ordinance hereby waiving the fees, application and renewal requirements of Sections 105, 106, 107, 108 and 109 of such Ordinance.

## CERTIFICATION

We, the undersigned, Chairman and Secretary of the Otoe-Missouria Tribal Council, do hereby certify by signature, that the above foregoing Resolution was given due consideration on this 4th day of May, 2011 with a quorum present and a vote of:

__6 FOR, __0 AGAINST, __0 ABSENT, and __1 ABSTAINING

(SEAL)

Chairman

ATTEST _____
Secretary

# EXHIBIT C

TF App. 0164



# OTOE·&MISSOURIA TRIBE OF INDIANS

8151 HIGHWAY 177
RED ROCK, OK 74651-0348

## RESOLUTION

**OMTC #** _2105c5_  **FY 2010**

**"A RESOLUTION ADOPTING THE CONSUMER FINANCE SERVICES REGULATORY COMMISSION ORDINANCE"**

**NOW, THEREFORE, BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE OTOE-MISSOURIA TRIBE OF INDIANS, AND**

**WHEREAS,** The Otoe-Missouria Tribal Council, the governing body of the Otoe-Missouria Tribe of Indians, in accordance with the Tribal Constitution, Article VIII-Powers, Section 1., duly convened to discuss, review, and approve tribal business, and

**WHEREAS.** the Constitution and By-Laws of the Otoe-Missouria Tribe of Indians provides that the Otoe-Missouria Tribal Council shall have the power to act on behalf of the Tribe in all matters on which the Tribe is empowered to act, and

**WHEREAS,** the Otoe-Missouria Tribal Council is the Supreme governing body of the Otoe-Missouria Tribe of Oklahoma with the authority to enact laws and ordinances,

**WHEREAS,** the Otoe-Missouria Tribe is desirous of providing a basis under tribal law to authorize and regulate the conduct of consumer financial services on Indian lands of the Otoe-Missouria Tribe,

**WHEREAS,** the Otoe-Missouria Tribe desires to approve the attached "Consumer Finance Regulatory Commission Ordinance": in order to authorize and regulate consumer financial services on the Indian Lands of the Otoe-Missouria Tribe, superseding any previous tribal consumer finance services ordinances.

**SO, THEREFORE BE IT RESOLVED,** that the Otoe-Missouria Tribal Council does hereby approve and adopt this resolution approving and adopting the attached Consumer Finance Services Regulatory Commission Ordinance effective immediately.

TF App. 0165

## OTOE-MISSOURIA TRIBE OF INDIANS
## TITLE [##]. INTERESTS, LOANS AND DEBT
## CHAPTER [##]. CONSUMER FINANCE SERVICES REGULATORY COMMISSION

Section 101. Ordinance; how cited.

This Chapter shall be known and may be cited as the Consumer Finance Services Regulatory Commission Ordinance.

Section 102. Terms, defined.

For purposes of the Consumer Finance Services Regulatory Commission Ordinance:

(1)     Check means any check, draft, or other instrument for the payment of money;

(2)     Consumer Finance Services means any person or entity who for a fee (a) accepts a check dated subsequent to the date it was written or (b) accepts a check dated on the date it was written and holds the check for a period of days prior to deposit or presentment pursuant to an agreement with or any representation made to the maker of the check, whether express or implied or (c) makes a cash loan that bears a date for repayment after the date that the loan proceeds are delivered to the borrower or (d) makes any other type of consumer loan or credit financing

(3)     Commission means the Otoe-Missouria Consumer Finance Services Regulatory Commission created by this Ordinance.

(4)     Licensee means any person licensed under this Ordinance; and

(5)     Person means an individual (non-Tribal Member), proprietorship, association, joint venture, joint stock company,    partnership, limited partnership, limited liability company, business corporation, nonprofit corporation, or any group of individuals however organized.

(6)     Loan means any loan whether it is secured by collateral or unsecured.

(7)     Tribal Council shall mean the duly-elected Tribal Council pursuant to the Tribal Constitution of the Otoe-Missouria Tribe of Indians.

(8)     Tribe shall mean the Otoe-Missouria Tribe of Indians.

Section 103.

The Tribe hereby establishes the Otoe-Missouria Consumer Finance Services Regulatory Commission (hereinafter, "Commission") as the public body solely responsible for the regulation of the Tribe's Consumer Finance Services operations. The purpose of the Commission is regulatory, not managerial. In order to carry out its regulatory duties, the Commission shall have unrestricted access to all areas of the lending operations and to all records.

(1)     Composition. The Commission shall constitute three (3) members including the Tribal Treasurer, Tribal Secretary, and one other member elected by the Tribal Council. A

1

**TF App. 0166**

Commissioner may be a member or non-member of the Tribe. Each Commissioner Member shall be at least twenty-one (21) years of age and have sufficient knowledge of lending regulation, business, finance or law to carry out the duties prescribed by this Ordinance. Each Commissioner shall take an oath to support and defend the Constitution and laws of the Tribe.

(2) Term of Office. Commission members shall serve for a period of three (3) years from the date of appointment and until a successor is duly appointed and installed. The Commission shall elect from among its members a Chairperson.

(3) Removal. To maintain the Commission's independence, Commissioners may be removed from office prior to the expiration of their respective terms for serious inefficiency, neglect of duty, misconduct in office, malfeasance in office, or for a conviction of or a plea of nolo contendere to a felony involving fraud, dishonesty or a crime of moral turpitude, or other acts that would render a Commissioner unqualified for his/her position by a majority vote of the Tribal Council. Prior to removal, such Commissioner shall be granted a hearing before the Tribal Council, and (b) given a written notice of the specific charges against him or her at least ten (10) days prior to such hearing. Any allegations of neglect of duty, misconduct, malfeasance, or other acts that would render a Commissioner unsuitable for his/her position must be substantiated by a preponderance of the evidence. Commissioners subject to removal will be given an opportunity to provide evidence rebutting the grounds for their proposed removal before the removal is considered. A vote of the Tribal Council on the validity of the removal shall be final and not subject to further appeal.

(4) Conflict of Interest. No member of the Commission may engage in any business which is subject to regulation by the provisions of this Ordinance.

Section 104. License required.

No person shall operate a Consumer Finance Services business within the jurisdiction of the Otoe-Missouria Tribe unless the person is licensed as provided in the Otoe-Missouria Tribe Consumer Finance Services Ordinance, save and except American Web Loan, Inc. (AWL) established pursuant to the laws of the Tribe which shall be granted a license upon its inception. AWL shall be subject to all other terms, conditions, rules and regulations found herein.

Section 105. Application for license; form; contents: criminal history record information check.

(1) An applicant for a license shall submit an application, under oath, to the Commission on forms prescribed by the Commission. The forms shall contain such information as the Commission may prescribe, including, but not limited to:

(a) The applicant's financial condition;

(b) The qualifications and business history of the applicant and of its officers, Directors, shareholders, partners, or members;

(c) Whether the applicant or any of its officers, directors, shareholders, partners, or members have ever been convicted of any (i) misdemeanor involving fraud or violation of law governing the consumer finance business or any business of a similar nature or (ii) felony;

2

TF App. 0167

(d)     Whether the applicant or any of its officers, directors, shareholders, partners, or members have ever been permanently or temporarily enjoined by a court of competent jurisdiction from engaging in or continuing any conduct or practice involving any aspect of a consumer finance service or any business of a similar nature;

(e)     A description of the applicant's proposed method of doing business; and

(f)     The applicant's social security or tax identification number.

Section 106. Application; fee.

The application required by Section 105 shall be accompanied by:

(1)     A nonrefundable application fee of five hundred dollars;

Section 107. License; issuance; conditions.

The Commission shall issue a license to an applicant, if, after any investigation of the applicant, the Commission determines that:

(1)     The experience, character, and general fitness of the applicant and its officers, directors, shareholders, partners, or members are such as to warrant the belief that the applicant will conduct the consumer finance services business honestly, fairly, and efficiently;

(2)     The applicant and its officers, directors, shareholders, partners, or members have not been convicted of a felony or misdemeanor in this state or any other jurisdiction which would indicate moral turpitude on the part of the applicant;

(3)     The applicant is financially responsible and will conduct the business pursuant to the Consumer Finance Services Ordinance; and

(4)     The applicant has assets of at least twenty-five thousand dollars available for operating the consumer finance services business.

Section 108. Application for license; timely action of Commission required; appeal.

The Commission shall approve or deny an application for a license by written order not more than thirty days after the filing of a substantially complete application. Failure of the Commission to act on a substantially complete application within thirty days shall constitute denial of the application. Any decision of the Commission issued pursuant to this ordinance may be appealed to the Tribal Council.

Section 109. License; posting; renewal; fee.

3

TF App. 0168

A license issued pursuant to the Consumer Finance Services Ordinance shall be conspicuously posted at the licensee's place of business. All licenses shall remain in effect until the next succeeding December 1, unless canceled, suspended, or revoked by the Commission or surrendered by the licensee. Licenses may be renewed annually by filing with the Commission a renewal fee of two hundred fifty dollars and an application for renewal containing such information as the Commission may require to indicate any material change in the information contained in the original application or succeeding renewal applications.

### Section 110. Surrender of license; effect.

A licensee may surrender a Consumer Finance Services license by delivering to the Commission written notice that the license is surrendered. The surrender shall not affect the licensee's civil or criminal liability for acts committed prior to such surrender, affect the liability of the surety on the bond, or entitle such licensee to a return of any part of the annual license fee or fees. The Commission may establish procedures for the disposition of the books, accounts, and records of the licensee and may require such action as he or she deems necessary for the protection of the makers of checks which are outstanding at the time of surrender of the license.

### Section 111. Licensee: duty to inform Commission; when.

A licensee shall be required to notify the Commission in writing within thirty days after the occurrence of any material development, including, but not limited to:

(1)     Bankruptcy or corporate reorganization;

(2)     Business reorganization;

(3)     Institution of license revocation procedures by any other state or jurisdiction;

(4)     The filing of a criminal indictment or complaint against the licensee or any of its officers, directors, shareholders, partners, members, employees, or agents; or

(5)     A felony conviction against the licensee or any of the licensee's officers, directors, shareholders, partners, members, employees, or agents

### Section 112. License: not transferable or assignable.

A license issued pursuant to the Consumer Finance Services Ordinance shall not be transferable or assignable.

### Section 113. Change in control of licensee; approval required.

The prior written approval of the Commission shall be required whenever a change in control of a licensee is proposed. Control in the case of a corporation shall mean (1) direct or indirect ownership or the right to control ten percent or more of the voting shares of the corporation or (2) the ability of a person or group acting in concert to elect a majority of the directors or otherwise effect a change in policy. Control in the case of any other entity shall mean any change in the principals of the organization, whether active or passive. The Commission may require such information, as he or

4

TF App. 0169

she deems necessary to determine whether a new application is required. The person or persons requesting such approval shall pay costs incurred by the Commission in investigating a change of control request.

## Section 114. Licensee; principal place of business; change of location; branch offices; approval required; fee.

A licensee may offer a consumer finance business only at an office designated as its principal place of business in the application. The licensee shall maintain its books, accounts, and records at its designated principal place of business. A licensee may change the location of its designated principal place of business with the prior written approval of the Commission. The Commission may establish forms and procedures for determining whether the change of location should be approved.

## Section 115. Operating with other business; conditions.

A licensee may operate a Consumer Finance Services business at a location where any other business is operated or in association or conjunction with any other business if:

(1) The books, accounts, and records of the consumer finance services business are kept and maintained separate and apart from the books, accounts, and records of the other business; and

(2) The other business is not of a type, which would tend to conceal evasion of the Consumer Finance Services Ordinance. If the Commission deter    mines upon investigation that the other business is of a type which would conceal evasion of the act, the Commission, shall order such licensee to cease the operation of the other business at such location.

## Section 116. Licensee; written notice; contents; fees, charges, and penalties; posting required.

(1) Every licensee shall, at the time any Consumer Finance Services transaction is made, give to the maker of the check, or if there are two or more makers, to one of them, or the borrower, a notice written in plain English disclosing:

    (a) The fee to be charged for the transaction;

    (b) The date on which the check will be deposited or presented for negotiation or the date the borrower's bank account will be debited; and

    (c) Any penalty which the licensee will charge if the check is not negotiable or the borrower's account cannot be debited on the date agreed upon.

## Section 117. Commission; examination of licensee; costs.

The Commission may examine the books, accounts, and records of each licensee no more often than annually, except as provided in Section 118. The costs of the Commission incurred in an examination shall be paid by the licensee.

5

TF App. 0170

Section 118. Alleged violations; Commission; powers and duties.

(1)    The Commission may examine or investigate complaints about or reports of alleged violations of the Consumer Finance Services Ordinance or any rule, regulation, or order of the Commission thereunder. The Commission may order the actual cost of such examination or investigation to be paid by the person who is the subject of the examination or investigation, whether the alleged violator is licensed or not.

(2)    The Commission may publish information concerning any violation of the act or any rule, regulation, or order of the Commission under the act.

(3)    For purposes of any investigation, examination, or proceeding under the act, the Commission may administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, agreements, or other documents or records which the Commission deems relevant or material to the examination, investigation, or proceeding.

(4)    In the case of refusal to obey a subpoena issued to any person, the Otoe-Missouria Tribal Court, upon application by the Commission, may issue an order requiring such person to appear before the Commission and to produce documentary evidence if so ordered to give evidence on the matter under investigation or in question. Failure to obey the order of the court may be punished by the court as contempt.

(5)    Upon receipt by a licensee of a notice of investigation or inquiry request for information from the department, the licensee shall respond within thirty calendar days. Each day a licensee fails to respond as required by this subsection shall constitute a separate violation.

(6)    If the Commission finds, after notice and opportunity for hearing, that any person has violated subsection (5) of this Section, the Commission may order such person to pay (a) an administrative fine of not more than one thousand dollars for each separate violation and (b) the costs of investigation. All fines collected by the department pursuant to this subsection shall be remitted to the Tribal Treasurer for such use as may be determined by the Tribal Council.

(7)    If a person fails to pay an administrative fine and the costs of investigation ordered pursuant to subsection (6) of this section, a lien in the amount of such fine and costs may be imposed upon all assets and property of such person within the jurisdiction of the Tribe and may be recovered in a civil action by the Commission. The lien shall attach to any other property of such person when notice of the lien is filed against the property with the [designated Tribal officer]. Failure of the person to pay such fine and costs shall constitute a separate violation of the Consumer Finance Services Ordinance.

Section 119. Licensee; disciplinary actions; failure to renew.

(1)    The Commission may, following notice and a hearing, suspend or revoke any license issued pursuant to the Consumer Finance Services Ordinance if he or she finds:

6

(a) A licensee or any of its officers, Commissions, partners, or members has knowingly violated the act or any rule, regulation, or order of the Commission thereunder;

(b) A fact or condition existing which, if it had existed at the time of the original application for such license, would have warranted the Commission to refuse to issue such license; or

(c) A licensee has abandoned its place of business for a period of sixty days or more.

(2) Except as provided in this Section, a license shall not be revoked or suspended except after notice and a hearing.

(3) If a licensee fails to renew its license as required by Section 109 and does not voluntarily surrender the license pursuant to Section 110, the Commission may issue a notice of expiration of the license to the licensee in lieu of revocation proceedings.

(4) Revocation, suspension, cancellation, or expiration of a license shall not impair or affect the obligation of a preexisting lawful contract between the licensee and any person, including a maker of a check.

(5) Revocation, suspension, cancellation, or expiration of a license shall not affect civil or criminal liability for acts committed before the revocation, suspension, cancellation, or expiration.

Section 120. Cease and desist order; procedure; appeal.

(1) If the Commission believes that any person has engaged in or is about to engage in any act or practice constituting a violation of the Consumer Finance Services Ordinance or any rule, regulation, or order of the Commission, the Commission may issue a cease and desist order.

(2) Upon entry of a cease and desist order the Commission shall promptly notify in writing all persons to whom the order is directed that it has been entered and of the reasons for the order. Any person to whom the order is directed may in writing request a hearing within fifteen business days after the date of the issuance of the order. Upon receipt of such written request, the matter shall be set for hearing within thirty business days after receipt by the Commission, unless the parties consent to a later date or the hearing officer sets a later date for good cause. If a hearing is not requested within fifteen business days and none is ordered by the Commission, the order of the Commission shall automatically become final and shall remain in effect until modified or vacated by the Commission. If a hearing is requested or ordered, the Commission, after notice and hearing, shall issue his or her written findings of fact and conclusions of law and may affirm, vacate, or modify the order.

(3) The Commission may vacate or modify an order if he or she finds that the conditions which caused its entry have changed or that it is otherwise in the public interest to do so. Any person aggrieved by a final order of the Commission may appeal the order to the Otoe-Missouria Tribal Court.

Section 121. Injunction, restraining order, or writ of mandamus.

If the Commission believes that any person has engaged in or is about to engage in any act or

7

practice constituting a violation of the Consumer Finance Services Ordinance or a violation of any rule, regulation, or order of the Commission thereunder, the Commission may initiate an action in Otoe-Missouria Tribal Court to enjoin such acts or practices and to enforce compliance with the ordinance or any order under the ordinance. Upon a proper showing a permanent or temporary injunction, restraining order, or writ of mandamus shall be granted or a receiver or conservator may be appointed for the defendant's assets. The Commission shall not be required to post a bond.

Section 122. Administrative fine; lien; failure to pay; separate violation.

(1)     If the Commission finds, after notice and hearing in accordance, that any person has violated the Consumer Finance Services Ordinance or any rule, regulation, or order of the Commission thereunder, the Commission may order such person to pay (a) an administrative fine of not more than five thousand dollars for each separate violation and (b) the costs of investigation.

(2)     If a person fails to pay an administrative fine and the costs of investigation ordered pursuant to subsection (1) of this Section, a lien in the amount of such fine and costs may be imposed upon all assets and property of such person within the jurisdiction of the Tribe and may be recovered in a civil action by the Commission. Failure of the person to pay such fine and costs shall constitute a separate violation of the Ordinance.

Section 123. Fees, charges, costs, and fines; distribution.

All fees, charges, costs, and fines collected by the Commission under the Consumer Finance Services Ordinance shall be remitted to the Tribal Treasurer for use as determined by the Tribal Council.

Section 124. Personal jurisdiction.

(1)     Obtaining a license pursuant to Consumer Finance Services Ordinance shall constitute consent to tribal jurisdiction and sufficient contact with the Tribe for the exercise of personal jurisdiction over the licensee in any action arising out of the licensee's activities within the jurisdiction of the Tribe.

(2)     Obtaining a loan, cash advance, or any other type of consumer financing, from any licensee where the loan, cash advance, or financing was approved by the licensee on the reservation of the Otoe-Missouria Tribe in Oklahoma shall constitute consent to tribal jurisdiction and sufficient contact with the Tribe for the application of Tribal law and regulations including, but not limited to, the Consumer Finance Services Ordinance, to the loan, cash advance, or consumer financing transaction.

Section 125. Commission; rules and regulations; additional powers.

The Commission may adopt and promulgate rules and regulations and issue orders, rulings, findings, and demands as may be necessary to carry out the purposes of the Consumer Finance Services Ordinance subject to approval by the Tribal Council.

TF App. 0173

## CERTIFICATION

We, the undersigned, Chairman and Secretary of the Otoe-Missouria Tribal Council, de hereby certify by signature, that the above and foregoing Resolution was given due consideration on this 10th day of February, 2010 with a quorum present and a vote of:

_____4__ FOR, ____0__ AGAINST, _____0__ ABSENT, and ___3___ ABSTAINING,

Thereby:      [ √ ] APPROVING      [  ] DISAPPROVING, this Resolution.

(SEAL)

ATTEST _____
        Barbara Walton, Secretary

_____
John R. Shotton
Chairman

# EXHIBIT D

**OPERATING AGREEMENT**
of
**GREAT PLAINS LENDING, LLC**

**An Otoe-Missouria Tribe of Indians Limited Liability Company**

THIS OPERATING AGREEMENT for GREAT PLAINS LENDING, LLC, an Otoe-Missouria Tribe of Indians company (the "Company"), is made and entered into and effective as of _____ 20___.

## RECITALS

The Member(s) acknowledge the following:

The Otoe-Missouria Tribe of Indians desires to form a limited liability company for the purpose of carrying on a for-profit business and to further the economic goals and initiatives of the Tribe.

The Company acting for the Tribe desires to set forth in writing the terms by which the Company will be organized and operated.

## ARTICLE I
## DEFINITIONS, NAME AND TERM

1.1. Definitions. In addition to the terms defined elsewhere in this Operating Agreement the following definitions shall apply:

a. "Act" means the Otoe-Missouria Tribe of Indians Limited Liability Company Act, as amended from time to time, and any successor to such statute.

b. "Operating Agreement" means the operating agreement of Great Plains Lending, LLC, as amended from time to time.

c. "Articles of Organization" mean the Articles of Organization of the Company filed with the Tribal Secretary, as amended from time to time.

d. "Board" means the Board of Directors or Directors of the Company acting pursuant to the authority conferred upon them by this Operating Agreement.

e. "Cash Flow" means all cash receipts of the Company during any year, other than capital contributions of the Tribe, less the sum payments of principal and interest on indebtedness of the Company (including working capital loans), all cash expenditures made in connection with the Company's business including, without limitation, capital expenditures, and all payments to Reserves to the extent such payments and expenditures are made from such cash receipts. Cash Flow shall be determined separately for each fiscal year.

f. "Company" means Great Plains Lending, LLC, an Otoe-Missouria Tribe of Indians

1

**TF App. 0176**

limited liability company.

    g. "Fiscal Year" means the Company's fiscal year.

    h. "Tribal Council" means the Tribal Council of the Otoe-Missouria Tribe of Indians.

    i. "Director(s)" means one or more of the persons appointed to manage the Company under Article III.

    j. "Member" means the Tribe as the sole Member of the Company.

    k. "Chairman" means the Chairman of the Tribe.

    l. "Profits and Losses" mean the income or loss of the Company determined in accordance with Generally Accepted Accounting Principles ("GAAP").

    m. "Reserves" mean, with respect to any fiscal year, any funds set aside or amount allocated during such year to reserves for Company expenses, both ordinary and capital, liabilities and operations, subject to the approval of the Board.

    n. "Tribe" means the Otoe-Missouria Tribe of Indians.

    1.2. <u>Formation</u>. The Company was organized by executing and filing the Articles of Organization with the Tribal Secretary pursuant to the Act.

    1.3. <u>Name and Principal Place of Business</u>. The name of the Company is Great Plains Lending, LLC. The principal place of business of the Company is the principal office as listed below or such other place as the Board designates from time to time.

    1.4. <u>Registered Office and Registered Agent</u>. The Company's principal office is located at 8151 Highway 177, Red Rock, OK 74651, and its registered agent at such address is a Company Director. The Company may change its registered office and/or registered agent from time to time as provided under the Act.

    1.5. <u>Term</u>. The term of the Company shall be perpetual, or until the Company is dissolved or merged in accordance with the provisions of this Operating Agreement and/or the Act.

**ARTICLE II**
**BUSINESS OF THE COMPANY**

    2.1. The business of the Company shall be:

    a. To accomplish any lawful purpose which shall at any time appear conducive or expedient for the protection or benefit of the Company and its assets;

    b. To exercise all the powers necessary to or reasonably connected with the Company's

2

**TF App. 0177**

business, which may be legally exercised by limited liability companies under the Act; and

    c. To engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

## ARTICLE III
## DIRECTORS

    3.1. <u>Authority of Director</u>. Except as otherwise provided in this Operating Agreement, and subject to the consent or approval of the Tribal Council with respect to those matters requiring such consent or approval under the terms of this Operating Agreement, the management of the Company shall be vested in the Board of Directors appointed in accordance with Section 3.5. The Directors shall exercise their management authority over the Company as provided in this Operating Agreement.

    3.2. <u>Roles of Individual Directors</u>.

    a. In addition to their collective management responsibility, which shall be exercised as described in Section 3.3 of this Operating Agreement, each Director shall possess the particular authority and discharge the specific responsibilities as the Board may delegate to the individual Director.

    b. The authority and responsibility delegated among the Directors may include:

    (i) developing strategic plans; (ii) developing business plans and projections; (iii) formulating marketing programs; (iv) scheduling and supervision of the Company's work crews; (v) purchasing materials and supplies required to perform the Company's contracts; (vi) bidding individual work projects for the Company; (vii) keeping all financial and business records of the Company; (viii) making any and all filings and registrations required by jurisdictions outside of the Tribe in which the Company operates; (ix) preparing reports and other communications with the Tribe; and (x) taking such other administrative action as shall be required to operate the Company.

    c. The Board shall choose a Chairperson and Chief Executive from among the Directors. The Chairperson shall have voting authority over all matters coming before the Board.

    d. The Directors may delegate their responsibilities to officers or other personnel of the Company, but shall continue to be responsible for the discharge of the delegated authority. A Director may serve as an officer in addition to their position as a Director.

    3.3. <u>Director Meetings</u>. The Directors shall meet at least monthly, or at the request of any of them, to (i) discuss their individual activities and responsibilities; (ii) by majority vote, to authorize major business actions, subject to Legislative consent or approval where specifically required by this Operating Agreement; (iii) by majority vote, adopt projections and business plans; and (iv) review and monitor achievement of goals and objectives described in the Company's business plans and projections.

TF App. 0178

3.5. Appointment and Replacement of Directors. The Directors of the Company shall be appointed by the Tribal Council. Any Director may be removed at any time by the Tribal Council, with or without cause, provided that a successor to such Director is appointed in accordance with this Section. Directors shall not serve for s specified term, and shall remain in office until they resign or are replaced. The initial number of Directors of the Company shall be five (5). Only such persons who have the experience and background to effectively manage the business and the affairs of the Company shall be appointed to the Board.

## ARTICLE IV
## CAPITAL

4.1. Initial Contributions to Capital by Members. On the date hereof, the Tribe has contributed sufficient capital and resources to allow for the ongoing business of the Company.

4.2. No Further Liability. The Tribe shall not be required to make any additional capital contributions, and the Tribe shall have no liability to creditors of the Company.

4.3. Working Capital Contributions and Loans. It is intended that the Company will operate separately from the Tribe and will not require continuing financial support from the Tribe. However, it may be necessary to obtain funding for working capital and/or capital acquisitions by the Company. If independent financing facilities are not available to the Company, the Tribe may provide such funding through loans or capital contributions on such terms and conditions as shall be agreed between the Directors on behalf of the Company and Tribal Council on behalf of the Tribe.

## ARTICLE V
## PROFITS AND LOSSES, DISTRIBUTIONS, CAPITAL ACCOUNTS

5.1. Profits and Losses. All Profits and Losses shall be allocated to the Tribe as the sole Member.

5.2. Distributions Prior to Dissolution. All Cash Flow shall be distributed to the Tribe, at least quarterly unless otherwise approved by the Tribal Council.

5.3. Distribution Upon Dissolution and Winding Up. Upon dissolution and winding up of the Company, the assets of the Company after payment of the debts and obligations of the Company and the funding of any Reserves shall be distributed to the Tribe.

## ARTICLE VI
## COMPENSATION TO DIRECTORS, EMPLOYMENT POLICIES AND BENEFITS

6.1. Generally. Directors shall be entitled to reasonable and competitive compensation for services rendered to the Company, but only to the extent approved in advance by the Board.

6.2. Reimbursement of Expenses. The Company shall reimburse the Directors and other employees for all out-of-pocket expenses they incur or have incurred on behalf of the Company

4

TF App. 0179

or in connection with the business of the Company pursuant to policies approved in advance by the Board.

6.3. Employment Policies and Benefits. The Company shall operate in accordance with such personnel policies and procedures and employee compensation and benefit plans as may be formulated by the Directors and approved by the Board, as the same may be amended from time to time.

## ARTICLE VII
## MANAGEMENT

7.1. Management.

a. The business and affairs of the Company shall be managed by its Directors acting as set forth in this Article and in Article III subject to approval and consent of the Board on those matters specified herein. Decisions relating to the business and affairs of the Company, other than those that are clearly routine or incidental to the day-to-day conduct of the Company's business, shall be made by majority vote of the Directors. The Directors are hereby authorized to take any action and make any decision within their areas of authority and delegated to them by the Board pursuant to Section 3.2 that is clearly routine or incidental to the day-to-day conduct of the Company's business. The following types of actions and decisions are not incidental to the day-today conduct of the Company's business and require the consent or approval of the Member(s): (i) selling, disposing of, or leasing the non-inventory assets of the Company having an aggregate value in excess of $50,000; (ii) acquiring any real or personal property with a value in excess of $50,000 other than building materials and supplies obtained in the ordinary course of the Company's business; (iii) incurring debt in excess of $100,000; (iv) making any distributions other than ordinary quarterly distributions to the Tribe; (v) mortgaging, pledging, or otherwise encumbering any assets of the Company; (vi) amending the Articles of Organization or Operating Agreement; (vii) taking or authorizing any act on behalf of the Company that contravenes these Articles; (viii) taking or authorizing any such act which would make it impossible to carry on the ordinary business of the Company; or (ix) taking or authorizing any other action or making any other decision requiring the consent or approval of the Tribal Council as may be set forth in this Operating Agreement.

b. The Directors shall manage and control the business of the Company in accordance with generally accepted business standards and the provisions of Article III, and shall devote such time to the Company's business as shall be reasonably necessary.

c. The Directors shall not be liable, responsible, or accountable in damages or otherwise to the Company for any acts performed or omitted by them in good faith except for acts or omissions which constitute gross negligence or willful misconduct. The Directors shall be indemnified and held harmless by the Company, to the extent of the Company's assets, against obligations and liabilities arising or resulting from or incidental to the management of the Company's affairs, provided that no Director shall be entitled to indemnification hereunder for acts or omissions constituting gross negligence or willful misconduct. Any such indemnification shall only be from the assets of the Company.

5

TF App. 0180

7.2. <u>Restrictions on Powers of Directors</u>. No Director, attorney-in-fact, employee, or agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit, to make distributions, or to render it pecuniary liable for any purpose unless authorized to act with respect to such matter in accordance with this Article and Article III.

7.3. <u>Meetings</u>. No annual meeting of the Member(s) is required. Special meetings of the Member(s), for any purpose or purposes, unless otherwise prescribed by the Act, may be called at any time by the Tribal Council.

7.4. <u>Informal Action</u>. The Directors may take any and all actions which they are required or permitted to take concerning the conduct of the business of the Company without a meeting if the action is evidenced by one or more written consents describing the action take and signed by all of the Directors.

7.5. <u>Administrative and Professional Services</u>. As an entity separate from the Tribe, the Company shall either contract with independent professionals for accounting, legal, and other services which the Company may require; or may contract with the Tribe to obtain such services from the Tribe's internal operating departments on such terms as shall be agreed between the Directors on behalf of the Company and Tribal Council on behalf of the Tribe.

## ARTICLE VIII
## ACCOUNTING AND BANK ACCOUNTS

8.1. <u>Books</u>. The Company shall maintain books and records which shall be kept at the principal office of the Company or such other place designated by the Legislature. The Tribe as sole Member shall have access to and the right to inspect and copy such books and records at any time.

