IN WITNESS WHEREOF, duly authorized representatives of each of the parties has executed this Agreement as of the Effective Date.

| Licensor: | Licensee: |
|---|---|
| **TC Decision Sciences, LLC** | **Plain Green, LLC** |
| By: _____ | By: _____/s/ Joel Rosette_____ |
| Name: Martin Wong | Name: Joel Rosette |
| Title: Chief Executive Officer | Title: Chief Executive Officer |
| Date: _____, 2015 | Date: ___July 1___, 2015 |
| Address: 4150 International Plaza, Ste. 400<br>Fort Worth, Texas 76109 | Address: 93 Mack Road, Suite 600<br>P.O. Box 270<br>Box Elder, Montana 59521 |

13

CONFIDENTIAL

TF App. 0504

TF-PA-001055

# EXHIBIT A

## SOFTWARE AND FEES

A. **Software Description:**

The Software shall consist of:

   a. <u>Origination Platform System</u>: Licensor's automated consumer loan origination and decisioning technology (the "**System**"). The System will undertake loan application review, credit underwriting, verification, and fraud detection, line increases, refinances and other related functions to enable Licensee to decision the loan.

   b. <u>Loan Management System</u>: Licensor's loan management software application. This is an internet-based installment loan platform that permits loan servicing, loan amortization and loan management, document storage, payment processing, client communications, complaint management administration, operational reporting, and collections..

Server Hardware requirements:
   - As of the Effective Date, the Software shall be hosted on a hardware platform located in a data center under contract with Licensor. Licensee may, upon prior written notice to and consent of Licensor (which consent shall not be unreasonably withheld), relocate the Software to Licensee's server in Licensee's data center or a data center under contract with Licensee. Licensor shall provide reasonable assistance with any such relocation by Licensee.

Notwithstanding any Use of the Software, Licensee shall have the exclusive right to determine whether to make any loans to any Borrowers.

B. **Fees and Costs:**

License Fees –

   a. <u>Origination Platform System Fee:</u> Licensee shall pay Licensor an Origination Platform System Fee equal to seventy dollars ($70.00) at the time of origination for each loan originated by Licensee.

   b. <u>Loan Management System Fee</u>: At the end of each month, Licensee shall pay Licensor a monthly Loan Management System Fee equal to seven dollars ($7.00) for each loan that is less than sixty-one (61) days past due as of the last day of the month.

Costs –

   a. Licensee shall reimburse Licensor for the following out-of-pocket costs and expenses incurred by Licensor in connection with this Agreement: ACH processing services performed by Clayton Servicing LLC.

   b. Licensor shall reimburse Licensee for the following out-of-pocket costs and expenses incurred by Licensee in connection with this Agreement and as approved by Licensor in writing: loan underwriting and verification.

CONFIDENTIAL

TF App. 0505

TF-PA-001056

**Payment Terms -**

a. Licensee shall pay all fees and costs referred to above within forty-five (45) calendar days after the end of each month. If Licensee does not make any payment as and when due then, in addition to paying such amount, Licensee shall also pay a late charge equal to the lesser of (i) one and one-half percent (1.5%) of the unpaid amount per month or portion thereof or (ii) the maximum late charge permitted by applicable law until the unpaid amount is paid in full.

**Professional Services -** Any work or other services requested by Licensee regarding the customization of the Software (other than standard implementation services that Licensor provides to others in the ordinary course of its business) that is not contemplated under this Agreement, will require that Licensor prepare a separate Statement of Work which details the services and costs for such additional professional services.

CONFIDENTIAL

**TF App. 0506**

TF-PA-001057

**EXHIBIT B**

**MAINTENANCE AND SUPPORT**

At no additional charge, Licensor shall provide the following Maintenance and Support to Licensee:

1.  **Updates.**

Licensor shall make available to Licensee all Updates (as defined in Section 1 of the Agreement). Due to the nature of internet- and web-based applications, Licensee acknowledges and agrees that only the current version of the Software will be enabled for Use and supported; all prior versions of the Software are archived under a source control system for historical reference purposes only, and are not maintained as functioning Software. Before implementing any Updates for Licensee, Licensor shall give Licensee the reasonable opportunity to review and approve all website text and credit decisioning functionality.

