Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000

Tyler P. Brown (Admitted *pro hac vice*)
Jason W. Harbour (Admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

*Counsel to the Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| In re:<br><br>**THINK FINANCE, LLC,** *et al.*,<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 17-33964 (HDH)**<br><br>**(Jointly Administered)** |

## NOTICE OF FILING OF SUPPLEMENT TO APPENDIX TO DEBTORS' CONSOLIDATED BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN VIRGINIA AND TEXAS CLAIMS AND OBJECTION TO PLAINTIFF STEPHANIE EDWARDS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**PLEASE TAKE NOTICE** that on July 27, 2018, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), filed the *Appendix to Debtors' Consolidated Brief in Support of Motion for Summary Judgment of Certain Virginia and Texas Claims and Objection to Plaintiff Stephanie Edwards' Motion for Partial Summary Judgment* [Dkt No. 714] (the "Appendix") in the above-captioned bankruptcy case.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit A is a supplement to the Appendix (the "Supplement").

**PLEASE TAKE FURTHER NOTICE** that a copy of the Supplement may be obtained at no charge at *https://www.americanlegal.com/TF* or for a fee at *https://ecf.txnb.uscourts.gov*.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Think Finance, LLC (6762), Think Finance SPV, LLC (4522), Financial U, LLC (1850), TC Loan Service, LLC (3103), Tailwind Marketing, LLC (1602), TC Administrative Services, LLC (4558), and TC Decision Sciences, LLC (8949).

**PLEASE TAKE FURTHER NOTICE** that subsequent to the filing of the Appendix, the Debtors received signed declarations from certain of the deponents whose excerpted deposition transcripts were included in the Appendix. These declarations, together with a reference to the applicable Appendix document each declaration supplements, are included in the Supplement attached hereto as <u>Exhibit A</u>.

DATED: August 7, 2018

<div style="margin-left: 40%;">

Respectfully submitted,

*/s/ Gregory G. Hesse*
Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
Email: ghesse@HuntonAK.com

-and-

Tyler P. Brown (Admitted *pro hac vice*)
Jason W. Harbour (Admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Email: tpbrown@HuntonAK.com
      jharbour@HuntonAK.com

*Counsel to the Debtors and Debtors in Possession*

</div>

**<u>Exhibit A</u>**
**Supplement to the Appendix**

**SUPPLEMENT TO APPENDIX TO DEBTORS' CONSOLIDATED BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF CERTAIN VIRGINIA AND TEXAS CLAIMS AND OBJECTION TO PLAINTIFF STEPHANIE EDWARDS' <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

<u>**TABLE OF CONTENTS**</u>

| Original Appendix Doc. No. | Supplemental Document | Supplemental Page Number |
|---|---|---|
| 2 | Affidavit of Jason Harvison in Support of Debtors' Motion for Summary Judgment of Certain Virginia and Texas Claims | TF App. 0759 |
| 3 | Affidavit of Michelle Nguyen in Support of Debtors' Motion for Summary Judgment of Certain Virginia and Texas Claims | TF App. 0773 |
| 4 | Affidavit of Linda Rogenski in Support of Debtors' Motion for Summary Judgment of Certain Virginia and Texas Claims | TF App. 0798 |
| 6 | Affidavit of Christopher Lutes in Support of Debtors' Motion for Summary Judgment of Certain Virginia and Texas Claims | TF App. 0808 |
| 7 | Affidavit of Kenneth Rees in Support of Debtors' Motion for Summary Judgment of Certain Virginia and Texas Claims | TF App. 0816 |
| 10 | Affidavit of Steven Haynes in Support of Debtors' Motion for Summary Judgment of Certain Virginia and Texas Claims | TF App. 0826 |

Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000

Tyler P. Brown (admitted *pro hac vice*)
Jason W. Harbour (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

*Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **THINK FINANCE, LLC,** *et al.*, | **Case No. 17-33964 (HDH)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**AFFIDAVIT OF JASON HARVISON IN SUPPORT OF DEBTORS' MOTION FOR
SUMMARY JUDGMENT OF CERTAIN VIRGINIA AND TEXAS CLAIMS**

I, Jason Harvison, having been duly sworn on oath this 27th day of July 2018 state as follows:

1.     I am over 21 years of age and am competent to testify to the statements set forth in this affidavit. The statements set forth in this affidavit are true and correct to the best of my knowledge, information, and belief based on my personal knowledge.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Think Finance, LLC (6762), Think Finance SPV, LLC (4522), Financial U, LLC (1850), TC Loan Service, LLC (3103), Tailwind Marketing, LLC (1602), TC Administrative Services, LLC (4558), and TC Decision Sciences, LLC (8949) (collectively, the "Debtors").

2.      On April 17, 2018, I was deposed, in person, under oath (the "Deposition"). A true and correct copy of excerpts from the official transcript of the Deposition are attached hereto as Exhibit A (the "Transcript").

3.      I adopt, restate and incorporate the excerpts from the Deposition, as recorded in the Transcript, as my statements in support of the Debtors' *Motion for Summary Judgment of Certain Virginia and Texas Claims*.

4.      If called upon, I could and would testify to the facts contained herein and the statements made at the Deposition as recorded in the Transcript.

Executed on this **27** th day of July 2018, in the County of Tarrant, Texas I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Jason Harvison

2

Jason Harvison

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA  *
BY ATTORNEY GENERAL JOSH      *
SHAPIRO,                      *
      Plaintiff,          *
                 *
VS.                * Civil Action
            * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
      Defendants.         *

*******************************************
ORAL AND VIDEOTAPED DEPOSITION OF
JASON HARVISON
APRIL 17, 2018
*******************************************

      DEPOSITION of JASON HARVISON, produced
as a witness at the instance of the Plaintiff, and
duly sworn, was taken in the above-styled and
numbered cause on the 17th day of April, 2018, from
8:53 a.m. to 4:22 p.m., before Christy R. Sievert,
CSR, RPR, in and for the State of Texas, reported by
machine shorthand, at the Fort Worth Club, 306 West
7th Street, Fort Worth, Texas 76102, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

## Page 2

```
 1            A P P E A R A N C E S
 2
 3   COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
 4     MR. IRV ACKELSBERG
       MR. JOHN J. GROGAN
 5     Langer, Grogan & Diver, PC
       1717 Arch Street, Suite 4130
 6     Philadelphia, Pennsylvania 19103
       Phone:   215-320-5701
 7     E-mail:  iackelsberg@langergrogan.com
               jgrogan@langergrogan.com
 8
 9     MR. SAVERIO "SAM" MIRARCHI
       Senior Deputy Attorney General
       Bureau of Consumer Protection
10     1600 Arch Street, Suite 300
       Philadelphia, Pennsylvania 19103
11     Phone:   215-560-2445
       E-mail:  smirarchi@attorneygeneral.gov
12
13   COUNSEL FOR JASON HARVISON:
14     MR. RICHARD L. SCHEFF
       Montgomery, McCracken, Walker & Rhoads, LLP
15     123 South Broad Street
       Philadelphia, Pennsylvania 19109
16     Phone:   215-772-7502
       E-mail:  rscheff@mmwr.com
17
18   COUNSEL FOR KENNETH REES:
19     MR. DAVID HERMAN
       Montgomery, McCracken, Walker & Rhoads, LLP
20     123 South Broad Street
       Philadelphia, Pennsylvania 19109
21     Phone:   215-772-7502
       E-mail:  jboughrum@mmwr.com
22
23
24
25
```

## Page 3

```
 1            A P P E A R A N C E S
                   (continued)
 2
 3   COUNSEL FOR THINK FINANCE, INC.:
 4     MR. MATT GATEWOOD
       Eversheds Sutherland (US), LLP
 5     700 Sixth Street, NW, Suite 700
       Washington, D.C.  20001
 6     Phone:   202-383-0100
       E-mail:  mattgatewood@eversheds-sutherland.com
 7
 8   COUNSEL FOR VICTORY PARK CAPITAL:
 9     MR. DANIEL P. SHAPIRO
       MR. MATTHEW W. HAWS
       Katten Muchin Rosenman, LLP
10     525 W. Monroe Street
       Chicago, Illinois  60661
11     Phone:   312-902-5622
       E-mail:  daniel.shapiro@kattenlaw.com
12              matthew.haws@kattenlaw.com
13
14   COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
15     MR. PATRICK DAUGHERTY
       Van Ness Feldman, LLP
16     1050 Thomas Jefferson Street, NW
       Seventh Floor
17     Washington, D.C.
       Phone:   202-298-1874
18     E-mail:  pod@vnf.com
19   ALSO PRESENT:
20     GUS PHILLIPS, Videographer
       KEVIN BYERS
21
22
23
24
25
```

