KELLETT & BARTHOLOW PLLC
Theodore O. Bartholow, III ("Thad")
Texas Bar No. 24062602
Karen L. Kellett
Texas Bar No. 11199520
11300 N. Central Expy., Ste 301
Dallas, Texas 75243
Phone: (214) 696-9000
Fax: (214) 696-9001
*Counsel for Ms. Gibbs*

Kristi C. Kelly, Esq.,* (pro hac vice)
Andrew J. Guzzo, Esq.,* (pro hac vice)
Casey S. Nash, Esq.,* (pro hac vice)
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com
*Counsel for Ms. Gibbs*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| THINK FINANCE, LLC, *et al.*, | : | Chapter 11 |
| | : | |
| | : | Case No. 17-33964 (HDH) |
| Debtors. | : | |
| | : | (Jointly Administered) |
| _____ | : | |

**PLAINTIFF DARELENE GIBBS' BRIEF IN OPPOSITION TO
DEBTORS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

SUMMARY ................................................................................................................... 1

RESPONSE TO DEBTORS' STATEMENT OF FACTS ................................................... 1

   I.    Ms. Gibbs' response to Part I. ...........................................................................2

   II.   Ms. Gibbs' response to Part II. .........................................................................7

     A.   Omitted facts regarding the restructuring of the contracts in 2015. ...........................7

     B.   Response to Debtors' statement of facts. ...................................................................8

   III.  Ms. Gibbs' response to Part III. ...................................................................10

ARGUMENT .............................................................................................................. 20

   I.    The prospective waive doctrine clearly applies in this case.....................................20

     A.   The provisions in Ms. Gibbs' lending agreement makes clear that federal law does not apply to the agreement. ................................................................................................ 20

     B.   This case is indistinguishable from *Dillon* and *Hayes*.................................................. 22

   II.   The choice-of-law provision is unenforceable under § 187(2)(b). ...........................23

   III.   The choice-of-law provision is unenforceable under § 187(2)(a)...........................24

     A.   Debtors conflate the standard under § 187(2)(a)....................................................... 24

     B.   No different than the Otoe-Missouria, the Chippewa Cree did not have a substantial relationship with the transaction.............................................................................. 24

     C.   Texas law invalidates choice-of-law provisions that are a product of subterfuge even where a substantial relationship exists............................................................................... 24

   IV.  Virginia law applies to the loan agreements. ......................................................25

     A.   Virginia law is the only viable option. ...................................................................... 25

     B.   Debtors should not be permitted to circumvent Virginia's laws through tribal affiliation. ...26

   IV.  Think Finance modeled its business after CashCall. .............................................26

CONCLUSION............................................................................................................ 28

# TABLE OF AUTHORITIES

**CASES**

*Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013)............................................................20

*Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010)............4

*CFPB v. CashCall, Inc.*, C.D. Cal. No. CV1507522JFWRAOX, 2018 WL 485963, at *3 (C.D. Cal. Jan. 19, 2018)
..................................................................................................................................................................26, 27

*Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017) ......................................21, 22, 23, 27

*Gibbs v. Plain Green, LLC*, No. 3:17CV495, 2018 WL 3614969, at *5 (E.D. Va. July 27, 2018) .............................4

*Gingras v. Rosette*, No. 5:15-CV-101, 2016 WL 2932163, at *15 (D. Vt. May 18, 2016) ..................................27, 28

*Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 668, 670 (4th Cir. 2016)............................................21, 22, 23

Indictment, *United States v. Hallinan*, No. 2:16-cr-130-ER-1 (E.D. Pa. Mar. 31, 2016) ...........................................28

Indictment, *United States v. Tucker*, No. 1:16-cr-91-PKC (S.D.N.Y. Feb. 8, 2016) (same) .....................................28

*Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 753 (1998)...............................................................21

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985).......................................20

*Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Services*, 769 F.3d 105, 118 (2d Cir. 2014)..................28

*Owen v. Miami Nation Enters.*, 386 P.3d 357, 374 (2016).........................................................................4, 14

*Somerlott v. Cherokee Nation Distributors, Inc.*, 686 F.3d 1144, 1157 (10th Cir. 2012)..........................................21

*Williams v. Big Picture Loans, LLC*, No. 3:17-CV-461, 2018 WL 3615988, at *2 (E.D. Va. July 27, 2018) ....3, 4, 14

*Williams v. Big Picture*, Case No. 3:17-cv-461, (E.D. Va. 2018) (July 25, 2018 Order at Dkt. 142) ....................3, 28

**SECONDARY SOURCES**

Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012) ........................................................21

## SUMMARY

This brief is filed in opposition to Debtors' Motion for Summary Judgment on one of Darlene Gibbs' Proof of Claims. Despite claims of wanting to have a bellwether, this motion does little to advance the ball in advance of the First Omnibus Objection of Certain Claims. Since co-claimant Lawrence Mwethuku had four Plain Green loans from 2012-2013 (before the purported restructure in 2015), the First Omnibus Objection of Certain Claims will not streamline or prevent a hearing on the issue.[1]

As the Court is aware, Gibbs is a co-claimant with Edwards, who filed a motion for partial summary judgment on July 3, 2018. Dkt. 641. Although they had different "lenders," Debtors filed a consolidated cross-motion as to both Edwards and Gibbs, attempting to combine the little amount of favorable facts for both lending enterprises. *See generally* Dkt. 711. Debtors also filed a motion for summary judgment as to Miller, who had a Great Plains loan. Although Gibbs will not belabor the Court with the same legal analysis supplied by Edwards' opposition/reply, it is important to keep these motions separate as they deal with separate lending programs. Accordingly, Ms. Gibbs uses this brief to respond to the factual differences in the Plain Green lending program and to raise additional arguments related to her loan, namely the prospective issues. Gibbs incorporates the remaining arguments of Edwards as applying to her transaction.

## RESPONSE TO DEBTORS' STATEMENT OF FACTS

Critically, the majority of the Debtors' "undisputed facts" are inadmissible pursuant to the Court's Order dated August 27, 2018 (Dkt. 828), which granted, in part, Ms. Edwards' Motion to Strike (Dkt. 782). More specifically, the Court held that the deposition transcripts of Linda Callnin,

---

[1] By contrast, if the Court finds Edwards' choice-of-law provision unenforceable, the same ruling would apply to any earlier contracts.

Linda Rogenski, Billi Ann Raining Bird, Neal Rosette, Sr., and Steven Haynes "shall not be considered as evidence for summary judgment." Dkt. 828 at 2. The Court further held that "prior deposition transcripts" of other witnesses "will only be considered" if Ms. Gibbs "had an opportunity to depose those individuals prior to the deadline to respond to the Debtors' motion for summary judgment." *Id*. To date, Stephen Smith, Martin Wong, and Michelle Nguyen are the only witnesses who have been deposed. Accordingly, the deposition testimony of Kenneth Rees, Christopher Lutes and Jason Harvison should not be considered as evidence. The Court should also refuse to consider the declaration of Whitford, who refuses to sit for a deposition as evidenced by the motion to quash filed by Plain Green.

