Gregory G. Hesse (Texas Bar No. 09549419)      Tyler P. Brown (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP                        Jason W. Harbour (admitted *pro hac vice*)
1445 Ross Avenue                                HUNTON ANDREWS KURTH LLP
Suite 3700                                      Riverfront Plaza, East Tower
Dallas, Texas 75209                             951 East Byrd Street
Telephone:  (214) 979-3000                      Richmond, Virginia 23219
                                                Telephone:  (804) 788-8200

*Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>**THINK FINANCE, LLC,** *et al.*,<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 17-33964 (HDH)**<br><br>**(Jointly Administered)** |

## DISCLOSURE STATEMENT ACCOMPANYING JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THINK FINANCE, LLC AND ITS SUBSIDIARY DEBTORS AND DEBTORS IN POSSESSION

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126.  THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE COURT FOR APPROVAL BUT HAS NOT YET BEEN APPROVED.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

### APRIL 22, 2019

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Think Finance, LLC (6762), Think Finance SPV, LLC (4522), Financial U, LLC (1850), TC Loan Service, LLC (3103), Tailwind Marketing, LLC (1602), TC Administrative Services, LLC (4558), and TC Decision Sciences, LLC (8949).

## IMPORTANT NOTICE

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL HOLDERS OF CLAIMS AND OTHER PARTIES IN INTEREST ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. THE TRANSMISSION OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. AFTER THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL BE MATERIALLY ACCURATE, OR (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE FOREGOING REGULATORY ENTITY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING, SECURITIES OF THE DEBTORS SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AS A STIPULATION OR AS A WAIVER, BUT, RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX,

SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

# TABLE OF CONTENTS

**ARTICLE I PURPOSE AND FUNCTION OF THE DISCLOSURE STATEMENT** ............1

**ARTICLE II GENERAL INFORMATION CONCERNING THE DEBTORS' BUSINESS** .........................................................................................2

2.1 **Business History Overview** ..............................................................2

2.2 **Corporate Structure** .........................................................................3

2.3 **Pre-Petition Capital Structure** .......................................................4

    (a) **GPLS** .........................................................................................4

        (1) Fixed Return Owed by GPLS ...............................................4

        (2) Agent Fee Owed by GPLS ....................................................4

    (b) **Promissory Notes** .....................................................................5

    (c) **Liabilities** .................................................................................5

**ARTICLE III EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES** ...............................................................6

3.1 **Dispute and Arbitration with Victory Park** ................................6

3.2 **Consumer Borrower Related Litigation Matters** ........................6

    (a) **The Pennsylvania Litigation** ..................................................7

    (b) **Putative Class Action Litigation** ...........................................7

        (1) The Vermont Litigation .......................................................7

        (2) The Virginia Litigation .......................................................7

        (3) The Florida Litigation .........................................................8

        (4) The North Carolina Litigation ............................................8

        (5) The California Litigation .....................................................9

    (c) **The CFPB Litigation** ...............................................................9

**ARTICLE IV THE CHAPTER 11 CASES** ...............................................................9

    (a) **Commencement of the Chapter 11 Case** ...............................9

    (b) **Appointment of the Creditors' Committee** ..........................10

    (c) **VPC Adversary Proceeding and Cash Collateral** ...............10

    (d) **Objections to GPLS Professional Expense Requests** ........13

    (e) **Retention of Professionals** ...................................................13

        (1) Hunton Andrews Kurth LLP...............................................13

        (2) Alvarez & Marsal North America, LLC .............................13

        (3) Goodwin Proctor LLP.........................................................13

|  |  | (4) | Eversheds Sutherland (US) LLP | 14 |

| | **(f)** | **Claims Process and Bar Dates** | 14 |
| | **(g)** | **First Omnibus Claims Objection** | 15 |
| | **(h)** | **Consumer Borrower Adversary Proceedings** | 16 |
| | **(i)** | **Putative Class Action Claims** | 16 |
| | **(j)** | **Extension of Exclusivity Periods** | 17 |
| | **(k)** | **Mediation** | 17 |
| | **(l)** | **The Consumer Litigation Settlement** | 17 |

**ARTICLE V THE REORGANIZED DEBTORS** .................................................. **25**

**ARTICLE VI SUMMARY OF THE PLAN OF REORGANIZATION** ................................ **26**

**6.1**   **Treatment of Unclassified Claims** ............................................... 26

    **(a)**   **Unclassified Claims Summary** ........................................... 26

    **(b)**   **Administrative Claims** ..................................................... 26

    **(c)**   **Professional Claims** ......................................................... 27

    **(d)**   **Priority Tax Claims** ......................................................... 28

**6.2**   **Summary of Classification and Treatment of Claims and Interests** .................... 28

    **(a)**   **Class 1 Priority Non-Tax Claims** ....................................... 29

    **(b)**   **Class 2 Other Secured Claims** ........................................... 29

    **(c)**   **Class 3 GPLS Claims** ....................................................... 29

    **(d)**   **Class 4 General Unsecured Claims** ..................................... 29

    **(e)**   **Class 5 Consumer Borrower Claims** ................................... 29

    **(f)**   **Class 6 Pennsylvania Regulatory Claim** ............................. 31

    **(g)**   **Class 7 CFPB Regulatory Claim** ....................................... 31

    **(h)**   **Class 8 Equity Interests** ................................................... 32

**6.3**   **Means for Implementation of the Plan** ......................................... 32

    **(a)**   **Substantive Consolidation** ................................................ 32

    **(b)**   **Restructuring Transactions** .............................................. 32

    **(c)**   **Consumer Litigation Settlement** ....................................... 33

    **(d)**   **Corporate Action** ............................................................ 33

    **(e)**   **Dissolution of Debtors** ..................................................... 33

    **(f)**   **The Reorganized Debtors' Cash Distribution** ...................... 34

    **(g)**   **Funding and Administrative Reserve Accounts** .................... 34

        (1)   The Administrative and Priority Cash Reserve ...................... 34

|  | (2) | The General Unsecured Claims Cash Pool | 34 |
|  | (3) | The Substantial Contribution Fund | 35 |
|  | (4) | The Professional Fee Escrow | 35 |
|  | (5) | The Litigation Trust Initial Funding | 35 |
| (h) | | Approval of Class Action Settlement | 35 |
| (i) | | Consenting Defendants' Cash Contribution | 36 |
| (j) | | Books and Records | 36 |
| (k) | | Section 1145 Exemption | 38 |
| (l) | | Exemption from Certain Taxes and Fees | 38 |
| (m) | | Class Action Injunctive and Other Relief | 39 |
| (n) | | Pennsylvania Settlement | 40 |
| (o) | | CFPB Settlement | 40 |
| (p) | | Subordination | 41 |
| (q) | | Cancellation of Notes, Instruments, Certificates, and Other Documents | 41 |
| (r) | | Effectuating Documents; Further Transactions | 41 |
| (s) | | Incentive Plans and Employee and Retiree Benefits | 41 |
| 6.4 | | The Litigation Trust | 42 |
| | (a) | Establishment of the Litigation Trust | 42 |
| | (b) | Transfer of Assets to the Litigation Trust | 42 |
| | (c) | Litigation Trust Funding | 42 |
| | (d) | Preserved Causes of Action | 43 |
| | (e) | Litigation Trust Distributions | 43 |
| | (f) | Duration of Trust | 43 |
| | (g) | Litigation Trust Oversight Board | 43 |
| | (h) | Appointment of Litigation Trustee | 44 |
| | (i) | Indemnification and Exculpation | 44 |
| | (j) | Transfer of GPL and PGL Property | 44 |
| 6.5 | | Executory Contracts and Unexpired Leases | 45 |
| | (a) | Assumption and Rejection of Executory Contracts and Unexpired Leases | 45 |
| | (b) | Insurance Policies | 45 |
| | (c) | Cure of Defaults and Objections to Cure and Assumption | 46 |

| | | | |
|---|---|---|---|
| | **(d)** | **Contracts and Leases Entered Into After the Petition Date** | 47 |
| | **(e)** | **Reservation of Rights** | 47 |
| **6.6** | | **Procedures Governing Distributions** | 47 |
| | **(a)** | **Distributions to Holders of Allowed Claims Other than Members of the Nationwide Consumer Borrower Settlement Class** | 47 |
| | **(b)** | **Distributions to Members of the Nationwide Consumer Borrower Settlement Class** | 47 |
| | **(c)** | **Special Rules for Distributions to Holders of Disputed Claims** | 48 |
| | **(d)** | **Delivery of Distributions** | 48 |
| | | (1) Record Date for Distributions to Holders of Claims | 48 |
| | | (2) Distribution Process | 48 |
| | | (3) Compliance Matters | 48 |
| | | (4) Foreign Currency Exchange Rate | 49 |
| | | (5) Fractional, Undeliverable, and Unclaimed Distributions | 49 |
| | | (6) Surrender of Canceled Instruments | 50 |
| | **(e)** | **Claims Paid or Payable by Third Parties** | 51 |
| | | (1) Maximum Distribution | 51 |
| | | (2) Claims Paid by Third Parties | 51 |
| | | (3) Claims Payable by Insurance Carriers | 51 |
| | | (4) Applicability of Insurance Policies | 51 |
| | **(f)** | **Setoffs** | 52 |
| **6.7** | | **Procedures for Resolving Disputed Claims** | 52 |
| | **(a)** | **Disputed Claims Process** | 52 |
| | **(b)** | **Prosecution of Objections to Claims and Interests** | 52 |
| | **(c)** | **Estimation of Claims** | 53 |
| | **(d)** | **Recoupment** | 53 |
| | **(e)** | **No Interest** | 53 |
| | **(f)** | **Disallowance of Claims** | 53 |
| **6.8** | | **Effect of Confirmation of the Plan** | 54 |
| | **(a)** | **Dissolution of the Creditors' Committee** | 54 |
| | **(b)** | **Discharge of Claims and Termination of Interests** | 54 |
| | **(c)** | **Releases by the Debtors** | 55 |

|  | (d) | **Releases by Members of the Nationwide Consumer Borrower Settlement Class** | 56 |
|  | (e) | **Releases by Releasing Parties** | 56 |
|  | (f) | **Exculpation** | 57 |
|  | (g) | **Injunction** | 58 |
|  | (h) | **Protection Against Discriminatory Treatment** | 58 |
|  | (i) | **Release of Liens** | 58 |
|  | (j) | **Reimbursement or Contribution** | 59 |
| **6.9** | | **Conditions Precedent to the Effective Date** | 59 |
|  | (a) | **Substantial Consummation** | 60 |
|  | (b) | **Effect of Non-Occurrence of Conditions to Consummation** | 60 |
|  | (c) | **Vacatur of Confirmation Order** | 60 |
| **6.10** | | **Modification, Revocation, or Withdrawal of the Plan** | 60 |
|  | (a) | **Modification of Plan** | 60 |
|  | (b) | **Effect of Confirmation on Modifications** | 61 |
|  | (c) | **Revocation or Withdrawal of Plan** | 61 |
| **6.11** | | **Retention of Jurisdiction** | 61 |
| **6.12** | | **Other Miscellaneous Plan Provisions** | 63 |
|  | (a) | **Additional Documents** | 63 |
|  | (b) | **Payment of Statutory Fees** | 63 |
|  | (c) | **Waiver of Federal Rule of Civil Procedure 62(a)** | 63 |
|  | (d) | **Reservation of Rights; Binding Effect** | 64 |
|  | (e) | **No Admissibility** | 64 |
|  | (f) | **Closing of Chapter 11 Cases** | 64 |
|  | (g) | **Service of Documents** | 64 |
|  | (h) | **Term of Injunctions or Stays** | 65 |
|  | (i) | **Entire Agreement** | 65 |
|  | (j) | **Plan Supplement Exhibits** | 65 |
|  | (k) | **Non-Severability** | 65 |
| **ARTICLE VII SOLICITATION AND VOTING PROCEDURES** | | | 66 |
| **7.1** | | **Classes Entitled to Vote on the Plan** | 66 |
| **7.2** | | **Votes Required for Acceptance by a Class** | 67 |
| **7.3** | | **Certain Factors to be Considered Prior to Voting** | 67 |

**7.4**     **Voting Procedures**........................................................................................67

**ARTICLE VIII CONFIRMATION PROCEDURES** ................................................................**68**

**8.1**     **The Confirmation Hearing**.......................................................................68

**8.2**     **Confirmation Standards**...........................................................................69

**8.3**     **Best Interests Test / Liquidation Analysis** .............................................70

**8.4**     **Funding and Feasibility of the Chapter 11 Plan** ...................................70

**8.5**     **Alternatives to Confirmation and Consummation of the Plan**.............70

**ARTICLE IX CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES**...................**71**

**9.1**     **Tax Consequences for the Debtors** .........................................................71

**9.2**     **Tax Consequences for the Reorganized Debtors** ...................................72

**9.3**     **Tax Consequences for Holders of Claims and Interests**........................72

**ARTICLE X CERTAIN FACTORS TO BE CONSIDERED** ................................................**73**

**10.1**     **General Considerations** ............................................................................73

        **(a)**     **Parties in Interest May Object to the Debtors' Classification of Claims and Interests** ........................................................................73

        **(b)**     **The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan**.....................................................74

        **(c)**     **The Debtors May Not Be Able to Secure Confirmation of the Plan** .........74

        **(d)**     **Risk of Non-Occurrence of Effective Date**...................................74

**10.2**     **The Claims of the GPLS Parties** .............................................................75

**10.3**     **Access to Funds in the Escrow Account**..................................................75

**10.4**     **Risk of Not Reaching Agreement on a Restructuring Term Sheet** ......75

**10.5**     **Potential Continuation of Litigation of the First Omnibus Objection to Claims**.........................................................................................................76

**10.6**     **Certain Tax Implications of the Chapter 11 Case** .................................76

**10.7**     **Disclosure Statement Disclaimer** ...........................................................76

        **(a)**     **Information Contained Herein Is for Soliciting Votes** ...............76

        **(b)**     **Disclosure Statement May Contain Forward-Looking Statements** ..........76

        **(c)**     **No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement** ..................................................................77

        **(d)**     **No Admissions Made** ....................................................................77

        **(e)**     **Failure to Identify Estate Causes of Action or Projected Objections** ....................................................................................77

**(f)**    **No Waiver of Right to Object or Right to Recover Transfers and Assets** ........................................................................................77

**(g)**    **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors** ..............................................................77

**(h)**    **The Potential Exists for Inaccuracies and the Debtors Have No Duty To Update** ..............................................................................78

**(i)**    **No Representations Outside of the Disclosure Statement Are Authorized** ......................................................................................78

**ARTICLE XI CONCLUSION AND RECOMMENDATION ...............................................78**

# ARTICLE I

## PURPOSE AND FUNCTION OF THE DISCLOSURE STATEMENT

This disclosure statement (this "Disclosure Statement") provides information regarding the *Joint Chapter 11 Plan of Reorganization of Think Finance, LLC and Its Subsidiary Debtors and Debtors in Possession* (as it may be further amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] which the Debtors are seeking to have confirmed by the Court. A copy of the Plan is attached hereto as **Exhibit A**. The rules of interpretation set forth in Article 1.2 of the Plan shall govern the interpretation of this Disclosure Statement.

The Debtors provide this Disclosure Statement to enable any creditor whose Claim is impaired under the Plan and is entitled to vote on the Plan, to arrive at a reasonably informed decision in exercising the right to vote to accept or reject the Plan. This Disclosure Statement should be read in its entirety prior to voting on the Plan. The information contained herein is based on records maintained by the Debtors, and no representation or warranty is made as to their complete accuracy.

For a class of impaired Claims to be considered to have accepted the proposed treatment of the class under the Plan, creditors who hold at least two-thirds in amount and more than one-half in number of Claims within the class must vote in favor of the Plan. If a party does not vote, i.e., does not return a fully completed Ballot within the specific time to the correct addressee, neither the party nor the amount of its Claim or Interest is counted to determine acceptance or rejection of the Plan. If you are entitled to vote and do not, the Ballots will be tallied as though your Claims did not exist. The Court can confirm the Plan even if the requisite acceptances are not obtained so long as the Plan complies with the Bankruptcy Code and accords fair and equitable treatment to any non-accepting Class.

Parties entitled to vote are furnished a Ballot on which to record their respective acceptances or rejections of the Plan. Those completed Ballots must be returned by the deadline set forth on the Ballot to American Legal Claim Services LLC (the "Solicitation Agent"), who will tally the votes and report the results to the Court prior to or at the Confirmation Hearing.

Each of the Debtors' officers, boards of managers, or members, as applicable, has approved the Plan and believes the Plan is in the best interests of the Debtors' Estates. As such, the Debtors recommend that all holders of impaired Claims that are entitled to vote accept the Plan by returning their ballots so as to be actually received by the Solicitation Agent no later than the deadline to be set by the Court.

**NO REPRESENTATIONS CONCERNING THE DEBTORS, THE DEBTORS' OPERATIONS, THE VALUE OF THE DEBTORS' PROPERTY OR THE PLAN ARE AUTHORIZED UNLESS THEY ARE IN THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS THE ONLY STATEMENT WITH RESPECT TO THE**

---

[2] Capitalized terms used, but not defined in this Disclosure Statement, shall have the meanings ascribed to such terms in the Plan. Accordingly, please refer to the Plan for definitions of certain important terms used in this Disclosure Statement.

**PLAN.  NO OTHER REPRESENTATION CONCERNING THE DEBTORS, THEIR OPERATIONS OR THE VALUE OF THEIR PROPERTY HAS BEEN AUTHORIZED. YOU SHOULD RELY ONLY ON THE REPRESENTATIONS OR INDUCEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  YOU SHOULD REPORT ANY ADDITIONAL REPRESENTATIONS AND INDUCEMENTS TO THE COURT, COUNSEL FOR THE DEBTORS OR THE OFFICE OF THE UNITED STATES TRUSTEE.**

**THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION BY THE COURT AS TO THE MERITS OF THE PLAN BUT MERELY CONFIRMS THAT THE DISCLOSURE STATEMENT IS ADEQUATE TO PROVIDE THE INFORMATION NECESSARY FOR YOU TO MAKE AN INFORMED JUDGMENT REGARDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**THIS DISCLOSURE STATEMENT PROVIDES INFORMATION ABOUT THE PLAN.  ALTHOUGH THE DEBTORS BELIEVE THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS ACCURATE, THE PROVISIONS OF THE PLAN CONTROL IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

If the Court does not confirm the Plan, the Debtors may amend the Plan or file a different Plan.  If the Court does not confirm the Plan and the exclusive period within which the Debtors can obtain acceptance expires, a party in interest may file a plan.  Additionally, on motion of a party in interest and after notice and a hearing, the Court may convert the Bankruptcy Case to a Chapter 7 case.

The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

## ARTICLE II

### GENERAL INFORMATION CONCERNING THE DEBTORS' BUSINESS

**2.1    Business History Overview**

Founded in 2001 in Fort Worth, Texas, Think Finance, LLC ("Think Finance"), which was formerly known as Think Finance, Inc., provides financial technology services to clients predominately in the online consumer lending industry.  Before the term "fintech" was coined, Think Finance was an established leader and innovator in the marketplace for online lending.

2

For nearly 20 years, Think Finance has provided technology solutions that enable lenders and their third-party service providers to enhance marketing, underwriting and loan servicing through the use of Think Finance's proprietary software technology, analytics and marketing services. In 2013, Think was ranked number two on the Forbes List of America's Most Promising Companies. It is a five-time honoree on the Inc. 5000 List of Fastest Growing Companies (2010-2015). Inc. magazine has described Think as a company that "develops next-generation financial products for under-served consumers using a technology and analytics platform to bridge the gap between payday loans and credit cards."[3]

Think Finance provides online lending solutions that allow lenders and their third-party service providers to market, underwrite, and service loans more effectively. The technology tools and services that Think Finance provides its clients span across the life of a loan, from origination or acquisition through payoff or sale of the debt. Think Finance has developed an online lending platform that allow lenders and their third-party service providers to grow their lending portfolios, mitigate fraud with established technology and process controls, and manage compliance through established credit policies. Think Finance has also offered administrative services to its clients, such as consumer marketing, loan servicing, and compliance and risk management services.

Prior to 2014, Think Finance had two discrete lines of businesses: (a) a direct lender and branded product provider to non-prime consumers and (b) a provider of a technology platform and other services to third-party lenders, including certain sovereign Native American tribal lenders. In May 2014, Think Finance spun off its direct lending and branded consumer products portfolio into a new independent company, called Elevate Credit, Inc. ("Elevate"). Since the spinoff of Elevate, Think Finance has focused on its core business of providing analytics, technology and administrative services to third-party lenders and to service providers to third-party lenders.

## 2.2 Corporate Structure

Debtor Think Finance is a Delaware limited liability company. Its parent company, TF Holdings, Inc. ("TF Holdings"), is the sole member of Think Finance, LLC, and is not a debtor in these cases. Think Finance, LLC is the sole member of Debtors TC Loan Service, LLC ("TC Loan Service"), Think Finance SPV, LLC ("Think SPV"), and Financial U, LLC ("Financial U"). TC Loan Service is the sole member of Debtors TC Administrative Services, LLC ("TCAS"), Tailwind Marketing, LLC ("Tailwind"), and TC Decision Sciences LLC ("Decision Sciences").

Non-Debtor parent company TF Holdings is also the parent to various sister companies of Think Finance, Cortex Holdings, LLC ("Cortex") and its subsidiaries, Jora Credit Holdings, LLC ("Jora") and its subsidiaries, and TF Investment Services, LLC ("TF Investment"), none of which are debtors in these cases. A complete corporate organizational chart is attached as Exhibit A to the *Declaration of Barney C. Briggs, Chief Financial Officer of Think Finance,*

---

[3] *See* Inc. 5000 #1898, "Think Finance" (2014), https://www.inc.com/profile/think-finance.

*LLC, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Doc. No. 12], which identifies the Debtor and non-Debtor companies owned directly and indirectly by TF Holdings as of Petition Date.