8.2. <u>Accounting and Reports</u>. Within sixty (60) days after the end of each fiscal year, the Directors shall deliver to the Tribe, (i) an audited balance sheet as of the end of such fiscal year and (ii) an audited GAAP.

8.3. <u>Bank Accounts</u>. The Company shall open and maintain bank accounts in which only funds of the Company shall be deposited. The funds in such accounts shall be disbursed solely for the business of the Company. Withdrawals from any Company bank account shall be made only upon the signature of such person or persons as the Directors may designate from time to time.

8.4. <u>Method of Accounting</u>. The books and records of the Company shall be maintained on the accrual method of accounting in accordance with GAAP.

## ARTICLE IX
## DISSOLUTION AND WINDING UP

9.1. <u>Dissolution</u>. The Company shall dissolve on the happening of any of the following events:

**TF App. 0181**

a. Written direction of the Tribal Council to dissolve the Company; or

b. By decree of judicial dissolution of the Tribe's Tribal Court pursuant to the Act.

9.2. <u>Procedure for Dissolution and Winding Up</u>. Upon the dissolution of the Company, a balance sheet shall be prepared by the Company's accountant and furnished to the Tribe within a reasonable time after dissolution. The Directors shall proceed with reasonable promptness to wind up the business of the Company. If the Directors are directed by the Tribal Council to sell Company assets, they shall not be required to do so promptly but shall have discretion to determine the time and manner in which the sale shall be made, giving due regard to general financial and economic conditions.

9.3. <u>Articles of Dissolution</u>. Upon completion of winding up, liquidation, and distribution of assets, the Directors shall file Articles of Dissolution and thereafter the Company shall cease to exist.

## ARTICLE X
## MISCELLANEOUS

10.1. <u>Notices</u>. All notices shall be in writing and deemed given when deposited in the United States Mail, first class postage paid, addressed to the party at his/her then recorded address reflected in the records of the Company.

10.2. <u>Entire Operating Document</u>. These Articles contain the entire statement of the terms and conditions upon which the Company shall be organized and operated and supersedes any prior acts or statements with respect thereto.

10.3. <u>Variations and Pronouns</u>. Each pronoun shall include any gender or number thereof as the identity of its antecedent may require.

10.4. <u>Successors in Interest</u>. Except as otherwise provided, all provisions of this Operating Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the respective heirs, executors, administrators, personal representatives, successors, and assigns of any of the parties affected.

10.5. <u>Execution of Additional Documents</u>. The Directors are authorized to execute and deliver such instruments necessary to comply with any laws, rules, or regulations relating to the formation of the Company or the conduct of business by the Company in any jurisdiction outside of the Tribe.

10.6. <u>Jurisdiction</u>. The Tribal Court shall possess exclusive jurisdiction over all matters and controversies regarding the interpretation and implementation of this Operating Agreement which may arise.

10.7. <u>Counterparts</u>. This Operating Agreement may be executed in several counterparts by the Chairman or Vice-Chairman of the Tribe and each executed counterpart shall be considered an original.

7

TF App. 0182

10.8. <u>Captions</u>. The captions at the beginning of the several articles, sections, and subsections of these Articles are not part of the context, but are merely labels to assist in the locating and reading of those sections and subsections and shall be ignored in construing this Operating Agreement.

10.9. <u>Governing Law</u>. This Operating Agreement shall be governed exclusively by its terms and by the laws of the Otoe-Missouria Tribe of Indians, including specifically the Act.

10.10. <u>Severability</u>. If any provision of this Operating Agreement shall be invalid, illegal, or unenforceable, the remainder of this Operating Agreement shall be enforceable to the fullest extent permitted by law. In addition, any provision of this Operating Agreement, which is construed to cause the Company to be taxed as a corporation under the federal tax law shall be repealed, limited, or construed in a manner which will allow the Company to qualify as an entity which is not treated as separate from its owner, the Tribe, for federal tax purposes.

10.11. <u>Creditors</u>. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

**ARTICLE XI**
**AMENDMENTS**

11.1. <u>Amendment</u>. These Articles may be amended only by the written action of the Board or Tribal Council.

APPROVED BY: _____

           Otoe-Missouria Tribe of Indians,
           Member, by Chairman of the Tribal
           Council

8

TF App. 0183

# EXHIBIT L

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, by Attorney General KATHLEEN G. KANE, | : : : : | CIVIL ACTION |
| *Plaintiff,* | : : | NO. 14-cv-07139-JCJ |
| v. | : : : | |
| THINK FINANCE, INC., et al., | : : | |
| *Defendants.* | : | |

**DECLARATION OF TED WHITFORD**

1.  My name is Ted Whitford.  I am over eighteen (18) years old and am competent to make this declaration.  Everything stated herein is based on my personal knowledge.  I would be competent to testify as to these facts if called upon to do so in a court of law or administrative proceeding.

2.  I am an enrolled member of the Chippewa Cree Tribe ("Tribe").  The Tribe was officially recognized by the Federal Government on November 23, 1935.

3.  At present, there are over 7,000 members of the Tribe.  The Tribe provides educational, health, and other social services to many, if not all, of these members.  The funding for these services comes from a variety of sources, but the Tribe is dependent upon revenue from certain business enterprises that operate as a vital and integral part of the Tribe.

TF App. 0184

4.      One of these enterprises is Plain Green, LLC ("Plain Green").  Plain Green is wholly owned and operated by the federally recognized Tribe.  It is chartered as a Tribal limited liability company.  I have, since 2011, been on the Board of Directors of Plain Green.  A copy of the Plain Green charter ("Charter") is attached hereto and incorporated herein as Exhibit A.  A copy of the Tribe's Limited Liability Company Act ("LLC Act") is attached hereto and incorporated herein as Exhibit B.

5.      Plain Green is a tribal lending entity that the Tribe created as an economic arm of the Tribe and subject to the laws of the Tribe.  *See* Charter art.  3.1; LLC Act § 101.  The Tribe has explicitly vested Plain Green with all of the "privileges and immunities" of the Tribe itself, including its immunity from suit.  *See* Charter art. 4.2. The Tribe appointed the initial directors of Plain Green when it created Plain Green, and the Tribe continues to appoint directors when their terms expire and vacancies exist. *See* Charter art. 7.2 to 7.5.

6.      Since Plain Green was created in 2011, revenue from the enterprise has been used to fund Tribal educational and social services, as well as general government expenses.

7.      To regulate its tribal lending activities, the Tribe has enacted a Tribal Consumer Regulatory Code, a copy of which is attached as Exhibit C, which provides for supervision and oversight of the activities of the tribal lending businesses, including Plain Green.

TF App. 0185

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.

Executed this $\underline{26}$ day of August 2015.

*Ted Whitford*

3

TF App. 0186

# EXHIBIT A

**TF App. 0187**

# ARTICLES OF ORGANIZATION
# OF
# PLAIN GREEN, LLC

### (REVISED FEBRUARY 20, 2013 FROM THE ORIGINAL ARTICLES OF ORGANIZATION AS APPROVED BY THE CHIPPEWA CREE TRIBAL BUSINESS COMMITTEE ON MAY 20, 2010)

The Chippewa Cree Tribe of the Rocky Boy's Indian Reservation ("Tribe"), a federally recognized Indian Tribe organized pursuant to Section 16 of the Act of June 18, 1934 (48 Stat. 984) (25 U.S.C. § 476) as amended by the Act of June 15, 1935 (48 Stat. 378), acting through the Chippewa Cree Tribal Business Committee, hereby authorizes these Articles of Organization to be filed under the Law and Order Code of the Chippewa Cree Tribe, Title 14, Chippewa Cree Tribe Limited Liability Company Act ("CCTLLA"), for the purpose of creating the Tribal limited liability company called Plain Green, LLC ("Company") described herein.

The Company described herein is to be wholly owned by the Chippewa Cree Tribe with management vested in the majority of its Members. Members shall be the elected leaders serving on the Tribal Business Committee who shall appoint five (5) individuals to serve as Managing Members of the Company and subject to Sections 101 to 1107 of the CCTLLA.

Section 1. Name. The name of the Company is:

Plain Green, LLC

Section 2. Duration. The period of existence of the Company shall be perpetual, except that the Company may have these Articles of Organization amended or restated or the Company may be dissolved in accordance with the CCTLLA.

Section 3. Purposes and Powers.

3.1. Purposes. The Company is formed pursuant to and shall be subject to the laws of the Tribe and shall be at all times wholly owned by the Tribe. The Tribe shall have the sole proprietary interest in, and shall have sole responsibility for the conduct of the activities of, the Company. The purposes for which the Company is organized are:

(a) To serve the social, economic, educational and health needs of the Tribe;

(b) To increase Tribal revenues;

(c) To enhance the Tribe's economic self-sufficiency and self-determination; and

(d) To provide positive, long-term social, environmental and economic benefits to Tribal members by enhancing the Tribe's business undertakings and prospects.

3.2. Powers. In furtherance of the foregoing purposes the Company shall have all of the rights, powers, privileges and federal immunities of the Tribe. The Company shall have

TF App. 0188

the authority as an instrumentality and agency of the Tribe to carry out all responsibilities as necessary, suitable or proper for the accomplishment of any of its purposes in providing financial services under Tribal law. Without in any way limiting the scope and generality of the foregoing, the Company shall have and may exercise the following powers, including but not limited:

(a) To engage in online an installment loan program under the under Title 10, the Chippewa Cree Tribal Credit Transaction Code as approved by the Chippewa Cree Business Committee by Tribal Resolution No. 19-11 on March 11, 2011 and Tribal Resolution No.____ on October 2, 2014.

(b) To engage, participate and provide any type of financial services and other lawful businesses, enterprises or ventures under Tribal laws;

(c) To generate revenue that will enable the Tribe to be self-sufficient and to provide economic support for the members of the Tribe;

(d) To provide for Tribal economic development, Tribal e-commerce and internet related business enterprise related activities;

(e) To provide for a corporate structure for Tribal economic development, Tribal e-commerce and Tribal internet related business enterprise opportunities; and

(f) To provide for Tribal economic development, Tribal e-commerce and internet related business enterprise related activities as an instrumentality and agency under Tribal law;

(g) To form subsidiary corporations and to enter into business associations, and other business arrangements;

(h) To conduct and carry out business either within or outside of the exterior boundaries of the Chippewa Cree Tribe of the Rocky Boy's Reservation pursuant to Tribal laws;

(i) To buy, sell, lease, and otherwise acquire and maintain buildings, offices, shops and other appurtenances proper and necessary for the carrying on of said business;

(j) To guarantee, purchase, hold, assign, mortgage, pledge or otherwise dispose of capital stock of, or any bonds, securities or other evidences of indebtedness created by any other corporation or organization that is in existence under the laws of the United States, any state, Indian tribe, nation, government, or country and to exercise all the rights, privileges, and powers of ownership;

(k) To enter into and make contracts of every kind and nature with any person, tribal government agency, firm, association, corporation, municipality, nation and/or Indian tribe;

TF App. 0189

(l) To purchase, take by gift or bequest, acquire, own lease, manage, operate, deal in and dispose of real and personal property of all kinds and descriptions, whenever situated;

(m) To incur debts and raise, borrow and secure the payment of any money in any lawful manner, including the issue and sale or other disposal of stocks, bonds, indentures, obligations, negotiable and transferable instruments and evidence of indebtedness of all kinds, including the provision of security interests as negotiated by the Company;

(n) To apply for, obtain, register, purchase, lease or otherwise acquire, own, hold, use, operate and introduce, and to sell, assign or otherwise dispose of any trademark, trade name, patent invention, improvements, and processes used in connection with or secured under letters patent, and to use, exercise, develop, grant and give licenses in respect thereto; and

(o) To exercise such powers as are incidental to the Company's powers and as may be at any time permitted under the CCTLLA and deemed desirable to give effect to the Company's purpose.

3.3. Purposes and Powers Not Limited. The enumeration herein of any specific purpose or power shall not be held to limit or restrict in any manner the exercise by the Company of the general powers and privileges now or hereafter conferred by the laws of the Tribe upon limited liability companies formed under the CCTLLA, or the accomplishment of any purpose now or hereafter permitted to the Company pursuant to these Articles of Organization.

Section 4. Immunities of the Company and Personnel.

4.1. Jurisdictional Immunity of the Company. The Chippewa Cree Tribe hereby confers on the Company all of the Tribe's rights, privileges and federal immunities concerning federal, state, and local taxes, regulation, and jurisdiction, to the same extent that the Tribe would have such rights, privileges, and immunities, if it engaged in the activities undertaken by the Company.

4.2. Sovereign Immunity of the Company and Personnel. The Chippewa Cree Tribe hereby confers on the Company sovereign immunity from suit to the same extent that the Tribe would have such sovereign immunity if it engaged in the activities undertaken by the Company. It is the intention of the Chippewa Cree Tribe that the extension to the Company of such sovereign immunity from suit shall apply to the Company's directors, officers, employees and agents to the same extent that the Tribe's directors, officers, employees and agents would have such sovereign immunity if the Tribe engaged in the activities undertaken by the Company. In furtherance of and in clarification of the Company's power to "sue and be sued" as set forth and intended in the CCTLLA, the Company shall have the power to sue and is authorized to consent to be sued in the

3

TF App. 0190

Chippewa Cree Tribal Court or another court of competent jurisdiction, provided, however, that:

(a) No such consent to suit shall be effective against the Company in any manner and to any extent whatsoever unless such consent is:

(1) Explicit,

(2) Contained in a written contract or commercial document to which the Company is a party, and

(3) Specifically approved by the Managing Members of the Company or as delegated to the CEO of the Company by a resolution approved by the Managing Members, and

(b) Any recovery against such Company shall be limited to the assets of the Company in the manner and to the extent as explicitly set forth in such consent.

Any consent to suit may, as explicitly set forth in such consent, be limited to the court or courts in which suit may be brought, to the matters that may be made the subject of the suit and to the assets or revenues of the Company against which any judgment may be executed.

Consent to suit by the Company shall in no way extend to an action against the Tribe, nor shall consent to suit by the Company in any way be deemed a waiver of any of the rights, privileges and immunities of the Tribe. The Tribe shall not be liable for the payment or performance of any of the obligations of the Company, and no recourse shall be had against any assets or revenues of the Tribe in order to satisfy the obligations of the Company.

The sovereign immunity of the Company shall not extend to actions against the Company by the Tribe.

Section 5. Principal Place of Business; Mailing Address; Registered Agent.

5.1. Principal Place of Business. The Company shall be a resident of and maintain its corporate headquarters on the Rocky Boy's Indian Reservation, in Montana, but may conduct its business activities any place in or outside of the United States. The Company may have such other offices, either within or without the Rocky Boy's Indian Reservation as the business of the Company may require from time to time.

5.2. Mailing Address and Registered Agent. The mailing address of the Company's initial registered office is Plain Green, LLC 93 Mack Road, Suite 600, P.O. Box 270, Box Elder, Montana 59521 and the name of the initial registered agent at this address is the CEO of Plain Green, LLC.

4

TF App. 0191

Section 6. Operational Requirements.

6.1. Fiscal Year. The Company shall have a fiscal year based on the calendar, January 1 thru December 31. Such fiscal year shall end on the last day of any one calendar year, and shall begin the first day of the next succeeding calendar year.

6.2. Operating Agreement. The Company shall prepare an operating agreement to carry out the day-to-day operational duties and responsibilities.

6.3. Annual Report. Not less than 120 days following the end of each fiscal year, the Company shall prepare and deliver to the Chippewa Cree Tribal Business Committee an annual report and an audited financial statement, including a balance sheet and a statement of income and expenses, including comparative figures from the preceding fiscal year.

Section 7. Managing Members.

7.1. Duties and Powers; Operating Agreement. The business and activities of the Company shall be managed by the Managing Members appointed by the Chippewa Cree Tribal Business Committee. The Managing Members are vested with all powers necessary to carry out the purposes of the Company and shall have control and management of the business and activities of the Company. The Managing Members shall in all cases act as a board of directors. The Managing Members may adopt such provisions in an operating agreement for the conduct of their meetings and the management of the Company as they may deem proper, not inconsistent with the Chippewa Cree Tribe Limited Liability Company Act and other Tribal laws, or these Articles of Organization.

7.2. Number. The number of Managing Members for the Company shall be five (5), of which three (3) shall be enrolled members of the Chippewa Cree Tribe. The Managing Members shall be comprised of: 1) two (2) Managing Members shall be enrolled members of the Chippewa Cree Tribe with no less than five (5) years of management experience in a successful, for-profit financial services business or legal experience with a financial services background or accounting/CPA background with a financial services business ; 2) two (2) Managing Members shall have executive management experience with a financial services business; and 3) the Tribal Business Committee shall appoint one (1) Tribal Business Committee member to serve as a Managing Member.

7.3. Term. The appointed Tribal Business Committee Managing Member shall serve according to the elected term of office. The remaining four Managing Members shall serve three (3) year staggered terms.

7.4. Selection. The Chippewa Cree Tribal Business Committee shall select and appoint all five (5) Managing Member positions, one (1) of whom also serves on the Tribal Business Committee. Any vacancies of the Managing Members shall be advertised and appointed by the Tribal Business Committee.

TF App. 0192

7.5. Resignation; Removal. Any Managing Member may resign at any time, such resignation shall be made in writing and to take effect immediately upon receipt, unless the notice specifies a later date. Any Managing Member may be removed, with cause, by the Tribal Business Committee or by the unanimous vote of the other Managing Members.

7.6. Chief Executive Officer. The Company will appoint and hire a Chief Executive Officer ("CEO") to manage the Company on a daily basis without interference by either the Members or Managing Members of the Company and/or Chippewa Cree Tribal Business Committee members. The CEO shall have the authority to hire and terminate employees whenever necessary.

Section 8. Indemnification. The Company may at the discretion of the Members and Managing Members, indemnify any current or former executive, manager, director, officer, trustee, partner, agent or employee against reasonable expenses actually necessarily incurred by him or her in connection with the defense of any action, suit, or proceeding in which he or she is made a party by reason of being, or having been, such executive, manager, director, officer, trustee, partner, agent or employee of the Company and the reasonable cost of settlement of any such action or proceeding, if a majority of Managing Members not seeking indemnification or otherwise involved in the controversy shall determine in good faith:

(a) That such person did not act, fail to act, or refuse to act willfully or with gross negligence or with fraudulent or criminal intent; and

(b) That legal fees paid or any settlements made are reasonable; and

(c) That the person seeking indemnification did not act beyond the scope of his or her employment or office; and

(d) That it is in the best interests of the Company that indemnification is made.

Section 9. Amendments. The Members and/or Managing Members may recommend amendments to the Articles of Organization from time to time as necessary and appropriate. No amendments to the Articles of Organization shall become operative until official approval is provided by the Managing Members and ratification by the Members of the Company, the elected officials on the Chippewa Cree Tribal Business Committee.

Dated: 4-14-15                          Organizer:

_____

Chairman Chippewa Cree Tribal Business
Committee pursuant to a Resolution of the
Chippewa Cree Tribal Business Committee

TF App. 0193

Filed: ___4 - 14 - 15___

AR

Janice Myers
Tribal Secretary

TF App. 0194

# EXHIBIT B

TF App. 0195

**CHIPPEWA CREE TRIBE**
**OF THE**
**ROCKY BOY'S INDIAN RESERVATION, MONTANA**

**LIMITED LIABILITY COMPANY ACT**

Amended May 7, 2015

**TF App. 0196**

TF App. 0197

## Chippewa Cree Tribe Limited Liability Company Act

### Part 1 – General Provisions

### Section 101.    Purposes of the LLC Act; Rules of Construction

(1)    This Part and all subsequent Parts and sections of this Chapter are for the purpose for developing and implementing the processes and procedures for the formation and operation of limited liability companies under tribal law.

(2)    This Chapter shall be liberally construed and applied to promote its underlying purposes and policies.

### Section 102.    Definitions.

As used in this Chapter, unless the context requires otherwise, the following definitions apply:

(1)    "Articles of organization" means articles filed pursuant to Section 201 of this Chapter and those articles as amended or restated. In the case of a foreign limited liability company, the term includes all records serving a similar function required to be filed under the laws of the tribe, state or country where it is organized.

(2)    "At-will company" means a limited liability company other than a term company.

(3)    "Business" includes every trade, occupation, profession, or other lawful purpose, whether or not carried on for profit.

(4)    "Corporation" means a corporation formed under the laws of this tribe or a foreign corporation.

(5)    "Court" includes every court having jurisdiction in the case, and the Chippewa Cree Tribal Court with regard to enforcement of the provisions of this Chapter.

(6)    "Debtor in bankruptcy" means a person who is the subject of an order for relief under Chapter 11 of the United States Code or a comparable order under federal, state, or tribal law governing insolvency.

(7)    "Disqualified person" means any person or entity that for any reason is or becomes ineligible under this part to become a member in a professional limited liability company.

(8)    "Distribution" means a transfer of money, property, or other benefit to a member in that member's capacity as a member of a limited liability company or to a transferee of a member's distributional interest.

(9)    "Distributional interest" means all of a member's interest in the distributions of a limited liability company.

(10)   "Event of dissociation" means an event that causes a person to cease to be a member.

(11)   "Foreign corporation" means a corporation that is organized under laws other than the laws of the Chippewa Cree Tribe.

(12)   "Foreign limited liability company" means an entity that is
        (a)    an unincorporated entity;
        (b)    organized under laws other than the laws of the Chippewa Cree Tribe;
        (c)    organized under a statute pursuant to which an entity may be formed that affords to each of its members limited liability with respect to the liabilities of the entity.

(13)   "Foreign limited partnership" means a limited partnership formed under any laws other than the laws of the Chippewa Cree Tribe.

(14) "Foreign professional limited liability company" means a limited liability company organized for the purpose of rendering professional services under laws other than the laws of the Chippewa Cree Tribe.

(15) "Licensing authority" means an officer, board, agency, court, or other authority on the Rocky Boy's Indian Reservation that has the power to issue a license or other legal authorization to render a professional service.

(16) "Limited liability company" or "domestic limited liability company" means an organization that is formed under this part.

(17) "Limited partnership" means a limited partnership formed under the laws of the Chippewa Cree Tribe or a foreign limited partnership.

(18) "Manager" means a person who, whether or not a member of a manager-managed company, is vested with authority under Section 301 of this Chapter.

(19) "Manager-managed company" means a limited liability company that is so designated in its articles of organization.

(20) "Member" means a person who has been admitted to membership in a limited liability company, as provided in Section 302 of this Chapter and who has not dissociated from the limited liability company.

(21) "Member-managed company" means a limited liability company other than a manager-managed company.

(22) "Operating agreement" means an agreement, including amendments, as to the conduct of the business and affairs of a limited liability company and the relations among the members, managers, and the company that is binding upon all of the members.

(23) "Person" means an individual, a general partnership, a limited partnership, a domestic or foreign limited liability company, a trust, an estate, an association, a corporation, or any other legal or commercial entity.

(24) "Professional limited liability company" means a limited liability company designating itself as a professional limited liability company in its articles of organization.

(25) "Professional service" means a service that may lawfully be rendered only by persons licensed under a licensing law of the Chippewa Cree Tribe and that may not be lawfully rendered by a limited liability company that is not a professional limited liability company.

(26) "Qualified person" means a natural person, limited liability company, general partnership, or professional corporation eligible under this part to own shares issued by a professional limited liability company.

(27) "Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is recoverable in a perceivable form.

(28) "Secretary" means the Secretary/Accountant of the Chippewa Cree Tribe.

(29) "Sign" means to identify a record by means of a signature, mark, or other symbol with the intent to authenticate it.

(30) "State" means the District of Columbia or the Commonwealth of Puerto Rico or any state, territory, possession or other jurisdiction of the United States other than the Chippewa Cree Tribe.

(31) "Term company" means a limited liability company designated as a term company in its articles of organization.

TF App. 0199

**Section 103**.  **Name.**
(1)  (a)  The name of each limited liability company as set forth in its articles of organization must contain the words "limited liability company" or the abbreviations "l.l.c.", or "llc". The word "limited" may be abbreviated as "ltd.", and the word "company" may be abbreviated as "co.".
    (b)  The name of a limited liability company as set forth in its articles of organization may not contain business name identifiers or other language that states or implies that the limited liability company is a business other than a limited liability company.
(2)  A limited liability company name must be distinguishable on the records of the Secretary from:
    (a)  the name of any business corporation, nonprofit corporation, limited partnership, or limited liability company organized or reserved under the laws of the Chippewa Cree Tribe;
    (b)  the name of any foreign business corporation, foreign nonprofit corporation, foreign limited partnership, or foreign limited liability company registered or qualified to do business on the Rocky Boy's Indian Reservation;
    (c)  any assumed business name, limited partnership name, trademark, service mark, or other name registered or reserved with the Secretary; and
    (d)  the corporate name of a domestic corporation that has dissolved but only for a period of 120 days after the effective date of its dissolution.

**Section 104.**  **Reservation of Name.**
(1)  The exclusive right to use a name may be reserved by:
    (a)  a person intending to organize a limited liability company and to adopt that name;
    (b)  a limited liability company or foreign limited liability company registered with the Chippewa Cree Tribe that intends to adopt that name;
    (c)  a foreign limited liability company intending to register with the Chippewa Cree Tribe and to adopt that name; or
    (d)  a person intending to organize a foreign limited liability company and to have it registered with the Chippewa Cree Tribe and to adopt that name.
(2)  The reservation must be made by filing with the Secretary application, executed by the applicant, to reserve a specified name. If the Secretary finds that the name is available for use by a domestic or foreign limited liability company, the Secretary shall reserve the name for the exclusive use of the applicant for a nonrenewable period of 120 days from the date the application is filed.
(3)  The right to the exclusive use of a reserved name may be transferred to another person by filing with the Secretary a notice of the transfer, executed by the applicant for whom the name was reserved, and by specifying the name to be transferred and the name and address of the transferee. The transfer may not extend the term during which the name is reserved.

**Section 105.**  **Registered Office and Registered Agent.**
(1)  A limited liability company shall continuously maintain with the Chippewa Cree Tribe:
    (a)  a registered office on the Rocky Boy's Indian Reservation that may, but need not be, the same as its place of business; and

TF App. 0200

(b) a registered agent for service of process who resides on the Rocky Boy's Indian Reservation and who may be served process, at the registered office, or their residence, or business office.

(2) Unless the registered agent signed the document making the appointment, the appointment of a registered agent or a successor registered agent on whom process may be served is not effective until the agent delivers a statement in writing to the Secretary accepting the appointment.

(3) A limited liability company may change its registered office or registered agent, or both, by delivering to the Secretary a statement setting forth:
(a) the name of the limited liability company;
(b) the address of its current registered office;
(c) if the address of its registered office is to be changed, the new address of the registered office; and
(d) if its registered agent or the agent's address is to be changed, the name and address of the successor registered agent or the current registered agent's new address.

(4) The change of address of the registered office or registered agent is effective on delivery of the statement to the Secretary. The appointment of a new registered agent is effective on delivery of the statement to the Secretary and on receipt by the Secretary of evidence that the new registered agent has accepted appointment pursuant to subsection (2).

(5) A registered agent of a limited liability company may resign as registered agent by delivering a written notice and two copies to the Secretary. The Secretary shall mail a copy of the notice to the limited liability company at its registered office and its principal place of business. The appointment of the registered agent terminates 30 days after receipt of the notice by the Secretary or on the appointment of a new registered agent, whichever occurs first.

(6) If a registered agent changes its address to another place on the Rocky Boy's Indian Reservation, it may change the address by delivering a statement to the Secretary as required by subsection (3), except that it need be signed only by the registered agent. The statement must recite that a copy of the statement has been mailed to the limited liability company.

**Section 106.** **Purpose of a Limited Liability Company.**
(1) A limited liability company organized under Part 2 of this Chapter has the purpose of engaging in any lawful business unless a more limited purpose is set forth in the articles of organization.
(2) Limited liability companies may be organized under Part 2 of this Chapter for any lawful purpose except for the purpose of banking or insurance.

**Section 107.** **Powers.**
A limited liability company may:
(1) if it so elects and is authorized to do so by the Business Committee, grant a limited waiver of sovereign immunity on behalf of a limited liability company, sue, be sued, complain, and defend in its name, provided that any such grant of authority to provide a limited waiver of sovereign immunity be explicitly provided for in the limited liability company's Articles of Organization or By-Laws and approved by Resolution of the Business Committee;

TF App. 0201

(2)   transact its business, carry on its operations, and have and exercise the powers granted by this part in any tribe or state; in any territory, district, or possession of the United States; and in any foreign country;

(3)   make contracts and guarantees, incur liabilities, and borrow money;

(4)   sell, lease, exchange, transfer, convey, mortgage, pledge, and otherwise dispose of any of its assets;

(5)   acquire by purchase or in any other manner, take, receive, own, hold, improve, and otherwise deal with any interest in real or personal property, wherever located;

(6)   issue notes, bonds, and other obligations and secure any of them by mortgage, deed of trust, or security interest of any of its assets;

(7)   purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, loan, pledge, or otherwise dispose of and otherwise use and deal in and with stock or other interests in and obligations of domestic and foreign corporations, associations, general or limited partnerships, limited liability companies, business trusts, and individuals;

(8)   invest its surplus funds, lend money from time to time in any manner that may be appropriate to enable it to carry on the operations or fulfill the purposes set forth in its articles of organization, and take and hold real property and personal property as security for the payment of funds loaned or invested;

(9)   elect or appoint agents and define their duties and fix their compensation;

(10)  sell, convey, mortgage, pledge, lease, exchange, transfer, and otherwise dispose of all or any part of its property and assets;

(11)  be a promoter, stockholder, partner, member, associate, or agent of any corporation, partnership, domestic or foreign limited liability company, joint venture, trust, or other enterprise;

(12)  indemnify and hold harmless any member, agent, or employee from and against any claims and demands whatsoever, except in the case of action or failure to act by the member, agent, or employee that constitutes willful misconduct or recklessness, and subject to the standards and restrictions, if any, set forth in the articles of organization or operating agreement;

(13)  cease its activities and dissolve;

(14)  pay pensions and establish pension plans, pension trusts, profit-sharing plans, share bonus plans, share option plans, and benefit or incentive plans for any of its current or former directors, officers, employees, and agents;

(15)  make donations for the public welfare or for charitable, religious, scientific, or educational purposes and, in time of war, make donations in aid of war activities; and

(16)  do every other act not inconsistent with law that is appropriate to promote and further the business and affairs of the limited liability company.

**Section 108**.     **Effect of Operating Agreement—Nonwaivable Provisions.**

(1)   Except as provided in subsection (2), all members of a limited liability company may enter into an operating agreement, which need not be in writing, to regulate the affairs of the company and the conduct of its business and to govern relations among the members, managers, and company. To the extent that the operating agreement does not otherwise provide, this part governs relations among the members, managers, and company.

(2)   An operating agreement need not be in writing except as otherwise provided in this part to:

TF App. 0202

    (a)    vary the recordkeeping requirements under Section 306 of the Chapter;

    (b)    vary the rights of members to share in distributions under Section 501 or Section 805 of the Chapter; or

    (c)    vary the process for admission of members under Section 302 of the Chapter.