2.  **Technical Support.**

    a.    Licensee will designate up to three (3) named persons on its technical support staff who will be authorized to contact Licensor to receive support with the Software. Licensee may change these designated persons from time-to-time by providing written notice to Licensor. Licensor shall provide support in the Use of the Software from its offices by telephone, email and fax during the hours of 9:00 a.m. to 5:00 p.m. CT, Monday to Friday, excluding holidays.

    b.    Licensor will use reasonable efforts to answer questions and correct problems (or to provide suitable temporary solutions or workarounds for problems) in the Licensor's initial response or consultation with Licensee. If further action is necessary, then Licensor will use reasonable efforts to answer the question or correct the problem (or to provide suitable temporary solutions or workarounds for problems) within twenty-four (24) hours after the Licensor Support Contact's initial telephone contact with Licensee. However, if Licensee reasonably believes and states that the problem is substantial and material to Licensee's Use of the Software, or that the problem causes the Software or any material function to be inoperable, then Licensor will use reasonable efforts to correct the problem (or to provide suitable temporary solutions or workarounds for problems) within four (4) hours after the Licensor Support Contact's initial telephone contact with Licensee and will continue efforts to correct the problem until resolution.

    c.    Licensor will not be responsible for failure to correct a problem to the extent that the problem is caused by (i) a malfunction of computer hardware or software other than the Software or the server software and hardware used by Licensor to host the Software, (ii) any modification of the Software by any party other than Licensor which problem would not have occurred but for such modification, (iii) use of the Software with systems other than those contemplated by this Agreement or the Documentation or (iv) Licensee's failure to implement the most recent update provided to Licensee by Licensor. In any such event, Licensor will advise Licensee and, upon request, may provide assistance as Licensee may reasonably request with respect to the problem at Licensor's standard professional services hourly rates.

    d.    Licensee will provide Licensor with reasonable access to Licensee's authorized technical support staff for the sole purpose of facilitating Licensor's performance of its Support and Maintenance obligations.

1

CONFIDENTIAL

e. Licensee will provide information and materials reasonably requested by Licensor for use in replicating, diagnosing and correcting an error or other Software problem reported by Licensee. If there have been modifications or custom coding made to the Software by parties other than the Licensor, then at Licensor's request the Licensee will be required to demonstrate that the issue, error or defect that is the basis of the Licensee's support request can be reproduced without the presence of any such modifications or custom coding made to the Software. Licensee acknowledges that all Updates provided by Licensor will be cumulative in nature, and therefore Licensee shall permit the installation of all Updates provided by Licensor as soon as Licensor and Licensee mutually deem practical. Licensee further acknowledges that Licensor's ability to provide satisfactory Support and Maintenance is dependent on Licensee (i) accepting the installation of all Updates, and (ii) providing Licensor with the information necessary to replicate problems.

f. At the request of Licensee, Licensor shall provide bank account management services on behalf of Licensee in accordance with a "flow of funds" protocol (the "Protocol") to be agreed to between Licensor and Licensee in writing, as revised from time to time. Licensee irrevocably grants to Licensor the right to act as its agent to withdraw and deposit monies to and from the bank accounts established and maintained by Licensee, to facilitate the funding of Loans and the collection of loan repayments during the Term of this Agreement pursuant to the Protocol.

g. Licensor agrees to the following service levels attached as Exhibit B-1.

CONFIDENTIAL

TF App. 0508

TF-PA-001059

# EXHIBIT B-1

# MAINTENANCE AND SUPPORT SERVICE LEVEL AGREEMENT

| Incident Report | Priority | Requested via Direct Call to Help Desk \ NOC | | Requested via ChangeGear \ Email | | After Hours via Call to Service Desk | |
|---|---|---|---|---|---|---|---|
| | | Response Time | Target Resolution | Response Time | Resolution | Response Time | Resolution |
| Outages | Priority 1 \ Urgency 1 | 15 Minutes | Work until resolved | 15 Minutes | Work Until Resolved | 15 Minutes | Work until Resolved |