## Page 4

```
 1            I N D E X
                            PAGE
 2
 3   Appearances................................. 2-3
 4   Exhibits.................................... 5-9
 5   Proceedings................................. 10
 6   JASON HARVISON:
        Examination by Mr. Ackelsberg.............. 11
 7
 8   Changes and Signature.................. 268-269
 9   Reporter's Certification............... 270-271
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

TF App. 0012
TF App. 0761

Jason Harvison

## Page 9

EXHIBITS
(continued)

NUMBER     DESCRIPTION     PAGE

Exhibit 146 Product and Operations  229
Overview
11-7-12
TF-PA 325436 - 325475
Exhibits 147 - 148 (Not marked or identified.)
Exhibit 149 Strengthening the Tribal  234
Model and Program Update
December 20, 2012
TF-PA 369516 - 369534
Exhibit 150 Proposal for Compliance  245
Risk Assessment Review
and Audit, Plain Green
Loans, LLC, The Chippewa
Cree Tribe
August 22, 2012
TF-PA 572588
TF-PA 572589 - 572595
Exhibit 151 CFPB Readiness Exams, Tribal  246
January 7, 2013, Preliminary
Draft
TF-PA 572596 - 572623
Exhibit 152 (Not marked or identified.)
Exhibit 153 Map and Legend  256
TF-PA 014425 - 014426
Exhibit 154 E-mail correspondence, 9-26-13  258
Re: Ho Chunk
TF-PA 257992 - 258004

## Page 10

1      THE VIDEOGRAPHER: We are now on the
2 record for the videotaped deposition of Jason
3 Harvison. The time is 8:53 a.m., April 17, 2018, in
4 the matter of Commonwealth of Pennsylvania, et al.,
5 vs. Think Finance, et al., Case No. 14-7139-JCJ,
6 being held in the United States Eastern District of
7 Pennsylvania.
8      The court reporter is Christy Sievert, and
9 the videographer is Gus Phillips. Both are
10 representatives of Kaplan Leaman & Wolfe Court
11 Reporters.
12      Will counsel please state their
13 appearances for the record.
14      MR. ACKELSBERG: Irv Ackelsberg for
15 the Commonwealth of Pennsylvania.
16      MR. GROGAN: John Grogan, also for the
17 Commonwealth.
18      MR. MIRARCHI: Saverio Mirarchi for
19 the Commonwealth of Pennsylvania.
20      MR. DAUGHERTY: Andrew Daugherty on
21 behalf of National Credit Adjusters.
22      MR. HAWS: Matthew Haws on behalf of
23 the Victory Park defendants.
24      MR. SHAPIRO: Daniel Shapiro for the
25 Victory Park defendants.

## Page 11

1      MR. GATEWOOD: Matthew Gatewood for
2 the Think Finance defendants.
3      MR. HERMAN: David Herman on behalf of
4 Kenneth E. Rees.
5      MR. SCHEFF: Richard Scheff for Jason
6 Harvison.
7      THE VIDEOGRAPHER: Counsel on the
8 phone?
9      MR. SCHEFF: There's no -- one of the
10 Victory Park guys, one of the clients.
11      THE VIDEOGRAPHER: Will the court
12 reporter please administer the oath.
13      JASON HARVISON
14      having been first duly sworn,
15      testified as follows:
16      EXAMINATION
17 BY MR. ACKELSBERG:
18   Q. Good morning, Mr. Harvison.
19      MR. SCHEFF: Hold on, we --
20      MR. ACKELSBERG: Yeah, we're going to
21 put on the record first.
22      MR. GATEWOOD: The parties have
23 conferred, and to facilitate the deposition process
24 and to avoid multiple disruptions per question, any
25 defendant that raises an objection; form, preserves

## Page 12

1 the objection with respect to all other defendants
2 as well, and the parties have agreed on that.
3      MR. ACKELSBERG: And I think we'll do
4 that -- you want to do that in -- going forward in
5 the other depositions so we won't even have to make
6 this statement going forward, right?
7      MR. GATEWOOD: That's right, it
8 will -- it will apply to all depositions.
9      MR. ACKELSBERG: Okay. Anything else
10 anyone wants to put on the record before we begin?
11 BY MR. ACKELSBERG:
12   Q. Good morning, Mr. Harvison.
13   A. Good morning.
14   Q. Welcome. I want to -- I'm Irv Ackelsberg,
15 as you know, representing the Commonwealth of
16 Pennsylvania.
17      Before we get into the substance of the
18 matters here, I want to -- I want to ask you a few
19 preliminary questions. The first is whether you
20 have been deposed before?
21   A. Yes, I have.
22   Q. Okay. And how many times?
23   A. Three separate times.
24   Q. Okay. And could you identify the three
25 times? And if you could, roughly, when it happened,

TF App. 0013
TF App. 0762

Jason Harvison

## Page 121

1    A.  Early on that was the expectations.
2    Q.  Okay.  And we're just talking about early
3  on.  I know there were changes made, and I -- and
4  we'll -- promise you, we're going to -- we're going
5  to work our way through them.  But I'm just really
6  dealing with the -- the initial -- establishing the
7  relationships the way things were in the beginning.
8  Okay?
9    A.  Okay.
10    Q.  With regard to application processing,
11  well, this -- this relates to the decision engine
12  that we talked about before; am I right?
13    A.  So, actually, I would say the decision
14  engine piece would be one below.  Application
15  processing is --
16    Q.  Okay.  That's the website?
17    A.  Yes.
18    Q.  And Think Finance was telling the tribe:
19  We can -- we'll put together the website for you,
20  right?
21    A.  So, actually, let me back up just real
22  quick.  So yes, so the application processing piece
23  would be -- you're right.  I was getting confused
24  here.  It would be on the -- what the tribes wanted
25  for the look and feel of the site, what kind of

## Page 122

1  creative, what kind of verbiage they wanted out
2  there, and also any kind of communications with the
3  customer before the application process was
4  completed.
5    Q.  And then under "Underwriting Criteria,"
6  then that's -- that's the decision engine, right?
7    A.  So here what would be requested -- required
8  of the tribes would be that they would have to
9  approve up front any kind of underwriting criteria,
10  whether that's knockout rules, score cuts that --
11  that they would set.  And then on a go-forward basis
12  any kind of modifications that needed to be made had
13  to be approved and -- reviewed and approved by the
14  tribe, and then there would also be ongoing
15  reporting on how the portfolio performed that they
16  would be expected to -- to review to make sure they
17  understand the portfolio is performing.
18    Q.  Now, I mean, when you went to the Chippewa
19  Cree, I mean, they didn't have any -- they didn't
20  have any experience running a loan operation like
21  you were -- like you were -- like you were offering
22  to set up for them, had they?
23    MR. GATEWOOD:  Objection; form.
24    MR. SCHEFF:  Object to the form.
25    A.  Sure.  I mean, actually, one of the

## Page 123

1  interesting things about the Chippewa Cree tribe
2  that we felt that they were a good partner for was
3  they actually had an established lending operation
4  already set up through another third-party servicer.
5  BY MR. ACKELSBERG:
6    Q.  Meaning Encore?
7    A.  I believe that was the partner that they
8  had.
9    Q.  Well, had they ever made a loan with
10  Encore?
11    A.  Have I ever made?
12    Q.  No.  Had the tribe ever made a loan with
13  Encore?
14    A.  It was my understanding that they had an
15  established platform, established site, and a
16  portfolio that was there.
17    Q.  That wasn't my question.  My question was
18  whether they were actually making loans on that
19  platform?
20    MR. SCHEFF:  Object to the form; asked
21  and answered.
22    You can answer again.
23    A.  That was my complete understanding.
24  BY MR. ACKELSBERG:
25    Q.  That you thought they were making loans?

## Page 124

1    A.  (Nods head affirmatively.)
2    Q.  Okay.  And so in terms of the -- the role
3  of the tribe with regard to underwriting, the tribe
4  had to -- the tribe had to approve any -- the
5  development of the -- the decision engine required
6  certain parameters that the tribe would have to --
7  would have to agree to, right?  They would have to
8  approve certain -- whatever the particular
9  underwriting criteria were of the platform that was
10  set up, right?
11    A.  The tribe would have to approve anything
12  that into the -- the underwriting.
13    Q.  Right.  So Think Finance would have to
14  develop something in order to -- there would have to
15  then be someone saying:  Yes, I approve that.
16  Right?  That's -- that's what the tribal role would
17  be, to approve what Think Finance put in front of
18  them, right?
19    MR. GATEWOOD:  Objection; form.
20    A.  My understanding was, and the way it
21  actually took place, was not that they just approve
22  anything that was sent over to them.  They -- they
23  would have to review any kind of changes that were
24  being proposed, understand the impacts that it would
25  have to the portfolio.  And since they did own a

31 (Pages 121 to 124)

TF App. 0014
TF App. 0763

Jason Harvison

## Page 125

1 piece of the portfolio, that they -- you know, they
2 wanted to make sure that it was a prudent decision.
3 So they -- they were the ones that had to review and
4 approve and make any suggested modifications back to
5 us --
6 BY MR. ACKELSBERG:
7     Q. And your --
8     A. -- on anything.
9     Q. And your sense was that the tribe really
10 understood all that and they understood -- when you
11 sent loan criteria, they understood that? I mean,
12 were you involved in that?
13         MR. GATEWOOD: Objection; form.
14     A. So most of the -- from a -- an underwriting
15 standpoint, a lot of that conversation came from our
16 risk department with -- with the partners. But I
17 reviewed some of the documentation that was sent --
18 you know, not every documentation but -- but how
19 that structure was put together, and I thought they
20 were very thorough on what the -- the changes were
21 being proposed for, what the impact would be so that
22 the tribe could really understand what was going on
23 and ask the questions they needed to ask to get
24 comfortable.
25 BY MR. ACKELSBERG:

## Page 126

1     Q. What about under "Funding and Payment
2 Processing," that was, basically, all done by Think
3 Finance, wasn't it?
4         MR. GATEWOOD: Objection; form.
5         MR. SCHEFF: Object to the form.
6     A. So under "Funding and Payment Processing,"
7 as -- as part of the system, the system would cue up
8 what -- what loans needed to be funded that night,
9 what loans needed to take payments out of.
10 BY MR. ACKELSBERG:
11     Q. Whose system?
12     A. The loan management system that was
13 licensed by the tribe. So based on loans that they
14 had originated, the system would cue up any kind of
15 outgoing credits or incoming debits, but those
16 were -- would all be going into a tribal account
17 that they owned.
18     Q. That would all be managed by Think Finance,
19 right?
20     A. That was the tribe's product that they
21 were -- I don't understand what you're saying.
22     Q. Well, I'm just trying to understand who's
23 doing what here. So let's go to the top -- from the
24 top. The tribe -- the marketing is done by Think,
25 but the tribe has to approve it before it goes out,

## Page 127

1 right?
2         MR. SCHEFF: Objection; asked and
3 answered.
4     You can answer it again.
5 BY MR. ACKELSBERG:
6     Q. That's -- right?
7     A. So I would say you see many lenders out
8 there partner with ad agencies, creative agencies to
9 do marketing for them on behalf of their products.
10 And so this is --
11     Q. Understood.
12     A. And so, just -- just as you see as in many
13 other industries, the tribe contracted with
14 telemarketing to do that -- that marketing, but they
15 had to be involved with every piece of communication
16 and creative to make sure it met their criteria.
17     Q. I understand. And they contract with Think
18 Finance to -- to operate the website and decision
19 engine?
20     A. So, I mean, once again, on the website
21 creative, there was -- there was work done with the
22 tribes on how to propose what that look and feel,
23 what that language would be that the tribes had
24 input on. Any kind of verbiage that was out there,
25 it had to be approved upon. And then the same thing

## Page 128

1 with the underwriting criteria, as I mentioned
2 earlier, that was something that it was their
3 underwriting criteria, they -- they set that
4 criterion up front when the program was established.
5 Any changes that were proposed, they approved or
6 made modifications to.
7     And the other thing they had -- they had
8 access to was at the end of the day, the -- the
9 decision engine that underwrote the loans based on
10 their criteria, it would say these are the loans
11 that met your criteria and these are the loans that
12 did not meet your criteria and so it had to be
13 declined, and they had the ability to go in and
14 review any and all of those to audit and sample and
15 make sure it met their criteria.
16     Q. Well, they had the ability, but they
17 didn't -- they didn't really have to do it in order
18 for the loans to be either approved or denied,
19 right?
20         MR. SCHEFF: Object to the form.
21         MR. GATEWOOD: Objection; form.
22     A. So to me, that's -- that's what I would
23 call a belts and suspenders approach. They had
24 already set up the criteria up front. They had
25 already made approvals on any changes that were made

32 (Pages 125 to 128)

TF App. 0015
TF App. 0764

Jason Harvison

Page 133

1  with that -- that were -- were a part of the deal
2  structure.
3  BY MR. ACKELSBERG:
4      Q.  Now, generally, in the sales presentations,
5  would -- would Think mention Victory Park by name or
6  just mention that we have an investor?
7          MR. GATEWOOD:  Objection; form.
8          MR. SCHEFF:  Object to the form.
9      A.  Going off memory, which is a long time ago,
10  my -- my memory was that there was an investor there
11  to purchase receivables but not talk about them
12  specifically.
13  BY MR. ACKELSBERG:
14      Q.  Let's look at another dec -- I'm sorry --
15  another report, a Rees report to the board
16  January 21, 2011.
17          (Exhibit No. 123 marked.)
18          MR. SHAPIRO:  Is this 123?
19          MR. ACKELSBERG:  Yes.
20  BY MR. ACKELSBERG:
21      Q.  So if you turn to the discussion in this --
22  in this board report, the report concerning "Think
23  Cash/Great Plains Lending."  Do you see that?
24      A.  Yes.
25      Q.  So, again, the date of this is

Page 134

1  January 21st, 2011.  And from the second paragraph,
2  it's -- it's clear that at this point in time, it
3  was still assumed that the company was going to
4  be -- that the -- that the ThinkCash migration was
5  going to be the Otoe-Missouria tribe, correct?
6          MR. SCHEFF:  Object to the form.
7      A.  So at this point, we were looking for
8  Otoe-Missouria to still be the first tribe we
9  launched with.
10  BY MR. ACKELSBERG:
11      Q.  Right.  And they -- and the expectation was
12  the first tribe would be the ones that would get the
13  returning customers from ThinkCash, right?
14          MR. SCHEFF:  Object to the form.
15      A.  So the first tribe had the ability to
16  market to the ThinkCash customers.
17  BY MR. ACKELSBERG:
18      Q.  Yeah.  Okay.  Now, in the -- in the last
19  paragraph, it says, "Because of the concerns about
20  the potential impact on valuation due to the tribal
21  deal," and then it says that the Great Plains
22  lending concept was discussed with some investment
23  bankers.  Do you see that?
24      A.  I do.
25      Q.  Okay.  So what's going on here?  Was this

Page 135

1  about -- was this about an IPO?
2          MR. GATEWOOD:  Objection; form.
3      A.  So my recollection on this was, from time
4  to time, investment bankers would come in and talk
5  to us about the potential for an IPO, and Ken had --
6  had talked to one of those investors about some of
7  the products we were looking to take to market.
8  BY MR. ACKELSBERG:
9      Q.  And so when Ken says they were surprisingly
10  nonplussed about the model, do you know why --
11  what's the reason for the surprise?
12      A.  No, I don't.
13      Q.  Okay.  The last -- on page 4, I'm sorry,
14  it's the -- the last item going forward, TF-PA
15  411042, the last bullet item is, "Complete the
16  automation of the debt sales process."  That's what
17  we were talking about before, right, the
18  arrangements with -- with Bret Horrocks?
19          MR. SCHEFF:  Object to the form.
20          You can answer the question if you can.
21      A.  Yeah, so what I would say that's more
22  around we would talk with the third-party debt
23  buyers.  I mean, Brett Horrocks was a consultant.
24  So that was completing the automations from the
25  lender and the debt buyer.

Page 136

1  BY MR. ACKELSBERG:
2      Q.  Now, I've noticed in -- in some of the
3  documents that with regard to the Otoe-Missouria,
4  there's reference to a group called The MacFarlane
5  Group.  Do you remember them and someone named Mark
6  Curry?
7      A.  I do.
8      Q.  Okay.  So what was the connection between
9  MacFarlane and Curry and the discussions about
10  whether or not to proceed with the Great Plains
11  Lending project with Otoe-Missouria?
12          MR. SCHEFF:  Object to the form.
13      A.  So my recollection on that was Mark Curry
14  is an individual that had been in the space.  We had
15  met him at conferences and things like that before.
16  Not -- not just tribal lending but other lending
17  ventures.
18          He had -- or one of his entities has
19  worked as a service provider to the Otoe-Missouria
20  tribe to launch American Web Loan.  They had a
21  single pay product out there.
22          THE REPORTER:  I'm sorry, American
23  what?
24          THE WITNESS:  American Web Loan.
25      A.  And that when we started to research the

34  (Pages 133 to 136)

TF App. 0016

TF App. 0765

Jason Harvison

---

**Page 137**

1 tribal lending model, I believe -- I believe it was
2 Ken that reached out to him to talk about a
3 potential partnership. And the Otoe-Missouria tribe
4 was looking to expand out past just the payday -- or
5 single pay product and wanted to go into installment
6 lending. So that's where the conversations began.
7 BY MR. ACKELSBERG:
8     Q. You mentioned a few times this idea of a
9 single pay product. So when you -- when you use
10 that term, you're referring to traditional payday
11 lending, right?
12         MR. SCHEFF: Object to the form.
13         You can answer the question.
14     A. Sometimes referred to as "payday." We
15 refer to as "single pay."
16 BY MR. ACKELSBERG:
17     Q. Okay. Meaning that the borrower takes a
18 loan for, let's say, two weeks and then after
19 two weeks, everything is due, the borrower can
20 either pay that or roll over for some additional
21 period of time, right? That's the single pay model,
22 right?
23         MR. SCHEFF: Object to the form.
24         You can answer the question.
25     A. A single pay model typically works under

---

**Page 138**

1 that construct or some variation of it.
2 BY MR. ACKELSBERG:
3     Q. Yeah. Okay. And the idea with an
4 installment loan product is that the consumer is
5 taking -- is taking a loan out for a -- for a longer
6 period of time than two weeks, right?
7         MR. SCHEFF: Object to the form.
8     A. So, typically, with an installment product,
9 what we had seen in our research, it had higher
10 satisfaction scores. And, like I said, from a
11 contract standpoint, there was a longer term product
12 with fixed payments that amortized over -- over that
13 term and gave -- just gave more consumer flexibility
14 than a single pay product.
15 BY MR. ACKELSBERG:
16     Q. And so as I understand it, the -- the
17 Otoe-Missouria was already doing a single pay
18 product through Mark Curry, and they were interested
19 in considering an installment loan product through
20 Think Finance? That's what -- that's what was
21 happening at that time?
22         MR. GATEWOOD: Objection; form.
23     A. So the way I would say it is that, yes,
24 Otoe-Missouria had a service provider relationship
25 already set up. They were the lender, had a program

---

**Page 139**

1 set up and were looking to expand their product
2 offerings, and we were somebody they were talking to
3 about that.
4         MR. ACKELSBERG: Now, let me show you
5 one more document. This is P-124.
6         (Exhibit No. 124 marked.)
7     A. (Reviews document.)
8 BY MR. ACKELSBERG:
9     Q. All right. So first off, do you -- do you
10 remember this -- this e-mail that Ken sent around
11 in -- on February 24th, 2011, saying that, "We
12 finally got the signed agreement for the tribe.
13 Gentlemen, start your engines"? Do you remember
14 that?
15     A. Yes.
16     Q. Okay. And what did -- how did you take
17 that start -- what was your understanding of "let's
18 start your engines" meant?
19         MR. SCHEFF: Object to the form.
20     A. Sure. I mean, I go back to -- you know, we
21 had gone through over the last, call it, five months
22 of the -- the termination of our bank partner
23 relationships, exploring new different partnerships
24 and channels to go into, a lot of work had gone into
25 the last 90 to 120 days to -- to explore some

---

**Page 140**

1 different options. The first tribal partnership had
2 been signed. And so just because the deal was
3 signed, it didn't mean the work was done yet. There
4 was a lot of work to be done to get that ready to
5 launch. And so it was -- it's kind of a celebration
6 of we signed our first deal, let's -- let's be
7 excited about that and get going.
8 BY MR. ACKELSBERG:
9     Q. Well, and then attached is that -- is that
10 signed agreement that he was saying he had gotten
11 back, right? Do you see the -- and the agreement is
12 the trademark and URL assignment agreement, correct?
13     A. Correct.
14     Q. And am I correct that the URL for Great
15 Plains Lending was already owned by -- by TailWind
16 at the time?
17     A. So I'll go back to what I said earlier this
18 morning was, that when we decided to explore the
19 path of a different lending model, we made an
20 investment on some work that we didn't know if it
21 would come to fruition or not. And so by doing some
22 of the IT work while we were doing the legal
23 research and procuring a name and a domain, a
24 website domain was part of that process. We didn't
25 know if it was going to be able to be used or not.

---

35 (Pages 137 to 140)

TF App. 0017
TF App. 0766

Jason Harvison

## Page 141

1  But we found the name Great Plains Lending, we
2  secured it, and we were able to transfer that other
3  to the first partner.
4      Q.  And, basically, what this agreement meant
5  was that the Otoe-Missouria tribe was agreeing to be
6  the tribal lender behind that product, Great Plains
7  Lending, that you had designed, right?
8          MR. GATEWOOD:  Objection; form.
9          MR. SCHEFF:  Object to the form; the
10  document speaks for itself.
11         You can answer the question if you can.
12      A.  That's the way I read it, yes.
13  BY MR. ACKELSBERG:
14      Q.  Okay.  And the agreement -- this agreement
15  in February was between TailWind Marketing and Great
16  Plains Lending, Incorporated, right?
17      A.  That's correct.
18      Q.  I found in -- let me just give you this
19  document and see if you can illuminate us on what it
20  is.
21         MR. ACKELSBERG:  This is 125.
22         (Exhibit No. 125 marked.)
23  BY MR. ACKELSBERG:
24      Q.  I think some of the copies are front and
25  back.  So you see this is part of the Think Finance

## Page 142

1  production, you see from the lower right-hand
2  corner.
3      A.  Uh-huh (affirmative response).
4      Q.  And this appears to be a resolution
5  establishing where the tribe -- the Otoe-Missouria
6  tribe established an entity called Great Plains
7  Lending, LLC, several months later.  Do you see
8  that?
9      A.  I do.
10      Q.  Okay.  Do you remember -- so let's take
11  this -- let's take this in steps.  So the last
12  document, February -- in late February 2011, Ken
13  Rees gets back the signed trademark and URL
14  assignment, and it's -- and it's with an
15  entity called Great Plains Lending, Incorporated,
16  right?
17      A.  That's correct.
18      Q.  All right.  Now, ultimately, the agreements
19  that -- that were signed that set up the Great
20  Plains Lending operation, the actual -- the actual
21  product operation, those agreements were all with an
22  entity, I'll represent to you was Plain Green
23  Lending, LLC, as opposed to Plain Green Lending,
24  Incorporated.  Do you remember anything in the delay
25  being connected to confusion about what the -- what

## Page 143

1  the contracting entity on the tribal side would be?
2          MR. SCHEFF:  Object to the form.
3          MR. GATEWOOD:  Objection; form.
4      A.  I don't.
5  BY MR. ACKELSBERG:
6      Q.  No.  Okay.
7          MR. ACKELSBERG:  I think we'll do one
8  more exhibit, and then this will be a good time for
9  a break.
10         MR. SCHEFF:  They're bringing in lunch
11  at 12:30.
12         MR. ACKELSBERG:  Oh, okay.
13         MR. SCHEFF:  So, again, break whenever
14  you want to break, but lunch will be here around
15  12:30.
16         (Exhibit No. 126 marked.)
17  BY MR. ACKELSBERG:
18      Q.  Now, I am right that in the sales
19  discussions with the tribes, the first step would
20  have -- would have generally been a nondisclosure
21  agreement?
22         MR. SCHEFF:  Object to the form.
23      A.  That's correct.
24  BY MR. ACKELSBERG:
25      Q.  Okay.  And so what we see here is a

## Page 144

1  nondisclosure agreement dated February 28th, 2011,
2  right?  And this is with the Chippewa Cree?
3      A.  That's correct.
4      Q.  Okay.  So this would then roughly situate
5  the beginnings of the substantive discussions with
6  the -- situate in time the substantive discussions
7  with the Chippewa Cree; am I right?
8          MR. SCHEFF:  Object to the form.
9      A.  I believe so, yes.
10  BY MR. ACKELSBERG:
11      Q.  Okay.  What do you recall -- and I -- let
12  me refer you back to the -- to that timeline, the
13  tribal timeline we looked at where -- where the
14  slide described a shift to a different tribe.
15         So you have February 24th, 2011, Ken Rees
16  is saying:  We've got back the first agreement,
17  start your engines, gentlemen, and four days later
18  there's a -- there's a nondisclosure agreement with
19  the Chippewa Cree.  Now, what can you tell us about
20  the shift from the focus on the Otoe-Missouria to
21  the shift -- to the shift to the Chippewa Cree?
22         MR. GATEWOOD:  Objection; form.
23         MR. SCHEFF:  Object to the form.
24      A.  So it was always the intent once we decided
25  to go down to partner with different tribes to have,

36 (Pages 141 to 144)

TF App. 0018
TF App. 0767

Jason Harvison

Page 145

1 you know, multiple programs out to market, similar
2 like we did -- similar -- similar to we did with
3 bank partners. And so even though we had already
4 been talking with the Otoe-Missouria tribe, we were
5 out trying to find other potential partners that we
6 could engage with, and this was the next one we were
7 introduced to.
8 BY MR. ACKELSBERG:
9 Q. Okay. So just the mere fact that there is
10 a nondisclosure agreement doesn't -- doesn't
11 indicate to you there was anything -- anything awry
12 with the -- with the Otoe-Missouria, it's just this
13 was just another tribe that you had -- that you were
14 exploring possibilities with?
15 MR. SCHEFF: Object to the form.
16 A. I believe so.
17 BY MR. ACKELSBERG:
18 Q. Okay. But you do recall that something
19 happened with Great Plains, and the -- and the
20 ThinkCash customer base ended up with Plain Green
21 rather than Great Plains, right? You remember that
22 happening, right?
23 MR. SCHEFF: Object to the form.
24 A. So I do remember there was -- there was a
25 delay in getting the Otoe-Missouria partnership

Page 146

1 live. And right now I can't remember exactly what
2 the -- the big piece of that, what caused that
3 delay. And so -- but once it started to slow down
4 and we had already identified -- the Chippewa Cree,
5 as I mentioned earlier, already had a lending
6 product to market, and they were -- they were
7 interested in moving forward pretty quickly, we
8 decided to move forward with Plain Green first.
9 BY MR. ACKELSBERG:
10 Q. Now, with regard to Great Plains Lending,
11 what you told us is that you had this -- this
12 contact in the industry, someone you knew, Mark
13 Curry, who made the connection with the tribe, that
14 they might be interested in expanding from a single
15 payment to an installment loan, right?
16 A. That's correct.
17 Q. Okay. What was your contact with the
18 Chippewa Cree? How did you -- how did you make that
19 connection?
20 A. Yeah, we were introduced -- we were
21 introduced to the Chippewa Cree through a gentleman
22 named Steve Haynes.
23 Q. And how -- how did you or the company know
24 Steve Haynes? What's -- what was your connection to
25 Steve Haynes?

Page 147

1 MR. SCHEFF: Object to the form.
2 A. So I believe the introduction was made as
3 we were working with an attorney who had a partner
4 that was working -- had a partner within his firm
5 that was working with Steve Haynes and knew that we
6 were exploring potential tribal relationships. And
7 they knew that Steve had previously done work in
8 Indian country on the gaming side and knew many of
9 the tribes very well and could help make some
10 introductions for us.
11 BY MR. ACKELSBERG:
12 Q. And so after learning that from that
13 attorney, what happened next?
14 A. There was an introduction made to Steve
15 Haynes. We gave him an overview of what we were
16 looking --
17 Q. Well, slow down. Who's the "we"?
18 A. I believe it would have been -- the first
19 conversation would have been probably myself and
20 Steve Schafer with -- with Steve Haynes.
21 Q. Okay.
22 A. And so we gave Steve an overview of what we
23 were looking to do by partnering with tribes, and he
24 felt like he had potential partners that could be
25 interesting for us to speak with. And so we

Page 148

1 negotiated a consulting agreement with him for him
2 to help introduce us to tribes.
3 Q. And so what happened next?
4 A. Steve made an introduction to the Chippewa
5 Cree. He felt like they would be a good partnership
6 because of what I mentioned earlier, they -- they
7 were already in the lending business. They were
8 looking to expand that operation. He felt like
9 because of their -- their -- their exposure already
10 into service provided lending and in the lending
11 space, that they would -- they would be of interest,
12 and he made the introduction for us.
13 Q. Now, when you say that the Chippewa Cree
14 was already in the lending business, would that have
15 been based on what Steve Haynes told you?
16 A. So, initially, it was what Steve Haynes
17 told us, but then also in conversations with members
18 up on the reservation, they also talked to us about
19 the programs they already had in market.
20 Q. And did Steve Haynes, in the -- before you
21 went to the tribe, did Steve Haynes mention anything
22 about -- about a company named Encore Services?
23 A. No, he didn't.
24 Q. Okay. So before you went out to the
25 Chippewa Cree, did you have any idea of -- of the

37 (Pages 145 to 148)

TF App. 0019
TF App. 0768

Jason Harvison

Page 169

1    A.  I remember calling it just our loan
2  management system, but at some point it became our
3  Legacy system because it became somewhat dated
4  versus the newer systems we put in place.
5    Q.  So if we use the term -- if the term
6  "Legacy" comes up, "Legacy platform," that probably
7  refers to the installment loan platform as opposed
8  to the line of credit platform?
9    MR. SCHEFF:  Object to the form.
10   A.  Okay.
11 BY MR. ACKELSBERG:
12   Q.  Is that -- is that okay?  Is that true?
13   A.  Yes.
14   Q.  Okay.  And how did the company refer to the
15 platform that operated the line of credit product
16 called Mobiloans?
17   A.  We refer to that underlying platform as the
18 CoreCard platform.
19   Q.  Okay.  I've also seen reference to
20 something called Roadrunner.  Do you know what that
21 is?
22   A.  I don't remember that name.
23   Q.  Okay.  So just so that I have it straight,
24 CoreCard is the loan platform for Mobiloans.  The
25 Legacy platform, or the LMS, would be the

Page 170

1  installment loan platform?
2    A.  Correct.
3    Q.  Okay.
4    MR. ACKELSBERG:  I show you another
5  memo by Ken Rees to the board.  This one is from
6  August of 2011, August 14, 2011, that I am going to
7  identify as Plaintiff's Exhibit 139.
8    (Exhibit No. 139 marked.)
9  BY MR. ACKELSBERG:
10   Q.  All right.  Turning on this report -- this
11 memo to the board, turning to the discussion on the
12 second page of what's referred to as "Think
13 Cash/Great Plains Lending/Plain Green Loans," in the
14 second sentence, referencing Great Plains Lending,
15 Mr. Rees says that, "This product," meaning Great
16 Plains Lending, "has a bit higher APR, and we will
17 be targeting affiliate and lead gen traffic as its
18 primary marketing channels."  Do you see that?
19   A.  I do.
20   Q.  Okay.  Now, could you explain what he's
21 referring to?  Now, you are, at this point in time,
22 overseeing the marketing teams, right?  That was
23 part of what you were doing as the -- the chief
24 product officer, right?
25   A.  In 2011, I didn't have the marketing team

Page 171

1  underneath me just yet.
2    Q.  What -- you had -- as I understand it, you
3  were vice president for products, right?
4    A.  Correct.
5    Q.  And so what was -- what did that entail?
6    A.  As I mentioned earlier, it was mainly
7  around product design, user experience, customer
8  communications, the customer service and the
9  operations role side of things, and then working
10 with the IT teams to get those products developed
11 and working with the external partners to make sure
12 we can meet the needs that they had as well.
13   Q.  Okay.  But as the product vice president
14 and as a member of the board, you understand what
15 Ken Rees is saying here when he says that Plain
16 Green has a bit higher APR -- I'm sorry -- Great
17 Plains Lending has a -- has a bit higher APR than
18 the Plain Green product and that Think will be
19 targeting affiliate and lead gen traffic as Great
20 Plains Lending's primary marketing channel; you know
21 what he's -- what he's saying there, don't you?  You
22 understand that?
23   MR. SCHEFF:  Object to the form.
24   MR. GATEWOOD:  Objection; form.
25 BY MR. ACKELSBERG:

Page 172

1    Q.  Do you understand that?
2    MR. SCHEFF:  Object to the form.
3    A.  So I can't speak to exactly what his
4  thought process was.  I can speak to what -- how I
5  understood it to read.
6  BY MR. ACKELSBERG:
7    Q.  Sure.  Why don't you do that?
8    A.  What I remember is the way we set up the
9  Great Plains program for the Otoe-Missouria tribe is
10 they put a product structure together that had a
11 slightly higher price point from an APR perspective
12 as compared to the Plain Green product.  And so what
13 that allowed them to do is actually to be able to go
14 out and market or -- or partner with us to market
15 the product through other channels that might have
16 traffic that defaulted at a slightly higher rate.
17 And because it was priced a little bit higher,
18 there's a little bit more appetite for risk that
19 they could take from a default perspective.
20   Q.  When -- when Mr. Rees says here that, "We
21 will be targeting affiliate and lead gen traffic,"
22 he's referring to Think Finance there, is he not?
23   MR. GATEWOOD:  Objection; form.
24   MR. SCHEFF:  Object to the form.
25   A.  As I mentioned, the way I read that is

43  (Pages 169 to 172)

TF App. 0020

TF App. 0769

Jason Harvison

## Page 173

1  because the program was set up with Great Plains to
2  have that structure, they were -- they had a
3  different threshold for risk tolerance to go out and
4  allow us to go market into channels that a company
5  like Plain Green might not be comfortable marketing
6  in.
7  BY MR. ACKELSBERG:
8      Q.  And so is it your testimony that -- I mean,
9  did Plain Green -- is it your testimony that Great
10  Plains Lending understood that it was receiving
11  lower quality customer traffic than Great -- than
12  Plain Green was?
13          MR. GATEWOOD:  Objection; form.
14          MR. SCHEFF:  Object to the form.
15      A.  As -- as I talked about earlier in the day,
16  when we set up the programs for Great Plains, one,
17  they design what the product structure would look
18  like and set the pricing targets, and we can go back
19  and compare on the pricing for Great Plains is set
20  higher than what Plain Green's was set at.
21          The Otoe-Missouria tribe had already been
22  using channels like affiliate and lead gen for their
23  current existing products and were comfortable with
24  going into that traffic or those channels for that
25  traffic.  And so when the product was designed, that

## Page 174

1  was the intent, to go into some of these channels
2  that in this past either Think Finance directly or
3  Think Finance with some of the other partners hadn't
4  marketed into before.
5  BY MR. ACKELSBERG:
6      Q.  Yeah, but that wasn't my question.  My
7  question was whether Think Finance told Great Plains
8  that the higher quality traffic was going to be
9  routed to Plain Green?
10          MR. GATEWOOD:  Objection; form.
11      A.  So I wouldn't say that the higher quality
12  traffic was being routed to -- to Plain Green.  As I
13  mentioned, Otoe-Missouria, with their existing
14  product, had already been in a variety of channels.
15  These were two channels they had already been in in
16  addition to search and direct mail, as -- as other
17  channels.  And so when they set this product up from
18  the beginning, the full intent was to use a broader
19  suite of channels to market into with the
20  understanding that you could have some channels that
21  performed differently from other channels.
22  BY MR. ACKELSBERG:
23      Q.  And you're saying this was -- well, strike
24  that.  I'll -- let's move on to the next -- the next
25  question.

## Page 175

1      Yeah, I'm -- I'm still trying to get an
2  answer to the question I asked, which was, did Think
3  Finance inform Great Plains Lending that it was
4  getting lower quality marketing traffic than the
5  Plain Green product?
6          MR. GATEWOOD:  Objection; form.
7  BY MR. ACKELSBERG:
8      Q.  Did they or didn't they?
9          MR. SCHEFF:  Object to the form; asked
10  and answered.
11      You can answer it again.
12      A.  So as I said, going into the product, the
13  Great Plains Lending arrangement was so that they
14  could have a broader array -- array of channels to
15  go into.  So they -- as I mentioned, they've already
16  been in these channels.  They were comfortable in
17  those channels.  And as the product was designed,
18  they were -- had full intent to go into those
19  channels.  So they -- they were marketed there
20  because of their comfort with those -- those areas
21  to go into.
22  BY MR. ACKELSBERG:
23      Q.  What's your understanding of Mr. Rees's --
24  the phrase that, "The increased interest rate will
25  help us keep our fund rates at target levels"?  Do

## Page 176

1  you see that?
2          MR. GATEWOOD:  Objection; form.
3  BY MR. ACKELSBERG:
4      Q.  What's your understanding of that?
5      A.  I do see that.  So the way I read that is
6  because of a product having a higher APR, it has a
7  higher yield sitting there, and so the lender is
8  able to keep a fund rated at a certain level and buy
9  into other channels that might have a little bit
10  higher loss rate.  So their -- their fund rate stays
11  the same, but because it has a little bit higher
12  price point, they can take on higher losses if they
13  need to make that channel work for them.
14      Q.  Okay.  The last paragraph states, "In
15  addition, we are trying to accelerate the creation
16  and lobbying efforts of the Native American Lending
17  Association.  Getting all of the tribes on the same
18  page about the mission membership and activities of
19  the association has been a challenge, but I am
20  optimistic that it will be operational this quarter.
21  We anticipate using it to publicize the virtues of
22  tribal lending to develop and maintain best
23  practices and to lobby against any potential
24  legislation that might impact the products."
25      What -- my question is, what do you

44 (Pages 173 to 176)

TF App. 0021
TF App. 0770

Jason Harvison

Page 237

1      A.  So --
2  BY MR. ACKELSBERG:
3      Q.  Am I right?  Please answer that --
4          MR. SCHEFF:  Object to the form.
5  BY MR. ACKELSBERG:
6      Q.  Please answer that question first.
7          MR. SCHEFF:  You can answer -- answer
8  it as you choose.
9      A.  Sure.  So one of the things we want to do
10  is look at the program from all aspects and make
11  sure that -- make sure that it was as solid as
12  poss- -- as possible.  Once again, as I said, as
13  programs grow to the size, you want to make sure
14  that from time to time you take a step back and make
15  sure that they've been set up and are running in the
16  most efficient manners.
17  BY MR. ACKELSBERG:
18      Q.  Well, why don't you turn to page 5 of this
19  presentation that -- that you prepared.  And now --
20  and on the slide entitled, "Simple Changes to
21  Mitigate True Lender Claims," the first thing you
22  came up with was an experienced CEO, right?  And
23  you're referring -- you're not referring to
24  Mr. Rees there, you're referring to at the tribe
25  level, right?

Page 238

1          MR. GATEWOOD:  Objection; form.
2      A.  So as I mentioned, this -- this was a
3  brainstorming exercise of things that could be done
4  to help make improvement, and it wasn't -- it wasn't
5  specific to any one tribe but just the thought
6  process of how we could make things --
7  BY MR. ACKELSBERG:
8      Q.  Right.
9      A.  -- improved.
10      Q.  Including have the tribes actually hire an
11  experienced CEO.  That was the first -- that was the
12  first thing that came out of the brainstorm, right?
13          MR. SCHEFF:  Object to the form.
14          MR. GATEWOOD:  Objection; form.
15      A.  I won't say that these were listed in any
16  particular order of --
17  BY MR. ACKELSBERG:
18      Q.  I'm sorry.  The first one you listed,
19  though, in --
20          MR. SCHEFF:  Don't interrupt his
21  answer, please.
22  BY MR. ACKELSBERG:
23      Q.  -- in this slide.
24      A.  So the first one mentioned within the
25  presentation.  But, like I said, they weren't in any

Page 239

1  kind of order of importance.
2      Q.  Well, that's because the -- there were --
3  as of this point in time, the tribes did not have an
4  experienced CEO, correct?
5          MR. GATEWOOD:  Objection; form.
6          MR. SCHEFF:  Object to the form.
7      A.  I think each tribe is at a different level
8  of what kind of experience they have within the
9  lending programs to manage their business.
10  BY MR. ACKELSBERG:
11      Q.  And how would you rank them, the three --
12  the three tribes in terms of their level of
13  sophistication with regard to the programs?
14          MR. SCHEFF:  As of December 20, 2012?
15          MR. ACKELSBERG:  Yes.
16          MR. SCHEFF:  Object to the form.
17      A.  Sure.  I think all three had made
18  significant progress in building out their -- their
19  internal business and operations.  You know, I mean,
20  to rank them, I don't -- I don't know that -- I
21  don't know what kind of system you want to use to
22  rank them on, but I think they all -- like I said, I
23  think they all had grown from an experience level,
24  grown from an understanding of the portfolios on --
25  on building out their teams.

Page 240

1      But you look at the size of these
2  business -- it's kind of, like, when you look at a
3  start-up, a start-up that has -- when we were PayDay
4  One and had five or ten people starting it up, that
5  program evolves and matures and you bring in
6  leadership as you get a more complex and more
7  sizable organization.  And as we looked and took a
8  step back and said where are these programs going,
9  you know, let's make sure they have -- let's make
10  sure we can talk to them about what could help them
11  to be as successful -- as successful as possible.
12  BY MR. ACKELSBERG:
13      Q.  I understand.  But at this point in time
14  you were preparing this, you weren't talking
15  about -- about one of the three tribes, you were
16  talking about the tribes collectively with regard to
17  this slide, were -- were you not?
18          MR. GATEWOOD:  Objection; form.
19          MR. SCHEFF:  Object to the form.
20      A.  Yes.
21  BY MR. ACKELSBERG:
22      Q.  Okay.  And so, collectively, you thought it
23  would be a good idea to strengthen the tribal model
24  by having the tribes hire an experienced CEO, an
25  accountant controller that was a CPA, an experienced

60  (Pages 237 to 240)

TF App. 0022
TF App. 0771

Jason Harvison

Page 241

1  compliance vendor management executive, and an
2  experienced risk management executive, correct?
3          MR. GATEWOOD:  Objection; form.
4          MR. SCHEFF:  Object to the form.
5  BY MR. ACKELSBERG:
6      Q.  That was your suggestion in this -- in
7  this -- in this presentation, right?
8          MR. SCHEFF:  Object to the form.
9      A.  So as I mentioned, as you -- as you look
10 and evaluate programs that mature to their level,
11 you're going to want to build out and have
12 specific -- one person might be able to do many
13 trades at one size, and then you've got to
14 specialize as it continues to grow.  And so all of
15 three of these programs have become fairly sizable,
16 and our recommendation was that they go ahead and
17 build out this expertise or broaden it from what
18 they had before.
19 BY MR. ACKELSBERG:
20     Q.  And another recommendation you had was to
21 actually establish a tribal credit committee and
22 documentation for the tribal credit committee,
23 right?
24         MR. GATEWOOD:  Objection; form.
25         MR. SCHEFF:  Object to the form.

Page 242

1      A.  So, yes, that was one of the
2  recommendations.
3  BY MR. ACKELSBERG:
4      Q.  Now, under -- under "Improve Optics," why
5  was optics important?
6      A.  So from -- the way this was presented --
7  and this also came out of some of the conversations
8  even meeting with tribal council, is when you talk
9  about a rev share, that is off -- that is off the
10 top line.  That has no expenses, whether that's
11 losses, marketing expense, operational expenses.
12 It's right off the top, which -- which is a number
13 that doesn't have to be watered down.
14         But a small number of revenue versus a
15 bigger number of profit can actually be the same
16 thing.  It's just there's more -- there's more items
17 that as you go through a P&L statement that are
18 taken out before you get to the net profit.
19         And so one thing we were looking at is --
20 because some of the partners would -- would get
21 confused on we want a piece of the profits, not of
22 the revenue.  And so we -- we discussed can we
23 create a revenue stream that could either be a
24 revenue share from the top of the funnel or a piece
25 of the profit so that we can -- we can help

Page 243

1  eliminate any kind of confusion that was out there.
2      Q.  Are you -- are you saying that the idea to
3  shift from 4 percent revenue share to a percent
4  profit share was the tribe's idea?
5          MR. SCHEFF:  Object to the form.
6      A.  So that's not what I was saying, but I --
7  BY MR. ACKELSBERG:
8      Q.  Oh, okay.
9      A.  But what I was saying is --
10     Q.  I thought that's what you said.
11         MR. SCHEFF:  Object to the form.  Let
12 him finish his answer.
13     A.  What I did say is that there was confusion
14 from the tribes when I was meeting with some of the
15 council members, not the entire tribes or the actual
16 lenders, but when I would meet with the council
17 members of trying to understand the difference
18 between a revenue share versus a profit share.  And
19 so we wanted to create a vehicle to where they could
20 look at either one of those numbers and feel
21 comfortable with it.
22 BY MR. ACKELSBERG:
23     Q.  And another idea you had for improving the
24 optics would be to have no automatic end-of-day
25 funding, to actually require daily tribal review

Page 244

1  prior to funding of loans, correct?  That was
2  another one of your ideas?
3          MR. SCHEFF:  Object to the form.
4          MR. GATEWOOD:  Objection; form.
5      A.  So as I mentioned before, and also multiple
6  times earlier in the conversation, the lenders all
7  had the -- the preapproved underwriting criteria
8  established in any changes taking place.  They still
9  had the right to go in and -- and review anything at
10 the end of the day.  This was one suggestion of do
11 we make that a -- does this system make that
12 mandatory that they have to go in and do that
13 review, or do we keep leaving -- leaving that as
14 what I mentioned earlier, as more of a belts and
15 suspenders approach to where they know that it's
16 already there, met their criteria, they know they
17 can audit.  It's just the third step in the process
18 where you can that make manually -- or make that
19 mandatory.
20 BY MR. ACKELSBERG:
21     Q.  Now, at the same time that Think was
22 looking for ways -- or that you, as the chief
23 product officer, was looking at ways to mitigate the
24 true lender risk, Think's true lender risk, am I
25 right that Think also hired the accounting firm of

61  (Pages 241 to 244)

TF App. 0023
TF App. 0772

Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000

Tyler P. Brown (admitted *pro hac vice*)
Jason W. Harbour (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

*Counsel to the Debtors and Debtors in
Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **THINK FINANCE, LLC**, *et al.*, | **Case No. 17-33964 (HDH)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## AFFIDAVIT OF MICHELLE NGUYEN IN SUPPORT OF DEBTORS' MOTION FOR SUMMARY JUDGMENT OF CERTAIN VIRGINIA AND TEXAS CLAIMS

I, Michelle Nguyen, having been duly sworn on oath this 27th day of July 2018 state as

follows:

1.     I am over 21 years of age and am competent to testify to the statements set forth

in this affidavit.  The statements set forth in this affidavit are true and correct to the best of my

knowledge, information, and belief based on my personal knowledge.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Think Finance, LLC (6762), Think Finance SPV, LLC (4522), Financial U, LLC (1850), TC Loan Service, LLC (3103), Tailwind Marketing, LLC (1602), TC Administrative Services, LLC (4558), and TC Decision Sciences, LLC (8949) (collectively, the "Debtors").

2.      On April 19, 2018, I was deposed, in person, under oath (the "Deposition"). A true and correct copy of excerpts from the official transcript of the Deposition are attached hereto as Exhibit A (the "Transcript").

3.      I adopt, restate and incorporate the excerpts from the Deposition, as recorded in the Transcript, as my statements in support of the Debtors' *Motion for Summary Judgment of Certain Virginia and Texas Claims*.

4.      If called upon, I could and would testify to the facts contained herein and the statements made at the Deposition as recorded in the Transcript.

Executed on this 27 th day of July 2018, in the County of DALLAS, TX

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Michelle Nguyen

2

Michelle Nyugen

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH    *
SHAPIRO,                     *
           Plaintiff,        *
                             *
VS.              * Civil Action
                 * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
           Defendants.       *

*******************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
MICHELLE NYUGEN
APRIL 19, 2018
*******************************************************

DEPOSITION of MICHELLE NYUGEN, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 19th day of April, 2018, from 9:04 a.m. to 5:20 p.m., before Christy R. Sievert, CSR, RPR, in and for the State of Texas, reported by machine shorthand, at the offices of Hunton & Williams, LLP, 1445 Ross Avenue, Suite 3700, Dallas, Texas 75202, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**Page 2**

1    A P P E A R A N C E S
2
3  COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4    MR. JOHN J. GROGAN
     MR. IRV ACKELSBERG
5    Langer, Grogan & Diver, PC
     1717 Arch Street, Suite 4130
6    Philadelphia, Pennsylvania 19103
     Phone:  215-320-5701
7    E-mail:  iackelsberg@langergrogan.com
         jgrogan@langergrogan.com
8
9    MR. SAVERIO "SAM" MIRARCHI
     Senior Deputy Attorney General
     Bureau of Consumer Protection
10   1600 Arch Street, Suite 300
     Philadelphia, Pennsylvania 19103
11   Phone:  215-560-2445
     E-mail:  smirarchi@attorneygeneral.gov
12
13 COUNSEL FOR MICHELLE NYUGEN:
14   MR. RICHARD L. SCHEFF
     Montgomery, McCracken, Walker & Rhoads, LLP
15   123 South Broad Street
     Philadelphia, Pennsylvania 19109
16   Phone:  215-772-7502
     E-mail:  rscheff@mmwr.com
17
18 COUNSEL FOR KENNETH REES:
19   MR. DAVID F. HERMAN
     Montgomery, McCracken, Walker & Rhoads, LLP
20   123 South Broad Street
     Philadelphia, Pennsylvania 19109
21   Phone:  215-772-7502
     E-mail:  dherman@mmwr.com
22
23
24
25

**Page 3**

1    A P P E A R A N C E S
     (continued)
2
3  COUNSEL FOR THINK FINANCE, INC.:
4    MR. MATT GATEWOOD
     Eversheds Sutherland (US), LLP
     700 Sixth Street, NW, Suite 700
5    Washington, D.C.  20001
     Phone:  202-383-0100
6    E-mail:  mattgatewood@eversheds-sutherland.com
7
8  COUNSEL FOR VICTORY PARK CAPITAL:
9    MR. DANIEL P. SHAPIRO
     MR. MATTHEW W. HAWS
     Katten Muchin Rosenman, LLP
10   525 W. Monroe Street
     Chicago, Illinois  60661
11   Phone:  312-902-5622
     E-mail:  daniel.shapiro@kattenlaw.com
12       matthew.haws@kattenlaw.com
13
14 COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
15   MR. PATRICK DAUGHERTY
     Van Ness Feldman, LLP
16   1050 Thomas Jefferson Street, NW
     Seventh Floor
     Washington, D.C.  20007
17   Phone:  202-298-1874
     E-mail:  pod@vnf.com
18
19 ALSO PRESENT:
20   GUS PHILLIPS, Videographer
     KEVIN BYERS
21   SCOTT ZEMINCK (Appearing telephonically)
22
23
24
25

**Page 4**

1    I N D E X
          PAGE
2
3  Appearances.................................. 2-3
4  Exhibits.................................... 5-6
5  Proceedings................................. 7
6  MICHELLE NYUGEN:
7    Examination by Mr. Grogan.................. 8
     Examination by Mr. Gatewood............... 287
8  Changes and Signature.................. 307-308
9  Reporter's Certification............... 309-310
10
...
25

1 (Pages 1 to 4)

WWW.KLWREPORTERS.COM

TF App. 0024
TF App. 0775

Michelle Nyugen

Page 5

E X H I B I T S

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 178 | Key Initiatives, Growth & Profitability | 84 |
| | TF-PA 671684 - 671695 | |
| Exhibit 179 | E-mail correspondence 7-31-13, Re: Updated | 119 |
| | TF-PA 521098 - 521113 | |
| Exhibit 180 | E-mail correspondence 5-20-14, Re: MBL Council Visit 5-27-14 (2).pptx | 167 |
| | TF-PA 300666 - 300706 | |
| Exhibit 181 | E-mail correspondence 11-21-14, Re: Plain Green Control of Loan Underwriting Criteria and Process | 184 |
| | TF-PA 673863 - 673864 | |
| Exhibit 182 | E-mail correspondence 5-8-15, Re: Plain Green Agreement | 186 |
| | TF-PA 667815 - 667817 | |
| Exhibit 183 | E-mail correspondence 3-18-14, Re: Summer Job | 197 |
| | TF-PA 120366 - 120369 | |
| Exhibit 184 | E-mail correspondence 4-17-14, Re: Updated Online Consumer Lending 2014.pptx | 201 |
| | TF-PA 276040 - 276067 | |
| Exhibit 185 | E-mail correspondence 4-11-13, Re: Decks from qbr | 215 |
| | TF-PA 611729 - 611756 | |
| Exhibit 186 | E-mail correspondence 5-2-13, Re: Exec agenda | 232 |
| | TF-PA 515479 - 515544 | |
| Exhibit 187 | E-mail correspondence 5-7-15, Re: Board Tutorial 5-7-14.pptx | 241 |
| | TF-PA 708090 - 708151 | |

Page 6

E X H I B I T S
(continued)

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 188 | E-mail correspondence 3-30-12, Re: VPC Covenant - Max Lines on PGL | 246 |
| | TF-PA 309917 - 309919 | |
| Exhibit 189 | E-mail correspondence 10-4-13, Re: AGAIN! Decision: Tribal customer acquisition | 250 |
| | TF-PA 244554 - 244557 | |
| Exhibit 190 | E-mail correspondence 5-3-13, Re: Latest Consumer Loan Agreements | 261 |
| | GPLP00006040 - 00006043 | |
| Exhibit 191 | E-mail correspondence 1-18-13, Re: PG credit agreement | 266 |
| | TF-PA 041391 - 041392 | |

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | E-mail correspondence 11-21-14, Re: Privileged and Confidential: Re: Plain Green Control of Loan Underwriting Criteria and Process | 288 |
| | TF-PA 673861 - 673862 | |

Page 7

P R O C E E D I N G S

1    THE VIDEOGRAPHER: We are now on the
2  record for the videotaped deposition of Michelle
3  Nguyen. The time is 9:04 a.m., April 19, 2018. In
4  the matter of the Commonwealth of Pennsylvania, et
5  al, vs. Think Finance, Incorporated, et al., Civil
6  Action No. 14-7139-JCJ, being held in the United
7  States Court for the Eastern District of
8  Pennsylvania.
9    The court reporter is Christy Sievert, and
10  the videographer is Gus Phillips. Both are
11  representatives of Kaplan, Leaman & Wolfe Court
12  Reporters.
13    Will counsel please state their
14  appearances for the record.
15    MR. GROGAN: John Grogan for the
16  Commonwealth of Pennsylvania.
17    MR. ACKELSBERG: Irv Ackelsberg, same.
18    MR. MIRARCHI: Saverio Mirarchi for
19  the Commonwealth of Pennsylvania.
20    MR. DAUGHERTY: Patrick Daugherty on
21  behalf of National Credit Adjusters.
22    MR. HAWS: Matthew Haws on behalf of
23  the Victory Park defendants.
24    MR. SHAPIRO: Dan Shapiro for the

Page 8

1  Victory Park defendants. And Scott Zeminick is on
2  the phone with us, general counsel of Victory Park.
3    MR. GATEWOOD: Matthew Gatewood for
4  the Think Finance defendants.
5    MR. HERMAN: David Herman on behalf of
6  Kenneth E. Rees.
7    MR. SCHEFF: Richard Scheff for
8  Michelle Nguyen.
9    MR. GROGAN: Could we also identify a
10  second person on the phone, please? Is there --
11    MR. HERMAN: No, that's the --
12    MR. SCHEFF: He already did.
13    MR. ACKELSBERG: That was just this
14  phone. All right.
15    MR. GROGAN: Swear in the witness,
16  please.
17    MICHELLE NYUGEN
18    having been first duly sworn,
19    testified as follows:
20    EXAMINATION
21  BY MR. GROGAN:
22  Q.  Good morning, Ms. Nguyen.
23  A.  Good morning.
24  Q.  Am I pronouncing your last name correctly?
25  A.  Yes.

2 (Pages 5 to 8)

TF App. 0025
TF App. 0776

Michelle Nyugen

Page 101

1   Q. -- Plain Green, not Great Plains?
2   A. With Plain Green.
3   Q. And do you -- do you know why?
4   A. Why. . .
5   Q. Why Plain Green, but not Great Plains?
6   A. At that time, Great Plains was not live.
7   Q. So Plain Green was ready to -- to go live
8   earlier than Plain Green -- than Great Plains?
9   A. From the timeline I recall, Plain Green was
10  live in the spring. Great Plains was live in the
11  summer.
12  Q. So you testified before that at least as of
13  November 2010, there had been no conversation with
14  the tribes.
15  A. Not with me.
16  Q. Okay. Do you know if anybody else at Think
17  Finance had been talking to tribes?
18  A. Talking to tribes?
19  Q. Yeah.
20  A. I don't -- I don't know.
21  Q. Okay. And Plain Green was up and lending
22  when?
23  A. I believe the date was in April.
24  Q. Of 2011?
25  A. Correct.

Page 102

1   Q. And they were the first of the -- of the
2   tribal products?
3   A. That's correct.
4   Q. Okay. And who followed Plain Green in
5   terms of coming on live?
6   A. Who followed?
7   Q. Which tribe followed?
8   A. Oh, after?
9   Q. Yeah.
10  A. The second tribe was Otoe-Missouria, and
11  the offering was called Great Plains.
12  Q. Okay. And both of the Great -- both the
13  Great Plains product and the Plain Green product
14  were installment loan products; is that correct?
15  A. Both Plain Green and Great Plains were
16  installment loan offerings.
17  Q. Okay. And then there came a time when you
18  developed a relationship with the -- the Tunica
19  tribe in Louisiana; is that correct?
20  A. That's correct.
21  Q. Okay. Did you travel there?
22  A. I did later.
23  Q. Okay. But not for the initial discussions
24  of the potential relationship?
25  A. No.

Page 103

1   Q. Okay. And that eventually became
2   Mobiloans?
3   A. That's correct.
4   Q. Okay. And Mobiloans was a line of credit
5   product?
6   A. That's correct.
7   Q. And were you involved in the decision as
8   to -- or why was Mobiloans line of credit instead of
9   installment?
10      MR. SCHEFF: Object to the form.
11      You can answer the question.
12  A. I wasn't part of that decision, because I
13  wasn't part of the initial ideation of that tribe.
14  BY MR. GROGAN:
15  Q. Who was?
16  A. Jason Harvison.
17  Q. Okay. Would Jason have decided that they
18  should be a line of credit product?
19      MR. GATEWOOD: Objection; form.
20      MR. SCHEFF: Object to the form.
21  A. When we have ideation with a -- with a
22  tribe as a service provider, we talk about the
23  different options. And so I would -- I would not
24  say that it was his decision.
25  BY MR. GROGAN:

Page 104

1   Q. Okay.
2   A. It was a decision made by all parties.
3   Q. Okay. And what's the difference between an
4   installment product and a line of credit product?
5   A. The installment product is a closed loan
6   product, where a consumer can pay the loan off over
7   several payments. And just depends on the term and
8   the length of the loan.
9       A line of credit product is an open --
10  open-ended product, meaning that they have a credit
11  upon which they can draw and pay down and draw
12  again.
13  Q. Okay. And had Think Finance ever been
14  involved with the line of credit product before
15  Mobiloans?
16  A. Yes.
17  Q. To the point where it got live?
18  A. Yes.
19  Q. And what product was that?
20  A. Elastic.
21  Q. Elastic. The state-based Elastic?
22  A. This is Elastic that is in partnership with
23  a bank.
24  Q. Irving Trust Bank?
25  A. That's correct.

26 (Pages 101 to 104)

TF App. 0026
TF App. 0777

Michelle Nyugen

Page 105

1  Q. How long did that product last?
2  A. I can't recall. I wasn't in charge of that
3  offering, so I don't --
4  Q. Who was in charge of that?
5  A. Jason Harvison, ultimately. But an
6  individual named Kerry Baker at the time.
7  Q. Okay. So at this time now, with the three
8  tribal products coming online, what were your
9  responsibilities at Think?
10  A. In 2011?
11  Q. Yeah.
12  A. My responsibilities were similar in regards
13  to my relationship with First Bank of Delaware. I'm
14  a service provider, and assisted them in terms of
15  defining the product, making sure it was live, to
16  their specifications. The brand, the marketing,
17  look and the feel, and any enhancements they wanted
18  to the product offering, as well as just being their
19  general point of contact.
20  Q. And you had responsibility for those
21  functions with regard to each of the tribal
22  products: Great Plains, Plain Green, and Mobiloans?
23  A. Plain Green and Great Plains in 2011, and
24  then eventually Mobiloans.
25  Q. Who was handling Mobiloans in 2011?

Page 106

1  A. It was Jason Harvison, along with that
2  Kerry Baker.
3  Q. And what was the -- why was -- do you
4  understand why Mobiloans was not within your purview
5  at that point, in 2011?
6  A. It was -- my understanding, was just
7  bandwidth. As you're assisting an organization with
8  a startup, there's a lot of -- lot to do as a
9  startup organization. And so I just didn't have
10  enough bandwidth.
11  Q. Now, as you started out in 2011, were the
12  Great Plains and Plain Green products on the -- the
13  loan management system at Think Finance?
14  A. They were using the loan management system.
15  Q. Okay.
16  A. Our platform.
17  Q. The same one that ThinkCash and PayDay One
18  had been on?
19  A. As the service provider, they were using
20  the same platform. Again, it was segregated, as a
21  service provider will do.
22  Q. But the same platform?
23  A. Correct.
24  Q. And was Mobiloans also on that platform?
25  A. No.

Page 107

1  Q. Okay. That was on a separate platform?
2  A. That's correct.
3  Q. Did they have different names?
4  A. The -- the platforms?
5  Q. Yeah.
6  A. I mean, the -- what I recall from the --
7  the platform for Mobiloans, the loan -- the core
8  loan management system was called CoreCard. So that
9  was actually the first time we utilized an outside
10  loan management system. And then it was part of the
11  overall platform.
12  Q. And which of the tribal products resided on
13  CoreCard?
14  A. Just the line of credit, the Mobiloans
15  offering.
16  Q. Okay. And the others remained. And do you
17  know why that was?
18  A. Why?
19  Q. Why the line of credit product would be on
20  a separate loan management platform than the
21  installment loan products.
22  A. Speed to market.
23  Q. How -- how so?
24  A. As I mentioned before, our -- our platform
25  was designed to support payday and installment

Page 108

1  loans. It would take longer to make modifications
2  for a line of credit. And so the decision was made
3  technically to utilize another loan management
4  system to -- to embed into the overall platform.
5  Q. You testified earlier that Plain Green came
6  online in April of 2011.
7  A. Yes.
8  Q. When did Great Plains go live, if you
9  recall?
10  A. I recall the summer of -- of that year.
11  Q. And how about Mobiloans?
12  A. I -- I recall the fall of that year.
13  Q. All right. Let's try Document A.
14  How are you doing?
15  A. I need to go to the restroom.
16  MR. SCHEFF: We've been going a little
17  less than an hour. Do you want to go to the
18  restroom?
19  THE WITNESS: Yeah.
20  THE VIDEOGRAPHER: We are off the
21  record. The time is 11:14 a.m.
22  (Break taken, 11:14 a.m. to 11:25 a.m.)
23  THE VIDEOGRAPHER: We are back on the
24  record. The time is 11:25 a.m.
25  BY MR. GROGAN:

27 (Pages 105 to 108)

TF App. 0027
TF App. 0778

Michelle Nyugen

Page 109

1    Q.   Ms. Nguyen, before we move on to the next
2  document, I wanted to ask you some follow-up
3  questions about the meetings, the initial meetings
4  with certain of the tribes.
5      You testified that the first one you
6  attended was in South Dakota with Mr. Webb; is that
7  correct?
8    A.   Right.
9    Q.   Who else was at that meeting?
10    A.   From Think Finance?
11    Q.   Who entirely.
12    A.   At least with Think Finance, it was myself,
13  Sarah Cutrona, Chris Lutes, Ken Rees.
14    Q.   Okay.  Do you recall anybody else from the
15  tribal side?
16    A.   It was only one meeting.  I -- I don't
17  recall who else.  It was really just Butch Webb and
18  whoever his associates were.
19    Q.   I see.  And over the course of your career
20  at Think Finance, how many initial meetings with
21  tribal entities did you attend?
22    A.   And you define "initial meetings" as the
23  first meeting?  The introductory meeting?
24    Q.   Yeah.
25    A.   Six or seven.

Page 110

1    Q.   Okay.  And generally, what would occur at
2  such a meeting?  Did they follow a pattern?
3    A.   Generally, the introductory meetings, we
4  would meet with individuals of the tribe, so whether
5  that be individuals as part of their economic
6  development organization, as an example, or even if
7  the tribe was smaller, possibly with the chairman or
8  the vice chairman or chairperson.
9      We would talk a bit about Think Finance
10  and the capabilities that we had as service
11  provider.  We would talk about, you know, the
12  platform, the marketing services, the underwriting
13  services.  We would discuss, you know, the -- if
14  they were so inclined, even go to a deeper
15  discussion of, you know, what they were initially
16  thinking from a product perspective.
17      And then we would also get to know that
18  tribe and really understand them as a tribe.  I
19  said, you know, earlier, their -- their essence,
20  meaning, you know, what's important to them for the
21  tribe, how that's important in terms of their brand,
22  and building that brand to make sure it aligned with
23  the tribe's values.  And -- and part of that was
24  actually meeting with other members of the tribe and
25  walking around, you know, the -- the tribe's

Page 111

1  grounds, if you will.
2    Q.   So what if the tribes that you were
3  speaking with had no money to lend?
4      MR. GATEWOOD:  Objection; form.
5      MR. SCHEFF:  Object to the form.
6    A.   In our earlier discussions, we didn't go
7  into that level of detail.  It was --
8  BY MR. GROGAN:
9    Q.   In the first --
10    A.   -- introductory, about who we were and who
11  they are and if there was a --
12    Q.   Well, I just imagine that if I were a
13  tribe, particularly an impoverished tribe, the first
14  thing I would say is, "Well, how -- I don't have any
15  money to lend.  How can I be a lender?"  Did that
16  ever come up?
17      MR. GATEWOOD:  Objection; form.
18      MR. SCHEFF:  Object to the form.
19    A.   I think I recall a meeting or so where a
20  tribe would indicate that it would want to
21  understand the next steps if they wanted to become a
22  lender and to have partnerships with us.
23  BY MR. GROGAN:
24    Q.   And how did you respond to that?
25    A.   My response would be -- what I recall

Page 112

1  saying was, you know, we needed to understand a
2  little bit more, sign an NDA, and we can start
3  having an ideation session with them.
4    Q.   But a tribe not having any money to lend
5  wasn't a deal breaker for Think Finance, right?
6      MR. GATEWOOD:  Objection; form.
7      MR. SCHEFF:  Object to the form.
8    A.   Yeah, I can't recall the specifics.  Each
9  tribe is different in terms of why we would partner
10  with them or not, or if the tribe decided to partner
11  with us.  It goes both ways.
12  BY MR. GROGAN:
13    Q.   Well, the three tribes that you did partner
14  with, at least in 2011 --
15    A.   Okay.
16    Q.   -- did they have lending capital available?
17    A.   You know, I wasn't privy to their
18  financials and how they utilized it.  So. . .
19    Q.   You didn't participate, you said, in the
20  negotiation of the terms with regard to the three
21  tribes in 2011.  Is that -- was that your testimony?
22    A.   That's correct.
23    Q.   Did you later come to participate in
24  negotiations with other tribes?
25    A.   I participated in the negotiations of the

28  (Pages 109 to 112)

TF App. 0028
TF App. 0779

Michelle Nyugen

Page 113

1  existing tribes at a later date.
2    Q.  When was that?
3    A.  I believe it was either -- it was probably
4  2014 or 2013.
5    Q.  Renegotiation of the deals with. . .
6    A.  With -- renegotiating of the contracts with
7  the Chippewa, Otoe, and Tunica.
8    Q.  Okay.  How long -- how many times were
9  those deals renegotiated?  Do you recall?
10   A.  Each tribe was different.
11   Q.  How about Plain Green?
12   A.  I recall specifically three times.
13   Q.  Three times?
14   A.  Uh-huh (affirmative response).
15   Q.  How about Mobiloans?
16   A.  What I recall is -- when I left, they were
17 still negotiating, so I guess you can call it one
18 and a half.
19   Q.  Okay.  And how about Plain Green -- or
20 Great Plains.  Sorry.
21   A.  For the Otoe, I think it's similar in terms
22 of it wasn't complete.  So you could say one and a
23 half.
24   Q.  And in those subsequent negotiations; that
25 is, not the first negotiation, were you involved in

Page 114

1  those?
2    A.  For the -- the Chippewa?
3    Q.  Yes, let's start there.
4    A.  Yeah.  I was involved in the second, but
5  not the -- the third.  I think I -- I had already
6  left by the time it was completed.
7    Q.  And who else from Think was involved in
8  that renegotiation discussion?
9    A.  You know, this was in 2014, so it was
10 Martin Wong.
11   Q.  Okay.  Anybody else?
12   A.  Counsel probably, just to write it up, and
13 the CFO at the time.
14   Q.  How about the second go-round with
15 Mobiloans?
16   A.  Mobiloans was around the same time period,
17 and so that would involve Martin Wong as well.
18   Q.  What precipitated the renegotiation?  Was
19 there a term to the first agreement that expired, or
20 just new issues arose, or. . .
21       MR. SCHEFF:  Object to the form.
22       You can answer the question.
23   A.  Each tribe was different.  So for the
24 Chippewa Cree, they had indicated that they wanted
25 to renegotiate the terms because they were -- had

Page 115

1  hired new individuals in terms of the organization.
2  And they specifically had indicated to me that
3  they're looking for a short-term renegotiation of
4  six months because they're eventually going to not
5  need the services of Think Finance as a platform
6  provider.  They had already evolved, and this is
7  already, call it, four or five years of the
8  evolution of their offering, so they were. . .
9  BY MR. GROGAN:
10   Q.  And so we're talking about 2014?
11   A.  Correct.
12   Q.  By 2014, they -- they felt they were pretty
13 close to being able to go on their own?
14       MR. SCHEFF:  Object to the form.
15       You can answer the question.
16   A.  In 2014, I specifically had conversations
17 with their COO, who indicated that they only wanted
18 to do a six-month deal in order to -- because they
19 were going to separate and not need Think Finance as
20 a platform provider or a service provider anymore.
21 BY MR. GROGAN:
22   Q.  And at that time, did you think they were
23 ready to go on their own?
24   A.  I was surprised, because they didn't share
25 internal strategies.  Which, that's their decision.

Page 116

1  That's their business strategy.  So, yes, I was
2  surprised.
3    Q.  You were surprised?
4    A.  Uh-huh (affirmative response).
5    Q.  How about with Mobiloans, do you recall
6  what occasioned their desire to -- to renegotiate?
7       MR. SHELDON:  Object to the form.
8       You can answer.
9    A.  So the -- the Tunica tribe, they were
10 always looking to take on more ownership.  And so I
11 think that's what -- that was the -- the reason.
12 BY MR. GROGAN:
13   Q.  And how about with regard to Great Plains?
14       MR. SCHEFF:  Same objection.
15       You can answer.
16   A.  I can't recall Otoe specifically, just
17 because, like I said, that was a longer process, and
18 it wasn't complete.  So I can't recall the -- the
19 start, why.
20 BY MR. GROGAN:
21   Q.  And do you recall in your tenure at Think
22 Finance, did Think ever come to an agreement with
23 another tribe other than the Chippewa, the Otoe, and
24 the Tunica?
25   A.  Not when I was there.  When I had left, we

29  (Pages 113 to 116)

TF App. 0029
TF App. 0780

Michelle Nyugen

---

Page 117

1   were still in negotiations with another tribe.
2     Q. Do you happen to know whether they've come
3   to an agreement with another tribe since you've
4   left?
5     A. I'm aware that they have.
6     Q. And which tribe is that?
7     A. I believe they're called Rosebud South
8   Dakota.
9     Q. Okay. And is there a lending product
10   associated with the Rosebud tribe?
11     A. Yes.
12     Q. Now, as I understand it, Mobiloans is still
13   in business. Is that correct?
14     A. That's my understanding.
15     Q. Do you know if Plain Green is still in
16   business?
17     A. That's my understanding. They're doing it
18   themselves.
19     Q. Okay.
20     A. They have their own platform.
21     Q. Do you know if anybody from Think Finance
22   is working with Plain Green?
23     A. I understand that there's some individuals
24   that are working, yeah.
25     Q. Do you know who they are?

---

Page 118

1     A. Yes.
2     Q. Who are they?
3     A. Linda Callnin.
4     Q. Linda Callnin is working for Plain Green?
5     A. That's my understanding.
6     Q. Anybody else?
7     A. An individual in marketing.
8     Q. Do you recall the name?
9     A. His name is Guy Dilger.
10     Q. Anybody else?
11     A. I think another person in accounting.
12     Q. Anybody else?
13     A. From Think Finance?
14     Q. Yeah. Or -- or somebody who might have
15   gone to Elevate.
16     A. Those are the three that I recall.
17     Q. Okay. Are you in contact with those folks?
18     A. I am via LinkedIn.
19     Q. How about Great Plains? Now, I understand
20   it, Great Plains went out of business at some point.
21     A. Okay.
22     Q. I mean, do you know that?
23     A. I haven't kept up with their offering.
24     Q. Do you know if they're back in the market?
25     A. I -- what I understand is, Otoe still has

---

Page 119

1   the American Web Loan offering that they had prior.
2   I don't -- I don't know what happened with Great
3   Plains or if it's on or off or what have you.
4     Q. When you left, Great Plains was still live
5   with Think Finance?
6         MR. GATEWOOD: Objection; form.
7     A. When I left, Think Finance was still
8   supporting the Great Plains platform.
9   BY MR. GROGAN:
10     Q. Okay. Let's -- let's change directions a
11   little -- well, not really, but let's get a new
12   document, anyway. We're marking this as P-179. And
13   I would ask you to take a look at that. The --
14   there is a cover e-mail, but my main interest is
15   with the attachments and e-mail which. . .
16         (Exhibit No. P-179 marked.)
17   BY MR. GROGAN:
18     Q. Again, my question is, you're familiar with
19   this?
20     A. Let me look through it.
21         (Reviews document.)
22   BY MR. GROGAN:
23     Q. All set?
24     A. Yes.
25     Q. Do you recognize this document?

---

Page 120

1     A. I'm familiar with it now.
2     Q. Were you the author of this document?
3     A. I think so.
4     Q. All right. Our metadata indicates that as
5   well. Okay. Great.
6         This is -- we've jumped ahead quite a bit.
7   We're in April of 2013.
8     Q. Is it April or July?
9     A. You're right. July. July. Okay.
10         What is an executive offsite, by the way?
11     A. That's where the executive team and key
12   leaders go to an all-day session to do strategy
13   planning.
14     Q. Did you do that regularly in the course of
15   your business?
16     A. Quarterly.
17     Q. Quarterly. Okay. And who would attend?
18     A. The executives and key leaders.
19     Q. So Mr. Rees?
20     A. Sorry. Yes. Ken, Chris Lutes, Jason
21   Harvison, Sarah Cutrona, Kevin Dahlstrom.
22     Q. I don't mean to -- to flatter you, but my
23   understanding is that you're in that executive
24   group. Or is that not an accurate reading of your
25   hierarchy?

---

30 (Pages 117 to 120)

TF App. 0030
TF App. 0781

Michelle Nyugen

Page 125

1 hires, you mean a hire within the tribal lending
2 organization, the Plain Green, Great Plains, and
3 Mobiloans?
4    A. That's correct.
5    Q. Not additional staff at Think Finance?
6    A. No.
7    Q. Okay. And all three have -- had tribal
8 call centers at that point; that's correct?
9    A. Yes.
10    Q. Okay. So if there's nothing filled in the
11 box underneath each of the tribal products, that
12 means that that benchmark of tribalization had not
13 yet been established?
14       MR. GATEWOOD: Objection; form.
15    A. From what I recall, if there wasn't an
16 indication here, then the tribe was still utilizing
17 Think Finance to provide those services and wasn't
18 able to take that in-house yet.
19 BY MR. GROGAN:
20    Q. Okay. Good.
21      You talk about the -- one of the items is
22 "tribal regulatory commission." Do you recall what
23 that was referring to?
24    A. From what I recall, I mean, that was
25 guidance based off of internal counsel.

Page 126

1       MR. GROGAN: This is your moment.
2       MR. GATEWOOD: You have to ask another
3 question.
4       MR. GROGAN: Oh, okay.
5 BY MR. GROGAN:
6    Q. Counsel recommended that you have tribal
7 regulatory -- that they have tribal regulatory
8 commissions?
9       MR. GATEWOOD: I would instruct the
10 witness not to answer to the extent that the answer
11 is derived from discussions with in-house counsel.
12 BY MR. GROGAN:
13    Q. Okay. To the extent -- and I really don't
14 want you to tell me what your counsel told you. But
15 do you have any understanding that didn't come from
16 counsel as to why tribal regulatory commissions were
17 important?
18       MR. SCHEFF: Object to the form.
19      You can answer the question.
20    A. The information I understand from tribal
21 regulatory, that piece came from counsel.
22 BY MR. GROGAN:
23    Q. I understand. Okay.
24      "All third-party contracts in the tribe's
25 name." And there's nothing filled in, in the boxes.

Page 127

1 What third-party contracts are you referring to?
2    A. This is 2013?
3    Q. July 2013.
4    A. From what I recall, these would be
5 contracts such as an agreement with a marketing
6 organization to print their direct mail pieces. In
7 the beginning, because it's a startup, oftentimes
8 us, as the marketing agency, would have the -- the
9 direct contracts. And the thought is, now that it's
10 over time, and the tribe had always indicated that
11 they wanted to evolve and do things on their own,
12 this is one of those indications of "You can have
13 the direct contract with the print house," as an
14 example.
15    Q. I see. This is 2013, though, and they
16 started in 2011. So we're two years into the tribal
17 lending programs?
18    A. Depends -- right. Because each tribe went
19 live different times. And so, you know, as -- that
20 would be one and a half, two years, you know, which
21 is pretty young in a startup organization.
22    Q. Okay. Well, with regard to Plain Green, it
23 was -- they started in April of '11. And this is
24 July 13th, right?
25    A. Sure.

Page 128

1    Q. So that's two years.
2    A. Okay.
3    Q. And with regard to Great Plains, you said
4 it was the summer of 2011?
5    A. Sure.
6    Q. So that's two years.
7    A. And then Mobiloans is not --
8    Q. A little bit less?
9    A. Right.
10    Q. Okay. What about the risk credit
11 committee, what was that function -- what's the
12 function of a risk credit committee?
13    A. The function of a risk credit committee
14 would be within a -- a lending organization to -- to
15 formally have a credit committee that would have
16 individuals that are working in the organization
17 with the rest -- with an underwriting or risk
18 background.
19    Q. Doing underwriting and risk analysis?
20       MR. GATEWOOD: Objection; form.
21       MR. SCHEFF: Object to the form.
22    A. Each organization, as a lender, can have --
23 their credit committees can vary. Some of them --
24 BY MR. GROGAN:
25    Q. And so what they do --

TF App. 0031
TF App. 0782

Michelle Nyugen

Page 129

1    A.  Some of them can be specifically the
2  underwriting, or some of them can be review and
3  audit.
4    Q.  And why did you think it important that the
5  tribes have risk credit committees?
6    MR. SCHEFF:  Object to the form.
7    A.  As I mentioned before, you know, as the
8  evolution of the tribes, you know, this is another
9  step for them to take on ownership and evolve as a
10  lender and to, you know, have -- to begin doing
11  their own underwriting.  They, you know, still are
12  looking to us as experts.
13  BY MR. GROGAN:
14    Q.  What couldn't they do without a risk credit
15  committee that you thought they should be doing?
16    MR. GATEWOOD:  Objection; form.
17    A.  I don't -- I wouldn't say it that way, in
18  terms of what they couldn't -- or could not do.
19  BY MR. GROGAN:
20    Q.  How would you say it?
21    A.  You know, as they've evolved, to, you know,
22  create more controls and audits in place.  And this
23  is an example of a -- one of those.  Just like a
24  large organization, you'll have a SOC.  But small
25  organizations that are startups, you don't have SOC;

Page 130

1  one, because it's not necessary.
2    Q.  I see.  And what functions of a risk credit
3  committee -- were those functions simply not being
4  done, or was Think Finance doing it?
5    MR. GATEWOOD:  Objection; form.
6    A.  I think, as I mentioned, it all depends on
7  the -- the definitions each lender would have for a
8  credit committee.  But they -- each of the tribes
9  worked with Think Finance to perform underwriting
10  capabilities and provide recommendations, and every
11  single time there is any changes or recommendations
12  to changes, the tribes would review that, and we
13  would have lengthy discussions of the impact to the
14  portfolio.
15  BY MR. GROGAN:
16    Q.  What would the tribe do to work with Think
17  to develop the underwriting principles?  What did
18  they do?
19    A.  I think it depends on the stage of their
20  evolution.  So are you -- are you asking in 2011,
21  when they started, or in 2014?
22    Q.  Let's ask right now in 20 -- in July 2013.
23  Because you wrote this down as an important -- I
24  assume an important item.  And I'm not clear about
25  what you meant with regard to those functions, what

Page 131

1  a risk credit committee would be doing and why it
2  was important for the tribes to be doing that.
3    MR. SCHEFF:  Do you have a question
4  there?  Why don't you ask --
5    MR. GROGAN:  Yeah.
6    MR. SCHEFF:  -- the question?
7    MR. GROGAN:  Well, that's the
8  question.
9    MR. SCHEFF:  Well, it didn't sound
10  like a question.  So why don't you rephrase it to
11  sound like a question?
12    MR. GROGAN:  Can you read back what I
13  wrote?
14    COURT REPORTER:  "Let's ask right in
15  July 2013.  Because you wrote this down as an
16  important -- I assume an important item.  And I'm
17  not clear about what you meant with regard to those
18  functions, what a risk credit committee would be
19  doing and why it was important for the tribes to be
20  doing that."
21    MR. SCHEFF:  Is that your question?
22  BY MR. GROGAN:
23    Q.  What did the risk credit -- what would a
24  risk credit committee do, and why was it important
25  for the tribes to be doing it?

Page 132

1    MR. GATEWOOD:  Objection; form.
2    MR. SCHEFF:  Object to the form.
3    You can answer the question if you can.
4    A.  Each tribe is different.  So an example is
5  Mobiloans.  They are always reviewing and are -- any
6  of the underwriting, or they can also audit.  So
7  that it would be a formalization of that process.
8  That could be minutes.  That could look like in the
9  form of a weekly internal evaluation of the
10  portfolio.  And it's just formalized.
11  BY MR. GROGAN:
12    Q.  So they were doing something already, but
13  it just wasn't formalized?
14    MR. SCHEFF:  Object to the form.
15    You can answer the question if you can.
16    A.  Like, from what I recall, again, it's a lot
17  of the -- as a startup, a lot of things weren't
18  formalized.  And so these were recommendations, just
19  like those other items, to formalize as you grow an
20  organization.
21  BY MR. GROGAN:
22    Q.  Do you recall any instance in which one of
23  the tribal lending partners suggested a change to
24  the underwriting?
25    A.  Yes.

33  (Pages 129 to 132)

TF App. 0032

TF App. 0783

Michelle Nyugen

## Page 133

1      MR. GATEWOOD: Objection; form.
2      A. Sorry.
3   BY MR. GROGAN:
4      Q. When?
5      A. I don't remember the time, but I do
6   remember different tribes and different discussions
7   of the changes to --
8      Q. What changes were they concerning?
9      A. You know, one example for Mobiloans is,
10  they wanted to change the underwriting for returning
11  customers and provide -- identify those good
12  customers and provide a rewards program. And so it
13  was two part, one for credit and one for the
14  reduction in the -- in the price point.
15     Q. They wanted to create a rewards program?
16     A. That's correct.
17     Q. And that's relating to underwriting?
18     A. It is, because you have to identify the
19  customers that are likely candidates to be rewarded.
20  You're not going to reward someone that's
21  delinquent.
22     Q. I understand. So they wanted to create a
23  rewards program?
24     A. Right. And so that would be part of the --
25  the risk decision, identifying those customers, when

## Page 134

1   are they going to be offered it, how does the
2   rewards program look. And so there was a lengthy
3   discussion that was -- I really recall that, for
4   sure.
5      Q. Do you recall any others?
6      A. Plain Green, you know, there was different
7   times in terms of whether it be former customers and
8   what that price point would look like, new
9   customers, the loan amounts to offer.
10     Q. When did these discussions occur with Plain
11  Green?
12     A. In terms of these specific discussions, I
13  can't recall. We had discussions -- I talked to
14  the -- each of these tribes every day about
15  different topics. We met weekly with the tribes to
16  review, you know, risks and underwriting changes, as
17  well as platform changes and marketing changes.
18     Q. I understand that. But my question was
19  about changes initiated by the tribes.
20     A. So I would -- I would have to go back and
21  look at any documents to give you the specific dates
22  of each of these items that they --
23     Q. You talked about the rewards program with
24  regard to Mobiloans.
25     A. Uh-huh (affirmative response).

## Page 135

1      Q. And with regard to former customers in
2   Plain Green.
3      A. Okay.
4      Q. Do you recall any other instances?
5      A. Great Plains.
6      Q. Okay.
7      A. Great Plains was -- you know, a lot of that
8   discussion was about the acquisition of new
9   customers and is there an opportunity to loosen the
10  credit criteria in order to obtain new customers,
11  even though it would be at a higher default.
12     Q. And when did those occur?
13     A. I would have to go back and look at those
14  notes. But those are the examples that I recall in
15  terms of risk credit decisions and discussions.
16     Q. And do you recall any other examples?
17     A. Yes.
18     Q. Okay. Go ahead.
19     A. Okay. Again, for, you know, Plain Green,
20  another discussion item was around, you know, can we
21  champion and challenge the different mail pieces,
22  and does that mean that the -- you should change the
23  underwriting underneath that?
24     Q. What were their problems with the mail
25  pieces?

## Page 136

1      A. I think it was more --
2      MR. GATEWOOD: Objection; form.
3      A. Sorry. It was more of an opportun- -- it
4   wasn't a -- an objection to it. It was really
5   discussion of an opportunity to improve and to
6   optimize. And so we had a lengthy discussion about
7   that, because you don't want to change too many
8   variables for a test.
9   BY MR. GROGAN:
10     Q. Okay. Anything else?
11     A. You know, for Mobiloans, we had a lengthy
12  discussion about what made up the risk criteria,
13  what's in some of the proprietary scores that we had
14  built for them. And so we kind of -- we talked
15  through that quite at length. I do recall that.
16     Q. Did you make changes because of that?
17     A. No. The -- that discussion was really
18  involved in really understanding all of the pieces
19  that went into the risk core, because they wanted to
20  make sure, in test, that it wasn't -- the score
21  wasn't build for a disparate impact, which was a
22  very good point that they brought out. And we had
23  to demonstrate that over and -- time and time again.
24  And that became actually a quarterly kind of
25  exercise that we had to do for -- for that tribe.

34 (Pages 133 to 136)

**TF App. 0033**
**TF App. 0784**

Michelle Nyugen

---

Page 137

1    Q.  Okay.  Good.
2        With regard to Great Plains, was
3  MacFarlane still playing a role?
4    A.  Correct.
5    Q.  What was the role that they were playing
6  with Great Plains Lending?
7    A.  As I mentioned, MacFarlane was already
8  working with Otoe.  They had the other offering, the