Because there is little record to support Debtors' Motion for Summary Judgment on one of Darlene Gibbs' Proof of Claims, and Ms. Gibbs is anticipated to take the depositions of Kenneth Rees, Christopher Lutes, Steven Haynes and Jason Harvison *after* the September 14 hearing date for the Summary Judgement Motions, it makes sense to defer ruling on the Darlene Gibbs Plain Green Proof of Claim. Additionally, depending on the Court's ruling on the Plain Green and Joel Rosette's Motion for Protective Order (Dkt. 871) and Virginia Movant's Motion to Quash Debtors' Deposition Subpoenas of Joel Rosette, Plain Green and Billi Anne Raining Bird (Dkt. 883), there is the opportunity to add to the factual record as to Plain Green loans in advance of the hearing for the First Omnibus Objection of Certain Claims.

## I.      Ms. Gibbs' response to Part I.

Much of the evidence submitted in support of Debtors' motion is inadmissible, except Michelle Nguyen's deposition testimony; Steven Smith's Declaration; Chippewa Cree Code (TF app. 240); Tribal Consumer Protection Bureau (TF App. 250); Martin Wong's Declaration (TF App. 758); 2011 and 2015 Plain Green Participation Agreements (TF App. 549, 552, 554, 565);

and the 2015 Plain Green Servicing Agreement (TF App. 673). In accordance with Rule 56(e) of the Federal Rules of Civil Procedure, Ms. Gibbs states that the following "facts" are disputed, inaccurate, or incomplete:

*Paragraph 1*. There is no admissible evidence cited to in paragraph 1.

*Paragraph 2*. This section exclusively discusses the relationship between Great Plains and Debtors, which is not relevant to Ms. Gibbs' Plain Green loan.

*Paragraph 3*. There is no admissible evidence cited to in paragraph 3.

*Paragraph 4*. The only admissible evidence in paragraph 4 is the Chippewa Cree Code and Tribal Consumer Protection Bureau. TF App. 240 and 250. Gibbs does not dispute that the Chippewa Cree Tribe adopted this Code and regulatory commission. However, she submits that the characterization is misleading to the extent it suggests that Debtors had no involvement with the adoption of the financial code. Pl. Supp. App. 1 (e-mail from Martin Wong indicating "Let's discuss how we help our tribes adopt the model code. GP should be done ASAP."). Ms. Gibbs also disputes that "***many*** states" do not cap interest rates; it is less than 5 states. Dkt. 711 at 8.

Ms. Gibbs disputes that Plain Green actually formed a regulatory commission. Although its Code attempts to establish a commission, there is no evidence that this occurred, and it certainly did not occur when the Code was enacted as a July 2015 powerpoint indicates that Plain Green did not have a Tribal Consumer Regulatory Commission. Pl. Supp. App. 90.[2]

Ms. Gibbs further disputes that Plain Green is an arm-of-the tribe. Although the doctrine of tribal sovereign immunity protects the tribe itself, [b]usiness entities that claim arm-of-the-tribe

---

[2] This façade of a "regulatory commission" is a common feature of the rent-a-tribe model. *Williams v. Big Picture Loans, LLC*, No. 3:17-CV-461, 2018 WL 3615988, at *2 (E.D. Va. July 27, 2018); *see also Williams v. Big Picture*, Case No. 3:17-cv-461, (E.D. Va. 2018) (July 25, 2018 Order at Dkt. 142) (denying motion to dismiss for failure to exhaust remedies because regulatory process lacked "indicia of neutrality and validity").

immunity have no inherent immunity of their own." *Owen v. Miami Nation Enters.*, 386 P.3d 357, 374 (2016).[3] Because the tribal entities were created for the purpose of facilitating a criminal enterprise and to benefit outsiders to the tribe, the application of the *Breakthrough* factors does not support extending tribal immunity to Plain Green.[4] Further, Gibbs is currently litigating Plain Green's arm-of-the tribe status in the Norther District of California and Eastern District of Virginia, where the Court has noted that Plain Green cannot invoke "the protection of sovereign immunity when that very right to protection is contested." *Gibbs v. Plain Green, LLC*, No. 3:17CV495, 2018 WL 3614969, at *5 (E.D. Va. July 27, 2018).

Paragraph 5. There is no admissible evidence in paragraph 5.

Paragraph 6. Ms. Gibbs disputes the characterization that VPC formed GPLS to the extent it suggests that Debtors were not involved with the process. Prior to the FDIC shutting down the rent-a-bank arrangement between Think Finance and First Bank of Delaware, VPC and Think Finance had a similar arrangement where loans were purchased by an entity known as GPLS Servicing Trust. *See* Pl. App. 149 ("GPLS Trust purchased Loans (as defined below) from

---

[3] When determining whether an entity may share in the inherent immunity of the tribe, courts typically apply a six factor test that considers: "(1) the entity's method of creation, (2) whether the tribe intended the entity to share in its immunity, (3) the entity's purpose, (4) the tribe's control over the entity, (5) the financial relationship between the tribe and the entity, and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010). This test "takes into account both formal and functional considerations" and examines, "not only the legal or organizational relationship between the tribe and the entity, but also the practical operation of the entity in relation to the tribe." *Miami Nation Enterprises*, 386 P.3d at 365.

[4] *Miami Nation Enterprises*, 386 P.3d at 249 ("it is common sense that if an entity provides a nominal percentage of its revenue to the tribe, and the tribe is barely involved, the entity cannot be said to stand in the place of the tribe. Moreover, if a tribe retains only a minimal percentage of the profits from the enterprise, it would appear that the enterprise may not be truly 'controlled' by the tribe."); *see also Williams*, 2018 WL 3615988, at *1 (finding five of the six Breakthrough factors weighed against finding that a comparable entity was an arm-of-the tribe entitled to immunity).

Universal Fund II, LLC"); *see generally* Pl. App. 001 (powerpoint explaining the overview of the lending program between Think Finance and First Bank of Delaware); *see also* Pl. Supp. App. 54 (explaining that "VPC collaborated with Think Finance to create a new structure to avoid banking regulatory issues" after FDIC shut down rent-a-bank arrangement).

Ms. Gibbs further disputes that VPC's outside investors "primarily funded GPLS," although this statement is immaterial. According to Think Finance's verified complaint against Victory Park, "Victory Park was the ***primary*** investor in a loan participation venture, GPLS[.]" *Think Finance*, Case No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. at ¶ 26) (emphasis added). Gibbs does not dispute that Think Finance's subsidiary, Think SPV, held an interest in the shares that "never exceeded 33%" until VPC redeemed its shares in 2017. Ms. Gibbs does not dispute that VPC has always owned the voting shares of GPLS. Finally, Edwards agrees with the statement that Debtors never *directly* "held participation interests in any loans," but notes that Think SPV indirectly held interests in the loans through its ownership of GPLS's shares.

*Paragraph 7*. The only admissible evidence in paragraph 7 are the 2011 and 2015 Plain Green Participation Agreements. Ms. Gibbs disputes the assertions that are contrary to the plain language in the documents. In particular, Plain Green did not hold the participation interests "for *several* business days." Dkt. 711 at 9 (emphasis added). It was two days per the terms of the Participation Agreement. Ms. Gibbs further disputes that Plain Green sold "participation interests ranging from 90-99%" to GPLS. Dkt. 711 at 10. Plain Green sold 99% of the participation interest from 2011 through December 2015. TF App. 549 at § 2(a). After the restructure, Plain Green was allowed to purchase 100% of the participation interests. TF App. 621 at § 2(a).