**2.3     Pre-Petition Capital Structure[4]**

**(a)     GPLS**

GPL Servicing Ltd. ("GPLS") is an entity incorporated under the Cayman Islands Companies Law. Pursuant to certain participation agreements, GPLS purchased participation interests in certain consumer loans issued by sovereign Native American tribal lenders commencing in 2011 and concluding in early 2017. As described further below, certain of the Debtors provided services to GPLS for which they are owed substantial fees. As a result of redemption of all other investors in GPLS in May 2017, Debtor Think SPV owns 100% of the remaining Participating Shares (as defined below) in GPLS.

GPLS also issued voting non-participating shares (the "Management Shares"), which entitle the holder to exercise voting rights relating to the management of GPLS, including to appoint directors. The Management Shares are 100% owned and controlled by Victory Park Capital Advisors, LLC ("Victory Park") through funds that it manages and/or wholly owned subsidiaries that it controls.

**(1)     Fixed Return Owed by GPLS**

GPLS issued three classes of participating non-voting shares: Series I-A and I-B, Series II and Series III shares (collectively, the "Participating Shares"). Each holder of Participating Shares earns a fixed annual return (the "Fixed Return") on its principal investment payable by GPLS monthly. As of the Petition Date, Think SPV held $54,816,667 in principal amount of Participating Shares based on amounts Think SPV contributed to GPLS. Following a share redemption, discussed below, Think SPV is the sole remaining holder of the Participating Shares. As of the Petition Date, GPLS owed Debtor Think SPV a "Fixed Return" of at least $5,271,780.84. In addition, as of the Petition Date, GPLS was obligated to redeem Think SPV's shares in GPLS, which would have resulted in the return of tens of millions of dollars of capital to Think SPV.

**(2)     Agent Fee Owed by GPLS**

Debtor TCAS and GPLS are parties to an Eleventh Amended and Restated Administrative Agency Agreement, dated as of July 7, 2016 (the "AAA"). Pursuant to the AAA, TCAS provides certain administrative services to GPLS. GPLS is obligated to pay TCAS a fee (the "Agent Fee") each month. As of the Petition Date, GPLS owed Debtor TCAS previously accrued, unpaid "Agent Fees" of at least $4,092,418.40.

---

[4]     The following summary is qualified in its entirety by reference to the operative documents and agreements.

**(b)      Promissory Notes**

As of the Petition Date, Think Finance was the lender under two secured intercompany loans: (a) an Amended and Restated Revolving Loan Agreement, Promissory Note and Security Agreement with TF Investment in the amount of $9.35 million (the "TF Investment Loan") and (b) a Revolving Loan Agreement, Promissory Note and Security Agreement with Cortex in a maximum commitment amount of $6 million (the "Cortex Holdings Loan").  As of the Petition Date, the balance on the TF Investment Loan was approximately $9 million and it paid interest weekly at the rate of 20% per annum.  The TF Investment Loan matured on May 10, 2018.  On June 14, 2018, TF Investment repaid the balance of the TF Investment Loan to the Debtors.  The outstanding balance on the Cortex Holdings Loan as of the Petition Date was approximately $3.5 million.  The Cortex Holdings Loan incurs interest monthly at the rate of 8% per annum, and it matures on May 31, 2019.

Think Finance also is the holder of a promissory note from Haynes Investment, Inc., with an original principal balance of $5.269 million and a current outstanding balance of approximately $2.5 million that matures on June 15, 2019.

**(c)      Liabilities**

The Debtors do not have any funded debt obligations or outstanding long-term interest-bearing debt.

The Debtors, Victory Park and the GPL Servicing Agent, LLC (the "Collateral Agent"), an entity wholly owned and controlled by Victory Park, are parties to a Fourth Amended and Restated Guaranty and Security Agreement, dated as of April 2, 2013 (as amended by a First Amendment to Fourth Amended and Restated Guaranty and Security Agreement, dated as of May 1, 2014, a Second Amendment to Fourth Amended and Restated Guaranty and Security Agreement, dated as of February 27, 2015, and a Third Amendment to Fourth Amended and Restated Guaranty and Security Agreement, dated as of July 25, 2016, the "GSA").  Pursuant to the GSA, the Debtors guaranteed certain obligations owed to Victory Park and GPLS under the participation agreements entered into by GPLS and the respective sovereign Native American tribal lenders.  To secure the guaranty of these obligations, the Debtors pledged substantially all of their assets to the "GPLS Parties," which consist of Victory Park, the Collateral Agent and GPLS.  As described in further detail below, the Debtors have denied that they currently owe any obligations to the GPLS Parties and have further denied that the security interest concerning these obligations is valid and enforceable.

The Debtors are the subject of certain disputed, contingent litigation claims described in Article III below.

## ARTICLE III

### EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

**3.1     Dispute and Arbitration with Victory Park**

Beginning in June 2017, Victory Park, through its ownership and control of the Collateral Agent, caused GPLS to cease making payment to certain of the Debtors of amounts that the Debtors believed were due under the terms of the AAA.  Victory Park took the position that these funds should be reserved to cover future indemnification claims against certain of the Debtors principally related to the Pennsylvania Litigation (discussed below).  Without access to such funds, the Debtors determined that they would be unable to meet their obligations to their creditors and, importantly, to meet payroll obligations.

On August 7, 2017, Think Finance, TCAS and Think SPV commenced an arbitration proceeding before JAMS, Ref# 1410007541 (the "Arbitration"), against Victory Park, its wholly owned affiliate Victory Park Management, LLC ("VP Management"), the Collateral Agent, and GPLS.  The arbitration demand asserted claims of tortious interference, breach of contract, conversion, and breach of fiduciary duty, among other claims.  The arbitration demand also sought emergency injunctive relief requiring GPLS to pay all amounts then due and owing to TCAS and Think SPV, plus attorneys' fees and costs.

On September 12, 2017, on the eve of the arbitration hearing, certain of the Debtors and Victory Park entered into a Confidential Interim Settlement Agreement (the "ISA") to provide interim liquidity to Think Finance while the parties attempted to negotiate a global resolution. Pursuant to the ISA, the parties agreed that Victory Park or one of its affiliates would transfer certain funds to Think Finance.

On September 12, 2017, in accordance with the ISA, the Debtors received the first payment of $4.3 million due under the ISA.  However, despite the Debtors complying with the terms of the ISA, the Debtors did not receive any additional payments due under the ISA, including a $4.2 million payment due on October 2, 2017.  On October 3, 2017, the Debtors sent a notice of default to the defendants in the Arbitration citing the failure to make the contemplated distribution on October 2, 2017.  Without these payments, the Debtors liquidity was rapidly diminishing.  The Debtors believe that they have claims for damages against Victory Park for its failure to comply with the ISA.  Certain of these claims have been asserted by the Debtors in the VPC Adversary Proceeding (as defined below and discussed in Article 4(c) below).

**3.2     Consumer Borrower Related Litigation Matters**

Since prior to the Petition Date, certain of the Debtors have been named as defendants in several litigation matters (the "Consumer Borrower Litigation," a full list of which is attached hereto as **Exhibit C**), summarized below, which have hindered the Debtors' ability to successfully pursue various new business opportunities, thereby contributing to their liquidity issues.

**(a) The Pennsylvania Litigation**

On November 13, 2014, the Commonwealth of Pennsylvania ("Pennsylvania"), through its attorney general, filed a civil action against certain of the Debtors and the former CEO of Think Finance, in the Court of Common Pleas of Philadelphia, First Judicial District of Pennsylvania, alleging violations of Pennsylvania consumer lending laws. On December 17, 2014, the lawsuit was removed to the U.S. District Court for the Eastern District of Pennsylvania and it is captioned *Commonwealth of Pa. v. Think Finance Inc., et al.*, Case No. 2:14-cv-07139-JCJ (E.D. Pa.) (the "Pennsylvania Litigation"). On April 7, 2017, the Commonwealth of Pennsylvania filed a second amended complaint, in which it added Victory Park, the Collateral Agent, and GPLS as defendants. The Debtors named as defendants have filed an answer in the Pennsylvania Litigation, denying the allegations contained therein. On December 15, 2017, the Bankruptcy Court entered an order providing that the automatic stay of 11 U.S.C. § 362(a) does not apply to the Pennsylvania Litigation. *See Order Granting Commonwealth of Pennsylvania's Motion for Determination That Its Regulatory Action Against the Debtors Is Excluded from the Automatic Stay, Pursuant to 11 U.S.C. § 362(b)(4)* [Doc. No. 201]. The parties have completed discovery in the Pennsylvania Litigation. On January 15, 2019, the district court entered an order continuing generally the deadline for seeking summary judgment as to the Debtors and the Victory Park defendants pending the outcome of settlement negotiations between the parties.

**(b) Putative Class Action Litigation**

**(1) The Vermont Litigation**

On May 13, 2015, two individuals filed a putative class action against officers and directors of Plain Green, LLC ("Plain Green"), one of the Debtors' sovereign Native American tribal lending clients, in the U.S. District Court for the District of Vermont alleging violations of state and federal consumer lending laws, *Gingras et al. v. Rosette et al.*, Case No. 15-cv-101 (D. Vt.) (the "Vermont Litigation"). The plaintiffs in the Vermont Litigation seek certification of a nationwide class of consumers who received one or more loans from Plain Green. On August 4, 2015, the plaintiffs amended the complaint to include certain of the Debtors, among other parties. The Debtors named as defendants moved to compel arbitration and, in the alternative, to dismiss the claims. On May 16, 2016, the district court denied the motion to compel arbitration. The Debtors that are named as defendants appealed that decision. The district court then stayed the Vermont Litigation pending the decision on appeal by the U.S. Court of Appeals for the Second Circuit. On January 26, 2018, the Court granted limited relief from the automatic stay of 11 U.S.C. § 362(a) for the Second Circuit to issue a decision. *See Order Granting Motion for Limited Relief from the Automatic Stay to Permit the Second Circuit to Rule on the Pending Appeals* [Doc. No. 272]. The Second Circuit has not yet issued a decision on appeal and the Vermont Litigation remains otherwise stayed as to the Debtors.

**(2) The Virginia Litigation**

On May 19, 2017, several individuals filed a putative class action against certain of the Debtors and the former CEO of Think Finance in the U.S. District Court for the Eastern District

of Virginia alleging violations of state and federal consumer lending laws, *Gibbs, et al. v. Rees, et al.*, Case No. 17cv386 (E.D. Va.) (the "Virginia Litigation"). GPLS also is a named defendant. The plaintiffs in the Virginia Litigation seek certification of a class of individuals who reside in Virginia and received one or more loans from Plain Green or Great Plains, LLC ("Great Plains"), another of the Debtors' sovereign Native American tribal lending clients. On August 7, 2017, the Debtors that are named as defendants filed a motion to compel arbitration and also filed a motion to dismiss the complaint. On March 23, 2018, the U.S. District Court for the Eastern District of Virginia issued a *Memorandum Opinion* transferring the Virginia Litigation to the U.S. District Court for the Northern District of Texas. On May 1, 2018, the U.S. District Court for the Northern District of Texas entered the *Agreed Order Granting Motion Pursuant to Northern District of Texas Misc. Order No. 33 to Refer the Above-Captioned Case to Be Adjudicated by Judge Harlan D. Hale of the U.S. Bankruptcy Court for the Northern District of Texas* [Doc. No. 514]. The Virginia Litigation was assigned Adv. Pro. No. 18-03069 (HDH) (Bankr. N.D. Tex.) and is currently stayed.

### (3) The Florida Litigation

On September 22, 2017, an individual filed a putative class action against certain of the Debtors and the former CEO of Think Finance in the U.S. District Court for the Middle District of Florida alleging violations of state and federal consumer lending laws, *Banks v. Rees et al.*, Case No. 17-cv-2201 (M.D. Fla.) (the "Florida Litigation"). GPLS also is a named defendant in the Florida Litigation. The Florida Litigation was filed by at least one of the same plaintiffs' attorneys who filed the Virginia Litigation (collectively, "VA/FL/CA Counsel") and the named defendants and allegations are substantially the same, but asserted under Florida law. The plaintiffs in the Florida Litigation seek certification of a class of individuals that reside in Florida and obtained one or more loans from Great Plains. The Florida Litigation was filed against the Debtors and the other defendants just prior to the Petition Date and was stayed as to the Debtors upon the bankruptcy filing. The Florida Litigation continued as to the other defendants. On March 30, 2018, as a result of the venue transfer ruling in the Virginia Litigation, the non-stayed parties in the Florida Litigation filed a joint motion to transfer the Florida Litigation to the U.S. District Court for the Northern District of Texas. On April 3, 2018, the U.S. District Court for the Middle District of Florida entered an order transferring the Florida Litigation to the U.S. District Court for the Northern District of Texas. On April 30, 2018, the U.S. District Court for the Northern District of Texas entered an order referring the Florida Litigation to the Bankruptcy Court [Doc. No. 501]. The Florida Litigation was assigned Adv. Pro. No. 18-03064 (HDH) (Bankr. N.D. Tex.) and is currently stayed.

### (4) The North Carolina Litigation

After the Petition Date, on February 16, 2018, several individuals filed a putative class action against Great Plains, the former CEO of Think Finance, Victory Park, GPLS, and various other non-Debtors alleging violations of various state and federal consumer lending laws. *Granger, et al. v. Great Plains Lending, LLC, et al.*, Case No. 18-cv-00112 (M.D.N.C.) (the "North Carolina Litigation"). The Debtors are not named as defendants. The plaintiffs in the North Carolina Litigation seek certification of a nationwide class of consumers who received one

or more loans from Great Plains.  The North Carolina Litigation was filed by at least one of the same plaintiffs' attorneys who filed the Vermont Litigation (all such counsel, collectively, "VT/NC Counsel").  The North Carolina Litigation remains pending.

### (5)    The California Litigation

After the Petition Date, on February 23, 2018, several individuals filed a putative class action against Plain Green, the former CEO of Think Finance, Victory Park, GPLS, and various other non-Debtors in the U.S. District Court for the Northern District of California alleging violations of state and federal consumer lending laws.  *Brice, et al. v. Reese, et al.*, Case No. 18-cv-01200 (N.D. Cal.) (the "California Litigation").  The Debtors are not named as defendants. The California Litigation was filed by VA/FL/CA Counsel and the allegations are essentially the same as those asserted in the Virginia Litigation and the Florida Litigation, but asserted under California law.  The plaintiffs in the California Litigation seek certification of a class of consumers residing in California who obtained one or more loans from Plain Green or Great Plains.  On June 6, 2018, following the venue transfer ruling in the Virginia Litigation, the U.S. District Court for the Northern District of California entered an order transferring the California Litigation as it relates to Victory Park, GPLS, the former CEO of Think Finance, and certain other defendants to the U.S. District Court for the Northern District of Texas, as assigned the California Litigation Case No. 18-cv-01867-N [Cal. Litigation Doc. No. 66].  On August 8, 2018, the U.S. District Court for the Northern District of Texas entered an order referring the California Litigation to the Bankruptcy Court [N.D. Tex. Cal Litigation Doc. No. 72].  The California Litigation was assigned Adv. Pro. No. 18-03313 (HDH) (Bankr. N.D. Tex.) and is currently stayed.

### (c)    The CFPB Litigation

After the Petition Date, on November 15, 2017, the Consumer Financial Protection Board (the "CFPB") initiated litigation against the Debtors in the U.S. District Court for the District of Montana (the "Montana Court") alleging various violations of federal consumer lending laws. *Consumer Fin. Prot. Bureau v. Think Finance, LLC et al.*, Case No. 4:17-cv-00127-BMM (D. Mont.) (the "CFPB Litigation").  The Debtors moved to dismiss the CFPB Litigation, which motion was denied on August 3, 2018.  On November 16, 2018, the CFPB and the Debtors filed a joint motion seeking to stay discovery for a period of 60 days in the CFPB Litigation.  The stay has since expired and discovery in the CFPB litigation has recommenced, but the parties have agreed to move the Montana Court for a further stay upon execution of an agreement concerning the Consumer Litigation Settlement that is amenable to the CFPB.

## <u>ARTICLE IV</u>

### THE CHAPTER 11 CASES

### (a)    Commencement of the Chapter 11 Case

On October 23, 2017 (the "Petition Date"), each of the Debtors filed its respective voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), with such cases being jointly administered under case number 17-33964 (HDH).

### (b)      Appointment of the Creditors' Committee

On November 2, 2017, the United States Trustee for the Northern District of Texas (the "U.S. Trustee") appointed as members of the Official Committee of Unsecured Creditors (the "Committee"): Marlin & Associates Holdings, LLC ("Marlin"), Patrick Inscho, and Mphasis Limited [Doc. No. 59]. On November 27, 2017, the U.S. Trustee appointed two additional members to the Committee: COP – Spectrum Center and India Banks. Ms. Banks is a named plaintiff in the Florida Litigation, and Mr. Inscho is a named plaintiff in the Virginia Litigation. Marlin was also involved in pre-petition litigation with the Debtors and its claims were scheduled as disputed and unliquidated. On January 1, 2018, the Court approved the retention of Cole Schotz P.C. [Doc. No. 237] as counsel to the Committee and on January 26, 2018, the Court approved Teneo Capital as financial advisor to the Committee [Doc. No. 273].

### (c)      VPC Adversary Proceeding and Cash Collateral

On the Petition Date, Debtor-Plaintiffs Think Finance, Think SPV, and TCAS commenced Adversary Proceeding No. 17-03106 (the "VPC Adversary Proceeding") by filing the *Verified Complaint* [VPC Adv. Doc. No. 1] (the "Complaint") against defendants Victory Park, VP Management, GPLS, and the Collateral Agent (collectively, the "VPC Defendants").

The Debtor-Plaintiffs initiated the VPC Adversary Proceeding because the Debtors believe that the lien asserted by the VPC Defendants against the Debtors' assets is invalid and that the Debtors have claims for damages against the VPC Defendants as a result of their pre-petition conduct described in Article 3.1, as well as certain post-petition conduct.

The Debtor-Plaintiffs seek the following relief in the Complaint: (i) an order compelling the VPC Defendants to turn over funds in their possession, custody or control that are property of the estate, and to turn over information, in accordance with the provisions of sections 542(a), (b), and (e) of the Bankruptcy Code; (ii) a judgment holding the VPC Defendants in contempt for willfully violating the automatic stay in section 362(a) of the Bankruptcy Code; (iii) an order disallowing the contingent, indemnification claims of the VPC Defendants; (iv) to the extent the claims of the VPC Defendants are not disallowed, an order estimating such claims at or close to $0 for all purposes in these bankruptcy cases and declaring void any liens asserted by the VPC Defendants to the extent they exceed the allowed amount of the estimated claims; and (v) to the extent the claims of the VPC Defendants are not disallowed or estimated at $0 for all purposes, an order equitably subordinating such claims and ordering that any lien securing such subordinated claims be transferred to the Debtors' estates.

In addition to seeking the relief above, the Debtor-Plaintiffs also seek damages in the Complaint against: (i) Victory Park and GPLS for breach of fiduciary duty; (ii) the Collateral Agent for breach of fiduciary duty; (iii) Victory Park, the Collateral Agent, and VP Management for tortious interference; (iv) GPLS for breach of contract of the AAA (as defined in the

Complaint); (v) GPLS for breach of contract of the Articles of Association (as defined in the Complaint); (vi) Victory Park, the Collateral Agent, and GPLS for conversion of funds held by GPLS; (vii) Victory Park, the Collateral Agent, VP Management, and GPLS for conversion of funds currently or previously held by VP Management; (viii) Victory Park, GPLS, and the Collateral Agent for breach of the implied covenant of good faith and fair dealing; (ix) Victory Park, the Collateral Agent, and VP Management for unjust enrichment; (x) the VPC Defendants for fraudulent inducement concerning the ISA; (xi) alternatively, the VPC Defendants for breach of the ISA; and (xii) the VPC Defendants for breach of the implied covenant of good faith and fair dealing concerning the ISA.

Contemporaneously with filing the Complaint, the Debtor-Plaintiffs also filed the *Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Order to Show Cause for Willful Violations of the Automatic Stay* [VPC Adv. Doc. No. 2] (the "Emergency Motion"). On October 31, 2017, the Court entered an Agreed Order [VPC Adv. Doc. No. 22] (the "Agreed Order"), which established an escrow account (the "Escrow Account") at Metropolitan Commercial Bank (the "Escrow Agent"). The Agreed Order required the GPLS Parties to deposit the Transferred Funds (as defined in the Complaint) into the Escrow Account and requires the VPC Defendants to deposit all additional funds GPLS received into the Escrow Account subject to the GPLS Holdback (as defined in the Agreed Order).

On October 27, 2017, the Court entered the *Interim Order Authorizing the Debtors to Use Cash Collateral, Granting Adequate Protection and Related Relief* [Doc. No. 37] (the "Interim Cash Collateral Order"). The Interim Cash Collateral Order authorized the Debtors to use cash collateral, limited the ability of the GPLS Parties to transfer any funds from accounts owned by GPLS, and scheduled the final cash collateral hearing for November 20, 2017.

Beginning on November 20, 2017, the parties conducted a contested hearing concerning the Emergency Motion and the Debtors' cash collateral motion. On December 4, 2017, the Court issued an oral ruling on the Emergency Motion and the Debtors' cash collateral motion (the "December 4 Ruling").

On December 7, 2017, the Court entered the *Order Granting Preliminary Injunction* [VPC Adv. Doc. No. 73] (the "Preliminary Injunction Order"). In the Preliminary Injunction Order, consistent with the December 4 Ruling, the Court ordered the turnover to the Debtors of $5 million of funds held in the Escrow Account, and ordered Defendants to cause GPLS to continue to transfer all funds to the Escrow Account subject to the GPLS Holdback. In the Preliminary Injunction Order, the Court also ordered Defendants to turn over information to the Debtors.

On December 7, 2017, the Court also entered the *Order Authorizing the Debtors to Use Cash Collateral, Granting Adequate Protection and Related Relief* [Doc. No. 182] (the "Cash Collateral Order"), which approved the Debtors' cash collateral motion as set forth therein and authorized the Debtors' use of cash collateral consistent with a Thirteen Week Forecast (as defined in the Cash Collateral Order).