(3)    The operating agreement may not:

    (a)    unreasonably restrict a right to information or access to records under Section 306 of the Chapter.

    (b)    eliminate the duty of loyalty under Section 305 of the Chapter, but the agreement may:

        (i)    identify specific types or categories of activities that do not violate the duty of loyalty, if not manifestly unreasonable; and

        (ii)    specify the number or percentage of members or disinterested managers that may authorize or ratify, after full disclosure of all material facts, a specific act or transaction that otherwise would violate the duty of loyalty;

    (c)    unreasonably reduce the duty of care under Section 305 of the Chapter;

    (d)    eliminate the obligation of good faith and fair dealing under Section 305 of the Chapter, but the operating agreement may determine the standards by which the performance of the obligation is to be measured, if the standards are not manifestly unreasonable;

    (e)    vary the right to expel a member upon the occurrence of an event specified in Section 701 of the Chapter

    (f)    vary the requirement to wind up the limited liability company's business in a case specified in Section 801(l)(c) or Section 802 of the Chapter; or

    (g)    restrict the rights of a person under this part, other than a manager, member, or transferee of a member's distributional interest.

## Part 2 – Formation

**Section 201.**     **Formation.**

(1)    One or more persons may form a limited liability company consisting of one or more members by signing and filing articles of organization with the Secretary. The person or persons need not be members of the limited liability company at the time of formation or after formation has occurred. A limited liability company is a legal entity distinct from its members.

(2)    Unless a delayed effective date is specified, the existence of a limited liability company begins when the articles of organization are filed with the Secretary.

(3)    The filing of the articles of organization by the Secretary pursuant to Section 205 of the Chapter is conclusive proof that the organizers have satisfied all conditions precedent to the creation of a limited liability company.

**Section 202.**     **Articles of Organization.**

(1)    The articles of organization must set forth:

    (a)    the name of the limited liability company that satisfies the requirements of Section 103 of this Chapter;

    (b)    whether the company is a term company and, if so, the term specified;

TF App. 0203

    (c)    the complete street address of its principal place of business on the Rocky Boy's Indian Reservation and, if different, its registered office and the name and complete street address of its registered agent at the registered office on the Rocky Boy's Indian Reservation;

    (d)    (i)    if the limited liability company is to be managed by a manager or managers, a statement that the company is to be managed in that fashion and the names of managers who are to serve as managers until the first meeting of members or until their successors are elected;

        (ii)    if the management of a limited liability company is reserved to the members, a statement that the company is to be managed in that fashion and the names and street addresses of the initial members;

    (e)    if the limited liability company is a professional limited liability company, a statement to that effect and a statement of the professional service or services it will render; and

    (f)    any other provision, not inconsistent with law, that the members elect to set out in the articles, including but not limited to a statement of whether there are limitations on the authority of members or management to bind the limited liability company.

(2)    It is not necessary to set out in the articles of organization any of the powers enumerated in Section 107 of the Chapter.

(3)    The articles of organization may not vary any nonwaivable provision set out in this Chapter. As to all other matters, if any provision of an operating agreement is inconsistent with the articles of organization:

    (a)    the operating agreement controls as to managers, members, and a member's transferee; and

    (b)    the articles of organization control as to a person, other than a manager, member, and member's transferee, that reasonably relies on the articles of organization to that person's detriment.

## Section 203.  Amendment of Articles of Organization—Restatement.

(1)    The articles of organization of a limited liability company are amended by filing articles of amendment with the Secretary. The articles of amendment must set forth:

    (a)    the name of the limited liability company;

    (b)    the date the articles of organization were filed; and

    (c)    the amendment to the articles of organization.

(2)    The articles of organization may be amended as desired, so long as the amended articles of organization contain only provisions that may be lawfully contained in articles of organization at the time of making the amendment.

(3)    Articles of organization may be restated at any time. Restated articles of organization must be filed with the Secretary, must be specifically designated as such in the heading, and must state either in the heading or in an introductory paragraph the limited liability company's present name and, if it has been changed, all of its former names and the date of the filing of its articles of organization. Restated articles of organization supersede the original articles of organization and any previous amendments to the original articles of organization.

7

(4)  An amendment to the articles of organization of a limited liability company must be in the form and manner designated by the Secretary.

## Section 204.  Execution of Documents.
(1)  Unless otherwise specified in this part, a document required by this part to be filed with or delivered to the Secretary must be executed:
   (a)  by any manager if management of the limited liability company is vested in one or more managers or by a member if management of the limited liability company is reserved to the members;
   (b)  if the limited liability company has not been formed, by the person or persons forming the limited liability company; or
   (c)  if the limited liability company is in the hands of a receiver, trustee, or other court-appointed fiduciary, by that fiduciary.
(2)  The person executing the document shall sign it and state, beneath or opposite the signature, the person's name and the capacity in which the person signs.
(3)  The person executing the document may do so as an attorney-in-fact. Powers of attorney relating to the execution of the document do not need to be shown to or filed with the Secretary.

## Section 205.  Filing With Secretary.
(1)  The original signed copy, together with a duplicate copy that may be either a signed, photocopied, or confirmed copy, of the articles of organization or any other document required to be filed pursuant to this part must be delivered to the Secretary.  If the Secretary determines that the documents conform to the filing provisions of this part, the Secretary shall, when all required filing fees have been paid:
   (a)  endorse on each signed original and duplicate copy the word "filed" and the date of its acceptance for filing;
   (b)  retain the signed original in the Secretary's files; and
   (c)  return the duplicate copy to the person who filed it or to the person's representative.
(2)  If the Secretary is unable to make the determination required for filing by subsection (1) at the time any documents are delivered for filing, the documents are considered to have been filed at the time of delivery if the Secretary subsequently determines that the documents as delivered conform to the filing provisions of Part 2 of this Chapter.
(3)  The filing fee shall be $25.00, except for the Tribe or a tribally-owned business.

## Section 206.  Effect of Delivery or Filing of Articles of Organization.
(1)  A limited liability company is formed when the articles of organization are delivered to the Secretary for filing.
(2)  Each copy of the articles of organization stamped or marked "filed" and marked with the filing date is conclusive evidence that all conditions precedent required to be performed by the organizers have been complied with and that the limited liability company has been legally organized and formed under this part.

TF App. 0205

**Section 207.**     __Annual Report For Secretary.__

(1)    A limited liability company or a foreign limited liability company authorized to transact business by the Chippewa Cree Tribe on the Rocky Boy's Indian Reservation shall deliver to the Secretary, for filing, an annual report that sets forth:

(a)    the name of the limited liability company and the tribe, state, or country under whose law it is organized;

(b)    the mailing address and, if different, street address of its registered office and the name of its registered agent at that office on the Rocky Boy's Indian Reservation;

(c)    the address of its principal office;

(d)    (i)    if the limited liability company is managed by a manager or managers, a statement that the company is managed in that fashion and the names and addresses of the managers;

(ii)    if the management of a limited liability company is reserved to the members, a statement to that effect;

(e)    if the limited liability company is a professional limited liability company, a statement that all of its members and not less than one-half of its managers are qualified persons with respect to the limited liability company.

(2)    Information in the annual report must be current as of the date the annual report is executed on behalf of the limited liability company.

(3)    The first annual report must be delivered to the Secretary between January 1 and April 15 of the year following the calendar year in which a domestic limited liability company is organized or a foreign limited liability company is authorized to transact business. Subsequent annual reports must be delivered to the Secretary between January 1 and April 15.

(4)    If an annual report does not contain the information required by this section, the Secretary shall promptly notify the reporting domestic or foreign limited liability company in writing and return the report to it for correction.

(5)    The annual report must be executed by at least one member of the limited liability company and must include the street address of the member.

(6)    A domestic professional limited liability company or a foreign professional limited liability company authorized to transact business on the Rocky Boy's Indian Reservation shall annually file before April 15, with each licensing authority having jurisdiction over a professional service of a type described in its articles of organization, a statement of qualification setting forth the names and addresses of the members and managers of the company and additional information that the licensing authority may by rule prescribe as appropriate in determining whether the company is complying with this Chapter. The licensing authority may charge a fee to cover the cost of filing a statement of qualification.

**Section 208.**     __Administrative Dissolution—Rules.__

(1)    A domestic limited liability company may be dissolved involuntarily by order of the Secretary if the limited liability company:

(a)    (i)    has failed for 60 days after a change of its registered office or registered agent to file in the office of the Secretary a statement of the change; or

(ii)    has failed for 60 days to appoint and maintain a registered agent on the Rocky Boy's Indian Reservation;

(b)    has failed for 140 days to file its annual report within the time required by law;

9

TF App. 0206

(c)   has failed to remit any fees required by law;
(d)   procured its certificate of existence through fraud; or
(e)   has exceeded or abused the authority conferred upon it by law and the excesses or abuses have continued after a written notice of the alleged excesses or abuses has been received from the Secretary by the registered agent of the limited liability company.

(2)   If dissolution is sought under subsection (1)(d) or (l)(e), the Secretary may dissolve a limited liability company when an alleged violation of subsection (l)(d) or (1)(e) is established by an order of tribal court or a court of another appropriate jurisdiction. In addition to any other person authorized by law, the Secretary or the tribal prosecutor may maintain an action in tribal court to implement the provisions of this section.

## Section 209.    Reinstatement of Dissolved Limited Liability Company.

(1)   The Secretary may:
(a)   reinstate a limited liability company that has been dissolved under the provisions of Section 208 of this Chapter.
(b)   restore to a reinstated limited liability company its right to carry on business on the Rocky Boy's Indian Reservation to exercise all of its privileges and immunities.

(2)   A limited liability company applying for reinstatement shall submit to the Secretary the application, executed by a person who was a member at the time of dissolution, setting forth:
(a)   the name of the limited liability company;
(b)   a statement that the assets of the limited liability company have not been liquidated;
(c)   a statement that a majority of its members have authorized the application for reinstatement; and
(d)   if its name has been legally acquired by another entity prior to its application for reinstatement, the name under which the limited liability company desires to be reinstated.

(3)   The limited liability company shall submit with its application for reinstatement:
(a)    all annual reports not yet filed with the Secretary.

(4)   When all requirements are met and the Secretary reinstates the limited liability company to its former rights, the Secretary shall:
(a)   conform and file in the office of the Secretary reports, statements, and other instruments submitted for reinstatement;
(b)   immediately issue and deliver to the reinstated limited liability company a certificate of reinstatement authorizing it to transact business; and
(c)   upon demand, issue to the limited liability company one or more certified copies of the certificate of reinstatement.

(5)   The Secretary shall not order a reinstatement if 5 years have elapsed since the dissolution.

(6)   A restoration of limited liability company rights pursuant to this section relates back to the date the limited liability company was involuntarily dissolved, and the limited liability company is considered to have been an existing legal entity from the date of its original organization.

## Section 210.    Fees For Filing, Copying, and Services.

(1)   The Secretary shall collect fees for the following:

10

**TF App. 0207**

(a)   filing documents as required by this Chapter; and
(b)   copying documents, priority handling documents, transmitting facsimile copies of documents, and providing computer-generated information.

## Section 211.   License Fee.

(1)   In addition to the filing fee authorized by Section 210 of this Chapter, the Secretary shall charge and collect from each foreign limited liability company:
(a)   a license fee at the time of filing its articles of incorporation; and
(b)   a license fee at the time of filing an application for a certificate of authority to transact business.

## Section 212.   Correcting Filed Record.

(1)   A limited liability company or foreign limited liability company may correct a record filed by the Secretary if the record contains a false or erroneous statement or was defectively signed.
(2)   A record must be corrected by:
(a)   preparing articles of correction that:
  (i)    describe the record, including its filing date, or have attached a copy of the record to the articles of correction;
  (ii)   specify the incorrect statement and the reason that it is incorrect or the manner in which the signing was defective; and
  (iii)  correct the incorrect statement or defective signing; and
(b)   delivering the corrected record to the Secretary for filing.
(3)   Articles of correction are effective retroactively on the effective date of the record that they correct except as to persons relying on the uncorrected record and adversely affected by the correction. As to those persons, the articles of correction are effective when filed.

## Section 213.   Certificate of Existence or Authority.

(1)   A person may request the Secretary to furnish a certificate of existence for a limited liability company or a certificate of authority for a foreign limited liability company.
(2)   A certificate of existence for a limited liability company must set forth:
(a)   the company's name;
(b)   that it is organized under the laws of the Chippewa Cree Tribe, the date of organization, whether its duration is at-will or for a specified term, and, if for a specified term, the period specified;
(c)   if payment is reflected in the records of the Secretary and if nonpayment affects the existence of the company, that all fees, taxes, and penalties owed to the Chippewa Cree Tribe have been paid;
(d)   whether its most recent annual report required by Section 207 of this Chapter has been filed with the Secretary;
(e)   that articles of termination have not been filed; and
(f)   other facts of record in the office of the Secretary if requested by the applicant.
(3)   A certificate of authority for a foreign limited liability company must set forth:
(a)   the company's name used on the Rocky Boy's Indian Reservation;
(b)   that it is authorized to transact business on the Rocky Boy's Indian Reservation;

11

(c)    whether its most recent annual report required by Section 207 of the Chapter has been filed with the Secretary;

(d)    that a certificate of cancellation has not been filed; and

(e) other facts of record in the office of the Secretary if requested by the applicant.

(4)    Subject to any qualification stated in the certificate, a certificate of existence or authority issued by the Secretary may be relied upon as conclusive evidence as of the date of the certificate that the domestic or foreign limited liability company is in existence or is authorized to transact business on the Rocky Boy's Indian Reservation.

## Section 214.    Liability For False Statement in Filed Record.

Subject to Section 303 of this Chapter, if a record authorized or required to be filed under this Chapter contains a false statement, a person who suffers loss by reliance on the statement may recover damages for the loss from the person who signed the record or caused another to sign it on that person's behalf and who knew the statement to be false at the time that the record was signed.

## Section 215.    Filing By Judicial Act.

If a person required by Section 204 of this Chapter to execute any record or document fails or refuses to do so, a person who is adversely affected by the failure or refusal may petition the Chippewa Cree Tribal Court to direct the signing of the record or document. If the court finds that it is proper for the record or document to be signed and that a designated person has failed or refused to sign the record, it shall order the Secretary to sign and file an appropriate record or document.

## Section 216.    Knowledge and Notice.

(1)    A person knows a fact if the person has actual knowledge of the fact.

(2)    A person has notice of a fact if the person:

    (a)    knows the fact;

    (b)    has received a notification of the fact; or

    (c)    has reason to know that the fact exists from other facts known to the person at the time in question.

(3)    A person notifies or gives a notification of a fact to another by taking steps reasonably required to inform the other person, whether or not the other person knows the fact.

(4)    A person receives a notification when the notification:

    (a)    comes to the persons attention; or

    (b)    is delivered at the person's place of business or at any other place held out by the person as a place for receiving communications.

(5)    An entity knows, has notice, or receives a notification of a fact for purposes of a particular transaction:

    (a)    when an individual conducting the transaction for the entity knows, has notice, or receives a notification of the fact; or

    (b)    when the fact would have been brought to the individual's attention had the entity exercised reasonable diligence.

(6)    An entity exercises reasonable diligence if it maintains reasonable routines for communicating significant information to the individual conducting the transaction for the entity and there is reasonable compliance with the routines.

TF App. 0209

    (a)    Reasonable diligence does not require an individual acting for the entity to communicate information unless the communication is part of the individual's regular duties or the individual has reason to know of the transaction and to know that the transaction would be materially affected by the information.

## Part 3 – Members/Managers

## Section 301.    Agency Power of Members and Managers.

(1)    Except as provided in subsection (2), a member is an agent of the limited liability company for the purpose of its business or affairs and the act of a member, including but not limited to the execution of any instrument in the name of the limited liability company for apparently carrying on in the usual way the business or affairs of the limited liability company binds the limited liability company, unless the member so acting has, in fact, no authority to act for the limited liability company in the particular matter and the person with whom the member is dealing has knowledge of the fact that the member has no such authority.

(2)    If the articles of organization provide that management of the limited liability company is vested in a manager or managers, whether designated as "manager" or otherwise:

    (a)    a member, acting solely in the capacity as a member, may not be an agent of the limited liability company; and

    (b)    a manager is an agent of the limited liability company for the purpose of its business or affairs and the act of a manager, including but not limited to the execution of any instrument in the name of the limited liability company for apparently carrying on in the usual way the business or affairs of the limited liability company binds the limited liability company, unless the manager so acting has, in fact, no authority to act for the limited liability company in the particular matter and the person with whom the manager is dealing has knowledge of the fact that the manager has no such authority.

(3)    An act of a manager or a member that is not apparently for carrying on in the usual way the business of the limited liability company does not bind the limited liability company, unless authorized in accordance with the articles of organization or the operating agreement, at the time of the transaction or at any other time.

(4)    An act of a manager or member in contravention of a restriction on authority may not bind the limited liability company to persons having knowledge of the restriction.

## Section 302.    Admissions of Members and Managers.

(1)    Except as provided in subsection (2), an admission or representation made by a member concerning the business or affairs of a limited liability company within the scope of the member's authority as provided for by this part is evidence against the limited liability company.

(2)    If the articles of organization provide that management of the limited liability company is vested in a manager or managers:

    (a)    an admission or representation made by a manager concerning the business or affairs of a limited liability company within the scope of the manager's authority, as provided for by this part, is evidence against the limited liability company; and

    (b)    the admission or representation of a member, acting solely in the capacity as a member, may not constitute evidence.

TF App. 0210

**Section 303.   Limited Liability Company Liability For Member's or Manager's Conduct.**

(1)   A limited liability company is liable for loss or injury caused to a person, or for a penalty incurred, as a result of a wrongful act or omission or other actionable conduct of a member or manager acting in the ordinary course of business of the company or with the authority of the company.

(2)   The failure of a limited liability company to observe the usual company formalities or requirements relating to the exercise of its company power or management of its business is not a ground for imposing personal liability on the member or managers of the limited liability company.

(3)

**Section 304.   Management and Voting.**

(1)   Unless the articles of organization or the operating agreement provide otherwise, in a member-managed company:

    (a)   each member has equal rights in the management and conduct of the company's business; and

    (b)   except as provided in subsection (3), any matter relating to the business of the company may be decided by a majority of the members.

(2)   Unless the articles of organization or the operating agreement provide otherwise, in a manager- managed company:

    (a)   each manager has equal rights in the management and conduct of the company's business;

    (b)   except as provided in subsection (3), any matter relating to the business of the company may be exclusively decided by the manager or, if there is more than one manager, by a majority of the managers; and

    (c)   a manager:

        (i)   must be designated, appointed, elected, removed, or replaced by a vote, approval, or consent of a majority of the members; and

        (ii)   holds office until a successor has been elected and qualified, unless the manager sooner resigns or is removed.

(3)   Unless the articles of organization or the operating agreement provide otherwise, the only matters of a member-managed or manager-managed company's business requiring the consent of all of the members are:

    (a)   the amendment of the operating agreement under Section 108 of this Chapter;

    (b)   the authorization or ratification of acts or transactions under Section 108(3)(b)(ii) of this Chapter that would otherwise violate the duty of loyalty;

    (c)   an amendment to the articles of organization under Section 203 of this Chapter;

    (d)   the compromise of an obligation to make a contribution under Section 402 of this Chapter;

    (e)   the compromise, as among members, of an obligation to make a contribution or return money or other property paid or distributed in violation of this part;

    (f)   the making of interim distributions under Section 501 of this Chapter, including the redemption or repurchase of an interest;

    (g)   the admission of a new member;

    (h)   the use of the company's property to redeem an interest subject to a charging order;

    (i)   the consent to dissolve the company under Section 801 of this Chapter;

14

(j)     a waiver of the right to have the company's business wound up and the company terminated under Section 801 of this Chapter;

(k)     the sale, lease, exchange, or other disposal of all, or substantially all, of the company's property with or without goodwill.

(4)     Action requiring the consent of members or managers under this Chapter may be taken without a meeting.

(5)     A member or manager may appoint a proxy to vote or otherwise act for the member or manager by signing an appointment instrument, either personally or by the member's or manager's attorney-in-fact.

**Section 305**.     **General Standards of Member's and Manager's Conduct.**

(1)     The only fiduciary duties that a member owes to a member-managed company and the other members are the duty of loyalty imposed by subsection (2) and the duty of care imposed by subsection (3).

(2)     A member's duty of loyalty to a member-managed company and its other members is limited to the following:

(a)     to account to the company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or derived from a use by the member of the company's property, including the appropriation of a company's opportunity;

(b)     to refrain from dealing with the company in the conduct or winding up of the company's business on behalf of a party or as a person having an interest adverse to the company; and

(c)     to refrain from competing with the company in the conduct of the company's business before the dissolution of the company.

(3)     A member's duty of care to a member-managed company and the other members in the conduct of and winding up of the company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

(4)     A member shall discharge the duties under this part or the operating agreement to a member- managed company and its other members and exercise any rights consistently with the obligation of good faith and fair dealing.

(5)     A member of a member-managed company does not violate a duty or obligation under this part or under the operating agreement merely because the member's conduct furthers the member's own interest.

(6)     A member of a member-managed company may lend money to and transact other business with the company. As to each loan or transaction, the rights and obligations of the member are the same as those of a person who is not a member, subject to other applicable law.

(7)     This section applies to a person winding up the limited liability company's business as the personal or legal representative of the last-surviving member as if the person were a member.

(8)     In a manager-managed company:

(a)     a member who is not also a manager owes no duties to the company or to the other members solely by reason of being a member;

(b)     a manager is held to the same standards of conduct as those prescribed for members in subsections (2) through (6);

15

    (c)   a member who pursuant to the operating agreement exercises some or all of the rights of a manager in the management and conduct of the company's business is held to the standards of conduct prescribed for members in subsections (2) through (6) to the extent that the member exercises the managerial authority vested in a manager by this part; and

    (d)   a manager is relieved of liability imposed by law for violation of the standards prescribed for members by subsections (2) through (6) to the extent of the managerial authority delegated to the members by the operating agreement.

**Section 306.**     <u>**Records and Information.**</u>

(1)   Unless otherwise provided in the articles of organization or a written operating agreement, a limited liability company shall keep at its principal place of business the following:

    (a)   a current and past list, setting forth the full name and last-known mailing address of each member and manager, if any, set forth in alphabetical order;

    (b)   a copy of the articles of organization and all amendments to the articles, together with executed copies of any powers of attorney pursuant to which any articles have been executed;

    (c)   copies of the limited liability company's (if applicable) federal, state, and local income tax returns and financial statements, if any, for the 3 most recent years or, if the returns and statements were not prepared for any reason, copies of the information and statements provided to or that should have been provided to the members to enable them to prepare their federal, state, and local tax returns for the period;

    (d)   copies of any effective written operating agreements and all amendments and copies of any written operating agreements no longer in effect;

    (e)   unless provided in writing in an operating agreement:

        (i)   a writing, if any, setting forth the amount of cash, the agreed value of other property or services contributed by each member, and the times or events upon which any additional contributions agreed to by each member are to be made;

        (ii)   a writing, if any, stating events that require the limited liability company to be dissolved and its affairs wound up; and

        (iii)   other writings, if any, prepared pursuant to a requirement in an operating agreement.

(2)   (a)   A member may, at the member's own expense, inspect and copy any limited liability company record, wherever the record is located, upon reasonable request during ordinary business hours.

    (b)   A former member and agents or attorneys of a former member must be provided access and the same right to copy records pertaining to the period that the former member was a member.

(3)   Members, if the management of the limited liability company is vested in the members, or managers, if management of the limited liability company is vested in the managers, shall render, to the extent the circumstances make it just and reasonable, true and full information of all things affecting the members to any member and to the legal representative of any deceased member or of any member under legal disability.

(4)   Failure of the limited liability company to keep or maintain any of the records or information required pursuant to this section may not be grounds for imposing liability on any person for the debts and obligations of the limited liability company.

TF App. 0213

**Section 307**.     <u>Actions By Members.</u>
(1)   A member may maintain an action against a limited liability company or another member for legal or equitable relief, with or without an accounting as to the company's business, to enforce:
(a)   the member's rights under the operating agreement;
(b)   the member's rights under this part; or
(c)   the rights and otherwise protect the interests of the member, including rights and interests arising independently of the member's relationship to the company.
(2)   The accrual of a right of action under this section and any time limits for asserting the right of action for a remedy under this section are governed by the laws of the Chippewa Cree Tribe. A right to an accounting upon a dissolution and winding up does not revive a claim barred by law.

**Section 308.     <u>Continuation of Term Company After Expiration of Specified Term.</u>**
(1)   If a term company is continued after the expiration of the specified term, the rights and duties of the members and managers remain the same as they were at the expiration of the term except to the extent inconsistent with rights and duties of members and managers of an at-will company.
(2)   If the members in a member-managed term company or the managers in a manager-managed term company continue the business without any winding up of the business of the company, it continues as an at-will company.

**Part 4 – Finance**

**Section 401.     <u>Contributions to Capital.</u>**
An interest in a limited liability company may be issued in exchange for tangible or intangible property or other benefit to the company, including money, promissory notes, services performed, or other agreements to contribute cash or property or contracts for services to be performed.

**Section 402.     <u>Liability For Contribution.</u>**
(1)   A promise by a member to contribute to the limited liability company is not enforceable unless set out in a writing signed by the member.
(2)   (a)   Except as provided in the articles of organization or the operating agreement, a member is obligated to the limited liability company to perform any enforceable promises to contribute cash or property or to perform services even if the member is unable to perform because of death, disability, or other reason.
      (b)   If a member does not make the required contribution of property or services, the member is obligated, at the option of the limited liability company, to contribute cash equal to that portion of value or the stated contribution that has not been made.
(3)   (a)   Unless otherwise provided in the articles of organization or the operating agreement, the obligation of a member to make a contribution or return money or other property paid or distributed in violation of this part may be compromised only with the unanimous consent of the members.

17

(b)   A creditor of a limited liability company who extends credit or otherwise acts in reliance on an obligation described in subsection (1), and without notice of any compromise, may enforce the original obligation.

**Section 403**.   <u>**Sharing of Profits and Losses.**</u>

Unless otherwise provided in the articles of organization or a written operating agreement, each member must be repaid that member's contributions to capital and share equally in the profits, losses, and surpluses remaining after all liabilities, including those to members, are satisfied.

**Section 404**.   <u>**Member's and Manager's Rights to Payments and Reimbursement.**</u>

(1)   A limited liability company shall reimburse a member or manager for payments made and indemnify a member or manager for liabilities incurred by the member or manager in the ordinary course of the business of the company or for the preservation of the company's business or property.

(2)   A limited liability company shall reimburse a member for an advance to the company beyond the amount of contribution that the member agreed to make.

(3)   A payment or advance made by a member that gives rise to an obligation of a limited liability company under subsection (1) or (2) constitutes a loan to the company upon which interest accrues from the date of the payment or advance.

(4)   A member is not entitled to remuneration for services performed for a limited liability company except for reasonable compensation for services rendered in winding up the business of the company.

**Part 5 – Distribution**

**Section 501**.   <u>**Sharing of Distributions**</u>.

Except as provided in Section 805 of this Chapter, distributions of cash or other assets of a limited liability company must be shared among the members and among classes of members in the manner provided in writing in the articles of organization or the operating agreement. If the articles of organization or the operating agreement does not so provide in writing, each member shall share equally in any distribution. A member is entitled to receive distributions described in this section from a limited liability company to the extent and at the times or upon the happening of the events specified in the articles of organization or the operating agreement or at the times determined by the members or managers pursuant to Section 304(3)(f).

**Section 502**.   <u>**Distribution In Kind**</u>.

Except as provided in the articles of organization or the operating agreement:

(1)   a member, regardless of the nature of the member's contribution, may not demand or receive any distribution from a limited liability company in any form other than cash; and

(2)   a member may not be compelled to accept from a limited liability company a distribution of any asset in kind to the extent that the percentage of the asset distributed to the members exceeds a percentage of that asset that is equal to the percentage in which the member shares in distributions from the limited liability company.

**Section 503**.   <u>**Distributions.**</u>

(1)   A distribution may not be made if, after giving effect to the distribution:

TF App. 0215

    (a) the limited liability company would not be able to pay its debts as they become due in the usual course of business; or

    (b) the limited liability company's total assets would be less than the sum of its total liabilities plus, unless the articles of organization or the operating agreement provides otherwise, the amount that would be needed, if the limited liability company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other members upon dissolution that are superior to the rights of the member receiving the distribution.

(2) The limited liability company may base a determination that a distribution is not prohibited under subsection (1) on either:

    (a) financial statements prepared on the basis of accounting practices and principles that are reasonable under the circumstances; or

    (b) a fair valuation or other method that is reasonable under the circumstances.

(3) Except as provided in subsection (5), the effect of a distribution under subsection (1) is measured as of:

    (a) the date the distribution is authorized if the payment occurs within 120 days after the date of authorization; or

    (b) the date payment is made if it occurs more than 120 days after the date of authorization.

(4) A limited liability company's indebtedness to a member incurred by reason of a distribution to be made to that member in accordance with this section is at parity with the limited liability company's indebtedness to its general unsecured creditors, except as otherwise provided by agreement.

(5) For purposes of this section:

    (a) if terms of indebtedness provide that payment of principal and interest is to be made only if and to the extent that payment of a distribution to members could then be made under this section, indebtedness of a limited liability company, including indebtedness issued as a distribution, is not a liability for purposes of determinations made under subsection (2); and

    (b) if the indebtedness is issued as a distribution, each payment of principal or interest on the indebtedness is treated as a distribution, the effect of which is measured on the date the payment is actually made.

**Section 504.**     **Liability Upon Wrongful Distribution**.

(1) A member or manager who votes for or assents to a distribution in violation of the articles of organization, the operating agreement, or Section 503 of this Chapter is personally liable to the limited liability company, but not to other persons, for the amount of the distribution that exceeds what could have been distributed without violating Section 503 of this Chapter or the articles of organization or the operating agreement if it is established that the member or manager did not perform the member's or manager's duties in compliance with Section 305 of this Chapter.

(2) A member of a manager-managed company who knew a distribution was made in violation of Section 503 of this Chapter, the articles of organization, or the operating agreement is personally liable to the company, but only to the extent that the distribution received by that member exceeded the amount that could have properly been paid to that member under Section 503 of this Chapter.

TF App. 0216

(3) A member or manager against whom an action is brought under this section may implead in the action:

    (a) other members and managers who voted for or assented to the distribution in violation of subsection (1) and may compel contribution from them; and

    (b) members who received a distribution in violation of subsection (2) and may compel a contribution from the members in the amount received in violation of subsection (2).

(4) A proceeding under this section is barred unless it is commenced within 2 years after the date of the distribution.

## Section 505. Right to Distribution.

Subject to Section 805, when a member becomes entitled to receive a distribution, the member has the status of and is entitled to all remedies available to a creditor of the limited liability company with respect to the distribution.

## Part 6 – Ownership and Transfer of Property.

## Section 601. Ownership of Limited Liability Company Property.

(1) Property transferred to or otherwise acquired by a limited liability company becomes property of the limited liability company. A member has no interest in specific limited liability company property.