| Incident Report | Priority | Requested via Direct Call to Help Desk | | Requested via ChangeGear | | After Hours via Call to Help Desk | |
|---|---|---|---|---|---|---|---|
| | | Response Time | Target Resolution | Response Time | Target Resolution | Response Time | Target Resolution |
| **Service Desk** | | | | | | | |
| Password Reset | | 15 Minutes | 1 hour | 4 business hours | 12 business hours | 1 hour | 2 hours |
| Unlock Account | | 15 Minutes | 1 hour | 4 business hours | 12 business hours | 1 hour | 2 hours |
| User Account - Disable | | N/A | N/A | 4 business hours | 12 business hours | 1 hour | 2 hours |
| VPN Issue | | 15 Minutes | 1 hour | 4 business hours | 12 business hours | 1 hour | 2 hours |
| **App Ops** | | | | | | | |
| Applications Status Stuck | | N/A | N/A | 4 business hours | 12 business hours | N/A | N/A |
| ACH Payment Research | | N/A | N/A | 4 business hours | 12 business hours | N/A | N/A |
| Password Issues | | N/A | N/A | 4 business hours | 12 business hours | N/A | N/A |
| **Service Desk** | | | | | | | |
| Software Issue (I3 Client, Citrix, etc...) | Priority 2 | Immediate | 4 business hours or reroute | 1 business day | 3 business days | 1 hour | 3 business days |
| Additional Access Request | Priority 2 | 4 business hours | 3 business day | 1 business day | 3 business days | 1 hour | 3 business days |
| Software Request | Priority 2 | 4 business hours | 3 business days | 1 business day | 3 business days | 1 hour | 3 business days |
| **App Ops** | | | | | | | |
| CBR issues | Priority 2 | N/A | N/A | 1 business day | 3 business days | N/A | N/A |
| Line Increases | Priority 2 | N/A | N/A | 1 business day | 3 business days | N/A | N/A |
| Remove Sold Banner | Priority 2 | N/A | N/A | 1 business day | 3 business days | N/A | N/A |
| **Service Desk** | | | | | | | |
| Schedule Non-Critical Support Work | | N/A | N/A | 1 business day | 5 business days | N/A | N/A |
| New Hire Request | | N/A | N/A | 1 business day | 5 business days | N/A | N/A |
| Hardware Issue | | N/A | N/A | 1 business day | 5 business days | N/A | N/A |
| **App Ops** | | | | | | | |
| Funding Out Of Balance | | N/A | N/A | 1 business day | 5 business days | N/A | N/A |

CONFIDENTIAL

TF App. 0509
TF-PA-001060

## EXHIBIT C

## PERSONAL DATA PRIVACY AND SECURITY

1. **Personal Data Privacy and Security.**

a. Definitions:

(i) "Personal Data" is any information relating to an identified or identifiable natural person, including but not limited to Borrowers.

(ii) "Licensee Personal Data" is Personal Data provided to Licensee by or on behalf of a natural person, including but not limited to Borrowers.

(iii) "Processing" of Licensee Personal Data shall mean and include any operation or set of operations which is performed upon Personal Data, whether or not by automatic means, such as collection, recording, organization, storage, adaptation or alteration, retrieval, accessing, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure or destruction.

(iv) "Affiliate" with respect to either party shall mean any entity, including without limitation, any individual, corporation, company, partnership, limited liability company or group, that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such party.

b. Neither party shall disclose Licensee Personal Data to third parties without having first received express written approval from the other party. Each party, including its staff, shall view and Process Licensee Personal Data only on a need-to-know basis and only to the extent necessary to perform this Agreement.

c. Each party shall implement industry standard technical and organizational measures to ensure the security and confidentiality of Licensee Personal Data in order to prevent, among other things: (i) accidental, unauthorized or unlawful destruction, alteration, modification or loss of Licensee Personal Data, (ii) accidental, unauthorized or unlawful disclosure or access to Licensee Personal Data, (iii) unlawful forms of Processing. The security measures taken shall be in compliance with applicable data protection regulations and shall be adapted to the risks presented by the Processing and the nature of the Licensee Personal Data to be Processed, having regard to the state of the art and the cost of implementation. Each party shall promptly inform the other of any breach of this security and confidentiality undertaking, unless prohibited from doing so by law.