9  American Web Loan product, but they also supported
10  the -- that tribe for back-end services, such as
11  hiring of the call center folks, HR, payroll,
12  their -- their books, if you will, the financials,
13  reconciling their P&L.
14    Q.  Did Mobiloans or Plain Green have a similar
15  organization working with them?
16        MR. GATEWOOD:  Objection; form.
17        MR. SCHEFF:  Object to the form.
18    A.  Plain Green did not have a back-end
19  consulting organization, that I was aware of.  And
20  Mobiloans did not have one.  Mobiloans would utilize
21  different vendors to assist because they were a
22  startup and they can't do everything in-house.
23  BY MR. GROGAN:
24    Q.  Good.
25        Take a look at page 7, if you would.

---

Page 138

1  These are benchmarks of what you think an industry
2  leader looked like?  Is that a fair statement of
3  what this is trying to capture?
4    A.  That's -- that's a fair statement.
5    Q.  Okay.  And, again, the same -- same drill:
6  If there's not a checkmark, that means it's missing
7  from that particular tribal product?
8        MR. SCHEFF:  Object to the form.
9    A.  If it was not a checkmark, then this is my
10  opinion --
11  BY MR. GROGAN:
12    Q.  Okay.
13    A.  -- of what was lacking and what needed to
14  be improved.
15    Q.  Okay.  And with regard to "stable and
16  scalable product with minimal compliance defects,"
17  that's -- Plain Green and GPL are okay, in your --
18  in your opinion, at that point?
19    A.  That's correct.
20    Q.  But Mobiloans was still challenged in that
21  area?
22    A.  That's correct.  I think -- you recall that
23  I said that we had utilized a different loan
24  management system, the CoreCard.  Because it wasn't
25  built in-house, we didn't know all the ins and outs,

---

Page 139

1  and so it caused some unacceptable defects that we
2  had to work through.
3    Q.  Okay.  But those defects would have been
4  caused by Think Finance difficulties, or -- or
5  deficits at Mobiloans?
6        MR. SCHEFF:  Object to the form.
7    A.  This line specifically was the platform
8  defects, and so it was the CoreCard itself.  You
9  know, it could be within the CoreCard build itself,
10  which is not something that was proprietary to Think
11  Finance.  Or it could have been around the platform
12  itself that touched CoreCard.  So it's both pieces.
13  BY MR. GROGAN:
14    Q.  Right.  But Mobiloans didn't have CoreCard
15  within their purview, right?  That was something
16  that Think Finance had?
17        MR. GATEWOOD:  Objection; form.
18    A.  CoreCard is part of the platform that was
19  licensed to --
20  BY MR. GROGAN:
21    Q.  Who licensed it?
22    A.  Who licensed. . .
23    Q.  CoreCard.
24    A.  Oh, I don't -- I don't recall.  I don't
25  know.  I'd have to look at the contracts.  I was --

---

Page 140

1    Q.  But was it Think Finance or Mobiloans?
2        MR. GATEWOOD:  Objection; form.
3  BY MR. GROGAN:
4    Q.  Or a Think Finance-related entity?
5        MR. GATEWOOD:  Same objection.
6    A.  I -- I don't know.  That's a technical -- I
7  was not part of that.
8  BY MR. GROGAN:
9    Q.  That's fine.
10        What was the metric that you were using in
11  determining whether there were minimal compliance
12  defects?  Do you recall?
13        MR. GATEWOOD:  Objection; form.
14    A.  I don't -- there was not another piece of
15  paper that had 12 items.  This is based on my
16  opinion from a product perspective and if there were
17  defects.  Any defect as a platform provider is not
18  acceptable.
19  BY MR. GROGAN:
20    Q.  And I just want to be clear.  When you say
21  a "stable platform" in that -- that item, you're
22  talking about the technical loan platform, you're
23  not talking about, for instance, tribal leadership
24  or marketing --
25    A.  I'm talking about the technical platform.

---

35  (Pages 137 to 140)

TF App. 0034
TF App. 0785

Michelle Nyugen

Page 145

1  referenced here, this says half of it, RISE has
2  access to. They get the first pass. What did that
3  mean?
4          MR. SCHEFF: Object to the form.
5      A. You know, from what I recall, it's -- you
6  know RISE, as I said before, the -- we identify the
7  universe of consumers that are responsive and would
8  have a decent default, and then we would overlap
9  them with the RISE states, and then anything --
10 remainder, we would -- as this says, we would split
11 amongst the tribes.
12 BY MR. GROGAN:
13     Q. Who's "we"?
14     A. The -- as a marketing agency --
15     Q. That's what you'd do? You'd allocate them
16 first to RISE, and then if there were a remainder,
17 to tribal products; is that right?
18         MR. GATEWOOD: Objection; form.
19     A. We -- as -- you know, as I stated, we would
20 identify those for RISE, and then any of the
21 remainders, we would recommend splitting them up
22 between the other three tribes --
23 BY MR. GROGAN:
24     Q. And how would you --
25     A. -- or direct mail.

Page 146

1      Q. -- split them up -- how would you split
2  them up between the tribes?
3      A. You know, it really depended on different
4  factors.
5      Q. Like what factors?
6      A. What the goals were for each of the tribes
7  in terms of the revenue growth, what each tribe
8  looked like in terms of their offering. You know,
9  Great Plains had a higher APR, and so they were --
10 that product was inclined to take a riskier customer
11 base, as well as the other channels that the tribes
12 were interested in. And so all of those came into
13 play when we talked about the direct mail pieces and
14 where they went.
15     Q. Okay. And who would get direct mail and
16 who wouldn't?
17     A. Again, like, it's all of those factors that
18 I indicated.
19     Q. Okay. And you said one of the factors was
20 what the goals for the revenue growth of the
21 individual tribal products was. Whose goals were
22 they?
23         MR. GATEWOOD: Objection; form.
24     A. In the beginning of each year, we would
25 meet with each of the tribes, because they're doing

Page 147

1  their budget. Or, actually, I would say the end of
2  the prior year for budget planning purposes. And we
3  would talk to them about their revenue goals, and we
4  would back into: Well, if you want X, then you need
5  Y type of customers at XZ assumption in terms of
6  revenue.
7          And so we would create a budget like any
8  organization. We would work with them as a
9  marketing organization, and we'd say: Okay, this is
10 your budget for X amount of customers. We would try
11 to meet with these different channels, whether
12 it be direct mail, or -- you know, for Great Plains,
13 it also included lead generation, paid search,
14 affiliate traffic.
15 BY MR. GROGAN:
16     Q. Now, direct mail, by its nature, is an
17 invitation to a customer to respond to a particular
18 product offering; is that right?
19     A. In general.
20     Q. So there would be direct mail that would
21 say, "Please call RISE if you want a loan," right?
22 And there would be some direct mail that said,
23 "Please call Plain Green if you want a loan," right?
24         MR. GATEWOOD: Objection; form.
25     A. There's different versions of direct mail.

Page 148

1  There could be a pre-approval. There could be an
2  invitation to apply. There could be another -- a
3  repeat customer direct mail piece to remind them of
4  the brand.
5  BY MR. GROGAN:
6      Q. Right. But they would all be
7  brand-specific, wouldn't they?
8      A. That's correct.
9      Q. Okay. Okay. So you're -- okay. That's
10 fine.
11         It says, "No current differentiation
12 between other channels today. Should other channels
13 follow DM volume split?"
14         And my first question is, what are the
15 other channels?
16     A. I -- you know, the -- I -- I can't really
17 remember this -- this bullet point. I mean. . .
18     Q. Did you mean other marketing channels?
19     A. Yes. But I don't -- I can't remember why I
20 put this here. Sorry. I just really can't
21 remember.
22     Q. Okay. Well, what are -- what are the other
23 marketing channels?
24     A. Paid search, lead generation. Lead
25 generation was really only for Great Plains.

37 (Pages 145 to 148)

TF App. 0035
TF App. 0786

Michelle Nyugen

---

Page 149

1  Affiliate traffic for all three. And then there's
2  repeat -- repeat customers are also considered a
3  channel.
4      Q. This document was created for the executive
5  offsite, right?
6      A. That's correct.
7      Q. Were tribal members or -- or
8  representatives of Plain Green, Mobiloans, or Great
9  Plains at that -- at those meetings?
10     A. No.
11     Q. Okay. Now, "Items to consider," and you
12  have some characteristics of the three different
13  tribal lending organizations. For instance,
14  Mobiloans is -- has "Strong political influence,"
15  "Lowest profit share," "Currently most profitable,
16  but will change as we lower pricing."
17        Now, what are these items to consider
18  relevant to?
19     A. They were -- from what I'm thinking, from
20  what I recall, these items were relevant for
21  identifying the best channels for each of the
22  different portfolios.
23     Q. I see.
24     A. So an example would be that, you know, as
25  Mobiloans is currently the most profitable, but will

---

Page 150

1  change over lower pricing, I indicated that the
2  tribe really wanted a rewards program, thus would
3  lower the pricing. To that end, a lead generation
4  as a channel would not fit in terms of that
5  Mobiloans offering, because typically lead
6  generation has a higher default -- has a higher
7  default with a lower price at the spread or the --
8  and won't be profitable for that tribe.
9      Q. And when you're saying Mobiloans is
10  currently the most profitable, profitable to whom?
11     A. I believe when I was writing this, it was
12  just in general, in terms of revenue minus the
13  losses. So the interest revenue minus the losses.
14     Q. But most profitable to Think Finance?
15        MR. GATEWOOD: Objection; form.
16        MR. SCHEFF: Object to the form.
17     A. I -- I didn't say that. I said profitable
18  as it pertains to -- I always looked at revenue
19  minus losses. Keep it simple in terms of that.
20  BY MR. GROGAN:
21     Q. Right. But a profitable product -- a
22  profitable Mobiloans product is profitable for Think
23  Finance and Mobiloans, right?
24     A. A profitable product is definitely
25  profitable for the Tunica tribe, absolutely.

---

Page 151

1      Q. And for Think Finance?
2      A. No, we -- it all depended on, you know,
3  each of the -- each of the contracts with each
4  tribes were different. But. . .
5      Q. I'm sorry, are you suggesting that a
6  profitable Mobiloans product is not profitable to
7  Think Finance?
8      A. No, I --
9        MR. GATEWOOD: Objection; form.
10        MR. SCHEFF: Misstates the testimony.
11        MR. GROGAN: Okay. I'm just asking
12  for the clarity.
13        MR. SCHEFF: Let's not play games
14  here.
15        MR. GROGAN: Richard.
16        MR. SCHEFF: You're just playing
17  games. She -- you know she didn't say that. Just
18  ask your question.
19        MR. GROGAN: I'm just asking her to
20  clarify that.
21     A. I -- I didn't say that. I said --
22  BY MR. GROGAN:
23     Q. Okay. What did you say?
24     A. -- profitable -- I said profitable equals
25  revenue minus the losses, and that would be

---

Page 152

1  profitable for the tribe. And as a service
2  provider, we wanted to make sure that each of our
3  tribes were profitable and meeting their budgets.
4      Q. Because it was profitable to Think Finance,
5  right?
6        MR. SCHEFF: Object to the form;
7  misstates the testimony.
8  BY MR. GROGAN:
9      Q. Okay. With regard to Mobiloans, it says
10  "lowest profit share." What does that refer to?
11     A. I believe that refers to the -- their
12  profit share of the agreements.
13     Q. So they -- they're receiving the lowest
14  profit share of -- relative to the other two tribal
15  products?
16     A. That -- this is relative to the other two
17  tribal products.
18     Q. And are we talking about the revenue share?
19     A. This is profit share.
20     Q. Okay.
21     A. But it's probably misstated.
22     Q. Okay. It says profit share, but do you
23  think it referred to revenue share?
24        MR. SCHEFF: Object to the form.
25        You can answer the question.

38 (Pages 149 to 152)

TF App. 0036
TF App. 0787

Michelle Nyugen

| Page 165 | Page 167 |
|---|---|

**Page 165**

1    MR. GATEWOOD: Objection; form.
2    A. From what I recall, this was purposes of --
3  for discussion items, and, you know, is there an
4  opportunity to reposition the brands.
5  BY MR. GROGAN:
6    Q. But repositioning them at different
7  segments of the -- of the market?
8    MR. GATEWOOD: Same objection.
9    A. Again, it's repositioning it, and then
10  discussing these items with the tribes and get their
11  feedback as a marketing agent.
12  BY MR. GROGAN:
13    Q. But repositioning them with regard to
14  different segments of the consumer markets?
15    MR. GATEWOOD: Objection; form.
16    MR. SCHEFF: Object to the form.
17    A. Again, it says "customer and product
18  discussion item." And so this is -- these were --
19  it's an ideation session. So it's repositioning it
20  from a brand perspective, and different customers,
21  if that makes sense to them, if it resonates to
22  them. . .
23  BY MR. GROGAN:
24    Q. Okay. I understand these are just
25  examples. Is -- is there any reason why Plain Green

**Page 166**

1  is not characterized in some way here?
2    A. I can't recall. I think these were just
3  examples for discussion.
4    Q. Okay. Thank you. If we could turn to
5  Document D, please.
6    MR. SCHEFF: John, we've been going
7  about an hour and ten minutes.
8    MR. GROGAN: What time is it?
9    MR. SCHEFF: 12:35.
10    MR. GROGAN: Are we having lunch
11  provided, or. . .
12    MR. SCHEFF: I guess. I don't know.
13  Did you make any arrangements? Because I didn't.
14    MR. GROGAN: No. This is an okay
15  time. If people need lunch now, that's fine.
16    MR. SCHEFF: Okay.
17    THE VIDEOGRAPHER: Go off the record?
18    MR. GROGAN: Yes.
19    THE VIDEOGRAPHER: We are off the
20  record at 12:34 p.m.
21    (Break taken, 12:34 p.m to 1:20 p.m.)
22    THE VIDEOGRAPHER: We're back on the
23  record. The time is 1:20 p.m.
24  BY MR. GROGAN:
25    Q. Welcome back, Ms. Nguyen. Thank you,

**Page 167**

1  again, for your patience.
2    I want to introduce a new document for our
3  discussion, and this is going to be Plaintiff's
4  Exhibit 180. It's a very large exhibit. You may
5  look at as much of it as you need to, but I will
6  preface my remarks by saying that I have a question
7  about what's on page 27, I think, is the only --
8  only part of this document that I'm concerned with.
9    (Exhibit No. P-180 marked.)
10    MR. SCHEFF: I'm sorry, you said 27?
11    MR. GROGAN: Page 27.
12    MR. SCHEFF: What's the Bates on that?
13  Because these don't appear to be numbered.
14    MR. GROGAN: Hold on.
15    MR. SCHEFF: Michelle, look as much
16  of this as you need to.
17    Oh, I'm sorry.
18    MR. GROGAN: Yeah, it's pretty clear.
19    MR. SCHEFF: It is -- they have --
20  they have numbers. Never mind. Got it.
21    A. (Reviews document.)
22    27? Is that right?
23  BY MR. GROGAN:
24    Q. Page 27, yes. The PowerPoint 27.
25    Have you studied under Dean Smith,

**Page 168**

1  Ms. Nguyen? Never mind. Strike that. I'm sorry.
2  I couldn't resist.
3    Take a look at the first page. I'm sorry,
4  I told you 27, but if you look at the cover of the
5  document --
6    A. This --
7    Q. Not the e-mail transmittal, but the cover
8  of the PowerPoint.
9    A. Okay.
10    Q. Do you recall this document?
11    A. I recall the document.
12    Q. All right. Are you the author of this
13  document?
14    A. I am author of the majority of this
15  document.
16    Q. Okay. Fine.
17    And what was this document used for? Do
18  you recall?
19    A. I believe this was a meeting that we met
20  with the council. I think we had indicated before
21  that I speak to different tribal members every
22  single day. We also had an opportunity to go out
23  there, and we made it a point of at least meeting
24  with each of the councils once a quarter. And so
25  this is an example of meeting with the council as a

WWW.KLWREPORTERS.COM

Michelle Nyugen

Page 169

1 quarter --
2 Q. Do you recall or can you tell what the
3 purpose of the meeting would have been?
4 A. So this is with Mobiloans. It was probably
5 twofold. Kind of giving them update on the -- on
6 the product and its evolution. And the second part
7 is, I -- I believe at this time, there was a new
8 chairman of the Tunica tribe.
9 Q. So generally informational? This wasn't
10 part of renegotiation of a contract or. . .
11 A. That's my understanding. I think it was --
12 it was just informational and -- as we did every
13 quarter.
14 Q. Okay. Take a look at page 27, ma'am. This
15 slide -- first of all, do you recall being the
16 person who wrote this slide?
17 A. You know, I don't recall if I did this or
18 if this was in conjunction with Chris Lutes.
19 Q. Okay. It says, "How do Think and VPC make
20 money? Think makes money two ways." You can look
21 at that. My first question: Is that accurate?
22 A. I -- I mean, I think it's -- it's missing
23 more detail.
24 Q. What -- what detail is missing?
25 A. There's the -- so this is 125 for every

Page 170

1 funded loan. That was from a marketing perspective.
2 And then there's also the -- the platform piece, and
3 that wasn't captured on here. So there's just --
4 there's more fees from a service provider
5 perspective, I believe.
6 Q. Anything else?
7 A. No. I think this is. . .
8 Q. That's accurate? I'm sorry. Accurate?
9 A. Yes.
10 Q. Okay.
11 A. Other than the clause I had indicated
12 earlier.
13 Q. Yeah, what does "credit guarantee provided
14 to GPLS" mean, if you know?
15 A. As the service provider, we also acted as
16 administrative agent, and I believe as part of that,
17 it's where the credit guarantee came into place.
18 Q. Do you know why it's referred to as the
19 credit guarantee rather than the administrative
20 agency fee?
21 A. Oh, I think I'm getting confused, then.
22 Q. Take your time.
23 A. So I -- I did misstate. So we indicated
24 before, the first bullet is probably missing some
25 fees, including the -- the admin fee that I spoke

Page 171

1 of. And I think from what I recall for -- for this
2 piece was, Think was the guarantee on -- credit
3 guarantee to GPLS for their fixed return, and
4 anything beyond that was the revenue for Think.
5 Q. Okay. And that's what you believe that
6 "credit guarantee provided to GPLS" is -- is
7 referring to?
8 A. That's what I recall.
9 Q. Okay. Take a look -- well, I lied again.
10 Page 28, if you'd just look at that for a second.
11 And I understand that this isn't your area, but,
12 again, my question is, is that generally accurate?
13 A. I -- I don't know. Because I see a lot of
14 pages in here that are draft, and so I'm not sure if
15 that's the final numbers. You know, like, the next
16 page is empty, and the other pages before were
17 empty, so I wasn't sure -- I don't know if this is a
18 draft format. So I don't -- I don't know if those
19 numbers are correct.
20 Q. Right. But looking at the substantive of
21 the numbers themselves, rather than -- I understand
22 your point that this may be a draft. But looking at
23 the numbers, do they appear to be accurate to you?
24 A. I -- I couldn't recall. You know, just to
25 your point, I'm not -- I wasn't the CFO, so I don't

Page 172

1 have them memorized and I don't know if this is the
2 final version.
3 Q. Right. And I -- I should have been
4 clearer. I'm not really concerned with the pinpoint
5 accuracy as to the number itself, but with the
6 general proportion among the three entities
7 represented there, MBL, Think, and VPC.
8 MR. SHAPIRO: What's the question?
9 MR. GROGAN: Is the general proportion
10 of the profitability -- I mean, I understand she
11 doesn't know whether it's 7.4 or 7.9. But is the
12 general proportion accurate?
13 MR. SHAPIRO: For 2013 --
14 MR. GROGAN: Yeah.
15 MR. SHAPIRO: -- for Mobiloans?
16 MR. GROGAN: As related -- in
17 relationship to Think and VPC.
18 MR. SHAPIRO: Okay. I'll object to
19 the form of the question. I think the witness has
20 already testified she doesn't have the foundation
21 for this.
22 But go ahead.
23 A. Yeah, I -- I would say that I don't -- you
24 know, again, this might be in draft form. I believe
25 that those are the correct parties, Mobiloans,

43 (Pages 169 to 172)

TF App. 0038
TF App. 0789

Michelle Nyugen

Page 201

1 a Think -- a Mobiloans staff and a -- and a Great
2 Plains staff; is that correct?
3    A.  At this time, that's correct.
4    Q.  Did it ever come a time when that was true?
5    A.  What I recall, early 2011, 2012, we had
6 enough individuals in one organization where they
7 were segregated.
8    Q.  But by 2014, that had changed?
9    A.  That's correct.
10   Q.  Okay.  Why had that changed?
11   A.  The company split occurred.
12   Q.  Not in March of 2014.
13   A.  No.  But by then, as you see, I said my
14 staff is quite small.  So. . .
15   Q.  I see.  Okay.  Thanks.
16       MR. GROGAN:  Can we turn to Document
17 H, please.  Document H is P -- will be P-184.
18       (Exhibit No. P-184 marked.)
19   A.  (Reviews document.)
20       Okay.
21 BY MR. GROGAN:
22   Q.  Okay.  Do you recognize this document?
23   A.  Yes.
24   Q.  What is it?
25   A.  I think it's a draft version for an initial

Page 202

1 meeting with a new tribe.
2    Q.  Okay.  Do you recall which tribe it was?
3    A.  I think it's the Ranchero tribe.  I believe
4 they're in California.
5    Q.  Okay.  And were you the author of this
6 document?
7    A.  Yes.
8    Q.  This is in April of 2014.  And you were
9 still involved at this point in -- in reaching out
10 to new -- potentially new tribal partners?
11   A.  Correct.
12   Q.  Okay.  How many of these would you do a
13 year, these outreaches?
14   A.  These outreaches for new tribes?
15   Q.  Uh-huh (affirmative response).
16   A.  In 2014, I -- I think there were three.
17   Q.  Okay.
18   A.  Three different tribes.
19   Q.  And did any of them come to fruition?
20   A.  I think I mentioned before, Rosebud.  But
21 they had signed after I had left.
22   Q.  I see.  Okay.  And if you take a look at
23 page 17 of the -- the presentation page 17.
24   A.  Okay.
25   Q.  And it says, "We have developed a unique

Page 203

1 turnkey platform for tribal corporations."
2       And what did you mean by the word
3 "turnkey"?
4    A.  I think what we were trying to convey is
5 that we are able to offer multiple solutions for a
6 tribe.  So that includes the build of the -- the
7 product offering, to marketing services, to
8 underwriting services.
9    Q.  Anything else?
10   A.  I think here, it also said "Access to
11 third-party capital."  We can help facilitate
12 introductions as well as compliance experience.
13   Q.  So just looking at this slide on page 17,
14 what you seem to be offering is a proven technology
15 platform, correct?
16   A.  Yes.
17   Q.  A marketing machine?
18   A.  Marketing services, yes.
19   Q.  Okay.  The underwriting?
20   A.  Yes.
21   Q.  Access to third-party capital for funding
22 of the loans; is that correct?
23       MR. GATEWOOD:  Objection; form.
24 BY MR. GROGAN:
25   Q.  What would the third-party capital be for?

Page 204

1    A.  It would be access to the third-party
2 capital, how they would need to -- to utilize it if
3 they needed to utilize --
4    Q.  Okay.
5    A.  -- capital.
6    Q.  Did you -- did you ever talk to a tribe
7 that didn't need access to third-party capital?
8       MR. GATEWOOD:  Objection; form.
9    A.  Yes.
10 BY MR. GROGAN:
11   Q.  Which one?
12   A.  Rosebud.
13   Q.  Okay.  Look on page 16 -- I mean -- I'm
14 sorry, 18.  "Who does what."  And I want you to
15 study this and tell me if you think this is
16 accurate.
17   A.  Okay.
18       (Reviews document.)
19       Okay.
20   Q.  And we see a list of things that Think
21 Finance will do and some things that the tribal
22 entity will do, the center column being sort of the
23 topics of the various things that have to be done.
24 Is that a fair summary?
25   A.  Yes.

51  (Pages 201 to 204)

TF App. 0039
TF App. 0790

Michelle Nyugen

Page 205

1    Q.  Okay.  And for the tribal entity, they
2  would have to do ongoing market reviews -- marketing
3  reviews?
4    A.  That's what this says.
5    Q.  What would that encompass?
6    A.  Examples would be the collaboration of
7  material, whether it's website material, e-mail
8  material, direct mail, what content they wanted to --
9  to utilize.  We would, as a marketing agent, provide
10  recommendations for them to agree, to strike, to
11  change.
12    Q.  And how about "periodic application reviews
13  and daily prefunding approval"?
14    A.  So this is in regards to the platform, as I
15  indicated, isn't able to take applications.  And so
16  you know, at the ideation, we would sit down with
17  the -- the lender and say:  Here are all the
18  proposed fields that you need for your application.
19  Do you agree?  And we'll build it.  And the consumer
20  can then apply online, and you will have access to
21  the data if you want to review it.  If you think
22  that we should not be asking certain fields, then we
23  can strike it.  So you always have access to that,
24  as well as tying to the next point of the
25  underwriting criteria.  So it's for auditing

Page 206

1  purposes as well, did we do what we say we were
2  going to do, per your requirements.
3    Q.  That's the kind of review that they would
4  engage in, to check to make sure the application was
5  the way they wanted it?
6    A.  Right.  And if they made changes, did we do
7  what we say we did, and demonstrate that.
8    Q.  And how about "daily prefunding approval"?
9    A.  This was also tied to -- somewhat with the
10  underwriting.  You know, in the beginning, we would
11  say, you know, at a high level, because we're
12  experts at -- from a risk management perspective,
13  certain customers that meet this kind of criteria,
14  you probably do minimal verifications, and the
15  system can automatically then approve a customer
16  based on that.  And then you can also audit those
17  applications at any time to make sure it's aligned
18  to what we had discussed.
19    Q.  And is that how the approvals worked?  Were
20  they done automatically?
21    A.  Not necessarily.
22    Q.  In what circumstances were they not done
23  automatically?
24    A.  It's all dependent upon the -- the
25  underwriting criteria with that tribe.  So some of

Page 207

1  them would go to a pending status where it would
2  have to be verified based on the documentation.
3    Q.  I understand.  But that's as to the
4  completeness or incompleteness of the application,
5  right?  I'm talking about applications that the
6  underwriting system approves.
7    A.  You had asked if -- was it always auto
8  approved, and I -- I said no.
9    Q.  My problem.  I don't mean that every
10  application was automatically approved.
11    A.  Okay.
12    Q.  I mean those applications that met the
13  criterion.
14    A.  Okay.
15    Q.  And were adequately verified.
16    A.  Okay.
17    Q.  They were automatically approved.
18       MR. GATEWOOD:  Objection; form.
19  BY MR. GROGAN:
20    Q.  Is that true?
21    A.  It all depended on which tribe and what
22  criteria.  They could say that maybe 5 percent would
23  be auto approved, or it could be:  No, I want -- I
24  want every single application to be approved, to be
25  verified.

Page 208

1    Q.  What does it mean to verify an application
2  for approval?
3    A.  It depends on the creditworthiness.
4  Sometimes the criteria would be just to -- for a
5  consumer to submit their identification, such as
6  FACTA, if someone had a fraud alert and you had to
7  submit in your driver's license.  Other instances we
8  need to verify income.
9    Q.  How did this work at Plain Green, for
10  instance?  What did they choose to do with automatic
11  approvals?
12    A.  It's hard to recall, because it's evolved
13  over the years since when they started in 2011 to
14  when I left.
15    Q.  Can you recall anything with regard to
16  Mobiloans?
17    A.  Again, it's -- each of them evolved over
18  time as -- as the universe would change, as maybe
19  there's a fraud ring.  And so the criteria is an
20  evolution, so I can't --
21    Q.  Was there a time in --
22    A.  -- recall --
23    Q.  -- any of the evolution of any of the
24  tribal products where someone at the -- on the
25  tribal lending side, at Plain Green or Mobiloans or

52 (Pages 205 to 208)

TF App. 0040
TF App. 0791

Michelle Nyugen

---

**Page 209**

1  Great Plains, was reviewing the verifications of
2  applications for each application that was funded?
3          MR. GATEWOOD: Objection; form.
4     A.  So you specify verifications. The tribes
5  had call centers, and as part of those call centers,
6  they performed verifications, and those tribal
7  member -- those were employees of that entity. And
8  so yes, they would verify.
9  BY MR. GROGAN:
10    Q.  Was there ever a time when anybody on the
11  tribal lending side was approving each loan
12  individually?
13         MR. GATEWOOD: Objection; form.
14    A.  So the purpose of partnering with a service
15  provider is to outline your criteria, and -- so the
16  system can do what you dictate. So that way,
17  there's not necessarily a reason for you to look at
18  every single loan and approve it. They have
19  purposes of auditing it to make sure that they
20  performed to their satisfaction.
21  BY MR. GROGAN:
22    Q.  Fair enough.
23        And with regard to underwriting, they --
24  they would approve the -- their function was to
25  review and approve the criteria and the loan

---

**Page 210**

1  amounts? That's what they needed to do?
2     A.  You know, I think I stated earlier, as we
3  would start the program and it's ongoing, we would
4  provide recommendations in terms of underwriting
5  criteria based on their -- their appetite for
6  losses, and we would change it, and we would
7  discuss.
8     Q.  Okay. And with regard to "Funding and
9  payment processing," it didn't look like that the
10  tribe has to do anything there; is that correct? It
11  says, "Automated funding process. Fund loans sold
12  to third party after two days."
13         MR. GATEWOOD: What's the question?
14  BY MR. GROGAN:
15    Q.  Is the tribe doing anything with regard to
16  that stage of the process?
17         MR. GATEWOOD: Objection; form.
18    A.  I don't think that this is probably very
19  clear. The intent for this was that the platform
20  can produce an ACH file, as we talked about before,
21  the mechanics, and then send it off to an ODFI, as
22  well as payments.
23  BY MR. GROGAN:
24    Q.  Verifications were done -- some of the
25  verifications were, in fact, done on the tribal end

---

**Page 211**

1  in the call centers, right?
2     A.  That's correct.
3     Q.  Okay. And with regard to "Collections," it
4  says, "Not applicable." Why is that?
5     A.  I don't know. Maybe this is a draft. I
6  don't know why it's not applicable. Loans go past
7  due. So. . .
8          COURT REPORTER: I'm sorry?
9     A.  Loans go past due, so I don't know why --
10  this must have been a draft form.
11  BY MR. GROGAN:
12    Q.  Someone would have to collect, right?
13    A.  Correct.
14    Q.  Okay. Let's turn to page 19. And, again,
15  this -- my question is really, generally, as you
16  look at this, is this generally accurate?
17    A.  Generally, this is accurate.
18    Q.  Okay. There would be no marketing cost to
19  the tribes?
20         MR. GATEWOOD: Objection; form.
21    A.  I think those were incorrect words because,
22  as we know from the way we structured it, there was
23  marketing costs from a cost per loan. And so I
24  think we were trying to convey that there's no large
25  cost up front from a -- you have to -- a large down

---

**Page 212**

1  payment, as an example.
2  BY MR. GROGAN:
3     Q.  Who ended up paying those per-loan
4  marketing costs in the TailWind costs? Who ended up
5  paying that?
6          MR. GATEWOOD: Objection; form.
7     A.  For which tribe?
8  BY MR. GROGAN:
9     Q.  All three.
10         MR. GATEWOOD: Same objection.
11    A.  I have to go back and -- and look at all of
12  the -- the mechanics.
13  BY MR. GROGAN:
14    Q.  Do you recall that GPLS reimbursed those
15  costs?
16         MR. GATEWOOD: Objection; form.
17    A.  I'll have to go back and look at some
18  documents to refresh.
19  BY MR. GROGAN:
20    Q.  You don't recall right now?
21    A.  I don't recall right now. All the fees get
22  confusing after a long time.
23    Q.  I understand.
24        "Minimal credit exposure." What was the
25  risk of the loss that the tribes faced in this --

---

53 (Pages 209 to 212)

TF App. 0041
TF App. 0792

Michelle Nyugen

| Page 217 | Page 219 |
|---|---|

**Page 217**

1    A.  I would surmise -- this is Jason, so he --
2    these are what his -- his notes are to each slide.
3    BY MR. GROGAN:
4    Q.  I see.
5         He says on page -- well, the third page
6    out -- I'll use the Bates numbers here because the
7    presentation pages are obscured.  Just go to 733.
8    "The main purpose is to discuss the changes that can
9    help protect a very large and successful business."
10        Protected from what, if you know?
11             MR. GATEWOOD:  Objection; form.
12             MR. SCHEFF:  Object to the form.
13   A.  I -- I don't -- I don't know.  I didn't
14   write this.
15   BY MR. GROGAN:
16   Q.  Did you participate at all in the creation
17   of this document?
18   A.  No.  I was off -- I was on vacation.
19   Q.  Okay.  Look at page 15.  And I think you
20   can see the PowerPoint pages.
21             MR. GATEWOOD:  Can you give us the
22   Bates number, please?
23             MR. GROGAN:  Sure.  I think I can.
24   BY MR. GROGAN:
25   Q.  I'm sorry, let's go to page 19, Bates No.

**Page 218**

1    748.
2         The slide says, "Risk to the tribal
3    program.  Why do we need to restructure the model?
4    To protect a growing $700 million business.
5         "What is the risk to the business?  States
6    may argue that the tribe is not the 'true lender'
7    due to TF's involvement."
8         Are you familiar with that phrase, the
9    "true lender"?
10   A.  I am familiar with that.
11   Q.  What do you understand that to mean?
12             MR. SCHEFF:  Objection.
13        To the extent that you can answer that
14   question without reference to discussions with
15   counsel, please do.  If not, then I assume
16   Mr. Gatewood will have a direction for you.
17   A.  I understand the "true lender" definition
18   from counsel.
19   BY MR. GROGAN:
20   Q.  Okay.  Was there discussion within Think
21   Finance about something called the "true lender
22   problem"?
23             MR. SCHEFF:  Just answer the question
24   "yes" or "no."
25        Unless, Matt, you have a different

**Page 219**

1    direction.
2             MR. GATEWOOD:  No, I -- I will
3    instruct the witness not to answer to the extent
4    that the answer requires her to divulge
5    conversations with counsel.
6    BY MR. GROGAN:
7    Q.  Can you answer that without revealing the
8    conversations with counsel?
9    A.  No.  The conversations included counsel.
10   Q.  All conversations that you had regarding
11   the true lender problem included counsel?
12             MR. SCHEFF:  Object to the form.
13   A.  The conversations we had regarding true
14   lender included counsel.
15   BY MR. GROGAN:
16   Q.  Apparently, Mr. Harvison has written a
17   note, "Risk is similar to what we saw with the bank
18   model partnerships."  Do you have an understanding
19   of what he means there?
20             MR. GATEWOOD:  Objection; form.
21   A.  I don't.  I can guess.  I don't know what
22   risk --
23             MR. SCHEFF:  Don't guess.
24   A.  I don't know what risk. . .
25             MR. SCHEFF:  No, I don't want her to

**Page 220**

1    guess.  She's not here to guess, she's here to tell
2    the truth.  Guessing is not telling the truth.
3    She's not going to guess.
4    BY MR. GROGAN:
5    Q.  All right.  Okay.  Let's take a look at
6    page 20.  "How is 'true lender' risk mitigated
7    today?"  And it lines out some activities.  And my
8    question to you is, looking at the -- looking at the
9    activities, not so much the large categorizations,
10   but the smaller bullet points, are these things
11   that, as you understand it, the tribes are doing?
12   A.  Let me just make sure -- 2013.  At this
13   time, I believe that those were the activities the
14   tribes were doing.
15   Q.  Okay.  And the activities that they were
16   doing on the reservation were program management,
17   application verifications, and limited customer
18   service work, and EOB review of loan underwriting?
19   A.  Correct.
20   Q.  What is EOB review?
21   A.  End of business.  End of business day.
22   Q.  I see.  They were reviewing the
23   underwriting at the end of the business day?
24   A.  It -- it goes back to our discussion of
25   they had the opportunity to audit.

55 (Pages 217 to 220)

TF App. 0042
TF App. 0793

Michelle Nyugen

Page 221

1    Q. On a daily basis?
2    A. Correct.
3    Q. Were they actually doing that?
4    A. I believe they were. I didn't speak about
5    it every day with them.
6    Q. Okay.
7    A. But I know that they're -- they identified
8    some issues that went bump in the night, and they
9    brought it to our attention.
10   Q. And they were also engaging in approvals
11   over the underwriting policies and changes,
12   marketing materials, and the product and website
13   changes?
14   A. That's correct.
15   Q. And we talked about that?
16   A. That's correct.
17   Q. Okay. And they own certain key contracts.
18   Contracts with the third-party call centers and with
19   data providers?
20   A. Correct.
21   Q. Okay. Were the tribes doing anything else
22   that's not reflected here?
23   In 2013? This time period?
24   Q. April 2013.
25   A. Not that I can recall right now.

Page 222

1    Q. Okay. Turn the page to -- I don't know
2    what. 22 or 21. "Opportunities to improve."
3    A. Okay.
4    Q. "Increased oversight by the tribes: Tribal
5    management team CEO, CRO, and CCO." Did each of the
6    tribal entities at this time have a CEO, CRO, and
7    CCO?
8    A. 2013. Each tribe was different. Plain
9    Green, for example, I believe had the CEO, as well
10   as Mobiloans. I can't recall if the -- the CCO was
11   already on board -- maybe not yet -- for Mobiloans.
12   Q. What's "CCO" stand for?
13   A. "Chief compliance officer." And then "CRO"
14   is "chief risk officer."
15   Q. Okay. And, I'm sorry, I missed your
16   testimony. Did -- you said Plain Green had the CEO,
17   but not the CRO and CCO?
18   A. I believe so at this April of 2013.
19   Q. Okay. And how about Mobiloans?
20   A. I believe Mobiloans had the CEO, which was
21   Marshall Pierite at the time. And I can't recall if
22   the CCO was already in place.
23   Q. And how about the CRO?
24   A. No, not the CRO.
25   Q. What about Great Plains?

Page 223

1    A. Not Great Plains. They were utilizing the
2    MacFarlane Group to that extent. That was -- that
3    was their wish.
4    Q. Okay. And "Established compliance programs
5    with testing." Is it the import of this slide that
6    the tribes did not yet have that in place; that was
7    an area where they could improve?
8    A. 2013. We -- the Think Finance affiliates,
9    if you will, were performing the compliance --
10   compliance program activities on their behalf and
11   providing them the results, and we were encouraging
12   them to either hire, as we said, a compliance
13   officer, or you can engage another firm.
14   Q. Okay. And how about the comprehensive
15   financial reporting, that was something Think was
16   doing as well at this stage?
17   A. I believe so.
18   Q. Then there's some contractual changes that
19   are contemplated, "Shift from a revenue share to a
20   profit share, 51 percent to the tribe." Was that
21   ever implemented?
22   A. Not while I was there.
23   Q. Okay. Do you know if it -- do you know if
24   it was done afterward?
25   A. I don't know.

Page 224

1    Q. Okay. "Increase tribe ownership from
2    1 percent to 5 percent." Was that ever done?
3    A. I believe it was done, but I don't --
4    again, I wasn't there by the time -- I left. It was
5    in -- it was in the works.
6    Q. "Transfer marketing agreements to the
7    tribe." What does that mean?
8    A. Oh, this is in relation to any marketing
9    agreements, similar to the third-party data
10   providers in the previous slide, to get those
11   contracts into the tribal entities' names.
12   Q. Because currently, they're in Think
13   Finance's name?
14   A. Or TailWind is an entity.
15   Q. Is the answer the same for the server and
16   maintenance agreements?
17   A. Correct.
18   Q. Okay. I confess to being confused about
19   "Operational improvement: Eliminate TF from
20   operation activities (fraud and complaint
21   management)."
22   What do you understand that to mean?
23   A. There were certain activities that Think
24   Finance was performing on behalf of the tribe, so
25   that includes fraud detection, as well as assisting

56 (Pages 221 to 224)

TF App. 0043
TF App. 0794

Michelle Nyugen

Page 289

1  Defendant's Exhibit 1 from Kristen Hensley, refresh
2  your recollection as to how the company responded to
3  that e-mail?
4       A.  Yes, that's correct.
5       Q.  For the record, can you just read the text
6  of the mail from Kristen Hensley?
7       A.  Yes.  "Greg, while I understand that you
8  have only been with Plain Green, LLC, for two
9  months, it is important that you realize that there
10  is a long history and series of decisions of which
11  you probably have very little insight.  As you are
12  aware, Think Finance and Plain Green do work
13  together on the credit underwriting policies and
14  strategies.  At our recent meetings earlier this
15  week, we all agreed to collaborate further on these
16  issues, as evidenced by the two-hour meeting
17  scheduled for today, to specifically discuss
18  underwriting.  Many assertions made in the below
19  e-mail are inaccurate, possibly due to your
20  relatively short time period at Plain Green.  We are
21  happy to discuss this further with you during the
22  call today and again in ongoing calls."
23       Q.  Thank you.  And did you work with
24  Ms. Hensley on issues like this?
25       A.  Yes.

Page 290

1       Q.  And did you often communicate with Plain
2  Green on issues related to this or other issues?
3       A.  Yes.
4       Q.  Can you -- earlier today, you testified
5  that you had, I think you said, frequent contact
6  with Plain Green.  So I want to ask specifically
7  about Plain Green, and then we'll ask a series of
8  the same questions with respect to the other tribes.
9       A.  Okay.
10       Q.  So with Plain Green, how often was your
11  contact?
12       A.  In the very beginning, or just in general?
13       Q.  Start at the very beginning.
14       A.  In -- in the very beginning, as with a
15  startup, there's a lot of touching, if you will.
16  And so what that means is, it was not only daily, it
17  was almost, you know, hourly, several times an hour,
18  talking about different aspects of starting a
19  lending program as a service provider, whether it be
20  "Here's an update on where we're at" from the
21  website that we discussed about earlier, or you had
22  questions on how underwriting would happen, and
23  it's -- it was a lot of that in the very beginning.
24       Q.  And would those conversations occur via
25  phone or e-mail or both?

Page 291

1       A.  Phone, e-mail, as well as in the very
2  beginning, we made a point to go up there at least
3  once a month at the start of the program, and after
4  the program, myself specifically.  We wanted to make
5  sure that everything was okay and that the -- the
6  tribe was happy.  That included meetings with the
7  members of Plain Green as well as the tribal
8  council.
9       Q.  I'll ask you about the tribal council in a
10  second, but in terms of the calls with Plain Green,
11  these are calls that you or other members of your
12  team were having with employees of Plain Green?
13       A.  Absolutely.
14       Q.  So even from day one, Plain Green had its
15  own employees?
16       A.  That's correct.
17       Q.  And then over time, would you say the
18  number of employees increased or decreased?
19       A.  Over time, the number of employees
20  increased.
21       Q.  Did it consistently increase from year to
22  year?  So if we looked at, for example, 2011 versus
23  2012, we would see an increase from '11 to '12?
24       A.  Yes.
25       Q.  Most likely an increase from '12 to '13 and

Page 292

1  so on?
2       A.  That's correct.
3       Q.  Okay.  Was that the same way with the other
4  two tribes?
5       A.  Yes.
6       Q.  In terms of number of employees?
7       A.  Absolutely.
8       Q.  And that the number of employees for both
9  Mobiloans and for Great Plains Lending also
10  increased over time?
11       A.  That's correct.
12       Q.  Okay.  So back to Plain Green.  You also
13  mentioned earlier today that you would have weekly
14  meetings with them.
15       A.  Yes.
16       Q.  Those would occur over the phone?
17       A.  Yes.
18       Q.  And who would participate in those?
19       A.  It would be myself, sometimes Jason
20  Harvison would attend the call, an individual to
21  represent marketing specifically, an individual to
22  represent the risk department specifically.  We had
23  a set agenda.  The agenda would comprise of always
24  giving an update on the product and enhancements,
25  how we're tracking against their earlier budget from

73 (Pages 289 to 292)

TF App. 0044
TF App. 0795

Michelle Nyugen

Page 293

1 a marketing perspective, as well as any updates on
2 risks in the portfolio itself, and if there was any
3 questions.
4 Q. Do you remember, especially in the first
5 year, when Plain Green --
6 MR. SCHEFF: Were you finished with
7 your answer?
8 THE WITNESS: Yes.
9 MR. SCHEFF: Okay.
10 BY MR. GATEWOOD:
11 Q. When the Plain Green operation was just
12 starting up, do you remember who from Plain Green
13 would participate in those weekly discussions?
14 A. In the very beginning, it would have been
15 Neal, as well as Billi Anne.
16 Q. That's Neal Rosette?
17 A. That's correct, Neal Rosette. And Billi
18 Anne Morsette.
19 Q. Any others?
20 A. On occasion, there might have been a
21 question regarding accounting, and so -- I can't
22 recall the accounting individual that would
23 participate as well.
24 Q. As the Plain Green program progressed,
25 would there be additional individuals from -- from

Page 294

1 Plain Green that would participate on the weekly
2 calls?
3 A. Yes.
4 Q. Take a -- you know, 2013 or 2014, and give
5 me an example of who might be on the calls at that
6 point in time.
7 MR. GROGAN: Objection to form.
8 A. You know, let's take 2014. You know, let's
9 take this November time period. The calls would now
10 include Greg Hillyard, who's over compliance. You
11 know, Bo Mitchell, who was acting as the chief
12 operating officer, which was a brand new role. Joel
13 was the CEO and acting in that capacity. Dan would
14 often sit in -- Dan Bellcore would often sit in on
15 the calls from an attorney perspective, as well
16 as -- you know, we would -- so those would be those
17 examples of individuals and how they have changed in
18 their roles and what they were looking for in those
19 calls.
20 BY MR. GATEWOOD:
21 Q. You also mentioned that you would meet with
22 tribal councils. Can you explain, with respect to
23 the Chippewa Cree, how often would these meetings
24 occur?
25 A. In the beginning, we actually met more

Page 295

1 often. I want to just say probably -- the call was
2 every other month, and then we ended up scheduling
3 it once a quarter. The objective of meeting with
4 the council would be to give the council an update
5 on the Plain Green program, how the program was
6 tracking against the budget, any other questions.
7 We wanted to make sure we had it open
8 for -- for the council. It was important that the
9 council understand Think Finance and its role as a
10 service provider. And that was clearly always the
11 case when -- even from the beginning, that Neal and
12 Billi Anne, as well as even Joel, they wanted to
13 always make sure that the service provider got in
14 front of the -- the tribal council so they can
15 provide that insight and -- and also building that
16 relationship and rapport with the tribal council.
17 Q. And where would those meetings with the
18 tribal council take place?
19 A. It was at Box Elder actually in the council
20 headquarters.
21 Q. On the reservation?
22 A. On the reservations, correct.
23 Q. Did it seem to you that as time went by,
24 the Plain Green employees learned more about the
25 lending operation?

Page 296

1 MR. GROGAN: Objection; form.
2 A. Over time, the -- the employees of Plain
3 Green certainly learned more and took on more
4 responsibilities. In the beginning, that tribe and
5 all the other tribes likened the relationship
6 somewhere to their casinos that they had and casino
7 management, where in the beginning, they would
8 ask -- they would lean heavily on the -- on the
9 service provider, and eventually learn more and take
10 it over. And so that was communicated to us early
11 days.
12 BY MR. GATEWOOD:
13 Q. And in Plain Green's case, Plain Green
14 ultimately took over the full, not only lending, but
15 also servicing of the program?
16 A. Yeah, servicing as well as even the
17 platform itself, which is tremendous for them.
18 Q. Okay. Let's turn to Great Plains.
19 A. Okay.
20 Q. From day one, what type of contact did you
21 have with Great Plains?
22 A. So Great Plains was a little bit different
23 because they had MacFarlane, which was beneficial at
24 least for the chairman, because he indicated that
25 the tribe was quite small and there was a lot that

74 (Pages 293 to 296)

TF App. 0045
TF App. 0796

Michelle Nyugen

Page 297

1  they had to deal with, and they were leaning heavily
2  on MacFarlane. They already had, like we said
3  before, American Web Loan, which was a lending
4  operation that I think was already live for one or
5  two years. And so they were familiar with that.
6     Our interactions with the -- the tribe,
7  you know, in the beginning, they -- they did hire
8  someone that's, you know, on site to -- to run the
9  call center and to be the point person and that
10  reported into both MacFarlane as well as a tribal
11  member.
12     Q. So even though MacFarlane performed some
13  task for Great Plains, they also had their own Great
14  Plains employees?
15     A. That's correct.
16     MR. GROGAN: Objection to the form.
17  BY MR. GATEWOOD:
18     Q. Did Great Plains have Great Plains
19  employees the day that it started making loans?
20     A. From what I recall, they -- they did,
21  because I -- I recall going up there and training
22  certain, you know, individuals. So. . .
23     Q. And same question that I asked for Plain
24  Green. Was it your understanding as the product
25  manager that the Great Plains employees became more

Page 298

1  knowledgeable as time went by?
2     A. Yes. That's correct. And they also ended
3  up hiring and utilizing more tribal members in terms
4  of taking roles and eventually becoming the vice
5  president of their consumer lending products.
6     Q. Did you have any weekly calls with the
7  Great Plains group?
8     A. We did. It was very similar format to the
9  Plain Green.
10     Q. Who would participate on those?
11     A. In that format, it would be the -- the
12  Great Plains individual and the MacFarlane
13  individuals, since that's who does -- that's who
14  they designated.
15     Q. Would any counsel -- legal counsel for the
16  tribe participate?
17     A. Yes.
18     Q. Who was that?
19     A. It changed. In the beginning, it was John
20  Kenny Hurts, and then later, it ended up being
21  Eric -- I don't recall his last name.
22     Q. Eric Low?
23     A. Thank you. Eric Low eventually. Oh, I'm
24  sorry, and also their in-house counsel -- sorry, I
25  forgot -- Rebecca Bartlett, you know, she was always

Page 299

1  available on those calls. And so we always had
2  frequent -- she was a direct member -- or she worked
3  directly for the tribe, and we always went through
4  her if we had questions or needed guidance or
5  approvals.
6     Q. And would Think Finance employees meet with
7  the Otoe-Missouria tribal council as well?
8     A. Yes.
9     Q. How often were those meetings?
10     A. That tribe was a bit busier, and so it
11  wasn't as frequent as the Chippewa, but we did
12  strive at least quarterly to provide updates.
13     Q. And where did those meetings occur?
14     A. In Ponca City on tribal land.
15     Q. On the reservation?
16     A. That's correct.
17     Q. With respect to the Tunica-Biloxi and
18  Mobiloans, what type of contact did you have with
19  them?
20     A. For Tunica, I think, as I stated earlier, I
21  came on board to support that, call it, you know,
22  maybe six or eight months later, after it had
23  launched. And the purpose of that was to make
24  everything uniform in terms of how we're handling
25  our relationships. And so then we ended up visiting

Page 300

1  them once a quarter. Again, similar format. We
2  would meet with the -- the internal people. With
3  Mobiloans, it would be Marshall Pierite as the
4  acting CEO or president. Kim Palermo was, I
5  believe, hired at the time, and she was a compliance
6  officer. And then we would meet with the tribal
7  council, the full tribal council.
8     Q. From the time period where you had direct
9  oversight of Think's relationship with Mobiloans,
10  what was your personal contact with them?
11     A. Can you clarify?
12     Q. Sure. You said that you took oversight of
13  the Mobiloans relationship, I guess, in early 2012?
14     A. I think so.
15     MR. GROGAN: Objection to the form.
16  BY MR. GATEWOOD:
17     Q. Did you have weekly meetings with Mobiloans
18  like you did with Plain Green and Great Plains?
19     MR. GROGAN: Objection to the form.
20     A. My communication with Mobiloans was weekly,
21  but as well as daily. And -- and that's not really
22  because I was new to the relationship and wanted to
23  make sure that they knew who I was and I was
24  available and able to support them.
25  BY MR. GATEWOOD:

75 (Pages 297 to 300)

TF App. 0046
TF App. 0797

Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000

Tyler P. Brown (admitted *pro hac vice*)
Jason W. Harbour (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

*Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **THINK FINANCE, LLC,** *et al.*, | Case No. 17-33964 (HDH) |
| Debtors.[1] | (Jointly Administered) |

## AFFIDAVIT OF LINDA ROGENSKI IN SUPPORT OF DEBTORS' MOTION FOR SUMMARY JUDGMENT OF CERTAIN VIRGINIA AND TEXAS CLAIMS

I, Linda Rogenski, having been duly sworn on oath this 27 th day of July 2018 state as follows:

1.       I am over 21 years of age and am competent to testify to the statements set forth in this affidavit. The statements set forth in this affidavit are true and correct to the best of my knowledge, information, and belief based on my personal knowledge.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Think Finance, LLC (6762), Think Finance SPV, LLC (4522), Financial U, LLC (1850), TC Loan Service, LLC (3103), Tailwind Marketing, LLC (1602), TC Administrative Services, LLC (4558), and TC Decision Sciences, LLC (8949) (collectively, the "Debtors").

2.      On April 18, 2018, I was deposed, in person, under oath (the "Deposition").  A true and correct copy of excerpts from the official transcript of the Deposition are attached hereto as Exhibit A (the "Transcript").

3.      I adopt, restate and incorporate the excerpts from the Deposition, as recorded in the Transcript, as my statements in support of the Debtors' *Motion for Summary Judgment of Certain Virginia and Texas Claims*.

4.      If called upon, I could and would testify to the facts contained herein and the statements made at the Deposition as recorded in the Transcript.

Executed on this 27th day of July 2018, in the County of Tarrant, Texas.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

_____
Linda Rogenski

2

TF App. 0799

Linda Rogenski

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO,            *
        Plaintiff,      *
                    *
VS.            * Civil Action
              * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
        Defendants.      *

*******************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
LINDA ROGENSKI
APRIL 19, 2018
*******************************************************

        DEPOSITION of LINDA ROGENSKI, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 19th day of April, 2018, from 9:06 a.m. to 4:49 p.m., before Christy R. Sievert, CSR, RPR, in and for the State of Texas, reported by machine shorthand, at the Fort Worth Club, 306 West 7th Street, Fort Worth, Texas 76102, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**Page 2**

1       A P P E A R A N C E S
2
3   COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4     MR. IRV ACKELSBERG
      MR. JOHN J. GROGAN
5     Langer, Grogan & Diver, PC
      1717 Arch Street, Suite 4130
6     Philadelphia, Pennsylvania 19103
      Phone:   215-320-5701
7     E-mail:  iackelsberg@langergrogan.com
               jgrogan@langergrogan.com
8
      MR. SAVERIO "SAM" MIRARCHI
9     Senior Deputy Attorney General
      Bureau of Consumer Protection
10    1600 Arch Street, Suite 300
      Philadelphia, Pennsylvania 19103
11    Phone:   215-560-2445
      E-mail:  smirarchi@attorneygeneral.gov
12
13  COUNSEL FOR LINDA ROGENSKI:
14    MR. RICHARD L. SCHEFF
      Montgomery, McCracken, Walker & Rhoads, LLP
15    123 South Broad Street
      Philadelphia, Pennsylvania 19109
16    Phone:   215-772-7502
      E-mail:  rscheff@mmwr.com
17
18  COUNSEL FOR KENNETH REES:
19    MR. JONATHAN BOUGHRUM
      Montgomery, McCracken, Walker & Rhoads, LLP
20    123 South Broad Street
      Philadelphia, Pennsylvania 19109
21    Phone:   215-772-7502
      E-mail:  jboughrum@mmwr.com
22
23
24
25

**Page 3**

1       A P P E A R A N C E S
2            (continued)
3   COUNSEL FOR THINK FINANCE, INC.:
4     MR. MATTHEW S. SHELDON
      Goodwin Procter, LLP
5     901 New York Avenue, NW
      Washington, D.C.  20001
6     Phone:   202-346-4000
7     E-mail:  msheldon@goodwinprocter.com
8   COUNSEL FOR VICTORY PARK CAPITAL:
9     MR. DANIEL P. SHAPIRO
      MR. MATTHEW W. HAWS
10    Katten Muchin Rosenman, LLP
      525 W. Monroe Street
11    Chicago, Illinois  60661
      Phone:   312-902-5622
12    E-mail:  daniel.shapiro@kattenlaw.com
               matthew.haws@kattenlaw.com
13
14  COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
15    MR. PATRICK DAUGHERTY
      Van Ness Feldman, LLP
16    1050 Thomas Jefferson Street, NW
      Seventh Floor
17    Washington, D.C.
      Phone:   202-298-1874
18    E-mail:  pod@vnf.com
19  ALSO PRESENT:
20    GUS PHILLIPS, Videographer
      KEVIN BYERS
21    SCOTT ZEMINCK (Appearing telephonically)
22
23
24
25

**Page 4**

1           I N D E X
                      PAGE
2
   Appearances................................. 2-3
3
   Exhibits.................... 5-7
4
   Proceedings...................... 8
5
6  LINDA ROGENSKI:
     Examination by Mr. Ackelsberg.............. 9
7
8  Changes and Signature................. 273-274
9  Reporter's Certification............... 275-276
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

TF App. 0047
TF App. 0800

Linda Rogenski

---

**Page 5**

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 155 | Universal Fund II | 31 |
| | Financial Result | |
| | August 2010 | |
| | TF-PA 504628 | |
| Exhibit 156 | Draft, Funds Flow | 57 |
| | Structure for GPL | |
| | TF-PA098465 - 098467 | |
| Exhibit 157 | E-mail correspondence | 108 |
| | 10-21-14, Re: Paths and other | |
| | info you requested | |
| | TF-PA 454508 - 454014 | |
| Exhibit 158 | Wells Fargo, WellsOne | 125 |
| | Account | |
| | TF-PA 454501 - 454507 | |
| Exhibits 159-161 | (Not marked or identified.) | |
| Exhibit 162 | E-mail correspondence | 134 |
| | 7-18-14, Re: Debt Sale wire | |
| | requests | |
| | TF-PA 359539 - 359551 | |
| Exhibit 163A | E-mail correspondence | 220 |
| | 9-24-12, Re: Plain Green | |
| | Audit Questions | |
| | TF-PA 351208 - 351217 | |
| Exhibit 163B | Think Finance - SOX | 224 |
| | Process Documentation, 5.3.0 | |
| | Daily Settlement | |
| | TF-PA 351218 - 351231 | |
| Exhibit 164 | E-mail correspondence | 134 |
| | 7-26-12, Re: Weekly Package | |
| | GPLP00209657 - 00209727 | |
| Exhibit 165A | VPC Monthly Package | 153 |
| | Checklist Produced in | |
| | Native Format | |
| | TF-PA 389604 | |

---

**Page 6**

E X H I B I T S
(continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 165B | E-mail correspondence | 154 |
| | 6-21-13, Re: GPLS Monthly | |
| | Package, May 2013 | |
| | GPLP00007224 | |
| Exhibit 166A | E-mail correspondence | 187 |
| | 6-6-13, Re: (Near Final) | |
| | Tribe Financials | |
| | TF-PA 368104 | |
| Exhibit 166B | Plain Green Lending | 187 |
| | Financial Results, May 2013 | |
| | Produced in Native Format | |
| | TF-PA 368105 | |
| Exhibit 166C | Mobiloans Lending | 187 |
| | Financial Results, May 31, 2013 | |
| | Produced in Native Format | |
| | TF-PA 3668106 | |
| Exhibit 166D | Great Plains Lending, LLC | 187 |
| | Financial Results, May 2013 | |
| | Produced in Native Format | |
| | TF-PA 368107 | |
| Exhibit 166E | E-mail correspondence | 207 |
| | 6-12-13, Re: May Financials | |
| | TF-PA 434714 - 434715 | |
| Exhibits 167-172 | (Not marked or identified.) | |
| Exhibit 173 | E-mail correspondence | 233 |
| | 9-13-12, Re: Plain Green | |
| | Audit Questions | |
| | TF-PA 323902 - 323910 | |
| Exhibits 174-175 | (Not marked or identified.) | |
| Exhibit 176 | E-mail correspondence | 238 |
| | 4-10-13, Re: PGL Financial | |
| | support for December 2012 | |
| | TF-PA 535853 - 535854 | |

---

**Page 7**

E X H I B I T S
(continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 177 | E-mail correspondence | 248 |
| | 4-17-13, Re: Other PG items | |
| | TF-PA 104005 | |

---

**Page 8**

P R O C E E D I N G S

1  THE VIDEOGRAPHER: We are now on the
2  record for the videotaped deposition of Linda
3  Rogenski. The time is 9:06 a.m., April 18, 2018.
4  In the matter of the Commonwealth of Pennsylvania,
5  et al, vs. Think Finance, Civil Action
6  No. 14-7139-JCJ. Being held in the United States
7  District Court for the Eastern District of
8  Pennsylvania.
9  The court reporter is Christy Sievert, and
10  the videographer is Gus Phillips. Both are
11  representatives of Kaplan Leaman and Wolfe Court
12  Reporters.
13  Will counsel please state their
14  appearances for the record.
15  MR. ACKELSBERG: Irv Ackelsberg,
16  special counsel for the Commonwealth of
17  Pennsylvania.
18  MR. MIRARCHI: Saverio Mirarchi, for
19  the Commonwealth of Pennsylvania.
20  MR. GROGAN: John Grogan, also for the
21  Commonwealth.
22  MR. DAUGHERTY: Andrew Daugherty, on
23  behalf of National Credit Adjusters.
24  MR. HAWS: Matthew Haws, on behalf of

---

2 (Pages 5 to 8)

TF App. 0048
TF App. 0801

Linda Rogenski

Page 9

1 the Victory Park defendants.
2 MR. SHAPIRO: Dan Shapiro, for the
3 Victory Park defendants. And Scott Zeminck, the
4 general counsel of Victory Park, on the telephone
5 with us as well.
6 MR. SHELDON: Matt Sheldon, for the
7 Think Finance defendants.
8 MR. BOUGHRUM: Jonathan Boughrum, for
9 Ken Rees.
10 MR. SCHEFF: Richard Scheff, for Linda
11 Rogenski.
12 LINDA ROGENSKI
13 having been first duly sworn,
14 testified as follows:
15 EXAMINATION
16 BY MR. ACKELSBERG:
17 Q. Good morning, Ms. Rogenski. And is it
18 Rogenski or Rogenski?
19 A. It's Rogenski.
20 Q. Rogenski. Okay.
21 I introduced myself to you before. I'm
22 Irv Ackelsberg, and I'm with -- representing the
23 Commonwealth of Pennsylvania. And you understand
24 this is litigation against your former employer,
25 Think Finance?

Page 10

1 A. Yes.
2 Q. Okay. And various other -- other
3 defendants.
4 Ms. Rogenski, have you ever been deposed
5 before?
6 A. One time.
7 Q. Okay. And was that in a personal matter or
8 related to your job?
9 A. Personal matter.
10 Q. Okay. And what kind of a case was that?
11 A. A car accident.
12 Q. Okay. So you might have some -- how long
13 ago was that?
14 A. It was in my early 20s.
15 Q. Okay.
16 A. So a long time ago.
17 Q. So -- okay. So -- so I'm sure your lawyer
18 has gone over, like, how this all works, and you've
19 got a -- feel already for how this is going to
20 happen, but just to clarify that you do understand
21 what's going on here, I need to just run through a
22 few preliminaries.
23 And the first is -- is just to confirm
24 with you that the way this -- the way this
25 proceeding works is that it's a series of questions

Page 11

1 and answers. And, you know, I'll be asking
2 questions. You -- you then answer. And then
3 your -- my questions, your answers are going to be
4 in a transcript that the court reporter here is
5 going to be preparing at the end, a written
6 transcript. Do you understand that?
7 A. Yes.
8 Q. And that it's possible that that transcript
9 could be used by any of the parties in this case
10 over the course of the -- the proceedings in this --
11 in this lawsuit. Okay?
12 A. Yes.
13 Q. Now, it's not just -- as you see, there's
14 lots of lawyers in the room. And so from time to
15 time, there may be an objection. Your lawyer may
16 object, but also some of these -- the other lawyers
17 representing the other parties may insert an
18 objection. They're objecting to my question. What
19 you need to understand is that unless your lawyer
20 directs you not to answer that specific question,
21 you still have to answer the question, even though
22 lawyers have objected. Okay?
23 A. Okay.
24 Q. All right. So the court reporter is going
25 to be typing -- well, not just my questions, not

Page 12

1 just your answers, but all the objections.
2 Everything that happens here on the record is going
3 to be recorded, and that's the official -- the
4 official transcript. Okay?
5 A. Okay.
6 Q. And because the written transcript, rather
7 than the videotape that -- that is being prepared,
8 is going to be the official record, we really need
9 you to -- to give us verbal responses to all the
10 questions. So nods or shakes or shrugs, those
11 things don't get -- make -- that's hard for the
12 court reporter to -- to record. So there may be a
13 moment when I say, "Is that a yes?" And, you know,
14 it -- please forgive me. It's not intended to be
15 disrespectful. It's just that we need -- we need
16 verbal responses to everything. Okay?
17 A. Okay.
18 Q. Alrighty. Another sort of ground rule is
19 that if you don't understand my question, it's
20 perfectly fine to say, "I don't understand the
21 question," and then I'll try to rephrase it. If you
22 don't know the answer to the question, you can --
23 that's perfectly fine too. You can just tell me, "I
24 don't know the answer to that."
25 Now, the -- the whole thing here is just --

3 (Pages 9 to 12)

TF App. 0049
TF App. 0802

Linda Rogenski

Page 121

1 period passes, you're not sharing anything with
2 anyone.
3 MR. ACKELSBERG: Exactly.
4 MR. SCHEFF: Thank you.
5 MR. ACKELSBERG: Dan, can we move on,
6 or is there anything else you need to clarify on the
7 record?
8 I would say to -- to counsel that given
9 that -- that there are these -- that there's this
10 other -- this other proceeding that's going on, and
11 if -- you should talk to me if -- if you're
12 concerned about -- I mean, I -- you know, I want to
13 make sure that I'm getting the right information
14 from creditors' committee counsel. If there's -- if
15 there's some disputes there, I certainly don't want
16 to do anything inconsistent with my obligations
17 under -- under the confidential --
18 MR. SCHEFF: We understand that.
19 MR. ACKELSBERG: Yeah.
20 MR. SHAPIRO: For the moment -- and we
21 will be in touch with you on this. For the moment,
22 please don't share this outside of this case. And
23 we'll be in touch with you on this document to let
24 you know whether that -- our position has changed on
25 that or -- or not.

Page 122

1 MR. ACKELSBERG: But with regard to
2 other documents, I can tell you that just -- there
3 was a representation made to me by -- by counsel for
4 the creditors' committee that there is an
5 understanding between him and Hunton Williams
6 that -- that documents marked confidential in our
7 case could be shared.
8 Now, I have not -- I have not shared
9 anything at this point, but I -- I'm trying to
10 remember what -- what was said. There certainly was
11 nothing explained in terms of any difference between
12 "confidential" or "confidential, attorneys' eyes
13 only." And so since nothing has been exchanged, I
14 would just ask you to clarify what --
15 MR. SHAPIRO: That's fair.
16 MR. ACKELSBERG: Yeah.
17 MR. SHAPIRO: So until we've had a
18 chance to do that, though, you won't share any of
19 these documents?
20 MR. ACKELSBERG: Yes, I -- I promise
21 that.
22 MR. SHAPIRO: Okay.
23 MR. SHELDON: And let me just state
24 for the record that I -- I think at least in some
25 instances, there's been some confusion between

Page 123

1 counsel for the creditors' committee as to what the
2 agreements with Hunton have been as to the sharing
3 of documents. And so before you share any
4 documents, I would just ask you to confer with
5 myself or confer with Hunton Williams to make sure
6 that everyone is on the same page.
7 MR. ACKELSBERG: I think I've already
8 said that I -- that I would do that.
9 MR. SHAPIRO: That's fine. Thank you.
10 BY MR. ACKELSBERG:
11 Q. So -- sorry, Ms. Rogenski, for the -- for
12 the lawyer distractions, but let's go -- you know,
13 now it's back to you.
14 So this started as an inquiry from Victory
15 Park to Chris Lutes, right? Or --
16 A. That's what it appears to be.
17 Q. Okay. And then it -- it's an inquiry
18 where -- where an investor is -- is asking for the
19 mechanics: How is it that Think Finance has actual
20 control over the -- the tribal bank accounts, right?
21 That's what. . .
22 A. That's what it appears to be asking.
23 Q. Okay. And so then Chris refers that to you
24 for you to help them understand how that actually
25 works?

Page 124

1 A. Yes.
2 Q. Okay. And as I understand, your answer is
3 that the control that -- that Think Finance finance
4 department has over the accounts titled in the name
5 of the tribal entities is not through the account
6 contract -- the account agreements themselves, but
7 rather, through some administrative -- separate
8 administrative agreement that Think has with Wells
9 Fargo at this point in time?
10 A. Access to the administrative portal.
11 Q. And what does that mean, "administrative
12 portal"?
13 A. That when you do online banking with Wells
14 Fargo, you are required to use a product they call
15 CEO, which is their client electronic something.
16 And that's where all of your accounts are housed and
17 that's where you set any kind of limits, where you
18 put positive pay or you say who's authorized to --
19 to set up a wire or release a wire, all that -- all
20 that type of information, and to look at account
21 balances in detail.
22 Q. And so the -- the criteria with regard to
23 access in -- in the various accounts that were
24 administered through the CEO portal, that was
25 determined by agreement between Think Finance and

31 (Pages 121 to 124)

TF App. 0050
TF App. 0803

Linda Rogenski

---

**Page 125**

1  Wells Fargo?
2          MR. SHELDON:  Object to form.
3      A.  Yes, I would say that was an agreement with
4  Think Finance -- it was Think Finance's CEO portal,
5  yes.
6  BY MR. ACKELSBERG:
7      Q.  So we previously -- well, strike that.
8      I'm going to show you one another
9  document, and then I think it will be a good time to
10 break for lunch.
11     A.  Are we finished with this one, sir?
12     Q.  Yes.  For the time being, yes.
13         (Exhibit No. 158 marked.)
14         MR. SCHEFF:  What number is this?
15         MR. ACKELSBERG:  158.
16 BY MR. ACKELSBERG:
17     Q.  We're looking at a bank statement from
18 Wells Fargo with regard to the Plain Green
19 collection account; am I right?
20     A.  Correct.
21     Q.  And this is from January of 2014?
22     A.  Yes.
23     Q.  And the address that appears to be the
24 mailing address for the account is the office of
25 Think Finance.  Am I right?

---

**Page 126**

1      A.  That's the address on the -- on the report.
2      Q.  And is -- was that the procedure for
3  monthly bank statements, that Wells would send --
4  we're talking about Plain Green at the moment --
5  would send the bank statements to Think Finance?
6      A.  I don't know if they mailed these or if we
7  went online and printed them out.
8      Q.  Okay.  But they were -- what we're looking
9  at here, TF-PA-454501, is an example of a bank
10 statement that -- during the period of time that
11 Wells was the bank handling the Plain Green
12 accounts, this is the way it was reported out by
13 Wells Fargo:  Plain Green, LLC, collection account,
14 in care of -- well, with an address of the Think
15 Finance office?
16     A.  That's correct.
17     Q.  And we're looking at the collection
18 account.  Am I right that the funding account would
19 have been done the same way?
20     A.  Without seeing it, but I would say yes,
21 because they were all under the Think Finance CEO
22 umbrella.
23     Q.  And the tribes did not have access to
24 the -- to the CEO portal at -- at Wells Fargo, did
25 they?

---

**Page 127**

1      A.  Yes, they did.
2      Q.  And did they have -- so -- and was that
3  true for all three of the tribes?
4      A.  No.  Only Plain Green had accounts at Wells
5  Fargo.
6      Q.  Okay.  And with regard to Plain Green, they
7  had access.  Did -- did the tribes themselves, as
8  far as you know, have the ability -- I'm sorry,
9  we're just talking about Plain Green.  Did Plain
10 Green have the ability, itself, to go into the
11 portal and wire money without Think Finance's
12 involvement?
13     A.  Without looking back at the specifics on
14 the -- the setup, I don't know the answer.  It does
15 take two people, one to set up, one to release.
16     Q.  Okay.  But -- so --
17     A.  Typically, we would set them up, and they
18 would go in and release.
19     Q.  And when they release, would they be doing
20 that through the portal?
21     A.  Yes.
22     Q.  Okay.  So it -- so in a typical wire
23 transfer, it would have required a setup on the
24 Think Finance side, and then an actual release from
25 the Plain Green side?

---

**Page 128**

1      A.  That would be correct.
2      Q.  Okay.  All done through the Wells portal?
3      A.  That would be correct.
4      Q.  Okay.  And how did the movement of money
5  work with regard to Great Plains Lending?
6      A.  It changed over time.  For the most part,
7  they handled most of the their wires on their own.
8  We would do the setup, and -- or they would do the
9  setup, and then they would release.  Meaning, Great
10 Plains sometimes set up their own wires and released
11 them, and sometimes we set them up, and they release
12 them.
13     Q.  So there were times when Great Plains would
14 release wires that Think Finance was not -- not
15 playing a role?
16     A.  Yes.
17     Q.  And did that include transfers to Great --
18 to GPLS?
19     A.  I wouldn't know without looking at some of
20 the transactions, but I would say no.
21     Q.  Okay.  So what kinds of transactions could
22 Great Plains Lending do out of their -- their
23 accounts -- and we're talking about the funding and
24 collection accounts, right?
25     A.  Yes.

---

32  (Pages 125 to 128)

TF App. 0051
TF App. 0804

Linda Rogenski

## Page 129

1    Q.  Okay.  So what was the extent of Great
2  Plains Lending's ability to move money in and out of
3  the funding or collections account by themselves
4  without Think Finance?
5    A.  They were their accounts.  They could move
6  anything they wanted to move.
7    Q.  Your previous answer said, though, that
8  they wouldn't have -- they wouldn't have done
9  anything on their own with regard to transfers to
10  GPLS.
11    A.  Not to my knowledge, because we always
12  coordinated that with them.  Gave them the amounts,
13  and they would confirm them and then do the wires.
14    Q.  Okay.  So you were involved in some fashion
15  at least with regard -- "you," I mean the Think
16  Finance finance people -- were involved in any -- in
17  any wire transfer that involved GPLS?
18    A.  Yes.
19    Q.  What about with Mobiloans?
20    A.  Mobiloans, at different points in time, it
21  was different.  The ultimate, I think, ending
22  position was that we would set up the wires, notify
23  them, and they would release them.
24    Q.  Okay.  And you mentioned that the other two
25  tribal entities other than Plain Green did not --

## Page 130

1  their accounts were not in -- in Wells Fargo, right?
2    A.  Correct.
3    Q.  Did -- well, did the banks that the other
4  tribes use have an administrative portal similar to
5  Wells' CEO function?
6    A.  I am -- I do not know.
7    Q.  Okay.  Because that was more on the
8  treasury side?
9    A.  No.  Just because we had the -- we had the
10  CEO portal -- being Think Finance owned the CEO
11  portal relationship with Wells Fargo, and we brought
12  the Plain Green tribes in under our umbrella for
13  ease of administration.  And the other two tribes
14  had their own banks, and I don't know how they had
15  their stuff set up.  They added us to have access to
16  view and access to set up wires.
17    Q.  Okay.
18    A.  "Us" meaning various people on the Think
19  Finance team.
20    Q.  What would -- were there ever a
21  circumstance where -- that you know, where Think
22  Finance set up a wire, and -- and the tribal entity
23  did not release?
24    A.  I can't remember a specific time.  That's
25  not to say it never happened.

## Page 131

1    Q.  Were there situations where the Think
2  Finance finance people were waiting to get the
3  attention of the tribe to release, and it took a
4  while for that to happen?
5    A.  Yes.
6    Q.  Okay.  How often did that happen?
7    A.  I can't even give you a percentage.  It was
8  just occasionally.
9    Q.  Were there -- as between the three tribes,
10  were -- were there -- was there a tribe that was --
11  I'm not sure what word to use -- delinquent or -- or
12  difficult for the -- for the Think Finance people in
13  terms of getting -- getting the proper release?
14    A.  I would say Plain Green, because they
15  had -- you know, they were in a remote location and
16  had weather issues and things at times.
17    Q.  So what would happen if -- let's say --
18  now, did you -- did you need -- let's say you want
19  to make -- it's Plain Green, and there's money
20  sitting in the collections account, and you want to
21  transfer the 99 percent to GPLS.  Right?  And that's
22  at Citibank, right?
23    A.  Yes.
24    Q.  So were there -- so I want to be clear in
25  what -- what kind of a situation we're talking

## Page 132

1  about.  Would that include situations where you and
2  Think Finance, in its capacity as the administrative
3  agent for VPC, is trying to get Plain Green to
4  release a wire that you've set up for the transfer
5  to GPLS for its 99 percent share?  Would that be the
6  kind of context that -- that you're talking about
7  where there would be some -- some delay in getting a
8  response back from Plain Green?
9       MR. SHAPIRO:  Object to form.
10    A.  That could happen.
11  BY MR. ACKELSBERG:
12    Q.  Okay.  And so what was the procedure for --
13  you know, in the situation where -- was there a way
14  that the wire could be released without the tribe
15  giving the okay?
16    A.  I'm sure there were occasions where the
17  wire was released prior to receiving okay from the
18  tribe when the wire cutoff time was approaching or
19  going to pass.  Generally, if they couldn't release
20  their wires, they would, in e-mail, tell us -- or in
21  phone call, tell us, "It's okay.  Go ahead and
22  release that for us.  We can't get into the office."
23    Q.  Okay.  And -- and were there times you
24  couldn't even get the e-mail back, and that you just
25  had to get -- had to get the wire to GPLS on your

33  (Pages 129 to 132)

TF App. 0052

TF App. 0805

Linda Rogenski

---

Page 201

1 inception to date, the money that's been transferred
2 to the tribe.
3    Q. I see. That's inception to date. Okay.
4 So in -- over the first two years of the program,
5 that's the total amount of cash that was paid over
6 to Plain Green?
7    A. Correct.
8    Q. Okay. And then what's the "loan
9 receivable" line mean?
10    A. This loan receivable would be the -- the
11 1 -- their 1 percent balance of the whole program.
12 The loans -- the -- they own all loans, but they're
13 only showing 1 percent on their balance sheet.
14    Q. Okay. What -- I'm just curious, what --
15 what does that mean that they -- they own all the
16 loans, but only 1 percent?
17    A. They -- we show the 1 percent because
18 they've sold off participations in 99 percent of the
19 loans. So we could break this into two lines and
20 show here's 100 percent, here's the 99 percent that
21 they sold participations in. Would get you down to
22 the same number. We just show the 1 percent.
23    Q. Well, I'm just curious about the way you
24 said that. You said, "They own all the loans, but
25 we only reflect 1 percent." What do you mean "they

Page 202

1 owned all the loans"?
2    A. They -- say they own the loans because
3 they -- they're the ones that created the loans.
4 They're their loans. They manage them, they collect
5 all the money on them, regardless of the fact that
6 they sold participations off in them. They manage
7 those loans. They're their loans.
8    Q. They manage them through you, right?
9 Through Think Finance?
10        MR. SCHEFF: Object to the form.
11    A. I don't know -- I mean, they're involved in
12 the management of them. They're authorizing, saying
13 that the loans are made or not made.
14 BY MR. ACKELSBERG:
15    Q. Okay. I'm just curious what you meant.
16 "Accountants receivable," what is that?
17    A. Well, that says, "Reimbursement of expenses
18 from GPLS and their service fee."
19    Q. Is that a cumulative number, or is that
20 just for a one month. . .
21    A. That's a point in time. The balance sheet
22 is a point in time.
23    Q. Okay. Same thing with "accounts
24 receivable"?
25    A. Yes. And that's -- you see that's two-day

Page 203

1 wire and payment clearing. So that's just cash
2 that's clearing through the banks.
3    Q. Okay. And then you have -- in the -- under
4 "Liabilities," the -- the "accounts payable and
5 accrued expenses," which it says, "Payables to
6 TailWind and TCDS," is -- is that -- that's just a
7 point in time, the -- the payables that -- that
8 exist in that point in time?
9    A. That should be the sum of the numbers over
10 here.
11    Q. Over where?
12    A. On May -- on the -- on the "Income
13 Statement" tab for May.
14    Q. Okay.
15    A. Without a calculator, I don't know, but
16 it's -- it should be close to that number.
17    Q. Okay. And then the "legal reserve," what's
18 that? That's pursuant to the contract, right?
19    A. That was pursuant to the contract. Just a
20 reserve they were required to have.
21    Q. And that's money sitting in an account
22 somewhere pursuant to the contract?
23    A. Yes. It would be in this cash up here
24 somewhere.
25    Q. Now, what about "notes payable to Haynes,"

Page 204

1 what's that about?
2    A. That is for Plain Green. I think we talked
3 about earlier that the Haynes -- Haynes -- there was
4 an agreement between Haynes and -- and Plain Green
5 tribe that they would lend them money. This was the
6 balance at a point in time.
7    Q. Now, we looked at an earlier point in time
8 where the money that Haynes was lending to Plain
9 Green to fund the loans was coming from Think
10 Finance, and that -- right?
11    A. That's a separate -- that's a separate --
12        MR. SCHEFF: Object to the form.
13    A. That's a separate contract between Think
14 Finance and Haynes.
15 BY MR. ACKELSBERG:
16    Q. Well, so it wouldn't even show up on -- it
17 wouldn't show up on this report?
18    A. The -- the part between Think and Haynes?
19    Q. Yes.
20    A. No, because these are Plain Green's
21 financials.
22    Q. Okay. Do you know if at this point in
23 time, the money that Haynes was lending to the tribe
24 was still coming from Think Finance?
25    A. I believe it --

WWW.KLWREPORTERS.COM

TF App. 0053
TF App. 0806

Linda Rogenski

Page 205

1      MR. SCHEFF:  Object to the form.
2      Go ahead.
3      A.  I believe it was.
4  BY MR. ACKELSBERG:
5      Q.  Okay.  And then it says, "Notes payable to
6  the tribe," a million dollars.  What's that?
7      A.  There was -- there was a -- a point in time
8  somewhere in this window, in '13, that the actual
9  Chippewa Cree wanted to put some excess cash they
10 had into their Plain Green structure to lend on
11 loans and to earn some extra interest on.  That was
12 theirs.
13     Q.  Okay.
14     A.  So another capital -- another financing
15 source.
16     Q.  And then Line 11, "Other payables," there's
17 a notes that says, "Intercept debt sale
18 payments/reserves."  So explain to us that line.
19     A.  Okay.  So that would -- that would be --
20 and so that would be any other -- it's what it says,
21 it's Intercept debt sale payments or reserves.  I'm
22 not sure how to explain it any -- any better than
23 that.  Yeah, I mean, I'm just not sure how to
24 explain that.  Intercept is the ACH processor.
25     Q.  Now ordinarily, when I've looked at balance

Page 206

1  sheets for lenders, I see, like, a provision for
2  loan loss.  I don't see that here.  Do you know why?
3      A.  That was part of the agreements, that
4  the -- the tribe would -- the tribe didn't have to
5  absorb -- actually, I have to look at the agreement
6  to get the specifics.  I don't remember the
7  specifics.  But --
8      Q.  But they weren't going to incur -- because
9  Think Finance was essentially incurring the risk of
10 loss on -- on bad loans; am I right?
11     MR. SHELDON:  Object to form.
12 BY MR. ACKELSBERG:
13     Q.  You're familiar with the contracts, right?
14     A.  Yes.
15     Q.  Yeah.  And that was your understanding of
16 the contracts, correct?
17     MR. SHELDON:  Object to form.
18     A.  Yes.
19 BY MR. ACKELSBERG:
20     Q.  Now, what is -- I know you told us that
21 with regard to the income statements, that the
22 accounting was done in accordance with GAAP,
23 G-A-A-P.  Would that be true of the balance sheet as
24 well?
25     A.  These are the program financials.  We do

Page 207

1  them in conformity with GAAP to the best we can.
2  They're not -- the program financials themselves are
3  not audited.  So I can't state that they were
4  independently audited and noted that they were under
5  GAAP.  These would go in -- these would go --
6  provided to the tribes, and they would combine them
7  with their operations, and then theirs should be
8  prepared in GAAP.
9      Q.  Okay.  And -- and without -- without
10 spending a lot of time on the Mobiloans and the
11 Plain Greens, can -- can we agree that -- that they
12 were done in accordance with the same protocol that
13 you've described with regard to Plain Green?
14     A.  Yes.
15     MR. SHELDON:  Counsel --
16     MR. ACKELSBERG:  Yeah.  Yes.  We're
17 near a break here.
18 BY MR. ACKELSBERG:
19     Q.  I want to -- we'll end with a document that
20 I've identified as 166-E.  We'll end -- I mean,
21 until the break.  There's -- there's a little bit
22 more.
23     (Exhibit No. 166-E marked.)
24     MR. SHELDON:  I think the witness
25 previously said she was hoping to take a break after

Page 208

1  the last exhibit.  How long are you going to --
2      MR. ACKELSBERG:  Yes.  Well, we
3  already heard from the -- we only have five minutes
4  left on the -- on the tape, so I -- I'm sorry you
5  missed that.  So I said we're going to -- he says
6  break in five, so I'm just going to --
7      MR. SHELDON:  No, I know, you're going
8  to be no more than five minutes.
9      MR. ACKELSBERG:  Yes.  Yes, before a
10 break.  Yes.
11     A.  (Reviews document.)
12 BY MR. ACKELSBERG:
13     Q.  So let me just ask a -- just a few -- a few
14 brief questions.  So you saw that in the previous
15 e-mail, we -- Bob Peterson was sending to Chris
16 Lutes all of the -- the tribal financials together.
17 You see that, right?
18     A.  Yes.
19     Q.  And then six days later, Chris Lutes is
20 sending to various people on the e-mail the Great
21 Plains Lending financials that had been sent to --
22 previously to Chris Lutes, right?
23     A.  That appears so.
24     Q.  Okay.  So I'm just -- my question is just
25 to kind get a sense of the -- of the protocol and

52 (Pages 205 to 208)

TF App. 0054
TF App. 0807

Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000

Tyler P. Brown (admitted *pro hac vice*)
Jason W. Harbour (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

*Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **THINK FINANCE, LLC,** *et al.,* | Case No. 17-33964 (HDH) |
| Debtors.[1] | (Jointly Administered) |

## AFFIDAVIT OF CHRISTOPHER LUTES IN SUPPORT OF DEBTORS' MOTION FOR SUMMARY JUDGMENT OF CERTAIN VIRGINIA AND TEXAS CLAIMS

I, Christopher Lutes, having been duly sworn on oath this 27th day of July 2018 state as follows:

1.      I am over 21 years of age and am competent to testify to the statements set forth in this affidavit. The statements set forth in this affidavit are true and correct to the best of my knowledge, information, and belief based on my personal knowledge.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Think Finance, LLC (6762), Think Finance SPV, LLC (4522), Financial U, LLC (1850), TC Loan Service, LLC (3103), Tailwind Marketing, LLC (1602), TC Administrative Services, LLC (4558), and TC Decision Sciences, LLC (8949) (collectively, the "Debtors").

2. On May 3, 2018, I was deposed, in person, under oath (the "Deposition"). A true and correct copy of excerpts from the official transcript of the Deposition are attached hereto as Exhibit A (the "Transcript").

3. I adopt, restate and incorporate the excerpts from the Deposition, as recorded in the Transcript, as my statements in support of the Debtors' *Motion for Summary Judgment of Certain Virginia and Texas Claims*.

4. If called upon, I could and would testify to the facts contained herein and the statements made at the Deposition as recorded in the Transcript.

Executed on this 27 th day of July 2018, in the County of Tarrant, Texas

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

_____
Christopher Lutes

2

**TF App. 0809**

Christopher Lutes

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO, *
　　　　　Plaintiff, *
　　　　　　　　　　　　　*
VS. 　　　　　* Civil Action
　　　　　　　　* No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
　　　　　Defendants. *

*****************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
CHRISTOPHER LUTES
MAY 3, 2018
*****************************************************

　　　DEPOSITION of CHRISTOPHER LUTES, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 3rd day of May, 2018, from 9:03 a.m. to 5:13 p.m., before Christy R. Sievert, CSR, RPR, in and for the State of Texas, reported by machine shorthand, at the Fort Worth Club, 306 West 7th Street, Fort Worth, Texas 76102, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