Ms. Gibbs also disputes that Plain Green "retained title to the loans." The Participation Agreement provided GPLS the right to purchase "undivided ninety-nine percent (99%)

participation interests in the Loans, income or profits therefrom and the applicable Loan Documents." TF App. 549 at § 2(a). As a result of this purchase, the Participation Agreement provides that GPLS "shall be considered for all purposes as, the legal and equitable owner of a Participation Interest," *and* "the associated Loan Documents (to the extent of such Participation Interest)." TF App. 550 at § 2(c).

Ms. Gibbs further disputes that Plain Green "retained servicing rights and provided customer service" on the loans. Rather, Plain Green delegated "customer support and collection services" to TC Decision Sciences pursuant to the Servicing Agreement dated May 25, 2011. Pl. Supp. App. 425-433. Tellingly, this Servicing Agreement is identical to the Servicing Agreement between TC Decision Sciences and Plain Green. Pl. Supp. App. at 181-187. Additionally, customer service was then outsourced to third parties companies such as InfoCision Management, LLC and MetaSource, LLC—non-tribal companies with principal places of business in Ohio and Pennsylvania. Pl. Supp. App. 207. For example, MetaSource handled 100% of "verifications," "support," "email" and "fax" responsibilities for the Plain Green loans. Pl. Supp. App 202-205. Think Finance, not Plain Green, handled the overflow if necessary. *Id.*[5]

*Paragraph 8.* Ms. Gibbs does not dispute that Think Finance was responsible for providing marketing and risk management services to Plain Green. However, Ms. Gibbs notes that Debtors characterization is misleading to the extent it suggests these responsibilities were performed by Tailwind and TC Decisions. Dkt. 711 at 10. Neither entity had a single employee and thus could

---

[5] Gibbs does not mean to suggest that this never changed. However, Debtors are clearly misrepresenting the role of Plain Green when Debtors assert the "Tribal Lenders have always had ultimate responsibility and oversight for every material aspect of these loans—underwriting, origination, servicing, marketing, and collection." Dkt. 711 at 2. The Servicing Agreement, coupled with the Redundancy By Outsourcer & Site Powerpoint, shows that Plain Green did not meaningfully participate in servicing and collections.

not have handled these responsibilities. Pl. Supp. App. 391 (Smith Dep. 29:10-17). Under disguise, Think Finance actually performed the services. Pl. Supp. App. 392 (Smith Dep. 43:12-16).

Ms. Gibbs does not dispute that Plain Green loans were originated through Think Finance's "sophisticated technology and software it had developed," which Plain Green licensed. Dkt. 711 at 10. Ms. Gibbs disputes that Plain Green "outsourced other services," to the extent it suggests that Debtors were not involve in the process, such Debtors' vendor relationship with third parties such as MetaSource. *See* Pl. Supp. App 202-205.

*Paragraph 9.* Ms. Gibbs disputes that Plain Green "had a substantial economic *interest* in the lending program." Dkt. 711 at 10 (emphasis added). Although Plain Green may have received a substantial *benefit* due to the scale of the program, Plain Green received 4.5% of the revenue on the loans, *at most*. See TF App. 549. Given this disparity, Plain Green's interest cannot be characterized as a "substantial economic interest" even under the most generous reading of the phrase. In addition, any economic interest must also be evaluated in terms of the risk of loss, which was *zero*. Pl. App. 35 (promoting the venture as an opportunity to "generate millions of dollars in cash flow" with "no risk of loss"). Put differently, while Plain Green had an economic interest in the upside of the program, it did not have the same equivalent risk because it did not lose any capital if a consumer defaulted. Further, Ms. Gibbs does not dispute that GPLS reimbursed the Tribe for "certain expenses," but it was not *all* expenses—further reducing the Tribe's economic benefits associated with the loans.

II.     **Ms. Gibbs' response to Part II.**

    A.     **Omitted facts regarding the restructuring of the contracts in 2015.**

Ms. Gibbs incorporates this section of Ms. Edwards' Consolidated Brief in Opposition to Debtors' Motion for Summary Judgment and Reply in Support of her Motion for Partial Summary

Judgment because it relies on the same legal argument and she relies on the facts to rebut the notion that the reason for the restructure was driven by the tribes.

### B.       Response to Debtors' statement of facts.

The only admissible evidence is: 2015 Plain Green Participation Agreement (TF App. 614) Steven Smith's Declaration (TF App 375); Steven Smith's Deposition (TF App 62-63, 64, 96-97); Michelle Nguyen's deposition transcript (TF App. 29-30); and March 1, 2016 Letter from Plain Green to TC Decision (TF App. 344).

*Paragraph 1*. Ms. Gibbs disputes that the re-negotiated contracts provided Plain Green with "even more operational responsibilities." Dkt. 711 at 11. Unsurprisingly, there is no evidence or citation to a single provision of any contract that provided Plain Green with "more operational responsibilities." This statement also directly contradicts the position taken throughout the brief that Plain Green always had a significant role in the operations since 2011.

Ms. Gibbs further disputes that Plain Green "retained a minimum 10% participation interest" under the 2015 Participation Agreement. It did not maintain any participation interest—instead, the agreement provides Plain Green "shall at all times maintain a minimum of ten (10%) percent interest in all Loans made by PGL i***n which GPLS owns a Participation Interest***." TF App. 621 (emphasis added). In other words, Plain Green maintained an interest; but not a participation interest as the term was used in the program. Ms. Gibbs further disputes that Plain Green received a service fee of 6.25%, plus $256 for any new borrower and $105 for every other loan. Dkt. 711 at 11. It received 90% of these amounts; GPLS received the other 10%. TF App. 624.

Finally, Ms. Gibbs disputes that Plain Green received $60 million in revenue, which is not based on Smith's personal knowledge.[6] Additionally, Debtors cherry-picked revenue paid to Great Plains and there is little reason to believe the number provided is accurate. Pl. Supp. App. 70 (Paikin Decl. ¶ 5).

*Paragraph 2*. There is no information pertaining to Plain Green in this paragraph.

*Paragraph 3*. Ms. Gibbs disputes that "from the beginning," Plain Green and Think Finance "envisioned using the expertise of their outside service providers to help get their operations off the ground" and that "they always anticipated responsibilities would transition to tribal personnel over time." Dkt. 711 at 11. This assertion is contrary to thousands of documents, including:

- the Consulting Agreement where Plain Green was simply required to "hire at least one (1) dedicated employee to work with [TC Decision Sciences] and/or [TC Decision Sciences'] affiliates related to operational and marketing functions." Pl. Supp. App. 17.

- It also directly contradicts the way the venture was pitched to the Tribe, *i.e.*, as a "turn-key solution" that would allow tribes to "generate millions of dollars in cash flow with no investment in technology, lending capital, or marketing costs, and with no risk of loss." App. 35.

- It also contradicts direct evidence from Victory Park, which claims that "VPC collaborated with Think Finance to create a new structure to avoid banking regulatory issues and leverage [Think Finance's] existing sourcing, underwriting and servicing platforms." Pl. Supp. App. 54.

- It also contradicts the extensive evidence showing that Think Finance only sought a more active role from tribal personnel in response to regulatory concerns. Pl. Supp. App. 239 (identifying "simple changes to mitigate" risk, including hiring experienced CEO for tribe and moving certain responsibilities to tribal entities).