11

On December 15, 2017, the VPC Defendants filed *Defendants' First Amended Answer to Plaintiffs' Verified Complaint, Affirmative Defenses, Counterclaims, and Third-Party Claims* [VPC Adv. Doc. No. 76] asserting claims against the Debtors (the "Counterclaim") and third party claims against certain non-Debtor affiliates (the "Third Party Claims"). The Debtors answered the Counterclaim on December 29, 2017. The non-Debtor affiliates filed a motion to dismiss the Third Party Claims on January 4, 2018. These motions to dismiss remain pending.

On December 22, 2017, the Debtors filed the *Plaintiff's Motion for Partial Summary Judgment* [VPC Adv. Doc. No. 82]. On January 9, 2018, Defendants filed the *Defendants' Motion for Partial Summary Judgment on Defendants' Declaratory Judgment Claim and Cross-Motion for Summary Judgment on Plaintiffs' Turnover and Contract Claim* [Adv. Pro. Doc. No. 97]. These summary judgment motions remain pending.

As of early January, 2018, the trial in the VPC Adversary Proceeding was scheduled to begin on February 26, 2018. On January 14, 2018, however, the Debtors filed the *Debtors' Motion for an Order Supplementing Order Authorizing the Debtors to Use Cash Collateral, Granting Adequate Protection and Related Relief* [Doc. No. 247] (the "First Supplemental Motion"), which sought approval of both an order staying the VPC Adversary Proceeding through at least April 23, 2018, and an order authorizing certain payments to some of the professionals of the GPLS Parties. Following a contested hearing on January 18, 2018, the Court approved the First Supplemental Motion (the "January 18 Ruling").

In accordance with the January 18 Ruling, on January 22, 2018, the Court entered the *Agreed Third Amended Scheduling and Case Management Order* [VPC Adv. Doc. No. 120] (the "Third Scheduling Order"), which stayed the VPC Adversary Proceeding through at least April 23, 2018. Also in accordance with the January 18 Ruling, on January 25, 2018, the Court entered the *Order Supplementing Order Authorizing the Debtors to Use Cash Collateral, Granting Adequate Protection and Related Relief* [Doc. No. 270] (the "First Supplemental Order"), which authorized certain payments to some of the professionals of the GPLS Parties.

On June 6, 2018, the Debtors filed the *Debtors' Motion for a Second Order Supplementing Order Authorizing the Debtors to Use Cash Collateral, Granting Adequate Protection and Related Relief* [Doc. No. 566] (the "Second Supplemental Motion") [Doc. No. 567]. The Second Supplemental Motion sought approval of both an order staying the VPC Adversary Proceeding through the later of October 31, 2018 or the termination of the Court ordered mediation described in Article 4(k) below, and entry of an order paying certain amounts to some of the professionals and service providers of the GPLS Parties. Following a contested hearing on June 19, 2018, the Court granted the Second Supplemental Motion, and on June 25, 2018, the Court entered the *Second Order Supplementing Order Authorizing the Debtors to Use Cash Collateral, Granting Adequate Protection and Related Relief* [Doc. No. 618] (the "Second Supplemental Order"). On June 26, 2018, in accordance with the Second Supplemental Order, the Court entered the *Agreed Fourth Amended Scheduling and Case Management Order* [VPC Adv. Doc. No. 133] staying the VPC Adversary Proceeding. The VPC Adversary Proceeding remains stayed, as the Court ordered mediation has not terminated.

**(d)**     **Objections to GPLS Professional Expense Requests**

Pursuant to the Cash Collateral Order, the GPLS Parties were authorized to periodically submit requests for payment of expenses incurred by their professionals, along with any invoices evidencing such expenses, to the Debtors, the U.S. Trustee, and the Committee (collectively, the "GPLS Expense Requests"). The Debtors, the U.S. Trustee, and the Committee were then provided with an opportunity to object to the GPLS Expense Requests. The Debtors submitted objections to the GPLS Expense Requests on various grounds. The Debtors reserved their rights to assert additional objections to such requests. The Debtors served objections to each of the GPLS Expense Requests (collectively, the "GPLS Expense Request Objections"). The Committee joined in the Debtors' GPLS Expense Request Objections or asserted additional objections with respect to the GPLS Expense Requests. The U.S. Trustee also has reserved rights in connection with the GPLS Expenses Requests.

**(e)**     **Retention of Professionals**

    **(1)**     **Hunton Andrews Kurth LLP**

To assist them in carrying out their duties as debtors-in-possession and to represent their interests otherwise in the Case, the Debtors filed with the Court an application seeking entry of an order authorizing the Debtors to retain Hunton Andrews Kurth LLP[5] as their counsel. On December 18, 2017, the Court entered an order approving the application on a final basis [Doc. No. 204].

    **(2)**     **Alvarez & Marsal North America, LLC**

To assist them in carrying out their duties as debtors-in-possession and to serve as their financial advisor, the Debtors filed with the Court an application seeking entry of an order authorizing the Debtors to retain Alvarez & Marsal North America, LLC as their financial advisor. On December 18, 2017, the Court entered an order approving the application on a final basis [Doc. No. 205].

    **(3)**     **Goodwin Proctor LLP**

To represent them as special litigation counsel in connection with investigations and litigation involving the CFPB or other agencies, the Debtors filed with the Court an application seeking entry of an order authorizing the Debtors to retain Goodwin Procter LLP as their special litigation counsel. On December 18, 2017, the Court entered an order approving the application on a final basis [Doc. No. 206]. Subsequently, the Debtors filed with the Court a supplemental application seeking to expand the scope of the Debtors' retention of Goodwin Procter LLP to include providing services in connection with certain claims brought by consumers that obtained loans from one of the Debtors' sovereign Native American tribal lending clients. On April 30,

---

[5] Please note that effective April 2, 2018, the law firm of Hunton & Williams LLP changed its name to Hunton Andrews Kurth LLP.

2018, the Court entered an order approving the supplemental application on a final basis [Doc. No. 493].

### (4)    Eversheds Sutherland (US) LLP

To assist them in the defense of claims asserted against the Debtors, including those asserted in litigation brought by Pennsylvania in the Pennsylvania Litigation, the Debtors filed with the Court an application seeking entry of an order authorizing the Debtors to retain Eversheds Sutherland (US) LLP as their special litigation counsel.  On January 26, 2018, the Court entered an order approving the application on a final basis [Doc. No. 274].

### (f)    Claims Process and Bar Dates

On November 11, 2017,  the Court entered the *Order (I) Establishing Bar Date for Filing Proofs of Claim, (II) Approving Proof of Claim Form, (III) Approving the Form and Manner of Notice Thereof, and (IV) Providing Certain Supplemental Relief* (the "Bar Date Order")[6] [Doc. No. 137].  The Bar Date Order established the following bar dates (each, a "Bar Date") for the filing of proofs of claim against the Debtors in the Bankruptcy Case:

- The General Bar Date.  March 1, 2018, at 4:00 p.m. as the Bar Date for the filing of all proofs of claim for claims arising prior to the commencement of the Bankruptcy Case;

- The Governmental Unit Bar Date.  April 23, 2018, at 4:00 p.m. as the Bar Date for the filing of all proofs of claim by any "governmental unit" as that term is defined in Section 101(27) of the Bankruptcy Code; and

- The Rejection Bar Date.  The later of the General Bar Date or thirty (30) days after the effective date of rejection of the subject executory contract or unexpired lease.

In the Bar Date Order, the Court also approved a process for providing notice to certain individuals (the "Consumer Borrowers") who obtained one or more loans from one of the Debtors' sovereign Native American tribal lender clients.  The Court approved the use of a Consumer Borrower Proof of Claim Form specifically tailored for Consumer Borrowers who elect to assert a claim against the Debtors related to such loans.  The Debtors provided notice of the Bar Date to approximately 1.13 million Consumer Borrowers.  Further, the Debtors published notice of the Bar Dates in the national editions of the *Wall Street Journal* and the *USA Today* on December 12, 2017, and December 13, 2017, respectively.

The Debtors scheduled approximately 100 claims in their Schedules (the "Scheduled Claims") in the aggregate amount of approximately $7.9 million.  In addition, as of the applicable Bar Dates, over 5,000 proofs of claim were filed in connection with the Bankruptcy

---

[6] Capitalized terms not otherwise defined in this section shall have the meaning given to them in the Bar Date Order.

Cases in an aggregate face amount that far exceeds the amount of the Scheduled Claims. Approximately 4,500 of the filed proofs of claim were filed by Consumer Borrowers. The Debtors believe that they have valid objections to a number of the filed claims and the ultimate total Allowed amount of such Claims may be significantly less than the asserted amounts. Moreover, as described below in Article 6.2, certain of the larger claims filed related to the litigation described in Article 3.2 are disputed and will be allowed by agreement for voting purposes only.

> (g)    **First Omnibus Claims Objection**

On March 19, 2018, the Debtors filed the Debtors' *First Omnibus Objection to Certain Claims* (the "First Omnibus Objection") [Doc. No. 359] seeking disallowance of the claims of six Consumer Borrowers from two states, Virginia and Texas, who asserted various claims against the Debtors under federal and state consumer lending laws. Each of them is represented by either VA/FL/CA Counsel or VT/NC Counsel.

The First Omnibus Objection was scheduled for trial beginning on October 3, 2018. The Debtors and the claimants subject to the First Omnibus Objection engaged in significant discovery in preparation for the trial.

On July 3, 2018, VA Counsel filed *Plaintiff Stephanie Edward's Motion for Partial Summary Judgment* [Doc. No. 640] and on July 27, 2018, the Debtors filed the *Debtors' Motion for Summary Judgment on Certain Virginia and Texas Claims and Objection to Plaintiff Stephanie Edwards' Motion for Partial Summary Judgment* [Doc. No. 701] (together, the "Summary Judgment Motions").

On September 20, 2018, the Court continued the trial on the First Omnibus Objection until at least October 9, 2018.

On September 26, 2018, the Court issued its oral ruling on the Summary Judgment Motions, denying both motions, and entered the *Order Denying Plaintiff Stephanie Edwards' Motion for Partial Summary Judgment* [Doc. No. 1011] and *Order Denying Debtors' Motion for Summary Judgment on Certain Virginia and Texas Claims* [Doc. No. 1012] (together, the "Summary Judgment Orders").

Following entry of the Summary Judgment Orders, the Court entered the *Agreed Order Amending Scheduling Order Concerning Debtors' First Omnibus Objection to Claims* [Doc. No. 1076], which rescheduled the trial on the First Omnibus Objection to begin on November 1, 2018. Prior to commencement of the rescheduled trial, the parties held a mediation and agreed to certain "essential terms" that would form the basis for a global settlement of the First Omnibus Objection and the other litigation described in Article 3.2. Based on this agreement, the trial on the First Omnibus Objection has been continued indefinitely.

**(h)     Consumer Borrower Adversary Proceedings**

VA/FL/CA Counsel have initiated six (6) adversary proceedings in this Court (collectively, the "VA/FL/CA Adversary Proceedings"), all against Debtor defendants. Those adversary proceedings are: *Gibbs, et al. v. Think Finances, LLC, et al.*, Adv. Pro No. 17-03117-hdh, filed Dec. 20, 2017, *Earl Browne v. Think Finance, LLC, et al.*, Adv. Pro. No. 17-03120-hdh, filed Dec. 21, 2017; *India Banks v. Think Finance, LLC, et al.*, Adv. Pro. No. 17-03121-hdh, filed Dec. 22, 2017; *Brice, et al. v. Think Finance, LLC, et al.*, Adv. Pro. No. 17-33964-hdh, filed March 1, 2018; *Griffiths, et al. v. Think Finance, LLC, et al.*, Adv. Pro. No. 18-03026-hdh, filed March 2, 2018; and *Price, et al. v. Think Finance LLC, et al.*, Adv. Pro. No. 18-03319-hdh filed October 12, 2018. The VA/FL/CA Adversary Proceedings assert the same claims as the proofs of claim, described below, filed by the same respective parties and are currently stayed as to the Debtor defendants.

**(i)     Putative Class Action Claims**

VA/FL/CA Counsel and VT/NC Counsel filed proofs of claims for the 17 Consumer Borrowers they respectively represent. Each of these proofs of claim asserts a putative class claim on behalf of other Consumer Borrowers.

On January 31, 2018, VT/NC Counsel filed the *Motion of Consumer Borrower Plaintiffs for Entry of an Order (I) Applying Bankruptcy Rule 7023 to the Class Claim, and (II) Certifying the Class for Purposes of the Class Claim* [Doc. No. 285] (the "Vermont Rule 7023 Motion"). On March 8, 2018, VT/NC Counsel filed the *Motion of Consumer Borrower Plaintiffs for Entry of an Order (I) Applying Bankruptcy Rule 7023 to Great Plains Borrower Class Claim, and (II) Certifying the Great Plains Borrower Class for Purposes of the Great Plains Borrower Class Claim* [Doc. No. 348] (the "North Carolina Rule 7023 Motion").

On February 7, 2018, VA/FL/CA Counsel filed the *Motion to Authorize Bankruptcy Rule 7023 to Virginia Plaintiffs' Proof of Claims and to Certify Class of Virginia Consumers* [Doc. No. 291] and memorandum in support [Doc. No. 292] (the "Virginia Rule 7023 Motion"). On March 1, 2018, VA/FL/CA Counsel filed (i) the *Motion to Authorize Bankruptcy Rule 7023 to Florida Plaintiff's Proof of Claims and to Certify Class of Florida Consumers* [Doc. No. 336] and memorandum in support [Doc. No. 337] (the "Florida Rule 7023 Motion"); and (ii) the *Amended Motion to Authorize Bankruptcy Rule 7023 to California Plaintiffs' Proof of Claims and to Certify Class of California Consumers* [Doc. No. 340] and memorandum in support [Doc. No. 341] (the "California Rule 7023 Motion"; and collectively with the Vermont Rule 7023 Motion, the North Carolina Rule 7023 Motion, the Virginia Rule 7023 Motion, and the Florida Rule 7023 Motion, the "Rule 7023 Motions").

The Debtors opposed the Rule 7023 Motions and the parties conducted substantial discovery related to the Rule 7023 Motions. On August 30, 2018, following a contested hearing, the Court entered the *Order Granting Motions for Application of Bankruptcy Rule 7023 to Proofs of Claim* [Doc. No. 849], in which the Court granted, in part, the Rule 7023 Motions by applying its discretion under Rule 9014 to apply Bankruptcy Rule 7023 to the subject claims.

16

The Rule 7023 Motions remain pending with respect to whether such claims satisfy the requirements of Civil Rule 23.

(j)     **Extension of Exclusivity Periods**

The Debtors have sought and received Court approval of seven extensions of (i) the period during which the Debtors have the exclusive right to file a plan or plans and (ii) the period during which the Debtors have the exclusive right to solicit acceptances of any plan. On March 8, 2019, the Court entered the *Seventh Order Extending Debtors' Exclusivity Periods Within Which to File a Plan and Solicit Votes Thereon* [Doc. No 1310], which extended (i) the period during which the Debtors have the exclusive right to file a plan or plans through and including April 22, 2019, and (ii) the period during which the Debtors have the exclusive right to solicit acceptances of any plan through and including June 21, 2019.

(k)     **Mediation**

Following a discussion on the record at a status conference concerning the possibility of scheduling a mediation to attempt to resolve the First Omnibus Objection, on April 27, 2018, the GPLS Parties filed the *GPLS Secured Parties' Motion for Entry of an Order (I) Compelling Mediation and (II) Granting Related Relief* [Doc. No. 476]. On May 15, 2018, the Court entered the *Agreed Order Approving the GPLS Secured Parties' Motion for Entry of an Order (I) Compelling Mediation and (II) Granting Related Relief* [Doc. No. 524] (the "Mediation Order"). Pursuant to the Mediation Order, the Court appointed Hon. David R. Jones, Chief United States Bankruptcy Judge for the Southern District of Texas to act as the mediator (the "Mediator").

The first in-person mediation occurred on July 9, 2018, and over the subsequent months the mediation parties continued to proceed with the mediation and to negotiate their various disputes.

Following an in-person mediation conducted on October 22, 2018, the mediation parties agreed in principle to the essential terms of a global settlement (the "Essential Terms"), provided that such settlement was subject to further negotiation among the parties to document the settlement.

On December 10, 2018, the mediation parties conduced an in-person mediation session with the Mediator (the "December 10 Mediation") to attempt to further resolve certain disputes concerning the documentation of the global settlement. Following the December 10 Mediation, the parties continued to attempt to further document the settlement based on the Essential Terms through telephone conferences, exchanges of drafts of a term sheet and in-person meetings.

(l)     **The Consumer Litigation Settlement**

The Consumer Litigation Settlement is critically important to the consensual, expedient resolution of the Chapter 11 Cases because it fully and finally resolves the claims and disputes among the Settling Parties, including, without limitation, the First Omnibus Claim Objection, the

17

Consumer Borrower Adversary Proceedings, and the Putative Class Action Claims described in Article IV(f)–(h).

- the Plan shall provide for all amounts remaining in the Escrow Account and funds held by GPLS to be transferred to the Debtors' estates, and all such funds not used to make payments or to fund reserves as required by the Plan shall be transferred to the Litigation Trust which shall receive all rights and interests in such funds from the Debtors, for administration by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement; provided, however, that the Plan shall provide that the treatment of the claims of the GPLS Parties, the funds in the Escrow Account, and the funds held by GPLS shall be either as agreed upon by the GPLS Parties, the Debtors, the Committee, and Nationwide Class Counsel, or as determined based on ruling of the Bankruptcy Court concerning such claims and such funds;

- other than obtaining documents pursuant to (i) the 2004 Order entered concerning CBIZ; and (ii) the 2004 Order entered concerning KPMG, the Committee shall continue any deadlines associated with any pending Bankruptcy Rule 2004 investigations of the Debtors and any other parties or entities. In addition, the Committee shall not seek authority to conduct any further or additional Bankruptcy Rule 2004 investigations unless and until the Consumer Litigation Settlement is terminated as it is the intention of the Settling Parties that the Committee will not conduct any other Bankruptcy Rule 2004 investigations while the Settling Parties seek to confirm the Plan. If, however, unforeseen events arise that do not result in the termination of the Consumer Litigation Settlement but cause the Committee to want to seek additional Bankruptcy Rule 2004 investigations, then the Committee shall only seek such additional Bankruptcy 2004 investigations with written consent from the Debtors, which consent shall not be unreasonably withheld; provided, however, for the avoidance of doubt, the Litigation Trustee shall succeed to the rights of the Committee in connection with such investigations on and after the Effective Date and the limitations stated herein on the Committee pursuing Bankruptcy Rule 2004 investigations shall not apply to the Litigation Trustee;

- although the Debtors acknowledge and agree that some of the following deadlines may need to be extended based on whether the GPLS Parties reach an agreement with the Debtors, the Committee, and the Nationwide Class Counsel concerning the Plan, or when the Bankruptcy Court schedules hearings concerning disputes with the GPLS Parties, within five days following reaching an executed agreement concerning the Consumer Litigation Settlement by the Debtors and all of the Consenting Stakeholders:

  o each Consenting Plaintiff shall move to stay, or otherwise confirm in writing to the Debtors and the applicable Consenting Defendant its agreement not to proceed with, all actions currently pending against the Debtors, their estates, and all Consenting Defendants, unless and until the Consumer Litigation Settlement is terminated in accordance with its terms;

  o proposed Nationwide Class Counsel shall file a motion, which shall be in a form reasonably acceptable to and not objected to by the Debtors, Committee, and all Consenting Plaintiffs and Consenting Defendants (the

"Approval Motion"), seeking, among other things, (a) to amend and consolidate various proofs of claim; (b) to invoke Bankruptcy Rule 7023 to the extent necessary; (c) certification of the Nationwide Consumer Borrower Settlement Class for settlement purposes only; (d) to appoint Nationwide Class Representatives; (e) to appoint Nationwide Class Counsel as class counsel; (f) preliminary approval of the Settlement pursuant to Fed. R. Civ. P. 23(e); (g) authorization of the release of funds from the Escrow Account to advance and pay noticing and related expenses in connection with the Settlement and the certification of the Nationwide Consumer Borrower Settlement Class; (h) to approve, among other things, the Class Administrator and the form and manner of notice to be served on members of the Nationwide Consumer Borrower Settlement Class; (i) to establish a deadline, at least 45 days after entry of the Preliminary Approval Order, for Nationwide Consumer Borrowers to return notice of their desire to opt out of the Nationwide Consumer Borrower Settlement Class or object to the Settlement (the "Opt-Out Deadline"); and (j) to authorize the Class Representatives to vote on behalf of the Nationwide Consumer Borrower Settlement Class to accept or reject the Plan;

   o Kelly Guzzo, P.L.C., Consumer Litigation Associates, P.C. and Tycko & Zaveeri, P.L.C. shall file a Motion for Preliminary Approval pursuant to Fed. R. Civ. P. 23 of the same Nationwide Consumer Borrower Settlement Class in the Eastern District of Virginia in connection with a settlement funded by Great Plains Lending, LLC, Plain Green, LLC, MobiLoans, LLC and Mark Curry and his companies, which shall be in a form reasonably acceptable to and not objected to by the Debtors, Committee, and all Consenting Plaintiffs and Consenting Defendants (the "Virginia Class Settlement"). If the Virginia Class Settlement is preliminarily approved, it shall be coordinated with the Nationwide Consumer Borrower Settlement Class to the extent practicable so that the Class members (and others receiving notice) and the Bankruptcy Court can fairly evaluate the combined effect of both settlements, including the proposed remedies, relief and releases, and so that the expense, complexities and delays associated with the settlements can be minimized, all to the extent consistent with Federal Rule of Civil Procedure 23, Bankruptcy Rule 7023, CAFA, other applicable law, and due process. Notwithstanding the foregoing or anything else herein, the approval of the Virginia Class Settlement is not a condition precedent to the confirmation of the Plan or to the Effective Date; and

   o the Debtors shall file a motion seeking authorization to enter into an agreement concerning the Consumer Litigation Settlement;