(2) Property may be acquired, held, and conveyed in the name of the limited liability company. Any estate in real property may be acquired in the name of the limited liability company, and title to any estate acquired must vest in the limited liability company rather than in the members individually.

## Section 602. Transfer of Real Property.

(1) Except as provided in subsection (5), title to property of the limited liability company that is held in the name of the limited liability company may be transferred by an instrument of transfer executed by any member in the name of the limited liability company.

(2) Title to property of the limited liability company that is held in the name of one or more members or managers may be transferred by an instrument of transfer executed by the persons in whose name title is held if there is an indication in the instrument transferring title to the property to them of:

    (a) their capacity as members or managers of a limited liability company; or

    (b) the existence of a limited liability company, even if the name of the limited liability company is not indicated.

(3) Property transferred under subsection (1) or (2) may be recovered by the limited liability company if it proves that the act of the person executing the instrument of transfer did not bind the limited liability company under Section 301 of this Chapter unless the property has been transferred by the initial transferee or a person claiming through the initial transferee to a subsequent transferee who gives value without having notice that the person who executed the instrument of initial transfer lacked authority to bind the limited liability company.

(4) Title to property of the limited liability company may be transferred free of any claims of the limited liability company or its members by the persons in whose name title is held to a transferee who gives value without having notice that it is property of a limited liability

TF App. 0217

company if title is held in the name of one or more persons other than the limited liability company and there is no indication in the instrument transferring title to the property to them of:

    (a)    their capacity as members or managers of a limited liability company; or

    (b)    the existence of a limited liability company.

(5)    If the articles of organization provide that management of the limited liability company is vested in a manager or managers:

    (a)    title to property of the limited liability company that is held in the name of the limited liability company may be transferred by an instrument of transfer executed by any manager in the name of the limited liability company; and

    (b)    a member, acting solely in the capacity of a member, may not transfer title as provided in subsection (5)(a).

## Section 603. Nature of Distributional Interest.

(1)    A member is not a co-owner of, and does not have a transferable interest in, property of a limited liability company.

(2)    A member's distributional interest in a limited liability company is personal property and, subject to the provisions of Section 605 of this Chapter, may be transferred in whole or in part.

(3)    An operating agreement may provide that a members distributional interest may be evidenced by a certificate of the interest issued by the limited liability company and, subject to the provisions of Section 605 of this Chapter, may also provide for the transfer of any interest represented by the certificate.

## Section 604. Rights of Judgment Creditor.

(1)    On application to a court of competent jurisdiction by any judgment creditor of a member, the court may charge the distributional interest of the member with payment of the unsatisfied amount of judgment, with interest. To the extent charged, the judgment creditor has only the rights of an assignee of the distributional interest. This part does not deprive a member of the benefit of any exemption laws applicable to a distributional interest.

(2)    The court may appoint a receiver of the share of the distributions due or to become due to a judgment debtor and make all other orders, directions, accounts, and inquiries that the judgment debtor may have made or that the circumstances require to give effect to the charging order.

(3)    A charging order constitutes a lien on the judgment debtors distributional interest. The court may order a foreclosure of a lien on a distributional interest subject to the charging order at any time. A purchaser of the distributional interest at a foreclosure sale has the rights of a transferee.

(4)    At any time before foreclosure, a distributional interest that is charged may be redeemed:

    (a)    by the judgment debtor;

    (b)    by one or more of the other members with property other than the company's; or

    (c)    with the company's property if permitted by the operating agreement.

(5)    This section provides the exclusive remedy by which a judgment creditor of a member or a transferee may satisfy a judgment out of the judgment debtor's distributional interest in a limited liability company.

TF App. 0218

**Section 605**.        <u>Transfer of Distributional Interest—Rights of Transferee</u>.

(1)    A transfer of a members distributional interest does not entitle the transferee to become a member or to exercise any rights of a member. A transfer entitles the transferee to receive, to the extent transferred, only the distributions to which the transferor would be entitled.

(2)    A transferee of a distributional interest may become a member of a limited liability company if and to the extent that the transferor gives the transferee the right in accordance with authority described in writing in the operating agreement or if all other members consent.

(3)    A transferee who has become a member, to the extent transferred, has the rights and powers, and is subject to the restrictions and liabilities, of a member under the operating agreement of a limited liability company and the provisions of this part. A transferee who becomes a member also is liable for the transferor members obligations to make contributions under Section 402 of this Chapter and for obligations under to return unlawful distributions, but the transferee is not obligated for the transferor members liabilities unknown to the transferee at the time that the transferee becomes a member.

(4)    Whether or not a transferee of a distributional interest becomes a member under subsection (2), the transferor is not released from liability to the limited liability company under the operating agreement or the provisions of this Chapter.

(5)    A transferee who does not become a member is not entitled to participate in the management or conduct of the limited liability company's business, may not require access to information concerning the company's transactions, and may not inspect or copy any of the company's records.

(6)    A transferee who does not become a member is entitled to:

(a)    receive, in accordance with the transfer, distributions to which the transferor would otherwise be entitled;

(b)    receive, upon dissolution and winding up of the limited liability company's business:

(i)    in accordance with the transfer, the net amount otherwise distributable to the transferor; and

(ii)     a statement of account only from the date of the latest statement of account agreed to by all the members; and

(c)    seek under Section 802(2) of this Chapter a judicial determination that it is equitable to dissolve and wind up the company's business.

(7)    A limited liability company does not have to give effect to a transfer until it has notice of the transfer.


**Part 7 – Withdrawal of Members**


**Section 701**.        <u>Events Causing Member's Dissociation.</u>

A member is dissociated from a limited liability company upon the occurrence of any of the following events:

(1)    the company's having notice of the member's express will to withdraw upon the date of notice or on a later date if specified by the member;

(2)    an event agreed to in the operating agreement as causing the member's dissociation;

(3)    upon transfer of all of a member's distributional interest, other than a transfer for security purposes or pursuant to a court order charging the member's distributional interest that has not been foreclosed;

TF App. 0219

(4)    the member's expulsion pursuant to the operating agreement;

(5)    the member's expulsion by unanimous vote of the other members if:

    (a)    it is unlawful to carry on the company's business with the member;

    (b)    there has been a transfer of substantially all of the member's distributional interest, other than a transfer for security purposes or pursuant to a court order charging the member's distributional interest, which has not been foreclosed;

    (c)    within 90 days after the company notifies a corporate member that it will be expelled because it has filed a certificate of dissolution or the equivalent, its charter has been revoked, or its right to conduct business has been suspended by the jurisdiction of its incorporation, the member fails to obtain a revocation of the certificate of dissolution or a reinstatement of its charter or its right to conduct business; or

    (d)    a partnership or a limited liability company that is a member has been dissolved, and its business is being wound up;

(6)    on application by the company or another member, the member's expulsion by judicial determination because the member:

    (a)    engaged in wrongful conduct that adversely and materially affected the company's business;

    (b)    willfully or persistently committed a material breach of the operating agreement or of a duty

owed to the company or the other members under Section 305 of this Chapter; or

    (c)    engaged in conduct relating to the company's business that makes it not reasonably practicable to carry on the business with the member;

(7)    the member's:

    (a)    becoming a debtor in bankruptcy;

    (b)    executing an assignment for the benefit of creditors;

    (c)    seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator of all or substantially all of the member's property; or

    (d)    failing, within 90 days after the appointment, to have vacated or stayed the appointment of a trustee, receiver, or liquidator of the member or of all or substantially all of the member's property obtained without the member's consent or acquiescence or failing within 90 days after the expiration of stay to have the appointment vacated;

(8)    in the case of a member who is an individual:

    (a)    the member's death;

    (b)    the appointment of a guardian or general conservator for the member; or

    (c)    a judicial determination that the member has otherwise become incapable of performing the member's duties under the operating agreement;

(9)    in the case of a member that is a trust or is acting as a member by virtue of being a trustee of a trust, distribution of the trust's entire rights to receive distributions from the company, except that this subsection does not apply to the substitution of a successor trustee;

(10)  in the case of a member that is an estate or is acting as a member by virtue of being a personal representative of an estate, distribution of the estates entire rights to receive distributions from the company, but not merely the substitution of a successor personal representative; or

(11)  termination of the existence of a member if the member is not an individual, estate, or trust other than a business trust.

TF App. 0220

**Section 702**. <u>**Member's Power to Dissociate—Wrongful Dissociation.**</u>
(1) Unless otherwise provided in the operating agreement, a member has the power to dissociate from a limited liability company at any time, rightfully or wrongfully, pursuant to Section 701 of this Chapter.
(2) If the operating agreement has not eliminated a members power to dissociate, the members dissociation from a limited liability company is wrongful only if:
   (a) it is in breach of an express provision of the agreement; or
   (b) before the expiration of the specified term of a term company:
      (i) the member withdraws by express will;
      (ii) the member is expelled by judicial determination under Section 701(6) of this Chapter;
      (iii) the member is dissociated by becoming a debtor in bankruptcy; or
      (iv) in the case of a member that is not an individual, trust, other than a business trust, or estate, the member is expelled or otherwise dissociated because it willfully dissolved or terminated its existence.
(3) A member that wrongfully dissociates from a limited liability company is liable to the company and to the other members for damages caused by the dissociation. The liability is in addition to any other obligation of the member to the company or to the other members.
(4) If a limited liability company does not dissolve and wind up its business as a result of a member's wrongful dissociation under subsection (2), damages sustained by the company for the wrongful dissociation must be offset against distributions otherwise due the member after the dissociation.

**Section 703**. <u>**Effect of Member's Dissociation.**</u>
(1) Upon a member's dissociation:
   (a) in an at-will company, the company shall cause the dissociated member's distributional interest to be purchased as provided under Section 704 and Section 705 of this Chapter; and
   (b) in a term company:
      (i) if the company dissolves and winds up its business on or before the expiration of its specified term, Part 8 of this part applies to determine the dissociated member's rights to distributions; and
      (ii) if the company does not dissolve and wind up its business on or before the expiration of its specified term, the company shall ensure that the dissociated member's distributional interest is purchased under Section 704 and Section 705 of this Chapter on the date that was specified for the expiration of the term at the time of the member's dissociation.
(2) Upon a member's dissociation from a limited liability company:
   (a) the member's right to participate in the management and conduct of the company's business terminates, except as otherwise provided in Section 803 of this Chapter, and the member ceases to be a member and must be treated the same as a transferee of a member;
   (b) the member's duty of loyalty under Section 305(2)(c) of this Chapter terminates; and
   (c) the member's duty of loyalty under Section 305(2)(a) and (2)(b) of this Chapter and duty of care under Section 305(3) of this Chapter continue only with regard to matters

TF App. 0221

arising and events occurring before the member's dissociation, unless the member participates in winding up the company's business pursuant to Section 803 of this Chapter.

**Section 704.      Company Purchase of Distributional Interest.**
(1)    A limited liability company shall purchase a distributional interest of a:

   (a)    member of an at-will company for its fair value determined as of the date of the member's dissociation if the member's dissociation does not result in a dissolution and winding up of the company's business under Section 801 of this Chapter; or

   (b)    member of a term company for its fair value determined as of the date of the expiration of the specified term that existed on the date of the member's dissociation if the expiration of the specified term does not result in a dissolution and winding up of the company's business under Section 803 of this Chapter.

(2)    A limited liability company shall deliver a purchase offer to the dissociated member whose distributional interest is entitled to be purchased not later than 30 days after the date determined under subsection (1). The purchase offer must be accompanied by:

   (a)    a statement of the company's assets and liabilities as of the date determined under subsection (1);

   (b)    the latest available balance sheet and income statement, if any; and

   (c)    an explanation of how the estimated amount of the payment was calculated.

(3)    If the price and other terms of a purchase of a distributional interest are fixed or are to be determined by the operating agreement, the price and terms so fixed or determined govern the purchase unless the purchaser defaults. If a default occurs, the dissociated member is entitled to commence a proceeding to have the company dissolved under Section 802(1)(d) of this Chapter.

(4)    If an agreement to purchase the distributional interest is not made within 120 days after the date determined under subsection (1), the dissociated member, within another 120 days, may commence a proceeding against the limited liability company to enforce the purchase. The company, at its expense, shall notify in writing all of the remaining members and any other person that the court directs of the commencement of the proceeding. The jurisdiction of the court in which a proceeding is commenced under this subsection is plenary and exclusive.

(5)    The tribal court shall determine the fair value of the distributional interest in accordance with the standards set forth in Section 705 of this Chapter, together with the terms for the purchase. Upon making these determinations, the court shall order the limited liability company to purchase or cause the purchase of the interest.

(6)    Damages for wrongful dissociation under Section 702(2) of this Chapter and all other amounts owing, whether or not currently due, from the dissociated member to a limited liability company, must be offset against the purchase price.

**Section 705**.      **Court Action to Determine Fair Value of Distributional Interest.**
(1)    In an action brought to determine the fair value of a distributional interest in a limited liability company, the court shall:

   (a)    determine the fair value of the interest, considering among other relevant evidence the going concern value of the company, any agreement among some or all of the members fixing the price or specifying a formula for determining value of

25

TF App. 0222

distributional interests for any other purpose, the recommendations of any appraiser appointed by the court, and any legal constraints on the company's ability to purchase the interest;

(b) specify the terms of the purchase, including, if appropriate, terms for installment payments, subordination of the purchase obligation to the rights of the company's other creditors, security for a deferred purchase price, and a covenant not to compete or other restriction on a dissociated member; and

(c) require the dissociated member to deliver an assignment of the interest to the purchaser upon receipt of the purchase price or the first installment of the purchase price.

(2) After the dissociated member delivers the assignment, the dissociated member has no further claim against the company, its members, officers, or managers, if any, other than a claim to any unpaid balance of the purchase price or a claim under any agreement with the company or the remaining members that is not terminated by the court.

(3) If the purchase is not completed in accordance with the court's specified terms, the company is to be dissolved upon application under Section 802(1)(d) of this Chapter. If a limited liability company is so dissolved, the dissociated member has the same rights and priorities in the company's assets as if the sale of the distributional interest had not been ordered.

(4) If the court finds that a party to the proceeding acted arbitrarily, vexatiously, or not in good faith, it may award one or more other parties reasonable expenses, including attorney fees and the expenses of appraisers or other experts, incurred in the proceeding. The finding may be based on the company's failure to make an offer to pay or to comply with Section 704(2) of this Chapter.

(5) Interest must be paid on the amount awarded from the date determined under Section 704(1) of this Chapter to the date of payment.


**Section 706.** **Dissociated Members Power to Bind Limited Liability Company.**
For 2 years after a member dissociates without the dissociation resulting in a dissolution and winding up of a limited liability company's business, the company is bound by an act of the dissociated member that would have bound the company under Section 301 of this Chapter before dissociation only if at the time of entering into the transaction the other party:

(1) reasonably believed that the dissociated member was then a member;

(2) did not have notice of the member's dissociation; and

(3) is not considered to have had notice under Section 707 of this Chapter.

**Section 707.** **Statement of Dissociation.**
(1) A dissociated member or a limited liability company shall file in the office of the Secretary a statement of dissociation, stating the name of the company and that the member is dissociated from the company.

(2) For the purposes of Section 301 and Section 706 of this Chapter, a person not a member is considered to have notice of the dissociation 90 days after the statement of dissociation is filed.

TF App. 0223

**Part 8 – Dissolution**

**Section 801**.    <u>**Dissolution.**</u>
(1)   A limited liability company is dissolved and its affairs must be wound up when one of the following occurs:
    (a)   at the time or upon the occurrence of events specified in writing in the articles of organization or operating agreement;
    (b)   consent of the number or percentage of members specified in the operating agreement;
    (c)   an event that makes it unlawful for all or substantially all of the business of the company to be continued, but any cure of illegality within 90 days after notice to the company of the event is effective retroactively to the date of the event for purposes of this section;
    (d)   the expiration of the term specified in the articles of organization; or
    (e)   entry of a decree of judicial dissolution under Section 802 of this Chapter.
(2)   Subject to subsection (3), a limited liability company continues after dissolution only for the purpose of winding up its business.
(3)   At any time after the dissolution of a limited liability company and before the winding up of its business is completed, the members, including a dissociated member whose dissociation caused the dissolution, may unanimously waive the right to have the company's business wound up and the company terminated. In that case:
    (a)   the limited liability company resumes carrying on its business as if dissolution had never occurred, and any liability incurred by the company or a member after the dissolution and before the waiver is determined as if the dissolution had never occurred; and
    (b)   the rights of a third party accruing under the provisions of Section 804(1) or arising out of conduct by the third party in reliance on the dissolution before the third party knew or received a notification of the waiver are not adversely affected.

**Section 802.**    <u>**Judicial Dissolution.**</u>
(1)   On application by or for a member or a dissociated member, the Chippewa Cree Tribal Court may order dissolution of a limited liability company, or other appropriate relief, when:
    (a)   the economic purpose of the company is likely to be unreasonably frustrated;
    (b)   another member has engaged in conduct relating to the company's business that makes it not reasonably practicable to carry on the company's business with that member remaining as a member;
    (c)   it is not otherwise reasonably practicable to carry on the company's business in conformity with the articles of organization and the operating agreement;
    (d)   the company failed to purchase the petitioner's distributional interest as required by Section 703 of this Chapter or
    (e)   the members or managers in control of the company have acted, are acting, or will act in a manner that is illegal, oppressive, fraudulent, or unfairly prejudicial to the petitioner.
(2)   On application by a transferee of a member's interest, the Chippewa Cree Tribal Court may determine that it is equitable to wind up the company's business:
    (a)   after the expiration of the specified term, if the company was for a specified term at

TF App. 0224

the time that the applicant became a transferee by member dissociation, transfer, or entry of a charging order that gave rise to the transfer; or

(b)    at any time, if the company was at will at the time that the applicant became a transferee by member dissociation, transfer, or entry of a charging order that gave rise to the transfer.

**Section 803**.    <u>**Winding Up.**</u>

(1)    Except as otherwise provided in the articles of organization or the operating agreement, the business or affairs of the limited liability company may be wound up:

(a)    by the members or managers who have authority under Section 504 of this Chapter to manage the limited liability company prior to dissolution; or

(b)    if one or more of the members or managers have engaged in wrongful conduct or upon other cause shown, by the Chippewa Cree Tribal Court on application of any member or any members legal representative or assignee.

(2)    The persons winding up the business or affairs of the limited liability company may, in the name of and for and on behalf of the limited liability company:

(a)    prosecute and defend suits;

(b)    settle and close the business of the limited liability company;

(c)    dispose of and transfer the property of the limited liability company;

(d)    discharge the liabilities of the limited liability company; and

(e)    distribute to the members any remaining assets of the limited liability company.

**Section 804**.    <u>**Agency Power and Liability of Members or Managers After Dissolution.**</u>

(1)    Except as provided in subsections (3) through (5), after an event causing dissolution of the limited liability company, a member may bind the limited liability company:

(a)    by an act appropriate for winding up the limited liability company's affairs or completing transactions unfinished at dissolution; and

(b)    by any transaction that would have bound the limited liability company, if it had not been dissolved, if the other party to the transaction does not have notice of the dissolution.

(2)    The filing of the articles of termination is presumed to constitute notice of dissolution for purposes of subsection (1)(b).

(3)    An act of a member that would not otherwise be binding on the limited liability company under subsection (1) is binding if it is authorized by the limited liability company.

(4)    An act of a member that would be binding under subsection (1) or would be otherwise authorized and that is in contravention of a restriction on authority may not bind the limited liability company to persons having knowledge of the restriction.

(5)    If the articles of organization vest management of the limited liability company in managers, a manager may exercise the authority of a member under subsection (1) and a member may not exercise the authority if the member is acting solely in the capacity of a member.

(6)    A member or manager who, with knowledge of the dissolution, subjects a limited liability company to liability by an act that is not appropriate for the winding up of the company's business is liable to the company for any damage caused by the act.

TF App. 0225

**Section 805.    Distribution of Assets.**

Upon the winding up of a limited liability company, the assets must be distributed as follows:

(1)    to creditors, including members and managers who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the limited liability company, whether by payment or the making of reasonable provision for payment, other than liabilities to members for distributions under Section 504 of this Chapter;

(2)    unless otherwise provided in the articles of organization or an operating agreement, to members and former members in satisfaction of liabilities for distributions under Section 504 of this Chapter;

(3)    unless otherwise provided in writing in the articles of organization or a written operating agreement, to members first for the return of their contributions and second respecting their limited liability company interests, in the proportions in which the members share in distributions.

**Section 806.    Articles of Termination.**

(1)    At any time after dissolution and winding up, a limited liability company may terminate its existence by filing with the Secretary articles of termination stating:

(a)    the name of the limited liability company;

(b)    the reason for filing the articles of termination;

(c)    the effective date of the articles of termination, which must be a date certain, if they are not to be effective upon the filing;

(d)    the name of the agent or agents authorized to receive service of process after dissolution or termination of the limited liability company;

(e)    the name of the person or persons authorized to wind up the business and authorized to execute documents on behalf of the limited liability company;

(f)    the date of the dissolution; and

(g)    that the company's business has been wound up and the legal existence of the company has been terminated.

(2)    The existence of a limited liability company is terminated upon the filing of the articles of termination or upon a later effective date, if specified in the articles of termination.

**Section 807.    Known Claims Against Dissolved or Terminated Limited Liability Companies.**

(1)    A dissolved or terminated limited liability company may dispose of the known claims against it by following the procedure described in this section.

(2)    The dissolved or terminated limited liability company shall notify its known claimants in writing of the dissolution or termination at any time after the effective date of the dissolution or termination. The written notice must:

(a)    describe information that must be included in a claim;

(b)    provide a mailing address where a claim may be sent;

(c)    state the deadline, which may not be less than 120 days from the later of the effective date of the written notice or the filing of the articles of termination pursuant to Section 806 of this Chapter, by which the dissolved or terminated limited liability company must receive the claim; and

(d)    state that the claim will be barred if not received by the deadline.

(3)    A claim against the dissolved or terminated limited liability company is barred:

29

(a)   if a claimant who was given written notice under subsection (2) does not deliver the claim to the dissolved or terminated limited liability company by the deadline; or

(b)   if a claimant whose claim was rejected by the dissolved or terminated limited liability company does not commence a proceeding to enforce the claim within 90 days from the effective date of the rejection notice.

(4)   For purposes of this section, 'claim' does not include a contingent liability or a claim based on an event occurring after the effective date of the dissolution or termination.

### Section 808.  Unknown Claims Against Dissolved or Terminated Limited Liability Companies.

(1)   Subject to Section 807 of this Chapter and subsections (2) through (5) of this section, the dissolution or termination of a limited liability company, including dissolution by the expiration of its term, does not take away or impair any remedy available to or against the limited liability company or its members or managers for any claim or right, whether or not the claim or right existed or accrued prior to dissolution or termination. A proceeding by or against the limited liability company may be prosecuted or defended by the limited liability company in its name. The members and managers have power to take action as appropriate to protect the remedy, right, or claim.

(2)   A dissolved or terminated limited liability company may publish notice of its dissolution or termination and request that persons having claims against it present the claims in accordance with the notice.

(3)   The notice must:

(a)   be published at least once in a newspaper of general circulation on the Rocky Boy's Indian Reservation where the dissolved or terminated limited liability company's principal office is located;

(b)   describe the information required to be contained in a claim and provide a mailing address to which the claim is to be sent; and

(c)   state that a claim against the limited liability company is barred unless a proceeding to enforce the claim is commenced within 5 years after publication of the notice.

(4)   If a dissolved or terminated limited liability company publishes a notice in accordance with subsection (3), the claim of each of the following claimants is barred unless the claimant commences a proceeding to enforce the claim against the dissolved or terminated company within 5 years after the publication date of the notice:

(a)   a claimant who did not receive written notice under Section 807 of this Chapter;

(b)   a claimant whose claim was timely sent to the dissolved or terminated company but not acted on; and

(c)   a claimant whose claim is contingent on or based on an event occurring after the effective date of dissolution or termination.

(5)   A claim not barred under this section may be enforced:

(a)   against the dissolved or terminated limited liability company, to the extent of its undistributed assets; or

(b)   if the assets have been distributed in liquidation, against a member of the dissolved or terminated company to the extent of the member's proportionate share of the claim or the company's assets distributed to the member in liquidation, whichever is less, but a member's total liability for all claims under this section may not exceed the total amount of assets distributed to the member.

TF App. 0227

**Section 809.    Involuntary Dissolution—Procedure.**

(1)  A limited liability company that is guilty of any of the actions or omissions described in Section 208(1) of this Chapter is in default. By reason of the default, the limited liability company may be involuntarily dissolved by order of the Secretary, thereby forfeiting its right to transact any business on the Rocky Boy's Indian Reservation.

(2)  On or before September 1 of each year, the Secretary shall compile a list of defaulting limited liability companies, together with the amount of any filing fee, penalty, or costs remaining unpaid.

(3)  The Secretary shall give notice to the defaulting limited liability companies by:

   (a)  mailing a letter addressed to the limited liability company in care of its registered agent or any director or officer; or

   (b)  publication of a general notice once a month for 3 consecutive months in the newspaper of the Rocky Boy's Indian Reservation.

(4)  The notice referred to in subsection (3) must specify the fact of the proposed dissolution and state that unless the grounds for dissolution described in Section 208 of this Chapter have been rectified within 90 days following the mailing or publication of notice:

   (a)  the Secretary will dissolve the defaulting limited liability companies;

   (b)  defaulting limited liability companies will forfeit the amount of any tax, penalty, or costs to the Chippewa Cree Tribe; and

   (c)  defaulting limited liability companies will forfeit their rights to carry on business within the Rocky Boy's Indian Reservation.

(5)  After 90 days following mailing or publication of each notice, the Secretary may, by order, dissolve all limited liability companies that have not satisfied the requirements of applicable law and compile a full and complete list containing the names of all limited liability companies that have been so dissolved. The Secretary shall immediately give notice to the dissolved limited liability companies as specified in subsection (3).

(6)  In the case of involuntary dissolution, all the property and assets of the dissolved limited liability companies must be held in trust by the members or managers of the limited liability companies and the limited liability companies may carry on business only as necessary to wind up and liquidate their business and affairs under Section 801 of this Chapter and to notify claimants under Sections 807 and 808 of this Chapter.

(7)  The administrative dissolution of a limited liability company does not terminate the authority of its registered agent for service of process.

**Section 810.    Reinstatement Following Administrative Dissolution.**

(1)  A limited liability company administratively dissolved may apply to the Secretary for reinstatement within 5 years after the effective date of dissolution. The applicant shall file an official application. The application must:

   (a)  recite the name of the company and the effective date of its administrative dissolution;

   (b)  state that the ground for dissolution either did not exist or has been eliminated;

   (c)  state that the company's name satisfies the requirements of  Section103 of this Chapter;

   (d)  contain a certificate from the department of revenue reciting that all taxes owed by the company have been paid; and

TF App. 0228

(e)    include all annual reports not yet filed with the Secretary.

(2)    If the Secretary determines that the application contains the information required by subsection (1) and that the information is correct, the Secretary shall cancel the certificate of dissolution, prepare a certificate of reinstatement that recites this determination and the effective date of reinstatement, file the original of the certificate, and serve the company with a copy of the certificate.

(3)    When reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative dissolution, and the company may resume its business as if the administrative dissolution had not occurred.

## Section 811.    Appeal From Denial of Reinstatement.

(1)    If the Secretary denies a limited liability company's application for reinstatement following administrative dissolution, the Secretary shall serve the company with a record that explains the reason or reasons for the denial.

(2)    The company may appeal the denial of reinstatement to the Chippewa Cree Tribal Court within 30 days after service of the notice of denial. The company shall appeal by petitioning the court to set aside the dissolution and attaching to the petition copies of the Secretary's certificate of dissolution, the company's application for reinstatement, and the Secretary's notice of denial.

(4)    The court may summarily order the Secretary to reinstate the dissolved company or may take other action that the court considers appropriate.

(5)    The court's final decision may be appealed as in other civil proceedings.

## Part 9 – Foreign Limited Liability Companies.

## Section 901.    Authority to Transact Business Required.

(1)    A foreign limited liability company may not transact business on the Rocky Boy's Indian Reservation until it obtains a certificate of authority from the Secretary.

(2)    The following activities, among others, do not constitute transacting business within the meaning of subsection (1):

    (a)    maintaining, defending, or settling any proceeding;

    (b)    holding meetings of the members or managers or carrying on other activities concerning internal affairs of the limited liability company;

    (c)    maintaining bank accounts;

    (d)    maintaining offices or agencies for the transfer, exchange, and registration of the limited liability company's own securities or maintaining trustees or depositaries with respect to those securities;

    (e)    selling through independent contractors;

    (f)    soliciting or obtaining orders, whether by mail or through employees or agents or otherwise, if the orders require acceptance outside the Rocky Boy's Indian Reservation before they become contracts;

    (g)    creating or acquiring indebtedness, mortgages, and security interests in real or personal property;

    (h)    securing or collecting debts or enforcing mortgages and security interests in property securing the debts;

TF App. 0229

(i)    owning real or personal property that is acquired incident to activities described in subsection (2)(h) if the property is disposed of within 5 years after the date of acquisition, does not produce income, or is not used in the performance of a function of the limited liability company;

(j)    conducting an isolated transaction that is completed within 30 days and that is not a transaction in the course of repeated transactions of a similar nature; or

(k)    transacting business in interstate commerce.

(3)    The list of activities in subsection (2) is not exhaustive.

(4)    Except as provided in subsection (2), a foreign limited liability company is transacting business within the meaning of subsection (1) if it enters into a contract with Chippewa Cree Tribe, an agency or department of the Chippewa Cree Tribe, or a wholly owned business or subsidiary business of the Chippewa Cree Tribe and must apply for and receive a certificate of authority to transact business before entering into the contract. The Secretary shall provide written notice to the contracting parties regarding the requirement that a foreign limited liability company obtain a certificate of authority. The foreign limited liability company must be allowed 30 days from the date of the notice to obtain the certificate of authority, and an existing contract may not be voided prior to the expiration of the 30 days.

**Section 902**.    **Consequences of Transacting Business Without Authority.**

(1)    A foreign limited liability company transacting business on the Rocky Boy's Indian Reservation without a certificate of authority may not maintain a proceeding in Chippewa Cree Tribal Court until it obtains a certificate of authority.

(2)    The successor to a foreign limited liability company that transacted business on the Rocky Boy's Indian Reservation without a certificate of authority and the assignee of a cause of action arising out of that business may not maintain a proceeding based on that cause of action in Chippewa Cree Tribal Court until the foreign limited liability company or its successor obtains a certificate of authority.

(3)    Chippewa Cree Tribal Court may stay a proceeding commenced by a foreign limited liability company or its successor or assignee until it determines whether the foreign corporation or its successor or assignee requires a certificate of authority. If it determines that a certificate is required, the court may further stay the proceeding until the foreign limited liability company or its successor obtains the certificate.

(4)    A foreign limited liability company is liable for a civil penalty of $50 for each day, but not to exceed a total of $10,000 for each year, that it transacts business on the Rocky Boy's Indian Reservation without a certificate of authority. The Chippewa Cree Tribal prosecutor may collect all penalties due under this subsection and deposit them to the general fund.