d. Each party shall notify the other party in the most expedient time possible under the circumstances and without unreasonable delay of any Security Breach involving any Licensee Personal Data, where "Security Breach" is defined as any event involving an actual, potential or threatened compromise of the security, confidentiality or integrity of the data, including but not limited to any unauthorized access or use, or any broader circumstances as defined in any applicable local law. Each party shall also provide the other party with a reasonably detailed description of the Security Breach, the type of data that was the subject of the Security Breach, the identity of each affected person, and any other information the other party may reasonably request concerning such affected persons and the details of the breach, as soon as such information can be collected or otherwise becomes available. The responsible party agrees to take action promptly, at its own expense, to investigate the Security Breach and to identify, prevent and mitigate the

4

**TF App. 0510**

CONFIDENTIAL

TF-PA-001061

effects of any such Security Breach, and to carry out any recovery or other action (e.g., mailing statutory notices) necessary to remedy the Security Breach. The content of any filings, communications, notices, press releases, or reports related to any Security Breach ("Notices") must first be approved by both parties prior to any publication or communication thereof to any third party. Licensor shall pay for or reimburse Licensee for all costs, losses and expenses relating to any Security Breach, including without limitation, the cost of Notices unless any such Security Breach is the result of negligence or fraud of the breaching party, employee or contractor.

e.  Each party shall implement measures necessary to reasonably ensure compliance by its staff with the obligations relating to Licensee Personal Data.

f.  During the term of this Agreement and for a period of one (1) year thereafter, each party reserves the right to conduct at any time during regular business hours, subject to a prior written notice, an on-site verification of the other party's compliance with obligations relating to Licensee Personal Data. Each party shall provide access to all concerned facilities, equipment and records in order to conduct such verification.

g.  If either party will Process any Licensee Personal Data or other information of Licensee's Borrowers ("Borrower Information") that is subject to Title V of the Gramm-Leach-Bliley Financial Services Modernization Act of 1999 and regulations promulgated under that Act (collectively "GLB") or other federal, state, and local laws, rules, regulations, and ordinances governing the privacy and security of customer information (collectively "Customer Information Privacy Laws"), then each party agrees to comply with GLB and other Customer Information Privacy Laws, and to protect and maintain the privacy of such Customer Information accordingly. Such compliance shall include, but not be limited to, each party (i) not disclosing any Customer Information to any third party except as expressly provided in this Agreement or otherwise directed or authorized in writing by Licensee; (ii) ensuring that its employees and subcontractors who obtain or have access to Customer Information comply at all times with the Customer Information Privacy Laws and the applicable provisions of this Agreement; and (iii) protecting and maintaining the security of all Customer Information in its custody or under its control. Each party shall immediately report to the other party any unauthorized disclosure or use of or any unauthorized access to any Customer Information in its custody or under its control.

No Personal Data will be transferred outside of the United States by either party.

# EXHIBIT I

TO THE

DECLARATION OF STEPHEN SMITH IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT OF CERTAIN
VIRGINIA AND TEXAS CLAIMS AND
IN OPPOSITION TO PLAINTIFF STEPHANIE EDWARDS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

## PARTICIPATION AGREEMENT (GREAT PLAINS LENDING)

THIS PARTICIPATION AGREEMENT (GREAT PLAINS LENDING) (this "Agreement"), is made as of this __ day of May, 2011 ("Effective Date"), by and among (a) GPL Servicing Ltd., a Cayman Islands exempted company incorporated with limited liability ("GPLS") and (b) Great Plains Lending, LLC, a business entity duly organized under and recognized by the laws of the Otoe-Missouria Tribe of Indians ("GP Lending"). Each party to this Agreement may be referred to herein as a "Party" or, collectively, as the "Parties."

*Recitals*

**WHEREAS**, Otoe-Missouria Tribe of Indians is a federally recognized Indian tribe endowed with sovereignty that predates the United States Constitution and whose sovereignty is recognized in the Indian Commerce Clause of the United States Constitution, subsequent United States Supreme Court cases and by the United States Congress.