```
 1          A P P E A R A N C E S
 2
 3   COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
 4     MR. IRV ACKELSBERG
       Langer, Grogan & Diver, PC
 5     1717 Arch Street, Suite 4130
       Philadelphia, Pennsylvania 19103
 6     Phone:   215-320-5701
       E-mail:  iackelsberg@langergrogan.com
 7
       MR. SAVERIO "SAM" MIRARCHI
 8     Senior Deputy Attorney General
       Bureau of Consumer Protection
 9     1600 Arch Street, Suite 300
       Philadelphia, Pennsylvania 19103
10     Phone:   215-560-2445
       E-mail:  smirarchi@attorneygeneral.gov
11
12   COUNSEL FOR CHRISTOPHER LUTES:
13     MR. RICHARD L. SCHEFF
       Montgomery, McCracken, Walker & Rhoads, LLP
14     123 South Broad Street
       Philadelphia, Pennsylvania 19109
15     Phone:   215-772-7502
       E-mail:  rscheff@mmwr.com
16
17   COUNSEL FOR KENNETH E. REES:
18     MR. DAVID F. HERMAN
       Montgomery, McCracken, Walker & Rhoads, LLP
19     123 South Broad Street
       Philadelphia, Pennsylvania 19109
20     Phone:   215-772-7502
       E-mail:  dherman@mmwr.com
21
22
23
24
25
```

## Page 3