- It also contradicts what *actually happened:* Think Finance provided the same services to Plain Green from its inception in 2011 through the termination of the contract in June 2016. These services included: 1) marketing services; 2)

---

[6] Mr. Smith testified he received this information in an email from another Think Finance employee, and prior to that did not have any personal knowledge to attest to this number. Pls. Supp. App. 411-413 (Smith Depo. 98:2-101:17).

underwriting services; 3) portfolio management; 4) servicing operations and collection services; 5) compliance and regulatory services; 6) investment in funding the loans; 7) financial management services; and 8) IT services and platforms. Pl. Supp. App. 382-6 (Wong Dep. 153:5-157:8).

Debtors not only ignore this objective evidence, but Debtors do not supply any admissible evidence to support their assertion that the lenders used Think Finance to get their operations off the ground. Dkt. 711 at 11-12. Rather, the first source is the inadmissible testimony of Raining Bird, a convicted felon who embezzled money from the Tribe. Pl. Supp. App. 223 (Raining Bird guilty plea). The second source of the evidence is Smith, whose testimony cannot be remotely characterized as claiming "they always anticipated responsibilities would transition to tribal personnel over time." Instead, Martin Wong testified that from 2011 until June 2016, Think Finance provided Plain Green 1) marketing services; 2) underwriting services; 3) portfolio management; 4) servicing operations and collection services; 5) compliance and regulatory services; 6) investment in funding the loans; 7) financial management services; and 8) IT services and platforms. Pl. Supp. App. 382-6 (Wong Dep. 153:5-157:8). Debtors' final statement that this is "exactly what happened" is disputed for the reasons. Not only is it not tribe specific, but it is generic and confusing and directly contradicted by the testimony of its CEO. Accordingly, there is no undisputed evidence that supports Debtors' position.

## III.    Ms. Gibbs' response to Part III.

The only admissible evidence is: Michelle Nguyen's deposition transcript (TF App. 27, 29, 31, 32, 33, 37-38 40-41, 43, 44, 45); Steven Smith's Declaration (TF App. 371-72, 373, 374, 375, 376); 2015 Plain Green Participation Agreement (TF App. 614);  2015 Plain Green Servicing Agreement (TF App. 673); 2011 Plain Green Marketing Agreement (TF App. 393); 2015 Plain Green Marketing Agreement (TF App. 426); and Steven Smith's Deposition (TF App 58, 59, 61, 66).

*Paragraph 1.* Ms. Gibbs disagrees that Plain Green's operations in 2015 is the only relevant consideration in this motion. A fact finder should understand the history, context, and circumstances leading to the responsibilities as of 2015.[7] Ms. Gibbs further disagrees that Plain Green "had grown increasingly independent from Think Finance from an operational perspective" by 2015. Dkt. 711 at 12 (citing TF App. 22, 29 (Harvison Dep. 239:11-25; Nguyen 115:12-116:2)). There are a number of problems with the assertion, including (1) Harvison's testimony is inadmissible; (2) Harvison left Think Finance in May 2014; and (3) it was a general statement regarding the three tribes' operations as of 2012; not specifically related to Plain Green. Further, although Nguyen cites the Tribe's independence from Think Finance, this is directly contradicted by an e-mail from Ken Rees who on May 2015 wrote: "███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████." Pl. Supp. App. 364 (emphasis added).

Ms. Gibbs further disputes Debtors' assertion that Plain Green "managed their own marketing relationships to draw in new loan applicants." Dkt. 712 at 12 (citing Nguyen Dep. 127:4-14). Ms. Nguyen's cited testimony does not remotely indicate that Plain Green managed its marketing relationships to draw new applicants.[8] Instead, Ms. Nguyen was commenting on a

---

[7] *See Williams*, 2018 WL 3615988 at *16 (explaining that the "impetus" behind a tribal lending restructure "was Martorello and Bellicose's desire to avoid liability, more so than the Tribe's interest in starting its own business").

[8] The testimony in its entirety is as follows: Q. "All third-party contracts in the tribe's name." And there's nothing filled in, in the boxes. What third-party contracts are you referring to? A. This is 2013? Q. July 2013. A. From what I recall, these would be contracts such as an agreement with a marketing organization to print their direct mail pieces. In the beginning, because it's a startup, oftentimes us, as the marketing agency, would have the – the direct contracts. And the thought is, now that it's over time, and the tribe had always indicated that they wanted to evolve and do things on their own, this is one of those indications of "You can have the direct contract with the print house," as an example."

powerpoint revolving around Think Finance's efforts to strengthen the business model. *Id*. The powerpoint indicated that "[a]ll third party contracts" should be "in the tribe's name," presumably because they were in the name of Think Finance. *See* TF App. 31 (Nguyen 126:24-25). In response, Ms. Nguyen testified about the types of contracts referred to in the powerpoint, such as "an agreement with a marketing organization to print their direct mail pieces." *Id*. at 127:4-6. To strengthen the model, Think Finance allowed the tribes "to have the direct contract with the print house." *Id*. at 127:4-6. This is a far different story than managing marketing relationships to draw new applicants, which was never suggested by Ms. Nguyen.

Ms. Gibbs does not dispute that the program structure provided Plain Green with the final decision-making with respect to underwriting. Dkt. 711 at 12. However, Ms. Gibbs disputes that Plain Green *meaningfully* "participated in developing criteria for approving and issuing loans." *Id*. Think Finance developed this criteria in 2009; long before Plain Green existed. Pl. Supp. App. 167 (showing the loan functionality manual was created in 2009 and adapted). Additionally, Plain Green was not provided access to the information in Think Finance's database used to develop the underwriting criteria. Pl. Supp. App. 376 (Wong Dep. 120:6-121:22) (explaining that Think Finance did not share its underwriting algorithm with the tribal lenders). Without the underlying data, Plain Green would have little reason to question or provide valuable input to Think Finance, who had been in the business for twenty years and touted that it had "best in class underwriting." App. 39.

Ms. Gibbs does not dispute that Plain Green eventually had a call center, but the timeframe of when it was operational remains unclear. Dkt. 711 at 12. For example, the July 2015 restructure powerpoint identifies building out the call center as a key item. Pl. Supp. App. 95. Further, the existence of the call center does not support Debtors' assertion that it was staffed by tribe members.

More importantly, Ms. Gibbs disputes this assertion to the extent that it suggests that her application was "verified" as "part of the loan underwriting process" on tribal land. Dkt. 711 at 12. This is inaccurate and misleading because the underwriting process is exclusively automated. In particular, Wong testified as follows:

> Q. So if I was a consumer taking out a Great Plains loan, I would go online to greatplainslending.com and I would fill out my information.· Correct?
>
> A. Yes. You would go on to their website and fill out an application, yes.
>
> Q. And I fill out a complete application; I hit "submit".· What happens next?
>
> A.· As discussed previously, that application would be processed based on the underwriting criteria that the lender has approved on our platform.· So it is our·platform that has the application, and provide all the underwriting and decisionmaking.
>
> Q. So the decisioning [sic] is automated, is that correct, based on the criteria?
>
> A. Decisioning is automated, that is correct.
>
> Turning gears to Plain Green:· Did Think Finance provide the same services that we discussed for Great Plains to Plain Green? …
>
> A.· Services that we'd provide to Plain Green were generally similar to the services we provided to Great Plains.