 &bull; within 10 days after the filing of the Approval Motion, the notice required by 28 U.S.C. § 1715 shall be provided by the Debtors and the Consenting Defendants or their designee, and such providing party shall rely upon the applicable usury limits for each of the Tier 2 states provided by proposed Nationwide Class Counsel in preparing such notice; and provided further

that the Debtors shall consult with proposed Nationwide Class Counsel in connection with calculating the proposed distribution information for such notice;

• within 40 days following reaching an executed agreement concerning the Consumer Litigation Settlement the Bankruptcy Court shall have entered an order substantially granting the relief sought in the Approval Motion (the "Preliminary Approval Order");

• within 7 days following reaching an executed agreement concerning the Consumer Litigation Settlement, proposed Nationwide Class Counsel shall provide the proposed Class Administrator with the applicable usury rate for each of the Tier 2 states;

• within 10 days following reaching an executed agreement concerning the Consumer Litigation Settlement, the Debtors shall provide the proposed Class Administrator global historical loan level data for Eligible Tribal Loans sufficient to enable an analysis of state-by-state distribution percentages and for use in all other distribution calculations contemplated by the Consumer Litigation Settlement or by CFPB in connection with any distributions from its Civil Penalty Fund;

• as soon as reasonably practicable, and in no event later than 45 days following entry of the Preliminary Approval Order, the Class Administrator shall mail and/or email the approved Class Notice as directed by the Preliminary Approval Order (including a special notice for Pennsylvania Borrowers that explains their separate classification and treatment), provided, that (i) the Debtors will provide all information necessary for the Class Administrator to generate a class list and utilize appropriate address update and location products and services, which update and location process will be conducted in consultation with the Debtors, and Nationwide Class Counsel, provided that the Debtors and Nationwide Class Counsel will cooperate in obtaining any collateral orders necessary to use such address update and location products services; (ii) to facilitate creation of this class list and for the additional purpose of effectuating the Consumer Litigation Settlement including enabling their answering of questions from potential members of the Nationwide Consumer Borrower Settlement Class the Debtors will provide on a confidential basis to Kelly Guzzo, P.L.C. and Consumer Litigation Associates, P.C. (who will be the firms receiving calls from consumer borrowers), the name, last 4 digits of the social security number, state, and loan payment amount information for the consumer borrowers of the Eligible Tribal Loans, provided that Kelly Guzzo, P.L.C., and Consumer Litigation Associates, P.C. (a) shall not provide such information to any Entity other than such consumer borrower and/or the Class Administrator and shall not use such information for any other purpose and (b) agree to the entry by the Bankruptcy Court of a protective order that so limits the ability of Kelly Guzzo, P.L.C. and Consumer Litigation Associates, P.C. to provide such information to anyone else (together (a) and (b) are referred to the "PII Prohibited Use/Protective Order Provisions"); and (iii) to facilitate the Pennsylvania AG communicating with Pennsylvania Borrowers and/or serving as paying agent for allocations for Pennsylvania Borrowers, the Debtors, or at the request of the Pennsylvania AG either Kelly Guzzo, P.L.C., Consumer Litigation Associates, P.C., or the Class Administrator, will provide on a confidential basis to the Pennsylvania AG the name, last 4 digits of the social security number, and loan payment amount information for the Pennsylvania Borrowers, provided that the Pennsylvania AG (x) shall not

provide such information to any Entity other than such Pennsylvania Borrower, the Class Administrator, and/or a service provider engaged by the Pennsylvania AG to assist the Pennsylvania AG in communicating with Pennsylvania Borrowers and/or serving as paying agent for allocations for Pennsylvania Borrowers, and shall not use such information for any other purpose and (y) agrees to the entry by the Bankruptcy Court of a protective order that so limits the ability of the Pennsylvania AG and any such service provider to provide such information to anyone else. After the Effective Date, the Reorganized Debtors shall, together with the Debtors, have the benefit of and right to enforce these provisions;

- no later than 10 Business Days after the Opt-Out Deadline has passed, the Bankruptcy Court shall hold a hearing to determine whether to (a) approve the Disclosure Statement, (b) authorize the Debtors to distribute the Plan Solicitation Materials, and (c) approve solicitation and voting procedures, including authorizing the class representatives to vote on the Plan on behalf of the Nationwide Consumer Borrower Settlement Class;

- within 5 Business Days following entry of the Disclosure Statement Approval Order, the Debtors shall distribute the Plan Solicitation Materials;

- within 45 days following entry of the Disclosure Statement Approval Order, the Bankruptcy Court shall hold the Confirmation Hearing on the Plan contemporaneously with the Final Fairness Hearing, provided that it is the intention of the Settling Parties that the Final Fairness Hearing shall be heard simultaneously by both the Bankruptcy Court and the United States District Court for the Northern District of Texas (the "Texas District Court") and that both the Bankruptcy Court and the Texas District Court shall approve and enter the Final Fairness Approval Order, and provided, further, that the Final Fairness Approval Order shall contain the Class Action Injunction and Other Relief;

- within 5 Business Days following the Confirmation Hearing, the Bankruptcy Court shall have entered the Confirmation Order and the Bankruptcy Court and the Texas District Court shall have entered the Final Fairness Approval Order, provided, however, that this 5 Business Day period may be extended as necessary so that the Final Fairness Approval Order is not entered less than 90 days after the mailing of any notices required by 28 U.S.C. § 1715;

- within 30 days following entry of the Confirmation Order and the Final Fairness Approval Order, the Effective Date shall have occurred; and

- on the Effective Date, in addition to other actions described herein or in the Plan, each of the following shall occur (except as the timing of such action shall otherwise be set forth in a future agreement or modified by Bankruptcy Court order):

    1. each Consenting Defendant shall pay its Consenting Defendants' Cash Contribution to the Litigation Trust, in accordance with the terms of the settlement with such Consenting Defendant and/or the confirmed Plan, as applicable;

21

2.      the remaining cash in the Escrow Account and all cash held by GPLS shall be transferred to the Debtors' estates, and then all such funds not used to make payments or to fund reserves as required by the Plan shall be transferred to the Litigation Trust which shall receive all rights and interests in such funds from the Debtors, for administration by the Litigation Trustee in accordance with the terms of the confirmed Plan and the Litigation Trust Agreement; provided, however, that the Plan shall provide that the treatment of the claims of the GPLS Parties, the funds in the Escrow Account, and the funds held by GPLS, shall be either as agreed upon by the GPLS Parties, the Debtors, the Committee, and Nationwide Class Counsel, or as determined based on rulings of the Bankruptcy Court concerning such claims and such funds;

3.      the reserve for Allowed Administrative Expenses, Priority Tax Claims and other Priority Claims shall be funded;

4.      cash in the amount of the Professional Fee Amount shall be deposited into the Professional Fee Escrow by the Debtors;

5.      the Reorganized Debtor Assets shall vest in the Reorganized Debtors and the Reorganized Debtor Cash Contribution shall be paid to the Reorganized Debtors;

6.      the reserve for the General Unsecured Claims Cash Pool shall be funded in the amount of at least $3 million, and it shall be held by the Litigation Trustee;

7.      the reserve for the Substantial Contribution Fund shall be funded and disbursed;

8.      the Litigation Trust shall be established in accordance with the Plan and the Litigation Trust Agreement, and all remaining Cash in the Debtors' estates (after funding 3 through 7 above) shall be transferred to the Litigation Trust; except for the funding of an expense reserve for the Litigation Trust in accordance with the terms of, and in the amount identified by, the Litigation Trust Agreement, the Cash transferred to the Litigation Trust shall be reserved for the initial distribution to members of the Nationwide Consumer Borrower Settlement Class, and the Plan shall provide that such initial distribution shall occur within 30 days following the Effective Date or as soon thereafter as reasonably practicable in the Litigation Trustee's discretion;

9.      the Litigation Trustee, the Litigation Trust Oversight Board, and the Advisory Committee shall be appointed;

10.      all Estate Causes of Action shall be transferred to the Litigation Trust to be prosecuted solely by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement;

11.      the releases and exculpation set forth in the Plan shall become fully enforceable and effective, except for (i) the releases from the Pennsylvania AG, which shall become effective upon entry of the order(s) contemplated by the Plan settling the

22

Pennsylvania Litigation, and (ii) the releases from the CFPB, which shall become effective upon entry of the order(s) contemplated by the Plan, including the consent order, settling the CFPB Litigation;

12. the (a) Consenting Plaintiffs other than the Pennsylvania AG and the CFPB shall take all steps necessary to dismiss the applicable Pending Litigation with prejudice (and obtain an appropriate Rule 54(b) order if necessary) in accordance with the paragraphs below, solely as to the Debtors (where applicable) and the Consenting Defendants, (b) Pennsylvania AG shall seek and obtain all orders necessary to settle, with the entry of a Rule 54(b) separate final judgment, all claims in the Pennsylvania Litigation against the Debtors in accordance with the below Pennsylvania AG Settlement section, and (c) the CFPB shall seek and obtain all orders necessary to settle, with the entry of a consent order, all claims in the CFPB Litigation against the Debtors in accordance with the below CFPB Settlement section;

13. the Reorganized Debtors shall reasonably cooperate, if needed, in efforts by the Settling Tribal Lenders to cause the GPL, MobiLoans and PGL Property to be transferred to the Litigation Trust in accordance with separate settlement agreements that may be reached with the Settling Tribal Lenders; provided, however, that since the Debtors are not currently aware of the extent of any cooperation required, nothing in the Plan shall require the Reorganized Debtors to incur expenses to so cooperate without provision being made for reasonable reimbursement, including actual internal and external costs, for such cooperation to be paid to the Reorganized Debtors from the Litigation Trust;

14. the Restructuring Transactions shall be consummated; and

15. the Class Action Injunctive and Other Relief shall take effect.

The Plan provides that the Debtors will retain the Reorganized Debtor Assets, which include, among other things, $5 million in cash, certain promissory notes, intercompany receivables, intellectual property, certain contracts, and rights under certain insurance policies. All other assets of the Estates will be transferred to a Litigation Trust for use and disbursement in accordance with the Plan and the Litigation Trust Agreement.

The Plan also provides for an agreed process for the certification of the Nationwide Consumer Borrower Settlement Class. The Nationwide Consumer Borrower Settlement Class shall include three tiers for purposes of determining distributions based on the state of residence of the Consumer Borrower at the time that the Consumer Borrower obtained an Eligible Tribal Loan. Details concerning the three tiers as set forth in Article 5.2(e).

The Nationwide Consumer Borrower Settlement Class shall be represented by Kelly Guzzo, P.L.C, Consumer Litigation Associates, P.C., Lowenstein Sandler, LLP, and Tycko & Zavareei, LLP. These law firms, and certain other law firms who represented Consumer Borrowers in the Chapter 11 Cases, shall receive aggregate compensation in the amount of $8,500,000 in the form of an allowed administrative expense claim under 11 U.S.C. §§

23

503(b)(3)(D) and 503(b)(4) for services provided during the Chapter 11 Cases to certain Consumer Borrower claimants and for serving the role of counsel to the Nationwide Consumer Borrower Settlement Class.

Stephanie Edwards, Patrick Inscho, Darlene Gibbs, Tamara Price, Sherry Blackburn, George Hengle, Regina Nolte, Lawrence Mwethuku, Lula Williams, India Banks, Jeri Brennan, JoAnn Griffiths, Alicia Patterson, Kimetra Brice, Jill Novorot, Earl Browne, Jessica Gingras, Angela Given, Vanessa Granger, Lilya McAtee, and Beverly Kristina Miller shall serve as the Nationwide Representatives of the Nationwide Consumer Borrower Settlement Class. In connection with their good-faith pre- and post-petition efforts to formulate, promote, and execute the Settlement on behalf of all Nationwide Consumer Borrowers, these individuals shall receive services awards in the amount of $7,500.

The Plan also provides for at least $3 million to be deposited into the General Unsecured Claims Cash Pool for distribution to creditors holding General Unsecured Claims. The Debtors are in the process of finalizing their reconciliation of General Unsecured Claims which shall be provided to the Committee. After consultation with counsel to the Committee, with the agreement of the Committee the Debtors may file and/or prosecute objections to General Unsecured Claims, as appropriate, prior to the Effective Date. On and after the Effective Date, the Litigation Trustee, shall have the sole authority and power on behalf of the Debtors' estates to file objections to General Unsecured Claims and settle any remaining disputed General Unsecured Claims in accordance with the terms of the Plan. As soon as reasonably practicable, the Committee with the assistance of the Consenting Plaintiffs shall object to the claims of Ken Rees, John Drew, TCV, LP and TCV Member Fund, LP and any other defendants, or potential defendants, in current or future litigation involving the claims of Consumer Borrowers seeking indemnification from the Debtors. The Debtors shall not oppose the objections to these claims.

The Plan provides that the Honorable Russell F. Nelms, U.S. Bankruptcy Judge for the Northern District of Texas (ret.), will be the initial Liquidating Trustee. There shall be appointed a Litigation Trust Oversight Board for the Litigation Trust comprised of representatives of each of the Consenting Plaintiffs other than the CFPB. The Litigation Trust Oversight Board shall have the right after the Effective Date to seek a replacement for the Litigation Trustee in accordance with the Litigation Trustee's retention agreement and the terms of the Plan and the Litigation Trust Agreement. The members of the Litigation Trust Oversight Board will not receive any additional compensation on account of serving in such capacity.

Although the Debtors dispute that the Pennsylvania AG has incurred any expenses that would be entitled to reimbursement as administrative expenses pursuant to 11 U.S.C. §§ 503(b)(3)(C), 503(b)(3)(D), and 503(b)(4), the Pennsylvania AG has asserted that it has incurred the following expenses:

- Actual time expended by his outside, special counsel in the amount of $4,044,600;

- In-house expenses attributed to his investigation of and litigation against the Debtors in the Pennsylvania Litigation in the amount of $594,617;

- Other expenses, including payments to other professionals, in the amount of $423,413; and

- Payments made to his bankruptcy counsel in the amount of $236,420.11.

The Plan provides as part of the Consumer Litigation Settlement that the Pennsylvania AG shall have an allowed substantial contribution claim under 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) in the amount of $4 million.

The Plan provides as part of the Consumer Litigation Settlement that the CFPB shall have an administrative expense claim under 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) in the amount of $7.00.

Counsel to the Consenting Plaintiffs and Marlin & Assoc., which serves as Committee chair, negotiated to allow Marlin & Assoc. an administrative expense claim of $50,000 under 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4), which purports to take into account actual time and expenses by outside counsel, in-house expenses, and outside expenses incurred by Marlin & Assoc. in connection with these Chapter 11 Cases, which allowed claim is provided for in the Plan.

## <u>ARTICLE V</u>

### THE REORGANIZED DEBTORS

The Plan contemplates the creation of one or more Reorganized Debtors that will receive from the Debtors, as of the Effective Date of the Plan, the Reorganized Debtor Assets.  The Reorganized Debtors will be newly-created Entities and will be owned upon their creation by TF Holdings, Inc., the sole member of Think Finance, LLC.  The Debtors will be dissolved in accordance with the Plan.

The Debtors contemplate that the Reorganized Debtors will be service providers to a variety of participants in the lending industry and to affiliates.  These services may include, but are not limited to, research and development of financial technology, shared services, and online lending solutions that allow lenders to market, underwrite, and/or service their loans more effectively.  The Reorganized Debtors may develop and/or provide other financial technology tools and services that would be highly useful to parties in identifying prospective borrowers, performing risk analysis, originating or acquiring loans, managing compliance, and performing a variety of other functions needed by lenders prior to and even after the payoff or sale of the debt.

The Reorganized Debtors will be solvent upon their creation.  They will be capitalized by the Reorganized Debtor Assets, which consists of cash, rights to payment and, among other assets, the Debtors' software platforms and other business-related contracts and assets, as set forth more specifically in the Plan.  Upon the Effective Date of the Plan, the Debtors anticipate

the Reorganized Debtors will be able to solicit new business based on the extremely knowledgeable and dedicated employees of the Debtors they expect to employ and the industry reputation of the capabilities of the existing technology platforms. A pro forma balance sheet for the Reorganized Debtors will be provided through a Plan Supplement.

## ARTICLE VI

SUMMARY OF THE PLAN OF REORGANIZATION

> **THE FOLLOWING SUMMARY PROVIDES ONLY A GENERAL OVERVIEW OF THE PLAN, WHICH IS QUALIFIED IN ITS ENTIRETY BY, AND SHOULD BE READ IN CONJUNCTION WITH, THE PLAN AND THE MORE DETAILED DISCUSSION APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT.**

**6.1    Treatment of Unclassified Claims**

   **(a)    Unclassified Claims Summary**

   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, including Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan. The Claim recoveries for such unclassified Claims are set forth below:

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| Administrative Claims | Paid in Allowed amount in Cash | 100% |
| Professional Fee Claims | Paid in Allowed amount in Cash | 100% |
| Priority Tax Claims | Paid in Allowed amount in Cash | 100% |

   **(b)    Administrative Claims**

   Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors, or the Litigation Trustee on or after the Effective Date, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash from the Administrative and Priority Claim Reserve equal to the amount of such Allowed Administrative Claim either: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities

26

incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the Debtors or Litigation Trustee, as applicable, in consultation with the Consenting Stakeholders; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

All requests for allowance and payment of an Administrative Claim, other than Professional Claims and the Substantial Contribution Claims, must be filed with the Court and served on counsel for the Debtors or the Reorganized Debtors, as applicable, or the Litigation Trustee on or after the Effective Date, by no later than the Administrative Claims Bar Date.  In the event that any party to an Administrative Claim on or before the Administrative Claims Objection Deadline, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.

    **(c)**    **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed and served in accordance with the Compensation Procedures approved by the Bankruptcy Court no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.  Allowed Professional Claims for services rendered prior to the Effective Date shall be paid in Cash in the amount the Bankruptcy Court allows from the Professional Fee Escrow, which shall be held in trust for the Professionals and funded with Cash equal to the Professional Fee Estimate on or before the Effective Date.  Claims for any post-Effective Date services by Professionals shall be submitted to the Litigation Trustee and paid in the ordinary course, but in no event later than fourteen (14) days after their submission.  Professionals shall deliver to the Debtors their estimates for purposes of computing the Professional Fee Estimate no later than five Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid fees and expenses of such Professional.  Any funds remaining in the Professional Fee Escrow after all Professional Claims have been paid will be deposited into the Litigation Trust for use in accordance with the Plan.

From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.  For the avoidance of doubt, the Reorganized Debtors and the Litigation Trustee may employ and pay any professionals in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.  Any professionals employed by the Litigation Trustee shall be paid from the funds in or generated by the Litigation Trust and not from the Professional Fee Escrow.

**(d)** **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive on the Effective Date payment in Cash from the Administrative and Priority Claim Reserve in an amount equal to the amount of such Allowed Priority Tax Claim or, as determined by the Debtors in consultation with the Consenting Stakeholders, regular installment payments from the Litigation Trustee from the Administrative and Priority Claim Reserve of a total value, as of the Effective Date, equal to the amount of the Allowed Priority Tax Claim as provided in section 1129(a)(9)(c) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash from the Administrative and Priority Claim Reserve in accordance with the terms of any agreement between the Debtors or the Litigation Trustee, as applicable, and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business, in each case from the Administrative and Priority Claim Reserve.

**6.2** **Summary of Classification and Treatment of Claims and Interests**

The Plan establishes a comprehensive classification of Claims and Interests. The table below summarizes the classification, treatment, voting rights, and estimated recoveries, estimated as of the date hereof, of the Claims and Interests, by Class, under the Plan. Amounts assumed in the projected Plan recovery analysis are estimates only.

| Class | Claim or Interest | Voting Rights | Treatment | Projected Plan Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | No | Unimpaired | 100% |
| 2 | Other Secured Claims | No | Unimpaired | 100% |
| 3 | GPLS Claims | Yes | Impaired | TBD |
| 4 | General Unsecured Claims | Yes | Impaired | TBD |
| 5 | Consumer Borrowers Claims | Yes | Impaired | TBD |
| 6 | Pennsylvania Regulatory Claim | Yes | Impaired | N/A |
| 7 | CFPB Regulatory Claim | Yes | Impaired | N/A |
| 8 | Equity Interests | Yes | Impaired | TBD |

28

**(a)**      **Class 1 Priority Non-Tax Claims**

Each holder of an Allowed Class 1 Claim shall receive Cash from the Administrative and Priority Claim Reserve in an amount equal to such Allowed Class 1 Claim.

**(b)**      **Class 2 Other Secured Claims**

Each holder of an Allowed Class 2 Claim shall receive (i) payment in full in Cash of its Allowed Class 2 Claim, including any accrued and unpaid interest, fees, and expenses as may be required to be paid, (ii) the collateral securing its Allowed Class 2 Claim; or (iii) such other treatment rendering its Allowed Class 2 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**(c)**      **Class 3 GPLS Claims**

Each Holder of an Allowed Class 3 Claim shall receive such amount as agreed to by the Debtors and the Consenting Stakeholders or as ordered by the Bankruptcy Court.

**(d)**      **Class 4 General Unsecured Claims**

Each holder of an Allowed Class 4 Claim shall receive a cash Distribution equal to its pro rata share of the General Unsecured Claims Cash Pool.

**(e)**      **Class 5 Consumer Borrower Claims**

Class 5 shall be made up of all Nationwide Consumer Borrowers, *excluding* those Nationwide Consumer Borrowers who effectively opt out of the Nationwide Consumer Borrower Settlement Class. The Nationwide Consumer Borrower Settlement Class Claim shall be allowed in an unliquidated amount, provided that the amount allowed for distribution purposes shall be deemed to be greater than the amount ultimately available for Distributions to members of the Nationwide Consumer Borrower Settlement Class, including without limitation any amount available for such distributions based on recoveries on Estate Causes of Action by the Litigation Trustee, provided, further, that such allowed class claim shall include, without limitation, a liquidated allowed claim in the amount of Distributions that are actually made to members of the Nationwide Consumer Borrower Settlement Class.. Distributions to members of the Nationwide Consumer Borrower Settlement Class shall be governed by the Plan and the Litigation Trust Agreement. Nationwide Class Counsel shall coordinate with counsel to the Pennsylvania AG in connection with any notices provided and distributions made to Pennsylvania Borrowers, which notices and distributions from the Litigation Trust shall be subject to approval by the Bankruptcy Court.