(5)    Notwithstanding the provisions of subsections (1) and (2) and except as provided in subsection (6), the failure of a foreign limited liability company to obtain a certificate of authority does not impair the validity of its acts or prevent it from defending any proceeding on the Rocky Boy's Indian Reservation.

(6)    A contract between the Chippewa Cree Tribe, an agency or department of the Chippewa Cree Tribe, or a wholly owned business of the Chippewa Cree Tribe and a foreign limited liability company that has failed to obtain a certificate of authority from Chippewa Cree Tribe, the contracting agency or department of the Chippewa Cree Tribe, or the contracting wholly owned business of the Chippewa Cree Tribe.

TF App. 0230

**Section 903.** **Application For Certificate of Authority.**

(1)    A foreign limited liability company may apply for a certificate of authority to transact business on the Rocky Boy's Indian Reservation by delivering an application to the Secretary for filing. The application must set forth:

    (a)    the name of the foreign limited liability company or, if its name is unavailable for use on the Rocky Boy's Indian Reservation, a name that satisfies the requirements of Section 909 of this Chapter;

    (b)    the name of the state, tribe, or country under whose law it is organized;

    (c)    its date of organization and period of duration;

    (d)    the street address of its principal office;

    (e)    the address of its registered office on the Rocky Boy's Indian Reservation and the name of its registered agent at that office; and

    (f)    the names and usual business addresses of its current managers, if different from its members.

(2)    A foreign limited liability company shall deliver with the completed application a certificate of existence or a similar document authenticated by the secretary of state or other official having custody of corporate records in the state, tribe, or country under whose law the foreign limited liability company is organized.

**Section 904.** **Registered Office and Registered Agent of Foreign Limited Liability Company.**

Each foreign limited liability company authorized to transact business by the Chippewa Cree Tribe shall continuously maintain on the Rocky Boy's Indian Reservation:

(1)    a registered office that may be the same as any of its places of business; and

(2)    a registered agent who shall be:

    (a)    an individual who resides on the Rocky Boy's Indian Reservation and whose business office may be identical with the registered office; or

    (b)    a domestic corporation, a limited liability company, or a foreign corporation or foreign limited liability company authorized to transact business by the Chippewa Cree Tribe.

**Section 905.** **Resignation of Registered Agent of Foreign Limited Liability Company.**

(1)    The registered agent of a foreign limited liability company may resign the agency appointment by signing and delivering to the Secretary for filing the original and two copies of a statement of resignation. The statement of resignation may include a statement that the registered office is also discontinued.

(2)    After filing the statement, the Secretary shall attach the filing receipt to one copy and mail the copy and receipt to the registered office if the office has not been discontinued. The Secretary shall mail the other copy to the foreign limited liability company at its principal office address shown in its most recent annual report.

(3)    The agency appointment is terminated and the registered office discontinued, if provided in the statement, 30 days after the date on which the statement was filed.

**Section 906.** **Change of Registered Office or Registered Agent of Foreign Limited Liability Company.**

TF App. 0231

(1) A foreign limited liability company authorized to transact business on the Rocky Boy's Indian Reservation may change its registered office or registered agent, or both, by delivering to the Secretary, for filing, a statement of change setting forth:
  (a) the foreign limited liability company's name;
  (b) the street address of its current registered office;
  (c) if the address of its registered office is to be changed, the new address of the registered office on the Rocky Boy's Indian Reservation;
  (d) the name and address of its current registered agent;
  (e) if its registered agent or the agent's address is to be changed, the name and address of the successor registered agent or the current registered agent's new address; and
  (f) the fact that after the change or changes are made, the street addresses of its registered office and the business office of its registered agent are identical.
(2) If a registered agent changes the street address of the registered agent's business office, the registered agent may change the street address of the registered office of any foreign limited liability company for which the registered agent is the registered agent by notifying the foreign limited liability company in writing of the change and signing, either manually or in facsimile, and delivering to the Secretary, for filing, a statement of change that complies with the requirements of subsection (1) and that states that the foreign limited liability company has been notified of the change.

## Section 907.    Amended Certificate of Authority.
(1) A foreign limited liability company authorized to transact business on the Rocky Boy's Indian Reservation shall obtain an amended certificate of authority from the Secretary if it changes:
  (a) its name;
  (b) the period of its duration; or
  (c) the state, tribe or country of its organization.
(2) The requirements of Section 903 of this Chapter for obtaining an original certificate of authority apply to obtaining an amended certificate under this section.

## Section 908.    Effect of Certificate of Authority.
(1) A certificate of authority issued by the Secretary authorizes a foreign limited liability company to transact business on the Rocky Boy's Indian Reservation subject to the right of the Chippewa Cree Tribe to revoke the certificate as provided in this part.
(2) A foreign limited liability company with a valid certificate of authority has the same rights and privileges as a domestic company of similar character and, except as otherwise provided by this part, is subject to the same duties, restrictions, penalties, and liabilities imposed on a domestic limited liability company of similar character.
(3) This part does not authorize the Chippewa Cree Tribe to regulate the organization or internal affairs of a foreign limited liability company authorized to transact business on the Rocky Boy's Indian Reservation.

## Section 909.    Name.
A certificate of authority may not be issued to a foreign limited liability company unless the name of the company satisfies the requirements of Section 103 of this Chapter. If the name of a foreign limited liability company does not satisfy the requirements of Section 103 of this

TF App. 0232

Chapter, to obtain or maintain a certificate of authority:

(1)   the foreign limited liability company may add the words "limited liability company", the abbreviation "l.l.c.", or the abbreviation "l.c." to its name for use on the Rocky Boy's Indian Reservation; or

(2)   if its real name is unavailable, the foreign limited liability company may use an assumed business name that is available and that satisfies the requirements of Section 207 of this Chapter, if it files the assumed business name with the Secretary.

## Section 910.      Withdrawal of Foreign Limited Liability Company.

(1)   A foreign limited liability company authorized to transact business on the Rocky Boy's Indian Reservation may not withdraw from the Rocky Boy's Indian Reservation until it obtains a certificate of withdrawal from the Secretary.

(2)   A foreign limited liability company authorized to transact business on the Rocky Boy's Indian Reservation may apply for a certificate of withdrawal by delivering an application to the Secretary for filing. The application must set forth:

(a)   the name of the foreign limited liability company and the name of the state, tribe, or country under whose law it is organized;

(b)   that it is not transacting business on the Rocky Boy's Indian Reservation and that it surrenders its authority to transact business on the Rocky Boy's Indian Reservation;

(c)   that it revokes the authority of its registered agent to accept service on its behalf and appoints the Secretary as its agent for service of process in any proceeding based on a cause of action arising during the time it was authorized to transact business on the Rocky Boy's Indian Reservation;

(d)   a mailing address to which the Secretary may mail a copy of any process served on the Secretary under subsection (3);

(e)   a commitment to notify the Secretary in the future of any change in its mailing address;

(f)   additional information as may be necessary or appropriate to enable the Secretary to determine and assess any unpaid fees or taxes payable by the foreign limited liability company.

(3)   After the withdrawal of the foreign limited liability company is effective, service of process on the Secretary under this section is service on the foreign limited liability company. Upon receipt of process, the Secretary shall mail a copy of the process to the foreign limited liability company at the mailing address set forth under subsection (2).

## Section 911.      Grounds For Revocation.

The Secretary may commence a proceeding under Section 912 of this Chapter to revoke the certificate of authority of a foreign limited liability company authorized to transact business on the Rocky Boy's Indian Reservation if:

(1)   the foreign limited liability company does not deliver its annual report to the Secretary within 140 days after it is due;

(2)   the foreign limited liability company is without a registered agent or registered office on the Rocky Boy's Indian Reservation for 60 days or more;

(3) the foreign limited liability company does not inform the Secretary under Section 105 of this Chapter  that its registered agent or registered office has changed, that its registered agent has resigned, or that its registered office has been discontinued within 60 days of the change,

TF App. 0233

resignation, or discontinuance; or

(4) the Secretary receives a duly authenticated certificate from the Secretary or other official having custody of company records in the state, tribe, or country under whose law the foreign limited liability company is organized, stating that it has been dissolved or disappeared as the result of a merger.

**Section 912.    Procedure For and Effect of Revocation.**

(1)    If the Secretary determines that one or more grounds exist under Section 911 of this Chapter for revocation of a certificate of authority, the Secretary shall serve the foreign limited liability company with written notice of the Secretary's determination.

(2)    If the foreign limited liability company does not correct each ground for revocation or demonstrate to the reasonable satisfaction of the Secretary that each ground determined by the Secretary does not exist within 60 days after service of the notice is mailed, the Secretary may revoke the foreign limited liability company's certificate of authority by signing a certificate of revocation that states the ground or grounds for revocation and the effective date of the revocation. The Secretary shall file the original of the certificate and mail a copy to the foreign limited liability company.

(3)    The authority of a foreign limited liability company to transact business on the Rocky Boy's Indian Reservation ceases on the date shown on the certificate revoking its certificate of authority.

(4)    The Secretary's revocation of a foreign limited liability company's certificate of authority appoints the Secretary as the foreign limited liability company's agent for service of process in any proceeding based on a cause of action that arose during the time the foreign limited liability company was authorized to transact business on the Rocky Boy's Indian Reservation. Service of process on the Secretary under this subsection is service on the foreign limited liability company. Upon receipt of process, the Secretary shall mail a copy of the process to the secretary of the foreign limited liability company at its principal office shown in its most recent annual report or in any subsequent communication received from the foreign limited liability company, stating the current mailing address of its principal office or, if no report or communication is on file, in its application for a certificate of authority.

(5)    Revocation of a foreign limited liability company's certificate of authority does not terminate the authority of the registered agent of the foreign limited liability company.

**Section 913.   Appeal From Revocation.**

(1)    A foreign limited liability company may appeal the Secretary's revocation of its certificate of authority to the Chippewa Cree Tribal Court within 30 days after service of the certificate of revocation is mailed. The foreign limited liability company may appeal by petitioning the court to set aside the revocation and by attaching to the petition copies of its certificate of authority and the Secretary's certificate of revocation.

(2)    The court may summarily order the Secretary to reinstate the certificate of authority or may take any other action the court considers appropriate.

(3)    The court's final decision may be appealed as in other civil proceedings.

**Section 914.    Admission of Foreign Professional Limited Liability Companies --
Application -- Revocation.**

TF App. 0234

(1)     A foreign professional limited liability company is entitled to a certificate of authority to transact business on the Rocky Boy's Indian Reservation only if:

    (a)     the name of the foreign professional limited liability company meets the requirements of Section 1102 of this Chapter;

    (b)     the foreign professional limited liability company is organized only for purposes for which a professional limited liability company may be organized under Part 11 of this Chapter; and

    (c)     all the members and not less than one-half of the managers of the foreign professional limited liability company are qualified persons with respect to the foreign professional limited liability company.

(2)     Notwithstanding Section 901 a foreign professional limited liability company may not be required to obtain a certificate of authority to transact business on the Rocky Boy's Indian Reservation unless it maintains an office on the Rocky Boy's Indian Reservation for the conduct of business or professional practice.

(3)     The application for a certificate of authority must include a statement that all the members and not less than one-half of the managers are licensed in at least one state or territory or the District of Columbia to render a professional service described in the statement of purposes of the foreign professional limited liability company.

(4)     The certificate of authority may be revoked by the Secretary if the foreign professional limited liability company fails to comply with any provision of Part 11 of this Chapter. The licensing authority shall certify to the Secretary, from time to time, the names of all foreign professional limited liability companies that have given cause for revocation, together with the pertinent facts, and shall concurrently mail to each foreign professional limited liability company at its registered office on the Rocky Boy's Indian Reservation a notice that the certification has been made. A certificate of authority of a foreign professional limited liability company may not be revoked unless there have been both 60 days' notice of intent to revoke and a failure to correct the noncompliance during the 60 days.

(5)     A foreign professional limited liability company is subject to all other provisions of Part 11 of this Chapter not inconsistent with this section.

## Part 10 – Suits by and Against the Limited Liability Company.

### Section 1001.     Suits By and Against Limited Liability Company.
Suit may be brought by or against a limited liability company in its own name.

### Section 1002.     Service of Process.
(1)     An agent for service of process appointed by a limited liability company or a foreign limited liability company is an agent of the company for service of any process, notice, or demand required or permitted by law to be served upon the company.

(2)     If a limited liability company or foreign limited liability company fails to appoint or maintain an agent for service of process on the Rocky Boy's Indian Reservation or the agent for service of process cannot with reasonable diligence be found at the agents address, the Secretary is an agent of the company upon whom process, notice, or demand may be served.

(3)     Service of any process, notice, or demand on the Secretary may be made by delivering to and leaving with the Secretary duplicate copies of the process, notice, or demand and, when

TF App. 0235

applicable, pursuant to the service provisions of the Chippewa Cree Tribal Rules of Civil Procedure. If the process, notice, or demand is not served pursuant to the provisions of the Chippewa Cree Tribal Rules of Civil Procedure, the Secretary shall forward one of the copies by registered mail, return receipt requested, to the company at its designated office, and the Secretary may require the person requesting the service to reimburse the Secretary for mailing costs. Service is effected under this subsection at the earliest of:

    (a)   the date on which the company receives the process, notice, or demand;

    (b)   the date shown on the return receipt, if signed on behalf of the company; or

(c)   5 days after its deposit in the mail, if mailed postpaid and correctly addressed.

(4)   The Secretary shall keep a record of all processes, notices, and demands served pursuant to this section and record the time of and the action taken regarding the service.

(5)   This section does not affect the right to serve process, notice, or demand in any manner otherwise provided by law.

**Section 1003.**   **Derivative Actions—Proper Plaintiff—Pleading—Expenses.**

(1)   A member of a limited liability company may maintain an action in the Chippewa Cree Tribal Court in the right of the company if the members or managers having authority to bring the action have refused to commence the action or an effort to cause those members or managers to commence the action is not likely to succeed.

(2)   In a derivative action for a limited liability company, the plaintiff must be a member of the company when the action is commenced and:

    (a)   must have been a member at the time of the transaction of which the plaintiff complains; or

    (b)   the plaintiffs status as a member must have devolved upon the plaintiff by operation of law or pursuant to the terms of the operating agreement from a person who was a member at the time of the transaction.

(3)   In a derivative action for a limited liability company, the complaint must set forth with particularity the effort of the plaintiff to secure initiation of the action by a member or manager or the reasons for not making the effort.

(4)   If a derivative action for a limited liability company is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise, or settlement of an action or claim, the court may award the plaintiff reasonable expenses, including reasonable attorney fees, and shall direct the plaintiff to remit to the limited liability company the remainder of the proceeds received.

**Section 1004.**   **Limited Waivers of Sovereign Immunity**

(1)   The Business Committee may grant the board of directors of a limited liability company the authority to provide a limited waiver of sovereign immunity on behalf of the limited liability company, but not on behalf of the Tribe, provided that such authority is provided for in the limited liability company's Articles of Organization or other By-Laws and the Articles of Organization or By-Laws are expressly approved by resolution of the Business Committee. If authority to provide a limited waiver of sovereign immunity is provided for in the limited liability company's Articles of Organization or other By-laws, the board of directors shall have the sole authority to resolve to grant a limited waiver of sovereign immunity on behalf of the limited liability company and the limited liability company need not seek additional authority from the Business Committee. A resolution of the board of

TF App. 0236

directors of the limited liability company that provides for a limited waiver of sovereign immunity shall serve as conclusive proof that the limited liability company is authorized to provide the limited waiver of sovereign immunity specified in such resolution provided that the Business Committee has previously resolved to approve the limited liability company's Articles of Organization or By-laws granting the board of directors such authority to provide limited waivers of sovereign immunity.

## Part 11 – Professional Limited Liability Company.

### Section 1101.    Purposes of Professional Limited Liability Companies.
Professional limited liability companies may be organized under this part only for the purpose of rendering professional services and services ancillary to professional services within a single profession, except that a professional limited liability company may be organized for the purpose of rendering professional services within two or more professions and for any purpose or purposes for which companies may be organized under this part to the extent that the combination of professional purposes or professional and business purposes is permitted by the licensing laws and rules of the Chippewa Cree Tribe applicable to the professions.

### Section 1102.    Professional Limited Liability Company Name.
The name of a domestic or foreign professional limited liability company:
(1)    must contain the words "professional limited liability company", "professional limited company", "professional l.l.c.", "professional llc", "p.l.l.c.", or "pllc"; and
(2)    must conform to rules promulgated by a licensing authority having jurisdiction of a professional service described in the articles of organization.

### Section 1103.    Professional Limited Liability Company Managers.
At least one-half of the managers of a professional limited liability company must be qualified persons with respect to the limited liability company.

### Section 1104.    Membership In Professional Limited Liability Company.
(1)    Only the following persons may be members of a professional limited liability company:
   (a)    natural persons authorized by law of the Chippewa Cree Tribe or any other tribe, state, a territory of the United States, or the District of Columbia to render a professional service permitted by the articles of organization of the professional limited liability company;
   (b)    general partnerships in which all the partners are authorized by law of the Chippewa Cree Tribe or any other tribe, state, a territory of the United States, or the District of Columbia to render a professional service permitted by the articles of incorporation and in which at least one partner is authorized by law of the Chippewa Cree Tribe to render a professional service permitted by the articles of organization of the professional limited liability company; and
   (c)    domestic or foreign professional corporations and domestic or foreign professional limited liability companies authorized by law of the Chippewa Cree Tribe or tribe, state to render a professional service permitted by the articles of organization of the professional limited liability company.
(2)    The licensing authority may by rule further restrict or condition the issuance of

TF App. 0237

membership interests in order to preserve ethical standards, but a rule may not cause a member at the time the rule becomes effective to become a disqualified person.

## Section 1105. <u>Rendering Services.</u>

A domestic or foreign professional limited liability company may render professional services on the Rocky Boy's Indian Reservation only through natural persons permitted to render the services on the Rocky Boy's Indian Reservation; however, nothing in this part requires any person employed by a professional limited liability company to be licensed to perform services for which a license is not otherwise required or prohibits the rendering of professional services by a licensed natural person acting in that person's individual capacity, even if the person is a member or manager of a professional limited liability company.

## Section 1106. <u>Responsibility For Services.</u>

(1) An individual who renders professional services as a member or an employee of a domestic or foreign professional limited liability company is liable for any negligent or wrongful act or omission in which the individual personally participates to the same extent as if the individual had rendered the services as a sole practitioner. A member or an employee of a professional limited liability company is not liable for the conduct of other members or employees unless the member or employee is at fault in appointing, supervising, or cooperating with them.

(2) A domestic or foreign professional limited liability company whose member or employee performs professional services within the scope of the member's or employee's employment or apparent authority to act for the company is liable to the same extent as the member or employee.

(3) Except as otherwise provided by statute, the personal liability of a member of a domestic or foreign professional limited liability company is no greater in any respect than that of a member of a limited liability company otherwise organized under this part.

## Section 1107. <u>Relationship to Clients And Patients.</u>

(1) The relationship between an individual performing professional services as an employee of a domestic or foreign professional limited liability company and a client or patient is the same as if the individual performed the services as a sole practitioner.

(2) The relationship between a domestic or foreign professional limited liability company performing professional services and the client or patient is the same as between the client or patient and the individual performing the services.

(3) Any privilege applicable to communications between a person rendering professional services and the person receiving the services recognized under the statutory or common law of the Chippewa Cree Tribe extends to a domestic or foreign professional limited liability company and its employees.

TF App. 0238

# EXHIBIT C

TF App. 0239

# TITLE 10 - CHIPPEWA CREE TRIBAL CODES

## CHIPPEWA CREE TRIBAL LENDING AND REGLATORY CODE

## (REVISED ON NOVEMBER 22, 2013, OCTOBER 2, 2014 AND MAY 7, 2015)

**TF App. 0240**

# CHAPTER 1.    FINDINGS, INTENT, POLICY

**10-1-101.  Findings.**  The Chippewa Cree Tribe of the Rocky Boy's Reservation, Montana (hereinafter the "Tribe"), through the Business Committee as the primary governing body of the Tribe, finds that:

    a.  The Tribe wishes to continue the development of the economy of the Tribe in order to improve the Tribe's economic self-sufficiency, to enable the Tribe to better serve the social, economic, educational, and health and safety needs of its members and visitors, and to provide its members with opportunities to improve their own economic circumstances.

    b.  The Tribe, shall establish the Tribal Consumer Protection Bureau (TCPB) and delegate to the TCPB the independent regulatory authority to license and regulate all Tribal Consumer Financial Services businesses within the jurisdiction of the Tribe.

    c.  Properly licensed and regulated Tribal Consumer Financial Services businesses conform to the well-established federal policy promoting Tribal self-determination, Tribal self-governance, and Tribal economic self-sufficiency.

    d.  Delegating the independent regulatory authority to the TCPB is essential to protect public welfare and preserve the integrity of the Tribal Consumer Financial Services businesses commensurate with Tribal law and policy and applicable federal law.

    e.  The Business Committee adopts Title 10 (as amended) of the Chippewa Cree Tribal Lending and Regulatory Code to administer the Tribal lending enterprise and gain public confidence in Consumer Financial Services that take place within the Tribe's jurisdiction.

    f.  The adoption of Title 10 (as amended) by the Business Committee is a necessary condition for the legal operation of Consumer Financial Services within the Tribe's reservation boundaries and is in the best interest of the Tribe.

    g.  Establishment of the Tribal Consumer Protection Bureau (TCPB) within the Regulatory Department of the Chippewa Cree Tribe to implement the purpose and intent of this Code within the Tribe's reservation boundaries is in the best interest of the Tribe and Consumers.

**10-1-102.  Intent.**  The Business Committee, on behalf of the Tribe, declares that the intent of this Code is to:

    a.  Diversify and expedite the development of the economy of the Rocky Boy's Reservation for the purposes in § 10-1-101(a) above.

    b.  To expressly delegate the independent regulatory authority to the Tribal Consumer Protection Bureau as provided in this Code.

TF App. 0241

    c.   Define the independent regulatory powers to be exercised by the Commissioner of the Tribal Consumer Protection Bureau in relation to the regulation, control, and oversight of the Consumer Financial Services businesses.

    d.   Ensure that Consumer Financial Services profits are used for the benefit of the Tribe, Tribal government programs and the Tribe's community.

    e.   Ensure that Consumer Financial Services are conducted appropriately by Licensees and borrowers and that they remain free from corrupt, incompetent, unconscionable, dishonest, unfair, deceptive and/or abusive practices.

    f.   Protect and ensure the interests of the public in the offering of Consumer Financial Services.

    g.   To provide fair and orderly Consumer complaint processes to resolve Consumer Financial Services disputes consistent with the Tribe's laws and policies and to preserve the Tribe's sovereign immunity.

    h.   Ensure that Tribal Consumer Financial Services laws are enforced.

**10-1-103. Policy.**

    a.   <u>Tribal Policy of Self-Government.</u> The Tribe is firmly committed to the principle of Tribal self-governance. Profits from Consumer Financial Services shall be utilized and expended only for the following purposes:

        1.   To fund the Tribe's government operations or programs;

        2.   To provide for the public health, education and general welfare of the Tribe and its members and visitors to the Tribal community;

        3.   To promote Tribal economic development and self-sufficiency; and

        4.   To donate to charitable organizations.

    b.   <u>Tribal Consumer Financial Services Policy.</u> The establishment, promotion and operation of Tribal Consumer Financial Services are necessary, provided that such Consumer Financial Services are regulated and controlled by the Tribe under this Code and the profits of such Tribal Consumer Financial Services are used exclusively for the benefit of the Tribe.

    c.   <u>Consumer Financial Services Authorized.</u> Consumer Financial Services that are subject to licensing under this Code are authorized and permitted only as described in this Code and any regulations adopted by the Commissioner of the Tribal Consumer Protection Bureau.

**10-1-104. Territorial Application.** This Code applies to Loans made by the Lender and includes modifications, refinancing, consolidations, and deferrals consummated within the

TF App. 0242

Tribe's jurisdiction. A loan, as that term is defined herein, shall be deemed prima facie evidence of the consumer's intent to accept the territorial application of this Code and the terms of the Loan Agreement.

## CHAPTER 2.    DEFINITIONS

**10-2-201. Definitions.**  In this Code, except where otherwise specifically provided or unless the context otherwise requires, the following terms and expressions shall have the following meanings:

   a. "Account" means any banking, checking, credit union, commercial, savings, savings and loan, brokerage, investment, or other kind of depository account held by a Consumer.

   b.  "Applicant" means any Person who has applied for a License under the provisions of this Code.

   c. "Application" means a request for the issuance of a License under the provisions of this Code.

   d. "Arm of the Tribe" means a commercial entity formed pursuant to the Tribe's law, ultimately overseen by the Tribe, and through which the Tribe intends to serve its interests, including those of its members and to which the Tribe has extended and granted its sovereign immunity as a means to protect the interests of the Tribe and its members.

   e. "Bureau" means the Tribal Consumer Protection Bureau.

   f. "Business Committee" means the Business Committee of the Tribe, as the governing body of the Tribe as defined and described in the Constitution and Bylaws of the Tribe.

   g. "Check" means a negotiable instrument that is drawn on a state, tribal or federal bank, credit union, or savings and loan association and is payable on demand.

   h. "Code" or "Title" means the Chippewa Cree Tribal Lending and Regulatory Code as enumerated in this document.  Code and Title may be used interchangeably and have the same meaning.

   i. "Commissioner" means a Commissioner of the Tribal Consumer Protection Bureau as appointed by the Business Committee.

   j. "Consumer" means a natural Person who, singly or jointly with another Person, is borrowing money from a Creditor for personal, family, household and/or small business purposes.

-4-

TF App. 0243

k. "Consumer Financial Services" means the business of providing a Loan, as that term is defined herein, to a consumer by a Lender under this Code, from the Tribe's reservation or Tribe's jurisdiction.

l. "Creditor" means the Person or entity regularly engaged in the business of making Loans, authorized by the Tribe, in whose favor an obligation exists by reason of which it is, or may become, entitled to the payment of money.

m. "Default" means a Consumer's failure to repay a Loan in compliance with the terms contained in a Loan Agreement.

n. "Federal Consumer Protection Laws" includes without limitation, the following, as applicable: 12 U.S.C. § 1031 Prohibiting Unfair, Deceptive or Abusive Acts or Practices; Truth in Lending Act, 15 U.S.C. §1601 et seq., and related regulations at 12 C.F.R. Part 226; Consumer Leasing Act, 15 U.S.C. §§ 1667 et seq., and related regulations at 12 C.F.R. Part 213; Fair Credit Billing Act, 15 U.S.C. § 1666a; Equal Credit Opportunity Act, 15 U.S.C. §1691 et seq., and related regulations at 15 C.F.R. Part 202; Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq., and related regulations at 12 C.F.R. Part 205; Fair Credit Reporting Act, 15 U.S.C. §1681 et seq. and related regulations at 12 C.F.R. Part 222); privacy provisions of Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 et seq., and related regulations at 16 C.F.R. Part 313 and 16 C.F.R. Part 314; Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., and related regulations at 16 C.F.R. Part 901; Talent Amendment, 10 U.S.C. § 987, and related regulations of the Department of Defense at 32 C.F.R. part 232; and Service Members' Civil Relief Act, 50 U.S.C. App. §§ 501-596, and any other applicable federal and tribal consumer protection laws, each as amended from time to time.

o. "Interest" means the compensation allowed by tribal law for the use, or forbearance, or detention of money or its equivalent, may be at a fixed or variable rate and includes without limitation, points, Loan origination fees, credit service or carrying charges, charges for unanticipated late payments, and any other charges, direct or indirect, as an incident to or as a condition of the extension of credit agreed to between the Creditor and a Consumer in the Loan agreement. These charges do not include charges made by a third party.

p. "License" means the official, legal and revocable Financial Service License issued by a Commissioner of the TCPB.

q. "Licensee" means a Person or entity that is licensed by a Commissioner of the TCPB to engage in the business of providing Tribal Consumer Financial Services including all Vendors providing any business related services to licensed Tribal Consumer Financial Services.

r. "Loan" means an extension of secured or unsecured credit to a Consumer for any purpose permitted under Tribal law.

TF App. 0244

s. "Loan Agreement" means a formal contract between the Tribal Lending Agency or Creditor and the Consumer which regulates the mutual promises made by each party in its Terms and Conditions, including consideration, applicable Interest, negative and positive covenants, terms of repayment and other provisions allowed by Tribal law. A Loan Agreement is not enforceable until consummated by the parties.

t. "Person" means a natural person, organization, or group of individuals acting as a unit, whether mutual, cooperative, fraternal, profit, nonprofit, or otherwise, provided that the term does not include the Federal Government or any agency thereof.

u. "Tribal Consumer Protection Bureau" or "TCPB" means the agency delegated with the independent regulatory authority established and described in Chapter 4 of this Code.

v. "Tribe" means the Chippewa Cree Indians of the Rocky Boy's Reservation, Montana.

w. "Tribal Lending Agency" means the authorized economic lending Arm of the Tribe.

x. "Vendor" means a Person or entity that is licensed by the Commissioner of the TCPB and provides any business related services to a Consumer Financial Services Licensee, such as but not limited to originating, processing or collecting Consumer Financial Services.

## CHAPTER 3.  LOAN REQUIREMENTS

## Part 1. EXTENSION OF CREDIT

**10-3-101. Extension of Credit.**  A Licensee may, subject to the provisions of this Title, extend credit to a Consumer in accordance with the terms and conditions set forth in any agreement between a Consumer and the Creditor and in connection therewith, may charge and collect Interest and other charges permitted by § 10-3-201 et. seq., and may take such security as collateral in connection therewith as may be acceptable to the Creditor.

## Part 2. USURY AND INTEREST RATES

**10-3-201. Rate of Interest Set by Written Agreement — No Maximum or Usury Restriction; Fees and Charges as Agreed Upon by the Creditor and the Consumer.**  Unless a maximum Interest rate or charge is specifically established elsewhere in this Title or the other laws of the Tribe, there is no maximum Interest rate or charge, or usury rate restriction between or among Persons if they establish the Interest rate or charge by written agreement.  The Creditor and the Consumer can agree upon what fees and charges may be assessed as set forth in any written agreement between the Creditor and the Consumer.

**10-3-202. Loan of Money — Presumption as to Interest.**  Whenever a Loan of money is made it is presumed to be made with Interest, unless it is otherwise expressly stipulated at the time in writing.

TF App. 0245

**10-3-203. Annual Rate of Interest Where not Specified.** When a rate of Interest is prescribed by a law or contract, without specifying the period of time by which such rate is to be calculated, it is to be deemed an annual rate.

**10-3-204. Loan to be Repaid in Current Money.** A Consumer, unless there is an express contract to the contrary, must pay the amount due in such money as is current at the time when the Loan becomes due, whether such money is worth more or less than the actual money lent.