**WHEREAS**, the government of the Otoe-Missouria Tribe of Indians operates businesses (including GP Lending) under a tribal constitution and tribal law within the Indian Country of the Otoe-Missouria Tribe of Indians.

**WHEREAS**, GP Lending is a business entity operating completely within the Indian Country of the Otoe-Missouria Tribe and solely within the jurisdiction of the laws and courts of the Otoe-Missouria Tribe of Indians, operates as an arm of the Otoe-Missouria Tribe of Indians, and explicitly possesses the sovereign immunity of the tribal government.

**WHEREAS**, GP Lending has all requisite authority under the laws of the Otoe-Missouria Tribe to make Loans (as defined below) to Borrowers (as defined below). As transactions originated and transacted completely within the Indian Country of Otoe-Missouria Tribe of Indians, these Loans are governed by the laws of the Otoe-Missouria Tribe of Indians and are consensual agreements that consent to and are within the jurisdiction of the Otoe-Missouria tribal courts.

**WHEREAS**, GP Lending, operating completely within the Indian Country of the Otoe-Missouria Tribe of Indians, has made and will make Loans to Borrowers.

**WHEREAS**, GP Lending desires to sell and transfer certain undivided participation interests in some of the Loans (collectively, the "Participated Loans") to GPLS in accordance with the terms and conditions of this Agreement.

**WHEREAS**, GPLS may from time to time desire to acquire such undivided participation interests offered by GP Lending in such Participated Loans without recourse in accordance with the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the promises and the covenants hereinafter set forth and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1

Confidential

TF App. 0512
TF-PA-244514

*Agreement*

1. **Definitions.** For the purposes of this Agreement, the following terms shall have the meanings indicated:

    (a) "Affiliate" shall mean with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with such other Person.

    (b) "Agreement" has the meaning set forth in the introductory paragraph.

    (c) "Annual Remittance Report" has the meaning set forth in Section 4(b).

    (d) "Applicant" shall mean a prospective Borrower.

    (e) "Book Value" shall mean the outstanding unpaid principal indebtedness plus any accrued interest on the Participated Loans.

    (f) "Borrowers" shall mean any obligor on a Loan.

    (g) "Business Day" shall mean a day other than a Saturday, Sunday or day on which the tribal government offices of the Otoe-Missouria Tribe of Indians are closed.

    (h) "Cash Revenue" shall mean all cash received for a given month from Borrowers on account of Participated Loans, except for any cash received during such month as repayment of the principal amount of any Participated Loans.

    (i) "Confidential Customer Information" shall mean Customer Information or other information about Borrowers or Applicants that is required to be kept confidential by the Requirements.

    (j) "Contingent Obligations" shall mean, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to any indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto.

    (k) "Customer Information" shall mean nonpublic information relating to Borrowers or Applicants, including without limitation, names, addresses, telephone numbers, e-mail addresses, credit information, account numbers, social security numbers, loan balances or other loan information, and lists derived therefrom and any other information required to be kept confidential by the Requirements.

    (l) "Daily Remittance Report" has the meaning set forth in Section 4(a).

    (m) "Effective Date" has the meaning set forth in the introductory paragraph.

    (n) "Filing Offices" shall mean (i) the Washington, D.C. Recorder of Deeds, (ii) the Office of the Tax Commission of the Otoe-Missouria Tribe of Indians and (iii) the Secretary of State of the State of Oklahoma.

Confidential

TF App. 0513
TF-PA-244515

(o) "GAAP" shall mean United States of America generally accepted accounting principles, consistently applied.

(p) "Governmental Authority" shall mean the Otoe-Missouria Tribe of Indians, federal or state government (or any political subdivision of any of the foregoing), and any agency, authority, commission, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, whether or not any such Governmental Authority has jurisdiction over GP Lending.

(q) "GP Indemnified Parties" has the meaning set forth in Section 20(a)(ii).

(r) "GP Indemnifying Party" has the meaning set forth in Section 20(a)(i).