```
 1          A P P E A R A N C E S
              (continued)
 2
 3   COUNSEL FOR THINK FINANCE, INC.:
 4     MR. MATTHEW S. SHELDON
       Goodwin Procter, LLP
 5     901 New York Avenue, NW
       Washington, D.C.  20001
 6     Phone:   202-346-4000
 7     E-mail:  msheldon@goodwinprocter.com
 8   COUNSEL FOR VICTORY PARK CAPITAL:
 9     MR. DANIEL P. SHAPIRO
       MR. MATTHEW W. HAWS
       Katten Muchin Rosenman, LLP
10     525 W. Monroe Street
       Chicago, Illinois  60661
11     Phone:   312-902-5622
       E-mail:  daniel.shapiro@kattenlaw.com
12         matthew.haws@kattenlaw.com
13
14   COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
15     MR. PATRICK DAUGHERTY
       Van Ness Feldman, LLP
16     1050 Thomas Jefferson Street, NW
       Seventh Floor
17     Washington, D.C.
       Phone:   202-298-1874
       E-mail:  pod@vnf.com
18
19   ALSO PRESENT:
20     WILL RAINE, Videographer
       KEVIN BYERS
21
22
23
24
25
```

## Page 4

```
 1          I N D E X
                         PAGE
 2
 3   Appearances.................................. 2-3
 4   Exhibits....................................... 5-7
 5   Proceedings................................... 8
 6   CHRISTOPHER LUTES:
 7     Examination by Mr. Ackelsberg.............. 9
 8   Changes and Signature.................. 304-305
 9   Reporter's Certification................ 306-307
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