Pl. Supp. App. 378-80 (Wong Depo. 148:18-149:7; 152:12-19); *see also* Pl. App. 39 (2011 powerpoint explaining that Think Finance was the "[f]irst to offer a fully automated loan process").

Thus, when Debtors say Plain Green employees "verified applications" as part of the underwriting, what they mean is that they reviewed applications where "there wasn't enough information to decline the application." Pls. Supp. App. 408 (Smith Depo.88:24-25). In these cases, Think Finance would provide a "verification group" with a "list of applications as they were coming through that needed further verification." Pls. Supp. App. 409 (Smith Depo. 89:5-7). The verification process typically involved obtaining an additional document from a consumer or verifying the address on the application through a background search on Lexis Nexis. Pls. Supp. App. 409 (Smith Depo. 89:10-21). And while 70% of approvals were automated *at some point in time*; and it is unknown what percentage of those remaining were actually handled by Plain Green.

13

Pls. Supp. App. 410 (Smith Depo.90:4-12).[9] More importantly, there is no evidence that any one at Plain Green specifically verified anything related to Ms. Gibbs' loans.

As explained above, Ms. Gibbs disputes that Plain Green re-negotiated its contracts with Debtors; and that those contracts shifted more responsibility to Plain Green. The final sentence of this paragraph also contains inadmissible evidence claiming that Plain Green had at least 77 employees during its history. Dkt. 711 at 13 (citing Smith Decl. ¶ 24). As evidenced by his deposition testimony, Smith lacks personal knowledge as to this assertion, which was compiled by searching through training records and e-mails. Pls. Supp. App. 418 (Smith Depo. 219:2-17). Further, Smith lacked any knowledge about how long any of these employees were active with Plain Green. Pls. Supp. App. 419 (Smith Depo.222:10-16).

*Paragraph 2*. Ms. Gibbs disputes that Plain Green was "a hundred percent responsible" for "key aspects of the origination process" from its moment of the program's inception. Dkt. 711 at 13. This assertion is supported by the inadmissible testimony of Lutes and directly contradicts the objective evidence to the contrary, such as the automated nature of the process and the role of MetaSource. *See* Pl. Supp. App. 5, 208-210. Edwards further disputes Debtors' claim that Plain Green was "actively overseen" by its Tribal Council. Dkt. 711 at 13 (citing Nguyen Dep. 168:19-169:1). The cited deposition testimony actually states that Ms. Nguyen spoke to different tribal members on a daily basis; and had quarterly meetings with Tribal Council. Ms. Nguyen's meeting with a tribal council member does not equate to Tribal Council "actively" overseeing Plain Green's operations.

---

[9] As explained below, Ms. Gibbs similarly disagrees with the legal significance of Plain Green's role in the verification process. *See Miami Nation Enterprise*, 386 P.3d at 377 ("But other evidence casts doubt on whether [the tribal entities'] role in approving loans indicates a significant degree of control."); *Williams*, 2018 WL 3615988 at *20 (explaining that the tribe's responsibility "in the loan process" was "pro forma review").

Ms. Gibbs further disputes the assertion that Ms. Nguyen kept in "constant contact" with Plain Green. Dkt. 711 at 13 (citing Nguyen Dep. 290:14-23). This testimony was specifically related to her interactions with Plain Green "in the very beginning." *See* TF. App. 44 (Nguyen Dep. 290:14-23) (responding to a question regarding the frequency of her contact with Plain Green). Moreover, this testimony directly contradicts internal documents, including e-mails from Rees claiming that Think Finance has "███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████." Pl. Supp. App. 17 (emphasis added).

Ms. Gibbs further disputes the assertion that Plain Green "took the lead" in defining the "product," "brand," "look," "any enhancements" and "frequently rejected or required changes to marketing creatives." Dkt. 711 at 13 (citing Nguyen, Harvison and Raining Bird Deps.). The only admissible testimony on this is Ms. Nguyen's, who generally described *her* responsibilities as assisting the lenders "in terms of defining the product," but nothing about who took the lead on this front. *See* TF App. 27 (Nguyen 105:13-19). The suggestion that Plain Green took "the lead" on defining the "product," "brand," and "look" also directly contradicts the objective evidence, which shows, inter alia, that Think developed the Great Plains trademark, brand, and website were created by Think Finance even before ever meeting with the Otoe-Missouria Tribe in February 2011. *See* Pls. App. 43-45 (initial meeting powerpoint showing graphics for website); Pls. App. 96-103 (transferring trademark and URL to Great Plains); Pls. Supp. App. 388 (Nguyen Dep. 45:2-11) (testifying that Think Finance came up with the name, brand, and logo for Great Plains before meeting with the tribe).

15

*Paragraph 3*. Ms. Gibbs disputes that "every time" a marketing, operations, or other significant change was proposed by Think Finance, it had to be submitted to Plain Green for approval. However, Ms. Gibbs does not dispute that Think Finance requested approval for changes to the language in the marketing materials, the language of the applications, etc. Dkt. 711 at 13. Ms. Gibbs does not dispute that 200 such changes were approved between 2015 and 2017. But nothing in the record suggests meaningful input from Plain Green prior to approval of any changes.

*Paragraph 4*. Ms. Gibbs does not dispute that the design of the loan application was approved by Plain Green, but notes that the record is unclear regarding how involved Plain Green was in the review and approval. Pl. App. 44. Ms. Gibbs disputes that Plain Green *meaningfully* "participated in developing criteria for approving and issuing loans." *Id*. Think Finance developed this criteria in 2009; long before Plain Green existed. Pl. Supp. App. 167 (showing the loan functionality manual was created in 2009). Additionally, Plain Green was not provided access to the information in Think Finance's database used to develop the underwriting criteria. Pl. Supp. App. 376 (Wong Dep. 120:6-121:22) (explaining that Think Finance did not share its underwriting algorithm or the core data used to build its models). Without the underlying data, Plain Green would have little reason to question or provide valuable input to Think Finance, who had been in the business for twenty years and touted that it had "best in class underwriting." App. 39.

Ms. Gibbs does not dispute that Plain Green was contractually entitled "to approve or deny each application on an individual basis." Dkt. 711 at 14. But she notes that this assertion is misleading to the extent it suggests that Plain Green manually reviewed applications on an individual basis. Applications were automatically approved and funded at the close of business each day; and there is no evidence that Plain Green actually reviewed or denied a single application. Pl. Supp. App. 399 (Smith Dep. 72:5-77:11). And, of course, Plain Green had no

incentive to deny an application as it held "no risk of loss" because it did not use its own money to make the loans to consumers.

*Paragraph 5.* Ms. Gibbs disputes the veracity of the statement that Plain Green's underwriting criteria was based on its "appetite for losses," because the structure made it impossible for Plain Green to incur a loss. Pl. App. 35 (explaining that the tribe "can generate millions of dollars in cash flow… with no risk of loss"); Pl. Supp. App. 54 (explaining that GPLS provided the funds to make the originations); *see also* TF App. 54 (Nguyen Depo. 206:8-18) (explaining that the tribes' agreements did not come with a risk of loss). In other words, Plain Green was not entitled to contribute any capital in return for either its: (1) 1% participation interest in the profits; or (2) 4.5% interest in the revenue.