Distributions to members of the Nationwide Consumer Borrower Settlement Class shall be allocated as follows:

o  Tier 1: the following states: Arizona, Arkansas, Colorado, Connecticut, Idaho, Illinois, Indiana, Kansas, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, Ohio, South Dakota, Vermont, Virginia, and Wisconsin.  Tier 1 shall receive 70% of the Litigation Trust Proceeds (the "Tier 1 Allocation"), in addition to injunctive and other relief in the form of the Class Action Injunctive and Other Relief; and

o  Tier 2: the following states: Alabama, Alaska, California, Delaware, Florida, Georgia, Hawaii, Iowa, Louisiana, Maine, Maryland, Michigan, Mississippi, Missouri, Nebraska, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Washington, West Virginia, Washington D.C., and Wyoming.  Tier 2 shall receive 30% of the Litigation Trust Proceeds (the "Tier 2 Allocation"), in addition to injunctive and other relief in the form of the Class Action Injunctive and Other Relief.

o  Tier 3: states other than Tier 1 states and Tier 2 states.  Tier 3 shall not receive any of the Litigation Trust Proceeds, but shall benefit from the Class Action Injunctive and Other Relief, and shall include the states of Nevada and Utah.

Each member of the Nationwide Consumer Borrower Settlement Class in a Tier 1 state shall receive a pro-rata distribution of the Tier 1 Allocation calculated based on the total amount paid by such Class member on Eligible Tribal Loans as reflected on the applicable Tribal Lender's books and records available to the Debtors, the GPLS Parties and/or the Settling Tribal Lenders, *provided* that the Pennsylvania Borrowers also may receive a portion of the other amounts paid to the Pennsylvania AG as part of the Settlement (the "Pennsylvania Borrower Additional Amounts").

Each member of the Nationwide Consumer Borrower Settlement Class in a Tier 2 state shall receive a pro-rata distribution of the Tier 2 Allocation calculated based upon the total amount of interest paid by such Class member on Eligible Tribal Loans, as reflected on the applicable Tribal Lender's books and records available to the Debtors, the GPLS Parties and/or the Settling Tribal Lenders, over the usury limit in such state applicable to unsecured installment loans issued by lenders subject to such state's laws in a similar dollar amount as the Eligible Tribal Loans.

Members of the Nationwide Consumer Borrower Settlement Class in a Tier 3 state shall not receive any monetary distribution.

Notwithstanding anything in the Plan or the Confirmation Order, Distributions from the Litigation Trust to individual members of the Nationwide Consumer Borrower Settlement Class shall not exceed the amount each of those consumers paid in excess of principal on his or her Eligible Tribal Loans.

The aggregate amount of all allocations for Pennsylvania Borrowers shall be paid to the Pennsylvania AG.  Subject to supervision of the Court and so long as consistent with all orders of the Court, the Pennsylvania AG may act as the paying agent for all allocations for Pennsylvania Borrowers and for all Pennsylvania Borrower Additional Amounts, and the

Pennsylvania AG may determine, in the Pennsylvania AG's sole discretion, all matters relating to (a) the timing of distributions to Pennsylvania Borrowers and (b) the distribution of the Pennsylvania Borrower Additional Amounts.

No other claims of any members of the Nationwide Consumer Borrower Settlement Class shall be allowed for distribution purposes. The allowance for distribution purposes of the Nationwide Consumer Borrower Settlement Class Claim is not intended to and shall not limit or adversely impact, nor enhance or favorably impact, in any way whatsoever Causes of Action of members or potential members of the Nationwide Consumer Borrower Settlement Class against Non-Released/Non-Exculpated Parties.

As set forth more fully in the Litigation Trust Agreement and/or Preliminary Approval Order, the Nationwide Consumer Borrower Settlement Class shall be represented by the following firms:

> Kelly & Guzzo, P.L.C.;
> Consumer Litigation Associates, P.C;
> Lowenstein Sandler; and
> Tycko & Zavareei, LLP

The following firms shall serve on an advisory committee:

> Kellett & Bartholow, PLLC;
> Berman Tabacco; and
> Gravel & Shea PC

**(f)      Class 6 Pennsylvania Regulatory Claim**

In full satisfaction of the Pennsylvania Regulatory Claim, the Pennsylvania AG shall be allowed a Claim in an unliquidated amount, temporarily for voting purposes in accordance with Bankruptcy Rule 3018(a), but shall not receive any Cash Distribution under the Plan on account of the Pennsylvania Regulatory Claim. All proofs of claim filed by the Pennsylvania AG shall be resolved and satisfied for all purposes pursuant to (i) the treatment for Pennsylvania Borrowers who are members of the Nationwide Consumer Borrower Settlement Class; (ii) the allowance of the Pennsylvania AG Administrative Expense Claim; and (iii) the Class Action Injunction and Other Relief concerning Pennsylvania.

**(g)      Class 7 CFPB Regulatory Claim**

In full satisfaction of the CFPB Regulatory Claim, the CFPB shall be allowed a Claim in an unliquidated amount, temporarily for voting purposes in accordance with Bankruptcy Rule 3018(a), but shall not receive any Cash Distribution under the Plan on account of the CFPB Regulatory Claim. All proofs of claim filed by the CFPB shall be resolved and satisfied for all purposes pursuant to (i) the treatment for Subject Consumers who are members of the Nationwide Consumer Borrower Settlement Class; (ii) the allowance of the CFPB Administrative Expense Claim and (iii) the relief provided in the CFPB Consent Order.

(h)    **Class 8 Equity Interests**

Holders of the Equity Interests shall have their Equity Interests cancelled on the Effective Date and shall receive all equity interests in the Reorganized Debtors.

**6.3    Means for Implementation of the Plan**

(a)    **Substantive Consolidation**

The Plan contemplates, and is predicated upon, the entry of an order, which may be the Confirmation Order, substantively consolidating the Estates and the Chapter 11 Cases for administrative convenience and for purposes of implementing the Plan.  Accordingly, on the Effective Date: (i) all Intercompany Claims and Equity Interests held by, between and among the Debtors shall be deemed eliminated, (ii) all assets and liabilities of the Debtors shall be merged or treated as if they were merged with the assets and liabilities of Think Finance, LLC, (iii) any obligation of a Debtor and all guarantees thereof by one or more of the other Debtors shall be deemed to be one obligation of Think Finance, LLC, and (iv) each Claim filed or to be filed against any Debtor shall be deemed filed only against the consolidated Think Finance, LLC, and shall be deemed a single Claim against and a single obligation of the consolidated Think Finance, LLC.  On the Effective Date, in accordance with the terms of the Plan, all Claims based upon co-obligations or guarantees of collection, payment, or performance made by the Debtors as to the obligations of another Debtor shall be merged into a single obligation of Think Finance, LLC, and otherwise shall be released and of no further force and effect.

Substantive consolidation shall not, and shall not be deemed to, prejudice any of (i) the Preserved Causes of Action, which shall survive for the benefit of the Debtors and their Estates and, upon the Effective Date, for the benefit of the Litigation Trust and its beneficiaries; or (ii) the available defenses to the Preserved Causes of Action.

(b)    **Restructuring Transactions**

On the Effective Date, the Debtors shall implement the Restructuring Transactions.  The actions to implement the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents for the dissolution of the Debtors and the creation of the Reorganized Debtors; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, interest, or right consistent with the terms of the Plan; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or aw; (d) creation of the Litigation Trust; and (e) all other actions that the Debtors determine to be necessary or appropriate and consistent with the Plan and Confirmation Order, including making filings or recordings that may be required by applicable law in connection with the Plan.

      (c)    **Consumer Litigation Settlement**

The Plan is intended to implement the Consumer Litigation Settlement, described in the Plan and this Disclosure Statement. Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan and the Consumer Litigation Settlement shall constitute a good-faith compromise and settlement of all Claims and Equity Interests. In the event that, for any reason, the Confirmation Order is not entered or the Effective Date does not occur, the Debtors reserve all of their rights with respect to any and all disputes resolved and settled under the Plan and Consumer Litigation Settlement. The entry of the Confirmation Order shall constitute the Court's approval of each of the compromises and settlements embodied in the Plan and the Consumer Litigation Settlement, and the Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness. The Plan and the Confirmation Order shall have res judicata, collateral estoppel, and estoppel (judicial, equitable, or otherwise) effect with respect to all matters provided for, or resolved pursuant to, the Plan and the Confirmation Order, including, without limitation, the release, injunction, exculpation, discharge, and compromise provisions contained in the Plan and the Confirmation Order.

      (d)    **Corporate Action**

Upon the Effective Date, the Debtors shall be authorized to implement the Restructuring Transactions, including to transfer the Reorganized Debtors' Assets to the Plan, to the Reorganized Debtors, without any requirement of further action by the members, officers, or managers of the Debtors or any further notice to or action, order, or approval of the Bankruptcy Court. Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including the implementation of the Restructuring Transactions. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors, including any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article 4.4 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

      (e)    **Dissolution of Debtors**

As soon as reasonably practicable following the Effective Date, or such later date as may be necessary to facilitate execution, submission and court approval of the CFPB Consent Order, the Debtors or Reorganized Debtors, as applicable, shall file a notice of dissolution of the Debtors with the Bankruptcy Court, upon which filing the Debtors shall be deemed dissolved for all purposes in accordance with applicable state and local law without any further action, plan of dissolution, notice or applicable with any state or local division, required on the part of the

Debtors or the Debtors' officers, managers or members, and all remaining officers, managers, or managing members, shall be dismissed without any further action required on the part of any such Debtor, the officers of such Debtor, or the members of such Debtor, provided that foregoing shall not restrict the Reorganized Debtors from entering into agreements for the continued employment of employees of the Debtors.

**(f)      The Reorganized Debtors' Cash Distribution**

On the Effective Date, or as soon as reasonably practicable thereafter, the following property of the Estate shall be transferred to and/or vest in the Reorganized Debtors: (i) the Reorganized Debtor Cash Distribution, which shall be paid to the Reorganized Debtors by the Escrow Agent on the Effective Date, or as soon as reasonably practicable thereafter; (ii) the MobiLoans Note; (iii) the Haynes Note; (iv) the Intercompany Receivables; (v) the Intellectual Property, FF&E, and employee-related assets (including business and employee contracts, leases and related matters, etc.), including assumed Executory Contracts (including employee contracts and leases), *provided that* the Reorganized Debtors shall be solely responsible for payment of any Cure to be paid in connection with any assumed Executory Contracts and leases; and (vi) the Insurance Rights.

**(g)      Funding and Administrative Reserve Accounts**

On the Effective Date, all remaining Escrow Funds and any remaining GPLS Funds shall vest in the Estate and shall be transferred to the Litigation Trust and shall be utilized, among other purposes set forth in the Plan, to fund the Reserve Accounts in accordance with Article 4.7 of the Plan. All Cash remaining in the Estates immediately after funding the Reserve Accounts and the payment of any other amounts required by the Plan, including the Reorganized Debtor Cash Distribution pursuant to Article 4.6 of the Plan, shall vest in, and be transferred to, the Litigation Trust.

**(1)  The Administrative and Priority Cash Reserve**

On the Effective Date, the Administrative and Priority Claims Reserve shall be established and funded in the amount of the aggregate Administrative and Priority Claims Estimate. Subject to the terms of the Plan, the Litigation Trustee shall pay each Allowed Administrative Claim as provided for in Article 2.1 of the Plan. In the event that excess Cash remains in the Administrative and Priority Claims Reserve after payment of all Allowed Administrative and Priority Claims, or at such time as the Cash in the Administrative and Priority Claims Reserve exceeds the Face Amount of the unpaid Administrative and Priority Claims, such Cash shall be transferred to the Litigation Trust for distribution in accordance with the Plan and the Litigation Trust Agreement.

**(2)   The General Unsecured Claims Cash Pool**

On the Effective Date, or as soon as reasonably practicable thereafter, the General Unsecured Claims Cash Pool shall be established and funded. Subject to the terms of the Plan,

34

the Litigation Trustee or its designee shall distribute the Cash in the General Unsecured Claims Cash Pool *pro rata* to holders of Allowed Class 4 Claims. The Litigation Trustee shall establish, fund and administer the Disputed General Unsecured Claims Reserve in accordance the Plan from the Cash deposited into the General Unsecured Claims Cash Pool. In the unlikely event that the amount in the General Unsecured Claims Cash Pool exceeds the allowed amount of General Unsecured Claims, then such excess funds shall be transferred to the Litigation Trust for distribution in accordance with the Plan and the Litigation Trust Agreement.

### (3) The Substantial Contribution Fund

On the Effective Date, or as soon as reasonably practicable thereafter, the Substantial Contribution Fund shall be established and funded in the amount of $12,550,007.00. Subject to the terms of the Plan, the Litigation Trustee shall distribute the Cash in the Substantial Contribution Fund to holders of the Substantial Contribution Claims.

### (4) The Professional Fee Escrow

On or before the Effective Date, the Professional Fee Escrow shall be established and funded by the Debtors in Cash in the amount of the aggregate Professional Fee Estimate. Each Professional Claim shall be paid from the Professional Fee Escrow as provided for in Article 2.2 of the Plan. In the event that excess Cash remains in the Professional Fee Escrow after payment of all Allowed Professional Fee Claims, such Cash shall be deposited into the Litigation Trust for distribution in accordance with the Plan and the Litigation Trust Agreement.

### (5) The Litigation Trust Initial Funding

On the Effective Date, or as soon as reasonably practicable thereafter, after the establishment and funding of the Reserve Accounts and payment of any other amounts required by the Plan, including payment of the Reorganized Debtor Cash Distribution pursuant to Article 4.6 of the Plan, the Litigation Trust Initial Funding shall be deposited into an account owned and controlled by the Litigation Trustee.

### (h) Approval of Class Action Settlement

The Plan incorporates and implements the terms and conditions of the Litigation Trust Agreement and constitutes and shall be deemed to be a motion for final approval of the Nationwide Consumer Borrower Settlement Class by the Bankruptcy Court pursuant to Bankruptcy Rule 9019(a) for purposes of voting on and receiving distributions under the Plan. Upon confirmation of the Plan, (i) each member of the Nationwide Consumer Borrower Settlement Class shall be entitled to received Distributions in accordance with the Litigation Trust Agreement and/or Preliminary Approval Order and (ii) all proofs of claim asserting Consumer Borrower Claims other than the single claim of the Nationwide Consumer Borrower Settlement Class, other than those timely filed Allowed Opt-Out Consumer Borrower Claims, shall be disallowed and/or expunged; provided, however, that the allowance of the class proof of claim on these terms shall not inure to the benefit of any one individual holder of a Consumer

35

Borrower Claim. The Plan shall constitute a motion (i) pursuant to section 502 of the Bankruptcy Code to allow for distribution purposes the class proofs of claim filed by the Nationwide Consumer Borrower Class Representatives and (ii) pursuant to Rule 3007 of the Bankruptcy Rules, to disallow and expunge all other Consumer Borrower Claims (other than Allowed Opt-Out Consumer Borrower Claims), including those filed as putative class claims on behalf of Consumer Borrowers of any state.

### (i)     Consenting Defendants' Cash Contribution

On the Effective Date, or as soon as reasonably practicable thereafter, each Consenting Defendant shall pay to the Litigation Trust an amount in Cash equal to its respective share of the Consenting Defendants' Cash Contribution. For the avoidance of doubt, the Consenting Defendants' Cash Contributions shall not constitute or be deemed (i) any admission of wrongdoing or illegality or any alleged capacity of the Debtors as lenders on any of the Eligible Tribal Loans or (ii) a concession by the Consumer Borrowers that the alleged wrongdoing or illegality did not occur.

### (j)     Books and Records

The Reorganized Debtors shall receive possession of and the right to use and maintain the original of all of Debtors' books and records. For the avoidance of doubt, the Litigation Trustee shall have full reasonable access to all such books and records for the purpose of investigating and pursuing the Estate Causes of Action, and the Litigation Trustee shall be deemed to share with the Reorganized Debtors in any attorney-client privilege, work product doctrine, or other privilege or immunity attaching to any such books and records necessary for investigating and pursuing the Estate Causes of Action, provided, however, that such sharing does not waive any such privilege or immunity.

On the Effective Date, or as soon as reasonably practicable thereafter, (i) the Litigation Trustee shall receive a copy of the Debtors' books and records held by any litigation vendor, at the expense of the Litigation Trust, in a form and manner whereby it is commercially and technologically reasonable to obtain such copy; and (ii) if it becomes necessary for the Reorganized Debtors to incur significant internal or external costs in connection with providing access to the Debtors' books and records to the Litigation Trustee, then the Reorganized Debtors and the Litigation Trustee shall enter into a reasonable shared services agreement governing the reimbursement of such costs. If the Reorganized Debtors and the Litigation Trustee do not reach an agreement on the terms of such shared services agreement, then either the Reorganized Debtors or the Litigation Trustee may seek an order from the Bankruptcy Court establishing reasonable terms for such shared services. If the Litigation Trustee reasonably determines that the expense of such access and use of such books and records is greater than the expense of fully duplicating them, then the Litigation Trustee may elect to obtain a copy at the expense of the Litigation Trust.

For the avoidance of doubt, the Litigation Trustee shall not be permitted to waive any privilege with respect to the Debtors' books and records, or disclose to any third-parties any

36

confidential PII, or any trade secrets or other confidential business information related to (a) shareholders except in connection with pursuing an Estate Cause of Action, (b) financial information, statements, or records of the Debtors except in connection with pursuing an Estate Cause of Action, (c) typical confidential employee information, (d) risk analysis products and methods (such as models, data and know how), (e) marketing services, strategies and methodologies, and (f) the technology platforms, systems, products and all other Intellectual Property, including without limitation software development and programs and related documentation, except for the fact of the occurrence of any transfer of such technology prior to the Petition Date related to an Estate Cause of Action, contained in such books and records without the consent of the Reorganized Debtors or in accordance with the following procedure: (i) the Litigation Trustee shall provide written notice to the Reorganized Debtors of the Litigation Trustee's intent to waive privilege and/or disclose information, which notice shall, among other things, identify the information at issue and the proposed use of such information; (ii) the Reorganized Debtors shall have five (5) business days after such notice is received to notify the Litigation Trustee that the Reorganized Debtors object to such disclosure or waiver; (iii) if the Reorganized Debtors timely object in writing, then the Reorganized Debtors and the Litigation Trustee shall meet and confer about such information and proposed use during the three (3) business days that follow the Reorganized Debtors' notification of the Litigation Trustee of the objection; (iv) if the parties do not reach an agreement, the Reorganized Debtors shall have until five (5) business days after the meet and confer concludes to file a pleading with the Bankruptcy Court seeking an order restricting such privilege waiver or disclosure; and (v) until such pleading is resolved by agreement of the Reorganized Debtors and the Litigation Trustee or order of the Bankruptcy Court, the Litigation Trustee shall not waive such privilege or disclose such information. In ruling on such a pleading, the Bankruptcy Court may consider and weigh governing law as to privilege, confidentiality, and/or trade secrets, as well as the possible or intended use of such information and the interests of the Reorganized Debtors concerning such disclosure or waiver.

As of and after the Effective Date, to the extent the Reorganized Debtors receive a valid subpoena requesting documents produced by the Debtors in the Pending Litigation or in the Bankruptcy Case, the Reorganized Debtors shall agree that such previously produced documents shall be deemed produced under such valid subpoena as long as there is a valid protective order in place in the applicable litigation that provides equivalent protections to the Reorganized Debtors, including without limitation notice to the Reorganized Debtors, as those provided to the Debtors under the applicable protective order in the Pending Litigation or the Bankruptcy Case.

Notwithstanding anything else in the Plan with respect to the GPL, MobiLoans and PGL Property, the Reorganized Debtors may retain the original of any data regarding any consumer borrowers owned by the Settling Tribal Lenders and maintained or otherwise held by the Debtors for or on behalf of the Settling Tribal Lenders, provided that the mutually acceptable shared services agreement with the Litigation Trustee shall address the Litigation Trustee's access to such data.

**(k)**     **Section 1145 Exemption**

The offer, issuance, and distribution of any Interests in the Reorganized Debtors, any other Successor Entity or newly-formed entity shall be exempt (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code), pursuant to section 1145 of the Bankruptcy Code, without further act or action, from registration under (i) the Securities Act, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities. Each of the foregoing securities (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable by any initial recipient thereof that (i) at the time of transfer, is not an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the issuer of such securities and has not been such an "affiliate" within 90 days of such transfer, and (ii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

To the extent beneficial interests in the Litigation Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests.