**10-3-205. Maximum Rate of Interest Where No Rate Specified — Commencement Where Date Not Specified.** Under an obligation to pay Interest, no rate being specified, Interest is payable from the date of the incurrence of debt, unless the parties have otherwise agreed, and in the like proportion for a longer or shorter term. In the computation of Interest for less than a year, three hundred sixty five days are deemed to constitute a year.

**10-3-206. When Interest Becomes Part of Principal.** The parties may, in any contract in writing whereby any debt is secured to be paid, agree that, if the Interest on such debt is not punctually paid, it shall become a part of the principal and thereafter bear the same rate of Interest as the principal debt.

**10-3-207. Interest on Moneys After They Become Due.** The Interest rate on moneys after they become due on any instrument of writing, and on moneys lent, or due on any settlement of Accounts, is the Interest rate as established in the written agreement and due from the day on which the balance is ascertained, and on moneys received to the use of another and detained from that other.

**10-3-208. Interest on Judgments, Statutory Liens and Inverse Condemnations. [Reserved]**

**10-3-209. Legal Rate of Interest Stipulated by Contract after Breach.** Any legal rate of Interest, stipulated by a contract, remains chargeable after a breach thereof, as before, until the contract is superseded by a verdict or other new obligation.

**10-3-210. Interest on Loan — Advance Deduction.** The Interest which would become due at the end of the term for which a Loan is made, not exceeding one year's Interest in all, may be deducted from the Loan in advance if the parties thus agree.

**10-3-211. Official Interest Rates.** The official Interest rate, as referenced throughout this Title, is the applicable interest rate set forth in the Loan Agreements or any/all other applicable contracts to the operations of the lending entity.

## Part 3. LIMITATIONS ON LOANS [Reserved]

## Part 4. CREDITOR REQUIREMENTS FOR LOANS

**10-3-401. Creditor Disclosure.** The Creditor shall disclose in any Loan Agreement the following:

    a.   The amount and date of the Loan;

TF App. 0246

b. The amount of the down payment, if any;

c. The circumstances or dates any payments are due and the amount of payments;

d. The maturity date;

e. A list of any property used to secure the Loan;

f. Any liens or title filings required;

g. A description of the method used to compute the charges;

h. An explanation of any fee or charge, including the cost of the Loan as an annual percentage rate (APR);

i. Any fee or charge that may be applied for delinquency;

j. Refinancing requirements, including any fee or charge;

k. Contact information for the Bureau and that any improprieties in making the Loan or in Loan practices may be referred to the Bureau;

l. The following or a similar notice in a prominent place on each Loan contract in at least twelve-point bold type face for any Loan with an Interest rate higher than a Category A or Category B rate of Interest:

> 1. **"THIS LOAN IS NOT INTENDED TO MEET LONG-TERM FINANCIAL NEEDS.  THIS LOAN SHOULD BE USED ONLY TO MEET SHORT-TERM CASH NEEDS."**

m. A Consumer may prepay a Loan at any time without penalty.

**10-3-402. Copy of Loan Documents.**  The Creditor shall provide a copy of the Loan documents described in § 10-3-401 to the Consumer upon consummation of the Loan.  The Consumer can choose how to receive the Loan documents in either a written or electronic copy of the Loan documents.

**10-3-403. Privacy.** The Creditor shall ensure that information obtained from the Consumer about the Consumer's Account remains confidential.

**10-3-404. Satisfaction of Loan — Release of assignments**.  When the payment of a Loan is satisfied in full, the Creditor shall release any liens against any property used as security, cancel any note, and release all assignments associated with the Loan Agreement.  The Creditor shall release any liens or assignments to the debtor within sixty days of receiving payment in full.

## Part 5. REQUIRED DISCLOSURES – LOAN AGREEMENT

**10-3-501. Notice to Consumer.** Before entering into a Loan Agreement, the Creditor shall disclose to the Consumer any information prepared by or at the direction of the Commissioner that:

    n. Explains, in simple language, all of the Consumer's rights and responsibilities in the Loan transaction;

    o. Includes contact information of the Bureau's office, or any other designated office as provided, that handles concerns or complaints by Consumers; and

    p. Informs Consumers that the Bureau's office can provide information about whether the Creditor is licensed and other legally available information.

**10-3-502. Specific Form Required.** Creditor shall provide consumers with a written agreement on a form specified or approved by the Commissioner that can be kept by the Consumer, which must include the following information:

    a. The name, address, and phone number of the Creditor making the Loan;

    b. The name, address, and phone number of the Consumer obtaining the Loan;

    c. All disclosures required by the federal Truth in Lending Act, 15 U.S.C. 1601, et seq.; and

    d. A clear description of the Consumer's payment obligations under the Loan.

## Part 6. RIGHT OF RESCISSION AND ARBITRATION

**10-3-601. Right of Rescission.**

    a. The Loan Agreement must contain a provision allowing the Consumer to rescind the transaction in writing, including electronic transmission and fax, if, by 5 p.m. of the Creditor's first business day following the day that the Loan was executed, the Consumer provides the Creditor with cash or certified funds equaling 100% of the amount Loaned to the Consumer.

    b. A Creditor may not charge a Consumer any fee or Interest if the Consumer rescinds the Loan as provided in § 10-3-601 (a).

    c. Except as provided in § 10-3-601 (a), a Consumer does not have a right to rescind a Loan unless the Creditor agrees to the rescission in writing.

TF App. 0248

**10-3-602. Arbitration.**

    a.  A Loan Agreement may not contain a mandatory arbitration clause that is oppressive, unconscionable, unfair, or in substantial derogation of a Consumer's rights.

    b.  A mandatory arbitration clause that complies with the applicable standards of the American Arbitration Association must be presumed to not violate the provisions of § 10-3-602 (a).

**Part 7. PROHIBITED AND PERMITTED FEES – ATTORNEY FEES AND COSTS**

**10-3-701. Permitted Fees.**

    a.  A Creditor may only charge or receive, directly or indirectly, any Interest, fees, or charges specifically authorized by the Loan Agreement.

    b.  If there are insufficient funds to pay a Check on the date of presentment, a Creditor may charge a fee as provided in the Loan Agreement.

    c.  If the Loan involves an electronic deduction and there are insufficient funds to deduct on the date on which the payment is due and authorized, a Creditor may charge a fee as provided in the Loan Agreement.

    d.  Reasonable attorney fees and court costs may be awarded in any action on a Loan entered into pursuant to this part to the extent as specifically authorized in the Loan Agreement. At no time shall the Loan Agreement have a unilateral clause for the award of attorney's fees.

**10-3-702. Prohibited Acts.** A Creditor making Loans may not commit, or have committed on behalf of the Creditor, any of the following prohibited acts:

    a.  Engaging in the business of lending unless the Commissioner has first issued a valid License or the Business Committee of the Tribe has authorized the Creditor to engage in the Consumer lending business by ordinance;

    b.  Threatening to use or using a criminal process in this or any other jurisdiction to collect on the Loan made to a Consumer in this jurisdiction or any civil process to collect the payment of Loans not generally available to Creditors to collect on Loans in Default;

    c.  Altering the date or any other information on a Check received from a Consumer;

    d.  Altering or changing the date upon which the Creditor and Consumer agreed to make any electronic deductions from the Consumer's Account unless the Consumer agrees, in writing, by voice, by electronic authorization or otherwise, to the change;

TF App. 0249

e.  Making any false, misleading, or deceptive representation to a financial institution relating to a Consumer who has agreed to provide payment for a Loan through an electronic deduction;

f.  Using any device or agreement that would have the effect of charging or collecting more fees, charges, or Interest than those allowed by this part;

g.  Engaging in unfair, deceptive or abusive practices in the making or collection of a Loan;

h.  Using or attempting to use the Consumer's authorization to deduct the amount set forth in the Loan Agreement or any other information obtained from the Consumer or the Consumer's financial institution for any purpose other than to collect the proceeds of the Loan;

i.  Charging any Interest, fees, or charges other than those specifically authorized by this Title; or

j.  Making a misrepresentation of a material fact by an Applicant in obtaining or attempting to obtain a License.

## CHAPTER 4. THE TRIBAL CONSUMER PROTECTION BUREAU

**10-4-101. Purpose.** The TCPB shall implement and enforce this Title, and any future regulations relating to Consumer Financial Services activities and associated licensing requirements under this Title.  It is the purpose and intent of the Tribe in creating the TCPB that the operations of the TCPB be conducted on behalf of the Tribe in order to protect the Consumers of Tribally licensed financial services and for the sole benefit and interest of the Tribe, its members and the residents of the Reservation.  In carrying out its purposes under this Title, the TCPB shall function as an independent regulatory Arm of the Tribe.

**10-4-102. Regulatory Department.**  The TCPB shall operate as the independent governmental regulatory subdivision of the Tribe located within the exterior boundaries of the reservation.

**10-4-103. Independent Governmental Regulatory Subdivision of the Tribe.**  As an independent governmental regulatory subdivision of the Tribe, the TCPB has been delegated the right to exercise one or more of the substantial governmental functions of the Tribe.  This delegation includes, regulating all Consumer Financial Services businesses and third party Vendors providing services to Consumer Financial Services businesses within the jurisdiction of the Tribe pursuant to Tribal law.  Notwithstanding any authority delegated to the TCPB under this Title, the Tribe reserves to itself, the right to bring suit against any Person or entity in its own right, on behalf of the Tribe or on behalf of the TCPB, whenever the Tribe deems it necessary to protect the sovereignty, rights and interests of the Tribe or the TCPB.

**10-4-104. Express Delegation for Independent Regulatory Authority.** The TCPB, pursuant to the express delegation of independent regulatory authority from the Business Committee, shall regulate the conduct of all businesses providing Tribal Consumer Financial Services, including

-11-

all third-party providers doing business with licensed Tribal Consumer Financial Services businesses as authorized by this Title.

**10-4-105. Tribal Consumer Protection Bureau.**

    a.  <u>Immunity from suit.</u>  The TCPB, as a governmental subdivision of the Tribe, enjoys the same privileges and immunities as the Tribe under Tribal and federal law, including sovereign immunity from suit in any tribal, federal or state court.

    b.  <u>No Waiver.</u>  Nothing in this Title shall be deemed or construed to be a waiver of sovereign immunity of the TCPB from suit, which shall only be waived pursuant to § 10-4-105(d) below.

    c.  <u>No Consent to Jurisdiction.</u>  Nothing in the Title shall be deemed or construed to be consent of the TCPB to the jurisdiction of the United States or of any state or of any other tribe with regard to the business or affairs of the TCPB.

    d.  <u>Waiver of Sovereign Immunity of the TCPB.</u> Sovereign immunity of the TCPB may be waived upon the recommendation of the TCPB and only by express resolution of the Business Committee of the Chippewa Cree Tribe.

        1.  <u>Resolution Effectuating Waiver.</u>  All waivers of sovereign immunity must be preserved by resolutions of continuing force and effect issued by the Business Committee of the Chippewa Cree Tribe.

        2.  <u>Policy on Waiver.</u>  Waivers of sovereign immunity are disfavored and shall be granted only when necessary to secure a substantial advantage or benefit to the TCPB or the Tribe.

        3.  <u>Limited Nature of Waiver.</u>  Waivers of sovereign immunity shall not be general but shall be specific and limited as to duration, grantee, transaction, property or funds, if any, of the TCPB subject thereto, and the court having jurisdiction pursuant thereto and law applicable thereto.

        4.  <u>Limited Effect of Waiver.</u> Neither the power to sue and be sued provided in § 10-4-105 (d), nor any express waiver of sovereign immunity by resolution of the Business Committee shall be deemed consent to the levy of any judgment, lien or attachment upon property of the TCPB or the Tribe.

**10-4-106. Sovereign Immunity of the Tribe.** With respect to the existence and activities of the TCPB, all inherent sovereign rights of the Tribe, as a Federally-recognized Indian Tribe, are hereby expressly reserved, including sovereign immunity from suit in any state, Federal or Tribal court. Nothing in this Code nor any action of the TCPB shall be deemed or construed to be a waiver of sovereign immunity from suit or counterclaim of the Tribe, a consent of the Tribe to the jurisdiction of the United States, any state or other tribe with regard to the business and affairs of the TCPB or the Tribe, a consent of the Tribe to any cause of action, counterclaim, case or controversy, or to the levy of any judgment, lien or attachment upon any property of the Tribe,

-12-

a consent to suit or counterclaim in respect to any land within the exterior boundaries of the Tribe's reservation, or to be a consent to alienation, attachment or encumbrance of any such land.

**10-4-107. TCPB Composition.**

a. In an effort to maintain the TCPB as an independent governmental subdivision of the Tribe, the TCPB shall be made up of a Commissioner. The Commissioner will have the authority to hire or retain employees and staff, as necessary. The Commissioner will always maintain independence, and at times may choose to hire independent contractors or consultants to perform compliance reviews to further this aim.

b. The Commissioner shall be appointed by a majority vote of the Business Committee.

c. <u>Qualifications</u>. The Commissioner shall have a background in the following areas: 1) Consumer protection and/or former regulatory experience, and/or 2) Indian law and/or tribal legal experience, and/or 3) financial services and/or banking experience, All TCPB employees, including the Commissioner, will undergo a background check (by an appropriate third party provider or Tribal police) prior to being installed.

d. No individual shall be eligible for any appointment to, or to continue to serve on the TCPB, who:

    1. Is a current Business Committee member;

    2. Is a current employee of the Tribal Lending Agency;

    3. Is a Person who has a financial or managerial interest in a Vendor of the Tribal Lending Agency;

    4. Is a Person who has been convicted of a felony or gaming offense, or any offense involving dishonesty or a breach of trust;

    5. Is a Person not considered suitable in accordance with the qualifications noted above.

e. A Commissioner may be removed from office by a majority vote of the Business Committee before the expiration of their term if, by a preponderance of the evidence, it is proven that the Commissioner demonstrated any:

    1. Neglect of duty;

    2. Misconduct;

    3. Malfeasance;

    4. Failure to disclose an actual or perceived conflict of interest;

TF App. 0252

5. Violation of this Code or any felonious Tribal, local, state or Federal law, or committal of any criminal activity involving dishonesty, or a breach of trust;

6. Failure to maintain suitability requirements during the Commissioner's term.

f. <u>Due process provisions for removal of Commissioner.</u>  Prior to removal from the position of Commissioner:

1. The Business Committee must give a written notice to the Commissioner that he/she is going to be removed from the TCPB;

2. The written notice must notify the Commissioner of the date of the removal and the cause for which he/she is being removed;

3. The Commissioner must request a hearing before the Business Committee within fourteen (14) business days after receiving the written notice;

4. The Business Committee will schedule a special meeting/hearing within twenty (20) business days or receiving the Commissioner's written notice and will immediately upon scheduling the special meeting/hearing, deliver notice to the Commissioner that advises the Commissioner:

   i. Of the date, time and place of the hearing;

   ii. That the hearing is the Commissioner's sole opportunity to present any information, arguments, documents, witnesses on his/her behalf prior to the final decision by the Business Committee;

   iii. That the hearing is informal and strict rules of evidence will not apply;

   iv. That the hearing will be audio recorded and video recorded (if possible); and

   v. That failure to appear for the scheduled hearing shall be cause for upholding the removal.

5. The decision of the Business Committee shall be in writing and state the reasons for the decision.

6. The decision of the Business Committee will be mailed via certified mail, return receipt requested, to the Commissioner within ten (10) business days after the special meeting; and

7. The decision of the Business Committee shall be final.

TF App. 0253

    g.   <u>Commissioner Compensation.</u>

        a.   The Commissioner's compensation shall be subject to negotiation and approval by the Business Committee.

    h.   <u>Funding for the TCPB</u>

        a.   The Tribe shall establish a separate pre-funded bank account which shall only be used to pay operating expenses of the TCPB, including the compensation of the Commissioner.

        b.   The Tribe shall have the ability to collect advances, reimbursements or licensing fees from Tribal Consumer Financial Services businesses to provide funding for the TCPB.

**10-4-108. Powers of the TCPB.** The TCPB has the authority and responsibility for the discharge of all duties imposed by law and this Code on the TCPB. The TCPB is authorized to exercise the following powers and responsibilities in addition to all powers already conferred by this Title:

    a.   To enforce regulations and rules furthering the purpose and provisions of this Title; provided that such regulations were legally authorized by the Business Committee.

    b.   To examine or inspect or cause to be examined or inspected each Licensee annually and more frequently if the TCPB considers it necessary.

    c.   To make or cause to be made reasonable investigations of any Licensee or Person as it deems necessary to ensure compliance with this Title or any lawful order of the TCPB, to determine whether any Licensee or Person has engaged, is engaging or is about to engage in any act, practice or transaction that constitutes an unsafe or unsound practice or violation of this Title, any applicable Federal Consumer Protection Laws or any order of the TCPB.

    d.   To establish procedures designed to permit detection of any irregularities such as fraud.

    e.   To review and respond in a timely manner to any complaints made to the TCPB regarding any Licensee.

    f.   To employ such advisors as it may deem necessary. Advisors may include, but are not limited to, lawyers, accountants, law enforcement specialists and financial service professionals.

    g.   To accept, review, approve or disapprove any Application for a License, including conducting or arranging for background investigations of all Applicants.

**10-4-109. Right to Entrance; Inspection.** The TCPB, during regular business hours, may enter upon any premises of any licensed consumer financial service business for the purpose of

-15-

making inspections and examining the Accounts, books, papers, and documents of any such Licensee. Such Consumer Financial Services business shall facilitate such inspection or examinations by giving every reasonable aid to the TCPB and to any properly authorized officer or employee of the TCPB. The results of such inspection shall be duly reported by the TCPB and a copy of such report given to the licensed Consumer Financial Services business.

**10-4-110. Investigations.** The TCPB, upon complaint or upon its own initiative or whenever it may deem it necessary in the performance of its duties or the exercise of its powers, may investigate and examine the operation and premises of any Person who is subject to the provisions of this Title. In conducting such investigation, the TCPB may proceed either with or without a hearing as it may deem best, but it shall make no order without affording any affected party notice and an opportunity for a hearing pursuant to TCPB regulations.

**10-4-111. TCPB Regulations.** The Commissioner may promulgate regulations as necessary to carry out the implementation and orderly performance of the TCPB's duties and powers regarding the following:

   a. The making of findings or other information required by or necessary to implement this Title;

   b. Interpretation and application of this Title, as may be necessary to enforce the TCPB's duties and exercise its powers;

   c. A regulatory system for overseeing Consumer Financial Services, including accounting, contacting, management and supervision;

   d. The conduct of inspections, investigations, hearings, enforcement actions and other powers of the TCPB authorized by this Code; and

   e. Specification of the amount and the schedule of applicable licensing and examination fees that shall be imposed by the TCPB.

      1. No regulation of the TCPB shall be of any force or effect unless it is adopted by the TCPB by written resolution and subsequently approved by a resolution of the Business Committee.

      2. The Tribal Court and any other court of competent jurisdiction shall take judicial notice of all Commission Regulations adopted pursuant to this Title.

**10-4-112. Quarterly Report to the Business Committee.** The TCPB shall file a semi-annual report with the Business Committee summarizing reports received from each Licensee and make such comments as it deems necessary to keep the Business Committee fully informed as to the status of the TCPB's activities. The TCPB shall define by regulation, subject to approval of the Business Committee, the schedule for the submission of such reports.

TF App. 0255

## CHAPTER 5.    LICENSING

## Part 1. LICENSE – APPLICATION REQUIREMENTS – BUSINESS LOCATIONS

### 10-5-101. Licensing.

a. A Person may not engage in or offer to engage in the business of Loans unless licensed by a Commissioner of the TCPB.  A License may be granted to a Person located within the jurisdiction of the Tribe who uses the internet, facsimiles, or third Persons to conduct transactions with Consumers located outside of the jurisdiction of the Tribe, or to a Person located outside of the jurisdiction of the Tribe who uses the internet, facsimiles, or third Persons to conduct transactions with Consumers in the jurisdiction of the Tribe.

b. An Applicant for a License to engage in the business of making Loans shall pay to the Bureau a non-refundable License Application fee.

c. The Application for licensure must be in writing, under oath, and in the form prescribed by TCPB.  The Application must contain, at a minimum:

   3. The name of the Applicant;

   4. The date of formation of a business entity;

   5. The physical address of each Loan office to be operated by the Applicant;

   6. The name and resident address of the owner or partners or, if a corporation or association, of the directors, trustees, and principal officers; and

   7. Any other pertinent information that the TCPB may require.

d. A License may not be issued for longer than 1 year.  The License year must coincide with the calendar year.

e. A Commissioner may not issue or renew a License unless findings are made that:

   1. The financial responsibility, experience, character, and general fitness of the Applicant warrant the belief that the business will be operated lawfully and fairly and within the provisions of this part;

   2. The Applicant has unencumbered assets of at least $25,000 for each location;

   3. The Applicant has provided a sworn statement that the Applicant will not in the future, directly or indirectly, use a criminal process to collect the payment of Loans or any civil process to collect the payment of Loans not generally available to Creditors to collect on Loans in Default;

-17-

TF App. 0256

4. The criminal history of the employees of the Applicant demonstrates no convictions involving fraud or financial dishonesty and no adverse civil judgments involving fraudulent or dishonest financial dealings; and

5. Other information that the Commissioner considers necessary has been provided.

f. More than one place of business may not be maintained under the same License, but the Commissioner may issue more than one License to the same Licensee upon compliance with the provisions of this section governing issuance of a single License.

**10-5-102. Licensing Exemptions. Creditors Exempt from Licensing Requirements**. The following entities are exempt from the licensing requirements of this part:

a. Any state bank and its subsidiary;

b. Any national bank and its subsidiary;

c. Any bank holding company and its subsidiary; and

d. Any other federally insured financial institution, its holding company and subsidiary.

## Part 2. LICENSE RENEWAL FEE

**10-5-201. Renewal:**

a. A Person licensed under § 10-5-101 shall pay, on or before December 1st of each year, a License renewal fee for each License that the Person holds under this part.

b. Failure to pay any yearly License renewal fee required by this section within the time prescribed will result in the automatic revocation of the License subject to renewal.

## Part 3. DENIAL OF LICENSE AND LICENSE REVOCATION

**10-5-301. Denial of License.**

a. A Commissioner may deny any new License or refuse to renew any License if:

1. Information that the Commissioner considers necessary has not been provided; or

2. The Applicant makes a material misstatement of fact or any material omission of fact in the Application.

-18-

    b. The Commissioner shall provide written notice, within ten (10) business days, to the Applicant of the denial or refusal, setting forth in the notice, the grounds upon which the denial or refusal is based.

## 10-5-302. License Revocation or Suspension — Restitution — Penalty.

    a. If there is cause for License revocation or suspension, a Commissioner shall provide a 10-day written notice of a proposed violation that includes a statement of the alleged violation and provision for a hearing or an opportunity for hearing. The notice must be based on a finding that any Person, Licensee, or officer, agent, employee, or representative, whether licensed or unlicensed, of the Person or Licensee has violated any of the provisions of this Title, has failed to comply with the rules, regulations, instructions, or orders promulgated by the Commissioner, has failed or refused to make required reports to the Commissioner, has furnished false information to the Commissioner, or has operated without a required License. The Commissioner may impose a civil penalty not to exceed $1,000 for each violation and not to exceed $5,000 for each administrative action and may issue an order revoking or suspending the right of the Person or Licensee, directly or through an officer, agent, employee, or representative, to do business in the jurisdiction of the Tribe as a Licensee or to engage in the business of making Loans. In addition, the Commissioner may order restitution to borrowers and reimbursement for the Commissioner's cost in bringing the administrative action.

    b. All notices, hearing schedules, and orders must be mailed to the Person or Licensee by certified mail to the address for which the License was issued or, in the case of an unlicensed business, to the last-known address of record.

    c. A revocation, suspension, or surrender of a License does not relieve the Licensee from civil or criminal liability for acts committed prior to the revocation, suspension, or surrender of the License.

    d. The Commissioner may reinstate any suspended or revoked License if there is not a fact or condition existing at the time of reinstatement that would have justified the Commissioner's refusal to originally issue the License. If a License has been suspended or revoked for cause, an Application may not be made for the issuance of a new License or the reinstatement of a suspended or revoked License for a period of six (6) months from the date of suspension or revocation.

    e. All civil penalties collected pursuant to this section must be deposited in the Tribe's general fund.

## Part 4. LICENSEE INFORMATION

**10-5-401. Information.** Each Licensee shall keep and use books, Accounts, and records that will enable the Commissioner to determine if the Licensee is complying with the provisions of this Title and maintain any other records required by the Commissioner. The Commissioner is authorized to examine the records at any reasonable time. The records must be kept for two (2)

-19-

years following the last entry on a Loan and must be kept according to generally accepted accounting procedures that include an examiner being able to review the recordkeeping and reconcile each Loan with documentation maintained in the Consumer's Loan file records.

## Part 5. EXAMINATION OF LICENSEE

**10-5-501. Examination.**

    a.   The TCPB may conduct an examination of each Licensee's lending operation to ensure that the License is in compliance with the provisions of this Title and any/all applicable federal laws.

    b.   A Licensee shall make available to a TCPB examiner the information required under this Title or required by applicable federal law.

**10-5-502. Fees.**

    a.   The Licensee shall pay the Bureau a fee for each examiner required to conduct an examination.

    b.   Fees are to be calculated from the beginning date of the examination.

    c.   The Bureau may charge a Licensee for no more than three (3) exams a year under this section.

## Part 6. ADJUDICATIVE HEARINGS AND PROCEDURES

**10-5-601. Hearings**.

    a.   The TCPB shall afford a Licensee the opportunity for an adjudicative proceeding before suspending a Licensee except in cases where the circumstances call for immediate action to protect the public safety, general welfare, or the integrity of the Tribal Consumer Financial Services operation, and observing the hearing requirements would be contrary to the public interest, in which case the Licensee shall be entitled to a prompt post-suspension hearing.

    b.   No hearing will be conducted with respect to any adjudicative proceeding unless an Application for an adjudicative proceeding and request for hearing is timely filed by the Licensee with the TCPB in compliance with this Code. The Application must be made in writing on a form to be obtained from the TCPB, or a facsimile thereof, and must be received within fourteen (14) business days of the party's receipt of a notice of administrative charges and opportunity for an adjudicative proceeding. An Application for an adjudicative proceeding and request for hearing shall accompany all notices of administrative charges.

    c.   If an Application for an adjudicative proceeding is not timely filed, then the party affected shall have waived their right to a hearing on the allegations set forth in the notice of administrative charges. The party shall be deemed to be in default and the

TF App. 0259

TCPB may take action against the party not to exceed the maximum penalty as stated in the notice of administrative charges and opportunity for an adjudicative proceeding, which action shall be final.

**10-5-602. Notice of Hearing Requirements.**

a. All parties that have filed a timely Application for adjudicated proceeding shall be served with a notice of hearing at least seven (7) calendar days before the date set for the hearing unless all parties consent to a shorter period. The notice shall state the time, place, and purpose of the hearing.

b. <u>Service of Process.</u> Service of Process to effectuate notice shall be required for all hearings under this Code.

c. <u>By Whom Served.</u> The TCPB shall cause to be served all orders, notices, and other documents issued by the TCPB, together with any other documents, which the TCPB is required by law to serve. Every other document shall be served by the party filing it.

d. <u>Upon Whom Served.</u> All papers served by either the TCPB or any party shall be served upon all counsel of record at the time of such filing and upon parties not represented by counsel or upon their agents designated by them or by law. Any counsel entering an appearance after the initiation of the proceeding shall notify all other counsel then of record and all parties not represented by counsel of such fact.

e. <u>Method of Service.</u> Service of all orders, notices, and other documents shall be made personally or by first-class or certified mail. Facsimile service by the TCPB is prohibited.

f. <u>When Service is Complete.</u> Service of notices and other documents shall be regarded as complete as follows:

    1. By personal service, upon delivery to the Person, attorney representing the party, designated agent of the party, any Person aged 18 or older residing at the residence of the party or corporate officer.

    2. By mail, upon deposit in the United States mail properly stamped and addressed; service is complete on the third day after mailing, excluding the date of mailing.

g. <u>Filing with the TCPB:</u>

    1. Documents required to be filed with the TCPB shall be deemed filed upon actual receipt of the documents by the TCPB, regardless of method of delivery.

    2. Documents may be transmitted for filing by hand delivery, U.S. mail, or courier.

TF App. 0260

3. The TCPB has the discretion to accept documents transmitted electronically or by facsimile. If the TCPB does not accept any documents which have been transmitted electronically or by facsimile, it shall, within three (3) business days, make good faith effort to notify the sending party that such service was not accepted.

4. The TCPB shall stamp all documents with the date and time of receipt.

5. Delivery of documents to any office of the TCPB other than the TCPB's office when said office is not occupied by the TCPB who can personally accept the documents shall not constitute a lawful filing of papers for any matter under the jurisdiction of the TCPB.

**10-5-603. Informal Proceedings: Discovery Limitations.**  In all proceedings before the Commission, discovery requests to the TCPB shall be limited to requests for production of written reports and supporting documents relevant to the charges.  Interrogatories and depositions shall not be allowed.

**10-5-604. Official Notice.**  The TCPB, upon request made before or during a hearing, or upon its own motion will officially notice:

a. <u>Federal Law.</u> The Constitution; congressional acts, resolutions, records, journals and committee reports; decisions of federal courts and administrative agencies; executive orders and proclamations; and all rules, orders and notices published in the Federal Register.

b. <u>Tribal Law.</u>  The Constitution of the Chippewa Cree Tribe; the Chippewa Cree Tribal Code, including Title 10, the Chippewa Cree Tribal Credit Transaction and Regulatory Code and all duly enacted ordinances, regulations and resolutions of the Business Committee as they apply to the Tribal Consumer Financial Service Licensee.

**10-5-605. Initial or Final Order**. Every decision and order, whether initial or final, shall:

a. Be correctly captioned as to the name of the TCPB and name of proceeding;

b. Designate all parties and counsel to the proceeding;

c. Include a concise statement of the nature and the background of the proceeding;

d. Be accompanied by appropriate numbered findings of fact and conclusions of law and a statement from the presiding officer of the credibility of the witnesses, and that the decision is based, all or in part, upon such findings;

e. Include the reason or reasons for the particular order or remedy afforded.  Findings shall be accompanied by a concise and explicit statement of the underlying evidence of record to support the findings;

TF App. 0261

f.   Reference specific authority or rules and provisions considered or relied upon.

**10-5-606. Judicial Review**.  The TCPB's decision may be appealed to the Chippewa Cree Tribal Court within 45 days of the date the written decision was served upon the appealing party.  The Court's review should be based on and limited to a review of the TCPB's record of decision.  The Court may vacate a decision made by the TCPB only if it is arbitrary and capricious or contrary to applicable law.

**10-5-607. Computation of Time**.  For the purposes of this section, in computing any period of time prescribed or allowed by TCPB in future regulations, an order of the TCPB, or by an applicable statute, the day of the act, event, or default after which the designated period of time begins to run is not to be included.  The last day of the period so computed is to be included, unless it is a Saturday, Sunday or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, Sunday, or a holiday. This section shall not apply to periods of License suspension.