(s) "GP Lending" has the meaning set forth in the introductory paragraph.

(t) "GPLS" has the meaning set forth in the introductory paragraph.

(u) "GPLS Collateral" has the meaning set forth in Section 18(c).

(v) "GPLS Indemnified Parties" has the meaning set forth in Section 20(a)(i).

(w) "GPLS Indemnifying Party" has the meaning set forth in Section 20(a)(ii).

(x) "GPLS Participation Percentage" shall mean ninety-nine percent (99%).

(y) "Hedging Obligations" shall mean, with respect to any specified Person, the obligations of such Person under: (i) interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements; (ii) other agreements or arrangements designed to manage interest rates or interest rate risk; and (iii) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

(z) "Indebtedness" of a Person shall mean, without duplication (i) all indebtedness for borrowed money; (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services (including, without limitation, "capital leases" in accordance with GAAP) (other than trade payables and accrued expenses incurred in the ordinary course of business); (iii) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments; (iv) all obligations evidenced by notes, bonds or similar instruments whether convertible or not, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses; (v) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such property); (vi) all indebtedness referred to in clauses (i) through (v) above secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets (including accounts and contract rights) owned by any Person, even though the Person which owns such assets or property has not assumed or become liable for the payment of such indebtedness; (vii) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds

TF App. 0514

Confidential

TF-PA-244516

referred to in clauses (i) through (vi) above; (viii) banker's acceptances; (ix) the balance deferred and unpaid of the purchase price of any property or services due more than three months after such property is acquired or such services are completed; (x) Hedging Obligations; and (xi) obligations under convertible securities of such Person.

(aa) "Indemnified Parties" has the meaning set forth in Section 20(a)(ii).

(bb) "Initial Term" has the meaning set forth in Section 16(a).

(cc) "Insolvency Event" has the meaning set forth in Section 16(b)(v).

(dd) "Laws" shall mean all applicable codes, statutes, laws, permits, rules, regulations, governmental requirements, ordinances, orders, policies, determinations, judgments, writs, injunctions, decrees and common law and equitable rules, causes of action, remedies and principles as the same may be amended, modified, supplemented or superseded from time to time.

(ee) "License Agreement" shall mean that certain License and Support Agreement, dated on or about the Effective Date, by and between GP Lending and TC Decision Sciences, LLC.

(ff) "Lien" shall mean any mortgage, lien, pledge, security interest, conditional sale or other title retention agreement, charge or other security interest or encumbrance of any kind, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement or any lease or license in the nature thereof, any option or other agreement to sell or give a security interest in.

(gg) "Loan Documents" shall mean the loan agreements, notes and other documentation executed by the Borrowers to obtain Loans.

(hh) "Loan Repayment Account" has the meaning set forth in Section 4(a).

(ii) "Loan Schedule" shall mean with respect to each Loan: at a minimum (i) a loan identification number; (ii) the name of the Borrower, (iii) the amount financed; (iv) the finance charge; (v) the origination date; and (vi) the final maturity date.

(jj) "Loans" shall mean short-term consumer loans in a principal amount not exceeding $2,500 with an initial term not exceeding 24 months.

(kk) "Master Participation Certificate" shall mean the certificate furnished by GP Lending to GPLS from time to time substantially in the form of Exhibit A attached hereto, which is deemed to be part of this Agreement.

(ll) "Material Adverse Effect" shall mean a material adverse effect on: (i) the business operations, properties, assets, condition (financial or otherwise) of GP Lending, as the case may be; (ii) the ability of GP Lending to fully and timely perform its obligations under this Agreement; (iii) the legality, validity, binding effect, or enforceability of this Agreement against GP Lending; or (iv) the rights, remedies and benefits available to GPLS or any of its Affiliates hereunder.

(mm) "Material Contract" shall mean any contract or other arrangement to which GP Lending is a party (other than this Agreement) for which breach, nonperformance, cancellation, termination or failure to renew could reasonably be expected to have a Material Adverse Effect.

Confidential

TF App. 0515

TF-PA-244517

(nn) "Monthly Remittance Report" has the meaning set forth in Section 4(b).