TF App. 0068
TF App. 0810

Christopher Lutes

## Page 5

E X H I B I T S

NUMBER       DESCRIPTION       PAGE

Exhibit 243    Great Plains Lending    109
                Flow of Funds for Ongoing
                Loan Originations and Sales
                TF-PA 013418

Exhibit 244    Credit Agreement, Plain    169
                Green, LLC, and Haynes
                Investments, Inc.
                TF-PA 000491 - 000503

Exhibit 245    Credit Agreement, Haynes    171
                Investments, Inc., and
                Think Finance, Inc.
                TF-PA 001231 - 001242

Exhibit 246    E-mail correspondence    182
                6-7-12, Re: Revised Structure
                GPLP 00151908 - 00151909

Exhibit 247    E-mail correspondence    186
                6-19-12, Re: Haynes Amendment
                TF-PA 583777 - 583778

Exhibit 248    E-mail correspondence    188
                11-15-12, Re: Fw: Revised
                Put Agreement for your
                review
                TF-PA 608431 - 608433

Exhibit 249    E-mail correspondence    191
                9-11-12, Re: Haynes Loan to PGL
                TF-PA 582865

Exhibit 250    E-mail correspondence    198
                1-18-13, Re: PG credit
                agreement
                TF-PA 041391 - 041392

Exhibit 251    Credit and Security    200
                Agreement
                TF-PA 000504 - 000529

Exhibit 252    Put Agreement    200
                TF-PA 269583 - 228385

## Page 7

E X H I B I T S
(continued)

NUMBER       DESCRIPTION       PAGE

Exhibit 263A    E-mail correspondence    243
                10-29-13, Re: Revised Model
                TF-PA 575005 - 575001

Exhibit 263B    VPC, Summary of Terms    243
                October 29, 2013
                TF-PA 575012 - 575015

Exhibit 264    E-mail correspondence    250
                12-14-13, Re: Monthly
                Reporting Package
                GPLP 00014578 - 00014581

Exhibit 265    E-mail correspondence    254
                12-24-13, Re: Fw: Rise
                Structural Overview Chart
                TF-PA 674500 - 674502

Exhibit 266    E-mail correspondence    255
                1-16-14, Re: Rise
                GPLP 00016130

Exhibit 267    E-mail correspondence    257
                3-13-14, Re: Insurance Overview
                TF-PA 210850

Exhibit 268    E-mail correspondence    263
                3-19-14, Re: GPLS/Split
                Discussion
                TF-PA 108729 - 108732

Exhibit 269-270  (Not marked or identified.)

Exhibit 271    E-mail correspondence    284
                6-20-14, Re: Monthly
                Reporting Package
                GPLP 00383459 - 00383563

## Page 6

E X H I B I T S
(continued)

NUMBER       DESCRIPTION       PAGE

Exhibit 253    Enterprise Risk Assessment    202
                Produced in Native Format
                TF-PA 290895

Exhibit 254    E-mail correspondence    203
                4-18-13, Re: Final No State
                lists for PG, GPL, Mobi
                TF-PA 267158 - 267160

Exhibit 255    E-mail correspondence    209
                11-20-13, Re: States serviced
                by tribes
                TF-PA 228363 - 228365

Exhibit 256    7-25-13 letter from C.    216
                Lutes
                TF-PA 041394 - 041397

Exhibit 257    E-mail correspondence    219
                8-8-13, Re: Fw: WSJ Article
                GPLP 00008844 - 00008845

Exhibit 258    E-mail correspondence    221
                8-14-13, Re: VPC
                TF-PA 678633 - 678635

Exhibit 259    E-mail correspondence    227
                8-19-13, Re: Forecasts
                TF-PA 367418 - 367420

Exhibit 260    E-mail correspondence    231
                8-21-13, Re: GPLS Letter
                TF-PA 677073

Exhibit 261    E-mail correspondence    238
                10-10-13, Re: Fw: Mobi
                TF-PA 309723 - 309725

Exhibit 262    E-mail correspondence    239
                10-7-13, Re: GPLS
                GPLP 00518002

## Page 8

1    P R O C E E D I N G S

2         THE VIDEOGRAPHER:  We are now on the

3    record for the video deposition of Chris Lutes.  The

4    time is 9:03 a.m. on May 3, 2018.

5         This is the matter of the Commonwealth of

6    Pennsylvania, et al., vs. Think Finance,

7    Incorporated, et al., Civil Action No. 14-7139-JCJ.

8    This is being held in the United States District

9    Court for the Eastern District of Pennsylvania.

10        The court reporter is Christy Sievert.

11   The videographer is Will Raine.  Both are

12   representatives of Kaplan, Leaman & Wolfe Court

13   Reporter.

14        And now would counsel please state your

15   appearances for the record.

16        MR. ACKELSBERG:  For the Commonwealth

17   of Pennsylvania, Irv Ackelsberg.  Also with me,

18   temporarily out in the hall, is Saverio Mirarchi

19   with the attorney general's office.

20        MR. SCHEFF:  Irv, could you

21   identify -- could you --

22        MR. ACKELSBERG:  Yes.  This is Kevin

23   Byers, our consultant.

24        MR. SCHEFF:  Thank you.

25        Richard Scheff for Christopher Lutes.

2 (Pages 5 to 8)

TF App. 0069
TF App. 0811

Christopher Lutes

Page 9

1      MR. HERMAN: David Herman for Kenneth
2  E. Rees.
3      MR. SHELDON: Matt Sheldon for the
4  Think Finance defendants.
5      MR. SHAPIRO: Dan Shapiro for the
6  Victory Park defendants. And Matt Haws, who's in
7  the hall right now, will be joining us shortly.
8      MR. DAUGHERTY: Patrick Daugherty on
9  behalf of National Credit Adjusters.
10     CHRISTOPHER LUTES
11     having been first duly sworn,
12     testified as follows:
13     EXAMINATION
14  BY MR. ACKELSBERG:
15     Q. Good morning, Mr. Lutes. It's very nice to
16  meet you, finally.
17     A. Thank you. Likewise.
18     Q. So we have to go through, as you know, a
19  few preliminaries just to make sure that, first of
20  all, you understand the procedure and what's
21  happening here. Have you been deposed before?
22     A. No, I have not.
23     Q. Okay. So I'm sure your lawyer has gone
24  through this, but I need to do it myself.
25  Basically, the way we're going to proceed, it's a

Page 10

1  series -- it's questions and answers. I ask a
2  question, you answer as best as you can. There may
3  be objections by your lawyer. And I can assure you
4  there will be objections from your lawyer and maybe
5  from other lawyers. But the way this -- the way
6  this works in a deposition as opposed to a trial is
7  that after the objections, you still have to answer
8  the question unless the -- your lawyer specifically
9  directs you not to answer the question. And, you
10  know, I'm guessing we're not going to be doing a
11  whole lot of that today, but it's -- but there will
12  be plenty of objections.
13     And so it's important that we not talk
14  over one another. The court reporter has to get
15  everything down. My question, the lawyer's
16  objection, your answer, the whole thing. But -- do
17  you understand that?
18     A. Yeah, I do.
19     Q. Okay. And we are being videotaped today,
20  but the official -- the record of this deposition is
21  the written transcript that the court reporter is
22  preparing, and the reason I stress that is that
23  nonverbal responses aren't picked up. So, you know,
24  if I say, "Is that a yes or a no," I mean --
25     A. I shouldn't nod my head.

Page 11

1     Q. Yeah, the nods aren't going to be picked
2  up. And if I -- and if I say, "Did you mean yes,"
3  it's not -- I'm not trying -- it's not an act of
4  disrespect. We just have to get it onto the --
5     A. Understood.
6     Q. -- onto the record.
7     Right. So nods or shrugs don't work. We
8  need verbal.
9     If you don't know the answer, just --
10  that's fine, "I don't know." If you don't
11  understand the question, please tell me, and I'll do
12  my best. I might ask you, well, what about the
13  question don't you understand, but we can -- we can
14  work together to clarify the question so we can
15  get -- we can get an answer from you to a question
16  that you understand.
17     A. Uh-huh (affirmative response).
18     Q. Let's see. What else haven't I covered?
19  We're going to take breaks. This will be a long day
20  for all of us. We'll take many breaks. If you need
21  a break, just tell us.
22     A. Okay.
23     Q. And I would just ask you to finish your
24  answer to the pending question, and then we can go
25  off the record and. . .

Page 12

1     A. Got it.
2     Q. And, finally, is there any reason, such as
3  illness, hearing disorder, medication, lack of
4  sleep, things like that, that would get in the way
5  of you giving this deposition your full attention
6  today?
7     A. No.
8     Q. Okay. So we are going to go just a little
9  bit into your background, and I'm --
10     A. Sure.
11     Q. -- going to try to breeze through this. My
12  understanding is that you're a CPA. Is that right?
13     A. Yes, I am, in the state of Arizona.
14     Q. Okay. And is that -- and your
15  certification is current?
16     A. Yes, it is.
17     Q. Okay. And am I right that at some point,
18  you were the CEO -- the CFO, the chief financial
19  officer, for Silicon Valley Bank?
20     A. Yes, I was.
21     Q. And where is that located?
22     A. That's located in Santa Clara, California.
23     Q. And during what period of time were you
24  with the bank?
25     A. I was with the bank from 1994 through 2001,

3 (Pages 9 to 12)

TF App. 0070
TF App. 0812

Christopher Lutes

Page 161

1  also -- I shouldn't say "we." The lawyers had
2  introduced the concept of you've got to wait two or
3  three days -- I think it might be two, maybe
4  three -- from the point --
5          MR. SHELDON: Let me just put in an
6  objection here and just say to the extent that your
7  answer requires revealing any information that was
8  communicated to you by Think's lawyers or Think's
9  outside counsel, please don't give -- provide that
10  answer. If you have any questions about it, we can
11  step out in the hall. To the extent your answer is
12  just conveying what ended up in a document, you
13  know, please talk about what ended up in a document,
14  not what -- what was communicated to you by Think's
15  in-house or outside counsel. Okay?
16      A.  Okay. Let me just finish the thought. I
17  know this was a little long-winded, but I think it
18  was an important point and that's why I'm taking my
19  time here.
20          Is that with each of the tribes, for tax
21  purposes, they held on to a hundred percent of the
22  originations of the loans for two to three business
23  days before they sold the participation to the GPLS
24  entity.
25          As you can appreciate, thousands of

Page 162

1  customer loans could be originated on a daily basis
2  by each of those tribes. They were concerned that
3  they would originate two to three days' worth of
4  loan and GPLS would say: We're not going to buy it.
5  And, suddenly, they're on the hook for a hundred --
6  holding a hundred percent of those loans and being
7  capital constrained on a pretty immediate time
8  space.
9          So what the lawyer -- what the concept
10  was, was to introduce that GPLS would advance two to
11  three days in the form of a reserve that in the
12  event that it said, no, we're not going to buy any
13  more, there was already a reserve to cover the two
14  to three days' worth of loans originated.
15  BY MR. ACKELSBERG:
16      Q.  Okay. That's what I was --
17      A.  So I'm sorry it was so longwinded, but
18  that's -- I wanted to get that out there. It was
19  really for the -- from my perspective, the tax and
20  the delay in being able to sell same day.
21      Q.  So I just -- I think I understand your
22  answer.
23          So I was asking how the loans were funded
24  in the first place, and it sounds like with
25  Mobiloans, the answer was there was a reserve

Page 163

1  account that GPLS set up to serve that function. Am
2  I right?
3          MR. SCHEFF: Object to the form;
4  misstates the testimony.
5          Answer the question if you can.
6      A.  I wouldn't phrase it that way. There was a
7  reserve that if the tribe wanted to use it for
8  originating loans or for other purposes, it had,
9  because it was meant -- capital meant to kind of
10  cover them in the situation that if GPLS stopped
11  buying, that covered the two to three days' worth of
12  loans that -- that they would have originated. Each
13  of the tribes could have had alternative sources for
14  funding the loans. I don't have privy to that
15  information.
16  BY MR. ACKELSBERG:
17      Q.  Well, they could have, but you're -- you're
18  not aware of them ever having -- having supplied any
19  outside funding capital to the funding of Mobiloans
20  loans --
21          MR. SCHEFF: Object to the form.
22          You can answer the question.
23  BY MR. ACKELSBERG:
24      Q.  -- loans, do you?
25      A.  I'm not aware of -- I just don't -- I don't

Page 164

1  have enough knowledge to answer that question. I
2  don't know.
3      Q.  You sat in, it sounds like, on two -- two
4  sales -- sales visits, one at the Chippewa Cree and
5  one at Mobiloans. You went with Jason and Michelle
6  or people from the product side, right? So this
7  happened twice, right?
8          MR. SCHEFF: Object to the form.
9          You can answer the question.
10      A.  From my perspective, I wouldn't call those
11  sales pitches. The Chippewa Cree was not a sales
12  pitch, as I think we discussed earlier. We might
13  have already signed the term sheet or we might have
14  been in the process. It was more of just an onsite
15  visit to meet our business partners.
16  BY MR. ACKELSBERG:
17      Q.  Do you remember -- do you remember the
18  term -- do you remember the -- you were at the
19  initial Mobiloans trip, though. And I'm wondering,
20  during that trip, do you remember someone on the
21  Think side explaining that the Tunica would not have
22  to lay out any money?
23      A.  I -- I don't -- I was at that presentation.
24  I don't specifically recall, but it's -- yeah, I
25  don't -- I don't recall specifically. I'm sure what

41 (Pages 161 to 164)

TF App. 0071

TF App. 0813

Christopher Lutes

Page 165

1 we would have -- would have explained to them is
2 with the reserve concept, that they shouldn't be
3 concerned from a capital perspective that they would
4 be originating loans that they would not be able to
5 sell at least 90 percent participation interest to
6 GPLS.
7    Q. Okay. Thank you.
8    Do you remember the term "turnkey"?
9    A. I would not have used it from a finance
10 perspective. So I --
11    Q. I'm not suggesting it's a financial term.
12 I'm asking whether --
13        MR. SCHEFF: Let him finish his
14 answer.
15 BY MR. ACKELSBERG:
16    Q. -- you remember the term being used by
17 other members of the team: Michelle or Jason, for
18 example?
19        MR. SCHEFF: Object to the form.
20    You can answer the question if you can.
21    A. No, I don't specifically recall.
22 BY MR. ACKELSBERG:
23    Q. You have seen it -- you have seen marketing
24 material where Think's services as a service
25 provider are described as a turnkey, haven't you?

Page 166

1        MR. SCHEFF: Object to the form.
2    You can answer the question.
3    A. I would say that from the services we
4 provide, the marketing services, the licensing of
5 the technology, in essence, yes, what we do is
6 turnkey. But there were certainly obligations that
7 the tribes as the originating lender would still be
8 a hundred percent responsible for that we weren't
9 involved in at all. So --
10 BY MR. ACKELSBERG:
11    Q. Like what?
12        MR. SHELDON: Hold on. Can we stop
13 for a second, please? Irv, I realize that you're
14 frustrated with some of the witness's answers and
15 you don't like some of the answers because of your
16 tone and you don't like of the length of answers.
17 But at probably a dozen different points through
18 this deposition already, which is only halfway
19 through, you've cut the witness off. And I'd just
20 ask you to please let the witness finish and wait
21 until the end. The witness is allowed to give the
22 full answer that he believes is necessary for any of
23 your questions. Okay?
24 BY MR. ACKELSBERG:
25    Q. My question was, like what?

Page 167

1    A. From my perspective, things that the tribe
2 would be responsible for besides just originating
3 the loan and, you know, reviewing, you know, the --
4 the credit decisioning suggestions or scores that we
5 gave them for their approval and understanding, and,
6 you know, the ACH things out of their accounts and
7 all of that stuff, they would be responsible for
8 the -- the customer support and the collections.
9    We did not handle the collections in any
10 way. We helped provide monitoring services to help
11 them monitor the outsourced customer support and
12 collections, but that ultimately was responsible for
13 the tribes. I'm sure I'm probably forgetting some
14 other operational things, but by no means did we
15 ever provide everything.
16        MR. ACKELSBERG: I'm going to break
17 very soon. I know we're all hungry. I'm just
18 trying to get to a good cutoff point.
19 BY MR. ACKELSBERG:
20    Q. So with Mobiloans, the funding of the loans
21 up front was done through a -- the reserve account,
22 right, that you described?
23        MR. SHAPIRO: Object to form.
24        MR. SCHEFF: Object to the form.
25    A. That's not how I would phrase my answer.

Page 168

1 There was a reserve account established, like I said
2 previously, to cover the two to three days' worth of
3 originations that they provided. Whether they chose
4 to use some of those funds to help them originate
5 loans or whether they used other third-party
6 capital, I'm not aware of.
7 BY MR. ACKELSBERG:
8    Q. Okay. And the same was true of Great
9 Plains Lending?
10    A. Yes, I believe so.
11    Q. And what about Plain Green?
12    A. Plain Green, that was the -- as you're
13 aware, the first transaction that we entered into.
14 I don't think the reserve concept was introduced
15 with them. Like I said, I know that they had an
16 existing lending relationship with Encore or
17 whoever. They had other capital means. So, no,
18 there was no reserve -- initial -- initial reserve
19 concept, as I recall. Whether we amended that
20 later, I know that there was suggestions, but I
21 can't recall whether that actually happened.
22        MR. ACKELSBERG: Okay. This is a good
23 time to break.
24        THE VIDEOGRAPHER: We are off the
25 record at 12:41 p.m.

42 (Pages 165 to 168)

TF App. 0072
TF App. 0814

Christopher Lutes

Page 169

1    (Break taken, 12:41 p.m. to 1:22 p.m.)
2    THE VIDEOGRAPHER: We are back on the
3  record at 1:22 p.m.
4  BY MR. ACKELSBERG:
5    Q.  Before we broke, Mr. Lutes, we were talking
6  about the -- how the loans got funded in the first
7  instance, specifically with regard to Plain Green,
8  and I want to show you a few agreements and ask
9  for -- for your comments.
10    A.  Sure.
11    MR. ACKELSBERG: So the first one, I
12  am going to -- I am going to identify it as Exhibit
13  P-244.
14    (Exhibit No. 244 marked.)
15    A.  (Reviews document.)
16    Okay.
17  BY MR. ACKELSBERG:
18    Q.  Okay.  Does this -- does this refresh your
19  recollection at all about how the loans got funded
20  in the first instance in the beginning of the Plain
21  Green relationship?
22    MR. SCHEFF: Object to the form.
23    A.  As I've discussed before, I'm not sure
24  whether there were any other capital arrangements
25  for Plain Green to help fund loans, but I am

Page 170

1  familiar with the Haynes Investment to Plain Green,
2  LLC.
3  BY MR. ACKELSBERG:
4    Q.  And so at the inception of the product,
5  Mr. Haynes, through this entity Haynes Investment,
6  provided $2 million in lending capital to the tribe;
7  am I right, to -- to Plain Green, LLC?
8    MR. SCHEFF: Object to the form.
9    A.  I'm not sure I would use the term "lending
10  capital."  Working capital for the -- for the
11  program, yeah.
12  BY MR. ACKELSBERG:
13    Q.  Okay.  Well, in fact, it had to be used to
14  fund loans.  It couldn't be used for any other
15  purpose; isn't that what the -- wasn't that your
16  understanding of what the purpose of this was?  I'm
17  not asking for your legal opinion.
18    A.  No, no, I'm just -- I wasn't a hundred
19  percent certain whether it was required just for
20  funding the loans or whether it could be used for
21  other working capital related to the -- the loan
22  program.
23    Q.  Okay.  I see.
24    You'll see that under the Recital B, "The
25  credit facility will be used to assist the borrower

Page 171

1  with the funding of certain installment loan
2  programs."  Do you see that?
3    A.  Yes.
4    Q.  Okay.  So you -- you do remember there
5  being a credit facility that Plain Green, LLC, had
6  with Haynes Investments in the beginning?
7    A.  Yes.
8    Q.  Okay.  Do you remember anything about how
9  it came to be?
10    A.  No.  I -- I don't recall those initial
11  conversations regarding Plain Green, Haynes or even
12  us and how we were involved with Haynes.
13    Q.  Okay.  And let me show you another
14  agreement.
15    MR. ACKELSBERG: This one is 245.
16    (Exhibit No. 245 marked.)
17    A.  (Reviews document.)
18    Okay.
19  BY MR. ACKELSBERG:
20    Q.  Do you remember this agreement?
21    A.  Yes, I do.
22    Q.  And why don't you explain to me what the
23  purpose of this agreement was?
24    A.  The purpose of this agreement was for us to
25  lend money to Haynes Investment.

Page 172

1    Q.  So that Haynes Investment could lend it to
2  Plain Green, right?
3    A.  Correct.
4    Q.  Okay.  And, in fact, I recall it was either
5  the deposition of -- it was one of the Lindas where
6  she kind of described there actually was a bank
7  account that was a a -- was a Haynes bank account and
8  a Plain Green bank account where -- and a -- and a
9  Think -- I forgot which entity it was which --
10    MR. SCHEFF: Let him finish his
11  question.
12  BY MR. ACKELSBERG:
13    Q.  I forgot what the name of the Think entity
14  was, but there actually were -- there was actually a
15  tran- -- on occasion, a transfer of money
16  facilitated by the finance department staff from the
17  Think Finance account to the Haynes account to the
18  Plain Green funding account.  Right?  And so you're
19  familiar that that was -- that there was actually a
20  Think Finance operation that corresponded to these
21  agreements?
22    A.  Yes.
23    Q.  Okay.  What was the purpose of Think
24  Finance giving money to Haynes to give to the tribe?
25    MR. SCHEFF: Object to the form.

43  (Pages 169 to 172)

TF App. 0073
TF App. 0815

Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000

Tyler P. Brown (admitted *pro hac vice*)
Jason W. Harbour (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

*Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **THINK FINANCE, LLC**, *et al.*, | **Case No. 17-33964 (HDH)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## AFFIDAVIT OF KENNETH REES IN SUPPORT OF DEBTORS' MOTION FOR SUMMARY JUDGMENT OF CERTAIN VIRGINIA AND TEXAS CLAIMS

I, Kenneth Rees, having been duly sworn on oath this 2_th day of July 2018 state as follows:

1.     I am over 21 years of age and am competent to testify to the statements set forth in this affidavit. The statements set forth in this affidavit are true and correct to the best of my knowledge, information, and belief based on my personal knowledge.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Think Finance, LLC (6762), Think Finance SPV, LLC (4522), Financial U, LLC (1850), TC Loan Service, LLC (3103), Tailwind Marketing, LLC (1602), TC Administrative Services, LLC (4558), and TC Decision Sciences, LLC (8949) (collectively, the "Debtors").

2. On May 8, 2018, I was deposed, in person, under oath (the "Deposition"). A true and correct copy of excerpts from the official transcript of the Deposition are attached hereto as Exhibit A (the "Transcript").

3. I adopt, restate and incorporate the excerpts from the Deposition, as recorded in the Transcript, as my statements in support of the Debtors' *Motion for Summary Judgment of Certain Virginia and Texas Claims*.

4. If called upon, I could and would testify to the facts contained herein and the statements made at the Deposition as recorded in the Transcript.

Executed on this 27th day of July 2018, in the County of Tarrant TX.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

_____

Kenneth Rees

2

Kenneth Rees

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA *
BY ATTORNEY GENERAL JOSH *
SHAPIRO, *
    Plaintiff, *
            *
VS.       * Civil Action
        * No. 14-7139-JCJ
THINK FINANCE, INC., et al., *
    Defendants. *

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
KENNETH REES
MAY 8, 2018

*****************************************************

     DEPOSITION of KENNETH REES, produced
as a witness at the instance of the Plaintiff, and
duly sworn, was taken in the above-styled and
numbered cause on the 8th day of May, 2018, from
9:08 a.m. to 5:46 p.m., before Christy R. Sievert,
CSR, RPR, in and for the State of Texas, reported by
machine shorthand, at the Fort Worth Club, 306 West
7th Street, Fort Worth, Texas 76102, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

---

**Page 2**

1         A P P E A R A N C E S
2
3 COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA:
4  MR. IRV ACKELSBERG
   Langer, Grogan & Diver, PC
5  1717 Arch Street, Suite 4130
   Philadelphia, Pennsylvania 19103
6  Phone:  215-320-5701
   E-mail: iackelsberg@langergrogan.com
7
   MR. SAVERIO "SAM" MIRARCHI
8  Senior Deputy Attorney General
   Bureau of Consumer Protection
9  1600 Arch Street, Suite 300
   Philadelphia, Pennsylvania 19103
10  Phone:  215-560-2445
   E-mail: smirarchi@attorneygeneral.gov
11
12 COUNSEL FOR KENNETH E. REES:
13  MR. RICHARD L. SCHEFF
   Montgomery, McCracken, Walker & Rhoads, LLP
14  123 South Broad Street
   Philadelphia, Pennsylvania 19109
15  Phone:  215-772-7502
   E-mail: rscheff@mmwr.com
16
17 COUNSEL FOR THINK FINANCE, INC.:
18  MR. MATTHEW S. SHELDON
   Goodwin Procter, LLP
19  901 New York Avenue, NW
   Washington, D.C. 20001
20  Phone:  202-346-4000
   E-mail: msheldon@goodwinprocter.com
21
22
23
24
25

---

**Page 3**

1       A P P E A R A N C E S
         (continued)
2
3 COUNSEL FOR VICTORY PARK CAPITAL:
    MR. DANIEL P. SHAPIRO
4  MR. MATTHEW W. HAWS
   Katten Muchin Rosenman, LLP
5  525 W. Monroe Street
   Chicago, Illinois 60661
6  Phone:  312-902-5622
   E-mail: daniel.shapiro@kattenlaw.com
7          matthew.haws@kattenlaw.com
8
9 COUNSEL FOR NATIONAL CREDIT ADJUSTERS:
    MR. PATRICK DAUGHERTY
10  Van Ness Feldman, LLP
   1050 Thomas Jefferson Street, NW
11  Seventh Floor
   Washington, D.C.
12  Phone:  202-298-1874
   E-mail: pod@vnf.com
13
14 ALSO PRESENT:
15  GUS PHILLIPS, Videographer
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1        I N D E X
           PAGE
2
3 Appearances.................................. 2-3
4 Exhibits..................................... 5-6
5 Proceedings.................................. 7
6 KENNETH REES:
    Examination by Mr. Ackelsberg................ 8
7
8 Changes and Signature.................... 345-346
9 Reporter's Certification................. 347-348
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

1 (Pages 1 to 4)

TF App. 0074
TF App. 0818

Kenneth Rees

Page 5

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 272 | How to Become a Bus Driver, Not a Bulldozer | 34 |
| Exhibit 273 | LendIt Fintech, Ken Rees | 43 |
| Exhibit 274 | Think Finance Business Plan, April 2013 TF-PA 683403 - 683418 | 46 |
| Exhibit 275 | E-mail correspondence 4-6-15, Re: GP article TF-PA 308918 - 308920 | 64 |
| Exhibit 276 | E-mail correspondence 11-30-12, Re: Presentation For Abu Dhabi Investors TF-PA 677353 - 677371 | 135 |
| Exhibit 277 | IPO Roadshow Presentation Breakout #1 TF-PA 670288 - 670295 | 141 |
| Exhibit 278 | E-mail correspondence 8-26-13, Re: Encore Video TF-PA 677068 | 200 |
| Exhibit 279 | Term Sheet for Think Finance - Chippewa Cree Transaction | 208 |
| Exhibit 280 | E-mail correspondence 10-24-13, Re: BMO TF-PA 606626 - 606627 | 226 |
| Exhibit 281 | E-mail correspondence 12-13-13, Re: Selected Expense Report TF-PA 674488 - 674489 | 229 |
| Exhibit 282 | Memorandum, 2-17-11 TF-PA 710233 - 710236 | 280 |
| Exhibit 283 | Memorandum, 4-13-11 TF-PA 710229 - 710232 | 283 |

Page 6

E X H I B I T S
(continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 284 | Memorandum, 5-18-11 TF-PA 710237 - 710240 | 292 |
| Exhibit 285 | Memorandum, 10-19-11 TF-PA 474695 - 474698 | 298 |
| Exhibit 286 | Memorandum, 12-14-11 TF-PA 705357 - 705361 | 303 |
| Exhibit 287 | E-mail correspondence 8-9-13, Re: GPL Volume TF-PA 680605 - 680606 | 305 |
| Exhibit 288 | E-mail correspondence 9-26-13, Re: Call to Bob from Tunica-Biloxi Tribal Chairman Marshall Pierite TF-PA 258168 | 315 |
| Exhibit 289 | E-mail correspondence 4-28-13, Re: Tribal training TF-PA 191141 | 318 |
| Exhibit 290 | LinkedIn, Think Finance | 325 |
| Exhibit 291 | E-mail correspondence 7-8-13, Re: FWST mention TF-PA 310765 - 310768 | 325 |
| Exhibit 292 | Think Finance Tribal Holdings Statement TF-pA 301317 - 301320 | 330 |

Page 7

1    THE VIDEOGRAPHER:  We are now on the
2  record for the videotaped deposition of Kenneth
3  Rees.  The time is 9:08 a.m., May 8, 2018, in the
4  matter of the Commonwealth of Pennsylvania vs. Think
5  Finance Incorporated, et al., Case No. 14-7139-JCJ,
6  being held in the United States District Court for
7  the Eastern District of Pennsylvania.
8    The court reporter is Christy Sievert.
9  The videographer is Gus Phillips.  Both are
10  representatives of Kaplan, Leaman & Wolfe Court
11  Reporting.
12    Will counsel please state their
13  appearances for the record.
14    MR. ACKELSBERG:  Irv Ackelsberg for
15  the Commonwealth of Pennsylvania.
16    MR. GROGAN:  John Grogan, also for the
17  Commonwealth.
18    MR. MIRARCHI:  Saverio Mirarchi for
19  the Commonwealth of Pennsylvania.
20    MR. DAUGHERTY:  Patrick Daugherty on
21  behalf of National Credit Adjusters.
22    MR. HAWS:  Matthew Haws on behalf of
23  the Victory Park defendants.
24    MR. SHAPIRO:  Dan Shapiro for the
25  Victory Park defendants.