Ms. Gibbs does not dispute that Debtors accurately quote Ms. Nguyen's vague testimony that the tribal lenders approved recommendations after "lengthy discussion of the impact to the portfolio." Dkt. 711 at 14 (citing Nguyen 130:8-14, 210:2-7). This statement is not only vague and broadly related to all three tribal entities. Ms. Gibbs further disputes that Plain Green and Great Plains offered "significantly different lending" products though this point is legally irrelevant. Dkt. 711 at 14. While the products had different loan amounts and interest rates, they were not "significantly different." *See* Pl. Supp. App. 191-2 (providing the standard pricing and terms for the loan programs). Moreover, any insinuation that Plain Green and Great Plains were the catalyst for the differences is false. As one executive explained: "Think **operates** a number of lending brands" including Plain Green and Great Plains. Pl. Supp. App. 257 (emphasis added). It "pursued this 'multi-product' strategy in order to be diversified from a regulatory standpoint." *Id*. However, Think Finance recognized that its "brand-building effort" may ultimately need to "focus on one

17

product brand," and it was "open to re-naming one" of the products "as part of the overall creative platform if appropriate." *Id*.

Ms. Gibbs disputes the assertion that the tribal lenders "explored changes to price points or credit criteria." Dkt. 711 at 14 (citing Nguyen Dep. 134:6-135:11). This testimony is far too general and provides no insight on the role of Plain Green in the underwriting. Moreover, Ms. Nguyen could not provide any more specific information, including when those purported discussions occurred. *See* TF App. 33.

Ms. Gibbs further disputes that Plain Green took over the process of verifying information submitted by applicants. Dkt. 711 at 14-15 (citing TF App. 40-41, Nguyen 206:9-18; 209:4-8). As explained above, 70% of approvals were automated; and it is unknown what percentage of those remaining were actually handled by Plain Green. *See, e.g.*, Pls. Supp. App. 410, 378 (Smith Dep. 90:4-12; Wong Dep. 148:18-149:7). Further, Ms. Gibbs disputes that the call center employees were *all* tribal members. Dkt. 711 at 14-15. While Ms. Gibbs assumes that some of the employees were tribal members, there is no evidence of the portion between members and non-members. In response to an interrogatory requesting it to identify tribal members employed by the respective lenders, Think Finance stated "it does not have the requested information." Pl. Supp. App. 34-42 (Ints. Nos. 7-17).

*Paragraph 6*. None of this evidence is admissible save for Smith's testimony that loan proceeds were disbursed to consumers via ACH from bank accounts owned by Tribal Lenders. TF App. 376. Ms. Gibbs does not dispute that Plain Green's name was on the account, but she disputes the insinuation that the funds in the accounts belonged to Plain Green. The account was funded by GPLS. *See, e.g*., Pl. Supp. App. 19.

Ms. Gibbs further disputes the characterization that Plain Green approval "was required for any ACH transfer or check disbursement." Dkt. 711 at 15. The ACH process is automated. Pl. Supp. App. 378 (Wong Dep. 148:10-16) (testifying "I don't know the precise process by which ACH debit into a borrower's account," but "in short, ACH is an automated process, the reference is an automated process.").

*Paragraph 7*. Ms. Gibbs disputes that "Think Finance never owned the servicing rights to any loan" and Plain Green was the "ultimate loan servicer[.]" Dkt. 114 at 15. Ms. Gibbs does not understand what the term "ultimate loan servicer" means, but regardless, TC Decision Sciences and Plain Green clearly entered into a "Servicing Agreement" dated May 25, 2011. Pl. Supp. App. 425-436. This agreement required TC Decision Sciences to provide: "(i) project management, (ii) support personnel, (iii) training support, (iv) technology infrastructure, and (v) facilities… to place outbound calls and receive inbound calls to provide customer support and collections services to" Plain Green's loans. *Id*. Ms. Gibbs disputes the other nonspecific allegations in this paragraph, which are contradicted by Martin Wong's testimony that Think Finance provided the same services to Plain Green throughout the 2011 through June 2016 timeframe. *See* Pl. Supp. App. 382-6 (Wong Dep. 153:5-157:8).

Ms. Gibbs disputes that Think Finance "did not handle collections in any way." Dkt. 114 at 16. The Servicing Agreement clearly states that Think Finance "will provide collection services to past due," Pl. App. 425, as well as provide "facilities" to "place outbound calls and receive inbound calls" to provide collection services. Pl. App. 436. And while Think Finance ultimately delegated these tasks to vendors, it managed the relationship with these vendors and performed their reviews. See Pl. Supp. App. 20-24, 194-211. In fact, one of the tribes did not even know the

19

third-party vendors handling their ACH and collections. Pl. Supp. App. 29-30. And when it came time to switch collection vendors, Think Finance was closely involved. Pl. Supp. App. 25-28.

*Paragraph 8*. This paragraph states that Plain Green terminated its relationship with Think Finance in June 2016. Ms. Gibbs does not dispute that fact. There are no other relevant facts that pertain to Ms. Gibbs' loan or Plain Green's ongoing operations.

## ARGUMENT

### I. The prospective waiver doctrine clearly applies in this case.

#### A. The provisions in Ms. Gibbs' lending agreement makes clear that federal law does not apply to the agreement.

It is well established that a choice-of-law provision is unenforceable if it "prospective[ly] waived" a "party's right to pursue statutory remedies." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); *see also Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013). In this case, Plain Green's lending agreements included a wholesale waiver of all state and federal laws, including all of Ms. Gibbs' and other similarly situated consumers' substantive rights under federal law. Ms. Gibbs's agreement states:

> **GOVERNING LAW; NON-APPLICABILITY OF STATE LAW; INTERSTATE COMMERCE:** This Agreement and the Agreement to Arbitrate **are governed by Tribal Law**. The Agreement to Arbitrate also comprehends the application of the Federal Arbitration Act, as provided below. Plain Green does not have a presence in Montana or any other state of the United States of America. Neither this Agreement nor the Plain Green is subject to the laws of any state of the United States. Plain Green **may** choose to **voluntarily** use certain federal laws as **guidelines** for the provision of services. **Such voluntary use does not represent acquiescence of the Chippewa Cree Tribe to any federal law unless found expressly applicable to the operations of the Chippewa Cree Tribe.**

Pl. Supp. App. at 374. Consistent with the governing law provisions, her agreement states that "Plain Green's inclusion of these disclosures does not mean that Plain Green consents to the application of state or federal law to Plain Green, to the Loan, or this Agreement." Pl. Supp. App. at 367. By extension, the agreement also provides that Plain Green is subject exclusively to the

Tribal regulatory authority. Pl. Supp. App. at 367. Ms. Gibbs's agreement also repeatedly specifies that the agreement is not subject to the laws of any state of the United States. Pl. Supp. App. 366. This point is also reiterated in the agreement's arbitration provision opt-out option, which specifies that in the event the consumer opts out the arbitration provision "any disputes shall nonetheless be governed under tribal law." Pl. Supp. App. at 373. As the Fourth Circuit observed, these terms "further illustrate that the choice of law provision in the arbitration agreement 'disavows[s] the application of all state and federal law' and 'unambiguously forbids an arbitrator from even applying applicable law." *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017) (quoting *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 668, 670 (4th Cir. 2016)).