**(l)**     **Exemption from Certain Taxes and Fees**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**(m)     Class Action Injunctive and Other Relief**

As of the Effective Date, although the Debtors deny that they committed any wrongdoing and the Debtors deny that they own or were lenders on any of the Eligible Tribal Loans, as part of the agreement to resolve the disputes among the Settling Parties pursuant to the Plan, the following injunctive and other relief shall take effect:

- while denying that they committed any wrongdoing and denying that they own or were lenders on any of the Eligible Tribal Loans, to the greatest extent permitted under applicable law, upon the agreement of the relevant Tribal Lenders or other owners of the loans, the Debtors shall consent to the unpaid principal, interest and fees of the Eligible Tribal Loans to members of the Nationwide Consumer Borrower Settlement Class being voided and adjusted to a zero balance. To the greatest extent permitted under applicable law, upon the agreement of the relevant Tribal Lenders or other owners of the loans, the Debtors consent to the notification of members of the Nationwide Consumer Borrower Settlement Class affected by the foregoing sentence that their Eligible Tribal Loans have been voided and adjusted to a zero balance (any costs of notification shall be funded from the Litigation Trust, and such notice may be made in the initial notice made to the Nationwide Consumer Borrower Settlement Class) by a description as to the effect of any final approval;

- while denying that they committed any wrongdoing, denying that they own or were lenders on any of the Eligible Tribal Loans, and denying that they were a furnisher to any consumer reporting agencies for any Eligible Tribal Loans, as long as Nationwide Class Counsel has provided the Debtors with acceptable evidence that the Settling Tribal Lenders agree to the deletion of such tradelines, the Debtors shall not object to a motion filed by the Consenting Plaintiffs for the entry of an Order requiring the deletion of all tradelines for any Eligible Tribal Loan from all consumer reporting agencies, except for Eligible Tribal Loans associated with a Tribal Lender that has not agreed to this removal;

- to the extent of their current knowledge, and solely for the purpose of effectuating the Class Action Injunctive and Other Relief, the Debtors, or if the Debtors have not provided such information prior to the Effective Date then the Litigation Trustee, shall provide on a confidential basis to Kelly & Guzzo, P.L.C. and Consumer Litigation Associates, P.C. a list of all Eligible Tribal Loans that have been sold or transferred to any third party, and the list will identify the loan numbers, the Tribal Lenders, the dates of sale, and the identity of such third parties, *provided* that any PII contained in such information shall be subject to the PII Prohibited Use/Protective Order Provisions;

- upon the vesting of the Reorganized Debtor Assets in the Reorganized Debtors and the creation and vesting of assets in the Litigation Trust in accordance with the Plan, the Debtors shall no longer conduct business; and

- the Reorganized Debtors (i) shall not use the PII provided by members of the Nationwide Consumer Borrower Settlement Class to the Tribal Lenders or to the Debtors (a) to market to such members or (b) to assess the value of marketing to such members; and (ii)

39

except as expressly contemplated by this Term Sheet, shall not sell or transfer to any other Entity the PII provided by members of the Nationwide Consumer Borrower Settlement Class to the Tribal Lenders or to the Debtors for such Entity to use the PII to market to such members;

For the avoidance of doubt, (i) the Class Action Injunctive and Other Relief shall not constitute or be deemed any admission of wrongdoing or illegality or any alleged capacity of the Debtors as lenders on any of the Eligible Tribal Loans and (ii) nothing in the Plan, including, without limitation, the releases granted by the Nationwide Consumer Borrower Settlement Class, shall be contingent upon the Tribal Lenders' agreement to all, or any portion of, the Class Action Injunctive and Other Relief, except that the express contingencies identified above concerning Tribal Lenders' consent or agreement must occur prior to the Debtors (a) agreeing to Eligible Tribal Loans being voided and adjusted to a zero balance, and related notices or (b) consenting to the deletion of certain tradelines.

**(n)     Pennsylvania Settlement**

On, or as soon as reasonably practicable after, the Effective Date, the Pennsylvania AG shall seek and obtain all orders necessary to settle, with the entry of a Rule 54(b) separate final judgment, all claims in the Pennsylvania Litigation against the Debtors. The Debtors and the Pennsylvania AG agree that one of such orders shall include injunction language that is substantively the same as the Class Action Injunction and Other Relief or as otherwise agreed by the Pennsylvania AG and the Debtors, provided that such injunction language shall only address conduct concerning Pennsylvania residents and shall not address conduct concerning residents of other states or commonwealths.

For the avoidance of doubt, the Pennsylvania AG Settlement shall not constitute or be deemed (i) any admission of wrongdoing or illegality or any alleged capacity of the Debtors as lenders on any of the Eligible Tribal Loans, or (ii) a concession by the Pennsylvania AG that the alleged wrongdoing or illegality did not occur.

It is understood and acknowledged by the Settling Parties that subject to the court in the Pennsylvania Litigation staying the Pennsylvania Litigation against the Debtors and the Consenting Defendants, the Pennsylvania AG may continue the Pennsylvania Litigation against the remaining defendants (the GPLS Parties, Kenneth Rees and National Credit Adjusters, LLC) without limitation and that any judgment, proceeds from such judgment, or settlement with such remaining defendants are the sole property of the Pennsylvania AG for distribution pursuant to further orders of the court in the Pennsylvania Litigation.

**(o)     CFPB Settlement**

Within 60 days after the Effective Date, or at such other time as mutually agreed upon prior to the Effective Date by the Debtors and the CFPB, the CFPB and the Debtors will each provide final approval for filing of a joint motion with the Montana court presiding over the CFPB Litigation seeking entry of a consent order in the form attached hereto as **Exhibit D** (the "CFPB Consent Order"). The CFPB shall then file the joint motion and CFPB Consent Order

and shall seek and obtain all other orders necessary to settle the CFPB Litigation and to dismiss the CFPB Litigation in accordance with the Plan and the CFPB Consent Order. For the avoidance of doubt, the CFPB Settlement is made in compromise of disputed claims. The CFPB Settlement does not constitute the withdrawal of the Debtors' denials and defenses in the CFPB Litigation or an admission by the Debtors of any facts or liability or wrongdoing, including, but not limited to, any liability or wrongdoing with respect to any allegations that were or could have been raised in the CFPB Litigation. This CFPB Settlement also does not constitute an admission by the CFPB that any claim is not well-founded, and nothing in the Plan should be construed as, or deemed to constitute, approval, sanction, or authorization by the CFPB of any of the Debtors' actions or business practices.

(p)    **Subordination**

The allowance, classification, and treatment of all Claims and Equity Interests under the Plan shall conform to and be consistent with the respective contractual, legal, and equitable subordination rights of such Claims and Equity Interests, and the Plan shall recognize and implement any such rights. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Debtors or the Litigation Trustee on or after the Effective Date reserve the right to seek to re-classify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

(q)    **Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the Effective Date, except to the extent otherwise provided herein, all notes, instruments, Certificates, and other documents evidencing Claims against the Debtors shall be canceled and the obligations of the Debtors or the Reorganized Debtors thereunder or in any way related thereto shall be discharged; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders of Allowed Claims to receive Distributions under the Plan and (b) allowing and preserving the rights of the Litigation Trustee, as applicable, to make Distributions on account of Allowed Claims as provided herein.

(r)    **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

(s)    **Incentive Plans and Employee and Retiree Benefits**

Except as otherwise provided herein, on and after the Effective Date, subject to any Final Order and, without limiting the authority provided under the Debtors' respective articles of

41

organization, bylaws and other formation and constituent documents, the Reorganized Debtors shall be authorized to: (a) amend, adopt, assume and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits (except with respect to any employee whose employment agreement is rejected on or prior to the Effective Date), retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

**6.4    The Litigation Trust**

   **(a)    Establishment of the Litigation Trust**

   The Litigation Trust shall be established and shall become effective on the Effective Date.  The Litigation Trust shall be governed and administered in accordance with the Plan and the Litigation Trust Agreement.

   **(b)    Transfer of Assets to the Litigation Trust**

   On the Effective Date, any and all assets and property of the Estates not transferred to the Reorganized Debtors pursuant to Article 4.6 of the Plan or otherwise addressed in the Plan shall be transferred to the Litigation Trust and administered by the Litigation Trustee in accordance with the terms of the Plan and the Litigation Trust Agreement, including, but not limited to, the Preserved Causes of Action, refunds, deposits, remnant assets, the General Unsecured Claims Cash Pool, any remaining funds in the Professional Fee Escrow following the payment of all Allowed Professional Claims and the Debtors' interests in GPLS.

   On or before the Effective Date, GPLS shall assign all interest in and rights to the Great Plains Reserve to the Estates, minus $1,000,000.00 to be held back to facilitate the wind-down of Great Plains and attorneys' fees approved by the court pursuant to the settlement reached in Gibbs v. Great Plains, et al..  On the Effective Date, the Estates' interest in the Great Plains Reserve shall be transferred to and vest in the Litigation Trust for administration by the Litigation Trustee in accordance with the terms of the Plan and the Litigation Trust Agreement.

   **(c)    Litigation Trust Funding**

   On the Effective Date, or on such other date as is set forth in the Litigation Trust Agreement, the Litigation Trust shall be established and receive the Litigation Trust Initial Funding.  Additionally, any net proceeds of the Preserved Causes of Action received subsequent to the Effective Date shall be deposited into the Litigation Trust for distribution in accordance

with the Plan and the Litigation Trust Agreement. For the avoidance of doubt, funding of the Litigation Trust shall not constitute or be deemed (i) any admission of wrongdoing or illegality or any alleged capacity of the Debtors as lenders on any of the Eligible Tribal Loans or (ii) a concession by Consumer Borrowers that the alleged wrongdoing or illegality did not occur.

### (d)      Preserved Causes of Action

Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Preserved Causes of Action shall be transferred by the Debtors (and deemed transferred) to the Litigation Trust free and clear of all Claims, Liens, charges, encumbrances, and rights and interests, without the need for any Entity to take any further action or obtain any approval and the Litigation Trust shall be authorized as the representative of the Estates to pursue the Preserved Causes of Action. In accordance with section 1123(b) of the Bankruptcy Code, the Litigation Trustee may enforce all rights to commence and pursue, as appropriate, any and all Preserved Causes of Action, and the Litigation Trustee's right to commence, prosecute, or settle any such Preserved Causes of Action shall be preserved notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date.

### (e)      Litigation Trust Distributions

The Litigation Trustee shall liquidate the Preserved Causes of Action and distribute any proceeds therefrom in accordance with the Plan and the Litigation Trust Agreement. The Litigation Trustee also shall administer the Unsecured Claims Cash Pool and make distributions to Allowed General Unsecured Claims in accordance with the Plan.

### (f)      Duration of Trust

The Litigation Trust shall have an initial term of five (5) years; provided, however, if warranted by the facts and circumstances, and subject to the approval of the Court, upon a finding that an extension of the term of the Litigation Trust is necessary to accomplish the purpose of the Litigation Trust, the Litigation Trustee shall be authorized to extend the Litigation Trust for six (6) months or longer provided that such extension is approved by the Court within (6) months of the beginning of the extended term. The Litigation Trust may be terminated earlier than its scheduled termination if (a) the Court has entered a Final Order closing all of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code or (b) the Litigation Trustee has administered all of the Preserved Causes of Action and performed all other duties required by the Plan and the Litigation Trust Agreement. As soon as practicable after the liquidation or abandonment of all Preserved Causes of Action, the Litigation Trustee shall seek entry of a Final Order closing the remaining Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

### (g)      Litigation Trust Oversight Board

On the Effective Date, the Litigation Trust Oversight Board shall be appointed. The Litigation Trust Oversight Board shall include representatives of each of the Consenting

Plaintiffs other than the CFPB. The members of the Litigation Trust Oversight Board shall not receive any additional compensation on account of serving in such capacity. The Litigation Trust Oversight Board shall have the duties set out in the Litigation Trust Agreement and the Plan including, without limitation, the right to seek a replacement for the Litigation Trustee on or after the Effective Date in accordance with the Litigation Trustee's retention agreement and the terms of the Litigation Trust Agreement.

**(h)** **Appointment of Litigation Trustee**

The Litigation Trustee shall serve as the trustee for the Litigation Trust. The appointment of the Litigation Trustee shall be effective as of the Effective Date. Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death, or incapacity of the Litigation Trustee, the Litigation Trust Oversight Board shall appoint a replacement Litigation Trustee and who, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of the predecessor Litigation Trustee. The Litigation Trustee shall be compensated and reimbursed for reasonable costs and expenses as set forth in, and in accordance with, the Litigation Trust Agreement. The Litigation Trustee shall have the powers and duties set forth in the Plan and in the Litigation Trust Agreement.

**(i)** **Indemnification and Exculpation**

The Litigation Trustee, and the Litigation Trustee's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the Litigation Trust, except those acts arising out of its own willful misconduct or gross negligence, and shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Litigation Trust, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification or reimbursement claim of the Litigation Trustee, or any other party entitled to indemnification or reimbursement under this subsection) shall be satisfied from the Litigation Trust.

**(j)** **Transfer of GPL and PGL Property**

The Reorganized Debtors shall reasonably cooperate, if needed, in efforts by the Settling Tribal Lenders to cause the GPL and PGL Property to be transferred to the Litigation Trust in accordance with separate settlement agreements that may be reached with the Settling Tribal Lenders; provided, however, nothing herein shall require the Reorganized Debtors to incur expenses to so cooperate without provision being made for reasonable reimbursement, including actual internal and external costs, for such cooperation to be paid to the Reorganized Debtors from the Litigation Trust.

**6.5** **Executory Contracts and Unexpired Leases**

The following shall be the treatment of Executory Contracts and Unexpired Leases:

**(a)** **Assumption and Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease (i) is expressly identified on the Assumption Schedule; (ii) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms herein, each Executory Contract and Unexpired Lease shall be deemed rejected to the Reorganized Debtors, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described rejection of all such Executory Contracts and Unexpired Leases.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

If a Claim arises from the rejection of any Executory Contract or Unexpired Lease pursuant to Article 6.1 of the Plan, such Claim shall be barred and unenforceable against the Debtors, Reorganized Debtors, the Litigation Trust, or their property unless a proof of claim asserting such Claim is filed with the Bankruptcy Court or the Solicitation Agent and served upon the Debtors within thirty (30) days after the Effective Date. Unless otherwise ordered by the Bankruptcy Court, any such rejection damages Claims shall be treated as General Unsecured Claims under the Plan.

**(b)** **Insurance Policies**

All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtor if necessary to continue the insurance policies in full force) all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption (and assignment, if necessary) of each of the insurance policies. For the avoidance of doubt, nothing in this provision shall impair the Debtors' right to the proceeds of the Insurance Rights.

45

**(c)      Cure of Defaults and Objections to Cure and Assumption**

The Reorganized Debtors shall be solely responsible for paying Cures, if any, on the Effective Date or as soon as practicable thereafter, or such other date that the Debtors or Reorganized Debtors, as applicable, and the counterparty agree.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid to a counterparty must be served on counsel to the Debtors on or before the Cure Objection Deadline.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment of the Cure; provided, however, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court by the Cure Objection Deadline.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is a dispute regarding Cure, the ability of the Reorganized Debtors to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption and assignment, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption and assignment, or as may be agreed upon by the Debtors, or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and the payment of any Cures shall result in the full release and satisfaction of Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed and assigned Executory Contract or Unexpired Lease at any time prior to the Effective Date.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

**(d) Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed and assigned by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

**(e) Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to determine whether to assume, assign or reject the related contract or lease, if applicable.

**6.6 Procedures Governing Distributions**

**(a) Distributions to Holders of Allowed Claims Other than Members of the Nationwide Consumer Borrower Settlement Class**

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Litigation Trustee on or after the Effective Date, as the case may be, and the Holder of the applicable Claim or Equity Interest, on the Initial Distribution Date, the Litigation Trustee shall make Distributions under the Plan on account of Claims Allowed on or before the Effective Date, subject to the rights of the Litigation Trustee, as applicable, to object to Claims; *provided*, *however*, that (1) the Reorganized Debtors shall be responsible for the payment of any Cure in accordance with Article 6.3 of the Plan and (2) Allowed Priority Tax Claims shall be paid in accordance with Article 2.3 of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors or the Litigation Trustee, as applicable, and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or, at the Litigation Trustee's election, through regular installment payments of a total value, as of the Effective Date, equal to the amount of the Allowed Priority Tax Claim as provided in section 1129(a)(9)(c) of the Bankruptcy Code.

**(b) Distributions to Members of the Nationwide Consumer Borrower Settlement Class**

The Class Administrator shall make Distributions to members of the Nationwide Consumer Borrower Settlement Class in accordance with the Plan and Litigation Trust Agreement. To the extent not provided by the Debtors prior to the Effective Date, the Litigation Trustee shall provide on a confidential basis sufficient information to the Class Administrator, and any subsequently appointed class administrator for the Nationwide Consumer Borrower Settlement Class, to make an initial Distribution and any subsequent Distributions to the

47

members of the Nationwide Consumer Borrower Settlement Class in accordance with the Plan and Litigation Trust Agreement.

### (c) Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until such Claim becomes an Allowed Claim.

### (d) Delivery of Distributions

#### (1) Record Date for Distributions to Holders of Claims

On the Confirmation Date, the Claims Register shall be closed and the Debtors and the Litigation Trustee on and after the Effective Date shall be authorized and entitled to recognize only those record holders, if any, listed on the Claims Register as of the close of business on the Confirmation Date. Notwithstanding the foregoing, if a Claim is transferred and the Claims Agent has been notified in writing of such transfer no later than 10 days before the Effective Date, the Litigation Trustee shall make Distributions to the transferee (rather than the transferor) only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. The Debtors or the Litigation Trustee on and after the Effective Date may, but shall have no obligation to, recognize transfers occurring after 10 days before the Effective Date.

#### (2) Distribution Process

Except as otherwise provided herein, Distributions to holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to beneficial holders of record as of the Confirmation Date: (1) to the address of such holder as set forth in the books and records of the applicable Debtor (or if the Claims Agent has been notified in writing, on or before the date that is 10 days before the Effective Date, of a change of address, to the changed address); (2) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the Debtors' books and records, no Proof of Claim has been filed and the Claims Agent has not received a written notice of a change of address on or before the date that is 10 days before the Effective Date; or (3) to any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. The Debtors, the Litigation Trustee, the Reorganized Debtors, and the Claims Agent shall not incur any liability whatsoever on account of any Distributions under the Plan.

#### (3) Compliance Matters

In connection with the Plan, to the extent applicable, the Litigation Trustee shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Litigation Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding

and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Litigation Trustee reserves the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances, to the extent applicable.

### (4) Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition on the Petition Date, for all purposes under the Plan, including voting, allowance and distribution.

### (5) Fractional, Undeliverable, and Unclaimed Distributions

*i.* *Fractional Distributions.* Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

*ii.* *Undeliverable Distributions.*

*a)* If any Distribution to a holder of an Allowed Claim other than a member of the Nationwide Consumer Borrower Settlement Class is returned as undeliverable, no further Distributions shall be made to such holder unless and until such holder provides notification to the Litigation Trustee or its designee of the then-current address or other necessary information for delivery, at which time all currently due missed Distributions shall be made to such holder on the next Distribution Date. Undeliverable Distributions shall remain in the possession of the Litigation Trustee or its designee until such time as a Distribution becomes deliverable, or such Distribution reverts to the Litigation Trust or is canceled pursuant to Article 7.3(e)(3) of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

*b)* The Class Administrator shall attempt to distribute all available funds that are distributable to members of the Nationwide Consumer Borrower Settlement Class pursuant to the Plan and Litigation Trust Agreement to class members that can be located. Any Unclaimed Distributions to such members shall be distributed as follows: (a) the first $5 million of Unclaimed Distributions shall be paid to the Pennsylvania AG for further distribution to Pennsylvania members who cashed their initial distribution checks and (b) the remaining Unclaimed Distributions

49

shall be paid pursuant to the Tier 1 Allocation and Tier 2 Allocation to all other members who cashed their initial distribution checks. At the discretion of the Litigation Trustee and the Litigation Trust Oversight Board, one additional distribution to members (including Pennsylvania members and other members) may be attempted if reasonably practicable to do so. Thereafter any Unclaimed Distributions remaining unclaimed 120 days after the foregoing final re-distribution of Unclaimed Distributions shall be paid 50% to the Pennsylvania AG for further distribution to members in Pennsylvania and 50% to the CFPB Civil Penalty Fund. The $5 million paid to the Pennsylvania AG in the first redistribution shall be credited against distributions otherwise to be made by the Litigation Trustee to Pennsylvania Borrowers through the Pennsylvania AG from proceeds of future settlements or judgments obtained against Non-Released/Non-Exculpated Parties.

*iii.* *Reversion.* Solely in respect of Distributions to holders of Allowed Claims other than members of the Nationwide Consumer Borrower Settlement Class, any Distribution under the Plan that is an Unclaimed Distribution for a period of six months after Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code. Subject to the terms of the Litigation Trust Agreement, the Litigation Trustee shall contribute all such Unclaimed Distributions to a charity selected by the Litigation Trustee. The Claim of any holder of a Claim or its successors with respect to such Unclaimed Distributions shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the Distribution that is an Unclaimed Distribution, to the contrary.

*iv.* *De Minimis Distributions.* Except in the case of members of the Nationwide Consumer Borrower Settlement Class, the Litigation Trustee shall not be required to, but may in his sole and absolute discretion, make Distributions of Cash in an amount less than $10 to any holder of an Allowed Claim. Any Allowed Claims affected by Article 7.3(e)(4) of the Plan shall be discharged and forever barred from assertion against the Debtors, the Reorganized Debtors, the Litigation Trust and their respective property or Estates.

**(6) Surrender of Canceled Instruments**

On the Effective Date, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent. Such Certificate shall be canceled solely with respect to the Debtors and the Reorganized Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate.

**(e)    Claims Paid or Payable by Third Parties**

**(1)  Maximum Distribution**

An Allowed Claim that receives (i) Distributions in the Allowed amount of such Claim or (ii) Distributions that combined with Distributions or other consideration provided on the Allowed Claim equal the Allowed amount of such Claim shall, in each case be deemed satisfied in full as to such Allowed Claim, and in no event shall an Allowed Claim receive Distributions in excess of the Allowed amount of such Claim.

**(2)    Claims Paid by Third Parties**

The Debtors or the Litigation Trustee on or after the Effective Date, in their sole discretion, may request that a holder of an Allowed Claim certify in writing and provide evidence reasonably acceptable to the Debtors or the Litigation Trustee, as applicable, to confirm whether: (i) the holder of such Claim has received payment in full on account of such Claim from a party that is not a Debtor; or (ii) such holder has been notified by or on behalf of a third party of any future Distributions or payment anticipated or estimated to be made on account of such Claim from such third party.