## CHAPTER 6.    CONSUMER PROTECTION PROCEDURES.

## Part 1. COMPLAINT PROCEDURE - RESPONSIBILITIES

**10-6-101. Consumer Rights.**

a.   The Consumer, at any time before/during/after the Loan process, may file a complaint with the Bureau.

b.   The Consumer has the legal right to file a complaint that alleges any/all violations of this Title and any/all applicable Federal laws relating to their Loan.

c.   The Consumer has the legal right to request all Loan documents related to their Loan activity, including, but not limited to copies of the original Loan documents, history of payment processing, and any/all authorizations provided by the Consumer directly related to Loan and payment authorization.

**10-6-102. Licensee Responsibilities**.

a.   Each Licensee shall appoint a resident agent for service of process and provide notice of such appointment to the Bureau.

b.   Licensee shall, upon request by the Bureau, provide all documents requested within (10) ten business days of request.

**10-6-103. Bureau Responsibilities.**

a.   The Bureau shall maintain a list of Licensees that is available to interested Persons and to the general public.

**TF App. 0262**

b. The Bureau shall also establish by rule a procedure under which an aggrieved Consumer or any member of the public may file a complaint against a Licensee or an unlicensed Person who violates any portion of this Title.

c. The Bureau may hold hearings, subject to this Title, upon the request of a party to the complaint, make findings of fact or conclusions of law, issue cease and desist orders, refer the matter to the appropriate law enforcement agency for prosecution for a violation of this Title, seek injunctive or other relief in any Tribal court, or suspend or revoke a License granted under this Title.

## Part 2. CIVIL REMEDIES

**10-6-201. Remedies**.

a. The remedies provided in this section are exclusive and cumulative and apply to Licensees and unlicensed Persons to whom this Title applies. Except with respect to the arbitration provision set forth in § 10-4-201(4) below, the courts of the Tribe have exclusive jurisdiction to apply and enforce the provisions of this Title, including this part.

   1. Any Person found to have intentionally violated this part is liable to the Consumer for actual damages. Costs and attorney's fees shall not be awarded unless specifically provided for in the Loan Agreement.

   2. A Consumer may sue for injunctive and other similar equitable relief to stop a Person from violating any provisions of this Title.

   3. The Consumer may not bring a class action suit to enforce this Title.

b. The Consumer and the Licensee or unlicensed Person may agree to arbitration in accordance with the terms of the Loan Agreement.

c. The remedies provided in this section are intended to be the exclusive remedies available to a Consumer for a violation of this Title.

## Part 3. INVESTIGATIONS BY COMMISSIONER — SUBPOENAS — OATHS — EXAMINATION OF WITNESSES AND EVIDENCE

**10-6-301. Investigations.** The Commissioner may investigate any matter, upon complaint or otherwise, if it appears that a Person has engaged in or offered to engage in any act or practice that is in violation of any provision of this Title or any rule adopted or order issued by the Commissioner pursuant to this Title.

**10-6-302. Subpoenas-Oaths-Examination of Witness-Evidence.**

a. The Commissioner may issue subpoenas to compel the attendance of witnesses and the production of documents, papers, books, records, and other evidence before it in any matter over which it has jurisdiction, control, or supervision pertaining to this

-24-

Title.  The Commissioner may administer oaths and affirmations to a Person whose testimony is required.

b.  If a Person refuses to obey a subpoena or to give testimony or produce evidence as required by the subpoena, a judge of any court of the Tribe may, upon application and proof of the refusal, issue a subpoena or subpoena duces tecum for the witness to appear before the Commissioner to give testimony and produce evidence as may be required.  The clerk of court shall then issue the subpoena, as directed, under the seal of the court, requiring the Person to whom it is directed to appear at the time and place designated in the subpoena.

c.  If a Person served with a subpoena refuses to obey the subpoena or to give testimony or produce evidence as required by the subpoena, the Commissioner may proceed under the contempt provisions or as otherwise provided by the law of the Tribe.

**10-6-303. Alternative Procedure. Production of Records Located Outside State — Alternate Procedures — Designated Record Inspectors.**  If the Commissioner requires the production of records that are located outside the jurisdiction of the Tribe, the party shall either make them available to the Commissioner at a convenient location within the Reservation of the Tribe or pay the reasonable and necessary expenses for the Commissioner to examine them at the place where they are maintained.  The Commissioner may designate representatives to inspect them on the Commissioner's behalf.

## Part 4. CEASE AND DESIST ORDERS

**10-6-401. Cease and Desist.** If it appears to the Commissioner that a Person has engaged in or is about to engage in any act or practice constituting a violation of any provision of this Title or any rule adopted or order issued by the Commissioner pursuant to this Title, the Commissioner may issue an order directing the Person to cease and desist from continuing the act or practice after reasonable notice and opportunity for a hearing.  The order may apply only to the alleged act or practice constituting a violation of this Title.

**10-6-402. Temporary Order.** The Commissioner may issue a temporary order pending the hearing that:

a.  Remains in effect until ten (10) days after the hearings examiner issues proposed findings of fact and conclusions of law and a proposed order; or

b.  Becomes final if the Person to whom notice is addressed does not request a hearing within ten (10) days after receipt of the notice.

**10-6-403. Violation**. A violation of an order issued pursuant to this section is subject to the penalty provisions of this Title and the laws of the Tribe.

TF App. 0264

**Part 5. INJUNCTIONS —RECEIVERS**

**10-6-501. Injunction.**

    a. Whenever the Commissioner has reason to believe that a Person is using, has used, or is about to knowingly use any method, act, or practice that violates any provision of this Title or any rule adopted or order issued by the Commissioner pursuant to this Title, the Commissioner, upon determining that proceeding would be in the public interest, may bring an action in the name of the Tribe against the Person to restrain by temporary or permanent injunction or temporary restraining order the use of the unlawful method, act, or practice.

    b. An action under this section may be brought in the any court of the Tribe.

    c. A Tribal court may issue temporary or permanent injunctions or temporary restraining orders to restrain and prevent violations of this Title, and an injunction must be issued without bond to the Commissioner. If the Commissioner is successful in obtaining an injunction or restraining order under this section, the Commissioner is entitled to an award of reasonable attorney's fees and costs.

**10-6-502. Receiver.** In addition to all other means provided by law for the enforcement of a restraining order or injunction, the court in which the action is brought may impound and appoint a receiver for the property and business of the defendant, including books, papers, documents, or records pertaining to the property or business, or as much of the property or business as the court considers reasonably necessary to prevent violations of this part. The receiver, when appointed and qualified, has the powers and duties as to custody, collection, administration, winding up, and liquidation of the property and business that are conferred upon the receiver by the court.

**10-6-503. Notice.** The notice for an action pursuant to § 10-7-501 must state generally the relief sought and be served at least twenty (20) days before the hearing of the action in which the relief sought is a temporary or permanent injunction. The notice for a temporary restraining order is governed by the laws of the Tribe.

**CHAPTER 7. RULEMAKING.**

**Part 1. NOTICE OF RULEMAKING**

**10-7-101. Adopting Rules.** In adopting rules under this Code, the TCPB shall, before adopting any rule, except an emergency rule or a housekeeping rule, do each of the following:

    a. Publish a notice of proposed rulemaking at least sixty (60) calendar days before the expiration of the public hearing and comment period for the proposed rulemaking action. In addition to publication, a copy of the notice shall be sent via first-class mail or hand delivered on or before the date of publication to any existing Licensee or pending Applicant for a License whose rights or duties will be substantially affected by the proposed rule.

-26-

b. Conduct, on the date and at the time and place designated in the notice, a public hearing at which any Person affected by the proposed rule, including organizations, may appear and be heard in Person, by attorney, or both, and may present the Person's or organization's position or contentions orally or in writing. The hearing date should be the last day of the public hearing and comment period.

c. <u>Public Hearing</u>. The public hearing for rulemaking except those given in § 10-7-101(b) above:

1. Shall be held on the Rocky Boy's Reservation. The TCPB shall make effort to allow all interested parties to make a full presentation of their oral comments, but the TCPB may, at its discretion, limit the time available to each commenter to whatever extent is necessary to conclude the meeting by the end of the business day. The TCPB may, if necessary and at its discretion, extend a hearing for an additional day.

2. May be held as a part of a regular or special meeting of the TCPB.

3. Shall be recorded or detailed minutes shall be taken.

## Part 2. REVIEW AND CONSIDERATION OF ALL SUBMITTED COMMENTS

**10-7-201. Comments.** Interested parties may submit written comments during the public hearing and comment period. The comments must be received by the TCPB before the comment period ends. Oral comments may be made in lieu of, or in addition to, written comments. The oral comments may be made only at the scheduled hearing.

a. If substantial changes to the proposed rule are made after the hearing and review of the submitted comments, a supplemental notice will be issued. An additional comment period shall be open for at least sixty (60) days. An additional hearing may be held at the discretion of the TCPB.

b. If substantial changes to the proposed rule are not made, or they have been made and the additional comment period has passed and no additional substantial changes are made, then the TCPB shall vote on the Final Rule. If the final rule passes the TCPB, the TCPB shall submit the final rule to the Tribal Business Committee for the Business Committee's consideration and vote.

c. If the Tribal Business Committee passes the final rule, then the TCPB shall publish the rulemaking order of adoption. The order of adoption must contain an effective date, and the effective date must be at least thirty (30) days after the adoption date.

## Part 3. HOUSEKEEPING RULEMAKING; EMERGENCY RULEMAKING

**10-7-301. Housekeeping Rulemaking**. The TCPB may hold a public hearing for a proposed housekeeping rule at its discretion. If the TCPB chooses to hold a public hearing, the hearing is subject to the requirements contained herein.

-27-

**10-7-302. Emergency Rulemaking Criteria**.  Emergency rulemaking is appropriate under the following circumstances:

    a. The circumstances call for immediate action to protect the public safety, general welfare, or the integrity of the Tribal Consumer Financial Services operation, and observing the notice and hearing requirements of regular rulemaking would be contrary to the public interest; or

    b. Binding law or regulation requires immediate adoption of a rule to protect the public or the Tribal Consumer Financial Services operation.

**10-7-303. Emergency Rulemaking Procedure.**

    a. Emergency rulemaking is exempt from the notice requirement given in § 10-7-101 to address the emergency.  The TCPB will vote on a proposed emergency rule as soon as possible, without a comment period.

    b. Upon adoption of an emergency rule by the TCPB, the emergency rule shall be submitted to the Tribal Business Committee for consideration and vote.

    c. Upon Adoption of the emergency rule by the Tribal Business Committee, the TCPB shall publish the rulemaking order of adoption. The order of adoption must contain an effective Date, and the effective date will be the day of adoption. The order of adoption shall contain a notice that interested parties may petition for the amendment or abrogation of the emergency rule.

**10-7-304. Petition for Rulemaking**.  An interested party may at any time petition for the issuance, amendment, or abrogation of a rule. The petition must be signed and filed with the TCPB.  The TCPB shall consider the petition and may, at its discretion, begin a rulemaking.

**10-7-305. Rulemaking-Commission Discharge of Duties**. The TCPB shall diligently discharge the duties imposed by this section, but a minor failure of publication or a failure to mail any notice or copy of a proposed rule does not necessarily invalidate any rule.

**10-7-305. Computation of Time.**  For the purposes of this section, in computing any period of time prescribed or allowed by TCPB regulation, an order of the TCPB, or by an applicable statute, the day of the act, event, or default after which the designated period of time begins to run is not to be included. The last day of the period so computed is to be included, unless it is a Saturday, Sunday or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, Sunday, or a holiday. This section shall not apply to periods of License suspension.

## CHAPTER 8. GENERAL PROVISIONS

**10-8-101. Governing Law.** Except as otherwise provided in this Code or the other laws of the Tribe, Loan Agreement between any Creditor authorized by the Tribe to lend money and a Consumer shall be governed by this Code and the laws of the Tribe notwithstanding any federal or Tribal law to the contrary.

TF App. 0267

**10-8-102. Severability.** If the application of any provision or clause of this Code is held invalid by a court of competent jurisdiction, such invalidity shall not affect other provisions or application of this Code if the remaining provisions can still be given effect without the invalid provision(s) or application(s).

**10-8-103. Administration.** The Commissioner of the Tribal Consumer shall be charged with the administration of this Code. The Commissioner is authorized to promulgate rules regarding those matters designated to be governed by this Code.

**10-8-104. Effective Date.** This Code shall take effect and be in full force and effect from and after the date of its final passage and approval of the Business Committee.

TF App. 0268

# EXHIBIT M

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

Barry Thompson, SBN 150349
    barry.thompson@hoganlovells.com
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
T   (310) 785-4600
F   (310) 785-4601

Neal Kumar Katyal, *pro hac vice* (pending)
    neal.katyal@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
T   (202) 637-5600
F   (202) 637-5910

*Attorneys for Respondents Great Plains Lending, LLC,*
*MobiLoans, LLC, Plain Green, LLC*

(additional counsel listed in signature block)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>　　　　　　　Petitioner,<br><br>v.<br><br>GREAT PLAINS LENDING, LLC, MOBILOANS, LLC & PLAIN GREEN, LLC,<br><br>　　　　　　　Respondents. | No. 2:14-cv-02090-MWF-PLA<br><br>The Hon. Michael W. Fitzgerald<br><br>**RESPONDENTS' DECLARATION OF JOHN SHOTTON IN OPPOSITION TO THE PETITION TO ENFORCE CIVIL INVESTIGATIVE DEMANDS**<br><br>Date:　　Mon., April 28, 2014<br>Time:　　11:30 A.M.<br>Room:　　1600 |

TF App. 0269

I, John Shotton, hereby declare under penalty of perjury of the laws of the United States:

1. I have personal knowledge of the facts stated herein and would be competent to testify as to those facts if called upon to do so in a court of law or administrative proceeding.

2. I serve as the elected Chairman of the Otoe-Missouria Tribe of Indians (the "Tribe"), a federally recognized Indian tribe, and have served in this capacity since 2007.

3. I also serve as the Secretary/Treasurer of Great Plains Lending, LLC ("Great Plains"), a business wholly owned and operated by the Tribe.

4. On February 4, 1984, the Tribe adopted the Constitution of the Otoe-Missouria Tribe of Indians as the supreme law governing all affairs of the Tribe.

5. Under Article IV, Section 1 of the Tribe's Constitution, the Tribal Council, of which I am Chairman, serves as the Tribe's governing body.

6. Under the Constitution, the Tribe's governing body—the Tribal Council—has the power to make all laws and ordinances for the benefit of the Tribe.

7. The Tribe is a Red Rock, Oklahoma-based Native American Tribe with nearly 3,000 members.

8. The Tribal Council exercised its constitutional power and adopted the Otoe-Missouria Tribe of Indians Limited Liability Company Act (the "LLC Act") on May 4, 2011, which governs the formation of businesses within the Tribe's jurisdiction, including wholly owned and operated Tribal businesses. (**Ex. A, LLC Act).**

9. The LLC Act established that wholly owned corporate entities created under the Act would be instrumentalities and arms of the Tribe and that the officers of such instrumentalities and arms would be deemed officers of the Tribe.

4

TF App. 0270

5

10. The LLC Act established that wholly owned corporate entities created under its authority would be established for the purpose of carrying out the authorities and responsibilities of the Tribe for economic development of the Tribe and advancement of its citizens.

11. Under this LLC Act, the Tribal Council passed Resolution OMTC #54293, creating Great Plains Lending, LLC on May 4, 2011. **(Ex. B, A Resolution Creating Great Plains Lending, LLC).**

12. Pursuant to Tribal law, Great Plains was created to advance the Tribe's economic development and to aid in addressing issues of public health, safety, and welfare.

13. The Tribal Council also exercised its sovereignty by developing, approving, and enacting the Otoe-Missouria Consumer Finance Services Regulatory Ordinance (the "Ordinance"), which governs all consumer finance business activity occurring within the Tribe's jurisdiction and implements the necessary regulation and oversight to ensure legal and lawful business operations. This Ordinance also established, pursuant to sovereign law-making and constitutional powers of the Tribal Council, the Otoe-Missouria Consumer Financial Services Regulatory Commission (the "Commission"). **(Ex. C, Otoe-Missouria Consumer Finance Services Regulatory Ordinance).**

14. The Commission is a regulatory agency formed pursuant to tribal law and functions as a governmental arm and instrumentality of the Tribe, with its principal place of governmental business located in Red Rock, Oklahoma. The Commission is tasked with regulating all consumer finance business occurring within the Tribe's jurisdiction, including the activities of Great Plains.

15. Great Plains is licensed by the Commission pursuant to the requirements of the Ordinance. Its license is in good standing. Pursuant to the Ordinance, Great Plains must be compliant with Tribal law to maintain its license. Great Plains

5

also voluntarily complies with all applicable federal consumer protection laws. The Commission has been active in assuring that Great Plains has complied with tribal and federal laws. **(Ex. D, Operating Agreement of Great Plains Lending, LLC).**

16. Tribal lending has been an invaluable vehicle for economic growth, tribal services, and tribal development. The impact of tribal lending on tribal growth and opportunity has been immeasurable, and its effects have proven critical for tribal advancement and financial assistance.

17. The Tribe's lending enterprise accounts for close to half of the Tribe's non-federal tribal budget, and has provided critical funding for new tribal housing and renovations.

18. Tribal lending has created dozens of jobs on tribal land, including financial support staff, Head Start educators, and tribal housing personnel.

19. Revenues from tribal lending have been used towards additional classrooms, books, and teachers for Head Start programs, as well as new after-school and summer programs for tribal youth. Revenues have also been used to support several tribal government programs that benefit the general membership, including child care services, employment training, health care and wellness coverage, child protection, and family violence protection.

20. Outside of gaming, tribal lending has been the most significant economic development opportunity that has been available to the Tribe, in terms of both revenue and job creation.

21. The Tribe's lending initiatives do not just support basic, fundamental needs for tribal operations and services. They extend the opportunity for the Tribe to move beyond the bottom line of economic footing.

22. Notwithstanding the treatment of Tribes as "States" under the Dodd–Frank Wall Street Reform and Consumer Protection Act, and the co-regulatory

6

framework that the Act establishes between Tribes and the Consumer Financial Protection Bureau ("CFPB" or "Bureau"), on June 12, 2012, the Bureau issued civil investigative demands ("CIDs") to several tribally owned and regulated lending entities, including Great Plains, *without any prior consultation with the Commission*.  The Tribe filed a joint petition to have the CIDs set aside on July 17, 2012.

23. Also in response to the CID, the Tribe began a series of meetings and consultations with the Bureau in an effort to demonstrate to the Bureau that it would provide any information requested in the CID in the context of a co-regulatory relationship.  Indeed, these meetings and consultations were meant to facilitate the development of a respectful co-regulatory relationship with the Bureau as envisioned by Congress in the Dodd–Frank Act.  These meetings included:

a. On September 26, 2012, the Tribe held its first meeting with the Bureau.  At this meeting, Bureau officials stated that they have a "general understanding" of tribal sovereignty and wished to adopt a system of "government-to-government consultation."  At the Bureau's request, the Tribe submitted to the Bureau a white paper detailing the aspects of tribal sovereignty as they relate to the tribes' right to engage in e-commerce and lending activities.

b. On February 12, 2013, the Tribe again met with the Bureau.  At this meeting, the Bureau told the Tribe that it was in the process of formulating an internal tribal consultation policy.

c. On March 19, 2013, the Tribe submitted questions to the Bureau to facilitate meaningful consultation.

7

TF App. 0273

d. On April 25 and June 10, 2013, additional meetings and discussions took place between the Bureau and the Tribe. As a result of these meetings, the Bureau advised the Tribe that "significant progress" was being made.

e. On September 12, 2013, the Tribe had its first meeting with Cheryl Parker-Rose, the then-newly appointed Director of the Bureau's Office of Intergovernmental Affairs. Also in attendance were John Pitts, Deputy Director of Intergovernmental Affairs, and various representatives from the Bureau's Legal Division and Office of Supervision. The Tribe distributed to the Bureau copies of the Ordinance and gave a detailed presentation of its regulatory system. Bureau representatives appeared receptive to the Tribe's sincere efforts to pursue a co-regulatory relationship.

f. On October 17, 2013, myself and multiple tribal leaders from tribes nationwide met with CFPB Director Richard Cordray and heads of the various Bureau divisions to discuss the tribes' desire to develop a co-regulatory relationship. At that meeting, Ms. Parker-Rose expressed an interest in visiting some of the tribes' reservations. After the October 17 meeting, the Tribe followed up with Ms. Parker-Rose and formally invited her to visit the Tribe's reservation.

24. On September 26, 2013, Director Cordray issued a Decision and Order Denying the Petition to Set Aside the CIDs. By this time, over a year had passed since the Tribe filed the Joint Petition to Set Aside the CIDs, during which the Tribe had made diligent efforts towards developing a co-regulatory relationship with the Bureau pursuant to which it could provide information to the Bureau on a voluntary basis.

25. The Bureau gave the Tribe an extended CID compliance date of October 24, 2013.

8

Shotton Declaration

**TF App. 0274**

26. On October 24, 2013, I wrote a letter to Director Cordray informing him that the Commission had directed Great Plains to gather the information requested by the CID and assuring him that the Tribe was willing to provide such information pursuant to a government to government request under the co-regualtory framework being discussed by the CFPB and the Tribe. **(Ex. E, Letter from Tribe to R. Cordray.)**

27. Having yet to hear anything from the Bureau regarding coordination between the Commission and the Bureau pursuant to which the Tribe could provide information to the Bureau, on January 29, 2014, the Tribe met again with Ms. Parker-Rose. At this meeting, the Tribe gave the Bureau a draft Model Lending Code and a draft Memorandum of Understanding ("MOU"). The Tribe also re-invited Ms. Parker-Rose to the reservation. Ms. Parker-Rose informed the Tribe that she would provide substantive comments on the MOU and the Model Lending Code within "four to five weeks" and that she would set an itinerary for a visit to the reservation within two weeks.

28. The draft MOU was developed in response to the Bureau's failure to respond to the Tribe's offer to coordinate with the Commission regarding the release of the information requested in the CIDs. Indeed, the sole purpose of the draft MOU is to further facilitate transparency and streamlined communication between the Tribe's lending business and the Bureau. **(Ex. F, Draft MOU.)**

29. More than five weeks after the January 29 meeting, the Tribe had not received any comments on the MOU or Model Lending Code, nor had Ms. Parker-Rose set an itinerary to visit the reservation. In fact, by this time, Ms. Parker-Rose was not returning any of the Tribe's telephone calls or emails.

30. On March 14, 2014, the Tribe learned through the Senate Committee on Indian Affairs that the Bureau never intended to review or comment on the documents submitted to them over a month before.

9

Shotton Declaration

31. The Tribe has yet to hear any response from the Bureau regarding the Tribe's willingness to turn over any and all requested information through intergovernmental coordination. Instead, the Bureau filed the instant enforcement action.

Dated: April 11, 2014

TF App. 0276

# EXHIBIT N

TO THE

DECLARATION OF MATTHEW S. SHELDON IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

**Exhibit 1 (Part 1 of 2)**

**Declaration of Theodore Whitford**
**(Vice Chairman, Chippewa Cree Tribe)**
**With Attachments (Exhibits A-C)**

TF App. 0277

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

**Richmond Division**

| | |
|---|---|
| DARLENE GIBBS, STEPHANIE EDWARDS, LULA WILLIAMS, PATRICK INSCHO, and LAWRENCE MWETHUKU, *on behalf of themselves and all individuals similarly situated,* | Civil Action No. 3:17-cv-495-MHL |
| Plaintiffs, | **DECLARATION OF THEODORE WHITFORD** |
| vs. | |
| PLAIN GREEN, LLC and GREAT PLAINS LENDING, LLC, | |
| Defendants. | |

## DECLARATION OF VICE-CHAIRMAN THEODORE WHITFORD

I, Theodore Whitford, hereby declare the following based on first-hand knowledge:

1. I serve as Vice-Chairman of the Chippewa Cree Indians of the Rocky Boy's Reservation (the "Tribe").

2. The Tribe is a federally-recognized Indian tribe. *See* Federal Register, List of "Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs," a true and correct copy of which is attached hereto as <u>Exhibit A</u>. The Tribe's reservation is located in the north central region of present-day Montana (the "Reservation").

3. The Tribe is an independent sovereign nation within the United States with a government that provides jobs, and infrastructure, and social and educational services, among other services, to its nearly 7,000 members, 3,500 of whom live on the Reservation.

1

4.   Although the Tribe's inherent sovereignty long predates the United States, the Tribe is organized under a Constitution and Bylaws adopted by the members of the Tribe pursuant to the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984 (25 U.S.C. § 461 *et seq.*)(the "Constitution"). A true and correct copy of the Constitution is attached hereto as Exhibit B.

5.   Under Article VI of the Constitution, the Chippewa Cree Business Committee (the "Business Committee") is the governing body for the Tribe and, in that capacity, is vested with the authority to enact laws and ordinances to promote the general welfare of the Tribe.

6.   The Chippewa Cree Tribe Limited Liability Company Act (the "LLC Act") was adopted by the Business Committee to provide a structure and process for forming and operating limited liability companies under Tribal law.  A true and accurate copy of the current version of the LLC Act is attached hereto as Exhibit C.

7.   Plain Green was duly organized under the LLC Act, and a true and accurate copy of Plain Green's Articles of Organization is attached hereto as Exhibit D.

8.   The Business Committee has amended Plain Green's Articles of Organization three times since Plaint Green's establishment in 2010, most recently in 2015 by Resolution No. 39-15 (April 13, 2015), in 2016 by Resolution No. 79-16 (August 11, 2016), and 2016 by Resolution No. 109-16 (October 16, 2016), which are collectively attached hereto as Exhibit E.

9.   The Tribe is the sole member of Plain Green LLC, which is operated as a manager-managed LLC, and the Tribe holds the exclusive authority to appoint and remove the manager.

10.    Plain Green operations are located on the Reservation and it controls and operates its own platforms and its loan products; it markets, underwrites, funds, processes, and

2

collects on all Plain Green loans to its customers. In short, Plain Green alone controls everything about its business cradle-to-grave from the Tribe's Reservation.

11.     The Tribe formed Plain Green to serve the social, economic, educational, and health needs of the Tribe; to generate Tribal revenues for governmental programs and projects; to enhance the Tribe's economic self-sufficiency and self-determination; and to provide positive, long-term social, environmental and economic benefits to Tribal members by enhancing the Tribe's business undertakings and prospects.  Ex. D.

12.     Through authorization and adoption of Plain Green's Articles of Organization, the Tribe conferred upon Plain Green all of the Tribe's right, privileges and federal immunities, including sovereign immunity, to the same extent that the Tribe would have such rights, privileges, and immunities, it if engaged in the activities undertaken by Plain Green.  Ex. D.

13.     The sole purpose of Plain Green is to be an "economic arm of the Tribe" and to have profits inure to the benefit of the Tribe and its tribal members on and off the Reservation.

14.     Plain Green serves a critical role in the Tribe's efforts to generate revenues as a means of promoting increased economic independence and self-determination.  The Tribe utilizes revenue from Plain Green for a variety of Tribal initiatives aimed at promoting the general welfare of the Tribe and its members, including development of a Tribal health clinic; funding Tribal community events, such as ceremonies and pow-wows; funding school supplies and medical equipment for Tribal members; and funding subsistence distributions to Tribal members, among other Tribal initiatives.  Without revenues from Plain Green, it would be much more difficult for the Tribe to meet the needs of its members and provide them with necessary governmental services, including law enforcement, fire, public utility, housing, and other fundamental welfare services.

3

TF App. 0280

15.     As "an arm of the Tribe" engaged in consumer financial services, Plain Green is subject to regulation under the Chippewa Cree Tribal Lending and Regulatory Code.  The Tribal Lending and Regulatory Code regulates a variety of Plain Green's activities, including extension of credit, application of usury and interest rates, and required loan agreement disclosures, among other topics.  A true and accurate copy of the Tribal Lending and Regulatory Code is attached hereto as Exhibit F.

16.     Plain Green is also subject to regulatory oversight by the Tribal Consumer Protection Bureau ("TCPB"), which is an independent governmental regulatory subdivision of the Tribe.  Ex. F at Chapter 4.  The TCPB conducts quarterly compliance audits of Plain Green in additional to an annual on-site review. *See id.*, §§ 10-4-108, 10-4-111.

17.     As "an arm of the Tribe" that engages in consumer financial services, Plain Green is subject to the licensure requirements outlined in Chapter 5 of the Tribal Lending and Regulatory Code.  Plain Green maintains a current license granted by the TCPB under the terms of the Tribal Lending and Regulatory Code.  A true and accurate copy of the license is attached hereto as Exhibit G.

I declare, under penalty of perjury of the laws of the United States and the Tribe, that the foregoing is true and correct as executed on this _18th_ day of September, 2017.

Theodore Whitford

4

TF App. 0281

# EXHIBIT A

TF App. 0282

Case 1:33-cv-00415-DLH Document 172-1 Filed 02/27/18 Page 297 of 302
Case 1:33-av-00415-DLH Document 171-4 Filed 02/13/17 Page 200 of 451 PageID 171

Federal Register / Vol. 81, No. 19 / Friday, January 29, 2016 / Notices   5019

**SUPPLEMENTARY INFORMATION:** In accordance with the December 12, 1988 court order in *National Coalition for the Homeless* v. *Veterans Administration,* No. 88–2503–OG (D.D.C.), HUD publishes a Notice, on a weekly basis, identifying unutilized, underutilized, excess and surplus Federal buildings and real property that HUD has reviewed for suitability for use to assist the homeless. Today's Notice is for the purpose of announcing that no additional properties have been determined suitable or unsuitable this week.

Dated: January 21, 2016.

**Brian P. Fitzmaurice,**

*Director, Division of Community Assistance, Office of Special Needs Assistance Programs.*

[FR Doc. 2016–01513 Filed 1–28–16; 8:45 am]

**BILLING CODE 4210–67–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

**[167 A2100DD/AAKC001030/ A0A501010.999900]**

### Renewal of Agency Information Collection for Tribal Self-Governance Program

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of submission to OMB.

**SUMMARY:** In compliance with the Paperwork Reduction Act of 1995, the Bureau of Indian Affairs (BIA) is submitting to the Office of Management and Budget (OMB) a request for approval for the collection of information for Tribal Self-Governance Program authorized by OMB Control Number 1076–0143. This information collection expires January 31, 2016.

**DATES:** Interested persons are invited to submit comments on or before February 29, 2016.

**ADDRESSES:** You may submit comments on the information collection to the Desk Officer for the Department of the Interior at the Office of Management and Budget, by facsimile to (202) 395–5806 or you may send an email to: *OIRA_ Submission@omb.eop.gov.* Please send a copy of your comments to: Sharee M. Freeman, Director, Office of Self-Governance, 1951 Constitution Avenue NW., Mail Stop 355–G SIB, Washington, DC 20240; telephone: (202) 219–0240, email: *Sharee.Freeman@bia.gov.* Please be sure to include the applicable OMB Control Number in the subject line of your comment.

**FOR FURTHER INFORMATION CONTACT:** Sharee Freeman, (202) 219–0240. You may review the information collection request online at *http:// www.reginfo.gov.* Follow the instructions to review Department of the Interior collections under review by OMB.