(oo) "Participated Loans" has the meaning set forth in the recitals.

(pp) "Participation Interest" has the meaning set forth in Section 2(a).

(qq) "Party" has the meaning set forth in the introductory paragraph.

(rr) "Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or agency or political subdivision thereof.

(ss) "Proceeding" shall mean any action, suit, proceeding, inquiry or investigation before or by any court, public board or government agency.

(tt) "Program" shall mean a lending program for the solicitation, marketing, and origination of Loans pursuant to Program Guidelines.

(uu) "Program Guidelines" shall mean those guidelines established by GP Lending for the administration of the Program, as amended, modified or supplemented from time to time by GP Lending.

(vv) "Purchases" has the meaning set forth in Section 2(a).

(ww) "Records" has the meaning set forth in Section 19(i).

(xx) "Register" has the meaning set forth in Section 15(c).

(yy) "Registrar" has the meaning set forth in Section 15(c).

(zz) "Renewal Term" has the meaning set forth in Section 16(a).

(aaa) "Requirements" shall mean all Tribal Laws and any federal or state laws, rules and regulations applicable to GP Lending, GPLS and the Program, and all other laws, regulations and guidelines that GP Lending irrevocably consents to adhere to as set forth in this Agreement.

(bbb) "Reserve Account" has the meaning set forth in Section 2(e).

(ccc) "Reserve Account Balance Requirement" has the meaning set forth in Section 2(e).

(ddd) "Retained Interests" shall mean the one percent (1.0%) undivided participation interests in the Loans and any income or profits therefrom to be retained by GP Lending upon the sale of each Participation Interest to GPLS.

(eee) "Securities" shall mean any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates

Confidential

TF App. 0516

TF-PA-244518

for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

(fff) "Service Fee" shall mean, for each calendar month, the applicable amounts as set forth on Exhibit B; provided, however that until such time that the aggregate principal Loan balances first exceed $5,000,000 in any month, the minimum Service Fee per month shall be $125,000.

(ggg) "Taxes" shall mean any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed.

(hhh) "TCDS" has the meaning set forth in Section 16(b)(iii).

(iii) "Terrorism Laws" shall mean (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States of America Treasury Department and any other enabling legislation or executive order relating thereto, and (ii) the USA PATRIOT Act.

(jjj) "Tribal Agency" shall mean any Otoe-Missouria Tribe of Indians tribal agency that has jurisdiction over GP Lending.

(kkk) "Tribal Law" shall mean any law or regulation duly enacted by the Otoe-Missouria Tribe of Indians.

(lll) "USA PATRIOT Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act, and the regulations adopted thereunder.

2. **Participation Interests**.

(a) Right to Purchase Participation Interests. During the term of this Agreement, GPLS or one or more of its Affiliates, shall have the non-exclusive right, but not the obligation, to purchase (each, a "Purchase") undivided ninety-nine percent (99%) participation interests in the Loans, any income or profits therefrom and the applicable Loan Documents (each a "Participation Interest" and, collectively, the "Participation Interests"). GP Lending must obtain the express written permission of GPLS prior to selling any loans or participation interests other than to GPLS, such permission not to be unreasonably withheld.

(b) Purchases and Sales of Participation Interests. On each Business Day, GP Lending shall provide a report of the Loans that were approved and funded by GP Lending which are eligible to be Participated Loans. In no event shall GP Lending sell any Participation Interests to GPLS for which the Loans shall have been outstanding for less than two (2) Business Days. If GPLS elects to make a Purchase, then GP Lending shall sell to GPLS, and GPLS shall purchase from GP Lending, such amount of Participation Interests as shall be specified by GP Lending at a purchase price (each, a "Purchase Price") equal to (i) the GPLS Participation Percentage of the applicable aggregate Book Value of the Participated Loans and (ii) the agreement by GPLS to pay the Service Fee with respect to such Participated Loans. On each Business Day on which GPLS purchases a Participation Interest, GP Lending shall automatically be deemed to have sold, transferred, assigned, set over and conveyed to GPLS, without recourse, except as set forth herein and subject to the terms of this

TF App. 0517

Confidential
TF-PA-244519