Page 8

1    MR. SHELDON:  Matt Sheldon for the
2  Think Finance defendants.
3    MR. SCHEFF:  Richard Scheff for Ken
4  Rees.
5    KENNETH REES
6  having been first duly sworn,
7    testified as follows:
8    EXAMINATION
9  BY MR. ACKELSBERG:
10    Q.  Mr. Rees, you have been deposed before?
11    A.  I have.
12    Q.  Okay.  So I'm sure you understand how this
13  works, but just to confirm that you do know the
14  ground rules, I want to just go over a few things
15  that I'm sure are familiar to you.
16    You see that there's a videographer.
17  There's also a court reporter.  The official record
18  of what happens today is the -- is going to be the
19  written transcript.  The reason I tell you that is
20  just to caution you that gestures -- verbal
21  responses -- don't register on the -- on the written
22  record, so we need -- we need verbal responses from
23  you.
24    And I'll do my best -- and the other thing
25  about the written record is that it's very hard for

2  (Pages 5 to 8)

TF App. 0075
TF App. 0819

Kenneth Rees

## Page 157

1   A.  So I'll walk through the history as I
2   remember it.  We were notified by FBD that they were
3   going to be terminating the program.  The program
4   was representing a very significant part of the
5   revenue and net income of the business.
6       We assembled the executive team together
7   that weekend to look at a wide variety of things to
8   do.  Continued to grow the -- the existing nonbank
9   product, adding new ones.  We looked at
10  opportunities in the UK.  We looked at new product
11  opportunities even outside of credit.  And sort of
12  moved down a path of -- and including a tribal lend,
13  which is something we hadn't really evaluated in the
14  past.  So we took all of those potential business
15  opportunities, began looking into them.
16      We actually ended up doing all of those
17  things.  You know, we bought a company in the UK.
18  We launched a prepaid debit card.  We launched a
19  rent-to-own product.  We enhanced the direct
20  consumer product to grow that more aggressively.
21  And then -- but as we were evaluating all the
22  alternatives -- I'm sorry if I'm doing too much
23  here --
24  Q.  That's okay.
25  A.  -- but I'm hoping this provides some of

## Page 158

1   what you're looking for.
2       We looked at -- at sort of other tribal
3   lending businesses.  There was a couple of court
4   cases at the time that had just been decided in
5   favor of the tribes, one in California and one in
6   Colorado -- I don't know the -- you know, what names
7   those were -- that seemed to specify what it would
8   take for a tribal lending entity to have sovereign
9   immunity and to not be, you know, subject to state
10  law as per the tribal sovereignty would be.
11      We looked at other programs that were out
12  there.  And then based on that, then based on --
13  really, you know, based on sort of the evaluation of
14  that by all the parties, including the board, we
15  decided that it made sense to move forward with
16  seeing if we could come up with a suitable tribal
17  relationship where we would provide technology and
18  services to them, very similar to the way we had
19  provided technology and services to the bank.
20  Q.  And at that point in time, were other of
21  your peer organizations -- well, let's say within --
22  within the OLA, other than Mark Curry, were there
23  other peer members of OLA that were doing business
24  under the tribal model?
25      MR. SCHEFF:  Object to the form.

## Page 159

1   A.  I think there were.  I don't know that I
2   could name any of them, but I'm pretty sure there
3   were other entities within the Online Lenders
4   Alliance that were licensing technology to tribal
5   lenders as well.
6   BY MR. ACKELSBERG:
7   Q.  Now, the first -- my understanding is the
8   first potential partner that the company talked to
9   was Butch Webb in South Dakota.  Right?
10  A.  Yes.
11  Q.  And how did that meeting come to be?
12  A.  Actually, our -- the founder of the
13  company, Mike Stinson, had known another gentleman
14  named John Templer, who had known Butch Webb.  And
15  when -- I -- I know that was the connection.  I
16  don't know exactly how it was sort of connected up
17  that Butch Webb was involved in a tribal lending
18  organization.  I don't remember that.
19      But one thing led to another, and we -- we
20  traveled up to North Dakota -- North or South
21  Dakota.  I think it was North Dakota -- to meet with
22  him.  We ultimately couldn't get comfortable with
23  his -- his business model.  It seemed to run
24  contrary to what -- you know, what we and outside
25  counsel thought was the legally justifiable lending

## Page 160

1   structures and --
2       MR. SCHEFF:  Stay away from whatever
3   counsel told you.
4       THE WITNESS:  Sorry.
5   A.  But in -- in any event, we -- I mean, did
6   not like the fact that there didn't seem to be an
7   arm of the tribe in any way involved with the --
8   with the lending operation.  So it was -- he was not
9   very happy about it, but -- but we told him we
10  weren't going to do business with him.
11  BY MR. ACKELSBERG:
12  Q.  Now, did Claudia Callaway play a role in
13  that connection?
14      MR. SCHEFF:  Just answer the question
15  "yes" or "no."
16  A.  I just don't know.
17  BY MR. ACKELSBERG:
18  Q.  Do you -- do you remember if she was
19  representing Butch Webb back at that time?
20  A.  Don't know.
21  Q.  Or CashCall or. . .
22  A.  I don't know.
23  Q.  The -- did Butch Webb have a
24  relationship -- now his company was called Western
25  Sky, right?

40  (Pages 157 to 160)

TF App. 0076
TF App. 0820

Kenneth Rees

## Page 161

1    A.  Yes.
2    Q.  And did Western Sky have -- have a
3  relationship with CashCall at that time, or did that
4  happen when you turned him down?
5    A.  I don't know.  He had an operation.  My
6  recollection, Western Sky was the name.  I don't
7  know if at that time he already had a relationship
8  with -- with CashCall or not.
9    Q.  I mean,, you do know eventually --
10    A.  Yes.
11    Q.  -- he did develop a relationship with
12  CashCall, right?
13    A.  Yes.
14    Q.  And that was one of your competitors,
15  right?
16    A.  They were an online lender.  I don't know
17  how much we directly competed with them.  They were
18  an online lender, though.
19    Q.  Okay.  And then the next -- as I understand
20  it, the next tribe that you made contact with was
21  the Otoe-Missouria.  Right?  And that was through
22  Mark Curry.
23    A.  I believe that's correct.
24    Q.  And I can show this to you if you want to
25  see it, but we've seen an e-mail from you to the

## Page 162

1  executives, I think it's February 28th, 2011, where
2  you say something to the effect of, "Start your
3  engines," where -- where you thought it looked like
4  the Otoe-Missouria were ready to -- ready to go.  Do
5  you remember that?
6         MR. SCHEFF:  Object to the form.
7  BY MR. ACKELSBERG:
8    Q.  I can show -- I can show you the e-mail.
9         MR. SCHEFF:  Lack of foundation.
10    You can answer the question if you can.
11    A.  I've seen the e-mail and --
12  BY MR. ACKELSBERG:
13    Q.  Okay.
14    A.  And I -- I think we believed that the
15  business relationship was going to happen.
16    Q.  And, in fact, the e-mail was connected to a
17  signed agreement whereby the tribe agreed to acquire
18  the website, Plain Green, that -- that Think Finance
19  had already -- already owned in terms of the URL,
20  right?  I mean,, that was the context of that,
21  correct?
22         MR. SCHEFF:  Object to the form.
23    You can answer the question.
24    A.  Yeah, you know, as we talked about when the
25  bank relationship was terminated, we were looking at

## Page 163

1  a lot of business opportunities and were -- one of
2  the biggest challenges for launching a product, we
3  launched a number of products over the years, is
4  getting an URL and getting a trademark that -- that
5  you could actually use.
6         So we had already gone and looked at a
7  whole bunch of different potential names and done
8  the trademark searches and found the URLs and bought
9  a few.  So we had a handful of things that we were
10  sort of sitting on.  So in order to, you know, help
11  them get live, we lice- -- well, not -- we actually
12  sold them, I think, the URL so that they could have
13  that as the basis for the product.
14  BY MR. ACKELSBERG:
15    Q.  So, in other words, that -- before you
16  approached the Otoe-Missouria, you already had a
17  website called greatplainslending.com, right?
18    A.  Yes.
19    Q.  And --
20    A.  Actually, I don't know if that's true.  I
21  know that we began looking for product names and
22  URLs.  Whether that was completed before we met
23  with the Otoe-Missouria, I don't know the exact
24  timing of that.
25    Q.  All right.  But the start your engines

## Page 164

1  e-mail was at the point where they -- whatever the
2  timing of your original meeting with them was, it
3  was -- it was at the point where they were saying,
4  okay, we'll -- we'll agree to this agreement to
5  assume the responsibility and ownership of that --
6  of that website, that URL, right?
7         MR. SCHEFF:  Object to the form; the
8  document speaks for itself.  An unmarked document
9  speaks for itself.
10    A.  I'm sorry, if you can rephrase the
11  question.
12  BY MR. ACKELSBERG:
13    Q.  See, that's the problem.  That's the
14  problem.
15         MR. SCHEFF:  Why don't you mark the
16  document.  Just mark the exhibit as opposed to --
17         MR. ACKELSBERG:  I'll be happy to.
18         MR. SCHEFF:  -- talking about it in
19  the air.
20         MR. ACKELSBERG:  That's fine, Richard.
21  I don't want to have any misunderstandings.
22         MR. SCHEFF:  Good.
23  BY MR. ACKELSBERG:
24    Q.  This document has already been marked
25  Exhibit 124.

41  (Pages 161 to 164)

TF App. 0077
TF App. 0821

Kenneth Rees

Page 181

1  day, at some point, Victory Park told you that they
2  were interested, right?
3      A.  That's correct.
4      Q.  Okay.  And so whoever kind of came up with
5  the name, either it was Victory Park or Think
6  Finance, or together, the concept came up of GPLS to
7  be a -- essentially, a replacement investment fund
8  for whatever the preexisting one was with regard to
9  First Bank of Delaware?
10          MR. SHAPIRO:  Object.
11          MR. SCHEFF:  Object to the form.
12          MR. SHAPIRO:  Object to the form.  And
13  inconsistent with prior testimony, mischaracterizing
14  the testimony.
15      A.  And, again, the way I remember it, and I
16  remember it fairly discreet, there was the Universal
17  Fund that Victory Park Capital was an investor in.
18  At some point in time, the GPLS fund was established
19  and Victory Park was an investor in that fund.  I
20  don't remember with any specificity how things
21  evolved and if they did evolve.  I'm sure Chris
22  could do a better job than I could about that.
23  BY MR. ACKELSBERG:
24      Q.  Okay.  Now, the Great Plains Lending
25  labelled product didn't -- didn't happen as you

Page 182

1  thought it was going to happen when you said start
2  the engines on February 28, 2011?
3          MR. SCHEFF:  Object to the form.
4          You can answer the question.
5      A.  Yes.
6  BY MR. ACKELSBERG:
7      Q.  Okay.  Instead, there was a -- there was a
8  switch to a different tribe, the Chippewa Cree in
9  Montana, correct?
10      A.  Yes.
11      Q.  Okay.  So what do you remember -- well,
12  first of all, what went wrong with the
13  Otoe-Missouria and Mark Curry, or whoever you were
14  talking with back then, or whoever --
15      A.  Yeah.
16      Q.  -- the company was talking with?
17      A.  You know, the difference between the
18  preliminary sort of deal terms that seemed to make
19  sense and the final paperwork, we just weren't
20  really happy with what we were seeing.  At a high
21  level, we thought that the -- we believed that the
22  way that we worked with the bank, which we felt was
23  very stable and a well-functioning structure, was
24  such that we had really -- you know, we were the
25  service provider for the bank, and there weren't

Page 183

1  intermediaries in between.  As we saw the final
2  proposed documents coming from -- from the tribe,
3  they had the sort of management company that the
4  tribe was using --
5      Q.  MacFarlane Group?
6      A.  I don't know which entity it was.  It
7  was -- it was one that Mark Curry was associated
8  with.  I don't know if it was The MacFarlane Group
9  or anyone else.  But -- but there was a business
10  entity that we were to be contracting with as
11  opposed to directly with the tribal lending entity,
12  and we didn't think that was a smart way to do
13  business.  And the --
14      Q.  Why not --
15          MR. SCHEFF:  Let him finish the
16  answer, please.
17      A.  You know, we -- we felt we had a business
18  model that, you know, A, it worked well.  It had had
19  FDIC -- in our minds at least, an FDIC sort of stamp
20  of approval on it because it had gone through FDIC
21  examination.  We wanted to replicate that as much as
22  possible.  And having another entity where also we
23  didn't feel like we'd be working directly with
24  that -- that, you know, tribal lending entity, it
25  just didn't feel like the right relation- -- I mean,

Page 184

1  we already walked away from the Butch Webb operation
2  because we didn't think that was an appropriate
3  way -- you know, we didn't think there was -- they
4  had any sovereign rights to lend at all.
5          And this, we just thought, was not the
6  kind of business relationship that would be a
7  stable, longstanding one that we wanted to be part
8  of.  So we had been continuing to talk to other
9  tribes.
10          And as you mentioned, I think it was
11  Haynes that bound the -- the -- what became the
12  Plain Green tribe, the Chippewa Cree tribe, and we
13  were sort of in parallel talking with those two --
14  two tribes.  And, ultimately, we were more
15  comfortable with the structure and the relationship
16  with the Chippewa Cree than we were with the
17  Otoe-Missouria at that time.
18  BY MR. ACKELSBERG:
19      Q.  Where did you get the impression that the
20  FDIC had approved of the structure that you had in
21  place with First Bank of Delaware?
22      A.  Well, it had gone through multiple FDIC
23  exams.
24      Q.  How do you know?
25          MR. SHELDON:  I would just caution

46 (Pages 181 to 184)

TF App. 0078
TF App. 0822

Kenneth Rees

---

Page 185

1 again if anything you're going to say would be as a
2 result of being told something by counsel, you know,
3 you can state that for the record, but if it's
4 independent of that, please do testify.
5     A.  It was independent.  It was from bank --
6 bank management.
7 BY MR. ACKELSBERG:
8     Q.  Like Alonzo?
9     A.  Alonzo and Harry Madonna, the chairmen.
10 And they -- I'm sorry, I just lost my train of
11 thought.  Excuse me.
12        Yeah, so back to the -- the sort of FDIC
13 oversight.  So you've probably seen that at one
14 point in time the FDIC stopped the bank from some of
15 its programs and thought that they exhibited
16 rent-a-bin characteristics.  Ours was excluded from
17 that.  And we did modify the structure of the
18 relationship with the bank, sort of looking at -- at
19 what the FDIC didn't like about the other
20 transactions.  That was actually largely what the
21 bank asked us to do.  And then -- and that's when we
22 established the Universal Fund -- for instance.
23 Yeah, Universal Fund --.  And the FDIC did -- I
24 think it was two more exams, at least one more exam
25 since that time.

---

Page 186

1        So from our perspective, you know, the
2 bank had been told this is how we think you ought to
3 be working with service providers for credit
4 programs.  We made changes specifically based on
5 bank guidance.  And then the FDIC looked at it and
6 continued that -- that business until the bank
7 ultimately exited it.
8        So, again, from our perspective, the FDIC
9 had looked at it and thought there was an
10 appropriate relationship for a lender and a service
11 provider to have.  So that was -- that was our
12 perspective and why we wanted to heed as close to
13 that structure as possible when working with tribes.
14     Q.  Based on your conversations with Alonzo
15 Primus and Harry Madonna, did you have the
16 impression that the FDIC had been informed by them
17 that the invest- -- that the investors in the
18 Universal Fund who was buying the participations
19 were family and friends of the bank leadership?
20     A.  The FDIC, my understanding -- and this is
21 really coming from representations from Alonzo and
22 others at -- at the bank, was pretty thorough in its
23 evaluation of these programs, both the program with
24 us and previous programs that the -- that the bank
25 had had.

---

Page 187

1        So I guess I'd be surprised if the FDIC
2 was unaware of it because they used that same
3 structure and the same -- some of the same
4 investors, at least for one program as well
5 as for ours, but I don't know for a fact whether the
6 FDIC didn't know that.
7     Q.  Okay.  You do know that the government
8 ultimately shutdown First Bank of Delaware, you do
9 know that, right?
10        MR. SCHEFF:  Object to the form; lack
11 of foundation.
12     A.  I will go ahead an answer the question.
13 They did shut it down, but, again, my
14 understanding is --
15 BY MR. ACKELSBERG:
16     Q.  They did or didn't?
17     A.  Oh, actually, did they shut it down?  I
18 thought the -- the bank actually sold all the
19 assets.
20     Q.  After they were sued by the justice
21 department?
22     A.  I don't know that that means they shut them
23 down.
24        MR. SCHEFF:  Object to the form; lack
25 of foundation.

---

Page 188

1     A.  Maybe -- maybe they -- I assumed that they
2 were selling assets, there was some value to those
3 assets as an -- as an entity.
4 BY MR. ACKELSBERG:
5     Q.  By the way, the -- the loan assets with
6 regard to the ThinkCash program, at the time the
7 bank was selling off its assets, Think Finance
8 already owned all those loan assets; am I right?
9        MR. SCHEFF:  Object to the form; lack
10 of foundation.
11     A.  So when the -- at the end of the -- when
12 the bank notified us that they wanted us -- they
13 wanted to no longer continue the program, they told
14 us they would stop originating by the end of the
15 year, and they asked us to -- to buy those assets
16 off of their books.  And I don't know if --
17 actually, I --
18 BY MR. ACKELSBERG:
19     Q.  Well, there weren't any --
20     A.  I just don't know.  There -- there was a --
21 they -- you know, their -- and I'm not sure how much
22 the bank retained.  It was maybe 2 or 3 percent that
23 they had on their books after they participated out
24 the majority to the Universal Fund --.  But at some
25 point in time, as sort of the end of the program,

TF App. 0079
TF App. 0823

Kenneth Rees

---

Page 189

1 they wanted to get all of those assets off their
2 books. And I don't know exactly where those ended
3 up. I don't think that Think bought those assets.
4 Maybe they did. But I thought they were ultimately
5 contributed to -- to another fund.
6     Q. The investment fund, right. But that
7 investment fund, due to those quirky accounting
8 rules back in the Universal -- Universal Fund
9 period, those loan assets were on the books of Think
10 Finance anyway, right?
11     A. I thought you asked --
12         MR. SCHEFF: Object to the form; lack
13 of foundation.
14         You can answer the question.
15     A. I thought you asked who bought the -- the
16 assets.
17 BY MR. ACKELSBERG:
18     Q. So it might --
19     A. I believe the assets were bought by the
20 investment fund, not by us.
21     Q. And then by virtue of those pesky
22 accounting rules, those -- they were actually shown
23 on the financial statements of Think Finance as
24 assets of the company?
25         MR. SCHEFF: Object to the form.

---

Page 190

1     A. I certainly wouldn't -- you know, I
2 wouldn't characterize accounting rules as pesky. I
3 just don't think they're an accurate way to judge
4 the contractual relationships that the -- that Think
5 had with the entities that it did business with.
6 BY MR. ACKELSBERG:
7     Q. Okay. Now, did -- did Think Finance when
8 it began talking with the Chippewa Cree, did it do
9 any due diligence on Steven Haynes, the go-between?
10         MR. SCHEFF: Object to the form; lack
11 of foundation.
12     A. You know, I don't know the answer to that.
13 Oftentimes we would do background checks on people
14 we work with. That was sort of a common practice.
15 I don't know if in that case we did. I know there
16 was some -- I mean,, I expect there was some vetting
17 of him by the people that worked with him and in how
18 we came into contact, I think you said Rick Eckman,
19 sort of was the person who was kind of the person
20 that put us together.
21         And I -- I just don't know exactly what --
22 you know, how much background or due diligence was
23 done on Haynes. I mean,, because it came from an
24 attorney, there might have been a sense that he had
25 already been vetted to a certain extent. But I

---

Page 191

1 don't know. Oftentimes we would do that.
2 BY MR. ACKELSBERG:
3     Q. And he was someone that you would -- you
4 trusted and had -- you know, he was involved in the
5 First Bank of Delaware product, right?
6         MR. SCHEFF: Object to the form.
7     A. I mean,, he was -- he was an attorney
8 with -- with a reputable law firm and seemed to have
9 a lot of experience in, you know, supporting credit
10 programs.
11 BY MR. ACKELSBERG:
12     Q. Well, but he's someone you knew and trusted
13 already, right?
14         MR. SCHEFF: Object to the form.
15 BY MR. ACKELSBERG:
16     Q. As -- as --
17     A. I mean,, so you're saying "trusted." I'm
18 sorry, there's a lot of attorneys in the room here.
19 He is an attorney. He is someone we worked with in
20 the past. I'm not sure "trusted" is the word I
21 would use for him, but he was a person who had
22 experience with us and we knew him and had worked
23 with him.
24     Q. Specifically, with regard to the
25 ThinkCash/First Bank of Delaware product, right?

---

Page 192

1     A. Yes.
2     Q. Okay. And with regard to the Chippewa
3 Cree, it's -- you know, the tribe itself, was there
4 any due diligence done by Think with regard to the
5 tribe?
6     A. I'm sorry, which tribe are we talking
7 about?
8     Q. Chippewa Cree.
9     A. The Chippewa Cree tribe.
10     Q. The tribe that Haynes -- Eckman and Haynes
11 connected you with.
12     A. Yes, it's -- it's not easy to get a lot of
13 detailed due diligence on -- on tribal
14 organizations. You don't have all the sort of
15 filings and stuff that you have with, you know, a
16 nontribal company. But we did what we could.
17         A lot of it actually came from Haynes.
18 Haynes had worked with the Chippewa Cree before.
19 And as far as various other tribal organizations he
20 had worked with, he seemed to think they were a
21 pretty sound business partner. There was certainly
22 a real need on the reservation for business
23 development, and he felt they'd be a good partner.
24         But I think we probably -- it was hard for
25 us to do a whole lot of additional due diligence on

---

48 (Pages 189 to 192)

TF App. 0080
TF App. 0824

Kenneth Rees

## Page 193

1    the Chippewa Cree as a business partner outside of
2    what Haynes represented to us.
3        Q.  And Haynes' business relationship with the
4    tribe was in a casino business, right?
5        A.  I believe he was in a casino business with
6    them.  I don't know any more details than that.  But
7    he had worked with them and thought they were good
8    business partners.
9        Q.  Did the company -- did Think Finance do any
10   due diligence with regard to the Chippewa Cree's
11   prior experience in the lending business?
12       A.  Well, I knew that they had a lending
13   business in the past.  It was one of the things that
14   made them an attractive business partner because
15   they had already had some experience with lending.
16   I don't know anything other than the fact that they
17   had a product that they -- that they told us that
18   they were unhappy with.
19       Q.  Did you look at the product or look at its
20   track record or. . .
21       A.  I didn't personally.
22       Q.  Did anybody at Think Finance do that?
23       A.  I can't speak to that.
24       Q.  So that's not something that you, as CEO,
25   required?  That wasn't information that you needed

## Page 194

1    in order to make a decision whether this was a good
2    partner?
3            MR. SCHEFF:  Object to the form.
4            You can answer the question.
5        A.  I can say I didn't do that.  And I can't
6    remember now exactly what due diligence was done on
7    that tribe.  I can speak to the fact that as a team
8    we got comfortable that they would be a good
9    business partner, but I just can't speak to exactly
10   what was done and how much detail was accomplished.
11   BY MR. ACKELSBERG:
12       Q.  To the extent the Chippewa Cree had any
13   prior experience in a lending operation, that would
14   have been with the service provider being a company
15   called Encore, Encore Services, right?
16       A.  I believe that's true; although, I don't
17   know exactly what role Encore played in the previous
18   lending business what the tribe had.  I remember
19   that name in association with the business but not
20   what the role was.
21       Q.  Well, did the -- did Think Finance do any
22   due diligence with regard to --
23       A.  To Encore?
24       Q.  -- to Encore?
25       A.  Not that I'm aware of.  That -- that was

## Page 195

1    a -- as far as we knew, that was a former business
2    relationship.  I think it had already ended by the
3    time that we had begun discussions with the tribe.
4    I'm not certain about that, but that was my
5    recollection.
6        Q.  Hang on just for a second.
7            Now, at some point you learned that --
8    sorry.  At some point Think Finance learned that
9    Encore was, in fact, getting a percentage of the
10   take from the Plain Green product, right?
11       A.  Yes.
12       Q.  Okay.
13       A.  It's very frustrating.
14       Q.  Explain.  Why was it so frustrating?
15       A.  We didn't think they had done any value in
16   terms of helping the tribe establish a relationship
17   with us, yet they were taking what we felt was, you
18   know, economic benefits from the tribe and putting
19   them into their own pocket for no value add.
20       Q.  Well -- so make sure I understand this.  So
21   when you were talking -- let's switch tribes.  When
22   you were talking to the Otoe-Missouria, you knew
23   that there was a nontribal, call it intermediary
24   service provider, that -- that you were talking with
25   about the possible relationship.  You were talking

## Page 196

1    with Mark Curry about whether or not you could
2    connect with the Otoe-Missouria, right?
3            MR. SCHEFF:  Object to the form;
4    compound question.
5            You can answer whatever question you
6    choose.
7        A.  So, you know, the -- I didn't know all the
8    details of how Curry worked with the Otoe, but Curry
9    was the intermediary -- intermediary that sort of
10   found us as a potential partner for the tribe.  So
11   they had added some value add there.  And, also, we
12   knew that they were providing some level of
13   consulting to the tribal lending about how to think
14   about their economic development on the reservation.
15   Neither of those things is true of Encore.
16   BY MR. ACKELSBERG:
17       Q.  Well -- okay.  So --
18       A.  So we just saw no value in what they were
19   doing.  Whereas -- whereas, Mark Curry -- and we can
20   argue about, you know, exactly how much they got.
21   I'm not sure exactly I know what it was.  But there
22   was real value add they provided to the tribe, and
23   they should have been compensated in some fashion
24   for that.
25       Q.  But did you care whether or not the

TF App. 0081
TF App. 0825

<table>
<tr><td>

Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000

</td><td>

Tyler P. Brown (admitted *pro hac vice*)
Jason W. Harbour (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200

</td></tr>
</table>

*Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **THINK FINANCE, LLC, *et al.*,** | **Case No. 17-33964 (HDH)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## AFFIDAVIT OF STEVEN HAYNES IN SUPPORT OF DEBTORS' MOTION FOR SUMMARY JUDGMENT OF CERTAIN VIRGINIA AND TEXAS CLAIMS

I, Steven Haynes, having been duly sworn on oath this 2_th day of July 2018 state as follows:

1.      I am over 21 years of age and am competent to testify to the statements set forth in this affidavit.  The statements set forth in this affidavit are true and correct to the best of my knowledge, information, and belief based on my personal knowledge.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Think Finance, LLC (6762), Think Finance SPV, LLC (4522), Financial U, LLC (1850), TC Loan Service, LLC (3103), Tailwind Marketing, LLC (1602), TC Administrative Services, LLC (4558), and TC Decision Sciences, LLC (8949) (collectively, the "Debtors").

2.    On June 26, 2018, I was deposed, in person, under oath (the "Deposition").  A true and correct copy of excerpts from the official transcript of the Deposition are attached hereto as Exhibit A (the "Transcript").

3.    I adopt, restate and incorporate the excerpts from the Deposition, as recorded in the Transcript, as my statements in support of the Debtors' *Motion for Summary Judgment of Certain Virginia and Texas Claims.*

4.    If called upon, I could and would testify to the facts contained herein and the statements made at the Deposition as recorded in the Transcript.

Executed on this _27_ th day of July 2018, in the County of _Dallas_ I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

_____
Steven Haynes

2

TF App. 0827

Steven Haynes

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

COMMONWEALTH OF :
PENNSYLVANIA :
    Plaintiff :
     :
     :
VS. : CIVIL ACTION NUMBER
     : 2:14-CV-07139
THINK FINANCE, INC., :
ET AL., :
    Defendants :

- - -

JUNE 26, 2018

- - -

Videotaped deposition of STEVEN
HAYNES, was taken pursuant to notice at 1735
Market Street, Philadelphia, Pennsylvania,
beginning at or about 8:30 a.m. before
Jeannine Cancelliere, Court Reporter and
Notary Public and David Levin, Videotape
Operator, there being present.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 S. Broad Street, Suite 1303
Philadelphia, Pennsylvania 19102

## Page 2

```
 1    APPEARANCES:
 2
 3       LANGER, GROGAN & DIVER, P.C.
         BY: IRV ACKELSBERG, ESQUIRE
 4       BY: JOHN J. GROGAN, ESQUIRE
         1717 Arch Street, Suite 4130
 5       Philadelphia, Pennsylvania 19103
         Phone: (215) 320-5701
 6       Representing the Plaintiff
         jgrogan@langergrogan.com
 7
 8
 9       ATTORNEY GENERAL'S OFFICE
         BY: SAVERIO MIRARCHI, ESQUIRE
10       1600 Arch Street, 3rd Floor
         Philadelphia, Pennsylvania 19103
11       Phone: (215) 560-2445
         Representing the Defendant
12       smirarchi@attorneygeneral.gov
13
14       MONTGOMERY McCRACKEN
         BY: RICHARD SCHEFF, ESQUIRE
15       BY: DAVID HERMAN, ESQUIRE
         123 South Broad Street
16       Philadelphia, Pennsylvania 19109
         Phone: (215) 772-7228
17       Representing Ken Rees
         rscheff@mmwr.com
18
19
         KATTEN, MUCHIN, ROSENMAN LLP
20       BY: DANIEL SHAPIRO, ESQUIRE
         BY: J. MATTHEW HAWS, ESQUIRE
21       525 W. Monroe Street
         Chicago, Illinois 60661-3693
22       Phone: (312) 902-5319
         Representing Victory Park
23       matthew.haws@kattenlaw.com
24
```

## Page 3

```
 1    APPEARANCES (continued)
 2
 3       GOODWIN PROCTER
         BY: MATTHEW SHELDON, ESQUIRE
 4       901 New York Avenue, NW
         Washington, D.C. 20001
 5       Phone: (202) 346-4000
         Representing Think Finance
 6       msheldon@goodwinlaw.com
 7
 8       VAN NESS FELDMAN
         BY: PATRICK DAUGHERTY, ESQUIRE
 9       1050 Thomas Jefferson Street, NW
         Washington, D.C. 20007-3877
10       Phone: (202) 298-1800
         Representing National Credit
11       Adjusters LLC
         pod@vnf.com
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1                I N D E X
 2                  - - -
 3    STEVEN HAYNES               PAGE
 4    BY MR. ACKELSBERG             8
 5    BY MR. SHELDON              302
 6    BY MR. DAUGHERTY            308
 7                  - - -
 8            E X H I B I T S
 9                  - - -
10    EXHIBIT NO.   PAGE
11       Haynes-1   12
12       P-337      20
13       P-338      80
14       P-339      85
15       P-340     123
16       P-341     130
17       P-342     134
18       P-343     135
19       P-344     141
20       P-345     142
21       P-346     147
22       P-347     149
23       P-348     154
24       P-349     164
```

1 (Pages 1 to 4)

TF App. 0109
TF App. 0828

Steven Haynes

Page 5

1   EXHIBITS (continued)
2       EXHIBIT NO.   PAGE
3       P-350        168
4       P-351        173
5       P-352        187
6       P-353        211
7       P-354        217
8       P-355        219
9       P-356        220
10      P-357        223
11      P-358        233
12      P-359        238
13      P-360        241
14      P-361        243
15      P-362        253
16      P-363        256
17      P-364        259
18      P-365        260
19      P-366        261
20      P-367        266
21      P-368        274
22      P-369        277
23      P-370        281
24      P-371        282

Page 6

1        VIDEOTAPE OPERATOR:  We're now
2   on the record my name is David Levin.  I am
3   the videographer employed by On the Record.
4   This is a video deposition in the United
5   States District Court for the Eastern District
6   of Pennsylvania, Civil Action No.
7   2:14-CV-07139.
8        Today's date is Tuesday, June
9   26th, 2018, and the video time is 8:38 a.m.
10  This deposition is being held at 1735 Market
11  Street, 21st Floor, Philadelphia,
12  Pennsylvania, in the matter of Commonwealth of
13  Pennsylvania versus Think Finance,
14  Incorporated, et al.
15       The deponent is Steven Haynes.
16  All counsel will be noted on the stenographic
17  record.  The court reporter is Jeannine
18  Cancelliere.  She'll now swear in the witness.
19       - - -
20       STEVEN HAYNES, after having been
21  first duly sworn, was examined and testified
22  as follows:
23       VIDEOTAPE OPERATOR:  Please
24  proceed, counsel.

Page 7

1        - - -
2        EXAMINATION
3        - - -
4   BY MR. ACKELSBERG:
5   Q.   Good morning, Mr. Haynes.
6   A.   Good morning.
7   Q.   We just met.  My name, again, is Irv
8   Ackelsberg, and I am one of the lawyers
9   representing the Commonwealth of Pennsylvania
10  in this matter.
11       Can you state the -- what's
12  your home address?
13  A.   4215 San Carlos Street, Dallas, Texas.
14  Q.   Do you have a different business
15  address?
16  A.   I do.
17  Q.   What's that?
18  A.   7515 Lemmon Avenue, Hangar R, Dallas,
19  Texas.
20  Q.   Hangar R, is that in an airport?
21  A.   It is.
22  Q.   Why do you have an office in an airport?
23  A.   Very cheap space.
24  Q.   Have you been deposed before?

Page 8

1   A.   I have.
2   Q.   How many times?
3   A.   Once for sure, maybe twice.
4   Q.   The one for sure, what case was that?
5   A.   It was a divorce case of a business
6   partner of mine.
7   Q.   I don't care about that divorce case.
8   What about the other case?
9   A.   It was an accident case.
10  Q.   Okay.  So nothing pertaining to your
11  business activities?
12  A.   No.
13  Q.   I assume your lawyer has explained to
14  you the procedures and -- but I need to go
15  over them just to make sure that we're on the
16  same page.
17       So what's going to happen is
18  as we proceed today, I am going to be asking
19  you questions.  You're going to be answering
20  those questions to the best of your ability.
21  There may be some comment from the lawyers in
22  the room.  Everything that is spoken is going
23  to be taken down by the court reporter, who's
24  sitting at your left.