Likewise, any argument by the Debtors that the waiver of federal law "merely preserve[s] [the Tribe's] immunity insofar as Congress has not abrogated it" would be unavailing. *See* Dkt. 711 at 45-46. The apparent purpose of the Governing Law provision was to protect Debtors and other third parties from the application of federal and state law. Indeed, because tribes and true tribal entities are protected by sovereign immunity, there would be no need to reinforce their immunity in a written agreement. Rather, the apparent purpose of the provision was to insulate the nontribal participants, such as Debtors, because the Tribe itself and any true economic subdivision of the Tribe would enjoy sovereign immunity from any lawsuit.[10]

---

[10] *See, e.g.*, *Somerlott v. Cherokee Nation Distributors, Inc.*, 686 F.3d 1144, 1157 (10th Cir. 2012) (Gorsuch, J., concurring) ("The Nation could have chosen to operate the chiropractic clinic itself and enjoy immunity for its operations." (citing *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 753 (1998)); *see also* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012) ("[M]ore tribes could choose to simply form, fund, and run operations of their own, solely for the benefit of their members, thus meeting Kiowa directly.").

**B.     This case is indistinguishable from *Dillon* and *Hayes*.**

The Fourth Circuit recently applied the prospective-waiver doctrine in two cases, holding that similar payday lending agreements—which also waived all federal law in favor of only tribal law—were void as a matter of law. *Dillon*, 856 F.3d at 337; *Hayes*, 811 F.3d at 673. The loan agreement considered by the Fourth Circuit in *Hayes* expressly stated that no federal law or regulation would apply to the agreement. *Hayes*, 811 F.3d at 669. Relying on the United States Supreme Court's established law concerning the prospective-waiver doctrine, the *Hayes* court held that the loan agreement was unenforceable, reasoning that "a party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of federal statutes to which it is and must remain subject." *Id.* at 675. A little over a year later, the Fourth Circuit expanded on this principal in *Dillon*, holding that a loan agreement that "implicitly accomplishes" what the agreement in *Hayes* expressly stated was also unenforceable. *Dillon*, 856 F.3d at 336.

Indeed, the *Dillon* decision considered the enforceability of an agreement that was entered into by one of the same lenders involved in this case—Great Plains—and that included terms that are substantively indistinct from the terms of Plaintiffs' payday loan agreements. In *Dillon*, the Fourth Circuit observed that "Great Plains purposefully drafted the choice of law provisions in the arbitration agreement to avoid the application of state and federal consumer protection laws." *Id.* at 336.

Here, Ms. Gibbs's lending agreement includes a similar provision, specifying that tribal law applies to the terms of the loan agreement, to the exclusion of all state and federal law. In fact, the governing law provision is relevant in part to the one in *Dillon*, providing "'[t]his Agreement and the Agreement to Arbitrate are governed by [tribal law]' and 'neither this Agreement nor the

Lender is subject to the laws of any state of the United States.'" *Dillon*, 856 F.3d at 335 (comparing to *Hayes*, 811 F.3d at 669); Pl. Supp. App. at 372 (stating "[t]his Agreement and the Agreement to Arbitrate are governed by [tribal law]" and "neither this Agreement nor the Lender is subject to the laws of any state of the United States"). As the Fourth Circuit noted, this provision also appeared in the lending agreement in *Hayes*. *Dillon*, 856 F.3d at 335.

Even worse, Ms. Gibbs's lending agreement specifies that "certain" federal laws may be "voluntarily" consulted by the lender as mere "guidelines." Specifically, the governing-law provision in the four more recently executed lending agreements states that the lender "***may choose*** to ***voluntarily*** use ***certain*** federal laws as ***guidelines*** for the provision of services." Pl. Supp. App. at 372. The agreement further specifies that "[s]uch ***voluntary*** use does not represent acquiescence . . . to any federal law unless expressly applicable to the operations of the [Tribe]." Pl. Supp. App. at 372.

As discussed in Ms. Edwards' brief in support of her motion for partial summary judgment, the Fourth Circuit's application of the prospective waiver doctrine is highly persuasive here, and courts have uniformly agreed and adopted the Fourth Circuit's decision. *See* Dkt. 641 at 21-24 (collecting cases).

## II. The choice-of-law provision is unenforceable under § 187(2)(b).

Ms. Gibbs incorporates Ms. Edwards' argument in her Memorandum in Support of her Motion for Partial Summary Judgment (Dkt. No. 641) and Ms. Edwards' Consolidated Brief in Opposition to Debtors' Motion for Summary Judgment and Reply in Support of her Motion for Partial Summary Judgment (Dkt. No. 907) because the analysis is the same.

### III.    The choice-of-law provision is unenforceable under § 187(2)(a).

#### A.    Debtors conflate the standard under § 187(2)(a).

Ms. Gibbs incorporates Ms. Edwards' argument in her Memorandum in Support of her Motion for Partial Summary Judgment (Dkt. No. 641) and Ms. Edwards' Consolidated Brief in Opposition to Debtors' Motion for Summary Judgment and Reply in Support of her Motion for Partial Summary Judgment (Dkt. No. 907) because the analysis is the same.

#### B.    No different than the Otoe-Missouria, the Chippewa Cree did not have a substantial relationship with the transaction.

Debtors rely on *identical facts* to establish the Chippewa Cree Tribe, like the Otoe-Missouria Tribe, has a "substantial relationship" to the transaction with Ms. Gibbs. Therefore, Ms. Gibbs incorporates Ms. Edwards' argument in her Memorandum in Support of her Motion for Partial Summary Judgment (Dkt. No. 641) and Ms. Edwards' Consolidated Brief in Opposition to Debtors' Motion for Summary Judgment and Reply in Support of her Motion for Partial Summary Judgment (Dkt. No. 907) because the analysis is the same.[11]

#### C.    Texas law invalidates choice-of-law provisions that are a product of subterfuge even where a substantial relationship exists.

Again, Ms. Gibbs incorporates Ms. Edwards' argument in her Memorandum in Support of her Motion for Partial Summary Judgment (Dkt. No. 641) and Ms. Edwards' Consolidated Brief in Opposition to Debtors' Motion for Summary Judgment and Reply in Support of her Motion for Partial Summary Judgment (Dkt. No. 907) because the analysis is the same.

---

[11] Martin Wong testified that  from 2011 until June 2016, Think Finance provided Plain Green 1) marketing services; 2) underwriting services similar to those of Great Plains; 3) portfolio management; 4) servicing operations and collection services; 5) compliance and regulatory services; 6) investment in funding the loans; 7) financial management services; and IT services and platforms. Pl. Supp. App. 382-6 (Wong Dep. 153:5-157:8).

## IV.    Virginia law applies to the loan agreements.

Ms. Gibbs, like Ms. Edwards, electronically accepted and signed her loan agreement in Virginia, and therefore, Virginia is the place of contracting. Pl. Supp. App. 366. Like Ms. Edwards, Ms. Gibbs agreed to the terms of the agreement "By electronically signing this Agreement." Pl. Supp. App. at 373. Ms. Gibbs's loan agreement also includes terms regarding the final approval of the loan, which indicates that the terms of the agreement, including the mandatory arbitration and choice-of-law clauses, were meant to apply to the parties' relationship prior to the loan being funded. Pl. Supp. App. at 373. In accepting the agreement, Ms. Gibbs certified that all information in her application was "true and correct"; she authorized Plain Green to "verify any information [she] provided"; she gave Plain Green "consent to obtain information about [her] from one or more consumer reporting agencies and other sources"; and she agreed that Plain Green could "withhold funding of [the] Loan" for Plain Green to confirm certain information and that she met all requirements for the loan. Pl. Supp. App. at 373. Thus, the agreement contemplates that its terms would apply to the period between Ms. Gibbs's acceptance and the funding of her loans. Pl. Supp. App. at 373.