If (i) the Debtors or Litigation Trustee on or after the Effective Date determine, based on the foregoing, that an Allowed Claim has been satisfied in full in accordance with Article 7.4(a) of the Plan, then unless the Bankruptcy Court orders otherwise, no Distributions shall thereafter be made on account of such Allowed Claim, or (ii) a holder of an Allowed Claim does not comply with this section, then unless the Bankruptcy Court orders otherwise, the Litigation Trustee shall not be required to make Distributions on account of such Allowed Claim, *provided* that nothing herein shall preclude a holder of an Allowed Claim from challenging such determination in the Bankruptcy Court.

**(3)    Claims Payable by Insurance Carriers**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim, such Claim shall be disallowed and expunged to the extent of any agreed upon satisfaction in accordance with this section after notice to such Holder of an Allowed Claim and an opportunity for a hearing.

**(4)    Applicability of Insurance Policies**

Except as otherwise provided herein, Distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any rights of any Entity, including insurers, under any policies of insurance.

**(f)     Setoffs**

Except as otherwise expressly provided for herein, the Debtors, the Reorganized Debtors or the Litigation Trustee on or after the Effective Date, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtors, the Reorganized Debtors or Litigation Trustee on or after the Effective Date, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtors, or the Litigation Trustee of any such Claims, rights, and Causes of Action that they may possess against such holder.  In no event shall any holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors, the Reorganized Debtors or the Litigation Trustee, as applicable, unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

**6.7     Procedures for Resolving Disputed Claims**

**(a)     Disputed Claims Process**

Except as otherwise provided herein, if an Entity files a Proof of Claim and the Debtors, or the Litigation Trustee on or after the Effective Date, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in Article VIII of the Plan.  Except as otherwise provided herein, all Proofs of Claim not filed in accordance with the requirements set forth in the Bar Date Order shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Litigation Trust or their respective property or estates without the need for any objection by the Debtors or the Litigation Trustee, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.

**(b)     Prosecution of Objections to Claims and Interests**

After consultation with counsel to the Committee, the Debtors shall file and/or prosecute objections to General Unsecured Claims, as appropriate, prior to the Effective Date.  On and after the Effective Date, the Litigation Trustee shall have the sole authority and power on behalf of the Estates to file objections to General Unsecured Claims and settle any remaining disputed General Unsecured Claims in accordance with the terms of the Plan.  Any objections to Claims

52

shall be served and filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Litigation Trustee shall have and retain any and all rights and defenses a Debtor had immediately prior to the Effective Date with respect to any Disputed Claim, including the Preserved Causes of Action.

(c)      **Estimation of Claims**

The Debtors or the Litigation Trustee on and after the Effective Date, as applicable, may at any time request that the Court estimate any contingent, unliquidated, or Disputed Claim, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, regardless of whether the Debtors, the Litigation Trustee or any other Person has previously objected to such Claim. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim and any appeal thereof. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the amount on which a reserve is to be calculated for purposes of any reserve requirement in the Plan, or (c) a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Litigation Trustee may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

(d)      **Recoupment**

In no event shall any holder of Claims be entitled to recoup any Claim against any Claim, right, or Cause of Action of the Debtors or the Litigation Trustee, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

(e)      **No Interest**

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

(f)      **Disallowance of Claims**

All Claims of any Entity from which property is sought by the Litigation Trustee under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Litigation Trustee alleges is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549,

or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Litigation Trustee, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**6.8    Effect of Confirmation of the Plan**

**(a)    Dissolution of the Creditors' Committee**

The Creditors Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code. On the Effective Date, the Creditors Committee shall be dissolved automatically and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases and the Plan and its implementation, and the retention or employment of the Creditors Committee's attorneys, financial advisors, and other agents shall terminate as of the Effective Date; provided, however, such attorneys and financial advisors shall be entitled to pursue their own Professional Claims and represent the Creditors Committee in connection with such Professional Claims.

**(b)    Discharge of Claims and Termination of Interests**

The Reorganized Debtors shall receive the benefit of any and all discharges under the Plan. On and after the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, the Reorganized Debtors may operate their business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

As discussed in detail herein, pursuant to Section 1123 of the Bankruptcy Code, and in consideration for the classification, Distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Equity Interests and controversies related to the contractual, legal and equitable rights that a holder of a Claim or Equity Interest may have in respect of such Claim or Equity Interest. All Distributions made to holders of Allowed Claims in any Class are intended to, and shall be, final.

Except as otherwise provided for herein and effective as of the Effective Date pursuant to section 1141(d) of the Bankruptcy Code: (a) the rights afforded in the Plan and the treatment of all Claims, Equity Interests, and Causes of Action that arose before the Effective Date shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all holders of Claims and Equity Interests, whether known or unknown, notwithstanding whether any such holders has filed a Proof of Claim or Equity Interest or has failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect

thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code, regardless of whether a Proof of Claim or Equity Interest with respect thereto was filed, whether the Claim or Equity Interest is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a Distribution hereunder; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, the Litigation Trustee, their successors and assigns, and their assets and properties any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

All Equity Interests shall be cancelled, disallowed, released, and extinguished as of the Effective Date, or as of such later date to facilitate execution of the consent order that has been agreed upon between the Debtors and the CFPB, and will be of no further force or effect; *provided*, *however*, that TF Holdings shall be the direct or indirect parent of the Reorganized Debtors.

(c)     **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' businesses, business practices or operations, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, nothing herein shall be deemed to release any of the Preserved Causes of Action being transferred to the Litigation Trust or any of the obligations or assets included in the Reorganized Debtor Assets.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of Article 9.3 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that Article 9.3 of the Plan is: (1) in exchange for**

the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all holders of Claims and Equity Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, the Debtors' Estates, and the Litigation Trustee asserting any claim or Cause of Action released pursuant to Article 9.3 of the Plan.

   (d) **Releases by Members of the Nationwide Consumer Borrower Settlement Class**

   As of the Effective Date, each member of the Nationwide Consumer Borrower Settlement Class is deemed to have released and discharged each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, (a) the Claims, alleged facts and Causes of Action asserted or that could have been asserted against any of the Released Parties in any Cause of Action prior to the Effective Date, including the Pending Litigation, and (b) any current or newly asserted Claim or Cause of Action against the Released Parties arising from or related to the Debtors' business activities or operations prior to the Effective Date or the Released Parties' actual or alleged, direct or indirect, involvement in consumer lending directly or indirectly involving the Debtors prior to the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations in connection with the Class Action Injunctive and Other Relief or any rights or obligations in connection with the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of Article 9.4 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that Article 9.4 of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released in Article 9.4 of the Plan; (3) in the best interests of the Debtors and all holders of Claims and Equity Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any Persons from asserting any Claim or Cause of Action released pursuant to Article 9.4 of the Plan.

   (e) **Releases by Releasing Parties**

   As of the Effective Date, each Releasing Party is deemed to have released and discharged each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that

such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' business activities or operations prior to the Effective Date, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including without limitation, (a) the Claims, alleged facts and Causes of Action asserted or that could have been asserted against any of the Released Parties in the Pending Litigation or any other Cause of Action prior to the Effective Date, and (b) any current or newly asserted claim or Cause of Action against the Released Parties arising from or related to the Debtors' business activities or operations prior to the Effective Date or the Released Parties' actual or alleged, direct or indirect, involvement in consumer lending directly or indirectly involving the Debtors prior to the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations in connection with the Class Action Injunctive and Other Relief or any rights or obligations in connection with the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Notwithstanding anything to the contrary in the foregoing or stated anywhere else herein, the CFPB does not release any Claims or Causes of Action against Cortex or Jora except for Claims and Causes of Action arising from or in connection with the Debtors' activities alleged in the amended complaint in the CFPB litigation in which Cortex also participated.

    (f)    **Exculpation**

    Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of related prepetition transactions, the Consumer Litigation Settlement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties

have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(g)     **Injunction**

Except as otherwise provided herein or for obligations issued pursuant hereto, all Entities that have held, hold, or may hold Claims or Equity Interests that have been released pursuant to Article 9.4 or Article 9.5 of the Plan, discharged pursuant to Article 9.2 of the Plan, or are subject to exculpation pursuant to Article 9.6 of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, and the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Persons on account of or in connection with or with respect to any such Claims or Equity Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Persons or the property or Estates of such Persons on account of or in connection with or with respect to any such Claims or Equity Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Persons or against the property or Estates of such Persons on account of or in connection with or with respect to any such Claims or Equity Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released, exculpated, or settled pursuant to the Plan.

(h)     **Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Person with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor acquired the Reorganized Debtor Assets from a Debtor that sought relief under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

(i)     **Release of Liens**

Except (a) with respect to the Liens securing Other Secured Claims (depending on the treatment of such Claims), or (b) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all

58

mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the respective Reorganized Debtors and their successors and assigns.

**(j)    Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(c)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**6.9    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived by the Debtors with the agreement of Nationwide Class Counsel:

**(1)**    the Preliminary Approval Order, the Disclosure Statement Approval Order, Final Fairness Approval Order, and the Confirmation Order shall have been entered by the Bankruptcy Court;

**(2)**    the Confirmation Order and Final Fairness Approval Order shall become Final Orders;

**(3)**    all authorizations, consents, regulatory approvals, rulings or documents (if any) that are necessary for the Plan's effectiveness shall have been obtained;

**(4)**    the Nationwide Consumer Borrower Settlement Class shall have been fully and finally certified and all collateral orders necessary to effectuate the class settlement shall have been entered;

**(5)**    during the time period beginning January 1, 2019, through the Effective Date, Cortex shall have paid the Debtors service fees in the aggregate amount substantially equal to the total service fees incurred for the time period beginning January 1, 2019, through the Effective Date;

**(6)**    all payments and transfers of assets from the Debtors' estates, and all other payments, required under the Plan to be made before the Effective Date shall have been made in accordance with the terms of the Plan; and

(7)     with respect to all documents, applications, and agreements necessary to implement the Plan: (1) all conditions precedent to such documents, applications, and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; (2) such documents, applications, and agreements shall have been tendered for delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units, regulators, or commissions in accordance with applicable laws; and (3) such documents, applications, and agreements shall have been effected or executed.

### (a)     Substantial Consummation

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

### (b)     Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Equity Interests, or any claims held by the Debtors; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

### (c)     Vacatur of Confirmation Order

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## 6.10    Modification, Revocation, or Withdrawal of the Plan

### (a)     Modification of Plan

Effective as of the date hereof: (a) the Debtors reserve the right in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or

omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**(b)     Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**(c)     Revocation or Withdrawal of Plan**

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Equity Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**6.11     Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of an Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

(b)     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)     resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365

of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) any dispute regarding whether a contract or lease is or was executory or expired; and (d) any dispute regarding rejection damages claims.

(d) ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to Distributions under the Plan;

(e) adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(f) enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

(g) enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(h) grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

(i) issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

(j) hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) any adversary proceedings related to the Chapter 11 Cases pending before the Court; (b) with respect to the repayment or return of Distributions and the recovery of additional amounts owed by the holder of a Claim or an Equity Interest for amounts not timely repaid pursuant to Article 7.4(a) of the Plan; (c) with respect to the releases, injunctions, and other provisions contained in Article IX of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (d) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (e) related to section 1141 of the Bankruptcy Code;

(k)      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(l)      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(m)      issue any order in aid of implementation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(n)      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

(p)      enforce all orders previously entered by the Bankruptcy Court; and

(q)      hear any other matter not inconsistent with the Bankruptcy Code.

## 6.12    Other Miscellaneous Plan Provisions

### (a)    Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Reorganized Debtors, or the Litigation Trustee, as applicable, and all holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### (b)    Payment of Statutory Fees

Subject to Article 4.1 of the Plan, all fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.  For the avoidance of doubt, the Reorganized Debtors shall not be liable for any such statutory fees.

### (c)    Waiver of Federal Rule of Civil Procedure 62(a)

The Debtors may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

63

**(d)      Reservation of Rights; Binding Effect**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Equity Interests prior to the Effective Date.

Upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, the Litigation Trustee and any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Person acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

**(e)      No Admissibility**

Neither the Consumer Litigation Settlement, the Disclosure Statement, the Plan, the Confirmation Order, nor any related documents shall be admissible or otherwise used or referenced or serve as an admission of fact in any litigation or adversary proceeding concerning the solvency of the Debtors or the liability of any third parties or entities.

**(f)      Closing of Chapter 11 Cases**

The Litigation Trustee shall, as promptly as practicable after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required to obtain closures of the Chapter 11 Cases under Bankruptcy Rule 3022, any applicable local rules, and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**(g)      Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors or the Litigation Trustee, as applicable, shall be served on:

| | |
|---|---|
| **Reorganized Debtors** | **TF Holdings, Inc.**<br>7701 Las Colinas Ridge, Suite 650<br>Irving, TX 75063<br>Attn:   Thomas D. Graber |
| **Counsel to Debtors** | **Hunton Andrews Kurth LLP**<br>951 East Byrd Street<br>Richmond, Virginia 23219<br>Attn.:  Tyler P. Brown |

|  | Jason W. Harbour |
| --- | --- |
| **Litigation Trustee** | The Honorable Russell F. Nelms<br>[] |
| **United States Trustee** | **Office of the United States Trustee<br>for the Northern District of Texas**<br>Earle Cabell Federal Building<br>1100 Commerce Street, Room 976<br>Dallas, TX 25242<br>Attn: Lisa L. Lambert |

(h)    **Term of Injunctions or Stays**

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect during the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan, the Confirmation Order shall remain in full force and effect in accordance with their terms.**

(i)    **Entire Agreement**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

(j)    **Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from https://www.americanlegal.com/TF    or    the    Bankruptcy    Court's    website    at www.txnb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

(k)    **Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid and enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void,

or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (c) non-severable and mutually dependent.

## ARTICLE VII

SOLICITATION AND VOTING PROCEDURES

**7.1     Classes Entitled to Vote on the Plan**

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim or Interest | Voting Rights | Status |
|-------|-------------------|---------------|--------|
| 3 | GPLS Claims | Yes | Impaired |
| 4 | General Unsecured Claims | Yes | Impaired |
| 5 | Consumer Borrower Claims | Yes | Impaired |
| 6 | Pennsylvania Regulatory Claim | Yes | Impaired |
| 7 | CFPB Regulatory Claim | Yes | Impaired |
| 8 | Equity Interests | Yes | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined herein), including a ballot setting forth detailed voting instructions.  If your Claim or Interest is included in the Voting Classes, you should read your ballot and carefully follow the instructions included in the ballot.  Please use only the ballot that accompanies this Disclosure Statement or the ballot that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provided to you.

**7.2      Votes Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance by a class of claims requires an affirmative vote of more than one-half in number of the Holders of the total allowed claims that have voted and an affirmative vote of Holders representing at least two-thirds in dollar amount of the total allowed claims that have voted.

**7.3      Certain Factors to be Considered Prior to Voting**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Court will confirm the Plan.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Classes.  For a further discussion of risk factors, please refer to Article X of this Disclosure Statement, entitled "Certain Factors to Be Considered."

**7.4      Voting Procedures**

Each Class entitled to Vote on the Plan will receive a solicitation package (the "Solicitation Package") in the form that will be attached to the *Motion for Order (I) Approving the Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, Including (A) Approving Form and Manner of Solicitation Procedures, (B) Approving Form and Notice of the Confirmation Hearing, (C) Establishing Record Date and Approving Procedures for Distribution of Solicitation Packages, (D) Approving Forms of Ballots, (E) Establishing Deadline for Receipt of Ballots, and (F) Approving Procedures for Vote Tabulations; (III) Establishing Deadline and Procedures for Filing Objections to Confirmation of the Plan; and (IV) Granting Related Relief* [Doc. No. ____] (the "Disclosure Statement and Solicitation Motion"), with instructions explaining how to vote and identifying the deadline by which votes must be received by the Solicitation Agent.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF

THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

## **ARTICLE VIII**

### CONFIRMATION PROCEDURES

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

### 8.1     The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Court, after notice, may hold a hearing to confirm a plan of reorganization. In the Disclosure Statement and Solicitation Motion, the Debtors requested that the Court set a date and time for the Confirmation Hearing. The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. The Debtors, in the Disclosure Statement and Solicitation Motion, will request that the Court set a date and time for parties in interest to file Plan objections. All objections to the Plan must be filed with the Court and served on the Debtors and certain other

parties in interest in accordance with the applicable order of the Court so that they are received on or before the deadline to file such objections as set forth therein.

**8.2 Confirmation Standards**

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Court may confirm a plan of reorganization.

- The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Case, in connection with the Plan and incident to the Case is subject to the approval of the Court as reasonable.

- With respect to each holder within an impaired Class of Claims or Interests, each such holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is unimpaired under the Plan, provided that the Plan may be confirmed despite not meeting this requirement if the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a Class of Claims or Interests is impaired under the Plan, at least one Class of Claims or Interests that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

**8.3    Best Interests Test / Liquidation Analysis**

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Based on the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis"), the Debtors believe that the value of any distributions if the Case were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.  As a result, the Debtors believe holders of Claims and Interests in all impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

**8.4    Funding and Feasibility of the Chapter 11 Plan**

All amounts necessary for the Debtors (on the Effective Date) or the Reorganized Debtors (after the Effective Date) to make payments or distributions pursuant to the Plan shall be available to the Debtors or Reorganized Debtors, as applicable, through Cash on hand, including the withdrawal of amounts currently held in the Escrow Account.

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization, unless the plan provides for a liquidation.  The Reorganized Debtors' cash flow forecasts demonstrate that the Reorganized Debtors will be solvent and confirmation of the Plan is not likely to be followed by a liquidation or the need for further financial reorganization.

**8.5    Alternatives to Confirmation and Consummation of the Plan**

If the Plan cannot be confirmed, the Debtors may seek to (1) prepare and present to the Court an alternative chapter 11 plan for confirmation, or (2) liquidate the Debtors under chapter 7 of the Bankruptcy Code.  If the Debtors were to pursue a chapter 7 liquidation, the Case would be converted to cases under chapter 7 of the Bankruptcy Code and a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on Creditors' recoveries and the Debtors is described in the unaudited Liquidation Analysis.

**ARTICLE IX**

CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

**THE FOLLOWING IS NOT INTENDED TO BE A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.   THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN FOR HOLDERS OF CLAIMS AND INTERESTS   ARE   COMPLEX   AND,   IN   SOME   CASES,   UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN INDIVIDUAL TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER.**

The following is a general summary of certain significant U.S. federal income tax consequences of the Plan to the holders of certain Claims and Interests.  This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Department regulations promulgated thereunder ("Treasury Regulations"), judicial decisions and current administrative rulings and practice as in effect on the date hereof.  These authorities are all subject to change at any time by legislative, judicial or administrative action, and such change may be applied retroactively in a manner that could adversely affect holders of Claims or Interests and the Debtors.

Due to a lack of definitive judicial or administrative authority or interpretation, the complexity of the application of the Tax Code and Treasury Regulations to the implementation of the Plan, the possibility of changes in the law, the differences in the nature of various Claims and Interests and the potential for disputes as to legal and factual matters, the tax consequences discussed herein are subject to substantial uncertainties.

**9.1     Tax Consequences for the Debtors**

Subject to certain exceptions, a debtor generally recognizes cancellation of indebtedness ("COD") income upon satisfaction of outstanding indebtedness equal to the excess of (i) the adjusted issue price of the indebtedness satisfied less (ii) the sum of the issue price of any new indebtedness issued, the amount of cash paid, and the fair market value of any other consideration (including stock of the debtor) given in satisfaction of the indebtedness.

A debtor may not be required to include COD income in gross income if the discharge of the debt occurs in a case under the Bankruptcy Code.  However, under the Tax Code the debtor generally must, after the determination of the tax imposed for the year of discharge, reduce its tax attributes (including net operating loss carryovers, tax credits, capital loss carryovers, and/or the tax basis of its assets) by the amount of COD income excluded from gross income by this exception.

**9.2 Tax Consequences for the Reorganized Debtors**

Since the 2017 tax year, TF Holdings, as the parent company of the Debtors and their non-Debtor affiliates has filed a consolidated tax return on behalf of the Debtors and their non-Debtor affiliates. As part of the Restructuring Transactions, the Reorganized Debtors are not assuming any tax liability of TF Holdings or any of the Debtors.

**9.3 Tax Consequences for Holders of Claims and Interests**

The U.S. federal income tax consequences of the Plan to a U.S. holder of a Claim or Interest (a "Holder") will depend, in part, on whether the Claim constitutes a "security" for federal income tax purposes, whether the holder reports income on the accrual or cash basis, whether the Holder has taken a bad debt deduction or worthless security deduction with respect to the Claim and whether the Holder receives distributions under the Plan in more than one taxable year. U.S. Holders should consult their tax advisors regarding the tax consequences of the Plan based on their individual circumstances.

Whether an instrument constitutes a "security" is determined based upon all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. Under somewhat different facts, the IRS has ruled that new debt obligations with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Because of the inherently factual nature of this determination, each U.S. Holder is urged to consult its tax advisor regarding whether such Claim constitutes a security for federal income tax purposes.

The Litigation Trustee will withhold distributions provided under the Plan and required by law to be withheld, and will comply with all applicable reporting requirements of the Tax Code. Under the Tax Code, interest, dividends and other "reportable payments" may under certain circumstances be subject to "backup withholding". Backup withholding generally applies if the holder of a Claim (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct TIN and the holder is not subject to backup withholding. Your Ballot contains a place to indicate your TIN.

72

Non-U.S. Holders may also be subject to withholding on payments under Chapter 3 of the Tax Code (*Withholding on fixed, determinable, annual, periodical income or "FDAP"*) and Chapter 4 of the Tax Code (*the Foreign Account Tax Compliance Act or "FATCA"*).  These withholding regimes generally apply to non-resident alien individuals and foreign corporations.

Holders of Claims and Interests should consult their respective individual tax advisors for more specific advice on the tax implications of the Plan on their specific situations.

**ARTICLE X**

CERTAIN FACTORS TO BE CONSIDERED

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, Holders of Claims that are entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

**10.1    General Considerations**

**(a)    Parties in Interest May Object to the Debtors' Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created five Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Court will reach the same conclusion.

73

**(b)      The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan**

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation.  If the Plan does not receive the required support from at least one impaired Class, the Debtors may not be able to confirm the Plan.