**SUPPLEMENTARY INFORMATION:**

### I. Abstract

The Office of Self-Governance is seeking renewal of the approval for information collection Tribal Self-Governance Program, as required by the Paperwork Reduction Act of 1995. The information collected will be used to establish requirements for entry into the pool of qualified applicants for Self-Governance and to meet reporting requirements of the Tribal Self-Governance Act.

### II. Request for Comments

On October 27, 2015, BIA published a notice announcing the renewal of this information collection and provided a 60-day comment period in the **Federal Register** (80 FR 65796). There were no comments received in response to this notice.

The BIA requests your comments on this collection concerning: (1) The necessity of this information collection for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) The accuracy of the agency's estimate of the burden (hours and cost) of the collection of information, including the validity of the methodology and assumptions used; (3) Ways we could enhance the quality, utility, and clarity of the information to be collected; and (4) Ways we could minimize the burden of the collection of the information on the respondents.

Please note that an agency may not conduct or sponsor, and an individual need not respond to, a collection of information unless it has a valid OMB Control Number.

It is our policy to make all comments available to the public for review at the location listed in the **ADDRESSES** section. Before including your address, phone number, email address or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

### III. Data

*OMB Control Number:* 1076–0143.

*Title:* Tribal Self-Governance program, 25 CFR part 1000.

*Brief Description of Collection:* The Self-Governance program is authorized by the Tribal Self-Governance Act of 1994, Public Law 103–413 (the Act), as amended. Indian Tribes interested in entering into Self-Governance must submit certain information as required by the Act. In addition, those Tribes and Tribal consortia that have entered into Self-Governance funding agreements will be requested to submit certain information as described in 25 CFR part 1000. This information will be used to justify a budget request submission on their behalf and to comport with section 405 of the Act that calls for the Secretary to submit an annual report to the Congress.

*Type of Review:* Extension without change of currently approved collection.

*Respondents:* Federally recognized Indian Tribes and Tribal consortia participating in or wishing to enter into Tribal Self-Governance.

*Number of Respondents:* 75.

*Number of Responses:* 84.

*Frequency of Response:* On occasion or annually.

*Obligation to Respond:* Responses are required to obtain or retain a benefit or are voluntary, depending upon the part of the program being addressed.

*Estimated Time per Response:* Completion times vary from 30 minutes to 400 hours, with an average of approximately 43 hours.

*Estimated Total Annual Hour Burden:* 4,443 hours.

*Estimated Total Annual Non-Hour Dollar Cost:* $10,500.

**Elizabeth K. Appel,**

*Director, Office of Regulatory Affairs and Collaborative Action—Indian Affairs.*

[FR Doc. 2016–01700 Filed 1–28–16; 8:45 am]

**BILLING CODE 4337–15–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

**[167 A2100DD/AAKC001030/ A0A501010.999900]**

### Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice.

**SUMMARY:** This notice publishes the current list of 566 Tribal entities recognized and eligible for funding and services from the Bureau of Indian Affairs (BIA) by virtue of their status as Indian Tribes. The list is updated from

Ex. A
PG - Motion to Dismiss

the notice published on January 14, 2015.

**FOR FURTHER INFORMATION CONTACT:**
Laurel Iron Cloud, Bureau of Indian Affairs, Division of Tribal Government Services, Mail Stop 4513–MIB, 1849 C Street NW., Washington, DC 20240. Telephone number: (202) 513–7641.

**SUPPLEMENTARY INFORMATION:** This notice is published pursuant to Section 104 of the Act of November 2, 1994 (Pub. L. 103–454; 108 Stat. 4791, 4792), and in exercise of authority delegated to the Assistant Secretary—Indian Affairs under 25 U.S.C. 2 and 9 and 209 DM 8.

Published below is a list of federally acknowledged Tribes in the contiguous 48 states and Alaska.

Amendments to the list include name changes and name corrections. To aid in identifying Tribal name changes and corrections, the Tribe's previously listed or former name is included in parentheses after the correct current Tribal name. We will continue to list the Tribe's former or previously listed name for several years before dropping the former or previously listed name from the list.

The listed Indian entities are acknowledged to have the immunities and privileges available to federally recognized Indian Tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations, and obligations of such Tribes. We have continued the practice of listing the Alaska Native entities separately solely for the purpose of facilitating identification of them and reference to them given the large number of complex Native names.

Dated: January 27, 2016.

**Lawrence S. Roberts,**
*Acting Assistant Secretary—Indian Affairs.*

## Indian Tribal Entities Within the Contiguous 48 States Recognized and Eligible To Receive Services From The United States Bureau of Indian Affairs

Absentee-Shawnee Tribe of Indians of Oklahoma

Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California

Ak-Chin Indian Community (previously listed as the Ak Chin Indian Community of the Maricopa (Ak Chin) Indian Reservation, Arizona)

Alabama-Coushatta Tribe of Texas (previously listed as the Alabama-Coushatta Tribes of Texas)

Alabama-Quassarte Tribal Town

Alturas Indian Rancheria, California

Apache Tribe of Oklahoma

Arapaho Tribe of the Wind River Reservation, Wyoming

Aroostook Band of Micmacs (previously listed as the Aroostook Band of Micmac Indians)

Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana

Augustine Band of Cahuilla Indians, California (previously listed as the Augustine Band of Cahuilla Mission Indians of the Augustine Reservation)

Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin

Bay Mills Indian Community, Michigan

Bear River Band of the Rohnerville Rancheria, California

Berry Creek Rancheria of Maidu Indians of California

Big Lagoon Rancheria, California

Big Pine Paiute Tribe of the Owens Valley (previously listed as the Big Pine Band of Owens Valley Paiute Shoshone Indians of the Big Pine Reservation, California)

Big Sandy Rancheria of Western Mono Indians of California (previously listed as the Big Sandy Rancheria of Mono Indians of California)

Big Valley Band of Pomo Indians of the Big Valley Rancheria, California

Bishop Paiute Tribe (previously listed as the Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony, California)

Blackfeet Tribe of the Blackfeet Indian Reservation of Montana

Blue Lake Rancheria, California

Bridgeport Indian Colony (previously listed as the Bridgeport Paiute Indian Colony of California)

Buena Vista Rancheria of Me-Wuk Indians of California

Burns Paiute Tribe (previously listed as the Burns Paiute Tribe of the Burns Paiute Indian Colony of Oregon)

Cabazon Band of Mission Indians, California

Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California

Caddo Nation of Oklahoma

Cahto Tribe of the Laytonville Rancheria

Cahuilla Band of Indians (previously listed as the Cahuilla Band of Mission Indians of the Cahuilla Reservation, California)

California Valley Miwok Tribe, California

Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California

Capitan Grande Band of Diegueno Mission Indians of California: (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California)

Catawba Indian Nation (aka Catawba Tribe of South Carolina)

Cayuga Nation

Cedarville Rancheria, California

Chemehuevi Indian Tribe of the Chemehuevi Reservation, California

Cher-Ae Heights Indian Community of the Trinidad Rancheria, California

Cherokee Nation

Cheyenne and Arapaho Tribes, Oklahoma (previously listed as the Cheyenne-Arapaho Tribes of Oklahoma)

Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota

Chicken Ranch Rancheria of Me-Wuk Indians of California

Chippewa Cree Indians of the Rocky Boy's Reservation, Montana (previously listed as the Chippewa-Cree Indians of the Rocky Boy's Reservation, Montana)

Chitimacha Tribe of Louisiana

Citizen Potawatomi Nation, Oklahoma

Cloverdale Rancheria of Pomo Indians of California

Cocopah Tribe of Arizona

Coeur D'Alene Tribe (previously listed as the Coeur D'Alene Tribe of the Coeur D'Alene Reservation, Idaho)

Cold Springs Rancheria of Mono Indians of California

Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California

Comanche Nation, Oklahoma

Confederated Salish and Kootenai Tribes of the Flathead Reservation

Confederated Tribes and Bands of the Yakama Nation

Confederated Tribes of Siletz Indians of Oregon (previously listed as the Confederated Tribes of the Siletz Reservation)

Confederated Tribes of the Chehalis Reservation

Confederated Tribes of the Colville Reservation

Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians

Confederated Tribes of the Goshute Reservation, Nevada and Utah

Confederated Tribes of the Grand Ronde Community of Oregon

Confederated Tribes of the Umatilla Indian Reservation (previously listed as the Confederated Tribes of the Umatilla Reservation, Oregon)

Confederated Tribes of the Warm Springs Reservation of Oregon

Coquille Indian Tribe (previously listed as the Coquille Tribe of Oregon)

Cortina Indian Rancheria (previously listed as the Cortina Indian Rancheria of Wintun Indians of California)

Coushatta Tribe of Louisiana

Cow Creek Band of Umpqua Tribe of Indians (previously listed as the Cow Creek Band of Umpqua Indians of Oregon)

**Federal Register** / Vol. 81, No. 19 / Friday, January 29, 2016 / Notices **5021**

Cowlitz Indian Tribe

Coyote Valley Band of Pomo Indians of California

Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota

Crow Tribe of Montana

Death Valley Timbi-sha Shoshone Tribe (previously listed as the Death Valley Timbi-Sha Shoshone Band of California)

Delaware Nation, Oklahoma

Delaware Tribe of Indians

Dry Creek Rancheria Band of Pomo Indians, California (previously listed as the Dry Creek Rancheria of Pomo Indians of California)

Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada

Eastern Band of Cherokee Indians

Eastern Shawnee Tribe of Oklahoma

Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California

Elk Valley Rancheria, California

Ely Shoshone Tribe of Nevada

Enterprise Rancheria of Maidu Indians of California

Ewiiaapaayp Band of Kumeyaay Indians, California

Federated Indians of Graton Rancheria, California

Flandreau Santee Sioux Tribe of South Dakota

Forest County Potawatomi Community, Wisconsin

Fort Belknap Indian Community of the Fort Belknap Reservation of Montana

Fort Bidwell Indian Community of the Fort Bidwell Reservation of California

Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California

Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon

Fort McDowell Yavapai Nation, Arizona

Fort Mojave Indian Tribe of Arizona, California & Nevada

Fort Sill Apache Tribe of Oklahoma

Gila River Indian Community of the Gila River Indian Reservation, Arizona

Grand Traverse Band of Ottawa and Chippewa Indians, Michigan

Greenville Rancheria (previously listed as the Greenville Rancheria of Maidu Indians of California)

Grindstone Indian Rancheria of Wintun-Wailaki Indians of California

Guidiville Rancheria of California

Habematolel Pomo of Upper Lake, California

Hannahville Indian Community, Michigan

Havasupai Tribe of the Havasupai Reservation, Arizona

Ho-Chunk Nation of Wisconsin

Hoh Indian Tribe (previously listed as the Hoh Indian Tribe of the Hoh Indian Reservation, Washington)

Hoopa Valley Tribe, California

Hopi Tribe of Arizona

Hopland Band of Pomo Indians, California (formerly Hopland Band of Pomo Indians of the Hopland Rancheria, California)

Houlton Band of Maliseet Indians

Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona

Iipay Nation of Santa Ysabel, California (previously listed as the Santa Ysabel Band of Diegueno Mission Indians of the Santa Ysabel Reservation)

Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California

Ione Band of Miwok Indians of California

Iowa Tribe of Kansas and Nebraska

Iowa Tribe of Oklahoma

Jackson Band of Miwuk Indians (previously listed as the Jackson Rancheria of Me-Wuk Indians of California)

Jamestown S'Klallam Tribe

Jamul Indian Village of California

Jena Band of Choctaw Indians

Jicarilla Apache Nation, New Mexico

Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona

Kalispel Indian Community of the Kalispel Reservation

Karuk Tribe (previously listed as the Karuk Tribe of California)

Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California

Kaw Nation, Oklahoma

Kewa Pueblo, New Mexico (previously listed as the Pueblo of Santo Domingo)

Keweenaw Bay Indian Community, Michigan

Kialegee Tribal Town

Kickapoo Traditional Tribe of Texas

Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas

Kickapoo Tribe of Oklahoma

Kiowa Indian Tribe of Oklahoma

Klamath Tribes

Koi Nation of Northern California (previously listed as the Lower Lake Rancheria, California)

Kootenai Tribe of Idaho

La Jolla Band of Luiseno Indians, California (previously listed as the La Jolla Band of Luiseno Mission Indians of the La Jolla Reservation)

La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California

Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin

Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin

Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan

Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada

Little River Band of Ottawa Indians, Michigan

Little Traverse Bay Bands of Odawa Indians, Michigan

Lone Pine Paiute-Shoshone Tribe (previously listed as the Paiute-Shoshone Indians of the Lone Pine Community of the Lone Pine Reservation, California)

Los Coyotes Band of Cahuilla and Cupeno Indians, California (previously listed as the Los Coyotes Band of Cahuilla & Cupeno Indians of the Los Coyotes Reservation)

Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada

Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota

Lower Elwha Tribal Community (previously listed as the Lower Elwha Tribal Community of the Lower Elwha Reservation, Washington)

Lower Sioux Indian Community in the State of Minnesota

Lummi Tribe of the Lummi Reservation

Lytton Rancheria of California

Makah Indian Tribe of the Makah Indian Reservation

Manchester Band of Pomo Indians of the Manchester Rancheria, California (previously listed as the Manchester Band of Pomo Indians of the Manchester-Point Arena Rancheria, California)

Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California

Mashantucket Pequot Indian Tribe (previously listed as the Mashantucket Pequot Tribe of Connecticut)

Mashpee Wampanoag Tribe (previously listed as the Mashpee Wampanoag Indian Tribal Council, Inc.)

Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan

Mechoopda Indian Tribe of Chico Rancheria, California

Menominee Indian Tribe of Wisconsin

Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California

Mescalero Apache Tribe of the Mescalero Reservation, New Mexico

Miami Tribe of Oklahoma

Miccosukee Tribe of Indians

Middletown Rancheria of Pomo Indians of California

Minnesota Chippewa Tribe, Minnesota (Six component reservations: Bois Forte Band (Nett Lake); Fond du Lac Band; Grand Portage Band; Leech Lake Band; Mille Lacs Band; White Earth Band)

Mississippi Band of Choctaw Indians

Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada

000003

Mohegan Tribe of Indians of Connecticut (previously listed as Mohegan Indian Tribe of Connecticut)

Mooretown Rancheria of Maidu Indians of California

Morongo Band of Mission Indians, California (previously listed as the Morongo Band of Cahuilla Mission Indians of the Morongo Reservation)

Muckleshoot Indian Tribe (previously listed as the Muckleshoot Indian Tribe of the Muckleshoot Reservation, Washington)

Narragansett Indian Tribe

Navajo Nation, Arizona, New Mexico & Utah

Nez Perce Tribe (previously listed as the Nez Perce Tribe of Idaho)

Nisqually Indian Tribe (previously listed as the Nisqually Indian Tribe of the Nisqually Reservation, Washington)

Nooksack Indian Tribe

Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana

Northfork Rancheria of Mono Indians of California

Northwestern Band of Shoshoni Nation (previously listed as the Northwestern Band of Shoshoni Nation of Utah (Washakie)

Nottawaseppi Huron Band of the Potawatomi, Michigan (previously listed as the Huron Potawatomi, Inc.)

Oglala Sioux Tribe (previously listed as the Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota)

Ohkay Owingeh, New Mexico (previously listed as the Pueblo of San Juan)

Omaha Tribe of Nebraska

Oneida Nation of New York

Oneida Tribe of Indians of Wisconsin

Onondaga Nation

Otoe-Missouria Tribe of Indians, Oklahoma

Ottawa Tribe of Oklahoma

Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes (formerly Paiute Indian Tribe of Utah (Cedar City Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes))

Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada

Pala Band of Mission Indians (previously listed as the Pala Band of Luiseno Mission Indians of the Pala Reservation, California) Pascua Yaqui Tribe of Arizona

Paskenta Band of Nomlaki Indians of California

Passamaquoddy Tribe

Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California

Pawnee Nation of Oklahoma

Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California

Penobscot Nation (previously listed as the Penobscot Tribe of Maine)

Peoria Tribe of Indians of Oklahoma

Picayune Rancheria of Chukchansi Indians of California

Pinoleville Pomo Nation, California (previously listed as the Pinoleville Rancheria of Pomo Indians of California)

Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias)

Poarch Band of Creeks (previously listed as the Poarch Band of Creek Indians of Alabama)

Pokagon Band of Potawatomi Indians, Michigan and Indiana

Ponca Tribe of Indians of Oklahoma

Ponca Tribe of Nebraska

Port Gamble S'Klallam Tribe (previously listed as the Port Gamble Band of S'Klallam Indians)

Potter Valley Tribe, California

Prairie Band Potawatomi Nation (previously listed as the Prairie Band of Potawatomi Nation, Kansas)

Prairie Island Indian Community in the State of Minnesota

Pueblo of Acoma, New Mexico

Pueblo of Cochiti, New Mexico

Pueblo of Isleta, New Mexico

Pueblo of Jemez, New Mexico

Pueblo of Laguna, New Mexico

Pueblo of Nambe, New Mexico

Pueblo of Picuris, New Mexico

Pueblo of Pojoaque, New Mexico

Pueblo of San Felipe, New Mexico

Pueblo of San Ildefonso, New Mexico

Pueblo of Sandia, New Mexico

Pueblo of Santa Ana, New Mexico

Pueblo of Santa Clara, New Mexico

Pueblo of Taos, New Mexico

Pueblo of Tesuque, New Mexico

Pueblo of Zia, New Mexico

Puyallup Tribe of the Puyallup Reservation

Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada

Quartz Valley Indian Community of the Quartz Valley Reservation of California

Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona

Quileute Tribe of the Quileute Reservation

Quinault Indian Nation (previously listed as the Quinault Tribe of the Quinault Reservation, Washington)

Ramona Band of Cahuilla, California (previously listed as the Ramona Band or Village of Cahuilla Mission Indians of California)

Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin

Red Lake Band of Chippewa Indians, Minnesota

Redding Rancheria, California

Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California (previously listed as the Redwood Valley Rancheria of Pomo Indians of California)

Reno-Sparks Indian Colony, Nevada

Resighini Rancheria, California

Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California

Robinson Rancheria (previously listed as the Robinson Rancheria Band of Pomo Indians, California and the Robinson Rancheria of Pomo Indians of California)

Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota

Round Valley Indian Tribes, Round Valley Reservation, California (previously listed as the Round Valley Indian Tribes of the Round Valley Reservation, California)

Sac & Fox Nation of Missouri in Kansas and Nebraska

Sac & Fox Nation, Oklahoma

Sac & Fox Tribe of the Mississippi in Iowa

Saginaw Chippewa Indian Tribe of Michigan

Saint Regis Mohawk Tribe (previously listed as the St. Regis Band of Mohawk Indians of New York)

Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona

Samish Indian Nation (previously listed as the Samish Indian Tribe, Washington)

San Carlos Apache Tribe of the San Carlos Reservation, Arizona

San Juan Southern Paiute Tribe of Arizona

San Manuel Band of Mission Indians, California (previously listed as the San Manual Band of Serrano Mission Indians of the San Manual Reservation)

San Pasqual Band of Diegueno Mission Indians of California

Santa Rosa Band of Cahuilla Indians, California (previously listed as the Santa Rosa Band of Cahuilla Mission Indians of the Santa Rosa Reservation)

Santa Rosa Indian Community of the Santa Rosa Rancheria, California

Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California

Santee Sioux Nation, Nebraska

Sauk-Suiattle Indian Tribe

Sault Ste. Marie Tribe of Chippewa Indians, Michigan

Scotts Valley Band of Pomo Indians of California

**Federal Register** / Vol. 81, No. 19 / Friday, January 29, 2016 / Notices

Seminole Tribe of Florida (previously listed as the Seminole Tribe of Florida (Dania, Big Cypress, Brighton, Hollywood & Tampa Reservations))

Seneca Nation of Indians (previously listed as the Seneca Nation of New York)

Seneca-Cayuga Nation (previously listed as the Seneca-Cayuga Tribe of Oklahoma)

Shakopee Mdewakanton Sioux Community of Minnesota

Shawnee Tribe

Sherwood Valley Rancheria of Pomo Indians of California

Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California

Shinnecock Indian Nation

Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation (previously listed as the Shoalwater Bay Tribe of the Shoalwater Bay Indian Reservation, Washington)

Shoshone Tribe of the Wind River Reservation, Wyoming

Shoshone-Bannock Tribes of the Fort Hall Reservation

Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada

Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota

Skokomish Indian Tribe (previously listed as the Skokomish Indian Tribe of the Skokomish Reservation, Washington)

Skull Valley Band of Goshute Indians of Utah

Snoqualmie Indian Tribe (previously listed as the Snoqualmie Tribe, Washington)

Soboba Band of Luiseno Indians, California

Sokaogon Chippewa Community, Wisconsin

Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado

Spirit Lake Tribe, North Dakota

Spokane Tribe of the Spokane Reservation

Squaxin Island Tribe of the Squaxin Island Reservation

St. Croix Chippewa Indians of Wisconsin

Standing Rock Sioux Tribe of North & South Dakota

Stillaguamish Tribe of Indians of Washington (previously listed as the Stillaguamish Tribe of Washington)

Stockbridge Munsee Community, Wisconsin

Summit Lake Paiute Tribe of Nevada

Suquamish Indian Tribe of the Port Madison Reservation

Susanville Indian Rancheria, California

Swinomish Indian Tribal Community (previously listed as the Swinomish Indians of the Swinomish Reservation of Washington)

Sycuan Band of the Kumeyaay Nation

Table Mountain Rancheria of California

Tejon Indian Tribe

Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band)

The Chickasaw Nation

The Choctaw Nation of Oklahoma

The Modoc Tribe of Oklahoma

The Muscogee (Creek) Nation

The Osage Nation (previously listed as the Osage Tribe)

The Quapaw Tribe of Indians

The Seminole Nation of Oklahoma

Thlopthlocco Tribal Town

Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota

Tohono O'odham Nation of Arizona

Tolowa Dee-ni' Nation (previously listed as the Smith River Rancheria, California)

Tonawanda Band of Seneca (previously listed as the Tonawanda Band of Seneca Indians of New York)

Tonkawa Tribe of Indians of Oklahoma

Tonto Apache Tribe of Arizona

Torres Martinez Desert Cahuilla Indians, California (previously listed as the Torres-Martinez Band of Cahuilla Mission Indians of California)

Tulalip Tribes of Washington (previously listed as the Tulalip Tribes of the Tulalip Reservation, Washington)

Tule River Indian Tribe of the Tule River Reservation, California

Tunica-Biloxi Indian Tribe

Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California

Turtle Mountain Band of Chippewa Indians of North Dakota

Tuscarora Nation

Twenty-Nine Palms Band of Mission Indians of California

United Auburn Indian Community of the Auburn Rancheria of California

United Keetoowah Band of Cherokee Indians in Oklahoma

Upper Sioux Community, Minnesota

Upper Skagit Indian Tribe

Ute Indian Tribe of the Uintah & Ouray Reservation, Utah

Ute Mountain Ute Tribe (previously listed as the Ute Mountain Tribe of the Ute Mountain Reservation, Colorado, New Mexico & Utah)

Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California

Walker River Paiute Tribe of the Walker River Reservation, Nevada

Wampanoag Tribe of Gay Head (Aquinnah)

Washoe Tribe of Nevada & California (Carson Colony, Dresslerville Colony, Woodfords Community, Stewart Community, & Washoe Ranches)

White Mountain Apache Tribe of the Fort Apache Reservation, Arizona

Wichita and Affiliated Tribes (Wichita, Keechi, Waco & Tawakonie), Oklahoma

Wilton Rancheria, California

Winnebago Tribe of Nebraska

Winnemucca Indian Colony of Nevada

Wiyot Tribe, California (previously listed as the Table Bluff Reservation—Wiyot Tribe)

Wyandotte Nation

Yankton Sioux Tribe of South Dakota

Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona

Yavapai-Prescott Indian Tribe (previously listed as the Yavapai-Prescott Tribe of the Yavapai Reservation, Arizona)

Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada

Yocha Dehe Wintun Nation, California (previously listed as the Rumsey Indian Rancheria of Wintun Indians of California)

Yomba Shoshone Tribe of the Yomba Reservation, Nevada

Ysleta del Sur Pueblo (previously listed as the Ysleta Del Sur Pueblo of Texas)

Yurok Tribe of the Yurok Reservation, California

Zuni Tribe of the Zuni Reservation, New Mexico

**Native Entities Within the State of Alaska Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs**

Agdaagux Tribe of King Cove

Akiachak Native Community

Akiak Native Community

Alatna Village

Algaaciq Native Village (St. Mary's)

Allakaket Village

Alutiiq Tribe of Old Harbor (previously listed as Native Village of Old Harbor and Village of Old Harbor)

Angoon Community Association

Anvik Village

Arctic Village (See Native Village of Venetie Tribal Government)

Asa'carsarmiut Tribe

Atqasuk Village (Atkasook)

Beaver Village

Birch Creek Tribe

Central Council of the Tlingit & Haida Indian Tribes

Chalkyitsik Village

Cheesh-Na Tribe (previously listed as the Native Village of Chistochina)

Chevak Native Village

Chickaloon Native Village

Chignik Bay Tribal Council (previously listed as the Native Village of Chignik)

Chignik Lake Village

Chilkat Indian Village (Klukwan)

Chilkoot Indian Association (Haines)

Chinik Eskimo Community (Golovin)

Chuloonawick Native Village

Circle Native Community

Craig Tribal Association (previously listed as the Craig Community Association)

Curyung Tribal Council
Douglas Indian Association
Egegik Village
Eklutna Native Village
Emmonak Village
Evansville Village (aka Bettles Field)
Galena Village (aka Louden Village)
Gulkana Village
Healy Lake Village
Holy Cross Village
Hoonah Indian Association
Hughes Village
Huslia Village
Hydaburg Cooperative Association
Igiugig Village
Inupiat Community of the Arctic Slope
Iqurmuit Traditional Council
Ivanoff Bay Tribe (previously listed as the Ivanoff Bay Village)
Kaguyak Village
Kaktovik Village (aka Barter Island)
Kasigluk Traditional Elders Council
Kenaitze Indian Tribe
Ketchikan Indian Corporation
King Island Native Community
King Salmon Tribe
Klawock Cooperative Association
Knik Tribe
Kokhanok Village
Koyukuk Native Village
Levelock Village
Lime Village
Manley Hot Springs Village
Manokotak Village
McGrath Native Village
Mentasta Traditional Council
Metlakatla Indian Community, Annette Island Reserve
Naknek Native Village
Native Village of Afognak
Native Village of Akhiok
Native Village of Akutan
Native Village of Aleknagik
Native Village of Ambler
Native Village of Atka
Native Village of Barrow Inupiat Traditional Government
Native Village of Belkofski
Native Village of Brevig Mission
Native Village of Buckland
Native Village of Cantwell
Native Village of Chenega (aka Chanega)
Native Village of Chignik Lagoon
Native Village of Chitina
Native Village of Chuathbaluk (Russian Mission, Kuskokwim)
Native Village of Council
Native Village of Deering
Native Village of Diomede (aka Inalik)
Native Village of Eagle
Native Village of Eek
Native Village of Ekuk
Native Village of Ekwok (previously listed as Ekwok Village)
Native Village of Elim
Native Village of Eyak (Cordova)
Native Village of False Pass
Native Village of Fort Yukon
Native Village of Gakona

Native Village of Gambell
Native Village of Georgetown
Native Village of Goodnews Bay
Native Village of Hamilton
Native Village of Hooper Bay
Native Village of Kanatak
Native Village of Karluk
Native Village of Kiana
Native Village of Kipnuk
Native Village of Kivalina
Native Village of Kluti Kaah (aka Copper Center)
Native Village of Kobuk
Native Village of Kongiganak
Native Village of Kotzebue
Native Village of Koyuk
Native Village of Kwigillingok
Native Village of Kwinhagak (aka Quinhagak)
Native Village of Larsen Bay
Native Village of Marshall (aka Fortuna Ledge)
Native Village of Mary's Igloo
Native Village of Mekoryuk
Native Village of Minto
Native Village of Nanwalek (aka English Bay)
Native Village of Napaimute
Native Village of Napakiak
Native Village of Napaskiak
Native Village of Nelson Lagoon
Native Village of Nightmute
Native Village of Nikolski
Native Village of Noatak
Native Village of Nuiqsut (aka Nooiksut)
Native Village of Nunam Iqua (previously listed as the Native Village of Sheldon's Point)
Native Village of Nunapitchuk
Native Village of Ouzinkie
Native Village of Paimiut
Native Village of Perryville
Native Village of Pilot Point
Native Village of Pitka's Point
Native Village of Point Hope
Native Village of Point Lay
Native Village of Port Graham
Native Village of Port Heiden
Native Village of Port Lions
Native Village of Ruby
Native Village of Saint Michael
Native Village of Savoonga
Native Village of Scammon Bay
Native Village of Selawik
Native Village of Shaktoolik
Native Village of Shishmaref
Native Village of Shungnak
Native Village of Stevens
Native Village of Tanacross
Native Village of Tanana
Native Village of Tatitlek
Native Village of Tazlina
Native Village of Teller
Native Village of Tetlin
Native Village of Tuntutuliak
Native Village of Tununak
Native Village of Tyonek
Native Village of Unalakleet
Native Village of Unga

Native Village of Venetie Tribal Government (Arctic Village and Village of Venetie)
Native Village of Wales
Native Village of White Mountain
Nenana Native Association
New Koliganek Village Council
New Stuyahok Village
Newhalen Village
Newtok Village
Nikolai Village
Ninilchik Village
Nome Eskimo Community
Nondalton Village
Noorvik Native Community
Northway Village
Nulato Village
Nunakauyarmiut Tribe
Organized Village of Grayling (aka Holikachuk)
Organized Village of Kake
Organized Village of Kasaan
Organized Village of Kwethluk
Organized Village of Saxman
Orutsararmiut Traditional Native Council (previously listed as Orutsararmuit Native Village (aka Bethel))
Oscarville Traditional Village
Pauloff Harbor Village
Pedro Bay Village
Petersburg Indian Association
Pilot Station Traditional Village
Platinum Traditional Village
Portage Creek Village (aka Ohgsenakale)
Pribilof Islands Aleut Communities of St. Paul & St. George Islands
Qagan Tayagungin Tribe of Sand Point Village
Qawalangin Tribe of Unalaska
Rampart Village
Saint George Island (See Pribilof Islands Aleut Communities of St. Paul & St. George Islands)
Saint Paul Island (See Pribilof Islands Aleut Communities of St. Paul & St. George Islands)
Seldovia Village Tribe
Shageluk Native Village
Sitka Tribe of Alaska
Skagway Village
South Naknek Village
Stebbins Community Association
Sun'aq Tribe of Kodiak (previously listed as the Shoonaq' Tribe of Kodiak)
Takotna Village
Tangirnaq Native Village (formerly Lesnoi Village (aka Woody Island))
Telida Village
Traditional Village of Togiak
Tuluksak Native Community
Twin Hills Village
Ugashik Village
Umkumiut Native Village (previously listed as Umkumiute Native Village)
Village of Alakanuk
Village of Anaktuvuk Pass
Village of Aniak