2 (Pages 5 to 8)

TF App. 0110
TF App. 0829

Steven Haynes

Page 25

1       THE WITNESS:  Yes, sir.
2    BY MR. ACKELSBERG:
3    Q.   Which came first, Think or Zest?
4    A.   Think Finance.
5    Q.   So both of those lending operations were
6    financed by Victory Park, right?
7       MR. SCHEFF:  Object to form.
8       THE WITNESS:  I don't know.
9    BY MR. ACKELSBERG:
10   Q.   Well, you know that Think was, right?
11      MR. SCHEFF:  Same objection.
12      THE WITNESS:  Yes, sir.
13   BY MR. ACKELSBERG:
14   Q.   Okay.  But you don't know if Zest was?
15   A.   No.
16   Q.   Okay.  Now, turn the page, and we're
17   now -- the number at the right-hand side would
18   be 914.
19   A.   Yes, sir.
20   Q.   Okay.  And this appears to be -- so this
21   is Terence Dunleavy's original e-mail, and it
22   appears to be him forwarding an e-mail from
23   you; am I right?
24      MR. SCHEFF:  Object to the

Page 26

1    form.
2       THE WITNESS:  I don't know.
3    BY MR. ACKELSBERG:
4    Q.   Well, let's look at this.  "Terry, two
5    years ago, I expanded by my dealings with
6    Native American tribes from gaming and energy
7    to installment and payday lenders."  Do you
8    see that?
9    A.   Yes, I do.
10   Q.   That's you speaking, right?  Or writing.
11      MR. SCHEFF:  Object to the
12   form.
13      THE WITNESS:  I don't know.
14   I've not seen this before.
15   BY MR. ACKELSBERG:
16   Q.   I'm not asking whether you've seen this
17   before.  I'm asking you, are those your words
18   to Terry?
19      MR. SCHEFF:  Object to form;
20   asked and answered.  You can answer it again.
21      THE WITNESS:  I don't know.
22   BY MR. ACKELSBERG:
23   Q.   Okay.  Well, this is in 2013, July of
24   2013.  It's correct, isn't it, that in 2011,

Page 27

1    two years earlier, you had expanded your
2    dealings with Native American tribes from
3    gaming and energy to installment and payday
4    lenders.  That is true, right?
5    A.   That is correct.
6    Q.   Okay.  And then the next sentence says:
7    I was responsible for setting up Think Finance
8    with the Rocky Boy reservation and was a party
9    to their agreements with Victory Park.  That's
10   all true, right?
11   A.   That's correct.
12   Q.   And the "I" there is Steven Haynes,
13   isn't it?
14      MR. SCHEFF:  Object to the
15   form.  You can answer the question.
16      THE WITNESS:  I don't
17   remember.  I can see where you can get that
18   conclusion.  I just don't remember.
19   BY MR. ACKELSBERG:
20   Q.   You don't remember writing this.  And I
21   appreciate that.  I understand that, but over
22   the course of reading this, you may -- it --
23   your recollection might get refreshed so this
24   sounds like something you probably wrote to

Page 28

1    Terry Dunleavy.
2       MR. SCHEFF:  Object to the
3    form; it misstates testimony.  You can answer
4    the question.
5    BY MR. ACKELSBERG:
6    Q.   Have we gotten to the point yet where
7    your recollection is refreshed?
8    A.   I don't remember writing this.  Clearly
9    the first paragraph is something that I have
10   done, yes.
11   Q.   Let's continue reading.  "Since that
12   initial deal, I've set up 12 other lenders
13   with tribes."  That's true, right?  Was that
14   true at the time, in July of 2013?
15   A.   Very close, yes.
16   Q.   It might have been an exaggeration a
17   little bit, but --
18   A.   Or it didn't take after they were put
19   together.  But yes, I had made introductions
20   of lenders to tribes.
21   Q.   One of those was ZestCash?
22   A.   Yes, sir.
23   Q.   Did that one get off the ground?
24   A.   I believe it did.

7 (Pages 25 to 28)

TF App. 0111
TF App. 0830

Steven Haynes

Page 29

1    Q.   Okay.  And what tribe was that?
2    A.   That was the Turtle Mountain Band of
3    Chippewa Indians.
4    Q.   And where are they located?
5    A.   In North Dakota.
6    Q.   Was that a payday product -- payday loan
7    product?
8    A.   I don't know what kind of product they
9    offered.
10   Q.   But it was an online lending product of
11   some sort?
12   A.   It was an online lending product, yes.
13   Q.   What was the -- do you know what the
14   website was called?  What would someone need
15   to type in to get to that website?
16   A.   I don't know.  I made an introduction
17   and once they were put together, I was
18   dismissed.  So I don't know what the terms of
19   what they were doing was.
20   Q.   What were the terms of your compensation
21   for putting that together?
22   A.   I got paid $100,00 for making the
23   introduction.
24   Q.   And nothing further?

Page 30

1    A.   Nothing further.
2    Q.   Who paid that?  Was that the tribe?  Was
3    that Victory Park?  I mean --
4    A.   It was -- it's always -- in my business,
5    it is always the commercial corporation that I
6    bring to the tribe that pays the fees.  It
7    would have been ZestCash.
8    Q.   And ZestCash is the name -- that's sort
9    of the equivalent of ThinkCash, if we look at
10   the Rocky Boy deal?
11        MR. SCHEFF:  Objection.
12        MR. SHAPIRO:  Object to the
13   form.
14        MR. SCHEFF:  You can answer
15   the question.
16        THE WITNESS:  I don't know
17   what their product was.  ZestCash was the
18   corporation that was looking for a tribe to do
19   online lending with.
20   BY MR. ACKELSBERG:
21   Q.   Okay.  And what year was that?
22   A.   I would have to guess.  I don't know for
23   sure.
24        MR. SCHEFF:  Don't guess.  If

Page 31

1    you know, you know.  If you don't, you don't.
2    BY MR. ACKELSBERG:
3    Q.   You know it was sometime after 2011,
4    right?  And it was sometime before July '13
5    when Mr. Dunleavy --
6    A.   Yes.
7    Q.   So somewhere in that range?
8    A.   Yes, sir.
9    Q.   Do you know if that -- do you know
10   during what period of time that loan product
11   was online?
12   A.   I believe it is still online.
13   Q.   How did you know that -- or did you know
14   that Victory Park was involved in the ZestCash
15   deal like it was in the Think Finance deal?
16        MR. SHELDON:  Objection to
17   form.
18        THE WITNESS:  I did not.
19   BY MR. ACKELSBERG:
20   Q.   Okay.  You say other tribes -- I'm
21   sorry.  You say with other lenders including
22   ZestCash, and then you say CompuCredit.  Is
23   that a deal that came to fruition?
24        MR. SCHEFF:  Object to the

Page 32

1    form for the characterization of the question.
2    Mr. Haynes has said he doesn't remember
3    writing this, and you're characterizing your
4    question as if he did.  You can answer your
5    question.
6        THE WITNESS:  I don't
7    remember the CompuCredit.  I just --
8    unfortunately, I don't.
9    BY MR. ACKELSBERG:
10   Q.   Okay.  What about Microbilt?
11   A.   Yes, I remember Microbilt.
12   Q.   Did you do a deal with Microbilt?
13   A.   Microbilt was a service provider and
14   they were in a couple of the deals that we
15   did.
16   Q.   With different tribes?
17   A.   Yes, sir.
18   Q.   What were those tribes?
19   A.   The Rosebud Sioux Tribe did a deal with
20   Microbilt.  I believe that the Ketowah tribe
21   may have been --
22   Q.   Spell Ketowah?
23   A.   K-E-T-O-W-A-H.
24   Q.   Where's the Ketowah tribe located?

8 (Pages 29 to 32)

TF App. 0112
TF App. 0831

Steven Haynes

## Page 53

1    Q.   When's the last time -- is Mr. Dunleavy
2    still representing you?
3    A.   He does.
4    Q.   Was the initial deal that you did
5    involving Think and the Rocky Boy Chippewa
6    Cree the biggest tribal lending deal you've
7    been involved in?
8         MR. SCHEFF:   Object to the
9    form.  You can answer the question.
10        THE WITNESS:   Yes.
11   BY MR. ACKELSBERG:
12   Q.   Is it the biggest in terms of the volume
13   of loans generated by the business?
14   A.   I don't know how many loans they've
15   generated.
16   Q.   Well, in terms of -- but it's the
17   biggest in terms of the most cash generated
18   for you though, correct?
19   A.   That's correct.
20   Q.   Why was that deal so lucrative?  What
21   were the aspects of that deal that made it
22   especially lucrative for you?
23   A.   Think Finance had decided that instead
24   of paying me a flat fee for making the

## Page 54

1    connection, they were going to pay me a
2    percent of collected revenues.
3    Q.   Good deal, huh?
4         MR. SCHEFF:   Object to the
5    form.  You can answer the question.
6         THE WITNESS:   It was a very
7    good deal for me.
8    BY MR. ACKELSBERG:
9    Q.   Why would they want to give you -- do
10   you have any sense of why they'd want to give
11   you 1 percent of their revenues?
12        MR. SHELDON:   Object to the
13   form.
14        THE WITNESS:   I believe at
15   the time in our discussions, it was not that
16   they wanted to give me 1 percent of the
17   revenues.  They just did not want to give me a
18   large flat fee for finding them a tribe.
19   BY MR. ACKELSBERG:
20   Q.   Let's move to the beginning of this
21   relationship with Think Finance and the Rocky
22   Boy Chippewa Cree.
23        How did you get connected
24   to -- did you have a -- you had a relationship

## Page 55

1    with the tribe before you had a relationship
2    with Think Finance, correct?
3    A.   That's correct.
4    Q.   That's why Think Finance was interested
5    in developing a relationship with you,
6    correct?
7         MR. SCHEFF:   Object to the
8    form.  You can answer the question.
9         MR. SHELDON:   Objection --
10   BY MR. ACKELSBERG:
11   Q.   As best as you understand.
12        MR. SHELDON:   Object to form.
13        MR. ACKELSBERG:   I'll
14   withdraw.  I'll restate the question.
15   BY MR. ACKELSBERG:
16   Q.   You spent time on the Rocky Boy
17   reservation in Box Elder, Montana?
18   A.   Yes, I have.
19   Q.   Okay.  How many times have you been
20   there?
21   A.   Half a dozen.
22   Q.   When was the first time?
23   A.   I'm not sure.
24   Q.   Approximately?

## Page 56

1    A.   Approximately 2006.
2    Q.   Okay.  And when's the most recent time?
3    A.   Probably around 2011.
4    Q.   When the deal was first set up with
5    Think Finance?
6         MR. SCHEFF:   Object to the
7    form.  You can answer the question.
8         THE WITNESS:   Correct.
9    BY MR. ACKELSBERG:
10   Q.   How would you describe -- describe the
11   reservation in Box Elder for me?
12   A.   It is poor.  It is disheveled.  It's
13   beautiful.
14   Q.   Would it be correct to say it is also
15   very remote?
16   A.   It is extremely remote.
17   Q.   Would I be correct to say that the
18   biggest population center is probably Great
19   Falls, which is roughly two hours away?
20   A.   Yeah, that's pretty safe to say.
21   Q.   Okay.  On the Canadian -- it's near the
22   Canadian border, correct?
23   A.   Correct.
24   Q.   But there's no population centers -- big

14  (Pages 53 to 56)

TF App. 0113
TF App. 0832

Steven Haynes

Page 57

1  population centers in Canada near Box Elder
2  either; am I right?
3  A.  I don't remember.  I think you're
4  correct.
5  Q.  What economic activity, if any, exists
6  at Box Elder?
7          MR. SCHEFF:  Object to the
8  form.  You can answer the question if you can.
9  BY MR. ACKELSBERG:
10  Q.  That you recall.
11  A.  They had an oil and gas industry on the
12  reservation.  They had a casino.
13  Q.  That's about it?
14  A.  That's about it.
15  Q.  Those half a dozen times that you were
16  in Box Elder, how did you get there?
17  A.  I would fly to Great Falls or someplace
18  close and rent a car and drive for a very long
19  time.
20  Q.  Now, the company that financed the
21  casino that you mentioned, that's a company
22  called BEH Gaming, correct?
23  A.  That's correct.
24  Q.  Okay.  Now, do you have any connection

Page 58

1  to that company or to the principals of that
2  company?
3          MR. SCHEFF:  Object to the
4  form.  You can answer the question.
5          THE WITNESS:  I have no
6  connection to the company.  I know the
7  principals.
8  BY MR. ACKELSBERG:
9  Q.  Okay.  And who are they, the principals?
10         MR. SCHEFF:  Irv, if this has
11  something to do with the eventual relationship
12  with Think Finance, then I don't have a
13  problem with this question.  But it if
14  doesn't, then we're just not going to his
15  other business relationships.  It's just none
16  of your business.
17  BY MR. ACKELSBERG:
18  Q.  You can answer the question.
19         MR. SCHEFF:  You can't answer
20  the question.  Does it have a relationship?
21         MR. ACKELSBERG:  Yes.
22         MR. SCHEFF:  Okay.  What's
23  the relationship?
24         MR. ACKELSBERG:  I'm not here

Page 59

1  to take your deposition.
2          MR. SCHEFF:  Let's go off.
3          VIDEOTAPE OPERATOR:  9:36,
4  off the record.
5              - - -
6     (Whereupon a short break was taken at this
7                    time.)
8              - - -
9          VIDEOTAPE OPERATOR:  9:42,
10  we're back on the record.
11  BY MR. ACKELSBERG:
12  Q.  So the casino that's on the Rocky Boy
13  reservation, it's called the Northern Winds
14  Casino?
15  A.  I believe that's correct.
16  Q.  So your role with regard to the casino
17  was supplying the slot machines?
18         MR. SCHEFF:  Object to the
19  form.  You can answer if you can.
20         THE WITNESS:  I supplied them
21  slot machines later in the life of the casino.
22  I was not involved in the building or the
23  opening of the casino.
24  BY MR. ACKELSBERG:

Page 60

1  Q.  Okay.  So the developer of the casino
2  was BEH, right?
3  A.  I believe that to be correct, yes.
4  Q.  Okay.  And at some point after it was
5  opened, you developed a contract -- you had an
6  agreement with the tribe to lease slot
7  machines, like you were talking about before?
8          MR. SCHEFF:  Object to the
9  form.  You can answer the question.
10         THE WITNESS:  I was --
11  entered into a revenue agreement to lease
12  machines to the tribe, to the casino, correct.
13  BY MR. ACKELSBERG:
14  Q.  Okay.  And through what business name
15  was your slot machine contract with the
16  Chippewa Cree?
17  A.  I believe it was AGame NV.  It may have
18  been Tribal Gaming Solutions.  I'm not sure
19  which one.  It may have been both.
20  Q.  AGame NV was a business -- who is your
21  partner in that business?
22  A.  Ray Brown.
23  Q.  And is Ray Brown connected to BEH
24  Gaming?

15  (Pages 57 to 60)

TF App. 0114
TF App. 0833

Steven Haynes

| Page 61 | Page 63 |

**Page 61**

1     MR. SCHEFF: Object to the
2 form.
3     THE WITNESS: I'm not sure.
4 BY MR. ACKELSBERG:
5 Q. How did you meet Ray Brown?
6 A. I met Ray Brown in Dallas years before.
7 He and a partner he had then came to my office
8 looking for capital at the time for Indian
9 gaming machine leasing.
10 Q. Was Mr. Brown the one who connected you
11 to the Chippewa Cree that led to the slot
12 machine deal at the Northern Winds Casino?
13     MR. SCHEFF: Object to the
14 form. You can answer the question.
15     THE WITNESS: Yes, Mr. Brown
16 introduced me to the Chippewa Cree.
17 BY MR. ACKELSBERG:
18 Q. As a result of that, you and Mr. Brown
19 created this LLC called AGame NV?
20     MR. SCHEFF: Object to the
21 form. You can answer the question.
22     THE WITNESS: I don't
23 remember it being specifically for or starting
24 with Chippewa Cree.

**Page 62**

1 BY MR. ACKELSBERG:
2 Q. But when you first met Mr. Brown, I
3 mean, you weren't talking specifically about
4 the Chippewa Cree, you were talking more
5 generally about providing machines to tribal
6 casinos, correct?
7     MR. SCHEFF: Object to the
8 form.
9     THE WITNESS: When Mr. Brown
10 came to our offices, he was looking for
11 financing for a whole host of gaming-related
12 opportunities in and off reservations.
13 BY MR. ACKELSBERG:
14 Q. And then at some time you and Mr. Brown
15 decided to create a business together?
16 A. That's correct.
17 Q. Okay. And what was the purpose of that
18 business?
19 A. The purpose of AGame was to develop
20 and -- develop tribal casinos, commercial
21 casinos, and to lease slot machines to those
22 casinos.
23 Q. And at some point, Mr. Brown brought to
24 your attention the possibility of AGame NV

**Page 63**

1 getting a piece of the action at the Northern
2 Winds Casino?
3     MR. SCHEFF: Object to the
4 form. You can answer the question if you can.
5     THE WITNESS: Mr. Brown, you
6 know, yes, brought it to our attention -- my
7 attention, the opportunity to lease slot
8 machines to the Northern Winds Casino.
9 BY MR. ACKELSBERG:
10 Q. And then how does this work? Do you and
11 Mr. Brown raise money to do this? Do you have
12 investors? Did you have investors in
13 AGame NV?
14     MR. SCHEFF: Why is this --
15 how is this relevant to this case, Mr.
16 Ackelsberg? I mean, honestly, how is this
17 relevant?
18     MR. ACKELSBERG: We'll get
19 back to AGame NV later. That's why.
20     MR. SCHEFF: Okay.
21 BY MR. ACKELSBERG:
22 Q. Now, the deal that you signed with the
23 Chippewa Cree for the slot machines, was there
24 any paperwork connected to that deal?

**Page 64**

1     MR. SCHEFF: Object to the
2 form. You can answer the question.
3     THE WITNESS: There were
4 always signed contracts with our agreements.
5 BY MR. ACKELSBERG:
6 Q. Did you provide those signed contracts
7 either to your lawyers at Dinsmore or to your
8 lawyers here at Montgomery McCracken?
9 A. I provided access to all of my files,
10 both on my computer and online and my file
11 cabinets.
12 Q. And that would include the contract for
13 the slot machines with the Chippewa Cree?
14 A. If they still exist, yes.
15 Q. Now, at the time that -- now, is the
16 first time that you went to the Rocky Boy
17 reservation to investigate the possibility of
18 the deal for the slot machine?
19     MR. SCHEFF: Object to the
20 form.
21     THE WITNESS: No, sir.
22 BY MR. ACKELSBERG:
23 Q. What was the occasion for your first
24 trip to the Rocky Boy reservation?

16 (Pages 61 to 64)

TF App. 0115
TF App. 0834

Steven Haynes

| Page 65 |
| --- |

1    A.  I believe my first trip, the casino was
2  under construction and they were looking for
3  help with their oil and gas leases.
4    Q.  And who was looking for help, the tribe?
5    A.  The tribal oil and gas corporation that
6  they owned.
7    Q.  I see.  And Mr. Brown made that
8  connection for you with the tribe?
9    A.  Yes, sir.
10    Q.  So this was after the meeting in Dallas
11  with Mr. Brown?  He connected you to the tribe
12  with regard to an oil and gas lease?
13    A.  Yes, sir.
14    Q.  Okay.  And did you have a contract with
15  the Chippewa Cree on an oil and gas deal?
16    A.  No, sir.  After investigating the
17  opportunity, there was no business to be done.
18    Q.  Okay.  And would the next time you went
19  up there, that would -- the next time you went
20  up there would have been with regard to the
21  slot machines?
22    A.  I'm not sure.  There was another
23  opportunity to build hotels and multifamily
24  housing up there.  And then after that -- or

| Page 66 |
| --- |

1  previous with the slot machines, there was
2  business opportunities growing out of
3  Mr. Brown's relationship with the tribe.
4    Q.  But none of them came to fruition?
5    A.  No, sir.
6    Q.  Now, with regard to the casino, given
7  how remote that reservation is, what was the
8  business plan for getting people to come to
9  the casino?
10          MR. SCHEFF:  Object to the
11  form.  You can answer the question if you can.
12  Again, I don't know how this is on point,
13  Mr. Ackelsberg, to this case.  You can answer
14  the question if you can.
15          THE WITNESS:  That's a very
16  good question.  I wasn't invested in the
17  casino.  I don't know what their business plan
18  was.
19  BY MR. ACKELSBERG:
20    Q.  Now, was Mr. Brown also the one who
21  connected you?  Did Mr. -- well, you already
22  had a relationship -- before the Think Finance
23  deal happened, you already had this
24  pre-existing relationship with the tribe,

| Page 67 |
| --- |

1  correct?
2    A.  That's correct.
3    Q.  Now, with the slot machines, for
4  example, who at the tribe were you dealing
5  with?
6    A.  I don't remember specifically.
7  Traditionally, we deal with the general
8  manager of the casino.
9    Q.  You weren't dealing with anyone in the
10  tribal council, that you remember?
11    A.  I had met members of the tribal council.
12  But the way the businesses always work is you
13  go to the general manager because they had the
14  knowledge of what they need on the
15  reservation.
16    Q.  And you don't remember who that general
17  manager was?
18    A.  I don't remember his name, no.
19    Q.  Okay.  So how did the first connection
20  with Think Finance happen?
21          MR. SCHEFF:  Object to the
22  form.  You can answer the question.
23          THE WITNESS:  My attorney,
24  Tim Anderson.

| Page 68 |
| --- |

1  BY MR. ACKELSBERG:
2    Q.  At Pepper?
3    A.  At Pepper Hamilton.  Introduced me to
4  Rick Eckman, who is also an attorney there who
5  was working with Think Finance to help them
6  find a tribe to partner with.
7    Q.  So tell us what happened.
8    A.  I met with Tim, talked to Rick Eckman on
9  the phone.  He set up a conference call
10  with -- or a call between myself and Jason
11  Harvison, and Jason came over after that phone
12  call and showed me a presentation of what it
13  is they were trying to accomplish.  And I
14  thought it was interesting; I thought I could
15  help them.
16    Q.  The meeting with Tim Anderson, was that
17  at Pepper's office in Philly.
18    A.  No, it was not.
19    Q.  Where was it?
20    A.  It was either -- I'm not sure where it
21  was.  I don't know.
22    Q.  Okay.  And so you met with Mr. Anderson.
23  He got Eckman on the phone, and this was
24  basically Eckman presenting a potential

17 (Pages 65 to 68)

TF App. 0116
TF App. 0835

Steven Haynes

---

Page 93

1    statements, all support documents."
2         So he's referring to the
3    Great Plains Lending website that they had
4    ready to go, right?
5         MR. SCHEFF: Object to the
6    form. Calls for speculation. You can answer
7    the question if you can.
8    BY MR. ACKELSBERG:
9    Q.   That you saw referenced in the
10   PowerPoint?
11   A.   I don't --
12        MR. SCHEFF: Same objection.
13   You can answer the question.
14        THE WITNESS: I don't know
15   what he was referring to in this.
16   BY MR. ACKELSBERG:
17   Q.   And then he says: I got pretty excited
18   yesterday around noon when you said that the
19   Montana tribe had everything ready to go and
20   then lost their funding.
21        Now, when you say that the
22   Montana -- well, first of all, the Montana
23   tribe, you're referring to Rocky Boy here,
24   right?

---

Page 94

1    A.   Rocky Boy was the only Montana tribe
2    that I had -- yes.
3    Q.   Yeah. Okay. So it would have been that
4    at the time that you were talking with
5    Mr. Shaper and Mr. Harvison prior to the NDA
6    being signed, that you and Mr. Brown had
7    already concluded your analysis where you
8    figured that Rocky Boy might be the one,
9    right?
10        MR. SCHEFF: Object to the
11   form. You can answer the question.
12        THE WITNESS: At this point,
13   we had found a tribe that hit all of our
14   criteria --
15   BY MR. ACKELSBERG:
16   Q.   Right.
17   A.   -- and Ray was chatting and talking to
18   them, yes.
19   Q.   Oh, so Ray was already talking about the
20   possibility of the deal before the NDA was
21   signed?
22   A.   Ray was the contact for the tribe. I
23   was the contact with Think Finance as he knew
24   the tribe well.

---

Page 95

1    Q.   Okay, okay. When it says here that the
2    tribe had everything ready to go and then lost
3    their funding, that was with regard to the
4    pre-existing online lending product that they
5    were trying to launch; am I right?
6         MR. SCHEFF: Object to the
7    form. You can answer the question if you can.
8         THE WITNESS: It was that
9    they had an online lending business in place,
10   correct.
11   BY MR. ACKELSBERG:
12   Q.   But they didn't have the funding to
13   launch it?
14        MR. SCHEFF: Object to the
15   form. You can answer the question if you can.
16        THE WITNESS: I don't
17   remember whether it was to launch it or to
18   grow it.
19   BY MR. ACKELSBERG:
20   Q.   Okay. Let's go to your reply. And then
21   you reply the same day, actually it looks like
22   15 minutes later. Do you see that?
23   A.   At the bottom of the first page?
24   Q.   Yes.

---

Page 96

1    A.   Yes.
2    Q.   Actually, you're all in Dallas at this
3    point, right? I mean -- or Dallas/Fort Worth.
4    Think Finance is in Fort Worth; and you're in
5    Dallas, right?
6    A.   That's correct.
7    Q.   Okay. So you reply to Steve and -- with
8    the following: "Steve, thanks for the e-mail.
9    We're moving quickly. I would greatly
10   appreciate a letter outlining my
11   compensation."
12        Because at that point, it
13   wasn't clear how you were going to get paid,
14   correct?
15   A.   That's correct.
16   Q.   Okay. So you wanted to know before you
17   get going with this, what's -- what are the
18   dollars for AGame NV, right?
19   A.   At this point, I had no idea how
20   valuable or invaluable or not valuable an
21   installment lending business was. So yes, I
22   wanted to know how I was going to get paid for
23   doing this work.
24   Q.   Okay. And then it says: I've extended

---

24  (Pages 93 to 96)

TF App. 0117
TF App. 0836

Steven Haynes

| | Page 97 |
|---|---|

1 the offer, meaning that Ray has talked --
2 that's -- when you say: I have extended the
3 offer, you're referring to Ray talking to the
4 tribe, right?
5 A. I'm not sure what I -- who I was
6 referring to when I say "I've extended an
7 offer."
8 Q. And it says that they are to meet
9 this -- meet, they're checking and working on
10 due diligence. They have to pool info and
11 call a meeting of their council and the
12 council members. I mean, you're talking about
13 the tribe here, right?
14 A. I don't remember if I was talking about
15 Ray talking to a tribal member, the business
16 office or their attorney, Robin Kovash. But
17 it was some representative of the tribe.
18 Q. Okay. So then you get a reply from
19 Steve Shaper. So your e-mail was at 2 p.m.
20 and then at quarter to four, Steve Shaper
21 replies to you, correct?
22 A. Correct.
23 Q. And I want to make sure I have this
24 correct, what it says. "Steve, if you, your

| | Page 98 |
|---|---|

1 Montana partner, or any other and Think
2 Finance are able to move fast enough to put
3 together an agreement whereby one of your
4 tribes is Think Finance's first tribal
5 partner, Think Finance will pay the tribal
6 corporation 4 1/2 percent of gross interest
7 collected from all loans made by that tribal
8 corporation through Think Finance." Right?
9 A. That's what it says, correct.
10 Q. Okay. And you or any entity you name,
11 1 percent of the gross interest collected. So
12 that was the offer, right?
13 A. That was the offer.
14 Q. So it was a total of 5 1/2 percent of
15 the revenue, 4 1/2 going to the tribe and 1
16 going to you or any entity that you name,
17 correct?
18 MR. SCHEFF: Object to form.
19 THE WITNESS: Yes, that's
20 what this says.
21 BY MR. ACKELSBERG:
22 Q. Well, that was the offer, right?
23 A. That was the offer.
24 Q. "Implicit" -- I'm continuing to read in

| | Page 99 |
|---|---|

1 Mr. Shaper's e-mail -- "Implicit is the fact
2 that Steven Haynes or another of his entities
3 will finance all loans made by the tribal
4 corporation for two days before they are sold
5 to Think Finance's outside loan financing
6 organization." Do you see that?
7 A. Yes, I see that.
8 Q. Okay. Now, was this the first time that
9 you heard anything about you being asked to
10 finance the loans being made by the tribe?
11 A. I don't remember if that is the first
12 time that this e-mail or it was in a prior
13 conversation.
14 Q. Well, when Jason Harvison first came to
15 you and you met at your residence, wasn't --
16 were any of these terms discussed?
17 MR. SCHEFF: "These terms"
18 meaning the compensation terms?
19 MR. ACKELSBERG: Yes, the
20 compensation terms.
21 MR. SCHEFF: Thank you. You
22 can answer that question.
23 THE WITNESS: Yes --
24 BY MR. ACKELSBERG:

| | Page 100 |
|---|---|

1 Q. In other words --
2 A. -- yes. We discussed fair compensation
3 for the roles played and -- yes.
4 Q. Were the numbers as high as they are in
5 the e-mail when you were talking with Jason?
6 A. I remember having a discussion with
7 Jason about how to lay out a plan that was
8 acceptable to a tribe because they had been
9 burned very many times in the past on
10 transactions. And it was best that they were
11 compensated off the top with no expenses taken
12 out, so they could calculate their income
13 every day and not worry about salaries paid to
14 other people or expenses or travel costs or
15 anything else.
16 So when this -- this fits the
17 general description of the tribe needs to have
18 a gross compensation plan. And I just don't
19 remember if in my discussion with Jason we
20 talked about me raising money for them or if
21 it first was brought up in this letter.
22 Q. Okay. And then Shaper says: This
23 applies only to Think Finance's first tribal
24 partner and signed agreements must be in place

25 (Pages 97 to 100)

TF App. 0118
TF App. 0837

Steven Haynes

---

Page 301

1    Q.   Okay.  Are you still involved with Plain
2    Green at all?
3    A.   I'm not involved with Plain Green in any
4    way.
5    Q.   Do you have any further relationships
6    with Think or Cortex?  Have you ever heard of
7    a company called Cortex?
8         MR. SCHEFF:  Object to the
9    form.
10        THE WITNESS:  I have heard of
11   Cortex.
12   BY MR. ACKELSBERG:
13   Q.   Have you had any business with Cortex?
14   A.   I don't do any business with Cortex, no.
15   Q.   Or with Think?
16   A.   I don't think I do any business directly
17   with Think, no.
18        MR. SCHEFF:  We're at 3:30.
19        MR. ACKELSBERG:  Thank you.
20        MR. SCHEFF:  Steven, can I
21   just talk to you for a second outside.
22        VIDEOTAPE OPERATOR:  3:31,
23   off the record.
24        3:32, we are back on the

---

Page 302

1    record.
2         - - -
3         EXAMINATION
4         - - -
5    BY MR. SHELDON:
6    Q.   Mr. Haynes, my name is Matt Sheldon.
7    I'm counsel for the Think Finance defendants.
8    And I will try to keep this brief because I
9    know you got to be somewhere.
10        I would like to revisit Mr.
11   Ackelsberg's series of questions regarding the
12   negotiations in 2011 between the Chippewa Cree
13   Tribe, yourself and Think Finance regarding
14   the establishment of the tribal lending
15   program.  Do you understand what time period
16   I'm talking about?
17   A.   Yes, sir.
18   Q.   Do you remember an attorney named Robin
19   Kovash with the firm Jones and Keller?
20   A.   Yes, sir.
21   Q.   Did that attorney represent the Chippewa
22   Cree tribe in the negotiations?
23   A.   Yes, he did.
24   Q.   How would you characterize Mr. Kovash's

---

Page 303

1    advocacy for the tribe in those negotiations?
2    A.   Vigorous.
3    Q.   Did Mr. Kovash push for contractual
4    terms more favorable to the tribe, than those
5    originally on the table?
6    A.   I believe he did.  I know that
7    everything was red lined and marked up
8    significantly.
9    Q.   Was it your recollection that Mr. Kovash
10   was successful in negotiating a more favorable
11   agreement for the tribe, than the terms
12   initially under consideration?
13   A.   I believe he did.
14   Q.   Did you introduce Mr. Kovash to the
15   tribe?
16   A.   No, sir.
17   Q.   Is it your understanding that Mr. Kovash
18   was already representing the Chippewa Cree
19   Tribe, before the tribe had any dealings with
20   Think Finance?
21   A.   Yes, he was.
22   Q.   In your line of work, you've helped
23   broker various contractual arrangements
24   between Native American tribes and non-tribe

---

Page 304

1    counter parties, right?
2    A.   Yes, sir.
3    Q.   Is it accurate that you brokered dozens
4    of such contractual arrangements?
5         MR. ACKELSBERG:  At this
6    point I object to the form of the question.
7         MR. SHELDON:  Let me finish
8    my questions, then you can -- you're objecting
9    to form.  You said, object to form.  We've got
10   a tight timeframe, let's go.
11        MR. ACKELSBERG:  What I'm
12   asking is, can I avoid doing that for every
13   question where you're leading?  Can we just
14   accept that I've objected --
15        MR. SHELDON:  Continued
16   objection granted.
17        MR. ACKELSBERG:  Thank you.
18   BY MR. SHELDON:
19   Q.   Is it accurate that in establishing
20   those contractual arrangements, the tribes
21   generally had to employ attorneys to negotiate
22   the terms acceptable to the tribe?
23   A.   In every case.
24   Q.   These attorneys charge for their time,

---

76  (Pages 301 to 304)

TF App. 0119
TF App. 0838

Steven Haynes

Page 305

1 correct?
2 A. Yes, sir.
3 Q. In your experience, brokering those
4 dozens of contractual arrangements, what was
5 the standard industry practice for the payment
6 of the tribe's attorney's fees?
7 A. In almost all instances, the commercial
8 enterprise trying to do business with the
9 tribe would pay the tribe's legal expenses.
10 Q. Does this include arrangements involving
11 the gaming industry?
12 A. Yes, sir.
13 Q. Oil and gas?
14 A. Yes.
15 Q. Real estate development?
16 A. Yes.
17 Q. Financial services arrangements?
18 A. Yes.
19 Q. Do you know why that was the case?
20 A. Early on, the tribes -- from '99 forward
21 the tribes had either little or no money. And
22 the lawyers representing them wouldn't do it
23 pro bono, so they expected the commercial
24 company to pay. Over time, as the casinos

Page 306

1 grew, more and more tribes became wealthy.
2 Those tribes no longer practice that. But the
3 tribes that don't have large sums of money
4 still require that the legal fees be paid by
5 the corporation trying to do business with the
6 tribe.
7 Q. Thank you. Is it correct that you
8 testified earlier today that Plain Green
9 negotiated to receive a payment of 4 1/2
10 percent of the gross revenue from its lending
11 operation supported by Think Finance?
12 A. Yes.
13 Q. Do you have any understanding as to what
14 45 percent of gross revenue generally
15 correlates to, in terms of a percentage of
16 profits?
17 MR. SCHEFF: 45 percent --
18 BY MR. SHELDON:
19 Q. 4.5 percent. Do you have any
20 understanding as to what 4.5 percent of gross
21 revenue generally correlates to, in terms of a
22 percentage of profit?
23 A. There's a general rule of thumb that
24 it's a 6X, 5 to 7X. So if you're getting 5

Page 307

1 percent of 4.5 percent, you can multiply that
2 by five. If the business is not particularly
3 successful, up to 7 if it's really successful.
4 And that would correlate to a
5 gross profit or an after expense, an EBITDA
6 number. So 4.5 percent would look roughly
7 somewhere between 25 and 35 percent of the
8 gross profits.
9 Q. By Plain Green negotiating 4 1/2 percent
10 of the gross revenue, it's your understanding
11 that that would roughly correlate to their
12 negotiating a share of the profits in the --
13 did you say 25 to 35 percent range?
14 A. Approximately, that's correct.
15 Q. Do you consider 4 1/2 percent of gross
16 revenue to be an industry standard
17 compensation term when it comes to contractual
18 arrangements involving Native American tribes?
19 A. It is extremely close. In the early
20 part of the gaming business, the NIGC, which
21 is the National Indian Gaming Congress, would
22 create a 30 percent barrier, which is the most
23 -- or the least that a tribe could get.
24 So they set the standard of

Page 308

1 where you needed to be able to pay a tribe to
2 do business with them.
3 Q. Thank you. Do you consider the
4 contractual arrangements involving Plain Green
5 and Think Finance to be industry standard in
6 terms of contractual arrangements involving
7 Native American tribe?
8 A. Yes, I do.
9 MR. SHELDON: No further
10 questions.
11 MR. SCHEFF: Patrick?
12 - - -
13 EXAMINATION
14 - - -
15 BY MR. DAUGHERTY:
16 Q. Mr. Haynes, have you ever heard of a
17 company called National Credit Adjusters?
18 A. No, sir.
19 MR. DAUGHERTY: No further
20 questions.
21 MR. SCHEFF: Dan? Dave?
22 MR. HERMAN: No questions.
23 VIDEOTAPE OPERATOR: That
24 concludes this deposition. The time is 3:38,

77 (Pages 305 to 308)

TF App. 0120
TF App. 0839