Again, Ms. Gibbs incorporates Ms. Edwards' argument in her Memorandum in Support of her Motion for Partial Summary Judgment (Dkt. No. 641) and Ms. Edwards' Consolidated Brief in Opposition to Debtors' Motion for Summary Judgment and Reply in Support of her Motion for Partial Summary Judgment (Dkt. No. 373) because the analysis is the same.

### A.    Virginia law is the only viable option.

Gibbs incorporates Ms. Edwards' argument in her Memorandum in Support of her Motion for Partial Summary Judgment (Dkt. No. 641) and Ms. Edwards' Consolidated Brief in Opposition

to Debtors' Motion for Summary Judgment and Reply in Support of her Motion for Partial Summary Judgment (Dkt. No. 907) because the analysis is the same.

      **B.**      **Debtors should not be permitted to circumvent Virginia's laws through tribal affiliation.**

Gibbs incorporates Ms. Edwards' argument in her Memorandum in Support of her Motion for Partial Summary Judgment (Dkt. No. 641) and Ms. Edwards' Consolidated Brief in Opposition to Debtors' Motion for Summary Judgment and Reply in Support of her Motion for Partial Summary Judgment (Dkt. No. 907) because the analysis is the same.

**IV.**      **Think Finance modeled its business after CashCall.**

Finally, Ms. Gibbs notes that Debtors devote a significant portion of their brief to distinguishing themselves from CashCall, another rent-a-tribe pioneer who has lost this choice-of-law argument in multiple forums. *See, e.g.*, Dkt. 711 at 41-42. Although Debtors correctly point to some differences between the two schemes, Debtors cannot hide from the fact that they share the same overarching business model. Indeed, when pitching Think Finance to potential investors, Victory Park described Think Finance as "substantially similar to the business model used by Cash Call for over nine months, Think Finance's main competitor." Pl. Supp. App. 54. And this makes perfect sense because, as Victory Park further explained to investors, Think Finance was "utilizing the same legal counsel as CashCall to construct the tribal lending model, Claudia Callaway[.]" Pl. Supp. App. 54.

Callaway's advice to her clients is well documented in the CashCall litigation. *CFPB v. CashCall, Inc.*, C.D. Cal. No. CV1507522JFWRAOX, 2018 WL 485963, at *3 (C.D. Cal. Jan. 19, 2018) (post-trial fact of finding and conclusion of law). Most notably, in January 2009, Callaway began advising her clients that rent-a-bank model "was no longer viable because of pressure from regulators and, therefore, she was advising her consumer lending clients to switch to a similar

business model, which involved partnering with an Indian tribal entity or member who would act in the same capacity as a state-chartered bank[.]" *Id*. Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*. Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

CashCall, with the assistance of a tribe member named Butch Webb, adopted the tribe member lending model "in large part because of the absence of any CRST law that would allow for the incorporation or creation of a new lending entity." *Id*. at 4. Callaway also introduced Think Finance to Webb, as a first potential partner. Pl. Supp. App. 423 (Rees Depo. 159:7-10). According to Ken Rees, Think Finance could not "ultimately couldn't get comfortable" with Webb's model as it seemed "to run contrary" to what "outside counsel thought was the legally justifiable lending structures." Pl. Supp. App. 424 (Rees Depo. 159:19-160:1). Accordingly, Think Finance went in the other direction using the second of Callaway's two "contemplated structures."

Think Finance's adoption of the arm-of-the tribe model does nothing to advance its cause that the choice-of-law provision is enforceable in this case. The overarching purpose of Callaway's rent-a-tribe model remained the same: to evade applicable state and federal law. Whether the nominal proceeds were going to an individual or a Tribe, the nominal relationship the reservation has to the transactions remains unchanged. And regardless, neither model is an exception to the fundamental public policy of Virginia or other states. Accordingly, Debtors' attempt to distinguish themselves from CashCall is unavailing, and other courts have refused to enforce similar choice of law provisions in cases that involved the arm of the tribe model. *See Dillon*, 856 F.3d at 337 (refusing to enforce the choice of law clause in a Great Plains lending agreement); *Gingras v. Rosette*, No. 5:15-CV-101, 2016 WL 2932163, at *15 (D. Vt. May 18, 2016) (refusing to enforce

27

the choice of law clause in a Plain Green lending agreement); *Williams v. Big Picture*, Case No. 3:17-cv-461, (E.D. Va. 2018) (July 25, 2018 Order at Dkt. 142). And in different context, courts have not allowed the arm of the tribe model to prevent enforcement of the law, both in civil and criminal contexts.[12]

## CONCLUSION

For the foregoing reasons, Ms. Gibbs requests the Court to deny the motion for summary judgment filed by the Debtors.

Respectfully submitted,

\_\_*/s/ Theodore O. Bartholow*\_\_\_\_
KELLETT & BARTHOLOW PLLC
Theodore O. Bartholow, III ("Thad")
Texas Bar No. 24062602
Karen L. Kellett
Texas Bar No. 11199520
11300 N. Central Expy., Ste 301
Dallas, Texas 75243
Phone: (214) 696-9000
Fax: (214) 696-9001

Kristi C. Kelly, VSB #72791* (pro hac vice)
Casey S. Nash, VSB #84261* (pro hac vice)
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: casey@kellyandcrandall.com
*Counsel for Ms. Gibbs*

Leonard A. Bennett, (pro hac vice)
Elizabeth W. Hanes, Esq., (pro hac vice)
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: elizabeth@clalegal.com

TYCKO & ZAVAREEI LLP
Anna C. Haac (pro hac vice)
Andrew J. Silver (pro hac vice)
1828 L Street, N.W., Suite 1000
Washington, DC 20036
Phone: 202-973-0900
Fax: 202-973-0950
Email: ahaac@tzlegal.com
Email: asilver@tzlegal.com

---

[12] *See Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Services*, 769 F.3d 105, 118 (2d Cir. 2014) (concluding the Otoe Missouria was unlikely to succeed in proving that Great Plains lending activity was outside the reach of New York's regulatory authority); Indictment, *United States v. Hallinan*, No. 2:16-cr-130-ER-1 (E.D. Pa. Mar. 31, 2016) (charges against individuals involved in alleged "rent-a-tribe" payday lending scheme); Indictment, *United States v. Tucker*, No. 1:16-cr-91-PKC (S.D.N.Y. Feb. 8, 2016) (same); *see also Gingras*, 2016 WL 2932163, at *25 (discussing the *Hallinan* and *Tucker* indictments).

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of September, 2018, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

       */s/ Theodore O. Bartholow*
KELLETT & BARTHOLOW PLLC
Theodore O. Bartholow, III ("Thad")
Texas Bar No. 24062602
11300 N. Central Expy., Ste 301
Dallas, Texas 75243
Phone: (214) 696-9000
Fax: (214) 696-9001
*Counsel for Ms. Gibbs*