**(c)      The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) such plan is feasible; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

**(d)      Risk of Non-Occurrence of Effective Date**

Although the Debtors believe that the Effective Date would occur very shortly after the Confirmation Date, there can be no assurance as to such timing.

74

**10.2    The Claims of the GPLS Parties**

The GPLS Parties have asserted significant claims against the Debtors for unpaid professional fees, expenses, and/or losses for which the GPLS Parties seek reimbursement pursuant to the GSA.  The GPLS Parties have asserted that all such alleged claims are secured by a first priority lien on substantially all of the Debtors' assets.  Certain of these claims for reimbursement are premised on certain of the Debtors' alleged breaches of the GSA and AAA.  As more fully set forth in Articles 2.3(c), 3.1, and 4(c), the Debtors have denied that they breached the GSA or AAA and that they are liable to the GPLS Parties for any amounts.  The Debtors have further challenged the assertion of the GPLS Parties that they are owed any sums or that any of their alleged claims are secured.  Nevertheless, if the Debtors are unable to reach an agreement with the GPLS Parties concerning the amount and status of their claims, the Debtors may have to litigate all or certain of these issues in advance of Plan confirmation.  If the Debtors are not successful in obtaining an order of the Court that disallows or significantly reduces the claims of the GPLS Parties and/or determines that such claims are unsecured, the Debtors may not be able to confirm the Plan.  The Debtors intend to continue discussing with the GPLS Parties opportunities to consensually resolve these disputes and to have the GPLS Parties join in a global resolution of the Chapter 11 Cases, but the Debtors cannot predict whether those discussions will be successful.

**10.3    Access to Funds in the Escrow Account**

The Debtors anticipate the need to withdraw additional funds from the Escrow Account to pay the administrative expenses of these Chapter 11 Cases and fund the Restructuring Transactions contemplated by the Plan.  The Debtors assert that the funds in the Escrow Account are property of the Debtors and the Estates and can be used to pay expenses incurred in accordance with the Cash Collateral Order or by further Order of the Bankruptcy Court.  The GPLS Parties have asserted a lien and/or ownership on the funds in the Escrow Account.  In addition, the Committee previously has objected to the Debtors' withdrawal of certain amounts from the Escrow Account.  If the Debtors are denied access to funds from the Escrow Account to fund any shortfalls they have in income to cover the administrative expenses of these Chapter 11 Cases, or to fund the Restructuring Transactions and other amounts contemplated by the Plan, the Debtors may not be able to continue in their efforts to obtain confirmation of the Plan or may not be able to consummate the Plan, even if confirmed.

**10.4    Risk of Not Reaching Agreement on a Restructuring Term Sheet**

The Debtors are continuing efforts to reach agreement with many of the major constituencies of these Chapter 11 Cases on the terms of a term sheet concerning the Consumer Litigation Settlement (the "Restructuring Term Sheet").  Such an agreement would bind those parties into supporting a chapter 11 plan consistent with the terms of the Restructuring Term Sheet.  While the Debtors are hopeful they will obtain agreement to the Restructuring Term Sheet and have the Bankruptcy Court approve of the Debtors' entry into the Restructuring Term Sheet, if that does not occur, it could negatively impact the ability of the Debtors to obtain confirmation of and consummate the Plan.  Without the support of the other parties to the

Restructuring Term Sheet, there is risk that the Debtors will not be able to obtain sufficient votes in favor of the Plan or to defeat potential objections to the Plan.

**10.5    Potential Continuation of Litigation of the First Omnibus Objection to Claims**

The Bankruptcy Court continued the trial of the Debtors' First Omnibus Objection to Claims upon learning of the parties' agreement to the Essential Terms reached through mediation on or about October 22, 2018. In the event the ongoing mediation does not successfully conclude in a manner that results in entry into the Restructuring Term Sheet or support for the Plan, the Debtors may need to litigate the allowance of any claims in favor of the Consumer Borrowers against the Debtors and to litigate the remaining Rule 7023 class certification issues. Such litigation could give rise to significant expenses to the Estates and impose considerable risk to the success of the Debtors' efforts to confirm the Plan. In addition, while the Debtors believe their litigation with PA and the CFPB can be resolved satisfactorily under the proposed Plan, if those parties do not enter into the Restructuring Term Sheet or support the Plan, such an event could result in the continuation of the litigation with those entities, which also might result in the incurrence of considerable expenses and impose considerable risk to the success of the Debtors' efforts to confirm the Plan.

**10.6    Certain Tax Implications of the Chapter 11 Case**

Holders of Allowed Claims and Interests should carefully review Article IX herein, "Certain U.S. Federal Income Tax Consequences," to determine how the tax implications of the Plan and the Case may adversely affect the Debtors and holders of Claims and Interests.

**10.7    Disclosure Statement Disclaimer**

**(a)        Information Contained Herein Is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

**(b)        Disclosure Statement May Contain Forward-Looking Statements**

Many of the statements included in this Disclosure Statement contain forward-looking statements and information relating to the Debtors. These forward-looking statements are generally identified by the use of terminology such as "may," "will," "could," "should," "potential," "continue," "expect," "intend," "plan," "estimate," "project," "forecast," "anticipate," "believe," or similar phrases or the negatives of such terms. These statements are based on the beliefs of the Debtors as well as assumptions made using information currently available to the Debtors. Such statements are subject to risks, uncertainties and assumptions, as well as other matters not yet known or not currently considered material by the Debtors. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected. Given these risks and uncertainties, Holders of Claims or Interests are cautioned not to place undue reliance on such forward-looking statements. Forward-looking statements do not

guarantee future performance. Holders of Claims or Interests should recognize these statements for what they are and not rely on them as facts. None of the Debtors undertakes any obligation to update or revise any of these forward-looking statements to reflect new events or circumstances after the date of this Disclosure Statement

(c)    **No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement**

**THIS DISCLOSURE STATEMENT IS NOT LEGAL, BUSINESS, OR TAX ADVICE TO YOU.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

(d)    **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any entity (including the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests, or any other parties-in-interest.

(e)    **Failure to Identify Estate Causes of Action or Projected Objections**

No reliance should be placed on the fact that a particular Estate Cause of Action or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement or discussed at length. Except as otherwise provided under the Plan, all Parties, including the Debtors and Litigation Trustee, reserve the right to continue to investigate Estate Causes of Action and objections to Claims and to pursue Estate Causes of Action and/or objections to Claims, as appropriate.

(f)    **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any claims or rights of the Debtors or of the Litigation Trustee to object to that holder's Allowed Claim, to bring Estate Causes of Action, or to recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any such Claims, Estate Causes of Action or avoidable transfers are specifically or generally identified herein or in the Plan.

(g)    **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited

due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(h)    **The Potential Exists for Inaccuracies and the Debtors Have No Duty To Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date.   Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.   Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Court.

(i)    **No Representations Outside of the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.   In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein.   You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the Office of the United States Trustee.

## ARTICLE XI

### CONCLUSION AND RECOMMENDATION

For all the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation of the Plan is preferable to all other alternatives.   The Debtors urge all holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so they will be received by the Solicitation Agent by the voting deadline that is set by the Court.

*[Remainder of page intentionally left blank]*

78

DATED: April 22, 2019

/s/ Gregory G. Hesse
Gregory G. Hesse (Texas Bar No. 09549419)
HUNTON ANDREWS KURTH LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75209
Telephone: (214) 979-3000
Email: ghesse@HuntonAK.com

-and-

Tyler P. Brown (admitted *pro hac vice*)
Jason W. Harbour (admitted *pro hac vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Email: tpbrown@HuntonAK.com
        jharbour@HuntonAK.com

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**The Plan**

[TO BE FILED SEPARATELY]

**Exhibit B**

**Liquidation Analysis**

[TO BE FILED IN ADVANCE OF THE HEARING ON APPROVAL OF THE DISCLOSURE
STATEMENT]

## Exhibit C

**Consumer Borrower Litigation**

<u>Consumer Borrower Litigation</u>:

- *Gingras et al. v. Rosette et al.*, Case No. 5:15-cv-00101-gwc (D. Vt.)
- *Gingras et al. v. Victory Park Capital Advisors, LLC et al.*, Case No. 5:17-cv-00233-GWC (D. Vt.)
- *Banks v. Rees, et al.*, Case No. 8:17-cv-02201-SDM-AAS (M.D. Fla.) and Adv. Proc. No. 18-03064 (HDH) (Bankr. N.D. Tex.)
- *Gibbs, et al. v. Rees, et al.*, Case No. 3:17-cv-00386-MHL (E.D. Va.) and Adv. Proc. No. 18-03069 (HDH) (Bankr. N.D. Tex.)
- *Brice et al v. Rees et al*, Case No. 3:18-cv-01200-MEJ (N.D. Cal.) and Adv. Proc. No. 18-03313 (HDH) (Bankr. N.D. Tex.)
- *Gibbs et al. v. Haynes Investments, LLC et al.*, Case No. 3:18-cv-00048-MHL (E.D. Va.) and Adv. Proc. No. 18-03072 (HDH) (Bankr. N.D. Tex.)
- *Granger, et al. v. Great Plains Lending, LLC, et al.*, Case No. 18-cv-00112-WO-JLW (M.D.N.C.)
- *Gibbs et al. v. Think Finance et al.*, Adv. Proc. No. 17-03117 (HDH) (Bankr. N.D. Tex.)
- *Browne et al. v. Think Finance et al.*, Adv. Proc. No. 17-03120 (HDH) (Bankr. N.D. Tex.)
- *Banks et al. v. Think Finance et al.*, Adv. Proc. No. 17-03121 (HDH) (Bankr. N.D. Tex.)
- *Brice et al. v. Think Finance et al.*, Adv. Proc. No. 18-03025 (HDH) (Bankr. N.D. Tex.)
- *Griffiths et al. v. Think Finance et al.*, Adv. Proc. No. 18-03026 (HDH) (Bankr. N.D. Tex.)
- *Price et al. v. Think Finance et al.*, Adv. Proc. No. 18-03319 (HDH) (Bankr. N.D. Tex.)

## **Exhibit D**

**CFPB Consent Order**

*Draft for Settlement Discussion Only*
*Subject to FRE 408 or Other Applicable Rules*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau, | |
| *Plaintiff*, | |
| v. | Case No. 4:17-cv-00127-BMM |
| Think Finance, LLC, formerly known as Think Finance, Inc., Think Finance SPV, LLC, Financial U, LLC, TC Loan Service, LLC, Tailwind Marketing, LLC, TC Administrative Services, LLC, and TC Decision Sciences, LLC, | Hon. Brian M. Morris |
| *Defendants*. | |

## STIPULATED FINAL CONSENT ORDER

Plaintiff Consumer Financial Protection Bureau (Bureau) commenced this civil action against Think Finance, LLC on November 15, 2017 to obtain injunctive relief, damages and other monetary relief, and civil money penalties.

The First Amended Complaint (Complaint), filed on March 28, 2018, alleges violations of Sections 1031(a) and § 1036(a)(1) of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). The Complaint also names as defendants several wholly-owned subsidiaries of Think Finance, LLC, namely, Think Finance SPV, LLC, Financial U, LLC, TC Loan Service, LLC, Tailwind Marketing, LLC, TC Administrative Services, LLC, and

1

TC Decision Sciences, LLC. (collectively, the Think Entities). Dkt. No. 38. The

Think Entities filed their answer on August 31, 2018, and in substance, denied the

Bureau's Complaint and raised various affirmative defenses. Dkt. No. 81. Plaintiff

and the Think Entities consent to the Court entering this Order.

**THEREFORE, it is ORDERED:**

**FINDINGS**

1.      This Court has jurisdiction over the parties and the subject matter of

this action.

2.      From 2011 through at least 2018, consumers in the Subject States

obtained credit extended in the name of Great Plains Lending, LLC, MobiLoans,

LLC, or Plain Green, LLC.  For those loans where repayments exceeded the

principal amount borrowed, consumers collectively paid at least $325,000,000 over

the principal amounts borrowed.  This figure does not account for loans in the

Subject States where the total payments were less than the principal amount

borrowed.

3.      Plaintiff and the Think Entities agree to entry of this Order, without

adjudication of any issue of fact or any adjudication of any remaining issues of

law, to settle and resolve all matters in this dispute arising from the conduct alleged

in the Complaint to the date this Order is entered.

4.      The Think Entities neither admit nor deny any allegations in the Complaint, except as specifically stated in this Order. The Think Entities admit only the facts necessary to establish the Court's jurisdiction over the Think Entities and the subject matter of this Order.

5.      The Think Entities waive all rights to seek judicial review or otherwise challenge or contest the validity of this Order. The Think Entities also waive any claims the Think Entities may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the Bureau's prosecution of the Bureau Litigation. Each party will bear its own costs and expenses, including without limitation attorneys' fees, in connection with the Bureau Litigation.

6.      Entry of this Order is in the public interest.

## DEFINITIONS

7.      "Effective Date" means the date on which the Order is entered by the Court.

8.      "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or her delegate.

9.      "Plan" means the Chapter 11 plan of the Think Entities.

10.     "Person" means any individual or entity, including any government, political subdivision, government agency or instrumentality, or Native American Tribe.

11. "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against the Think Entities based on substantially the same allegations as described in the Complaint.

12. "Reorganized Debtors" means one or more newly formed entities wholly owned by TF Holdings, Inc. that are, by operation of the Plan, to receive the property and rights identified in the Plan.

13. "Subject States" means Arizona, Arkansas, Colorado, Connecticut, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, and South Dakota.

14. The "Think Entities" means Think Finance, LLC, Think Finance SPV, LLC, Financial U, LLC, TC Loan Service, LLC, Tailwind Marketing, LLC, TC Administrative Services, LLC, and TC Decision Sciences, LLC.

## ORDER
## I.
## CONDUCT RELIEF

**IT IS ORDERED that**:

15. The Think Entities and the Reorganized Debtors (each an "Enjoined Party") are permanently restrained and enjoined from:

    a. providing services to a Subject Lender that constitute

        extending credit to, servicing credit extended to, or collecting

4

on credit extended to, a consumer who has identified his or her residential address at the time of the advancement of funds as being in a Subject State; or

b. providing services directly to a Subject Lender, or to another Person for use of a Subject Lender, in connection with a Subject Lender's activities in extending credit to, servicing credit extended to, or collecting on credit extended to a consumer who has identified his or her residential address at the time of the advancement of funds as being in a Subject State, where the Enjoined Party knows or is reckless in not knowing that the entity is a Subject Lender.

c. For purposes of this Paragraph15, a Subject Lender shall mean any entity or individual that makes a loan to a consumer who has identified his or her residential address at the time of the advancement of funds as being in a Subject State where such loan is either at an interest rate in excess of the Subject State's usury limit for that loan or the entity or individual lends without a license from the Subject State for that loan. For purposes of this paragraph 15c., the usury limit and licensing requirements referenced shall be those of the

consumer's state of residence which the consumer has

identified at the time of the advancement of funds.

16.     The conduct prohibitions in Paragraph 15 do not apply:

a.   if the credit in question: (i) is originated or issued by a

federally or state chartered depository institution or other

entity and if the application of state or other law with respect

to the loan is preempted under the Federal laws of the United

States of America; or

b.   to support services of a type provided to businesses generally

or a similar ministerial service.

## MONETARY PROVISIONS
## II.
## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED that:**

17.     Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), pursuant to

the agreement of the parties as part of the Plan and by reason of the violations of

law alleged in the Complaint and alleged to continue to the entry of this Order, and

taking into account the factors in 12 U.S.C. 5565(c)(3), the Think Entities must pay

a civil money penalty of $7 ($1 for each Defendant), jointly and severally, in favor

of the Bureau. The Think Entities shall pay this penalty in accordance with their obligations in Paragraphs [XX] of the Plan.

18. The civil money penalty paid under this Order will be deposited in the Civil Penalty Fund of the Bureau as required by § 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

19. The Think Entities must treat the civil money penalty paid under this Order as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, the Think Entities may not:

a. claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Order; or

b. seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Order.

20. To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, the Think Entities may not argue that the Think Entities are entitled to, nor may the Think Entities benefit by, any offset or reduction of any compensatory monetary remedies in the Related Consumer Action because of the civil money penalty paid in this action.

7

## III.
## COMPLIANCE PROVISIONS
## IV.
## Reporting Requirements

**IT IS FURTHER ORDERED that:**

21.     After the Effective Date, the Think Entities and the Reorganized

Debtors must notify the Bureau of:

a.     any future development that may affect compliance obligations

arising under this Order, including but not limited to a dissolution,

assignment, sale, merger, or other corporate reformation; or

b.     the filing of any future bankruptcy or insolvency proceeding by

or against the Think Entities and the Reorganized Debtors; or a change in

name or address for the Think Entities and the Reorganized Debtors.

22.     The Think Entities and the Reorganized Debtors must provide the

notice required in Paragraph 21 as soon as practicable after learning about the

development or at least 30 days before the development is finalized, whichever is

sooner.

23.     Within 7 days of the Effective Date, the Think Entities and

Reorganized Debtors must:

a.     designate at least one telephone number and email, physical,

and postal address as a point of contact, which the Bureau may use to

communicate with the Think Entities and the Reorganized Debtors;

8

      b.     identify all businesses for which the Think Entities and the Reorganized Debtors are the majority owner, or that the Think Entities and the Reorganized Debtors directly or indirectly control, by providing all of the businesses' names, telephone numbers, and physical, postal, email, and Internet addresses; and

      c.     describe the activities of each such business, including the products and services offered, and the means of advertising, marketing, and sales.

24.    The Think Entities and the Reorganized Debtors must report to the Bureau any change in the information required to be submitted under Paragraph 23 as soon as practicable or at least 30 days before the change, whichever is sooner.

## V.

## Notices

**IT IS FURTHER ORDERED that:**

25.    Unless otherwise directed in writing by the Bureau, all notices, submissions, requests, communications, or other documents related to the Order must be in writing with the subject line, "CFPB v. Think Finance, LLC, et al." and directed as follows:

*If to the Bureau:*

By overnight courier (not the U.S. Postal Service), as follows:

Assistant Director for Enforcement
Bureau of Consumer Financial Protection
ATTENTION: Office of Enforcement
1700 G Street, N.W.
Washington D.C. 20552

And contemporaneously by email to Enforcement_Compliance@cfpb.gov.

*If to the Think Entities:*

Chief Executive Officer

Think Finance, LLC

7701 Las Colinas Ridge, Suite 650, Irving, TX 75063

With a copy to the General Counsel at the same address

*If to the Reorganized Debtors:*

Chief Executive Officer

TF Holdings, Inc.

7701 Las Colinas Ridge, Suite 650, Irving, TX 75063

With a copy to the General Counsel at the same address

## VI.

## Order Distribution and Acknowledgment

## IT IS FURTHER ORDERED that:

26.     Within 7 days of the Effective Date, the Think Entities and the

Reorganized Debtors must submit to the Enforcement Director an

acknowledgement of receipt of this Order, sworn under penalty of perjury.

27. Within 30 days of the Effective Date, the Think Entities and the Reorganized Debtors must deliver a copy of this Order to any employees or any Outside Counsel who will have responsibilities under this Order.

28. The Think Entities and the Reorganized Debtors must deliver a copy of this Order to any future executive officers, shareholders, partners, employees, and any other new agents and representatives who will have responsibilities related to the subject matter of the Order before they assume their responsibilities.

29. The Think Entities and the Reorganized Debtors must secure a signed and dated statement acknowledging receipt of a copy of this Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 *et seq*., within 30 days of delivery, from all persons receiving a copy of this Order under this Section.

## VII.

## Cooperation with the Bureau

**IT IS FURTHER ORDERED that:**

30. The Think Entities must cooperate fully with the Bureau in this matter and in any investigation related to or associated with the conduct alleged in the Complaint. The Think Entities must provide truthful and complete information, evidence, and testimony. The Think Entities must cause their officers, employees, representatives, or agents to appear for interviews, discovery, hearings, trials, and

any other proceedings that the Bureau may reasonably request upon 5 days written notice, or other reasonable notice, at such places and times as the Bureau may reasonably designate, without the service of compulsory process.

31.    The Think Entities and the Reorganized Debtors must cooperate fully to help the Bureau determine the identity and location of each consumer borrower, and the amount each consumer borrowed and repaid on credit that was extended in the name of Great Plains Lending, LLC, MobiLoans, LLC, or Plain Green, LLC. The Think Entities and the Reorganized Debtors must provide such information in its or its agents' possession or control within 14 days of receiving a written request from the Bureau.

## VIII.

## Compliance Monitoring

**IT IS FURTHER ORDERED that:**

32.    Within 14 days of receipt of a written request from the Bureau, the Think Entities and the Reorganized Debtors must submit requested non-privileged information related to the requirements of this Order, which must be made under penalty of perjury; provide sworn testimony related to the requirements of this Order and Think Entities and the Reorganized Debtors' compliance with those requirements; or produce non-privileged documents related to the requirements of

this Order and the Think Entities and the Reorganized Debtors' compliance with those requirements.

33.    The Think Entities and the Reorganized Debtors must permit Bureau representatives to interview about the requirements of this Order and the Think Entities and the Reorganized Debtors' compliance with those requirements any employee or other person affiliated with the Think Entities and the Reorganized Debtors who has agreed to such an interview. Nothing in this Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## IX.

## Recordkeeping

34.    The Think Entities and the Reorganized Debtors must create or, if already created, must retain for at least 5 years from the Effective Date all documents and records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Bureau.

35.    The Think Entities and the Reorganized Debtors must retain the documents described in Paragraph 34 for at least 5 years.

36.    Defendants must make documents identified in Paragraph 34 available to the Bureau upon the Bureau's request.

# X.

## Retention of Jurisdiction

**IT IS FURTHER ORDERED that:**

37.     The Court will retain jurisdiction of this matter for purposes of construction, modification (including any request by any Party to modify the conduct prohibitions), and enforcement of this Order.

**SO ORDERED AND ADJUDGED.**

_____          _____

The Honorable Brian M. Morris          DATE
United States District Judge

14